IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: June 4, 2007)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT IN CAUSE NOS. 06-407T, 06-408T, 06-411T, 06-810T AND 06-811T**

# TABLE OF CONTENTS

ISSUES PRESENTED . . . . . 2

STATEMENT OF THE CASE . . . . . 2

ARGUMENT . . . . . 7

UNDER SECTION 752, THE SHORT SALE OBLIGATIONS MUST BE INCLUDED IN PARTNERSHIP LIABILITIES . . . . . 7

A. The Statute. . . . . . 8

B. Application of the Statute . . . . . 8

C. The Short Sale Obligations are §752 Liabilities. . . . . . 13

PLAINTIFFS GROSSLY MISSTATED THE BASIS OF THE YAHOO AND CORNING SHARES AND THE 40% PENALTY ASSESSED UNDER 26 U.S.C. §6662 SHOULD BE SUSTAINED . . . . . 17

CONCLUSION. . . . . . 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Cemco Investors, LLC v. United States*, Case No. 04C8211 (D.C.E.D. Ill. March 27, 2007) . . . . . . . . . . 15

*COLM Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006) . . . . . . . . . . 15,16,19

*Helmer v. Commissioner*, T.C. Memo 1975-160 . . . . . . . . . . 15

*Provost v. United States*, 269 U.S. 443 (1926) . . . . . . . . . . 3

*Salina Partnership v. Commissioner*, T.C. Memo 2000-352 . . . . . . . . . . 14,15,16,19

## FEDERAL STATUTES

26 U.S.C. §357 . . . . . . . . . . 14

26 U.S.C. §357(c) . . . . . . . . . . 16

26 U.S.C. §357(c)(3) . . . . . . . . . . 16

26 U.S.C. §357(c)(3)(B) . . . . . . . . . . 16

26 U.S.C. §708(a) . . . . . . . . . . 12

26 U.S.C. §722 . . . . . . . . . . 10,11,13,17

26 U.S.C. §723 . . . . . . . . . . 13

26 U.S.C. §731(a) . . . . . . . . . . 12

26 U.S.C. §731(b) . . . . . . . . . . 12

26 U.S.C. §732 . . . . . . . . . . 12

26 U.S.C. §732(a) . . . . . . . . . . 12

26 U.S.C. §732(b) . . . . . . . . . . 12

26 U.S.C. §732(c) . . . . . . . . . . 12

26 U.S.C. §733 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,11,12

26 U.S.C. §752 . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3,4,7,8,9,10,11,12,13,14,15,16,17,19

26 U.S.C. §752(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10,11,13,14

26 U.S.C. §752(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10,11,13,14

26 U.S.C. §752-1(a)(4)(ii)(2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 U.S.C. §752-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

26 U.S.C. §1233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 U.S.C. §6226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

26 U.S.C. §6662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,4,17

26 U.S.C. §6662(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 U.S.C. §6662(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 U.S.C. §6662(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

26 U.S.C. §6662(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 U.S.C. §6662(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

26 U.S.C. §6662-2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Rev. Rul. 73-301, 1973-2 C.B. 215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rev. Rul. 88-77, 1988-2 C.B. 128 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Rev. Rul. 95-26, 1995-1 C.B. 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Rev. Rul. 95-45, 1995-1 C.B. 53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Title IV of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, §401-407, 96 Stat. 324, 648-71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## MISCELLANEOUS

I.R.S. Notice 2000-44, 2000-2 C.B. 255 (September 5, 2000) . . . . . . . . . . . . . . . . . . 4, 15

H.R. Rep. No. 98-861, at 856-857 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT IN**
**CAUSE NOS. 06-407T, 06-408T, 06-411T, 06-810T AND 06-811T**

In these consolidated tax cases, heirs of the late Marvin Sands ("Marvin") are claiming more than $125 million in artificial tax benefits attributable to their participation in partnership tax shelters, commonly known as Son of BOSS.[1] Marvin founded the Canandaigua Wine Company--predecessor of the conglomerate now known as Constellation Brands, Inc. ("Constellation"). Since his death, the company continues to be controlled by his family (most notably his widow Marilyn and their two sons, Richard and Robert) and trusts for the benefit of his family (Marvin's Trust, Andrew's Trust, Abigail's Trust and Zachary's Trust) (collectively the "Sands Heirs"). (PF 1-4). During 2001, the Sands Heirs, as a group, engaged in two Son of BOSS tax shelters promoted by The Heritage Organization, L.L.C. ("Heritage"), for the purpose of eliminating taxes on built-in capital gains. (PF 14-17). By this motion, the United States requests summary judgment as to all issues relating to the second shelter (the "Second Shelter").

Specifically, the United States requests summary judgment sustaining the disallowance of the artificial tax benefits attributable to the Second Shelter in the cases involving CWC Partnership I ("CWC"), M,L,R & R ("MLRR"), Mickey Management, L.P. ("Mickey L.P."), Alpha I, L.P. ("Alpha") and Beta Partners, L.L.C. ("Beta"). R,R,M & C Group. L.P. ("RRMC Group") and R,R,M & C Partners, L.L.C. ("RRMC Partners") participated only in the first shelter (the "First Shelter"), and that shelter is only addressed herein as background information.[2] While CWC

---

[1] "BOSS" stands for Bond and Option Sales Strategy.

[2] The First Shelter is more complex because it also involves charitable remainder unitrusts ( the "CRUTs") which were only in existence for a short time. The U.S. anticipates filing a separate motion for summary judgment on the First Shelter. The United States notes, however, that a decision on the issues pertaining to the Second Shelter should be controlling and dispositive of the primary issue raised in the First Shelter.

participated in both the First and Second Shelters, this motion addresses only the portion of the CWC adjustments relating to the Second Shelter. If granted, this motion will dispose of all issues in the cases involving Alpha, Beta, Mickey, L.P., and MLRR, as well as CWC's participation in the Second Shelter.

## ISSUES PRESENTED

1. Whether the short sale obligations assumed by the partnerships are "liabilities" for purposes of 26 U.S.C. § 752?

2. If so, whether the 40% or 20% accuracy-related penalty under section 6662 apply to the resulting underpayments of tax relating to the Second Shelter?

## STATEMENT OF THE CASE[3]

The facts of this case are set out in detail in the United States' Proposed Findings of Uncontroverted Fact and they can be summarized as follows:

The Sands Heirs are wealthy individuals who anticipated receiving very substantial amounts of capital gain income primarily from their sale of Constellation stock in 2001 and later years. (PF 1-4, 10-13). In their attempt to shelter that income from taxation, they engaged in two Son of BOSS tax shelters promoted to them by Heritage, agreeing to pay Heritage 25% of their present and future tax savings realized by their participation in the tax shelters. (PF 14-16). As structured by Heritage, the Son of BOSS tax shelters engaged in by the Sands Heirs involved all seven of the partnerships that are the subject of these consolidated cases: CWC, Mickey, L.P., MLRR, RRMC

[3] Many of the dates used in this pleading are the dates set forth in plaintiffs' Complaints. In the Complaints, however, plaintiffs allege that the events occurred "on or about" the stated dates. While the United States has accepted these dates for summary judgment purposes, the actual date for an activity referenced may not be exact. To the extent that the exact dates are material to any issues which may ultimately remain for trial, the United States anticipates ascertaining these exact dates through discovery.

Group; RRMC Partners; Alpha, and Beta. The Sands Heirs owned substantially all of the interests in these partnerships. The first three, CWC, MLRR, and Mickey, L.P., were family investment partnerships (the "Family Partnerships"). The other four, RRMC Group, RRMC Partners, Alpha, and Beta, were newly created at the direction of Heritage to participate in the Son of BOSS tax shelter plans (the "Shelter Partnerships").[4] (PF 5-9, 17 - 20, 37 &38).

The Heritage shelters used by the Sands Heirs were designed around partnership contributions of open short sale positions in U.S. Treasury notes. (PF 16 & 17). A short sale is a sale of securities that are not owned by the seller. *Provost v. United States*, 269 U.S. 443,450-51 (1926). Securities are borrowed (usually from a brokerage house) and then sold on the open market. The seller has the proceeds from the sale but is required to replace the borrowed property in kind (referred to as "closing out" the short sale) at some future date. Although the short sale obligations were assumed by the partnerships here, the obligations to close the short sales were improperly omitted as partnership liabilities under section 752.[5] (PF 24, 25 27, 28, 41-43, 54). The resulting overstatement of their investment is the source of the Sands Heirs' claim to artificial tax benefits. (PF 29).

In the First Shelter, the Sands Heirs made partnership contributions of open short sale positions of approximately $75 million of U.S. Treasury notes and claimed artificial tax benefits equal to the short sale proceeds on the partnership returns filed by RRMC Group and RRMC Partners. (PF 16). In the Second Shelter, the Sands Heirs contributed open short sale positions in

---

[4] Notwithstanding the use of terms such as "partnership," "partner," "contribution," "distribution," and others consistent with petitioners' characterization of events, defendant does not concede for any other purpose that the events occurred as so characterized under applicable local law or for federal income tax purposes.

[5] Except as otherwise indicated, section references in the text refer to sections of the Internal Revenue Code of 1986, as amended, or the regulations thereunder.

another $44 million of U.S. Treasury notes (the Short Sales") and claimed artificial tax benefits equal to the short sale proceeds (the "Short Sale Proceeds") on the partnership returns filed by Alpha and Beta. (PF 17). After TEFRA[6] administrative proceedings with respect to the seven participating partnerships, the IRS disallowed all of the artificial tax benefits attributable to these two Son of BOSS tax shelters and applied the accuracy-related penalty under section 6662 to the resulting underpayments of tax by the Sands Heirs. (PF 51-58). Plaintiffs dispute these adjustments at the partnership-level pursuant to section 6226.

In 2000, the Internal Revenue Service published I.R.S. Notice 2000-44, 2000-2 C.B. 255 (September 5, 2000), addressing this shelter, advising that the claimed losses were not allowable, that participants may become subject to penalties, and that the shelter, if employed, must be disclosed on taxpayers' returns. *App. B, pgs. 1-3.* A Son of BOSS tax shelter involves the partnership contribution of encumbered property in which the associated obligation is expressly assumed by the partnership yet completely ignored for tax purposes. The omission of this liability and the resulting overstatement of the partner's investment is the source of the artificial tax benefits claimed in a Son of BOSS tax shelter. As structured by Heritage, the Second Shelter, is based on the supposition that short sale obligations are not liabilities under 26 U.S.C. §752 and, hence, do not reduce outside basis. As stated in the Heritage materials prepared for the Sands Heirs, "[t]he outstanding obligations to return the U.S. Treasuries do not affect basis due to the fact that the obligations are not fixed and determinable." (PF 29). By not recognizing the short sale obligations associated with the Short Sales (the "Short Sale Obligations"), the Sands Heirs, through Alpha and

---

[6] The partnership provisions of Title IV of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, § 401-407, 96 Stat. 324, 648-71, as codified under section 6221 *et seq*.

Beta, artificially increased their basis in 67,525 shares of the common stock of Corning, Inc. (the "Corning Shares") and 33,400 shares of common stock of Yahoo, Inc. (the "Yahoo Shares") by approximately 3700% above the stocks' cost basis. (PF 30, 35).

Through the Second Shelter, the Sands Heirs attempted to leverage a relatively small capital investment into a $44 million artificial tax loss. With a combined margin deposit of $1.34 million "the Margin Deposit"), they sold short $44 million of United States Treasury notes. (PF 21). Fifteen days later, the short positions were closed and a gain of $90,018 was realized. (PF 27). In the interim, the Sands Heirs contributed an additional $1.24 million which was used to purchase the Corning and Yahoo Shares. (PF 25 and 30). While a portion of the Corning and Yahoo Shares were subsequently sold at a loss, this loss was vastly less than the losses claimed by Alpha, MLRR and Mickey, L.P..[7] In fact, using the cost basis of the Yahoo and Corning Shares, the losses actually incurred by Alpha, MLRR and Mickey, L.P. from their combined sales of 14,500 shares of the Corning Stock and an additional 7,250 shares of the Yahoo Stock, were less than the gain realized from the Short Sales after the Short Sales were closed. (PF 27, 30 and 45 - 47).

Even though the Short Sales resulted in a small gain, plaintiffs claimed $44 million in artificial losses by a pre-arranged artifice that improperly ignores or misinterprets certain provisions of the Internal Revenue Code relating to partnerships. That artifice was as follows:

As already noted, on December 11, 2001, the Sands Heirs entered into the Short Sales. (PF

[7] Using its cost basis, Alpha lost $27,085 on 5300 shares of the Corning Stock, while realizing a gain of $3,302.50 on the sale of 2650 shares of Yahoo Stock. (PF 29 and 44). Using a carryover cost basis from Alpha, MLRR lost $23,502 on the sale of 4,600 shares of the Corning Stock, and another $2,859 on the sale of 2300 shares of Yahoo Stock. (PF 29 and 45). Similarly, and also using a carryover cost basis from Alpha, Mickey, L.P. lost $23,457 on the sale of 4,600 shares of the Corning Stock, and another $2,859 on the sale of 2300 shares of Yahoo Stock. (PF 29 and 46).

22). On December 17, 2001, the Sands Heirs contributed to Alpha their brokerage accounts (which held the proceeds of the Short Sales), the corresponding obligation to close the Short Sales, and some additional cash.[8] (PF 25). This additional cash was used by Alpha to purchase 67,525 shares of Corning at $8.82/share ($595,570.50) and 33,400 shares of Yahoo at $17.95/share ($599,530).[9] (PF 30). On December 20, 2001, Alpha contributed to Beta the Yahoo and Corning Shares, the Short Sales Proceeds, the corresponding obligation to cover the Short Sales, and the remaining additional cash. (PF 31).

On December 26, 2001, Beta closed/covered the Short Sales for $44,203,069, realizing a net gain of $90,018. (PF 27). On December 27, 2001, Beta liquidated and made a distribution of the Corning and Yahoo Shares to Alpha.[10] (PF 34). At this time, Alpha improperly allocated its $44,000,000 basis in Beta, which was attributable to the Short Sales Proceeds, to its Corning and Yahoo Shares, thereby artificially inflating basis in the Corning and Yahoo Shares by approximately 3700% (the "Inflated Stock Basis").[11] (PF 35). During 2001 and 2002, Alpha transferred 52,450 of the Corning Shares and 25,042 of the Yahoo Shares to its partners who, in turn, passed the Inflated Stock Basis along to MLRR and to Mickey, L.P. (PF 36, 38-40). When Alpha, the MLRR Partners and Mickey, L.P. sold the shares of the Corning and Yahoo Shares over the next year, they

---

[8] See Exhibit 1 for a diagram illustrating the formation of Alpha and Beta.

[9] The Merrill Lynch brokerage statements actually show that Alpha was debited $599,811.07 for the Corning Shares. Presumably this $4,240.57 difference accounts for brokerage commissions. Regardless this $4,240.57 discrepancy is not material.

[10] See Exhibit 2 for a diagram illustrating the distribution of the Yahoo and Corning Shares following the Beta's deemed liquidation.

[11] With respect to the Corning Shares, $339.68/share based on its claimed basis of $1,747,325 divided by 5300 representing the number of shares sold, rather than the $8.82/share actually paid by Alpha for the Corning Shares. With respect to the Yahoo Shares, $695.53/share based on its claimed basis of $1,843,154 divided by 2,650 representing the number of shares sold, rather than the $17.95/share actually paid by Alpha for the Yahoo Shares.

improperly claimed a carry-over of the Inflated Stock Basis, resulting in substantial losses on the sale of the stock. (PF 48-50). Correspondingly, CWC reported a proportional part of the carry-over Inflated Stock Basis in Alpha (approximately $5.7 million) on its 2001 partnership return.

Plaintiffs employ a specious interpretation of 26 U.S.C. §752 of the Internal Revenue Code to maintain that Alpha's basis in Beta is not reduced by Beta's extinguishment of the obligation to close the Short Sales. (PF 29). Plaintiffs ignore the fact that Beta's extinguishment of the Short Sales liability also decreased Alpha's liability, as Beta's partner, to satisfy the underlying liability. (PF 41 - 45, 48-50). Under 26 U.S.C. §752, when Beta closed the Short Sales, Alpha should have reduced its basis in Beta by $44,000,000 since the obligation to close the Short Sales no longer existed. (PF 54-55). This reduced basis should have carried over to MLRR, CWC and to Mickey, L.P. (PF 57-58). Plaintiffs' interpretation of § 752 is wrong as a matter of law. The government is therefore entitled to summary judgment sustaining the adjustments relating to the Second Shelter.

## ARGUMENT

### UNDER SECTION 752, THE SHORT SALE OBLIGATIONS MUST BE INCLUDED IN PARTNERSHIP LIABILITIES.

The artificially high bases Plaintiffs claim in this case depends on the untenable argument that their obligation to cover the Short Sales, that is to replace the $44 million of borrowed Treasury notes, was not a liability for purposes of § 752. Plaintiffs treat their contribution of the $44 million in proceeds from the Short Sale as a contribution of unencumbered funds; however, plaintiffs fail to account for their liability to close the Short Sales under § 752. Plaintiffs claim that the tax basis of the Yahoo and Corning Shares was increased by $44 million-- from the original cost basis to the Inflated Stock Basis—by the Sands Heirs' participation in the Second Shelter. The difference between the original cost basis and the Inflated Stock Basis is the same $44 million in artificial tax

benefits created by the omission of the Short Sale Obligations from partnership liabilities under section 752. If the Short Sale Obligations are included in partnership liabilities under that section, the tax basis of the Yahoo and Corning Shares is decreased to their original cost basis and Plaintiffs will not achieve the non-economic losses that they sought by entering into this tax shelter.

A. The Statute

I.R.C. § 752 governs the treatment of liabilities by partners and partnerships. The statute provides, in relevant part:

> (a) Increase in Partner's Liabilities. - Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) Decrease in Partner's Liabilities. - Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

B. Application of the statute

We believe that the only contested issue in the cases involving the Second Shelter (Alpha, Beta, Mickey, MLRR and that part of the CWC case related to the Second Shelter) is whether the partnerships' obligation to close short sales are "liabilities" for purposes of §752, which we address in subsection C of this brief. Before we address the treatment of the Short Sale Obligation as a liability, we describe how §752 affects partners' bases in the partnership when a partnership has assumed partners' liabilities. We do not believe that plaintiffs will dispute the matters addressed here in subsection B, nor will they take issue with the ultimate conclusion that they will lose the

cases related to the Second Shelter (including that part of the CWC case involving the Second Shelter), if the Short Sale Obligations are treated as liabilities for purposes of §752.

Under the aggregate notion of partnership taxation, partnership liabilities must be allocated among the partners.[12] This is accomplished through §752, which treats a partner's increase in his/her share of partnership liabilities as a contribution of money by the partner, or a partner's decrease in his/her share of partnership liabilities as a distribution of cash to the partner.[13] What is particularly significant under the facts of this case, is the treatment of the decrease in a partner's liabilities when the short sale is closed and the obligation to replace the borrowed securities is extinguished. Under § 752(b), the decrease in a partner's share of liabilities that results from covering the short sale is considered a distribution of money to the partner and results in a decrease in basis in the partnership.

The effect of including the short sale obligations in partnership liabilities is to require the Sands Heirs to adjust their outside bases under sections 752(a) and (b) to reflect changes in their

---

[12] The premise of § 752 in partnership taxation is simple enough. It is well accepted for tax purposes that when a person uses borrowed money to purchase something, he is treated just as if the money were his outright: he is given a full "basis credit" for purchases. The loan proceeds are not treated as income when they are received and they are not allowed as a deduction when the loan is repaid or the taxpayer is otherwise relieved of the liability for the loan. The role of § 752 of the Internal Revenue Code is to replicate these results in the context of a partnership. Laura E. Cunningham & Noel B. Cunningham, *The Logic of Subchapter K* 105 (2d ed. 2000).

[13] If a partner contributes partnership property in which he has a cost basis of $100, in exchange for a 50% interest in the partnership, he will have a basis of $100 in his 50% partnership interest. If the contributed property was encumbered by a liability of $80, his basis in the partnership will instead be $60, which is calculated as follows: $100 basis for the cost of the contributed property, less $80 for the liability assumed by the partnership, plus $40 for his 50% share of what is now a partnership liability. The adjustment appropriately reflects the economic effect of the liability. If partnership liabilities are involved, sections 752(a) and (b) adjusts this initial outside basis to reflect the partners' respective shares of those liabilities. The omission of an obligation from partnership liabilities under section 752 creates a claim by the participant that his outside basis remained $100 because no adjustment is made for the partnership's assumption of the obligation under section 752(b). In this way, a Son of BOSS participant artificially inflates his outside basis by the amount of the omitted obligation and the participant claims an artificial tax benefit in the form of a built-in capital loss equal to the omitted obligation without any economic investment.

respective shares of partnership liabilities, including decreases in their individual liabilities resulting from the partnership's assumption of those obligations.

Under section 722, when the Sands Heirs contributed the assets to the Alpha partnership, they obtained an initial outside basis in Alpha of approximately $47 million, equal to the sum of the $1.3 million aggregate balance in their Merrill Lynch Accounts, the $1.3 million Margin Deposit, and the $44 million Short Sales Proceeds, plus interest thereon. When the Short Sale Obligations were assumed by Alpha,[14] this initial outside basis was decreased under sections 752(b) and 733 to reflect the decrease in the Sands Heirs' individual liabilities by $44 million and then increased under sections 752(a) and 722 to reflect the increase in the Sands Heirs' shares of Alpha's partnership liabilities by approximately the same amount.[15] Under the facts of this case, this was essentially a wash, because the partners all contributed encumbered assets in proportion to their partnership interests and the partnership liabilities were already allocated to the partners in accordance with their percentage ownership. Initially, the inclusion of the Short Sale Obligations in partnership liabilities under section 752 does not result in any net decrease in outside basis because the Sands Heirs retain liability for their respective shares of that obligation as partners of Alpha. Treas. Reg. § 1.752-2.

Likewise, when Alpha contributed the assets to Beta in exchange for a 99.0043% interest therein and Beta's assumption of the Short Sale Obligations, Alpha obtained an initial outside basis in Beta under section 722 equal to approximately $47 million consisting of the $1.3 million

[14] The same analysis applies to the assumption of the Short Sale Obligations of Abigail and Zachary's Trusts by CWC.

[15] For this purpose, the interests of the Sands Heirs as limited partners owning 99.90% of Alpha are aggregated with their indirect interest of 0.10% held through R,R,M & C Management Corporation ("RRMC Corp.").

aggregate amount of the original cost basis of the Yahoo and Corning Shares, the $1.3 million Margin Deposit, the $44 million Short Sales Proceeds, plus interest thereon. Because the Short Sale Obligations were assumed by Beta, this initial outside basis was decreased under sections 752(b) and 733 to reflect the decrease in Alpha's individual liabilities by $44 million and increased under sections 752(a) and 722 to reflect the increase in Alpha's share of Beta's partnership liabilities by the same amount. Under sections 752(a) and (b), this initial outside basis is adjusted to reflect the decrease in Alpha's individual liabilities by $44 million and the increase in Alpha's 99.0043% share of Beta's partnership liabilities, for a net decrease of 0.9957% of that $44 million in partnership liabilities allocated to Gloria Robinson ("Gloria"). Sections 752(a) and (b) also require adjustments to be made to the Sands Heirs' outside basis to reflect the net change in their shares of partnership liabilities of Alpha because those liabilities include Alpha's share of the partnership liabilities of Beta. Consequently, the $47 million aggregate outside basis of the Sands Heirs in Alpha is deceased by the 0.0043% share of the Short Sale Obligations allocated to Gloria.[16] With the exception of this relatively minor net decrease, the outside basis of the Sands Heirs in Alpha and the outside basis of Alpha in Beta remains approximately $47 million as long as they remain liable for the Short Sale Obligations as direct and indirect partners of Beta.

When the Short Sales were closed by Beta, however, the partnership liabilities of Beta decreased to $-0-. Likewise, Alpha's share of those partnership liabilities decreased to $-0-, and the Sands Heirs' shares of the partnership liabilities of Alpha also decreased to $-0-. Under section 752(b), the decrease in Alpha's share of Beta's liabilities results in a decrease in Alpha's outside

---

[16] Under section 752, the same result obtains to the outside basis of Abigail and Zachary's Trusts in CWC because their shares of CWC's partnership liabilities include its share of the partnership liabilities of Alpha, which include its share of the partnership liabilities of Beta.

basis in Beta by $44 million, and the decrease in the Sands Heirs' shares of the partnership liabilities of Alpha to $-0- likewise results in a corresponding decrease in their outside basis in Alpha by $44 million. This is because the decrease in the partner liabilities is considered a distribution and under § 733 a distribution reduces outside basis.

Alpha's purchase of Gloria's interest in Beta resulted in a termination of Beta's status as a partnership for tax purposes under section 708(a). As a result, Alpha obtained a carryover basis in the Yahoo and Corning Shares distributed in the liquidation of Alpha's interest under section 731(b). Under section 732(b), Alpha's adjusted basis in the distributed Yahoo and Corning Shares equaled Alpha's outside basis in Beta immediately before the distribution, less the amount of cash distributed to Alpha. Alpha's then outside basis of approximately $3 million was allocated first to the cash distributed including the Margin Deposit, interest earned thereon, and the gain from the Short Sales, leaving approximately $1.2 million to be allocated to the Yahoo and Corning Shares under section 732(c).

Since Alpha obtains a carryover basis in the distributed Yahoo and Corning Shares under section 732, the tax basis in those shares is not artificially inflated if Alpha's outside basis is not inflated. By treating the Short Sale Obligations as partnership liabilities under section 752, the appropriate result is that Alpha obtains a carryover basis in the Yahoo and Corning Shares equal to the original cost basis of the stock because all of Alpha's investment of cash in Beta has been returned to Alpha by the distribution of Beta's assets.

Under section 731(a), the Sands Heirs do not recognize gain on the distribution of the Yahoo and Corning Shares because the amount of their outside basis equals the original cost basis in the Yahoo and Corning Shares distributed. Under section 732(a), the Sands Heirs received a carryover

basis in the distributed Yahoo and Corning Shares equal to the Alpha's original cost basis. When the Yahoo and Corning Shares were contributed to Mickey, L.P. and MLRR, the Sands Heirs did not recognize gain on the exchange, receiving a carryover basis in their partnership interests under section 722. Likewise, Mickey, L.P. and MLRR obtained a carryover basis in the Yahoo and Corning Shares under section 723 equal to the original cost basis.

As initially stated, however, we believe that the only contested issue in the cases involving the Second Shelter is whether the partnerships' obligation to close short sales are "liabilities" for purposes of §752. As discussed in subsection C, it is clear that the Short Sale Obligation must be treated as a liability. Accordingly, the Sands Heirs must adjust their outside bases under sections 752(a) and (b) to reflect changes in their respective shares of partnership liabilities, including decreases in their individual liabilities resulting from the partnership's assumption of those obligations.

C. The Short Sale Obligations are §752 Liabilities

A short sale is a transaction in which an investor sells borrowed securities, generally in anticipation of a price decline, and is required to return an equal amount of shares at some point in the future. On December 11, 2001, the Sands Heirs sold short U.S. Treasury notes in the approximate amount of $44,000,000. Their controlled partnership, Beta, subsequently covered the Short Sales with U.S. Treasury notes that it purchased on December 26, 2001–15 days later.

Plaintiffs admit that the Short Sale Obligations were assumed by their partnerships, that the Short Sale Obligations were treated as liabilities for financial accounting purposes, and that the Short Sale Obligations were in fact paid by Beta purchasing replacement securities at the closing of the Short Sales. Furthermore, they cannot dispute that, if § 752 applies to the Short Sale

Obligations, the tax basis of the Yahoo and Corning Shares is equal to the original cost basis, whether those shares are in the hands of Alpha, Mickey, L.P., or MLRR. Plaintiffs also cannot deny that their interpretation of § 752 would permit any partner to create artificial tax benefits virtually at will in amounts limited only by his ability to leverage his assets. Notwithstanding all that, the petitioners incorrectly maintain that the definition of partnership liabilities under § 752 should not include Short Sale Obligations.

In transactions involving the contribution of open short sale positions, section 752 applies to treat the Short Sale Obligations as section 752(a) and (b) liabilities. See Rev. Rul. 95-45, 1995-1 C.B. 53 (short sale obligation is a liability for purposes of section 357 because it increases the tax basis of property); Rev. Rul. 95-26, 1995-1 C.B. 131 (same result under section 752). Under Revenue Ruling 95-26, a short sale of securities creates an obligation on the part of the partnership to deliver identical securities to close out the short sale and concludes that the short sale described in the ruling creates a partnership liability under section 752.

In *Salina Partnership v. Commissioner*, T.C. Memo 2000-352, the Tax Court held that a partnership's obligation to close a short sale position in U.S. Treasury notes is a partnership liability for purposes of section 752. After referring to a definition of "liability" in Black's Law Dictionary, the Tax Court explained:

> Based on the aforementioned meaning of the term "liability", and consistent with the policy underlying Section 752, we hold that Salina's obligation to close its short sale by replacing Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the Treasury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN.

*Id.* The Tax Court also rejected the taxpayers' argument that the application of section 752 was

inconsistent with the open transaction doctrine employed under section 1233, holding that "the conclusion that a partnership's short sale of securities creates a partnership liability within the meaning of section 752 ... does not create tension or conflict with the deferred recognition of gain or loss prescribed for short sales under section 1233." *Id.* at 2011.

The Tax Court in *Salina* addressed Rev. Rul. 73-301, 1973-2 C.B. 215 and *Helmer v. Commissioner*, T.C. Memo 1975-160 and held that even though these authorities demonstrate that " the amounts received by a partnership in an open transaction generally are not characterized as a liability under section 752, the transaction must nevertheless be examined to determine whether the partnership incurred related liabilities that may require partner-level basis adjustments pursuant to section 752." *Id.* at 2012. The Court also distinguished *Helmer* and held that the option payments in *Helmer* "represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services. In contrast, Salina's gain or loss on the sale of the borrowed Treasury bills was dependent upon the cost to Salina of fulfilling its obligation to replace the borrowed Treasury bills. Consequently, we hold that *Helmer v. Commissioner*... does not support petitioner's position in this case." *Id.* at 2012.[17] Accordingly, the Tax Court held that "Salina's obligation to close its short sale by replacing the Treasury bills that it borrowed ... represented a partnership liability within the meaning of Section 752." *Id.* at 2013.

More recently, the same result was reached in *COLM Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006)(appeal pending, No. 06-11422 (5th Cir.)). In that case, another Son

---

[17] More recently, in *Cemco Investors, LLC v. United States*, Case No. 04C8211 (D.C.E.D. Ill. March 27, 2007), the Court concluded that IRS Notice 2000-44, 2000-2 C.B. 255 and Treas. Reg. 1.752-1(a)(4)(ii)(2003) reverse any conflict suggested by *Helmer* and make it clear that short options must be taken into account as liabilities in computing the basis of property contributed to a partnership. However, the liabilities in issue here are not options and are not contingent.

of BOSS tax shelter designed by Heritage was at issue, and the question on motion for summary judgment was whether the short sale obligations should be included in partnership liabilities under § 752. *COLM Producer* addressed a similar situation in which the taxpayer artificially inflated his outside basis in a partnership by $100 million by making a purported contribution of an open short sale position of $100 million of U.S. Treasury notes. *COLM Producer*, 460 F. Supp.2d at 713-714. The district court expressly rejected the taxpayer's argument that the liability to replace the borrowed Treasury notes was a contingent liability. Relying on *Salina* and the plain meaning of the term "liabilities," the district court also held that the short sale obligations assumed by the partnership in that case were partnership liabilities under section 752.

It is evident that Congress contemplated consistent definitions of the word "liability" under Section 752 of the Code and Section 357(c)(3). *See* H.R. Rep. No. 98-861, at 856-857 (1984), 1984-3 (Vol. 2) C.B. 110, 111. *App. B, pgs. 4-6.* Section 357(c) provides rules regarding the assumption of a liability in corporate reorganizations. Under Section 357(c)(3)(B), obligations that result in the creation, or an increase in the basis of any property are treated as liabilities for purposes of that section. *See* Rev. Rul. 88-77, 1988-2 C.B. 128 (holding that partnership liabilities do not include accrued but unpaid expenses and accounts payable because these liabilities do not create or increase the basis of a partnership asset or give rise to a deduction when incurred).

Plaintiffs rely primarily on the same superficial analogy to contingent liabilities rejected in *COLM Producer* and *Salina Partnership*. Furthermore, plaintiffs' obligation to cover the Short Sales was never contingent. The investor was required to replace the securities sold short. Because the borrower incurring a short sale obligation increases his tax basis by the amount of the short sale proceeds, that obligation is fundamentally the same as more conventional purchase-money financing

that would be included in partnership liabilities under § 752. The short sale proceeds that were used to increase the Sands Heirs' outside basis under § 722 were acquired on the strength of the obligations they now seek to ignore. A liability that is truly contingent does not ordinarily create or increase the borrower's tax basis in any property precisely because the obligation is contingent.

On the 2002 partnership returns of Alpha, Mickey, L.P., CWC and MLRR, the Inflated Stock Basis is claimed on sales of Yahoo and Corning Shares, resulting in artificial capital losses that are allocated to the Sands Heirs. In each of the Alpha, Beta and CWC FPAAs, the IRS increased partnership liabilities by the aggregate amount of $44,293,087 to provide for the Short Sale Obligations ultimately assumed and extinguished by Beta. In the Alpha, Mickey, L.P. and MLRR FPAAs, the IRS also decreased the claimed inflated basis in the Corning and Yahoo Shares. The Inflated Basis Adjustments for 2002 similarly treat the Short Sale Obligations as partnership liabilities, thereby decreasing the claimed basis in the Yahoo and Corning Shares sold. Under the carryover basis rules, increasing partnership liabilities to include the Short Sale Obligations on the 2001 returns automatically decreases the tax basis that can be claimed on sales of the Yahoo and Corning Shares on the 2002 returns.

**PLAINTIFFS GROSSLY MISSTATED THE BASIS OF THE YAHOO AND CORNING SHARES AND THE 40% PENALTY ASSESSED UNDER 26 U.S.C. §6662 SHOULD BE SUSTAINED.**

The IRS properly determined that the following penalties are applicable against the Alpha and Beta partners for their treatment of partnership items related to their Son of BOSS transactions:

(1) a 40% penalty for a gross valuation misstatement (§ 6662(b)(3) and (h));[18]

---

[18] Because there is no stacking of penalties, the maximum penalty is either 20% or 40% of the underpayment of tax, even if an underpayment is attributable to more than one type of misconduct. *See* Treas. Reg. § 1.6662-2(c).

(2) a 20% penalty for substantial valuation misstatement ( § 6662(b)(3));

(3) a 20% penalty for substantial understatement of income tax (§ 6662(b)(2)); and

(4) a 20% penalty for negligence or disregard of rules and regulations (§ 6662(b)(1)).

A gross valuation misstatement exists if the value or *adjusted basis* of property claimed on the return is 400% more than the amount determined to be the correct amount of such value or *adjusted basis*. (§6662 (e) and (h)). Since the actual basis of the Yahoo and Corning Shares distributed to the taxpayers should be $1,195,100.50 rather than the $44,000,000 claimed, this 400% threshold is exceeded. Thus, the 40% gross valuation penalty applies. The IRS properly calculated the applicable penalties at the 40% level for shelter participants' 2001 and 2002 tax returns. On the partnership returns filed by Alpha, MLRR, CWC and Mickey, L.P., the Sands Heirs claimed the inflated basis on the Yahoo and Corning Shares to generate substantial artificial losses. The 400% threshold for imposing the 40% penalty applicable to a gross valuation misstatement is dwarfed by the magnitude of the tax benefits claimed by the Sands Heirs.

Here, Alpha improperly allocated $44,000,000 to its basis in the Corning and Yahoo Shares, thereby artificially inflating that basis by nearly 3700%.[19] Alpha, MLRR, CWC and Mickey, L.P. all reported this artificially inflated basis on their partnership returns. This basis misstatement exceeds 400% and represents a "gross valuation misstatement." As such, the 40% penalty imposed by the Alpha, MLRR, CWC and Mickey, L.P. FPAAs is appropriate and it should be sustained."[20]

---

[19] With respect to the Corning Shares, $339.68/share based on its claimed basis of $1,747,325 divided by 5300 representing the number of shares sold, rather than the $8.82/share actually paid by Alpha for the Corning Shares. With respect to the Yahoo Shares, $695.53/share based on its claimed basis of $1,843,154 divided by 2,650 representing the number of shares sold, rather than the $17.95/share actually paid by Alpha for the Yahoo Shares.

[20] Because some of the penalty assessment made against CWC relates to the other tax shelter transaction, the United States is only seeking summary judgment on the penalty assessments related to the Alpha/Beta transaction at issue in this Motion.

## CONCLUSION

The Short Sale Obligations at issue are liabilities under §752. As previously noted, two Courts have already concluded that 26 U.S.C. §752 requires that the obligation to replace borrowed Treasury securities be treated as a liability. *COLM Producer*, 460 F. Supp.2d at 715; *Salina*, 2000 (RIA) T.C. Memo ¶2000-352, at 2013. The FPAAs before the Court adjust the plaintiffs' various partnerships' returns consistent with this requirement. Accordingly, the United States is entitled to summary judgment sustaining the FPAAs issued to plaintiffs Alpha, Beta, MLRR and Mickey, L.P. The United States is also entitled to summary judgment sustaining penalties in the FPAAs.

Respectfully submitted,

/s/ Thomas M. Herrin

THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney