IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: June 4, 2007)

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

* * *

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, the United States submits these Proposed Findings of Uncontroverted Fact.[1] These facts rely on allegations in plaintiffs' complaints, documents produced in plaintiffs' initial disclosures, and a declaration of Thomas M. Herrin with exhibits, attached hereto as Appendix A. These facts are proposed here as uncontroverted solely for purposes of summary judgment. The defendant otherwise reserves the right to dispute them. Accordingly, other than for summary judgment purposes, the adoption of terms such as "partnership," "partner," contribution," "distribution," and others consistent with petitioners' characterization of events does not reflect an admission by the defendant that petitioner's characterization of events is correct under applicable local law or for federal income tax purposes.

* * *

[1] Many of the dates used in this pleading are the dates set forth in plaintiffs' Complaints. In the Complaints, however, plaintiffs allege that the events occurred "on or about" the stated dates. While the United States has accepted these dates for summary judgment purposes, the actual date for an activity referenced may not be exact. To the extent that the exact dates are material to any issues which may ultimately remain for trial, the United States anticipates ascertaining these exact dates through discovery.

## PROPOSED FINDINGS OF UNCONTROVERTED FACT

### I. THE TAX SHELTER PARTICIPANTS

1. During the period at issue, Constellation Brands, Inc. ("Constellation") was a leader in the production and marketing of branded beverage alcohol products in North America and the United Kingdom. Govt. Ex. 1, App. A at p. 2.

2. For the company's fiscal year ending February 28, 2001, Constellation's gross sales exceeded $3 billion. Govt. Ex. 1, App. A at p. 3.

3. In 1945, the predecessor of Constellation, Canandaigua Wine Company, was founded by the late Marvin Sands ("Marvin"). Govt. Ex. 2, App. A at pp. 4-6.

4. Marvin and his wife, Marilyn Sands ("Marilyn"), had three children: (i) Richard Sands ("Richard"), (ii) Robert Sands ("Robert"); and (iii) Laurie Sands ("Laurie"). Laurie is now deceased. Govt. Ex. 2, App. A at pp. 4-6.

5. In 1992, Marvin, Laurie, Richard, and Robert formed M, L, R & R, a New York general partnership (MLRR), by contributing cash in exchange for interests therein. Govt. Ex. 3, App. A at p. 7.

6. On January 17, 1995, Richard, Robert, and Laurie formed CWC Partnership I, a New York general partnership ("CWC"). Laurie owned 99%, Robert owned .5% and Richard owned .5%. Govt. Ex. 4, App. A at pp. 5 and 17.

7. On January 17, 1995, Laurie transferred her interest in MLRR to CWC. Govt. Ex. 4, App. A at p. 33 and Govt. Ex. 5, App. A at p. 34.

8. Upon her death in 1995, Laurie's will transferred her interest in CWC to various trusts for the benefit of her husband, Andrew Stern ("Andrew") and her children, Abigail Stern

("Abigail") and Zachary Stern ("Zachary"), including a marital and non-marital trust for the benefit of Andrew designated as the Trust FBO Andrew Stern U/A Fifth C and the Trust FBO Andrew Stern Fifth D ("Andrew's Trusts"), the Trust FBO Abigail Stern U/A Fifth G ("Abigail's Trust"), and the Trust FBO Zachary Stern U/A Fifth G ("Zachary's Trust"). CWC Complaint ¶ 2

9. On or about April 6, 1999, Marvin transferred his interest in MLRR to a revocable trust pursuant to The Marvin Sands Master Trust Agreement ("Marvin's Trust"). Govt. Ex. 6, App. A at p. 35.

10. After Marvin's death, a controlling interest in Constellation continued to be held by his family and trusts for their benefit (Marvin's Trust, Andrew's Trust, Abigail's Trust and Zachary's Trust). Govt. Ex. 7, App. A at p. 38.

11. In 2001, as a group, Richard, Robert, Marilyn, Andrew and the trusts (collectively the "Sands Heirs") owned a sufficient number of Class A Shares and Class B Shares to determine the outcome of any corporate transaction or other matter submitted to Constellation's shareholders for approval. Govt. Ex. 7, App. A at p. 38.

12. During 2001 and 2002, Richard was the Chief Executive Officer, President, and Chairman of the Board of Constellation, and Robert was a Director and Group President. Govt. Ex. 7, App. A at pp. 41 and 42.

13. As of July 31, 2001, the Sands Heirs owned approximately 11% of the outstanding Class A Shares of Constellation and approximately 93% of its Class B Shares, representing 62% of Constellation's voting power and 22% of the outstanding equity. Govt. Ex. 7, App. A at pp. 40 and 45.

## II. THE HERITAGE TAX SHELTERS

14. By letter dated March 29, 2001, The Heritage Organization, L.L.C. ("Heritage"), contacted Richard to promote a strategy to "eliminate the total tax liability on capital gains." Govt. Ex. 8, App. A at pp. 46-47.

15. After meeting with Heritage representatives, Richard, Robert, Marilyn and Andrew executed non-disclosure and fee agreements required by Heritage to obtain disclosure of the tax strategy. These agreements required the Sands Heirs to pay $2,000,000 to Heritage for any unauthorized disclosure of the tax strategy and also required the Sands Heirs to pay Heritage an additional 25% of the value of all present and future taxes avoided by the use of the strategy. Govt. Ex. 9, App. A at pp. 48-61.

16. These consolidated cases (06-407T, 06408T, 06-409T, 06-410T, 06-411T, 06-810Tand 06-811T) involve the Sands Heirs' participation in two Heritage promoted tax shelters. In the first of the two shelters (the "First Shelter"), the Sands Heirs sought to turn a $64 million gain from the sale of nearly $75 million in Constellation stock (with a basis of about $9 million) into nearly a $20 million loss. To accomplish this goal, the Sands participated in a tiered partnership arrangement involving R,R,M & C Group, L.P. ("RRMC Group"), R,R,M & C Partners, LLC ("RRMC Partners") and the short sale of approximately $76.5 million in U.S. Treasury notes used to artificially inflate the basis of partnership assets. The Sands Heirs sought to further obfuscate their tax avoidance scheme by parking the $75 million obtained from selling 2,002,002 shares of Constellation stock, for about five months, in their controlled Charitable Remainder Unitrusts (the "CRUTS"). RRMC Group Complaint ¶¶19 - 32; RRMC Partners Complaint ¶¶ 19 - 32.

17. Beginning in December 2001, the Sands Heirs participated in the second of the tax shelters promoted to them by Heritage ("Second Shelter"). The Second Shelter is the subject of the United States' Motion for Summary Judgment. The Second Shelter also used a tiered partnership arrangement, similar to the one used in the First Shelter. The Second Shelter utilized Alpha I, L.P. ("Alpha"), Beta Partners, L.L.C. ("Beta") and the short sale of approximately $44 million in U.S. Treasury notes to artificially inflate the basis of partnership assets. Alpha Complaint ¶¶ 18 - 34; Beta Complaint ¶¶ 18 -34.

## III. STRUCTURING THE SECOND SHELTER

18. On December 3, 2001, Alpha was formed as a limited partnership.[2] Richard, Robert, Marilyn, Andrew, Marvin's Trust and CWC (together, the "Second Shelter Participants") held 99.90% of the partnership's interests. R,R,M & C Management Corporation ("RRMC Corp.") held the remaining .1% of the partnership. Govt. Ex. 10, App. A at pp. 89-92; Alpha Complaint ¶¶2 - 3.

19. Abigail and Zachary participated in the Second Shelter by virtue of the 99% Class 2 interest that their trusts held in CWC. Richard and Robert held the remaining 1% Class 2 interest in CWC. Andrew, Andrew's Trust, Richard and Robert held 100% of CWC's Class 1 interests. Alpha Complaint ¶¶ 6, 18 - 26; CWC Complaint ¶¶ 2, 19 - 27.

20. By agreement dated December 10, 2001, Alpha and Gloria Robinson ("Gloria") formed Beta as a limited liability company. Alpha held a 99.0043% interest in Beta and Gloria held the remaining .9957% interest in Beta. Govt. Ex. 11, App. A at p. 133; Beta Complaint ¶¶ 2 and 29.

---

[2] See Govt. Ex. 24, App. A at p. 284 for a diagram illustrating the formation of Alpha and Beta.

## IV. THE SHORT SALES

21. Collectively, on December 12, 2001, the Second Shelter Participants transferred approximately $1.1 million to their respective Paine Webber Accounts as margin deposits ("Margin Deposits"). Govt. Ex. 10, App. A at pp. 135-153.

22. On December 12, 2001, the Second Shelter Participants opened approximately $44 million in short sale positions in their Paine Webber Accounts by selling short an aggregate face amount of $30,800,000 U.S. Treasury notes bearing coupon interest of 2.75% due 9/30/03 and an aggregate face amount of $13,200,000 U.S. Treasury notes bearing coupon interest of 4.625% due 5/15/06 (collectively, the "Short Sales"). Govt. Ex. 12, App. A. at pp.135-153; Alpha Complaint ¶18.

23. On December 12, 2001, the Short Sales' proceeds of approximately $44,000,000 (collectively, the "Short Sales Proceeds") were deposited in the Second Shelter Participants' Paine Webber Accounts, subject to the respective obligations to close the Short Sales (collectively, the "Short Sales Obligations"). Govt. Ex.12, App. A pp.135-153; Alpha Complaint ¶18.

24. On or about December 13, 2001, the Abigail and Zachary Trusts transferred their respective Short Sales Proceeds and the obligations to close their portion of the Short Sales to CWC. Alpha Complaint ¶¶19 and 20.

25. On December 17, 2001, the Shelter Participants contributed the Short Sales Proceeds, the Short Sales Obligations and cash, in the aggregate amount of $1,240,000, to Alpha in exchange for partnership interests in the percentages set forth in the table below:

| Participant | Amount | Interest |
|---|---|---|
| Marilyn | 181,736.19 | 14.641 |
| Robert | 265,614.43 | 21.401 |
| Richard | 223,675.31 | 18.022 |
| CWC | 160,766.20 | 12.949 |
| Marvin Trust | 335,512.97 | 27.030 |
| Andrew | 72,694.48 | 05.857 |
| Total | $1,239,999.50 | 99.9% |

Alpha Complaint ¶¶21 - 26.

26. On December 20, 2001, RRMC Corp. contributed $2,582 in exchange for a 0.10% interest as general partner in Alpha. Alpha Complaint ¶27.

27. On December 20, 2001, Alpha's assets, including both the Short Sales Proceeds and the Short Sales Obligations, were contributed to Beta in exchange for a 99.0043% interest in Beta. Beta closed the Short Sales on December 26, 2001, recognizing a net gain of $90,018. Alpha Complaint ¶¶ 29 and 30.

## V. INFLATING THE BASIS OF THE YAHOO AND CORNING STOCK

28. The Sands Heirs treated the Short Sales Obligations as liabilities for financial accounting purposes but not for tax accounting purposes under sections 752(a) and (b). Govt. Ex. 10, App. A at p. 90; Alpha Complaint ¶ 56.

29. The Second Shelter is based on the supposition that short sale obligations are not liabilities under 26 U.S.C. §752 and, hence, do not reduce outside basis. As stated in the Heritage materials prepared for the Sands Heirs, "[t]he outstanding obligations to return the U.S. Treasuries do not affect basis due to the fact that the obligations are not fixed and determinable." Govt. Ex. 13, App. A at p. 190. By not recognizing the Short Sale Obligations, the Sands Heirs, through Alpha and Beta, artificially increased their basis in shares of Yahoo and Corning stock by more than

3000% above the cost basis of that stock. Govt. Ex. 14, App. A at pp. 200-201; Govt. Ex. 15, App. A at p. 207.

30. On December 17, 2001, Alpha purchased 67,525 shares of the common stock of Corning, Inc. ("Corning Shares"), at $8.82 per share, for $595,570.50 ("Corning Cost Basis") and 33,400 shares of the common stock of Yahoo, Inc. ("Yahoo Shares"), at $17.95 per share, for $599,530 (the "Yahoo Cost Basis"). Govt. Ex. 14, App. A at pp. 200-201; Govt. Ex. 15, App. A at p. 207; Alpha Complaint ¶28.

31. As previously noted, on December 20, 2001, Alpha transferred the Short Sales Proceeds (approximately $44,000,000), the Short Sale Obligations, $1,343,553 in cash and both the Yahoo and Corning stock to Beta in exchange for a 99.043% interest in Beta. Gloria held the remaining .9957 % interest in Beta. Govt. Ex. 14, App. A at p. 200; Alpha Complaint ¶29.

32. On December 27, 2001, Beta purchased $30,800,000 face amount of U.S. Treasury notes due 9/30/2003 for $30,843,550 and $13,200,000 face amount of U.S. Treasury notes due 5/15/2006 for $13,359,591 to close the Short Sales, at a gain of $90,018. Govt. Ex. 14, App. A at p. 200; Govt. Ex. 16, App. A at pp. 210-212; Alpha Complaint ¶30.

33. On December 27, 2001, Alpha purchased Gloria's 0.9957% interest in Beta. Alpha Complaint ¶31.

34. When Alpha acquired 100% of Beta, Beta became a single-member limited liability company that is treated as a disregarded entity under I.R.C. § 7701, effectively terminating Beta's existence as a partnership for tax purposes and triggering a deemed liquidating distribution under I.R.C. § 731(b) of the $1,466,135 cash held by Beta, the Corning Shares and the Yahoo Shares. Govt. Ex. 14, App. A at p. 200; Alpha Complaint ¶ 31.

35. After the constructive liquidation of Beta, Alpha allocated its outside basis, including the basis initially attributable to the Short Sales Proceeds, among Beta's remaining assets, claiming an aggregate adjusted tax basis in the Yahoo Shares of $22,262,094, or $695.52 per share, and an aggregate adjusted tax basis in the Corning Shares of $23,230,361, or $329.69 per share (altogether, the "Inflated Stock Basis").[3] Govt. Ex. 14, App. A at p. 200; Alpha Complaint ¶¶ 53 and 54.

## VI. CLAIMING THE INFLATED BASIS

36. In the aggregate, Alpha distributed 52,450 Corning Shares and 25,042 Yahoo Shares to the Second Shelter Participants and RRMC Corp. during 2001 and 2002 (the "Distributed Shares") in which the Second Shelter Participants claimed a carryover basis equal to the Inflated Stock Basis. Govt. Ex. 17, App. A at p. 213; Govt. Ex. 18, App. A at pp. 219-232; Govt. Ex. 19, App. A at pp. 240-257; Alpha Complaint ¶32.

37. On February 26, 2002, Marilyn formed Mickey Management, Inc ("Mickey, Inc."), a wholly owned corporation. Mickey Complaint ¶¶ 1 - 4.

38. On February 26, 2002, Marilyn formed Mickey Management, L.P. ("Mickey, L.P.") by contributing 2,300 shares of the Yahoo stock and 4,600 shares of the Corning stock which had been distributed to her by Alpha, in exchange for a 99% limited partnership interest. Mickey, Inc. acquired the remaining 1% interest, as general partner. Mickey Complaint ¶¶ 2, 3, 33 and 34.

39. On February 26, 2002, the Second Shelter Participants, other than Marilyn, contributed 2,300 of the Yahoo shares and 4,600 of the Corning Shares, which had been distributed to them by Alpha, to MLRR. MLRR Complaint ¶¶ 1, 33 and 34.

---

[3] See Govt. Ex. 25, App. A at p. 285 for a diagram illustrating the distribution of the Yahoo and Corning stock following Beta's deemed liquidation.

40. Proportionately, on a per share basis, Mickey, L.P. and MLRR claimed a carryover inside basis in the Yahoo and Corning stock equal to the Inflated Stock Basis. Mickey Complaint ¶¶ 35 and 36; MLRR Complaint ¶¶ 35 and 36.

41. On April 19, 2002, Beta filed a partnership return on Form 1065 for the tax period ending December 27, 2001 (the "Beta Return"), without including the Short Sales Obligations in partnership liabilities under sections 752(a) and (b). Govt. Ex. 20, App. A at pp. 269-277; Beta Complaint ¶ 46.

42. On April 26, 2002, Alpha filed a Form 1065 partnership return for 2001 ("2001 Alpha Return"). The 2001 Alpha Return did not include the Short Sales Obligations as partnership liabilities under sections 752(a) and (b). Govt. Ex. 18, App. A at pp. 214-233; Alpha Complaint ¶ 56.

43. On October 20, 2002, CWC filed its Form 1065 partnership return for 2001 ("CWC Return"). The CWC Return failed to include the Short Sales Obligations as partnership liabilities under sections 752(a) and (b). CWC Complaint ¶ 42.

44. On October 20, 2002, MLRR filed its Form 1065 partnership return for 2001 ("MLRR Return"). Proportionate to the number of shares sold, the MLRR Return claimed the Inflated Stock Basis on its sales of Distributed Shares reported on Schedule D, thereby reflecting an artificially high loss on the sale of the stock. Govt. Ex. 21, App. A at pp. 278-279; MLRR Complaint ¶¶ 50 and 51.

45. On December 18, 2002, Alpha sold 5,300 Corning Shares for $19,661 and 2650 Yahoo Shares for $44,265. Govt. Ex. 19, App. A at p. 239; Alpha Complaint ¶¶ 33 and 34.

46. On December 18, 2002, MLRR sold 4,600 Corning Shares for $17,070 and 2,300 Yahoo Shares for $38,426. Govt. Ex. 22, App. A at pp. 280-281; MLRR Complaint ¶¶ 35, 36, 50 and 51.

47. On December 18, 2002, Mickey, L.P. sold 4,600 Corning Shares for $17,115 and 2,300 Yahoo Shares for $38,426. Govt. Ex. 22, App. A at pp. 280-281; Mickey Complaint ¶¶ 35, 36, 50 and 51.

48. On August 14, 2003, Mickey, L.P. filed its Form 1065 partnership return for 2002 ("Mickey 2002 Return"). Proportionately to the number of shares sold, the Mickey 2002 Return claimed the Inflated Stock Basis on its sales of Distributed Shares reported on Schedule D, thereby reflecting an artificially high loss on the sale of the stock. Govt. Ex. 22, App. A at pp. 280-281; Mickey Complaint ¶¶ 35, 36, 50 and 51.

49. On September 14, 2003, Alpha filed its Form 1065 partnership return for 2002 ("Alpha 2002 Return"). Proportionately to the number of shares sold, the Alpha 2002 Return claimed the Inflated Stock Basis on its sales of Distributed Shares on Schedule D, thereby reflecting an artificially high loss on the sale of the stock. Govt. Ex. 19, App. A, p. 239; Alpha Complaint ¶¶ 33, 34, 53 and 54.

50. On September 16, 2003, MLRR filed its Form 1065 partnership return for 2002 ("MLRR 2002 Return"). Proportionately to the number of shares sold, the MLRR 2002 Return claimed the Inflated Stock Basis on its sales of Distributed Shares on Schedule D, thereby reflecting an artificially high loss on the sale of the stock. Govt. Ex. 22, App. A at pp. 280-281; MLRR Complaint ¶¶ 35, 36, 50 and 51.

## VII. THE FPAA ADJUSTMENTS

51. On December 22, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustments of Alpha's partnership items for 2001 and 2002 ("Alpha FPAA"). Alpha Complaint ¶ 35 and Exhibit A to Alpha Complaint.

52. On December 22, 2005, the IRS mailed a notice of Final Partnership Administrative Adjustments of Beta's partnership items for the short period ending December 27, 2001 ("Beta FPAA"). Beta Complaint ¶ 36 and Exhibit A to Beta Complaint.

53. On December 28, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustments of CWC's partnership items for 2001 ("CWC FPAA"). On the CWC FPAA, the IRS's primary adjustment was to increase partnership liabilities by the amount of $21,032,464, which adjustment reflects CWC's participation in the First and Second Shelters. CWC Complaint ¶ 28 and Exhibit A to CWC Complaint.

54. On the Alpha FPAA (as it related to year 2001) and the Beta FPAA, the IRS's primary adjustment was an increase in partnership liabilities by the aggregate amount of $44,293,087, treating the Short Sales Obligations as partnership liabilities under sections 752(a) and (b) (the "Partnership Liability Adjustment"). Alpha Complaint ¶ 35; Beta Complaint ¶ 36; Exhibit A to Alpha Complaint; Exhibit A to Beta Complaint.

55. In the Alpha FPAA (as it related to year 2002), the IRS's primary adjustment was to disallow the portion of the Inflated Stock Basis in excess of the Cost Basis in the Yahoo Shares and Corning Shares on the ground that the Partnership Liability Adjustment for 2001 decreased Alpha's outside basis in Beta by the amount of the Short Sales Proceeds, causing an equivalent

decrease in the Inflated Stock Basis under section 732 (the "Inflated Basis Adjustment"). Alpha Complaint ¶ 35 and Exhibit A to Alpha Complaint.

57. On September 7, 2006, the IRS issued separate Notices of Final Partnership Administrative Adjustments of the partnership items of Mickey, L.P. and MLRR for 2002 (collectively, the "M&M FPAA") in which the IRS's primary adjustment was the Inflated Basis Adjustment resulting in the disallowance of the associated capital losses claimed by the partnerships for 2002. Mickey Complaint ¶ 37; MLRR Complaint ¶ 37; Exhibit A to Mickey Complaint; Exhibit A to MLRR Complaint.

58. In the Alpha FPAA, the Beta FPAA, the CWC FPAA, and the M&M FPAA, the IRS asserted a 20% and a 40% accuracy-related penalty because all of the underpayments of tax by the Sands Heirs were attributable to gross valuation misstatements, viz., the overstatement of their outside bases in Alpha and Beta by the amount of the Short Sales Proceeds. Exhibit A attached to Alpha Complaint, Beta Complaint, CWC Complaint, Mickey Complaint, and MLRR Complaint.

Respectfully submitted,

/s/ Thomas M. Herrin
THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney

/s/ Louise Hytken
Of Counsel