# AGREEMENT

In consideration of the mutual promises and covenants of each to the other, this Agreement (referred to herein as the "Agreement") is entered into by and between The Heritage Organization, L.L.C (herein referred to as the "Organization") and Richard E. Sands, Ph D., Jennifer Sands, and all entities listed in Exhibit B attached hereto (these Persons, together with their Affiliates [as herein defined], are collectively referred to herein as the "Principals"). The Organization and the Principals are sometimes referred to herein as a "Party" or, collectively, as "Parties."

## ARTICLE I
## PROCESS

The Organization's Group, after receiving the necessary data and objectives regarding the financial situation and potential tax liabilities of the Principals and after meeting with the Principals to discuss their objectives, may communicate to the Principals one or more Strategies which, singularly or in combination, may produce one or more of the following results (herein referred to as the "Results").

(a) Realize a profit on the current and future disposition of the common stock of Constellation Brands, Inc. and other common stock currently held by the Principals; or

(b) Increase the diversification of the Principals' holdings and reduce the economic risk related to the volatility of the market price of the common stock of Constellation Brands, Inc. and other common stock currently held by the Principals; or

(c) Enhance the privacy and confidentiality of the Principals' financial information and correlatively, reduce risks to their personal safety and security by placing assets in other entities; or

(d) Limit or reduce the Principals' liability for risks of hedging and investment transactions by placing assets in other entities; or

(e) Provide an opportunity to reduce the Principals' Federal, state or local income or capital gains tax liabilities (referred to herein as "Taxes That Would Have Been Incurred As Projected For The Principals") in the event of the Principals Converting any and all kinds of Property by way of a Sale including, by way of example but not limitation, the common stock of Constellation Brands, Inc. and other common stock, real property, securities, intangible property, intellectual property, contracts, contractual rights and personal property (any and all kinds of property, whether or not the property is owned by or controlled by the Principals including, but not limited to those specifically described above, are referred to herein as "Property").

The Organization's Group may communicate an economic analysis of the Strategies to the Principals, and if the Principals so request in writing, and subject to fulfillment of the other provisions of this Agreement, the Organization's Group will then meet with any attorney, accountant, appraiser, investment banker, valuation Expert, or other advisor or Expert representing any of the Principals who has earlier executed and delivered to the Organization a prior written agreement having provisions, terms and conditions satisfactory to the Organization (herein such Persons are referred to as "Authorized Advisors") and communicate the Strategies to them.

## ARTICLE II
## NO OBLIGATION FOR PRINCIPALS TO IMPLEMENT

The Principals are not obligated to Implement any of the Strategies communicated by the Organization's Group under this Agreement. In the event the Principals do not Implement any of the Strategies or attempt to obtain a Result using the Strategies, they owe the Organization none of the fees for Implementation described in Article IV.

## ARTICLE III
## FEES AND EXPENSES BEFORE IMPLEMENTATION

Upon the execution of this Agreement, the Principals shall pay the Organization Seven Thousand Five Hundred Dollars ($7,500.00) for the purpose of covering the Organization's Group travel expenses for meetings between the Organization's Group and the Principals, or their Authorized Advisors, and any employee, partner, manager, stockholder, agent, representative, trustee, officer, member or director of any Principal which is not a Natural Person who has executed and delivered to the Organization a written agreement having provisions, terms and conditions satisfactory to the Organization (herein such Persons are referred to as "Authorized Persons").

## ARTICLE IV
## FEES IN THE EVENT OF IMPLEMENTATION

4.1 <u>The Organization's Fees in the Event of Implementation of the Strategies</u>. If the Principals Implement, in whole or in part, any one or more of the Strategies or Implement any one or more of the Results using any of the Strategies (either is referred to herein as a "Utilization"), the Principals shall pay, in addition to all other amounts due under this Agreement, a fee of twenty-five percent (25%) of all present and future Taxes That Would Have Been Incurred As Projected For The Principals that would have been incurred by any Principal without a Utilization relating in any way to a Sale or relating in any way to any Strategy that has as one of its objectives or byproducts the effect of reducing Taxes That Would Have Been Incurred As Projected For The Principals relating in any way to (i) all Property used to Implement one or more of the Strategies related to each Result, and (ii) all Property otherwise used in any way with any Strategy to attempt to obtain each Result (all Property used in either way is referred to herein as "Implementing

Copyright 2001 The Heritage Organization, L.L.C.



CG0001

GOVERNMENT EXHIBIT 9

PENGAD-Bayonne, N.J.

DOJ-005690

APP-A-000048

transa

Property") As used herein, the term "Highest Value" means the greater of (i) the total consideration received in the event of a Sale or (ii) the market value for that Property determined without considering any reductions or discounts in value including by way of example, but not limitation, those for minority positions, size of holdings, blockage, liquidation rights, marketability, restrictions, fractionalization, and/or other facts or situations. For determining Value, marketable securities used in any Strategy shall be valued as of the last trade or closing price on the day on which Implementation of that particular Strategy begins. In calculating the fee under the Article IV, the fee shall be based upon the determination of realized (or avoided) gains or increases assuming the "Highest Value" of the Implementing Property. The fees under this Article IV shall apply to all Property used to Implement a Strategy or to attempt to obtain a Result using a Strategy at any time during the one hundred twenty (120) months following the date of the first Revealing of a particular Strategy by the Organization's Group to any of the Principals. The intent of this Article IV is that the fees shall be calculated based on present and future Taxes That Would Have Been Incurred As Projected For The Principals as reasonably calculated by the Organization under this Agreement (without regard to subsequent adjustments thereto by the Principals, the Internal Revenue Service or otherwise), and without regard to potential savings from other strategies that may be available or known, whether used or not.

4.2 Maximum Fee. The Principals will be obligated to pay fees under this Article IV, as stated in Sections 4.1 and 4.4, for the total Value of Implementing Property. This determination will be made initially at the time that any Strategy is first Implemented, and the fees under this Article IV will be due and payable pursuant to that initial determination until such time as that determination is adjusted. If the Value of the Implementing Property involved in a future Utilization increases the total Value of all Implementing Property which has been involved in a Utilization, this determination will be adjusted so that the fees under this Article IV shall be due and payable for the total Value of Implementing Property at the time of such determination. The fees for any Result under this Article IV of this Agreement shall not be paid twice for the same Implementing Property, nor shall any additional or greater fee be due because the Value of any Implementing Property on which a fee has been paid increases thereafter, unless the amount of the increases in Value of any Implementing Property have not previously been used in calculating the percentage fees, stated in Section 4.1 and this Section 4.2, and an additional Strategy is Implemented using Implementing Property having such increases in Value on which fees have not been paid.

4.3 Usefulness And Value Of The Strategies. The Principals Acknowledge that the Strategies are not necessarily composed of information which is proprietary, trade secrets or exclusively known to the Organization's Group and that the usefulness and value of the Strategies may be attributable to the timing, sequencing and combinations of the various non-proprietary components of the Strategies or to the fact that the Strategies may not be known to the Principals even though they may be known to others.

4.4 Timing of Fees. One-half of the Fees due pursuant to this Article IV shall be due and paid to the Organization within five (5) business days after any time any of the Principals orally advise the Organization that they wish to Implement, in whole or in part, any one or more of the Strategies. The balance of the Fees due pursuant to this Article IV shall be due and paid to the Organization before the expiration of ten (10) business days after a Utilization.

## ARTICLE V
## POSSIBLE RESULTS AND RELEASES

5.1 Uncertainty of Results. The Principals Acknowledge that the attempted Results from the Strategies are subject to interpretations of current Law and may be substantially impacted by changes of Law. (The term "Law" as used herein shall be broadly construed and shall mean and include, by way of example but shall not be limited to, statutes, codes, legislation, regulations, revenue rulings, private rulings, interpretations, technical advice memorandums, administrative decisions, administrative interpretations, and/or court decisions.) The Principals further Acknowledge that, if large tax savings are realized, the Internal Revenue Service could possibly disallow or contest these large tax savings and that tax payments and court proceedings may be necessary to gain or defend any tax savings.

5.2 No Reliance On The Organization's Group. The Principals Acknowledge that the Organization's Group does not engage in the practice of law or accounting, or act as an appraiser or valuation Expert, or provide any Expert service. The Principals Acknowledge that they will not take any action with respect to the Strategies or the Results until after the Authorized Advisors representing the Principals have reviewed the Strategies, judged the effects of the Strategies, modified them and made final recommendations to the Principals on any actions to be taken by the Principals. The Principals Acknowledge that they will act solely on the advice of their Authorized Advisors, that the Principals have exercised and will at all times in the future exercise independent judgment in determining to enter into this Agreement and to Implement any of the Strategies or attempt to achieve a Result using any of the Strategies, and that they have not relied and will not rely upon any advice, information, representations or agreements, oral or otherwise, of the Organization's Group. The Principals Acknowledge that the Organization's Group shall have no responsibility or obligation to inform or notify the Principals of any changes of Law or to disclose to the Principals any different, revised or future Strategies other than any Strategies which may be initially disclosed to the Principals pursuant to this Agreement.

5.3 **INDEMNIFICATION OF THE ORGANIZATION. The Principals hereby release, hold harmless and agree to indemnify the Organization's Group from Any and All Claims by any of the Principals or any Person arising out of or relating in any way to any Strategies, to any Results, to any of the Principals, any of their Affiliates and/or any of their Family Members including, by way of example but not limited to, any claims alleging negligence, gross negligence, error, omission or wrongful conduct by the Organization's Group, and extending to any and all damages, costs, attorneys' fees, experts' costs, valuation costs, accounting fees, civil or criminal tax liabilities, penalties, interest and other results or outcomes of any and all tax returns, tax liabilities, tax positions, contracts, transfers, purchases, sales, investments and**

Copyright 2001 The Heritage Organization, L L C.

transactions with respect to any Property, and of any and all negotiations, contests and legal proceedings, whether or not related to taxes, to the Principals or to any Strategies.

## ARTICLE VI
## OTHER COSTS IN THE EVENT OF IMPLEMENTATION

The Principals will be solely responsible for paying all costs including, but not limited to, legal fees, accounting fees, interest, investment banking costs or fees, brokerage costs, valuation costs, and all other costs of any Expert services, related in any way to the consideration or a Utilization of any Strategies. The Principals Acknowledge that the Organization's Group shall not be responsible or liable for paying or reimbursing any taxes, penalties on taxes or interest on taxes including, but not limited to, any state or federal taxes on income, estates, gifts, unified transfers, generation-skipping transfers, capital gains, excise or other taxes, additions to taxes, penalties or interest with respect to any tax liabilities and tax returns of the Principals or other Persons.

## ARTICLE VII
## FEES IN THE EVENT THE PRINCIPALS ELECT TO REVEAL THE STRATEGIES

7.1 The Organization's Fees in the Event the Principals Elect to Reveal the Strategies. If any of the Principals Reveal the Strategies to one or more Persons, they will pay the fees set out in this Article VII.

7.2 To Whom The Principals May Reveal Without Any Fees. The Principals may Reveal the Strategies, without incurring liability for the fees described in this Article VII below, only to Persons who, prior to having any Strategies Revealed, are Authorized Advisors or Authorized Persons.

7.3 To Whom The Principals May Reveal With Fees. In the event that any of the Principals Reveal one or more of the Strategies to any Person other than Authorized Advisors or Authorized Persons, the Principals agree to pay to the Organization the following fees: (i) Two Million Dollars ($2,000,000.) for each Person to whom the Strategies are Revealed, directly or indirectly, by the Principals themselves or through any Persons, which fees shall be due and payable, with respect to each such Person, ten (10) days after the Strategies are Revealed to such Person; and (ii) if any of the Strategies are Implemented by any Person to whom the Strategies are Revealed, directly or indirectly, by the Principals themselves or through any Persons, six (6%) percent of the Value of all Property used to Implement any of the Strategies or attempt to obtain a Result using the Strategies, which fees shall be due and payable, with respect to Property used to Implement a Strategy, ten (10) days after the first act is taken to Implement any of the Strategies, and, with respect to Property subsequently used to Implement a Strategy, ten (10) days after the first time that such Property is used to Implement any of the Strategies. However, the Principals shall not be liable under this Article VII for any fee owed by any Authorized Advisor under this Agreement or any other agreement. The fees under this Article VII shall apply to all Property used to Implement a Strategy or to attempt to obtain a Result using a Strategy at any time during the one hundred twenty (120) months following the date of the first Revealing of a particular Strategy by the Organization's Group to any of the Principals. The Principals Acknowledge that the fees described in this Article VII shall be paid by the Principals in addition to the fees owed by each and every other Person, having an agreement with the Organization, who is present or involved in a situation that results in Revealing one or more of the Strategies. However, the Principals shall not be liable under this Article VII for any fee owed by any Authorized Advisor or Authorized Person under this Agreement or any other agreement.

7.4 Burden of Proof and Only Fees Paid. In the event that any fees are claimed by the Organization under Article VII of this Agreement, the burden of proof shall be on the Organization as to whether such fees are owed and the amount thereof. Notwithstanding anything else to the contrary in this Agreement, the Organization shall be limited to the fees set forth in this Article VII for any act resulting in fees owed the Organization under this Article VII and shall not be entitled to recover consequential, special or punitive damages for any such act.

7.5 No Permission To Violate Copyrights or Trademarks. This Agreement and other materials furnished to the Principals or Authorized Advisors or Authorized Persons by the Organization's Group may be copyrighted, trademarked or service-marked under Federal Law. No permission is granted hereby to copy or disseminate, in any manner, materials which are copyrighted, trademarked or service-marked by the Organization's Group. Further, the Principals Acknowledge that their copies of this document and all terms of this Agreement will be kept confidential and not Revealed to any Person.

## ARTICLE VIII
## DISCLOSURE AND NOTICES

8.1 Confidentiality By The Organization. Unless the Organization receives oral permission from any of the Principals, the Organization agrees to keep confidential, within the Organization, all documents received from the Principals, (i) except as may be desirable by the Organization in obtaining research on an anonymous basis, at the Organization's expense, from attorneys, accountants, appraisers and/or other Experts, and/or (ii) except as the Organization may be compelled under the process of law and/or (iii) except that the Principals agree that their identity and the general nature of their transaction(s) may be disclosed to potential clients of the Organization and/or (iv) except during an arbitration between the Parties in accordance with this Agreement.

8.2 Exception to Principals' Disclosure. The Principals will not be obligated to pay the Organization any fee for the Revealing of a Strategy if a Revealing is (i) compelled under the process of law, when such legal process has not been caused or initiated by any of the Principals or if any of the Principals cannot, using their best but not unreasonable efforts, resist such process of law, or (ii) during an arbitration between the Parties in accordance with this Agreement.

Copyright 2001 The Heritage Organization, L L C.



CG0003

DOJ-005692

APP-A-000050

8.3 Disclosure Relating to Fees, Required Notices and Waiver of Privileges. Each of the Principals agrees to obtain and disclose to the Organization promptly upon request all data, facts and documents relating to possible fees or the calculation of possible fees due to the Organization under this Agreement. In the event that there is a Utilization by any of the Principals, the Principals agree to deliver to the Organization, within fourteen (14) days after each time that any Property is involved in a Utilization, written notice identifying each Strategy which has been Implemented and the nature and estimated Value of all Implementing Property. In the event that any of the Principals Reveal one or more of the Strategies to any Person other than an Authorized Advisor or Authorized Person, the Principals agree to deliver to the Organization, within seven (7) days after each time that any of the Strategies is Revealed, written notice containing the name of each Person to whom any of the Strategies has been Revealed and identifying each Strategy which has been Revealed to each such Person. The Principals Acknowledge that all limitation periods for bringing an action to recover fees under this Agreement shall be tolled until such time as all written notices required under this Article VIII have been received by the Organization, and, subject to the limitations on damages provided for in Section 7.4 hereof, that the failure to timely deliver each such written notice to the Organization shall be a continuing, material breach of this Agreement by the Principals. To facilitate enforcement of the provisions of this Agreement, the Principals hereby Acknowledge that none of the Principals will assert, so as to avoid any disclosure otherwise required under this Agreement, any and all privileges, including, by way of example but not limitation, any attorney-client privileges, work product privileges, accountant-client privileges and all other privileges which may now or hereafter exist, with respect to communications between any of the Principals and any Persons to whom any of the Strategies are Revealed.

8.4 Delivery of Notices. All notices, approvals, disclosures and other communications required or permitted to be given under this Agreement shall be in writing and shall be (i) delivered personally, (ii) sent via Federal Express (or another comparable overnight messenger service), (iii) sent via telecopy, or (iv) mailed, certified or registered mail, return receipt requested, to the Parties at the following addresses or such notified changed address:

If to the Organization:

The Heritage Organization, L.L.C.
Attention: W. Ralph Canada, Jr.
Suite 800, East Tower, Providence Towers
5001 Spring Valley Road
Dallas, Texas 75244-3942
Telecopier: (972) 991-5140

If to the Principals:

Constellation Brands, Inc.
Attention: Robert S. Sands
300 Willowbrook Office Park
Fairport, New York 14450
Telecopier: (716) 218-2160

With a copy to:

Vickie A. Walker
P.O. Box 168
Pleasant View, Tennessee 37146
Telecopier: (615) 746-2472

8.5 Methods for Delivery of Notice. Mailed notices shall be deemed given upon the expiration of five (5) business days after deposit into the United States mail, registered or certified with return receipt requested and with postage fully prepaid, or, if a returned receipt requested is returned to the sender within ten (10) business days after deposit into the United States mail, the later date of actual receipt as evidenced by the return receipt. All other notices shall be deemed given upon actual receipt by the recipient. Each of the Parties agrees to notify the other Parties in writing of any change in addresses and telecopier numbers set forth above, and Acknowledges that, unless and until such notice is given, delivery of all notices to the addresses and telecopier numbers set forth above shall be effective and binding on the intended recipient.

## ARTICLE IX
## FEE PAYMENTS AND COLLECTIONS

The Principals shall be jointly and severally liable for all payments due to the Organization under this Agreement (including, without limitation, any costs, fees, or damages of any kind), and Acknowledge that all such payments shall be made at the offices of the Organization in Dallas County, Texas. The Principals Acknowledge that all fees, expenses and other payments to the Organization under this Agreement shall be due, paid and nonrefundable regardless of whether any Results are obtained, in whole or in part, by the Principals or any other Person, and regardless of the direct and indirect results and effects of any actions taken with respect to any Strategies or any Results. No condition, performance, result, action or activity, other than those stated in this Agreement, is required for the Principals' payment of any fees under this Agreement. If this Agreement is terminated for any reason, other than by the expiration of any 120-month time periods stated herein, the Principals shall pay to the Organization, its successors or assignees on any Utilizations after termination of this Agreement, the fees to which the Organization would have been entitled had this Agreement remained in full force and effect. No interpretation or effect of this Agreement or any other action by any Party, Person or court shall prevent payment of fees to the Organization, its successors or assignees by the Principals, as stated in this Agreement, within thirty (30) days after a Utilization. Payment of fees to the Organization at the time due by the Principals is the essence of this Agreement. Subject to the limitations on damages provided for in Section 7.4 hereof, the Principals Acknowledge that any failure by them to pay fees, on time, to the Organization, its successors or assignees when due will cause special or consequential harm and special or consequential damages to the Organization, its successors or assignees in excess of the amount of

Copyright 2001 The Heritage Organization, L L C

such fees and that the extent of such damages will be difficult, if not impossible, to ascertain. The Principals and the Organization stipulate and Acknowledge that in the event the Principals do not pay fees, at the time due, when due to the Organization under this Agreement, the Organization will and could be harmed and damaged in many ways which are consequential as well as special and which may include, by way of example but are not limited to the items, reasons and consequences stated in Exhibit A.

For those items, reasons and consequences stated in Exhibit A and other consequences which are not stated in Exhibit A but could reasonably be envisioned or foreseen by the Parties, the Principals and the Organization stipulate and Acknowledge that the special and/or consequential harm and special and/or consequential damages to the Organization caused by the Principals' failure to pay any and all such fees, at the time due, to the Organization, under the Terms of this Agreement, are incapable of accurate calculation or determination and, while one or more is certain to occur, are uncertain as to amount and shall reasonably be very many times greater than the amount of any fees, expenses and other payments unpaid by the Principals to the Organization. Therefore, subject to the limitations on damages provided for in Section 7.4 hereof, the Principals stipulate and Acknowledge, that in the event of their failure to pay fees to the Organization, its successors or assignees, when due, and within ten (10) business days after receiving written notice of the nonpayment of any fees, the Principals shall pay to the Organization, its successors or assignees damages of three (3) times the amount of such fees unpaid at the time due for the consequential harm and/or consequential damages to the Organization caused by the Principals' failure to pay any and all such fees, at the time due, to the Organization, under the Terms of this Agreement. The Principals and the Organization stipulate and Acknowledge that the amount stipulated and Acknowledged under this Agreement as damages to be paid by the Principals to the Organization is stipulated and Acknowledged by the Parties to be a reasonable forecast of just compensation for the special and/or consequential harm and special and/or consequential damages which are caused by the Principals' failure to pay any and all such fees unpaid at the time due to the Organization under the Terms of this Agreement. Further, the Principals and the Organization stipulate and Acknowledge that the Principals shall not be liable to the Organization for any amount of special and/or consequential harm and special and/or consequential damages in excess of those stated in this Article IX of this Agreement.

## ARTICLE X
## DEFINITIONS

Terms Used in This Agreement. The definitions and explanations of terms set forth below or elsewhere in this Agreement shall govern the meaning, interpretation and application of such terms as used in this Agreement. Words not defined in this Agreement shall have their ordinary meanings.

10.1 The term "Acknowledge" shall mean to agree, understand, recognize, represent, warrant and acknowledge.

10.2 The term "Affiliate" shall be broadly construed and shall mean when used with reference to any Party to this Agreement, any Person which is beneficially owned or held for the benefit of any Party to this Agreement or any of their Family Members and/or, directly or indirectly, controlled by any Party to this Agreement or any of their Family Members. For the purposes of this definition, "control" when used with respect to any Party to this Agreement shall be broadly construed and shall mean and include, by way of example but not limitation, the power to direct, totally or partially, (The term "partially" shall mean having at least a five (5%) percent interest in the control, management, stockholdings, profits, equity, or beneficial interests of a Person) the actions, management or policies of a Person, directly or indirectly, whether through the ownership of voting securities, by contract, through trust, by agreement, or otherwise. Further, the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

10.3 The term "Any and All Claims" shall be broadly construed and shall mean any and all disputes, claims, causes of action and other controversies which now exist or which may hereafter arise at any time between any of the Principals and the Organization's Group, including by way of example but not limitation, any and all claims sounding in contract or in tort, any and all claims at law or in equity, any and all causes of action under common law, any and all causes of action under any present or future federal or state statutes or regulations, including , by way of example but not limited to, any and all disputes regarding the valuation of any Property, any and all disputes regarding the amount of any fee, reimbursement or other payment under this Agreement, and/or any and all disputes arising under or relating in any way to this Agreement, any omission or commission of any act relating in any way to this Agreement, its provisions, its terms or conditions and/or related to any taxes, to the Principals or to any Strategies.

10.4 The term "Authorized Arbitrator" shall be narrowly construed and shall mean any Natural Person for whom each and all of the following requirements have been met or such other Natural Person who is mutually agreed upon in writing by the Parties:

(i) Such Natural Person shall be, at the time of his selection as an Authorized Arbitrator, an executive officer of an investment banking firm which, during the last full calendar year prior to his selection as an Arbitrator, such firm had annual gross revenues greater than Five Hundred Million ($500,000,000) Dollars; and

(ii) Each Party hereto shall provide the other Party hereto written notice identifying, by name, address, firm name, firm address, office and residence telephone numbers, each such executive officer being considered by such Party for selection as an Authorized Arbitrator; and

(iii) Each such candidate shall have executed and delivered to the Organization a written agreement having provisions, terms and conditions mutually satisfactory to the Organization relating to terms and conditions under which the Authorized Arbitrators may Reveal the Strategies and having provisions, terms and conditions satisfactory to the Organization which protects the Strategies and all confidential information relating thereto; and

(iv) Such executive officers have been designated by the Organization, in writing within the previous sixty (60) days, to the Principals as having executed and delivered to the Organization a satisfactory written agreement; and

Copyright 2001 The Heritage Organization, L.L.C.

(v) Each such executive officer shall have been selected within ninety (90) days after the written notice of one Party served on the other requesting an arbitration; and

(vi) Each such executive officer shall, at the time of his selection as an Authorized Arbitrator, be an executive officer engaged in mergers and acquisitions; and

(vii) Each such executive officer shall have had personal earnings from their firms of at least One Million Dollars ($1,000,000.) in the calendar year preceding his selection as an Authorized Arbitrator; and

(viii) Neither such executive officers, their firms nor any family member of any such executive officers shall have or have had, at any time, any relationship of any kind including, by way of example but not limitation, social, business, pecuniary, familial, or otherwise with either the Organization, the Principals or the Authorized Advisors or the agents, employees, Affiliates, Representatives or Family Members of either the Organization, the Principals or the Authorized Advisors. It is the intent of this Agreement to eliminate any Person as an Authorized Arbitrator who, for any reason, may have a tendency to be partial to one of the Parties to this Agreement.

10.5 The term "Converting" shall be broadly construed and shall mean the transferring, selling, swapping, trading, exchanging, contributing, modifying, changing, altering, and/or transforming of Property.

10.6 The term "Expert" shall be broadly construed and shall mean to engage in the practice of law, the practice of accounting, to act as an appraiser, valuation expert, investment banker, investment advisor or to provide any expert or professional service whatsoever.

10.7 The term "Family Member" shall be broadly construed and shall mean Ancestors, spouses of Ancestors, Descendants and spouses of Descendants. "Descendants" and "Ancestors" shall include stepchildren and adopted children.

10.8 The terms "Implement", "Implemented", and "Implementation" shall be broadly construed in favor of the Organization and shall mean any act in furtherance of any of the Strategies, including, by way of example but not limitation, to use, undertake, begin, act upon, start, or execute any of the Strategies or Results, in whole or in part, directly or indirectly, whether or not in the same form or substance as disclosed to the Principals by the Organization's Group.

10.9 The term "Internal Revenue Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

10.10 The term "Natural Person" shall mean one or more individual human beings. The term "Non-Natural Person" shall mean any type of organization, legal entity, division or grouping including, by way of example but not limited to, any corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision of any government.

10.11 The term "Organization" as used in this Agreement shall mean The Heritage Organization, L.L.C., a Delaware limited liability company, its Affiliates and/or their successors or assigns.

10.12 The term "Organization's Group" as used in this Agreement shall be broadly construed and shall mean the Organization, its Affiliates and/or its Representatives.

10.13 The term "Person" shall be broadly construed and shall mean both Natural persons and Non-Natural Persons.

10.14 The term "Representative" shall be broadly construed and shall mean and include any Person related in any way to an employee, officer, director, member or stockholder of the Organization by blood or business interest or which is an Affiliate of an officer, director, member or stockholder of the Organization, any Affiliate of the Organization or any Person employed, contracted, hired or controlled, directly or indirectly, by the Organization or any of its Affiliates including, by way of example but not limited to, appraisers, attorneys, accountants, tax counsel, investment bankers, brokers, securities dealers, and banks.

10.15 The term "Reveal", "Revealed" or "Revealing" shall be broadly construed and shall mean and include, as the tense may require, informing, describing to, discussing with, disclosing to, allowing to become known to or allowing discovery by any Person.

10.16 The term "Sale" shall be broadly construed and shall mean that the Implementing Property involved in a Utilization has been converted to, contributed to or for and/or exchanged for, some other asset, including, by way of example but not limited to, cash (present or future), income, debt or equity in another Person including, by way of example but not limited to, by way of a transfer, sale, contribution, exchange, merger, incorporation or reorganization, and such cash, debt or equity has been received by the Principals and/or their transferees, assignees, or successors in interest. Whether the foregoing has occurred shall be determined independently for each portion of the Implementing Property.

10.17 The term "Strategies" shall be broadly construed and shall mean the securities, contracts, Persons identified, facts, data, knowledge, documentation, opinions, combinations of concepts, ideas, techniques, methods, transactions, combinations, sequences of events, timing, financial models, diagrams, illustrations, and procedures divulged, described, communicated, detailed, arranged or identified by the Organization's Group, in written, numerical or graphic form, and all variations, modifications, sequences, rearrangements and recombinations thereof.

## ARTICLE XI
## CONSIDERATION, WAIVERS, AMENDMENTS AND COPIES

11.1 Consideration. The Parties Acknowledge that the promises and covenants contained in this Agreement provide good and sufficient consideration for every promise, duty, term, condition, obligation, agreement, transfer, conveyance and right contained in this Agreement. The Principals Acknowledge that it is not required for the Organization's Group to communicate any Strategies to all of the Principals who have executed this Agreement for each of the Principals to be bound by this Agreement. Communicating with Natural Persons who are Parties to this Agreement and who are employees, partners, stockholders, trustees, officers, members or

Copyright 2001 The Heritage Organization, L.L.C.

directors of any Principal which is not a Natural Person is deemed to be Communicating to the Principal which is not a Natural Person.

11.2 No Other or Prior Agreements and/or Inducements. **By signing this Agreement, the Parties Acknowledge that there were no promises, representations or agreements, oral, written or implied, made to them by any Party or other Person which induced them to enter into this Agreement. The Parties further Acknowledge that there are no other agreements between them, oral, written or implied, other than those stated explicitly in this written Agreement.**

11.3 Waivers of Breaches. The failure or delay by any Party to insist upon the strict performance or enforcement of every promise, duty, term, condition, obligation, agreement, transfer, conveyance and right contained in this Agreement shall not be deemed a release or waiver of any of its rights, powers or any of the provisions of this Agreement or a waiver of any breach or default by the Party of any term, condition, or provision of this Agreement, nor shall any custom or practice which may grow up between the Parties in the administration of this Agreement be construed to waive or lessen the rights of any Party to insist upon the performance by any other Party in strict accordance with the terms, conditions, and provisions set forth herein. To be effective, any waiver must be in writing and signed by the Party so waiving, and any such waiver shall apply only to the matter or instance so specifically waived and shall not operate or is to be construed as a waiver of any subsequent breach by any Party.

11.4 Amendments and Supplemental Agreements. This Agreement embodies all understandings and all agreements between the Parties, supersedes all prior agreements and understandings, and may be changed, terminated, amended or supplemented only by an agreement, in writing, fully executed (referred to herein as a "Supplemental Agreement") by all the Parties affected by the Supplemental Agreement and delivered in accordance with any express terms hereof.

11.5 Notarization and Dating. The signatures of one or more of the Parties to this Agreement may be notarized. The failure of the signature, of any Party to this Agreement, to be notarized and/or dated shall not affect the validity and binding effect of their signature on the execution of this Agreement.

11.6 Multiple Copies, Counterparts, Photocopies and Facsimiles. This Agreement may be executed in any number of multiple copies or counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such identical copy or counterpart. A photocopy of any executed copy or counterpart shall be valid as an original. Likewise, a facsimile of any executed copy or counterpart and/or a photocopy of a facsimile of any executed copy or counterpart shall be valid as an original. Facsimile transmission of any signed original document shall be the same as delivery of an original document. At the request of any Party, the Parties will confirm facsimile transmitted signatures by signing an original document.

11.7 Titles, Captions and Headings. Titles, captions and headings of articles, sections and subsections and of any other parts of this Agreement are descriptive for reference purposes and convenience only. They are not intended to reflect, restrict or to in any way limit or amplify the terms, provisions, covenants and conditions of this Agreement, or to encompass all of the terms, provisions, covenants and conditions of this Agreement or to interpret or govern such terms and provisions. The text of the terms and provisions themselves shall control. Titles, captions and headings of articles, sections and subsections and of any other parts of this Agreement are for identification only, are otherwise not part of this Agreement, and shall not in any way whatsoever define, limit or describe the scope or intent of this Agreement, nor in any way affect the meaning or interpretation of this Agreement.

## ARTICLE XII
## MISCELLANEOUS

12.1 Rules of Interpretation. Whenever necessary in this Agreement or where the context requires, the singular number shall include the plural where appropriate, words of any gender shall include each other gender where appropriate, words that can be used as a noun or a verb shall be read as appropriate in their context, and, other than where specifically negated, words expressing the conjunctive shall also include the disjunctive (and vice versa). The Parties Acknowledge that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement or any amendments or exhibits thereto.

12.2 Survival and Effect on Representatives and Assigns. Certain provisions of this Agreement by their nature provide post-termination protection and rights to the Parties and shall survive termination of this Agreement. Such provisions so surviving shall be determined by a liberal construction of and by the nature of the particular provision. This Agreement and the rights hereunder may be assigned only by the Organization. This Agreement and the rights of the Parties hereunder shall be binding upon and inure to the benefit of the Parties hereto and their respective Affiliates, heirs, executors, administrators, personal representatives, legal representatives, successors and permitted assigns.

12.3 Choice of Law, Jurisdiction, Venue and Agent for Service. The construction and performance of this Agreement, and Any and All Claims, shall be governed by Texas law. Without waiving or limiting the provisions of Article XIII - AGREEMENT TO ARBITRATE, each of the Parties to this Agreement (i) consents to the personal jurisdiction of the state and federal courts in Dallas County, Texas for Any and All Claims; and (ii) Acknowledges that, as to Any and All Claims, any and all lawsuits and other proceedings, except proceedings to enforce arbitration awards, shall be brought in Dallas County, Texas and in no other jurisdiction or venue. Each of the Principals hereby appoints the Texas Secretary of State as their agent for service of process with respect to Any and All Claims, and waives any and all rights to a trial by jury for Any and All Claims. Any notice or legal process served on the Texas Secretary of State as agent for service of process for the Principals shall also be contemporaneously sent by the Organization's Group to the Principals in the manner provided in Article VIII hereof.



Copyright 2001 The Heritage Organization, L.L.C.

award

12.4 Invalidity and Remedy. If any part, section, clause, paragraph, sentence, term or provision (collectively and separately referred to herein as a "Term") of this Agreement is held to be illegal, void, invalid, or unenforceable by any court or arbitration panel of competent jurisdiction, it is the intention of the Parties that this Agreement shall be construed and enforced as if such illegal, void, invalid, or unenforceable Term had never comprised a part of this Agreement; and the remaining Terms of this Agreement shall remain in full force and effect and shall not be affected by the illegal, void, invalid, or unenforceable Term or by its severance from this Agreement. To the extent that any Terms of this Agreement shall be held to be unenforceable or void in whole or in part, then in lieu of each such unenforceable or void Term, there shall be added automatically as a part of this Agreement a Term as similar, in terms and effects, as such unenforceable or void Term as may be possible and be legal, valid, and enforceable.

## ARTICLE XIII
## AGREEMENT TO ARBITRATE

13.1 Arbitration The Parties agree to submit to and settle Any and All Claims by binding arbitration. On the written notice of one Party served on the other, the Parties Acknowledge that they shall submit to binding arbitration and Acknowledge that they shall settle Any and All Claims by binding arbitration. A Party shall commence an arbitration by giving written notice to another Party demanding an arbitration which notice shall set forth the claim and the facts on which the claim is based. Such arbitration shall comply with and be governed, to the extent not inconsistent with this Agreement, by the provisions of the Commercial Arbitration Rules of the American Arbitration Association and the Optional Procedures for Large, Complex Commerical Disputes of the American Arbitration Association (as those Rules and Procedures exist as of September 1, 2000, without regard to any subsequent amendments or revisions thereto), and in addition thereto, the Organization shall be entitled to immediately compel production of all data, facts and documents. In the event that the provisions of this Article XIII are inconsistent with any term, condition or provision of the Commercial Arbitration Rules of the American Arbitration Association or the Optional Procedures for Large, Complex Commercial Disputes of the American Arbitration Association (as those Rules and Procedures exist as September 1, 2000, without regard to any subsequent amendments or revisions thereto), then the provisions of this Agreement shall control. Each of the Parties Acknowledges that no lawsuit or court proceedings shall be instituted or prosecuted with respect to Any and All Claims, except for legal proceedings to enforce arbitration awards. Accordingly, each Party waives and releases any and all rights such Party has to any trial or other proceeding in any court, except for legal proceedings to enforce arbitration awards.

13.2 Selection of Arbitrators and Hearing. All arbitrators selected must be Authorized Arbitrators. Within ninety (90) days after the delivery of a notice to arbitrate, the Principals shall jointly appoint one Authorized Arbitrator as an arbitrator and the Organization shall appoint one Authorized Arbitrator as an arbitrator. Within thirty (30) days of their appointment, the two arbitrators so chosen shall select a third impartial, Authorized Arbitrator. If either the Principals or the Organization shall fail to appoint an Authorized Arbitrator within the prescribed time period, then the arbitration shall proceed forward in all respects as provided in this Article XIII, except that the Authorized Arbitrator timely appointed shall function as the sole arbitrator of the dispute (and the Party that failed to timely appoint its Authorized Arbitrator shall have waived any further right to do so, and no third Authorized Arbitrator shall be selected by the sole Authorized Arbitrator, the American Arbitration Association or otherwise). If the Authorized Arbitrators selected by the Parties are unable or fail to agree upon the third Authorized Arbitrator, the third Authorized Arbitrator shall be selected by the American Arbitration Association within thirty (30) days from the expiration of such thirty (30) day period. All appointments shall be immediately communicated to all Parties in writing. All arbitration proceedings shall take place in Dallas County, Texas, and the arbitration hearing shall be held within sixty (60) days of the appointment of the third Authorized Arbitrator and at a time mutually convenient to the Parties. In the event that the time of the arbitration hearing cannot be agreed upon by the Parties, then the time for same shall be chosen by the American Arbitration Association upon not less than ten days' notice to the Parties. Any of the foregoing deadlines may be extended by written mutual agreement of the Parties. The hearing shall be conducted in conformity with the Federal Rules of Civil Evidence, including by way of example, but not limitation, affidavit testimony shall not be allowed.

13.3 Costs of Arbitration. If any arbitration, action at law or in equity is necessary to enforce or interpret the terms of this Agreement or an award rendered by the Authorized Arbitrators, the prevailing Party shall be entitled to its attorneys' fees, its costs and its expenses and its costs and expenses of the Authorized Arbitrators in addition to any other relief to which it may be entitled. However, the initial costs and expenses of the Authorized Arbitrators for any arbitration shall be first split evenly between the Principals and the Organization and shall be paid monthly into an account administered by the Authorized Arbitrators.

13.4 Stipulations. The Parties stipulate and agree that the value of the consideration to be paid by the Principals under this Agreement exceeds Fifty Thousand Dollars ($50,000.), that this Agreement involves interstate commerce, and that this Agreement is enforceable under both the Texas Arbitration Act, Tex. Civ. Prac. & Rem. Code @ 171.001 (Vernon Supp. 1997), et seq., and the Federal Arbitration Act, 9 U.S.C. § 1, et seq.

13.5 Powers of the Arbitrators Except as otherwise provided herein, the Authorized Arbitrators shall determine the rights and obligations of the Parties according to the substantive and procedural laws of the State of Texas and shall have the authority to award any remedy or relief, whether final or provisional, whether legal or equitable (including, but not limited to, the power to grant any request by the Organization for temporary restraining orders and/or injunctive relief) that a court of the State of Texas could order or grant; however, the Authorized Arbitrators (i) shall have no authority to award punitive damages, exemplary damages, or any damages except those damages specifically provided for in this Agreement, (ii) shall not, in any event, make any ruling, finding, or award that does not conform to the terms and conditions of this Agreement, and (iii) shall not make, fashion, or award any relief or

Copyright 2001 The Heritage Organization, L.L.C.

arately

award that could not be made, fashioned, or awarded by a court of the State of Texas. The Authorized Arbitrators shall hear and determine the outcome of the dispute between the Parties by majority vote.

13 6 Award of the Arbitrators. The award of the Authorized Arbitrators shall be final and conclusive upon the Parties, shall be in writing and shall specify the factual and legal bases for the award, shall be signed by a majority of the Authorized Arbitrators, and shall be rendered within thirty (30) days of the conclusion of the arbitration hearing(s). All monetary awards shall bear interest at the highest legal rate from the date such sums were originally due and payable through the date such sums are paid. Judgment upon the award rendered by the Authorized Arbitrators may be entered in any court of competent jurisdiction.

13.7 Confidentiality of the Proceedings. None of the Parties, nor any Authorized Arbitrator appointed in connection herewith, shall disclose the existence, content or results of any arbitration hereunder (including any information revealed in discovery or placed into evidence in connection with those proceedings), and any proceedings brought to enforce any arbitration award rendered hereunder shall be filed under seal and otherwise kept confidential to the maximum extent permitted by law. However, the Organization shall not be restricted or hindered by the provisions of this Section 13.7 from disclosing or using data or information known to it prior to the arbitration, except as otherwise provided by this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Copyright 2001 The Heritage Organization, L.L.C.

Each and every Party Acknowledges to each and every other Party that each has the right, authority, and power to enter into this Agreement, which has been authorized by all necessary action of each such Person. **This written Agreement represents the final agreement between the Parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements or representations of the Parties. There are no oral agreements or representations between the Parties.** Each signature below is binding on the Persons signing, at the time signed, regardless of whether or not all other Persons named herein sign this Agreement and regardless of whether or not any and all signatures of each Person is acknowledged before a notary, and constitutes that Person's Acknowledgment, agreement to and acceptance of every promise, duty, term, condition, obligation, agreement, transfer, conveyance, and right contained in this Agreement, which has been executed by The Heritage Organization, L L.C. and is made and is effective the 9th day of August, 2001.

The Heritage Organization, L L.C.
A Delaware limited liability company
(the "Organization")

By: Gary M. Kornman
Gary M. Kornman As its Chief Executive and as President of its Manager
An Authorized Officer
Dated: August 9, 2001

Richard E. Sands, Ph.D., An Individual
(a "Principal")
Dated: August 8, 2001

Jennifer Sands, An Individual
(a "Principal")
Dated: August 8, 2001

Richard E. Sands, Ph D., acting in his representative or other capacity, if any, whether it be as an officer, member, manager, partner, trustee and/or beneficiary to execute for and bind on behalf of any and/or all of the entities listed in Exhibit B attached hereto.
Dated: August 8, 2001

Jennifer Sands, acting in her representative or other capacity, if any, whether it be as an officer, member, manager, partner, trustee and/or beneficiary to execute for and bind on behalf of any and/or all of the entities listed in Exhibit B attached hereto.
Dated: August 8, 2001

Copyright 2001 The Heritage Organization, L.L.C.

lter into
hat the

STATE OF NEW YORK )
)
COUNTY OF Monroe )

This instrument was acknowledged before the Notary signing below, on this 9th day of August, 2001, by Richard E. Sands, Ph D., who personally appeared, acknowledged and identified himself to the Notary signing below or is known to the Notary signing below and acknowledged that he has executed the foregoing instrument for the purposes and consideration therein contained, by himself signing.

In witness whereof I hereunto set my hand and official seal.
SEAL

JUDITH A. CELENTANI
Notary Public in the State of New York
County of Ontario #4762158
Commission Expires December 31, 2002
My Commission Expires:

Printed Name of Notary

Signature of Notary
Notary Public in State of New York

STATE OF NEW YORK )
)
COUNTY OF Monroe )

This instrument was acknowledged before the Notary signing below, on this 9th day of August, 2001, by Jennifer Sands, who personally appeared, acknowledged and identified herself to the Notary signing below or is known to the Notary signing below and acknowledged that she has executed the foregoing instrument for the purposes and consideration therein contained, by herself signing.

In witness whereof I hereunto set my hand and official seal.
SEAL

JUDITH A. CELENTANI
Notary Public in the State of New York
County of Ontario #4762158
Commission Expires December 31, 2002
My Commission Expires:

Printed Name of Notary

Signature of Notary
Notary Public in State of New York

STATE OF New York )
)
COUNTY OF Monroe )

This instrument was acknowledged before the Notary signing below, on this 10th day of August, 2001, by Gary M. Kornman, who personally appeared, acknowledged and identified himself to the Notary signing below to be the Chief Executive and the President of the Manager of The Heritage Organization, L.L.C., a Delaware limited liability company, acknowledged that he is duly authorized to sign the foregoing instrument on behalf of said entity, and executed the foregoing instrument for the purposes and consideration therein contained, by himself signing as the Chief Executive and the President of the Manager of The Heritage Organization, L.L.C., on behalf of The Heritage Organization, L.L.C., a Delaware limited liability company.

In witness whereof I hereunto set my hand and official seal.
SEAL

KAREN J MEGAFFEE
Notary Public, State of New York
No 01ME5037146
Ontario County
Commission Expires December 19, 2002

My Commission Expires: 12/19/02

Karen J. Megaffee
Printed Name of Notary

Signature of Notary
Notary Public in State of New York

Copyright 2001 The Heritage Organization, L.L.C.



CG0011

DOJ-005700

APP-A-000058

## EXHIBIT A

The Principals and the Organization stipulate and Acknowledge that if the Principals do not pay fees at the time due to the Organization under this Agreement, the Organization will and/or could be harmed and damaged in many ways which are consequential as well as special and which may include, by way of example but are not limited to, the following consequences, items, reasons and results:

a) There will and/or could be a reduction in the Organization's ability to finance the growth of its business. This will and/or could cost the Organization the loss of future economic benefits; and

b) There will and/or could be a reduction in the ability of the Organization to continue its business because of the loss of some of its employees because of the Organization's inability to pay adequate and/or highly competitive compensation to any and all of its employees; and

c) There will and/or could be a reduction in the ability of the Organization to continue its business by the payment of incentive compensation to those of its employees who were involved in rendering services to the Principals; and

d) There will and/or could be a reduction in the ability of the Organization to operate its business by the prompt payment of the expenses of its business operations; and

e) There will and/or could be a reduction in the profits and/or earnings of the Organization which will negatively affect the Organization's sales value to third party buyers; and

f) There will and/or could be a reduction in the profits and/or earnings of the Organization which will and/or could negatively affect the Organization's fair market value and/or the value of its securities from time to time in the public or private marketplace; and

g) There will and/or could be a reduction in the Organization's service to its existing customers. This will and/or could result in a loss of "good will" with its existing customers which will and/or could negatively affect the Organization's business and/or value; and

h) There will and/or could be a reduction in the Organization's service to its existing customers. This will and/or could result in a loss of referrals from its existing customers which will and/or could negatively affect the Organization's business and/or value; and

i) Potential customers will and/or could learn that the Organization was in a dispute with a customer. This will and/or could negatively affect the Organization's ability to engage new customers. This inability will and/or could negatively affect the Organization's business and/or value; and

j) There will and/or could be the loss of the Organization's ability to earn revenues from seeking other customers during the time it spends dealing with the Principals regarding the payment of the Organization's Fees; fees; and

k) There will and/or could be the loss of the Organization's ability to earn revenues from using its resources to service other customers during the time it spends dealing with the Principals regarding the payment of the Organization's Fees; fees; and

l) Any future action required by the Organization to collect any Fees, fees, expenses and other payments from the Principals will and/or could cost the Organization the loss of the opportunity to use the time of its personnel to earn revenues by seeking new customers; and

m) Any future action required by the Organization to collect any Fees, fees, expenses and other payments from the Principals will cost the Organization the loss of the opportunity to use the time of its personnel to earn revenues from servicing other customers; and

n) Any future action required by the Organization to collect any Fees, fees, expenses and other payments from the Principals will cost the Organization the loss of the opportunity to use the time of its personnel for promoting the customer satisfaction necessary for the Organization to gain referrals to new customers from its present customers; and

o) There will and/or could be the loss of the Organization's ability to pay its debts as they are due and/or its creditors will and/or could take action to get or foreclose on its assets; and

Copyright 2001 The Heritage Organization, L.L.C

p) There will and/or could be the loss of the Organization's ability to borrow money on favorable terms and/or to borrow money at all; and

q) There will and/or could be the insolvency of the Organization and the necessity for the Organization to seek protection from its creditors; and

r) There will and/or could be the loss of some of the Organization's personnel resulting from the Organization's inability to pay their compensation; and

s) There will and/or could be a reduction in the profits and/or earnings of the Organization which will and/or could negatively affect the Organization's business and/or value in the public or private sale of its securities; and

t) There will and/or could be a reduction in the profits and/or earnings of the Organization which will and/or could negatively affect the Organization's business and/or value in the public or private market trading price of its securities; and

u) There will and/or could be a reduction in the profits and/or earnings of the Organization which will and/or could negatively affect the Organization's business and/or value and will negatively affect the Organization's ability to acquire other businesses using its securities; and

v) There will and/or could be a reduction in the profits and/or earnings of the Organization which will and/or could negatively affect the Organization's business and/or value and will negatively affect the Organization's ability to acquire other businesses using its cash; and

w) There will and/or could be a reduction in the profits and/or earnings of the Organization which will and/or could negatively affect the Organization's business and/or value and will negatively affect the Organization's ability to acquire other businesses using its credit.

Copyright 2001 The Heritage Organization, L.L.C.

# EXHIBIT B

CWC Partnership-I, a New York general partnership.

CWC Partnership-II, a New York general partnership.

M,L,R&R, a New York general partnership.

Laurie Sands Trust Under Will for the benefit of Andrew Stern, M D.

Marvin Sands Master Trust

Mac and Sally Sands Foundation, Incorporated, a Virginia non-stock corporation.

Copyright 2001 The Heritage Organization, L L C.