IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: July 5, 2007)

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-409 T |

R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER

Plaintiff,

v. 06-410 T

THE UNITED STATES,

Defendant.

---

CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,

Plaintiff,

v. 06-411 T

THE UNITED STATES,

Defendant.

---

MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,

Plaintiff,

v. 06-810 T

THE UNITED STATES,

Defendant.

---

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, plaintiffs hereby respond to the facts alleged by defendant in its Proposed Findings of Uncontroverted Fact.

## I. General Objections

Plaintiffs object to defendant's repeated characterization of the transactions entered by plaintiffs as "tax shelters" and to the repeated characterization of plaintiffs' partners as "tax shelter participants." Defendant does not define the term "tax shelter" or cite to any evidence to support the purported facts that the investments at issue were "tax shelters" or the investors were "tax shelter participants." Rather, defendant uses this self-serving terminology throughout its Proposed Findings of Uncontoverted Fact in complete disregard for RCFC 56(e) and 56(h)(1). As stated in Plaintiffs' Proposed Findings of Fact being filed in support of their cross-motion for summary judgment, plaintiffs made the investments at issue in this case for valid business reasons, and the evidence plaintiffs cite to support that fact is unrebutted. Accordingly, plaintiffs

responses in no way constitute an admission as to the validity of such characterizations by defendant.

## II Specific Responses

1. During the period at issue, Constellation Brands, Inc. ("Constellation") was a leader in the production and marketing of branded beverage alcohol products in North America and the United Kingdom. Govt. Ex. 1, App. A at p. 2.

**Response:** Agree.

2. For the company's fiscal year ending February 28, 2001, Constellation's gross sales exceeded $3 billion. Govt. Ex. 1, App. A at p. 3.

**Response:** Agree.

3. In 1945, the predecessor of Constellation, Canandaigua Wine Company, was founded by the late Marvin Sands ("Marvin"). Govt. Ex. 2, App. A at pp. 4-6.

**Response:** Agree in part. The original company name in 1945 was Canandaigua Industries. Govt. Ex. 2, App. A at p. 4.

4. Marvin and his wife, Marilyn Sands ("Marilyn"), had three children: (i) Richard Sands ("Richard"), (ii) Robert Sands ("Robert"); and (iii) Laurie Sands ("Laurie"). Laurie is now deceased. Govt. Ex. 2, App. A at pp. 4-6.

**Response**: Agree.

5. In 1992, Marvin, Laurie, Richard, and Robert formed M, L, R & R, a New York general partnership (MLRR), by contributing cash in exchange for interests therein. Govt. Ex. 3, App. A at p. 7.

**Response:** Agree.



AO 1720954.1

6. On January 17, 1995, Richard, Robert, and Laurie formed CWC Partnership I, a New York general partnership ("CWC"). Laurie owned 99%, Robert owned .5% and Richard owned .5%. Govt. Ex. 4, App. A at pp. 5 and 17.

**Response:** Agree.

7. On January 17, 1995, Laurie transferred her interest in MLRR to CWC. Govt. Ex. 4, App. A at p. 33 and Govt. Ex. 5, App. A at p. 34.

**Response:** Agree.

8. Upon her death in 1995, Laurie's will transferred her interest in CWC to various trusts for the benefit of her husband, Andrew Stern ("Andrew") and her children, Abigail Stern ("Abigail") and Zachary Stern ("Zachary"), including a marital and non-marital trust for the benefit of Andrew designated as the Trust FBO Andrew Stern U/A Fifth C and the Trust FBO Andrew Stern Fifth D ("Andrew's Trusts"), the Trust FBO Abigail Stern U/A Fifth G ("Abigail's Trust"), and the Trust FBO Zachary Stern U/A Fifth G ("Zachary's Trust"). CWC Complaint ¶ 2

**Response:** Agree.

9. On or about April 6, 1999, Marvin transferred his interest in MLRR to a revocable trust pursuant to The Marvin Sands Master Trust Agreement ("Marvin's Trust"). Govt. Ex. 6, App. A at p. 35,

**Response**: Agree.

10. After Marvin's death, a controlling interest in Constellation continued to be held by his family and trusts for their benefit (Marvin's Trust, Andrew's Trust, Abigail's Trust and Zachary's Trust). Govt. Ex. 7, App. A at p. 38.

**Response:** Agree.



AO 1720954.1

11. In 2001, as a group, Richard, Robert, Marilyn, Andrew and the trusts (collectively the "Sands Heirs") owned a sufficient number of Class A Shares and Class B Shares to determine the outcome of any corporate transaction or other matter submitted to Constellation's shareholders for approval. Govt. Ex. 7, App. A at p. 38.

**Response:** Agree.

12. During 2001 and 2002, Richard was the Chief Executive Officer, President, and Chairman of the Board of Constellation, and Robert was a Director and Group President. Govt. Ex. 7, App. A at pp. 41 and 42.

**Response:** Agree.

13. As of July 31, 2001, the Sands Heirs owned approximately 11% of the outstanding Class A Shares of Constellation and approximately 93% of its Class B Shares, representing 62% of Constellation's voting power and 22% of the outstanding equity. Govt. Ex. 7, App. A at pp. 40 and 45.

**Response:** Agree.

14. By letter dated March 29, 2001, The Heritage Organization, L.L.C. ("Heritage"), contacted Richard to promote a strategy to "eliminate the total tax liability on capital gains." Govt. Ex. 8, App. A at pp. 46-47.

**Response**: Disagree because the letter dated March 29, 2001 (Govt Ex. 8) is an unsigned letter from the files of Heritage. Richard Sands testified that he did not recall ever receiving or reviewing that letter, and such evidence is unrebutted. Pl. Ex. 57, App. B at p. 1389 - 1390. Plaintiffs propose the following alternative statement of fact:

In the spring of 2001, the Heritage Organization, L.L.C. ("Heritage") contacted Richard Sands regarding the strategies for financial planning, estate planning, and tax planning offered by Heritage. Pl. Ex. 53, App. B at p. 1357.

15. After meeting with Heritage representatives, Richard, Robert, Marilyn and Andrew executed non-disclosure and fee agreements required by Heritage to obtain disclosure of the tax strategy. These agreements required the Sands Heirs to pay $2,000,000 to Heritage for any unauthorized disclosure of the tax strategy and also required the Sands Heirs to pay Heritage an additional 25% of the value of all present and future taxes avoided by the use of the strategy. Govt. Ex. 9, App. A at pp. 48-61.

**Response**: Agree only that after meeting with Heritage representatives, Robert Sands and Richard Sands executed non-disclosure and fee agreements with Heritage, and that Marilyn Sands also executed such an agreement.

Defendant did not cite any evidence to support its statement that such agreements were "required by Heritage" for any purpose, and plaintiffs do not know what Heritage would "require," as the parties have not yet deposed any representative of Heritage.

Plaintiffs agree that the agreements required payment of $2,000,000 for any unauthorized disclosure of the investment strategy presented by Heritage, but note that they were authorized to disclose the investments to their advisors, including Freddy Robinson and Jonathan Blattmachr. Pl. Ex. 52 and 53, App. B at pp. 1351, 1358.

Plaintiffs do not agree that the fee agreements required them to pay any "additional" fee; defendant does not explain what the fees were in addition to. Plaintiffs otherwise agree that the agreements calculated a fee as 25% of all "projected" present and future taxes that would have been incurred but were not incurred due to implementation of the financial plan.

Plaintiffs do not agree that Marilyn Sands and Andrew Stern ever met with Heritage representatives as that never occurred. Pl. Ex. 56 and 57, App. B at p.1375-



AO 1720954.1

1376, 1396-1397. Furthermore, defendant did not support its statement with any evidence that Andrew Stern executed a non-disclosure and fee agreement, and plaintiffs are unaware of the existence of any such document.

16. These consolidated cases (06-407T, 06408T, 06-409T, 06-410T, 06-411T, 06-810Tand 06-811 T) involve the Sands Heirs' participation in two Heritage promoted tax shelters. In the first of the two shelters (the "First Shelter"), the Sands Heirs sought to turn a $64 million gain from the sale of nearly $75 million in Constellation stock (with a basis of about $9 million) into nearly a $20 million loss. To accomplish this goal, the Sands participated in a tiered partnership arrangement involving R,R,M & C Group, L.P. ("RRMC Group"), R,R,M & C Partners, LLC ("RRMC Partners") and the short sale of approximately $76.5 million in U.S. Treasury notes used to artificially inflate the basis of partnership assets. The Sands Heirs sought to further obfuscate their tax avoidance scheme by parking the $75 million obtained from selling 2,002,002 shares of Constellation stock, for about five months, in their controlled Charitable Remainder Unitrusts (the "CRUTS"). RRMC Group Complaint ¶¶19 - 32; RRMC Partners Complaint ¶¶ 19 - 32.

**Response**: Plaintiffs disagree with this statement of purported fact on multiple grounds.

First, it has no relevance to this motion, as it involves entities and investments not at issue in defendant's motion.

Second, as noted in plaintiffs' General Objection, plaintiffs disagree with defendant's characterizations of plaintiffs' investments as "tax shelters." The only authorities cited by defendant to support these "statements of fact" are plaintiffs' complaints which do not support the stated facts. In fact, plaintiffs' goals for participating in the transactions described above included making a profit, diversifying their holdings which were

concentrated in Constellation stock, accomplishing estate planning goals, and providing for philanthropic interests, in addition to obtaining any potential tax benefit. Pl. Ex. 57, App. B at pp. 1394, 1397A.

Third, defendant cites no evidence to support its statement that the Sands family members sought to turn a $64 million gain from the sale of Constellation stock into a $20 million loss. In fact, plaintiffs' goals for participating in the transactions described above included making a profit, diversifying their holdings which were concentrated in Constellation stock, accomplishing estate planning goals, and providing for philanthropic interests, in addition to obtaining any potential tax benefit. Plaintiffs Exhibit 57, App. B at pp. 1394, 1397A.

Fourth, plaintiffs disagree that the Sands entered into short sales of approximately $76.5 million. The Sands entered into short sales of approximately $84 million. Pl. Ex. 59, App. B at pp. 1407-1408.

Fifth, plaintiffs disagree that participating in the partnerships and short selling the Treasury notes was used to "artificially inflate the basis of partnership assets." Plaintiffs properly reported their transactions under the Internal Revenue Code and there was nothing "artificial" about those consequences; the tax result is simply what the Code required.

Sixth, plaintiffs further disagree that the Sands "sought to further obfuscate their tax avoidance scheme by parking the $75 million obtained from selling 2,002,002 shares of Constellation stock, for about five months, in their controlled Charitable Remainder Unitrusts." Defendant cites no evidence to support this statement. The Sands transferred their limited partnership interests in RRM&C Group to the CRUTS for philanthropic

reasons, and such evidence is unrebutted. Plaintiffs Exhibit 57, App. B at p. 1399. Moreover, the Sands did not ever transfer "$75 million obtained from selling 2,002,002 shares of Constellation stock" to the CRUTS; rather, the Sands gifted their limited partnership interests in RRM&C Group to the CRUTS. Plaintiffs Exhibit 56, App. B at pp. 1380 - 1381. Finally, the Sands did not control the Educational and Health Support Fund which was the charitable remainder beneficiary of the CRUTs and which was controlled by three independent trustees unrelated to the Sands. Plaintiffs Exhibit 56, App. B at pp. 1383 – 1385.

Seventh, plaintiffs disagree with the figures cited by defendant. If plaintiffs had sold $76.5 million in Treasury notes, as stated by defendant, the loss they experienced on the sale of the Constellation Brands stock would have been approximately $10 million, rather than $20 million. ($76.5 million plus $9 million minus $75 million). Plaintiffs actually sold short approximately $84 million in Treasury notes.

Plaintiffs agree that the sale price of the Constellation stock was nearly $75 million and agree that the Sands family members participated in RRMC Group, and through it, in RRMC Partners.

17. Beginning in December 2001, the Sands Heirs participated in the second of the tax shelters promoted to them by Heritage ("Second Shelter"). The Second Shelter is the subject of the United States' Motion for Summary Judgment. The Second Shelter also used a tiered partnership arrangement, similar to the one used in the First Shelter. The Second Shelter utilized Alpha I, L.P. ("Alpha"), Beta Partners, L.L.C. ("Beta") and the short sale of approximately $44 million in U.S. Treasury notes to artificially inflate the basis of partnership assets. Alpha Complaint ¶¶ 18 - 34; Beta Complaint ¶¶ 18 -34.



AO 1720954.1

**Response:** Plaintiffs disagree with this statement of purported fact on multiple grounds. First, as noted in plaintiffs' General Objection, plaintiffs disagree with defendant's characterizations of plaintiffs' investments as "tax shelters." The only authorities cited by defendant to support these "statements of fact" are plaintiffs' complaints which do not support the stated facts. In fact, plaintiffs' goals for participating in the transactions described above included making a profit, diversifying their holdings which were concentrated in Constellation stock, accomplishing estate planning goals, and providing for philanthropic interests, in addition to obtaining any potential tax benefit. Pl. Ex. 57, App. B at pp. 1394, 1397A.

Second, plaintiffs disagree that participating in the partnerships and short selling the Treasury notes was used to "artificially inflate the basis of partnership assets." Plaintiffs properly reported their transactions under the Internal Revenue Code and there was nothing "artificial" about those consequences; the tax result is simply what the Code required.

Third, plaintiffs disagree with any implication that Alpha was formed for purposes of implementing a tax shelter. Alpha is a family investment partnership that the Sands family still uses for investment purposes. It has made profits of approximately $21 million and currently holds approximately $61 million in assets. Pl. Ex. 13, 52, and 53, App. B at pp. 247, 250, 1352, 1358.

Plaintiffs agree that the Sands family members sold short Treasury notes totaling approximately $44 million.

18. On December 3, 2001, Alpha was formed as a limited partnership.[1] Richard, Robert, Marilyn, Andrew, Marvin's Trust and CWC (together, the "Second Shelter Participants") held 99.90% of the partnership's interests. R,R,M & C Management Corporation ("RRMC Corp.") held the remaining, 1% of the partnership. Govt. Ex. 10, App. A at pp. 89-92; Alpha Complaint ¶¶ 2 - 3.

**Response:** As stated in plaintiffs' general objections, plaintiffs disagree with defendant's characterization of the Alpha limited partners as the "Second Shelter participants." Plaintiffs disagree that any of the sources cited by defendant support its allegation that the Alpha limited partners participated in a tax shelter. Plaintiffs further disagree that RRMC Corp. held a 1% interest in the Alpha. RRMC Corp. held a .1% interest in Alpha. Pl. Ex. 5, App. B at p. 40. Plaintiffs agree that Alpha was formed as a limited partnership on December 3, 2001 and that Richard, Robert, Marilyn, Andrew, CWC and Marvin's Trust collectively held 99.9% of the partnership's interests.

Plaintiffs disagree with Govt. Exhibit 24 (see footnote 1) on several grounds. As stated above in plaintiffs' general objections, plaintiffs object to defendant's characterization of the activities and investments of plaintiffs or their partners as tax shelters. Plaintiffs disagree with defendant's characterization of the formation of Alpha and Beta as "Formation of the Shelter Partnerships." Defendant's Exhibit 24 is also factually inaccurate as it does not include a description of the contribution made by RRM & C Management Corp. to Alpha or of the contribution made by Gloria Robinson to Beta. Defendant's exhibit 24 also incorrectly indicates that Gloria Robinson held a

[1] See Govt. Ex. 24, App. A at p. 284 for a diagram illustrating the formation of Alpha and Beta.

9957% interest in Beta (rather than a .9957 % interest). Plaintiffs' Exhibits 5, 32, and 35 App. B at pp. 40, 1096, and 1146.

19. Abigail and Zachary participated in the Second Shelter by virtue of the 99% Class 2 interest that their trusts held in CWC. Richard and Robert held the remaining 1% Class 2 interest in CWC. Andrew, Andrew's Trust, Richard and Robert held 100% of CWC's Class 1 interests. Alpha Complaint ¶¶ 6, 18 - 26; CWC Complaint ¶¶ 2, 19 - 27.

**Response:** Plaintiffs disagree with the above statement on several grounds. Plaintiffs disagree with defendant's characterization of the investment activities of CWC as the "Second Shelter." Plaintiffs further disagree that Abigail, Zachary, or CWC participated in a tax shelter. The sources cited by defendant for its purported statements of fact, plaintiffs' complaints, do not in any way support defendant's characterizations. Furthermore, though Abigail and Zachary held beneficial interests in their trusts, they did not control the trusts as the trustees were Marilyn Sands and Andrew Stern. Pl. Ex. 16, 19, 23 and 24, App. B at pp. 312, 620, 1040-1044, 1048-1052.

Plaintiffs disagree that Andrew Stern held a Class 1 interest in CWC, as only the trusts for his benefit, Richard, and Robert held 100% of the Class 1 interests in CWC. Pl. Ex. 8, App. B at pp. 104 - 123.

Plaintiffs agree that the Abigail Trust and the Zachary Trust together held a 99% Class 2 interest in CWC and that Richard and Robert held the remaining 1% Class 2 interest in CWC.

20. By agreement dated December 10, 2001, Alpha and Gloria Robinson ("Gloria") formed Beta as a limited liability company. Alpha held a 99.0043% interest in Beta and



AO 1720954.1

Gloria held the remaining .9957% interest in Beta. Govt. Ex. 11, App. A at p. 133; Beta Complaint ¶¶ 2 and 29.

**Response:** Agree.

21. Collectively, on December 12, 2001, the Second Shelter Participants transferred approximately $1.1 million to their respective Paine Webber Accounts as margin deposits ("Margin Deposits"). Govt. Ex. 10, App. A at pp. 135-153.

**Response:** As stated in their general objections, plaintiffs disagree with defendant's characterization of the Alpha limited partners as the "Second Shelter Participants." Plaintiffs agree that Richard, Robert, Marilyn, Andrew, Marvin's Trust, the Abigail Trust, and the Zachary Trust collectively transferred approximately $1.1 million to their respective PaineWebber accounts on December 12, 2001. Pl. Ex. 32, App. B at pp. 1097-1099.

22. On December 12, 2001, the Second Shelter Participants opened approximately $44 million in short sale positions in their Paine Webber Accounts by selling short an aggregate face amount of $30,800,000 U.S. Treasury notes bearing coupon interest of 2.75% due 9/30/03 and an aggregate face amount of $13,200,000 U.S. Treasury notes bearing coupon interest of 4.625% due 5/15/06 (collectively, the "Short Sales"). Govt. Ex. 12, App. A. at pp. 135-153; Alpha Complaint ¶ 18.

**Response:** As stated in plaintiffs' general objections, plaintiffs' disagree with defendant's characterization of the Alpha limited partners as the "Second Shelter Participants." Plaintiffs further disagree that the short sales were opened on December 12. The short sales were opened on December 11, 2001 with delivery occurring on December 12, 2001. Pl. Ex. 15, App. B at pp. 298-311.

Plaintiffs agree that approximately $44 million in short sale positions were opened by Richard, Robert, Marilyn, Andrew, Marvin's Trust, the Abigail Trust, and the Zachary Trust, by them collectively selling short an aggregate face amount of $30,800,000 U.S. Treasury notes bearing coupon interest of 2.75% due 9/30/03 and an aggregate face amount of $13,200,000 U.S. Treasury notes bearing coupon interest of 4.625% due 5/15/06.

23. On December 12, 2001, the Short Sales' proceeds of approximately $44,000,000 (collectively, the "Short Sales Proceeds") were deposited in the Second Shelter Participants' Paine Webber Accounts, subject to the respective obligations to close the Short Sales (collectively, the "Short Sales Obligations"). Govt. Ex.12, App. A pp.135-153; Alpha Complaint ¶ 18.

**Response:** As stated in plaintiffs' general objections, plaintiffs' disagree with defendant's characterization of the Alpha limited partners as the "Second Shelter Participants." Plaintiffs agree that the short sale proceeds were deposited into the PaineWebber accounts of Richard, Robert, Marilyn, Andrew, Marvin's Trust, the Abigail Trust, and the Zachary Trust, and that such accounts also held the respective obligations to close the short sales.

24. On or about December 13, 2001, the Abigail and Zachary Trusts transferred their respective Short Sales Proceeds and the obligations to close their portion of the Short Sales to CWC. Alpha Complaint ¶¶ 19 and 20.

**Response:** Plaintiffs agree only that on December 13, 2001, the Abigail Trust and Zachary Trust transferred the assets in their respective PaineWebber accounts and to

CWC and also delegated their respective obligations to close the short sales to CWC. Pl. Ex. 23 and 24, App. B at p. 1040, 1048.

25. On December 17, 2001, the Shelter Participants contributed the Short Sales Proceeds, the Short Sales Obligations and cash, in the aggregate amount of $1,240,000, to Alpha in exchange for partnership interests in the percentages set forth in the table below:

| Participant | Amount | Interest |
|---|---|---|
| Marilyn | 181,736.19 | 14.641 |
| Robert | 265,614.43 | 21.401 |
| Richard | 223,675.31 | 18.022 |
| CWC | 160,766.20 | 12.949 |
| Marvin Trust | 335,512.97 | 27.030 |
| Andrew | 72,694.48 | 05.857 |
| Total | $1,239,999.50 | 99.9% |

Alpha Complaint ¶¶ 21 - 26.

**Response:** As stated above in plaintiffs' general objections, plaintiffs disagree with defendant's characterization of the Alpha limited partners as the "Shelter Participants." Defendant presented no evidence other than the Alpha complaint to support its characterization, and plaintiffs further disagree that the Alpha Complaint supports defendant's characterization. Plaintiffs further disagree that the aggregate amount of the cash and short sale proceeds contributed to Alpha and the obligations to close the short sales delegated to Alpha equaled $1,240,000 because the estimated fair market value of the contributions to Alpha was $2,579,379.58 and because the actual fair market value could not be determined as the Alpha limited partners could not know the cost to acquire replacement Treasury notes to close the short sales. Pl. Ex. 5 and 16-22, App. B at pp.

40-41, 314, 340, 351, 416, 443, 453, 517-518, 546, 556-557, 622, 650, 660-661, 728, 756, 766-767, 833-834, 862, 872-873, 937-938, 966, 976-977.

Plaintiffs agree only that on December 17, 2001, the Alpha limited partners contributed the assets in their respective PaineWebber accounts which included the short sale proceeds and cash to Alpha and delegated to Alpha the contingent obligation to close the short sales in exchange for the partnership interest percentages set forth in the table above. Pl. Ex. 5, 25 – 30, App. B at pp. 40-41, 1056 - 1095.

26. On December 20, 2001, RRMC Corp. contributed $2,582 in exchange for a 0.10% interest as general partner in Alpha. Alpha Complaint ¶ 27.

**Response:** Agree.

27. On December 20, 2001, Alpha's assets, including both the Short Sales Proceeds and the Short Sales Obligations, were contributed to Beta in exchange for a 99.0043% interest in Beta. Beta closed the Short Sales on December 26, 2001, recognizing a net gain of $90,018. Alpha Complaint ¶¶ 29 and 30.

**Response:** Plaintiffs disagree that the short sale obligations were "contributed" to Beta. Plaintiffs agree only that Alpha contributed the assets in its PaineWebber accounts which included the short sale proceeds and cash to Beta and delegated to Beta the contingent obligation to close the short sales in exchange for a 99.0034% partnership interest in Beta. Pl. Ex. 36, App. B at p. 1148.

Plaintiffs agree that Beta closed the short sales on December 26, 2001, recognizing a net gain of $90,018.

28. The Sands Heirs treated the Short Sales Obligations as liabilities for financial accounting purposes but not for tax accounting purposes under sections 752(a) and (b). Govt. Ex. 10, App. A at p. 90; Alpha Complaint ¶ 56.

**Response:** Plaintiffs agree that the Sands family members did not treat the short sale obligations as liabilities for tax purposes. Plaintiffs properly reported their transactions under the Internal Revenue Code, and the tax result is simply what the Code required for executory contracts which were contingent in amount and thus did not constitute liabilities under Section 752.

Plaintiffs disagree that the Sands family members treated the short sale obligations as liabilities for financial accounting purposes. Plaintiffs are unaware of any financial statements treating the short sale obligations as liabilities for financial accounting purposes and disagree that the sources cited by defendant support defendant's allegation.

29. The Second Shelter is based on the supposition that short sale obligations are not liabilities under 26 U.S.C. §752 and, hence, do not reduce outside basis. As stated in the Heritage materials prepared for the Sands Heirs, "[t]he outstanding obligations to return the U.S. Treasuries do not affect basis due to the fact that the obligations are not fixed and determinable." Govt. Ex. 13, App. A at p. 190. By not recognizing the Short Sale Obligations, the Sands Heirs, through Alpha and Beta, artificially increased their basis in shares of Yahoo and Corning stock by more than 3000% above the cost basis of that stock. Govt. Ex. 14, App. A at pp. 200-201; Govt. Ex. 15, App. A at p. 207.

**Response:** As stated above in plaintiffs' general objections, plaintiffs disagree with defendant's characterization of the activities and investments of Alpha or its limited partners as a tax shelter. Plaintiffs further disagree that the Sands family members artificially increased their bases in shares of Yahoo and Corning stock by more than 3000% above the cost basis of the stock. Plaintiffs agree that they did not recognize the short sale obligations as liabilities for tax purposes, and that the Heritage materials make

the statement quoted above. However, plaintiffs properly reported their transactions under the Internal Revenue Code, and the tax result is simply what the Code required for executory contracts which were contingent in amount and thus did not constitute liabilities under Section 752. Pl. Ex. 16 – 22, App. B at pp. 314, 340, 351, 416, 443, 453, 517-518, 546, 556-557, 622, 650, 660-661, 728, 756, 766-767, 833-834, 862, 872-873, 937-938, 966, 976-977.

30. On December 17, 2001, Alpha purchased 67,525 shares of the common stock of Corning, Inc. ("Corning Shares"), at $8.82 per share, for $595,570.50 ("Corning Cost Basis") and 33,400 shares of the common stock of Yahoo, Inc. ("Yahoo Shares"), at $17.95 per share, for $599,530 (the "Yahoo Cost Basis"). Govt. Ex. 14, App. A at pp. 200-201; Govt. Ex. 15, App. A at p. 207; Alpha Complaint ¶ 28.

**Response**: Agree.

31. As previously noted, on December 20, 2001, Alpha transferred the Short Sales Proceeds (approximately $44,000,000), the Short Sale Obligations, $1,343,553 in cash and both the Yahoo and Corning stock to Beta in exchange for a 99.043% interest in Beta. Gloria held the remaining .9957 % interest in Beta. Govt. Ex. 14, App. A at p. 200; Alpha Complaint ¶ 29.

**Response:** Plaintiffs disagree that the short sale obligations were "contributed" to Beta. Plaintiffs agree only that Alpha contributed the assets in its PaineWebber accounts which included the short sale proceeds and cash to Beta and delegated to Beta the contingent obligation to close the short sales in exchange for a 99.0034% partnership interest in Beta. Pl. Ex. 36, App. B at p. 1148.

Plaintiffs agree that Gloria held a .9957% interest in Beta.

32. On December 27, 2001, Beta purchased $30,800,000 face amount of U.S. Treasury notes due 9/30/2003 for $30,843,550 and $13,200,000 face amount of U.S. Treasury notes due 5/15/2006 for $13,359,591 to close the Short Sales, at a gain of $90,018. Govt. Ex. 14, App. A at p. 200; Govt. Ex. 16, App. A at pp. 210-212; Alpha Complaint ¶ 30.

**Response:** Agree.

33. On December 27, 2001, Alpha purchased Gloria's 0.9957% interest in Beta. Alpha Complaint ¶ 31.

**Response:** Agree.

34. When Alpha acquired 100% of Beta, Beta became a single-member limited liability company that is treated as a disregarded entity under I.R.C. § 7701, effectively terminating Beta's existence as a partnership for tax purposes and triggering a deemed liquidating distribution under I.R.C. § 731(b) of the $1,466,135 cash held by Beta, the Corning Shares and the Yahoo Shares. Govt. Ex. 14, App. A at p. 200; Alpha Complaint ¶ 31.

**Response:** Plaintiffs agree that when Alpha acquired 100% of Beta, Beta became a single-member limited liability company that is treated as a disregarded entity under I.R.C. § 7701. Plaintiffs disagree with the remainder of defendant's statement for the following reason: Alpha is treated as having received a liquidating distribution under I.R.C. § 731(b) of its 99.9% share of the assets of Beta (cash and Yahoo and Corning stock) followed by a purchase of Gloria Robinson's share of the Beta assets in accordance with Rev. Rul. 99-6, 199-1 C.B. 432 (situation 1). Pl. Ex. 16 – 22, App. B at pp. 354-355, 457-458, 560-561, 664-665, 770-771, 876-877, 980-981.

35. After the constructive liquidation of Beta, Alpha allocated its outside basis, including the basis initially attributable to the Short Sales Proceeds, among Beta's remaining

assets, claiming an aggregate adjusted tax basis in the Yahoo Shares of $22,262,094, or $695.52 per share, and an aggregate adjusted tax basis in the Corning Shares of $23,230,361, or $329.69 per share (altogether, the "Inflated Stock Basis").[2] Govt. Ex. 14, App. A at p. 200; Alpha Complaint ¶¶ 53 and 54.

**Response**: As stated above, plaintiffs disagree that a "constructive liquidation" of Beta occurred as Alpha is treated as having received a liquidating distribution of its 99.9% share of the assets of Beta (cash and Yahoo and Corning stock) followed by a purchase of Gloria Robinson's share of the Beta assets in accordance with Rev. Rul. 99-6, 199-1 C.B. 432 (situation 1). Pl. Ex. 16 – 22, App. B at pp. 354-355, 457-458, 560-561, 664-665, 770-771, 876-877, 980-981. Plaintiffs agree that Alpha held an aggregate adjusted tax basis in the Yahoo Shares of $22,262,094, or $695.52 per share, and an aggregate adjusted tax basis in the Corning Shares of $23,230,361, or $329.69 per share, but plaintiffs do not agree that Alpha ever "claimed" this total adjusted tax basis or that the sources cited by defendant support such a statement. Furthermore, as stated above in plaintiffs' general objections, plaintiffs disagree with defendant's characterization of the adjusted tax basis in the Yahoo shares and Corning shares as the "Inflated Stock Basis." Even under defendant's theory, the $695.52 adjusted tax basis per share of Yahoo and the $329.69 adjusted tax basis per share of Corning included the original cost of the stock. Pl. Ex. 7, App. B at p. 69. Therefore, defendant's characterization of the entire basis claimed by Alpha as "Inflated Stock Basis" is inappropriate.

[2] See Govt. Ex. 25, App. A at p. 285 for a diagram illustrating the distribution of the Yahoo and Corning stock following Beta's deemed liquidation.

36. In the aggregate, Alpha distributed 52,450 Corning Shares and 25,042 Yahoo Shares to the Second Shelter Participants and RRMC Corp. during 2001 and 2002 (the "Distributed Shares") in which the Second Shelter Participants claimed a carryover basis equal to the Inflated Stock Basis. Govt. Ex. 17, App. A at p. 213; Govt. Ex. 18, App. A at pp. 219-232; Govt. Ex. 19, App. A at pp. 240-257; Alpha Complaint ¶ 32.

**Response:** As stated above in plaintiffs' general objections, plaintiffs disagree with defendant's characterizations of the Alpha limited partners as the "Second Shelter Participants" and their carryover basis in the Yahoo and Corning stock, which equaled the adjusted tax basis, as the "Inflated Stock Basis." Plaintiffs disagree that Alpha distributed 25,042 shares of Yahoo stock to the Alpha partners as Alpha distributed 25,942 shares of Yahoo stock in 2001 and 2002. Pl. Ex. 54, App. B at pp. 1363 - 1364; Govt. Ex. 17, App. A at p. 213. Plaintiffs disagree that Alpha distributed 52,450 shares of Corning stock to the Alpha partners as Alpha distributed 50,054 shares of Corning stock in 2001 and 2002. Pl. Ex. 54, App. B at pp. 1363-1364; Govt. Ex. 17, App. A at p. 213. Plaintiffs disagree that the Alpha limited partners claimed an inflated basis in the Yahoo and Corning stock. The Alpha limited partners held a carryover basis in the stock distributed to them equal to the adjusted tax basis of the stock as held by Alpha. Pl. Ex. 7, 44, and 45, App. B at pp. 69, 1199, 1219. Plaintiffs do not agree that Alpha ever "claimed" this total adjusted tax basis or that the sources cited by defendant support such a statement.

37. On February 26, 2002, Marilyn formed Mickey Management, Inc ("Mickey, Inc."), a wholly owned corporation. Mickey Complaint ¶¶ 1 - 4.

**Response:** Agree.

38. On February 26, 2002, Marilyn formed Mickey Management, L.P. ("Mickey, L.P.") by contributing 2,300 shares of the Yahoo stock and 4,600 shares of the Corning stock which had been distributed to her by Alpha, in exchange for a 99% limited partnership interest. Mickey, Inc. acquired the remaining 1% interest, as general partner. Mickey Complaint ¶¶ 2, 3, 33 and 34.

**Response:** Agree.

39. On February 26, 2002, the Second Shelter Participants, other than Marilyn, contributed 2,300 of the Yahoo shares and 4,600 of the Corning Shares, which had been distributed to them by Alpha, to MLRR. MLRR Complaint ¶¶ 1, 33 and 34.

**Response**: As stated above in plaintiffs' general objections, plaintiffs disagree with defendant's characterization of the Alpha limited partners as the "Second Shelter Participants." Defendant cites no evidence to support its characterization other than the MLRR Complaint, which does not support defendant's characterization.

Plaintiffs agree that Robert, Richard, Andrew, the Marvin Sands Trust and CWC collectively contributed 2,300 of the Yahoo shares and 4,600 of the Corning Shares, which had been distributed to them by Alpha, to MLRR. Plaintiffs cannot confirm or deny the precise date when such stock was contributed to MLRR, but will agree that such contribution was made on February 26, 2002 solely for purposes of this motion.

40. Proportionately, on a per share basis, Mickey, L.P. and MLRR claimed a carryover inside basis in the Yahoo and Corning stock equal to the Inflated Stock Basis. Mickey Complaint ¶¶ 35 and 36; MLRR Complaint ¶¶ 35 and 36.

**Response:** As stated above in plaintiffs' general objections, plaintiffs disagree with defendant's characterization of the adjusted tax basis of the Yahoo and Corning stock as the "Inflated Stock Basis." Defendant cites no evidence to support its characterization

other than the Mickey Complaint and the MLRR Complaint, which do not support defendant's characterization. Plaintiffs agree only that Mickey Management and M, L, R & R claimed a carryover inside basis in the Yahoo and Corning stock equal to the adjusted tax basis of the stock as held by Alpha at distribution to the Alpha partners. Pl. Ex. 7, 44 and 45, App. B at pp. 69, 1199, 1219.

41. On April 19, 2002, Beta filed a partnership return on Form 1065 for the tax period ending December 27, 2001 (the "Beta Return"), without including the Short Sales Obligations in partnership liabilities under sections 752(a) and (b). Govt. Ex. 20, App. A at pp. 269-277; Beta Complaint ¶ 46.

**Response:** Agree.

42. On April 26, 2002, Alpha filed a Form 1065 partnership return for 2001("2001 Alpha Return"). The 2001 Alpha Return did not include the Short Sales Obligations as partnership liabilities under sections 752(a) and (b). Govt. Ex. 18, App. A at pp. 214-233; Alpha Complaint ¶ 56.

**Response:** Agree.

43. On October 20, 2002, CWC filed its Form 1065 partnership return for 2001 ("CWC Return"). The CWC Return failed to include the Short Sales Obligations as partnership liabilities under sections 752(a) and (b). CWC Complaint ¶ 42.

**Response:** Plaintiffs disagree that CWC filed its 2001 partnership return on October 20, 2002 as the return is dated September 16, 2002. Pl. Ex. 8, App. B at p. 99. Plaintiffs agree only that the CWC return did not include the obligations to close the short sales as partnership liabilities under sections 752(a) and (b). Pl. Ex. 8, App. B at p. 102. Plaintiffs do not agree that CWC was required to include the obligations as liabilities or otherwise "failed" to include anything required on its Form 1065 for 2001, and the CWC

complaint does not support the conclusion that CWC "failed" to properly report its income from 2001.

44. On October 20, 2002, MLRR filed its Form 1065 partnership return for 2001 ("MLRR Return"). Proportionate to the number of shares sold, the MLRR Return claimed the Inflated Stock Basis on its sales of Distributed Shares reported on Schedule D, thereby reflecting an artificially high loss on the sale of the stock. Govt. Ex. 21, App. A at pp. 278-279; MLRR Complaint ¶¶ 50 and 51.

**Response:** Plaintiffs disagree with defendant's purported statement of fact on several grounds. Plaintiffs disagree that MLRR filed its Form 1065 for 2001 on October 20, 2002 as the return is dated August 2, 2002. Pl. Ex. 58, App. B at p. 1402. Furthermore, plaintiffs disagree with defendant's characterization of the basis claimed by MLRR on the sale of stock in 2001 as the "Inflated Stock Basis." MLRR claimed the carryover basis from its partners which equaled the adjusted tax basis of Alpha in the stock distributed from Alpha to its partners. Pl. Ex. 6, 7 and 58, App. B at pp. 49-62, 74-87, 1406. Plaintiffs also disagree with defendant's view that MLRR's return reflected an "artificially" high loss on the sale of the stock. Defendant has not defined "artificially high loss," and the authority defendant cites to support its view is the MLRR Complaint and the MLRR tax return for 2001. Neither document uses such terminology or otherwise supports defendant's view.

45. On December 18, 2002, Alpha sold 5,300 Corning Shares for $19,661 and 2,650 Yahoo Shares for $44,265. Govt. Ex. 19, App. A at p. 239; Alpha Complaint ¶¶ 33 and 34.

**Response:** Agree.

46. On December 18, 2002, MLRR sold 4,600 Corning Shares for $17,070 and 2,300 Yahoo Shares for $38,426. Govt. Ex. 22, App. A at pp. 280-281; MLRR Complaint ¶¶ 35, 36, 50 and 51.

**Response:** Agree.

47. On December 18, 2002, Mickey, L.P. sold 4,600 Corning Shares for $17,115 and 2,300 Yahoo Shares for $38,426. Govt. Ex. 22, App. A at pp. 280-281; Mickey Complaint ¶¶ 35, 36, 50 and 51.

**Response:** Agree.

48. On August 14, 2003, Mickey, L.P. filed its Form 1065 partnership return for 2002 ("Mickey 2002 Return"). Proportionately to the number of shares sold, the Mickey 2002 Return claimed the Inflated Stock Basis on its sales of Distributed Shares reported on Schedule D, thereby reflecting an artificially high loss on the sale of the stock. Govt. Ex. 22, App. A at pp. 280-281; Mickey Complaint ¶¶ 35, 36, 50 and 51.

**Response:** Plaintiffs disagree with defendant's purported statement of fact on several grounds. Plaintiffs disagree that Mickey Management filed its Form 1065 for 2002 on August 14, 2003, as the return is dated July 25, 2003. Pl. Ex. 44, App. B at p. 1195. Furthermore, plaintiffs disagree with defendant's characterization of the basis claimed by Mickey Management on the sale of stock in 2002 as the "Inflated Stock Basis." Mickey Management claimed the carryover basis from its partners which equaled the adjusted tax basis of Alpha in the stock distributed from Alpha to its partners. Pl. Ex. 6, 7 and 45, App. B at pp. 49-62, 74-87, 1219. Plaintiffs further disagree with defendant's view that Mickey Management's return reflected an "artificially" high loss on the sale of the stock. Defendant has not defined "artificially high loss," and the authority defendant cites to support its characterization and its view are Mickey Management's tax return and the

Mickey Management Complaint. Neither document uses such terminology or otherwise supports defendant's view.

49. On September 14, 2003, Alpha filed its Form 1065 partnership return for 2002 ("Alpha 2002 Return"). Proportionately to the number of shares sold, the Alpha 2002 Return claimed the Inflated Stock Basis on its sales of Distributed Shares on Schedule D, thereby reflecting an artificially high loss on the sale of the stock. Govt. Ex. 19, App. A, p. 239; Alpha Complaint ¶¶ 33, 34, 53 and 54.

**Response**: Plaintiffs disagree with defendant's purported statement of fact on several grounds. Plaintiffs disagree that Alpha filed its Form 1065 for 2002 on September 14, 2003 as Alpha's return is dated July 28, 2003. Pl. Ex. 7, App. B at p. 64. Furthermore, plaintiffs disagree with defendant's characterization of the basis claimed by Alpha on the sale of stock in 2002 as the "Inflated Stock Basis." Alpha claimed its adjusted tax basis in the stock it sold. Pl. Ex. 6 and 7, App. B at pp. 49-62, 74-87. Plaintiffs further disagree with defendant's view that Alpha's return reflected an "artificially" high loss on the sale of the stock. Defendant has not defined "artificially high loss," and the authority defendant cites to support its characterization and its view are Alpha's tax return and the Alpha Complaint. Neither document uses such terminology or otherwise supports defendant's view.

50. On September 16, 2003, MLRR filed its Form 1065 partnership return for 2002 ("MLRR 2002 Return"). Proportionately to the number of shares sold, the MLRR 2002 Return claimed the Inflated Stock Basis on its sales of Distributed Shares on Schedule D, thereby reflecting an artificially high loss on the sale of the stock. Govt. Ex. 22, App. A at pp. 280-281; MLRR Complaint ¶¶ 35, 36, 50 and 51.



AO 1720954.1

**Response:** Plaintiffs disagree with defendant's purported statement of fact on several grounds. Plaintiffs disagree that MLRR filed its Form 1065 for 2002 on September 16, 2003 as the return is dated July 31, 2003. Pl. Ex. 45, App. B at p. 1214. Furthermore, plaintiffs disagree with defendant's characterization of the basis claimed by MLRR on the sale of stock in 2002 as the "Inflated Stock Basis." MLRR claimed the carryover basis from its partners which equaled the adjusted tax basis of Alpha in the stock distributed from Alpha to its partners. Pl. Ex. 6, 7 and 45, App. B at 49-62, 74-87, 1219. Plaintiffs further disagree with defendant's view that MLRR's return reflected an "artificially" high loss on the sale of the stock. Defendant has not defined "artificially high loss," and the authority defendant cites to support its characterization and its view are MLRR's tax return and the MLRR Complaint. Neither document uses such terminology or otherwise supports defendant's view.

51. On December 22, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustments of Alpha's partnership items for 2001 and 2002 ("Alpha FPAA"). Alpha Complaint ¶ 35 and Exhibit A to Alpha Complaint.

**Response:** Plaintiffs agree that the IRS issued the Alpha FPAA for 2001 and 2002 on December 22, 2005.

52. On December 22, 2005, the IRS mailed a notice of Final Partnership Administrative Adjustments of Beta's partnership items for the short period ending December 27, 2001 ("Beta FPAA"). Beta Complaint ¶ 36 and Exhibit A to Beta Complaint.

**Response:** Plaintiffs agree that the IRS issued the Beta FPAA for the short period ending December 27, 2001 on December 22, 2005.

53. On December 28, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustments of CWC's partnership items for 2001 ("CWC FPAA"). On the CWC FPAA, the IRS's primary adjustment was to increase partnership liabilities by the amount of $21,032,464, which adjustment reflects CWC's participation in the First and Second Shelters. CWC Complaint 128 and Exhibit A to CWC Complaint.

**Response:** Plaintiffs agree that on December 28, 2005, the IRS issued the CWC FPAA. and that the primary adjustment in the CWC FPAA was to increase the partnership liabilities by $21,032,464. Plaintiffs disagree such adjustment reflects the participation of CWC in two tax shelters and, as stated in plaintiffs' general objections above, disagree with defendant's characterization of CWC's membership in RRMC Group and in Alpha as participation in tax shelters. In fact, the goals of the Sands family for participating in the transactions described above included making a profit, diversifying their holdings which were concentrated in Constellation stock, accomplishing estate planning goals, and providing for philanthropic interests, in addition to obtaining any potential tax benefit. Pl. Ex. 57, App. B at pp. 1394, 1397A.

54. On the Alpha FPAA (as it related to year 2001) and the Beta FPAA, the IRS's primary adjustment was an increase in partnership liabilities by the aggregate amount of $44,293,087, treating the Short Sales Obligations as partnership liabilities under sections 752(a) and (b) (the "Partnership Liability Adjustment"). Alpha Complaint ¶ 35; Beta Complaint ¶ 36; Exhibit A to Alpha Complaint; Exhibit A to Beta Complaint.

**Response**: Agree.

55. In the Alpha FPAA (as it related to year 2002), the IRS's primary adjustment was to disallow the portion of the Inflated Stock Basis in excess of the Cost Basis in the Yahoo Shares and Corning Shares on the ground that the Partnership Liability Adjustment for 2001

decreased Alpha's outside basis in Beta by the amount of the Short Sales Proceeds, causing an equivalent decrease in the Inflated Stock Basis under section 732 (the "Inflated Basis Adjustment"). Alpha Complaint ¶ 35 and Exhibit A to Alpha Complaint.

**Response:** Plaintiffs disagree with defendant's characterization of the portion of the adjusted tax basis in the Yahoo and Corning stock disallowed by the Alpha FPAA as "Inflated Stock Basis" and with defendant's characterization of the adjustment by the FPAA as the "Inflated Basis Adjustment." Plaintiffs further disagree that the "Partnership Liability Adjustment" decreased Alpha's outside basis in Beta by the amount of the short sale proceeds. As stated in paragraph 23, the short sale proceeds were approximately $44 million. The "Partnership Liability Adjustment" was an increase in partnership liabilities by the aggregate amount of $44,293,087. (Paragraph 54, above). Plaintiffs agree only that the primary adjustment by the IRS in the Alpha FPAA as it relates to 2002 was to disallow the portion of the adjusted tax basis of Alpha in shares of Yahoo and Corning stock that Alpha sold in 2002 that exceeded the amounts Alpha originally paid for the stock on several grounds, including that "Under I.R.C. § 732, [Alpha] failed to establish that the Partnership obtained adjusted bases in the Yahoo Shares and the Corning Shares in excess of the respective amounts allowed when distributed by Beta Partners, LLC." Exhibit A to Alpha Complaint.

56. No paragraph 56 was included in defendant's Proposed Findings of Uncontroverted Fact.

57. On September 7, 2006, the IRS issued separate Notices of Final Partnership Administrative Adjustments of the partnership items of Mickey, L.P. and MLRR for 2002 (collectively, the "M&M FPAA") in which the IRS's primary adjustment was the

Inflated Basis Adjustment resulting in the disallowance of the associated capital losses claimed by the partnerships for 2002. Mickey Complaint ¶ 37; MLRR Complaint ¶ 37; Exhibit A to Mickey Complaint; Exhibit A to MLRR Complaint.

**Response:** Plaintiffs disagree with defendant's characterization of the adjustment by the FPAA as the "Inflated Basis Adjustment." Plaintiffs agree that on September 6, 2007, the IRS issued separate FPAAs to Mickey Management and to MLRR for 2002. Plaintiffs agree only that the primary adjustment by the IRS in those FPAAs was to disallow capital losses claimed by the partnerships for 2002 on several grounds, including that "Under I.R.C. § 732, [Mickey Management and MLRR] failed to establish that the Partnership obtained adjusted bases in the Yahoo Shares and the Corning Shares in excess of the respective amounts allowed when contributed by [their partners]." Exhibit A to Mickey Complaint; Exhibit A to MLRR Complaint.

58. In the Alpha FPAA, the Beta FPAA, the CWC FPAA, and the M&M FPAA, the IRS asserted a 20% and a 40% accuracy-related penalty because all of the underpayments of tax by the Sands Heirs were attributable to gross valuation misstatements, viz., the overstatement of their outside bases in Alpha and Beta by the amount of the Short Sales Proceeds. Exhibit A attached to Alpha Complaint, Beta Complaint, CWC Complaint, Mickey Complaint, and MLRR Complaint.

**Response:** Plaintiffs agree that in the Alpha, Beta, CWC, Mickey Management, and M, L, R & R FPAAs the IRS asserted a 20% and a 40% accuracy-related penalty based on its determination that all of the underpayments of tax were attributable to gross valuation misstatements. Plaintiffs disagree that any underpayment of tax or any gross valuation misstatements were made by the Sands or by Alpha, Beta, CWC or Mickey Management

and disagree that the Sands family members overstated their outside bases in Alpha and Beta by the amount of the short sales proceeds. Neither plaintiffs nor their partners made an underpayment of tax or a gross valuation misstatement. Pl. Ex. 16-22, App. B at pp. 377-379, 479-481, 582-584, 686-688, 792-794, 898-900, 1002-1004. Furthermore, the Sands family members did not overstate their outside bases in Alpha and Beta by the amount of the short sales proceeds. Pl. Ex. 16-22, App. B at pp. 377-379, 479-481, 582-584, 686-688, 792-794, 898-900, 1002-1004.

Dated: July 5, 2007

Respectfully submitted,

/s/ Lewis S. Wiener____________

LEWIS S. WIENER
Sutherland, Asbill & Brennan LLP
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0140
Fax: (202) 637-3593
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 853-8000
(404) 853-8806 (fax)

Kent L. Jones

Sutherland, Asbill & Brennan
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0732
Fax: (202) 637-3593

Attorneys for Plaintiffs