**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

No.06-407T
(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)
Judge Emily C. Hewitt
(E-Filed July 5, 2007)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | No. 06-407T |
| BETA PARTNERS, L.L.C, BY AND THROUGH ALPHA I, L.P., A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | No. 06-408T |
| R,R,M & C PARTNERS, L.L.C., BY AND THROUGH R,R,M & C GROUP, L.P., A NOTICE PARTNER,<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | No. 06-409T |

| | | |
|---|---|---|
| R,R,M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | ) | No. 06-410T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G, ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 06-411T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 06-810T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-811T |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT IN CAUSE NOS. 06-407T, 06-408T, 06-411T, 06-810T, AND 06-811T AND BRIEF IN SUPPORT AND PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

# TABLE OF CONTENTS

**PAGE(S)**

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

I. Introduction. . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II. Defendant's Motion for Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

III. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I. THE REQUIREMENT TO COVER A SHORT SALE IS NOT A LIABILITY WITHIN THE MEANING OF SECTION 752 . . . . . . . . . . . . . . . . . . . . . . . .8

A. The Interplay of Section 705 and Section 752 . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B. The Requirement to Cover a Short Sale Is Not a Liability for Purposes of Section 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C. The Authorities Cited by Defendant Do Not Alter the Legal Principle that Contingent Obligations are not liabilities under section 752 . . . . . . . . . . . . . . . . . 22

1. Rev. Rul. 95-26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

2. Salina Partnership LP v. Commissioner . . . . . . . . . . . . . . . . . . . . . . . . .26

3. Colm Producer, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

II. NO ACCURACY-RELATED PENALTIES SHOULD APPLY IN THIS CASE . . . . . 32

A. The Penalties Do Not Apply By Their Own Terms . . . . . . . . . . . . . . . . . . . . . . 33

1. There was not a "substantial understatement" of tax . . . . . . . . . . . . . . . . 33

a. Defendant's motion for summary judgment on the substantial understatement penalty should be denied. . . . . . . . . . 34

b. Plaintiffs' cross-motion for summary judgment on the substantial understatement penalty should be granted . . . . . . . . .34

2. Plaintiffs were not negligent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

a. Defendant's motion for summary judgment on the negligence penalty should be denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

b. Plaintiffs' cross-motion for summary judgment on the negligence penalty should be granted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

3. Neither the "substantial valuation misstatement" penalty nor the "gross valuation misstatement" penalty can apply . . . . . . . . . . . . . . . . . . . . . . . . .38

a. There was no misstatement on any return of the tax imposed by chapter 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

b. Any Underpayment of Tax Is Not Attributable to a Misstatement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

B. The Penalty Provisions of Section 6662(a) Are Inapplicable Where, as Here, a Taxpayer Relied Reasonably and in Good Faith Upon Professional Tax Advice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Brown v. Helvering*, 291 U.S. 193 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bursten v. United States*, 395 F.2d 976, 981 (5th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Chamberlain v. Comm'r*, 66 F.3d 729, 733 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir.1971) . . . . . . . . . . . . . . . . . . . . 41

*Cinema '84 v. Comm'r*, 412 F.3d 366 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Commissioner v. Acker*, 361 U.S. 87 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

*Colm Producer, Inc. v. United States*, 460 F.Supp.2d
713 (N.D. Tex. 2006 5th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30-32

*Deluxe Corp. v. United States*, 885 F.2d 848 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . .42

*Deputy v. du Pont*, 308 U.S. 488 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*E.C. Allen v. A.G. Edwards & Sons, Inc.*, 606 F.2d 84 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . 8

*Estate of Monroe v. Comm'r*, 124 F.3d 699, 714-15 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 45

*Foxman v. Comm'r*, 41 T.C. 535, 551, n.9, *aff'd*, 352 F.2d 466 (2d Cir. 1965) . . . . . . . ....... . . 47

*Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*Helvering v. Credit Alliance Corp.*, 316 U.S. 107 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hendricks v. Comm'r*, 423 F.2d 485 (4th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 28

*Henry v. Comm'r*, 170 F.3d 1217, 1220-1221 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . .45

*Klamath Strategic Investment Fund, LLC v. United States*,
440 F. Supp. 2d 608 (E.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 27, 36

*Koshland v. Helvering*, 298 U.S. 441 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*La Rue v. Comm'r*, 90 T.C. 465 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*Long v. Comm'r*, 71 T.C. 1 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Mauerman v. Comm'r*, 22 F.3d 1001, 1006 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

*Neonatology Assoc., P.A. v. Comm'r*, 299 F.3d 221(3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . ..44

*Nico v. Comm'r*, 67 T.C. 647 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Olson v. United States*, 172 F.3d 1311 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

*Reser v. Comm'r*, 112 F.3d 1258, 1268 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

*Richardson v. Comm'r*, 121 F.2d 1 (2d Cir. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 11

*Rite Aid Corp. v. United States*, 255 F.3d 1357 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . .41

*Salina Partnership v. Comm'r*, 80 T.C.M. (CCH) 686 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 26-30

*Srivastava v. Comm'r*, 220 F.3d 353, 367 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

*Stephenson Trust v. Comm'r*, 81 T.C. 283 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14-41

*Stratmore v. Comm'r*, 48 T.C.M. (CCH) 1369 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

*USA Choice Internet Service, LLC v. United States*, 73 Fed. Cl. 780 (2006) . . . . . . . . . . . . . . . .23

*Nalle v. Comm'r*, 997 F.2d 1134 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Stanford v. Comm'r*, 152 F.3d 450 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-45

*United States v. Boyle*, 469 U.S. 241, 251 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Weiner v. United States*, 389 F.3d 152 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

CODE SECTIONS

701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

722. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

731. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

733. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

752. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

1233. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

6662. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

6664. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

REVENUE RULINGS

Rev. Rul. 57-29, 1957-1 C.B. 519 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Rev. Rul. 73-301, 1973-2 C.B. 215. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Rev. Rul. 79-294, 1979-2 C.B. 305. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

TREASURY REGULATIONS

Treas. Reg. § 1.6662-4(g)(4)(i)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

Treas. Reg. § 1.6664-4(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Treas. Reg. § 1.1233-1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

MISCELLANEOUS

S. Rep. No. 81-2375. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.R.S. G.C.M. 37,332 (Nov. 25, 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

I.R.S. G.C.M. 37,971 (June 1, 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

I.R.S. G.C.M. 37,860 (Feb. 16, 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.R.S. G.C.M. 38,237 (Feb. 15, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.R.S. G.C.M. 35,328 (May 4, 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Alice Welt Cunningham, Short-Sale Obligations and Basis in Partnership Interests, 72 Tax Notes 1663 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1 William S. McKee et al., Federal Taxation of Partnerships and Partners ¶7.01[1] (3d ed. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 26

## ISSUES PRESENTED

1. Whether contingent obligations assumed by Alpha I, L.P. and then Beta Partners, LLC to cover short sales of United States Treasury notes are "liabilities" within the meaning of 26 U.S.C. § 752?

2. Whether the accuracy-related penalties prescribed in 26 U.S.C. § 6662 apply with respect to any underpayment of tax that would result if Alpha and Beta and their partners were required to treat the contingent obligations as "liabilities"?

3. Whether plaintiffs acted reasonably and in good faith in taking the tax positions at issue, such that the accuracy-related penalties enumerated in 26 U.S.C. § 6662 can not apply by virtue of 26 U.S.C. § 6664(c)?

## STATEMENT OF THE CASE

### I. Introduction

These consolidated cases involve a series of partnerships used by members of the Sands family to facilitate gifts to various charities and to invest family wealth in a tax-efficient manner. Defendant's motion for summary judgment, and plaintiffs' cross-motion for summary judgment, pertain to only certain of these partnerships: Alpha I, L.P. ("Alpha"), Beta Partners, LLC ("Beta"), Mickey Management, L.P., M,L,R&R, and CWC Partnership I.[1]

Plaintiffs filed suit with respect to each of these partnerships to contest adjustments that defendant made to the partnerships' tax returns. Defendant premised these adjustments on the extraordinary position that Alpha and Beta and their partners should have treated obligations to "cover" several short sales of United States Treasury notes as "liabilities" for purposes of section 752.[2] The taxpayers did not treat the obligations to close the short sale positions as liabilities for

---

[1]The cross-motions should be treated as cross-motions for partial summary judgment with respect to CWC Partnership I because it also was a partner in R,R,M&C Group, L.P., which is not at issue in these cross-motions.

[2] Unless otherwise noted, all references to the "Code" or to sections cited herein refer to the Internal Revenue Code of 1986, as amended and as in effect during the years in question.

the simple reason that those obligations were contingent, in that the future cost to acquire the replacement Treasury notes that would be needed to close the short sales was unknown until the short sales were actually closed. It is black-letter law that contingent obligations are not to be treated as "liabilities" for purposes of section 752.

The Court should reject defendant's effort to disavow the settled legal principle that an obligation that is contingent either in effect or in amount is not a "liability" under section 752. Defendant has consistently relied on this settled principle when it works to its benefit (to increase taxes owed), and the Court should fairly and consistently apply it when it works to the benefit of taxpayers (to decrease taxes owed). A single word in a statute (i.e., "liability") cannot vary in meaning simply based on whose ox is being gored.[3] *See Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 2d 608, 619 (E.D. Tex. 2006) (holding that section 752 did not apply to contingent obligations arising in another case that defendant called "Son of Boss", based on the settled law and defendant's prior interpretation of the term "liability").

## II. Defendant's Motion for Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment

The premise of defendant's motion is that Alpha and Beta and their partners should have treated contingent obligations to "cover" several short sale positions of United States Treasury notes (hereinafter "the contingent cover obligations") as liabilities for purposes of section 752. The contingent cover obligations were assumed by Alpha from its limited partners, and then by Beta from Alpha. If defendant is correct, plaintiffs' failure to treat the contingent cover obligations as liabilities ultimately resulted in Alpha incorrectly determining its tax basis in Yahoo and Corning stock, and in Alpha's partners incorrectly determining their tax bases in

---

[3] As one well-respect treatise on partnership taxation has observed, "[o]ver the years, the Service has consistently attempted to maximize the fiscal by being inconsistent in its view of what constitutes a liability for 752 purposes . . . ." 1 WILLIAM S. MCKEE ET AL., FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶ 7.03 at 7-3 (3d ed.1997). (Reproduced in Appendix A).

Alpha.[4] Even if defendant's theory were correct, however, for the reasons discussed below, plaintiffs strongly disagree with defendant's assertions that this resulted in plaintiffs or any of their partners avoiding tax on $44 million of income.

While defendant has styled its motion as a motion for summary judgment, in fact it is a motion for partial summary judgment, because its resolution, even if favorable to defendant, will not dispose of all of the issues in the Alpha, Beta, M,L,R&R or Mickey Management, L.P. cases. If defendant's motion were granted, it would resolve only the substantive tax issues raised by defendant in the Notices of Final Partnership Administrative Adjustment ("FPAAs") that it issued to those partnerships. However, defendant also has asserted accuracy-related penalties with respect to any underpayment of tax that results from those adjustments. While defendant seeks summary judgment for those penalties pursuant to 26 U.S.C. § 6662(a) (Def.'s Mot. Summ. J. 17-18), defendant's motion does not address plaintiffs' defenses to these penalties which will remain for resolution regardless of how the Court might decide defendant's motion on the substantive legal issue in this case.

Plaintiffs are cross-moving for summary judgment on the appropriate treatment of the contingent obligation to cover a short sale under section 752. Plaintiffs agree with defendant that, aside from penalties, this is the only contested issue in the Alpha, Beta, M,L,R&R and Mickey Management, L.P. cases. (Def.'s Mot. Summ. J. 8, 13.) Plaintiffs also are cross-moving for summary judgment on the penalties asserted by defendant on any underpayment of tax that might result from resolution of the substantive section 752 issue, as the accuracy related penalties under 26 U.S.C. § 6662 do not apply and even if they could otherwise be applicable, those penalties cannot apply in this case because plaintiffs acted reasonably and in good faith in taking the tax positions at issue.

---

[4] Alpha distributed some of the Yahoo and Corning stock to its partners, who in turn contributed it to two other partnerships, M,L,R&R and Mickey Management, L.P. MLR&R sold some of the stock in 2001 and 2002. Mickey Management, L.P. and Alpha also sold some of the stock in 2002.

## III. Factual Background

In its motion for summary judgment, defendant goes to great lengths in its effort to bias the Court against the Alpha partnership, which defendant alleges (without citation to any supporting evidence) was a "tax shelter" used by members of the Sands' family to avoid tax on $44 million in income. (Def.'s Mot. Summ. J. 4, 5). The clear record, however, shows that plaintiffs have used only $7,811,557 in "excess" losses from the sales of Yahoo and Corning stock; far less than the $44 million alleged by defendant. (Pls. PFUF ¶ 37.) In addition, the allegation that Alpha was created to avoid tax is belied by the undisputed evidence that the Sands used, and continue to use, Alpha to pool family wealth in a variety of investments, and that Alpha has generated approximately $21 million in income and currently holds approximately $61,000,000 of assets. (Pls. PFUF ¶ 13.)[5] Plaintiffs have filed a separate document (titled Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Fact) to respond to these and other baseless assertions made by defendant, as required by Ct. Fed. Cl. R. 56(h)(2).

Plaintiffs also have filed their Proposed Findings of Uncontroverted Fact ("Pls. PFUF") as a separate document in support of their cross-motion for summary judgment, in accordance with Ct. Fed. Cl. R. 56(h)(1). The facts critical to plaintiffs' response to defendant's motion and plaintiffs' cross-motion are as follows:

1. In March 2001, a representative of The Heritage Organization (Heritage) contacted the Sands family regarding possible strategies the family could implement to transfer wealth between generations and diversify their assets in a tax-efficient manner. (Pls. PFUF ¶ 1.) Based in part on discussions with Heritage, the Sands family members implemented a financial plan, a

---

[5] This case has become a "high profile" case in the Sands' hometown of Rochester, New York, and filings are under constant review by the local press. Thus, defendant's repeated misrepresentation or mischaracterization of material facts such as these is particularly prejudicial to plaintiffs. Plaintiffs are uncertain of the appropriate remedy for these misstatements, but believe some rebuke is in order given their materiality.

part of which included formation of and investment by the family members in Alpha. (Pls. PFUF ¶ 5.)

2. Alpha was formed in late 2001 as a limited partnership under the laws of the state of Missouri. (Pls. PFUF ¶ 7.) The purpose of the partnership was to provide an investment vehicle for the family members to pool assets and to enhance the privacy of the family's financial information. (Pls. PFUF ¶ 6.) The six limited partners in Alpha were Robert Sands, Richard Sands, Marilyn Sands, Andrew Stern, the Marvin Sands Master Trust, and CWC Partnership I ("CWC"), collectively the "Alpha limited partners." (Pls. PFUF ¶ 8.) The general partner of Alpha was R, R, M & C Management Corporation, which was owned 50% by Richard Sands and 50% by Robert Sands. (Pls. PFUF ¶¶ 10, 12.) The Sands family has used Alpha to make many investments over the years, and, during this period, Alpha has generated more than $21 million of profits. (Pls. PFUF ¶ 13.) Alpha presently holds approximately $61,000,000 in assets. (*Id*.)

3. On December 11, 2001, each of the Alpha limited partners executed short sales of Treasury Notes through UBS PaineWebber ("PaineWebber") accounts.[6] (Pls. PFUF ¶ 14.) On December 17, 2001, the Alpha limited partners all contributed their respective PaineWebber accounts and various amounts of cash to Alpha for limited partner interests in the partnership. (Pls. PFUF ¶ 18). Their respective partnership interests were as follows:

- Robert Sands 21.401% limited partner interest
- Richard Sands 18.022% limited partner interest
- Marilyn Sands 14.641% limited partner interest
- CWC 12.949% limited partner interest
- Andrew Stern 5.857% limited partner interest
- Marvin Sands Trust 27.030% limited partner interest.

[6] The principle partners in CWC Partnership I ("CWC") are Trust FBO Abigail Stern U/W Laurie Sands ("Abigail Trust") and Trust FBO Zachary Stern U/W Laurie Sands ("Zachary Trust"). The Abigail Trust and the Zachary Trust also executed short sales of Treasury notes in brokerage accounts at PaineWebber, and then contributed their PaineWebber accounts and cash to CWC.

RRM&C Management Corp. also contributed $2,582 to Alpha for a .1% general partner interest. (Pls. PFUF ¶ 18.)

4. The short sales were just one of the many investments made by the Sands family associated with Alpha over the years. (Pls. PFUF ¶ 13). They made these specific investments for a number of reasons including: 1) to hedge against the impact of movements in interests rates on their stock holdings in Constellation Brands; 2) to profit from movements in interest rates; 3) to potentially obtain tax benefits; and 4) to increase diversification and liquidity in their investment portfolios. (Pls. PFUF ¶ 15.) As defendant notes, the Alpha limited partners computed their tax bases in Alpha by reference to the cash that they contributed to Alpha unreduced by the contingent obligation to cover the short sale positions, because contingent obligations are not "liabilities" within the meaning of section 752. (Pls. PFUF ¶¶ 55, 58, and 61). On December 17, 2001, Alpha also purchased 67,525 shares of Corning stock and 33,400 shares of Yahoo stock. (Pls. PFUF ¶ 20.)

5. Beta Partners LLC (Beta) was formed on December 10, 2001, also under the laws of the state of Missouri. (Pls. PFUF ¶ 21.) Its initial members were Alpha and Gloria Robinson. (Pls. PFUF ¶ 22.) Beta was formed to provide individual investors outside the family an opportunity to invest with the family members. (Pls. PFUF ¶ 21.) On December 20, 2001, Alpha contributed the Yahoo and Corning shares and the remaining cash it had received from the Alpha limited partners (and the requirement to "cover" the short sales) to Beta for the majority membership interest. (Pls. PFUF ¶ 23.) Also on December 20, Ms. Robinson contributed cash to Beta in exchange for her minority membership interest. (Pls. PFUF ¶ 24.) As defendant also notes, Alpha computed its tax basis in Beta by reference to the cash that it contributed to Beta unreduced by the contingent obligation to cover the short sale positions, because contingent

obligations are not "liabilities" within the meaning of section 752, which was consistent with the position taken by Alpha's partners. (Pls. PFUF ¶¶ 55, 58, and 61).

6. On December 26, 2001, Beta used most of its cash to acquire Treasury notes which it used to close the short sales. Beta recognized a profit of $90,018 upon closing the short sales. (Pls. PFUF ¶ 25.)

7. On December 27, 2001, Gloria Robinson and Alpha entered an agreement whereby Alpha agreed to purchase Gloria Robinson's membership interest in Beta, which had the effect of terminating Beta pursuant to section 708(b)(1)(B). (Pls. PFUF ¶ 26.) Alpha then took possession of Beta's assets, which principally consisted of the shares of Yahoo and Corning stock. (Pls. PFUF ¶ 27.)

8. During 2001 and 2002, Alpha transferred most of the Yahoo and Corning stock to its partners in varying amounts. (Pls. PFUF ¶ 28.) The partners then contributed some of that stock to M,L,R&R, and some to Mickey Management, L.P. (*Id.*) Alpha, M,L,R&R and Mickey Management, L.P. each sold some of the Yahoo and Corning stock during 2002. (Pls. PFUF ¶ 32.) The total losses claimed by these partnerships on the sales of the Yahoo and Corning stock was $15,647,272. (Pls. PFUF ¶ 36.) However, the Alpha limited partners could "use" only $7,811,557 of these losses to offset their taxable income because they had losses from other ventures. (Pls. PFUF ¶ 37.)[7]

9. In deciding to engage in the above transactions, the Alpha limited partners (none of whom are tax practitioners) relied on the advice they received from their personal advisors at their long-time accounting firm Bernard Robinson & Company ("Bernard Robinson") and at the law firm of Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") who reviewed the

[7] Some of the other losses were derived from transactions involving RRM&C Group, which is also at issue in these consolidated cases but is not at issue in these cross-motions. However, even if those losses were disallowed, plaintiffs would still will have "used" less than one-third of the $44 million in losses from sales of Yahoo and Corning stock alleged by defendant.

financial plan presented by Heritage. (Pls. PFUF ¶¶ 39-41.) In implementing the transactions described above and in determining the correct tax treatment of the transactions, the Alpha limited partners engaged Lewis, Rice & Fingersh, L.C. ("Lewis Rice") to provide legal services and tax opinions relating to the transactions. (Pls. PFUF ¶ 48.) Lewis Rice personnel spent some 549 hours in their representation of the partners of plaintiffs. (Pls. PFUF ¶ 52.) Lewis Rice extensively researched and analyzed the applicable law, conducted due diligence and requested and received from the Alpha limited partners the information necessary for evaluating the tax consequences of the transactions. (Pls. PFUF ¶¶ 53-54.) The opinions issued by Lewis Rice were based both on their research and analysis of the applicable law and authorities and on the experience, professional judgment, and assessment of the probable outcome of litigation or other adversarial proceedings by Lewis Rice. (Pls. PFUF ¶ 56.) Lewis Rice concluded that the position that the contingent obligations to cover the short sale positions were not liabilities for purposes of section 752 was more likely than not correct. (Pls. PFUF ¶ 55.) The Alpha limited partners relied on the opinions issued by Lewis Rice in determining the proper tax treatment of the transactions described above. (Pls. PFUF ¶ 58.) That treatment is reflected in the tax returns prepared by Bernard Robinson for plaintiffs and their partners. (Pls. PFUF ¶ 61.)

## ARGUMENT

### I. THE REQUIREMENT TO COVER A SHORT SALE IS NOT A LIABILITY WITHIN THE MEANING OF SECTION 752.

When an investor borrows securities such as United States Treasury notes and then sells the borrowed securities (*i.e.*, a "short sale"), his investment is based on the economic assessment that the fair market value of the securities will fall before he has to acquire replacement securities and deliver them to the lender. *See, e.g., E.C. Allen v. A.G. Edwards & Sons, Inc.*, 606 F.2d 84, 85 (5th Cir. 1979). If the value **does** fall, the cost of the securities to cover the short sale will then be less than the amount for which the borrowed securities were sold, and the investor will

have a profit. For tax purposes, the investor will recognize as gain (or loss, if the cost to cover increases) the difference between the proceeds received upon selling the borrowed securities and the cost, or "basis," of the replacement securities.

However, the investor obviously cannot know whether he will have a gain or a loss on the short sale until the date that he acquires the replacement securities to be delivered to the lender, because he cannot know in advance how much the replacement securities will cost. For that reason, under Treas. Reg. § 1.1233-1(a) and the "open transaction" doctrine, the investor does not recognize income or loss for tax purposes until he acquires and delivers the replacement securities to the lender, even though he earlier received proceeds upon the disposition of the borrowed securities.[8] The short sale is not closed until the replacement property is actually delivered to the lender, even if the borrower acquires and holds the replacement property in a separate account, because until delivery the borrower is free to use the replacement as he sees fit. *Richardson v. Comm'r*, 121 F.2d 1 (2d Cir. 1941).

Section 1233 and the open transaction doctrine reflect a broad, consistent theme in the Code that defers the recognition of contingencies until they become certain. While contingencies may have significant economic value or cost, the tax law generally does not allow taxpayers to take into account as certainties things that are actually unknown, regardless of their economic value or cost. This principle particularly permeates the provisions of the Code that control a partner's basis in his partnership interest. Applying this principle, the IRS and the courts have

[8] This rule often benefits the Service, because it prevents taxpayers from deducting losses until the transaction is complete. For example, in *Hendricks v. Comm'r*, 51 T.C. 235, 241-43 (1968), *aff'd*, 423 F.2d 485 (4th Cir. 1970), the taxpayer's broker purchased securities in December to cover a series of short sales, but such purchase was not settled until the following January. The taxpayer claimed a loss on his short sale positions in December because, in part, the cost of covering the short sale position was irrevocably fixed. The Commissioner nevertheless argued that the taxpayer could not deduct the loss until the following year (which began with January) because his purchase of the covering securities was not settled until that time. The Tax Court agreed with the Service finding that section 1233 and Treas. Reg. § 1.1233-1(a)(1) controlled the issue.

long held that taxpayers may not adjust their bases in partnerships to account for contingencies, just as they may not take into account gain or loss on transactions that are still open.

**A. The Interplay of Section 705 and Section 752**

The Code provides specific rules for how partners in partnerships are to account for income and loss from investments such as short sales, and it establishes a "pass through" regime under which a partnership acts as a conduit through which items of income and loss are passed to its partners. The partnership does not pay any tax on its income; rather, it is the partners who report their shares of the partnership income or loss on their own tax returns and pay tax or deduct losses accordingly. *See* Section 701.

Section 705 plays a critical role in making adjustments to the partners' tax basis in their partnership interests (known as their "outside bases"), to reflect the results of partnership operations. It provides, in relevant part:

> (a) General rule.--The adjusted basis of a partner's interest in a partnership shall . . . be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests)--
>
> (1) increased by the sum of his distributive share for the taxable year and prior taxable years of--
>
> (A) taxable income of the partnership as determined under section 703(a),
>
> . . .
>
> (2) decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of--
>
> (A) losses of the partnership . . . .

For example, assume a partnership has two partners, each with a 50% interest, and the partnership holds only an asset in which it has a basis of $100. If the partnership sells the asset for $160, the partnership will have a $60 gain (and $160 of cash), and it will report $30 of income to each of the two partners, which they must report on their tax returns, paying any resulting tax. Section 705 then requires each partner to increase her basis in the partnership by that $30 to avoid the double taxation that would otherwise result when she ultimately sells her

partnership interest (her 50% share is now worth $80) or the partnership distributes cash.[9] The mirror image is also true – section 705(a) also requires a partner to decrease his outside basis by his share of distributions from the partnership or his share of partnership losses (so he can deduct a loss only once). Under section 705(a), a partner's outside basis in a partnership is thus adjusted at the end of each year during which the partnership recognizes gain or loss.

Partnerships, like other taxpayers, do not recognize gain or loss on a short sale until replacement securities are acquired and delivered to the lender, and section 1233 accordingly defers the recognition of gain or loss until that time. *See* Treas. Reg. § 1.1233-1(a)(1) ("For income tax purposes, a short sale is not deemed to be consummated until delivery of property to close the short sale."); *see also Richardson*, 121 F.2d at 4 (stating that gain or loss on a short sale was "only realized when the borrowed stock was delivered, or at least not before the lender acquired an equitable interest in specific shares."). Thus, a partner's outside basis in a partnership that holds an open short sale position will be adjusted under section 705 to reflect the gain or loss on the short sale when the partnership acquires and delivers the securities to cover the short sale.

The Service used this very rule in Rev. Rul. 73-301, 1973-2 C.B. 215, where it held that section 705 governs when a partner's basis in a partnership is to be adjusted to account for "contingent" obligations, like the obligation to cover a short sale. The issue involved in that ruling -- whether interim payments received by a partnership in connection with a long-term contract constituted liabilities for purposes of section 752 -- is similar to the question here. In concluding that the interim payments were not "liabilities" within the meaning of section 752, the ruling stated that "[t]he income or loss from performance of the contract will affect the basis

[9] A partner must recognize gain to the extent the proceeds from a sale of her interest exceed her outside basis. *See* sections 741, 1001. A partner also must recognize gain on any distribution of money that she receives from a partnership in excess of her outside basis. *See* section 731(a)(1).

of the partnership interests of the partners, **as provided in section 705(a), when such income or loss is recognized** for Federal income tax purposes." *Id*. at 216 (emphasis added).

Defendant's position in this case, on the other hand, inconsistently treats the requirement to cover a short sale as a "liability" for purposes of section 752 **before** the partnership acquires and delivers the securities to cover the short sale, i.e., while the transaction is still open. Section 752, which governs the treatment of liabilities by partners and partnerships, provides:

> (a) Increase in partner's liabilities.--Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) Decrease in partner's liabilities.--Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.
>
> (c) Liability to which property is subject.--For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.
>
> (d) Sale or exchange of an interest.--In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

Under section 752(b), a partner must decrease his basis in the partnership to the extent that the partnership assumes the partner's individual "liabilities."[10] In turn, under section 752(a), all partners are then to increase their bases in their partnership interests for their share of the new "partnership" liability.[11]

In the next section of this brief, plaintiffs will show that the contingent cover obligations are not "liabilities' within the meaning of section 752, as that term has long been interpreted and applied by defendant and the courts. For now, however, it is important to understand the incongruity that defendant's position would create between sections 705 and 752. By treating a

---

[10] Section 752(b) treats a decrease in a partner's liabilities as a distribution of money to him from the partnership. The distribution of money from the partnership reduces basis dollar-for-dollar. *See* section 733.

[11] Section 752(a) treats an increase in a partner's share of partnership liabilities as a contribution of property to the partnership. The contribution increases the partner's basis in the partnership on a dollar-for-dollar basis. *See* section 722.

contingent cover obligation as a "liability" subject to section 752, the Service would require an estimated adjustment to the partners' bases in the partnership for the amount of the section 752 liability when the "liability" is assumed by the partnership, even though the Code precludes recognition of gain or loss on the transaction precisely because the cost to cover that is reflected in that "liability" cannot be anticipated. Thus, the amount of the section 752 liability cannot be quantified without prematurely treating the short sale as a closed transaction to derive a fixed and determinable liability in direct violation of Treas. Reg. § 1.1233-1(a)(1) and the open transaction doctrine.

By focusing on section 752 – and avoiding discussion of sections 705, 1233, and the open transaction doctrine – defendant's brief incorrectly describes only part of the story. Indeed, defendant's brief noticeably lacks any explanation of how taxpayers are to estimate the amount of a "liability" that is contingent for purposes of calculating their initial cost basis in a partnership. In the case of a short sale of Treasury notes, the cost to cover will depend on movements in interest rates, which will drive the cost to acquire covering securities up or down. No taxpayer, including plaintiffs, can estimate with any certainty the cost to cover such a short sale for purposes of calculating the "liability".

Defendant's position cannot be reconciled with Treas. Reg. § 1.1233-1(a)(1), which provides (emphasis added): "**For income tax purposes** a short sale is not deemed to be consummated until delivery of property to close the short sale." There is nothing in section 1233 or Treas. Reg. § 1.1233-1(a)(1) that indicates that open transaction treatment under this regulation "for income tax purposes" meant to say "for income tax purposes **except** under Code 752," which is the limitation that defendant now advocates. Defendant may not unilaterally add this restriction to the statute in disregard of its own regulations. An administrative agency "may not usurp the authority of Congress by adding restrictions to a statute which are not there."

*Stephenson Trust v. Comm'r,* 81 T.C. 283, 288 (1983) (quoting *Estate of Boeshore v. Comm'r,* 78 T.C. 523, 527 (1982)).

### B. The Requirement to Cover a Short Sale Is Not a Liability for Purposes of Section 752.

Defendant's position not only ignores sections 1233 and 705, it is also in direct conflict with well-settled precedent holding that the requirement to cover a short sale position is **not** a "liability" within the meaning of section 752.

In 1975 the Internal Revenue Service won a case in the United States Tax Court that governs this issue and that is directly on point. *Helmer v. Comm'r,* 34 T.C.M. (CCH) 727 (1975) involved two partners in a partnership that sold an option to acquire property owned by the partnership to a development corporation. The development corporation paid upfront consideration for the option and also made annual payments that were to be applied to the purchase price of the property if the option were exercised. The partnership treated these payments as "liabilities" that increased the Helmers' basis in their partnership interests under sections 752(a) and 722 on the theory that the partnership would have to credit these payments against the purchase price **if** the development corporation decided to exercise the option. The Service, however, argued that the amount that the partnership received for giving the option was **not** a "liability" within the meaning of section 752. The resolution of this issue was important to the Helmers because the partnership distributed the option proceeds to them and, under section 731(a), the Helmers would have taxable gain to the extent the distributions exceeded their partnership bases (so they wanted to count the option payments as a liability to increase their bases). As is the case with short sales, the partnership could not, under the open transaction doctrine, recognize income on the option contract (which also would have increased outside basis) until the option either expired or was exercised. The court agreed with the Service and held that the option proceeds were not a liability for purposes of section 752 because the

obligation of the partnership to credit the payments to the development corporation was contingent upon the option being exercised. The Helmers were therefore not allowed to increase their bases in the partnership and, as a result, they had taxable gain on the distributions from the partnership.

The Service again successfully argued that "contingent" obligations are not "liabilities" within the meaning of section 752 in *Long v. Comm'r*, 71 T.C. 1 (1978), *motion for reconsideration*, 71 T.C. 724 (1979), *aff'd and remanded*, 660 F.2d 416 (10th Cir. 1981). In that case, the courts held that contingent or contested obligations are not "liabilities" for purposes of increasing partnership basis until the obligations become fixed or liquidated. The taxpayer in *Long* was the beneficiary of the estate of his deceased father. The decedent was a partner in a partnership that constructed buildings, and upon his death the estate took his place as a partner in the partnership. Two lawsuits, which sought millions of dollars in damages for construction-related claims, were pending against the partnership when the father died. Shortly thereafter, the partnership was liquidated and the taxpayer, as beneficiary of the estate, claimed a loss on the liquidation. The estate treated the construction claims against the partnership as "liabilities" for purposes of section 752, which would have increased its basis in the partnership allowing it to deduct the losses. But the Service refused to allow the taxpayer to include the estate's share of such "liabilities" in its outside basis because such liabilities were contingent. The court agreed:

> The treatment of the other claims is not so clear, however the generic sense of the term, **contingent or contested liabilities** such as the Kansas City Life-TWA and USF&G claims **are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated.** This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. We think that partnership liabilities should be treated in the same manner. We see no logical reason for distinguishing the above cases solely because the asset involved is an interest in a partnership, and neither party suggests such a distinction. Those liabilities are fixed or paid.

> The Kansas City Life-TWA and USF&G claims were too contingent at the death of the decedent to be included in the estate's initial computation of its basis in the decedent's partnership interest. Liability for those claims had not been established and was in fact contested. Moreover, the amounts of damages sought were by no means definite or fixed.

*Id*. at 7-8 (emphasis added) (citations omitted). The court in *Long* gave two independent reasons for holding that the claims were not liabilities for purposes of section 752: the obligations were contingent, and they were also indefinite in amount.

The Service has on many occasions ruled that contingent or executory obligations do not constitute liabilities under section 752. Most on point, in Rev. Rul. 57-29, 1957-1 C.B. 519, the taxpayer entered into a "when-issued" securities contract that gave the taxpayer the future right to receive a fixed payment in return for its contractual obligation to deliver specific securities to the buyer when and if such securities were issued. The Service ruled that:

> In computing the cost basis of assets for any purpose, the Internal Revenue Service does not recognize an obligation of a taxpayer reflected in an executory contract prior to the performance of the contract. Such an executory contract to buy or sell securities which has cost the taxpayer nothing has a basis of zero to him, for Federal income tax purposes, in computing his gain or loss on a subsequent sale or disposition thereof prior to performance on the contract.

*Id*. at 519-20. The "when-issued" security purchase agreements addressed in this Ruling are treated as short sales for tax purposes. *See* section 1233(e)(2)(A); Treas. Reg. §§ 1.1233-1(c)(1), 1.1233-1(c)(6) Ex. 6 (applying short sale rules to "when issued" securities); S. REP. NO. 81-2375, at 87 (1950) (providing that the entry into a contract to sell stocks or securities "when issued" shall be considered as a short sale and the performance of such contract or the assignment thereof for value shall be considered as a closing of such short sale) (reproduced in Appendix A); I.R.S. G.C.M. 37,332 (Nov. 25, 1977) ("when issued" sales contracts are treated as short sales subject to section 1233). Thus, in flat contrast to the position that defendant is taking in this case, the Service has already ruled that an executory obligation such as the obligation to cover a short sale is **not** to be treated as a liability for purposes of section 752.

The position adopted by the Service in Rev. Rul. 57-29 was reaffirmed in Rev. Rul. 79-294, 1979-2 C.B. 305. In Rev. Rul. 79-294, the Service stated that a commodity futures contract (including a short position under a commodity futures contract) is merely an executory contract and not a liability under section 752. *Id*. *See also* I.R.S. G.C.M. 37,971 (June 1, 1979) ("The Internal Revenue Service does not recognize an obligation of a taxpayer reflected in an executory contract prior to the performance of the contract."); I.R.S. G.C.M. 37,860 (Feb. 16, 1979) ("[I]n computing the cost basis of an executory contract **for any purpose** the Service does not recognize an obligation of a taxpayer reflected in an executory contract prior to performance of the contract.") (emphasis added); I.R.S. G.C.M. 38,237 (Feb. 15, 1980) ("[T]he Service does not recognize the obligation of a taxpayer reflected in an executory contract prior to performance of the contract.").

*Helmer* and *Long* and the cited IRS pronouncements all stand for the same fundamental proposition: contingent obligations (*i.e.*, those where the obligation itself is unmatured, executory, or speculative) are not "liabilities" for purposes of section 752. Obligations that are contingent in amount also are not "liabilities" for purposes of section 752, even if such obligations are "definite" in the sense that it is certain that the obligor will have to transfer at least some property to satisfy the obligation. In *La Rue v. Comm'r*, 90 T.C. 465 (1988), the Service argued, and the Court agreed, that obligations that are fixed in the sense that it is known that **some** amount will be paid, but that remain contingent in amount, do not constitute "liabilities" for purposes of section 752. The court stated the meaning of "liability" for purposes of section 752 was established in *Long* and that, even though a contract may create a definite obligation to replace securities, that obligation does not represent a "liability" under section 752 until the cost of that obligation becomes fixed in amount:

> Once the 'back office' failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the



AO 1710944.6

> NYSE rules. **Goodbody was under an obligation to replace any missing securities or money.** Essentially, Goodbody's books were in error because of the back office problems and the Haskins report reflected estimated liability figures. All of petitioners' witnesses testified that these were transactions for which the partnership was liable. **There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.**
>
> **Petitioners have not shown that these amounts were determinable with reasonable accuracy.** As a result of the Haskins audit, Goodbody (and Merrill Lynch) knew which particular securities would have to be sold or purchased and how much money was missing from customer accounts. However, it was not certain upon which of these claims Goodbody would ultimately be liable, because the smaller the amount of the transaction the less likely the customer would be to claim it. In addition, **the exact amount of loss or gain was not determinable until actual purchase or sale. Valuation of the claims may be a purely ministerial matter because of the ready market for securities, but is not readily determinable until purchase or sale occurs.** The additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates. Accrual accounting requires that the amount be determinable with 'reasonable accuracy.' **A loss is not determinable until the securities are actually purchased or sold, and the transaction closed. We accordingly hold that because the reserves were not a fixed obligation of the partnership sufficiently determinable in amount in 1970, they cannot be included in the partners' bases in that year.**

*LaRue*, 90 T.C. at 479-80 (footnotes omitted) (emphasis added). *See also Long*, 71 T.C. at 8 (holding that the obligation was not a section 752 liability because, in part, "the amounts of damages sought were by no means definite or fixed"). The obligation at issue in *LaRue* – to replace identified missing securities and money – was an obligation substantially similar to plaintiffs' obligation to cover a short sale of Treasury notes and, in *LaRue*, the Tax Court clearly held that, despite the ready market from which the securities could be obtained, the amount of the obligation was contingent and speculative and therefore such obligation could not represent a "liability" under section 752.

The requirement to cover the short sale that is involved in the present case is contingent in the same manner as the obligations addressed in *Helmer*, *Long*, and *La Rue*. Although the

borrower in a short sale must eventually purchase like securities (in this case, Treasury notes) to cover the short sale, that obligation is open, executory and not fixed in amount. Even if the cover requirement matures, the taxpayer can not know how much it will cost to acquire the covering securities until they are actually acquired, and the obligation therefore remains contingent in amount until that time. For these reasons, the executory cover requirement can **not** be treated as a liability for purposes of section 752 under the settled precedents.

The conclusion that an obligation that is contingent in amount is not a "liability" also draws support from the ruling of the Supreme Court, again at the urging of the Service, that the obligation to cover a short sale is **not** an "indebtedness" because it does not require the repayment of money. In *Deputy v. du Pont*, 308 U.S. 488 (1940), the taxpayer borrowed stock and agreed to return it within ten years, and also agreed in the interim to pay the lender all dividends that he received on the borrowed shares. The taxpayer then sold the stock to nine du Pont executives (*i.e.*, he sold it short). In 1931, the taxpayer paid the lender $567,648 in dividends that had been paid on the stock, and he deducted that amount as "interest paid or accrued . . . on indebtedness" under former section 23(b) (the predecessor to current section 163). The Service contended that an obligation to cover a short sale was not "indebtedness" and disallowed the deduction. The Supreme Court decided the issue under a plain meaning approach. It determined that "indebtedness" meant "borrowed money" and "interest on indebtedness" meant "compensation for the use or forbearance of money." The Court held that while the requirement to cover the short sale was an "obligation," it was not "borrowed money," and could not therefore be "indebtedness." *Id*. at 497-98.

The ruling in *du Pont* is that a short sale involves the borrowing of property, not money, and that an obligation to return property does not qualify as "debt" for tax purposes. The Court's decision in *du Pont* illustrates that there are two independent components to a short sale that may

not be collapsed for tax purposes: the borrowing of a security and the sale of a security. The taxpayer in *du Pont* was not allowed to deduct his "interest" expense because he had not borrowed any money and incurred any "indebtedness" under the plain meaning of that term – he had instead only borrowed property. The cash received in a short sale is thus attributable to the sale of the borrowed property and is not attributed to any borrowing of funds.

The Service may not disregard the holding it advocated in *du Pont* to suit its different purposes in this case. Either the obligation to return property in a short sale is a "debt" for tax purposes or it is not. The Supreme Court, and Congress through legislative enactments,[12] have determined that the obligation to return property in a short sale is **not** a "debt" or a "borrowing" for tax purposes. An executory promise to return property in a short sale cannot be a "liability" for the same reason. The terms "liability," "debt" and "indebtedness" are synonymous. *See* THE NEW ROGET'S THESAURUS IN DICTIONARY FORM 126-27 (Norman Lewis, ed., Berkley Books rev. ed 1978) (1961). (Debt: "liability . . . indebtedness") (reproduced in Appendix A). Indeed, at one time defendant proposed a definition of "liability" for purposes of section 752 which would only apply to "debt", which under *du Pont* would not include obligations to cover a short sale.[13] Because there is no valid reason for defining a "liability" differently than "debt,"

---

[12] Congress has also recognized that the requirement to cover a short sale is not a "debt" for tax purposes. Several provisions of the Code have been enacted to treat a short sale position as debt only for specific purposes. *See, e.g.*, sections 163(d)(3)(C), 246A(d)(3)(B), 263(g)(2), 265(a)(5). These provisions make clear that, but for their existence, the requirement to cover a short sale would not otherwise constitute "debt" for tax purposes. The "bluebook" explanation of the legislative changes to sections 163, 246A, 263, and 265 also indicates that "a short sale was **not** treated as a borrowing" prior to these changes. Staff of the Joint Committee on Taxation, 98th Cong., GENERAL EXPLANATION OF THE REVENUE PROVISIONS OF THE DEFICIT REDUCTION ACT OF 1984 at 156-57 (Comm. Print 1985) (emphasis added) (reproduced in Appendix A).

[13] Temp. Treas. Reg. § 1.752-1T(k) (since withdrawn by the IRS but reproduced in Appendix A) provided (emphasis added):

> **(k) Examples.** The following examples illustrate the application of the rules of this section. Except as otherwise provided, ***these examples assume that*** . . . ***(2) partnership indebtedness constitutes debt for federal income tax purposes*** . . . .
>
> **Example 2(ii)** . . . As provided by paragraph (g) of this section [the definition of liability], ***an obligation that constitutes a debt for federal income tax purposes*** is a liability of the obligor only to the extent that incurring or holding such obligation gives rise to (1) the creation of, or an increase in, the basis of any property owned by the obligor . . . .

defendant is bound by that result until Congress amends the statute to provide for a different rule. *See Brown v. Helvering*, 291 U.S. 193, 200 (1934) ("Except as otherwise specifically provided by statute, a liability does not accrue as long as it remains contingent.").

Defendant failed to offer any explanation of why the contingent obligations to cover are to be treated as liabilities for purposes of section 752. Instead, in a "declare victory and walk away" moment, defendant in a footnote without any explanation merely states that the "liabilities in issue here . . . are not contingent." (Def.'s Mot. Summ. J. 15, n.17.) This is directly contrary to section 1233 and defendant's longstanding position that obligations to cover short sales **are** contingent. *See, e.g.*, I.R.S. G.C.M. 35,328 (May 4, 1973) (describing a short sale as "involving [an] obligation which would vary with changes in market values while the proceeds of the transaction remained fixed from the time it was entered"). The cost to cover the short sale is either contingent or it is not: defendant should not be allowed to treat the obligation to cover a short sale as open and contingent for purposes of deferring gain or loss, but as immediately closed and fixed and determinable for purposes of recognizing and quantifying a "liability." Defendant is necessarily bound by the same legal standards for computing basis that it has long imposed on taxpayers, both with respect to how basis is calculated under section 752 and for application of the open transaction doctrine.

The impracticality of defendant's position is also apparent. There is no provision in the Code or the Treasury regulations that speaks to how the amount of a short sale obligation is to be measured before it is closed. This should be expected, because the Code and regulations otherwise treat a short sale as an open position until the covering securities are delivered to the lender. *See* Treas. Reg. § 1.1233-1(a)(1) ("For income tax purposes, a short sale is not deemed to be consummated until delivery of property to close the short sale."). There is no realistic

method for determining the amount of the obligation until the cover transaction is concluded – for it is not possible to know today what the cost to cover will be tomorrow.

The lack of any meaningful method for estimating the amount of these contingencies is well-demonstrated by defendant's own motion. At first, defendant indicates that the amount of the "liability" at issue for purposes of section 752 is $44,000,000, which is the actual amount of cash that the Alpha limited partners received in the short sales (excluding accrued interest). (Def.'s Mot. Summ. J. 7, 10.) Later, however, defendant states that the amount of the liability should be a different amount – $44,293,087 – but does not explain the source of that calculation. (*Id.* at 17.) Defendant fails to explain why either number would be appropriate, presumably because no authority or guidance exists for **either** position.

### C. The Authorities Cited by Defendant Do Not Alter the Legal Principle that Contingent Obligations are not liabilities under section 752.

Defendant cites three authorities to support its argument that an obligation to cover a short sale is a liability for purposes of section 752: Rev. Rul. 95-26; *Salina Partnership v. Comm'r*, 80 T.C.M. (CCH) 686 (2000); and *Colm Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006 (appeal pending, No. 06-11422 (5th Cir.)). Each of these are discussed below.

#### 1. <u>Rev. Rul. 95-26</u>

Rev. Rul. 95-26, 1995-1 C.B. 131, is a one-page ruling virtually devoid of any analysis which the IRS used in self-serving fashion in an effort to reverse its long-standing position on section 752, by adopting the novel position that an obligation to cover a short sale position is a liability for purposes of section 752. Plaintiffs urge the Court to reject the notion that the Service may walk away from the body of law *that the Service helped create* in a result-oriented Revenue Ruling. The Internal Revenue Code is not a playground; it is a system of laws that must apply

equally to defendant and taxpayers. If the Service wants to now change the definition of the term "liability" for purposes of section 752, its recourse should be to Congress.

In any event, Revenue Ruling 95-26 is nothing more than a restatement of defendant's litigating position and is therefore not entitled to any deference:

> Revenue rulings lack the force of law, *see Western Co. of N. Amer. v. United States*, 323 F.3d 1024, 1032 (Fed.Cir.2003) ("[R]evenue rulings merely represent the position of the United States and do not bind this court."), although they may be instructive in the absence of controlling authority. *See, e.g., Sealy Power, Ltd. v. Commissioner of Internal Revenue,* 46 F.3d 382, 394-95 (5th Cir.1995) (applying certain factors employed in previous revenue rulings); *St. Louis Bank for Coop. v. United States,* 224 Ct.Cl. 289, 624 F.2d 1041, 1050 (1980) ("Revenue rulings ... can provide some guidance as to the types of transactions [in this case].").

*USA Choice Internet Service, LLC v. United States,* 73 Fed. Cl. 780, 792-93 (2006). *See also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *see also Chock Full O'Nuts Corp. v. United States,* 453 F.2d 300, 303 (2d Cir.1971).

The analysis in Revenue Ruling 95-26 is incredibly brief and is not persuasive:

> Section 752(a) provides that an increase in a partner's share of partnership liabilities is treated as a contribution of money by the partner to the partnership.
>
> Rev. Rul. 88-77, 1988-2 C.B. 129, provides that partnership liabilities for purposes of § 752 include an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings).
>
> A short sale creates an obligation on the part of the seller to return the borrowed securities. *See, e.g., Deputy v. du Pont*, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). In addition, the cash received in the short sale is an asset of the partnership. Thus, the basis of the partnership's assets is increased. Therefore, PRS's short sale creates a liability under § 752 . . . .

*Id*. at 132. The ruling's rationale is that an obligation automatically becomes a section 752 liability if incurring the obligation creates or increases the basis of a partnership asset. This position is fundamentally incorrect for at least four distinct reasons.

First, the Service's position is incompatible with *du Pont*. The Service cites *du Pont* for the proposition that a short sale does not create "indebtedness," but then inconsistently (and without any analysis) states that a short sale is nevertheless a "liability." As discussed earlier in this brief, those conflicting positions are not technically or logically reconcilable.

Second, the Service's position is in **direct conflict** with the holdings that it advocated in *Helmer* and *La Rue* and similar cases. The position of the Service, which the courts have adopted, is that obligations that are contingent in effect or in amount do **not** qualify as section 752 liabilities. An obligation to cover a short sale is executory and contingent in amount. Because the Service has long advocated this very rule, its inconsistent assertions in the ruling are plainly entitled to no deference.

Third, the conclusion of the Service is directly counter to the very reason **why** taxpayers must defer gain or loss on short sale positions until the covering securities are acquired and delivered to the lender. As discussed in detail earlier in this memorandum, taxpayers must, under the open transaction doctrine and Treas. Reg. § 1.1233-1(a)(1), defer recognition of gain or loss on open short sale transactions because the gain or loss cannot be calculated with any certainty until the transaction is closed. The same principle underlies *Helmer*, *La Rue*, and all the related authorities discussed earlier in this memorandum – a contingent obligation is not a liability under section 752 precisely because it is unclear whether the taxpayer will incur a cost to satisfy the obligation or what the amount of such cost may be. Rev. Rul. 95-26, however, purports to require taxpayers to somehow estimate the amount of the "liability" while the obligation remains contingent and uncertain. Defendant's position here – that the obligation to cover a short sale can be estimated with sufficient certainty to quantify the liability (although defendant fails to explain how) – is flatly inconsistent with the position embodied in his own

regulations that gain or loss on open short sale positions must be deferred until the transaction is closed because the gain or loss can **not** be estimated with any certainty.

Finally, the Ruling fundamentally misconstrues the true nature of a short sale. The sole support offered by the Ruling for its conclusion is that the partnership received cash as compensation for the short sale obligation. That premise is fundamentally flawed, however, because the partnership did not receive **any** cash as a result of incurring the short sale obligation; rather, the borrowing resulted in the partnership receiving only securities and that is all it was required to return to the lender. As discussed above, the borrowing of securities (*i.e.*, the obligation under *du Pont*) does not give rise to an asset that increases a partnership's basis in its assets. It is the **sale** of the borrowed securities that results in the cash proceeds, **not** the borrowing, and the sale of the securities does not create any obligation.[14]

The fallacy of the Service's reasoning in Rev. Rul. 95-26 is well-recognized. For example, one author wrote:

> [T]he commissioner's syllogism, which equates the short sale proceeds with increased basis in the partnership assets and therefore with a concomitant increase in partnership liabilities under section 752, confuses the sale, which produces the proceeds, with the securities borrowing. Because it is the sale, not the borrowing, that gives rise to the cash and creates additional basis, there is no liability to which section 752 status can attach.

ALICE WELT CUNNINGHAM, SHORT-SALE OBLIGATIONS AND BASIS IN PARTNERSHIP INTERESTS, 72 TAX NOTES 1663 (1996) (reproduced in Appendix A). The leading treatise on partnership taxation similarly provides:

[14] The Service appears to erroneously combine the receipt of the sale proceeds and the borrowing into one transaction, but that is precisely the construct rejected by the Supreme Court in *du Pont*. Indeed, if the borrowing and sale were to be collapsed into one transaction, then the Supreme Court in *du Pont* would have had no choice but to conclude that the taxpayer had effectively borrowed cash, by first borrowing securities and then selling them for cash. But that is not what underpins *du Pont*; it is instead the sale of the borrowed securities that gives rise to cash in a short sale transaction, and the tax consequences of that sale are deferred by section 1233 until the delivery of securities to replace those that were borrowed and sold. *See also Zlotnick v. TIE Communications*, 836 F.2d 818, 820 (3d Cir. 1988) ("'Selling short', therefore, actually involves two separate transactions: the short sale itself and the subsequent covering purchase . . . .").

> It is the sale, not the borrowing, that gives rise to an increase in the partnership's assets. Under the peculiar rules governing short sales, the "basis" of the securities that are sold is simply not relevant to the taxation of the transaction, because the tax consequences of the sale are deferred and ultimately determined by reference to the cost of the securities that are used to repay the loan (which are not the securities that were originally sold).

1 WILLIAM S. MCKEE ET AL., FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[1] at 7-6 to -7 (3d ed. 1997) (criticizing Rev. Rul. 95-26) (reproduced in Appendix A). .

2. Salina Partnership LP v. Commissioner

In *Salina Partnership v. Commissioner*, 80 T.C.M. (CCH) 686 (2000), Judge Jacobs of the Tax Court incorrectly determined in an informal opinion that a short sale obligation **is** a liability for purposes of section 752. That decision was issued as a "memorandum opinion" which, under Tax Court rules, has no precedential value. *See Nico v. Comm'r*, 67 T.C. 647, 654 (1977) ("[W]e consider neither revenue rulings nor Memorandum Opinions of this Court to be controlling precedent."), *aff'd in part, rev'd in part on other grounds*, 565 F.2d 1234 (2d Cir. 1977); *Stratmore v. Comm'r,* 48 T.C.M. (CCH) 1369, 1371 (1984) ("It is well settled that the Tax Court does not consider its Memorandum Opinions to be binding precedent."), *rev'd on other grounds*, 785 F.2d 419 (3d Cir. 1986). In any event, the decision in *Salina* cannot withstand scrutiny.[15]

At the outset, the court in *Salina* erred in relying on Rev. Rul. 95-26, which is itself entitled to no deference and is severely flawed for the reasons discussed above. More fundamentally, the court erred in *Salina* by assuming section 752 serves the purpose of "avoid[ing] distortions in the tax reporting of partnership items by promoting parity between a partnership's aggregate inside basis in its assets and its partners' outside bases in their partnership interests," which Judge Jacobs believed justified applying it in a manner that was inconsistent

[15] The parties settled *Salina* prior to resolution of the appeal, also making it of questionable value as precedent.

with the application of sections 1233 and 705. *Salina*, 80 T.C.M. (CCH) at 698. That assumption is in error for several reasons.

Most critically, the suggestion that an obligation must be treated as a liability under section 752 to equate the partners' collective bases in their partnership interests (i.e., "outside basis") and the partnership's basis in its assets (i.e., "inside basis") is incorrect. For example, in this case, the partners' outside bases in Alpha and Beta would approximate the partnerships' inside bases in their assets regardless of whether the contingent obligations to cover are treated as liabilities. Thus, the single-most important reason cited by Judge Jacobs for treating the contingent obligation to cover a short sale position simply does not apply in this case.

The *Salina* court erred, in any event, in suggesting that section 752 is intended to equate inside and outside basis. Defendant apparently failed to inform the court in *Salina* that defendant knew that the definition of "liability" it had successfully advocated - that it does not include contingent obligations - would cause disparities between inside and outside basis, but decided as a policy matter not to seek a change to that definition. Pls. Ex. 7, App. A at p. 81-82 (Starke notes).[16] Apparently, equating inside and outside basis is only of importance to defendant when that works to increase taxes owed. *See Klamath*, 440 F.Supp.2d at 619 ("The positions the government took in [*Long*, *Helmer*, and *LaRue*] resulted in the same disparity between inside and outside basis that it protests will occur here under Plaintiff's position . . . . The only difference between the 752 Cases regarding liability and this case is that the taxpayer is receiving the benefit rather than the IRS.").[17]

---

[16] Plaintiffs have reproduced in Appendix A testimony given by Richard Starke, an employee of the IRS, in Jade Trading, LLC v. United States, #03-2164T, presently pending before the Court of Federal Claims, as well as his notes admitted as an exhibit during his testimony. Plaintiffs discuss these notes in more detail later in this brief.

[17] Moreover, Congress has not, until very recently and well after the transaction at issue, made equality of inside and outside basis a significant priority. Indeed, the general rule under sections 734 and 743 is that "inside" basis is **not** adjusted as a result of sales of, or distributions with respect to, partnership interests, even though these transactions often create inequality of inside and outside basis. Code section 734(a), 743(a). Until recently, partnerships were given complete discretion in whether to equalize inside and outside basis in such situations by making an election to do so under section 754.

In addition, the court in *Salina* failed to recognize the scope of section 1233. On its face, section 1233 appears to provide only a rule that governs the characterization of the result of a short sale (*i.e.*, whether it is ordinary income or short-term or long-term capital gain). However, in *Hendricks v. Comm'r*, 423 F.2d 485, 486-87 (4th Cir. 1970), *aff'g* 51 T.C. 235, which was one of the few authorities relied on by Judge Jacobs in *Salina*, the Tax Court specifically held that section 1233 and Treas. Reg. § 1.1233-1(a)(1) required the conclusion for purposes of determining the timing of the gain or loss that a short sale is not deemed to be consummated until delivery of property to close the short sale. The court emphasized the point that the Regulation states that it applies "For income tax purposes." *Hendricks*, 51 T.C. at 241. Judge Jacobs did not explain why Treas. Reg. § 1.1233-1(a)(1) does not similarly apply for purposes of section 752 when it says it applies "for income tax purposes" without any limitation.

The *Salina* court also erred in rejecting the taxpayer's analogy between the cash proceeds of a short sale and the option proceeds in *Helmer*:

> Although the two transactions are both considered open transactions for purposes of application of the income tax, the transactions are materially different for purposes of analysis under section 752. The option payments that the partnership received in *Helmer v. Commissioner*, *supra*, represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services. In contrast, Salina's gain or loss on the sale of borrowed Treasury bills was dependent upon the cost to Salina of fulfilling its obligation to replace the borrowed Treasury bills. Consequently, we hold that *Helmer v. Commissioner, supra,* does not support petitioner's position in this case.

*Salina*, 80 T.C.M. (CCH) at 700. The conclusion that the option proceeds in *Helmer* "represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services" is flatly wrong. The option payments in *Helmer* were **not** for the sale of a partnership asset, they were for an ongoing option of the payor to purchase a partnership asset. The option payments in *Helmer* were also most certainly **not** "free and clear of any claim for repayment or demand," because the option proceeds were

required to be credited against the purchase price if the holder exercised the option and the transaction became a purchase, which would have required the partnership to transfer the property and recognize gain or loss (as happens when a short sale is closed). In any event, the court in *Salina* failed entirely to address how an obligation that is contingent in amount could be a liability for purposes of section 752 in light of *Long* and *La Rue*.

Judge Jacobs also erroneously deemed the taxpayer's reliance on *du Pont* "misplaced." The court stated that "the Supreme Court's rejection of the taxpayer's argument [in *du Pont*] was more firmly rooted in the Court's holding that the disputed payments did not constitute a payment of interest within the meaning of the statute." *Id*. (internal citation omitted). In *du Pont,* however, the Supreme Court disallowed the deduction for interest **only** on the basis of its determination that there was no indebtedness. That finding was central to the conclusion in *du Pont*, and it is now so well accepted that Congress enacts specific legislation when it desires a short sale obligation to be treated as debt for a specific purpose.[18]

The *Salina* court then undertook the ambitious task of trying to narrow the specific holding of the Supreme Court in *du Pont*, asserting:

> [T]he Supreme Court's statement . . . that "an obligation is not necessarily an 'indebtedness'" . . . does not constitute a blanket holding that a borrower's obligation to close a short sale by returning the borrowed securities to the lender will never be considered an indebtedness . . . .

*Id*. To the best of plaintiffs' knowledge, the *Salina* decision is the only case since *du Pont* to question what has long been the accepted rule that a short sale obligation is not an indebtedness. Even the Service recognized that a short sale is not indebtedness in Rev. Rul. 95-26, 1995-1 C.B. 131. Judge Jacobs cited no authority for this statement, and it is clearly wrong.

In short, the court's conclusion in *Salina* was inconsistent with (a) the "open transaction" treatment of short sales for every other purpose of the Code, *see, e.g.*, Treas. Reg. § 1.1233-

[18] See authorities cited in footnote 11.

1(a)(1); (b) defendant's position that tax-deferred receipts, such as at issue in *Helmer* and Rev. Rul. 73-301, do not create outside basis, notwithstanding the resulting imbalance between inside and outside basis, when such discrepancy works to defendant's advantage; (c) decades of case law which hold that contingent obligations are not section 752 liabilities; and (d) established jurisprudence that the obligation to replace the property borrowed in a short sale is not a "borrowing of money" that would create a "debt" or "indebtedness" for tax purposes.

Having rejected or ignored years of precedent embodied in *du Pont*, *Long*, *La Rue*, *Helmer*, and multiple pronouncements from the Service, the *Salina* court turned to Black's Law Dictionary to find a definition of the term "liability" for purposes of section 752. That dictionary contains the following definition for the term:

> 1. The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment. * * * 2. A financial or pecuniary obligation * * *.

The court stated that this definition was dispositive, stating:

> Based upon the aforementioned meaning of the term "liability", and consistent with the policy underlining section 752, we hold that Salina's obligation to close its short sale by replacing the Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the Treasury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN. Significantly, Salina reported the obligation as a liability on its opening balance sheet.

*Id*. Obviously, the use of a dictionary definition to ignore the controlling case law that interprets this statutory term is unjustified and inappropriate.[19]

3. <u>Colm Producer, Inc.</u>

[19] To the extent that the dictionary definition of the term "liability" were apt, it is still possible to harmonize it with the controlling case law such as *du Pont*. As quoted above, one of the definitions of the term "liability" provided by the dictionary is a "financial or pecuniary obligation". In *du Pont*, the Supreme Court determined that the obligation to cover a short sale is not "debt" because it is not an obligation to return money. Accordingly, such obligation also does not satisfy the dictionary definition of a "liability" as a financial or pecuniary obligation.

Although defendant relies on *Colm*, it directly supports plaintiffs' position in this case. In *Colm*, the United States District Court for the Northern District of Texas acknowledged that the IRS in Rev. Rul. 95-26 and Judge Jacob in *Salina* had both concluded that the obligation to cover a short sale position should be regarded as a "liability" for purposes of section 752. The district court in *Colm* nevertheless concluded that the term "'liability' within the meaning of section 752 does **not** encompass contingent obligations" and that *LaRue*, *Long* and *Helmer* "stand for the proposition that liabilities that are contingent as to the obligation itself or as to the amount of the obligation do not qualify as 'liabilities' for purposes of section 752." *Colm*, 460 F.Supp.2d. at 716.

The district court concluded however, that the obligation to cover the short sale positions in that case **ceased to be contingent** when the taxpayer sold the partnership that held the short sale position to an unrelated third-party. "[T]he amount of the obligation became fixed at the moment GMK sold Valiant because at that time GMK could determine its gain or loss on the short sale transaction according to the current market rates for T-notes; any future fluctuations in the interest rates affected the gain or loss of the short sale transaction only as to Czerwinski, not GMK." *Id.* The district court concluded in *Colm* that the obligation to cover the short sale **was contingent and *not a liability* for purposes of section 752, until the point in time when the partnership was sold and the amount of the liability became determinable.**

Defendant has ignored the actual holding of *Colm* and has made no effort to explain how *Colm* should apply in this case – for in this case, unlike in *Colm*, plaintiffs did not sell Alpha. While it is certainly true that the cost to cover the short sales became fixed and determinable in the present case when the sales were closed, that does not affect plaintiffs' tax reporting, because the cost to cover under the *Colm* rationale became a "liability" only when held by Beta. Even if section 752 became applicable at that moment in time, under section 752(a), Alpha and Gloria

Robinson, as the partners in Beta, would increase their bases in their partnership interests by their share of Beta's liability.[20] At the same time, the extinction of that liability through the closing of the short sale positions would require them to reduce their bases in Beta by the same amount under section 752(b). These adjustments are "a wash," leaving their tax reporting position unaffected. Thus, contrary to defendant's assertion, *Colm* provides no support for its position in this case.

## II. NO ACCURACY-RELATED PENALTIES SHOULD APPLY IN THIS CASE.

In its motion, the defendant asserts that it is entitled to judgment that "the 40% or 20% accuracy-related penalty under section 6662 apply to the resulting underpayments of tax relating to" sales of the Yahoo and Corning stock. (Def.'s Mot. Summ. J. 2.) Defendant asserts that the IRS properly determined the following penalties against Alpha and Beta and their partners:

A) a 20% penalty for substantial understatement of income tax;

B) a 20% penalty for negligence of disregard of rules and regulations;

C) a 20% penalty for substantial valuation misstatement; and

D) a 40% penalty for gross valuation misstatement.

(Def.'s Mot. Summ. J. 17-18.)[21] Even if the defendant's view of the substantive tax law issue in this case were accepted, the penalties proposed by defendant cannot be upheld for several reasons.

First, none of the penalties are proper under section 6662. Second, even if one or more of the penalties could somehow apply under section 6662, section 6664 prohibits the assertion of any such penalty since plaintiffs acted reasonably and in good faith in taking the tax positions at

[20] Plaintiffs have not found any authority to support the district court's proposition in *Colm* that basis should be recomputed under section 752 when the obligation becomes fixed and determinable. However, as indicated in the text, resolution of that issue is unnecessary because it does not make a difference in this case.

[21] As indicated by defendant, these are all alternative penalties in that if the Court sustains any one of these penalties, it cannot sustain any of the others. Treas. Reg. § 1.6662-2(c) (prohibiting "stacking" of accuracy-related penalties).

issue. Plaintiffs cross-move for summary judgment on the applicability of these penalties. Although defendant did not move for summary judgment on the reasonable cause and good faith issue, plaintiffs are moving for summary judgment on that issue as well.[22]

A. The Penalties Do Not Apply By Their Own Terms.

1) *There was not a "substantial understatement" of tax.*

Sections 6662(a) and (b)(2) direct that a 20% accuracy-related penalty shall apply to the portion of any underpayment of tax that is attributable to any "substantial understatement of income tax." A "substantial understatement" is defined as any understatement of income tax for any taxable year that exceeds the greater of: (1) 10 percent of the tax required to be shown on the return or (2) $5,000. Section 6662(d)(1)(A). However, the amount of any such understatement is to be reduced by that portion of the understatement which is attributable to the tax treatment of any item for which there was "substantial authority." Section 6662(d)(2)(B).

"The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662-3(b)." Treas. Reg. § 1.6662-4(d)(2). In turn, Treas. Reg. § 1.6662-3(b) provides: "If a return position is reasonably based on one or more of the authorities set forth in § 1.6662-4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662-4(d)(2)." The authorities described in Treas. Reg. § 1.6662-4(d)(3)(iii)

[22] Congress has modified sections 6662 and 6664 since 2001, but the relevant changes were not made retroactive. Accordingly, plaintiffs refer to those sections as they existed during 2001.

include provisions of the Code, Treasury regulations, court cases, and certain IRS guidance and legislative history.

If the item involves a "tax shelter, then in addition to having substantial authority the taxpayer must also reasonably believe that the tax treatment of such item was more likely than not the proper treatment." Section 6662(d)(2)(C)(i). For this purpose, a "tax shelter" is defined as any partnership, plan or arrangement if a significant purpose of such partnership, plan or arrangement is tax avoidance. Section 6662(d)(2)(C)(iii). Also for this purpose, "a taxpayer is considered reasonably to believe that the tax treatment of an item is more likely than not the proper tax treatment if" . . . "[t]he taxpayer reasonably relies in good faith on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the [specified manner] and unambiguously states that the tax advisor concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service." Treas. Reg. § 1.6662-4(g)(4)(i)(B).

a) *Defendant's motion for summary judgment on the substantial understatement penalty should be denied.*

Although defendant seeks judgment on the substantial understatement penalty, it failed to support its motion with any facts or analysis that would show that this penalty is applicable. Indeed, the defendant's brief is devoid of **any** discussion of this penalty, aside from raising it as an issue and stating that the IRS properly asserted it. As defendant has failed to show that any taxpayer involved in this case would have a substantial understatement of tax if Alpha's obligations to cover the short sales were treated as liabilities for purposes of section 752 (either before or after any underpayment is reduced for any amount for which there exists substantial authority), defendant's motion should be denied.

b) *Plaintiffs' cross-motion for summary judgment on the substantial understatement penalty should be granted.*

An increase in tax that might result from treating Alpha's obligations to cover the short sale positions as "liabilities" for purposes of section 752 does not establish an "understatement" for purposes of calculating the substantial understatement penalty because there was substantial authority for taking the position that the contingent cover obligations were not liabilities for purposes of section 752. *See* section 6662(d)(2)(B)(i) (requiring that the amount of any understatement be reduced by that portion of the understatement which is attributable to the tax treatment of any item for which there was substantial authority).

Plaintiffs had substantial authority for taking the position that the obligations to cover the short sale positions were not liabilities for purposes of section 752, as demonstrated by:

- Plaintiffs' earlier discussion of the extensive authority for not treating the contingent cover obligations as liabilities for purposes of section 752.
- Plaintiffs have attached lengthy legal opinions that they received from the highly-regarded law firm of Lewis, Rice & Fingersh. In these opinions, the Lewis Rice firm conducted an extensive and thorough review of the relevant authorities, and concluded that the contingent cover obligations were not a liabilities for purposes of section 752. The authorities discussed in these opinions also demonstrate that there was substantial authority for plaintiffs' position. (Pl. Ex. 16-22, App. B, at pp. 312-1039).
- Plaintiffs have also attached an article written by Alice Welt-Cunningham titled Short-Sale Obligations and Basis in Partnership Interests, for Tax Notes Today, a major tax periodical, in 1996. Ms. Cunningham also examined the existing legal authorities and independently concluded that obligations to cover short sales should not be treated as liabilities for purposes of section 752, and that the Internal Revenue Service overreached when it ruled to the contrary in Rev. Rul. 95-26. (Pl. Ex. 6, App. A, at pp. 21-38).

The legal authorities discussed by these scholars all make clear that their was substantial authority for taking the position that the contingent cover obligations were not liabilities for purposes of section 752.

The only court to have addressed this issue has concluded that taxpayers who engaged in the transactions that are labeled "Son of Boss" transactions by the IRS had substantial authority for the position that they took. *See Klamath Strategic Investment Fund, LLC*, 472 F.Supp.2d 885, 900-01 (E.D. Tex. 2007). The holding in *Klamath* that an obligation that is contingent in effect or in amount is not a "liability" under section 752 plainly constitutes substantial authority for the position taken by the taxpayers in this case.

Defendant is likely to contend that this case involves a "tax shelter" as defined in section 6662(d)(2)(C)(iii) and that plaintiffs therefore must also show that they reasonably believed that their tax position was more likely than not correct to invoke the "substantial authority" reduction to any resulting underpayment in tax. Even if that standard applies here (which we dispute), the record makes clear that plaintiffs reasonably believed that their tax position was more likely than not correct. With respect to the short sale issue, and as explained in more detail below in discussing plaintiffs' reasonable cause and good faith, they relied on the advice given to them by Lewis Rice in the form of written legal opinions that unambiguously concluded that there was a greater than 50% likelihood of their position being upheld if challenged by the IRS. Plaintiffs have attached affidavits from Richard and Robert Sands, the owners of the general partner in Alpha and representatives of the Sands family, in which they aver that they relied on the Lewis Rice opinion in taking the tax position at issue. Plaintiffs have thus satisfied the requirement in section 6662(d)(2)(B)(i) that they reasonably believed that the tax treatment was more likely than not the proper treatment. See Treas. Reg. § 1.6662-(g)(4)(i):

> [A] taxpayer is considered reasonably to believe that the tax treatment of an item is more likely than not the proper tax treatment if" . . . "[t]he taxpayer reasonably

> relies in good faith on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the [specified manner] and unambiguously states that the tax advisor concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service.

2) *Plaintiffs were not negligent.*

Negligence means "any failure to make a reasonable attempt to comply with the provisions" of the Code. Section 6662(c). A taxpayer is not negligent if he has a "reasonable basis" for taking a tax position. The reasonable basis standard is lower than the substantial authority standard. Treas. Reg. § 1.6662-4(d)(2).

a) *Defendant's motion for summary judgment on the negligence penalty should be denied*.

As with the substantial understatement penalty, defendant seeks judgment on the negligence penalty, but failed to support its motion with any facts or analysis that would show that the penalty is applicable. Once again, the defendant's brief is devoid of **any** discussion of this penalty, aside from raising it as an issue and stating that the IRS properly asserted it. As defendant has failed to show that Alpha, M,L,R&R or Mickey Management, L.P. or any of their partners were negligent in the tax reporting that is at issue in this case, defendant's motion should be denied.

b) *Plaintiffs' cross-motion for summary judgment on the negligence penalty should be granted*.

Plaintiffs had a "reasonable basis" for taking the position that the contingent cover obligations were not liabilities under section 752 for the same reasons discussed above with respect to substantial authority. However, plaintiffs feel compelled to give a further response to this issue, given that defendant has called their interpretation of section 752 "specious." (Def.'s Mot. Summ. J. 7.)

Plaintiffs' tax position under section 752 was based, in large part, on defendant's position in *Helmer*, *Long* and *LaRue*. Defendant's assertion that plaintiffs' position was specious is belied by defendant's own understanding that its interpretation of section 752 is, at best, "cramming through a result." Notes made by Richard Starke, an attorney in the office of Chief Counsel in 1995, confirm that the IRS was well aware that the position it had taken on the definition of a "liability" for purposes of section 752 could result in taxpayers obtaining tax benefits. Pls. Ex. 7, App. A at p. 81-82. Mr. Starke was charged with drafting IRS Revenue Ruling 95-45, which addressed whether a short sale is a liability in the corporate context. As reflected in his notes, Mr. Starke attended numerous meetings with IRS officials where the definition of "liability" for purposes of section 752 was discussed. Mr. Starke reports that the IRS understood that the manner in which "liability" had been defined could be advantageous or disadvantageous to the IRS, depending on the situation, and that the underlying issue involved "mismatch between inside and outside basis." He then reported that "if [the IRS] had to choose one poison or another, [Stuart Brown, then Chief Counsel of the Internal Revenue Service] tended [to] agree with Helmer (a position IRS perhaps needs, lesser of two evils.)" *Id.*

Chief Counsel Brown suggested writing a regulation to cover these issues. In debating the correct path, the Treasury Department advocated using section 752 to equate inside and outside basis, but understood such use of section 752 would be "cram[ming] through [a] result" and "not an entirely clean way of doing it." *Id.* Therefore, it is both disingenuous and legally unsupportable for the government to assert a negligence penalty based on a taxpayer's interpretation of section 752 that is in accord with defendant's own longstanding interpretation of that section. Plaintiffs respectfully believe they are entitled to summary judgment on this issue.

3) *Neither the "substantial valuation misstatement" penalty nor the "gross valuation misstatement" penalty can apply.*

Section 6662(a) provides (with emphasis added):

> If this section applies to any portion of an underpayment of tax required to be shown on **a return**, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

In turn, section 6662(b) states (with emphasis added):

> This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:
> **(1)** Negligence or disregard of rules or regulations.
> **(2)** Any substantial understatement of income tax.
> **(3)** Any substantial valuation misstatement **under chapter 1**.
> **(4)** Any substantial overstatement of pension liabilities.
> **(5)** Any substantial estate or gift tax valuation understatement.

Section 6662(e)(1)(A) then provides (with emphasis added):

> For purposes of this section, there is a substantial valuation misstatement **under chapter 1** if--
> **(A)** the value of any property (or the adjusted basis of any property) claimed **on any return of tax imposed by chapter 1** is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be) . . .

Finally, section 6662(h) increases the accuracy-related penalty prescribed in section 6662(a) from 20% to 40% in the case of a "gross valuation misstatement" which means "any substantial valuation misstatement **under Chapter 1** as determined under subsection (e) by substituting '400 percent' for '200 percent' each place it appears." Section 6662(h)(1) and (2)(A)(ii)(I).

Defendant's motion for summary judgment on this penalty should be denied, and plaintiffs' cross motion should be granted, because there was no misstatement of value or basis on any return of tax imposed by chapter 1. To the extent there was any misstatement of value or basis on any return of tax imposed by chapter 1, it was far smaller than that suggested by defendant, and any underpayment of tax would not be "attributable" to such misstatement.

a) *There was no misstatement on any return of tax imposed by chapter 1*.

Defendant's position in this case is that, because plaintiffs did not treat the obligations to cover the short sale positions as liabilities for purposes of section 752, they overstated their bases

in the Yahoo and Corning stock and, therefore, claimed inappropriate losses when that stock was sold by various partnerships. However, the plain language of section 6662(e) makes clear that the valuation misstatement penalties may only apply if the misstatement – in this case a purported overstatement of basis - occurs on a "return of tax imposed by chapter 1." There is no ambiguity in this language and there can be no doubt that this requirement is intentional; for Congress only made the "return of tax imposed by chapter 1" requirement applicable to the valuation misstatement penalty, and not to the other accuracy-related penalties contained in section 6662(a), such as the negligence penalty.

In its motion, defendant argued that the gross valuation misstatement should apply because Alpha, MLRR, CWC and Mickey, L.P. all sold Yahoo and Corning stock claiming on **their** returns bases in that stock that exceeded the correct bases by more than 400%. Plaintiffs agree that to the extent there was any overstatement of bases in the Yahoo and Corning stock, such overstatement was reported on the partnerships' returns. None of the allegedly overstated basis would ever be reported on any individual partners' return, because such stock was sold by the partnerships.

The valuation misstatement penalty cannot apply to these alleged overstatements of basis because a partnership return **is not a return of tax imposed by chapter 1**. Rather, it is an information return (not a return of tax) required to be filed only because of the Information Return requirements of chapter 61 of the Code. *See, e.g., Olson v. United States,* 172 F.3d 1311, 1316 (Fed. Cir. 1999) ("Under the Internal Revenue Code (the "Code"), a partnership is required to file an annual information return, but is not a taxable entity for federal income tax purposes. See I.R.C. §§ 701 6031."); *Cinema '84 v. Comm'r,* 412 F.3d 366, 368 n.1 (2d Cir. 2005) ("Partnerships are not taxable entities under the Internal Revenue Code. *See* 26 U.S.C. § 701.

Therefore, instead of filing traditional tax returns, they file 'information returns.' *See* 26 U.S.C. § 6031; 26 C.F.R. § 1.6031(a)-1.")

It is undisputed that any overstatements of basis in this case were not claimed on returns of tax imposed by Chapter 1. Thus, the valuation misstatement penalties cannot apply, and this is particularly true given that penalty statutes are to be strictly construed against the government. *See, e.g.*, *Commissioner v. Acker*, 361 U.S. 87, 91 (1959) ("We are here concerned with a taxing Act which imposes a penalty. The law is settled that penal statutes are to be construed strictly, and that one is not to be subject to a penalty unless the words of the statute plainly impose it.") (internal quotations, citations and footnotes omitted).

Defendant, on the other hand, has sought through a regulation to remove this requirement from the statute, and to make the penalty applicable to information returns that are not tax returns or required by Chapter 1. *See* Treas. Reg. § 1.6662-5(h). This is an interpretive regulation not promulgated under any specific delegation of authority from Congress. As such the regulation is invalid, because the Treasury department cannot by regulation add terms or requirements to a statute absent an express delegation of authority. An administrative agency "may not usurp the authority of Congress by adding restrictions to a statute which are not there." *Stephenson Trust v. Comm'r*, 81 T.C. 283, 288 (1983) (quoting *Estate of Boeshore v. Comm'r*, 78 T.C. 523, 527 (1982)); *see also Rite Aid Corp. v. United States*, 255 F.3d 1357, 1359 (Fed. Cir. 2001). Executive agencies, including the Service, are not permitted to legislate by adding terms or requirements to a statutory scheme that Congress has not provided. *See Koshland v. Helvering*, 298 U.S. 441, 447 (1936) (Where "the provisions of the act are unambiguous, and its directions specific, there is no power to amend it by regulation."); *Helvering v. Credit Alliance Corp.*, 316 U.S. 107, 113 (1942) (rejecting a regulation that "not only was contradictory of the plain terms of the [statute] but attempted to add a supplementary legislative provision, which could only

have been enacted by Congress"); *Nalle v. Comm'r*, 997 F.2d 1134, 1139 (5th Cir. 1993) ("In the absence of any ambiguity, our analysis must be confined to the plain language of the statute"); *Deluxe Corp. v. United States*, 885 F.2d 848, 853 (Fed. Cir. 1989) ("A regulation serves to implement the law, not change it."). And, as noted above, this bedrock constitutional principle must be applied even more stringently to this regulation because it seeks to impose a penalty. Thus, the regulation must fail because it purports to impose a penalty that is not sanctioned by the statute.

Accordingly, plaintiffs are entitled to summary judgment that the valuation misstatement penalties cannot apply, even if all of the facts alleged by defendant were true.

b) *Any Underpayment of Tax Is Not Attributable to a Misstatement*.

Defendant's argument on the misstatement penalty is confused. It appears that defendant is arguing that the 40% misstatement penalty applies to the entire $44 million basis that is at issue regardless of whether any taxpayer ever claimed that basis in connection with a sale of the Yahoo or Corning stock. Clearly, that is incorrect, as the accuracy-related penalties only apply as a percentage of underpayments of tax. *See* section 6662(a). The 40% penalty can apply in this case, if at all, only to understatements of tax stemming from overstatements of basis actually reported and that resulted in underpayments of tax in connection with sales of Yahoo and Corning stock. In other words, defendant cannot penalize plaintiffs for "claiming" allegedly overstated basis that they did not in fact claim, or even on amounts "claimed" to the extent that eliminating the claimed amount does not result in an understatement of tax. The partners in Alpha, M,L,R&R and Mickey Management, L.P, to whom the losses on the Yahoo and Corning stock were allocated, had other losses on their individual returns, such that they used only $7,811,557 of the Yahoo and Corning losses; far less than the $44 million asserted by defendant.

Defendant also failed to address the statutory limitation on the valuation misstatement penalties. They only apply to underpayments of tax that are "attributable" to a misstatement. Thus, the 20% penalty contained in section 6662(e) and the 40% penalty contained in section 6662(h) can apply only if the underpayment of tax is "attributable to one or more gross valuation misstatements." Section 6662(h)(1). "Attributable to" means "'due to, caused by, or generated by.'" *Stanford v. Comm'r*, 152 F.3d 450, 459 (5th Cir. 1998) (quoting *Lawinger v. Comm'r*, 103 T.C. 428, 435 (1994)).

In this case, defendant has totally disallowed the losses at issue. "Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit." *Heasley*, 902 F.2d 380, 383 (5th Cir. 1990). *See also Weiner v. United States*, 389 F.3d 152 (5th Cir. 2004).

For all of these reasons, the "gross valuation misstatement" penalty may not apply as a matter of law.

B. <u>The Penalty Provisions of Section 6662(a) Are Inapplicable Where, as Here, a Taxpayer Relied Reasonably and in Good Faith Upon Professional Tax Advice</u>.

Even if the penalties raised by defendant could be applicable, "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Section 6664(c)(1). As discussed below, the undisputed facts make clear that plaintiffs have satisfied this standard.

The opinions of Lewis, Rice & Fingersh, L.C. ("Lewis Rice") demonstrate that the treatment of the tax issues in this case by plaintiffs Alpha I, L.P., CWC Partnership I, M, L, R &

R, and Mickey Management, L.P. and their partners was amply supported by applicable statutes, regulations and judicial precedent and was objectively reasonable. These opinions collectively make it clear that there was "reasonable cause" for the positions taken by the partnerships and their partners. Moreover, the opinions of Lewis Rice were provided to all the members of Alpha I, L.P., including Robert Sands and Richard Sands, the owners of Alpha's general partner, R, R, M & C Management Corporation.[23] These opinions establish the "good faith" basis for the positions taken by the partnerships and their partners. For these simple and compelling reasons, penalties may not be imposed in this case.

In determining whether there is a "reasonable basis" for the position taken, taxpayers are entitled to rely on the advice of professional tax advisors, precisely as occurred here. It is well established that "[r]eliance on . . . professional advice . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. § 1.6664-4(b)(1). Reliance is reasonable when the taxpayer supplies necessary information to a competent professional who does not suffer from a conflict of interest. *Neonatology Assoc., P.A. v. Comm'r*, 299 F.3d 221, 234 (3d Cir. 2002).

The Supreme Court has squarely held that, "[w]hen an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." *United States v. Boyle*, 469 U.S. 241, 251 (1985) (emphasis omitted). A taxpayer who receives competent professional advice as to the permissible tax treatment of an

[23] In some cases, defendant has argued that a Final Partnership Administrative Adjustment, or an FPAA, as was issued here, does not vest jurisdiction in a reviewing court to consider partners' defenses to penalties that have been asserted against the partnership (even though the partners would be liable for the penalty), such as whether they acted with reasonable cause and in good faith. However, in cases such as this, where the partners were also general partners in the partnership (i.e., Richard and Robert Sands' control of Alpha), defendant does agree that a reviewing court has jurisdiction to consider those defenses. *See* Industry Specialization Program Coordinated Issue, Notional Principal Contracts, 2005 WL 43711 (Jan. 6, 2005) ("To the extent that the taxpayer effectively acted as the general partner and that the intent of the general partner is determined at the partnership level, it is likely that such partnership level determinations may also dispose of partner-level defenses under the unique facts of each case."); Industry Specialization Program Coordinated Issue, "Basis Shifting" Tax Shelter, 2002 WL 32351285 (Dec. 3, 2002).

item is not negligent in following that advice to reduce his tax liability. *See, e.g., Henry v. Comm'r*, 170 F.3d 1217, 1220-1221 (9th Cir. 1999) (holding that negligence penalties should not be sustained when the taxpayers acted reasonably in consulting their long-time accountant and relying on his preparation of their tax returns classifying certain stock option proceeds as long-term capital gain); *Estate of Monroe v. Comm'r*, 124 F.3d 699, 714-15 (5th Cir. 1997) (holding that no negligence penalties could be imposed on a taxpayer who, on the advice of the Touche Ross accounting firm and with the purpose of minimizing tax on his estate, asked his heirs to disclaim their bequests and then transferred like amounts to the disclaiming heirs as *inter vivos* gifts); *Chamberlain v. Comm'r,* 66 F.3d 729, 733 (5th Cir. 1995) ("Because the taxpayers reasonably relied on the advice of a tax expert in claiming the loss, the negligence penalty should not have been imposed.").

Consulting one professional tax advisor is generally sufficient. *Boyle*, 469 U.S. at 251 (holding that taxpayers are not required to seek a "second opinion" in order to rely reasonably upon professional tax advice); *see also Stanford v. Commissioner*, 152 F.3d 450, 461 (5th Cir. (finding reasonable cause, and reversing the Tax Court's contrary finding, where taxpayers relied upon the advice of "an experienced CPA"). And having commissioned expert advice, taxpayers are generally entitled to rely upon it. As the Supreme Court held in *Boyle*:

> Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. "Ordinary business care and prudence"do not demand such actions.

469 U.S. at 251 (citation omitted).

Even sophisticated taxpayers have no duty to ensure that their tax professionals conduct "sufficient research to give knowledgeable advice," *Stanford*, 152 F.3d at 461. "'It is for exactly this reason that many intelligent investors hire independent, educated experts to advise them,'

particularly with respect to arcane matters of tax law . . . ." *Id.* (quoting *Mauerman v. Comm'r*, 22 F.3d 1001, 1006 (10th Cir. 1994)). Attorneys who are not tax specialists have the same right of reliance as other taxpayers: it is a "matter of judicial knowledge" that "most lawyers have only scant knowledge of the tax laws." *Bursten v. United States*, 395 F.2d 976, 981 (5th Cir. 1968); *see also Reser v. Comm'r*, 112 F.3d 1258, 1268 (5th Cir. 1997) (recognizing that a personal-injury attorney's "education, albeit advanced, provided her with no special knowledge of complex tax issues such as basis computation"); *cf. Srivastava v. Comm'r*, 220 F.3d 353, 367 (5th Cir. 2000) (holding that taxpayers could not reasonably rely upon the advice of their trial lawyer regarding the tax treatment of their settlement funds, because he was not a tax lawyer and had recommended they see a tax lawyer).

A corollary of the right to rely reasonably upon tax experts is that the taxpayer has no duty to "out-guess" them. *Heasley*, 902 F.2d at 385. Put otherwise, the reasonableness of a taxpayer's reliance on expert advice regarding the tax laws does not depend upon the ultimate correctness of the advice given. *See Boyle*, 469 U.S. at 250 ("'[R]easonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney . . . even when such advice turned out to have been mistaken."); *Stanford*, 152 F.3d at 461 ("Although [the CPA's] legal interpretation . . . turned out ultimately to be incorrect -- and indeed gave rise to a substantial understatement of tax on the Stanfords' 1990 joint return -- we find that the Stanfords' reliance on that interpretation constitutes 'reasonable cause' for purposes of precluding the penalty imposed against them for that understatement."); *Klein v. U.S.*, 94 F. Supp. 2d 838, 853 (E.D. Mich. 2000) (denying the government's motion for summary judgment on the taxpayer's negligence because "it is quite possible for a taxpayer to be ultimately wrong about his tax obligations to the government without having been negligent.").

Applying these standards makes clear that the taxpayers exercised ordinary care in determining their tax liability, by consulting tax experts both at the time of the transaction and at the time they filed their return. Ordinary business care and prudence do not require taxpayers to second-guess the expert advice of tax professionals. *Boyle*, 469 at 251; *Heasley*, 902 F.2d at 384. This rule should especially hold true where the applicable sections of the Code are the particular province of specialists, as is certainly the case here, which involves the extraordinarily complex provisions in subchapter K that govern partnership tax:

> The distressingly complex and confusing nature of the provisions of subchapter K present a formidable obstacle to the comprehension of these provisions without the expenditure of a disproportionate amount of time and effort even by one who is sophisticated in tax matters with many years of experience in the tax field . . . [Subchapter K's] complex provisions may confidently be dealt with by at most only a comparatively small number of specialists who have been initiated into its mysteries.

*Foxman v. Comm'r*, 41 T.C. 535, 551, n.9, *aff'd*, 352 F.2d 466 (2d Cir. 1965).

As the undisputed evidence shows, at the time they entered the transactions, the taxpayers (partners of plaintiffs) relied reasonably and in good faith on Lewis Rice, on their independent accountants at their customary CPA firm of Bernard Robinson & Company, L.L.P. ("Bernard Robinson"), and on their long-time attorney at Milbank Tweed Hadley & McCloy LLP ("Milbank Tweed"), Jonathan Blattmachr. The taxpayers were not tax practitioners. The taxpayers requested and received the views of their advisors, Freddy Robinson of Bernard Robinson and Jonathan Blattmachr of Milbank Tweed, on the financial plans presented by The Heritage Organization before entering into any such plans. All of these advisors were experienced tax practitioners who were competent and qualified to render tax advice to the taxpayers.

To implement the transactions at issue in these cases, the taxpayers relied on the advice and assistance of Lewis Rice. Prior to filing their returns, the taxpayers provided Lewis Rice

with the information necessary for the firm to render its opinion on the transactions at issue in these consolidated cases. Lewis Rice issued opinions to the taxpayers based in part on the facts and information provided by the taxpayers, and those opinions were reflected in the tax treatment exhibited in the tax returns prepared by Bernard Robinson for plaintiffs and their partners. The opinions issued by Lewis Rice were based on their research and analysis of the applicable law and authorities and the experience, professional judgment, and assessment of the probable outcome of litigation or other adversarial proceedings by Lewis Rice. Lewis Rice personnel spent some 549 hours in their representation of the partners of plaintiffs.

The taxpayers here relied upon the skilled professional advice of highly qualified attorneys at Lewis Rice and obtained the advice of their trusted personal advisors. Reliance on this formidable quantity of accumulated advice was entirely reasonable and easily meets the standard of due care. These facts clearly exhibit the efforts of plaintiffs and their partners to properly assess their tax liability. *See* Treas. Reg. § 1.6664-4(b)(1).

**CONCLUSION**

Plaintiffs respectfully request an Order that their contingent obligations to cover the short sale positions involved in the Alpha, Beta, M,L,R&R and Mickey Management, L.P. cases are not liabilities for purposes of section 752.

Plaintiffs also request an Order (if necessary) that they are not liable for any penalties asserted by defendant with respect to any underpayment of tax that might result from Alpha, M,L,R&R or Mickey Management, L.P. overstating basis in the shares of Yahoo and Corning stock that they sold during 2001 and 2002, as a result of plaintiffs failure to treat the contingent obligations to cover as tax "liabilities."

Respectfully submitted this 5th day of July, 2007.

/s/ Lewis S. Wiener
LEWIS S. WIENER
Sutherland, Asbill & Brennan
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0140
Fax: (202) 637-3593
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 853-8000
(404) 853-8806 (fax)

Kent L. Jones
Sutherland, Asbill & Brennan
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0732
Fax: (202) 637-3593
Attorney for Plaintiffs

# CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing **PLAINTIFFS' RESPONSE TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT** has been made on July 5, 2007 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, TX 75201
thomas.m.herrin@usdoj.gov

This 5th day of July, 2007

/s/ Lewis S. Wiener
LEWIS S. WIENER
Sutherland, Asbill & Brennan
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0140
Fax: (202) 637-3593
Email:lewis.wiener@sablaw.com

Of Counsel:
N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 853-8000
(404) 853-8806 (fax)

Kent L. Jones
Sutherland, Asbill & Brennan
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0732
Fax: (202) 637-3593
Attorney for Plaintiffs