CHAPTER 7

# Basis Consequences of Partnership Liabilities


¶ 7.01 Types of Liabilities That Affect Basis ........ 7-1
[1] Defining Liabilities That Affect Basis ........ 7-1
[2] Sales and Contributions of Encumbered Property; Transferor's Retention of Responsibility to Pay ........ 7-8
¶ 7.02 Loans by Partners and Related Persons ........ 7-10
[1] Partner Loans as Partnership Liabilities ........ 7-10
[2] Characterization of Partner Loans as Capital Contributions: The Thin Partnership Doctrine ........ 7-11
¶ 7.03 Tier Partnerships ........ 7-15
¶ 7.04 Section 752(c): The Fair Market Value Limitation on Nonrecourse Liabilities ........ 7-15
[1] Inapplicability of Section 752(c) if the Transferee Assumes Personal Liability ........ 7-16
[2] Inapplicability of Section 752(c) to Sales or Exchanges of Partnership Interests ........ 7-16
[3] Contributions and Distributions of Encumbered Property ..... 7-18
[4] Other Possible Applications of Section 752(c) ........ 7-19
[5] Timing Considerations ........ 7-22
[6] Effect of Section 7701(g) on Section 752(c) ........ 7-23
¶ 7.05 Liability Assumptions ........ 7-24


## ¶ 7.01 TYPES OF LIABILITIES THAT AFFECT BASIS

### [1] Defining Liabilities That Affect Basis

As discussed in Chapter 6, the basis rules of Subchapter K are intended to create and preserve a basis relationship in which the partnership's aggregate basis in its assets generally equals the aggregate bases of the partners in their partnership interests.[1] Preservation of inside/outside basis equality helps avoid distortions that otherwise would result from treating a partnership as an entity separate from

[1] See ¶ 6.01.



EXHIBIT 1

its partners. The basis adjustment rules of § 752 are an integral part of this scheme. Section 752(a) provides that a partner is treated as contributing money to the partnership to the extent his share of partnership liabilities increases or he assumes a partnership liability.[2] Conversely, § 752(b) treats a partner as receiving a money distribution to the extent his share of partnership liabilities decreases or the partnership assumes his personal liability.[3] Because increases and decreases in a partnership's liabilities usually have a direct or indirect correlative effect on the partnership's basis in its assets and because contributions and distributions of money increase and decrease a partner's basis,[4] a principal effect of § 752 is to help create and preserve "inside/outside" basis equality.

If a partnership borrows money, the basis of its assets increases by the amount of cash received, even though the receipt of the borrowed funds is not income. By treating the partners as contributing cash in an amount equal to their shares of the debt, inside/outside basis equality is preserved and distortions are avoided. If a liability for borrowed money were not added to the partners' bases, they could be taxed on a distribution of the borrowed cash even though there is no gain inherent in the partnership's assets. A similar result could occur if a partnership incurs a purchase money liability to acquire property, since the liability is added to the partnership's basis in the property.

Inside/outside basis equality is also preserved if a partnership incurs a deductible liability, such as an accrual-method account payable. In these situations, the decrease in the basis of the partnership assets associated with the deduction offsets the increase associated with the liability so that there is no net change in the basis of the partnership's assets. A similar "no change" result occurs in the partners' bases in their interests if the accrued payable is treated as a § 752 liability and added to the partners' bases, because the basis decrease resulting under § 705 from the deduction of the accrued payable is offset by the increase resulting from adding the account payable to their basis.

While § 752 performs a valuable policy function by preserving the equality of inside and outside basis, it operates only on obligations that are treated as "liabilities." As will be discussed, some obligations, such as cash-method accounts payable, fall within the generally understood definition of the term "liability," but have no immediate effect on the basis of partnership assets. Therefore, treating such payables as liabilities for § 752 purposes would run counter to the purposes of the section. Conversely, certain obligations, such as the obligation of the grantor of property to deliver property on exercise of the option, are not generally thought to be liabilities, but the basis of the grantor's assets nevertheless is increased by any premium received upon the grant of the option (even though the premium is not taxed on receipt). Thus, § 752 may not achieve its

[2] Reg. § 1.752-1(b).

[3] Reg. § 1.752-1(c).

[4] §§ 722, 732.

inside/outside basis-equalizing function if the term "liability" is given its ordinary meaning.

From a pure policy perspective, a "liability" for § 752 purposes should include any obligation (broadly defined) of the partnership or a partner to the extent that incurring or holding it results in the creation of, or an increase in, the basis of any property owned by the obligor (including cash); a deduction taken into account in computing taxable income; or a nondeductible, noncapitalizable expenditure. This definition would exclude from the definition of "liability" for § 752 purposes certain obligations that are commonly thought to be liabilities, such as cash-method accounts payable. By contrast, such a policy-oriented definition might be read to treat as liabilities certain obligations that are not commonly thought of as liabilities, such as the obligation of an optionor/partnership to deliver partnership property on the exercise of an option to the extent that the partnership received a premium that was not included in the partnership's income.

Interestingly, in 1989 the Service published Temporary and Proposed § 752 Regulations that included a broad, policy-oriented definition of "liability" like the one proffered in the preceding paragraph.[5] This definition was excluded, without explanation, from the final § 752 Regulations. This failure to deal with the definition of "liability" by Regulation is unfortunate in view of the inconsistent positions that have been taken historically by the Service and the courts on the issue. The resulting confusion, explored below, leaves both the Service and taxpayers in a position to argue in close cases either that policy considerations should bend the dictionary definition of the term "liabilities" or, in the alternative, that the term used in the statute should be accorded its plain meaning.[6]

Over the years, the Service has consistently attempted to maximize the fisc by being inconsistent in its view of what constitutes a liability for § 752 purposes, sometimes reading the term in an unnatural way to achieve sound policy results and other times reading it more conventionally. The courts, by contrast, have been fairly literal in their interpretation, but so far their inclination to favor literalism over policy has only been exercised to the detriment of specific taxpayers. It is unclear whether they would be so inflexible if the result favored the taxpayer.

In view of the foregoing, it is necessary to consider various types of obligations to determine whether treating them as liabilities for § 752 purposes furthers the goal of maintaining inside/outside basis equality, and whether the term "liability" can fairly be read to encompass the obligation in question. Cash-method accounts payable, for example, are clearly liabilities in the ordinary meaning of the term. Nevertheless, treating them as liabilities for § 752 purposes

---

[5] Temp. Reg. § 1.752-1T(g), TD 8237, 1989-1 CB 180 (1988).

[6] The plain meaning argument is bolstered by the fact that the broadest definition cannot eliminate all of the inside/outside basis anomalies that can result in a system that treats a partnership and partners as separate entities.

would create *inequality* of outside and inside basis, thereby thwarting the purpose of § 752. The Service's position is that cash-method payables do not constitute § 752 liabilities,[7] although it maintained a contrary position for many years.[8] The view that cash-method payables should not be § 752 liabilities is correct from a policy perspective and should prevail even though it does some violence to the common meaning of the term "liabilities."[9] Similar policy considerations suggest that unpaid expenditures should not be treated as § 752 liabilities until they become deductible under the all events and economic performance rules of § 461. Similarly, deferred compensation expenses should not be treated as § 752 liabilities until they become deductible.

Contingent or contested liabilities are like cash-method accounts payable in that they generally are not deducted or added to basis until they become fixed.[10] While the Regulations do not state expressly that contingent obligations are not § 752 liabilities, they strongly support that conclusion. Thus, for purposes of determining whether a partner bears the economic risk of loss with respect to a liability, Regulations § 1.752-2(b)(4) provides that a "payment obligation is disregarded if . . . the obligation is subject to contingencies that make it unlikely that the obligation will ever be discharged," and that a payment obligation that "would arise at a future time after the occurrence of an event that is not determinable with reasonable certainty" is "ignored until the event occurs."[11]

Support for a policy-based definition of the term "liability" for § 752 purposes is not consistent and suggests (perhaps not surprisingly) that the plain meaning of the term may prevent it from being interpreted as broadly as policy

---

[7] Rev. Rul. 88-77, 1988-2 CB 128.

[8] Rev. Rul. 60-345, 1960-2 CB 211, revoked by Rev. Rul. 88-77, 1988-2 CB 128.

[9] A similar definitional debate arose in the corporate tax area under § 357. While most courts tailored the definition of "liabilities" to fit the policy, the issue created enough confusion that § 357(c)(2) was finally added to the Code to ensure that cash-method payables would not be treated as liabilities for § 357 purposes.

[10] See, e.g., Albany Car Wheel Co., 40 TC 831 (1963), aff'd per curiam, 333 F2d 653 (2d Cir. 1964) (contingent severance pay liability does not increase basis of purchased assets); Associated Patentees, 4 TC 979 (1945) (acq.) (basis of patent does not include estimated cost under agreement to pay sellers 80 percent of royalties earned). Contested or contingent liabilities are not deductible until the requirements of § 461 are satisfied and should not be treated as § 752 liabilities until they become deductible.

[11] See Marshall Long, 71 TC 1 (1978), aff'd in part and rev'd in part on other issues, 660 F2d 416 (10th Cir. 1981) (contingent or contested liabilities do not increase partners' bases under § 752); Gibson Prods. Co.-Kell Blvd. v. United States, 460 F. Supp. 1109 (ND Tex. 1978), aff'd, 637 F2d 1041 (5th Cir. 1981) (alternative holding). The reason that the § 752 Regulations, quoted in text, are not directly on point is that they address the question of whether a liability is a recourse or nonrecourse liability and not whether it is a "liability" in the first place.

considerations might suggest. For example, in Revenue Ruling 73-301,[12] the Service ruled that progress payments received by a partnership using the completed-contract method do not constitute partnership liabilities under § 752, even though treating them as liabilities would further the policy objective of maintaining equality of inside and outside basis. Instead, the ruling characterizes such payments, together with the right to receive additional payments for work to be performed, as "unrealized receivables," the income from which increases the basis of partners' interests only when recognized by the partnership for tax purposes. The ruling emphasizes that the partnership had fully earned the payments and was under no obligation to return them or perform additional services to retain them. Thus, no "liability" existed in the usual sense. While the ability to utilize the completed-contract method to defer tax recognition of receipts has been eroded by changes in § 460, the holding and analysis of the ruling remains applicable to other situations, such as the receipt of a premium for granting an option on property, in which the tax recognition of receipts is deferred.

The Service's position in Revenue Ruling 73-301 is consistent with the position of the Tax Court in *George Helmer*,[13] where the Tax Court held that no § 752 liability results when a partnership grants an option to purchase partnership property in exchange for a cash premium from the optionee. Even though the holding resulted in the partnership receiving money (and increasing the basis of its property) without a correlative increase in the partners' bases in their partnership assets, the court held that the option agreement did not create a liability because "it created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future."[14]

In Revenue Ruling 95-26,[15] the Service ruled that an obligation to deliver securities created by a short sale is a § 752 liability.[16] This ruling, which relies on Revenue Ruling 88-77,[17] is based on the logic that the term "liability" for § 752 purposes includes any obligation to the extent that its incurrence creates or increases the basis of any partnership asset, including cash. A short sale creates an obligation (to deliver identical securities in the future) and results in an increase in partnership assets (the cash proceeds from the short sale).

While the result of Revenue Ruling 95-26 is to eliminate an instance where inside/outside basis disparities may otherwise be created, its logic is somewhat

---

[12] 1973-2 CB 215. While this ruling was published before Temporary Regulations § 1.752-1T(g), defining "liabilities" for § 752 purposes, its holding and analysis continue to be correct.

[13] 34 TCM 727 (1975).

[14] Id. at 731. The obligation to deliver the property upon exercise of the option did not create a liability.

[15] 1995-1 CB 53.

[16] Cf. Rev. Rul. 95-45, 1995-1 CB 53 (short sale obligation is a liability for purposes of §§ 357 and 358).

[17] 1988-2 CB 129.

problematic and is inconsistent with Revenue Ruling 73-301, discussed above. First, the ruling's reliance on *Deputy v. du Pont*[18] seems curious. The issue in *Deputy v. du Pont* was the availability of an interest deduction to a short seller. The Supreme Court denied the deduction because it found the short seller's obligation was not an indebtedness for purposes of the predecessor to § 163, stating that "although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness'. . . . "[19] One might argue whether the concept of a "liability" for purposes of § 752 is (or should be) broader than the concept of "indebtedness" for purposes of supporting an interest deduction; however, the proposition that an obligation *is* a liability for § 752 purposes is not supported by a case holding that an obligation is *not* an indebtedness for other purposes.[20]

Second, the simple proposition that any obligation that creates an asset is a liability for § 752 purposes is inconsistent with the Service's position in other § 752 rulings,[21] and at least one case.[22]

Finally, the assertion that a short sale creates a § 752 liability ignores the statutory scheme for the taxation of short sales. In form and fact a short sale is two transactions, a borrowing of securities, offset by an obligation to deliver identical securities back to the lender; and a sale of the borrowed securities for money. It seems clear that the borrowing of securities does not increase the borrower's basis. For example, if a partnership borrows $100 from a bank, the loan proceeds ($100) increase the partnership's basis in its assets and, under § 752, increase the partners' bases in their interests. If the partnership later borrows securities and pledges them as additional collateral for the loan, it seems clear that borrowing the securities does not increase the partnership's basis in any asset and should not increase the partners' bases under § 752.

In a short sale, the borrowed securities, instead of being pledged, are actually sold for cash. It is the sale, not the borrowing, that gives rise to an increase in the partnership's assets. Under the peculiar rules governing short sales, the "basis" of the securities that are sold is simply not relevant to the taxation of the transaction, because the tax consequences of the sale are deferred and ultimately determined by reference to the cost of the securities that are used to repay the

---

[18] 388 US 488 (1940).

[19] Id. at 498.

[20] Curiously (indeed, almost inexplicably), a few weeks before the Service issued Revenue Ruling 95-26 treating short sales as liabilities for § 752 purposes, it issued Revenue Ruling 95-8, 1995-1 CB 53, which relied on *Deputy v. du Pont* in support of its holding that a short sale does not create an "indebtedness" for purposes of § 514(c).

[21] See Rev. Rul. 73-301, 1973-2 CB 215 (discussed in text above); Rev. Rul. 81-241, 1981-2 CB 146 (same as Rev. Rul. 73-301, except distribution exceeds bases of partners in their partnership interests).

[22] George Helmer, 34 TCM 727 (1975) (partnership receives option payment not currently includible in income, distributes payments to partners; Service successfully argues no increase in partnership § 752 liabilities).

loan (which are not the securities that were originally sold).[23] Because the tax consequences of a short sale are kept open, a short sale is like an option, which the Service has successfully argued in *Helmer* does not create a liability for § 752 purposes even though the basis of the optionor is increased by the tax-deferred option premium.

It is beyond cavil that a nonrecourse liability incurred to purchase or improve property is a liability that is included in the amount realized by the seller[24] and the cost basis of the buyer.[25] Nevertheless, during the age of tax shelters, taxpayers often purported to incur large nonrecourse liabilities to purchase depreciable or depletable property or to pay deductible expenditures. In such situations, the courts carefully scrutinize such putative obligations. Sometimes courts treat such obligations as legitimate nonrecourse liabilities,[26] but in other cases, based on factual findings that the obligations materially exceeded the value of the property that stood as the sole security for their payment, the courts have declined to accord tax validity to the obligations, finding that they are shams, are too contingent, or do not represent a true investment in the property.[27] Any nonrecourse partnership liability that is disregarded under any of these theories is also disregarded for § 752 purposes.

While the courts are apt to ignore, or treat as contingent, an ersatz nonrecourse liability that materially exceeds the value of the collateral at the time the liability is incurred, future changes in the value of the collateral are generally ignored.[28] Thus, once a nonrecourse obligation is recognized as a liability for purposes of the income tax laws in general and § 752 in particular, it will continue to be treated as a liability (or disregarded) until it is paid or until some intervening event (other than a change in the value of the collateral) justifies a reassessment of the obligation.[29]

Just as decreases in the value of property securing a valid nonrecourse liability do not cause the liability to cease to be a liability for basis purposes, the potential inability of the partnership or a partner to pay a validly incurred

---

[23] See Reg. § 1.1233-1(a)(1) (short sale not closed and completed transaction until property delivered to lender to close out borrowing).

[24] See Commissioner v. Tufts, 461 US 300 (1983).

[25] See Crane v. Commissioner, 331 US 1, 14 (1947); Blackstone Theatre Co., 12 TC 801 (1949) (acq.); cf. Edna Morris, 59 TC 21, 32–34 (1972) (acq.).

[26] See, e.g., Manuel D. Mayerson, 47 TC 340 (1966) (acq.); David F. Bolger, 59 TC 760 (1973) (acq.); Robert L. Brock, 59 TC 732 (1973) (acq.); Rev. Rul. 69-77, 1969-1 CB 59.

[27] See, e.g., Estate of Charles T. Franklin, 64 TC 752 (1975), aff'd, 544 F2d 1045 (9th Cir. 1976); David L. Narver, Jr., 75 TC 53 (1980), aff'd per curiam, 670 F2d 855 (9th Cir. 1982); Sydney S. Baron, 83 TC 542 (1984), aff'd, 798 F2d 65 (2d Cir. 1986); Rev. Rul. 77-110, 1977-1 CB 58; Rev. Rul. 81-278, 1981-2 CB 159.

[28] See Commissioner v. Tufts, 461 US 300 (1983); § 7701(g).

[29] See infra ¶ 7.04.

recourse liability generally does not cause the liability to be excluded from basis under § 752. This is consistent with the general rule, outside the partnership area, under which an accrual-method taxpayer is entitled to deduct accrued expenses even though he may be unable to pay them.[30]

### [2] Sales and Contributions of Encumbered Property; Transferor's Retention of Responsibility to Pay

If a partnership transfers property encumbered by a recourse liability to a person who assumes the liability, the liability ceases to be a partnership liability for basis purposes.[31] If partnership property is transferred "subject to" a recourse obligation, § 752(c) makes clear that the obligation is no longer treated as a liability of the partnership to the extent of the value of the property at the time of the transfer, even if the transferee does not expressly assume the liability.[32]

The application of § 752(c) is uncertain if encumbered property is sold or transferred to or by a partnership, pursuant to a contract under which the transferor purports to retain the primary and ultimate obligation to pay the encumbrance. For example, assume a transferor of property that has a value of $100 and that is encumbered by a liability of $40 transfers the property (which remains encumbered by the debt) for a down payment of $30 and a "wrap-around" or "all-inclusive" note from the transferee of $70. Under the terms of the contract, the transferor remains obligated to service the underlying or "wrapped" indebtedness of $40.[33] Typically, in arrangements of this type, the transferor retains title to the property until all amounts due from the transferee are paid. A variety of different contractual arrangements are possible, however, some of which may generate tax consequences that differ from those associated with this "typical" arrangement.

The issue under § 752(c) is whether the "wrapped" liability that continues to encumber the transferred property is treated as assumed, or taken "subject to," by the transferee or whether the transferor's obligation to continue to service the wrapped indebtedness is effective to cause the obligation to remain an obligation

---

[30] See, e.g., Zimmerman Steel Co. v. Commissioner, 130 F2d 1011 (8th Cir. 1942); Fahs v. Martin, 224 F2d 387 (5th Cir. 1955).

[31] See generally Reg. § 1.752-1(d).

[32] See infra ¶ 7.04.

[33] In contrast, if the property were transferred in a normal "subject to" arrangement, the purchaser would give the transferor a down payment of $30 and a note for $30 and agree to service the original $40 encumbrance; however, if the purchaser did not assume the encumbrance, the creditor's recourse would be limited to his rights against the property and his rights to proceed personally against the transferor. Despite the transferor's continued personal liability for the encumbrance and the absence of any similar obligation of the transferee, under these circumstances the liability is treated, to the extent of the value of the property, as an obligation of the transferee under § 752(c).