Calendar No. 2380

81st Congress } SENATE { Report
2d Session } { No. 2375

# THE REVENUE ACT OF 1950

## REPORT

OF THE

## COMMITTEE ON FINANCE

UNITED STATES SENATE

TO ACCOMPANY

## H. R. 8920

A BILL TO REDUCE EXCISE TAXES, AND FOR OTHER PURPOSES

August 22 (legislative day, July 20), 1950.—Ordered to be printed

UNITED STATES
GOVERNMENT PRINTING OFFICE
71876 WASHINGTON : 1950

tabbies
EXHIBIT
2

bill to the same extent as under present law, your committee has deleted the proposed technical amendment to section 107 (b).

In determining, for the purposes of section 107 (b), the tax which would be attributable to the gain on the sale of an artistic work if it had been received ratably in a taxable year before the enactment of this bill, such gain will be treated as ordinary gain. In the case of the sale, prior to the effective date of the amendment, of an artistic work by a creator who has elected the installment basis under section 44, the tax treatment of installment payments received after such effective date will be governed by the rule of *Snell* v. *Commissioner* (97 F. (2d) 891).

The amendments made by subsections (a) and (b) of section 211 will be applicable only with respect to taxable years beginning after the date of the enactment of the bill.

### HOLDING PERIOD FOR CAPITAL ASSETS

Subsection (c) of section 211, which corresponds to section 209 (c) and (e) of the House bill, provides that the holding period used for determining whether a capital gain or loss is long-term or short-term shall be 3 months instead of 6 months as under present law. To accomplish this purpose, subsection (c) strikes out "six months" or "6 months" and inserts in lieu thereof "3 months" in sections 117 (a), (b), (j), and (k) of the code. Similar amendments are made to sections 12 (g) (2) (relating to the tax in case of capital gains); 23 (k) (4) (relating to nonbusiness debts); 107 (b) (relating to compensation for services rendered for a period of 36 months or more); 165 (b) (relating to taxability of beneficiary of an employee's trust); 169 (c) (relating to income of participants in a common trust fund); 182 (relating to tax of partners) and 362 (b) (6) (relating to treatment of capital gain dividends from regulated investment companies) to conform such sections to the proposed 3-month holding period.

The amendments made by subsection (c) will apply with respect to sales or exchanges made after the date of the enactment of the bill.

## SECTION 212. SHORT SALES OF CAPITAL ASSETS

This section is the same as section 210 of the bill as passed by the House except that the designation of the subsection to be added to the Internal Revenue Code is (l) instead of (m).

This section amends section 117 of the code (relating to capital gains and losses) by adding a new subsection (designated (l)) to provide specific rules as to the tax consequences of certain short sales of property. These rules apply only to short sales of stocks or other securities, to transactions in stocks or securities on a "when issued" basis, and to transactions in commodity futures. Moreover, the rules apply only where the dealings are in such property which is a capital asset, as defined in section 117 (a), in the hands of the taxpayer. Hedging operations by operators of grain elevators, millers, producers of cloth, and so forth, which give rise to ordinary gain or loss rather than to capital gain or loss, are not subject to the rules.

The first two rules, set forth in section 117 (l) (1), are applicable wherever property substantially identical to that sold short has been held by the taxpayer on the date of the short sale for not more than 3

months or is acquired by him after the short sale and on or before the date of the closing thereof. In such a case:

Rule (1): Any gain upon the closing of the short sale shall, under the provisions of section 117 (l) (1) (A), be considered as a short-term capital gain. This rule applies without regard to when the property actually used to close the short sale was acquired.

Rule (2): The holding period of such substantially identical property shall, under the provisions of section 117 (l) (1) (B) and notwithstanding the provisions of section 117 (h), be considered to begin on the date of the closing of the short sale, or on the date of a sale, gift, or other disposition of such property, whichever date occurs first. If several quantities of property substantially identical to that sold short were acquired at different times not more than 3 months prior to the short sale and prior to the closing thereof, this rule shall apply to such property in the order of the dates of its acquisition.

The third rule, set forth in section 117 (l) (2), is applicable wherever property substantially identical to that sold short has been held by the taxpayer on the date of the short sale for more than 3 months. In such a case:

Rule (3): Any loss upon the closing of the short sale shall, notwithstanding the provisions of section 117 (g) (2), be considered as a long-term capital loss. This rule, like rule (1), applies without regard to when the property actually used to close the short sale was acquired.

Rules (1) and (3) do not apply to so much of the property sold short as exceeds in quantity the substantially identical property described in sections 117 (l) (1) and 117 (l) (2), respectively; nor does rule (2) apply to so much of the substantially identical property described in section 117 (l) (1) as exceeds in quantity the property sold short.

The following examples illustrate the application of this section to short sales of stock:

Example (1): A taxpayer buys 100 shares of X stock at $10 per share on February 1, sells short 100 shares at $16 per share on April 1, and closes the short sale on May 2 by delivering the 100 shares bought on February 1 to the lender of the stock used to effect the short sale. Since 100 shares of X stock had been held by the taxpayer on the date of the short sale for not more than 3 months, the gain of $600 upon the transaction is, by application of rule (1), short-term capital gain.

Example (2): A taxpayer buys 100 shares of X stock at $10 per share on February 1, sells short 100 shares at $16 per share on April 1, closes the short sale on May 1 with 100 shares of stock purchased on that date at $18 per share, and sells the 100 shares of stock (purchased on February 1) at $18 per share on May 2. The $200 loss upon the closing of the short sale is, as under present law, short-term capital loss. By application of rule (2), the holding period of the stock bought on February 1 is considered to begin on May 1 (the date of the closing of the short sale); the $800 gain upon the sale of such stock is, therefore short-term capital gain.

Example (3): The taxpayer buys 100 shares of X stock at $10 per share on February 1, sells short 100 shares at $16 per share on June 1, sells the 100 shares of stock (purchased on February 1) at $18 per share on July 1, and closes the short sale on July 1 with 100 shares of stock purchased on that date at $18 per share. The $800 gain upon the sale of the stock bought on February 1 is, of course, long-term capital gain. Since the taxpayer had held 100 shares of X stock on the date of the

short sale for more than 3 months, the $200 loss upon the closing of the short sale is, by application of rule (3), long-term capital loss.

Example (4): The taxpayer sells short 100 shares of X stock at $16 per share on February 1. He buys 250 shares of the same stock on March 1 at $10 per share and holds the latter stock until June 2 (more than 3 months) when 100 shares are delivered to close the short sale made on February 1. Since substantially identical property was acquired by the taxpayer after the short sale and before it was closed, the $600 gain is short-term capital gain. The holding period of the remaining 150 shares is not affected by section 117 (l), since to that extent the substantially identical property exceeds the quantity of the property sold short.

In the case of transactions in stocks or other securities on a "when issued" basis, the entry into a contract to sell such stocks or securities "when issued" shall be considered as a short sale and the performance of such contract or the assignment thereof for value shall be considered as a closing of such short sale. For the purpose of rules (1) and (2), but not for the purpose of rule (3), the acquisition of a "put" or other option to sell property at a fixed price shall be considered as a short sale, and the exercise or expiration (by reason of failure to exercise) of such option shall be considered as a closing of such short sale.

In the application of the three rules, the term "taxpayer" shall be read as "taxpayer or his spouse." As a result, if the spouse of the taxpayer holds property substantially identical to that sold short by the taxpayer, the three rules shall apply to the same extent as if such substantially identical property were held by the taxpayer. However, the three rules do not so apply where the taxpayer and his spouse are legally separated under a decree of divorce or of separate maintenance.

The three rules are also applicable to transactions in commodity futures. As applied to simultaneous long and short transactions in the same commodity, for delivery in the same future period and in the same market this section is consistent in purpose with Mimeograph 6243, issued by the Bureau of Internal Revenue on March 8, 1948.

In the case of commodity futures transactions, however, the three rules do not apply to what are commonly known as "arbitrage" or "straddle" transactions; that is, to a long position in one market and a short position in another market, requiring delivery in the same month of the same or substantially identical commodities, entered into on the same day and subsequently closed on the same day. However, where the quantity of the commodity involved in one market exceeds the quantity of the commodity involved in the other, the rules apply to such excess.

No general definition of substantially identical property is given in this section, since it is believed that the term must be applied in accordance with the actual circumstances of each transaction. As applied to securities, this term has for many years been in section 118 of the code, and various rulings and decisions have been made which will, in general, be equally applicable to the provisions of this proposed amendment. It is not believed that the term substantially identical should be applied to securities of different corporations (except in special situations as, for example, the securities of predecessor and successor corporations in a reorganization), nor, in general, to pre-

ferred stock or bonds as compared with common stocks. However in special situations, such as where preferred stock or bonds are convertible into common stock of the same corporation, the relative values and price changes may be so similar as to make them substantially identical to the common stock. Different commodities such as corn and wheat, which are not generally through custom of the trade used as hedges for each other, would not be substantially identical. Section 117 (l) (3) (B) (ii) expressly provides that different futures—for example, May wheat and July wheat—shall not be considered as substantially identical. Contracts on different markets may, depending upon the circumstances, be so similar as to be regarded as substantially identical; in each such case, the historical similarity in price movements in the two markets is a primary factor to be considered.

The amendments made by this section are applicable only with respect to taxable years beginning after the date of enactment of the bill. Even with respect to such taxable years, however, the amendments do not apply where the short sale was made on or before the date of enactment of the bill.

## SECTION 213. TREATMENT OF GAINS TO SHAREHOLDERS OF COLLAPSIBLE CORPORATIONS

This section corresponds to section 211 of the bill as passed by the House. Your committee, however, has made technical amendments and changed the designation of the subsection to be added to the Internal Revenue Code from (n) to (m).

Your committee has also restricted the limitations on the application of the new subsection so as to make subject to the provisions thereof gain realized by a shareholder upon his stock in a collapsible corporation if such shareholder owned stock at any time after the commencement of the manufacture, construction, or production of the property which was considered as owned at such time by another shareholder who then owned, or was considered as owning, more than 10 percent in value of the outstanding stock of the corporation.

This section of the bill adds a new subsection (m), relating to collapsible corporations, to section 117 of the code. The collapsible corporation is a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long-term capital gain taxable only at a rate of 25 percent.

Under paragraph (1) of the subsection as added to the code, gain from the sale or exchange of stock of a collapsible corporation will be treated as gain from the sale or exchange of property which is not a capital asset. This treatment is to be effective, however, only to the extent that the use of the device is interpreted as giving rise to gain which gain is considered (but for the provisions of the subsection) as long-term capital gain.

The term "collapsible corporation" is specifically defined by paragraph (2) of the subsection to mean a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution