# Short-Sale Obligations And Basis In Partnership Interests.

**lice Welt Cunningham looks at the state of the law regarding the relationship between short-sale bligations and section 752.**

**ate:** Sep. 23, 1996

**===== FULL TEXT ======**

HORT-SALE OBLIGATIONS
ND BASIS IN PARTNERSHIP INTERESTS

y Alice Welt Cunningham

ABLE OF CONTENTS

. The Cases

. The Facts
. The Parties' Positions

. The Revenue Rulings

I. Evaluation of the Cases and Rulings

. Syllogism: Sales Proceeds = Basis = Liability
. The Criticism

/. Short-Sale Taxation

. The Open-Transaction Doctrine
. Proposed Legislative Remedies

. Conclusion

EXHIBIT
tabbies
6

1] Two companion cases currently being litigated in the Tax Court, Fulcrum Financial Partners v. ommissioner /1/ and FFP Acquisition Partners, L.P. v. Commissioner, /2/ raise the issue of whether an bligation to close a short sale /3/ constitutes a liability under section 752 /4/ for purposes of determining the ases of partnership interests on a constructive partnership liquidation under section 708(a)(1)(B). Although e cases concern the taxable year 1991, the issue is important because the analysis propounded in the ommissioner's Notices of Final Partnership Administrative Adjustment /5/ in the two cases is similar to that et forth by the Internal Revenue Service this past year in three revenue rulings, Revenue Ruling 95-26, /6/ evenue Ruling 95-45 /7/ and Revenue Ruling 95-8, /8/ which take inconsistent positions regarding whether short-sale obligation constitutes a liability under various code provisions.

2] This article first details the Fulcrum and FFPA cases (Part I) and the three recent rulings collectively ropounding the commissioner's position that a short-sale obligation constitutes a liability under section 752 r purposes of calculating a partner's basis in his partnership interest under sections 705 and 722 (Part II). he article then evaluates that position. To this end, the article considers both general section 752 theory, cluding the Treasury regulations' post-1991 partnership anti-abuse rule / 9 (Part III), and the open-ansaction doctrine traditionally applicable to the taxation of short sales, including recent legislative roposals to overturn that approach (Part IV). On this basis, the article concludes that, to the extent not

overed prospectively in the partnership area by the regulations' new anti-abuse rule, the remedy for the /pe of short-sale abuse illustrated by the Fulcrum and FFPA cases must be legislative rather than dministrative (Part V).

THE CASES

ı. THE FACTS

3] The facts involve a two-person general partnership (Fulcrum) originally owned 99 percent by one partner Meridian Leasing Corporation) and 1 percent by the other (Cebern, Inc.). On November 27 and December 7, 1991, the partnership borrowed two-year Treasury notes from unrelated securities lenders and sold them ɔ unrelated purchasers for $142,352,930, depositing the sales proceeds in a brokerage margin account in ccordance with its agreement with the lenders. At the time of the sale, the partnership did not own ecurities to cover the sale. /10/

4] Immediately following the sale, substantially all of the proceeds were invested in forward repurchase ıgreements, which in effect involve lending the cash to a securities holder in exchange for securities which ıe borrower agrees to buy back, together with interest, at a future date. /11/ Such transactions generally are haracterized for tax purposes as loans. /12/ At the same time (i.e., on November 27 and December 17, the ame dates as the short sales), the partnership engaged in a reverse repurchase of five-year Treasury ıotes /13/ by purchasing them for $112,620,117, immediately reselling them, and agreeing with the urchaser to repurchase them at a specified future date for a specified amount. /14/ (With the reverse epurchase agreement, the taxpayer in effect put itself in the same position as the borrower in the forward epurchase agreement, so that the reverse repo was properly accounted for as a liability, i.e., as a orrowing, from its perspective.) /15/ The partnership thus acquired two assets, the forward repurchase ıgreements, financed with the proceeds of the short sales, and the five-year Treasury notes, financed by neans of the reverse repurchase agreements.

5] On December 23, within six days following the December 17 short sale and reverse repurchase nancing, a new partner, FFP Acquisition Partners, L.P. ("FFPA"), purchased a 98 percent interest in the artnership from Meridian, creating a three-person partnership, with FFPA holding 98 percent, Meridian 1 ercent, and Cebern 1 percent. This shift in partnership interests resulted in a constructive termination of the artnership under section 708(a)(1)(B), which prescribes such a termination if a 50 percent-or- more shift in ıe total interest in partnership profits and capital occurs within a 12-month period.

6] Under Treasury regulation section 1.708-1(b)(1)(iv), /16/ the effect of the constructive termination was wofold. First, the partnership was deemed to distribute its properties to the purchaser and to the other emaining partners in proportion to their respective interests in the partnership, giving the partners a ubstituted basis under section 732(b) for the constructively distributed partnership property equal to their reexisting bases for their partnership interests. Second, the purchaser and the other remaining partners vere deemed to contribute the partnership property (with its newly substituted basis equal to the preexisting ases of their partnership interests under step one above) to the "new" partnership, where the property vould take a carryover basis under section 723 equal to its basis in the hands of the contributing partners. 'he partners correspondingly took a substituted basis in the same amount under section 722 for the bases f their interests in the "new" partnership. /17/

7] As applied to Fulcrum, these rules meant that the partnership properties deemed distributed to the artners took a substituted basis equal to the partners' aggregate bases for their preexisting partnership nterests under section 732(b). Pursuant to section 732(c), this substituted basis was then allocated among hose properties in proportion to their respective adjusted bases in the hands of the partnership. As so letermined, that basis in turn constituted the property's carryover basis under section 723 on its deemed econtribution to the reconstituted partnership.

:. THE PARTIES' POSITIONS

. THE TAXPAYERS.

3] Arguing that the cost of securities necessary to close the short sale represented a contingent amount that ould not be known at the time of the constructive partnership termination on December 23, /18/ the axpayers calculated the bases of their partnership interests without regard to the short-sale obligation, roducing a figure of some $165 million. Of this amount, approximately $69 million was allocated to the orward repurchase agreements and $54 million to the five-year Treasury notes acquired under the reverse epurchase agreements, producing short-term capital gains of approximately $75 million and $60 million /hen those assets were sold on December 26, three days following the constructive termination occasioned y FFPA's purchase of its 98 percent interest. On the same date (December 26), the short sale of the two-ear Treasury notes was closed at a loss of approximately $655,000 (the $143 million cost to purchase ecurities to close the sale less the $142,352,930 proceeds originally received from the short sale). /19/ Jnder section 705(a)(1), this gain correspondingly increased the partners' bases for their interests despite ne absence of remaining assets in the partnership. This in turn created the potential for an equally artificial oss upon any subsequent disposition of those interests, thereby reportedly enabling FFPA and its owners to efresh an expiring capital loss carryforward.

9] Based on these transactions, for its taxable year ending December 31, 1991, the partnership claimed a hort-term capital gain of approximately $135 million (the $75 million gain on the sale of the forward epurchase agreements plus the $60 million gain on the sale of the reverse repurchase securities). It llocated 98 percent of this amount, or $132 million, to FFPA. /20/

:. THE COMMISSIONER.

10] Based on the partnership's monthly brokerage account statements, the actual gain on the sale of the ong positions (the forward repurchase agreements and the five-year Treasury notes acquired under the everse repurchase agreements) was approximately $900,000, compared to the loss of $655,000 on closing ne short sale of the two-year Treasury notes. /21/ But for the short-sale proceeds, which were invested in ong positions (the forward repurchase agreements and the five-year Treasury notes acquired under the everse repurchase agreements), coupled with the constructive partnership termination caused by FFPA's ntrance on December 23 (six days after the December 17 short sale and three days before the December :6 closing of the short sale), the partnership would not have acquired those assets without a corresponding asis to offset against the sales proceeds on calculating the short-term capital gain desired by FFPA. ccordingly, the Service treated the obligation to close the short sale as a "liabilit[y] of [the] partnership" nder section 752, apparently measured by the value of the forward purchase agreements held as collateral or performance of the short-sale obligation. /22/

11] This characterization of the short-sale obligation as a section 752 liability, if sustained, would completely reclude the short-term capital gain desired by FFPA. Specifically, the liability would be treated as a ontribution of money under section 752(a), thereby increasing the bases of the partners' interests under ection 722 and the bases of the partnership property deemed distributed and recontributed on the onstructive partnership termination. Accordingly, the basis attributable to the short-sale obligation would ffset the amount realized on the partnership's subsequent sale of its long positions, reducing the artnership's short-term capital gain to $250,000 and FFPA's share thereof to $245,000. /23

12] In reaching this conclusion for the partnership's 1991 taxable year, the commissioner used an analysis imilar to that set forth in two recent rulings, Revenue Rule 95-26 /24/ and Revenue Ruling 95-45. /25/ In the Explanation of Items accompanying the two Notices of Adjustment for Fulcrum and FFPA, the commissioner elied on the then-applicable temporary Treasury reg. section 1.752-1T(g) /26/ (since replaced by final egulations), /27/ which defined the term "liability" for purposes of section 752 to include any obligation that esults in "[t]he creation of, or an increase in, the basis of any property owned by the obligor (including cash

ttributable to borrowings[.])" /28/ The explanations also cited Revenue Ruling 88-77, /29/ which interpreted 1e terms "liabilities of a partnership" and "partnership liabilities" in section 752 to include only those bligations that either create basis (including cash from the borrowings) or give rise to an immediate eduction. Finally, the explanations pointed to Ruling 95-26, /30/ the post-1991 ruling characterizing a short-ale obligation as a section 752 liability, as involving a fact pattern "similar" to that involved in the Fulcrum nd FFPA cases. /31/

13] The explanations purported to distinguish the authorities relied on by the taxpayers, Helmer v. ;ommissioner /32/ (which denied a section 752 basis offset for option premiums taxed to the distributee artners) and Revenue Ruling 73-301 /33/ (which denied a section 752 basis offset for progress payments istributed by a construction partnership reporting on a completed-contract method), reasoning that in each 1stance there was no obligation to repay the amounts received or to perform further services. By contrast, 1e Service argued that "[i]n a short sale, the seller is always under the obligation to return substantially imilar securities to the lender[.]" /34/

14] Because the short sale proceeds had been invested in forward repurchase agreements, and because 1e amount the partnership could expect to receive upon "reselling" the subject securities was fixed under 1ose agreements, the commissioner contended that the amount of the short-sale obligations was fixed ather than contingent. As stated in her Explanations to the Notices of Adjustment, "[t]he taxpayer knows ow much they [sic] will receive upon the 'reselling' of the securities. Thus, it can be argued that the value of 1e securities held as collateral represent [sic] the amount of the liability on the short sale with reasonable ccuracy." /35/

15] The commissioner thus considered the short-sale obligation to be a fixed liability includable under ection 752 in calculating the bases of the partnership interests under 722. Correspondingly, the short-sale bligation became includable in calculating under sections 732(b) and (c) the bases of the partnership roperty deemed distributed and recontributed on the constructive partnership termination.

. THE REVENUE RULINGS

16] As propounded in three recent rulings interpreting the characterization of short-sale obligations under arious provisions of the code, Treasury's position applies an equally questionable interpretation of previous aw.

17] Revenue Ruling 95-26, /36/ cited in the Explanations to the Notices of Adjustment as "similar" /37/ to the ulcrum and FFPA cases, expressly holds that a partnership obligation to return securities sold short onstitutes a "liability" for purposes of section 752. Its reasoning is twofold. First, it correctly maintains that a hort sale creates an obligation to return the securities borrowed to effect the sale. However, the ruling cites 1 support of this proposition Deputy v. du Pont, /38/ a Supreme Court case that expressly held that a short-ale obligation does not create "indebtedness" for purposes of the interest deduction under the 1928 redecessor /39/ of section 163 because "although an indebtedness is an obligation, an obligation is not ecessarily an indebtedness[.]" /40/ Second, the ruling maintains that the cash proceeds of the short sale reate a partnership asset, thereby increasing basis and bringing the obligation within the cash-proceeds-qual-basis rubric propounded for section 752 characterization by Revenue Ruling 88-77. /41/

18] Revenue Ruling 95-45 /42/ applies a similar bootstrap analysis to characterize the short-sale obligation f a shareholder who contributes his interest in the sales proceeds, in conjunction with a section 351 1corporation of a going business, as a liability for purposes of section 357 (which treats liabilities transferred 1 incorporations as taxable "boot" to the extent in excess of the basis of the transferred property) and ection 358 (which treats transferred liabilities as money received in calculating the basis of the transferor's tock). Applying the same reasoning expounded for partnership liabilities by Revenue Ruling 95-26, /43/ ;evenue Ruling 95-45 cites Deputy v. du Pont /44/ for the proposition that a short sale creates an obligation ) return the borrowed securities. Because that obligation results in an increase in asset basis, the ruling

oncludes that the obligation constitutes a "liability," even though acknowledging that the sales proceeds are ot currently taxable /45/ precisely because offset by the obligation to replace the borrowed securities. /46/

19] By contrast, Revenue Ruling 95-8, /47/ although issued in conjunction with the other two rulings, holds ıat an exempt organization's income from a short sale does not result in unrelated business taxable income nder section 511 from "debt-financed property" under sections 512(b)(4) and 514(a) and (b). Its rationale is ıat there is no "acquisition indebtedness" within section 514(c) because under Deputy v. du Pont, /48/ a hort-sale obligation creates an "obligation" but not an "indebtedness."

I. EVALUATION OF THE CASES AND RULINGS

.. THE SYLLOGISM: SALES PROCEEDS = BASIS = LIABILITY

20] In sum, the three 1995 short-sale rulings collectively hold that the requirement to replace or return the ecurities borrowed to effect a short sale constitutes an "obligation," which in turn constitutes a "liability" for urposes of sections 752, 357, and 358, even though not an "indebtedness" for purposes of section 514. As ı the Explanations to the Notices of Adjustment in the Fulcrum and FFPA cases, the rulings' rationale eems to be that, because the sales proceeds create basis, they constitute a "liability" even though, as Revenue Ruling 95-45 expressly acknowledges, such proceeds remain untaxed in the recipient's hands until losure of the sale. /49/

21] As detailed somewhat more fully in the explanations, the Service view is that once the obligation is ıcurred, the amount thereof can be determined "with reasonable accuracy," thus satisfying the "all events" est specified for the accrual of a deduction by section 461(h) and Treasury reg. section 1.461-1(a)(2). /50/ 'his capacity to measure the amount of the obligation, in turn, supposedly makes the obligation sufficiently choate" to permit its characterization as a section 752 liability under the rule of La Rue v. Commissioner, /51/ a case of first impression that denied such characterization to a brokerage partnership's eserve for back office liabilities because they were insufficiently fixed in amount to satisfy the regulation's all events" test. In other words, relying on a single Tax Court case of first impression, which in fact held the ther way, the Service views the capacity to measure the amount of the short-sale proceeds, and therefore ıe increased basis in partnership assets, as the touchstone of section 752 liability status. In its words, "the mount of the short-sale liability is the amount of basis to which the short sale gave rise." /52/

22] The Service maintains this view even though it calculated that amount differently in the two pending ases than in the rulings. In the Fulcrum and FFPA cases, the amount of the short-sale liability apparently /as calculated by reference to the value of the securities held as collateral (the forward repurchase greements in which the short-sale proceeds were invested). /53/ In Revenue Ruling 95-45, by contrast, the mount of the liability was calculated by reference to the sales proceeds received, notwithstanding a ubsequent drop in the value of the replacement securities. /54/

23] Taken together, the three rulings and the two Notices of Adjustment adopt the syllogism that the xistence of short-sale proceeds creates increased basis in the partnership assets and therefore a section '52 liability, regardless of the indeterminate nature of the offsetting repayment obligation.

3. THE CRITICISM

. THE CASE IN FAVOR

ı. GENERAL RULES.

24] It is certainly the case, as a general rule, that the basis rules specified for liabilities under section 752 ıre intended to create and preserve the relationship in which the partnership's aggregate basis in its assets the "inside basis") equals the partners' aggregate bases in their partnership interests (the "outside basis").

'his purpose of section 752, in turn, is intended to further the generic goal of subchapter K of keeping inside )asis roughly equivalent to outside basis. /55/ This is the point behind temporary Treasury reg. section .752-1T(g) /56/ and Revenue Ruling 88-77, /57/ relied on by the commissioner in her two Notices of \djustment, /58/ that the term "liability" for purposes of section 752 includes any obligation that increases he basis of partnership property. By treating the partners' shares of increases of such liabilities as a :ontribution of money under 752 and therefore as an addition to the bases of their interests under section '22, the equivalence between inside and outside basis is preserved.

). SECTION 357 EQUIVALENCE.

25] Moreover, as suggested by the parallel positions regarding short-sale obligations propounded for ;ections 752 and 357 by Revenue Rulings 95-25 /59/ and 95-45, /60/ the term "liabilities" is intended to have he same meaning for both provisions. In particular, when the Deficit Reduction Act of 1984 /61/ amended ;ection 704 to better regulate built-in gains and losses on partnership contributions and retroactive illocations among partners, the Conference Report specifically approved earlier amendments to section 357 c) that had excepted the accrued but unpaid liabilities of a cash-basis shareholder from the reach of that jain-recognition provision. /62/ The conferees expressly dictated the same result for section 752. /63/

:. THE PARTNERSHIP ANTI-ABUSE RULE.

26] Finally, the technique showcased by the Fulcrum and FFPA cases, which combines short-term )artnership with nominal partners and an abusive partnership liquidation allocation under section 732(b) and c), would now be precluded by the general partnership anti-abuse rule of Treasury regulation section 1.701-:, adopted in 1994. Specifically, that regulation now stipulates that, regardless of terms purportedly ;atisfying the specifications of the partnership provisions, a transaction must be consistent with the "intent of ;ubchapter K" or run the risk of having the desired tax treatment disregarded, adjusted, or modified, where ax avoidance is a principal purpose of the use of those provisions. /64/ In particular, the partnership must be bona fide" and the transaction entered into "for a substantial business purpose"; the transaction must urvive scrutiny under "substance over form principles" and must accurately reflect the partners' economic igreement and income. /65/

27] Among the examples set forth in the regulation, three address liquidating distributions where the basis f partnership property, as in the Fulcrum and FFPA cases, is affected by the substituted basis rules of ection 732(b) and (c). /66/ Although none involves a short sale, one, example 11, could possibly be :xtended to reach the facts of the Fulcrum transaction.

28] The example's facts involve an attempt to use the liquidation and basis allocation rules of section 732(b) nd (c) to permit an outsider to utilize a preexisting partnership to acquire appreciated land owned by the artnership through a liquidating distribution of the land and substantially depreciated property. The would-e partner contributes $100 cash (thereby acquiring a basis for his partnership interest in the same amount nder section 722), then receives in liquidation of that interest land with a fair market value of $95 and nother asset with a fair market value of $5. Because both assets have bases in the partnership of $5, upon ıeir distribution in liquidation they each acquire $50 of the new partner's $100 basis for his partnership ıterest. He is then able to sell the second asset at a substantial loss (postliquidation basis of $50 minus fair ıarket value of $5).

29] The example denies the desired loss, reasoning that "[s]ection 732 is not intended to serve as the basis )r plans or arrangements in which inconsequential or immaterial assets are included in the distribution with principal purpose of obtaining substantially favorable tax results by virtue of the statute's simplifying rules /iz., section 732(c)'s allocation of the liquidated partner's basis for his interest among the distributed roperties in proportion to their respective bases to the partnership.]" /67/ A similar analysis would seem qually applicable to the artificial gain generated in the Fulcrum and FFPA cases by the same basis-etermination rules.

30] Yet another example (Example 7), although not concerned with liquidating distributions affected by the ›asis-determination rules of section 732(b) and (c), nonetheless appears apposite. As in the Fulcrum and FFPA cases, it involves both temporary and nominal accommodation partners, in this instance to generate ın artificial tax loss for the remaining partner. The parties are a foreign corporation (the temporary partner) vith an interest of 90 percent, a domestic partner (the intended beneficiary) with an interest of 9.9 percent, ınd a promoter (the nominal partner), with an interest of 0.1 percent. The three partners contribute in ›roportion to their interests a total of $10,000 cash, which the partnership uses to purchase and lease out ›quipment in that amount. After selling its rights to receive rentals under the lease for $9,000, the ›artnership liquidates out the foreign partner in exchange for the cash, leaving only $1,000 worth of the ›riginal cash contribution in partnership solution (the $10,000 value of the equipment less the $9,000 lease ıst sold). The partnership buys $8,000 worth of real property solely in exchange for recourse debt, thereby ›tepping up the remaining two partners' bases in their partnership interests by their shares of the debt under ›ection 752. This basis step-up, in turn, permits the partnership to sell the equipment subject to the lease for ›1,000 (the equipment's actual net value), generating a $9,000 artificial passthrough tax loss for the partners $10,000 cost-$1,000 sales price).

31] On these facts, the regulation finds the partnership not bona fide and the transaction lacking a ›ubstantial business purpose. The commissioner accordingly is authorized to recast the transaction. /68/ \gain, a similar analysis would seem equally applicable to the nominal accommodation partners utilized to ›enerate Fulcrum's artificial tax gain.

!. THE CASE AGAINST.

32] Notwithstanding the foregoing examples, the anti-abuse rule, which was adopted over vociferous ›rotest, applies by its terms only to transactions occurring on or after May 12, 1994. /69/ Although the ·ulcrum transaction is arguably subject to attack under the general substance-over-form principles on which he anti-abuse rule is founded, it seems inappropriate to apply those principles to an area (subchapter K) so ›rmalistic that a specific regulation was felt required and that applies prospectively only.

33] Moreover, the regulation contains no short-sale example. Although the Tax Section of the New York State Bar Association proposed such an example illustrating a fact pattern similar to that utilized in the ·ulcrum and FFPA cases, /70/ Treasury declined to include the example in the final regulations. /71/

34] In this author's opinion at least, in the absence of applicable regulations, there is insufficient authority to ıstify the result sought by the Notices of Adjustment and the two 1995 short-sale rulings. Although the ulings may apply prospectively, they should not be applied to the taxable year (1991) involved in the ·ulcrum and FFPA cases.

35] More importantly, in the words of one well-known partnership commentary, their approach (and ıerefore that of the Notices of Adjustment, which apply the same principles), is "critically flawed[.]" /72/

36] First, the commissioner's syllogism, which equates the short sale proceeds with increased basis in the ›artnership assets and therefore with a concomitant increase in partnership liabilities under section 752, onfuses the sale, which produces the proceeds, with the securities borrowing. Because it is the sale, not ıe borrowing, that gives rise to the cash and creates additional basis, there is no liability to which section '52 status can attach. /73/

37] Secondly, the commissioner's approach is contrary to the few apposite authorities, Helmer v. Commissioner, /74/ and Revenue Ruling 73-301, /75/ which deny offsetting liability status under section 752 ›r option payments and construction progress payments taxed to the distributee partners on receipt. \lthough, as discussed above, the commissioner in the Fulcrum and FFPA cases attempts to distinguish ıat line of authority, /76/ her attempt is unconvincing. A short seller's executory obligation to return ›orrowed securities is no different from an optionor's executory obligation to perform if the option is

·xercised or a contractor's executory obligation to complete construction. / 77

38] Nor does the fact that the initial incurrence of the obligation creates proceeds, and therefore basis, :hange this analysis. Despite the goal reflected in section 752, to conform a partnership's inside and outside ›asis, the existence of the short- sale proceeds (even if immediately invested in substantially similar ;ecurities as in the Fulcrum and FFPA cases), cannot resolve the contingent nature of the liability while the ›bligation to cover the sale remains outstanding. Over 60 years of short-sale case law holds otherwise. The ›roceeds/liability equivalency approach taken by the commissioner in the Fulcrum and FFPA cases and the elated revenue rulings directly contravenes that authority. /78/

39] Because the correct taxation of short sales lies at the heart of the issue involved in the Fulcrum and FFPA cases and the three 1995 revenue rulings, this article now focuses on that subject. The analysis first ;onsiders the open-transaction doctrine traditionally applied to such sales and then recent attempts to ›verrule that doctrine legislatively.

V. SHORT-SALE TAXATION

\. THE OPEN-TRANSACTION DOCTRINE

40] As currently codified in section 1233, traditional short- sale theory treats the sale of borrowed property is an open transaction that engenders no tax effect until delivery of property to close the sale. /79/ The 'reasury regulations interpreting section 1233 expressly so provide. Section 1.1233-1(a)(1) states the ieneral rule that "[f]or income tax purposes, a short sale is not deemed to be consummated until delivery of ›roperty to close the short sale." /80/ Similarly, section 1.1233-1(a)(4) provides:

]f the short sale is made through a broker and the broker
›orrows property to make a delivery, the short sale is not
'eemed to be consummated until the obligation of the seller
reated by the short sale is finally discharged by the delivery
f property to the broker to replace the property borrowed by
ıe broker. /81/

41] This approach reflects a principle established by over 60 years of case law. /82/ The Service itself has eld that open- transaction treatment is available even where the taxpayer holds identical shares in a eparate account with the same broker at the time the borrowed shares are used to effect the short ale, /83/ and even where the effect of the deferral is to grant a decedent's estate a fair market value basis n the shares used to close the sale, thereby permitting the appreciation locked in by the sale to escape axation entirely. /84/

42] The net effect of the open-transaction treatment traditionally afforded to short sales is that the basis of ıe stock sold short becomes irrelevant. Under the basis identification rule contained in Treasury regulation ection 1.1012-1(c), which permits taxpayers to identify the shares used to effect a particular sale, /85/ gain r loss on the short sale is calculated by reference to the difference between the amount realized (i.e., the roceeds received from the sale) and the basis of the shares actually used to close the sale. /86/ Similarly, nless governed by the special holding period rules of section 1233(b) and (d) (which respectively prevent ıe conversion of short-term to long-term gain and of long-term to short- term loss), the holding period for etermining gain or loss on the sale is determined by that of the property used to close the sale. /87/

43] The open transaction analysis just described traditionally has applied to options, /88/ and to transactions nalogized to short sales. /89/

44] The theory behind this treatment is that until the delivery of specific shares in closure of the short-sale bligation, the seller retains flexibility regarding the choice of shares used to close the transaction. /90/

45] This concern is amply illustrated by Hendricks v. Commissioner, /91/ a case that ping-ponged back and orth from the Tax Court to the Fourth Circuit through five separate decisions /92/ while the appellate court ttempted to have determined as a factual matter whether the seller had the ability, under relevant exchange nd brokerage house rules, to retain a long position in the particular shares purchased to close out the sale.

46] The shares in question had been purchased in late December of 1963 but not settled until January 3 nd 6, 1964, five business days after the respective purchases. Like the Service in its Notices of Adjustment 1 the Fulcrum and FFPA cases, /93/ the taxpayer argued that the short sale loss was taxable in the earlier ear because its amount became "ascertainable and irrevocably fixed" /94/ by December when the shares ntended to close the sale were purchased. Relying on the Treasury regulation quoted above, /95/ the ommissioner argued that the losses could not be taken into account until actual delivery of the shares took lace the following January.

47] Considering the case for the third time, the Fourth Circuit approved the Tax Court's original holding, /hich had approved the commissioner's "consistent position[,]" /96/ as expressed in the regulations, that a hort sale is consummated only on delivery. Noting its "embarrassment[,]" the Fourth Circuit "frankly confess ed]" that its decision to remand on the factual issue had been a "mistake" because the open-transaction rule xpounded in the Treasury regulation approved by the Tax Court was designed precisely to obviate the kind f factual inquiry otherwise facilitated by the flexibility afforded sellers in short sales. /97/

48] To the same effect is Richardson v. Commissioner. /98/ Rejecting the taxpayer's argument that a short ale should have been taxable in 1932 when the covering shares were purchased rather than in 1933 when ne sale was closed, the Second Circuit intoned, "such a shifting intent to cover a short sale ought not to be ne critical event which would determine gain or loss under a tax statute. It would leave the whole matter of xing the event to the taxpayer's own will." /99/

3. PROPOSED LEGISLATIVE REMEDIES

49] Two proposals contained in the revenue reconciliation provisions of President Clinton's proposed udget bill for fiscal year 1997, /100/ submitted to Congress on March 19, 1996, attempt to achieve egislatively the goals sought by the commissioner in the Fulcrum and FFPA cases and related revenue ulings. These are an average basis proposal and a constructive sale rule.

. AVERAGE BASIS PROPOSAL.

50] The first, adding new section 1020 /101/ to the Internal Revenue Code, would require that the bases of ubstantially identical securities be computed on an average basis rather than under the specific dentification rule now applicable under Treasury regulation section 1.1012-1(c). /102/ Under the proposal, a axpayer selling less than all of such securities would be treated as having sold them on a first-in-first-out asis.

51] Under the provision, the definition of a security, defined by reference to current section 475(c)(2), /103/ vould include not only stock and debt but interests therein such as options and short positions. /104/ Accordingly, the average basis proposal would defeat short sales "against the box" (i.e., those where the eller holds substantially identical property at the time of the sale), /105/ even without application of the onstructive sale proposal discussed below, because the taxpayer would no longer be able specifically to dentify borrowed securities as the ones delivered to close the sale. /106/ For example, if a taxpayer owned 20 shares of stock with an average cost basis of $20 and borrowed 10 shares of stock immediately prior to elling 10 shares, the taxpayer would have a $20 tax basis in each of the shares sold, and would determine he shares sold using the first-in-first-out method. The basis of the stock actually delivered to close the sale vould have no effect on the taxpayer's calculation of its average basis. /107

2. CONSTRUCTIVE SALE PROPOSAL.

52] The second proposal, adding new section 1259, /108/ would treat an "appreciated financial position" (meaning any position, including a short sale, option, or partnership interest, that would generate gain if sold), as having been constructively sold if the taxpayer entered into one or more positions, including a short sale of substantially identical property, which would, "for some [undefined] period, substantially eliminate both risk of loss and opportunity for gain on the appreciated financial position[.]" /109/ The taxpayer would recognize gain (but not loss /110/) on the constructive sale, and would be treated as if the long position had been sold and immediately repurchased. /111/

53] Because the constructive sale rule would treat the appreciated long position as if it had been sold and then repurchased, the rule would affect not only the measurement of gain (which would be calculated under the new average basis rules) /112/ but the basis and holding period of the long position (i.e., the retained stock) as well. Whereas under traditional open-transaction analysis the relevant basis and holding period would be that of the property used to close the sale, /113/ under the president's constructive sale proposal, the long position deemed to have been sold at the time of the short sale would receive an appropriate adjustment, /114/ specifically, an increase in the basis of that position. /115/ A new holding period for the long position would begin as if the taxpayer had actually acquired that position on the date of the constructive sale. /116/ If the taxpayer then actually disposed of the long position (i.e., the stock previously deemed to have been sold), any offsetting position (such as the short sale obligation, if not yet closed out) would be treated as causing a new constructive sale of any appreciated position in substantially identical property that the taxpayer held at that time. /117/

54] The two budget proposals just discussed have been much criticized by the commentators /118/ and possibly are being rethought by Treasury. /119/ Moreover, as of this writing at least, no similar proposals have appeared in pending congressional legislation. /120/ Finally, it is highly unlikely that either of these provisions could be applied to thwart the particular abuse represented by the Fulcrum and FFPA cases. Both the average basis and the constructive sale proposals are directed primarily toward short sales against the box, where preexisting shares supply the average basis used in calculating gain and trigger the constructive sale provisions. By contrast, the abuse in the Fulcrum transaction arose from the postsale purchase of securities (forward repos and five-year Treasury notes) substantially similar to those needed to cover the sale (two-year Treasury notes), thus substantially diminishing the contingent aspect of the outstanding delivery obligation without triggering inclusion of that obligation in calculating basis on the partnership termination. /121/ Nonetheless, the very existence of such proposals suggests that the Service should not be able to change retroactively by fiat (whether in a series of revenue rulings or in a Notice of Adjustment) a method of short-sale taxation of sufficiently long standing to induce the president to propose change solely by legislation.

V. CONCLUSION

55] It is rare for this author to take a position against the commissioner, /122/ particularly on facts as egregious as those involved in the Fulcrum and FFPA cases. Nonetheless, as shown by the conflicting positions propounded in Revenue Rulings 95-26, /123/ 95- 45, /124/ and 95-8, /125/ the commissioner's analysis of a short-sale closure obligation as a section 752 liability is analytically flawed. Although correct in its interpretation of section 752 as a mechanism for equalizing the partnership's inside and outside basis, it flies in the face of the few authorities to consider the nature of similar obligations in a section 752 context /126/ and directly contravenes over 60 years' worth of case law, now codified in section 1233, which expressly defers calculation of the consequences of a short sale until closure of the delivery obligation. /127/

56] As correctly framed by the parties, /128/ the issue boils down to whether a short-sale obligation is sufficiently determinate to qualify as a liability for purposes of section 752. Notwithstanding the proceeds/liability equivalency standard /129/ propounded by the commissioner in the Notices of Adjustment and the two new rulings under sections 752 and 357, /130/ the mere existence of short-sale proceeds cannot resolve the contingency while the offsetting obligation to cover the short sale remains indeterminate in amount.

57] Admittedly, the immediate investment of the sales proceeds in substantially similar securities, as in the 'ulcrum and FFPA cases, effectively minimizes the contingency, thus making the transaction closer to a hort sale against the box. Thus, notwithstanding the flawed analysis of the section 752 issue in Revenue Ruling 95-26 and the absence of a specific short-sale example in the partnership regulations' anti-abuse ule, /131/ no doubt such transactions, on a prospective basis only, can be addressed under the general uidelines of that rule.

58] In the nonpartnership area, however, the long-standing tradition of deferred taxation of short sales uggests the need for a legislative rather than an administrative remedy. The average basis and onstructive sale proposals contained in the president's fiscal year 1997 budget recommendations support his view.

59] As for transactions predating the anti-abuse rule and any corrective legislation, unless relief can be ound under general substance-over-form principles, perhaps such transactions must just be left standing.

'OOTNOTES

1/ No. 3944-96, Doc 96-11736 (20 pages) (filed Mar. 5, 1996).

2/ No. 3943-96, Doc 96-11735 (26 pages) (filed Mar. 5, 1996). The two cases currently are subject to notions to dismiss on various jurisdictional grounds, including the assertion that Turner Capital Corp. does iot constitute a valid tax matters partner eligible under section 6226(a) to file the petitions.

3/ A short sale means a sale of stock not owned by the seller at the time of sale, viz., of borrowed stock, isually in the expectation of profiting from an anticipated decline in value of replacement securities ourchased to close the sale (thereby generating a gain), or to lock in profit on securities already owned that ire substantially similar to those borrowed and sold (a "short sale against the box"). See, e.g., William J. Goldberg & Mark T. Watson, "Short Sales Against the Box: Endangered Income Tax Planning Technique," 9 . Fin. Planning 62 (June 1996).

4/ Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (as imended).

5/ Section 6223(a)(2) requires the Internal Revenue Service to notify the partners regarding a final oartnership administrative adjustment resulting from a proceeding against the partnership.

6/ 1995-1 C.B. 131, 95 TNT 48-13 (short-sale obligation constitutes section 752 liability).

7/ 1995-1 C.B. 53, 95 TNT 110-10 (short-sale obligation constitutes liability for purposes of sections 357 ind 358).

8/ 1995-1 C.B. 107, 95 TNT 2-10 (short-sale liability not indebtedness and therefore not "acquisition ndebtedness" within section 514(c)(1) for purposes of making stock sold short "debt- financed property" vithin section 512(b)(4) and 514(b)(1), therefore income from short sale not "unrelated business taxable ncome" within section 511(a)) (all discussed infra Part II).

9/ Treas. reg. section 1.701-2 (as amended in 1995).

10/ Petition, Fulcrum v. Commissioner, No. 3944-96 (filed Mar. 5, 1996) [hereinafter Fulcrum Petition], at oaras. 9(b), (c).

11/ Fulcrum Petition, supra note 10, at para. 9(d). For exhaustive definition, see Jeanne L. Schroeder, Repo Madness: The Recharacterization of Repurchase Agreements Under the Bankruptcy Code and the

U.C.C.," 46 Syracuse L. Rev. 999, 1004-06 (1996) (explaining occasional characterization, as in Fulcrum and FFPA Petitions, of lender's side of transaction as "forward repo" rather than the traditional "reverse repo"). For traditional definition and regulatory issues, see, e.g., Daniel Cunningham & Thomas Werlen, Providing a Legal Basis for Repurchase Transactions in the U.S.," XV Int'l Fin. L. Rev. 55, 55 (Apr. 1996).

12/ E.g., Rev. Rul. 74-27, 1971-1 C.B. 24 (bank's "purchase and resale" of tax-exempt securities constituted loan to "seller" of securities, so tax-exempt interest remained with seller, and bank taxable on interest component of "purchase and resale" transaction). Followed, Rev. Rul. 77-59, 1977-1 C.B. 196 (REIT's purchase and resale" of Treasury securities loan to bank, not purchased for investment, so REIT's assets for purposes of REIT qualification nonqualifying bank repayment obligations rather than qualifying Treasury securities). But see, e.g., David C. Garlock, Federal Income Taxation of Debt Instruments, 1-26-28 (2d ed. Supp. 1995) (discussing circumstances in which transaction may not be treated as loan).

13/ Fulcrum Petition, supra note 10, at para. 9(b), (e).

14/ Id., at para. 9(e). See Schroeder, supra note 11, at 1005 (some institutions reverse customary terminology, calling purchase and put a "repo" and sale and repurchase a "reverse repo").

15/ See Fulcrum Petition, supra note 10, at para. 9(f)(2) (reflecting reverse repo as liability). See also LTR 8234016 (May 21, 1982) ("seller's" obligation in sale and repurchase agreement to repurchase securities constitutes evidence of indebtedness for purposes of OID rules).

16/ Treas. reg. section 1.708-1(b)(1)(iv) (1956).

17/ Note that under a proposed revision to Treasury reg. section 1.708-1(b)(1)(iv), the two steps described above would be reversed. First, the "old" partnership would transfer its assets and liabilities to the "new" partnership in exchange for interests in the new partnership, enabling the partnership property to retain the same basis as in the hands of the old partnership under the carryover basis provisions of section 723. Second, the "old" partnership would then distribute the partnership interests in the "new" partnership in liquidation to the purchasing partner and the other remaining partners, who would take a substituted basis for the new partnership interests under section 732(b), equal to the partners' bases for their interests in the old partnership. Prop. Treas. reg. section 1.708-1(b)(1)(iv), 61 Fed. Reg. 21,985 (May 13, 1996). According to the preamble to the proposed regulations, the purposes of the proposed revisions include avoiding the change in the bases of the partnership assets caused by the ordering rule of the current regulation. Id. Cf. Letter from Russell G. Vreeland of Hillman & Glorioso (Vienna, Va.) to IRS (June 26, 1996), Doc 96-20038 (2 pages) (requesting elective exception from proposed regs' basis-retention rule to reflect premium over old basis paid by new partner).

18/ Fulcrum Petition, supra note 10 at para. 9(c). See La Rue v. Commissioner, 90 T.C. 465, 88 TNT 64-10 (1988) (brokerage partnership's reserve for back office liabilities not includable in basis of partnership interest as section 752 liability for purposes of calculating loss on abandonment, because amount contingent or speculative). Cf. Long v. Commissioner, 71 T.C. 1 (1978); 71 T.C. 724 (1979) (supplemental opinion), rev'd and remanded on another issue, 660 F.2d 416 (10th Cir. 1981) (contested liabilities not includable in basis of partnership interest under section 752 until paid).

19/ Fulcrum Petition, supra note 10, at paras. 9(g)(6), (8); (h)-(j).

20/ Fulcrum Financial Partners, Notice of Final Partnership Administrative Adjustment (Dec. 4, 1995) [hereinafter Fulcrum Notice of Adjustment] at para. 5(a)(2); FFP Acquisition Partners, L.P., Notice of Final Partnership Administrative Adjustment (Dec. 4, 1995) [hereinafter FFPA Notice of Adjustment] at para. 5(a)(2).

21/ Fulcrum Notice of Adjustment, supra note 20, at 3; FFPA Notice of Adjustment, supra note 20, at 3.

22/ See Fulcrum Notice of Adjustment, supra note 20, at 4, 5; FFPA Notice of Adjustment, supra note 20, at , 5 ("The short sale creates basis of partnership assets in the cash and subsequently the forward epurchase agreements") ("the value of the securities held as collateral represent [sic] the amount of the ability on the short sale with reasonable accuracy.").

23/ Fulcrum Notice of Adjustment, supra note 20, at para. 5(a)(2); FFPA Notice of Adjustment, supra note 0, at para. 5(a)(2).

24/ 1995-1 C.B. 131.

25/ 1995-1 C.B. 53.

26/ Temp. Treas. reg. section 1.752-1T(g) (as amended in 1989).

27/ Treas. reg. section 1.752-1 (1991). Although the final regulations "curiously" do not contain a definition f the term "liability," this omission "clearly is not intended to reflect substantive disagreement with the efinition included in the Temporary Regulations." William S. McKee, et al., Federal Taxation of Partnerships Partners para. 7.01[1] (2d ed. 1996 Cum. Supp. No. 2). Rather the intention was to effect a simplification f those regulations. See New York State Bar Assocation Tax Sec. Committee on Partnerships, Report on llocation of Partnership Debt Regulations section II (July 5, 1989) (recommending simpler style because of roposed regulations' complexity).

28/ See also temp. Treas. reg. section 1.752-1T(k) Ex. (2) (accrued interest expense and accounts payable f cash-basis partnership not section 752 liabilities because they have created neither (a) partnership basis, b) deduction taken into account in computing taxable income, nor (c) nondeductible expenditure not hargeable to capital account).

29/ 1988-2 C.B. 128, 88 TNT 191-12 (denying section 752 characterization for accrued but unpaid xpenses of cash-basis partnership).

30/ 1995-1 C.B. 131.

31/ Fulcrum Notice of Adjustment, supra note 20, at 6; FFPA Notice of Adjustment, supra note 20, at 6.

32/ 34 T.C.M. 727 (1975).

33/ 1973-2 C.B. 215.

34/ Fulcrum Notice of Adjustment, supra note 20, at 5; FFPA Notice of Adjustment, supra note 20, at 5.

35/ Id.

36/ 1995-1 C.B. 131.

37/ Fulcrum Notice of Adjustment, supra note 20, at 6; FFPA Notice of Adjustment, supra note 20, at 6.

38/ 308 U.S. 488 (1940).

39/ Rev. Act of 1928 section 23(b).

40/ 308 U.S. at 497.

APP-A-33

41/ 1988-2 C.B. 128 (discussed supra note 29 and accompanying text).

'42/ 1995-1 C.B. 53.

'43/ 1995-1 C.B. 131.

'44/ 308 U.S. 488 (1940).

'45/ 1995-1 C.B. 53, 53.

46/ Cf. Commissioner v. Tufts, 461 U.S. 300 (1983) (nonrecourse debt taxable in full on disposition of encumbered property despite decline in property's value; nonrecourse debt proceeds not taxed when received, even though included in property's basis, because offset by corresponding repayment obligation).

47/ 1995-1 C.B. 107.

48/ 308 U.S. 488 (1940).

49/ Supra note 45.

50/ Treas. reg. section 1.461-1(a)(2) (as amended in 1994). Under the regulation, the all events test raditionally permitted the accrual of an expense when "all events have occurred which determine the fact of he liability, and the amount of such liability can be determined with reasonable accuracy." See section 461 h)(4) (restating traditional test). Since 1984, however, section 461(h) generally has required that the test not be treated as having been satisfied until the occurrence of economic performance, such as the provision of equired goods or services. Pub. L. No. 98-369 section 91(a), 98th Cong., 2d Sess. (1984) (adumbrating "all events" test of Treas. reg. section 1.461-1(a)(2)).

51/ 90 T.C. 465 (1988), cited with approval in both Fulcrum Notice of Adjustment, supra note 20, at 5; and FFPA Notice of Adjustment, supra note 20, at 5.

52/ Rev. Rul. 95-45, 1995-1 C.B. 53, 53.

53/ Fulcrum Notice of Adjustment, supra note 20, at 5; FFPA Notice of Adjustment, supra note 20, at 5.

54/ 1995-1 C.B. 53 (borrowed securities sold for $1,000x, replacement securities cost $800x).

55/ McKee et al., supra note 27, at 2d ed. 1990 paras. 6.01, 7.01[1].

56/ Temp. Treas. reg. section 1.752-1T(g) (as amended in 1989).

57/ 1988-2 C.B. 128.

58/ Supra notes 26-29 and accompanying text.

59/ 1995-1 C.B. 131.

60/ 1995-1 C.B. 53 (both discussed supra Part II).

61/ Pub. L. No. 98-369, 98th Cong., 2d Sess. (1984).

62/ Pub. L. No. 95-600, 95th Cong., 2d Sess. (1978) (amending section 357(c) and 358(d)). See S. Rep. No. 1263, 95th Cong., 2d Sess. 183-85 (1978), 1978-3 (vol. 1) C.B. 481-83 (1978) (approving Focht v. Commissioner, 68 T.C. 223 (1977), acq., 1980-2 C.B. 1) (cash-basis payables not liabilities within section 357(c) if would have been deductible by transferor).

63/ H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess. 56-57 (1984), 1984-3 (vol. 2) C.B. 110-11 (approving section 357 amendments and disapproving Rev. Rul. 60-345, 1960-2 C.B. 211) (which had reached opposite conclusion under section 752)). See Rev. Rul. 88-77, 1988-2 C.B. 128 (definition of liabilities for section 752 meant to be consistent with section 357, revoking Rev. Rul. 60-345 on strength of legislative history).

64/ Treas. reg. section 1.701-2(b) (as amended in 1995).

65/ Treas. reg. section 1.701-2(a) (as amended in 1995).

66/ Treas. reg. section 1.701-2(d) Exs. 9-11.

67/ Treas. reg. section 1.701-2(d) Ex. 11(ii).

68/ Treas. reg. section 1.701-2(d) Ex. 7(ii).

69/ Treas. reg. section 1.701-2(g).

70/ N.Y. St. B.A. Tax Sec. Comm. on Partnerships, Report on the Proposed Anti-Abuse Rule 79-82, Ex. 13 (July 1, 1994).

71/ Possibly because the three short-sale rulings (discussed supra Part II) were in train.

72/ McKee et al., supra note 27, at 1996 Cum. Supp. No. 2 para. 7.01[1].

73/ See id.

74/ 34 T.C.M. 727 (1975).

75/ 1973-2 C.B. 215 (both discussed supra notes 32-34 and accompanying text). See also La Rue v. Commissioner, 90 T.C. 465 (1988) (section 752 basis increase denied to partners claiming loss on involuntary disposition of insolvent brokerage business because reserve for back office liabilities insufficiently fixed in amount to satisfy all events test of Treas. reg. section 1.461-1(a)(2)). Cf. Rev. Rul. 81-241, 1981-2 C.B. 146 (partner's cash withdrawals from periodic payments received by partnership on partially completed long-term construction contract income to extent in excess of partner's basis for interest) (no discussion of section 752 issue).

76/ Supra notes 32-34 and accompanying text.

77/ See McKee, et al., supra note 27, at 1996 Cum. Supp. No. 2 para. 7.01[1].

78/ Cf. id. (Rev. Rul. 95-26 inconsistent with section 1233 scheme for taxation of short sales).

79/ Dept. of Treasury, General Explanations of the Administration's Revenue Proposals 72 (March 1996) [hereinafter Treasury Explanation]; Joint Comm. on Tax'n, Description of Revenue Provisions Contained in the President's Fiscal Year 1997 Budget Proposal 60 (Comm. Print. Mar. 27, 1996) [hereinafter Joint Committee Report] (both citing short sales as classic instances of open- transaction treatment). Cf. Provost v. United States, 269 U.S. 443, 452 (1926) (stamp tax) (short sale completed when borrowed stock delivered to purchaser).

80/ Treas. reg. section 1.1233-1(a)(1) (as amended in 1980).

81/ Treas. reg. section 1.1233-1(a)(4) (as amended in 1980)

32/ E.g., Le Baron v. Commissioner, 39 B.T.A. 747 (1939); Bingham v. Commissioner, 27 B.T.A. 186 1932), acq., XII-1 C.B. 2.

33/ Rev. Rul. 72-478, 1972-2 C.B. 487 (citing Treas. reg. section 1.1233-1(a)(1), sale not consummated intil shares delivered to close sale).

34/ Rev. Rul. 73-524, 1973-2 C.B. 307 (short sale consummated only when sale covered, so postdeath asis rules apply). For proposed legislation that would override this result, see President Clinton's FY 1997 udget bill, Title IX, Revenue Reconciliation Act of 1996 (Mar. 19, 1996) section 9512(b) [hereinafter President's Proposed Revenue Reconciliation Act] (taxing open pre-act short-sale position as income in espect of a decedent under section 691 as if received by seller without benefit of otherwise applicable basis tep-up rules).

35/ Treas. reg. section 1.1012-1(c) (as amended on June 11, 1996).

36/ Treas. reg. section 1.1233-1(c)(6) Exs. 1-6, (d)(2)(iii). E.g., Bingham v. Commissioner, 27 B.T.A. 186 1932) (gain on short sale from large block determined by bases of specific shares subsequently purchased o close sale, not under FIFO principle).

37/ Treas. reg. section 1.1233-1(c)(6) Exs. 2, 3 (second example). For straightforward overview of current aw, see Goldberg & Watson, supra note 3. For clear example, see National-Standard Co. v. Commissioner, 80 T.C. 551, 567-68 (1983) (Tannenwald, Chief Judge, dissenting), aff'd 749 F.2d 369 (6th Cir. 1984).

38/ Rev. Rul. 58-234, 1958-1 C.B. 279 (propounding general open-transaction rule for both issuer and holder for both puts and calls). Followed, Rev. Rul. 59-242, 1959-2 C.B. 125 (acquisition of put upon exercise of restricted stock option not disqualifying disposition of restricted stock because transaction not closed until put exercised). See Rev. Rul. 71-521, 1971-2 C.B. 313 (holder's cost of put premium not part of stock basis but carried in deferred capital account until exercise, when offset against sale proceeds). Cf. Helmer v. Commissioner, 34 T.C.M. 727 (1975) (option not section 752 liability eligible to create basis in partnership interest to offset taxable distribution of option premium: no liability to repay premium or to perform future services). But see Lee A. Sheppard, Viewpoint, "Clear Reflection for Contingent Payment Securities," Tax Notes, Mar. 4, 1996, pp. 1411, 1412 (noting Treasury consideration to amend open-transaction approach historically accorded options to reflect time value of money on longer-term options and prepaid forward contracts).

39/ National-Standard Co. v. Commissioner, 80 T.C. 551, 567 (1983) (Tannenwald, Chief Judge, dissenting), aff'd 749 F.2d 369 (6th Cir. 1984) (arguing for sale-or-exchange treatment on repayment of foreign currency loan "by way of analogy to a short sale").

90/ Hendricks v. Commissioner, 423 F.2d 485, 486-487 (4th Cir. 1970) (per curiam) (short sale loss taxable on 1/64 settlement date rather than on 12/63 purchase of covering shares); Richardson v. Commissioner, 121 F.2d 1, 4 (2d Cir. 1941) (short-sale taxable in 1933 when closed, not in 1932 when covering shares purchased) (both rejecting determination by reference to taxpayer's intent).

91/ 423 F.2d 485 (4th Cir. 1970) (per curiam).

92/ 51 T.C. 235 (1968); aff'd per curiam 69-2 U.S.T.C. para. 9517 (4th Cir. 1969) (withdrawn); 70-1 U.S.T.C. para. 9252 (4th Cir. 1969) (remanding for express finding re whether taxpayers could retain shares purchased to close sale); on remand 29 T.C.M. 36 (1970) (Tax Court not clear whether Fourth Circuit meant unqualified right or ability to do so if brokerage house rule waived, so made finding on both points); 423 F.2d 485 (4th Cir. 1970) (aff'g original Tax Court decision per curiam) (open-transaction rule of Treas. reg. section 1.1233-1(a) obviates need for factual inquiry).

93/ Supra Part I.B.2.

94/ 423 F.2d at 486.

95/ Treas. reg. section 1.1231-1 (quoted supra notes 80 and 81).

96/ 423 F.2d at 486.

97/ Id. at 487.

98/ 121 F.2d 1 (2d Cir.), cert. denied 314 U.S. 684 (1941).

99/ Id. at 4.

100/ President's Proposed Revenue Reconciliation Act, supra note 84, sections 9311 (average basis proposal), 9512 (constructive sale proposal).

101/ President's Proposed Revenue Reconciliation Act, supra note 84, section 9311.

102/ Supra note 85 and accompanying text.

103/ New section 1020(b), proposed by act section 9311(a).

104/ Joint Committee Report, supra note 79, at 59.

105/ Supra note 3.

106/ Treasury Explanation, supra note 79, at 71.

107/ Example borrowed from id.

108/ President's Proposed Revenue Reconciliation Act, supra note 84, section 9512.

109/ New section 1259(b) (definition of "appreciated financial position"), (c) (constructive sale rule), proposed by act section 9512(a). See new section 1259(c)(1)(B) (last sentence), expressly including within this rubric "a short position with respect to substantially identical property" (i.e., a short sale against the box), because fluctuations in the value of the long property would be offset by opposing fluctuations in the value of the short property, thereby eliminating both the risk of loss and the opportunity for gain. See Treasury Explanation, supra note 79, at 73, Joint Committee Report, supra note 79, at 60-61 (both citing short sales against the box as paradigm lock-in transactions triggering constructive sale rule). For the same reason, the proposed constructive sale rule expressly applies to the granting of a call or the acquisition of a put with respect to the same or substantially identical property if there is "a substantial certainty" that the option will be exercised. New section 1259(c)(1)(B). See also id. as interpreted by Treasury Explanation, supra, and Joint Committee Report, supra (taxpayer would recognize gain on appreciated financial position in stock, debt, or partnership interest if enters into transaction substantially eliminating risk of loss or opportunity for gain, regardless of whether transaction involves substantially identical property).

110/ New section 1259(a) (calling for gain recognition), (b) (definition of "appreciated financial position" triggering constructive sale rule "if there would be gain were such position sold"). See Joint Committee Report, supra note 79, at 60 (current recognition of gain, not loss).

111/ Treasury Explanation, supra note 79, at 73.

112/ Joint Committee Report, supra note 79, at 61.

113/ Supra notes 85-86 (basis), 87 (holding period) and accompanying text.

114/ New section 1259(a)(2)(A), proposed by act section 9512(a).

115/ Treasury Explanation, supra note 79, at 73, Joint Committee Report, supra note 79, at 61. As liscussed supra note 110, the constructive sale provision applies by its terms only where gain would result.

116/ New section 1259(a)(2)(B), proposed by act section 9512(a); Treasury Explanation, supra note 79, at '3; Joint Committee Report, supra note 79, at 61.

117/ New section 1259(d)(1), proposed by act section 9512(a); Treasury Explanation, supra note 79, at 73; oint Committee Report, supra note 79, at 61.

118/ E.g., Sheryl Stratton, "Average Cost Basis: An Idea Whose Time Has Come?" Tax Notes, Apr. 1, 996, p. 21 (average basis proposal); Bear Stearns & Co., Comments Submitted to House Ways & Means Comm. (May 30, 1996), Doc 96-17270 (7 pages) (constructive sale proposal).

119/ Sheryl Stratton, "How Far Will Treasury Extend Current Accrual?" Tax Notes, Mar. 4, 1996, pp. 1305, 307 (Treasury may be rethinking "fuzzy" constructive sale standard in favor of bright-line test) (apparently eferring to proposed section 1259(c)(1)(A) provision triggering sale if position entered "for some period" vhich "substantially" eliminates possibility of gain or loss on preexisting appreciated financial position).

120/ See Carolyn Wright, "PSA Battles White House Budget Proposals, and May Be Winning," Tax Notes, uly 8, 1996, pp. 157, 159 (current year's Republican and Democratic budget proposals devoid of anti-securities provisions present in Clinton budget). See also Alissa J. Rubin, "Tax Cuts Take Back Seat in Hill's Vrap-Up Agenda," Congressional Quarterly 2026 (July 20, 1996); "Republican Tax Cut Plan Is Losing Steam," Tax Notes, July 15, 1996, p. 257 (both saying time running out for passage of major tax bill). But cf. H.R. 2491, Seven-Year Balanced Budget Reconciliation Act of 1995 section 11022(a), 104th Cong., 1st Sess., Doc 95-10445 (475 pages) (vetoed 1995 tax bill (i) suspending proposed basis inflation adjustment or calculating sales gain while asset subject to transaction that substantially reduces risk of holding it and ii) increasing amount realized on long-term short sales by specified inflation adjustment).

121/ But see new section 1259(c)(1)(B), proposed by act section 9512(a) (discussed supra note 109) reaching transactions not involving substantially identical property if transaction eliminates risk of loss or opportunity for gain on appreciated financial position in stock, debt, or partnership interests). Although the statute seems directed to sales of partnership interests themselves and expressly excepts from the constructive sale rule such interests not qualifying as marketable securities if the sale occurs within one year ollowing entry into the sales contract, section 1259(c)(3), the sweep of the legislative history is much broader. See Treasury Explanation, supra note 79, at 73; Joint Committee Report, supra note 79, at 61 both purporting to reach appreciated partnership interests whenever holder enters into transaction locking n gain).

122/ E.g., Alice Welt Cunningham, "The Philip Morris Case and Section 988," Tax Notes, Aug. 21, 1995, p. 983 (debt-repayment gain attributable to foreign currency depreciation should be ineligible for deferral under sections 108 and 1017); "A Requiem for Fulton Gold," 72 Taxes 365, 367-70 (1994) (criticizing real estate vorkout commentaries for claiming absence of income realization on discharge of nonrecourse debt encumbering depreciated property); "Reprise: Characterization of Income Under the Tax Benefit Rule," 43 Tax. Law. 121 (1989) (portion of nonrecourse mortgage attributable to accrued but unpaid interest and taxes should be taxed on mortgage discharge as ordinary income under tax benefit rule rather than as property gain under Tufts rule).