# CONDENSED TRANSCRIPT

# WITH

# FULL INDEX

PROVIDED BY: ALLIANCE SHORTHAND, INC.

SUITE 1500 - ALLIANCE BUILDING

183 EAST MAIN STREET

ROCHESTER, NEW YORK 14604

TELEPHONE - (585)546-4920

FAX - (585)546-4934

EXHIBIT

tabbles

3

--------------------------------------------x

IN THE MATTER OF PARTNERSHIP-LEVEL ADMINISTRATION PROCEEDINGS WITH RESPECT TO: ALPHA I, LP, BETA I, LP RRM&C GROUP, LP and RRM&C PARTNERS, LLC,

--------------------------------------------x

Deposition Upon Oral Examination Of: Richard Sands

Location: Internal Revenue Service 255 East Avenue Rochester, New York 14614

Date: September 30, 2005

Time: 9:00 a.m.

Reported By: Christine Kester

Alliance Shorthand, Inc.

183 East Main Street

Suite 1500

Rochester, New York 14604



Appearing on Behalf of Plaintiff:
Elaine Harris, Esq.
Internal Revenue Service
4050 Alpha Road, Suite 1300
Dallas, Texas 75244-4203

Appearing on Behalf of Defendant:
N. Jerold Cohen, Esq.
Thomas A. Cullinan, Esq.
Sutherland Asbill & Brennan, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996

* * *



IT IS HEREBY STIPULATED by and among the attorneys for the respective parties, in accordance with the Federal Rules of Civil Procedure, that this deposition may be taken by the Plaintiff at this time, pursuant to Subpoena;

FURTHER STIPULATED, that all objections except as to the form of the questions and responsiveness of the answers, be reserved until trial;

FURTHER STIPULATED, that the witness may read and sign the deposition and make any corrections to same before any Notary Public;

AND FURTHER STIPULATED, that if the original deposition has not been duly signed by the witness and returned to the attorney taking the deposition by the time of trial or any hearing in this cause, a certified copy of the deposition may be used as though it were the original.



INGRED JEFFRIES: Today is Friday, September 30, 2005. It's approximately 9:08 a.m. My name is Ingred Jeffries. I'm a revenue agent.

We'll have all the participants introduce themselves, starting to my right.

MR. CULLINAN: Thomas Cullinan.

MR. COHEN: N. Jerold Cohen.

RICHARD SANDS: Richard Sands.

MS. HARRIS: Elaine Harris, attorney for the IRS.

INGRED JEFFRIES: And we're here in the matter of TEFRA proceedings with respect to Alpha I, LP, Beta Partners, LLC, RRM&C Group, LP, RRM&C Partners, LLP.

Please swear in the witness.

R I C H A R D S A N D S,
called herein as a witness, first
being duly sworn, testified as follows:
DIRECT EXAMINATION BY MS. HARRIS:

MR. COHEN: Before we proceed, let me say that this is the second of two related interviews. The first interview which took place yesterday of Mr. Robert Sands was concluded.

At the outset of the first interview, I

RICHARD SANDS - DX BY MS. HARRIS

Q. And you were regularly involved in dealing with the large financial transactions; is that true?
A. Yes.
Q. And at what point did you assume the primary responsibility for those transactions?
A. When I became the President, in whatever year that was. By definition, that gave me primary responsibility. But it needs to be made clear that as the President or even the CEO in 1993, you're leading a team of people.
Q. I understand that.
A. Very good.
Q. I certainly understand that.
A. Eventually the buck stopped with me.
Q. And being that --
A. Prior to it stopping with the Board of Directors, of course.
Q. I understand.
At the time that you became President, do you recall who was on the Board?
A. In 1993, which I became President before '93, I believe -- it's all very confusing time-wise.
Q. I understand that you can't remember exact dates.



RICHARD SANDS - DX BY MS. HARRIS

A. I'm not very orientated towards titles, but the Board consisted of myself, my father, I believe my brother, a gentleman named Burt Silk, a gentleman named George Bressler and Jim Lock.
Q. Thank you.
In your personal affairs, did you engage in investment activities on your own account?
A. Starting?
Q. Did you --
A. Yes. From?
Q. Let's just say --
A. From 1979, yes.
Q. Okay.
A. Prior to 1979, no.
Q. Who has assisted you in that? Who has -- let's say --
A. Hundreds of people.
Q. Let's say in --
A. That's an exaggeration. Dozens.
Q. Who has assisted you and advised you in those investment activities? Let's say during 2001, who was your broker, your accountant, your investment banker, if you had a personal investment banker? I don't even know if that's appropriate.



RICHARD SANDS - DX BY MS. HARRIS

A. During 2001?
Q. Yes, sir.
A. I mean, I don't know. I would suspect -- we know Heritage was an advisor. Robinson and Company was an advisor. Marty Falk was an advisor. We had accounts with Merrill, a gentleman named Bill Goodrich, which he may have left, was advising on certain accounts. My father was dead. Okay, that's it. There were probably a couple, three more.
Q. I've heard you use the word "we." I know your family has a number of trusts and jointly owned partnerships. What I'm asking about or trying to get at is for yourself on your own account. Who did you go to for investment advice?
A. There is very little difference between my own account and we. It's all a big complicated set of partnerships that we used to invest in, so... It really is all we because we are investing primarily for partnerships.
If you want to talk about my own account, my own account is very small and very limited.
Q. During that time, was there one partnership or joint investment where your -- where most of your



RICHARD SANDS - DX BY MS. HARRIS

assets were managed?
A. No, there was not one. There were multiples.
Q. You've listed a number of people previously as being involved in your family's investment activities or being advisors to your family investment activities.
A. Yes.
Q. Who was the regular accountant, if there was one, for the family's personal business?
A. Bernard Robinson and Company.
Q. How long had he been your accountant for -- the accountant for the family, if you remember?
A. I think dating back to the '50s.
Q. So he was with your father before he died, correct?
A. With my father?
Q. He was with -- he was advising -- he advised your father and was an accountant for him --
A. Again, he advised the family. Bernard Robinson and Company prepared our tax returns from the time that we were kids.
Q. During that period -- I'm talking now about 2001 forward -- who was your -- who was the attorney

RICHARD SANDS - DX BY MS. HARRIS

you went to most often for legal advice?

A. Are we on personal?

Q. Yes, sir.

A. A whole variety of attorneys typically selected by my brother, which may mean my brother.

Q. In your personal affairs, again --

A. The same thing. My brother selects our attorneys, because he is an attorney.

Q. What sort of matters does -- what sort of matters, in general, do you believe your brother is competent to advise you? What areas is he -- does he have enough expertise to advise you?

A. Selecting attorneys and taking the input of the attorneys and distilling it into common man's language.

Q. If you had a tax problem, would you go to your brother to explain it or would you go to your brother to make a contact with an attorney who had expertise in that area?

MR. CULLINAN: You're asking him to speculate.

Q. At the time we're referring to 2001/2002, have you -- if you had a tax problem, where would you go?



RICHARD SANDS - DX BY MS. HARRIS

A. This is a personal tax problem?

MR. CULLINAN: Here again, you're asking him to speculate; "If you had a tax problem in 2001."

Q. Did you have any tax issues, personal, in 2001?

A. "Tax issues," I don't know what a "tax issue" is.

Q. Did you ever use a tax lawyer in, let's say, for personal matters before 2001?

A. Yes.

Q. When you -- how did you find the tax lawyer that you used?

A. If we were seeking tax advice from a tax lawyer, my brother would select the tax lawyer.

Q. But your brother wouldn't give you the actual advice?

A. I don't know the definition of "giving actual advice." If my brother gave his opinion on the tax lawyer's information, my brother would give me his judgment on the information that any lawyer would give us, whether it be tax or whether it be, you know, matrimonial, whether it be -- what other types of lawyers are there -- security lawyers.



RICHARD SANDS - DX BY MS. HARRIS

Whether it be -- I'm thinking personal lawyer -- a real estate lawyer. Okay.

MR. COHEN: Did you consider Robert to be an expert in tax law?

THE WITNESS: No.

Q. During this period from --

THE WITNESS: Are you allowed to ask questions?

MR. COHEN: She didn't object.

Q. You and your brother also have a personal relationship, obviously?

A. We're brothers.

Q. Yes. And you work closely together?

A. At work.

Q. And you socialize after work?

A. Sometimes.

Q. And your familles are close? Would you described them as close?

A. Some parts of our family.

Q. I understand.

A. Some parts are distant.

Q. I understand.

When you and your brother are discussing matters that -- I'm trying to talk here about your



RICHARD SANDS - DX BY MS. HARRIS

personal affairs -- when you and your brother are discussing personal matters that relate to your legal situation and in a situation where you have asked him to advise you about the advice that another attorney has given, how do you know he's acting as your brother or as your lawyer? How do you -- what's the difference between his legal advice and his -- and your personal and what he would say to you as a bother?

A. I don't think there is a difference. He's a lawyer. He speaks to me as a brother as a lawyer. There is never a difference. He never says, "I'm speaking to you as a brother, not as a lawyer."

Q. I understand.

A. It's very one-sided. He's a lawyer.

Q. When did you first meet Gary Corman?

A. Sometime in 2001.

Q. Do you recall the first meeting you had with him face-to-face?

A. I don't.

Q. Do you know approximately how many times you met with him face-to-face?

A. I don't.

Q. Did Robert meet with him in your absence?

RICHARD SANDS - DX BY MS. HARRIS

terms; decoded, out there, squashed, unretrievable, if they are even present.

MR. CULLINAN: And these specific exhibits that you have, I think, represents or potentially, I guess, because they are signed they do, but these are POWERPoint presentations that Gary Corman or Heritage put on prior to the transaction being implemented. I'm not even sure that they accurately depict what actually occurred.

MS. HARRIS: That's the question for the witness.

MR. CULLINAN: I think that's a tough question. I can spend two or three hours with the document, and I'm not sure if I could figure out whether it accurately depicts what happened.

MS. HARRIS: Well, the question for the witness is whether he could refresh his recollection by looking at those.

A. And I said, "No, I do not believe so."

Q. And what I'm going to ask you, then, is that how is it that you don't remember anything about these transactions, but you do remember that you had these goals of estate planning, investment profit and diversification?



RICHARD SANDS - DX BY MS. HARRIS

A. Because they have been consistent goals for over 20 years.

Q. But --

A. They are the goals of today. They are the goals of five years ago. They are the goals of ten years ago. They are the goals of 15 years ago. They are the goals of 20 years ago.

Q. Do you actually remember discussing those goals in the context of the transactions?

A. No. I don't remember discussing those goals in the context of the transaction. I do not remember the specific discussions; nor do I remember the specifics of any discussions.

Q. I'll leave it at that.

Did you and any of your family have a prior relationship with Millbanks before the advice in connection with the transactions?

A. Yes.

Q. Can you tell me what kind of relationship that was?

A. I believe Millbanks --

MR. CULLINAN: You can keep it general.

A. I believe Millbanks handled my sister's will and estate planning associated with that,



RICHARD SANDS - DX BY MS. HARRIS

because my sister knew she was going to die. And there was plenty of time to deal with it.

Q. I understand.

A. In other words, she wasn't struck by a car.

Q. I understand.

Well, I think before we end this interview, I need to get that Exhibit 1 back into --

MR. COHEN: I have a copy of Exhibit 1. But, unfortunately I've packed it away so I wouldn't have so much to carry in my briefcase. I will mail a copy to you and a copy to our court reporter.

MR. CULLINAN: I thought you had a copy --

MS. HARRIS: We have a copy, and I was asking if you would look at it and get satisfied with it --

MR. COHEN: This one does not look to be the same.

MR. HARRIS: It's not the same because it's -- or it may not be the same. That's not the exhibit from this interview. We're looking for the one from the prior interview.

MR. COHEN: I tell you what, if you would xerox a copy of this for me, I'm will take this and compare it to the one in my suitcase, and if it is



RICHARD SANDS - DX BY MS. HARRIS

the same -- that would be the best way to do it.

MS. HARRIS: I want to make sure by looking at it that this is the one that I had in mind.

MR. COHEN: Remember I was looking at my copy yesterday, so the one that I was looking at is the one that you were using as Exhibit 1 yesterday.

MS. HARRIS: And your request for documents in the hands of the Government that came from third parties relevant to these transactions. You know, I think you've made that request plain on the record. If you would rather just make that request on the record, I can respond to it there. If you'd rather draft a description that you feel more comfortable with after some thought, then you could do it that way. I don't want to require you to send a letter when you've made the request on the record.

MR. CULLINAN: On the record, we'd like all documents that the Government has received from any third party regarding what we have herein described as the transactions.

Who has the Government received documents from?

MS. HARRIS: I can't necessarily tell you that because of disclosure. Other than the -- I can