# APPRAISAL OF THE
# R, R, M & C GROUP LIMITED PARTNERSHIP

## SECTION 1. INTRODUCTION

### 1.1 Description of the Assignment:

The subject of this appraisal report is a 24.975% interest in the R, R, M & C GROUP LIMITED PARTNERSHIP, a closely held Missouri limited partnership. The subject business' primary business activity is an open-ended investment company. The objective of this appraisal is to determine the fair market value of a 24.975% limited partnership interest in the R, R, M & C GROUP LIMITED PARTNERSHIP for the purpose of making gifts of the limited partnership interest. The date of valuation is defined as the appraisal effective date and is September 21, 2001.

### 1.2 Scope of the Assignment:

The scope of my assignment is limited to establishing the fair market value of a 24.975% limited partnership interest in the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001 for the sole purpose of establishing its fair market value for gifting purposes.

### 1.3 Applicability of Revenue Ruling 59-60:

Revenue Ruling 59-60 specifies the relevant factors which must be considered in the preparation of an appraisal report concerning an operating business entity for any purpose involving the Internal Revenue Service. More specifically, those factors include the following:

(a) The nature of the business and the history of the enterprise since inception.

(b) The economic outlook in general and the outlook for the specific industry in particular.

(c) The financial condition of the business and its book value.

(d) The earnings capacity of the company.

(e) The dividend paying capacity of the company.

(f) The value of intangible assets and goodwill, if any.

(g) Previous sales of the company's stock (or other ownership interest) and the size of the interest to be valued.

(h) The market value of companies or corporations engaged in the same or similar businesses, having their stocks actively traded in a free and open market, either on an exchange or over the counter.

**1.4 Definitions:**

(a) Fair market value is the cash or cash equivalent price at which the property would change hands between a willing buyer and a willing seller; neither being under a compulsion to buy or to sell and both having reasonable knowledge of all relevant facts.

(b) Goodwill is that intangible asset which arises as a result of name, reputation, customer patronage, location, products and similar factors that have not been separately identified and/or valued but which generate economic benefits.

(c) A "Going Concern" is an operating business enterprise.

(d) Non-Operating Assets and Liabilities are those assets and liabilities present in the business that are not necessary to the ongoing operations of the business.

**1.5 Principal Sources of Information:**

The principal sources of information used in this valuation analysis are the company's financial statements and income tax returns, interviews with the company's owners, IPO studies, market research studies from Partnership Profiles and Willamette Management Associates, as well as other studies cited in this report dealing with the marketability of limited partnership interests.

**1.6 Assumptions and Limiting Conditions:**

(a) This report is an appraisal report designed to give an opinion of fair market value. It is not an accounting report, and it should not be relied upon to disclose hidden assets or to verify financial reporting. It is an opinion of the value of a 24.975% interest in the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001.

(b) I have accepted the financial information of the R, R, M & C GROUP LIMITED PARTNERSHIP without testing their accuracy. The financial information/statements consist of balance sheets, income statements, assets statements and/or statements of cash flows. The accuracy of the financial statements is the sole responsibility of the management of the R, R, M & C GROUP LIMITED PARTNERSHIP.

(c) I have relied on representations made by the general partner(s) about the background and history of the business. The management of the R, R, M & C GROUP LIMITED PARTNERSHIP has acknowledged to me that the information they provided was complete and accurate. However, I assume no responsibility for the accuracy of the information provided to me by the business's management.

(d) All facts and data as set forth in this report were obtained from sources considered to be reliable. However, I assume no liability for the accuracy of the information provided to me by others.

(e) This valuation report is based upon facts and conditions existing as of the date of valuation. I have not considered subsequent events. Unless specifically requested by the client and agreed upon by us, I have no obligation to update my report for such events and conditions.

(f) The estimate of value opined to in this report applies only to the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001. In addition, my estimate of value is valid only for the purpose of establishing a fair market value of the limited partnership interest.

## SECTION 2. THE NATIONAL ECONOMY

### 2.1 General Economic Overview

Reports from Federal Reserve Districts generally indicated that overall economic activity remained sluggish in August and early September, with several suggesting that activity slowed further. Back-to-school buying gave retailers in some regions a boost in sales, but overall consumer spending generally was said to be flat to down. Residential real estate markets were described as "brisk," "strong," or "steady" in most reports, buoyed in large part by low mortgage rates. By contrast, demand for commercial space reportedly softened further in most Districts. Manufacturing activity remained weak in nearly all regions, and the softness appeared to be broad based. Lending activity was mixed. Demand remained strong for residential mortgages, while demand for business loans was flat to down in most Districts as many lenders continued to tighten standards on some commercial loans. Relatively soft labor markets persisted in most Districts, with a few reports

indicating further easing. Upward pressure on wages remained subdued, but contacts in some Districts continued to express concern about rising health insurance premiums. Upward price pressures were again restrained in nearly all Districts. Input cost pressures were said to be easing as well.

### 2.2 Consumers Spending and Tourism

Overall consumer spending remained soft in most of the country during August and early September, while upward pressures on retail prices were subdued. Over half of the District reports indicated that retail sales were flat to down in the reporting period. Atlanta and Minneapolis reported retail sales increases, as did Dallas but from very weak levels. In the important back-to-school segment, merchants in the Boston, Chicago, and St. Louis Districts noted strong sales, while those in the New York, Philadelphia, and Kansas City regions had mixed, less-than-expected, and flat results, respectively. Federal income tax rebates had only a limited effect on spending in August, with New York and Chicago indicating no significant impact, while the Atlanta report suggested that tax rebates (along with heavy discounting) boosted overall sales. Minneapolis noted that state sales tax rebates helped retail sales. Consumers in many areas remained value-conscious, and large discount stores continued to outperform general merchandisers in some regions. Merchants in over half the Districts expected either flat sales or only moderate growth for the remainder of the year, with one contact in the Boston region describing the retail outlook as "grim." Most Districts reported that retail inventories were in good shape. Total sales of new light vehicles were relatively soft in most regions, and the Cleveland and Dallas reports noted a shift toward used vehicles. Reports of tourism spending were mixed, while business travel generally remained soft. Upward pressure on

retail prices appeared to ease further in some regions, and Chicago and Dallas indicated that there were more reports of price decreases than increases.

### 2.3 Construction and Real Estate

Real estate and construction activity were mixed, as the residential side remained strong, while the commercial segment softened further. Residential sales were relatively steady at high levels in most of the country, even in the Districts that reported slightly softer sales activity--New York, Philadelphia, and Atlanta. Softness was noted, however, in the demand for high-end homes in some reports, while Kansas City and Dallas indicated that overall home sales were soft in a few high-tech intensive areas. Contacts in many regions attributed much of the strength to continued low mortgage rates. District reports indicated that commercial activity remained weak in nearly all regions, and softened further in most. Downward pressure mounted on office rental rates as available space continued to increase. The amount of sublease space becoming available picked up in the St. Louis and Minneapolis Districts, while it reportedly slowed in the Chicago and Dallas regions. Industrial real estate markets softened in one-third of the Districts, while retail development declined from high levels in the Atlanta and Chicago Districts. Hotel occupancy fell in a few regions, leading to decreased room rental rates.

### 2.4 Manufacturing

Overall manufacturing activity was weak again in August, but there were positive signs contained in a few District reports. Virtually all regions reported that new orders and production were weak, and nearly one-half suggested that conditions had deteriorated further. However, Boston, New York, Chicago, and Kansas City reported that the declines in manufacturing activity

appeared to be stabilizing, while Richmond's manufacturing sector expanded for the first time in a year. Capital equipment spending remained weak, as contacts in some Districts reported that businesses had a "wait and see" attitude. Nearly one-half of the Districts indicated that high-tech manufacturing industries generally softened further in August. Some contacts in the Dallas and San Francisco Districts, however, suggested that the sector may have bottomed. Most Districts reported that manufacturers continued to trim inventories and many suggested that further inventory reductions were in the offing. Soft demand and stiff competition, in many cases from foreign producers, kept downward pressure on selling prices, and most input prices were reportedly flat to down. Increases in new orders and production in machine tool and shipping/packaging materials were noted by Chicago and Minneapolis.

## 2.5 Banking and Finance

Overall lending activity was reported to be mixed, as household demand for loans remained strong in most areas while softness in business lending persisted. Over half of the district reports indicated that household lending activity remained relatively robust, with only Boston, New York, St. Louis, and San Francisco reporting a general softening. Low mortgage interest rates continued to buoy home buying and spur mortgage refinancing in many areas. Contacts in the Boston, Philadelphia, and Cleveland Districts suggested that consumer delinquencies increased in the latest period, and New York noted rising delinquencies on residential mortgages. Reports on business lending activity were mixed, but generally indicated soft demand. Only the Philadelphia and Kansas City reports alluded to a general pickup in business lending activity, but the increases were very modest. One-third of the districts noted a further deterioration in business loan quality, although

contacts indicated that banks were well positioned to weather the increases in nonperforming or problem loans. Banks in one-third of the regions continued to tighten standards on business loans. Deposit increases were noted by Boston, Kansas City, and Dallas, while St. Louis reported a slight decline.

## 2.6 Labor Markets

Labor markets continued to ease in most parts of the country in August with over half the District reports suggesting soft and/or softening demand for labor. Boston and St. Louis indicated that demand for high-tech workers continued to erode, while Atlanta suggested that potential employers had become much more selective and high-tech job searches had become longer. Staffing agency reports were mixed, but generally pointed to continued weaker demand. By contrast, New York reported that overall labor demand was stable, while St. Louis indicated that worker shortages persisted despite recent loosening of labor markets. Richmond, Kansas City, and Minneapolis noted a shortage of nurses. There were also signs of stabilization in manufacturing employment in a few regions. Boston noted an increase in weekly hours, and Chicago reported that a few manufacturers were calling back a small percentage of furloughed workers. There were scattered reports of moderately increasing wages but, for the most part, upward wage pressures continued to ease along with labor demand. In fact, the Cleveland report suggested that unions were trading off negotiated wage increases in exchange for job security provisions. Contacts in four Districts expressed concern over rising health insurance costs, while those in the Atlanta and Chicago regions also noted rising liability insurance costs.

## 2.7 Agriculture and Natural Resources

Agricultural conditions were reportedly mixed across the country. Districts that span the Plains or northern portions of the Corn Belt (Cleveland, Chicago, Minneapolis, Kansas City, and Dallas) reported inadequate moisture conditions in many areas that were expected to negatively affect corn, cotton, and soybean yields. Recent rains were expected to help the winter wheat crop in some areas and provide a boost to late soybean yields, but were too late to help corn yields. Districts covering the southern Corn Belt and the southeastern states (Richmond, Atlanta, and St. Louis) reported generally favorable conditions for the corn, cotton, soybean, and peanut crops. San Francisco recorded mostly favorable crop conditions but noted that continued low market prices were stressing some producers. Chicago and Minneapolis also indicated that some bankers expressed concern about low levels of farm-derived income and the financial health of their customers.

Extractive natural resource industries were reported to be operating at high levels in most cases. The active oil and gas rig count in August was reported level to slightly lower than July in the Dallas, Kansas City, and Minneapolis Districts. Kansas City noted that drilling activity remained constrained by a shortage of rig workers. Minneapolis observed that mining activity varied across the District. Most iron mines were back in full production, following a slowdown earlier in the summer, while several nonferrous metal facilities in Montana remained closed.

## SECTION 3. SURVEY OF THE SUBJECT BUSINESS

### 3.1 History

The R, R, M & C GROUP LIMITED PARTNERSHIP began business operations in the state of Missouri on August 23, 2001. The partnership has one (1) general partner and four (4) limited partners. The business operates from premises located at 500 North Broadway, Suite 2000, St. Louis, Missouri 63102. The partnership is basically an open-ended investment company.

### 3.2 Business Purposes of the Partnership

Section 2.3 of the Partnership agreement states that the Partnership will accomplish the following:

> The purpose of the Partnership is to own, manage, purchase, invest in or reinvest in, sell, finance, mortgage, encumber, and otherwise transact, directly or indirectly, in real estate, common or preferred stocks, options, bond and debentures of United States or foreign corporations or governmental entities, deeds of trust, mortgages, notes, shares or participations in any common fund, mutual fund, money market fund or other securities, investments and property and to engage in any and all activities related or incidental thereto, or such other business as may be agreed upon by the Partners. The Partnership may make purchases and sales, outright or financed, by way of short sales, puts, calls, straddles, and sales against the box, on margin or otherwise, covered or uncovered; and for the purpose of enabling the Partners to exercise the powers granted under this Section 2.3, to maintain and operate margin accounts, discretionary accounts, or any other type of brokerage accounts, and to pledge or mortgage partnership assets as security for loans or advances made to the Partnership in conjunction with any transaction permitted under this Section 2.3. Such business may be conducted through direct ownership or through indirect ownership by investing in other entitles, including other limited partnerships, which own, manage, purchase, invest in or reinvest in, sell, mortgage, encumber or otherwise transact in real estate, property, investments and securities.

### 3.3 Prior Transactions

There have been no fair market value transactions involving an interest in the R, R, M & C GROUP LIMITED PARTNERSHIP.

## 3.4 Nature of the Partnership's Assets

The assets held by the company are basically passive in nature. As a result, the elements of Revenue Ruling 59-60 must be applied within the context of the structure and purposes of an investment company which conducts its business in the form of a partnership.

## 3.5 Terms of the Partnership

The terms of the partnership agreement, executed August 23, 2001, establish that the primary purpose of the Partnership is to own, manage, purchase, invest in or reinvest in, sell, finance, mortgage, encumber, and otherwise transact, directly or indirectly, in real estate, common or preferred stocks, options, bond and debentures of United States or foreign corporations or governmental entities, deeds of trust, mortgages, notes, shares or participations in any common fund, mutual fund, money market fund or other securities, investments and property and to engage in any and all activities related or incidental thereto, or such other business as may be agreed upon by the Partners.

Subject to certain income tax considerations as detailed in the document, all profits and losses of the partnership shall be calculated in accordance with generally accepted accounting principles, consistently applied, (including each item of income, gain, loss or deduction entering into the computation thereof), and shall be allocated among the Partners in accordance with each Partner's share of Partnership interests. (See Section 5.3)

Under Section 3.6 a partner is not entitled to withdraw any part of his capital account or to receive any distributions from the partnership acceptance provided in the agreement.

Under Section 4.1 the general partner has complete authority over and exclusive control and management of the business and affairs of the partnership.

Under Section 4.3 the limited partners will take no part in, or at any time interfere in any manner with, the management, conduct, or control of the partnership's business and operations, and has no right or authority to act for or by the partnership in any manner.

Under Section 5.1 of the partnership agreement the net cash flow is to be distributed at such times and such amounts as the managing partner, in its sole discretion, deems appropriate.

Under Section 6.1, neither the admission to the partnership of any additional limited partner, nor the transfer of an interest by or an event of dissolution with respect to any limited partner, results in the termination or dissolution of the partnership or affects its continuance in any manner whatsoever.

Under Section 6.3 only three events will terminate the partnership. The first is an occurrence of an event of dissolution with the respect to a general partner but only if the partnership does not continue in accordance with the provisions of Sections 6.4 which allows remaining general partners to continue the business or, if there are no general partners, the limited partners have the right to continue if a majority in interest of them so elect. The second event is the written agreement of the general partner and a majority-in-interest of the limited partners. The final event would be expiration of the term provided in Section 2.5 which is December 31, 2051.

Under Section 7.3 (a), no limited partner may voluntarily resign or withdraw as a limited partner from the partnership.

Under Section 7.3 (b) provides that any transferee or assignee of an interest in the partnership has no right to become a substitute limited partner unless the general partner consents in writing to such substitution. Thus, without the consent of the general partner, a person acquiring a limited partnership interest becomes an assignee only, which merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled. (See Section 7.4)

## SECTION 4. SELECTION OF VALUATION METHODOLOGY

### 4.1 Rationale

Generally, a hypothetical willing buyer of a partnership interest will pay a much lower price than its "liquidation value," if the partnership agreement does not give a hypothetical willing buyer the unilateral right to liquidate.

Most ownership interests in family partnerships are worth less than liquidation value when valued by the income approach or net asset value approach. The reason is that most of the cash flow generated by a family business is reinvested rather than distributed. Consider that a buyer who obtains liquidation control will pay a much higher price for the access to retained cash than a buyer who does not acquire liquidation control will pay for the low distributable yield.

Tax case law supports a potentially substantial difference between liquidation value and the income approach or net asset value approach. The valuation of an ownership interest in a business for tax purposes is generally determined by reference to the price a hypothetical willing buyer would pay a hypothetical willing seller assuming that neither is under a compulsion to enter into the transaction and both are fully apprised of all relevant facts. In situations where a taxpayer does not

have unilateral liquidation control of a family partnership, and depending on its distributable cash flow, courts have found that the taxpayer's interest in the partnership may have a value 40% to 85% lower than if a hypothetical willing buyer had liquidation control. (For a more complete analysis of the valuation factors relevant for partnership interests see IRS Valuation Guide for Income, Estate and Gift Taxes - Valuation Training for Appeals Officers, 9-1 to 9-5 (CCH Federal Estate and Gift Tax Reports, Number 239, January 28, 1994).)

The income approach generally entails the capitalization of current earnings or the discounting of future earnings. In both approaches, the valuation expert selects the appropriate measure of earning power (net income, gross cash flow, net cash flow, operating cash flow or other measure) to capitalize it to discount future value. Generally, a capitalization of earnings method is used when there is no expected growth in earnings or the expected growth is consistent. A discounted cash flow method is used when future growth is predictable and varies significantly over the predicting period. Also, since statistical data from publicly traded companies are used in determining a capitalization rate or a discount rate, and since interests in closely-held companies do not have access to the ready market of a public company, a discount for marketability is applied to the capitalization of earnings valuation conclusion or the discounted future earnings conclusion and, if applicable, a minority discount is also applied.

The net asset value (which does not equate to either book value nor liquidation value) approach is generally used for valuing investment-holding partnerships owning financial securities, passive investments in oil and passive investments in timber or passive investments in real estate. Basically, under this valuation approach, the experts take the fair market value of the assets of the

partnership and subtract liabilities, and apply a marketability discount and, if applicable, a minority or lack of liquidation control discount.

Limited partnerships are usually formed for a specific investment purpose and in this regard they are similar in nature to an investment or holding company. Investment companies are business organizations that use the proceeds of the sale of their own securities, (or their capital account, in the case at hand,) to invest and manage a diversified portfolio of stocks, bonds, real estate or other assets which are generally passive in nature. In some cases the partnership will hold investments in operating businesses such as the R, R, M & C GROUP LIMITED PARTNERSHIP.

The R, R, M & C GROUP LIMITED PARTNERSHIP is an open-ended investment company. The terms of the partnership agreement include no language that would preclude any of the partners from making additional contributions of capital for investment purposes (see Article III of the agreement).

It is a well-established fact that the fair market value for open-ended investment company securities is their redemption, or net asset, value. Furthermore, the market generally applies substantial discounts to the net asset value of these securities. Despite the fact that limited partnership interests are often unsellable, a market value for the interest must be determined. In addition, despite obvious factual and financial differences, the regulations of the Internal Revenue Code treat the valuation of partnership interests and closely held corporate stock similarly.

## 4.2 Selection of Methodology

Based on a review of the preliminary valuation conclusions, I have selected the net asset value as the primary representation of the fair market value for the R, R, M & C GROUP LIMITED

and studies that support the theoretical discounts from underlying partnership liquidation value that experts have testified to in court proceedings. Six of the more complete and better known of these studies are those performed in 1992 through 1997, by Partnership Profiles, Inc. editor Spencer Jefferies. See Partnership Profiles, Inc., "LP Secondary Market Discounts: How Much?" *The Perspective* (May/June 1992): 1-2; and Partnership Profiles, Inc., "LP Secondary Market Discounts: An Update?" *The Perspective* (May/June 1993): 1-4; and Partnership Profiles, Inc., "The Low-Down Secondary Market Discounts," *The Perspective* (May/June 1994).

In all three studies, actual trading prices of investment units on the secondary market were compared with valuations of those units established by the general partners or by independent appraisers. The 1992 studies found that secondary market discounting averaged 44%; the 1993 studies concluded that this figure increased to 46% and the 1994 studies found this figure increased to 48%. See Mark S. Thompson, Ph.D. and Eggert Dagbjartsson, "Market Discounting of Partial Ownership Interests," The Appraisal Journal (October 1994): 536. The study commissioned by the Investment Program Association in 1992 found an average discount from estimated values of 48%. Those studies were of publicly offered partnerships that were not publicly traded.

It is clear that the discounts would be greater for the typical family limited partnership because there does not exist any secondary market for those interests and in many cases the cash distributions are extremely low. According to an article in the Appraisal Journal, a careful analysis of those 1992 and 1993 studies by Partnership Profiles would indicate that in a no cash flow, or low cash flow situation, discounts were as high as 70% to 90%:

> An important finding of the 1992 and 1993 studies by Partnership Profiles is the importance of cash distributions to investors in the pricing of these investment units;

that is, the greater the annual cash flow to the holders of the units as percentage of net asset value, the less the discount applied in the marketplace. For partnerships with no cash flow, discounts have averaged nearly 70% and have, at times, risen to as high as 90%. For some partnerships, no buyers could be found at any price suggesting that the discount was 100%. These latter partnerships were excluded from the 1993 study. (See Mark S. Thompson, Ph.D. and Eggert Dagbjartsson, "Market Discounting of Partial Ownership Interests" The Appraisal Journal (October 1994).)

Another leading valuation expert analyzed the Partnership Profiles, Inc. studies, and had the following comments in his outline:

Last June, Partnership Profiles, Inc. published its third annual study on limited partnership, secondary market price-to-value discounts. Unit net asset values for 143 publicly registered but nontraded real estate partnerships were compared to the prices at which investors acquired these interests in the secondary market during the period ended May 31, 1994. The average discount to net asset value in the current study was 48 percent, which compared to 46 and 44 percent in the 1993 and 1992 studies, respectively.

Results of the 1994 study by category are indicated below.

| Category | # of Partnerships | Average Discount |
|---|---|---|
| Equity - Distributing | 71 | 49% |
| Equity - Non-Distributing | 17 | 76% |
| Equity/Mortgage Hybrids | 23 | 54% |
| Triple-Net-Lease | 22 | 19% |
| Mortgages - Insured | 4 | 28% |
| Mortgages - Uninsured | 6 | 53% |

In a November article in Shannon Pratt's Newsletter Charles L. Elliott and Alex W. Howard made the following observations:

It is the IRS predisposition that the value of a partnership interest is equal to a pro rata share of its net asset value (NAV). This flies in the face of both rational analysis and market evidence.

First, consider the rationale for a discount from NAV, applicable to limited partnership interests: (1) **No access to assets.** The limited partner has no ability to control the disposition or hypothecation of partnership assets; (2) **No management**

**participation.** Limited partners are excluded from participation in management; and (3) **Lack of Marketability.** There is no existing market for most limited partnership interests. Lack of marketability is further exacerbated by transfer restrictions in many limited partnership agreements.

The above rationale suggests that both minority interest and lack of marketability discounts are applicable to limited partnership interests, as well as to corporate securities. Generally speaking, in the corporate securities context: (1) Minority interest discounts, as a subtraction from enterprise value may range from 20 and 40 percent, and (2) The marketability discount typically may reduce the minority value (the as-if-publicly traded value) by 30 to 50 percent.

A total discount from NAV would reflect both the minority and lack of marketability factors. Since the above discounts are considered in sequence, a 40 percent minority discount followed by a 50 percent marketability discount would result in a total discount from NAV of 70 percent. (See Shannon Pratt's "Business Valuation Update," Vol.1, No. 2, November 1995.)"

The article gave three examples of how empirical data was useful in reaching settlements with the IRS.

(1) **General partnership owning 1200 acres of real estate.** Two 16 percent interests were gifted and the NAV was discounted by 35 percent. On audit the IRS contended no discount but the authors contended a 60 percent discount based on empirical data. The 35 percent discount was accepted by the IRS.

(2) **Estate owning 40 percent of corporation owning three large ranches.** IRS initially proposed a 30 percent discount from NAV. Empirical data indicated a 62 percent discount which, coupled with an additional lack of marketability discount, yielded a 77 percent discount from NAV at the IRS appellate level.

(3) **Estate owning 1 percent general and 72 percent limited partnership interest in ranching company.** Again with strong empirical evidence a 58 percent discount from NAV was accepted by the IRS.

It is clear from the empirical evidence the nondistributing partnerships command a substantially larger discount than distributing partnerships. The following are the 1995 statistics compiled by the "*Partnership Spectrum*," May/June, 1995.

| Category | # of Partnerships | Average Discount |
|---|---|---|
| Equity - Distributing | 87 | 41% |
| Equity - Non-Distributing | 32 | 64% |
| Equity/Mortgage Hybrids | 24 | 42% |
| Triple-Net-Lease | 26 | 20% |
| Mortgages - Insured | 14 | 19% |
| Mortgages - Uninsured | 6 | 44% |

*Partnership Spectrum's* 1996 study of 1,970 transactions in 167 real estate partnerships shows an average price to underlying NAV discount of 38%. This compares with comparable average discounts of 41% and 48% in 1995 and 1994, respectively.

As in previous studies, the most important factor influencing the unit price is whether the partnership is paying regular cash distributions. The partnerships were broken down into six categories, with average discounts as follows:

| Category | # of Partnerships | Average Discount |
|---|---|---|
| Equity - Distributing | 77 | 37% |
| Equity - Non-Distributing | 33 | 56% |
| Equity/Mortgage Hybrids | 15 | 37% |
| Triple-Net-Lease | 27 | 22% |
| Mortgages - Insured | 12 | 25% |
| Mortgages - Uninsured | 3 | 66% |

Jefferies explains that, "The study breaks down the 77 equity distributing partnerships into 11 categories, first by type of property, and then within each property type, by the amount of debt financing employed. The partnerships with little or no debt traded at significantly lower discounts compared to partnerships utilizing significant leverage.

"The type of real estate owned is also a factor in the discount equation. A matrix included in the study shows, for example, that unleveraged mini-warehouse partnerships traded at an average discount of 32%, while similarly financed partnerships owning mobile home parks traded at an average discount of 43%."

In the study Jefferies says, "For non-distributing partnerships, the most important factor determining the amount of price-to-value discount is the partnership's prospects for resuming regular cash distribution in the near future."

The study backs up this statement with specific examples of partnerships that appear to be on the verge of resuming distributions and several with no real prospects of resuming cash distributions for the foreseeable future.

The 1995 year-end net asset values reported by the sample group of 167 partnerships were compared to the weighted average prices at which investors purchased units in the secondary market during the 60-day period ending May 30, 1996. Jefferies considers the April/May transaction period to be appropriate because most year-end net asset value reports are available to investors by then.

According to *The Partnership Spectrum*, the study reflects actual transactions reported by 12 secondary market firms that act as intermediaries in matching up buyers and sellers of non-traded public partnerships.

In 1997, the real estate gold rush had officially spilled over into the secondary market for real estate partnerships where buyers of "used" partnership units are paying higher prices than ever before in terms of discounts to net asset values.