line with the 1999 and 1998 discount studies which reported average discounts of 46% and 43%, respectively, for non-distributing partnerships.

As so many formerly non-distributing partnerships have either been liquidated or been able to resume distributions in recent years, the universe of non-distributing, equity-based real estate partnerships for which net asset value information is available has declined dramatically. In fact, six of the nine non-distributing partnerships in last year's study have either begun paying distributions or been liquidated since last year. As these partnerships continue to fade away, it will become even more difficult to determine how secondary market buyers are pricing these partnerships in terms of discounts.

At an average discount of 42%, the non-distributing partnerships in this year's study are purely equity-based, with the exception of Resources Pension Shares 5. This partnership is a "hybrid" since it owns real estate and holds mortgage loans.

### 6.5.4 Undeveloped Land (Average Discount: 38%)

The smallest group of partnerships in this year's study, these three partnerships were formed to acquire undeveloped land on an all-cash basis. The investment objective of these partnerships is to enhance the value of their land holdings through pre-development activities such as rezoning, annexation and land planning. The partnerships periodically pay cash distributions as parcels are sold to developers, assuming such proceeds are not needed to fund pre-development costs at other parcels such as utility access, installation of roads and other infrastructure. All of these partnerships are debt-free, except for Inland Land Appreciation Fund I which has borrowed an

amount equal to about 19% of the cost basis of its land parcels from its general partner to pay predevelopment costs at certain parcels.

The average price-to-value discount of 38% for these partnerships in the new study is down slightly from an average discount of 40% last year. The best explanation for this decline is that these partnerships re now one year closer to being liquidated compared to last year, resulting in secondary market buyers pricing them accordingly. In the 1999 study, the average discount for these partnerships was 46%.

Although with only three partnerships this makes for a very small group, the average price-to-value discounts for these partnerships fall into a very narrow range of 37% to 39%. This was also the case with these same three land partnerships in last year's study which traded in a tight discount range of 39% to 40%.

The three land partnerships in this study are managed by Chicago-based Inland Real Estate Corp. which has no indicated that it has any current plans for a near-term liquidation of these partnerships. Instead, the partnerships sell off land parcels on a piece-meal basis to developers as opportunities arise.

The land held by these partnerships generally produces enough income to pay property taxes, insurance and other miscellaneous expenses. Most of this income is derived from farming or other leasing activities. For instance, of the 2,122 acres owned by Inland Land Appreciation Fund I at the end of last year, 1,940 acres were leased to local farmers. While this income covers some of the partnerships' operating expenses, it's not sufficient to pay operating distributions to the limited partners.

Although the Inland land partnerships do not pay operating distributions, they do pay special distributions form time to time consisting of proceeds from property sales. In the past few years, these partnerships have paid annual cash distributions in differing amount. If not for these distributions, the price-to-value discounts for these partnerships would no doubt be much higher since investors would have to wait until all the land has been sold and the partnership liquidated before they receive anything bank for their investment. Appraisers using discount data from the land partnerships in this study to value a minority interest in farm land or other undeveloped land should keep this in mind, especially when the holder of the minority interest being valued is not expected to received any distributions until *all* of the land is sold.

### 6.5.5 Triple-Net-Lease Programs (Average Discount: 24%)

All or substantially all of the real estate properties owned by the 26 partnerships in this group are net-leased to tenants pursuant to long-term lease agreements, whereby the lessees are obligated to pay all insurance, taxes and day-to-day maintenance expenses associated with the properties. Unlike other real estate partnerships which actively manage their properties, triple-net-lease programs generally act as landlord only. While restaurants are the most common property type owned by these programs, other types of real estate include industrial/warehouse facilities, hotels and office buildings.

The average price-to-value discount for the net-lease programs in this year's study is 24%. This represents a slight increase over the average discount of 21% for the 24 partnerships in this group in last year's study.

the "Equity-Distributing" group previously discussed, this discount gap has narrowed in recent years to the point that it hardly exists at all. Indeed, the debt-free partnerships in this category traded at an average discount of 24%, while the leveraged partnerships changed hands at an average discount of 25%. This compares to average discounts in last year's study of 20% and 23%, respectively.

While the historical leveraged versus unleveraged discount differential applicable to "Equity-Distributing" partnerships has dissipated in recent years due to secondary market buyers shortening their liquidation time-frames for these partnerships, this does not explain the similar narrowing of the discount gap between leveraged and unleveraged net-lease partnerships since these partnerships are generally not expected to be liquidated in the near term. Therefore, one must assume that buyers of net-lease partnerships are focusing almost solely on operating cash distributions, with the capital structure of the partnership coming into play only when determining how these units should be priced in terms of current distribution yields.

### 6.5.6 Insured Mortgage Programs (Average Discount: 28%)

Substantially all of the real estate assets owned by the nine programs in this group consist of mortgage loans and/or mortgage-backed securities secured by multi-family apartment complexes, whereby payment of principal and interest by the borrowers if fully, or at lease substantially, guaranteed by the federal government or an agency thereof. To a lesser extent, some of the programs in this group also hold uninsured equity interest or subordinated loans relating to the properties securing their mortgages.

Because these debt-free partnerships consistently pay cash distributions, and because their mortgage loans are insured, units of these programs historically trade at the lowest price-to-

value discounts among the various categories of real estate partnerships. However, the average discount for the partnerships in this year's study is 28% which is up significantly from 21% in last year's study.

It's not clear exactly why discounts for these partnerships have increased over the past year. The higher average discount in the current study is partially attributable to one of the partnerships – namely, Capital Mortgage Plus – trading at an overall discount of 42%. But even if this partnership was excluded from the study, the average discount for the other six partnerships would still be 25%.

One possible reason for the rise in price-to-value discounts for the units of insured mortgage partnerships is that loan prepayments in the past several years have caused the "best" loans held by these programs – i.e., those loans secured by properties performing well enough to pay participation interest – to have been paid off already due to refinancing by borrowers. (In addition to regular monthly principal and basic interest payments, these loans typically entitle the lender to receive additional income through a participation interest in the underlying properties, contingent upon the successful operation of the properties.) If so, this would mean that most of the loans remaining in these portfolios can not be expected to pay anything over and above the minimum insured mortgage partnerships in this group are down to portfolios consisting primarily of "work-out" situations and loans that borrowers have been unable to refinance at lower interest rates because of the performance of the underlying properties.

As with triple-net-lease partnerships, buyers of insured mortgage partnerships place much emphasis on current distribution yields which average 12.3% for the partnerships in the current

study compared to 12.5% in last year's study. These yields can be quite misleading, however, since insured mortgage programs typically supplement their distributions with regular principal repayments from their mortgage loans and/or mortgage-backed securities which represents a return *of* capital rather than a return *on* capital. This difference between actual earnings and cash distributions widens as loans are paid off, unless an adjustment is made to the partnership's distribution rate.

## 6.6 Empirical Data as it Relates to Family Limited Partnerships

Charles L. Elliott summarized the above empirical value as it relates to family limited partnerships as follows:

> Conclusion: Discounting (analogous to minority interest/lack of marketability discounts related to corporate securities) is operative as well in regard to limited partnership interests, as confirmed by the experience in the secondary market for limited partnership interests. As the characteristics of the family limited partnership are likely to be inferior to the actively traded, publicly syndicated partnership and, in addition, has no marketability, the discounts prevalent in the secondary market should represent the minimum applicable to the family partnership." (Emphasis added). (See Charles L. Elliott, "Valuation Considerations Pertinent to the Partnership Alternative in Estate Planning.")

In an outline prepared by Business Valuation Services, Inc. for the Continuing Professional Education for the Internal Revenue Service Federal Estate and Gift Tax Attorneys of the Midstates Region the following observation was made: "Discounts are almost always calculated off of net asset value as determined by valuing the underlying investments at their control values." (See "Valuation: Common Battleground Issues and Anecdotal War Stories," Business Valuation Services, Inc. (August 15, 1995).)

Finally, it is important to understand that a hypothetical willing buyer of a limited partnership interest in any limited partnership whose agreement contains the same provisions as the "default" state law provisions (whether or not that partnership interest is owned by a partner while he is living or upon his death) would only pay an amount that is substantially discounted from the underlying liquidation value of that partnership interest.

The fair market value of a limited partnership interest is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. (See Treas. Reg. 20.203 I-l(b).) Among the relevant facts in connection with determining the fair market value of a limited partnership interest are the restrictions that are inherent under state law of a transferred partnership interest. (See Sections 7 and 8 of the agreement.) Another relevant fact is the likely behavior of the remaining general partners or limited partners upon the transfer of the general partnership interest or limited partnership interest. (See IRC Sections 2703 and 2704 which did not eliminate the "willing buyer, willing seller test" of Treasury Reg. 20.2031-1(b).)

Basically, a hypothetical willing buyer of a limited partnership interest will either assume the other partners will admit that hypothetical willing buyer into the partnership with partner rights or only with the rights of an assignee of a limited partnership interest. It should be noted, however, that in the R, R, M & C GROUP LIMITED PARTNERSHIP Agreement, a buyer would merely be an assignee. An assignee would only be able to become a limited partner with the unanimous consent of the general partners and after several other conditions are met pursuant to the terms of the partnership agreement.

Even if the buyer of a limited partnership unit became a limited partner, limited partners have very limited rights. The laws of the state of Missouri that are applicable to the R, R, M & C GROUP LIMITED PARTNERSHIP must be reviewed.

Thus, the limited partners cannot withdraw, i.e., force a redemption of their interest, and are entitled to liquidation distributions only upon a liquidation of the partnerships. The Missouri Limited Partnership Act does not allow a limited partner to force a buyout of his interest even when the partnership agreement does not have a set term of duration. A willing buyer of a limited partnership unit of the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001 would take into account that there is one (1) general partner in good health. Even if the general partner(s) died, the remaining limited partners by majority vote can elect to continue the partnership. (See Section 6.4 (b) of the R, R, M & C GROUP LIMITED PARTNERSHIP Agreement.) Thus, as was pointed our under both U.S. vs. Land 33 F2nd 170 and the Estate of Harrison v. Commissioner 52 TCM 1306, the Fifth Circuit and the Tax Court have correctly noted that a hypothetical willing buyer of a partnership interest from an estate looks forward. Consequently, the willing buyer of a R, R, M & C GROUP LIMITED PARTNERSHIP unit will have to assume the partnership will continue and his investment will be locked in with no ability to a force a redemption of his interest, a termination of the partnership or a distribution of any income to him.

### 6.7 Selection of Publicly Traded Discount

Based upon the empirical data provided by the Partnership Profile Studies I have selected a discount of 42% for the subject partnership.

## SECTION 7. ADJUSTMENTS FOR MARKETABILITY DISCOUNTS

In determining the fair market value of the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001, it is my opinion that a marketability discount be applied to the valuation of the R, R, M & C GROUP LIMITED PARTNERSHIP.

### 7.1 Adjustment for Marketability Discount:

The concept of "marketability" deals with the liquidity of the interest; that is, how quickly and certainly it can be converted to cash at the owner's discretion. A good definition of "marketability" is "the ability to convert the property to cash quickly, with minimum transaction and administrative costs in so doing, and with a high degree of certainty of realizing the expected amount of net proceeds."

Since interests in closely held companies do not, by definition, enjoy the ready market of a publicly traded stock, a share in a privately held company usually is worth less than an otherwise comparable share in a publicly held one. The importance of the marketability factor in business valuation has been gaining increasing recognition over the years. There is considerable evidence suggesting that the discount for the lack of marketability factor alone for a closely held company should average between 35 percent and 60 percent.

It is important to distinguish between discounts for lack of marketability and a discount for a minority interest. These are two separate concepts, although they are somewhat interrelated. The primary factor bearing on the value of the minority interest in relation to the value of the total entity is the degree of control the minority interest does or does not have over the particular company.

(The concept of marketability deals with the liquidity of the interest, that is, how quickly and certainly it can be converted to cash at the owner's discretion.)

Marketability discounts are calculated separately from minority interest discounts and control premiums. Marketability discounts sometimes are needed because several approaches to valuation are calculated using comparable sales or discount rates that are based on marketable business interests.

In actual application, the control premium or minority interest discount usually is applied before the marketability discount to determine the fair market value of the business interest on a freely traded basis. Once the marketability discount has been applied, the result is the fair market value of the closely-held business interest.

Subtracting a discount for lack of marketability is the final adjustment normally required when valuing a block of closely-held stock. Because many valuation approaches rely on data generated from securities from the public marketplace, the results are for freely-traded stock. Because closely-held stock is not as freely traded as publicly traded stock, investors will require a discount to compensate them for the closely-held stock's relative illiquidity.

In 1983, Lawrence H. Averill, Jr., Dean of the School of Law of the University of Arkansas at Little Rock, clearly articulated the rationale for a lack of marketability discount:

> The lack of marketability problem is inherent in the valuation of all business interests that are not actively traded on recognized markets. The poor marketability of nontraded business interests stems from several factors. First, most of these businesses are small, family-owned and run operations. Such businesses run great risk of failure. The greater the risk, the lower the value. Second, these interests lack liquidity. There is no large pool of potential buyers for these interests when they come on the market. The longer it takes to sell an asset, the lower the value will be as compared to more actively tradable assets. Such a business interest must be sold

> at a substantial discount in order to attract buyers, as recognized by court decisions. The actual amount of the discount, of course, will vary from situation to situation. (See Lawrence H. Averill, Jr., "Estate Valuation Handbook", (New York: John Wiley & Sons, 1983), p. 177.)

The market places a far greater value differential on the liquidity factor alone in its pricing of common stocks and other similar equity interests than in its pricing of any other class of investment assets, for many sound reasons. For common stocks as a group, investors expect to realize the majority of their return in the form of capital gains at the time of sale of the stock and only a smaller part of their total return in the form of dividends while they hold the stock. Thus, the ability to sell the stock is crucial to the actual realization of the investor's return for buying and holding the stock.

### 7.2 Studies of Restricted Stock and Public Offerings:

While sophisticated participants in the capital market have always known that the pricing of common stocks is highly dependent on their liquidity, it is only since 1971 that a body of evidence has begun to be developed and disseminated to isolate and quantify the differential in security pricing that is due to the marketability factors.

The current evidence providing empirical support for discounts for lack of marketability generally falls into two fields of study: (1) studies of restricted stock transactions, and (2) studies of private transactions in the common stock of companies which subsequently had initial public offerings. A discussion of the major studies in each of these two fields is presented below.

Studies of restricted stock specifically isolate the value of the marketability factor from all other factors. Restricted stock is stock of a publicly traded company which is subject to certain trading restrictions. A publicly traded company may sell securities which are not registered with the

Securities and Exchange Commission (the "SEC") through private placements. However, these securities cannot be resold in the public capital market, except under SEC rule 144, which requires a two-year holding period. See 255 Fed. Reg. 20894 (May 21, 1990). As a result of this trading restriction, such privately placed stock is restricted.

Evidence of the price discount required by purchasers of restricted stock is found by comparing the price of a privately placed stock to the price of its unrestricted publicly traded counterpart. As literally hundreds of such arm's-length transactions have been studied, they provide a strong base of empirical evidence from which to quantify an appropriate discount for lack of marketability.

The studies of market prices of restricted stocks now cover a time span from the late 1960s through 1997. These comprehensive studies, covering literally hundreds of transactions, indicate quite consistently an average discount for the restricted stock of a publicly traded company of 35% to 45% as compared to its freely tradable counterpart stock.

However, this discount is based upon transactions in stock which will be freely tradable in a relatively short period of time. One would expect the appropriate discount for lack of marketability to be significantly higher for a minority interest in a closely held company (which in all likelihood will never have a public market), than for the securities included in these restricted stock studies.

While studies of restricted stocks provide compelling evidence of the discounts for lack of marketability associated with stocks which are (temporarily) restricted from their public market, a second line of evidence is obtained through studies of initial public offerings ("IPOs"). The scope

of these IPO studies includes transactions in the stock of companies that were private at the time of the transaction, but subsequently had a successful initial public offering.

The discount for lack of marketability is generally determined as the difference between a company's IPO stock price and the price at which the company's stock traded in private transactions prior to the IPO, when the company's stock did not trade on a public market, adjusted for factors such as changes in earnings levels and industry price/earnings ratios. The IPO studies add to the evidence presented by the restricted stock studies, and assist in determining marketability discounts applicable to appraised values arrived at through approaches based upon publicly traded companies.

There are two major studies of IPOs; the Emery study and the Willamette Management Associates study. Similar to the restricted stock studies, the studies of IPOs now cover a significant time span from the late 1970s through 1993. Through these studies, nearly each and every IPO of the last 20 years has been examined for relevant evidence. Based upon the results of the Emery studies and the Willamette Management Associates studies, typical discounts for lack of marketability associated with private transactions in closely held stock compared to public market transactions in the same stock fall within a range of 40% to 70%.

**Willamette Management Pre-IPO studies**

| Time Period | Number of Companies Analyzed | Number of Transactions Analyzed | Median Discount |
|---|---|---|---|
| 1975-78 | 17 | 31 | 54.7% |
| 1979 | 9 | 17 | 62.9% |
| 1980-82 | 58 | 113 | 55.5% |
| 1983 | 85 | 214 | 60.7% |
| 1984 | 20 | 33 | 74.4% |
| 1985 | 18 | 25 | 43.2% |

| | | | |
|---|---|---|---|
| 1986 | 47 | 74 | 47.5% |
| 1987 | 25 | 40 | 43.8% |
| 1988 | 13 | 19 | 51.8% |
| 1989 | 9 | 19 | 50.4% |
| 1990 | 17 | 23 | 48.5% |
| 1991 | 27 | 34 | 31.8% |
| 1992 | 36 | 75 | 52.4% |
| 1993 | 51 | 110 | 53.3% |

Source: *Pratt, Reilly and Schweihs, Valuing a Business, 3rd edition, p. 348, with updated data. The text provides a description of the construction of the studies.*

**Robert W. Baird & Co. Pre-IPO studies**

| Study | # of IPO Prospectuses Reviewed | # of Qualifying Transactions | Mean Discount | Median Discount |
|---|---|---|---|---|
| 1995-97 | 732 | 91 | 43% | 42% |
| 1994-95 | 318 | 46 | 45% | 45% |
| 1992-93 | 443 | 54 | 45% | 44% |
| 1990-92 | 266 | 35 | 42% | 40% |
| 1989-90 | 157 | 23 | 45% | 40% |
| 1987-89 | 98 | 27 | 45% | 45% |
| 1985-86 | 130 | 21 | 43% | 43% |
| 1980-81 | 97 | 13 | 60% | 66% |
| All 8 Studies | 2,241 | 310 | 44% | 43% |

Source: *John Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock (Eighth in a Series), November 1995 through April 1997."*

## 7.3 Other Studies and Discount Factors

The quantification of the marketability discount usually involves comparing the stock prices of common stocks that are identical except for the fact that one group of stock is classified as restricted stock. Over the past twenty-five years, other numerous studies have indicated that the discount for lack of marketability in the public marketplace is approximately 30 percent to 45

percent. The following table lists the most other commonly cited studies regarding discounts for the lack of marketability.

**Discount for lack of marketability:**
**Results of 30 years of studies**

**Summary of Restricted Stock Studies**

| Study | Years Covered in Study | Average Discount (%) |
|---|---|---|
| SEC Overall Average | 1966-69 | 25.8 |
| SEC Nonreporting OTC Companies | 1966-69 | 32.6 |
| Gelman | 1968-70 | 33.0 |
| Trout | 1968-72 | 33.5 |
| Moroney | 1969-72 | 35.6 |
| Maher | 1969-73 | 35.4 |
| Standard Research Consultants | 1978-82 | 45.0 |
| Willamette Mgmt. Associates | 1981-84 | 31.2 |
| Silber | 1981-88 | 33.8 |
| FMV Opinions Inc. | 1979-92 | 23.0 |
| Management Planning | 1980-95 | 27.7 |

Source: *Pratt, Reilly and Schweihs, Valuing a Business, 3rd edition, p. 343, augmented by Management Planning study. The "Valuing a Business" chapter provides a summary of each restricted stock study, plus a reference to where details of each were originally published.*

Because each business has its own unique marketability issues, adjustments to this base rate are usually necessary. In order to help quantify the various factors affecting the marketability of a closely-held business, the base marketability discount rate should be increased or decreased based on the following factors:

1. Restrictions on Transfers.
2. Amount and consistency of dividends pay out
3. Prospects of public offering or sale of company.
4. The existence of a put option.

Most of the convertible preferred stocks used as sources of transaction data for this study automatically converted to common stock at the IPO date. Most had non-cumulative dividends and were mandatorily redeemable by the company within a few years after issuance in the absence of an IPO.

To determine the price of the common stock for transactions involving convertible preferred stock, they divided the sale price of the convertible preferred stock by the number of common shares into which the preferred stock was convertible or they used the conversion factor given. The resulting common stock price includes value enhancements incorporated in the convertible preferred stock.

They found 53 transactions to use in this study. These were comprised of 42 convertible preferred stock transactions and 11 common stock transactions. While heavily Internet orientated, the dot-com companies were quite diverse in operations, covering 26 different SIC codes. The largest SIC code grouping was in classification 7375 – "Information Retrieval Services," which had 13 companies. The next largest grouping was a tie between classification 5961 – "Catalog and Mail Order Houses," and 7379 – "Computer Related Services, Not Elsewhere Classified," which both had 5 companies.

The mean discount of the 53 sale transactions in this study prior to their IPOs was 54% and the median was also 54%. The mean and median discounts arising from the 42 convertible preferred stock transactions were 54% and 53%, respectively. For the 11 common stock transactions, the mean discount was also 54%, while the median was somewhat higher at 59%.

There seemed to be little correlation between revenues, equity of IPO offer size and the size of the discount. Those companies having the largest market capitalizations after the IPO tended to have transactions with larger discounts than those having smaller market capitalizations. Companies with larger losses tended to have lower discounts than companies with smaller losses.

While equity and revenues were relatively small for the dot-com companies, their IPO offer sizes were high in relation to those measurements. Prior to the IPO, median equity was $2.8 million, median revenue was $5.7 million, and the median net loss was $12.1 million. The median price to revenue (sales) ratio was 52 to 1 based on the median market capitalization at the IPO and the median revenues prior to the IPO. The median IPO offer size was $63 million, and the median market capitalization after the IPO was $295 million.

Discounts in the current study are in line with our broader, earlier study of sale transactions that were in our November 1995 through April 1997 pre-IPO discount study. In that study the 22 sale transactions had mean and median discounts of 54% and 61%, respectively,

The final question to be answered is, if the kinds of discounts found in these studies occur where marketability is probable, but not a certainty, how much greater should discounts be for stock that has little if any chance of ever becoming marketable?

**7.5 Selection of Marketability Discount:**

After considering all of the above factors, it is my opinion that a 50% discount for lack of marketability is appropriate to apply to the gifted partnership units of the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001. The rationales for the discount are: there are no prospects of a public offering or sale of the Partnership; there is only a very limited market which

might be interested in purchasing the limited partnership units, but at a substantial discount from asset market value; the gifted limited partnership interests cannot exercise control of the partnership, nor can the gifted limited partnership interests force a liquidation of its interest under Missouri law. Also, since the interest being valued represents an interest in a family limited partnership in which the partnership agreement closely follows the state limited partnership default rules which only allows a willing buyer to acquire the interest being valued as an assignee only without the Required Consent of the other Partners, a secondary market is practically nonexistent.

**7.6 Value Conclusion:**

Based on my analysis of the R, R, M & C GROUP LIMITED PARTNERSHIP and all of the factors affecting its value, it is my opinion that the fair market value of a 24.975% interest in the business's Limited Partnership units as of September 21, 2001 is $5,198,897 and is calculated as follows:

| | |
|---|---|
| Adjusted net asset value of LP | $71,780,711 |
| Less: Discount established by the public market (42%) | ($30,147,899) |
| Fair market value prior to marketability discount | $41,632,812 |
| Less: Lack of marketability discount (50%) | ($20,816,406) |
| Fair Market Value of 100% interest in The R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001 | $20,816,406 |
| Limited Partners gift value ($20,816,406 x 24.975%) | $5,198,897 |

## SECTION 8. CERTIFICATION OF APPRAISER

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

4. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.

5. My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with Uniform Standards of Professional Appraisal Practice.

6. No one provided significant professional assistance to the person signing this report.

GEORGE E. GOERIG

# ADDENDUM A

## APPRAISER QUALIFICATIONS OF GEORGE E. GOERIG

1007 West 3rd Avenue, Suite 301
Anchorage, AK 99501
(907) 278-9926

**EMPLOYMENT HISTORY:**

1971 - 1977 - Employed by the Seattle District and Anchorage District as an estate and gift tax attorney.
1977 - 1996 - Partner in the law firm of Davis & Goerig, P.C.
1996 - Present - Owner of the firm Goerig & Associates

**EDUCATION:**

1966 - Bachelor of Arts from Gonzaga University
1971 - Juris Doctorate from Gonzaga School of Law.
1971 - 1977 - While employed by the Internal Revenue Service as and estate and gift tax attorney attended the following courses provided by the National Appraisal Institute (MAI) as follows:

MAI Course 1A which included appraisal principles, appraisal procedures, basic income capitalization, general applications and standards of professional practice.

MAI Course 1B which included advanced income capitalization, highest and best use of market analysis, advanced sales comparison cost approaches, report for writing and valuation analysis, and advanced applications.

MAI Course 4 which taught the valuation techniques for rural properties.

Attended the following courses while employed by the Internal Revenue Service and which were sponsored by the IRS:

The Basic Valuation Course sponsored by the Internal Revenue Service for its estate and gift tax attorneys regarding appraisal principles and appraisal procedures and the techniques used to value closely-held companies.