LEWIS, RICE & FINGERSH, L.C.

ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
TEL (314) 444-7600 WWW.LRF.COM FAX (314) 241-6056

April 12, 2002

Mrs. Marilyn Sands, Mr. Robert Sands, and Mr. Richard Sands,
Trustees of The Marvin Sands Master Trust
c/o Constellation Brands, Inc.
300 Willowbrook Office Park
Fairport, New York 14450-4222

Dear Mrs. and Messrs. Sands:

You have requested our opinion with respect to certain Federal income tax consequences of certain aspects of the Financial Plan.[1]

**FACTS**

The assets of the Trust consist primarily of a 43% interest in MLRR, of which CWC-I is a general partner. The Managing Partners of CWC-I are Richard Sands and Robert Sands. Over the years, Richard Sands and Robert Sands, Managing Partners of the general partner of MLRR, have primarily directed the investments of MLRR. As Trustees of the Trust, they have exercised primary responsibility regarding investments by the Trust.

Over the years, consistent with her fiduciary obligations, Marilyn Sands has relied heavily on the business and investment advice of family members: initially the advice of her late husband Marvin and, since his death, the advice of her sons Richard Sands and Robert Sands. All references in the following paragraphs to Marilyn Sands' knowledge, her beliefs, and her decisions should be taken as references to her understanding of the knowledge and beliefs of her sons and decisions made based on the knowledge, beliefs, advice, and recommendations of her sons.

---

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by The Marvin Sands Master Trust ("Trust") having the duration, purposes, and components discussed in this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "Reg." relates to the referenced section of the regulations issued under the Code as set forth in Title 26 of the Code of Federal Regulations, (iv) "IRS" refers to the Internal Revenue Service, (v) "RMC" refers to R, R, M & C Management Corporation, (vi) "ALP" refers to Alpha I L.P., (vii) "BLC" refers to Beta Partners L.L.C., (viii) "Constellation" or "Company" refers to Constellation Brands, Inc., (ix) "CWC-I" refers to CWC Partnership-I, (x) "MLRR" refers to M, L, R & R, (xi) "PaineWebber" refers to UBS PaineWebber, Inc., and (xii) "Treasury Notes" refers to United States Treasury Notes. Although this letter is directed to Mrs. and Messrs. Sands (collectively, the "Trustees"), they are generally referred to in the third persons herein to assure clarity of reference.

SANDS 10634

EXHIBIT
16
tabbies

Robert Sands is Group President and a member of the Board of Directors of Constellation. He first joined Constellation in 1986 as General Counsel. He was made Vice President and appointed to the Board of Directors in June 1990. After overseeing numerous acquisitions, Robert Sands was appointed Executive Vice President and General Counsel in October 1993, overseeing the expansion of Constellation's legal department. In 1998, Robert Sands was appointed to the role of Chief Executive Officer International after he spearheaded the acquisition of Constellation's United Kingdom division. Robert Sands was named Group President in early 2000, and assumed the management of the Canandaigua Wine Company and Matthew Clark divisions. Robert Sands is a graduate of the Skidmore College in Saratoga Springs, New York. He holds a J.D. from Pace University School of Law in New York City, New York.

Richard Sands is President, Chairman of the Board, and Chief Executive Officer of Constellation. He joined Constellation in 1979. After serving in various positions involving wine production, finance, and sales and marketing, he was appointed Executive Vice President in 1982. Richard Sands was named President and Chief Operating Officer in 1986, and assumed the management of Constellation's domestic and worldwide operations with his appointment to Chief Executive Officer in 1993. In September 1999, he was elected Chairman of the Board. Richards Sands is a graduate of the University of Vermont. He holds an M.A. and a Ph.D. in social psychology from the University of North Carolina.

Richard Sands and Robert Sands regularly monitor current developments in business and economics. They regularly read the Wall Street Journal, the New York Times, Fortune, Business Week, the Financial Times, various newsletters, and other publications with a general-investment orientation. Richard Sands and Robert Sands also read several publications geared specifically to the alcoholic beverage business.

The Sands family is the Company's largest shareholder. Members of the Sands family and the Trust conduct many collective investment activities through MLRR. Over the years, MLRR has worked to maintain a well-diversified investment portfolio. Through its interest in MLRR, the Trust has invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities), (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merger, acquisition, or disposition), and (iii) directional arbitrage (investing in long and/or short positions in a security). These activities have resulted in an unconventional portfolio that enhances return and decreases volatility, and the Financial Plan is, in part, an extension of the above described investment strategy.

In the early days of December 2001, the Trustees believed the United States economy had slowed materially. By December 11, 2001, the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on eleven separate occasions in 2001 by a total of 475 basis points. Thus, the Federal Funds Rate on

December 11, 2001, was 1.75%, rather than 6.50%, the rate on January 1, 2001. The Trustees believed that interest rates had bottomed and that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. Although the Trustees viewed this prospect as both a concern and an opportunity, they believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

The Trustees deemed a short sale of Treasury Notes to be an attractive investment opportunity, presenting a reasonable prospect for a significant profit, even if it presented no tax benefits. Even so, there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately three percent (3%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can recognize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change.

Other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

The Trustees became interested in, and ultimately decided to adopt, the Financial Plan to effect several objectives, including:

- Realize investment profits on dispositions of Constellation stock and on purchases and sales of other investments, including one or more short positions in Treasury Notes or similar securities.
- Increase the diversification of the Trust's investment holdings.
- Provide greater liquidity in the Trust's investment portfolio.
- Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock and purchases and sales of other investments.
- Enhance the privacy and confidentiality of the Sands family's financial information and, correlatively, reduce risks to the personal safety and security of beneficiaries of the Trust.

The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of the Trust's investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale, the disposition of Constellation stock and the purchase and sale of other investments, the improvement to the Sands family's privacy and personal security, and the anticipated tax benefits, all contributed to the Trustees' determination to adopt the Financial Plan.

The Trust has used limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss in the Trust's investment activities, and Richard Sands and Robert Sands have caused several entities to be formed to effect the Financial Plan for the Trust over the next several years. Moreover, use of such entities tends to limit contract or tort liability generated by an entity to the assets of that entity, permits admission of or sale to an outside investor of a limited group of assets or activities, and facilitates transfer of a beneficial interest in assets without transferring the assets or an undivided interest in the assets themselves, limiting the effect of state transfer taxes. If a limited liability entity is given a name unrelated to those of its equity owners, it may promote the privacy and security of those owners.

The Trustees have implemented and intend to continue to implement each element of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. To effect the purposes of the Financial Plan set forth above, the contemplated elements of the Financial Plan are:

- Incorporation of RMC on August 23, 2001, the issuance to each of Richard Sands and Robert Sands, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to each of Richard Sands and Robert Sands, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by each of Richard Sands and Robert Sands to RMC of 1,001 shares of Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001.

- Formation of ALP on December 3, 2001.

- The execution of a short sale of Treasury Notes on December 11, 2001.

- To effect this short sale, the Trust borrowed Treasury Notes from PaineWebber, thereby incurring an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds of the short sale in the Trust's account pending the Trust's acquisition and delivery to PaineWebber of Treasury Notes to close the transaction. Specifically, the Treasury Notes were in two lots. The first lot had a total face amount of $8,330,000, and was due 09/30/03 at 2.750%. The second lot had a total face amount of $3,570,000, and was due 05/15/06 at 4.625%. The net proceeds of the short sales totaled $11,979,266.83, comprising $11,921,010.94 of principal and $58,255.89 of accrued interest.

- CWC-I, Andrew Stern, Marilyn Sands, Richard Sands, Robert Sands, and the Trust contributed assets to ALP on December 17, 2001, in exchange for a limited partner interests of 12.949%, 5.857%, 14.641%, 18.022%, 21.401%, and 27.030%, respectively; and RMC contributed assets to ALP on December 17, 2001, in exchange for a 0.1% general partner interest. More specifically, the Trust transferred its PaineWebber brokerage account noted above, together with cash in the amount of $335,512.97, and each other limited partner contributed cash and a Paine Webber brokerage account that held the proceeds of a short sale of Treasury Notes, each in an amount proportional to the percentage interest of the partner, together with the related obligation to close the short sale. The assets transferred by RMC to ALP consisted of $2,582.00 of cash.

- Purchase by ALP of 67,525 shares of stock in Corning, Inc. (NYSE:GLW) and 33,400 shares of stock in Yahoo, Inc. (NasdaqNM:YHOO) on December 17, 2001.

- Formation of BLC on December 10, 2001.

- Contribution of assets by ALP to BLC on December 20, 2001, in exchange for a 99.0043% membership interest; and contribution of assets by Gloria S. Robinson ("Robinson") to BLC on December 20, 2001, in exchange for a 0.9957% membership interest. More specifically, ALP transferred to BLC its Paine Webber brokerage account holding the proceeds of the short sales of Treasury Notes described above, together with the GLW and YHOO shares noted above, and Robinson transferred to BLC cash in the amount of $25,000.

- On December 26, 2001, BLC closed the short sale of Treasury Notes at a cost of $44,203,069.47, comprising $43,927,468.75 of principal and $275,600.72 of accrued interest.

- BLC realized a $150,218.75 gain on the short sale transaction, but incurred net interest expense of $60,200.80, for a net economic gain on the short sale transaction of $90,017.95.

- At such intervals and in such increments as market conditions indicate could be profitable and appropriate, BLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

In addition to the elements of the Financial Plan noted above, on December 27, 2001, ALP and Robinson agreed to, and closed, a purchase by ALP of the membership interest of Robinson in BLC for a cash purchase price of $25,999.13.

No part of the property held by BLC at the time of ALP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of BLC, as those terms are defined in Code section 751 and its related regulations.

As Officers and Directors of Constellation, Richard Sands and Robert Sands are accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently verifying such data. Furthermore, they are familiar with and comfortable taking business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and they are relying in recommending that the Trustees pursue the Financial Plan.

Over the years, the Trustees have relied on advice from investment advisors and have made independent investment decisions. The Trust has held a wide range of investments and used a variety of investment techniques, taking into account positions held directly, and those held indirectly through investment partnerships, through managed accounts, and through the MLRR. These investments included publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States Treasury obligations, municipal obligations, mutual funds, and compensatory and non-compensatory stock options. Investment techniques the Trust has used either directly or indirectly, as indicated above, included short sales, short sales against the box, hedging transactions, and margin accounts. The Trust has used a variety of entities in its investments, including general partnerships, limited partnerships, and limited liability companies.

In deciding to pursue the Financial Plan, the Trustees considered it to be a multiyear, multiple transaction strategy, intending to use the entities created as a part of the Financial Plan for a series of future investments, and possibly also for estate planning and wealth distribution purposes.

In deciding to pursue the Financial Plan, the Trustees were aware that the Trust would be obligated to pay substantial fees, but they had a reasonable expectation that the gains the Trust would receive from the series of future investments would exceed the fees and costs—including the fee paid to The Heritage Organization, L.L.C. ("Heritage")—that it incurred in connection with the Financial Plan.

In retaining Heritage to assist them, the Trustees believed that the Trust was retaining a sophisticated, trusted adviser and the Trustees expected to receive more from Heritage than assistance in structuring investment transactions so that they produced the best tax results. The Trustees understood that Heritage has rendered a wide range of services to some of their other clients related to the business, investment, and family issues faced by those clients.

Despite the Trust's transfer of the brokerage account to ALP, and the subsequent transfer of that account by ALP to BLC, the Trust retained (through those entities) a significant potential

for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on any aspect of the Financial Plan receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges any of the contemplated tax consequences of the Financial Plan.

Neither the Trust nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by BLC of Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

At all relevant times, ALP, BLC, and the Trust have held each of the assets and interests related to the Financial Plan, including, without limitation, the long positions in Constellation, GLW, and YHOO stock, and the short position in Treasury Notes, as capital assets, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in Financial Plan—including, without limitation, Gloria S. Robinson—participated for investment purposes and for his, her, or its own account, not as agent, nominee, or "straw party" for another. To the Trustees' knowledge, no participant in the Financial Plan received any indemnity or assurance that he, she, or it would be protected against loss.

In rendering the opinions set forth in the section entitled "Opinions of Counsel" below, we have reviewed various documents (collectively, the "Operative Documents"). The Operative Documents include, but are not limited to, the following:

- Articles of Incorporation of RMC dated August 23, 2001;
- Certificate of Incorporation of RMC dated August 23, 2001;
- Election by a Small Business Corporation (Form 2553) of RMC effective August 23, 2001, dated August 23, 2001;
- Certificate of Limited Partnership of ALP dated December 3, 2001;
- Agreement of Limited Partnership of ALP dated as of December 3, 2001;

- Transfer and Assignment dated December 17, 2001, reflecting the transfer by the Trust of its PaineWebber brokerage accounts to ALP;
- Articles of Organization of BLC dated December 10, 2001;
- Certificate of Organization of BLC dated December 10, 2001;
- Operating Agreement of BLC dated December 10, 2001;
- Transfer and Assignment dated December 20, 2001, reflecting the transfer by ALP of its PaineWebber brokerage accounts to BLC;
- Limited Liability Company Interest Purchase Agreement dated December 27, 2001, between ALP and Robinson;
- Wire transfer authorization and instructions dated December 27, 2001, relating to a transfer of $25,999.13 from ALP to Robinson; and
- Record of completion on December 27, 2001, of the above-referenced wire transfer transaction.

## OPINIONS OF COUNSEL

Based upon the "Facts" set forth above, the "Analysis" set forth below, and subject to the "Conditions and Limitations" set forth below, we are of the opinion[2] that there is substantial authority for the Federal income tax treatment of the above-described elements of the Financial Plan in accordance with the opinions enumerated below, and that it is more likely than not that the Federal income tax treatment of the above-described elements of the Financial Plan as set forth in the opinions enumerated below is proper:

1. The obligation to replace the Treasury Notes borrowed for the short sale will not be treated as a "liability" within the meaning of Code section 752. Consequently, the obligation to replace the borrowed securities will not reduce either the basis of the Trust in its partnership interest in ALP or the basis of ALP in its membership interest in BLC.

2. BLC terminated under Code section 708(b)(1)(A) upon the purchase by ALP of the interest of Robinson in BLC because, after that purchase, only one of the members of

---

[2] In issuing these opinions, we have determined the weight of the authorities as required by the Regulations regarding the "substantial authority" and "more likely than not" standards under Code section 6662 and related Regulations, as discussed below.

BLC remained and, as a result, no part of the operations of BLC thereafter will be carried on by any of its partners in a partnership.

3. Upon the termination of BLC under Code section 708(b)(1)(A), BLC will be deemed to have made a liquidating distribution of all of its assets to ALP and Robinson, and following this distribution, ALP will be treated as purchasing the assets deemed to have been distributed to Robinson in liquidation of Robinson's interest in BLC. ALP will take a cost basis and a new holding period (beginning on the day immediately following the date of the sale) in those assets deemed to have been purchased from Robinson. ALP will be considered to have received a liquidating distribution of those assets attributable to ALP's former interest in BLC.

4. Pursuant to Code section 731(a)(1), ALP will be required to recognize gain (if any) in an amount equal to the excess of the money actually or constructively distributed to it over the adjusted tax basis of such partner's interest in the partnership. Pursuant to Code section 731(a)(2), ALP will not recognize a loss on the transaction unless the only property distributed consists of money, unrealized receivables (as defined in Code section 751(c)), and inventory items (as defined in Code section 751(d)). Under Code section 732(b), ALP will take a basis in the assets deemed to have been received in the liquidation of its interest in BLC equal to ALP's basis in its BLC interest, less any money actually or constructively distributed to such partner. Under Code section 735(b), ALP will take a holding period in the assets deemed to have been received in the liquidation of its interest in BLC that includes the holding period of the terminating partnership in those assets, as determined under section 1223.

In connection with these opinions, we note that, on November 14, 2000, the United States Tax Court issued a memorandum opinion in *Salina Partnership, LP v. Commissioner*,[3] holding that an obligation to replace United States Treasury Bills borrowed for a short sale was a "liability" within the meaning of Code section 752. We believe that the Court's conclusion on that issue is incorrect, would be reversed on appeal, and would not be followed if the issue were presented to a different court. However, the parties settled the issues presented in *Salina* and certain related cases by documents filed with the court on September 24, 2001. A more detailed analysis of *Salina* is set forth below in the section entitled "***Federal income tax status of short sale obligations—Cases—Salina.***"

[3] T.C. Memo. 2000-352 (November 14, 2000) ("*Salina*") (citations to *Salina* herein use the pagination of the Court's slip opinion).

## ANALYSIS

***Opinion standards***

In issuing the opinions set forth above and in analyzing the potentially-applicable legal authorities, we have used the "substantial authority" and "more likely than not" terminology and related standards as set forth in Code sections 6662 and 6664 and related Regulations.

The "more likely than not" standard[4] requires that there be a greater than fifty percent chance of success. Accordingly, each opinion stated above on a more likely than not basis means that, in the opinion of this firm, there is a greater than fifty percent (50%) likelihood that the Federal income tax treatment with which the opinion deals will be upheld if challenged by the IRS.

By contrast, the substantial authority standard[5] requires that the weight of authorities supporting the treatment be substantial in relation to the weight of authorities supporting contrary treatment.[6] Although the substantial authority standard is less demanding than the more likely than not standard, it requires more than a mere reasonable basis.[7] The Regulations specify not only the authorities considered for this purpose,[8] but also certain operating rules in establishing the weight of the authorities.[9] Generally, the weight of an authority depends on its relevance and persuasiveness, type (e.g., statute, regulation, published ruling, private letter ruling, et al.), factual and logical specificity, and age. Accordingly, each opinion stated above with respect to the existence of "substantial authority" for a stated conclusion means that, in the opinion of this

---

[4] Reg. § 1.6662-4(d)(2).
[5] *Id.*
[6] Reg. § 1.6662-4(d)(3)(i).
[7] Reg. § 1.6662-4(d)(2).
[8] Reg. § 1.6662-4(d)(3)(iii) states that for purposes here relevant:

> only the following are authority for purposes of determining whether there is substantial authority for the tax treatment of an item: applicable provisions of the Internal Revenue Code and other statutory provisions; proposed, temporary and final regulations construing such statutes; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; General Explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); private letter rulings and technical advice memoranda issued after October 31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); Internal Revenue Service information or press releases; and notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin. Conclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority. The authorities underlying such expressions of opinion where applicable to the facts of a particular case, however, may give rise to substantial authority for the tax treatment of an item.

[9] Reg. § 1.6662-4(d)(3)(ii).