firm, the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment, each determined in accordance with the principles stated in the applicable statutes and Regulations, and as summarized above.

***Federal income tax status of short sale obligations***

<u>*Statute and regulations*</u>

Code section 752 provides, in pertinent part, that

> (a) INCREASE IN PARTNER'S LIABILITIES.--Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) DECREASE IN PARTNER'S LIABILITIES.--Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

Any such deemed contribution or distribution as a result of an increase or decrease in a partner's share of partnership liabilities will increase or decrease the partner's adjusted basis in his partnership interest and, if the deemed distribution exceeds the partner's adjusted basis, will result in gain recognition.[10]

Neither Code section 752 nor the Regulations promulgated thereunder defines the term "liability" or describes the characteristics of a "liability." Similarly, neither Code section 752 nor the Regulations thereunder indicates whether the obligation of an individual who has engaged in a short sale transaction will be characterized as a "liability" under Code section 752.

A temporary regulation issued in December 1988 included the following definition of a "liability" as that term is used in Code section 752:

> Except as otherwise provided in the regulations under section 752, an obligation is a liability of the obligor for purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to--
>
> (1) *The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);*
>
> (2) A deduction that is taken into account in computing the taxable income of the obligor; or

[10] Code sections 705, 731.

(3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.[11]

Without explanation, the Treasury Department excluded this definition when it issued final regulations in December 1991.[12]

Many sections of the Code in addition to section 752 use the term "liability," frequently in the context of a tax liability under the Code, but no section defines the term generally. Code section 357 uses the term in requiring gain recognition on certain asset transfers to a corporation in which "liabilities" are assumed or the transferee corporation receives assets subject to certain "liabilities" of the transferor. Neither Code section 357 nor the Regulations promulgated thereunder defines the term "liability" or describes the characteristics of a "liability." Similarly, neither Code section 357 nor the Regulations thereunder indicates whether the obligation of an individual who has engaged in a short sale transaction will be characterized as a "liability" under Code section 357. After courts considering whether *accounts payable* constituted liabilities under section 357 reached inconsistent conclusions,[13] Congress enacted Code section 357(c)(3)[14] in 1978, in order "to resolve the ambiguity as to whether for purposes of sections 357(c) and 358(d) the term 'liabilities' includes deductible liabilities of a cash basis taxpayer."[15] Code section 357(c)(3) reads:

> (c)(3)(A) IN GENERAL.--If a taxpayer transfers, in an exchange to which section 351 applies, a liability the payment of which either--
> (i) would give rise to a deduction, or
> (ii) would be described in section 736(a),
> then, for purposes of paragraph (1), the amount of such liability shall be excluded in determining the amount of liabilities assumed.

---

[11] Treas. Reg. § 1.752-1T(g), T.D. 8237, 1989-1 C.B. 180 (emphasis added).

[12] T.D. 8380 (Dec. 20, 1991).

[13] *Compare Bongiovanni v. Commissioner*, 470 F.2d 921 (2d Cir. 1972) (payables of a cash-method taxpayer were not liabilities for purposes of section 357(c); observing that "Section 357(c) was meant to apply to what might be called 'tax' liabilities, i.e., liens in excess of tax costs, particularly mortgages encumbering property transferred in a Section 351 transaction"); *and Focht v. Commissioner*, 68 T.C. 223 (1977), *acq.* 1980-2 C.B. 1 (obligation is not a liability for purposes of section 357 to the extent that the obligation would have been deductible if paid); *with Thatcher v. Commissioner*, 533 F.2d 1114, 1117 (9th Cir. 1976) (same issue, opposite conclusion, observing that "(i)n its ordinary meaning, the term 'liability' means 'that which one is under an obligation to pay ... debt ... [as] opposed to assets.' Webster's New International Dictionary (2d ed. 1941)").

[14] In enacting this provision, however, Congress made it clear that it was "not intended to affect the definition of the term liabilities for any other provision of the Code, including sections 357(a) and 357(b)." *Id.* Six years later, in adopting amendments to the partnership-tax sections of the Code relating to contributed property, the House Ways and Means Committee commented: "The committee intends that, similar to the amendments recently made to section 357(c) (and contrary to Rev. Rul. 60-345, 1960-2 C.B. 211), these accrued but unpaid items should not be treated as partnership liabilities for purposes of section 752." H.R. Rep. No. 98-861, 98th Cong., 2nd Sess. 856-57 (1984), 1984-3 C.B. (Vol. 2) 1, 110-11.

[15] S. Rep. No. 95-1263, 95th Cong., 2nd Sess. 185 (1978), 1978-3 C.B. (Vol. 1) 315, 483. Code section 358(d) causes the basis of stock received in an exchange transaction to which Code section 351, 354, 355, 356, or 361 applies to be reduced by the amount of certain liabilities assumed by the corporation as part of the exchange consideration, with the exception of liabilities excluded under section 357(c)(3).

> (c)(3)(B) EXCEPTION.--Subparagraph (A) shall not apply to any liability to the extent that the incurrence of the liability resulted in the creation of, or an increase in, the basis of any property.

Code section 1233, Reg. § 1.1233-1, and IRS revenue rulings[16] treat a short sale as a taxable event upon the delivery of property to close the short sale. The gain or loss is the difference between the sale proceeds received (upon executing the short sale) and the cost of the property used to close the transaction.[17] Although the IRS generally asserts that "open transaction" treatment applies only in "rare and extraordinary cases,"[18] and has successfully challenged some taxpayers' efforts to defer gain recognition by applying that doctrine,[19] it is clear that with limited statutory exceptions,[20] short sales are not taxable during the period in which they are open. Nevertheless, in a 1998 field service advice memorandum,[21] the IRS took the position of the IRS that these provisions are irrelevant in determining whether the obligation of a short seller to acquire and deliver securities to replace those it borrowed is a "liability" for purposes of Code section 752.[22]

As a part of appropriations legislation[23] for fiscal year 2001, Congress adopted and President Clinton signed into law the Community Renewal Tax Relief Act of 2000 (the "CRTR Act"). One of the administrative and technical corrections provisions included in the CRTR Act states:

---

[16] Rev. Rul. 72-478, 1972-2 C.B. 487; Rev. Rul. 73-524, 1973-2 C.B. 307.

[17] Reg. § 1.1233-1(c)(6).

[18] *E.g.*, Reg. § 1.1001-1(a); Temp. Reg. § 15A.453-1(d)(2)(iii).

[19] *E.g.*, *Waring v. Commissioner*, 412 F.2d 800 (3d Cir. 1969); *McCormac v. United States*, 424 F.2d 607 (Ct. Cl. 1970).

[20] For example, Code section 1259, enacted in 1997, generally deems an appreciated financial position to be constructively sold if the taxpayer engages in certain transactions that substantially eliminate both risk of loss and opportunity for gain on the appreciated financial position. Congress adopted this legislation to terminate, among other things, the tax benefits associated with the so-called "short sale against the box transaction." In such a transaction, a taxpayer sells a security short while holding a long position in the identical security. Prior to the enactment of Code section 1259, a taxpayer did not recognize gain under the short against the box transaction until the year in which the short position was closed. By its terms, the new provision applies only to transactions that substantially eliminate any risk of loss or opportunity for gain. A short sale of property that the taxpayer does not currently own does not substantially eliminate the risk of loss or opportunity for gain from ownership of the property.

[21] Field Service Advice is not a ruling or technical advice memorandum from the IRS, but rather direction from IRS National Office to IRS field agents with respect to legal positions to take in an examination and the factual development required in connection with such positions. Field Service Advice memoranda are not included in the list of documents characterized as "authority" in Reg. § 1.6662-4(d)(3)(iii) for purposes of weighing whether "substantial authority" exists for a tax return position.

[22] Field Service Advice 199913016 (Dec. 23, 1998) (IRS commented that "Neither I.R.C. §1233 nor Reg. §1.1233-1(a)(1) prescribe or suggest when the obligation that arises in a short sale transaction is included in basis of the partnership assets. In addition, there is nothing in the legislative history of I.R.C. §1233 or in the history of Reg. §1.1233-1(a)(1) to suggest such a rule exists. ... Our position is that the only provisions which govern the determination of when the value of an obligation is included in the basis of the partnership assets are the partnership rules under Subchapter K, specifically, I.R.C. §§752 , 732 and 722. ")

[23] The Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 106th Cong. 2nd Sess. (2000).

SEC. 309. PREVENTION OF DUPLICATION OF LOSS THROUGH ASSUMPTION OF LIABILITIES GIVING RISE TO A DEDUCTION.

(a) IN GENERAL.--Section 358 (relating to basis to distributees) is amended by adding at the end the following new subsection:

"(h) SPECIAL RULES FOR ASSUMPTION OF LIABILITIES TO WHICH SUBSECTION (d) DOES NOT APPLY.--

"(1) IN GENERAL.--If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability--

"(A) which is assumed in exchange for such property, and

"(B) with respect to which subsection (d)(1) does not apply to the assumption.

"(2) EXCEPTIONS.--Except as provided by the Secretary, paragraph (1) shall not apply to any liability if--

"(A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or

"(B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

"(3) LIABILITY.--For purposes of this subsection, the term 'liability' shall include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title."

(b) DETERMINATION OF AMOUNT OF LIABILITY ASSUMED.--Section 357(d)(1) is amended by inserting "section 358(h)," after "section 358(d),".

(c) APPLICATION OF COMPARABLE RULES TO PARTNERSHIPS AND S CORPORATIONS.--The Secretary of the Treasury or his delegate--

(1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships, and

(2) may prescribe rules which provide appropriate adjustments under subchapter S of chapter 1 of such Code in transactions described in paragraph (1) involving S corporations rather than partnerships.

(d) EFFECTIVE DATES.--

(1) IN GENERAL.--The amendments made by this section shall apply to assumptions of liability after October 18, 1999.

(2) RULES.--The rules prescribed under subsection (c) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules.

To the extent that this legislation is either self-executing[24] or is implemented by Treasury Regulations, it does not adversely affect, and appears to provide additional support for, the

[24] Many decided cases deem the issuance of regulations to be a condition to the application of statutes providing consequences "only to the extent provided in regulations prescribed by the Secretary," unless the statute is intended to provide a rule favorable to taxpayers that would be thwarted by the application of that general principle. *See Estate of Maddox v. Commissioner*, 93 T.C. 228, 233-234 (1989); *First Chicago Corp. v. Commissioner*, 88 T.C.

opinion stated above that the obligation to replace the Treasury Notes borrowed for the short sale will not be treated as a "liability" within the meaning of Code section 752. The reasons for this conclusion include the following:

- The legislation does not yet apply to partnerships as the Treasury Department has not yet issued the implementing regulations authorized by Section 309(c)(1) of the CRTR Act. Although the legislation provides that the Treasury Department "shall prescribe" the subject rules, it is uncertain what form those rules may take, what exceptions they may provide, how quickly, if ever, the Treasury Department will exercise its regulatory authority, whether the Treasury Department will choose to make the regulations effective on October 18, 1999, or on some later date as it is authorized to do under Section 309(d)(2) of the CRTR Act, and whether valid regulations can be issued with such a retrospective effective date.

- Second, the legislation directs the issuance of regulations "to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in" Code section 358(h)(3). It is not clear what Congress had in mind in crafting this language, but the transactions that constitute the Financial Plan cannot reasonably be characterized as ***accelerating or duplicating losses.*** It is uncertain how the IRS will give effect to this language in drafting regulations. Although any regulation issued by the IRS would likely be applied by a court consistently with the plain meaning of the words it used, this statutory language could be taken into account if the regulation is either inconsistent with the statute or is ambiguous, diminishing the possibility that this legislation could require a basis reduction for obligations such as those involved in the Financial Plan.

- Third, the statute provides, in general, that any fixed or contingent obligation to make payment is deemed to be a "liability," without regard to whether it is otherwise characterized as a liability for purposes of Federal income taxation. In common

---

663, 676-677 (1987), *affd,* 842 F.2d 180 (7th Cir. 1988); *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819, 829 (1984). In other circumstances, particularly where the regulation is to provide "how" the statute is to apply, courts examine the text of the statute, the related legislative history, and other pertinent evidence to determine whether the statute should not be effective until the issuance of regulations. *Schwalbach v. Commissioner*, 111 T.C. 215, 226 (1998). If the court does not conclude that the statute should be regarded as ineffective until the issuance of regulations, the statute "may be interpreted in light of all pertinent evidence, textual and contextual, of its meaning." *Id. citing Commissioner v. Soliman*, 506 U.S. 168, 174 (1993); *Crane v. Commissioner*, 331 U.S. 1, 6-7 (1947); *Old Colony R.R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932), *Trans City Life Ins. Co. v. Commissioner*, 106 T.C. at 299-300; *Estate of Neumann v. Commissioner*, 106 T.C. 216 (1996); *H Enters. Intl., Inc. v. Commissioner*, 105 T.C. 71, 81-85 (1995). *Compare* Code section 108(e)(4) (stating that "to the extent provided in regulations prescribed by the Secretary" certain acquisitions of debt by persons related to the debtor are treated as acquisitions of the debt by the debtor) *with* T.D. 8460, 1993-1 CB 19 (issuing regulations under Code section 108(e)(4) and commenting that "It remains the position of the Service and Treasury that section 108(e)(4) is effective from the date of its enactment. The statutory language of section 108(e)(4) is reasonably clear in its primary application.").

parlance, "making payment" denotes the satisfaction of a ***pecuniary*** obligation.[25] By limiting the definition of "liability" to obligations "to make payment," Congress effectively excluded from the "liability" definition the obligation of a short seller ***to replace in kind*** the Treasury Notes borrowed to effect a short sale.

- Fourth, to determine the basis of stock received from a corporation in exchange for a capital contribution to that corporation (or the basis of a partnership interest received from a partnership in exchange for a capital contribution to that partnership, if applicable to partnerships), the statute sets forth a general rule and two important exceptions.

  - The general rule is that if, after taking into account other applicable limitations, the basis of the stock (or of the partnership interest, if applicable to partnerships) received exceeds its fair market value, then that basis is to be reduced (but not below its fair market value) by the amount of the assumed[26] liabilities, determined as of the date of the exchange.

  - Two exceptions—the "trade or business transfer" exception and the "substantially all of the assets transfer" exception—exclude obligations that otherwise would be characterized as liabilities under the definition stated above and would reduce the basis of the stock (or of the partnership interest, if applicable to partnerships) received in the exchange. More specifically, if the trade or business with which an obligation is associated is transferred to the person assuming the liability as part of the exchange, or if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation, then such obligations will not reduce the basis of the stock (or the partnership interest, if applicable to partnerships) received in the exchange. ***Nevertheless, Congress expressly authorized the Treasury Department to issue regulations limiting these exceptions.*** The Conference Committee report on the Consolidated Appropriations Act included this observation about these exceptions:

    > The exceptions for transfers of a trade or business, or of substantially all the assets, with which a liability is associated, are intended to obviate the need for

---

[25] *See, e.g.*, THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE (Fourth Ed. 2000) ("TRANSITIVE VERB : 1. To give money to in return for goods or services rendered: "pay the cashier." ... INTRANSITIVE VERB : 1. To give money in exchange for goods or services."), *republished at* http://www.bartleby.com/61/49/P0124900.html.

[26] The Conference Committee report provides that, for this purpose "The determination whether a liability (as more broadly defined for purposes of this provision) has been assumed is made in accordance with the provisions of section 357(d)(1) of the Code. Under the standard of 357(d)(1), a recourse liability is treated as assumed if, based on all the facts and circumstances, the transferee has agreed to and is expected to satisfy such liability (or portion thereof), whether or not the transferor has been relieved of the liability. ... Similarly, a nonrecourse liability is treated as assumed by the transferee of any asset subject to such liability." H.R. Rep. 106-1033, 106th Cong., 2nd Sess. 1019 (2000).

> valuation or basis reduction in such cases. The exceptions are not intended to apply to situations involving the selective transfer of assets that may bear some relationship to the liability, but which do not represent the full scope of the trade or business, (or substantially all the assets) with which the liability is associated.

- Finally, Congress chose in the waning days of 2000 to adopt this legislation that had been introduced in substantially similar form in 1998 and 1999. During those years, the Congress, the Treasury Department, the IRS, and the tax bar have devoted substantial amounts of time and attention to the best ways to address certain so-called "tax shelter" transactions, at least one of which represented "tax avoidance using artificially high basis."[27] Taking into account the recent legislative, regulatory, and enforcement efforts dedicated to such matters, this legislation represents the judgment of Congress on when a contingent obligation should be characterized as a "liability" in determining the basis of a partnership interest. As Congress decided generally to exclude an obligation from this definition if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation, and to apply this definition retroactively to October 19, 1999, the IRS and the courts thereafter should defer to that liability definition.

In summary, Congress decided that, for this purpose, an obligation is a "liability" that reduces the basis of a partnership interest if

(a) the Treasury Department issues implementing regulations to apply the corporate basis statute to partnerships, and
(b) the obligation is an "obligation to make payment," and
(c) the obligation is assumed by the partnership in a transfer in which the partnership issues a partnership interest, and
(d) the obligation is ***not*** assumed in connection with the transfer to the partnership of either a trade or business or substantially all of the assets with which the obligation is associated, unless Treasury Regulations supersede the generally-applicable exception with respect to an obligation assumed in connection with such a transfer.

The Financial Plan involves an obligation to replace Treasury Notes borrowed to effect a short sale. That obligation is not a liability under this definition for several reasons. First, the obligation to replace the borrowed Treasury Notes is not an "obligation to make payment" as required by the statute. Second, although the assumption of the obligation to replace the borrowed Treasury Notes to close the short sale occurs in a transfer in which the partnership issues a partnership interest, that assumption is part of a transfer in full of the brokerage account—including the proceeds of sale of the borrowed Treasury Notes, the margin deposit, and the obligation to replace the borrowed Treasury Notes. Accordingly, under the CRTR Act, unless and until the Treasury Department issues valid regulations to the contrary, that obligation is not a

[27] IRS Notice 2000-44, I.R.B. 2000-36, 255.

"liability" triggering the basis reduction rule. Finally, the Treasury Department has not issued implementing regulations to apply the corporate liability definition statute to partnerships and, although any regulations ultimately issued may be retroactive, this letter applies the law as it exists today.

After the enactment of the CRTR Act, the IRS issued Notice 2001-17, entitled "Contingent Liability Tax Shelter." In that Notice, the IRS described the structure of the transaction in pertinent part, as follows:

> These transactions take several forms but, in all cases, involve the transfer of a high basis asset (i.e., an asset with a basis that approximates its fair market value) to a corporation purportedly in exchange for stock of the transferee corporation, and the transferee corporation's assumption of a liability (such as a liability for deferred compensation or other deferred employee benefits or an obligation for environmental remediation) that the transferor has not yet taken into account for federal income tax purposes. The transferor typically remains liable on the underlying obligation. The basis and fair market value of the transferred asset, which may be a security of another member of the same affiliated group of corporations, are generally only marginally greater than the present value of the assumed liability. Therefore, the value of the stock of the transferee received by the transferor is minimal relative to the basis and fair market value of the asset transferred to the transferee corporation.
>
> . . .
>
> The transferor typically sells the stock of the transferee corporation for its fair market value within a relatively short period of time after the purported §351 exchange and claims a tax loss in an amount approximating the present value of the liability assumed by the transferee corporation. In the case of a transaction involving members of an affiliated group that has elected to file a consolidated return, the transaction is structured with the intention of avoiding the loss disallowance rule of §1.1502-20 of the Income Tax Regulations. In addition to the transferor's purported loss on the sale of the stock of the transferee corporation, the transferee corporation may claim a §162 deduction with respect to payments on the liability.[28]

The IRS declared its belief that "***any business purposes*** taxpayers may assert for certain aspects of these transactions are far outweighed by the purpose to generate deductible losses for federal income tax purposes,"[29] and asserted its intent to disallow losses claimed with respect to these transactions. The basis for such intended disallowances varied, however.

> For transfers on or before October 18, 1999, as well as for transfers after October 18, 1999, that are not subject to §358(h), the Service will disallow such losses for one or more reasons, including but not limited to the following: (1) that the purported §351 exchange lacks sufficient business purpose to qualify as a §351 exchange; (2) that the transfer of the asset to the transferee corporation is not, in substance, a transfer of property in exchange for stock within the meaning of §351, but instead is either an agency arrangement for the transferor or simply a payment to the transferee for its assumption of a liability; (3) that the purported §351 exchange constitutes an acquisition of control of the transferee corporation for the principal purpose of tax avoidance within the meaning of §269(a) and thus the purported loss should be disallowed under

[28] IRS Notice 2001-17, *reprinted in Daily Tax Report* (January 19, 2001) at L-16.
[29] *Id.* (emphasis added).

> §269(a); (4) that the principal purpose of the transferee's assumption of the liability was a purpose to avoid federal income tax or was not a bona fide business purpose within the meaning of §357(b)(1), and thus the assumption of the liability should be treated as money received by the transferor that reduces its basis in the transferee stock; (5) that the purported loss on the sale of the stock of the transferee corporation is disallowed or limited by the loss disallowance rules of §1.1502-20, including the anti-avoidance rule in §1.1502-20(e) and the duplicated loss rule in §1.1502-20(c); (6) that the purported loss on the sale of the stock of the transferee corporation is not a bona fide loss actually sustained by the transferor, as required by §1.165-1(b); and (7) that the overall transaction lacks sufficient economic substance to be respected for federal income tax purposes, see ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir. 1998), cert. denied, 526 U.S. 1017 (1999).[30]

The IRS observed that it "may impose penalties on participants in these transactions, or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under §6662, the return preparer penalty under §6694, the promoter penalty under §6700, and the aiding and abetting penalty under §6701," and that "(t)ransactions that are the same as or substantially similar to those described in this Notice 2001-17 (***including transactions utilizing partnerships***) are identified as "listed transactions" for the purposes of §1.6011-4T(b)(2) of the Temporary Income Tax Regulations and §301.6111-2T(b)(2) of the Temporary Procedure and Administration Regulations."[31]

The IRS position stated in Notice 2001-17 with respect to transactions after October 18, 1999, is inconsistent with the requirements of current law for several reasons. First, the IRS states generally that such losses are disallowed under Code section 358(h), described above. In stating this position, it did not analyze that section and, in particular, it did not analyze or state its intention with respect to the content of regulations to be issued under that section dealing with the "substantially all of the assets transfer" exception or the application of the new legislation to partnerships. As a result, it is unclear how the IRS will avoid the application of that exception in general and, more particularly, how it will avoid that exception for all such transactions without nullifying the legislative exception by regulation, an action that would suggest strongly the invalidity of the regulation.

Second, as discussed above, the IRS declared that it would rely on seven stated grounds in disallowing losses claimed with respect to "transfers after October 18, 1999, that are not subject to §358(h)." Where Congress specifically considers a subject and enacts comprehensive legislation to solve the problems presented, courts have declined thereafter to apply Federal common law principles, finding that Congressional action preempted the area.[32] The position of

---

[30] *Id.*

[31] *Id.* (emphasis added).

[32] *See, e.g., City of Milwaukee v. States of Illinois and Michigan*, 451 U.S. 304 (1981) (Federal environmental legislation preempted Federal common law of nuisance); *Smith v. Commissioner*, 78 T.C. 350, 388 (1982) (declining to apply a nonstatutory wash sale analysis to deny losses claimed on commodity straddle transactions and commenting that "we do not believe it is within the province of this Court to attempt to draft our own novel straddle integration provision" where (1) the statutory wash sale provisions did not apply, and (2) Congress recently had adopted legislation dealing with the issue prospectively.)

the IRS in Notice 2001-17 represents an attempt to apply the new law beyond the limits set forth by Congress. Moreover, to the extent the new law does not provide the restriction sought by the IRS, the IRS attempts improperly to supplement the new law with Federal common law, ignoring tax and nontax decisions to the contrary. As noted above, the IRS and the courts should defer to the new liability definition adopted by Congress, generally retroactive to October 19, 1999, that generally excludes an obligation if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation.

<u>*Cases—In general*</u>

In *Deputy v. du Pont,*[33] Pierre du Pont borrowed 9,000 shares of du Pont stock for a 10-year period and, in connection with the borrowing of the stock, undertook to pay the lender of the shares all dividends paid by the corporation during the 10-year period. The Supreme Court rejected du Pont's argument that the payment of such amounts should be deductible as interest expense under section 23(b) of the Revenue Act of 1928, the predecessor of the current authority for the deduction of interest expense, Code section 163. The Court explained its reasoning as follows:

> ***Clearly respondent owed an obligation to the Delaware Company. But although an indebtedness is an obligation, an obligation is not necessarily an "indebtedness" within the meaning of §23(b).*** Nor are all carrying charges "interest." In *Old Colony Railroad Co. v. Commissioner*, 284 U. S. 552, this Court had before it the meaning of the word "interest" as used in the comparable provision of the 1921 Act (42 Stat. 227). It said, p. 560, "* * * as respects 'interest', the usual import of the term is the amount which one has contracted to pay for the use of borrowed money." It there rejected the contention that it meant "effective interest" within the theory of accounting or that "Congress used the word having in mind any concept other than the usual, ordinary and everyday meaning of the term." p. 561. It refused to assume that the Congress used the term with reference to "some esoteric concept derived from subtle and theoretic analysis." p. 561.
>
> We likewise refuse to make that assumption here. It is not enough, as urged by respondent, that "interest" or "indebtedness" in their original classical context may have permitted this broader meaning. We are dealing with the context of a revenue act and words which have today a well-known meaning. In the business world "interest on indebtedness" means compensation for the use or forbearance of money. In absence of clear evidence to the contrary, we assume that Congress has used these words in that sense. In sum, we cannot sacrifice the "plain, obvious and rational meaning" of the statute even for "the exigency of a hard case."[34]

In *Hendricks v. Commissioner,*[35] the Fourth Circuit deemed a short sale to be closed in the year of the settlement date of the transaction in which stock was acquired by the taxpayer and delivered by their broker to the party from which stock had been borrowed to effect the short sale. The court rejected the taxpayer's argument that the date of the order to cover should

---

[33] 308 U.S. 488 (1940).
[34] *Id.* at 497-498 (emphasis added, citations and footnotes omitted).
[35] 423 F.2[nd] 485 (4th Cir. 1970), *aff'g per curiam,* 51 T.C. 235 (1968); T.C. Memo. 1970-13.

SANDS 10653

control, even though the taxpayer had sufficient funds in his account to cover the purchase at the time of the order.

In *Helmer v. Commissioner,*[36] a partnership granted a third party ("X") an option to purchase real estate owned by the partnership. X had to make an initial payment of $150,000 and annual payments of $75,000 for the option. So long as the option was outstanding, the partnership retained the right to remain in possession of the property and to retain the profits therefrom. The only restriction on the option payments was that they be applied against the purchase price of the property if X should exercise its purchase option. The partnership received option payments for three years and distributed them to its partners. Under Code section 731, cash distributions to partners are subject to tax to the extent the amount distributed exceeds the distributee's partnership interest adjusted basis. That basis includes the partner's share of partnership liabilities under Code section 752. Among the issues decided by the Tax Court was whether the partnership's receipt of option payments gave rise to a partnership liability under Code section 752, as the taxpayer contended in that case. The court rejected that contention. Even though the option payments had not yet been recognized for income tax purposes pending the exercise or lapse of the purchase option, the receipt of such payments did not give rise to a section 752 liability because the option agreement "created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future."

In *Long v. Commissioner,*[37] the Tax Court addressed the issue of contested liabilities arising from a contract that was the subject of litigation. Two parties sued a partnership for damages resulting from structural defects in a building constructed by the partnership. Another party sued the partnership on its performance bond. One of the partners died before the suits were settled, and the estate claimed the contingent damage amounts as liabilities to be included in the decedent's basis in the partnership interest. In resolving this issue, the court observed:

> Although they may be considered "liabilities" in the generic sense of the term, contingent or contested liabilities such as the Kansas City Life-TWA and USF&G claims are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated. ***This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset.*** *See, e.g., Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 179 (1973); *Lemery v. Commissioner*, 52 T.C. 367, 377 (1969), *aff'd per curiam*, 451 F.2d 173 (9th Cir. 1971); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), *aff'd per curiam*, 333 F.2d 653 (2d Cir. 1964). ***We think that partnership liabilities should be treated in the same manner.*** *See generally* McKee, Nelson & Whitmire, FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[2] (1977). We see no logical reason for distinguishing the above cases solely because the asset involved is an interest in a partnership, and neither party

[36] T.C. Memo. 1975-160.
[37] 71 T.C. 1 (1978), *supplemented on reconsideration*, 71 T.C. 724 (1979), *aff'd on this issue*, 650 F.2nd 416 (10th Cir. 1981).