the amount realized on the sale of property or as payments on a lapsed option to purchase property.

Similarly, the partnership in *Salina* is obligated to close its short sale by acquiring replacement Treasury securities and delivering them to the broker from which it borrowed such securities for purposes of the short sale. At the time an investor borrows the securities to effect a short sale, the price at which he will be able to purchase shares to satisfy that obligation is unknown.[56] Both the *Helmer* and the *Salina* transactions involve such uncertainty that Federal law defers the imposition of income tax until the resolution of that uncertainty. Although the uncertainty in *Helmer* goes to the nature of the transaction and the character of the income, gain, or loss and the uncertainty in *Salina* goes to the amount of the gain or loss recognized on the transaction, Federal tax law deems each uncertainty sufficiently significant to defer income or loss recognition, notwithstanding a strong prejudice in tax statutes and decisions against so-called "open transaction" treatment. This Federally-recognized uncertainty also should be deemed sufficiently significant (as the Tax Court did in *Helmer*) to defer recognition of any potential partnership liability under Code section 752. The court observed that the facts of the cases are different, but it did not set forth a rationale to distinguish *Salina* from *Helmer* as a matter of law.[57]

The court then addressed Salina's reliance on *Deputy v. du Pont, supra*, the United States Supreme Court decision that denied a deduction for interest expense claimed by a taxpayer who had engaged in a short sale.[58] The Tax Court deemed Salina's reliance "misplaced," observing that "the Supreme Court's rejection of the taxpayer's argument was more firmly rooted in the Court's holding that the disputed payments did not constitute a payment of interest within the meaning of the statute...."[59] The Tax Court then attempted to distinguish the Supreme Court's reasoning in *Deputy v. du Pont,* asserting:

> [T]he Supreme Court's statement ... that "an obligation is not necessarily an 'indebtedness'" ... does not constitute a blanket holding that a borrower's obligation to close a short sale by returning the borrowed securities to the lender will never be considered an indebtedness....

---

[56] The court's comparison of *Helmer* with the facts in *Salina* makes the same error as the IRS did in Rev. Rul. 95-26, *supra*, misconceiving or misconstruing the nature of a short sale as explained by the United States Supreme Court in *Provost v. United States, supra*. See note 97 and the accompanying text.

[57] As a matter of logic, one could infer that the court would find no Section 752 liability if, rather than engaging in a short sale of a security, an investor instead sold a call option on a security he did not own. Consistent with the *Salina* court's explanation of *Helmer*, such a transaction would yield proceeds to the call writer that would be "free and clear of any claim for repayment or demand for further services." If the call option holder exercised his option, the option writer would have had to acquire and transfer the securities, just as the option writer in *Helmer* would have had to transfer the property if the holder of the option in that case had exercised its option.

[58] See text accompanying footnotes 37 & 38.

[59] *Salina* at 49.

> We, of course, are in no way constrained (nor prepared) to assume that a liability within the meaning of Code section 752 must satisfy the definition of an indebtedness as that term is used elsewhere in the Code.[60]

The Tax Court did not cite a textual basis for either of these purported distinctions in the *du Pont* decision or in any later decisions of the Supreme Court or any other court.

At this point in its opinion, the court had (1) cited, and then ignored, the withdrawn temporary regulations that included a definition of the term "liability," (2) declared that it was "not convinced" that the IRS position on the issue was inconsistent with Code section 1233 and Reg. §1.1233-1, (3) declared that it was "not persuaded" that the IRS position on the issue was inconsistent with Rev. Rul. 73-301, and *Helmer*, and (4) asserted that Salina's citation of *Deputy v. du Pont* overstated the Supreme Court's holding in the case. After seventeen pages of analysis of the Code section 752 issue, including observations that neither the statute nor the final regulations defined the term "liability," the court observed that Salina did not offer the court a definition of the term "liability."

The court did not cite or analyze other cases applying Code section 752 or the term "liability" either in a partnership tax context or in any other Federal income tax context. Instead, it ignored conventional precedent and resorted to Black's Law Dictionary for guidance in determining the "ordinary meaning" of the term "liability." It found and quoted the following definition:

> 1. The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment. * * * 2. A financial or pecuniary obligation * * *.[61]

The Tax Court deemed this definition to be dispositive, stating:

> Based upon the aforementioned meaning of the term "liability", and consistent with the policy underlining section 752, we hold that Salina's obligation to close its short sale by replacing the Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the Treasury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN. Significantly, Salina reported the obligation as a liability on its opening balance sheet.[62]

The Tax Court opinion in *Salina* is most noteworthy for its inconsistencies, incongruities, loose ends, and omissions. In particular, the Tax Court:

[60] *Salina* at 49-50.
[61] *Salina* at 50, *citing* Black's Law Dictionary 925 (7th ed. 1999).
[62] *Salina* at 50-51.

LEWIS, RICE & FINGERSH, L.C.



- Deemed the matching of inside basis and outside basis important, and relied upon an "ordinary meaning" construction of the term "liability," but failed to harmonize, distinguish, or even mention the rejection by the McKee, Nelson, Whitmire partnership taxation treatise of an "ordinary meaning" construction as a way of effecting the matching of inside basis and outside basis, even though the court cited that treatise earlier in its opinion;[63]

- Observed that it was "significant" that Salina reported the obligation as a liability on its opening balance sheet,[64] did not explain why such reporting was significant, and failed to note that, after reviewing the nature and objectives of financial accounting and tax accounting, the United States Supreme Court has held that "[g]iven this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable";[65]

- Cited the definition of "liability" in Temp. Reg. 1.752-1T(g) with apparent approval and noted it again in connection with the discussion of Rev. Rul. 88-77, *supra*, but failed to mention that Treasury issued the final regulations—omitting this definition—on December 20, 1991, before the beginning of the 1992 year in controversy before the Court in *Salina*;[66]

- Discussed Rev. Rul. 95-26—issued well after the close of the 1992 tax year in controversy—as though it had been outstanding during the year in controversy, without recognizing the extremely limited effect given to such agency opinions by all courts[67] and without mention of the inconsistent use of *Deputy v. du Pont, supra*, in Rev. Rul. 95-8;[68]

- Disregarded the United States Supreme Court's decision in *Deputy v. du Pont, supra*, with slight analysis;

---

[63] See footnote 52.
[64] *Salina* at 51.
[65] *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 542-543 (1979).
[66] The court did observe that "the final regulations under section 752 do not contain a definition of the term 'liabilities.'" *Salina* at 40. Although the court does not appear to have used this withdrawn definition in deciding the case, it is unclear why it chose to cite the regulation if not to use it.
[67] *Compare Salina* at 40-41 with the authorities set forth in footnote 88 and the related text. Moreover, as noted by the Tax Court in *Estate of Morgan v. Commissioner*, 52 T.C. 478, 484 (1969), aff'd per curiam 448 F.2nd 1397 (9th Cir. 1971), in responding to an IRS citation of a ruling issued after the period in controversy in that case, "We dismiss this argument by pointing out that the Revenue Ruling is no more binding nor has any more legal force than the opening statements of counsel at the time of trial of this case."
[68] See footnote 77 and related text.

- Failed to discuss any of the cases that deferred tax recognition of liabilities deemed too contingent to quantify;[69]

- Placed reliance on a dictionary definition despite the existence of a statute (Code section 1233) on a closely-related subject, and many cases in a variety of contexts considering the existence and treatment of obligations and liabilities;[70] and

- Issued the case as a memorandum opinion, a class usually limited to cases involving the application of settled legal principles to the facts presented, even though it was the first case to consider whether the obligation to close a short sale should be characterized as a liability for purposes of Code section 752.[71]

The parties settled the issues presented in *Salina* and certain related cases by documents filed with the court on September 24, 2001. Accordingly, *Salina* never became a final decision, making the precedential value of the Tax Court opinion uncertain at best. Likewise, it is uncertain whether any inference can be drawn from the positions in and the settlement of the *Fulcrum* case. Until another case presenting the Code section 752 issue arises and is litigated to a final decision, the IRS position merely represents one of two positions on this issue. We believe that the Court's conclusion on the Code section 752 issue in *Salina* is incorrect, would have been reversed on appeal, and would not be followed if the issue were presented to a different court.

If the IRS challenges the tax consequences of the elements of the Financial Plan discussed herein, it may well attempt to use *Salina* as precedent notwithstanding the settlement of that decision and related cases. Were it to do so, a reviewing court would have to consider the precedential value, if any, of the Tax Court opinion in *Salina*. In addition, a reviewing court would scrutinize carefully the facts in each situation to determine the extent to which the transactions in controversy are comparable and the extent to which they are distinguishable from those presented in *Salina*. Until another case presenting the Code section 752 issue arises and is litigated to a final decision, such a comparison is of uncertain value.

---

[69] *Long v. Commissioner*, 71 T.C. 1 (1978), *supplemented on reconsideration*, 71 T.C. 724 (1979), *aff'd on this issue*, 650 F.2[nd] 416 (10th Cir. 1981), *citing Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 179 (1973); *Lemery v. Commissioner*, 52 T.C. 367, 377 (1969), *aff'd per curiam*, 451 F.2d 173 (9th Cir. 1971); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), *aff'd per curiam*, 333 F.2d 653 (2d Cir. 1964), and McKee, Nelson & Whitmire, FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS 7.01[2] (1977); *LaRue v. Commissioner*, 90 T.C. 465 (1988).

[70] The court commented that it was "in no way constrained (nor prepared) to assume that a liability within the meaning of Code section 752 must satisfy the definition of an indebtedness as that term is used elsewhere in the Code." *Salina* at 50. Its assertion in this respect—that the Supreme Court's determination that the short sale obligation is not indebtedness should be ignored in favor of a "plain meaning" construction effected as though the Tax Court were writing on a blank slate—is inconsistent with the canons of statutory construction that provide, in general, that (1) statutes *in pari materia* should be construed consistently with one another, *e.g.*, N. Singer, SUTHERLAND STATUTORY CONSTRUCTION §51.02, 121 & n. 3 (5[th] Ed. 1992), and (2) statutes dealing with the same subject are to be construed to be in harmony if reasonably possible, *id.* at 122 & n. 13.

[71] B. Bittker & L. Lokken, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶115.2.1 (Second/Third Edition 2000).

*IRS pronouncements*

In Rev. Rul. 73-301,[72] the IRS considered the situation of a partnership, using the completed contract method of accounting, which incurred costs not deducted currently and received progress payments not included in income currently. It booked the progress payments as debits to cash and credits to deferred income. It then made a cash distribution to a partner in excess of his positive capital account balance. The partnership agreement provided that, on withdrawal from the partnership or upon its liquidation, any indebtedness of a partner to the partnership was to be deducted from the amount otherwise distributable to that partner. The IRS ruled that the progress payments were unrealized receivables under Code section 751(c), not liabilities for purposes of Code section 752, and that the distribution to the partner in excess of his positive capital account balance was properly regarded as a distribution, not a loan, as it did not create ***"an unconditional and legally enforceable obligation to pay a sum certain at a determinable date."***[73] The IRS reasoned that the progress payments "represent amounts received on account of services performed on the contract not yet reported as gross income."[74]

In Rev. Rul. 88-77,[75] the IRS determined that accrued expenses of a cash-basis partnership are not Code section 752 liabilities, reasoning:

> For purposes of section 752 of the Code, the terms "liabilities of a partnership" and "partnership liabilities" include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to an immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest. The preceding sentence uses the term "assets" to include capitalized items that are properly allocable to future periods, such as organizational expenses and construction period expenses.[76]

This ruling demonstrates that even though such accounts payable are liabilities within the financial accounting meaning of the term, the IRS would not regard them as such if incurred by a taxpayer using the cash receipts and disbursements method of accounting.

In 1995, the IRS issued three revenue rulings addressing the treatment of short sales in different contexts. The first such ruling, Rev. Rul. 95-8,[77] held that the income or loss from a short sale is not unrelated debt-financed income under Code section 514. The IRS observed that income from a short sale can only be unrelated debt-financed income if the exempt organization incurs "acquisition indebtedness," and observed that "in *Deputy v. du Pont*, 308 U.S. 488, 497-

---

[72] 1973-2 C.B. 216.
[73] *Id.* at 217 (emphasis added).
[74] *Id.* at 216.
[75] 1988-2 C.B. 129.
[76] *Id.* at 129.
[77] 1995-1 C.B. 107.

98 (1940), 1940-1 C.B. 118, 122, the Supreme Court held that although a short sale created an obligation, it did not create ***indebtedness*** for purposes of the predecessor of §163."[78]

Several weeks later, in Rev. Rul. 95-26,[79] citing *Deputy v. du Pont*, the same case it had relied upon in Rev. Rul. 95-8 in determining that a short sale did not create indebtedness resulting in unrelated debt-financed income, the IRS concluded that a short sale does create a liability for purposes of Code section 752, reasoning:

> A short sale creates an obligation on the part of the seller to return the borrowed securities. See, e.g., *Deputy v. du Pont*, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). In addition, the cash received in the short sale is an asset of the partnership. Thus, the basis of the partnership's assets is increased. Therefore, [the partnership]'s short sale creates a liability under §752, and the adjusted bases of the partnership interests of *A* and *B* are increased under §722 to reflect their shares of the liability under §752.[80]

The ruling also cited Rev. Rul. 88-77 for the proposition that a "liability" includes an obligation "to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings)."[81]

Finally, in Rev. Rul. 95-45,[82] again citing *Deputy v. du Pont*, the IRS held that a corporation's assumption of a shareholder's obligation to provide replacement securities to a broker-dealer pursuant to a short sale was the assumption of a liability for purposes of Code sections 357 and 358, reasoning:

> A short sale creates an obligation on the part of the seller to return the borrowed securities. See, e.g., Deputy v. du Pont, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118, 122 (a short sale creates an obligation although not an indebtedness). The initial proceeds of an open short sale are not currently taxed to the short seller, but nonetheless are an asset of the short seller, increasing the aggregate adjusted basis of its total assets by the amount of the proceeds. Because the obligation on the part of the seller to return the borrowed securities resulted in an increase in the adjusted basis of its assets, the obligation is treated as a liability. See S. Rep. No. 1263, 95th Cong., 2d Sess. 183-185 (1978), 1978-3 C.B. 481-483 (an obligation that creates basis is treated as a liability); Rev. Rul. 95-26, 1995-14 I.R.B. 6; and Rev. Rul. 88-77, 1988-2 C.B. 128. Therefore, for purposes of §§357 and 358, the assumption by *S* of the obligation to deliver replacement securities constitutes the assumption of a liability, and the amount of the short-sale liability is the amount of basis to which the short sale gave rise.[83]

In August 2000, the IRS issued Notice 2000-44. That notice describes two transactions. The IRS describes the second transaction (the one relevant to the instant analysis) as follows:

---

[78] *Id.* at 108 (emphasis added).
[79] 1995-1 C.B. 131.
[80] *Id.* at 132.
[81] *Id.*
[82] 1995-1 C.B. 53.
[83] *Id.* at 53.

> In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities. ... On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.
>
> The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of §165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under §752, or under §1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under §165(c)(2). *See Fox v. Commissioner*, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.

IRS Notice 2000-44 identifies the transactions it describes and other "substantially similar" transactions as "listed transactions" for purposes of the transaction-disclosure and document-retention provisions of Reg. §1.6011-4T(b)(2) and the investor-list requirements of Reg. §301.6112-1T (A-4). That designation subjects persons effecting such transactions to the return-disclosure and record-keeping requirements[84] of Code section 6011 and Reg. §1.6011-4T, and the confidential corporate tax shelter registration and investor-list maintenance provisions of Code sections 6111(d) and 6112. The Notice raises the possibility that the IRS believes such transactions were subject to those requirements prior to issuance of the Notice. In addition, the Notice asserts that persons who were required to register such transactions and maintain such lists[85] but who failed to do so may be subject to penalties under Code sections 6707 and 6708.

The transaction described in the Notice presents only a slight potential for (non-tax) economic profit or loss in that, as described, it is fully hedged, being a purchase and sale of call options with the same expiration date with "slightly" different strike prices. As a result, any change in the price of the security that is the subject of the options should result in an increase in the price of one option and a substantially offsetting decrease in the price of the other option. As presented in the Notice, there is no apparent motive for the transaction relating to any security or property other than the call options purchased and sold.

---

[84] Such requirements, by their terms, apply only to taxpayers "required to file a return for a taxable year with respect to a tax imposed under section 11, 594, 801, or 831 ... ." Those sections impose tax on corporations, mutual savings banks, life insurance companies, and non-life insurance companies, respectively.

[85] Generally, the organizers, managers, and vendors of a tax shelter are responsible for such actions.

By contrast, the elements of the Financial Plan effected by Mrs. Sands and discussed in this letter presented an unhedged potential for nontax economic profit and loss, which was enhanced substantially by effecting the short sale on margin. Despite a theoretical similarity to the way in which the transfer of the brokerage account in the present transaction increases basis, the transaction addressed in the recent IRS Notice presents a significantly different nontax economic profile than that of the Financial Plan.

The position of the IRS as stated in revenue rulings, field service advice, and technical advice, has varied over the years and has utilized the following principal considerations: (1) whether there was an unconditional and legally enforceable obligation to pay a sum certain at a determinable date,[86] and (2) whether incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to an immediate deduction to the partnership or, under Code section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest.[87] A close review of the positions of the IRS on this issue is necessary, taking into account the principle that

> IRS revenue rulings are not binding precedent on this court. "Unlike treasury regulations, which are promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act, revenue rulings 'do not have the force and effect of law' and therefore are 'accorded less weight than regulations.'" *American Stores Co. v. American Stores Co. Retirement Plan*, 928 F.2d 986, 994 (10th Cir. 1991) (quoting *Flanagan v. United States*, 810 F.2d 930, 934 (10th Cir. 1987)). Revenue rulings do not have the force and effect of regulations and may not be used to alter the plain language of a statute. *C.I.R. v. Schleier* 515 U.S. 323, 336, 115 S. Ct. 2159, 2167 n. 8, 132 L.Ed.2nd 294 (1995).
>
> Revenue rulings are given considerable weight when they are issued contemporaneously with the enactment of the statute and have been in long use, and the statutory language has been reenacted without change, indicating apparent congressional satisfaction with the prevailing interpretation. *See Davis v. United States*, 495 U.S. 472, 481-85, 110 S.Ct. 2014, 2020-22, 109 L.Ed.2nd 457 (1990) (legislative reenactment doctrine as applied to revenue rulings). *See generally* Linda Galler, *Emerging Standards for Judicial Review of IRS Revenue Rulings*, 72 B.U.L. REV. 841 (1992).[88]

The IRS position in Rev. Rul. 73-301—that the progress payments at issue there were not liabilities for purposes of Code section 752 because they did not create an unconditional and

---

[86] Rev. Rul. 73-301, *supra*.
[87] Rev. Rul. 88-77, *supra*; Rev. Rul. 95-26, *supra*.
[88] *ABC Rentals of San Antonio, Inc. v. Commissioner*, 142 F.3rd 1200, 1205 (10th Cir. 1998); *see also Christenson v. Harris County*, 529 U.S. 576, 146 L.Ed.2nd 621 (2000) (interpretations set forth in agency opinion letters, policy statements, agency manuals, and enforcement guidelines all lack the force of law, do not warrant judicial deference, but are entitled to respect only to the extent of their power to persuade); *Stark v. Commissioner*, 86 T.C. 243, 250-251 (1986) (absent special circumstances, a revenue ruling merely represents the Commissioner's position with respect to a specific factual situation); *Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2nd 1142, 1146-47 (5th Cir. 1971) ("A ruling is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on the Secretary or the courts. It does not have the effect of a regulation or a Treasury Decision."), *citing with approval United States v. Bennett*, 186 F.2nd 407, 410 (5th Cir. 1951) (a ruling has "no more binding or legal force than the opinion of any other lawyer…").

legally enforceable obligation to pay a sum certain at a determinable date—is in harmony with the classic definition[89] of a debt for Federal income tax purposes, with the "all events test" cited by the Tax Court in *LaRue*, and with the Supreme Court's opinion in *Deputy v. du Pont.*

The IRS position in Rev. Rul. 88-77 that the accrued expenses of the cash basis partnership in that ruling were not liabilities within the meaning of Code section 752 was based on the following rationale:

> The present issue is similar to that arising under section 357(c) of the Code when property and liabilities are contributed to a controlled corporation in exchange for stock. For purposes of determining the basis of the stock received in the exchange under section 358 and any gain that must be recognized on the exchange under section 357(c), section 357(c)(3) provides that the term "liabilities" shall not include obligations the payment of which would give rise to a deduction or that would constitute a guaranteed payment under section 736(a). This rule is subject to an exception found in section 357(c)(3)(B) for liabilities the incurrence of which resulted in the creation of, or an increase in, the basis of any property. Section 357(c)(3) was added by the Revenue Act of 1978.
>
> The legislative history accompanying the amendment to section 704(c) made by the Tax Reform Act of 1984 explicitly rejected the conclusion reached in Revenue Ruling 60-345 in favor of an interpretation of section 752 that is consistent with section 357(c). See H.R. Rep. No. 861, 98th Cong., 2d Sess. 856-857 (1984), 1984-3 (Vol. 2) C.B. 110, 111.[90]

The report of the Conference Committee adopted in connection with the amendments to Subchapter K as part of the Deficit Reduction Act of 1984 supports the narrow holding of Rev. Rul. 88-77, as the committee stated: "The committee intends that, similar to the amendments recently made to section 357(c) (and contrary to Rev. Rul. 60-345, 1960-2 C.B. 211), these accrued but unpaid items should not be treated as partnership liabilities for purposes of section 752."[91] However, Rev. Rul. 88-77 goes on to observe that

> Under *P*'s method of accounting, *P*'s obligations to pay amounts incurred for interest and services are not deductible until paid. For purposes of section 752 of the Code, the terms "liabilities of a partnership" and "partnership liabilities" include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to an immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest. The preceding sentence uses the term "assets" to include capitalized items that are properly allocable to future periods, such as organizational expenses and construction period expenses.
>
> The liabilities incurred by *P* for interest expense and services do not create or increase the basis of a partnership asset or give rise to a deduction when incurred. Therefore, for purposes of computing

[89] *Gilbert v. Commissioner*, 248 F.2d 399, 402 (2d Cir. 1957) (a "debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof").
[90] 1988-2 C.B. at 129.
[91] 1984-2 C.B. (Vol. 2) at 110-11.

> *A*'s adjusted basis in *P*, *A* may not treat *P*'s accrued expenses and accounts payable as a liability of the partnership.[92]

The narrow conclusion of Rev. Rul. 88-77—that the accrued expenses and accounts payable of the cash-basis partnership should not be treated as partnership liabilities for purposes of Code section 752—is supported by the authorities it cites. No authority cited by the IRS supports the "definition" of a partnership liability suggested by the IRS, as quoted above. Moreover, such a definition was not necessary to the conclusion of the ruling. The weight accorded this *dictum* definition should reflect these considerations.

Rev. Rul. 95-26 reached its conclusion that a "short sale of securities described in this ruling creates a partnership liability under §752"[93] as follows:

> Rev. Rul. 88-77, 1988-2 C.B. 129, provides that partnership liabilities for purposes of §752 include an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings).
>
> A short sale creates an obligation on the part of the seller to return the borrowed securities. See, e.g., *Deputy v. du Pont*, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). In addition, the cash received in the short sale is an asset of the partnership. Thus, the basis of the partnership's assets is increased. Therefore, [the partnership's] short sale creates a liability under §752, and the adjusted bases of the partnership interests of *A* and *B* are increased under §722 to reflect their shares of the liability under §752.[94]

Although Rev. Rul. 95-26 cites *Deputy v. du Pont* and accurately summarizes its holding, it then ignores that holding. The essential rationale of Rev. Rul. 95-26 rests on the unsupported principle that an obligation is a liability if incurring the obligation creates or increases the basis of partnership assets. Both the rationale and the conclusion of Rev. Rul. 95-26 should be rejected for several reasons.

- First, as noted above, although Rev. Rul. 88-77 does ***state*** the principle for which Rev. Rul. 95-26 cites it, that principle was *dictum*: neither necessary to the conclusion reached in Rev. Rul. 88-77 nor supported by any authority cited in Rev. Rul. 88-77. Accordingly, the citation of Rev. Rul. 88-77 does not ***support*** the principle for which it is cited in Rev. Rul. 95-26.

- Second, the determination in Rev. Rul. 95-26 that the partnership's short sale creates a liability under Code section 752 because "partnership liabilities for purposes of §752 include an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings)" is inconsistent with the Supreme Court's determination in *Deputy v. du*

---

[92] 1988-2 C.B. at 129.
[93] 1995-1 C.B. at 132.
[94] *Id.*

*Pont* that the obligation of a short seller to replace the borrowed securities is not "indebtedness." Rev. Rul. 95-26 makes no attempt to reconcile its determination or rationale with either the *du Pont* decision or the determination of the IRS in Rev. Rul. 95-8 that the obligation of a short seller is not "indebtedness."

- Third, the assertion in Rev. Rul. 95-26 that the partnership's short sale creates a liability under Code section 752 is inconsistent with cases such as *Long* and *LaRue* and with Rev. Rul. 73-301 rejecting such classification for obligations that are contingent and indefinite, as is the obligation of a short seller to replace the borrowed securities.[95] In addition, the characterization of the obligation to replace Treasury Notes borrowed to effect the short sale as a "liability" is also inconsistent with the provisions of the CRTR Act, discussed above, to the extent it is applicable to partnership obligations.

- Fourth, to the extent that Rev. Rul. 95-26 implies that the obligation of a short seller to replace the borrowed securities is determinable with reasonable accuracy so as to avoid the obstacles in *Long*, *LaRue*, and Rev. Rul. 73-301, it is also inconsistent with the general statutory pattern in Code section 1233 of deferring the taxation of short sales until their closing, as expressly admitted in Rev. Rul. 95-45.[96]

- Finally, Rev. Rul. 95-26 appears fundamentally to misconceive or misconstrue the nature of a short sale, deeming it incorrectly to be a single operation in which taxpayer A who does not own security X obtains cash from a broker in exchange for a promise to provide security X to that broker in the future. Rather, as the U.S. Supreme Court has recognized, the opening of the short encompasses two transactions. In the first, A borrows in kind security X from the broker and incurs an obligation to return identical securities to the broker. A then sells security X on the open market for cash. Thus, contrary to the implication of Rev. Rul. 95-26, the borrowing of the security creates only an obligation to replace the borrowed security. There are no loan proceeds. It is the sale of the borrowed security that gives rise to the partnership's receipt of cash, but the tax consequences of that sale are deferred by Code section 1233 until the delivery of securities to replace those borrowed and sold.[97]

---

[95] The facts recited in Rev. Rul. 95-26 do not indicate that the short seller in that ruling was protected against loss on the transaction in any way.

[96] *But see* Field Service Advice 199913016 (setting forth the IRS litigation position that the deferral of taxation of short sales under Code section 1233 "does not apply to the determination of when the obligation is able to be included in the basis of partnership assets" and that "the only provisions which govern the determination of when the value of an obligation is included in the basis of the partnership assets are the partnership rules under Subchapter K, specifically, I.R.C. §§752 , 732 and 722.").

[97] A. Cunningham, *Short-Sale Obligations and Basis in Partnership Interests*, 72 TAX NOTES 1663, 1669-1670 (September 23, 1996). In *Provost v. United States*, 269 U.S. 443, 453 (1926), the Court recited the following as the "four separate steps" of a completed short sale transaction: "(1) the sale of the stock by the person effecting the short sale, followed by the transfer and delivery of the certificates for the borrowed stock to the purchaser's broker; (2) the transfer of the shares from the lender to the borrower, who uses them for delivery on the customer's short sale; (3)

The preceding critique of Rev. Rul. 95-26 is particularly relevant to the weighing of authorities required in arriving at legal opinions in general and, in particular, in determining whether "substantial authority" exists for a legal proposition. Even though Rev. Rul. 95-26 is relatively recent and deals directly with the classification under Code section 752 of the borrowing of a security for a short sale, it is best viewed as a conclusory statement of IRS position, unsupported by the authorities it purports to cite, rather than a reasoned analysis supported by existing precedent. Accordingly, the other authorities reviewed above should be accorded more weight than Rev. Rul. 95-26.

*Synthesis and conclusion*

Taken together, the statutes, regulations, cases, and IRS pronouncements establish that:

- Neither the Code nor the regulations defines the term "liability" for purposes of Code section 752. Although sections of the Code other than section 752 use the term "liability," no such section defines the term generally. When conflicting interpretations of the term in Code section 357 gave rise to administrative concerns, Congress amended Code section 357 to resolve them. Congress did not authorize the IRS to define "liability" on a case-by-case basis.[98]

- The CRTR Act (1) provided that for purposes of Code section 358(h), the term "liability" includes "any ... contingent obligation to make payment," (2) excluded any such contingent obligation if it is assumed in connection with a transfer of substantially all of the assets with which the obligation is associated, and (3) directed the IRS to issue regulations to prevent the acceleration or duplication of losses through the assumption of liabilities described in section 358(h)(3) of such Code in transactions involving partnerships. For the reasons discussed above, to the extent that the CRTR Act applies and the IRS does not issue valid regulations to the contrary, the obligation to replace Treasury Notes borrowed to effect the short sale is not a "liability," and the basis reduction rule of Code section 358(h) should not be applicable to the Financial Plan transactions described in this letter as a result of the substantially all of the assets transfer exception.

- Since the Supreme Court's 1940 decision in *Deputy v. du Pont*, there has been no question that the obligation of a short seller to return the borrowed shares is not

the purchase by the borrowing broker of the stock required to repay the loan; and (4) the transfer and delivery by the borrower to the lender of the certificates for the purchased shares to replace the shares borrowed."

[98] *See* W. McKee, W. Nelson & R. Whitmire, FEDERAL INCOME TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[1] (1997) (the omission of the definition of the term "liability" from the final regulations under Code section 752 was unfortunate, as it "leaves both the Service and taxpayers in a position to argue in close cases either that policy considerations should bend the dictionary definition of the term 'liabilities' or, in the alternative, that the term used in the statute should be accorded its plain meaning.")

"indebtedness" as that term is used in the interest expense deduction provisions of the Code.

- Although the Tax Court issued the *Salina* opinion relatively recently, it never became a final decision as *Salina* and several related cases were settled prior to the case becoming ripe for appeal. We believe that the Court's conclusion on that issue is incorrect, is inconsistent with prior precedent, would be reversed on appeal, and would not be followed if the issue were presented to a different court. As a result, we believe that the Salina opinion should be given less weight than cases not settled by the parties and in which the parties have had the motivation and the opportunity to obtain review by a court of appeals of the Tax Court's reasoning or conclusions.

- None of the 1995 revenue rulings has yet been the subject of a final judicial decision, and two of such rulings[99] conflict both with the third ruling[100] and with *Deputy v. du Pont*, the Supreme Court decision each ruling cites.

- Cases such as *Long* and *LaRue*[101] have deemed obligations that are "contingent and indefinite" not to be "liabilities" as that term is used in Code section 752. Accordingly, it is clear that not every obligation is a "liability," just as the Supreme Court determined that not every obligation is indebtedness.

Weighing the relevant authorities, there is substantial authority for the position that the obligation of a short seller to return borrowed securities is not a liability under Code section 752, and it is more likely than not that the obligation of a short seller to return borrowed securities is not a liability under Code section 752, even after the issuance of the Tax Court opinion in *Salina*.

***Investment partnership status of BLC***

BLC is a limited liability company. Under the so-called "check-the-box" rules found in Reg. § 301.7701-3(b)(1)(i), BLC was treated initially[102] as a partnership for federal income tax purposes in that it had two members and did not elect to be treated as an association taxable as a corporation under Reg. § 301.7701-2(b)(2).

Under Code section 731, the in-kind distribution of property (other than money) by partnerships to partners generally is not an event requiring the recognition of income by the

---

[99] Rev. Rul. 95-26, *supra*; and Rev. Rul. 95-45, *supra*.
[100] Rev. Rul. 95-8, *supra*.
[101] A short seller's obligation to return borrowed securities closely resembles the "back office" obligation to replace missing securities discussed in *LaRue*. In each case, the amount of the obligation cannot be determined with reasonable accuracy until the acquisition of the securities to be used to replace the borrowed or missing instruments.
[102] See the discussion below entitled "Tax termination of BLC; tax basis of assets deemed distributed in liquidation" regarding the deemed termination that occurred for federal income tax purposes when BLC became a single-member limited liability company.

distributee partner. Code section 731(c) modifies this general rule, providing that the term "money" includes marketable securities, and that such securities are to be taken into account at their fair market value at the date of the distribution. When this modification applies, a partner who receives a distribution of marketable securities is taxed as though he had received cash, generally recognizing gain in an amount equal to the excess of the cash and the fair market value of the marketable securities distributed over such partner's adjusted tax basis in his partnership interest immediately prior to the distribution.

The recharacterization of marketable securities as money under Code section 731(c) is subject to a number of exceptions, two of which are particularly important in the present analysis. First, Code section 731(c)(3)(A)(i) and related regulations provide that the general rule does not apply to the distribution to a partner of a security contributed to the partnership by such partner.

Second, Code section 731(c)(3)(A)(iii) and related regulations provide that the general rule does not apply to a distribution of marketable securities by an "investment partnership" to an "eligible partner" of such a partnership. The Code defines an investment partnership as

> any partnership which has never been engaged in a trade or business and substantially all of the assets (by value) of which have always consisted of (i) money, (ii) stock in a corporation, (iii) notes, bonds, debentures, or other evidences of indebtedness, (iv) interest rate, currency, or equity notional principal contracts, (v) foreign currencies, (vi) interests in or derivative financial instruments (including options, forward or futures contracts, short positions, and similar financial instruments) in any asset described in any other subclause of this clause or in any commodity traded on or subject to the rules of a board of trade or commodity exchange, (vii) other assets specified in regulations prescribed by the Secretary, or (viii) any combination of the foregoing.[103]

The statute also makes it clear that a partnership is not treated as being engaged in a trade or business by reason of activities done as an investor, trader, or dealer in any of the assets listed above. The statute defines its other key term—eligible partner—as any partner who did not contribute to the partnership any property other than assets of the types listed above before the date of the distribution in question.[104]

Applying these standards to BLC, all, or substantially all, of the assets of the partnership will be those assets listed above permitted to be held by an investment partnership. In addition, the activities of BLC are limited to those activities listed above permitted to be effected by an investment partnership. The only contributions BLC received consisted solely of assets listed

---

[103] Code section 731(c)(3)(C)(i).

[104] Code section 731(c)(3)(C) (the statute provides further that "the transferor or transferee in a nonrecognition transaction involving a transfer of any portion of an interest in a partnership with respect to which the transferor was not an eligible partner" is not an "eligible partner").

above permitted to be held by an investment partnership. Accordingly, BLC will be classified as an investment partnership and each partner will be an eligible partner of an investment partnership, as those terms are used in Code section 731(c). As a result, Code section 731(c) will not cause the recognition[105] of gain upon the (constructive) distribution of its marketable securities upon its liquidation, as discussed below. Code section 731(c)(3)(A)(i) also applies in that the assets deemed to be distributed to ALP upon the liquidation were those it contributed to BLC.

***Tax termination of BLC; tax basis of assets deemed distributed in liquidation***

Following the purchase by ALP of the membership interest of Robinson in BLC, BLC terminated pursuant to Code section 708(b)(1)(A), which provides that termination occurs when "no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership." In general, regulations provide that a Code section 708(b)(1)(A) termination is deemed to occur when "the winding up of the partnership affairs is completed."[106] BLC continued to exist as a matter of state law, and neither effected nor intends to effect a winding up of that entity or its affairs. Rather, it will continue to exist but to be characterized thereafter as a disregarded entity pursuant to Reg. §301.7701-3(b)(1)(ii). Accordingly, BLC will terminate for tax purposes when the winding up of its affairs as a multiple-member organization is completed.

Neither Code section 708(b)(1)(A) nor the related regulations provides a clear explanation of what occurs or is deemed to occur upon the termination of a partnership pursuant to that section.[107] Nonetheless, both common sense and commentary[108] indicate that upon the termination of BLC, or any other two-person partnership, pursuant to Code section 708(b)(1)(A), the remaining person (the person who purchased the interest of his former partner) is deemed to receive a distribution of all of the remaining assets in liquidation of his interest in the terminated partnership.

In determining the Federal income tax treatment of ALP, Rev. Rul. 99-6[109] prescribes that BLC is deemed to make a liquidating distribution of all of its assets to ALP and Robinson, and following this distribution, ALP is treated as purchasing the assets deemed to have been distributed to Robinson in liquidation of Robinson's interest in BLC. ALP's basis in the assets attributable to Robinson's former interest in BLC is the purchase price paid by ALP to Robinson.

---

[105] Similarly, Code section 737 does not cause the taxation of the "net precontribution gain" in the marketable securities constructively distributed in liquidation because such assets were constructively distributed to the partner who contributed such assets to the partnership. Code section 737(d)(1).
[106] Reg. §1.708-1(b)(3)(i).
[107] By comparison, Reg. §1.708-1(b)(1)(iv) provides that upon a termination under Code section 708(b)(1)(B), a specific series of events is deemed to occur.
[108] *See* W. McKee, W. Nelson & R. Whitmire, FEDERAL INCOME TAXATION OF PARTNERSHIPS AND PARTNERS ¶12.05[3] (3rd Ed. 1997).
[109] 1999-1 CB 432.

ALP's holding period for these assets begins on the day immediately following the date of the sale.

Upon the termination of BLC, ALP is considered to receive a distribution of those assets attributable to ALP's former interest in BLC. ALP must recognize gain or loss, if any, on the deemed distribution of the assets to the extent required by section 731(a). Specifically, ALP will recognize gain (if any), in an amount equal to the excess of the money actually or constructively distributed to such partner over the adjusted tax basis of such partner's interest in the partnership.[110] ALP will not recognize a loss on the transaction unless the only property distributed consists of money, unrealized receivables (as defined in Code section 751(c), and inventory items (as defined in Code section 751(d).[111] ALP's basis in the assets received in the deemed liquidation of its interest in BLC is determined under Code section 732(b), specifically ALP's basis in its partnership interest, less any money actually or constructively distributed to such partner.[112]. Correlatively, pursuant to Code section 735(b), ALP will take a holding period in the property received that includes the holding period of the terminating partnership in those assets, as determined under section 1223.

***Substance over form, step transaction, and related judicial doctrines***

It has been recognized at least since the 1934 decision in *Helvering v. Gregory*[113] that

> Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.[114]

Nevertheless, there are limits to such arrangements. For almost as long as there has been a Federal income tax, there has been a tension in the administration of the law between the determination of tax liability based upon the form of transactions effected by taxpayers, on one hand, and efforts by the IRS and occasionally by taxpayers, on the other hand, to override form so as to tax the substance of what—if anything—a taxpayer has done. In effecting the latter sort of analysis, the IRS and the courts have crafted several different but related doctrines. Briefly stated, those doctrines are:

- The so-called "substance over form," "sham transaction," "economic substance," and "economic reality" doctrines, under which a transaction will be given effect for Federal income tax purposes only if it has non-tax[115] economic substance.[116]

---

[110] Code section 731(a)(1).
[111] Code section 731(a)(2).
[112] Code section 732(b). This aggregate basis is allocated among the assets in accordance with rules prescribed in Code section 732(c).
[113] 69 F.2d 809 (2d Cir. 1934), *aff'd* 293 U.S. 465 (1935).
[114] *Id.* at 810.

- The so-called "step transaction doctrine," under which transactions that are separate in form will be integrated and taxed as a single transaction if (a) they are "component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result,"[117] (b) the steps were "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series,"[118] or (c) following the first step, there was a binding commitment to take the later steps.[119] As a result of the development of these alternative criteria examining different factors with potentially-conflicting results, there is some uncertainty as to which test a court may apply when the step transaction doctrine is invoked.[120]

*Substance*

Many courts cite the Supreme Court decision in *Frank Lyon Co. v. United States*[121] as the seminal authority on the attributes of a transaction that will be recognized for Federal income tax purposes:

> [W]here ... there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes.[122]

Many courts have applied this standard since the Supreme Court issued the decision in 1978. One such effort—the Fourth Circuit's 1985 decision in *Rice's Toyota World, Inc. v. Commissioner*[123]—influenced subsequent decisions substantially. The Fourth Circuit noted:

> The tax court read *Frank Lyon Co. v. United States*, 435 U. S. 561, 98 S.Ct. 1291, 55 L.Ed.2nd 550 (1978), to mandate a two-pronged inquiry to determine whether a transaction is, for tax purposes,

---

115 *Gregory v. Helvering*, 293 U.S. 465, 469 (1935) (refusing to recognize a transaction as a reorganization after examining "what actually occurred" and finding "[s]imply an operation having no business or corporate purpose – a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character....")
116 *Knetch v. United States*, 364 U.S. 361, 366 (1960) (quoting *Gilbert v. Commissioner, supra*, 411) (holding a transaction to have been a sham because it "did 'not appreciably affect his beneficial interest except to reduce his tax' ... for it is patent that there was nothing of substance to be realized by Knetch from this transaction beyond a tax deduction.")
117 *King Enterprises, Inc. v. United States*, 418 F.2d 511, 516 (Ct. Cl. 1969) (quotations and footnote omitted).
118 *American Bantam Car Co. v. Commissioner*, 11 T.C. 397, 405 (1948), *aff'd per curiam*, 177 F.2d 513 (3rd Cir 1949), *cert. denied*, 339 U.S. 920 (1950).
119 *Commissioner v. Gordon*, 391 U.S. 83 (1968).
120 *E.g., McDonald's Restaurants of Illinois, Inc. v. Commissioner*, 688 F.2nd 520 (7th Cir. 1982).
121 435 U.S. 561 (1978) ("*Frank Lyon*").
122 *Id.* at 583-584.
123 752 F.2nd 89 (4th Cir. 1985) ("*Rice's*").

SANDS 10450

> a sham. To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists. *Rice's Toyota*, 81 T. C. at 209; *see also Hilton v. Commissioner* 74 T. C. 305, 349-50 (1980), *aff'd per curiam* 671 F.2nd 316 (9th Cir. 1982). We agree that such a test properly gives effect to the mandate of the Court in *Frank Lyon* that a transaction cannot be treated as a sham unless the transaction is shaped solely by tax avoidance considerations. *See* 435 U.S. at 583-84, 98 S.Ct. at 1303-04.[124]

The Fourth Circuit's analysis thus required ***both*** the absence of any business purpose other than obtaining tax benefits ***and*** the absence of any reasonable possibility of profit for a transaction to be treated as a sham and disregarded for Federal income tax purposes. That principle implied that the presence of ***either*** element would require that the transaction be respected. The court summarized the elements of the test as follows: "The business purpose inquiry simply concerns the motives of the taxpayer in entering the transaction. ... [T]he economic substance inquiry ... requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits."[125] After reviewing the record, the court affirmed the Tax Court's determination on this issue, making the following comment on business purpose:

> Rice's failure seriously to evaluate the likely residual value of the computer, its willingness to pay an inflated purchase price, and its use of nonrecourse debt that would facilitate abandonment of the transaction provide ample support for the tax court's finding that Rice did not have profit motivation apart from tax benefits.[126]

Since the decision in *Rice's*, most of the courts of appeals have had occasion to consider comparable issues.[127] The standards applied by the various circuits differ from one another and continue to evolve.[128]

---

[124] *Id.* at 91-92.
[125] *Id.* at 92, 94.
[126] *Id.* at 94.
[127] *Dewees v. Commissioner*, 870 F.2d 21 (1st Cir. 1989) (holding that "transactions so clearly lack any significant possibility of profit (tax advantages aside) that the taxpayer cannot deduct the loss"); *Gardner v. Commissioner*, 954 F.2d 836, 839 (2d Cir. 1992) ("it is well established that a subjective profit motive can not save a transaction that objectively lacks economic substance...") (*citing Knetsch v. United States*, 364 U.S. 361, 365 (1960); *Lerman v. Commissioner*, 939 F.2d 44, 55 (3d Cir. 1991), *cert. denied*, 112 S. Ct. 590 (1991); and *Forseth v. Commissioner*, 845 F.2d 746, 748 (7th Cir. 1988)); *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989) ("The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses."); *Yosha v. Commissioner*, 861 F.2d 494 (7th Cir. 1988) ("A transaction has economic substance when it is the kind of transaction that some people enter into without a tax motive, even though the people fighting to defend the tax advantages of the transaction might not or would not have undertaken it but for the prospect of such advantages—may indeed have had no other interest in the transaction."); *IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) ("we do not decide whether the *Rice's Toyota World* test requires a two-part analysis because we conclude that the ADR trades here had both economic substance and business purpose. ... A taxpayer's subjective intent to avoid taxes thus will not by itself determine whether there was a business purpose to a transaction."); *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988) ("business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses"); *Keeler*

Characteristic of the current analysis of this issue in several judicial circuits is the Third Circuit's opinion in *ACM Partnership v. Commissioner.*[129] In that case, the Third Circuit summarized the required inquiry as follows:

> In applying these principles, we must view the transactions "as a whole, and each step, from the commencement . . . to the consummation . . . is relevant." The inquiry into whether the taxpayer's transactions had sufficient economic substance to be respected for tax purposes turns on both the "objective economic substance of the transactions" and the "subjective business motivation" behind them. However, these distinct aspects of the economic sham inquiry do not constitute discrete prongs of a "rigid two-step analysis," but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes.[130]

In applying the "objective economic substance" review, the court considered "whether the transaction has any practical economic effects other than the creation of income tax losses."[131] In evaluating the "subjective business motivation" for the transaction, the court affirmed the Tax Court's reliance "on evidence that the transactions were not intended to serve any 'useful non-tax purpose' and were not reasonably expected to generate a pre-tax profit."[132]

The transaction involved in the *ACM Partnership* case related to the Colgate-Palmolive Company ("Colgate"). Colgate had reported over $100 million in long-term capital gain in 1988 as a result of selling a wholly-owned subsidiary. It had considered and rejected several proposals to reduce the liability related to that gain. In May 1989, a Merrill Lynch representative presented a proposal to Colgate for an investment partnership that would generate capital losses that Colgate could use to offset some of its 1988 capital gains. Colgate consulted a law firm with respect to the proposal. The law firm summarized the transaction as follows:

> A (a foreign entity), B, and C form the ABC Partnership (ABC) on June 30, 1989 with respective cash contributions of $75, $24 and $1. Immediately thereafter, ABC invests $100 in short-term securities which it sells on December 30, 1989, to an unrelated party. The fair market value and

---

*v. Commissioner*, 243 F.3rd 1212 (10th Cir. 2001) (affirming Tax Court disallowance of losses on transactions that had no practical economic effects other than the creation of income tax losses); *Winn-Dixie Stores, Inc. v. Commissioner*, 254 F.3d 1313 (11th Cir. 2001) (disallowed deductions based on Tax Court finding that an insurance program "could never generate a pretax profit," commenting that the economic substance "doctrine has few bright lines, but it is clear that transactions whose sole function is to produce tax deductions are substantive shams"); *Drobny v. United States*, 86 F.3d 1174, 77 AFTR 2nd 96-1667 (Fed. Cir. 1996) (in opinion not officially published and not citable as precedent under court rules, court stated the *Rice's* criteria and affirmed sham transaction treatment based on finding that "the transaction had no practical economic effects because no reasonable possibility of a profit existed").

128 See, in this connection, the discussion, *infra*, of recent decisions of the Fifth Circuit in *Compaq Computer Corp. v. Commissioner* and the Eighth Circuit in *IES Industries, Inc. v. United States.*

129 157 F.3rd 231 (3rd Cir. 1998), *aff'g, rev'g in part, and remanding* T.C. Memo. 1997-115, *cert. denied*, 526 U.S. 1017 (1999).

130 *Id.* at 247 (citations omitted).

131 *Id.* at 248 (quotations omitted).

132 *Id.* at 253.

> face amount of the short-term securities at the time of the sale is still $100. In consideration for the sale, ABC receives $70 cash and an installment note that provides for six semiannual payments ..... Each payment equals the sum of a notional principal amount multiplied by the London Interbank Offering Rate (LIBOR) at the start of the semiannual period. ABC uses the $70 cash and the first payment on the installment note to liquidate A's interest in ABC and uses the subsequent interest payments to purchase long-term securities.[133]

The Third Circuit summarized the law firm's advice on the transaction as follows:

> The law firm advised that the sale of the short-term securities would be reported as a contingent installment sale under the installment method which governs "dispositions[s] of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs," I.R.C. §453, and the ratable basis recovery rule .... Temp. Treas. Reg. §15a.453-1(c)(3)(i). Thus, the law firm advised, ABC would recover $25 of its basis in each of the 4 taxable years from 1989 through 1992, and ABC would recognize gain to the extent that the payments received in any year exceeded the $25 or loss to the extent that the payments fell below the $25, but only if the loss were carried over to a year with sufficient reported gains against which to offset that loss.[134]

A representative of the foreign partner testified that the transaction:

> would create a capital gain and in a later stage a capital loss, and that ... depending on the percentage of your participation, you would either take part in the gain or the loss. So by having us being the majority partner at the start, we would take the majority of the gain, while in a later stage one of the other partners would take the loss.[135]

From a business perspective, Colgate considered using the proposed partnership to invest in its own debt in order to reduce its vulnerability to a decline in interest rates and to offset a decline in the value of that debt that had followed rumors of Colgate's being a likely target for a hostile takeover or leveraged buyout.[136] In doing so, however, the plan contemplated that the partnership's assets would be "fully hedged" against changes in value due to interest rate fluctuations.[137]

Reviewing the Tax Court's objective economic consequences of the transaction, the Third Circuit observed:

> ACM sold the Citicorp notes "for consideration equal to [their] purchase price" and thus did not realize any gain or loss in the notes' principal value. Moreover, as the court observed, the lack of change in principal value was not merely coincidental, but was inherent in the terms of the notes and of the transactions in which they were traded. Likewise, the court found that the interest income generated by the notes could not have a material effect on ACM's financial position because the Citicorp notes paid interest at a rate that varied only nominally from the rate that

---

[133] *Id.* at 234 (footnote omitted).
[134] *Id.* (citations and footnote omitted).
[135] *Id.* at 237 (quotations omitted).
[136] *Id.*
[137] *Id.*

SANDS 10453

> ACM's cash contributions "were already earning . . . in . . . deposit accounts before the notes were acquired," resulting in only a $3,500 difference in yield over the 24-day holding period, a difference which was obliterated by the transaction costs associated with marketing private placement notes to third parties.
>
> These findings, which are amply supported by the record, demonstrate a lack of objective economic consequences arising from ACM's offsetting acquisition and virtually immediate disposition of the Citicorp notes. On November 3, 1989, ACM invested $175 million of its cash in private placement Citicorp notes paying just three basis points more than the cash was earning on deposit, then sold the same notes 24 days later for consideration equal to their purchase price, in a transaction whose terms had been finalized by November 10, 1989, one week after ACM acquired the notes. These transactions, which generated the disputed capital losses by triggering the application of the ratable basis recovery rule, offset one another with no net effect on ACM's financial position. Examining the sequence of ACM's transactions as a whole as we must in assessing their economic substance, we find that these transactions had only nominal, incidental effects on ACM's net economic position.[138]

Moving to the subjective business motivation for the transaction, the Third Circuit:

- Rejected ACM's argument that the Tax Court erred in reviewing the subjective business purposes and profit motives for the transaction, the Court finding that even if the pertinent statute has no express business-purpose requirement, the economic-substance cases supported the Tax Court's review to determine whether the transaction was "'entered into without expectation of economic profit and [with] no purpose beyond creating tax deductions;'"[139]

- Analyzed ACM's interim investment in Citicorp notes, finding no error in the Tax Court's finding that such investment "was motivated by the pursuit of the tax advantages of a contingent installment sale rather than by a need for an interim investment pending its acquisition of Colgate debt;"[140]

- Analyzed and rejected ACM's contemporaneously-documented, non-tax reasons for acquiring the notes accounted for on a contingent installment sale basis, concluding that those reasons "cannot withstand scrutiny in light of the stated purposes behind the partnership itself, because the investment in the Citicorp notes impeded rather than advanced ACM's professed goal of making its cash available to acquire Colgate debt issues, just as the investment in the LIBOR notes impeded rather than advanced the professed goal of acquiring partnership assets that would hedge against Colgate's exposure to declining interest rates outside the partnership;"[141]

[138] *Id.* at 249 (citations and footnotes omitted).
[139] *Id.* at 253 (quoting *Wexler v. Commissioner*, 31 F.3rd 117, 123-24 (3rd Cir. 1994)).
[140] *Id.* at 255.
[141] *Id.* at 256.

- Observed that (1) the documents outlining the proposed transactions explained the contemplated tax consequences in detail, but did not detail the expected rate of return on the instruments themselves, (2) Colgate did not attempt to determine whether the transactions would be profitable taking into account transaction costs approximating $3 million, and (3) the plan required ACM to hold the "LIBOR notes" for two years in which time their value was likely to decline if interest rates declined as Colgate predicted and as actually occurred;

- Concluded that "neither ACM nor any of its partners reasonably anticipated any profits resulting from the relevant transactions, which entailed an economically inconsequential investment in Citicorp notes and a decidedly unprofitable investment in LIBOR notes whose value would be expected to decline under contemporaneously predicted market conditions."[142]

In the final analysis, although it denied the contingent installment sale treatment sought by Colgate, the Third Circuit's decision determined that "ACM's possession of the LIBOR notes, although not intended to serve non-tax purposes, had significant non-tax economic effects, consisting of several million dollars in actual economic losses."[143] It reversed the decision of the Tax Court denying the actual losses suffered on the disposition of those notes.[144]

In *ASA Investerings Partnership v. Commissioner,*[145] the District of Columbia Circuit affirmed a Tax Court decision denying the tax benefits of another contingent installment sale note transaction designed by Merrill Lynch. In *ASA*, both the Tax Court and the Court of Appeals took a different approach than the courts took in *ACM*, neither reaching the economic substance issue. Each court concluded that the facts and circumstances—principally the partnership agreement and the conduct of Merrill Lynch and the "partners" in planning, considering, and implementing the transaction—demonstrated that there was no partnership recognizable for Federal income tax purposes. Responding to ASA's argument that the controlling Supreme Court authority[146] required recognition of the partnership if (1) its purpose is the equivalent of business activity, or (2) it conducts business activities, the Court of Appeals stated:

> We agree if engaging in business activity were sufficient to validate a partnership ASA would qualify. It was infused with a substantial amount in capital ($1.1 billion), and invested it in PPNs, LIBOR notes, and other short-term notes over a period of two years. In fact, however, courts have understood the "business activity" reference in *Moline* to exclude activity whose sole purpose is tax avoidance. ... Thus, what the petitioner alleges to be a two-pronged inquiry is in fact a unitary

---

[142] *Id.* at 258.
[143] Id. at 262.
[144] *Id.* at 261-263.
[145] 201 F.3rd 505 (D.C. Cir. 2000) ("*ASA*"), *aff'g* T.C. Memo. 1998-305, *cert. denied* 148 L.Ed. 2nd 117 (October 2, 2000).
[146] *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943) ("*Moline*").

test—whether the 'sham' be in the entity or the transaction—under which the absence of a nontax business purpose is fatal.[147]

In its decision not to respect the partnership, and to characterize the relationship as being that of debtor and creditor, the Tax Court noted the following considerations:

- divergent business goals of the "partners,"
- conduct of the parties as to income allocations, guaranteed return, and loss allocations did not conform to the partnership agreement, but to a preliminary business agreement of the parties (the "Bermuda Agreement"),
- the only ASA asset with a significant potential to fluctuate in value was "perfectly" hedged,
- although ABN, the second "partner," bore the risk of loss attributable to the potential bankruptcy of the issuers of its debt instruments, that risk was de minimis due to the creditworthiness of those issuers,[148]
- Allied Signal was obligated to and did in fact pay all expenses of ASA (a fact in conformity with the Bermuda Agreement but in conflict with the partnership agreement),
- despite ABN's voting rights under the partnership agreement, Allied Signal made all of the critical decisions required to be made by the partnership,
- Allied Signal's conduct toward ABN and, more generally, toward the selection of its foreign "partner," more closely resembled the conduct of a borrower toward a potential lender, and
- ABN's consideration of the transaction was handled in the same manner as any large corporate loan.[149]

Upon its review of the Tax Court decision, the Court of Appeals affirmed, finding no clear error in these findings of fact.

The United States District Court for the District of Columbia recently issued its decision in a third case, *Boca Investerings Partnership v. United States,*[150] dealing with the proposed rejection of tax consequences claimed in connection with a contingent installment sale note transaction (similar to those discussed in *ACM* and *ASA* above) designed by Merrill Lynch, the client in this case being American Home Products Corporation ("AHP"). Unlike *ACM* and *ASA*, the court in *Boca* concluded that Boca had established by a preponderance of the evidence that the IRS had erred and, as a result, entered judgment for Boca. The court's key conclusions, based primarily on factual findings, were that the IRS erred in determining that:

---

[147] *Id.* at 512 (footnote omitted).
[148] But see footnote 156 and accompanying text regarding recent decisions of the Fifth Circuit and Eighth Circuit characterizing risk minimization as an exercise of good business judgment that should not contribute to the designation of a transaction as a sham.
[149] *ASA Investerings Partnership v. Commissioner*, T.C. Memo. 1998-305.
[150] 167 F.Supp.2d 298 (D.D.C. 2001) ("*Boca*").

- Boca (the partnership organized by AHP and unrelated foreign investors) should not be recognized as a partnership for federal income tax purposes on the theory that the parties did not intend to form a partnership and did not form a partnership for purposes of federal income tax,
- the transactions financing the purchase and sale of the private placement notes (the instruments purchased and then sold on an installment basis) should not be recognized for federal income tax purposes on the theory that the transactions lacked economic substance, were prearranged and predetermined, and had no legitimate business purpose,
- Syringa and Addiscombe (the foreign investors) were not partners in Boca on the theory that Syringa and Addiscombe made loans rather than capital contributions to the partnership,
- the transactions undertaken by Boca with respect to the purchase and sale of private placement notes should be collapsed so that no gain or loss is recognized for federal income tax purposes on the theory that, under the step transaction doctrine, transitory steps occurring as part of a plan may be disregarded if they add nothing of substance to the completed transaction,
- Boca's sales of the private placement notes should be disqualified from installment sale reporting under Code section 453 on the theory that the steps necessary to create a market for the LIBOR notes were taken at the time the notes were issued, and
- the allocation of the installment tax gain lacked substantial economic effect under Code section 704(b) and should be reallocated to American Home Products.

It is fair to view *Boca* as a case demonstrating that even where several taxpayers engage in transactions sharing common elements, the tax consequences of those transactions may vary. AHP won the *Boca* case—despite the losses of other taxpayers in similar cases—in part because of evidence regarding how and why it engaged in the transactions at issue. It remains to be seen whether *Boca* will be appealed to the District of Columbia Circuit—the Circuit that affirmed the pro-government decision in *ASA*—and, if so, how that court will deal with the District Court's fact-intensive decision. The *Boca* decision is one of several setbacks[151] the IRS has suffered recently in its tax shelter litigation efforts. Several commentators[152] have suggested that these losses could prompt a reexamination of the IRS tax shelter litigation strategy.

In cases recently decided by the Fifth Circuit[153] and the Eighth Circuit[154] involving different corporate taxpayers that effected similar transactions, those courts rejected government

[151] *See Compaq Computer Corp. v. Commissioner*, 277 F.3rd 778 (5th Cir. 2001) ("*Compaq*"); *United Parcel Service of America v. Commissioner*, 254 F.3rd 1014 (11th Cir. 2001) ("*UPS*"); *IES Industries, Inc. v. United States*, 253 F.3rd 350 (8th Cir. 2001) ("*IES*").
[152] *Government's Loss in Boca Partnership Case Seen Suggesting Need to Rethink Litigation*, Daily Tax Report (October 11, 2001).
[153] *Compaq, supra.*
[154] *IES, supra.*

arguments characterizing those transactions as shams lacking economic substance. In each case, the taxpayer bought American Depositary Receipts ("ADRs") with respect to the stock of a foreign corporation. The taxpayer purchased those ADRs so that the settlement date would fall on or before the record date for an anticipated dividend by the foreign corporation. The taxpayer then sold those ADRs so that the settlement date of the sale would fall after the record date for the anticipated dividend. In doing so, the taxpayer bought the ADRs cum dividend, sold them ex dividend, and retained the dividend right. In each case, the taxpayer received the dividend less the applicable foreign withholding tax. Each taxpayer reported the full amount of the dividend, a capital loss on the sale of the ADRs, and a foreign tax credit in the amount of the foreign tax withheld from the dividend payment. The IRS asserted that the transactions were shams, and the Tax Court (in *Compaq*) and the United States District Court for the Northern District of Iowa (in *IES*) both agreed.

The Courts of Appeals disagreed. Each court first concluded that the taxpayer had realized dividend income in the gross amount paid by the foreign corporation, without reduction by the foreign tax withholding. So viewed, the transactions resulted in a pre-tax profit to the taxpayers.

In each case, the court considered the subjective intent of the taxpayer. In this connection, the Eighth Circuit and the Fifth Circuit agreed that "a taxpayer's subjective intent to avoid taxes thus will not by itself determine whether there was a business purpose to a transaction."[155]

The IRS also argued that the transactions were shams because, it said, there was no risk of loss. The courts disagreed, the Eighth Circuit commenting that

> The risk may have been minimal, but that was in part because IES did its homework before engaging in the transactions. ... As the entity legally entitled to receive the ADR dividends, being the legal owner on the record date, IES likewise bore the risk that the dividend would not be paid. In consideration of that risk and after doing its own investigation, IES rejected some of the ADR trades that Twenty-First proposed. ... IES did make some of the trades when the U.S. markets were closed, in order to avoid the risk of fluctuations in market price of the ADRs between the purchase and sale and to prevent a third party from attempting to break up the trades, again demonstrating the exercise of good business judgment. ***We are not prepared to say that a transaction should be tagged a sham for tax purposes merely because it does not involve excessive risk. IES's disinclination to accept any more risk than necessary in these circumstances strikes us as an exercise of good business judgment consistent with a subjective intent to treat the ADR trades as money-making transactions.***[156]

In another "economic substance" case decided adversely to the IRS, the Eleventh Circuit reversed a decision of the Tax Court in *UPS*, a case in which the IRS had challenged on economic substance grounds the tax consequences of a reorganization of UPS' "excess value insurance" operation. The Eleventh Circuit stated its operating principles as follows:

[155] *IES, supra*, at 355; *Compaq, supra*, at 783-784.
[156] *IES, supra*, at 355 (emphasis added).

> This economic-substance doctrine, also called the sham-transaction doctrine, provides that a transaction ceases to merit tax respect when it has no "economic effects other than the creation of tax benefits." Even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance. ... The kind of "economic effects" required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party. ... A "business purpose" does not mean a reason for a transaction that is free of tax considerations. Rather, a transaction has a "business purpose," when we are talking about a going concern like UPS, as long as it figures in a bona fide, profit-seeking business.[157]

Applying these principles, the court found that the UPS reorganization created genuine obligations enforceable by an unrelated party, a "real economic effect" obviating its classification as a per se sham. The court went on to find that the reorganization "simply altered the form of an existing, bona fide business," supporting the inference that it also had an adequate business purpose, requiring it to be respected for federal income tax purposes.[158]

*Synthesis and conclusion*

Weighing the relevant authorities, and taking into account the pertinent facts and circumstances, there is substantial authority for the position that the judicial "substance over form" and "step transaction" doctrines will not alter the Federal income taxation of the elements of the Financial Plan discussed in this letter, and it is more likely than not that such doctrines will not alter the Federal income taxation of the elements of the Financial Plan discussed in this letter. In reaching this conclusion, we rely in part on the following considerations:

- First, in deciding to pursue the Financial Plan, Mrs. Sands considered it to be a multi-year, multiple-transaction strategy, and had a reasonable expectation that the gains she would receive from investments made as part of the Financial Plan would exceed the fees and costs incurred in pursuing the Financial Plan. Moreover, Mrs. Sands decided to pursue the Financial Plan for legitimate investment, estate-planning, and privacy/security purposes. Although the tax consequences of the Financial Plan were a consideration, there were significant non-tax economic purposes for which the Financial Plan was designed including, without limitation, realizing profits on short sales of Treasury Notes and on purchases and sale of other investment assets, and increasing the diversification of Mrs. Sands' investment portfolio.

- Second, the short sales of Treasury Notes were completely unhedged. As a result, depending on how interest rates might fluctuate, BLC had a significant economic potential for either profit or loss.

[157] *UPS, supra*, at 1018-1019 (citations and footnotes omitted).
[158] *Id.* at 1020.

- Third, although the Financial Plan comprises several transactions, some of which occurred in a short span of time,[159] these transactions were not mutually interdependent, effected pursuant to a "binding commitment" to enter into all such transactions, or component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.

We observe that, in *Salina*, the Tax Court dealt with an economic substance attack by the IRS on a transaction somewhat similar to the one addressed in this opinion. The facts of that case, and the Court's reasoning in resolving the economic substance issue in favor of the taxpayer in that case, are set forth above in a section entitled "***Federal income tax status of short sale obligations—Cases—Salina***."

***Partnership anti-abuse regulations***

*Regulations*

So-called anti-abuse regulations adopted in 1995 assert that the intent of the partnership tax provisions of the Code—"Subchapter K"—is to permit taxpayers to conduct joint business and investment activities through a flexible arrangement without incurring an entity-level tax. The regulations condition this on the satisfaction of three requirements. First, the partnership must be bona fide, and each partnership transaction or series of related transactions must be entered into for a substantial business purpose. Second, the form of each partnership transaction must be respected under substance over form principles. Third, except as otherwise provided in Subchapter K, the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income.

Under the anti-abuse regulations, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate Federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast[160] the transaction for Federal tax purposes so as to achieve tax results that are consistent with the intent of subchapter K.

[159] If the transactions are extremely close in time, courts are more likely to regard them as an integrated whole. Some courts have given this test very little weight. *See, e.g., Hinricksen v. Braicks*, 137 F.2d 632 (9th Cir. 1943) (one-half hour apart separate transactions); *H.B. Zachry Co. v. Commissioner*, 49 T.C. 73, 82 (1967 (three days)). In fact, some courts have held that if each transaction has independent economic substance, the transactions should not be integrated even if the subsequent transactions are planned at the outset. *See, e.g., Turner Broadcasting System, Inc. v. Commissioner*, 111 T.C. 315, 325-329 (1998).

[160] Should a "recasting" be indicated, Reg. §1.701-2(b) authorizes the IRS to take several types of action "to achieve tax results that are consistent with the intent of subchapter K…." These include (1) disregarding the partnership as a separate entity; (2) deeming one or more purported partners not to be partners for Federal tax purposes; (3) adjusting the accounting method used by the partnership or by a partner to reflect clearly the income of the partnership or the partner; (4) reallocating the partnership's items of income, gain, loss, deduction, or credit, and (5) otherwise adjusting or modifying the partner's or the partnership's claimed tax treatment. *Id.*

The determination of whether a partnership has been formed or availed of with a forbidden principal purpose must be based upon a review of "all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction."[161] The regulations list the following as non-exclusive factors to be considered in this review:

> (1) The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly;
>
> (2) The present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated and treated as steps in a single transaction. For example, this analysis may indicate that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest in the partnership was liquidated or disposed of (in whole or in part) would be a partner only temporarily in order to provide the claimed tax benefits to the remaining partners;
>
> (3) One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities (through distribution preferences, indemnity or loss guaranty agreements, or other arrangements), or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital;
>
> (4) Substantially all of the partners (measured by number or interests in the partnership) are related (directly or indirectly) to one another;
>
> (5) Partnership items are allocated in compliance with the literal language of Reg. §§1.704-1 and 1.704-2 but with results that are inconsistent with the purpose of section 704(b) and those regulations. In this regard, particular scrutiny will be paid to partnerships in which income or gain is specially allocated to one or more partners that may be legally or effectively exempt from federal taxation (for example, a foreign person, an exempt organization, an insolvent taxpayer, or a taxpayer with unused federal tax attributes such as net operating losses, capital losses, or foreign tax credits);
>
> (6) The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or related party); or
>
> (7) The benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distributee partner (or related party).[162]

Even if a partnership satisfies the anti-abuse tests summarized above, the regulations include an alternative rule regarding "abuse of entity treatment." Under that provision, the IRS "can treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Internal Revenue Code or regulations promulgated

[161] Reg. §1.701-2(c).
[162] *Id.*

thereunder" unless a separate provision of the Code or regulations provides for treatment of the partnership as an entity.[163]

The "intent of Subchapter K" portion of the anti-abuse regulations includes thirteen examples. In one example, a person ("X") who is not a partner desires to acquire and hold indefinitely certain land owned by partnership PRS. The property has a value of \$95*x* and a tax basis of \$5*x*. Pursuant to a plan a principal purpose of which is to permit X to recover for tax purposes a substantial portion of the purchase price for the land, X contributes \$100*x* to PRS for a partnership interest. Subsequently, but when the value of the partnership's assets have not changed materially, PRS distributes to X in liquidation of its interest in PRS the land and another asset with a value and basis to PRS of \$5*x*. As a result of this transaction, X's \$100*x* basis in his partnership interest is allocated among the two assets in proportion to their bases, resulting in a basis of \$50 in each asset. X then sells the asset worth \$5 and recognizes a loss of \$45. The IRS explained its view of the transaction as follows:

> Although section 732 recognizes that basis distortions can occur in certain situations, which may produce tax results that do not satisfy the proper reflection of income standard of paragraph (a)(3) of this section, the provision is intended only to provide ancillary, simplifying tax results for bona fide partnership transactions that are engaged in for substantial business purposes. Section 732 is not intended to serve as the basis for plans or arrangements in which inconsequential or immaterial assets are included in the distribution with a principal purpose of obtaining substantially favorable tax results by virtue of the statute's simplifying rules. The transaction does not properly reflect X's income due to the basis distortions caused by the distribution that result in shifting a significant portion of X's basis to this inconsequential asset. Moreover, the proper reflection of income standard contained in paragraph (a)(3) of this section is not treated as satisfied, because, taking into account all the facts and circumstances, the application of section 732 to this arrangement, and the ultimate tax consequences that would thereby result, were not clearly contemplated by that provision of subchapter K. In addition, by using a partnership (if respected), the partners' aggregate federal tax liability would be substantially less than had they owned the partnership's assets directly (see paragraph (c)(1) of this section). On these facts, PRS has been formed and availed of with a principal purpose to reduce the taxpayers' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under applicable judicial principles and statutory authorities, such as the disguised sale rules under section 707, see paragraph (h) of this section), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.[164]

In issuing the final regulations, the IRS responded to comments on the proposed regulations that questioned the scope of the regulations and their relationship to established legal doctrines (e.g., business purpose, substance over form, step transaction, sham transaction). The IRS commented:

> The final regulation confirms certain fundamental principles that must, in all cases, be satisfied in applying the provisions of subchapter K to partnership transactions, to assure that those provisions are not used to achieve inappropriate tax results. While the fundamental principles reflected in the

[163] Reg. §1.701-2(e).
[164] Reg. §1.701-2(d), example 11(ii).

> regulation are consistent with the established legal doctrines, those doctrines will also continue to apply.
>
> So viewed, the uncertainty regarding the application of the regulation reflects the uncertainty that already exists in properly evaluating transactions under current law, including the proper application of existing legal doctrines. As a result, the regulation should not impose any undue administrative burdens on either taxpayers or the IRS.[165]

One must consider not only how the anti-abuse regulations should be applied to the elements of the Financial Plan discussed in this letter, but—as a threshold issue—whether the anti-abuse regulations are valid.

*Possible invalidity of regulations*

Although some prominent commentators have remarked that "it appears doubtful that the overall landscape of Subchapter K has changed meaningfully by reason of this Regulation,"[166] other prominent commentators have observed that the regulations represent an appropriation of legislative authority that is both radical[167] and startling.[168] In the view of such commentators, the regulations are of questionable validity,[169] at best.[170]

Code section 7805(a) authorizes the Secretary to issue "all needful rules and regulations ... as may be necessary by reason of any alteration of law in relation to internal revenue." In accordance with controlling judicial authority, in determining the validity of a tax regulation, one must make several determinations:

- First, one must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. ... [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[171] In determining whether Congress has spoken directly to the issue, the Supreme Court has directed a broad inquiry, taking

---

[165] T.D. 8588, 1995-1 C.B. 109, 112.
[166] A. Willis, J. Pennell, P. Postlewaite, PARTNERSHIP TAXATION ¶1.03[6] (6th Ed. 2000).
[167] R. Lipton, *The Partnership Anti-Abuse Regs. Revisited: Is There Calm After The Storm?*, 83 J. TAX. 68, 74 (1995).
[168] W. Nelson, *The Limits Of Literalism: The Effect Of Substance Over Form, Clear Reflection And Business Purpose Considerations On The Proper Interpretation Of Subchapter K*, 73 TAXES 641, 658 (1995).
[169] R. Lipton, *supra*, 74; S. Banoff, *Anatomy of an Antiabuse Rule: What's Really Wrong with Reg. Section 1.701-2*, 95 TNT 56-84 (March 20, 1995) ("the courts are likely to question the validity of such anti-abuse regulations").
[170] W. Nelson, *supra* (the anti-abuse regulation "cannot be defended as either a statement of preexisting law or as an application of normal interpretive rules"); C. Allison, *The Section 701 Final Regulation: Does It Have A Foundation Of Rock Or Sand?*, 54 N.Y.U. INST. ON FEDERAL TAXATION §7.05 (1996) ("there is an ample basis for a court to hold the Final Regulation invalid").
[171] *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984).

into account (1) the context not only of the words or phrases in controversy, but also of their place in the overall statutory scheme, (2) other Federal legislation, particularly later and more specific legislation on the subject, and (3) common sense.[172]

- Second, one must determine whether the regulation was issued under the Code section 7805(a) general authority to "prescribe all needful rules and regulations" or under a specific statutory grant of authority. If the former, a reviewing court will accord such a regulation "less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision."[173]

- Third, one must consider whether the regulation "'harmonizes with the plain language of the statute, its origin, and its purpose,'"[174] taking into account "whether the regulation 'is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent.' *National Muffler Dealers Assn. v. United States*, *supra*, at 477; and '[i]f the regulation dates from a later period, the manner in which it evolved merits inquiry.' *Ibid.* We also consider, if pertinent, 'the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent reenactments of the statute.' *Ibid.*"[175]

Ultimately, the courts will uphold the validity of tax regulations if they "implement the congressional mandate in some reasonable manner."[176]

In *Helvering v. Credit Alliance Corp.*,[177] the Supreme Court refused to enforce a regulation dealing with the dividends-paid credit available at that time, reasoning that "the regulation [at issue] not only was contradictory of the plain terms of the [statute] but attempted to add a supplementary legislative provision, which could only have been enacted by Congress."[178] The IRS may not ignore the literal meaning of a statute even if there are unintended consequences of legislation.[179] In *Crooks v. Harrelson*, the Court stated:

---

[172] *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 146 L.Ed.2nd 121 (2000).
[173] *Rowan Companies, Inc. v. United States*, 452 U. S. 247, 253 (1981)
[174] *Id.* (quoting *National Muffler Dealers Assn. v. United States*, 440 U. S. 472, 477 (1979))
[175] *Id.*
[176] *United States v. Correll*, 389 U. S. 299, 307 (1967).
[177] 316 U.S. 107 (1942).
[178] *Id.* at 113. A regulation is out of "harmony" with the statute's origin and purpose and therefore invalid if it purports to add restrictions not enacted by Congress to a statute. *Estate of Boeshor v. Commissioner*, 78 T.C. 523, 527 (1982).
[179] *Crooks v. Harrelson*, 282 U.S. 55 (1930); *Hanover Bank v. Commissioner*, 369 U.S. 672, 688 n. 23 (1962) (quoting *Fabreeka Products Co. v. Commissioner*, 294 F.2nd 876, 879 (1st Cir. 1961)) ("'[g]ranting the government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the