LEWIS, RICE & FINGERSH, L.C.



> It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts.[180]

In *Edward L. Stephenson Trust v. Commissioner*,[181] the Tax Court considered an IRS regulation permitting IRS consolidation of multiple trusts, and concluded:

> Our review of the history of subchapter J and the restrictions on multiple trusts convinces us that the consolidation regulation is invalid because it adds restrictions not contained in the statute nor contemplated by Congress. The grounds for our conclusion are: First, Congress consciously enacted clear rules in 1969 to eliminate some, but not all, of the tax benefits associated with multiple trusts. The consolidation regulation goes beyond the statute by eliminating *all* of the tax benefits of multiple trusts. Second, the consolidation regulation takes a subjective approach to the multiple trust issue. This approach conflicts with the objective approach adopted by Congress. Third, the regulation extends beyond the statute and exceeds congressional intent by purporting to overrule the *Morris Trusts* case.[182]

Congress has previously reviewed many provisions of the Code and enacted revisions or expressly authorized the issuance of regulations to eliminate or deter potential abuses.[183] If Congress intended that partnership transactions be subject to the "principal purpose" test set forth in the anti-abuse regulations, it could enact such a provision, as it has done with the fourteen provisions referenced in footnote 183. It did not do so, although it has enacted and repealed tax-avoidance-oriented provisions as a part of subchapter K. By way of example:

- Congress enacted Code section 704(b), relating to the effectiveness of allocations of items of partnership income, gain, loss, deduction, and credit as part of the Internal Revenue Code of 1954. That section provided,[184] in part, that allocations of tax items

---

Congressional thumb, not the court's"); *Busse v. Commissioner*, 479 F.2d 1147, 1152 (7th Cir. 1973) ("However much the statute, in operation, may offend the Commissioner's sense of symmetry and propriety, we cannot say that the results it causes are either absurd or unintended by Congress. Courts have no power (just as the Commissioner has no power in his capacity as an administrative official) to rewrite legislative enactments to give effect to their 'ideas of policy and fitness or the desirability of symmetry in statutes.'") (quoting *United States v. Shirah*, 253 F.2d 798, 800 (4th Cir. 1958))).

180 282 U.S. at 60.

181 81 T.C. 283 (1983).

182 *Id.* at 294-95 (footnote omitted).

183 Each of the following sections either sets forth or authorizes issuance of regulations to set forth anti-abuse or anti-avoidance provisions: Code sections 72(e)(11), 108(c)(5), 197(f)(9)(F), 338(e)(3), 361(b)(3), 732(f)(8), 860L(h), 877(d)(4)(D), 901(k)(4)(C), 953(e)(7), 954(h)(7), 1274A(e)(2), 1397F(2), and 6255(g)(1). Not only has the Congress not enacted a statute making a specific grant of authority to issue anti-abuse or anti-avoidance provisions in the partnership setting, it has not even granted authority to issue regulations to effect the purposes of subchapter K as it has done in implementing many provisions of the Code. *See, e.g.*, Code section 777 (authorizing the issuance of regulations "as may be appropriate to carry out the purposes" of sections 771 through 776, dealing with certain electing large partnerships).

184 Code section 704(b)(2). Prior to the amendment, section 704(b) read as follows:

would be made in accordance with the partners' interests in the partnership where the avoidance or evasion of any tax was the principal purpose of the agreement of the parties on such determinations. Congress removed that principal purpose test from Code section 704(b) in 1976, replacing it with a substantial economic effect test.

- In 1999, Congress enacted Code section 732(f), requiring an adjustment to the basis of corporate stock distributed to a partner that is a corporation (other than the issuer of the distributed stock). As a part of that provision, Congress authorized the IRS to issue regulations "as may be necessary to carry out the purposes of this subsection, including regulations to avoid double counting and to prevent the abuse of such purposes."[185]

In the corporate context, Congress has provided in Code section 357(b) that where a liability assumption occurs in a transaction the income from which is, in general, not presently subject to taxation, the assumption is taxed as though cash had been received if the principal purpose of the taxpayer with respect to the assumption was to avoid Federal income tax on the transaction, or was otherwise not a bona fide business purpose. Had Congress favored a broad principal-purpose/anti-abuse rule for partnership transactions, it would have included in Code section 752 a provision similar to section 357(b).

In summary, there are significant indications that the partnership anti-abuse regulation is invalid to the extent that it attempts to do more than simply codify into regulation the judicial doctrines of substance over form, sham transaction, economic substance, economic reality, and step transaction.

*Application on the merits*

Even if the partnership anti-abuse regulation is deemed to be valid, the taxation of the Financial Plan as contemplated in this opinion letter is consistent with the three requirements of that regulation. As noted above, those requirements are first, the partnership must be bona fide and each partnership transaction or series of related transactions must be entered into for a substantial business purpose; second, the form of each partnership transaction must be respected under substance over form principles; and third, except as otherwise provided in Subchapter K, the tax consequences under subchapter K to each partner of partnership operations and of

---

A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

[185] Code section 732(f)(8).

transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income. The reasons supporting this conclusion are essentially the same reasons advanced above in support of the conclusion that the judicial "substance over form" and "step transaction" doctrines will not alter the Federal income taxation of the Financial Plan.

First, the Financial Plan was undertaken for legitimate investment, estate-planning, and privacy/security purposes. Although the tax consequences of the Financial Plan were a consideration, there were significant non-tax economic purposes for which the Financial Plan was designed including, without limitation, realizing profits on short sales of Treasury Notes, and increasing the diversification of Mrs. Sands' investment portfolio.

Second, the short sales of Treasury Notes were completely unhedged. As a result, depending on how interest rates might fluctuate, BLC had both a significant potential for profit as well as the economic risk of loss.

Third, although the Financial Plan comprises several transactions, some of which occurred in a short span of time, these transactions were not mutually interdependent, effected pursuant to a "binding commitment" to enter into all of the transactions, or component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.

Fourth, the partnership agreement of ALP and the operating agreement of BLC in form and in operation accurately reflect the partners' economic agreements. No allocations in such agreements lack substantial economic effect.

Fifth, although the Tax Section of the New York State Bar Association proposed[186] in a formal comment on the proposed anti-abuse regulation that the IRS include an example that would address specifically a pattern similar to the Financial Plan transactions described above, the IRS chose not to include such an example even though it did include thirteen examples, four of which concluded that the facts presented required a recasting of the transaction.

*Conclusion*

Weighing the relevant authorities, and taking into account the pertinent facts and circumstances, there is substantial authority for the position that the partnership anti-abuse rules set forth in Reg. § 1.701-2 will not alter the Federal income taxation of the Financial Plan, and it

[186] N.Y. St. B.A. Tax Sec. Comm. on Partnerships, Report on the Proposed Anti-Abuse Rule 79-82, Ex. 13 (July 1, 1994).

is more likely than not that such rules[187] will not alter the Federal income taxation of the Financial Plan.

*Tax shelter registration, list keeping, and disclosure; related penalties*

*Tax shelter registration.* There are two sets of tax shelter registration requirements. The first set applies to certain arrangements in which a significant purpose of the structure is to avoid or evade Federal income tax for a direct or indirect participant that is a corporation. No element of the Financial Plan should be characterized as an arrangement with such a purpose. Accordingly, this set of registration requirements should not apply. The second set of registration requirements applies in the context of a noncorporate taxpayer if an arrangement has several statutorily-prescribed characteristics. Those required characteristics include that the arrangement be (1) required to be registered under federal or state securities law, (2) sold under an exemption from registration requiring the filing of a notice with a federal or state securities agency, or (3) a substantial investment. An arrangement is a substantial investment if (a) the aggregate amount that may be offered for sale exceeds $250,000, and (b) there are expected to be five or more investors. The Financial Plan involves seven investors (Marilyn Sands, Robert Sands, Richard Sands, Andrew Stern, the Marvin Sands Master Trust, CWC-I, and Mrs. Robinson). However, even if the Financial Plan involved fewer than five investors, Treasury regulations provide that

> For purposes of determining whether investments are parts of a substantial investment, similar investments offered by the same person or related persons (as defined in section 168(e)(4)) are aggregated together. Investments are considered similar if they involve similar principal business assets and similar plans or arrangements. Investments that include no business assets will be considered similar if they involve similar plans or arrangements.[188]

The conference committee report adopted at the time of enactment of this provision illustrated the operation of the aggregation provision by an example involving eight limited partnerships, each with a different general partner, three different limited partners, but investing in a separate but similar asset, concluding that registration would be required.[189] A virtually-identical example appears in the Treasury regulations relating to registration.[190]

---

[187] From a procedural perspective, the IRS has recognized that the some discretion must be exercised in asserting violations of the anti-abuse rule. In Announcement 1994-27, the IRS advised that it was establishing a partnership team as part of its Industry Specialization Program, and that an Issue Specialist on that team

> will be designated to provide expertise to field examiners on all issues raised under proposed regulation 1.701-2 ... once the regulation has been finalized. In addition, as a §1.701-2 issue is considered in an examination, ***the appropriateness of the §1.701-2 determination must be coordinated with the Issue Specialist and the National Office.***

*Id.* (emphasis added).

[188] Reg § 301.6111-1T (Q&A 22).

[189] H.R. Rep. No. 98-432, 98th Cong., 2nd Sess. 226 (1984).

[190] Reg § 301.6111-1T (Q&A 22).

Concerning the requirement of five or more investors, the regulations relating to an offering involving (in the aggregate) fewer than five investors state that registration is not required if there is neither knowledge nor reason to know that the person making the offering (or a related person) will offer subsequent similar investments. However, the regulation states that a tax shelter organizer will be presumed to have known of similar investments offered during the twelve months following the first offering of an investment.

If a court were to sustain an IRS assertion that the Financial Plan should be aggregated for this purpose with separate but similar investments of unrelated parties, the filing of a tax shelter registration could be required.

If an arrangement is within the definition of a tax shelter required to be registered, the statute places the duty to register on several people. These include the person principally responsible for organizing the shelter, any other person who participated in the organization of the shelter, and any person who participated in the sale or management of the shelter when it was not registered. Treasury regulations elaborate on this, making it clear that even though preparation of documents establishing the shelter and other acts frequently done by lawyers generally constitute participation in organization, the performance of such acts "will not constitute participation in the organization or management of a tax shelter unless the person performing the act is related to the tax shelter (or a principal organizer of the tax shelter) or the person participates in the entrepreneurial risks or benefits of the tax shelter." The regulation contemplates determination of whether parties are "related" by reference to the related party / anti-churning rules related to accelerated cost recovery deductions as set forth in Code section 168(e)(4) as it existed in 1984. The examples set forth in the registration regulations provide the following guidance:

> For example, assume that A forms Z partnership, a tax shelter for which registration is required. Z hires the X law firm, none of the partners of which is related to the tax shelter, to prepare the documents necessary to register the offering of Z securities with the Securities and Exchange Commission. X charges $100 an hour for its services in connection with the preparation of the necessary documents, and payment of the fee is not contingent. X will not be treated as a participant in the organization of the tax shelter. If, however, X were to charge a fee equal to 1 percent of the value of the units in the tax shelter that are sold, X would be considered a participant in the organization of the shelter.
>
> As another example, assume that individual C is an attorney employed by W corporation, the corporate general partner and principal organizer of Z, and that C prepares the documents necessary to register the tax shelter with the Securities and Exchange Commission. C will be treated as having participated in the organization of the tax shelter regardless of the way in which C's compensation is structured, because C, as an employee, is related to the principal organizer of the tax shelter.[191]

[191] Reg § 301.6111-1T (Q&A 30)

Although the penalty for failure to register a tax shelter is severe—the greater of $500 or 1% of the aggregate amount invested in the shelter—the penalty is imposed on "a person who is required to register a tax shelter under section 6111," and is not imposed where the failure to register is due to reasonable cause. However, if the Financial Plan or one or more components of that Plan were characterized as a tax shelter, as observed above, the individuals or entities that participated in the organization, sale, or management of the tax shelter would be required to effect a registration.

*Listkeeping*. In addition to registration of tax shelters as defined in Code section 6111, the Code also provides that any person who organizes a "potentially abusive tax shelter" or sells an interest in such a shelter must keep a list of the names, addresses, identification numbers, and certain other information relating to each investor. The definition of a "potentially abusive tax shelter" subject to this requirement includes not only tax shelters required to register with the IRS as such, but also "any transaction a significant purpose of the structure of which is the avoidance or evasion of Federal income tax within the meaning of section 6111(d)(1)(A) and §301.6111-2T(b)." As interpreted by regulations, any person who participates in the organization, management, or sale of the investment is subject to this requirement, but the definition contains a cross-reference to the definition of "principal organizer" in the tax shelter registration regulations, which in turn contain the legal services safe harbor described above. To the extent it is applicable, the penalty for failure to maintain an investor list is $50 for each person not listed, not to exceed $100,000 for any calendar year, but is not imposed where the failure to maintain the list is due to reasonable cause.

*Disclosure*. The last of the tax-shelter provisions to which the IRS, the Congress, and the tax bar have devoted a significant amount of attention recently is the requirement that taxpayers attach a specific disclosure statement to their returns if they participated in one or more "reportable transactions." There are two types of reportable transactions. The first type comprises the so-called listed transactions, transactions specifically identified by the IRS in published guidance as such, or transactions substantially similar to the ones so identified. To date, the IRS has identified seventeen listed transactions. The second type of reportable transaction is defined by its characteristics. At present, the failure to make the required disclosure of participation in a reportable transaction pursuant to these provisions is not subject to penalty, although the failure to make such a disclosure could be taken into account in considering whether to impose a deficiency-related penalty, such as the accuracy-related penalty, on an affected taxpayer. These disclosure provisions would take on more significance if proposed tax shelter legislation is enacted or proposed regulations are adopted, each as discussed below.

*Interest and penalties*

If the IRS were to assert a deficiency in tax relating to any aspect of the Financial Plan in general and the tax consequences of that plan discussed in this letter in particular, interest would be payable on any deficiency ultimately determined to be due. The IRS would also consider the assertion of penalties, sometimes referred to as "additions to tax."

Interest on underpayments of tax and on most penalties (including the accuracy-related penalty, discussed below) accrues at a rate equal to three percentage points over the Federal short-term interest rate. The IRS reviews these rates on a quarterly basis. For the quarter beginning April 1, 2002, interest on underpayments by taxpayers other than corporations will accrue at six percent (6%) per annum. Interest compounds daily, resulting in the accrual of interest on unpaid interest.

As noted above, the IRS would consider the assertion of penalties or additions to tax were it to assert a tax deficiency in connection with the Financial Plan. The principal penalty it would be likely to consider is the so-called "accuracy-related penalty" imposed under Code section 6662. That penalty will be sustained if an underpayment of tax is attributable to negligence, disregard of rules or regulations, or a substantial understatement of income tax.[192] The penalty is twenty percent (20%) of the amount of the underpayment so attributable.[193] The penalty percentage is forty percent (40%) to the extent attributable to a gross valuation misstatement.[194] The Code defines a gross valuation misstatement, as that term might be applied in this case, as being present if "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)...."[195]

In general, the "underpayment" subject to tax is the excess of the correct tax over the tax reported on the taxpayer's return and not abated, credited, refunded, or otherwise repaid.[196] However, the term is limited further for this purpose. In general, the underpayment is reduced by those portions attributable to positions for which there was "substantial authority," as that term is defined, or for which there was adequate disclosure on the taxpayer's return.[197] Congress limited these reductions in cases involving "tax shelters," as defined. Congress defined a tax shelter for this purpose as follows:

> 6662(d)(2)(C)(iii) TAX SHELTER.--For purposes of this subparagraph, the term "tax shelter" means--
> (I) a partnership or other entity,
> (II) any investment plan or arrangement, or
> (III) any other plan or arrangement,
> if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.

---

[192] Code section 6662(b). The penalty also can be imposed where an underpayment is attributable to a substantial valuation overstatement, a substantial overstatement of pension liabilities, or a substantial estate or gift tax valuation understatement. *Id.*
[193] Code section 6662(a).
[194] Code section 6662(h)(1).
[195] Code sections 6662(e)(1)(A), 6662(h)(2).
[196] Code sections 6211(b)(2), 6662(d)(2).
[197] Code section 6662(d)(2)(B).

A portion of an underpayment attributable to a "tax shelter" item is excluded if there is "substantial authority" for the taxpayer's treatment of that item, and the taxpayer reasonably believed that his tax treatment of that item was more likely than not the proper treatment.[198]

As developed in applicable Regulations,[199] a taxpayer is deemed to satisfy the reasonable belief requirement if:

> The taxpayer reasonably relies in good faith on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the manner described in paragraph (d)(3)(ii) of this section and unambiguously states that the tax advisor concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service.

That Regulation also states that one must take into account all of the facts and circumstances in determining whether this reasonable belief requirement has been satisfied and, in any event, that standard will not be deemed to be satisfied unless the requirements of Reg. §1.6664-4(c)(1) have been satisfied.[200] That section provides, in pertinent part, that:

- Reliance may not be reasonable or in good faith if the taxpayer knew, or should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.

- The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances including the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. This requirement will not be satisfied if the taxpayer fails to disclose a fact that he knows, or should know, to be relevant to the proper tax treatment of an item.

- The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person.

As noted above in the section entitled "opinion standards," we have used the "substantial authority" and "more likely than not" terminology and related standards as set forth in Code sections 6662 and 6664 and related Regulations in analyzing the potentially-applicable legal authorities and in issuing the opinions set forth above. Although this letter and the opinions set forth above should satisfy the opinion requirements, you must rely on those opinions reasonably and in good faith in order to avoid the imposition of the accuracy-related penalty on matters opined on above.

---

[198] Code section 6662(d)(2)(C)(i)(II).
[199] Reg. §1.6662-4(g)(4)(i)(B).
[200] Reg. §1.6662-4(g)(4)(ii).

*2001-2002 IRS disclosure initiative and enforcement activities*

In December, 2001, the IRS issued an announcement inviting taxpayers to disclose, on or before April 23, 2002, their tax treatment of tax shelters and other items that might subject such taxpayers to the so-called "accuracy-related penalty." In return, the IRS announcement generally offers to waive the accuracy-related penalty as to items so disclosed. To qualify, the disclosure had to satisfy certain substantive and procedural requirements set forth in the IRS notice. More specifically, the disclosure has to

- relate to a tax item covered by the initiative, and not to one of the six classes of items specifically excluded from the initiative;
- be filed with the IRS at the location specified by the notice by the deadline stated in that notice;
- set forth the material facts, the taxpayer's tax treatment of the item, the taxable years affected by the item; the names and addresses of (a) any parties who promoted, solicited, or recommended the taxpayer's participation in the transaction underlying the item and who had a financial interest, including the receipt of fees, in the taxpayer's decision to participate, and (b) if known to the taxpayer, any parties who advised the persons who promoted, solicited, or recommended the taxpayer's participation in the transaction;
- set forth a statement agreeing to provide, if requested, copies of all transactional documents, deliberative memoranda used by the taxpayer in its decision-making process, and all opinions and memoranda that provide a legal analysis of the item, whether prepared by the taxpayer or a tax professional on behalf of the taxpayer; and
- set forth a statement under penalties of perjury that the person signing the disclosure has examined the disclosure and that, to the best of that person's knowledge and belief, the information provided as part of the disclosure contains all relevant facts and is true, correct, and complete.

In mid-March, 2002, Treasury Department officials made several statements regarding its intention to "tighten the noose around people who would abuse the public tax system." The new effort contemplates changes to tax regulations, a possible request for changes in current tax statutes, and unspecified "administrative action."

*Risk of adverse legislation*

Over the past several years, Congress has considered several proposals that, if enacted, would have imposed a more demanding disclosure and penalty structure for transactions characterized as "tax shelters." In August 2001, the Senate Finance Committee released a bipartisan staff discussion draft, revising proposals issued by the staff of that committee in May 2000 and in October 2000. Under the most recent draft, a taxpayer would be subject to a forty

percent (40%) penalty on any "applicable tax shelter understatement." As defined by the draft, an applicable tax shelter understatement generally is an increase in the income tax of a taxpayer resulting from a difference between the taxpayer's treatment of items attributable to a tax shelter, as defined, and the proper tax treatment of those items. However, tax attributable to an item would be excluded from the applicable tax shelter understatement if:

- there was substantial authority for the tax treatment of such item by the taxpayer,
- the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return, ***and***
- the taxpayer had a reasonable belief that the tax treatment of such item by the taxpayer was more likely than not the proper treatment.

Accordingly, if this proposal were to be enacted, if a taxpayer did not make an affirmative disclosure of the relevant facts relating to an issue, the penalty could be applied if the taxpayer lost in litigation even if the position taken on the return was supported by substantial authority and the taxpayer reasonably believed that his return was accurate.

The proposal also provides that certain tax opinions, known as "disqualified opinions,"[201] and certain tax advisors, each known as a "disqualified tax advisor,"[202] could not be relied upon to establish that a taxpayer had the requisite "reasonable belief." As to any applicable tax shelter understatement, the proposal would eliminate the "reasonable cause" exception presently provided under Code section 6664(c)(1).

The proposal presently includes an effective date provision that would apply these rules to transactions entered into, offerings, or activities, as the case may be, after the enactment of the bill. As a result, the proposals, if enacted, would not apply to initial stages of the Financial Plan. However, if the proposal is adopted and, in doing so, Congress changes the effective date provisions so as to cause these provisions to apply to the entire Financial Plan, the IRS might argue that this Firm should be characterized as a "disqualified tax advisor" based upon its receipt of client referrals from one or more persons who or which IRS might argue to be tax shelter organizers or promoters. Were this Firm to be so characterized, the opinions stated in this letter could not be used to establish reasonable cause and thereby to avoid assessment of an accuracy-related penalty even if all other conditions for avoiding such a penalty were present.

---

[201] Specifically, the proposal would characterize a tax opinion as a "disqualified opinion" if it: (i) is based on unreasonable factual or legal assumptions (including assumptions as to future events), (ii) unreasonably relies on representations, statements, findings, or agreements of the taxpayer or any other person, (iii) does not identify and consider all relevant facts, or (iv) fails to meet any other requirement as the Secretary may prescribe.

[202] Specifically, the proposal would characterize an advisor as a "disqualified tax advisor" if the advisor: (i) is an organizer or promoter of the tax shelter, (ii) is compensated directly or indirectly by such organizer or promoter with respect to the tax shelter, (iii) has a contingent fee arrangement with respect to such tax shelter, (iv) has any type of referral agreement or other similar agreement or understanding with such organizer or promoter which relates to the tax shelter, or (v) has any other similar characteristic which, as determined under regulations prescribed by the Secretary, is indicative of a potential conflict of interest or compromise of independence

In addition to this revision to the accuracy-related penalty, the bill—titled the Tax Shelter Disclosure Act—would:

- impose a new penalty[203] for failure to make a statutorily-required disclosure of information relating to participation in a so-called "listed transaction" or "reportable transaction;"
- expand confidential corporate tax shelters registration provisions to cover transactions not involving corporations.
- expand and increase the current penalties for aiding and abetting the promotion of tax shelters;
- increase the penalty imposed on tax shelter promoters and organizers who fail to maintain investor lists;
- increase the penalties on promoters who furnish false or fraudulent statements in connection with tax shelter transactions; and
- authorize the Treasury Department to censure tax advisers or impose monetary sanctions against tax advisers and firms that participate in "inappropriate shelter activities" and practice before IRS.

Several groups have submitted comments on and suggestions for changes of these proposals.[204] The effective date sections of the bill provide generally that it is to be applied to transactions entered into, offerings, or activities, as the case may be, after the enactment of the bill.

In March, 2002, the Senate Finance Committee convened the first of a series of hearings on tax shelter issues. At that hearing, representatives of the Treasury Department testified, presenting both legislative proposals and enforcement / regulatory actions they intend to take to address what they characterized as abusive tax avoidance problems. Those proposals are set forth as Appendix A to this letter.

---

[203] As to a reportable transaction, the penalty amount would be the greater of (A) 5 percent of any increase in Federal tax which results from a difference between the taxpayer's treatment (as shown on its return) of items attributable to the reportable transaction to which the failure relates and the proper tax treatment of such items, or (B) $100,000. As to a listed transaction, the penalty amount would be the greater of (A) 10 percent of any increase in Federal tax which results from a difference between the taxpayer's treatment (as shown on its return) of items attributable to the reportable transaction to which the failure relates and the proper tax treatment of such items, or (B) $200,000.

[204] *See, e.g.*, Washington Council Ernst & Young Comments Dated September 4, 2001, to Senate Finance Committee on Proposed Tax Shelter Disclosure Act, BNA Daily Tax Report (September 10, 2001) (submitted on behalf of the Tax Fairness Coalition); Arthur Anderson LLP Letter Dated September 4, 2001, Transmitting Comments on Proposed Tax Shelter Disclosure Act on Behalf of the Coalition for Fair Taxation of Business Transactions, BNA Daily Tax Report (September 10, 2001); ABA Tax Section Comments Dated September 6, 2001, to Senate Finance Committee on Proposed Tax Shelter Disclosure Act, BNA Daily Tax Report (September 10, 2001); New York State Bar Association Comments Dated October 30, 2001, to Senate Finance Committee and House Ways and Means Committee on Draft Tax Shelter Legislation Proposed by the Senate Finance Committee, BNA Daily Tax Report (November 6, 2001).

None of the proposed changes discussed in this section has been enacted into law (or, where applicable, issued as a temporary or final regulation), and it is uncertain whether any of these proposed changes will be adopted in the future. Nevertheless, there can be no assurance that Congress will not enact new laws or modify existing laws, or that the Treasury Department will not issue new regulations or modify existing regulations, that would adversely affect the opinions set forth in this letter. Likewise, there can be no assurance that Congress will not enact new laws or modify existing laws, or that the Treasury Department will not issue new regulations or modify existing regulations, that would result in a more severe application of interest and penalties if IRS were to succeed in asserting any adjustment with respect to any element of the Financial Plan.

**CONDITIONS AND LIMITATIONS**

Our opinion is based solely upon our understanding of the facts as set forth above, the representations set forth in a Certificate of Mrs. Sands dated April 11, 2002, and the Operative Documents. A copy of the Certificate is attached to this letter.

In rendering the opinions set forth above, we have assumed the accuracy of all information set forth in the Certificate, the authenticity of all original documents, the conformity of all document copies to the original documents, and the genuineness of all signatures. We have also assumed that each transaction contemplated herein will be carried out strictly in accordance with the Operative Documents and with the Certificate. Any variance in the facts from those set forth herein may adversely affect our opinions, and may cause the Financial Plan to have Federal income tax consequences that differ from those reflected in the opinions set forth above.

The opinions set forth above are based upon our understanding and interpretation of the Code and its legislative history, the Regulations, administrative rulings, and published court decisions as of the date of this letter. These authorities may be modified, amended, or revoked at any time. Any such change may or may not be retroactive with respect to transactions entered into prior to the issuance thereof, could alter significantly the Federal income tax consequences of the transactions discussed in this letter, and could cause those consequences to differ significantly from the opinions expressed in this letter. There is no assurance that legislative, judicial, or administrative changes will not occur in the future, and we assume no obligation to advise you of any such changes or to update or modify this letter to reflect any such developments that may occur after the date of this letter.

The opinions set forth above reflect our legal judgment on certain Federal income tax issues relating to the Financial Plan, as presented and discussed herein. Many of the issues raised by the Financial Plan, including matters on which we have stated opinions, are extremely complex and have not been addressed by the IRS or the courts and, therefore, have not been resolved definitively. Our opinions are based upon our interpretation and understanding of existing law. Such opinions have no official status or binding effect of any kind. Accordingly, we

can provide no assurance that the interpretation of the Federal income tax laws set forth in our opinions will prevail if challenged by the IRS in an administrative or judicial proceeding. Our opinions are based on the assumption that the taxpayers will undertake reasonable effort and expense to present these positions if challenged. We express no opinion with respect to Federal or state securities laws, state, local, or foreign tax consequences, or any other Federal, state, local, or foreign issue not specifically referred to and discussed above.

Our opinions also reflect our assessment of the probable outcome of litigation or other adversarial proceedings properly and effectively presented by your representatives arising from IRS challenges to the transactions discussed herein. Such proceedings are often resolved on the basis of negotiation between the government and the taxpayer. Our opinions address the current state of the law and not the impact of subsequent negotiations between the IRS and taxpayers.

This opinion letter is furnished to you solely for your benefit, and is not to be used, circulated, quoted, or otherwise referred to, or relied upon by any other person without the express written consent of Lewis, Rice & Fingersh, L.C. We assume no responsibility for the tax treatment of other participants to the transactions described herein. This opinion letter is rendered as of the date set forth above.

Very truly yours,

LEWIS, RICE & FINGERSH, L.C.

Lewis, Rice & Fingersh, L.C.

# APPENDIX

THE TREASURY DEPARTMENT'S ENFORCEMENT PROPOSALS
FOR ABUSIVE TAX AVOIDANCE TRANSACTIONS

SUBMITTED IN CONNECTION WITH TESTIMONY OF
MARK WEINBERGER,
ASSISTANT SECRETARY OF THE TREASURY FOR TAX POLICY
BEFORE THE SENATE FINANCE COMMITTEE
MARCH 20, 2002

## THE TREASURY DEPARTMENT'S ENFORCEMENT PROPOSALS FOR ABUSIVE TAX AVOIDANCE TRANSACTIONS

The Treasury Department is announcing an initiative that will ensure that the Treasury Department and the IRS have the tools to combat abusive tax avoidance transactions. Fairness requires that the Treasury Department and the IRS identify these transactions (along with the taxpayers who invest in them and the persons who promote them), evaluate the tax positions taken, and take appropriate enforcement actions.

What underlies these transactions is the mind-numbing complexity of the Internal Revenue Code. Its multitude of rules provide the opportunities for those who would seek improperly to reduce their tax liabilities. Rules that provide for nonrecognition of gains and losses, a two-tier tax system, mechanical basis adjustments, rules for allocation of income and losses among partners, crediting of foreign taxes paid – all rules that serve important purposes – are just some of the rules that may be used in these transactions to create unintended tax benefits. These abusive transactions harm the public fisc, erode the public's respect for the tax laws, and consume valuable public and private resources.

Transparency – insuring that questionable transactions are disclosed and subject to IRS review – is critical to the Government's ability to identify and address abusive tax avoidance practices. The Treasury Department believes that clear rules mandating transparency and vigorous enforcement are essential to curbing abusive tax avoidance transactions. If a promoter is comfortable with selling a transaction, a taxpayer is comfortable with entering into that transaction, and a tax practitioner is comfortable with advising that the transaction is proper, then they all should be comfortable with the IRS knowing about and understanding the transaction.

The existing enforcement provisions in the Internal Revenue Code (Code) for tax avoidance transactions, along with the temporary regulations issued in February 2000, are designed to give the Treasury Department and the IRS the opportunity to evaluate questionable transactions at the earliest opportunity. Section 6111 of the Code requires promoters who market transactions to register with the IRS transactions that either will generate a certain level of tax benefit or are corporate tax avoidance transactions that are marketed on a confidential basis. Section 6112 requires that promoters maintain lists of investors in registered transactions as well as other potential tax avoidance transactions. The regulations under Section 6011 require corporate taxpayers to disclose on their tax returns transactions that the IRS has identified as tax avoidance transactions or that have certain characteristics common to tax avoidance transactions.

Since the beginning of this Administration, the Treasury Department has made clear its commitment to curtailing abusive tax practices. The Treasury Department in particular wanted to evaluate the return disclosures from the 2000 corporate filing season, which ended in the fall of 2001, to determine whether the existing enforcement regime is working and, if not, what additional measures are required. This review is complete. The apparent willingness of certain taxpayers and their advisors to parse words in a manner that narrows requirements and expands exceptions has been disappointing.

The Treasury Department's enforcement initiative, which includes both administrative actions and legislative proposals, will significantly enhance the current enforcement regime and curtail the use of abusive tax avoidance transactions. These proposals focus on increased transparency and enhanced penalties. Transparency is central to the Treasury Department and the IRS' ability to evaluate promptly new tax avoidance transactions and to address them quickly. Enhanced penalties are necessary to alter the "risk/reward" analysis taxpayers undertake when entering into these transactions.

The Treasury Department has concluded that a more effective enforcement regime would be created by a web of rules – rules that reinforce each other by requiring the same information about a questionable transaction to be provided to the IRS both by the taxpayers participating in these transactions and by the promoters and their advisors, who also will be required to maintain lists of investors. These rules will allow the IRS to identify taxpayers who fail to disclose based on the promoter's registration of the transaction with the IRS, promoters who fail to register based on a taxpayer's disclosure or based on a taxpayer's audit, and other taxpayers who fail to disclose based on a promoter's investor list.

One of the primary goals of these proposals is certainty. Clearer disclosure rules, without exceptions and perceived loopholes, will be easier for taxpayers and their advisors to apply, harder for taxpayers and their advisors to manipulate, and easier for the IRS to administer and enforce. The Treasury Department's proposals, for example, will broaden and align the rules and regulations for disclosure, registration, and list keeping under Sections 6011, 6111, and 6112 of the Code. The IRS will have multiple sources of information about questionable transactions, including the identity of the participants. Taxpayers and promoters will find avoiding IRS scrutiny of questionable transactions to be difficult.

Taxpayers and promoters also will find avoiding IRS scrutiny to be hazardous. The Treasury Department is proposing enhanced penalties for the failure to disclose and maintain the information required by the IRS to enforce the tax laws. The Treasury Department, for instance, will seek legislation creating a new strict liability penalty for a taxpayer's failure to disclose a listed transaction. This penalty for the first time would sanction taxpayers for failure to obey the disclosure rules. More generally, taxpayers and promoters who disregard the rules for disclosure, registration and list-keeping will face an increased risk of penalties.

**2001 Taxpayer Return Disclosures**

The corporate returns that were filed during the fall 2001 filing season were the first to be fully covered by the revised disclosure regulations under Section 6011 of the Code. To date, 99 corporate taxpayers have disclosed 272 transactions.

- Only 64 listed transactions were disclosed. Listed transactions are transactions that previously have been identified by the IRS in published guidance as tax avoidance transactions. Based on other information, the Treasury Department and the IRS have reason to believe that a far greater number of listed transactions were undertaken.
- The remaining 208 disclosures were for transactions that satisfy a multi-factor test designed to identify transactions that have at least two of five characteristics common to tax avoidance transactions (the 2-of-5 filter test). Two types of transactions, however, account for 159 of these disclosures. The Treasury Department and the IRS believe that taxpayers and promoters are manipulating the requirements and exceptions to the 2-of-5 filter test to avoid disclosure.

The small amount of disclosure was disappointing. From the information the Treasury Department and the IRS have seen, this disclosure is a small segment of the universe of transactions that should have been disclosed. A number of factors have led to insufficient disclosure, registration, and list-keeping.

First, the rules in Sections 6011, 6111, and 6112 of the Code do not contain a consistent definition of a transaction that must be disclosed and registered, and for which investor lists must be maintained. While this situation is due, in part, to differing statutory requirements, it also reflects the desire, when these rules were drafted, to exclude legitimate business transactions and minimize taxpayer administrative burden. The result, unfortunately, is a set of elegantly constructed, but complicated, rules. The Treasury Department's enforcement initiative will create a single, clear definition of a transaction that must be disclosed and registered, and for which lists must be maintained.

Second, the rules and regulations under Section 6011, 6111, and 6112 contain a number of exceptions intended to ensure that the rules are narrowly tailored. For instance, the disclosure requirements contain an exception for transactions for which there is a generally accepted understanding that the taxpayer's intended tax treatment is properly allowable. Another disclosure exception is for transactions that the IRS has "no reasonable basis" to challenge.

The Treasury Department believes that many taxpayers and promoters have read the exceptions broadly to cover virtually everything and interpreted the filters in the 2-of-5 filter test narrowly to cover virtually nothing. While some interpretations are good faith interpretations of the rules, others are attempts to assure taxpayers that they can engage in tax avoidance transactions without appropriate disclosure. The Treasury

Department's enforcement initiative will eliminate any confusion about the obligation to disclose questionable transactions to the IRS.

Third, the penalties for the failure to comply with the existing enforcement regime may be insufficient to deter efforts to avoid IRS scrutiny. For example, there currently is no penalty on a taxpayer for failure to disclose a transaction subject to the disclosure requirements (although nondisclosure may be a factor in determining if an accuracy-related penalty applies to any underpayment). The Treasury Department's enforcement initiative will create a new and significant penalty on taxpayers who fail to disclose transactions, and will increase significantly the penalty imposed on promoters who delay in providing investor lists to the IRS. Corporations also will be required to disclose publicly to their shareholder penalties that they incur for undisclosed listed transactions. Finally, the Government will be authorized to seek injunctions against promoters who repeatedly disregard the registration and list-keeping rules.

Finally, many taxpayers and promoters believe that they can disregard the rules and avoid detection. As described below, the IRS already is taking steps to increase its detection of tax avoidance transactions, and these proposals will significantly enhance the IRS' ongoing efforts.

**Ongoing Efforts to Combat Abusive Tax Avoidance Transactions and Their Promoters**

The Treasury Department and the IRS recently have taken a number of important, additional steps to combat abusive tax practices. The Treasury Department and the IRS are committed to making sure that the necessary time, effort, and resources are committed to this important issue.

Taxpayer Initiatives

- Encouraged Voluntary Disclosure – IRS Announcement 2002-2, which was issued last December, gives taxpayers an incentive to disclose questionable transactions and other items that may have resulted in an underpayment. Under the Announcement, if a taxpayer discloses a questionable transaction before April 23, 2002, the IRS will waive the accuracy-related penalty if additional tax ultimately is due. In order to obtain this relief, a taxpayer must disclose all relevant information about the transaction, including the identity of any promoter. The IRS already has received almost 150 disclosures and expects many additional disclosures in the coming weeks. The IRS will use the information it receives to pursue promoters, identify taxpayers that have not disclosed reportable transactions, and evaluate the new types of transactions that are identified.
- Issued Penalty Guidelines – Along with the disclosure initiative, the IRS issued penalty guidelines for tax avoidance transactions, including guidelines for the coordination of penalty consideration with the IRS' Office of Tax Shelter Analysis. These guidelines will ensure that penalties are impartially, fairly, and consistently considered in all tax avoidance transaction cases.

- Evaluated Additional Transactions – The Treasury Department and the IRS recently issued Notice 2002-21, which warns that the IRS will challenge transactions using a loan assumption agreement to claim an inflated basis in assets, Notice 2002-18, which announces the Government's intention to promulgate regulations preventing the duplication of losses by a consolidated group, and Notice 2001-45, which warns that the IRS will challenge transactions improperly shifting basis from one party to another. In addition, the Treasury Department and the IRS recently promulgated final regulations on hedging transactions that prevent employers from deferring tax on income from investments used to fund deferred executive compensation. Other transactions currently are under review. The Treasury Department and the IRS recognize the critical need to expedite the process for reviewing questionable transactions and are working to meet this objective.
- Made Additional Resources Available to Address Abusive Tax Avoidance Transactions – Recent published guidance in areas that have consumed significant IRS audit resources, such as accounting method and timing issues, will allow the IRS to devote more of its audit resources to tax avoidance transactions.
- Developed a Mandatory IDR for LMSB Cases – The IRS' Large and Midsize Business Division (LMSB) has developed an information document request (IDR) that will be used for all LMSB audits beginning in April 2002. This mandatory IDR will request information regarding all listed transactions.
- Increased Coordination with the Department of Justice – In order to coordinate the Government's efforts against abusive tax avoidance practices and conserve resources, the Treasury Department and the IRS have increased their coordination with the Department of Justice on tax avoidance transaction cases.
- Entered into Tax Information Exchange Agreements (TIEAs) - The Treasury Department has mounted a concerted effort to enter into agreements covering the exchange of tax information with significant foreign financial centers where the possibility of hiding income or assets poses a serious problem. Agreements recently have been reached with three key offshore financial centers – the Cayman Islands, Antigua and Barbuda, and The Bahamas.

Promoter Initiatives

The IRS is vigorously pursuing actions against the promoters of corporate and individual tax avoidance transactions. The IRS' objectives are to curb the most egregious promoters, penalize non-compliance, and obtain investor lists that will allow the IRS to target and examine those taxpayers who have engaged in potential tax avoidance transactions.

The IRS has contacted some 30 promoters of tax avoidance transactions in connection with their marketing activities.

- "Soft Letters" – The IRS has requested, through so-called "soft letters," information from these promoters. These letters request investor lists as well as

information regarding compliance with the registration requirements under Section 6111. A number of promoters already have provided the IRS with a significant amount of information, including investor lists.

- Summonses – The IRS, in cooperation with the Department of Justice, is using summonses to force reluctant promoters to provide investor lists and other materials related to their promotion of tax avoidance transactions. These summonses already are proving to be a valuable tool, and additional summonses are being prepared. The IRS and the Department of Justice will seek to enforce all summonses in court, if necessary.

- Penalty Audits – The IRS has begun more than a dozen promoter penalty audits and expects to begin additional audits in the coming weeks.

The IRS also has intensified its enforcement efforts against promoters of abusive tax avoidance transactions and scams directed primarily at individuals and small businesses. These schemes include claims that the federal income tax is unconstitutional, claims that individuals are citizens of the States and therefore not subject to federal income tax, claims that U.S. citizens are not subject to U.S. income tax because of Section 861 of the Code (so-called "Zero Tax" schemes), and credit claims for slavery reparations. The Treasury Department believes that these schemes are especially pernicious because the individuals targeted by promoters often have a limited understanding of their legal duties and obligations. Recent and ongoing actions include:

- Injunctions Granted – The Department of Justice has obtained injunctions against six promoters of abusive tax avoidance schemes, including a preliminary injunction that was issued on February 20, 2002.
- Pending Cases – The Department of Justice has filed an additional eight actions against promoters of abusive tax avoidance schemes.
- Future Cases – The IRS has referred a number of additional promoter cases to the Department of Justice in order to initiate legal action against these promoters.

In addition, the IRS is pursuing a major initiative against promoters of abusive offshore trust schemes. These schemes use banks located in offshore financial centers to help U.S. individuals hide income while at the same time allowing these individuals to access their offshore money in the U.S. by using credit cards issued by the offshore banks. The IRS believes that thousands of individuals are using these schemes to evade tax. In addition to an extensive publicity campaign to educate the public about the dangers of these schemes, the IRS is working to shut them down.

- Summonses to Financial Networks – Summonses have been issued to two financial networks to obtain transaction information that will allow the IRS to identify individuals who are using credit cards issued by foreign banks to evade tax.
- Summonses to Vendors – Although information obtained from the financial networks may identify accounts, these schemes are set up so that the financial

networks often do not have information identifying specific persons. Summonses will be issued to vendors expected to have identification information for credit card transactions. The IRS expects to identify individuals through these vendor summonses.

- IRS Audits - The IRS will initiate audits of individuals who are identified as participants in these schemes. If an identified individual is already under audit, this information will be provided to the auditor.
- Criminal Prosecution – The IRS and the Department of Justice will initiate, where appropriate, criminal proceedings against individuals who have violated the criminal laws by participating in these schemes.

Aggressive enforcement and continuous taxpayer education will continue to be keys to the Government's efforts to close down the tax schemes being marketed to individuals and small businesses. For the more sophisticated tax avoidance transactions, increased transparency, supported by stiffer penalties, is needed.

* * *

The Treasury Department's enforcement proposals are divided into administrative actions and legislative proposals. These proposals, collectively, will enhance and expand the efforts to combat abusive tax avoidance transactions.

## THE TREASURY DEPARTMENT'S ADMINISTRATIVE ACTIONS

1. **Expand the Disclosure Rules to Cover Partnerships, S Corporations, Trusts, and Some Individuals** – The Treasury Department and the IRS will amend the regulations under Section 6011 of the Code to require partnerships, S corporations, trusts and individual taxpayers to disclose "reportable transactions," as described in Administrative Action No. 3, below. This requirement, however, will not affect individuals unless they engage in specifically identified tax avoidance transactions or in other transactions resulting in a significant reduction of tax liability.

   *Reason for Proposal: Under current law, only corporate taxpayers are required to disclose reportable transactions on a tax return. The Treasury Department believes that potentially abusive tax avoidance transactions are increasingly being used by high net-worth individuals. Individuals, for example, have used transactions modeled after those described in Notice 2000-44 (the so-called "Son of Boss" transaction) and Notice 2001-45 (basis-shifting transaction) to avoid paying income tax. In addition, potentially abusive transactions by both corporations and individuals often employ partnerships and trusts to achieve unintended tax results. The Treasury Department believes that individuals, partnerships, S corporations, and trusts should be required to disclose questionable transactions. While this will*