LEWIS, RICE & FINGERSH, L.C.

ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM

TEL (314) 444-7600 FAX (314) 241-6056

April 12, 2002

Dr. Andrew Stern and Mrs. Marilyn Sands, Trustees
Trust F/B/O Abigail Stern U/W Laurie Sands
c/o Constellation Brands, Inc.
300 Willowbrook Office Park
Fairport, New York 14450-4222

Dear Dr. Stern and Mrs. Sands:

You have requested our opinion with respect to certain Federal income tax consequences of certain aspects of the Financial Plan.[1]

## FACTS

The assets of the Trust include a 49.5% Class 2 Partners interest in CWC-I. CWC-I is a general partnership formed under the laws of the State of New York. The Managing Partners of CWC-I are Richard Sands and Robert Sands. The Managing Partners have the discretion to make distributions of available cash to Class 2 Partners in proportion to the balances in a Class 2 Partners' capital account. The principal investment of CWC-I is Constellation common stock.

As of September 4, 2001, CWC-I was the beneficial owner[2] of 766,092 shares of Constellation Class A common stock. If CWC-I had been the beneficial owner of those Constellation shares from January 1, 2001, through September 4, 2001, the aggregate value of those holdings would have varied from a high of $35,247,892.92 to a low of $20,516,709.85. Constellation stock had been volatile, and it was CWC-I's principal investment asset.

---

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by the Trust F/B/O Abigail Stern U/W Laurie Sands ("Trust") having the duration, purposes, and components discussed in this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "Reg." relates to the referenced section of the regulations issued under the Code as set forth in Title 26 of the Code of Federal Regulations, (iv) "IRS" refers to the Internal Revenue Service, (v) "RMC" refers to R, R, M & C Management Corporation, (vi) "ALP" refers to Alpha I L.P., (vii) "BLC" refers to Beta Partners L.L.C., (viii) "Constellation" or "Company" refers to Constellation Brands, Inc., (ix) "CWC-I" refers to CWC Partnership-I, (x) "MLRR" refers to M, L, R & R, (xi) "PaineWebber" refers to UBS PaineWebber, Inc., and (xii) "Treasury Notes" refers to United States Treasury Notes. Although this letter is addressed to Dr. Stern and Mrs. Sands (collectively, the "Trustees"), they are generally referred to in the third persons herein to assure clarity of reference.

[2] See Pre-Effective Amendment to Form S-3 of Constellation, filed with the Securities and Exchange Commission on September 3, 2001, at page S-45 with respect to computation of the number of shares reflected in text.

EXHIBIT 19

Over the years, consistent with their fiduciary obligations, the Trustees have consulted with Richard Sands and Robert Sands, in their capacity as Managing Partners of CWC-I, in connection with the investment of the assets of CWC-I and relied on their knowledge, advice, and investment decisions. All references in the following paragraphs to the Trustees' knowledge, beliefs, and decisions should be taken as references to their understanding of the knowledge and beliefs of the Managing Partners of CWC-I, and decisions the Trustees made based on their understanding of the knowledge, beliefs, advice, and recommendations of the Managing Partners of CWC-I.

The Sands family is the Company's largest shareholder. Members of the Sands family and the Trust, through its interest in CWC-I, conduct many collective investment activities through MLRR, of which CWC-I is a general partner. Over the years, MLRR has worked to maintain a well-diversified investment portfolio. Through the interest of CWC-I in MLRR, the Trust has invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities), (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merger, acquisition, or disposition), and (iii) directional arbitrage (investing in long and/or short positions in a security). These activities have resulted in an unconventional portfolio that enhances return and decreases volatility, and the Financial Plan is, in part, an extension of the above described investment strategy.

On June 20, 2001, Constellation announced that it had filed a Shelf Registration Statement on Form S-3 with the Securities and Exchange Commission. That shelf registration allowed Constellation to issue various types of securities, including debt, Class A common stock and preferred stock, from time to time, up to an aggregate of $750 million. An officer of Constellation explained that the registration helped the Company maintain financial flexibility, provided efficient access to the capital markets, supported its growth, and permitted it to refinance debt when market conditions were favorable.

On September 4, 2001, Constellation announced that it had filed a pre-effective amendment to its $750 million Shelf Registration Statement to authorize the sale of up to 2.15 million shares of Constellation's Class A common stock beneficially owned by members of the Sands family (the "Secondary Offering"). Constellation's announcement explained that the sale of these shares would accomplish certain objectives of the Sands family, including portfolio diversification, estate planning and charitable giving. Nevertheless, Constellation explained, the Sands family would remain the largest shareholder of Constellation stock following the completion of the sale.

The Trust, through its interest in CWC-I, had a substantial unrealized profit in the stock of Constellation that CWC-I held at the inception of the Financial Plan. Richard Sands and Robert Sands, as Managing Partners of CWC-I, indicated to the Trustees that they decided to sell some of CWC-I's Constellation stock in the Secondary Offering for the reasons noted above. Richard Sands and Robert Sands have advised the Trustees that they decided to do so before and

independently of the Trustees deciding to implement the Financial Plan. Richard Sands and Robert Sands also advised the Trustees that they would have sold those Constellation shares irrespective of whether the Trustees decided to effect the short sales of Treasury Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

By the time of the September 4, 2001, SEC filings referenced above, the Trustees believed the United States economy had slowed materially. At that time, the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on seven separate occasions in 2001 by a total of 300 basis points. Thus, the Federal Funds Rate on September 4, 2001, was 3.50%, rather than 6.50%, the rate on January 1, 2001. Nevertheless, the Trustees believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. Although they viewed this prospect as both a concern and an opportunity, the Trustees believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

By the time of the September 4, 2001, SEC filings referenced above, the Trustees deemed the implementation of the Financial Plan, including a short sale of Treasury Notes, to be an attractive investment opportunity, presenting a reasonable prospect for significant profits after taking into account all related fees and expenses, even if it presented no income tax benefits, particularly when considered in conjunction with the Trust's beneficial ownership of Constellation stock through its interest in CWC-I. Even so, there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately three percent (3%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can recognize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change. The short sale of Treasury Notes was a transaction independent of the sale of Constellation stock and had its own separate business purpose.

Other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

The Trustees became interested in, and ultimately decided to adopt, the Financial Plan to effect several objectives, including:

- Realize investment profits on dispositions of Constellation stock and on purchases and sales of other investments, including one or more short positions in Treasury Notes or similar securities.

- Increase the diversification of the Trust's investment holdings.
- Provide greater liquidity in the Trust's investment portfolio.
- Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock and purchases and sales of other investments.
- Enhance the privacy and confidentiality of the Sands family's financial information and, correlatively, reduce risks to the personal safety and security of beneficiaries of the Trust.

The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of the Trust's investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale, the disposition of Constellation stock and the purchase and sale of other investments, the improvement to the Sands family's privacy and personal security, and the anticipated tax benefits, all contributed to the Trustees' determination to adopt the Financial Plan.

The Trust has used limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss in the Trust's investment activities, and Richard Sands and Robert Sands have caused several entities to be formed to effect various elements of the Financial Plan for the Trust over the next several years. Moreover, use of such entities tends to limit contract or tort liability generated by an entity to the assets of that entity, permits admission of or sale to an outside investor of a limited group of assets or activities, and facilitates transfer of a beneficial interest in assets without transferring the assets or an undivided interest in the assets themselves, limiting the effect of state transfer taxes. If a limited liability entity is given a name unrelated to those of its equity owners, it may promote the privacy and security of those owners.

The Trustees have implemented and intend to continue to implement each element of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the Financial Plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. To effect the purposes of the Financial Plan set forth above, the contemplated elements of the Financial Plan are:

- Incorporation of RMC on August 23, 2001, the issuance to each of Richard Sands and Robert Sands, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to each of Richard Sands and Robert Sands, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by each of Richard Sands and Robert Sands to RMC of 1,001 shares of

Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001.

- The opening of a brokerage account at PaineWebber by the Trust on August 21, 2001, the transfer of $362,500 cash by the Trust to the brokerage account at PaineWebber on August 23, 2001.
- The opening of a short sale of Treasury Notes on August 23, 2001, and the closing of that short sale transaction by R, R, M & C Partners, L.L.C. ("RLC"), an entity in which the Trust had an indirect interest, on September 6, 2001.
- On October 1, 2001, RLC sold all 2,002,002 shares of Constellation Class A common stock it owned in the Secondary Offering at the public offering price of $38.75 per share.

Following the closing of the Secondary Offering on October 1, 2001, the Trust, through its interest in CWC-I, retained a substantial interest in Constellation. CWC-I had the shared power to vote or dispose of 118,094 shares of Class A common stock of Constellation and 1,524,770 shares of Class B common stock of Constellation. The Class B shares are convertible into Class A shares on a one-for-one basis at any time at the option of the Class B shareholder.

The Trust, through its interest in CWC-I, continued to have a substantial unrealized profit in the stock of Constellation that CWC-I held following the completion of the Secondary Offering. Richard Sands and Robert Sands have advised the Trustees that they determined to sell additional shares of Constellation stock to continue to enhance the diversification of the portfolio of CWC-I, and to achieve greater liquidity, but to do so in an orderly way so as to maximize the proceeds of such dispositions and to comply with applicable securities laws. Richard Sands and Robert Sands have advised the Trustees that they would have determined to sell additional shares of Constellation stock held by CWC-I irrespective of whether the Trust decided to effect the short sales of Treasury Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

By late November 2001, the Open Market Committee of the Federal Reserve Board had reduced the Federal Funds Rate on 11 separate occasions in 2001 by a total of 475 basis points. Nevertheless, the Trustees believed, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. Although they viewed this prospect as both a concern and an opportunity, the Trustees believed that a short position in Treasury Notes was likely

to rise in value as interest rates began to rise again. Accordingly, the Trust commenced additional trades to attempt to take advantage of this opportunity.

- Formation of ALP on December 3, 2001.
- The execution of a second short sale of Treasury Notes on December 11, 2001.
- To effect this short sale, the Trust borrowed Treasury Notes from PaineWebber, thereby incurring an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds of the short sale in the Trust's account pending the Trust's acquisition and delivery to PaineWebber of Treasury Notes to close the transaction. Specifically, the Treasury Notes were in two lots. The first lot had a total face amount of $1,995,000, and was due 09/30/03 at 2.750%. The second lot had a total face amount of $855,000, and was due 05/15/06 at 4.625%. The net proceeds of the short sales totaled $2,868,984.07, comprising $2,855,032.03 of principal and $13,952.04 of accrued interest.
- The Trust contributed its PaineWebber account noted above to CWC-I, together with cash in the amount of $80,383.31.
- CWC-I, Andrew Stern, Marilyn Sands, The Marvin Sands Master Trust, Richard Sands, and Robert Sands contributed assets to ALP on December 17, 2001, in exchange for a limited partner interests of 12.949%, 5.857%, 14.641%, 27.030%, 18.022%, and 21.401%, respectively; and RMC contributed assets to ALP on December 17, 2001, in exchange for a 0.1% general partner interest. More specifically, CWC-I transferred the Trust's PaineWebber brokerage account noted above, which was also holding the proceeds of another short sale on December 11, 2001, of $1,995,000 of Treasury Notes dated 09/30/03 with a coupon rate of 2.750% and of $855,000 of Treasury Notes dated 05/15/06 with a coupon rate of 4.625%, together with cash in the amount of $160,766.20, and each other limited partner contributed cash and a Paine Webber brokerage account that held the proceeds of a short sale of Treasury Notes, each in an amount proportional to the percentage interest of the partner, together with the related obligation to close the short sale. The assets transferred by RMC to ALP consisted of $2,582.00 of cash.
- Purchase by ALP of 67,525 shares of stock in Corning, Inc. (NYSE:GLW) and 33,400 shares of stock in Yahoo, Inc. (NasdaqNM:YHOO) on December 17, 2001.
- Formation of BLC on December 10, 2001.
- Contribution of assets by ALP to BLC on December 20, 2001, in exchange for a 99.0043% membership interest; and contribution of assets by Gloria S. Robinson ("Robinson") to BLC on December 20, 2001, in exchange for a 0.9957% membership

interest. More specifically, ALP transferred to BLC its Paine Webber brokerage account holding the proceeds of the short sales of Treasury Notes described above, together with the GLW and YHOO shares noted above, and Robinson transferred to BLC cash in the amount of $25,000.

- On December 26, 2001, BLC closed the short sale of Treasury Notes at a cost of $44,203,069.47, comprising $43,927,468.75 of principal and $275,600.72 of accrued interest.
- BLC realized a $150,218.75 gain on the short sale transaction, but incurred net interest expense of $60,200.80, for a net economic gain on the short sale transaction of $90,017.95.
- At such intervals and in such increments as market conditions indicate could be profitable and appropriate, BLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

In addition to the elements of the Financial Plan noted above, on December 27, 2001, ALP and Robinson agreed to, and closed, a purchase by ALP of the membership interest of Robinson in BLC for a cash purchase price of $25,999.13.

The Managing Partners of CWC-I have indicated to the Trustees that, as officers and directors of Constellation, they are accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently verifying such data. Furthermore, the Managing Partners of CWC-I are familiar with and comfortable taking business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and they are relying in recommending that the Trustees pursue the Financial Plan.

Over the years, consistent with their fiduciary obligations, the Trustees have both relied on advice of the Managing Partners of CWC-I and have made independent investment decisions. Through CWC-I, the Trust has held a wide range of investments and used a variety of investment techniques, taking into account positions held directly, and those held indirectly through investment partnerships, through managed accounts, and through the Company. These investments included publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States Treasury obligations, municipal obligations, mutual funds, and compensatory and non-compensatory stock options. Investment techniques the Trust has used either directly or indirectly, as indicated above, included short sales, short sales against the box, hedging transactions, and margin accounts. The Trust has used a variety of entities in its investments, including general partnerships, limited partnerships, and limited liability companies.

In deciding to pursue the Financial Plan, the Trustees considered it to be a multiyear, multiple transaction strategy, intending to use the entities created as a part of the Financial Plan for a series of future investments, and possibly also for estate planning and wealth distribution purposes.

In deciding to pursue the Financial Plan, the Trustees were aware that the Trust would be obligated to pay substantial fees, but they had a reasonable expectation that the gains the Trust would receive from the series of future investments would exceed the fees and costs—including the fee paid to The Heritage Organization, L.L.C. ("Heritage")—that it incurred in connection with the Financial Plan.

In retaining Heritage to assist them, the Trustees believed that the Trust was retaining a sophisticated, trusted adviser and they expected to receive more from Heritage than assistance in structuring investment transactions so that they produced the best tax results. The Trustees understood that Heritage has rendered a wide range of services to some of their other clients related to the business, investment, and family issues faced by those clients.

Despite the Trust's transfer of the brokerage account to CWC-I, and the subsequent transfer of that account by CWC-I to ALP and ALP to BLC, the Trust retained (through those entities) a significant potential for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on any aspect of the Financial Plan receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges any of the contemplated tax consequences of the Financial Plan.

Neither the Trust nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by BLC of Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

At all relevant times, CWC-I, ALP, BLC, and the Trust have held each of the assets and interests related to the Financial Plan, including, without limitation, the long positions in Constellation, GLW, and YHOO stock, and the short position in Treasury Notes, as capital assets, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in Financial Plan—including, without limitation, Gloria S. Robinson—participated for investment purposes and for his, her, or its own account, not as agent, nominee, or "straw party" for another. To the Trustees' knowledge, no participant

in the Financial Plan received any indemnity or assurance that he, she, or it would be protected against loss.

No part of the property held by BLC at the time of ALP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of BLC, as those terms are defined in Code section 751 and its related regulations.

In rendering the opinions set forth in the section entitled "Opinions of Counsel" below, we have reviewed various documents (collectively, the "Operative Documents"). The Operative Documents include, but are not limited to, the following:

- Articles of Incorporation of RMC dated August 23, 2001;
- Certificate of Incorporation of RMC dated August 23, 2001;
- Election by a Small Business Corporation (Form 2553) of RMC effective August 23, 2001, and dated August 23, 2001;
- Certificate of Limited Partnership of ALP dated December 3, 2001;
- Agreement of Limited Partnership of ALP dated as of December 3, 2001;
- Transfer and Assignment dated December 13, 2001, reflecting the transfer by the Trust of its PaineWebber brokerage accounts to CWC-I;
- Transfer and Assignment dated December 17, 2001, reflecting the transfer by CWC-I of its PaineWebber brokerage accounts to ALP;
- Articles of Organization of BLC dated December 10, 2001;
- Certificate of Organization of BLC dated December 10, 2001;
- Operating Agreement of BLC dated December 10, 2001;
- Transfer and Assignment dated December 20, 2001, reflecting the transfer by ALP of its PaineWebber brokerage accounts to BLC;
- Limited Liability Company Interest Purchase Agreement dated December 27, 2001, between ALP and Robinson;
- Wire transfer authorization and instructions dated December 27, 2001, relating to a transfer of $25,999.13 from ALP to Robinson; and

- Record of completion on December 27, 2001, of the above-referenced wire transfer transaction.

**OPINIONS OF COUNSEL**

Based upon the "Facts" set forth above, the "Analysis" set forth below, and subject to the "Conditions and Limitations" set forth below, we are of the opinion[3] that there is substantial authority for the Federal income tax treatment of the above-described elements of the Financial Plan in accordance with the opinions enumerated below, and that it is more likely than not that the Federal income tax treatment of the above-described elements of the Financial Plan as set forth in the opinions enumerated below is proper:

1. The obligation to replace the Treasury Notes borrowed for the short sale will not be treated as a "liability" within the meaning of Code section 752. Consequently, the obligation to replace the borrowed securities will not reduce either the basis of the Trust in its partnership interest in CWC-I, the basis of CWC-I in its partnership interest in ALP, or the basis of ALP in its membership interest in BLC.

2. BLC terminated under Code section 708(b)(1)(A) upon the purchase by ALP of the interest of Robinson in BLC because, after that purchase, only one of the members of BLC remained and, as a result, no part of the operations of BLC thereafter will be carried on by any of its partners in a partnership.

3. Upon the termination of BLC under Code section 708(b)(1)(A), BLC will be deemed to have made a liquidating distribution of all of its assets to ALP and Robinson, and following this distribution, ALP will be treated as purchasing the assets deemed to have been distributed to Robinson in liquidation of Robinson's interest in BLC. ALP will take a cost basis and a new holding period (beginning on the day immediately following the date of the sale) in those assets deemed to have been purchased from Robinson. ALP will be considered to have received a liquidating distribution of those assets attributable to ALP's former interest in BLC.

4. Pursuant to Code section 731(a)(1), ALP will be required to recognize gain (if any) in an amount equal to the excess of the money actually or constructively distributed to it over the adjusted tax basis of such partner's interest in the partnership. Pursuant to Code section 731(a)(2), ALP will not recognize a loss on the transaction unless the only property distributed consists of money, unrealized receivables (as defined in Code section 751(c)), and inventory items (as defined in Code section 751(d)). Under Code section 732(b), ALP will take a basis in the assets deemed to have been

[3] In issuing these opinions, we have determined the weight of the authorities as required by the Regulations regarding the "substantial authority" and "more likely than not" standards under Code section 6662 and related Regulations, as discussed below.

received in the liquidation of its interest in BLC equal to ALP's basis in its BLC interest, less any money actually or constructively distributed to such partner. Under Code section 735(b), ALP will take a holding period in the assets deemed to have been received in the liquidation of its interest in BLC that includes the holding period of the terminating partnership in those assets, as determined under section 1223.

In connection with these opinions, we note that, on November 14, 2000, the United States Tax Court issued a memorandum opinion in *Salina Partnership, LP v. Commissioner*,[4] holding that an obligation to replace United States Treasury Bills borrowed for a short sale was a "liability" within the meaning of Code section 752. We believe that the Court's conclusion on that issue is incorrect, would be reversed on appeal, and would not be followed if the issue were presented to a different court. However, the parties settled the issues presented in *Salina* and certain related cases by documents filed with the court on September 24, 2001. A more detailed analysis of *Salina* is set forth below in the section entitled "***Federal income tax status of short sale obligations—Cases—Salina***."

**ANALYSIS**

***Opinion standards***

In issuing the opinions set forth above and in analyzing the potentially-applicable legal authorities, we have used the "substantial authority" and "more likely than not" terminology and related standards as set forth in Code sections 6662 and 6664 and related Regulations.

The "more likely than not" standard[5] requires that there be a greater than fifty percent chance of success. Accordingly, each opinion stated above on a more likely than not basis means that, in the opinion of this firm, there is a greater than fifty percent (50%) likelihood that the Federal income tax treatment with which the opinion deals will be upheld if challenged by the IRS.

By contrast, the substantial authority standard[6] requires that the weight of authorities supporting the treatment be substantial in relation to the weight of authorities supporting contrary treatment.[7] Although the substantial authority standard is less demanding than the more likely than not standard, it requires more than a mere reasonable basis.[8] The Regulations specify not only the authorities considered for this purpose,[9] but also certain operating rules in establishing

[4] T.C. Memo. 2000-352 (November 14, 2000) ("*Salina*") (citations to *Salina* herein use the pagination of the Court's slip opinion).
[5] Reg. § 1.6662-4(d)(2).
[6] *Id.*
[7] Reg. § 1.6662-4(d)(3)(i).
[8] Reg. § 1.6662-4(d)(2).
[9] Reg. § 1.6662-4(d)(3)(iii) states that for purposes here relevant:

the weight of the authorities.[10] Generally, the weight of an authority depends on its relevance and persuasiveness, type (e.g., statute, regulation, published ruling, private letter ruling, et al.), factual and logical specificity, and age. Accordingly, each opinion stated above with respect to the existence of "substantial authority" for a stated conclusion means that, in the opinion of this firm, the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment, each determined in accordance with the principles stated in the applicable statutes and Regulations, and as summarized above.

***Federal income tax status of short sale obligations***

<u>*Statute and regulations*</u>

Code section 752 provides, in pertinent part, that

> (a) INCREASE IN PARTNER'S LIABILITIES.--Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) DECREASE IN PARTNER'S LIABILITIES.--Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

Any such deemed contribution or distribution as a result of an increase or decrease in a partner's share of partnership liabilities will increase or decrease the partner's adjusted basis in his

---

only the following are authority for purposes of determining whether there is substantial authority for the tax treatment of an item: applicable provisions of the Internal Revenue Code and other statutory provisions; proposed, temporary and final regulations construing such statutes; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; General Explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); private letter rulings and technical advice memoranda issued after October 31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); Internal Revenue Service information or press releases; and notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin. Conclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority. The authorities underlying such expressions of opinion where applicable to the facts of a particular case, however, may give rise to substantial authority for the tax treatment of an item.

[10] Reg. § 1.6662-4(d)(3)(ii).

partnership interest and, if the deemed distribution exceeds the partner's adjusted basis, will result in gain recognition.[11]

Neither Code section 752 nor the Regulations promulgated thereunder defines the term "liability" or describes the characteristics of a "liability." Similarly, neither Code section 752 nor the Regulations thereunder indicates whether the obligation of an individual who has engaged in a short sale transaction will be characterized as a "liability" under Code section 752.

A temporary regulation issued in December 1988 included the following definition of a "liability" as that term is used in Code section 752:

> Except as otherwise provided in the regulations under section 752, an obligation is a liability of the obligor for purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to--
>
> (1) *The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);*
>
> (2) A deduction that is taken into account in computing the taxable income of the obligor; or
>
> (3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.[12]

Without explanation, the Treasury Department excluded this definition when it issued final regulations in December 1991.[13]

Many sections of the Code in addition to section 752 use the term "liability," frequently in the context of a tax liability under the Code, but no section defines the term generally. Code section 357 uses the term in requiring gain recognition on certain asset transfers to a corporation in which "liabilities" are assumed or the transferee corporation receives assets subject to certain "liabilities" of the transferor. Neither Code section 357 nor the Regulations promulgated thereunder defines the term "liability" or describes the characteristics of a "liability." Similarly, neither Code section 357 nor the Regulations thereunder indicates whether the obligation of an individual who has engaged in a short sale transaction will be characterized as a "liability" under Code section 357. After courts considering whether *accounts payable* constituted liabilities under section 357 reached inconsistent conclusions,[14] Congress enacted Code section 357(c)(3)[15] in

---

[11] Code sections 705, 731.
[12] Treas. Reg. § 1.752-1T(g), T.D. 8237, 1989-1 C.B. 180 (emphasis added).
[13] T.D. 8380 (Dec. 20, 1991).
[14] *Compare Bongiovanni v. Commissioner*, 470 F.2d 921 (2d Cir. 1972) (payables of a cash-method taxpayer were not liabilities for purposes of section 357(c); observing that "Section 357(c) was meant to apply to what might be called 'tax' liabilities, i.e., liens in excess of tax costs, particularly mortgages encumbering property transferred in a Section 351 transaction"); *and Focht v. Commissioner*, 68 T.C. 223 (1977), *acq.* 1980-2 C.B. 1 (obligation is not a liability for purposes of section 357 to the extent that the obligation would have been deductible if paid); *with Thatcher v. Commissioner*, 533 F.2d 1114, 1117 (9th Cir. 1976) (same issue, opposite conclusion, observing that

1978, in order "to resolve the ambiguity as to whether for purposes of sections 357(c) and 358(d) the term 'liabilities' includes deductible liabilities of a cash basis taxpayer."[16] Code section 357(c)(3) reads:

> (c)(3)(A) IN GENERAL.--If a taxpayer transfers, in an exchange to which section 351 applies, a liability the payment of which either--
> (i) would give rise to a deduction, or
> (ii) would be described in section 736(a),
> then, for purposes of paragraph (1), the amount of such liability shall be excluded in determining the amount of liabilities assumed.
>
> (c)(3)(B) EXCEPTION.--Subparagraph (A) shall not apply to any liability to the extent that the incurrence of the liability resulted in the creation of, or an increase in, the basis of any property.

Code section 1233, Reg. § 1.1233-1, and IRS revenue rulings[17] treat a short sale as a taxable event upon the delivery of property to close the short sale. The gain or loss is the difference between the sale proceeds received (upon executing the short sale) and the cost of the property used to close the transaction.[18] Although the IRS generally asserts that "open transaction" treatment applies only in "rare and extraordinary cases,"[19] and has successfully challenged some taxpayers' efforts to defer gain recognition by applying that doctrine,[20] it is clear that with limited statutory exceptions,[21] short sales are not taxable during the period in

---

"(i)n its ordinary meaning, the term 'liability' means 'that which one is under an obligation to pay ... debt ... [as] opposed to assets.' Webster's New International Dictionary (2d ed. 1941)").

[15] In enacting this provision, however, Congress made it clear that it was "not intended to affect the definition of the term liabilities for any other provision of the Code, including sections 357(a) and 357(b)." *Id.* Six years later, in adopting amendments to the partnership-tax sections of the Code relating to contributed property, the House Ways and Means Committee commented: "The committee intends that, similar to the amendments recently made to section 357(c) (and contrary to Rev. Rul. 60-345, 1960-2 C.B. 211), these accrued but unpaid items should not be treated as partnership liabilities for purposes of section 752." H.R. Rep. No. 98-861, 98th Cong., 2nd Sess. 856-57 (1984), 1984-3 C.B. (Vol. 2) 1, 110-11.

[16] S. Rep. No. 95-1263, 95th Cong., 2nd Sess. 185 (1978), 1978-3 C.B. (Vol. 1) 315, 483. Code section 358(d) causes the basis of stock received in an exchange transaction to which Code section 351, 354, 355, 356, or 361 applies to be reduced by the amount of certain liabilities assumed by the corporation as part of the exchange consideration, with the exception of liabilities excluded under section 357(c)(3).

[17] Rev. Rul. 72-478, 1972-2 C.B. 487; Rev. Rul. 73-524, 1973-2 C.B. 307.

[18] Reg. § 1.1233-1(c)(6).

[19] *E.g.*, Reg. § 1.1001-1(a); Temp. Reg. § 15A.453-1(d)(2)(iii).

[20] *E.g.*, *Waring v. Commissioner*, 412 F.2d 800 (3d Cir. 1969); *McCormac v. United States*, 424 F.2d 607 (Ct. Cl. 1970).

[21] For example, Code section 1259, enacted in 1997, generally deems an appreciated financial position to be constructively sold if the taxpayer engages in certain transactions that substantially eliminate both risk of loss and opportunity for gain on the appreciated financial position. Congress adopted this legislation to terminate, among other things, the tax benefits associated with the so-called "short sale against the box transaction." In such a transaction, a taxpayer sells a security short while holding a long position in the identical security. Prior to the enactment of Code section 1259, a taxpayer did not recognize gain under the short against the box transaction until the year in which the short position was closed. By its terms, the new provision applies only to transactions that substantially eliminate any risk of loss or opportunity for gain. A short sale of property that the taxpayer does not

which they are open. Nevertheless, in a 1998 field service advice memorandum,[22] the IRS took the position that these provisions are irrelevant in determining whether the obligation of a short seller to acquire and deliver securities to replace those it borrowed is a "liability" for purposes of Code section 752.[23]

As a part of appropriations legislation[24] for fiscal year 2001, Congress adopted and President Clinton signed into law the Community Renewal Tax Relief Act of 2000 (the "CRTR Act"). One of the administrative and technical corrections provisions included in the CRTR Act states:

> SEC. 309. PREVENTION OF DUPLICATION OF LOSS THROUGH ASSUMPTION OF LIABILITIES GIVING RISE TO A DEDUCTION.
> (a) IN GENERAL.--Section 358 (relating to basis to distributees) is amended by adding at the end the following new subsection:
>
> "(h) SPECIAL RULES FOR ASSUMPTION OF LIABILITIES TO WHICH SUBSECTION (d) DOES NOT APPLY.--
>
> "(1) IN GENERAL.--If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability--
>
> "(A) which is assumed in exchange for such property, and
>
> "(B) with respect to which subsection (d)(1) does not apply to the assumption.
>
> "(2) EXCEPTIONS.--Except as provided by the Secretary, paragraph (1) shall not apply to any liability if--
>
> "(A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or
>
> "(B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.
>
> "(3) LIABILITY.--For purposes of this subsection, the term 'liability' shall include any fixed or contingent obligation to make payment,

---

currently own does not substantially eliminate the risk of loss or opportunity for gain from ownership of the property.

[22] Field Service Advice is not a ruling or technical advice memorandum from the IRS, but rather direction from IRS National Office to IRS field agents with respect to legal positions to take in an examination and the factual development required in connection with such positions. Field Service Advice memoranda are not included in the list of documents characterized as "authority" in Reg. § 1.6662-4(d)(3)(iii) for purposes of weighing whether "substantial authority" exists for a tax return position.

[23] Field Service Advice 199913016 (Dec. 23, 1998) (IRS commented that "Neither I.R.C. §1233 nor Reg. §1.1233-1(a)(1) prescribe or suggest when the obligation that arises in a short sale transaction is included in basis of the partnership assets. In addition, there is nothing in the legislative history of I.R.C. §1233 or in the history of Reg. §1.1233-1(a)(1) to suggest such a rule exists. ... Our position is that the only provisions which govern the determination of when the value of an obligation is included in the basis of the partnership assets are the partnership rules under Subchapter K, specifically, I.R.C. §§752 , 732 and 722. ")

[24] The Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 106th Cong. 2nd Sess. (2000).

without regard to whether the obligation is otherwise taken into account for purposes of this title."

(b) DETERMINATION OF AMOUNT OF LIABILITY ASSUMED.--Section 357(d)(1) is amended by inserting "section 358(h)," after "section 358(d),".

(c) APPLICATION OF COMPARABLE RULES TO PARTNERSHIPS AND S CORPORATIONS.--The Secretary of the Treasury or his delegate--

(1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships, and

(2) may prescribe rules which provide appropriate adjustments under subchapter S of chapter 1 of such Code in transactions described in paragraph (1) involving S corporations rather than partnerships.

(d) EFFECTIVE DATES.--

(1) IN GENERAL.--The amendments made by this section shall apply to assumptions of liability after October 18, 1999.

(2) RULES.--The rules prescribed under subsection (c) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules.

To the extent that this legislation is either self-executing[25] or is implemented by Treasury Regulations, it does not adversely affect, and appears to provide additional support for, the opinion stated above that the obligation to replace the Treasury Notes borrowed for the short sale will not be treated as a "liability" within the meaning of Code section 752. The reasons for this conclusion include the following:

- The legislation does not yet apply to partnerships as the Treasury Department has not yet issued the implementing regulations authorized by Section 309(c)(1) of the CRTR Act. Although the legislation provides that the Treasury Department "shall prescribe" the subject rules, it is uncertain what form those rules may take, what exceptions they

---

[25] Many decided cases deem the issuance of regulations to be a condition to the application of statutes providing consequences "only to the extent provided in regulations prescribed by the Secretary," unless the statute is intended to provide a rule favorable to taxpayers that would be thwarted by the application of that general principle. *See Estate of Maddox v. Commissioner*, 93 T.C. 228, 233-234 (1989); *First Chicago Corp. v. Commissioner*, 88 T.C. 663, 676-677 (1987), *affd*, 842 F.2d 180 (7th Cir. 1988); *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819, 829 (1984). In other circumstances, particularly where the regulation is to provide "how" the statute is to apply, courts examine the text of the statute, the related legislative history, and other pertinent evidence to determine whether the statute should not be effective until the issuance of regulations. *Schwalbach v. Commissioner*, 111 T.C. 215, 226 (1998). If the court does not conclude that the statute should be regarded as ineffective until the issuance of regulations, the statute "may be interpreted in light of all pertinent evidence, textual and contextual, of its meaning." *Id. citing Commissioner v. Soliman*, 506 U.S. 168, 174 (1993); *Crane v. Commissioner*, 331 U.S. 1, 6-7 (1947); *Old Colony R.R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932), *Trans City Life Ins. Co. v. Commissioner*, 106 T.C. at 299-300; *Estate of Neumann v. Commissioner*,106 T.C. 216 (1996); *H Enters. Intl., Inc. v. Commissioner*, 105 T.C. 71, 81-85 (1995). *Compare* Code section 108(e)(4) (stating that "to the extent provided in regulations prescribed by the Secretary" certain acquisitions of debt by persons related to the debtor are treated as acquisitions of the debt by the debtor) *with* T.D. 8460, 1993-1 CB 19 (issuing regulations under Code section 108(e)(4) and commenting that "It remains the position of the Service and Treasury that section 108(e)(4) is effective from the date of its enactment. The statutory language of section 108(e)(4) is reasonably clear in its primary application.").

may provide, how quickly, if ever, the Treasury Department will exercise its regulatory authority, whether the Treasury Department will choose to make the regulations effective on October 18, 1999, or on some later date as it is authorized to do under Section 309(d)(2) of the CRTR Act, and whether valid regulations can be issued with such a retrospective effective date.

- Second, the legislation directs the issuance of regulations "to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in" Code section 358(h)(3). It is not clear what Congress had in mind in crafting this language, but the transactions that constitute the Financial Plan cannot reasonably be characterized as ***accelerating or duplicating losses***. It is uncertain how the IRS will give effect to this language in drafting regulations. Although any regulation issued by the IRS would likely be applied by a court consistently with the plain meaning of the words it used, this statutory language could be taken into account if the regulation is either inconsistent with the statute or is ambiguous, diminishing the possibility that this legislation could require a basis reduction for obligations such as those involved in the Financial Plan.

- Third, the statute provides, in general, that any fixed or contingent obligation to make payment is deemed to be a "liability," without regard to whether it is otherwise characterized as a liability for purposes of Federal income taxation. In common parlance, "making payment" denotes the satisfaction of a ***pecuniary*** obligation.[26] By limiting the definition of "liability" to obligations "to make payment," Congress effectively excluded from the "liability" definition the obligation of a short seller ***to replace in kind*** the Treasury Notes borrowed to effect a short sale.

- Fourth, to determine the basis of stock received from a corporation in exchange for a capital contribution to that corporation (or the basis of a partnership interest received from a partnership in exchange for a capital contribution to that partnership, if applicable to partnerships), the statute sets forth a general rule and two important exceptions.

  - The general rule is that if, after taking into account other applicable limitations, the basis of the stock (or of the partnership interest, if applicable to partnerships) received exceeds its fair market value, then that basis is to be reduced (but not

[26] *See, e.g.*, THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE (Fourth Ed. 2000) ("TRANSITIVE VERB : 1. To give money to in return for goods or services rendered: "pay the cashier." … INTRANSITIVE VERB : 1. To give money in exchange for goods or services."), *republished at* http://www.bartleby.com/61/49/P0124900.html.

below its fair market value) by the amount of the assumed[27] liabilities, determined as of the date of the exchange.

- Two exceptions—the "trade or business transfer" exception and the "substantially all of the assets transfer" exception—exclude obligations that otherwise would be characterized as liabilities under the definition stated above and would reduce the basis of the stock (or of the partnership interest, if applicable to partnerships) received in the exchange. More specifically, if the trade or business with which an obligation is associated is transferred to the person assuming the liability as part of the exchange, or if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation, then such obligations will not reduce the basis of the stock (or the partnership interest, if applicable to partnerships) received in the exchange. ***Nevertheless, Congress expressly authorized the Treasury Department to issue regulations limiting these exceptions***. The Conference Committee report on the Consolidated Appropriations Act included this observation about these exceptions:

> The exceptions for transfers of a trade or business, or of substantially all the assets, with which a liability is associated, are intended to obviate the need for valuation or basis reduction in such cases. The exceptions are not intended to apply to situations involving the selective transfer of assets that may bear some relationship to the liability, but which do not represent the full scope of the trade or business, (or substantially all the assets) with which the liability is associated.

- Finally, Congress chose in the waning days of 2000 to adopt this legislation that had been introduced in substantially similar form in 1998 and 1999. During those years, the Congress, the Treasury Department, the IRS, and the tax bar have devoted substantial amounts of time and attention to the best ways to address certain so-called "tax shelter" transactions, at least one of which represented "tax avoidance using artificially high basis."[28] Taking into account the recent legislative, regulatory, and enforcement efforts dedicated to such matters, this legislation represents the judgment of Congress on when a contingent obligation should be characterized as a "liability" in determining the basis of a partnership interest. As Congress decided generally to exclude an obligation from this definition if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation, and

---

[27] The Conference Committee report provides that, for this purpose "The determination whether a liability (as more broadly defined for purposes of this provision) has been assumed is made in accordance with the provisions of section 357(d)(1) of the Code. Under the standard of 357(d)(1), a recourse liability is treated as assumed if, based on all the facts and circumstances, the transferee has agreed to and is expected to satisfy such liability (or portion thereof), whether or not the transferor has been relieved of the liability. ... Similarly, a nonrecourse liability is treated as assumed by the transferee of any asset subject to such liability." H.R. Rep. 106-1033, 106th Cong., 2nd Sess. 1019 (2000).

[28] IRS Notice 2000-44, I.R.B. 2000-36, 255.

to apply this definition retroactively to October 19, 1999, the IRS and the courts thereafter should defer to that liability definition.

In summary, Congress decided that, for this purpose, an obligation is a "liability" that reduces the basis of a partnership interest if

(a) the Treasury Department issues implementing regulations to apply the corporate basis statute to partnerships, and
(b) the obligation is an "obligation to make payment," and
(c) the obligation is assumed by the partnership in a transfer in which the partnership issues a partnership interest, and
(d) the obligation is ***not*** assumed in connection with the transfer to the partnership of either a trade or business or substantially all of the assets with which the obligation is associated, unless Treasury Regulations supersede the generally-applicable exception with respect to an obligation assumed in connection with such a transfer.

The Financial Plan involves an obligation to replace Treasury Notes borrowed to effect a short sale. That obligation is not a liability under this definition for several reasons. First, the obligation to replace the borrowed Treasury Notes is not an "obligation to make payment" as required by the statute. Second, although the assumption of the obligation to replace the borrowed Treasury Notes to close the short sale occurs in a transfer in which the partnership issues a partnership interest, that assumption is part of a transfer in full of the brokerage account—including the proceeds of sale of the borrowed Treasury Notes, the margin deposit, and the obligation to replace the borrowed Treasury Notes. Accordingly, under the CRTR Act, unless and until the Treasury Department issues valid regulations to the contrary, that obligation is not a "liability" triggering the basis reduction rule. Finally, the Treasury Department has not issued implementing regulations to apply the corporate liability definition statute to partnerships and, although any regulations ultimately issued may be retroactive, this letter applies the law as it exists today.

After the enactment of the CRTR Act, the IRS issued Notice 2001-17, entitled "Contingent Liability Tax Shelter." In that Notice, the IRS described the structure of the transaction in pertinent part, as follows:

> These transactions take several forms but, in all cases, involve the transfer of a high basis asset (i.e., an asset with a basis that approximates its fair market value) to a corporation purportedly in exchange for stock of the transferee corporation, and the transferee corporation's assumption of a liability (such as a liability for deferred compensation or other deferred employee benefits or an obligation for environmental remediation) that the transferor has not yet taken into account for federal income tax purposes. The transferor typically remains liable on the underlying obligation. The basis and fair market value of the transferred asset, which may be a security of another member of the same affiliated group of corporations, are generally only marginally greater than the present value of the assumed liability. Therefore, the value of the stock of the transferee

> received by the transferor is minimal relative to the basis and fair market value of the asset transferred to the transferee corporation.
>
> . . .
>
> The transferor typically sells the stock of the transferee corporation for its fair market value within a relatively short period of time after the purported §351 exchange and claims a tax loss in an amount approximating the present value of the liability assumed by the transferee corporation. In the case of a transaction involving members of an affiliated group that has elected to file a consolidated return, the transaction is structured with the intention of avoiding the loss disallowance rule of §1.1502-20 of the Income Tax Regulations. In addition to the transferor's purported loss on the sale of the stock of the transferee corporation, the transferee corporation may claim a §162 deduction with respect to payments on the liability.[29]

The IRS declared its belief that "***any business purposes*** taxpayers may assert for certain aspects of these transactions are far outweighed by the purpose to generate deductible losses for federal income tax purposes,"[30] and asserted its intent to disallow losses claimed with respect to these transactions. The basis for such intended disallowances varied, however.

> For transfers on or before October 18, 1999, as well as for transfers after October 18, 1999, that are not subject to §358(h), the Service will disallow such losses for one or more reasons, including but not limited to the following: (1) that the purported §351 exchange lacks sufficient business purpose to qualify as a §351 exchange; (2) that the transfer of the asset to the transferee corporation is not, in substance, a transfer of property in exchange for stock within the meaning of §351, but instead is either an agency arrangement for the transferor or simply a payment to the transferee for its assumption of a liability; (3) that the purported §351 exchange constitutes an acquisition of control of the transferee corporation for the principal purpose of tax avoidance within the meaning of §269(a) and thus the purported loss should be disallowed under §269(a); (4) that the principal purpose of the transferee's assumption of the liability was a purpose to avoid federal income tax or was not a bona fide business purpose within the meaning of §357(b)(1), and thus the assumption of the liability should be treated as money received by the transferor that reduces its basis in the transferee stock; (5) that the purported loss on the sale of the stock of the transferee corporation is disallowed or limited by the loss disallowance rules of §1.1502-20, including the anti-avoidance rule in §1.1502-20(e) and the duplicated loss rule in §1.1502-20(c); (6) that the purported loss on the sale of the stock of the transferee corporation is not a bona fide loss actually sustained by the transferor, as required by §1.165-1(b); and (7) that the overall transaction lacks sufficient economic substance to be respected for federal income tax purposes, see ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir. 1998), cert. denied, 526 U.S. 1017 (1999).[31]

The IRS observed that it "may impose penalties on participants in these transactions, or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under §6662, the return preparer penalty under §6694, the promoter penalty under §6700, and the aiding and abetting penalty under §6701," and that "(t)ransactions that are the same as or substantially similar to those described in this Notice

---

[29] IRS Notice 2001-17, *reprinted in Daily Tax Report* (January 19, 2001) at L-16.
[30] *Id.* (emphasis added).
[31] *Id.*

2001-17 (***including transactions utilizing partnerships***) are identified as "listed transactions" for the purposes of §1.6011-4T(b)(2) of the Temporary Income Tax Regulations and §301.6111-2T(b)(2) of the Temporary Procedure and Administration Regulations."[32]

The IRS position stated in Notice 2001-17 with respect to transactions after October 18, 1999, is inconsistent with the requirements of current law for several reasons. First, the IRS states generally that such losses are disallowed under Code section 358(h), described above. In stating this position, it did not analyze that section and, in particular, it did not analyze or state its intention with respect to the content of regulations to be issued under that section dealing with the "substantially all of the assets transfer" exception or the application of the new legislation to partnerships. As a result, it is unclear how the IRS will avoid the application of that exception in general and, more particularly, how it will avoid that exception for all such transactions without nullifying the legislative exception by regulation, an action that would suggest strongly the invalidity of the regulation.

Second, as discussed above, the IRS declared that it would rely on seven stated grounds in disallowing losses claimed with respect to "transfers after October 18, 1999, that are not subject to §358(h)." Where Congress specifically considers a subject and enacts comprehensive legislation to solve the problems presented, courts have declined thereafter to apply Federal common law principles, finding that Congressional action preempted the area.[33] The position of the IRS in Notice 2001-17 represents an attempt to apply the new law beyond the limits set forth by Congress. Moreover, to the extent the new law does not provide the restriction sought by the IRS, the IRS attempts improperly to supplement the new law with Federal common law, ignoring tax and nontax decisions to the contrary. As noted above, the IRS and the courts should defer to the new liability definition adopted by Congress, generally retroactive to October 19, 1999, that generally excludes an obligation if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation.

*Cases—In general*

In *Deputy v. du Pont,*[34] Pierre du Pont borrowed 9,000 shares of du Pont stock for a 10-year period and, in connection with the borrowing of the stock, undertook to pay the lender of the shares all dividends paid by the corporation during the 10-year period. The Supreme Court rejected du Pont's argument that the payment of such amounts should be deductible as interest expense under section 23(b) of the Revenue Act of 1928, the predecessor of the current authority

[32] *Id.* (emphasis added).
[33] *See, e.g., City of Milwaukee v. States of Illinois and Michigan*, 451 U.S. 304 (1981) (Federal environmental legislation preempted Federal common law of nuisance); *Smith v. Commissioner*, 78 T.C. 350, 388 (1982) (declining to apply a nonstatutory wash sale analysis to deny losses claimed on commodity straddle transactions and commenting that "we do not believe it is within the province of this Court to attempt to draft our own novel straddle integration provision" where (1) the statutory wash sale provisions did not apply, and (2) Congress recently had adopted legislation dealing with the issue prospectively.)
[34] 308 U.S. 488 (1940).

for the deduction of interest expense, Code section 163. The Court explained its reasoning as follows:

> ***Clearly respondent owed an obligation to the Delaware Company. But although an indebtedness is an obligation, an obligation is not necessarily an "indebtedness" within the meaning of §23(b).*** Nor are all carrying charges "interest." In *Old Colony Railroad Co. v. Commissioner*, 284 U. S. 552, this Court had before it the meaning of the word "interest" as used in the comparable provision of the 1921 Act (42 Stat. 227). It said, p. 560, "* * * as respects 'interest', the usual import of the term is the amount which one has contracted to pay for the use of borrowed money." It there rejected the contention that it meant "effective interest" within the theory of accounting or that "Congress used the word having in mind any concept other than the usual, ordinary and everyday meaning of the term." p. 561. It refused to assume that the Congress used the term with reference to "some esoteric concept derived from subtle and theoretic analysis." p. 561.
>
> We likewise refuse to make that assumption here. It is not enough, as urged by respondent, that "interest" or "indebtedness" in their original classical context may have permitted this broader meaning. We are dealing with the context of a revenue act and words which have today a well-known meaning. In the business world "interest on indebtedness" means compensation for the use or forbearance of money. In absence of clear evidence to the contrary, we assume that Congress has used these words in that sense. In sum, we cannot sacrifice the "plain, obvious and rational meaning" of the statute even for "the exigency of a hard case."[35]

In *Hendricks v. Commissioner,*[36] the Fourth Circuit deemed a short sale to be closed in the year of the settlement date of the transaction in which stock was acquired by the taxpayer and delivered by their broker to the party from which stock had been borrowed to effect the short sale. The court rejected the taxpayer's argument that the date of the order to cover should control, even though the taxpayer had sufficient funds in his account to cover the purchase at the time of the order.

In *Helmer v. Commissioner,*[37] a partnership granted a third party ("X") an option to purchase real estate owned by the partnership. X had to make an initial payment of $150,000 and annual payments of $75,000 for the option. So long as the option was outstanding, the partnership retained the right to remain in possession of the property and to retain the profits therefrom. The only restriction on the option payments was that they be applied against the purchase price of the property if X should exercise its purchase option. The partnership received option payments for three years and distributed them to its partners. Under Code section 731, cash distributions to partners are subject to tax to the extent the amount distributed exceeds the distributee's partnership interest adjusted basis. That basis includes the partner's share of partnership liabilities under Code section 752. Among the issues decided by the Tax Court was whether the partnership's receipt of option payments gave rise to a partnership liability under Code section 752, as the taxpayer contended in that case. The court rejected that contention.

---

[35] *Id.* at 497-498 (emphasis added, citations and footnotes omitted).
[36] 423 F.2nd 485 (4th Cir. 1970), *aff'g per curiam,* 51 T.C. 235 (1968); T.C. Memo. 1970-13.
[37] T.C. Memo. 1975-160.

Even though the option payments had not yet been recognized for income tax purposes pending the exercise or lapse of the purchase option, the receipt of such payments did not give rise to a section 752 liability because the option agreement "created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future."

In *Long v. Commissioner*,[38] the Tax Court addressed the issue of contested liabilities arising from a contract that was the subject of litigation. Two parties sued a partnership for damages resulting from structural defects in a building constructed by the partnership. Another party sued the partnership on its performance bond. One of the partners died before the suits were settled, and the estate claimed the contingent damage amounts as liabilities to be included in the decedent's basis in the partnership interest. In resolving this issue, the court observed:

> Although they may be considered "liabilities" in the generic sense of the term, contingent or contested liabilities such as the Kansas City Life-TWA and USF&G claims are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated. ***This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset.*** *See, e.g., Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 179 (1973); *Lemery v. Commissioner*, 52 T.C. 367, 377 (1969), *aff'd per curiam*, 451 F.2d 173 (9th Cir. 1971); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), *aff'd per curiam*, 333 F.2d 653 (2d Cir. 1964). ***We think that partnership liabilities should be treated in the same manner.*** *See generally* McKee, Nelson & Whitmire, FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[2] (1977). We see no logical reason for distinguishing the above cases solely because the asset involved is an interest in a partnership, and neither party suggests such a distinction. Those liabilities should be taken into account only when they are fixed or paid. Cf. *Albany Car Wheel Co. v. Commissioner, supra* at 841.[39]

In *LaRue v. Commissioner*,[40] the Tax Court considered the income tax liabilities of former partners of a failed securities brokerage business ("Goodbody"). One issue presented was when it is appropriate to recognize (for purposes of Code section 752) a liability to customers resulting from "back office problems." The court reviewed the *Long* decision, discussed above, commenting that

> The test used in *Long* focused on the fact of liability and whether the amount of the liability was definite or fixed. This test is similar, if not identical, to the "all-events" test for deduction of accrued expenses. Because an accrual basis partnership uses the "all-events" test to determine when an expense is deductible, we think that test may be properly used to determine when the corresponding liability is includable in basis.[41]

---

[38] 71 T.C. 1 (1978), *supplemented on reconsideration*, 71 T.C. 724 (1979), *aff'd on this issue*, 650 F.2nd 416 (10th Cir. 1981).
[39] *Id.* at 7-8 (emphasis added); *see also* LTR 7704269550A (April 26, 1977) (holding a nonrecourse obligation was not includable as a Code section 752 liability unless the taxpayer demonstrated that the note was not contingent, citing a similar set of authorities).
[40] 90 T.C. 465 (1988).
[41] *Id.* at 478 (citations omitted).

The court then analyzed the obligation resulting from Goodbody's back office problems, discussing the tax characteristics of its obligation to replace securities, like the obligation of a short seller to replace borrowed securities:

> Once the "back office" failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the NYSE rules. Goodbody was under an obligation to replace any missing securities or money. Essentially, Goodbody's books were in error because of the back office problems and the Haskins report reflected estimated liability figures. All of petitioners' witnesses testified that these were transactions for which the partnership was liable. There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.
>
> Petitioners have not shown that these amounts were determinable with reasonable accuracy. As a result of the Haskins audit, Goodbody (and Merrill Lynch) knew which particular securities would have to be sold or purchased and how much money was missing from customer accounts. However, it was not certain upon which of these claims Goodbody would ultimately be liable, because the smaller the amount of the transaction the less likely the customer would be to claim it. ***In addition, the exact amount of loss or gain was not determinable until actual purchase or sale. Valuation of the claims may be a purely ministerial matter because of the ready market for securities, but is not readily determinable until purchase or sale occurs.*** The additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates. Accrual accounting requires that the amount be determinable with "reasonable accuracy." A loss is not determinable until the securities are actually purchased or sold, and the transaction closed. We accordingly hold that because the reserves were not a fixed obligation of the partnership sufficiently determinable in amount in 1970, they cannot be included in the partners' bases in that year.[42]

<u>*Cases—Fulcrum*</u>

The IRS issued Notices of Final Partnership Administrative Adjustments to two partnerships in 1996, each presenting the issue of whether an obligation to close a short sale constitutes a liability for purposes of Code section 752. On March 8, 2000, after the parties had filed motions for summary judgment, but before the court had issued an opinion, the parties settled one case.[43] The other case was *Salina*, discussed below.

Fulcrum was a partnership that (1) borrowed two-year Treasury Notes with an aggregate face amount of approximately $140 million from a broker pursuant to a "forward repurchase agreement," (2) sold short the borrowed Treasury Notes to unrelated purchasers, (2) deposited the proceeds (approximately $142 million) from the sale in the partnership's brokerage account, and (3) invested the proceeds of the short sale in the forward repurchase agreement, which was treated as an asset of (loan by) the partnership for Federal income tax purposes. At the same time, Fulcrum (y) purchased five-year Treasury Notes with an aggregate face amount of approximately $110 million from an unrelated party for approximately $112 million, and

---

[42] *Id.* at 479-480 (emphasis added and footnote omitted).
[43] *Fulcrum Financial Partners v. Commissioner*, U.S. Tax Court Docket No. 3944-96 ("*Fulcrum*").

(z) financed the purchase of the five-year Treasury Notes by entering into a reverse repurchase agreement with an unrelated party, which was treated as a loan to the partnership for Federal income tax purposes.

A partner in Fulcrum then sold a 98 percent interest in the partnership, causing a technical termination of the partnership under Code section 708(a)(1)(B). Under the regulation then in effect, following this technical termination, Fulcrum was deemed to have made a distribution of all of its assets to its partners, who were deemed to contribute those assets to a successor partnership. A partner who receives a (deemed) liquidating distribution allocates his adjusted tax basis in the partnership interest being liquidated among the assets (deemed to be) received. Fulcrum asserted that its obligation to replace the borrowed securities under the short sale was not a liability under Code section 752 and therefore did not contribute to the basis of the assets deemed to have been received in the liquidation under the regulation.[44]

Finally, the partnership deemed to have been the successor to Fulcrum closed out its short sale position and the forward repurchase agreement by purchasing two-year Treasury Notes for approximately $143 million, delivering those notes to the forward repurchase agreement counterparty and receiving approximately $144 million from that counterparty. The partnership deemed to have been the successor to Fulcrum also closed out its reverse repurchase agreement transaction and its long position in five-year Treasury Notes by repaying approximately $114 million due the reverse repurchase agreement counterparty, receiving the five-year Treasury Notes from that counterparty, and selling the five-year Treasury Notes for approximately $114 million.

Fulcrum's partners reported capital gain of approximately $135 million on the transactions described above for the calendar year 1991. Of that amount, approximately $125 million was reported as gain by TIC Leasing Corp. ("TIC"), an affiliate of Turner Broadcasting System, Inc. ("TBS"). TBS sold the stock of TIC in 1994 and reported a capital loss on that sale of approximately $131 million.

Relying upon Rev. Rul. 88-77 and the temporary regulations under Code section 752,[45] the IRS took the position that the short sale obligation was a "liability." It distinguished Rev. Rul. 73-301, *Helmer*, and *LaRue*, ultimately stating its rationale as follows:

> Here, the short sale is an integral part of the investment position that [the purchaser of the partnership interest] is acquiring. All of the short sale proceeds have been invested in forward repurchase agreements. Under these agreements the taxpayer has "purchased" substantially similar securities which are held as collateral for the short sale obligation. The taxpayer knows how much

[44] The taxpayer and the IRS took unusual positions in Fulcrum, the taxpayer advocating a position leading to a larger gain on the transaction as a result of excluding the short-sale obligation from its partnership interest basis, and the IRS arguing for inclusion of the obligation in basis and a correlatively smaller gain.

[45] Although the notice of final partnership administrative adjustments was issued to Fulcrum in December 1995 with respect to the calendar year 1991, the IRS cited the "liability" definition in temporary regulations even though that definition was not included in final regulations issued by IRS on December 20, 1991.

> they will receive upon the "reselling" of the securities. Thus, it can be argued that the value of the securities held as collateral represent the amount of the liability on the short sale with reasonable accuracy.[46]

By Stipulation of Settlement filed November 16, 1999, and a related closing agreement, the parties resolved the Fulcrum case. In pertinent part, the parties agreed that Fulcrum's capital gain for tax year 1991 was approximately $81 million (rather than approximately $135 million reported on its tax return), and that TBS' capital loss on the sale of the TIC stock was approximately $83 million (rather than approximately $131 million reported on its tax return).

<u>*Cases—Salina*</u>

As noted above, after the United States Tax Court issued its opinion in *Salina* on November 14, 2000, the parties settled the issues presented in *Salina* and certain related cases by documents filed with the court on September 24, 2001. Even though *Salina* never became a final decision, making the precedential value of the Tax Court opinion uncertain, this letter will discuss the court's analysis in some detail.

In 1992, an investment banker at Goldman Sachs & Co. ("Goldman Sachs") developed an investment strategy with the acronym STAMPS (Special Treasury and Mortgage Partnership Units) to provide above-market returns to corporate or institutional clients and also to provide certain accounting and tax advantages. Another company, BEA Associates ("BEA"), had a similar plan known by the acronym MAPS ("Mortgage Arbitrage Partners") that used a broader array of investments but with a shorter range of maturities. BEA agreed to serve as investment adviser and portfolio manager for the STAMPS strategy.

In early October 1992, Goldman Sachs presented the STAMPS program to FPL Group, Inc. ("FPL"), the parent company of Florida Power & Light Co. Later that month, both Goldman Sachs and BEA met with representatives of FPL regarding both STAMPS and MAPS. In those October 1992 meetings, Goldman Sachs and BEA (1) promoted STAMPS as a means to increase FPL's return on its short-term, fixed-income investments, (2) advised that FPL would recognize a capital gain for Federal income tax purposes upon entering into the STAMPS transaction, while simultaneously creating a built-in loss in its partnership interest, and (3) projected that the MAPS strategy would allow FPL to earn between 4% and 7% over the current Treasury bill yields, higher than it had been earning on its then-current short-term commercial paper investments.

In mid-December 1992, the FPL board of directors considered the proposed investment, concluding that "investing in the partnership would increase the return on the funds substantially and still keep them available for capital expenditures as needed" and that "the partnership could engage in certain transactions that could utilize certain of the tax losses from" FPL's recent sale

---

[46] Notice of Final Partnership Administrative Adjustments issued to Fulcrum Financial Partners, dated December 4, 1995, Form 886-A (Explanation of Items) at 5.

of one of the members of its affiliated group. The board approved the investment, requiring that it liquidate its investments by December 30, 1992.

On December 16, 1992, two limited liability companies[47] formed in 1992 under non-United States law by a Dutch bank[48] formed Salina as a Delaware limited partnership. On December 17, 1992, Caraville contributed $750,000 for a 1% interest, and Pallico contributed $74,250,000 for a 99% interest.

On December 17, 1992, Salina ***purchased*** Treasury ***Notes*** in the principal amount of $140,000,000, bearing interest at 4.625%, and maturing on November 30, 1994. Salina borrowed $70,087,500 of the purchase price from Goldman Sachs under a master repurchase agreement secured by the Treasury notes.

On December 17, 1992, Salina entered into a ***short sale*** of United States Treasury ***Bills*** with a face value of $350,000,000, bearing interest at a rate not disclosed in the opinion, and maturing on June 17, 1993. Salina obtained the Treasury Bills to effect this transaction pursuant to a master repurchase agreement with ABN and Goldman Sachs.[49]

On December 28, 1992, FPL transferred $76,540,327 to Pallico for a 98% limited partner interest in Salina. That day, Salina's investment advisor recommended that Salina liquidate its existing investments and that it reinvest the proceeds under the MAPS strategy. After Salina authorized it to do so, the advisor closed the short position in Treasury bills by purchasing Treasury bills at a cost of $344,675,333, sold Salina's Treasury Notes for $140,408,750, and repaid the amounts due under the repurchase agreement.

From January 1993 through November 1994, Salina (through its investment advisor) pursued the MAPS strategy, realizing a 1993 return (after fees) of approximately eight percent. In 1994, due to interest rate changes, Salina had no earnings from its MAPS strategy. Salina liquidated on November 30, 1994. FPL received $63,175,099 in cash and $16,713,749 in mortgage-backed securities in the liquidation.

Salina filed its Federal partnership income tax (information) return for the period from December 28 to December 31, 1992, asserting that FPL's purchase of its interest from Pallico triggered a termination of Salina, ultimately resulting in the realization of a $344,000,000 short-

[47] Caraville Corporation, N.V. ("Caraville") and Pallico Corporation, N.V. ("Pallico").
[48] ABN AMRO Bank, N.V. ("ABN").
[49] As the IRS has recognized in Tech. Advice Mem. 9410008 (1993), some taxpayers use repurchase agreements to borrow securities for short sales:

> Taxpayer often enters, through its broker, into a short sale of Treasury securities in the following manner. Taxpayer obtains Treasuries in a reverse repurchase transaction (a reverse repo). That is, Taxpayer purchases the Treasuries from a dealer, and simultaneously agrees to resell the securities to the dealer at a fixed price on a specified future date. Taxpayer then sells the securities in the marketplace. The proceeds of the sale are remitted to the person from which the Treasuries were originally transferred.

term capital gain upon the liquidation of Salina's investments on December 31, 1992 due to a reduction of Salina's basis in the partnership assets resulting from the distribution and recontribution of the assets deemed to occur under the partnership termination regulations then in effect.

The IRS disagreed, asserting that (1) FPL's purchase lacked economic substance, and (2) Salina erroneously computed the substituted basis of the assets it sold after the termination, in particular in not recognizing the obligation to close the short sale of Treasury bills as a liability under Code section 752. The Tax Court litigation followed.

The court addressed each of the objections expressed by the IRS in turn. After reviewing the facts and the case law with respect to the economic substance requirement, the court concluded that (1) FPL entered into the Salina transaction to achieve a valid business purpose independent of tax benefits, (2) FPL's investment in Salina provided a reasonable opportunity for FPL to earn profits independent of tax benefits, and (3) the potential profits associated with the investment were not *de minimis* relative to the perceived tax benefit. Although the court's analysis of the economic substance issue was quite extensive, this letter will not review that analysis in detail.

The court then proceeded to an analysis of the second contention of the IRS, namely that the short-term capital gain reported by Salina should be reduced substantially because Salina should have treated the obligation to close the short sale as a partnership liability, which would have increased its basis in the assets upon the deemed termination of the partnership and reduced the gain on their disposition.

The court began its analysis by commenting on the blend of aggregate and entity approaches to the concept of a partnership that are incorporated into Subchapter K of the Code. The court stated that in an effort to avoid "distortions in income tax reporting" resulting from such a hybrid approach, Congress had enacted several provisions "that generally are intended to equate the aggregate of the partnership's inside bases in its assets with the aggregate of its partners' outside bases in their partnership interests."[50] As examples of Congressional attempts to match inside and outside basis, the Court cited Code sections 722, 705(a), and 752. The first two sections do effect a matching of inside and outside basis.[51] The court associated Code section 752 with this matching in general based on the "practical impact" of the basis adjustments required by Code section 752, citing to this summary in a well-respected treatise:

> If a partnership borrows money, the basis of its assets increases by the amount of cash received, even though the receipt of the borrowed funds is not income. By treating the partners as contributing cash in an amount equal to their shares of the debt, inside/outside basis equality is preserved and distortions are avoided. If a liability for borrowed money were not added to the

[50] *Salina* at 36.

[51] Code section 722 increases a partner's adjusted basis by the amount of the adjusted basis of property contributed, matching the partnership's basis in the contributed asset under Code section 723 and Code section 705(a).

> partners' bases, they could be taxed on a distribution of the borrowed cash even though there is no gain inherent in the partnership's assets. A similar result could occur if a partnership incurs a purchase money liability to acquire property, since the liability is added to the partnership's basis in the property.[52]

Although not apparently considered by the court, the same section of the same treatise cited by the court discusses several problems in defining the term "liability" for these purposes, and considers the effect of those problems on how well Code section 752 works in matching inside and outside basis.[53]

The court then observed that, although the regulations do not define the term "liabilities," revenue rulings and the predecessor temporary regulations did so. The court began by summarizing Rev. Rul. 88-77, *supra*, Rev. Rul. 95-26, *supra*, and the definition of "liability" that was set forth in Temp. Reg. §1.752-1T(g), but was not included in the final regulations issued before the beginning of the 1992 tax year in controversy in *Salina*.

The IRS position in the case was based on the syllogism that (a) Code section 752 liabilities include an obligation to the extent it creates or increases the partnership's basis in any asset, including cash attributable to borrowings (Rev. Rul. 88-77, *supra*), (b) a short sale creates an obligation to return the borrowed securities (*Deputy v. Du Pont, supra*) that causes an increase the partnership's basis in its assets by the amount of cash received on the sale of the borrowed securities (Rev. Rul. 95-26, *supra*), consequently (c) the obligation to return securities borrowed to effect a short sale is a Code section 752 liability.

The court observed that Salina contended that the IRS position was inconsistent with the taxation of short sale under Code section 1233, and with Rev. Rul. 73-301, *supra*, and *Helmer v. Commissioner, supra*. The court concluded that "*[f]or present purposes*, we observe that the provisions of sections 1233 and 752 are mutually exclusive," based on the "disparate policies that sections 1233 and 752 are intended to promote," and that the characterization of the obligation to close the short sale as a Code section 752 liability "does not create tension or conflict with the deferred recognition of gain or loss prescribed for short sale transactions under

---

[52] W. McKee, W. Nelson & R. Whitmire, FEDERAL INCOME TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[1] (1997).

[53] In part, that discussion stated:

> While § 752 performs a valuable policy function by preserving the equality of inside and outside basis, it operates only on obligations that are treated as "liabilities." As will be discussed, some obligations, such as cash-method accounts payable, fall within the generally understood definition of the term "liability," but have no immediate effect on the basis of partnership assets. Therefore, treating such payables as liabilities for § 752 purposes would run counter to the purposes of the section. Conversely, certain obligations, such as the obligation of the grantor of property to deliver property on exercise of the option, are not generally thought to be liabilities, but the basis of the grantor's assets nevertheless is increased by any premium received upon the grant of the option (even though the premium is not taxed on receipt). Thus, § 752 may not achieve its inside/outside basis-equalizing function if the term "liability" is given its ordinary meaning.

*Id.*

section 1233."[54] The court did not explain why the functions of Sections 1233 and 752 and the policies that might be inferred from those functions could not be reconciled or harmonized, or under what circumstances or for what purposes those sections would ***not*** be mutually exclusive.

The court also stated that it was "not persuaded" that the position of the IRS in *Salina*, as set forth in Rev. Rul. 95-26, *supra*, conflicted with Rev. Rul. 73-301, *supra*, or *Helmer v. Commissioner, supra*. After summarizing each of the latter authorities, the court stated:

> In sum, the authorities that petitioner relies upon demonstrate that, although the amounts received by a partnership in an open transaction generally are not characterized as a liability under section 752, the transaction must nevertheless be examined to determine whether the partnership incurred related liabilities that may require partner-level basis adjustments pursuant to section 752. In light of these competing considerations, we reject petitioner's argument that the Commissioner's reasoning in Rev. Rul. 95-26, 1995-1 C.B. 131, conflicts with Rev. Rul. 73-301, *supra*, and the Court's holding in Helmer v. Commissioner, supra.[55]

Having stated a general principle subject to an exception based upon further examination, the court did not make further examination, but moved on to another subject. The court observed that Salina attempted to analogize between the option payments received by the partnership in *Helmer* and the cash proceeds received in *Salina*. The court concluded:

> Although the two transactions are both considered open transactions for purposes of application of the income tax, the transactions are materially different for purposes of analysis under section 752. The option payments that the partnership received in *Helmer v. Commissioner, supra*, represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services. In contrast, Salina's gain or loss on the sale of borrowed Treasury bills was dependent upon the cost to Salina of fulfilling its obligation to replace the borrowed Treasury bills. Consequently, we hold that *Helmer v. Commissioner, supra*, does not support petitioner's position in this case.[56]

Contrary to the Tax Court's recital, the option payments in *Helmer* were ***not*** for the sale of a partnership asset, but rather were for an ongoing ***option*** of the payor to purchase a partnership asset, which payments were to be credited against the purchase price ***if*** the holder exercised the option and the transaction became a purchase. If the option holder ***did*** exercise the option, the option holder would have been required to pay the balance of the purchase price, and the option grantor would have been required to convey the property and recognize gain or loss (and depreciation recapture or other ordinary income components, as indicated by applicable law and facts) on the disposition of the property. If the option holder did ***not*** exercise the option, no sale would have occurred, the option grantor would have retained the payments, the transaction would have concluded, and the option grantor would have recognized income under Code section 1234(b). At the time of the filing of the return at issue in *Helmer*, it was unclear whether the option would be exercised and, correlatively, whether the payments would be taxed as part of

---

[54] *Salina* at 43 (emphasis added).
[55] *Salina* at 47.
[56] *Id.*