> ACM's cash contributions "were already earning . . . in . . . deposit accounts before the notes were acquired," resulting in only a $3,500 difference in yield over the 24-day holding period, a difference which was obliterated by the transaction costs associated with marketing private placement notes to third parties.
>
> These findings, which are amply supported by the record, demonstrate a lack of objective economic consequences arising from ACM's offsetting acquisition and virtually immediate disposition of the Citicorp notes. On November 3, 1989, ACM invested $175 million of its cash in private placement Citicorp notes paying just three basis points more than the cash was earning on deposit, then sold the same notes 24 days later for consideration equal to their purchase price, in a transaction whose terms had been finalized by November 10, 1989, one week after ACM acquired the notes. These transactions, which generated the disputed capital losses by triggering the application of the ratable basis recovery rule, offset one another with no net effect on ACM's financial position. Examining the sequence of ACM's transactions as a whole as we must in assessing their economic substance, we find that these transactions had only nominal, incidental effects on ACM's net economic position.[139]

Moving to the subjective business motivation for the transaction, the Third Circuit:

- Rejected ACM's argument that the Tax Court erred in reviewing the subjective business purposes and profit motives for the transaction, the Court finding that even if the pertinent statute has no express business-purpose requirement, the economic-substance cases supported the Tax Court's review to determine whether the transaction was "'entered into without expectation of economic profit and [with] no purpose beyond creating tax deductions;'"[140]

- Analyzed ACM's interim investment in Citicorp notes, finding no error in the Tax Court's finding that such investment "was motivated by the pursuit of the tax advantages of a contingent installment sale rather than by a need for an interim investment pending its acquisition of Colgate debt;"[141]

- Analyzed and rejected ACM's contemporaneously-documented, non-tax reasons for acquiring the notes accounted for on a contingent installment sale basis, concluding that those reasons "cannot withstand scrutiny in light of the stated purposes behind the partnership itself, because the investment in the Citicorp notes impeded rather than advanced ACM's professed goal of making its cash available to acquire Colgate debt issues, just as the investment in the LIBOR notes impeded rather than advanced the professed goal of acquiring partnership assets that would hedge against Colgate's exposure to declining interest rates outside the partnership;"[142]

---

[139] *Id.* at 249 (citations and footnotes omitted).
[140] *Id.* at 253 (quoting *Wexler v. Commissioner*, 31 F.3rd 117, 123-24 (3rd Cir. 1994)).
[141] *Id.* at 255.
[142] *Id.* at 256.

- Observed that (1) the documents outlining the proposed transactions explained the contemplated tax consequences in detail, but did not detail the expected rate of return on the instruments themselves, (2) Colgate did not attempt to determine whether the transactions would be profitable taking into account transaction costs approximating $3 million, and (3) the plan required ACM to hold the "LIBOR notes" for two years in which time their value was likely to decline if interest rates declined as Colgate predicted and as actually occurred;

- Concluded that "neither ACM nor any of its partners reasonably anticipated any profits resulting from the relevant transactions, which entailed an economically inconsequential investment in Citicorp notes and a decidedly unprofitable investment in LIBOR notes whose value would be expected to decline under contemporaneously predicted market conditions."[143]

In the final analysis, although it denied the contingent installment sale treatment sought by Colgate, the Third Circuit's decision determined that "ACM's possession of the LIBOR notes, although not intended to serve non-tax purposes, had significant non-tax economic effects, consisting of several million dollars in actual economic losses."[144] It reversed the decision of the Tax Court denying the actual losses suffered on the disposition of those notes.[145]

In *ASA Investerings Partnership v. Commissioner,*[146] the District of Columbia Circuit affirmed a Tax Court decision denying the tax benefits of another contingent installment sale note transaction designed by Merrill Lynch. In *ASA*, both the Tax Court and the Court of Appeals took a different approach than the courts took in *ACM*, neither reaching the economic substance issue. Each court concluded that the facts and circumstances—principally the partnership agreement and the conduct of Merrill Lynch and the "partners" in planning, considering, and implementing the transaction—demonstrated that there was no partnership recognizable for Federal income tax purposes. Responding to ASA's argument that the controlling Supreme Court authority[147] required recognition of the partnership if (1) its purpose is the equivalent of business activity, or (2) it conducts business activities, the Court of Appeals stated:

> We agree if engaging in business activity were sufficient to validate a partnership ASA would qualify. It was infused with a substantial amount in capital ($1.1 billion), and invested it in PPNs, LIBOR notes, and other short-term notes over a period of two years. In fact, however, courts have understood the "business activity" reference in *Moline* to exclude activity whose sole purpose is tax avoidance. ... Thus, what the petitioner alleges to be a two-pronged inquiry is in fact a unitary

---

[143] *Id.* at 258.
[144] Id. at 262.
[145] *Id.* at 261-263.
[146] 201 F.3rd 505 (D.C. Cir. 2000) ("*ASA*"), *aff'g* T.C. Memo. 1998-305, *cert. denied* 148 L.Ed. 2nd 117 (October 2, 2000).
[147] *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943) ("*Moline*").

test—whether the 'sham' be in the entity or the transaction—under which the absence of a nontax business purpose is fatal.[148]

In its decision not to respect the partnership, and to characterize the relationship as being that of debtor and creditor, the Tax Court noted the following considerations:

- divergent business goals of the "partners,"
- conduct of the parties as to income allocations, guaranteed return, and loss allocations did not conform to the partnership agreement, but to a preliminary business agreement of the parties (the "Bermuda Agreement"),
- the only ASA asset with a significant potential to fluctuate in value was "perfectly" hedged,
- although ABN, the second "partner," bore the risk of loss attributable to the potential bankruptcy of the issuers of its debt instruments, that risk was de minimis due to the creditworthiness of those issuers,[149]
- Allied Signal was obligated to and did in fact pay all expenses of ASA (a fact in conformity with the Bermuda Agreement but in conflict with the partnership agreement),
- despite ABN's voting rights under the partnership agreement, Allied Signal made all of the critical decisions required to be made by the partnership,
- Allied Signal's conduct toward ABN and, more generally, toward the selection of its foreign "partner," more closely resembled the conduct of a borrower toward a potential lender, and
- ABN's consideration of the transaction was handled in the same manner as any large corporate loan.[150]

Upon its review of the Tax Court decision, the Court of Appeals affirmed, finding no clear error in these findings of fact.

The United States District Court for the District of Columbia recently issued its decision in a third case, *Boca Investerings Partnership v. United States,*[151] dealing with the proposed rejection of tax consequences claimed in connection with a contingent installment sale note transaction (similar to those discussed in *ACM* and *ASA* above) designed by Merrill Lynch, the client in this case being American Home Products Corporation ("AHP"). Unlike *ACM* and *ASA*, the court in *Boca* concluded that Boca had established by a preponderance of the evidence that the IRS had erred and, as a result, entered judgment for Boca. The court's key conclusions, based primarily on factual findings, were that the IRS erred in determining that:

---

[148] *Id.* at 512 (footnote omitted).

[149] But see footnote 157 and accompanying text regarding recent decisions of the Fifth Circuit and Eighth Circuit characterizing risk minimization as an exercise of good business judgment that should not contribute to the designation of a transaction as a sham.

[150] *ASA Investerings Partnership v. Commissioner*, T.C. Memo. 1998-305.

[151] 167 F.Supp.2d 298 (D.D.C. 2001) ("*Boca*").

- Boca (the partnership organized by AHP and unrelated foreign investors) should not be recognized as a partnership for federal income tax purposes on the theory that the parties did not intend to form a partnership and did not form a partnership for purposes of federal income tax,
- the transactions financing the purchase and sale of the private placement notes (the instruments purchased and then sold on an installment basis) should not be recognized for federal income tax purposes on the theory that the transactions lacked economic substance, were prearranged and predetermined, and had no legitimate business purpose,
- Syringa and Addiscombe (the foreign investors) were not partners in Boca on the theory that Syringa and Addiscombe made loans rather than capital contributions to the partnership,
- the transactions undertaken by Boca with respect to the purchase and sale of private placement notes should be collapsed so that no gain or loss is recognized for federal income tax purposes on the theory that, under the step transaction doctrine, transitory steps occurring as part of a plan may be disregarded if they add nothing of substance to the completed transaction,
- Boca's sales of the private placement notes should be disqualified from installment sale reporting under Code section 453 on the theory that the steps necessary to create a market for the LIBOR notes were taken at the time the notes were issued, and
- the allocation of the installment tax gain lacked substantial economic effect under Code section 704(b) and should be reallocated to American Home Products.

It is fair to view *Boca* as a case demonstrating that even where several taxpayers engage in transactions sharing common elements, the tax consequences of those transactions may vary. AHP won the *Boca* case—despite the losses of other taxpayers in similar cases—in part because of evidence regarding how and why it engaged in the transactions at issue. It remains to be seen whether *Boca* will be appealed to the District of Columbia Circuit—the Circuit that affirmed the pro-government decision in *ASA*—and, if so, how that court will deal with the District Court's fact-intensive decision. The *Boca* decision is one of several setbacks[152] the IRS has suffered recently in its tax shelter litigation efforts. Several commentators[153] have suggested that these losses could prompt a reexamination of the IRS tax shelter litigation strategy.

In cases recently decided by the Fifth Circuit[154] and the Eighth Circuit[155] involving different corporate taxpayers that effected similar transactions, those courts rejected government

---

[152] *See Compaq Computer Corp. v. Commissioner*, 277 F.3rd 778 (5th Cir. 2001) ("*Compaq*"); *United Parcel Service of America v. Commissioner*, 254 F.3[rd] 1014 (11[th] Cir. 2001) ("*UPS*"); *IES Industries, Inc. v. United States*, 253 F.3[rd] 350 (8[th] Cir. 2001) ("*IES*").

[153] *Government's Loss in Boca Partnership Case Seen Suggesting Need to Rethink Litigation*, Daily Tax Report (October 11, 2001).

[154] *Compaq, supra.*

[155] *IES, supra.*

arguments characterizing those transactions as shams lacking economic substance. In each case, the taxpayer bought American Depositary Receipts ("ADRs") with respect to the stock of a foreign corporation. The taxpayer purchased those ADRs so that the settlement date would fall on or before the record date for an anticipated dividend by the foreign corporation. The taxpayer then sold those ADRs so that the settlement date of the sale would fall after the record date for the anticipated dividend. In doing so, the taxpayer bought the ADRs cum dividend, sold them ex dividend, and retained the dividend right. In each case, the taxpayer received the dividend less the applicable foreign withholding tax. Each taxpayer reported the full amount of the dividend, a capital loss on the sale of the ADRs, and a foreign tax credit in the amount of the foreign tax withheld from the dividend payment. The IRS asserted that the transactions were shams, and the Tax Court (in *Compaq*) and the United States District Court for the Northern District of Iowa (in *IES*) both agreed.

The Courts of Appeals disagreed. Each court first concluded that the taxpayer had realized dividend income in the gross amount paid by the foreign corporation, without reduction by the foreign tax withholding. So viewed, the transactions resulted in a pre-tax profit to the taxpayers.

In each case, the court considered the subjective intent of the taxpayer. In this connection, the Eighth Circuit and the Fifth Circuit agreed that "a taxpayer's subjective intent to avoid taxes thus will not by itself determine whether there was a business purpose to a transaction." [156]

The IRS also argued that the transactions were shams because, it said, there was no risk of loss. The courts disagreed, the Eighth Circuit commenting that

> The risk may have been minimal, but that was in part because IES did its homework before engaging in the transactions. ... As the entity legally entitled to receive the ADR dividends, being the legal owner on the record date, IES likewise bore the risk that the dividend would not be paid. In consideration of that risk and after doing its own investigation, IES rejected some of the ADR trades that Twenty-First proposed. ... IES did make some of the trades when the U.S. markets were closed, in order to avoid the risk of fluctuations in market price of the ADRs between the purchase and sale and to prevent a third party from attempting to break up the trades, again demonstrating the exercise of good business judgment. ***We are not prepared to say that a transaction should be tagged a sham for tax purposes merely because it does not involve excessive risk. IES's disinclination to accept any more risk than necessary in these circumstances strikes us as an exercise of good business judgment consistent with a subjective intent to treat the ADR trades as money-making transactions.***[157]

In another "economic substance" case decided adversely to the IRS, the Eleventh Circuit reversed a decision of the Tax Court in *UPS*, a case in which the IRS had challenged on economic substance grounds the tax consequences of a reorganization of UPS' "excess value insurance" operation. The Eleventh Circuit stated its operating principles as follows:

---

[156] *IES, supra*, at 355; *Compaq, supra*, at 783-784.
[157] *IES, supra*, at 355 (emphasis added).

> This economic-substance doctrine, also called the sham-transaction doctrine, provides that a transaction ceases to merit tax respect when it has no "economic effects other than the creation of tax benefits." Even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance. ... The kind of "economic effects" required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party. ... A "business purpose" does not mean a reason for a transaction that is free of tax considerations. Rather, a transaction has a "business purpose," when we are talking about a going concern like UPS, as long as it figures in a bona fide, profit-seeking business.[158]

Applying these principles, the court found that the UPS reorganization created genuine obligations enforceable by an unrelated party, a "real economic effect" obviating its classification as a per se sham. The court went on to find that the reorganization "simply altered the form of an existing, bona fide business," supporting the inference that it also had an adequate business purpose, requiring it to be respected for federal income tax purposes.[159]

*Synthesis and conclusion*

Weighing the relevant authorities, and taking into account the pertinent facts and circumstances, there is substantial authority for the position that the judicial "substance over form" and "step transaction" doctrines will not alter the Federal income taxation of the elements of the Financial Plan discussed in this letter, and it is more likely than not that such doctrines will not alter the Federal income taxation of the elements of the Financial Plan discussed in this letter. In reaching this conclusion, we rely in part on the following considerations:

- First, in deciding to pursue the Financial Plan, the Trust considered it to be a multi-year, multiple-transaction strategy, and had a reasonable expectation that the gains it would receive from investments made as part of the Financial Plan would exceed the fees and costs incurred in pursuing the Financial Plan. Moreover, the Trust decided to pursue the Financial Plan for legitimate investment, estate-planning, and privacy/security purposes. Although the tax consequences of the Financial Plan were a consideration, there were significant non-tax economic purposes for which the Financial Plan was designed including, without limitation, realizing profits on short sales of Treasury Notes and on purchases and sale of other investment assets, and increasing the diversification of the Trust's investment holdings.

- Second, the short sales of Treasury Notes were completely unhedged. As a result, depending on how interest rates might fluctuate, BLC had a significant economic potential for either profit or loss.

---

[158] *UPS, supra*, at 1018-1019 (citations and footnotes omitted).
[159] *Id.* at 1020.

- Third, although the Financial Plan comprises several transactions, some of which occurred in a short span of time,[160] these transactions were not mutually interdependent, effected pursuant to a "binding commitment" to enter into all such transactions, or component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.

We observe that, in *Salina*, the Tax Court dealt with an economic substance attack by the IRS on a transaction somewhat similar to the one addressed in this opinion. The facts of that case, and the Court's reasoning in resolving the economic substance issue in favor of the taxpayer in that case, are set forth above in a section entitled "***Federal income tax status of short sale obligations—Cases—Salina***."

*Partnership anti-abuse regulations*

*Regulations*

So-called anti-abuse regulations adopted in 1995 assert that the intent of the partnership tax provisions of the Code—"Subchapter K"—is to permit taxpayers to conduct joint business and investment activities through a flexible arrangement without incurring an entity-level tax. The regulations condition this on the satisfaction of three requirements. First, the partnership must be bona fide, and each partnership transaction or series of related transactions must be entered into for a substantial business purpose. Second, the form of each partnership transaction must be respected under substance over form principles. Third, except as otherwise provided in Subchapter K, the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income.

Under the anti-abuse regulations, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate Federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast[161] the transaction for Federal tax purposes so as to achieve tax results that are consistent with the intent of subchapter K.

---

[160] If the transactions are extremely close in time, courts are more likely to regard them as an integrated whole. Some courts have given this test very little weight. *See, e.g., Hinricksen v. Braicks*, 137 F.2d 632 (9th Cir. 1943) (one-half hour apart separate transactions); *H.B. Zachry Co. v. Commissioner*, 49 T.C. 73, 82 (1967 (three days)). In fact, some courts have held that if each transaction has independent economic substance, the transactions should not be integrated even if the subsequent transactions are planned at the outset. *See, e.g., Turner Broadcasting System, Inc. v. Commissioner*, 111 T.C. 315, 325-329 (1998).

[161] Should a "recasting" be indicated, Reg. §1.701-2(b) authorizes the IRS to take several types of action "to achieve tax results that are consistent with the intent of subchapter K...." These include (1) disregarding the partnership as a separate entity; (2) deeming one or more purported partners not to be partners for Federal tax purposes; (3) adjusting the accounting method used by the partnership or by a partner to reflect clearly the income of the partnership or the partner; (4) reallocating the partnership's items of income, gain, loss, deduction, or credit, and (5) otherwise adjusting or modifying the partner's or the partnership's claimed tax treatment. *Id.*

The determination of whether a partnership has been formed or availed of with a forbidden principal purpose must be based upon a review of "all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction."[162] The regulations list the following as non-exclusive factors to be considered in this review:

> (1) The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly;
>
> (2) The present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated and treated as steps in a single transaction. For example, this analysis may indicate that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest in the partnership was liquidated or disposed of (in whole or in part) would be a partner only temporarily in order to provide the claimed tax benefits to the remaining partners;
>
> (3) One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities (through distribution preferences, indemnity or loss guaranty agreements, or other arrangements), or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital;
>
> (4) Substantially all of the partners (measured by number or interests in the partnership) are related (directly or indirectly) to one another;
>
> (5) Partnership items are allocated in compliance with the literal language of Reg. §§1.704-1 and 1.704-2 but with results that are inconsistent with the purpose of section 704(b) and those regulations. In this regard, particular scrutiny will be paid to partnerships in which income or gain is specially allocated to one or more partners that may be legally or effectively exempt from federal taxation (for example, a foreign person, an exempt organization, an insolvent taxpayer, or a taxpayer with unused federal tax attributes such as net operating losses, capital losses, or foreign tax credits);
>
> (6) The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or related party); or
>
> (7) The benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distributee partner (or related party).[163]

Even if a partnership satisfies the anti-abuse tests summarized above, the regulations include an alternative rule regarding "abuse of entity treatment." Under that provision, the IRS "can treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Internal Revenue Code or regulations promulgated

---

[162] Reg. §1.701-2(c).
[163] *Id.*

thereunder" unless a separate provision of the Code or regulations provides for treatment of the partnership as an entity.[164]

The "intent of Subchapter K" portion of the anti-abuse regulations includes thirteen examples. In one example, a person ("X") who is not a partner desires to acquire and hold indefinitely certain land owned by partnership PRS. The property has a value of $95*x* and a tax basis of $5*x*. Pursuant to a plan a principal purpose of which is to permit X to recover for tax purposes a substantial portion of the purchase price for the land, X contributes $100*x* to PRS for a partnership interest. Subsequently, but when the value of the partnership's assets have not changed materially, PRS distributes to X in liquidation of its interest in PRS the land and another asset with a value and basis to PRS of $5*x*. As a result of this transaction, X's $100*x* basis in his partnership interest is allocated among the two assets in proportion to their bases, resulting in a basis of $50 in each asset. X then sells the asset worth $5 and recognizes a loss of $45. The IRS explained its view of the transaction as follows:

> Although section 732 recognizes that basis distortions can occur in certain situations, which may produce tax results that do not satisfy the proper reflection of income standard of paragraph (a)(3) of this section, the provision is intended only to provide ancillary, simplifying tax results for bona fide partnership transactions that are engaged in for substantial business purposes. Section 732 is not intended to serve as the basis for plans or arrangements in which inconsequential or immaterial assets are included in the distribution with a principal purpose of obtaining substantially favorable tax results by virtue of the statute's simplifying rules. The transaction does not properly reflect X's income due to the basis distortions caused by the distribution that result in shifting a significant portion of X's basis to this inconsequential asset. Moreover, the proper reflection of income standard contained in paragraph (a)(3) of this section is not treated as satisfied, because, taking into account all the facts and circumstances, the application of section 732 to this arrangement, and the ultimate tax consequences that would thereby result, were not clearly contemplated by that provision of subchapter K. In addition, by using a partnership (if respected), the partners' aggregate federal tax liability would be substantially less than had they owned the partnership's assets directly (see paragraph (c)(1) of this section). On these facts, PRS has been formed and availed of with a principal purpose to reduce the taxpayers' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under applicable judicial principles and statutory authorities, such as the disguised sale rules under section 707, see paragraph (h) of this section), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.[165]

In issuing the final regulations, the IRS responded to comments on the proposed regulations that questioned the scope of the regulations and their relationship to established legal doctrines (e.g., business purpose, substance over form, step transaction, sham transaction). The IRS commented:

> The final regulation confirms certain fundamental principles that must, in all cases, be satisfied in applying the provisions of subchapter K to partnership transactions, to assure that those provisions are not used to achieve inappropriate tax results. While the fundamental principles reflected in the

[164] Reg. §1.701-2(e).
[165] Reg. §1.701-2(d), example 11(ii).

> regulation are consistent with the established legal doctrines, those doctrines will also continue to apply.
>
> So viewed, the uncertainty regarding the application of the regulation reflects the uncertainty that already exists in properly evaluating transactions under current law, including the proper application of existing legal doctrines. As a result, the regulation should not impose any undue administrative burdens on either taxpayers or the IRS.[166]

One must consider not only how the anti-abuse regulations should be applied to the elements of the Financial Plan discussed in this letter, but—as a threshold issue—whether the anti-abuse regulations are valid.

*Possible invalidity of regulations*

Although some prominent commentators have remarked that "it appears doubtful that the overall landscape of Subchapter K has changed meaningfully by reason of this Regulation,"[167] other prominent commentators have observed that the regulations represent an appropriation of legislative authority that is both radical[168] and startling.[169] In the view of such commentators, the regulations are of questionable validity,[170] at best.[171]

Code section 7805(a) authorizes the Secretary to issue "all needful rules and regulations ... as may be necessary by reason of any alteration of law in relation to internal revenue." In accordance with controlling judicial authority, in determining the validity of a tax regulation, one must make several determinations:

- First, one must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. ... [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[172] In determining whether Congress has spoken directly to the issue, the Supreme Court has directed a broad inquiry, taking

[166] T.D. 8588, 1995-1 C.B. 109, 112.
[167] A. Willis, J. Pennell, P. Postlewaite, PARTNERSHIP TAXATION ¶1.03[6] (6th Ed. 2000).
[168] R. Lipton, *The Partnership Anti-Abuse Regs. Revisited: Is There Calm After The Storm?*, 83 J. TAX. 68, 74 (1995).
[169] W. Nelson, *The Limits Of Literalism: The Effect Of Substance Over Form, Clear Reflection And Business Purpose Considerations On The Proper Interpretation Of Subchapter K*, 73 TAXES 641, 658 (1995).
[170] R. Lipton, *supra*, 74; S. Banoff, *Anatomy of an Antiabuse Rule: What's Really Wrong with Reg. Section 1.701-2*, 95 TNT 56-84 (March 20, 1995) ("the courts are likely to question the validity of such anti-abuse regulations").
[171] W. Nelson, *supra* (the anti-abuse regulation "cannot be defended as either a statement of preexisting law or as an application of normal interpretive rules"); C. Allison, *The Section 701 Final Regulation: Does It Have A Foundation Of Rock Or Sand?*, 54 N.Y.U. INST. ON FEDERAL TAXATION §7.05 (1996) ("there is an ample basis for a court to hold the Final Regulation invalid").
[172] *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984).

> into account (1) the context not only of the words or phrases in controversy, but also of their place in the overall statutory scheme, (2) other Federal legislation, particularly later and more specific legislation on the subject, and (3) common sense.[173]

- Second, one must determine whether the regulation was issued under the Code section 7805(a) general authority to "prescribe all needful rules and regulations" or under a specific statutory grant of authority. If the former, a reviewing court will accord such a regulation "less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision."[174]

- Third, one must consider whether the regulation "'harmonizes with the plain language of the statute, its origin, and its purpose,'"[175] taking into account "whether the regulation 'is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent.' *National Muffler Dealers Assn. v. United States*, *supra*, at 477; and '[i]f the regulation dates from a later period, the manner in which it evolved merits inquiry.' *Ibid.* We also consider, if pertinent, 'the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent reenactments of the statute.' *Ibid.*"[176]

Ultimately, the courts will uphold the validity of tax regulations if they "implement the congressional mandate in some reasonable manner."[177]

In *Helvering v. Credit Alliance Corp.*,[178] the Supreme Court refused to enforce a regulation dealing with the dividends-paid credit available at that time, reasoning that "the regulation [at issue] not only was contradictory of the plain terms of the [statute] but attempted to add a supplementary legislative provision, which could only have been enacted by Congress."[179] The IRS may not ignore the literal meaning of a statute even if there are unintended consequences of legislation.[180] In *Crooks v. Harrelson*, the Court stated:

---

[173] *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 146 L.Ed.2nd 121 (2000).
[174] *Rowan Companies, Inc. v. United States*, 452 U. S. 247, 253 (1981)
[175] *Id.* (quoting *National Muffler Dealers Assn. v. United States*, 440 U. S. 472, 477 (1979))
[176] *Id.*
[177] *United States v. Correll*, 389 U. S. 299, 307 (1967).
[178] 316 U.S. 107 (1942).
[179] *Id.* at 113. A regulation is out of "harmony" with the statute's origin and purpose and therefore invalid if it purports to add restrictions not enacted by Congress to a statute. *Estate of Boeshor v. Commissioner*, 78 T.C. 523, 527 (1982).
[180] *Crooks v. Harrelson*, 282 U.S. 55 (1930); *Hanover Bank v. Commissioner*, 369 U.S. 672, 688 n. 23 (1962) (quoting *Fabreeka Products Co. v. Commissioner*, 294 F.2nd 876, 879 (1st Cir. 1961)) ("'[g]ranting the government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the

> It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts.[181]

In *Edward L. Stephenson Trust v. Commissioner*,[182] the Tax Court considered an IRS regulation permitting IRS consolidation of multiple trusts, and concluded:

> Our review of the history of subchapter J and the restrictions on multiple trusts convinces us that the consolidation regulation is invalid because it adds restrictions not contained in the statute nor contemplated by Congress. The grounds for our conclusion are: First, Congress consciously enacted clear rules in 1969 to eliminate some, but not all, of the tax benefits associated with multiple trusts. The consolidation regulation goes beyond the statute by eliminating *all* of the tax benefits of multiple trusts. Second, the consolidation regulation takes a subjective approach to the multiple trust issue. This approach conflicts with the objective approach adopted by Congress. Third, the regulation extends beyond the statute and exceeds congressional intent by purporting to overrule the *Morris Trusts* case.[183]

Congress has previously reviewed many provisions of the Code and enacted revisions or expressly authorized the issuance of regulations to eliminate or deter potential abuses.[184] If Congress intended that partnership transactions be subject to the "principal purpose" test set forth in the anti-abuse regulations, it could enact such a provision, as it has done with the fourteen provisions referenced in footnote 184. It did not do so, although it has enacted and repealed tax-avoidance-oriented provisions as a part of subchapter K. By way of example:

- Congress enacted Code section 704(b), relating to the effectiveness of allocations of items of partnership income, gain, loss, deduction, and credit as part of the Internal Revenue Code of 1954. That section provided,[185] in part, that allocations of tax items

---

Congressional thumb, not the court's"); *Busse v. Commissioner*, 479 F.2d 1147, 1152 (7th Cir. 1973) ("However much the statute, in operation, may offend the Commissioner's sense of symmetry and propriety, we cannot say that the results it causes are either absurd or unintended by Congress. Courts have no power (just as the Commissioner has no power in his capacity as an administrative official) to rewrite legislative enactments to give effect to their 'ideas of policy and fitness or the desirability of symmetry in statutes.'") (quoting *United States v. Shirah*, 253 F.2d 798, 800 (4th Cir. 1958))).

[181] 282 U.S. at 60.

[182] 81 T.C. 283 (1983).

[183] *Id.* at 294-95 (footnote omitted).

[184] Each of the following sections either sets forth or authorizes issuance of regulations to set forth anti-abuse or anti-avoidance provisions: Code sections 72(e)(11), 108(c)(5), 197(f)(9)(F), 338(e)(3), 361(b)(3), 732(f)(8), 860L(h), 877(d)(4)(D), 901(k)(4)(C), 953(e)(7), 954(h)(7), 1274A(e)(2), 1397F(2), and 6255(g)(1). Not only has the Congress not enacted a statute making a specific grant of authority to issue anti-abuse or anti-avoidance provisions in the partnership setting, it has not even granted authority to issue regulations to effect the purposes of subchapter K as it has done in implementing many provisions of the Code. *See, e.g.*, Code section 777 (authorizing the issuance of regulations "as may be appropriate to carry out the purposes" of sections 771 through 776, dealing with certain electing large partnerships).

[185] Code section 704(b)(2). Prior to the amendment, section 704(b) read as follows:

would be made in accordance with the partners' interests in the partnership where the avoidance or evasion of any tax was the principal purpose of the agreement of the parties on such determinations. Congress removed that principal purpose test from Code section 704(b) in 1976, replacing it with a substantial economic effect test.

- In 1999, Congress enacted Code section 732(f), requiring an adjustment to the basis of corporate stock distributed to a partner that is a corporation (other than the issuer of the distributed stock). As a part of that provision, Congress authorized the IRS to issue regulations "as may be necessary to carry out the purposes of this subsection, including regulations to avoid double counting and to prevent the abuse of such purposes."[186]

In the corporate context, Congress has provided in Code section 357(b) that where a liability assumption occurs in a transaction the income from which is, in general, not presently subject to taxation, the assumption is taxed as though cash had been received if the principal purpose of the taxpayer with respect to the assumption was to avoid Federal income tax on the transaction, or was otherwise not a bona fide business purpose. Had Congress favored a broad principal-purpose/anti-abuse rule for partnership transactions, it would have included in Code section 752 a provision similar to section 357(b).

In summary, there are significant indications that the partnership anti-abuse regulation is invalid to the extent that it attempts to do more than simply codify into regulation the judicial doctrines of substance over form, sham transaction, economic substance, economic reality, and step transaction.

*Application on the merits*

Even if the partnership anti-abuse regulation is deemed to be valid, the taxation of the Financial Plan as contemplated in this opinion letter is consistent with the three requirements of that regulation. As noted above, those requirements are first, the partnership must be bona fide and each partnership transaction or series of related transactions must be entered into for a substantial business purpose; second, the form of each partnership transaction must be respected under substance over form principles; and third, except as otherwise provided in Subchapter K, the tax consequences under subchapter K to each partner of partnership operations and of

---

A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

[186] Code section 732(f)(8).

transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income. The reasons supporting this conclusion are essentially the same reasons advanced above in support of the conclusion that the judicial "substance over form" and "step transaction" doctrines will not alter the Federal income taxation of the Financial Plan.

First, the Financial Plan was undertaken for legitimate investment, estate-planning, and privacy/security purposes. Although the tax consequences of the Financial Plan were a consideration, there were significant non-tax economic purposes for which the Financial Plan was designed including, without limitation, realizing profits on short sales of Treasury Notes, and increasing the diversification of the Trust's investment holdings.

Second, the short sales of Treasury Notes were completely unhedged. As a result, depending on how interest rates might fluctuate, BLC had both a significant potential for profit as well as the economic risk of loss.

Third, although the Financial Plan comprises several transactions, some of which occurred in a short span of time, these transactions were not mutually interdependent, effected pursuant to a "binding commitment" to enter into all of the transactions, or component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.

Fourth, the partnership agreement of ALP and the operating agreement of BLC in form and in operation accurately reflect the partners' economic agreements. No allocations in such agreements lack substantial economic effect.

Fifth, although the Tax Section of the New York State Bar Association proposed[187] in a formal comment on the proposed anti-abuse regulation that the IRS include an example that would address specifically a pattern similar to the Financial Plan transactions described above, the IRS chose not to include such an example even though it did include thirteen examples, four of which concluded that the facts presented required a recasting of the transaction.

*Conclusion*

Weighing the relevant authorities, and taking into account the pertinent facts and circumstances, there is substantial authority for the position that the partnership anti-abuse rules set forth in Reg. § 1.701-2 will not alter the Federal income taxation of the Financial Plan, and it

[187] N.Y. St. B.A. Tax Sec. Comm. on Partnerships, Report on the Proposed Anti-Abuse Rule 79-82, Ex. 13 (July 1, 1994).

is more likely than not that such rules[188] will not alter the Federal income taxation of the Financial Plan.

***Tax shelter registration, list keeping, and disclosure; related penalties***

*Tax shelter registration.* There are two sets of tax shelter registration requirements. The first set applies to certain arrangements in which a significant purpose of the structure is to avoid or evade Federal income tax for a direct or indirect participant that is a corporation. No element of the Financial Plan should be characterized as an arrangement with such a purpose. Accordingly, this set of registration requirements should not apply. The second set of registration requirements applies in the context of a noncorporate taxpayer if an arrangement has several statutorily-prescribed characteristics. Those required characteristics include that the arrangement be (1) required to be registered under federal or state securities law, (2) sold under an exemption from registration requiring the filing of a notice with a federal or state securities agency, or (3) a substantial investment. An arrangement is a substantial investment if (a) the aggregate amount that may be offered for sale exceeds $250,000, and (b) there are expected to be five or more investors. The Financial Plan involves seven investors (Marilyn Sands, Robert Sands, Richard Sands, Andrew Stern, the Marvin Sands Master Trust, CWC-I, and Mrs. Robinson). However, even if the Financial Plan involved fewer than five investors, Treasury regulations provide that

> For purposes of determining whether investments are parts of a substantial investment, similar investments offered by the same person or related persons (as defined in section 168(e)(4)) are aggregated together. Investments are considered similar if they involve similar principal business assets and similar plans or arrangements. Investments that include no business assets will be considered similar if they involve similar plans or arrangements.[189]

The conference committee report adopted at the time of enactment of this provision illustrated the operation of the aggregation provision by an example involving eight limited partnerships, each with a different general partner, three different limited partners, but investing in a separate but similar asset, concluding that registration would be required.[190] A virtually-identical example appears in the Treasury regulations relating to registration.[191]

---

[188] From a procedural perspective, the IRS has recognized that the some discretion must be exercised in asserting violations of the anti-abuse rule. In Announcement 1994-27, the IRS advised that it was establishing a partnership team as part of its Industry Specialization Program, and that an Issue Specialist on that team

> will be designated to provide expertise to field examiners on all issues raised under proposed regulation 1.701-2 ... once the regulation has been finalized. In addition, as a §1.701-2 issue is considered in an examination, ***the appropriateness of the §1.701-2 determination must be coordinated with the Issue Specialist and the National Office.***

*Id.* (emphasis added).

[189] Reg § 301.6111-1T (Q&A 22).

[190] H.R. Rep. No. 98-432, 98th Cong., 2nd Sess. 226 (1984).

[191] Reg § 301.6111-1T (Q&A 22).

Concerning the requirement of five or more investors, the regulations relating to an offering involving (in the aggregate) fewer than five investors state that registration is not required if there is neither knowledge nor reason to know that the person making the offering (or a related person) will offer subsequent similar investments. However, the regulation states that a tax shelter organizer will be presumed to have known of similar investments offered during the twelve months following the first offering of an investment.

If a court were to sustain an IRS assertion that the Financial Plan should be aggregated for this purpose with separate but similar investments of unrelated parties, the filing of a tax shelter registration could be required.

If an arrangement is within the definition of a tax shelter required to be registered, the statute places the duty to register on several people. These include the person principally responsible for organizing the shelter, any other person who participated in the organization of the shelter, and any person who participated in the sale or management of the shelter when it was not registered. Treasury regulations elaborate on this, making it clear that even though preparation of documents establishing the shelter and other acts frequently done by lawyers generally constitute participation in organization, the performance of such acts "will not constitute participation in the organization or management of a tax shelter unless the person performing the act is related to the tax shelter (or a principal organizer of the tax shelter) or the person participates in the entrepreneurial risks or benefits of the tax shelter." The regulation contemplates determination of whether parties are "related" by reference to the related party / anti-churning rules related to accelerated cost recovery deductions as set forth in Code section 168(e)(4) as it existed in 1984. The examples set forth in the registration regulations provide the following guidance:

> For example, assume that A forms Z partnership, a tax shelter for which registration is required. Z hires the X law firm, none of the partners of which is related to the tax shelter, to prepare the documents necessary to register the offering of Z securities with the Securities and Exchange Commission. X charges $100 an hour for its services in connection with the preparation of the necessary documents, and payment of the fee is not contingent. X will not be treated as a participant in the organization of the tax shelter. If, however, X were to charge a fee equal to 1 percent of the value of the units in the tax shelter that are sold, X would be considered a participant in the organization of the shelter.
>
> As another example, assume that individual C is an attorney employed by W corporation, the corporate general partner and principal organizer of Z, and that C prepares the documents necessary to register the tax shelter with the Securities and Exchange Commission. C will be treated as having participated in the organization of the tax shelter regardless of the way in which C's compensation is structured, because C, as an employee, is related to the principal organizer of the tax shelter.[192]

[192] Reg § 301.6111-1T (Q&A 30)

Although the penalty for failure to register a tax shelter is severe—the greater of $500 or 1% of the aggregate amount invested in the shelter—the penalty is imposed on "a person who is required to register a tax shelter under section 6111," and is not imposed where the failure to register is due to reasonable cause. However, if the Financial Plan or one or more components of that Plan were characterized as a tax shelter, as observed above, the individuals or entities that participated in the organization, sale, or management of the tax shelter would be required to effect a registration.

*Listkeeping*. In addition to registration of tax shelters as defined in Code section 6111, the Code also provides that any person who organizes a "potentially abusive tax shelter" or sells an interest in such a shelter must keep a list of the names, addresses, identification numbers, and certain other information relating to each investor. The definition of a "potentially abusive tax shelter" subject to this requirement includes not only tax shelters required to register with the IRS as such, but also "any transaction a significant purpose of the structure of which is the avoidance or evasion of Federal income tax within the meaning of section 6111(d)(1)(A) and §301.6111-2T(b)." As interpreted by regulations, any person who participates in the organization, management, or sale of the investment is subject to this requirement, but the definition contains a cross-reference to the definition of "principal organizer" in the tax shelter registration regulations, which in turn contain the legal services safe harbor described above. To the extent it is applicable, the penalty for failure to maintain an investor list is $50 for each person not listed, not to exceed $100,000 for any calendar year, but is not imposed where the failure to maintain the list is due to reasonable cause.

*Disclosure*. The last of the tax-shelter provisions to which the IRS, the Congress, and the tax bar have devoted a significant amount of attention recently is the requirement that taxpayers attach a specific disclosure statement to their returns if they participated in one or more "reportable transactions." There are two types of reportable transactions. The first type comprises the so-called listed transactions, transactions specifically identified by the IRS in published guidance as such, or transactions substantially similar to the ones so identified. To date, the IRS has identified seventeen listed transactions. The second type of reportable transaction is defined by its characteristics. At present, the failure to make the required disclosure of participation in a reportable transaction pursuant to these provisions is not subject to penalty, although the failure to make such a disclosure could be taken into account in considering whether to impose a deficiency-related penalty, such as the accuracy-related penalty, on an affected taxpayer. These disclosure provisions would take on more significance if proposed tax shelter legislation is enacted or proposed regulations are adopted, each as discussed below.

***Interest and penalties***

If the IRS were to assert a deficiency in tax relating to any aspect of the Financial Plan in general and the tax consequences of that plan discussed in this letter in particular, interest would be payable on any deficiency ultimately determined to be due. The IRS would also consider the assertion of penalties, sometimes referred to as "additions to tax."

Interest on underpayments of tax and on most penalties (including the accuracy-related penalty, discussed below) accrues at a rate equal to three percentage points over the Federal short-term interest rate. The IRS reviews these rates on a quarterly basis. For the quarter beginning April 1, 2002, interest on underpayments by taxpayers other than corporations will accrue at six percent (6%) per annum. Interest compounds daily, resulting in the accrual of interest on unpaid interest.

As noted above, the IRS would consider the assertion of penalties or additions to tax were it to assert a tax deficiency in connection with the Financial Plan. The principal penalty it would be likely to consider is the so-called "accuracy-related penalty" imposed under Code section 6662. That penalty will be sustained if an underpayment of tax is attributable to negligence, disregard of rules or regulations, or a substantial understatement of income tax.[193] The penalty is twenty percent (20%) of the amount of the underpayment so attributable.[194] The penalty percentage is forty percent (40%) to the extent attributable to a gross valuation misstatement.[195] The Code defines a gross valuation misstatement, as that term might be applied in this case, as being present if "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)...."[196]

In general, the "underpayment" subject to tax is the excess of the correct tax over the tax reported on the taxpayer's return and not abated, credited, refunded, or otherwise repaid.[197] However, the term is limited further for this purpose. In general, the underpayment is reduced by those portions attributable to positions for which there was "substantial authority," as that term is defined, or for which there was adequate disclosure on the taxpayer's return.[198] Congress limited these reductions in cases involving "tax shelters," as defined. Congress defined a tax shelter for this purpose as follows:

> 6662(d)(2)(C)(iii) TAX SHELTER.--For purposes of this subparagraph, the term "tax shelter" means--
>
> (I) a partnership or other entity,
> (II) any investment plan or arrangement, or
> (III) any other plan or arrangement,
>
> if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.

---

193 Code section 6662(b). The penalty also can be imposed where an underpayment is attributable to a substantial valuation overstatement, a substantial overstatement of pension liabilities, or a substantial estate or gift tax valuation understatement. *Id.*
194 Code section 6662(a).
195 Code section 6662(h)(1).
196 Code sections 6662(e)(1)(A), 6662(h)(2).
197 Code sections 6211(b)(2), 6662(d)(2).
198 Code section 6662(d)(2)(B).

A portion of an underpayment attributable to a "tax shelter" item is excluded if there is "substantial authority" for the taxpayer's treatment of that item, and the taxpayer reasonably believed that his tax treatment of that item was more likely than not the proper treatment.[199]

As developed in applicable Regulations,[200] a taxpayer is deemed to satisfy the reasonable belief requirement if:

> The taxpayer reasonably relies in good faith on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the manner described in paragraph (d)(3)(ii) of this section and unambiguously states that the tax advisor concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service.

That Regulation also states that one must take into account all of the facts and circumstances in determining whether this reasonable belief requirement has been satisfied and, in any event, that standard will not be deemed to be satisfied unless the requirements of Reg. §1.6664-4(c)(1) have been satisfied.[201] That section provides, in pertinent part, that:

- Reliance may not be reasonable or in good faith if the taxpayer knew, or should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.
- The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances including the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. This requirement will not be satisfied if the taxpayer fails to disclose a fact that he knows, or should know, to be relevant to the proper tax treatment of an item.
- The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person.

As noted above in the section entitled "opinion standards," we have used the "substantial authority" and "more likely than not" terminology and related standards as set forth in Code sections 6662 and 6664 and related Regulations in analyzing the potentially-applicable legal authorities and in issuing the opinions set forth above. Although this letter and the opinions set forth above should satisfy the opinion requirements, you must rely on those opinions reasonably and in good faith in order to avoid the imposition of the accuracy-related penalty on matters opined on above.

---

199 Code section 6662(d)(2)(C)(i)(II).
200 Reg. §1.6662-4(g)(4)(i)(B).
201 Reg. §1.6662-4(g)(4)(ii).

*2001-2002 IRS disclosure initiative and enforcement activities*

In December, 2001, the IRS issued an announcement inviting taxpayers to disclose, on or before April 23, 2002, their tax treatment of tax shelters and other items that might subject such taxpayers to the so-called "accuracy-related penalty." In return, the IRS announcement generally offers to waive the accuracy-related penalty as to items so disclosed. To qualify, the disclosure had to satisfy certain substantive and procedural requirements set forth in the IRS notice. More specifically, the disclosure has to.

- relate to a tax item covered by the initiative, and not to one of the six classes of items specifically excluded from the initiative;
- be filed with the IRS at the location specified by the notice by the deadline stated in that notice;
- set forth the material facts, the taxpayer's tax treatment of the item, the taxable years affected by the item; the names and addresses of (a) any parties who promoted, solicited, or recommended the taxpayer's participation in the transaction underlying the item and who had a financial interest, including the receipt of fees, in the taxpayer's decision to participate, and (b) if known to the taxpayer, any parties who advised the persons who promoted, solicited, or recommended the taxpayer's participation in the transaction;
- set forth a statement agreeing to provide, if requested, copies of all transactional documents, deliberative memoranda used by the taxpayer in its decision-making process, and all opinions and memoranda that provide a legal analysis of the item, whether prepared by the taxpayer or a tax professional on behalf of the taxpayer; and
- set forth a statement under penalties of perjury that the person signing the disclosure has examined the disclosure and that, to the best of that person's knowledge and belief, the information provided as part of the disclosure contains all relevant facts and is true, correct, and complete.

In mid-March, 2002, Treasury Department officials made several statements regarding its intention to "tighten the noose around people who would abuse the public tax system." The new effort contemplates changes to tax regulations, a possible request for changes in current tax statutes, and unspecified "administrative action."

*Risk of adverse legislation*

Over the past several years, Congress has considered several proposals that, if enacted, would have imposed a more demanding disclosure and penalty structure for transactions characterized as "tax shelters." In August 2001, the Senate Finance Committee released a bipartisan staff discussion draft, revising proposals issued by the staff of that committee in May 2000 and in October 2000. Under the most recent draft, a taxpayer would be subject to a forty

percent (40%) penalty on any "applicable tax shelter understatement." As defined by the draft, an applicable tax shelter understatement generally is an increase in the income tax of a taxpayer resulting from a difference between the taxpayer's treatment of items attributable to a tax shelter, as defined, and the proper tax treatment of those items. However, tax attributable to an item would be excluded from the applicable tax shelter understatement if:

- there was substantial authority for the tax treatment of such item by the taxpayer,
- the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return, ***and***
- the taxpayer had a reasonable belief that the tax treatment of such item by the taxpayer was more likely than not the proper treatment.

Accordingly, if this proposal were to be enacted, if a taxpayer did not make an affirmative disclosure of the relevant facts relating to an issue, the penalty could be applied if the taxpayer lost in litigation even if the position taken on the return was supported by substantial authority and the taxpayer reasonably believed that his return was accurate.

The proposal also provides that certain tax opinions, known as "disqualified opinions,"[202] and certain tax advisors, each known as a "disqualified tax advisor,"[203] could not be relied upon to establish that a taxpayer had the requisite "reasonable belief." As to any applicable tax shelter understatement, the proposal would eliminate the "reasonable cause" exception presently provided under Code section 6664(c)(1).

The proposal presently includes an effective date provision that would apply these rules to transactions entered into, offerings, or activities, as the case may be, after the enactment of the bill. As a result, the proposals, if enacted, would not apply to initial stages of the Financial Plan. However, if the proposal is adopted and, in doing so, Congress changes the effective date provisions so as to cause these provisions to apply to the entire Financial Plan, the IRS might argue that this Firm should be characterized as a "disqualified tax advisor" based upon its receipt of client referrals from one or more persons who or which IRS might argue to be tax shelter organizers or promoters. Were this Firm to be so characterized, the opinions stated in this letter could not be used to establish reasonable cause and thereby to avoid assessment of an accuracy-related penalty even if all other conditions for avoiding such a penalty were present.

---

[202] Specifically, the proposal would characterize a tax opinion as a "disqualified opinion" if it: (i) is based on unreasonable factual or legal assumptions (including assumptions as to future events), (ii) unreasonably relies on representations, statements, findings, or agreements of the taxpayer or any other person, (iii) does not identify and consider all relevant facts, or (iv) fails to meet any other requirement as the Secretary may prescribe.

[203] Specifically, the proposal would characterize an advisor as a "disqualified tax advisor" if the advisor: (i) is an organizer or promoter of the tax shelter, (ii) is compensated directly or indirectly by such organizer or promoter with respect to the tax shelter, (iii) has a contingent fee arrangement with respect to such tax shelter, (iv) has any type of referral agreement or other similar agreement or understanding with such organizer or promoter which relates to the tax shelter, or (v) has any other similar characteristic which, as determined under regulations prescribed by the Secretary, is indicative of a potential conflict of interest or compromise of independence