information regarding compliance with the registration requirements under Section 6111. A number of promoters already have provided the IRS with a significant amount of information, including investor lists.

- Summonses – The IRS, in cooperation with the Department of Justice, is using summonses to force reluctant promoters to provide investor lists and other materials related to their promotion of tax avoidance transactions. These summonses already are proving to be a valuable tool, and additional summonses are being prepared. The IRS and the Department of Justice will seek to enforce all summonses in court, if necessary.

- Penalty Audits – The IRS has begun more than a dozen promoter penalty audits and expects to begin additional audits in the coming weeks.

The IRS also has intensified its enforcement efforts against promoters of abusive tax avoidance transactions and scams directed primarily at individuals and small businesses. These schemes include claims that the federal income tax is unconstitutional, claims that individuals are citizens of the States and therefore not subject to federal income tax, claims that U.S. citizens are not subject to U.S. income tax because of Section 861 of the Code (so-called "Zero Tax" schemes), and credit claims for slavery reparations. The Treasury Department believes that these schemes are especially pernicious because the individuals targeted by promoters often have a limited understanding of their legal duties and obligations. Recent and ongoing actions include:

- Injunctions Granted – The Department of Justice has obtained injunctions against six promoters of abusive tax avoidance schemes, including a preliminary injunction that was issued on February 20, 2002.
- Pending Cases – The Department of Justice has filed an additional eight actions against promoters of abusive tax avoidance schemes.
- Future Cases – The IRS has referred a number of additional promoter cases to the Department of Justice in order to initiate legal action against these promoters.

In addition, the IRS is pursuing a major initiative against promoters of abusive offshore trust schemes. These schemes use banks located in offshore financial centers to help U.S. individuals hide income while at the same time allowing these individuals to access their offshore money in the U.S. by using credit cards issued by the offshore banks. The IRS believes that thousands of individuals are using these schemes to evade tax. In addition to an extensive publicity campaign to educate the public about the dangers of these schemes, the IRS is working to shut them down.

- Summonses to Financial Networks – Summonses have been issued to two financial networks to obtain transaction information that will allow the IRS to identify individuals who are using credit cards issued by foreign banks to evade tax.
- Summonses to Vendors – Although information obtained from the financial networks may identify accounts, these schemes are set up so that the financial

networks often do not have information identifying specific persons. Summonses will be issued to vendors expected to have identification information for credit card transactions. The IRS expects to identify individuals through these vendor summonses.

- IRS Audits - The IRS will initiate audits of individuals who are identified as participants in these schemes. If an identified individual is already under audit, this information will be provided to the auditor.
- Criminal Prosecution – The IRS and the Department of Justice will initiate, where appropriate, criminal proceedings against individuals who have violated the criminal laws by participating in these schemes.

Aggressive enforcement and continuous taxpayer education will continue to be keys to the Government's efforts to close down the tax schemes being marketed to individuals and small businesses. For the more sophisticated tax avoidance transactions, increased transparency, supported by stiffer penalties, is needed.

* * *

The Treasury Department's enforcement proposals are divided into administrative actions and legislative proposals. These proposals, collectively, will enhance and expand the efforts to combat abusive tax avoidance transactions.

## THE TREASURY DEPARTMENT'S ADMINISTRATIVE ACTIONS

1. **Expand the Disclosure Rules to Cover Partnerships, S Corporations, Trusts, and Some Individuals** – The Treasury Department and the IRS will amend the regulations under Section 6011 of the Code to require partnerships, S corporations, trusts and individual taxpayers to disclose "reportable transactions," as described in Administrative Action No. 3, below. This requirement, however, will not affect individuals unless they engage in specifically identified tax avoidance transactions or in other transactions resulting in a significant reduction of tax liability.

   *Reason for Proposal: Under current law, only corporate taxpayers are required to disclose reportable transactions on a tax return. The Treasury Department believes that potentially abusive tax avoidance transactions are increasingly being used by high net-worth individuals. Individuals, for example, have used transactions modeled after those described in Notice 2000-44 (the so-called "Son of Boss" transaction) and Notice 2001-45 (basis-shifting transaction) to avoid paying income tax. In addition, potentially abusive transactions by both corporations and individuals often employ partnerships and trusts to achieve unintended tax results. The Treasury Department believes that individuals, partnerships, S corporations, and trusts should be required to disclose questionable transactions. While this will*

*result in some duplicative reporting, the duplicative reporting will ensure disclosure and also may deter improper transactions.*

2. **Centralize the Receipt and Review of Disclosures by Partnerships, S Corporations, Trusts, and Individuals** – Disclosures of transactions must be submitted as part of a taxpayer's return. The IRS currently requires that copies of corporate taxpayer disclosures be sent to a single location so that the IRS' Office of Tax Shelter Analysis can coordinate their review. This centralized filing requirement for disclosures will be expanded to disclosures required for partnerships, S corporations, trusts, and individuals and will permit the expeditious review of all disclosures.

   *Reason for Proposal: The Treasury Department believes that the review of all disclosures, whether by corporations, individuals, partnerships, S corporations, or trusts must be centralized and coordinated. The coordinated review of these disclosures will allow the Treasury Department and the IRS to identify trends and new types of transactions and will ensure the consistent evaluation of disclosed transactions. Moreover, the certainty of review that will result from centralized disclosure should serve to deter improper transactions.*

3. **Expand and Unify the Definition of a "Reportable Transaction" for Return Disclosure, Registration and List-Maintenance Purposes** – The Treasury Department and the IRS will amend the regulations under Sections 6011, 6111, and 6112 of the Code to establish a single definition of the types of transactions (reportable transactions) that must be disclosed by taxpayers and registered by promoters, and for which lists of investors must be maintained by promoters.[1]

   The current regulations under Section 6011 require taxpayers to disclose (i) listed transactions (i.e., tax avoidance transactions identified by the IRS in published guidance), subject to a minimum tax effect requirement; and (ii) transactions that satisfy the 2-of-5 filter test, subject to a number of exceptions. The current regulations under Section 6111 requiring registration of confidential corporate tax shelters and the current regulations under Section 6112 requiring list maintenance use different standards than those in the Section 6011 regulations, but each set of regulations has exceptions similar to those in the Section 6011 regulations.

   The IRS' identification of listed transactions under current regulations has played an important role in compelling disclosure of transactions, discouraging future participation in these transactions, and guiding IRS audits in the field. Listed

[1] Certain legislative changes will be required to allow for the full conformity of the definition of a reportable transaction for purposes of Sections 6011, 6111, and 6112 of the Code. See Legislative Proposal No. 8, below

transactions will remain an important part of the definition of a reportable transaction.

Under new regulations, the 2-of-5 filter test will be replaced by clearer rules that will be easier for taxpayers and their advisors to apply and the IRS to administer. In addition, the minimum tax effect requirement for listed transactions and the exceptions to the 2-of-5 filter test (including exceptions for transactions for which there is a generally accepted understanding that the taxpayer's intended tax treatment is properly allowable, and the exception for transactions that the IRS has "no reasonable basis" to challenge) will be eliminated.

These rules will have the effect of broadening the scope of transactions required to be registered with and reported to the IRS. The IRS will have the ability to issue published guidance to narrow the requirements as appropriate. In addition, the IRS will establish expedited procedures permitting taxpayers (and particularly those taxpayers who enter into multiple transactions of the same type) to seek a determination from the IRS that their transactions are not reportable transactions.

Under this proposal, a reportable transaction will be defined as a transaction (including a series of related transactions) falling into any of the following categories:

- Listed Transactions – Any transaction specifically identified by the IRS in published guidance as a tax avoidance transaction without regard to the size of the tax savings.

- Loss Transactions – Any transaction resulting in, or that is expected to result in, a loss under Section 165 of the Code of at least:

  - For corporate taxpayers – $10 million in any single year, or $20 million in any combination of years.
  - For partnerships and S corporations – $10 million in any combination of years.
  - For trusts – $2 million in any single year or $4 million in any combination of years, whether or not any losses flow through to one or more beneficiaries.
  - For individual taxpayers – $2 million in any single year, or $4 million in any combination of years.

- Transactions with Brief Asset Holding Periods – Any transaction resulting in a tax credit (including a foreign tax credit) if the underlying asset giving rise to the credit was held by the taxpayer for less than 45 days. This definition will be limited to transactions resulting in tax credits exceeding $250,000.

- Significant Book-Tax Differences – Any book-tax difference of at least $10 million, subject to specific exceptions for book-tax differences that are not indicative of potentially abusive tax avoidance practices, such as depreciation, depletion, amortization, bad-debt reserves, state and local taxes, and employee compensation.

- Transactions that are Marketed under Conditions of Confidentiality and that Provide Minimum Tax Benefits – Any transaction promoted under conditions of confidentiality, if the transaction results in, or is expected to result in (i) a reduction in taxable income of an individual, partnership, S corporation, or trust of at least $250,000, or (ii) a reduction in taxable income of any corporate taxpayer of at least $500,000. Conditions of confidentiality do not include the fact that a taxpayer's financial information is subject to restrictions on disclosure.

Under this proposal, this same definition of a reportable transaction will be used to identify those transactions that must be registered by promoters under Section 6111 and for which lists must be maintained pursuant to Section 6112 of the Code. The exceptions to disclosure also will be eliminated for purposes of promoter registration and list maintenance.

The Treasury Department recognizes that this definition of a reportable transaction potentially will cover many transactions that may not be abusive tax avoidance transactions. This definition, however, will enable the Treasury Department and the IRS to accomplish two important objectives. First, this definition will give the Treasury Department and the IRS the information needed to evaluate promptly potentially questionable transactions. Equally important, this definition will allow the Treasury Department and the IRS to identify problems and anomalies with existing rules and regulations for which statutory or regulatory changes should be considered.

> *Reason for Proposal: Taxpayers and promoters are interpreting the requirements in the current rules narrowly and reading the exceptions liberally. The Treasury Department believes that a clear and consistent rule for disclosure, registration, and list-maintenance will ensure that the IRS has more than one source of information about a reportable transaction. The IRS must have the ability to move quickly from a promoter registration to the promoter's investor list in order to identify non-disclosing taxpayers. Similarly, the IRS must be able to move quickly from a taxpayer disclosure of a reportable transaction to a promoter who might have failed to register the transaction, and from the promoter's investor list to non-disclosing taxpayers. This web of disclosure will increase the likelihood that taxpayers who fail to disclose and promoters who fail to register will be identified.*

4. **Clarify the Definition of a Listed Transaction** – Under current law, a "listed transaction" includes any transaction that is the same or "substantially similar" to a transaction identified by the IRS in published guidance as a tax avoidance transaction. The Treasury Department and the IRS will amend the regulations under Section 6011 of the Code to clarify that a listed transaction includes any transaction designed to produce the same or similar type of tax result using the same, or similar, tax strategy. For example, a transaction that relies on Sections 318 and 302 to shift basis from one person to another in a factual situation similar to the one in IRS Notice 2001-45 would be a listed transaction.

   *Reason for Proposal: Some taxpayers and promoters have applied the "substantially similar" standard in an overly narrow manner to avoid disclosure. Some taxpayers and promoters, for example, have made subtle and insignificant changes to a listed transaction in order to claim that their transaction is not subject to disclosure. Others have taken the position that their transaction is not substantially similar to a listed transaction because they have an opinion concluding that the transaction is proper. The Treasury Department believes that these interpretations are improper. The change to the definition of a listed transaction is intended to halt these practices.*

5. **Impose Strict Liability for Accuracy-Related Penalties for Reportable Transactions that are not Disclosed** – Under current law, taxpayers may claim a defense to the accuracy-related penalty, even for an undisclosed reportable transaction resulting in an underpayment, based on an opinion regarding the tax consequences of the transaction. The Treasury Department and the IRS will amend the regulations under Sections 6662 and 6664 of the Code to provide two similar, but distinct, rules for reportable transactions that are not disclosed. These amended regulations generally will provide that the defenses to the penalty under Sections 6662(d)(2)(B) and (C) and 6664(c) are not available in these cases.

   For listed transactions that are not disclosed, the amended regulations will provide that (i) a taxpayer cannot rely on, among other things, an opinion as a defense to the imposition of the accuracy-related penalty under Section 6662 if the transaction results in an underpayment and (ii) that any underpayment resulting from the transaction will be treated as an underpayment attributable to negligence or the disregard of rules or regulations for purposes of Section 6662. In other words, the increased accuracy-related penalty of 25%, in addition to the $200,000 failure to disclose penalty,[2] will apply regardless of the amount of the underpayment.

   For other reportable transactions (i.e., non-listed transactions) that are not disclosed, the amended regulations will provide that a taxpayer cannot rely on, among other things, an opinion as a defense to the imposition of the accuracy-related penalty

[2] See Legislative Proposal No. 1, below.

under Section 6662 if the transaction results in an underpayment. Whether any resulting underpayment is attributable to negligence or the disregard of rules or regulations will depend on the facts.

> <u>Reason for Proposal</u>: *The Treasury Department believes that many reportable transactions are not being disclosed. Promoters are advising taxpayers to disregard the disclosure requirements on grounds that an opinion will be sufficient to avoid accuracy-related penalties even if a listed transaction is identified during audit and results in an underpayment. The Treasury Department believes there should not be defenses to the accuracy-related penalties in cases where a reportable transaction is not disclosed. In the case of a listed transaction, there should be strict liability regardless of the amount of the understatement.*

6. **<u>Impose Strict Liability for Accuracy-Related Penalties for Transactions Based on the Invalidity of a Regulation that are not Disclosed</u>** – Some promoters are advising taxpayers to participate in certain tax avoidance transactions based on opinions that conclude that a contrary regulation is invalid. The Treasury Department and the IRS will amend the regulations under Sections 6662 and 6664 of the Code to provide that a taxpayer cannot rely on an opinion as a defense to the imposition of the accuracy-related penalty under Section 6662 for any underpayment attributable to the disregard of rules or regulations if the underlying transaction or item (whether or not a "tax shelter" as defined by Section 6662) was not adequately disclosed. The defenses to the penalty under Sections 6662(d)(2)(B) and 6664(c) would not be available in these cases.

> <u>Reason for Proposal</u>: *Taxpayers and promoters should not be permitted to rely on opinions – rendered for penalty protection – that conclude that one or more regulations are invalid unless the taxpayer discloses that its position is based on the invalidity of a regulation. Although the Treasury Department believes that such opinions currently are insufficient to establish a defense to the penalty, some promoters nevertheless are encouraging participation in (and nondisclosure of) transactions based on such opinions. The Treasury Department believes that this practice is improper for all transactions regardless of whether they are reportable transactions.*

7. **<u>Broaden the Range of Persons who are Required to Register Reportable Transactions and Maintain Lists of Investors</u>** – The Treasury Department and the IRS will amend the regulations under Sections 6111 and 6112 of the Code to clarify that all parties materially involved with a reportable transaction must register a transaction and maintain lists of investors. Material participation will be measured by the fees received, or expected to be received, as a result of the transaction or a series of related transactions (<u>e.g.</u>, fees in excess of $250,000 for corporate transactions, or in excess of $100,000 for individual transactions). In addition, a material participant may include a return preparer if the return preparer or an affiliate was materially involved with the transaction.

   In order to avoid unnecessary burden, the Treasury Department and the IRS will allow otherwise obligated persons to agree to have a single person register a transaction on behalf of a group of promoters and advisors so long as the registration identifies all of the promoters and advisors subject to the agreement. The IRS would not be precluded from imposing a penalty on any obligated party otherwise required to register a transaction if the transaction is not registered. A promoter or advisor always will have the option of registering a transaction on its own. Each promoter or advisor, however, will be required to maintain its own list of investors. Clarifying legislation to coordinate the language in Section 6111 and 6112 may be requested. <u>See</u> Legislative Proposal No. 9, below.

   > *<u>Reason for Proposal</u>: The IRS is dealing with many situations where promoters have not registered transactions or maintained lists of investors. Some promoters, for example, have argued that they are merely "advisors" or "return preparers" (and not an organizer or seller) for a transaction and therefore are not subject to the registration and list-maintenance requirements. In other instances, the promoting parties use or create a separate entity that they claim promotes the transactions. Afterwards, this separate entity ceases doing business, and there is no registration or investor list. The Treasury Department believes that these practices are improper.*

8. **<u>Establish Standards for Opinions in Circular 230</u>** – Circular 230 provides standards and ethical rules for practice before the IRS. In January 2001, the Treasury Department and the IRS issued proposed amendments to Circular 230 that would establish new rules and standards for opinions that are used to support tax avoidance transactions. These amendments reflect Treasury's concern that many of these opinions were being written to promote a transaction without reaching a firm conclusion about the validity of the transaction, were inadequately discussing important legal issues, were reaching inconsistent conclusions on issues, or were based on questionable factual assumptions. The Treasury Department believes that practitioners have a duty to the integrity of the tax system as well to their clients, and in the case of opinions used to promote or support tax avoidance transactions, a high degree of diligence and analysis is appropriate.

The Treasury Department and the IRS are evaluating these proposed amendments in light of the extensive comments received from the major tax professional organizations and will issue revised proposed regulations shortly. In addition, the Treasury Department and the IRS will finalize other proposed amendments to Circular 230 that were issued in January 2001.

*Reason for Proposal: Taxpayers participating in tax avoidance transactions often rely on opinions by tax professionals that the transactions are legitimate and proper. Many taxpayers will not participate in these transactions without opinions, either as a basis for participating in a transaction or as protection from penalties. Some tax professionals are rendering opinions that fall short of the minimum standards that the Treasury Department believes are appropriate. This proposal will address this problem by establishing minimum standards for these types of opinions.*

9. **Provide a Consistent Form for Return Disclosures** – The IRS will issue a disclosure form, to be submitted by taxpayers as part of their returns and to the IRS' Office of Tax Shelter Analysis, that will clearly identify the information required to be disclosed for reportable transactions. These forms will require taxpayers to disclose information relevant to the IRS' evaluation of a transaction – e.g., a description of the transaction, its participants (including tax-indifferent parties), its principal tax benefits, and the promoter.

*Reason for Proposal: Although existing rules require that certain information be included as part of a disclosure, the Treasury Department believes that a standard form will ensure that the disclosures are made and that all relevant information is provided to the IRS.*

10. **Establish Procedures for Early Examinations of Potential Tax Avoidance Transactions** – The IRS will establish procedures for the early examination of potential tax avoidance transactions while allowing, if necessary, for the examination of other issues at a later time. This process will allow the IRS to quickly identify, evaluate, and shut down abusive tax avoidance transactions.

*Reason for Proposal: Although existing rules under Section 7605 of the Code permit the early examination of a particular issue, the Treasury Department and the IRS believe that these procedures should be clarified to emphasize the availability of an early examination of potential tax avoidance transactions. This action will ensure that the IRS will be able to act quickly on disclosures and registrations of reportable transactions, while allowing for the examination of other issues as part of the regular audit process.*

11. **<u>Target Abusive Tax Avoidance Schemes</u>** – The IRS will re-deploy resources to identify and shut down abusive tax avoidance schemes. For example, the IRS' Small Business/Self Employed Division (SBSE) is finalizing the establishment of a centralized organization charged with developing leads on these schemes. As part of this effort, SBSE will establish a dedicated network of at least one examination group/collection group team in each of the 16 SBSE areas to work on abusive tax scheme cases; establish a new executive position to focus solely on abusive tax schemes, money laundering and fraud; implement additional monitoring of the Internet and other media outlets where abusive tax schemes often are advertised; increase efforts to educate the public about why these schemes are illegal; and increase efforts to shut down promoters.

> *<u>Reason for Proposal</u>: Many abusive tax avoidance schemes that are targeted at individuals and small businesses are marketed through a number of different mass media outlets. The Treasury Department believes that increased monitoring of these media outlets, as well as increased publicity about the dangers of these schemes, will help curb these tax avoidance schemes.*

**<u>THE TREASURY DEPARTMENT'S LEGISLATIVE PROPOSALS</u>**

1. **<u>Impose a Penalty for the Failure to Disclose Reportable Transactions</u>** – The Treasury Department will seek legislation that would:

   - Impose a penalty on corporate taxpayers for each failure to disclose a listed transaction equal to the sum of (i) $200,000 <u>and</u> (ii) 5% of any underpayment resulting from the listed transaction.
   - Impose a penalty of $50,000 on corporate taxpayers for each failure to disclose a reportable transaction (other than a listed transaction).
   - Impose a penalty of $200,000 on partnerships, S corporations, and trusts for each failure to disclose a listed transaction, and $50,000 for each failure to disclose other reportable transactions.
   - Impose a penalty on individual taxpayers for each failure to disclose a listed transaction equal to the sum of (i) $100,000 <u>and</u> (ii) 5% of any underpayment resulting from the listed transaction.
   - Impose a penalty of $10,000 on individual taxpayers for each failure to disclose a reportable transaction (other than a listed transaction).

   The portion of this proposed penalty that is dependent on the amount of any underpayment will be incorporated as an increase to the existing accuracy-related penalty under Section 6662. The disclosure penalty for listed transactions will not be waivable.

> *<u>Reason for Proposal</u>: Although the failure to disclose a transaction is a factor in determining whether an accuracy-related penalty should be imposed, current law does not impose a penalty*

*for the mere failure to disclose a reportable transaction on a return. The Treasury Department believes that nondisclosure should be subject to a separate sanction because it undermines the IRS' ability to evaluate questionable transactions.*

2. **Require Public Disclosure by Corporate Taxpayers of Penalties for the Failure to Disclose Listed Transactions and Accuracy-Related Penalties Resulting from an Undisclosed Listed Transaction** – The Treasury Department will seek legislation requiring corporate taxpayers to disclose, in their filings with the Securities and Exchange Commission, any penalty for the failure to disclose a listed transaction and any accuracy-related penalty resulting from an undisclosed listed transaction.

   *Reason for Proposal: The Treasury Department believes that a corporation should be required to disclose to its shareholders the corporation's participation in a listed transaction if the corporation incurs any penalties as a result of not disclosing the transaction to the IRS.*

3. **Expand and Increase the Penalty for a Promoter's Failure to Register a Reportable Transaction** – The Treasury Department will seek legislation that would amend Section 6707 of the Code, which provides for the penalty on promoters for the failure to register a transaction under Section 6111. The amendment would:

   - Impose, for listed transactions, a penalty equal to the greater of 50% of the fees paid to the promoter or $200,000. This penalty would be increased to 75% for the intentional failure to register a transaction or the intentional failure to provide complete or true information as part of a registration.
   - Impose, for the failure to register all other reportable transactions, a penalty of $50,000.

   *Reason for Proposal: The Treasury Department believes that a significant penalty should be imposed on the failure to register a reportable transaction.*

4. **Increase the Penalty for a Promoter's Failure to Timely Turn Over Investor Lists** – The Treasury Department will seek legislation that would replace the existing penalty in Section 6708 of the Code for a promoter's failure to maintain lists of investors in a reportable transaction. Under the Treasury Department's proposal, the penalty would be changed so that if a promoter fails to provide the IRS with a list of investors within 20 business days after receipt of the IRS' written request, the promoter would be subject to a penalty of $10,000 for each additional business day that the requested information is not provided. This penalty would be imposed for each investor list that a promoter fails to maintain or delays in providing to the IRS. The IRS would have the discretion to extend the deadline or waive all or a portion of the penalty for good cause shown.

> *Reason for Proposal: Too many promoters are using delaying tactics to avoid turning over investor lists. The Treasury Department believes that the penalty statute must be structured to sanction this type of behavior.*

5. **Permit Injunction Actions against Promoters who Repeatedly Disregard the Registration and List-Maintenance Requirements** – The Treasury Department will seek legislation to amend Section 7408 of the Code to allow the Government to enjoin promoters after the repeated disregard of the rules requiring the registration of reportable transactions under Section 6111 of the Code and the maintenance of investor lists under Section 6112 of the Code. An injunction would place a promoter under court order to abide by the registration and list-maintenance requirements. The promoter then would be in contempt of court if it violates these rules in the future.

> *Reason for Proposal: One of the persistent problems faced by the Treasury Department and the IRS is the fact that some promoters are ignoring the rules even in the face of penalties. The Treasury Department believes that the threat of an injunction will enable the Treasury Department and the IRS to curb the most egregious behavior by promoters.*

6. **Impose a Penalty for the Failure to Report an Interest in a Foreign Financial Account** – The Treasury Department will seek legislation that will impose, in addition to existing criminal penalties, a civil penalty of $5,000 for the failure to comply with the rules and regulations requiring the reporting of information requested on the "Report of Foreign Bank and Financial Accounts" (Form TD F 90-22.1). The IRS would have the ability to waive the penalty, in whole or in part, if the taxpayer paid all U.S. tax due with respect to the taxpayer's foreign accounts and the taxpayer demonstrates that the failure to file this form was due to reasonable cause.

> *Reason for Proposal: The Treasury Department believes that many taxpayers are not filing Forms TD F 90-22.1 even though they have an obligation to do so. Because many tax avoidance transactions involve foreign financial accounts, information about a taxpayer's interest in a foreign financial account will enhance the IRS' ability to identify participants in tax avoidance transactions.*

7. **Increase the Penalty for Frivolous Return Positions** – The Treasury Department, in its 2003 fiscal year budget, has proposed to increase the penalty for frivolous tax returns from $500 to $5,000. This amendment would further deter individual taxpayers from taking positions that have no basis in law or fact, such as claims that the Federal income tax is unconstitutional and claims for slavery reparations. The

IRS would publish, at least annually, a listing of positions, arguments, requests, and proposals deemed frivolous for purposes of the statute.

> *Reason for Proposal: The IRS has been faced with a significant number of individuals who are filing returns based on frivolous arguments or who are seeking to hinder tax administration by filing returns that are patently incorrect. The IRS must address such frivolous arguments through statutorily mandated procedures, which result in delay and additional administrative burden and expense. The Treasury Department believes that enhanced penalties will deter egregious taxpayer behavior and enable the IRS to utilize its resources more efficiently.*

8. **Permit a Single Definition of a Reportable Transaction for Disclosure, Registration, and List-Maintenance Requirements** – The Treasury Department will seek legislation amending the statutory definition of a transaction that must be registered under Section 6111 of the Code (currently, a "tax shelter" as defined in Section 6111(c) and (d)) using the existing definition under section 6112(b)(2) – i.e., "any entity, investment plan or arrangement or other plan or arrangement which of a type which the Secretary determines by regulations as having a potential for tax avoidance or evasion." Among other things, this would eliminate the "conditions of confidentiality" requirement in Section 6111(d). In addition, the registration requirements under Section 6111 would be expanded to cover transactions entered into by individuals, partnerships, S corporations, and trusts.

> *Reason for Proposal: This proposal will allow for regulations that will establish a single definition of a "reportable transaction" for purposes of disclosure, registration and list maintenance. See Administrative Action No. 3, above.*

9. **Confirm the Treasury Department and the IRS' Ability to Expand the Number of Persons Required to Register Reportable Transactions and Maintain Investor Lists** – The Treasury Department will seek legislation confirming that the registration requirements under Section 6111 of the Code and the list-maintenance requirements of Section 6112 apply to all organizers and sellers of a reportable transaction, including persons who assist such persons, and confirming the Treasury Department and the IRS' authority to impose conditions on agreements among promoting parties to have only one person (on behalf of a group of promoters) register a reportable transaction and maintain lists of investors. See Administrative Action No. 7, above.

SUBSTANTIVE LAW CHANGES TO CURB ABUSES

1. **Expand Section 901(k)** – The Treasury Department will seek legislation that will amend Section 901(k) of the Code to cover income streams other than dividends (which already are covered by the statute) that are subject to foreign withholding

taxes. Other income streams that may be subject to foreign withholding taxes include interest and royalties. The amendment would require a minimum holding period for the underlying property generating the income and deny foreign tax credits with respect to any withheld foreign taxes if the minimum holding period is not satisfied.

> *Reason for Proposal: The Treasury Department is concerned that the recent appellate decisions in Compaq and IES may cause taxpayers to renew their efforts to trade in foreign tax credits to reduce their U.S. tax liability. While Section 901(k) of the Code already addresses the specific type of transaction at issue in these cases, this section should be expanded to cover other similar transactions.*

2. **Address Income-Separation Transactions** – The Treasury Department will seek legislation to curb "income-separation" transactions that are structured to create immediate tax losses or to convert current ordinary income into deferred capital gain. These transactions are similar to the bond-stripping transactions that were prohibited by Section 1286 of the Code and preferred stock-stripping transactions that were prohibited by Section 305(e).

> *Reason for Proposal: Subsequent to the enactment of Section 1286, which applies only to bonds, and Section 305(e), which applies only to preferred stock, taxpayers have been engaging in essentially identical transactions using similar assets – i.e., assets providing for relatively stable, periodic income and with substantial future value. Although the IRS is pursuing these transactions under existing tax principles, legislation is needed to create a more comprehensive, consistent tax regime.*

In a common form of these types of transactions, a taxpayer acquires shares in a money-market mutual fund, which provide for a periodic income stream and which have a constant redemption value (e.g., $1 per share). The taxpayer separates the right to receive the income stream over a specific period (e.g., 15 years) from the right to the underlying shares at the end of that period. When the future right to the shares is sold, the parties claim that under the technical rules (i) the taxpayer has a large tax loss on the sale of the future right to the shares (this is accomplished through the allocation of the entire tax basis solely to the future right to the shares), and (ii) the buyer, rather than recognizing ordinary income periodically as the future right to the shares increases in value over time, claims that it is entitled to defer income until a future sale, at which time the buyer will claim that its income is capital gain. Other types of assets used in these income-stripping transactions include leases and service contracts.

The Treasury Department will propose legislation that will treat an income-separation transaction as a secured borrowing, not a separation of ownership. Debt

characterization will ensure that the parties' ongoing tax treatment from the transaction clearly reflects income.

# CERTIFICATE

**Robert Sands**
c/o Constellation Brands, Inc.
300 Willowbrook Office Park
Fairport, New York 14450-4222

April 11, 2002

Lewis, Rice & Fingersh, L.C.
500 North Broadway, Suite 2000
St. Louis, Missouri 63102

**Re: Representations with respect to the Financial Plan**[1]

Ladies and Gentlemen:

I submit this letter in connection with my request for your opinion with respect to certain federal income tax consequences of the Financial Plan. Based upon my personal knowledge, it was and is my understanding and belief that the following facts were true, correct, and complete in all respects at the beginning of the implementation of the Financial Plan, and that the following facts are and will continue to remain true, correct, and complete on the date as of which you issue your legal opinion and thereafter through the completion of the Financial Plan unless I provide written notice to you to the contrary.[2]

1. I am Group President and a member of the Board of Directors of Constellation. I first joined Constellation in 1986 as General Counsel. I was made Vice President and appointed to the Board of Directors in June 1990. After overseeing numerous acquisitions, I was appointed Executive Vice President and General Counsel in October 1993, overseeing the expansion of Constellation's legal department. In 1998, I was appointed to the role of Chief Executive Officer International after I spearheaded the acquisition of Constellation's United Kingdom division. I was named Group President in early 2000, and assumed the management of the Canandaigua Wine Company and Matthew Clark divisions. I am a graduate of the Skidmore College in Saratoga Springs, New York. I hold a J.D. from Pace University School of Law in New York City, New York.

---

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by Mr. Robert Sands having the duration, purposes, and components discussed in this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "IRS" refers to the Internal Revenue Service, (iv) "RMC" refers to R, R, M & C Management Corporation, (v) "ALP" refers to Alpha I L.P., (vi) "BLC" refers to Beta Partners L.L.C., (vii) "Constellation" or "Company" refers to Constellation Brands, Inc., (viii) "CWC-I" refers to CWC Partnership-I, (ix) "MLRR" refers to M, L, R & R, (x) "PaineWebber" refers to UBS PaineWebber, Inc., and (xi) "Treasury Notes" refers to United States Treasury Notes.

[2] Accordingly, use of the past tense in these representations should be deemed also to refer to the present unless the text or context indicates otherwise.

2. As of September 4, 2001, I was the beneficial owner[3] of 1,724,654 shares of Constellation Class A common stock. If I had been the beneficial owner of those Constellation shares from January 1, 2001, through September 4, 2001, the aggregate value of those holdings would have varied from a high of $79,351,330.54 to a low of $46,187,958.77. Constellation stock had been volatile, and it was one of my principal investment assets.

3. During my employment by Constellation, I have accumulated a significant investment in the Company's stock. The Sands family is the Company's largest shareholder. Members of my family and I conduct many collective investment activities through MLRR. Over the years, MLRR has worked to maintain a well-diversified investment portfolio. Through MLRR, I have invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities), (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merger, acquisition, or disposition), and (iii) directional arbitrage (investing in long and/or short positions in a security). These activities have resulted in an unconventional portfolio that, I believe, enhances return and decreases volatility. The Financial Plan is, in part, an extension of the above described investment strategy.

4. On June 20, 2001, Constellation announced that it had filed a Shelf Registration Statement on Form S-3 with the Securities and Exchange Commission. That shelf registration allowed Constellation to issue various types of securities, including debt, Class A common stock and preferred stock, from time to time, up to an aggregate of $750 million. An officer of Constellation explained that the registration helped the Company maintain financial flexibility, provided efficient access to the capital markets, supported its growth, and permitted it to refinance debt when market conditions were favorable.

5. On September 4, 2001, Constellation announced that it had filed a pre-effective amendment to its $750 million Shelf Registration Statement to authorize the sale of up to 2.15 million shares of Constellation's Class A common stock beneficially owned by members of the Sands family (the "Secondary Offering"). Constellation's announcement explained that the sale of these shares would accomplish certain objectives of the Sands family, including portfolio diversification, estate planning and charitable giving. Nevertheless, Constellation explained, the Sands family would remain the largest shareholder of Constellation stock following the completion of the sale.

6. I had a substantial unrealized profit in the stock of Constellation that I held at the inception of the Financial Plan. I decided to sell some of my Constellation stock in the Secondary Offering for the reasons noted above. I decided to do so before and independently of deciding to implement the Financial Plan. I would have sold those Constellation shares irrespective of whether I decided to effect the short sales of Treasury Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

---

[3] See Pre-Effective Amendment to Form S-3 of Constellation, filed with the Securities and Exchange Commission on September 3, 2001, at page S-45 with respect to computation of the number of shares reflected in text.

7. By the time of the September 4, 2001, SEC filings referenced above, I believed that the United States economy had slowed materially. At that time, I was aware that the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on seven separate occasions in 2001 by a total of 300 basis points. Thus, the Federal Funds Rate on September 4, 2001, was 3.50%, rather than 6.50%, the rate on January 1, 2001. Nevertheless, I believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. I viewed this prospect as both a concern and an opportunity. I believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

8. By the time of the September 4, 2001, SEC filings referenced above, I deemed the implementation of the Financial Plan, including a short sale of Treasury Notes, to be an attractive investment opportunity, presenting a reasonable prospect for significant profits after taking into account all related fees and expenses, even if it presented no income tax benefits, particularly when considered in conjunction with my ownership of Constellation stock. I discussed such an investment with an investment advisor, who concurred with that evaluation. Even so, I recognized that there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately three percent (3%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can recognize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change. The short sale of Treasury Notes was a transaction independent of the sale of Constellation stock and had its own separate business purpose.

9. Other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

10. I became interested in, and ultimately decided to adopt, the Financial Plan to effect several objectives, including:

10.1. Refine the identification of my short-term, intermediate-term, and long-term investment objectives, and set priorities among competing objectives including wealth preservation, current income generation, principal growth, investment risk reduction, diversification, and opportunistic short-term investing.

10.2. Realize investment profits on dispositions of Constellation stock and on purchases and sales of other investments, including one or more short positions in Treasury Notes or similar securities.

10.3. Increase the diversification of my investment holdings.

10.4. Provide greater liquidity in my investment portfolio.

10.5. Identify my wealth-transfer objectives, determine in what ways and over what period I seek to achieve them, and implement a plan to realize those objectives.

10.6. Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock and purchases and sales of other investments.

10.7. Enhance the privacy and confidentiality of my family's financial information and, correlatively, reduce risks to our personal safety and security.

11. The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of my investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale, the disposition of Constellation stock and the purchase and sale of other investments, the enhancement of my ability to effect my wealth-transfer objectives, the improvement to my family's privacy and personal security, and the anticipated tax benefits, all contributed to my determination to adopt the Financial Plan.

12. I have used limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss both in my investment activities and in my business dealings, and have caused several entities to be formed to effect various elements of the Financial Plan over the next several years. Moreover, use of such entities tends to limit contract or tort liability generated by an entity to the assets of that entity, permits admission of or sale to an outside investor of a limited group of assets or activities, and facilitates transfer of a beneficial interest in assets without transferring the assets or an undivided interest in the assets themselves, limiting the effect of state transfer taxes. If a limited liability entity is given a name unrelated to those of its equity owners, it may promote the privacy and security of those owners and their family members.

13. I have implemented and intend to continue to implement each element of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. To effect the purposes of the Financial Plan set forth above, the contemplated elements of the Financial Plan are:

13.1. Incorporation of RMC on August 23, 2001, the issuance to me, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to me, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by me to RMC of 1,001 shares of Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001.

13.2. The opening of a brokerage account at PaineWebber by me on August 21, 2001, and the transfer of $725,000 cash by me to the brokerage account at PaineWebber on August 23, 2001.

13.3. The opening of a short sale of Treasury Notes on August 23, 2001, and the closing of that short sale transaction by R, R, M & C Partners, L.L.C. ("RLC"), an entity in which I had an indirect interest, on September 6, 2001.

13.4. On October 1, 2001, RLC sold all 2,002,002 shares of Constellation Class A common stock it owned in the Secondary Offering at the public offering price of $38.75 per share.

Following the closing of the Secondary Offering on October 1, 2001, I retained a substantial interest in Constellation. I had the sole power to vote or dispose of 428,299 shares of Class A common stock of Constellation and 1,475,648 shares of Class B common stock of Constellation. The Class B shares are convertible into Class A shares on a one-for-one basis at any time at the option of the Class B shareholder.

I continued to have a substantial unrealized profit in the stock of Constellation that I held following the completion of the Secondary Offering. I determined to sell additional shares of Constellation stock to enhance the diversification of my portfolio, to achieve greater liquidity, and to facilitate my estate planning and charitable giving objectives, but to do so in an orderly way so as to maximize the proceeds of such dispositions and to comply with applicable securities laws. I would have determined to sell additional shares of Constellation stock irrespective of whether I decided to effect the short sales of Treasury Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

By late November 2001, I was aware that the Open Market Committee of the Federal Reserve Board had reduced the Federal Funds Rate on 11 separate occasions in 2001 by a total of 475 basis points. Nevertheless, I believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. I viewed this prospect as both a concern and an opportunity. I believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again. Accordingly, I commenced additional trades to attempt to take advantage of this opportunity.

13.5. Formation of ALP on December 3, 2001.

13.6. The execution of a second short sale of Treasury Notes on December 11, 2001.

13.7. To effect this short sale, I borrowed Treasury Notes from PaineWebber, thereby incurring an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds of the short sale in my account pending my acquisition and delivery to PaineWebber of Treasury Notes to close the transaction. Specifically, the Treasury Notes were in two lots. The first lot had a total face amount of $6,615,000, and was due 09/30/03 at 2.750%. The second lot had a total face amount of

$2,835,000, and was due 05/15/06 at 4.625%. The net proceeds of the short sales totaled $9,512,947.19, comprising $9,466,685.16 of principal and $46,262.03 of accrued interest.

13.8. CWC-I, Andrew Stern, Marilyn Sands, The Marvin Sands Master Trust, Richard Sands, and I contributed assets to ALP on December 17, 2001, in exchange for a limited partner interests of 12.949%, 5.857%, 14.641%, 27.030%, 18.022%, and 21.401%, respectively; and RMC contributed assets to ALP on December 17, 2001, in exchange for a 0.1% general partner interest. More specifically, I transferred the PaineWebber brokerage account noted above, together with cash in the amount of $265,614.43, and each other limited partner contributed cash and a Paine Webber brokerage account that held the proceeds of a short sale of Treasury Notes, each in an amount proportional to the percentage interest of the partner, together with the related obligation to close the short sale. The assets transferred by RMC to ALP consisted of $2,582.00 of cash.

13.9. Purchase by ALP of 67,525 shares of stock in Corning, Inc. (NYSE:GLW) and 33,400 shares of stock in Yahoo, Inc. (NasdaqNM:YHOO) on December 17, 2001.

13.10. Formation of BLC on December 10, 2001.

13.11. Contribution of assets by ALP to BLC on December 20, 2001, in exchange for a 99.0043% membership interest; and contribution of assets by Gloria S. Robinson ("Robinson") to BLC on December 20, 2001, in exchange for a 0.9957% membership interest. More specifically, ALP transferred to BLC its Paine Webber brokerage account holding the proceeds of the short sales of Treasury Notes described above, together with the GLW and YHOO shares noted above, and Robinson transferred to BLC cash in the amount of $25,000.

13.12. On December 26, 2001, BLC closed the short sale of Treasury Notes at a cost of $44,203,069.47, comprising $43,927,468.75 of principal and $275,600.72 of accrued interest.

13.13. BLC realized a $150,218.75 gain on the short sale transaction, but incurred net interest expense of $60,200.80, for a net economic gain on the short sale transaction of $90,017.95.

13.14. At such intervals and in such increments as market conditions indicate could be profitable and appropriate, BLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

14. In addition to the elements of the Financial Plan noted above, on December 27, 2001, ALP and Robinson agreed to, and closed, a purchase by ALP of the membership interest of Robinson in BLC for a cash purchase price of $25,999.13.

15. No part of the property held by BLC at the time of ALP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of BLC, as those terms are defined in Code section 751 and its related regulations.

16. Having been the General Counsel, Chief Executive Officer International, Group President and a member of the Board of Directors of Constellation, I am accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently verifying such data. I am familiar with and comfortable taking business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and upon which I am relying in pursuing the Financial Plan.

17. Over the years, I have both relied on advice from investment advisors and have made independent investment decisions. I have held a wide range of investments and used a variety of investment techniques, taking into account positions held personally and directly, and those held indirectly through investment partnerships, through managed accounts, and through the Company. These investments included publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States Treasury obligations, municipal obligations, mutual funds, and compensatory and non-compensatory stock options. Investment techniques I have used either directly or indirectly, as indicated above, included short sales, short sales against the box, hedging transactions, and margin accounts. I have used a variety of entities in my investments, including general partnerships, limited partnerships, and limited liability companies. In managing the Company and in making my personal investments, I have monitored a variety of economic indicators including interest rates, housing starts, the Consumer Price Index, United States Treasury obligation yields, developed country market returns, emerging country market returns and currency values as related to the United States dollar.

18. I regularly monitor current developments in business and economics. I regularly read the Wall Street Journal, the New York Times, Fortune, Business Week, the Financial Times, various newsletters, and other publications with a general-investment orientation. I also read several publications geared specifically to the alcoholic beverage business.

19. In deciding to pursue the Financial Plan, I considered it to be a multiyear, multiple transaction strategy, intending to use the entities created as a part of the Financial Plan for a series of future investments, and possibly also for estate planning and wealth distribution purposes.

20. In deciding to pursue the Financial Plan, I was aware that I would be obligated to pay substantial fees, but I had a reasonable expectation that the gains I would receive from the series of future investments would exceed the fees and costs—including the fee paid to The Heritage Organization, L.L.C. ("Heritage")—that I incurred in connection with the Financial Plan.

21. In retaining Heritage to assist me, I believed that I was retaining a sophisticated, trusted adviser and I expected to receive more from them than assistance in structuring

investment transactions so that they produced the best tax results. I understood that they have rendered a wide range of services to some of their other clients related to the business, investment, and family issues faced by those clients.

22. Despite my transfer of the brokerage account to ALP, and the subsequent transfer of that account by ALP to BLC, I retained (through those entities) a significant potential for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

23. No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on any aspect of the Financial Plan receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges any of the contemplated tax consequences of the Financial Plan.

24. Neither I nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by BLC of Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

25. At all relevant times, ALP, BLC, and I have held each of the assets and interests related to the Financial Plan, including, without limitation, the long positions in Constellation, GLW, and YHOO stock, and the short position in Treasury Notes, as a capital asset, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in Financial Plan—including, without limitation, Gloria Robinson—participated for investment purposes and for his, her, or its own account, not as agent, nominee, or "straw party" for another. To my knowledge, no participant in the Financial Plan received any indemnity or assurance that he, she, or it would be protected against loss.

The undersigned is authorized to make the foregoing representations on behalf of RMC, ALP, and BLC. The foregoing representations also reflect my knowledge of the transactions discussed above. I understand that you will rely on the foregoing in connection with the issuance of the opinion I have requested with respect to the Financial Plan. You are hereby authorized to rely upon the representations made above without undertaking any independent verification of any such representation.

Very truly yours,

Robert Sands