# LIMITED LIABILITY COMPANY

# OPERATING AGREEMENT

# OF

# BETA PARTNERS L.L.C.

DATED: DECEMBER 10, 2001

EXHIBIT 35

# TABLE OF CONTENTS


Section — Page

1. Definitions; Construction. .......... 1
    - 1.1. Definitions. .......... 1
    - 1.2. Construction. .......... 6
2. Formation. .......... 6
    - 2.1. Formation of the Company. .......... 6
    - 2.2. Name of the Company. .......... 6
    - 2.3. Purpose of the Company. .......... 6
    - 2.4. Places of Business of the Company. .......... 7
    - 2.5. Filing of the Articles of Organization. .......... 7
    - 2.6. Registration of Fictitious Names. .......... 7
    - 2.7. Registered Agent. .......... 7
    - 2.8. Nature of the Members' and the Manager's Liabilities. .......... 7
    - 2.9. Interests Not Certificated. .......... 7
    - 2.10. Existence. .......... 7
    - 2.11. Seal. .......... 7
3. Capital of the Company. .......... 7
    - 3.1. Initial Contributions. .......... 7
    - 3.2. Additional Contributions. .......... 8
    - 3.3. Failure to Make Contributions. .......... 8
        - 3.3.1. Effect of Default. .......... 8
        - 3.3.2. Right to Cure. .......... 8
        - 3.3.3. Expulsion of Defaulting Member. .......... 8
        - 3.3.4. Members' Obligation to Make Defaulted Contribution. .......... 8
    - 3.4. No Interest on Contributions. .......... 8
    - 3.5. Capital Accounts. .......... 9
        - 3.5.1. Maintenance of Capital Accounts. .......... 9
        - 3.5.2. Single Capital Account. .......... 9
        - 3.5.3. Transferee's Capital Account. .......... 9
        - 3.5.4. Revaluation of Capital Accounts. .......... 9
        - 3.5.5. Contributed Property. .......... 9
    - 3.6. Third-Party Creditor. .......... 10
4. Management of the Company. .......... 10
    - 4.1. Manager. .......... 10
        - 4.1.1. Management of the Company. .......... 10
        - 4.1.2. Appointment of the Manager. .......... 12
        - 4.1.3. Term of the Manager. .......... 12
        - 4.1.4. Resignation of the Manager. .......... 12
        - 4.1.5. Removal of the Manager. .......... 12
        - 4.1.6. Notice of Removal; Contest. .......... 13
        - 4.1.7. Vacancies. .......... 13
    - 4.2. Approval Rights of the Members. .......... 13

4.2.1. Actions Requiring Majority Approval. 13
4.2.2. Actions Requiring Unanimous Approval or an Affected Member's Approval. 14
4.2.3. No Other Approval Rights. 14
4.3. Officers of the Company. 14
4.4. Execution of Documents. 14
4.5. Members Not Agents. 14
4.6. Discharge of Duties. 14
4.7. Loans and the Transaction of Business with Members, the Manager and Affiliates of Members and the Manager 14
4.8. Activities of Members. 15
4.9. Remuneration of Managers. 15

5. Distributions. 15

5.1. Interim Distributions for Taxes. 15
5.1.1. State Income Taxes. 15
5.1.2. Tax Withholding. 16
5.1.3. Equalization of Distributions. 16
5.2. Other Interim Distributions. 16
5.3. Distributions Upon Dissolution. 16
5.4. Withdrawals. 16
5.5. Offset. 16

6. Allocations. 17

6.1. Allocation of Profits and Losses. 17
6.2. Allocations for Income Tax Purposes. 17
6.2.1. Allocation of Taxable Income and Losses. 17
6.2.2. §704(c) Allocations. 17
6.2.3. Allocation of Credits. 17
6.2.4. Capital Accounts. 17
6.3. Special Allocation Provisions. 17
6.3.1. Interim Allocations. 17
6.3.2. Code §754 Election. 18
6.3.3. Losses Creating Negative Capital Accounts. 18
6.3.4. Qualified Income Offset. 18
6.3.5. Cancellation of Debt Income. 18
6.3.6. Nonrecourse Liabilities. 18
6.3.6.1. Nonrecourse Deductions. 18
6.3.6.2. Minimum Gain Chargeback. 18
6.3.6.3. Member Nonrecourse Debt Minimum Gain Chargeback. 19
6.3.7. Income from the Receipt of an Interest. 19
6.3.8. Ordering Rules. 19
6.3.9. Modifications. 19
6.3.10. Curative Allocations. 19
6.4. Distributions In Kind. 19

7. Certain Tax Matters. 19

7.1. Treatment as a Partnership for Income Tax Purposes. 19
7.2. Tax Returns and Tax Information. 20
7.2.1. Year-End Tax Information. 20
7.2.2. Estimated Tax Information. 20

7.2.3. Tax Returns and Tax Treatment. ....20
7.2.4. Discussions with the Company ....20
7.3. Tax Matters Partner. ....20
7.3.1. Initial Tax Matters Partner. ....20
7.3.2. Successor Tax Matters Partner. ....21
7.4. Special Elections. ....21

8. Dissolution and Winding Up of the Company. ....21
8.1. Events Causing the Dissolution of the Company. ....21
8.2. Winding Up. ....21
8.2.1. Cessation of Business. ....21
8.2.2. Liquidating Distributions. ....22
8.2.3. Termination. ....22
8.3. Dissolution of the Company After Event of Withdrawal. ....22

9. New Members and Transfers of Members' Interests. ....22
9.1. New Members. ....22
9.2. Assignment of an Interest. ....22
9.3. Permitted Withdrawals or Assignments. ....22
9.4. Withdrawals and Assignments; Right of First Refusal. ....23
9.4.1. Death or Adjudication of Insanity or Incapacity. ....23
9.4.2. Right of First Refusal. ....23
9.4.3. Company's Option to Purchase. ....23
9.5. Forced Sale/Purchase Rights. ....24
9.5.1. Notice of Sale. ....24
9.5.2. Sale and Purchase of Interest; Failure to Close. ....24
9.5.3. Pending Rights. ....24
9.6. Substitute and New Members. ....25
9.6.1. Execution of Documents. ....25
9.6.2. Effective Date. ....25
9.6.3. Reimbursement of Expenses. ....25
9.6.4. Amendment to Schedule A. ....25
9.6.5. Compliance With Securities Laws. ....25
9.6.6. Publicly Traded Partnerships. ....25
9.7. Transfer of an Interest Other Than in Compliance With This Agreement. ....25
9.8. Expulsion of a Member. ....25
9.9. Valuation Procedure. ....26

10. Records and Accounting. ....26
10.1. Accounting Matters. ....26
10.2. Financial Statements. ....26
10.3. Bank Accounts. ....27
10.4. Members and the Manager Accountable as a Fiduciary. ....27
10.5. Right to an Accounting. ....27
10.6. Company Property. ....27
10.7. Commingling of Assets. ....27
10.8. Required Information. ....27

11. Meetings of Members. ....28
11.1. Meetings. ....28
11.2. Place of Meetings. ....28

11.3. Time of Meetings. 28
11.4. Quorum. 28
11.5. Notice of Meetings. 28
11.6. Waiver of Notice. 28
11.7. Proxies. 28
11.8. Voting of Certain Members. 29
11.8.1. Corporations, Etc. 29
11.8.2. Deceased Persons. 29
11.8.3. Fiduciaries. 29
11.8.4. Secured Parties. 29
11.9. Informal Action by Members. 29
11.10. Rules of Meetings. 29
11.11. Presumption of Assent. 29
11.12. Tele-Participation in Meetings. 29

12. Indemnifications. 29

12.1. Indemnification of Members and the Manager. 29
12.1.1. Indemnification with Respect to Third Party Actions. 29
12.1.2. Indemnification with Respect to Actions by or in the Right of the Company. 30
12.2. Indemnification of Tax Matters Partner. 30
12.3. Indemnification by Members. 30
12.4. Indemnification Provided in This Section Non-Exclusive. 31

13. General Provisions. 31

13.1. Accounting Terms. 31
13.2. Amendment and Modification. 31
13.3. Captions. 31
13.4. Counterpart Facsimile Execution. 31
13.5. Counterparts. 31
13.6. Entire Agreement. 31
13.7. Failure or Delay. 31
13.8. Further Assurances. 31
13.9. Governing Law. 31
13.10. Legal Fees. 32
13.11. Notices. 32
13.12. Priority. 32
13.13. Remedies Cumulative. 32
13.14. Schedules. 32
13.15. Severability. 32
13.16. Specific Performance. 32
13.17. Submission to Jurisdiction. 32
13.18. Successors and Assigns. 33
13.19. Third-Party Beneficiary. 33

14. Arbitration. 33

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

This Limited Liability Company Operating Agreement is made as of this 10th day of December, 2001, among those Persons signatories hereto.

## RECITALS

A. The parties have formed a limited liability company under the laws of the State of Missouri.

B. The parties wish to set forth their agreement concerning the conduct of the business and affairs of such limited liability company and the relative rights and obligations of the parties in relation thereto, all as set forth herein.

## AGREEMENT

In consideration of the foregoing, the mutual covenants herein contained and other good and valuable consideration (the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties by their execution hereof), the parties agree as follows.

**1. Definitions; Construction.**

**1.1. Definitions.** For purposes of this Agreement, the following capitalized terms have the following meanings.

"Act" means the Missouri Limited Liability Company Act.

"Additional Member" has the meaning set forth in Section 9.1.

"Adjusted Capital Account Deficit" means the negative balance in a Member's Capital Account as of the relevant time, adjusted to: (i) increase such Capital Account by: (a) the amount, if any, of such negative balance which such Member is obligated to restore under this Agreement; and (b) the amount, if any, of such negative balance which such Member is deemed to be obligated to restore under Treasury Regulation §§1.704-2(g)(1) and 1.704-2(i)(5); and (ii) reduce such Capital Account with the items described in Treasury Regulation §§1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Affiliate" means: (i) any Person which, directly or indirectly, is in control of, is controlled by or is under common control with the party for whom an affiliate is being determined; or (ii) any Person who is a director or officer (or comparable position) of any Person described in clause (i) above or of the party for whom an affiliate is being determined. For purposes hereof, control of a Person means the power, direct or indirect, to: (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or comparable positions) of such Person; or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise and either alone or in conjunction with others.

"Agreement" means this Limited Liability Company Operating Agreement, including all Exhibits and Schedules hereto.

"Articles of Organization" means the articles of organization filed with the Missouri Secretary of State's office pursuant to the Act and as herein provided for the purpose of forming the Company.

"Bankruptcy" has the meaning ascribed to such term in the Act.

"Basis" with respect to any asset means the adjusted basis thereof as determined in accordance with §1011(a) of the Code.

"Budget" means the budget (including cash flow, operations and capital expenditures) of the Company and its Subsidiaries prepared for each Fiscal Year on a consolidating and consolidated basis.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the laws of the United States of America or the State of Missouri.

"Business Plan" means the strategic business plan of the Company and its Subsidiaries which outlines the strategic direction and marketing plans of the Company and its Subsidiaries.

"Capital Account" means, with respect to any Member, the capital account maintained by the Company for such Member in accordance herewith and with Treasury Regulation §1.704-1(b)(2)(iv).

"Capital Expenditure" means all expenditures (excluding interest capitalized during construction) which must be capitalized under GAAP.

"Cause" means that the specified Person has: (i) willfully breached any of its material obligations under this Agreement and, if curable, such breach has not been cured within 30 days after written notice of such breach from Members representing at least 33 1/3% of the Percentage Interests; (ii) acted in a manner that constitutes gross negligence in the performance of its obligations under this Agreement or with respect to the activities or businesses of the Company or of any Subsidiary; (iii) engaged in conduct that constitutes fraud or willful malfeasance with respect to the Company or any Subsidiary or in the conduct of its duties under this Agreement; or (iv) committed a crime involving moral turpitude or been convicted of any felony.

"Change in Control" means the direct or indirect acquisition (or series of related acquisitions) by any Person of voting securities in the specified Person if the percentage of voting securities in the specified Person owned directly or indirectly by such acquiring Person and all Affiliates of such acquiring Person immediately after such acquisition (or series of related acquisitions) in the aggregate is more than 50% of the issued and outstanding securities in the specified Person entitled to vote; provided that there is no Change in Control if such acquiring person and all Affiliates of such acquiring Person owned directly or indirectly immediately prior to such acquisition (or series of related acquisitions) in the aggregate more than 50% of the issued and outstanding securities in the specified Person entitled to vote. For purposes of this definition, the term "acquisition" means any transaction resulting in any change in the respective ownership of securities in the specified Person, including a purchase, exchange, gift, redemption, merger, consolidation, issuance of securities and the exercise of an option or warrant or similar right. For purposes of this definition, the term "securities" includes common stock, preferred stock, partnership interests, limited liability company member interests and any other ownership interests (including instruments convertible or exchangeable into ownership interests) in the specified Person which entitles the owner or holder thereof to elect or appoint the board of directors, the board of managers, the board of governors or any other comparable managing board, officer, manager or person of the specified Person.

"Code" means the Internal Revenue Code of 1986.

"Company" has the meaning set forth in Section 2.1.

"Company Minimum Gain" has the meaning ascribed to the term "partnership minimum gain" in Treasury Regulation §1.704-2(b)(2) and as computed pursuant to Treasury Regulation §1.704-2(d).

"Competing Business" means any business venture which competes with the Company or with any Subsidiary. For purposes of determining whether a business venture is a Competing Business, the only relevant inquiry is: (i) the actual business activities being conducted by the Company or by a Subsidiary at the time of determination; and (ii) the business activities which the Company or any Subsidiary intends to conduct at the time of determination, but only if such business activities are set forth or incorporated in the Business Plan at the time of determination.

"Contingent Obligation" means, as to any Person, any direct or indirect liability, contingent or otherwise, of such Person with respect to any Debt or Contractual Obligation of another Person if the purpose or intent of such Person in incurring the Contingent Obligation is to provide assurance to the obligee of such Debt or Contractual Obligation that such Debt or Contractual Obligation will be paid or discharged, that any agreement relating thereto will be complied with or that any holder of such Debt or Contractual Obligation will be protected (in whole or in part) against loss in respect thereof.

"Contractual Obligation" means any obligation, agreement, commitment or undertaking, whether oral or written.

"Contribution" means, with respect to a Member, the total amount of cash and the agreed fair market value of other property, the use of property, services rendered, a promissory note or other binding obligation to contribute cash or property or perform services or any other valuable consideration, if any, transferred or agreed to be transferred to the Company by such Member in accordance with this Agreement.

"Debt" of a Person means: (i) all obligations of such Person for borrowed money; (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (iii) all obligations of such Person to pay the deferred purchase price of property or services; (iv) all capitalized lease obligations of such Person; (v) all obligations or liabilities of others secured by a Lien on any asset owned by such Person, whether or not such obligation or liability is assumed by such Person; (vi) all contingent obligations, including Contingent Obligations, of such Person; and (vii) all other obligations or liabilities of such Person which are required by GAAP (without regard to materiality) to be shown as a liability or otherwise disclosed in financial statements.

"Economic Risk of Loss" has the meaning ascribed to such term in Treasury Regulation §1.752-2.

"Electing Member" has the meaning set forth in Section 9.5.

"Event of Withdrawal" means with respect to any Member: (i) the assignment of the Member's entire Interest; (ii) the withdrawal or resignation of the Member; (iii) the complete termination, liquidation or dissolution of the Member; (iv) the Bankruptcy of the Member; (v) the death of the Member; (vi) the adjudication of insanity of the Member; or (vii) the adjudication of incapacity of the Member.

"First Appraiser" has the meaning set forth in Section 9.9.

"Fiscal Year" means the tax year required to be adopted by the Company pursuant to the Code and applicable Treasury Regulations.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession.

"Governmental Authority" means any government of any nation, state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Immediate Family" means as to any individual such Person's spouse, lineal descendants, adopted children, parents, grandparents and siblings, as well as the spouses of the foregoing.

"Independent Venture" means any business venture which is not a Competing Business.

"Interest" means the share of a Member in the Profits, Losses, Capital Accounts, deductions and credits of, and the right to receive distributions from, the Company, in addition to the right to exercise all approval and other rights of a Member, all as set forth herein.

"IRS" means the Internal Revenue Service of the U.S. Department of Treasury.

"Law" means any law, rule, regulation, ordinance, order, decree or other requirement having the force of law and, where applicable, any interpretation thereof by any authority having jurisdiction with respect thereto or charged with the administration thereof.

"Lien" means any mortgage, deed of trust, security agreement, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or otherwise), security interest, financing statement or preferential arrangement of any kind or nature whatsoever, including any conditional sale or other title retention agreement.

"Liquidating Member" has the meaning set forth in Section 8.2.1.

"Majority of the Members" means Members owning more than 50% of the Percentage Interests held by all Members at the time of determination.

"Manager" means the Person serving as a manager of the Company under Section 4.1.

"Member" means those Persons set forth on Schedule A, and all other Persons who become Members in the Company as provided herein, in each such Person's capacity as a Member in the Company.

"Member Nonrecourse Debt" has the meaning ascribed to the term "partner nonrecourse debt" in Treasury Regulation §1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" has the meaning ascribed to the term "partner nonrecourse debt minimum gain" in Treasury Regulation §1.704-2(i)(2) and as determined pursuant to Treasury Regulation §1.704-2(i)(3).

"Member Nonrecourse Deduction" has the meaning ascribed to the term "partner nonrecourse deduction" in Treasury Regulation §1.704-2(i)(1).

"Minimum Gain Chargeback" has the meaning ascribed to such term in Treasury Regulation §1.704-2(b)(2).

"Modified Alternative Minimum Taxable Income" means the Company's cumulative alternative minimum taxable income for the applicable Fiscal Year as estimated by the Company.

"Modified Taxable Income" means the Company's cumulative taxable income for the applicable Fiscal Year as estimated by the Company.

"Net Cash Flow" for any period means the Company's gross receipts for such period (excluding Contributions and the proceeds of indebtedness for borrowed money) reduced by the sum of: (i) the Company's expenses for such period that are actually incurred (as distinguished from expenses such as depreciation); (ii) reserves (to the extent not included in clause (i)) as are established by the Manager from time to time; (iii) the repayments during such period of principal of all Company Debt; and (iv) Capital Expenditures made by the Company during such period.

"Nonrecourse Deductions" has the meaning ascribed to such term in Treasury Regulation §1.704-2(b)(1).

"Nonrecourse Liability" has the meaning ascribed to such term in Treasury Regulation §1.704-2(b)(3), and includes both secured and unsecured Debt.

"Officer" means a Person serving as an officer of the Company in accordance with Section 4.3.

"Percentage Interest" means the percentages set forth next to each Member's name on Schedule A, as the same may be amended from time to time in accordance herewith.

"Permitted Transferee" has the meaning set forth in Section 9.3.

"Person" means any natural person, corporation, limited partnership, general partnership, joint venture, association, company, trust, joint stock company, bank, trust company, land trust, vehicle trust, business trust, real estate investment trust, estate, limited liability company, limited liability partnership, limited liability limited partnership or other organization irrespective of whether it is a legal entity, and any Governmental Authority.

"Positive Capital Account" means, as to a Member as of the relevant time, the amount of the balance in excess of zero in such Member's Capital Account.

"Prime Rate" means the highest rate published from time to time as the "Prime Rate" in *The Wall Street Journal.*

"Profits" or "Losses" means, with respect to any Fiscal Year, an amount equal to the Company's taxable income or loss for such year determined pursuant to Code §703(a) adjusted to: (i) include income exempt from federal income tax (and not otherwise taken into account in computing Profits and Losses); (ii) include Company expenditures described in Code §705(a)(2)(B) or treated as such pursuant to Treasury Regulation §1.704-1(b)(2)(iv)(i) (and not otherwise taken into account in computing Profits or Losses); and (iii) take into account any adjustments to depreciation, gain or loss for such Fiscal Year resulting from any difference between the Basis of any asset and its book value.

"Qualified Income Offset" has the meaning ascribed to such term in Treasury Regulation §1.704-1(b)(2)(ii)(d).

"Second Appraiser" has the meaning set forth in Section 9.9.

"Securities Act" means the Securities Act of 1933.

"Special Allocations" has the meaning set forth in Section 6.3.10.

"Subsidiary" means any Person more than 50% of the voting securities of which is owned (whether directly or indirectly through one or more Subsidiaries) by the Company.

"Substitute Member" means a Person who becomes a Member in the place of another Member, but only in accordance with the provisions hereof.

"Tax Matters Partner" has the meaning ascribed to such term in Code §6231(a)(7).

"Treasury Regulation" means those regulations promulgated by the U.S. Department of the Treasury pursuant to authority of the Code or any other revenue law of the United States of America.

"Valuation Procedure" means the procedure set forth in Section 9.9 to determine the value of an Interest.

"Withdrawing Member" has the meaning set forth in Section 9.4.

**1.2. Construction.** Unless the context of this Agreement clearly requires otherwise: (i) references to the plural include the singular and vice versa; (ii) references to any Person include such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement; (iii) references to one gender include all genders; (iv) "including" is not limiting; (v) "or" has the inclusive meaning represented by the phrase "and/or"; (vi) the words "hereof", "herein", "hereby", "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (vii) section, clause, Exhibit and Schedule references are to this Agreement unless otherwise specified; (viii) reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof; and (ix) specific or general references to any Law means such Law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.

**2. Formation.**

**2.1. Formation of the Company.** The Members hereby constitute and form themselves as a limited liability company pursuant to the provisions of the Act and this Agreement (the "Company"), effective upon the date of this Agreement.

**2.2. Name of the Company.** The name of the Company is "Beta Partners L.L.C." The business of the Company may be conducted under any other name deemed necessary or desirable by the Manager.

**2.3. Purpose of the Company.** The purpose of the Company is to conduct or promote any business or activity which limited liability companies are allowed or permitted to conduct under Law. The Company may engage in any or all of such activities (or any combination thereof) directly or through one or more Subsidiaries as determined by the Manager from time to time, or may enter into joint venture arrangements (whether in the form of corporations, partnerships, limited partnerships, limited liability companies or otherwise and whether or not a Subsidiary) with third parties or other contractual arrangements with third parties as may be determined by the Manager from time to time for purposes of

engaging in any such business or activity. It is anticipated that the Company will engage in investment activities; however, the Company shall not be limited to such activities.

2.4. **Places of Business of the Company.** The Company's initial principal place of business is to be located at 500 North Broadway, Suite 2000, St. Louis, Missouri 63102. The Manager may change the Company's principal place of business at such times and to such location as the Manager deems appropriate. The Company may have such additional places of business and offices as the Manager deems appropriate.

2.5. **Filing of the Articles of Organization.** If not already accomplished before the date of this Agreement, the Manager is to file the Articles of Organization in accordance with the Act with the Missouri Secretary of State's office promptly upon the execution of this Agreement by all Members. The Manager will thereafter file any necessary amendments to, or restatements of, the Articles of Organization and other filings and will do all things requisite to the maintenance of the Company as a limited liability company under the Act. No copy of any amendment to, or restatement of, the Articles of Organization or other filings need be delivered to any Member unless a Member specifically requests the same.

2.6. **Registration of Fictitious Names.** The Manager is to cause any other name under which the Company conducts business to be registered and filed as a fictitious name in each jurisdiction in which the Company conducts business under such name as required by Law.

2.7. **Registered Agent.** The Company is to have and continuously maintain in the State of Missouri a registered office which may be, but need not be, the same as the Company's principal place of business in Missouri. In addition, the Company is to have and continuously maintain a registered agent as required by the Act and other Law and whose business office is identical with the Company's registered office. The Company may change its registered office or registered agent as permitted by the Act.

2.8. **Nature of the Members' and the Manager's Liabilities.** Neither the Manager nor any Member is liable, jointly or severally, for any Debts or obligations of the Company, under a judgment, decree or order of a court, or in any other manner, solely by reason of being a Member or the Manager or both. A Member has no obligation to restore a negative Capital Account.

2.9. **Interests Not Certificated.** No Interest will be represented by a certificate or other evidence of ownership. Rather, a Member's Interest will be recorded on Schedule A hereto, as the same may be amended from time to time, and in the records of the Company.

2.10. **Existence.** The term of the Company is perpetual.

2.11. **Seal.** The Company will not have a seal.

3. **Capital of the Company.**

3.1. **Initial Contributions.** In exchange for their Interests, the Members will contribute to the capital of the Company that amount of money or property set forth next to their respective names in Schedule A under the column "Contribution." Each Member contributing cash will make such Contribution to the Company in immediately available funds on the date set forth next to such Member's name on Schedule A. Each Member contributing property will make such Contribution to the Company by executing such bills of sale, deeds, assignment and assumption agreements and other documents as may be necessary to transfer the property to the Company or as may be reasonably requested by the Manager, in each case in form and substance satisfactory to the Manager, and will make such Contribution on the date set forth next to such Member's name on Schedule A.

3.2. **Additional Contributions.** At any time and from time to time during the term of the Company, if the Manager determines that the Company requires additional capital, the Manager is to give each Member written notice of the amount of such required additional Contributions. In connection with the investment activities to be conducted by the Company, it is anticipated that the Company may need to settle investment transactions on the third business day after the Company's trades in accordance with Rule 15c6-1 of the Securities and Exchange Commission. Consequently, following the Manager's written notice of a required additional Contribution, each such additional Contribution will be made, in immediately available cash, by the Members in proportion to their then Percentage Interests within two (2) business days after the Manager sends written notice of demand therefor. Each Member agrees that, for purposes of the Act, this Section 3.2 is such Member's written agreement to make any Contribution determined by the Manager in accordance with this Section 3.2.

3.3. **Failure to Make Contributions.** If any Member (the "Defaulting Member") fails to make any Contribution required under Section 3.1 or Section 3.2 (the "Defaulted Contribution"), the Company and the other Members have the following rights and remedies.

3.3.1. **Effect of Default.** The Manager is to promptly notify all Members (including the Defaulting Member) of any Defaulted Contribution. While any default exists with respect to a Defaulting Member's Defaulted Contribution, the Defaulting Member is not entitled to vote on any Company matter, including those set forth in Section 4.2. Any distribution that would otherwise be payable to the Defaulting Member hereunder is to be withheld from the Defaulting Member and applied to the Defaulting Member's obligation to make the Defaulted Contribution.

3.3.2. **Right to Cure.** A Defaulting Member has the right to cure his Defaulted Contribution by paying to the Company, within one (1) business day of the Defaulting Member's receipt of the notice issued pursuant to Section 3.3.1, the Defaulting Member's Defaulted Contribution plus interest thereon at the prime rate (as set forth in The Wall Street Journal) plus 3% from the date the Defaulted Contribution was required to be made by the Defaulting Member.

3.3.3. **Expulsion of Defaulting Member.** If a Defaulting Member fails to cure his Defaulted Contribution within the time period permitted under Section 3.3.2, the Defaulting Member will thereupon be expelled as a Member and will forfeit (for a purchase price equal to such Defaulting Member's Capital Account) his Interest to the other Members in proportion to each Member's (other than the Defaulting Member's) Percentage Interest. Schedule A will thereupon be amended to delete the Defaulting Member and adjust the remaining Members' Percentage Interests on the basis of total Contributions made by each Member through that date in relation to total Contributions made by all Members through that date. Such purchase price is to be paid to the Defaulting Member by the Company in cash, without interest, within 30 days of the date the Defaulting Member was required to make his Contribution pursuant to Section 3.2.

3.3.4. **Members' Obligation to Make Defaulted Contribution.** If a Defaulting Member fails to cure his Defaulted Contribution within the time period permitted under Section 3.3.2, the Manager shall promptly so notify the other Members and all such Members shall make additional Contributions, the sum of which shall equal the Defaulted Contribution. Each Member's additional Contribution pursuant to this Section shall be made immediately upon notification pursuant to this Section and shall be an amount equal to the Defaulted Contribution multiplied by a percentage, the numerator of which is the Percentage Interest of such contributing Member and the denominator of which is the Percentage Interests of all contributing Members.

3.4. **No Interest on Contributions.** No interest will be paid by the Company to any Member on any contribution to the Company's capital, whether or not such contribution is in excess of the amount of Contributions which such Member agreed to contribute to the Company under this Agreement.

3.5. **Capital Accounts.** The Company will establish and maintain Capital Accounts for each Member in accordance with this Section 3.5.

3.5.1. **Maintenance of Capital Accounts.** The determination and maintenance of the Capital Accounts are to be effected by the Manager in his reasonably exercised discretion, applying principles consistent with this Agreement and the regulations promulgated under Code §704, including Treasury Regulation §1.704-1(b)(2)(iv) and other Law, in order to assure that all allocations herein have substantial economic effect for federal income tax purposes or are otherwise permitted by the Code and applicable Treasury Regulations. Towards that end, each Member's Capital Account is to be: (i) increased by (a) the amount of money contributed by the Member to the Company, (b) the fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code §752) and (c) allocations to the Member of Profits; and (ii) decreased by (a) the amount of money distributed to the Member by the Company, (b) the fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to under Code §752) and (c) allocations to the Member of Losses. In cases where Section 3.5.4 is applicable, each Member's Capital Account is to be adjusted in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(g) for allocations to the Member of income, gain, loss and deduction (including depreciation, depletion, amortization or other cost recovery) as computed for book purposes with respect to the revalued property. In the event an election is made or is in effect under Code §732, §734 or §743, each Member's Capital Account is to be adjusted in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(m) for allocations to the Member of any adjustments to the Basis of any Company property under such Code sections. Adjustments to Capital Accounts in respect of Profits, Losses or items thereof are to be made with reference to the federal tax treatment of such items (and in the case of book items, with reference to the federal tax treatment of the corresponding tax items) at the Company level without regard to any requisite or elective tax treatment of such items at the Member level in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(n).

3.5.2. **Single Capital Account.** A Member who has more than one Interest will have a single Capital Account that reflects all such Interests, regardless of the class of Interest owned by such Member and regardless of the time or manner in which such Interests were acquired.

3.5.3. **Transferee's Capital Account.** In the event any Interest is transferred in accordance with the terms of this Agreement, the transferee succeeds to the Capital Account of the transferor to the extent such Capital Account relates to the transferred Interest as provided in Treasury Regulation §1.704-1(b)(2)(iv)(1). However, if the transfer causes a termination of the Company under Code §708(b)(1)(B), the Company's properties will, except for purposes of distributions made pursuant to Section 5, be deemed to have been distributed in liquidation of the Company to the Members (including the transferee of the Interest) and deemed recontributed by such Members and transferees in reconstitution of the Company.

3.5.4. **Revaluation of Capital Accounts.** The Company may, in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(f), increase or decrease the Members' Capital Accounts to reflect a revaluation of the Company's property (including intangible assets such as goodwill) on the Company's books (based on the fair market values of such property on the date of such readjustment).

3.5.5. **Contributed Property.** The Members agree that the fair market value of any property contributed to the capital of the Company pursuant to Section 3.1 on the date of its Contribution is set forth on Schedule A. In the event the IRS disagrees with such determination of fair market value by the Members, the Company will make such curative allocations of income and distributions to the

Members as are necessary to achieve the same results as if such fair market value had been respected by the IRS.

**3.6. Third-Party Creditor.** A Member's obligation to make a Contribution is not enforceable by a third-party creditor of the Company.

**4. Management of the Company.**

**4.1. Manager.**

**4.1.1. Management of the Company.** The management of the Company is vested in the Manager. Except as set forth in this Agreement, the Manager is the agent of the Company for the purpose of its ordinary business and affairs, and has complete authority over and exclusive control and management of the day-to-day affairs of the Company without the affirmative vote, approval or consent of any of the Members. The act of the Manager for carrying on the business of the Company in the usual way and in the ordinary course binds the Company. In connection with such management, the Manager may employ on behalf of the Company or on behalf of any Subsidiary any other Person to perform services for the Company, including the Manager, Members or Affiliates of any Member or Affiliates of the Manager. In furtherance of carrying on the business of the Company, the Manager may, subject to Section 4.2, do the following and bind the Company:

**4.1.1.1.** enter into and perform Contractual Obligations of any kind necessary or desirable to the Company's or any Subsidiary's business;

**4.1.1.2.** establish, maintain, deposit in and withdraw from checking, savings, custodial and other accounts in the name of the Company in such banks, trust companies or other financial institutions as the Manager may from time to time select;

**4.1.1.3.** execute any notifications, statements, reports, returns or other filings that are necessary or desirable to be filed with any Governmental Authority;

**4.1.1.4.** determine the capital requirements of the Company and the need for additional Contributions in satisfaction thereof, borrow money and incur Debt on behalf of the Company or of any Subsidiary on a nonrecourse basis to the Members and secure the same with the Company's or any Subsidiary's property, including borrowing from Members, the Manager, Affiliates of Members and Affiliates of the Manager;

**4.1.1.5.** take such actions and execute such documents as may be required in connection with any loan agreement, mortgage, note, bond, indemnity, security agreement, escrow, bank letter of credit or other evidence of indebtedness which may be required in connection with Debt incurred by the Company or by any Subsidiary;

**4.1.1.6.** establish reasonable reserve funds from revenues derived from the Company's or any Subsidiary's operations to provide for future requirements of the Company's or any Subsidiary's business;

**4.1.1.7.** form, organize, acquire, sell, dispose of, reorganize or liquidate a Subsidiary;

**4.1.1.8.** prepare the Budget for each Fiscal Year and any amendments thereto;

4.1.1.9. prepare the Business Plan from time to time, and any amendments thereto;

4.1.1.10. invest the Company's and any Subsidiary's current assets in such investments as the Manager deems proper including, without limitation, purchases and sales, outright or financed, by way of short sales, puts, calls, straddles, and sales against the box, on margin or otherwise, covered or uncovered;

4.1.1.11. make loans or advances to other Persons (including Members, the Manager, Affiliates of Members and Affiliates of the Manager), all upon terms and with such security as the Manager deems necessary under the circumstances;

4.1.1.12. do all acts which the Manager deems necessary or appropriate for the protection and preservation of the Company's or any Subsidiary's assets;

4.1.1.13. carry at the expense of the Company such insurance for public liability and other coverage (including directors and officers or comparable liability insurance) necessary or appropriate to the business of the Company and the Subsidiaries in such amounts and of such types as the Manager determines from time to time;

4.1.1.14. make and revoke any election permitted to the Company by any Governmental Authority;

4.1.1.15. compromise, settle or submit to arbitration, and institute, prosecute and defend any and all actions or claims in favor of or against the Company or any Subsidiary or relating to the Company's or any Subsidiary's business;

4.1.1.16. obtain all permits and licenses necessary for the operation of the Company's or any Subsidiary's business and the ownership of its assets;

4.1.1.17. hire or appoint employees, agents, independent contractors or officers of the Company or of any Subsidiary;

4.1.1.18. acquire by purchase, lease or otherwise, any real or personal property (including securities of or interests in corporations, partnerships, limited partnerships, limited liability companies or other Persons) which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company or of any Subsidiary;

4.1.1.19. construct, operate, maintain, finance, improve, own, sell, dispose of, convey, assign, license, mortgage or lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Company or of any Subsidiary;

4.1.1.20. prepay in whole or in part, refinance, recast, increase, modify or extend any Debt or any mortgages or security agreements affecting the assets of the Company or of any Subsidiary and in connection therewith execute any extensions or renewals thereof or any mortgages on the assets of the Company or of any Subsidiary;

4.1.1.21. invest or reinvest any or all of the revenues of the Company or of any Subsidiary in new assets or existing assets of the Company or of any Subsidiary;

4.1.1.22. engage in any kind of activity necessary to, in connection with or incidental to the accomplishment of the purposes of the Company or of any Subsidiary;

4.1.1.23. employ, when and if in the Manager's sole discretion the same is deemed necessary or advisable, brokers, managers, consultants, agents, accountants, lawyers or other expert advisors, notwithstanding the fact that the Manager, an Officer, a Member or an Affiliate of any of the foregoing may have an interest in, employ or be one of the brokers, managers, consultants, agents, accountants, lawyers or other expert advisors;

4.1.1.24. sell, exchange, lease, license, mortgage, pledge or transfer all or substantially all or less than substantially all of the assets of the Company or of any Subsidiary either in or other than in the ordinary course of its business;

4.1.1.25. dissolve and wind up the Company;

4.1.1.26. pay all fees, compensation and reimbursements to the Manager and his Affiliates as provided for herein;

4.1.1.27. amend this Agreement or the Articles of Organization;

4.1.1.28. change the name of the Company at any time; and

4.1.1.29. take any and all actions (whether described above or not) and engage in any kind of activity and perform and carry out all functions of any kind necessary to or in connection with the business of the Company or of any Subsidiary and exercise all rights and remedies of the Company or of any Subsidiary in connection with any of the foregoing.

4.1.2. **Appointment of the Manager.** The initial Manager is Alpha I L.P. Any Manager other than the initial Manager is to be elected by a Majority of the Members. The Manager may, but need not be, a Member.

4.1.3. **Term of the Manager.** Alpha I L.P. will serve as the initial and sole Manager until such time as an Event of Withdrawal or Change in Control occurs with respect to such Member or until the removal of such Member, whichever first occurs. Any Manager, other than the initial Manager, is to be appointed for a term of two years and occupies such position for the term for which he is elected and until his successor has been elected and qualified or until he resigns as Manager or dies or becomes incapacitated or, if he is a Member, until the occurrence of an Event of Withdrawal or Change in Control with respect to him or until his removal hereunder, whichever first occurs. A Manager may be reappointed for an unlimited number of terms.

4.1.4. **Resignation of the Manager.** A Manager may resign as Manager at any time for any reason. Any such resignation must be in writing and must be delivered to the Members. A resignation is effective upon such delivery.

4.1.5. **Removal of the Manager.** The initial Manager may not be removed as Manager except for Cause (subject to Section 4.1.6). Any such removal of the initial Manager may only be by vote of a Majority of the Members (but, for this purpose, a Majority of the Members is to be calculated without regard to the Member who appointed the Manager if the Member who appointed the Manager is also a Member at that time) at a special meeting of the Members called for such purpose. A Manager other than the initial Manager may be removed with or without Cause (subject to Section 4.1.6) but only upon the vote of a Majority of the Members (but, for this purpose, a Majority of the Members is to be calculated without regard to such Manager if such Manager is also a Member at that time) at a special meeting of the Members called for such purpose.

**4.1.6. Notice of Removal; Contest.** The Members must give written notice to the Manager of the vote to remove the Manager for Cause, and such notice must specify the circumstances constituting Cause as asserted by such Members. The removal of the Manager for Cause takes effect on the date specified in the Member vote unless the arbitration provisions are utilized, in which case the final determination will be made in accordance with such arbitration procedures. The Manager may, within 30 days following receipt of a notice given pursuant to this Section, contest the assertion of Cause by the Members by written notice to the Members and submission of the matter to arbitration as set forth in Section 14 within such 30 day period. If there is a finding by the arbitrator that Cause exists, the Manager will be removed on the date set forth in the arbitration ruling (not to exceed 30 days after such ruling). If the arbitrator determines that Cause did not exist, the notice of the Members will be deemed rescinded.

**4.1.7. Vacancies.** In the case of a vacancy in the position of Manager for one of the reasons set forth above, a Majority of the Members are to fill such vacancy at the annual meeting of the Members or at a special meeting of the Members called for such purpose.

**4.2. Approval Rights of the Members.**

**4.2.1. Actions Requiring Majority Approval.** Notwithstanding Section 4.1, neither the Manager nor the Company may enter into or conduct any of the following transactions without the consent of a Majority of the Members:

**4.2.1.1.** admit a Person as a Member except as provided in this Agreement;

**4.2.1.2.** amend this Agreement (subject to Section 4.2.2);

**4.2.1.3.** approve a merger or consolidation of the Company with another Person;

**4.2.1.4.** change the status of the Company from one in which management of the Company is vested in the Manager to one in which management of the Company is vested in the Members;

**4.2.1.5.** modify, compromise or release the amount and character of the Contributions which a Member is required to make or promises to make hereunder;

**4.2.1.6.** assign the Company's property in trust for creditors or on the assignee's promise to pay the Debts of the Company;

**4.2.1.7.** dispose of the goodwill of the Company's business;

**4.2.1.8.** do any act which would make it impossible to carry on the ordinary business of the Company;

**4.2.1.9.** confess a judgment against the Company;

**4.2.1.10.** sell, convey, assign, exchange or otherwise dispose of all or substantially all of the Company's property (provided that this Section 4.2.1.10 does not apply to the grant of a Lien nor does it apply to any transfer of assets to any Subsidiary nor to the sale of any investment securities);

**4.2.1.11.** borrow money in the name of the Company or issue evidences of indebtedness of the Company, in each case in excess of $100,000, or refinance, recast, modify or extend the same, or secure the same by mortgage, deed of trust, pledge or other Lien;

4.2.1.12. commit to make, or make, any Capital Expenditure during any Fiscal Year and not included in the Budget for that Fiscal Year in excess of $25,000;

4.2.1.13. possess any property of the Company, or assign the rights of the Company in specific property, for other than a Company purpose; or

4.2.1.14. cause the Company to enter into one or more transactions with a Member (other than in its capacity as a Member) or the Manager (other than in his capacity as the Manager) or an Affiliate of a Member or an Affiliate of the Manager except as otherwise specifically permitted hereunder.

4.2.2. **Actions Requiring Unanimous Approval or an Affected Member's Approval.** Notwithstanding Sections 4.1 and 4.2.1, neither the Manager, the Company nor any other Member may, without the consent of all the Members, do any act materially in contravention of this Agreement. In addition, neither the Manager, the Company nor any other Member may amend this Agreement or the Articles of Organization if such amendment materially adversely affects the rights of a Member under this Agreement without the consent of such affected Member.

4.2.3. **No Other Approval Rights.** Except as specifically set forth in this Agreement, a Member has no approval rights with respect to the Company or its business or affairs.

4.3. **Officers of the Company.** The Company may have a Chief Executive Officer, a President, a Chief Financial Officer, one or more Vice Presidents, a Treasurer, a Secretary and such other officers as the Manager may determine from time to time. Any such Officer will be appointed by the Manager, will serve at the discretion of the Manager (and may be removed by the Manager with or without Cause) and will have such duties and authority as the Manager may determine from time to time not inconsistent with the provisions of this Agreement.

4.4. **Execution of Documents.** The Manager, any Officer or any other Person designated by the Manager or by the Members may execute any and all documents relating to the Company and the Company's business but, as to any document which requires the approval of the Members as set forth in Section 4.2, only if such document has been approved by the Members in accordance with Section 4.2.

4.5. **Members Not Agents.** No Member, acting solely in its capacity as a Member, is an agent of the Company, nor does such Member have any authority to bind the Company.

4.6. **Discharge of Duties.** The Manager and each Officer is to discharge his duties hereunder and under the Act in good faith, with the care a corporate officer of like position would exercise under similar circumstances, in the manner he reasonably believes to be in the best interest of the Company. Unless he has knowledge concerning the matter in question that makes such reliance unwarranted, in discharging his duties hereunder, the Manager and each Officer is entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by: (i) one or more employees of the Company or of any Subsidiary whom the Manager or Officer, as applicable, reasonably believes to be reliable and competent in the matters presented; or (ii) legal counsel, accountants or other Persons as to matters the Manager or Officer, as applicable, reasonably believes are within such Person's professional or expert competence. Neither the Manager nor any Officer is liable to the Company or to any Member for any such action so taken, or any failure to take such action, if he performs his duties in compliance with this Section 4.6.

4.7. **Loans and the Transaction of Business with Members, the Manager and Affiliates of Members and the Manager.** Members, the Manager or their respective Affiliates may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more

obligations of, provide collateral for and transact other business with the Company or any Subsidiary, in each case subject to the limitations and required consents, if any, set forth herein and, subject to Law, have the same rights and obligations with respect thereto as a Person who is not the Manager or a Member. Loans to the Company or to any Subsidiary by any Member are not Contributions. No Contractual Obligation or transaction between the Company (or any Subsidiary) and the Manager or one or more Officers, or Affiliates of any of the foregoing, is void or voidable solely for such reason, or solely because the Manager or Officer is present at or participates in the meeting of the Members which approves the Contractual Obligation or transaction, or solely because his or their votes are counted for such purpose, if: (i) the material facts as to his relationship or interest and as to the Contractual Obligation or transaction are disclosed or are known to the Members, and the Contractual Obligation or transaction is specifically approved in good faith by vote of a Majority of the Members (including for this purpose only Members who are disinterested); or (ii) the Contractual Obligation or transaction is fair as to the Company (or such Subsidiary) as of the time it is authorized, approved or ratified by a Majority of the Members. Interested Members may be counted in determining the presence of a quorum at a meeting of the Members which approves the Contractual Obligation or transaction.

**4.8. Activities of Members.** It is understood that the Manager, Officers and Members are and will be engaged in other interests and occupations unrelated to the Company. The Manager and any Member or Officer may engage in and have an interest in Independent Ventures of every nature and description, independently or with others. Neither the Company nor any other Member has any right by virtue of this Agreement in and to such Independent Ventures or in and to the income or profits derived therefrom whether or not such Independent Venture was presented to such Member, Officer or the Manager as a direct or indirect result of its connection with the Company or with any Subsidiary. Neither the Manager nor any Officer or Member may engage in or have an interest in any Competing Business unless the Competing Business is conducted by the Company or by a Subsidiary, or unless the Manager (if the Manager is independent) or a Majority of the Members (if the Manager is not independent and only including Members who are independent) otherwise agrees. If the Manager or an Officer or Member does engage in or have an interest in a Competing Business in contravention of this Section, any profits or income the Manager, Officer or Member receives from the Competing Business are to be segregated and held in trust for the Company. Neither the Manager nor any Officer is required to devote all or substantially all of his time to the business of the Company. It is understood and agreed that: (i) a business venture will not be deemed a Competing Business being engaged in by, or in which a Manager, Officer or Member has an interest in if, at the time such Manager, Officer or Member, as applicable, began engaging in or first had an interest in such business venture, such business venture was an Independent Venture; and (ii) the mere ownership of 5% or less of the stock or other equity securities of a publicly traded Person will not be deemed to be engaging in or having an interest in a Competing Business.

**4.9. Remuneration of Managers.** For acting as the Manager hereunder, the Manager is only entitled to receive such remuneration as is determined by a Majority of the Members from time to time. The Manager is entitled to be reimbursed for any and all direct expenses that the Manager incurs on behalf of the Company or of any Subsidiary.

5. **Distributions.** Distributions to the Members under this Section 5 will be made in the same order of priority as the order set forth below. Thus, a distribution identified in a Section with a lower number will be made in full before any portion of a distribution identified in a Section with a higher number is made.

**5.1. Interim Distributions for Taxes.**

**5.1.1. State Income Taxes.** The Company will pay the state and local income taxes, if any, attributable to the taxable income of the Company in those jurisdictions where such income taxes are