COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407T

(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

\- - - - - - - - - - - - - - - - X

ALPHA I, L.P., by and through )
ROBERT SANDS, a notice partner, )
Plaintiff )Case No. 06-407T
-vs- )
THE UNITED STATES, )
Defendant )

\- - - - - - - - - - - - - - - - X

Deposition of ROBERT SANDS taken pursuant to notice at Constellation Brands, 370 Woodcliff Drive, Suite 300, Fairport, New York on Wednesday, June 13, 2007 commencing at 9:30 a.m.

Reported by:
COMPUTER REPORTING SERVICE
Amy M. Condon, CSR, RPR
270 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614 (585) 325-3170

EXHIBIT 56

APPEARANCES:

SUTHERLAND, ASBILL & BRENNAN, LLP
By: KENT L. JONES, Esq.
JULIE BOWLING, Esq.
1275 Pennsylvania Avenue, N.W.
Washington, D.C., 20004
Attorneys for plaintiff.

U.S. DEPARTMENT OF JUSTICE
By: THOMAS M. HERRIN, Esq.
MICHELLE C. JOHNS, Esq.
717 North Harwood Street, Suite 400
Dallas, Texas 75201
Attorneys for defendant.

Q. Yes. But you said Richard attended so I had to be sure.

A. I am assuming Richard attended that meeting. I believe he attended that meeting, let me put it that way.

Q. All right. As far as -- tell me the meetings that you recall. Let's go with that. Your recollection.

A. There were a number of meetings and I really have a very vague recollection of the specific meetings. I mean, you know, we're talking quite a few number of years ago and I just don't recall all of the meetings with Heritage.

Q. All right.

A. I'm not trying to be difficult but, you know.

Q. I understand. There's a time frame issue here.

As far as again the meetings that were held, who attended any of the meetings with regard to yourself and your family and I'm going to include Andrew Stern in terms of family.

A. I don't recall him attending any meetings.

Q. How about your mother, did she ever attend any of the meetings?

A. I don't recall her attending any meetings.

Q. Is it likely that neither one of them attended any of the meetings?

A. Likely? Do you want me to answer?

MR. JONES: That sounds like it's calling for speculation. He said he doesn't recall them attending so when you say likely are you saying please speculate about --

MR. HERRIN: I'm not asking him to speculate. I'm trying -- he doesn't recall. As I interpret what he was saying he didn't think they did, he wasn't absolutely positive.

I want to get a little bit more likely than not simply because I'm trying to go the next step deciding whether there's a point in taking their deposition.

MR. JONES: I appreciate that and I'm sure he'll like to help you with his recollection on it but I think he had trouble with the word likely. Why don't you answer that the best you can.

THE WITNESS: I don't believe my mother or Andy Stern attended any meetings with Heritage.

BY MR. HERRIN:

Q. Would it be fair to say that any information

they received with regard to the partnership, two partnerships and the transactions that ensued from those partnerships, came either from yourself or from Richard?

A. You're asking me if I believe that's the case?

Q. Yes.

A. Yes.

MR. JONES: As an aside, fair to say is a Texan expression. I've argued with counsel about it on other occasions.

BY MR. HERRIN:

Q. During these Heritage meetings, meetings with Heritage personnel, do you recall what kind of presentations were being made, were they being made with a power point, were they being made like on a wipe board, were they handing out materials, what's your recollection?

A. You know, I recall materials. I recall -- I'm not sure if it was power point. I seem to recall power point.

Q. All right. So power point would have been done in a different room or is this room large enough to put up a screen for power point?

just recall that there is other things in here.

Look, you can see very briefly talks about maximum fees and it talks about other things in here and other -- in other sections as I haven't had a chance to go through this and I wouldn't suggest it would be productive to do so because I would only be, you know, reading it and giving you my interpretation of it at this stage, not what my interpretation of it was at that stage.

Q. All right.

A. I've only identified this as a document on which I believe it is my signature as well. So --

Q. Are you suggesting that this may not be the agreement that you signed or a copy of the agreement that you signed?

A. I don't know.

Q. All right. You stated that some of the meetings you had other legal advisors present. Who were those -- who would those advisors have been?

A. Jonathan Blattmachr attended a number of the meetings.

Q. And who is Jonathan Blattmachr?

A. He is an attorney with Milbank Tweed.

Q. Now, did you have to get permission from

Heritage for Mr. Blattmachr to attend these meetings?

A. Need to get permission? He attended the meetings.

Q. All right. Did you get any permission from Heritage for him to attend?

A. Heritage obviously allowed his attendance. I don't recall an issue of permission for Jonathan Blattmachr. They were fine with him attending the meetings.

Q. Any other legal advisors that attended?

A. Nope, not to my recollection.

Q. How about investment advisors, you said somebody from Bernard Robinson attended one meeting.

A. They are accountants, our accountants.

Q. Do you recall who --

A. Jonathan was our attorney.

Q. And Bernard Robinson were your accountants?

A. Correct.

Q. I asked do you recall who from that firm would have attended the meetings?

A. Freddy Robinson.

Q. And would he have attended more than one meeting?

A. I believe so, yes.

A. At least in part, yes.

Q. And who were the trustees for CWC and your mother's CRUT?

A. I don't remember. Again, I can speculate but --

Q. I'm not asking you to do that.

A. You don't really want me to do that, right?

Q. On the same day that the CRUTS were formed - and I'll represent to you that it was September 21st, 2001, give or take a day, yourself, CWC and Marilyn, Richard assigned their interest in RRM&C Group to the CRUTS, is that your recollection as well?

A. I don't remember the specifics of -- I don't remember the specifics as to dates and so on and so forth. So I don't want to -- you know, I'm not -- I don't want to verify that the dates that you're reporting on are the correct dates or that those things actually happened, you know, exactly as you've stated.

Q. But they -- do you recall that the interest in RRM&C Group -- I'm sorry. The interest -- yeah, in the Group, they were assigned to the respective CRUTS, your interest in Group was assigned to the Robert charitable remainder unitrust, your mom's was assigned to the Marilyn, CWC was assigned to that, et-cetera,

et-cetera, is that your understanding?

A. Without commenting on the exact form of the transaction your term assignment, okay, I believe that they were donated or assigned or something to that effect to the CRUTS, yes. The LP, you're talking about the LP interest?

MR. JONES: Yeah, he's talking about RRM&C Group, LP.

MR. HERRIN: Right.

THE WITNESS: Yes, I think that that's what happened.

BY MR. HERRIN:

Q. And what was the reason for making these assignments?

A. Well, a number of fold. We had created the CRUTS and clearly with the intent that a charity would receive the remainder interest. So there was charitable intent, we talked about how CRUTS work. It's a vehicle for making a charitable contribution and retaining a current interest for a period of years.

So those were the reasons for why we assigned the LP interest to the CRUT clearly.

Q. At the time that the interest were assigned to the CRUT, did you anticipate the CRUTS lasting to

twenty years that they would have been set up for?

A. They were set up with a twenty -- I believe, I'm not agreeing, they were set up with a long-term. You say twenty years, I'll take your word for it.

So that was all that was contemplated at the time that the CRUT was set up. That was the only things that were agreed to and that was basically it.

Q. Aside from what was agreed to, what was your understanding on how long you intended them to be in existence?

A. The term specified in the CRUT. We knew that they would not have any shorter duration than the term specified in the CRUT.

Q. At the time that you set up the CRUT, your CRUTS, what were you anticipating being the value of the remainder interests at the end of the term?

A. I don't remember. When you say anticipating -- well, I don't remember what the value of the remainder interest was.

Q. Do you recall that at the time you assigned RRM&C Group the interest to the CRUT, it held Constellation stock worth about $75 million?

A. Not opining on the specific amount, it held Constellation stock when we assigned the LP interest to

Q. Do you know who set up the Sands Supporting Foundation?

A. I don't even know that it was set up.

Q. All right. Subsequent to it being named the beneficiary who was it changed to, who was the beneficiary changed to?

A. I think it -- a supporting organization called the Health and Education -- I call it the Health and Education Fund. I don't remember the -- I don't know the exact legal name of it.

Q. Does it sound like Educational and Health Support Fund?

A. Yes, that's it.

Q. What is the Educational and Health Support Found?

A. A supporting organization that was set up to benefit a group of charities that are designated which are largely educational, not-for-profit educational and health related institutions.

Q. Could you tell me who some of those charities are?

A. Via Health, I believe would be one of them.

MR. JONES: Excuse me, could you tell us how you spell Via Health?

THE WITNESS: V-i-a, H-e-a-l-t-h.

MR. JONES: Thank you.

MR. HERRIN: That part I got. I just don't know what it is.

THE WITNESS: Hospital system. Harley School, which is an independent K through 12 school. Probably -- I say probably because I don't -- I haven't looked at that list in a while. But Norman Howard which is a school that specializes in learning disabilities.

Thompson Hospital, Thompson Health System which is another health system. Those would be examples of what's on the list. Probably Skidmore College which is my college. Those are the types of things that are on the list.

BY MR. HERRIN:

Q. Okay. That's an organization that continues, the Educational and Health Support Fund continues today?

A. Yes.

Q. Who were the trustees for that fund?

A. James Locke.

Q. L-o-c-k-e?

A. Uhm-uhm. Wes - I don't know what his real

name is - Stalling, and Freddy Robinson.

Q. There are no Sands family members that are trustees?

A. No.

Q. Who is James Lock?

A. He's -- what do you mean who is he?

Q. Help us out here.

A. What do you want to know?

Q. Is he an attorney of yours, is he an employee, a friend? How is he associated --

A. He is an attorney at Nixon Peabody.

Q. Is that a Rochester firm?

A. It's a national firm.

Q. Do they have a Rochester office?

A. Yes.

Q. Is he in the Rochester office?

A. Yes.

Q. And how about Wes Stalling?

A. He's an accountant at Bernard Robinson and Company.

Q. Now, shortly after the Educational and Health Support Fund was named as the trustee before the CRUTS were terminated, do you recall the circumstances of it being terminated?