COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407T

(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

- - - - - - - - - - - - - - - - - - X

ALPHA I, L.P., by and through )
ROBERT SANDS, a notice partner, )
Plaintiff )Case No. 06-407T
-vs- )
THE UNITED STATES, )
Defendant )

- - - - - - - - - - - - - - - - - - X

Deposition of RICHARD SANDS taken pursuant to notice at Constellation Brands, 370 Woodcliff Drive, Suite 300, Fairport, New York on Tuesday, June 12, 2007 commencing at 9:30 a.m.

Reported by:
COMPUTER REPORTING SERVICE
Amy M. Condon, CSR, RPR
270 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614 (585) 325-3170





EXHIBIT 57

APPEARANCES:

SUTHERLAND, ASBILL & BRENNAN, LLP
By: KENT L. JONES, Esq.
JULIE BOWLING, Esq.
1275 Pennsylvania Avenue, N.W.
Washington, D.C., 20004
Attorneys for plaintiff.

U.S. DEPARTMENT OF JUSTICE
By: MICHELLE C. JOHNS, Esq.
THOMAS M. HERRIN, Esq.
717 North Harwood Street, Suite 400
Dallas, Texas 75201
Attorneys for defendant.

# INDEX


Richard Sands

Examination by Ms. Johns 4 - 117


## UNITED STATES EXHIBITS


No. 1 - Letter 18

No. 2 - Nondisclosure agreement 29

No. 3 - Invoice 45

No. 4 - Invoice 46

No. 5 - Accounting statement 56

No. 6 - Fiscal statement 88

No. 7 - Financial statement 90

No. 8 - E-mail 91

No. 9 - Spread sheet 99

No. 10 - Time line 100

No. 11 - Time line 100

No. 12 - Letter 103

No. 13 - Letter 103

Q. Let me show you something that may refresh your memory.

A. I don't know what it means to be familiar with an LLC.

Q. Well, let's start this way. I'll show you this letter, and Tom, do you want to go ahead and pull it out and we'll mark it.

This has a government exhibit on it it because it was attached to our MSJ and we'll mark it Exhibit 1 for the deposition.

(U.S. Exhibit No. 1 - letter - marked for identification.)

BY MS. JOHNS:

Q. This is a letter dated March 29th, 2001 addressed to you from someone named Chet Decker.

Do you recall -- do you want to take a minute to look at this letter?

MR. JONES: I'll note for the record this isn't a signed copy, and you said it comes from your files?

MS. JOHNS: I think it does, yeah.

MR. JONES: So it's an unsigned perhaps draft of a letter.

THE WITNESS: Okay.

BY MS. JOHNS:

Q. Do you recall this letter?

A. No.

Q. Do you recall receiving it?

A. No.

Q. Do you think this is the first time you've seen it or do you think you might have seen it back in March of 2001 or you just don't remember it?

A. From reading the first paragraph it looks to me as if this is a follow-up to cold calls that Heritage placed to me.

Q. Okay.

A. Which I receive thousands of.

Q. So let's start from your very first interaction with The Heritage Organization. You said you got some cold calls?

A. I got a cold call.

Q. Do you remember when that was? Just generally. I don't need an exact date.

A. Early 2001.

Q. Okay. What did they say on the call?

A. I don't remember to be quite honest.

Q. And how many times did they call you?

A. I think once, twice maybe. Again, I could be

correct -- incorrect.

Q. At what point did you decide you wanted to actually have a face to face meeting with Heritage?

A. I never decided that.

Q. Okay. Did you -- let me ask this: Did you ever have a face to face meeting with Heritage?

A. Yes. I was involved in a face to face meeting with Heritage.

Q. And when was that meeting?

A. I don't remember.

Q. Was it in 2001?

A. I would suspect so.

Q. Okay. How many face to face meetings with Heritage did you have?

A. I don't recall.

Q. Now, you said that the cold calls -- at some point the cold calls --

A. Call.

Q. Cold call?

A. Potential call.

Q. Became a face to face meeting. Who made that decision to finally say, okay, let's meet with Heritage?

A. My brother.

Q. Robert?

A. Uhm-uhm.

Q. In that first face to face meeting, was it here?

A. I don't recall.

Q. Do you remember flying to Dallas for the meeting?

A. I don't recall.

Q. Okay. Who was at this first face to face meeting with Heritage?

A. I really don't recall specifically anyone, but I believe Gary Kornman was certainly there, but I could be incorrect.

Q. So the only person from the Heritage side you remember being there was Gary?

A. That's not what I said. I said I don't recall at all who was there.

MR. JONES: Let me advise the witness that you should not speculate on answering the questions.

THE WITNESS: Very good. I don't recall who was there.

BY MS. JOHNS:

Q. Who from your family was at the meeting?

A. I don't recall.

Q. Now, how many -- I don't think I asked you this already, but how many face to face meetings with Heritage did you have?

A. No idea, I don't recall.

Q. And you don't ever remember traveling to Dallas to meet with Heritage?

A. I don't recall traveling to Dallas to meet with Heritage.

Q. At this first meeting that we talked about, this first face to face meeting with Heritage in 2001, what was discussed?

A. I don't recall. I don't recall any specifics of any meetings.

Q. Okay. Would reviewing this letter refresh your memory at all about maybe what was discussed at the meeting?

A. Not one bit.

Q. Can you say today why Heritage -- why would Heritage contact you, why would they make a cold call to you, do you know?

A. I can't speculate about why they would do anything.

Q. Do you know why Robert finally agreed to meet with Heritage?

A. Yes.
Q. Why was that?
A. We had discussed a potential sale of family owned Constellation stock along with some estate planning and philanthropic plans along with certain uncertainties that we would face once we started the process of selling family stock. And I told Rob as I believe, okay -- this is really reconstruction - of the fact that this group had called me and talked about similar things. That's what I believe, but that may not be precise. That's the connection.
Q. Okay. In your meeting with Heritage and in the time leading up to the implementation of these transactions, what were your goals for the transactions that are at issue in this litigation?
A. One, to make a profit; two, to diversify our holdings which were very concentrated in Constellation stock. These are not in order of priority necessarily. Three, to do some estate planning work; four, to provide for the philanthropic needs that we would be having at the time and in the future. I think that's basically, you know, a basic family business plan or financial plan you would call.
Q. Now, this letter I've shown you that I marked

as Exhibit 1 states in the fourth paragraph entitled capital gains, it says, we offer strategies that can eliminate the total tax liability on capital gains.

Was one of your goals to eliminate the total tax liability on capital gains?

MR. JONES: I'm going to object to the form of the question only because you refer to this as a letter. It's an unsigned copy of something and it hasn't been established that it was sent or received.

So I object to the characterization that it's a letter. It's not supported by the record. You can answer the question if you understood it.

THE WITNESS: Could you repeat the question?

BY MS. JOHNS:

Q. This letter states that Heritage offers strategies that can eliminate the total tax liability on capital gains.

Was one of the these goals on these transactions to eliminate the total tax liability on capital gains with respect to the sale of the Constellation stock?

A. The question is not clear to me. If the question is -- was it the goal to eliminate totally capital gains tax?

Q. Right. Well, that's --