IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: August 14, 2007)

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, the United States responds to the facts alleged by plaintiffs in its Proposed Findings of Uncontroverted Fact.

## I. General Objections

The United States will not dispute that Alpha I, L.P. was formed as a partnership insofar as (i) a formal certificate of limited partnership was filed on the date stated pursuant to Missouri Uniform Limited Partnership Law Section 359.091 and (ii) the partnership agreement, on its face, met the requirements for a partnership under Missouri Uniform Limited Partnership Law Section 359.011(7), however, the United States denies (i) that the partnership, in actual operation, satisfied the requirement that partners possess a bona fide intention to carry on a legitimate business for profit under Missouri Partnership Law Section 358.060(1) and (ii) that a partnership existed for federal income tax purposes. Subject to these reservations and solely for purposes of Plaintiffs' and Defendant's motions for summary judgment, the United States will not dispute that Alpha was a partnership and adopts terms in relation to Alpha that are consistent with that characterization. The

United States does not concede for any other purpose that the events occurred as so characterized under applicable local law or for federal income tax purposes.

The United States does not dispute that articles of organization were filed for Beta Partners, LLC pursuant to Missouri Limited Liability Company Act § 347.039, and that the operating agreement for Beta, on its face, satisfied the requirements for a limited liability company under the Act, but denies that Beta constituted a partnership for federal income tax purposes. Subject to these reservations and solely for purposes of Plaintiffs' and Defendant's motions for summary judgment, the United States will not dispute that Beta was a partnership and adopts terms in relation to Beta that are consistent with that characterization. The United States does not concede for any other purpose that the events occurred as so characterized under applicable local law or for federal income tax purposes.

## II. Specific Responses

### Contact with Heritage

1. In the spring of 2001, a representative of The Heritage Organization (Heritage) contacted the Sands family regarding possible strategies the family could implement to transfer wealth between generations and diversify their assets in a tax-efficient manner. Plaintiffs' Exhibits 52 and 53, App. B at pp. 1350, 1357.

**Response:** The United States disputes that Heritage contacted the Sands family regarding strategies the family could implement to transfer wealth between generations and diversify their assets in a tax-efficient manner and instead asserts that Heritage contacted the Sands family to promote a tax avoidance scheme to generate artificial losses to avoid taxation on capital gains.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

On May 10, 2001, Chester Decker, of The Heritage Organization, L.L.C., contacted Richard Sands by telephone to discuss a strategy to eliminate federal and state capital gain tax entirely. App-B-1-2. At that time, Decker explained that Heritage would be paid a contingency fee, based on a "percentage of tax dollars you would have paid." App-B-3. After being assured that the Heritage strategy would "eliminate the capital gains tax," Richard Sands arranged for a May 31, 2001 office meeting with Heritage personnel. App-B-3. The entire May 10, 2001 conversation dealt with the elimination of capital gains tax. At one point, Richard Sands even states that he had previously used a strategy of [Jonathan] Blattmachr, commenting that Blattmachr's strategy hadn't eliminated the capital gain tax to zero. App-B-12-13.

2. On behalf of the Sands family, Robert Sands conducted due diligence before deciding to implement any of the strategies suggested by Heritage. Robert Sands requested references from Heritage and contacted those references. He also asked Jonathan Blattmachr of Milbank, Tweed, Hadley & McCloy LLP to provide him Jonathan's impression of Heritage and some background information on Gary Kornman, one of the principals of Heritage. Plaintiffs' Exhibits 1, 2, 52 and 53, App. B at pp. 1-5, 1350-1351, 1357.

**Response:** The United States disputes the term "due diligence" as that term is undefined and is a term of art which calls for a legal conclusion.

3. Robert Sands, as an attorney for the family, often researched law firms or investment firms the family was considering engaging and made recommendations to the family based on his due diligence. Plaintiffs' Exhibits 3, 52, and 53, App. B at pp. 9, 1351, 1358.

**Response:** The United States disputes the term "due diligence" as that term is undefined and is a term of art which calls for a legal conclusion.

4. Based on the due diligence conducted by Robert, Robert and Richard agreed to meet with representatives of Heritage. Robert, Richard, and some of their advisors (including Jonathan Blattmachr and Freddy Robinson) met with representatives from Heritage on several occasions in 2001. Plaintiffs' Exhibits 52 and 53, App. B at pp. 1351, 1358.

**Response:** The United States disputes the term "due diligence" as that term is undefined and is a term of art which calls for a legal conclusion.

**Although the United States does not dispute that the referenced meetings occurred, pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following additional uncontroverted facts in order to fully address the nature of the referenced meetings.**

On May 31, 2001, Tim Seaberg, of The Heritage Organization, L.L.C., met with Richard Sands and Robert Sands at the Constellation, Inc. office. During the meeting, Richard Sands stated that they were interested in "diversifying out of Constellation a small amount like maybe $30 million in stock." App-B-19. During the meeting, Richard sought assurances that 'this is not a tax deferral this is a complete elimination ...." App-B-21. Richard also asked Seaberg if Heritage would guarantee results and he was told that "there would be no economic substance if we said if it doesn't work you get all your money back." Notwithstanding this statement, Seaberg went on to explain a "deal" where all of the tax savings could be put into escrow for three years drawing interest. After three years at the end of the statute, if the escrowed money didn't have to be used for the taxes, it would be split 50/50. App-B-24. Richard also asked if Heritage would pay defense costs, stating that "there are some law firms that are selling similar type arrangements [that] are paying defense

costs. Richard also stated that "[d]eals that we've done we usually get defense costs through the appeal level." App-B-22.

At the May 31st meeting, Seaberg explained that the Sands would get a "[m]ore likely than not" opinion letter from a Top 200 law firm. (Seaberg later explained that the opinion letter would cost $100,000 to $150,000. App-B-32. Seaberg further explained that if the "worst case scenario happens and you've got to pay all the taxes" "you've basically got a loan from the government for 8% for 8 to 10 years." App-B-26.

Richard Sands asked Seaberg about the proprietary nature of the transaction, stating that "there's a lot of these things floating around." App-B-27. Seaberg explained that "the combination and the way we set it up is proprietary." Seaberg went on to state that some people stopped doing the transaction when a "treasury not[ic]e known as 2000-44 that came out last year that um dealt with I guess a similar area of the tax code and it caused some people to stop doing it." App-B-28. Richard Sands was very insistent that the strategy eliminate capital gains. During the May 31 meeting, Richard proposed an example using zero basis stock that they might initiate now but not sell for six months. App-B-29-30. Seaberg explained that they were essentially 'creating a loss that offsets the gain." App-B-31.

The May 31st meeting concluded by setting up a second meeting on June 13, 2001, which would be attended by Heritage founder Gary Kornman. App-B-43-45.

On June 13, 2001, Tim Seaberg and Gary Kornman, of The Heritage Organization, L.L.C., met with Richard Sands and Robert Sands at the Constellation, Inc. office. During the meeting, much of the discussion concerned avoiding estate and gift taxes. When the topic turned to capital gains, Kornman explained that their transaction would "give you as much basis as you want to be

used any time in the future." Richard Sands specifically asked about and was assured by Kornman that they could shelter both long term and short term capital gains. App-B-62. As Kornman later explained, "[w]e're going to create something with basis so that you can use that basis, as you need year by year to create an offsetting loss." App-B-83. Near the conclusion of the meeting a subsequent meeting was scheduled for June 27, 2001. App-B-92.

On June 27, 2001, Tim Seaberg and Gary Kornman met with Robert Sands and Jim Locke at the Constellation, Inc. office. Locke was an attorney with Nixon, Peabody. App-B-100. During the meeting, Robert said to Kornman that "elimination of the capital gains on the sale of the stock that's probably the first thing that we would embark upon with you." Robert elaborated, [t]his is the first level of importance because we're thinking of selling [?] stock." App-B-110. Kornman later tells Robert "we can set it up to do exactly what you want to do. I mean [?] capital gains long or short it doesn't make a difference. We can eliminate the tax." App-B-115. Later still, Kornman explains that "if you ever get audited and our agreement is part of what they'll see there's a business purpose built into the original engagement agreement. Uh obviously when you sign this thing it won't have the bold E that says what we're really doing it for is capital gains." App-B-121.

**The Transactions**

5. Based in part on discussions with Heritage, the Sands family members and certain trusts implemented a financial plan, a part of which included formation of and investment by the family members in Alpha I, L.P. ("Alpha"). Plaintiffs' Exhibits 52 and 53, App. B at pp. 1352, 1358.

**Response:** The United States disputes the term “financial plan” and “investment” and instead asserts that the Sands family members and trusts implemented a plan to generate artificial losses to avoid taxation on capital gains. App-B-1-134.

6. The purpose of Alpha was to provide an investment vehicle for the family members to pool assets and to enhance the privacy of the family's financial information. Plaintiffs' Exhibits 52 and 53, App. B at pp. 1352, 1359.

**Response:** The United States disputes that Alpha was formed to provide an investment vehicle for the family members to pool assets and to enhance the privacy of the family's financial information and instead asserts that Alpha was formed to implement the tax avoidance scheme at issues in this case. App-B-1-134.

7. Alpha is a limited partnership formed on December 3, 2001 under the laws of Missouri. Plaintiffs Exhibit 4, App. B at pp. 11-12.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs’ statement.

8. During 2001 and 2002, the six limited partners in Alpha were Robert Sands, Richard Sands, Marilyn Sands, Andrew Stern, the Marvin Sands Master Trust, and CWC Partnership I ("CWC") (hereinafter referred to collectively as the "Alpha limited partners"). Plaintiffs' Exhibits 5, 6 and 7, App. B at pp. 38-43, 49-56, 59-63, 72-82, 86-88.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs’ statement.

9. CWC is a general partnership organized under the law of New York. As of December 31, 2001, the Trust FBO Abigail Stern U/W Laurie Sands ("Abigail Trust") and Trust FBO

Zachary Stern U/W Laurie Sands ("Zachary Trust") each held a 49.5% Class 2 partnership interest in CWC. Richard Sands and Robert Sands each held a .5% Class 2 partnership interest in CWC. Plaintiffs' Exhibit 8, App. B at pp. 104-111, 116-123.

**Response:** The United States does not dispute plaintiffs' statement.

10. The general partner in Alpha was at all times R, R, M & C Management Corp. Plaintiffs' Exhibits 5, 52, and 53, App. B at pp. 22, 1352, 1359.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement.

11. R, R, M & C Management Corp. is a corporation that was formed on August 23, 2001 under the laws of Missouri. Plaintiffs' Exhibit 9, App. B at pp. 227-228.

**Response:** The United States does not dispute plaintiffs' statement.

12. In 2001 and 2002, R, R, M & C Management Corp.'s sole shareholders were Robert Sands and Richard Sands. Robert Sands and Richard Sands each provided $55,000 and 1,001 shares of Constellation stock to Management Corp. in exchange for the stock they received from Management Corp. Plaintiffs' Exhibits 10, 11, and 12, App. B at pp. 229-230, 235-246.

**Response:** The United States does not dispute plaintiffs' statement.

13. The Sands family has used Alpha to make many investments in the years since its formation, and during this period, Alpha has generated more than $21 million of profits. Alpha presently holds approximately $61,000,000 in assets. Plaintiffs' Exhibit 13, App. B at pp. 247, 250.

**Response:** The United States disputes the use of the term "many." The United States otherwise does not dispute plaintiffs' statement with this finding of fact but the United States does not agree

with the implication that because Alpha “made many investments in the years since its formation” that it is a bona fide partnership for federal income tax purposes. The United States further asserts that these other investments in Alpha were unrelated to the tax transactions at issue in this case. The United States also does not agree with the implication that Alpha was set up for purposes other than to implement the tax avoidance schemes promoted by Heritage. App-B-1-134.

14. On December 11, 2001, Richard Sands, Robert, Sands, Marilyn Sands, Andrew Stern, the Marvin Sands Master Trust, the Abigail Trust, and the Zachary Trust all executed short sales of Treasury Notes through UBS PaineWebber ("PaineWebber") accounts. The short sales were in an aggregate face amount of approximately $30,800,000 U.S. Treasury notes bearing coupon interest of 2.75% due 9/30/03 and an aggregate face amount of approximately $13,200,000 U.S. Treasury notes bearing coupon interest of 4.625% due 5/15/06 for total proceeds of approximately $44 million. Plaintiffs' Exhibits14 and 15, App. B at pp. 253-297, 298-311.

**Response:** The United States does not dispute plaintiffs’ statement.

15. The Sands family members entered into the short sales for a variety of reasons, including: 1) to hedge against the impact of movements in interests rates on their stock holdings in Constellation Brands; 2) to profit from movements in interest rates; 3) to potentially obtain tax benefits; and 4) to increase diversification and liquidity in their investment portfolios. Plaintiffs' Exhibits 52 and 53, App. B at pp. 1352-1353, 1359.

**Response:** The United States disputes because the Sands family entered into the shorts sales to generate artificial losses to avoid taxation on capital gains. App-B-1-134.

16. At the time the Sands family members entered into the short sales, they could not know the cost to acquire the replacement Treasury notes that would be needed to close the short sales. The cost to cover the short sales of Treasury notes is determined by movements in interest rates that directly impact the price of Treasury notes needed to close the short sales. Plaintiffs' Exhibits 16 - 22, App. B at pp. 314, 340, 351, 416, 443, 453, 517-518, 546, 556-557, 622, 650, 660-661, 728, 756, 766-767, 833-834, 862, 872-873, 937-938, 966, 976-977.

**Response:** The United States disputes that the cost to cover the short sales of Treasury notes is determined by movements in interest rates that directly impact the price of Treasury notes needed to close the short sales, as the United States' expert reports, which are not due until October 29, 2007, will explain. While plaintiffs could not know the cost to close the short sales at some future date, they could determine the cost to acquire the replacement Treasury notes that would be needed to close the short sales at any present point in time. App-B-161-162.

17. The Abigail Trust and the Zachary Trust contributed the assets in their PaineWebber accounts, which were the proceeds of the short sales and cash, and delegated the obligation to cover the short sales to CWC on December 13, 2001. Plaintiffs' Exhibits 23 and 24, App. B at pp. 1040-1055.

**Response:** The United States does not dispute plaintiffs' statement that the Abigail Trust and the Zachary Trust transferred the assets in their PaineWebber accounts, which were the proceeds of the short sales and cash, and transferred the obligation to cover the short sales to CWC on December 13, 2001. SANDS8681-8682; SANDS8690-8691.

18. On December 17, 2001, the Alpha limited partners all contributed various amounts of cash and their respective PaineWebber accounts and delegated the obligation to cover the short sales to Alpha for limited partner interests in the partnership. Their respective partnership interests were as follows:

| | | |
|---|---|---|
| a. | Robert Sands | 21.401% limited partner interest |
| b. | Richard Sands | 18.022% limited partner interest |
| c. | Marilyn Sands | 14.641% limited partner interest |
| d. | CWC | 12.949% limited partner interest |
| e. | Andrew Stern | 5.857% limited partner interest |
| f. | Marvin Sands Trust | 27.030% limited partner interest. |

Plaintiffs' Exhibits 5, 25, 26, 27, 28, 29, 30, and 32 App. B at pp. 40-43, 1056-1095,1097-1099.

**Response:** The United States does not dispute plaintiff's statement that on December 17, 2001, the Alpha limited partners transferred various amounts of cash and their respective PaineWebber accounts and transferred the obligation to cover the short sales to Alpha for limited partner interests in the partnership. SANDS8548-8549; SANDS8570-8571; SANDS8555-8556; SANDS8563-8564; SANDS8578-8579; SANDS8587-8588.

19. RRM&C Management Corp. also contributed $2,582 to Alpha for a .1% general partner interest. Plaintiffs' Exhibits 5 and 31, App. B at pp. 40-43, 1096.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement.

20. On December 17, 2001, Alpha purchased 67,525 shares of Corning stock and 33,400 shares of Yahoo stock. Plaintiffs' Exhibit 33, App. B at pp. 1000-1102.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement.

**Although the United States does not dispute that the referenced meetings occurred, pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following additional uncontroverted facts in order to fully address the nature of the referenced meetings.**

The purchase of the Yahoo and Corning stock was part of the tax avoidance scheme seeking to inflate the value of the Yahoo and the Corning stock and to improperly generate artificial losses. App-B-131-134.

21. Beta Partners, LLC ("Beta") was a limited liability company formed on December 10, 2001 under the laws of Missouri. Beta was formed to provide individual investors outside the family an opportunity to invest with the family members. Plaintiffs' Exhibits 34, 52 and 53, App. B. at pp. 1103-1105, 1353, 1359.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement to the first sentence. The United States disputes that Beta was formed to provide individual investors outside the family an opportunity to invest with family members and instead asserts that Beta was formed as part of a plan to generate artificial losses to avoid taxation on capital gains.

22. The initial members in Beta were Alpha and Gloria Robinson. Plaintiffs' Exhibit 35, App. A at pp. 1144-1147.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following additional uncontroverted fact.**

The use of Gloria Robinson was part of the tax avoidance scheme seeking to inflate the value of the Yahoo and the Corning stock and to improperly generate artificial losses. App-B-131-134.

23. On December 20, 2001, Alpha contributed the Yahoo and Corning shares and the cash it had received from the Alpha limited partners (along with the requirement to "cover" the Short Sales) to Beta for the majority membership interest. Plaintiffs' Exhibits 35 and 36, App. B at pp. 1146-1155.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement.

24. On December 20, 2001, Gloria Robinson contributed $25,000 cash to Beta in exchange for her minority membership interest. Plaintiffs' Exhibits 35, 37 and 38, App. B at pp. 1146-1147, 1156, 1158.

**Response:** Subject to General Objection above, the United States does not dispute plaintiffs' statement.

25. On December 26, 2001, Beta used most of its cash to acquire Treasury notes which it used to close the Short Sales. Beta recognized a profit of $90,018 upon closing the short sales. Plaintiffs' Exhibits 39, 40, and 41, App. B at pp. 1161-1168, 1178-1179, 1182.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement that Beta reported a gain of $90,018 on its 2001 Form 1065, and alleges that Beta's 2001 Form 1065 and the PaineWebber account statements indicate that the short sales were closed on December 27, 2001.

26. On December 27, 2001, Gloria Robinson and Alpha entered an agreement whereby Alpha agreed to and closed a purchase of Gloria Robinson's membership interest in Beta, which had the effect terminating Beta pursuant to Code Section 708(b)(1)(B). Plaintiffs' Exhibits 42 and 43, App. B at pp. 1189-1194.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement.

27. Alpha then took possession of Beta's assets, which principally consisted of the shares of Yahoo and Corning stock. Plaintiffs' Exhibit 54, App. B at p. 1363. (Kevin's affidavit)

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement that Beta distributed its assets to Alpha.

28. During 2001 and 2002, Alpha transferred most of the Yahoo and Corning stock to its partners in varying amounts. The partners then contributed some of that stock to M,L,R&R, and some to Mickey Management, L.P. Plaintiffs' Exhibits 6, 7, 44, 45, and 54, App. B at pp. 50, 86, 1199, 1219, 1363-1364.

**Response:** Subject to the General Objection above, the United States does not dispute plaintiffs' statement.

29. M, L, R & R is a general partnership organized under the laws New York. The partners of M, L, R & R in 2002 were Richard Sands, Robert Sands, the Marvin Sands Trust, CWC, and Andrew Stern (hereinafter referred to collectively as "the M, L, R & R partners"). Plaintiffs' Exhibit 45, App. B at pp. 1234-1249.

**Response:** The United States does not dispute plaintiffs' statement.

30. Mickey Management, L.P. was a limited partnership organized under the laws of Delaware on February 26, 2002. During 2002, Marilyn Sands was a 99 % limited partner in Mickey Management, L.P. Plaintiffs' Exhibit 46, App. B at p. 1269; Mickey Management Answer ¶ 2.

**Response:** The United States does not dispute plaintiffs' statement.

31. The 1% general and Tax Matters Partner in Mickey Management, L.P. was at all times Mickey Management Inc., a corporation formed under the laws of Delaware. Mickey Management Inc. was 100% owned by Marilyn Sands in 2002. Plaintiffs' Exhibit 47, App. B at p. 1270-1271; Mickey Management Answer, ¶¶ 3-4, Mickey Management Complaint ¶ 4.

**Response:** The United States does not dispute plaintiffs' statement.

32. Alpha, M,L,R&R and Mickey Management, L.P. each sold some of the Yahoo and Corning stock during 2002. Plaintiffs' Exhibits 7, 44, and 45, App. B at pp. 69, 1199,1219.

**Response:** The United States does not dispute plaintiffs' statement.

33. On December 18, 2002, Alpha sold 5,300 of the Corning shares for $19,661 and 2,650 of the Yahoo shares for $44,265. On the Form 1065 filed by Alpha for the taxable period ending December 31, 2002, Alpha reported a total basis in this Corning stock of $1,747,325, resulting in a long-term capital loss of $(1,727,664) and a total basis in this Yahoo stock of $1,843,154, resulting in a long-term capital loss of $(1,798,889). Plaintiffs' Exhibit 7, App. B at p. 69.

**Response:** Subject to the general objections, the United States does not dispute plaintiffs' statement that on December 18, 2002, Alpha sold 5,300 of the Corning shares for $19,661 and 2,650 of the

Yahoo shares for $44,265. The United States also does not dispute plaintiffs' statement that Alpha "reported" a total basis in this Yahoo stock of $1,843,154 for the taxable period December 31, 2002, but the United States does dispute that this resulted in a long term capital loss. The United States also does not dispute plaintiffs' statement that Alpha "reported" a total basis in this Corning stock of $1,747,325 for the taxable period December 31, 2002, but the United States disputes that this resulted in a long term capital loss. App-B-131-134.

34. On December 18, 2002, M, L, R & R sold the 4,600 shares of Corning for a total sales price of $17,070 and 2,300 shares of Yahoo for $38,426. M, L, R & R reported a tax basis in the 4,600 shares of Corning of $1,516,528, resulting in a short-term capital loss of $(1,499,458). M, L, R & R reported a tax basis in the 2,300 shares of Yahoo of $1,599,673, resulting in a short-term capital loss of $(1,561,247). Plaintiffs' Exhibit 45, App. B at p. 1219.

**Response:** The United States does not dispute plaintiffs' statement. to the first sentence, but alleges that the account statements indicate that the sales took place on December 23, 2002. The United States does not dispute plaintiffs' statement that M, L, R & R "reported" a tax basis in the 4,600 shares of Corning of $1,516,528 and that M, L, R & R "reported" a tax basis in the 2,300 shares of Yahoo of $1,599,673. However, the United States disputes that either of the sales resulted in a short-term capital loss.

**However, pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following additional uncontroverted fact.**

The purchase of the Yahoo and Corning stock was part of the tax avoidance scheme seeking to inflate the value of the Yahoo and the Corning stock and to improperly generate artificial losses. App-B-131-134.

35. On December 18, 2002, Mickey Management, L.P. sold 4,600 shares of Corning for a total sales price of $17,115 and 2,300 shares of Yahoo for $38,422. Mickey Management, L.P. reported a tax basis in 4,600 shares of Corning of $1,516,573, resulting in a short-term capital loss of $(1,499,458). Mickey Management, L.P. reported a tax basis in 2,300 shares of Yahoo of $1,599,703, resulting in a short-term capital loss of $(1,561,281). Plaintiffs' Exhibit 44, App. B at p. 1199.

**Response:** The United States does not dispute the first sentence. The United States also does not dispute that Mickey Management, L.P. "reported" a tax basis in the 4,600 shares of Corning of $1,516,573 and that Mickey Management, L.P. "reported" a tax basis in the 2,300 shares of Yahoo of $1,599,703. However, the United States disputes that either of the sales resulted in a short-term capital loss. App-B-131-134.

36. The total losses claimed by these partnerships on the sales of the Yahoo and Corning stock was $(15,647,272). Plaintiffs' Exhibits 7, 44, 45, and 58 App. B at pp. 69, 1199,1219, 1406.

**Response:** The United States does not dispute plaintiffs' statement that the total losses "reported" by these partnerships on the sales of the Yahoo and Corning stock was $(15,647,272), but disputes that these partnerships are entitled to recognize these losses. App-B-131-134.

37. The Alpha limited partners could "use" only $7,811,557 of these losses to offset their taxable income because they had losses from other ventures. Plaintiffs' Exhibit 54, App. B at p. 1363.

**Response:** The United States disputes plaintiffs' statement because the language "losses from other ventures" is too vague for the United States to properly evaluate the statement. The United States further disputes that they were unable to "use" the artificial losses. To the extent their "use" was

limited by other losses, the Alpha partners would carry forward the unused losses to future years not currently at issue.

38. Plaintiffs (including the Alpha limited partners) still hold much of the Yahoo and Corning stock because it has not been sold. Plaintiffs' Exhibit 54, App. B at p. 1364.

**Response:** The United States does not dispute plaintiffs' statement.

**Reasonable Cause and Good Faith of Plaintiffs and Their Partners**

39. Robert Sands, though an attorney, does not practice tax law. He is not a certified public accountant ("CPA") and has had no special tax training beyond a basic income tax course in law school. Plaintiffs' Exhibit 52, App. B at p. 1350.

**Response:** The United States disputes plaintiffs' statement. Robert Sands' 'background, education, investment sophistication and experience" is "impressive." (Plaintiffs' Summary Judgment Ex. 55.)

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

According to William Falk, an attorney with Lewis, Rice & Fingersh, the background, education, investment sophistication and experience of the Sands family were impressive. (Plaintiffs' Summary Judgment Ex. 55).

40. None of the other Alpha limited partners are attorneys or CPAs. Plaintiffs' Exhibit 53, App. B at p. 1357.

**Response:** The United States does not dispute plaintiffs' statement.

41. In deciding to engage in the above transactions, the Alpha limited partners relied on the advice they received from their personal advisors at their long-time accounting firm Bernard Robinson & Company ("Bernard Robinson") and at the law firm of Milbank, Tweed, Hadley

& McCloy LLP ("Milbank Tweed") who reviewed the financial plan presented by Heritage. Plaintiffs' Exhibits 52 and 53, App. B at pp. 1351, 1353, 1358, 1360.

**Response:** The United States disputes the term "financial plan" and instead asserts that the Sands family members and trusts implemented a plan to generate artificial losses to potentially avoid taxation on capital gains. Accordingly, the Sands family did not properly rely on advice from Bernard Robinson or Milbank Tweed since the factual representations provided by the Sands Family to their advisors contained material misrepresentations. App-B-1-134.

42. Members of the Sands family had engaged Bernard Robinson & Company to prepare tax returns and provide tax advice for decades prior to 2001, beginning in the 1950s. Plaintiffs' Exhibits 3, 52 and 53, App. B at pp. 1351, 1358.

**Response:** The United States does not dispute plaintiffs' statement.

43. Members of the family had also engaged the law firm of Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed"), in particular Jonathan Blattmachr, to provide legal services beginning in the 1990s. Plaintiffs' Exhibits 3, 52 and 53, App. B at pp. 1351, 1358.

**Response:** The United States does not dispute plaintiffs' statement.

44. Heritage recommended that the Alpha limited partners engage Lewis, Rice & Fingersh ("Lewis Rice") to assist them in implementing the transactions described above. Plaintiffs' Exhibit 52, App. B at pp. 1352, 1359.

**Response:** The United States does not dispute plaintiffs' statement.

45. Lewis Rice made an independent evaluation whether to enter into attorney-client relationships with the Sands family members. Lewis Rice independently determined the fee it would seek directly from the Sands family for its services, based upon its estimate of the

amount of time and complexity of the services and based upon the factors expressly permitted under the applicable rules of professional conduct in Missouri. The fee was not dependent upon the outcome of any transaction, nor was it a percentage of an amount invested. Plaintiffs' Exhibit 55, App. B at p. 1369.

**Response:** The United States disputes the use of the term "independent evaluation" as used in the first sentence. Lewis Rice was instrumental in structuring the underlying shelters. App-B-1-158.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

Lewis Rice was already actively involved in implementing the Heritage tax shelters when Robert Sands purportedly conducted his due diligence of the firm. App-B-131-158.

46. Heritage did not pay or agree to pay Lewis Rice any referral fee. In addition, Lewis Rice did not pay or agree to pay any referral fee to Heritage, nor did the firm split any fees with Heritage. Plaintiffs' Exhibit 55, App. B at p. 1369.

**Response:** The United States rescheduled the depositions of Heritage employees to accommodate plaintiffs. Without this deposition testimony, the United States is not prepared to address the merits of this factual representation.

47. Robert Sands completed his due diligence on Lewis Rice on behalf of his family. He researched Lewis Rice and reviewed information on the principal attorneys who would be assisting the family in the transactions described above. Plaintiffs' Exhibits 48 and 52, App. B at pp. 1272 -1280, 1352.

**Response:** The United States disputes the term "due diligence" as that term is undefined and is a term of art which calls for a legal conclusion. The United States further maintains that Lewis Rice was instrumental in structuring the underlying shelters. App-B-1-158.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

Lewis Rice was already actively involved in implementing the Heritage tax shelters when Robert Sands purportedly conducted his due diligence of the firm. App-B-131-158.

48. In implementing the transactions described above and in determining the correct tax treatment of the transactions, the Alpha limited partners engaged Lewis Rice to provide legal services and tax opinions relating to the transactions. The engagement agreements with Lewis Rice were independent of any agreements with Heritage. Plaintiffs' Exhibits 49 and 55, App. B at pp. 1281-1294, 1369.

**Response:** The United States disputes that the tax opinions determined the correct tax treatment of the transactions or that plaintiffs solicited the letter to determine the "correct" tax treatment of the transaction. Instead the tax opinions were solicited with the sole intent of obtaining a letter that agrees with the transaction proposed by Heritage. Furthermore, the Alpha limited partners were not entitled to rely on any tax opinions provided by Lewis Rice since the factual representations provided by the Sands Family to Lewis Rice contained material misrepresentations. App-B-1-134.

49. Lewis Rice independently determined the fee the firm would seek from the clients for their services, and they were paid for their services by the partners of plaintiffs Alpha I, L.P. and R, R, M & C Group, L.P. Plaintiffs' Exhibits 50 and 55, App. B at p. 1295-1315, 1369.

**Response:** The United States rescheduled the depositions of Heritage employees to accommodate plaintiffs. Without this deposition testimony, the United States is not prepared to fully address the merits of this factual representation.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

The use of Lewis, Rice was part of the tax avoidance scheme from the beginning. During the May 31, 2001 meeting with Heritage personnel, Richard Sands specifically asked if Heritage would pay defense costs, stating that "there are some law firms that are selling similar type arrangements [that] are paying defense costs. Richard also stated that "[d]eals that we've done we usually get defense costs through the appeal level." App-B-22. Tim Seaberg answered that the Sands would get a "[m]ore likely than not" opinion letter from a Top 200 law firm. Seaberg later explained that the opinion letter would cost $100,000 to $150,000. App-B-32.

50. The principal attorneys at Lewis Rice who worked on implementing the transactions described above and in drafting legal opinions relating to the proper tax treatment of the transactions were Michael Mulligan, William Falk, and Lawrence Weltman. Plaintiffs' Exhibits 52 and 55, App. B at pp. 1352, 1369, 1371-1372.

**Response:** The United States disputes that the legal opinions relate to the proper tax treatment of the transactions, but otherwise the United States does not dispute plaintiffs' statement.

51. Michael Mulligan, William Falk, and Lawrence Weltman are experienced attorneys who have primarily practiced in the area of tax law. Michael Mulligan is Co-Chairman of the Estate Planning Department at Lewis Rice and had been with the firm since 1972. Mr. Mulligan has written numerous articles on tax and estate planning issues. He also has spoken

frequently on such topics at conferences for attorneys and accountants. William Falk is the Chairman of the Tax Department at Lewis Rice and previously practiced law with the Internal Revenue Service and with Thompson Coburn LLP. Mr. Falk received his LL.M. in taxation from Washington University School of Law in 1982. When he worked with the IRS, Mr. Falk served as a Trial Attorney and Tax Shelter Litigation Coordinator with the Internal Revenue Service, Office of District Counsel, St. Louis, Missouri. Lawrence Weltman received his law degree from Washington University School of Law in 1968, and his LL.M. in taxation from New York University School of Law in 1970. Mr. Weltman practiced with Baker & McKenzie from 1970-1973 and has been with Lewis Rice since 1973. Plaintiffs' Exhibits 48 and 55, App. B at pp. 1272-1280, 1368, 1372.

**Response:** The United States does not dispute plaintiffs' statement.

52. Over the course of its engagement, 10 different Lewis Rice personnel expended approximately 549 hours representing the Sands family. Mr. Mulligan spent approximately 122 hours on the engagement, and Mr. Falk, who was the principal drafter of the opinions, personally spent approximately 258 hours on the engagements. Plaintiffs' Exhibit 55, App. B at p. 1369.

**Response:** The United States disputes plaintiffs' statement. Lewis Rice was instrumental in structuring the underlying shelters. App-B-1-158.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

Lewis Rice was paid pursuant to a flat rate fee agreement with the Sands. App-B-135-158. Lewis Rice was able to quote a fee for the services to be rendered, including preparing opinion

letters, because the services to be rendered were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

53. Lewis Rice researched Constellation Brands and conducted interviews of various Alpha limited partners or requested information from them to determine their purposes in engaging in the transactions, their investment experience, their investment goals, and other relevant information. Based on the information gathered, Lewis Rice prepared factual representations for the Alpha limited partners to sign. Plaintiffs' Exhibits 16 - 22 and 55, App. B at pp. 407-414, 509-515, 612-619, 716-725, 822-831, 928-935, 1032-1039, 1371.

**Response:** The United States disputes since the factual representations prepared by Lewis Rice and signed by the Alpha limited partners contained material misrepresentations. Furthermore, Marilyn Sands and Andrew Stern testified that they had no contact with Lewis Rice.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

The factual representations prepared by Lewis Rice and signed by the Alpha limited partners contained material misrepresentations. The services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158. Furthermore, Lewis, Rice did not contact either Marilyn Sands or Andrew Stern. App-B-167-168, 171.

54. Lewis Rice extensively researched and analyzed the applicable law and authorities in evaluating the tax consequences of the transactions. Plaintiffs' Exhibit 55, App. B at p. 1372.

**Response:** The United States disputes since the opinions issued by Lewis Rice were prepared after the IRS issued Notice 2000-44, which describes Son of BOSS tax shelters. A Son of BOSS tax

shelter involves the partnership contribution of encumbered property in which the associated obligation is expressly assumed by the partnership yet completely ignored for tax purposes. The omission of this liability and the resulting overstatement of the partner's investment is the source of the artificial tax benefits claimed in a Son of BOSS tax shelter. A Son of BOSS transaction is a variant of the so-called Bond and Option Sales Strategy, or BOSS tax shelter, which the Treasury and IRS addressed in Notice 99-59. As in the BOSS shelter, the Son of BOSS scheme uses a series of contrived steps (in this case involving interests in a partnership) to generate artificial tax losses designed to offset income from other transactions. The tax shelters used by plaintiffs meet this criteria.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

55. Lewis Rice issued an opinion dated April 12, 2002 to each of the Alpha limited partners. The opinions concluded that it was more likely than not correct to not treat the contingent obligations to cover the short sale positions as liabilities for purposes of section 752. Plaintiffs' Exhibits 16 - 22, App. B at pp. 319, 422, 525, 629, 735, 841, 945.

**Response:** The United States does not dispute plaintiffs' statement that the opinions may have concluded that it was more likely than not correct to not treat the contingent obligations to cover the short sale positions as liabilities for purposes of section 752, but disputes that this is the correct tax treatment under section 752. The United States also disputes that the Alpha limited partners were

entitled to rely on this opinion since the factual representations provided by the Sands Family to Lewis Rice contained material misrepresentations.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

The Alpha limited partners were not entitled to rely on the Lewis, Rice tax opinion letters since the factual representations provided by the Sands Family to Lewis, Rice contained material misrepresentations. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

56. The opinions Lewis Rice issued to the members of the Sands family were based on the research and analysis of applicable law and authorities, consistent with applicable opinion standards, and the experience, professional judgment, and assessment of the probable outcome of litigation or other adversarial proceedings arising from IRS challenges to the transactions. Plaintiffs' Exhibit 55, App. B at p. 1372.

**Response:** The United States disputes since the opinions issued by Lewis Rice were prepared after the IRS issued Notice 2000-44, which describes Son of BOSS tax shelters. A Son of BOSS tax shelter involves the partnership contribution of encumbered property in which the associated obligation is expressly assumed by the partnership yet completely ignored for tax purposes. The omission of this liability and the resulting overstatement of the partner's investment is the source of the artificial tax benefits claimed in a Son of BOSS tax shelter. A Son of BOSS transaction is a variant of the so-called Bond and Option Sales Strategy, or BOSS tax shelter, which the Treasury and IRS addressed in Notice 99-59. As in the BOSS shelter, the Son of BOSS scheme uses a series

of contrived steps (in this case involving interests in a partnership) to generate artificial tax losses designed to offset income from other transactions. The tax shelters used by plaintiffs meet this criteria.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

The Alpha limited partners were not entitled to rely on the Lewis, Rice tax opinion letters since the factual representations provided by the Sands Family to Lewis, Rice contained material misrepresentations. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

57. Lewis Rice continues to affirm that the opinions rendered accurately reflected the law and the proper tax treatment of the transactions at the time the opinions were issued, and that the tax treatment by the plaintiffs would more likely than not be upheld. Plaintiffs' Exhibit 55, App. B at p. 1372.

**Response:** The United States disputes that the opinions issued by Lewis Rice accurately reflected the law and the proper tax treatment of the transactions at the time the opinions were issued since the factual representations prepared by Lewis Rice and signed by the Alpha limited partners contained material misrepresentations.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

The Alpha limited partners were not entitled to rely on the Lewis, Rice tax opinion letters since the factual representations provided by the Sands Family to Lewis, Rice contained material

misrepresentations. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

58. The Alpha limited partners relied on the opinions issued by Lewis Rice in determining the proper tax treatment of the transactions described above. Plaintiffs' Exhibits 52 and 53, App. B at pp. 1353, 1359.

**Response:** The United States disputes that the Alpha limited partners properly relied on the opinions issued by Lewis Rice since the factual representations provided by the Sands Family to their advisors contained material misrepresentations.

**Pursuant to C.F.C. Rule 56(h)(2), the United States proposes the following uncontroverted fact in lieu of the one proposed by plaintiffs.**

The Alpha limited partners were not entitled to rely on the Lewis, Rice tax opinion letters since the factual representations provided by the Sands Family to Lewis, Rice contained material misrepresentations. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. As Alpha's limited partners had entered into the Heritage transactions with the primary intent of generating artificial tax losses, the opinion letters constitute nothing more than window dressing. App-B-1-158.

59. Bernard Robinson & Company prepared tax returns for plaintiffs Alpha, Beta, and CWC, and their partners in 2001 and for plaintiffs Alpha, CWC, Mickey Management, L.P., and M, L, R & R and their partners in 2002. Plaintiffs' Exhibits 6, 7, 8, 41, 44, 45, and 51, App. B at pp. 44, 64, 99, 1180, 1195, 1214, 1316.

**Response:** The United States does not dispute plaintiffs' statement.

60. Both Jonathan Blattmachr and Freddy Robinson, who the Alpha limited partners had engaged to advise them generally on the Heritage financial plan, concurred with the rationale for the positions taken on the tax returns of plaintiffs and their partners. Plaintiffs' Exhibits 52 and 53, App. B at pp. 1353, 1360.

**Response:** The United States disputes the term "financial plan" and instead asserts that the Sands family members and trusts implemented a plan to generate artificial losses to potentially avoid taxation on capital gains. The United States asserts that Plaintiffs' supporting documentation for this statement is the affidavit of Robert Sands and Richard Sands, and not that of Jonathan Blattmachr or Freddy Robinson. Further, any concurrence of Jonathan Blattmachr or Freddy Robinson is suspect since the factual representations provided by the Sands Family to their advisors contained material misrepresentations.

61. The positions taken on the tax returns prepared by Bernard Robinson & Company for plaintiffs and their partners are consistent with the opinion by Lewis Rice that it was more likely than not correct to not treat the contingent obligations to cover the short sale positions as liabilities for purposes of section 752. Plaintiffs' Exhibits 52 and 53 App. B at pp. 1353, 1360.

**Response:** The United States does not dispute plaintiffs' statement that the positions on the tax returns are consistent with the proposition that the obligation to close a short sale is not a § 752 liability. The United States disputes that this is a correct position.

62. The Alpha limited partners trusted their advisors, Freddy Robinson, Jonathan Blattmachr, and Lewis Rice in taking the tax positions at issue and had no reason to question their advice. Plaintiffs' Exhibits 52 and 53, App. B at pp. 1353, 1360.

**Response:** The United States disputes that the Alpha limited partners had no reason to question the advice of their advisors, Freddy Robinson and Jonathan Blattmachr. Further, the Alpha limited partners knew that the factual representations provided to their advisors contained material misrepresentations.

Respectfully submitted,

/s/ Thomas M. Herrin
THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney

Louise Hytken
Of Counsel