IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: August 14, 2007)

ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER

Plaintiff,

v. — 06-407 T

THE UNITED STATES,

Defendant.

---

BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER

Plaintiff,

v. — 06-408 T

THE UNITED STATES,

Defendant.

---

R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,

Plaintiff,

v. — 06-409 T

THE UNITED STATES,

Defendant.

---

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO**
**PLAINTIFF' CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**TO PLAINTIFFS' REPLY TO**
**UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. UNDER SECTION 752, THE SHORT SALE OBLIGATIONS MUST BE INCLUDED IN PARTNERSHIP LIABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. An obligation to close a short sale is a fixed liability because one who borrows securities in a short sale has a legal obligation to replace the borrowed property with equivalent property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. The IRS's consistent position is that when, as here, an obligation creates or increases the basis of any of the obligor's assets, that obligation is a "liability" under I.R.C. § 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C. Revenue Rulings 88-77 and 95-26, which contain the IRS's interpretation of the term "liability," are entitled to *Chevron* deference . . . . . . . . . . . . . . . . . . . . 11

D. The authorities on which appellants rely are inapposite . . . . . . . . . . . . 15

E. Even if Revenue Ruling 95-26 reflects a change in the IRS's interpretation of § 752, the validity of the ruling would be unaffected . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II. IN THE ALTERNATIVE, TREAS. REG. § 1.752-6 REQUIRES THE SANDS HEIRS TO REDUCE THEIR BASES IN ALPHA AND ALPHA TO REDUCE ITS BASIS IN BETA BY THE AMOUNT OF THE OBLIGATION TO CLOSE THE SHORT SALE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. Treas. Reg. § 1.752-6 is a legislative regulation and has the force and effect of law . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C. Treas. Reg. § 1.752-6 must be given the retroactive effect for which Congress explicitly provided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

III. PLAINTIFFS ARE LIABLE FOR THE ACCURACY RELATED PENALTIES . . . . . 25

A. 20% Substantial Understatement of Tax Penalty – The plaintiffs did not have substantial authority for the positions taken on their returns . . . . . 26

B. 20% Negligence Penalty - The Plaintiffs did not have a reasonable basis for the positions taken on their returns . . . . . 27

C. Substantial/Gross Valuation Misstatement Penalty . . . . . 29

D. Plaintiffs' reasonable cause arguments must be rejected . . . . . 30

1. TEFRA jurisdiction – generally . . . . . 30

2. The Court does not have jurisdiction in this TEFRA proceeding to determine whether the Sands Heirs may be excused from penalties under I.R.C. § 6664(c). . . . . . 31

3. Even if this Court has jurisdiction to review the "reasonable cause" defense, fact issues preclude the Court from granting summary judgment at this time . . . . . 33

4. Even if this Court has jurisdiction to review the "reasonable cause" defense, the plaintiffs did not have reasonable cause for taking the positions on their returns . . . . . 34

CONCLUSION. . . . . . 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACM Partnerhip v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . 6

*Alexander v. United States*, 44 F.3d 328 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 30

*Ammex, Inc. v. United States*, 367 F.3d 530 (6th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Anderson, Clayton & Co. v. United States*, 562 F.2d 972 (5th Cir. 1977) . . . . . . . . . . 24

*Atlantic Mutual Insurance Co. v. Commissioner*, 523 U.S. 382 (1998) . . . . . . . . . . . . 11

*Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*COLM Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 10, 40

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,12, 21, 22

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed.Cir.2006) . . . . . . . . . . . 21

*Deputy v. du Pont*, 308 U.S. 488 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Fears v. Commissioner*, 129 T.C. 2 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Foil v. Commissioner*, 920 F.2d 1196(5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Fransen v. United States*, 191 F.3d 599 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 21

*Harlan v Commissioner*, 116 T.C. 31 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 38

*Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975) . . . . . . . . . . . . . . . . . . . . 10, 15, 16

*Hendricks v. Commissioner*, 423 F.2d 485 (4th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . 7

*Illes v. Commissioner*, 982 F.2d 163 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Kandi v. United States*, 2006 WL 83463 (W.D. Wash. 2006), *appeal docketed*, No. 06-35209 (9th Cir. March 14, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 25

*La Rue v. Commissioner*, 90 T.C. 465 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007) . . . . . . . . . . . . . . 17, 18

*Long Term Capital Holdings v. U.S.*, 330 F. Supp. 2d 122 (D.Conn 2004) . . . . . . 29, 38

*Long v. Commissioner*, 71 T.C. 1 (1978), *rev'd in part on other grounds*, 660 F.2d 416 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Marcello v. Commissioner*, 380 F.2d 499 (5th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . 27

*Massengill v. Commissioner*, 876 F.2d 616 (8th Cir) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Merino v. Commissioner*, 196 F.3d 147 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 38

*Neely v. Commissioner*, 85 T.C. 934 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Neonatology Associates, P.A., v. Commissioner*, 299 F.3d 221 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Nicole Rose Corp. v. Commissioner*, 320 F.3d 282 (2nd Cir. 2002) . . . . . . . . . . . . . . . . 38

*Omohundro v. United States*, 300 F.3d 1065 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 12

*Salina Partnership, LP v. Commissioner*, 80 T.C.M. (CCH) 686 (2000) . . . . . . . . . . 2, 7, 10, 18, 26, 29, 40

*Santa Monica Pictures, LLC v. Commissioner*, 89 T.C.M. (CCH) 1157 (2005) . . . . . . 29

*Schlumberger Technology Corp. v. United States*, 55 Fed. Cl. 203 (2003) . . . . . . . . . 11

*Siddell v. Commissioner*, 225 F.3d 103 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Snap-Drape, Inc. v. Commissioner*, 98 F.3d 194 (5th Cir. 1996) . . . . . . . . . . . . . . . . . 24

*United States v. Mead Corp.*, 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) . . . . . . . . . . . . . . . . . 4

*Weiner v. United States*, 389 F.3d 152 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 30, 31

*Zfass v. Commissioner*, 118 F.3d 184 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Zlotnick v. TIE Communications*, 836 F.2d 818(3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . 5

## FEDERAL STATUTES

12 C.F.R. § 220.12(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

29 U.S.C. § 213(a)(15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Community Renewal Tax Relief Act of 2000, Pub. L. No.
106-554, 114 Stat. 2763A-587 §309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Community Renewal Tax Relief Act of 2000, Pub. L. No.
106-554, 114 Stat. 2763A-587 §309(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

Community Renewal Tax Relief Act of 2000, Pub. L. No.
106-554, 114 Stat. 2763A-587 §309(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Community Renewal Tax Relief Act of 2000, Pub. L. No.
106-554, 114 Stat. 2763A-587 §309(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

H.R. Conf. Rep. No. 106-1033 at 1017 (2000), *reprinted in* 2000-3 C.B.
304, 347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

H.R. Rep. No. 83-1337 at A236-237 (1954), *reprinted in* 1954 U.S.C.C.A.N.
4017, 4376-4377 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.R.C. § 357(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.R.C. § 357(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.R.C. § 358(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.R.C. § 358(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21 22

I.R.C. § 358(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 22

I.R.C. § 465 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.R.C. § 705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.R.C. § 705(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.R.C. § 705(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.R.C. § 705(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.R.C. § 705(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.R.C. § 705(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.R.C. § 721(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

I.R.C. § 722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8 9

I.R.C. § 731 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.R.C. § 733 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.R.C. § 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.R.C. § 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 - 10, 12 - 16, 18, 20, 22, 27 - 29, 38, 40

I.R.C. §752(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 19, 20

I.R.C. §752(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 19, 20

I.R.C. § 1233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7, 8

I.R.C. § 6221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

I.R.C. §6226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I.R.C. §6226(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I.R.C. §6226(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

I.R.C. § 6230(c)(1)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I.R.C. § 6231(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

I.R.C.§ 6662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.R.C.§ 6662(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I.R.C.§ 6662(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I.R.C.§ 6662(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

I.R.C.§ 6662(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25

I.R.C.§ 6662(d)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.R.C.§ 6662(d)(2)(C)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.R.C.§ 6662(d)(2)(C)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.R.C.§ 6662(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25

I.R.C. § 6664(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.R.C. § 6664(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

I.R.C. § 6664(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.R.C. § 6664(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.R.C. § 7805(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.R.C. § 7805(b) . . . . . . . . . . 23,24, 25

I.R.C. § 7805(b)(1) . . . . . . . . . . 22, 24

I.R.C. § 7805(b)(2) . . . . . . . . . . 24

I.R.C. § 7805(b)(3) . . . . . . . . . . 22, 23 24

I.R.C. § 7805(b)(4) . . . . . . . . . . 24

I.R.C. § 7805(b)(5) . . . . . . . . . . 25

I.R.C. § 7805(b)(6) . . . . . . . . . . 23, 25

I.R.C. § 7805(b)(7) . . . . . . . . . . 25

Notice 200-44 . . . . . . . . . . 26, 27 28, 29 33

Rev. Rul. 57-29, 1957-1 C.B. 519 . . . . . . . . . . 15

Rev. Rul. 73-301, 1973-2 C.B. 215 . . . . . . . . . . 15, 16

Rev. Rul. 79-294, 1979-2 C.B. 305 . . . . . . . . . . 14

Rev. Rul. 88-77, 1988-2 C.B. 128, 129 . . . . . . . . . . 8, 9, 11, 12, 16, 18

Rev. Rul. 95-26 . . . . . . . . . . 2, 9 10, 11, 12, 13, 14, 16, 17, 18, 26, 27, 28, 29

Rev. Rul. 95-45 . . . . . . . . . . 16

Rev. Rul. 95-45, 1995-1 C.B. 53 . . . . . . . . . . 10, 14

S. Rep. No. 83-1622 at 405 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 5047 . . . . . . . . . . 4

Taxpayer Bill of Rights 2, Pub. L. No. 104-168, 110 Stat. 1452, I.R.C. . . . . . . . . . . 24

T.D. 9062, 2003-2 C.B. 46, 67 . . . . . . . . . . 20, 21

T.D. 9207, 2005-1 C.B. . . . . . . . . . . 9, 23

Treas. Directive 27-10, 55 Fed. Reg. 42532-02 (1990) . . . . . . . . . . 12

Treas. Order 111-2, 1981-1 C.B. 698 . . . . . . . . . . 11

Treas. Reg. § 1.358-7 . . . . . . . . . . 22

Treas. Reg. § 1.6662-2 . . . . . . . . . . 27

Treas. Reg. § 1.6662-2(c) . . . . . . . . . . 25, 27

Treas. Reg. § 1.6662-4(d)(2) . . . . . . . . . . 26

Treas. Reg. § 1.6662-4(d)(3)(ii) . . . . . . . . . . 26

Treas. Reg. § 1.701-2 . . . . . . . . . . 3

Treas. Reg. § 1.752-1(a)(1)(ii) . . . . . . . . . . 9

Treas. Reg. § 1.752-1(a)(4) . . . . . . . . . . 9

Treas. Reg. § 1.752-1(a)(4)(i)(A) . . . . . . . . . . 9

Treas. Reg. § 1.752-1(a)(4)(ii) . . . . . . . . . . 9, 18

Treas. Reg. § 1.752-1(a)(4)(iv) . . . . . . . . . . 9

Treas. Reg. § 1.752-1T(g), 1989-1 C.B. 180, 192 . . . . . . . . . . 9

Treas. Reg. § 1.752-6 . . . . . . . . . . 2, 3, 19, 20, 21, 22, 23, 25,

Treas. Reg. § 1.752-6(d)(1) . . . . . . . . . . 19

Treas. Reg. § 301.6221-1(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Treas. Reg. § 301.6221-1T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Treas. Reg. §301.6231(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Treas. Reg. § 301.6231(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Treas. Reg. § 301.6226(f)-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Treas. Reg. § 301-7701-15(c)(1)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Treas. Reg. § 601.601(d)(2)(i)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Treas. Reg. § 601.601(d)(2)(v)(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**MISCELLANEOUS**

*Black's Law Dictionary* 925 (7th ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

*James Christian, Robert Shapiro, and John-Paul Whalen, Naked Short Selling: How Exposed Are Investors*, 43 Hous. L. Rev. 1033, 1041 (2006) . . . . . . . 5

*Robert Bird & Alan Tucker, Tax Sham or Prudent Investment: Deconstructing the Government's Pyrrhic Victory in Salina Partnership v. Commissioner*, 22 Va. Tax. Rev. 231, 253 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Zachary Knapper, Future-Priced Convertible Securities and the Outlook for "Death Spiral" Securities Fraud Litigation*, 26 Whittier L. Rev. 359, 371 & n.79 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## INTRODUCTION

The United States has moved for summary judgment that, as a matter of law, the obligation to replace borrowed Treasury securities (short sales) is treated as a liability under I.R.C. §752. The United States further moved for summary judgment sustaining the 40% penalty imposed by §6662(b)(3) and (h) because plaintiffs' tax returns show a gross valuation misstatement. Plaintiffs have now cross-moved for summary judgment that the obligation to replace borrowed Treasury securities (short sales) is not a liability under §752. Plaintiffs also maintain that the accuracy related penalties do not apply or that they are excused because plaintiffs relied on tax opinions when they claimed the inflated basis on their tax returns. Plaintiffs are wrong on both counts and summary judgment should be granted sustaining the FPAAs in Cause Nos. 06-407T, 06-408T, 06-411T, 06-810T and 06-811T.[1]

Plaintiffs' cross-motion for summary judgment contends that the obligation to "to acquire replacement securities and deliver them to the lender" (P. MSJ, p.8) is not a liability for purposes of §752 because the cost to acquire the covering securities cannot be determined until the short positions are actually closed. (P.MSJ, p.19). The plaintiffs are wrong.

The ordinary meaning of the term "liability," contained in § 752, encompasses the obligation to close a short sale because one who borrows securities in a short sale has an unconditional legal obligation to replace the borrowed property. This obligation is not contingent in amount, as plaintiffs erroneously contend. An obligation to close a short sale is an

---

[1] Cause No. 06-411T involves the participation of CWC Partnership I in two separate tax shelters. At this time, the United States only seeks summary judgment with respect to the tax shelter involving the December 11, 2001 short sales (para. 24 - 27 of the CWC Complaint). Accordingly, a summary judgment ruling that the obligation to replace borrowed Treasury Securities (short sales) is a liability under I.R.C. §752, and sustaining the accuracy related penalties will only partially dispose of the issues raised in that proceeding.

obligation to replace the borrowed property, not to return a sum of money. Thus, the borrower's obligation is fixed at the time the short sale occurs. That the cost of satisfying the obligation may fluctuate with the market does not make the obligation itself contingent. Therefore, the obligation to close a short sale is a "liability" under § 752(a) and (b). *Salina Partnership, LP v. Commissioner*, 80 T.C.M. (CCH) 686 (2000); *COLM Producer, Inc. v. United States*, 460 F.Supp. 2d 713, 716 (N.D. Tex. 2006)(appeal pending 5th Circuit, Case No. 06-11422); Rev. Rul. 95-26.

In an effort to avoid the imposition of penalties, plaintiffs' brief strongly implies, if not states outright, that the Sands Heirs participated in the subject transactions for legitimate reasons by alluding to vaguely defined investment, estate planning and charitable purposes. The evidence proves this was not the case at all. In transcripts of taped telephone and in-person conversations with representatives of The Heritage Organization, Richard and Robert Sands frankly admit that their sole motivation from the very beginning was to avoid not just some but ALL of the capital gains taxes that they would otherwise owe on anticipated dispositions of appreciated property. Most disturbing, they well knew that they were not entitled to the tax benefits claimed and took active steps to conceal the true nature of the transactions from the government.

For purposes of summary judgment, the United States asserted that the only contested issues in the cases involving the Second Shelter is whether the partnerships' obligation to close the short sales are "liabilities" for purposes of § 752. The United States requested summary judgment solely on § 752 since resolution of the § 752 issue would be the simplest path to resolving these cases. Since the plaintiffs have moved for summary judgment as well, our

responsive brief now raises the application of Treas. Reg. § 1.752-6 as an alternative basis to deny the tax treatment of the transactions at issue in these cases.

If this Court disagrees with the United States regarding the application of § 752 and Treas. Reg. § 1.752-6, unresolved factual and legal issues remain for which a trial would be needed, including, but not limited to: (1) whether the transactions involved should be disregarded because they lacked economic substance and served no business purpose; (2) whether the underlying transactions were a factual sham; (3) whether the partnerships should be disregarded because the parties did not intend to join together as partners to conduct business activity for a purpose other than tax avoidance; (4) whether the transactions should be recharacterized pursuant to the Anti-Abuse rule of Treas. Reg. §1.701-2; (5) whether there was a primary profit motive for entering into the short sale transactions; and (6) the partnership level determination of all factors having an impact on any § 465 partner-level at risk determinations derived from the partnership's books and records.

## **ISSUES PRESENTED**

1. Whether the short sale obligations assumed by the partnerships are "liabilities" for purposes of I.R.C. § 752?

2. Alternatively, whether Treas. Reg. § 1.752-6 requires the Sands Heirs to reduce their bases in their partnership interests in Alpha and Alpha to reduce its basis in its partnership interest in Beta by the amount of the obligation to close the short sale.

3. If so, whether the accuracy-related penalties under section 6662 apply to the resulting underpayments of tax relating to the Second Shelter?[2]

4. Whether the Court has jurisdiction to determine the Plaintiffs' reasonable cause penalty defense in this partnership proceeding, or whether this defense can only be determined in a partner level proceeding?

5. If the Court can determine reasonable cause, whether fact issues preclude summary judgment on this issue at this time, or alternatively, whether the facts establish that the Plaintiffs are not entitled to be excused from the penalties under a "reasonable cause" exception.

## ARGUMENT

### I. UNDER SECTION 752, THE SHORT SALE OBLIGATIONS MUST BE INCLUDED IN PARTNERSHIP LIABILITIES.

#### A. An obligation to close a short sale is a fixed liability because one who borrows securities in a short sale has a legal obligation to replace the borrowed property with equivalent property.

It is axiomatic that "[t]he task of resolving [a] dispute over the meaning of . . . [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). Section 752, however, does not define the term "liability."[3] Thus, in *COLM*, 460 F.Supp. 2d at 715, the Court relied on the plain

[2] The United States did not address the negligence or substantial understatement of tax penalties in its motion as the penalties are not cumulative. Similarly, the United States did not address the 20 % substantial valuation misstatement penalty because the magnitude of the valuation misstatements are so great that they far exceed the 400% threshold for the application of the 40% gross valuation misstatement penalty. Because plaintiffs place these penalties in issue through their cross-motion for summary judgment, the United States will address them in response to plaintiffs' motion.

[3] Section 752, as well as the other partnership provisions of Subchapter K of the Internal Revenue Code, was enacted as part of the Internal Revenue Code of 1954. *See* Act of August 16, 1954, Pub. L. No. 591, 68A Stat. 3, 251. The legislative history does not elucidate the meaning of "liability." It merely explains that § 752 was intended to deal with the effect on a partner of his assumption of partnership liabilities and the partnership's assumption of his

meaning of "liability," as elucidated in Black's Law Dictionary. *See Black's Law Dictionary* 925 (7th ed. 1999) (defining "liability" as "the quality or state of being legally obligated or accountable" and as "[a] financial or pecuniary obligation").

Here, the obligation to replace the borrowed Treasuries was a fixed obligation at all times. It was a fixed obligation when the short sale occurred and at all times thereafter. The obligation to replace the borrowed Treasuries was never contingent. The obligation arose at the time the Treasuries were borrowed and continued until the Treasuries were replaced by Beta. This was true when the short sales were made, when the proceeds and obligation to cover were transferred to Alpha and when the proceeds and obligation to cover were transferred to Beta. As we shall demonstrate, below, the critical premise of plaintiffs' argument, *i.e.*, that the obligation to replace borrowed securities with equivalent securities is a contingent obligation entirely outside the scope of § 752 of the Code, is plainly wrong and, accordingly, their entire argument necessarily fails.

There can be no doubt that the ordinary meaning of "liability" encompasses an obligation to close a short sale because one who borrows securities in a short sale has a fixed, legal obligation to return the borrowed property. *See Zlotnick v. TIE Communications*, 836 F.2d 818, at 820 (3rd Cir. 1988); James Christian, Robert Shapiro, and John-Paul Whalen, *Naked Short Selling: How Exposed Are Investors*, 43 Hous. L. Rev. 1033, 1041 (2006). Indeed, plaintiffs appear to concede (P.MSJ, p. 8-9) that a short seller has an unconditional obligation to close the short sale by replacing the borrowed property.

---

liabilities. *See* S. Rep. No. 83-1622 at 405 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 5047 (emphasis added). *Accord* H.R. Rep. No. 83-1337 at A236-237 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017, 4376-4377 (1954).

Plaintiffs contend, however, that, as to Alpha, the obligation to replace the borrowed treasuries was contingent because at the time the brokerage account was contributed to Beta, the short sale remained open and the price and time at which replacement securities would be acquired was unknowable. They therefore contend that Alpha's obligation to close the short sales was a contingent obligation and, consequently, not a "liability" under I.R.C. § 752.

Plaintiffs are wrong. The obligation to close a short sale is not analogous to an obligation to pay an unliquidated sum of money, the amount of which may vary with future events. In a short sale, the investor has borrowed securities, not money, from a broker, and it is the securities, that must be returned, not money, as plaintiffs seem to concede (P.MSJ, p.9). The broker does not care whether the borrower keeps the borrowed securities in his account and subsequently returns them, or whether he sells them, as occurred here, and subsequently buys and returns to the broker, similar securities bearing the same face value. Indeed, the broker does not care what it will cost to close the short positions, except to the extent of the protection afforded by the margin account, Because the investor's obligation is to replace the borrowed property with the same or similar property, his obligation is fixed at the time he borrows the property. That the borrower may make a profit or incur a loss with respect to his short sale of the borrowed property, depending on fluctuations in the market, does not make his obligation to the lender to replace the borrowed property a contingent one. On the contrary, regardless of any subsequent change in the market value of the borrowed securities, the borrower's unconditional obligation to replace the borrowed property remains unchanged. Indeed, plaintiffs have cited no authority holding that an unconditional obligation to replace property borrowed from a third party is a contingent liability.

Moreover, this Court, we respectfully submit, should be loathe to accept the unnatural construction of the term "liability" that plaintiffs have proffered as the centerpiece of their abusive scheme to turn what was in economic terms essentially a wash transaction into a $44 million loss for tax purposes. *See ACM Partnerhip v. Commissioner*, 157 F.3d 231, 252 (3d Cir. 1998).

Plaintiffs' contention (P.MSJ, p. 9) that the tax treatment of short sales as open transactions until the sales are closed (*see* I.R.C. § 1233) somehow renders the liability of the borrower to replace the property a contingent liability makes no sense. Furthermore, the Tax Court in *Salina Partnership, LP v. Commissioner*, 80 T.C.M. (CCH) 686 (2000) -- a case on all fours with this case -- rejected it. The court reasoned that I.R.C. §§ 752 and 1233 have disparate policies that warrant different treatment (*id.* at 698):

> Petitioner's argument overlooks the disparate policies that sections 1233 and 752 are intended to promote. Section 1233 . . . defers recognition of gain or loss until the short sale is closed, to clarify and simplify the tax treatment of a transaction that is something of hybrid. See *Hendricks v. Commissioner*, 423 F.2d 485, 486-487 (4th Cir. 1970). . . . In contrast, the basis adjustment provisions in subchapter K, including sections 705 and 752, are intended to avoid distortions in the tax reporting of partnership items by promoting parity between a partnership's aggregate inside basis in its assets and its partners' outside bases in their partnership interests.

This reasoning is sound and applies here.

The question of whether a transaction is open or closed for purposes of determining when gain or loss on the transaction should be computed has nothing to do with whether an obligation to replace borrowed property with equivalent property is a contingent or fixed obligation. Further, the application of open transaction principles to the determination of bases would

undermine the comprehensive statutory scheme in the Code that governs matters of basis. Basis is a dynamic concept; a taxpayer's basis in property is adjusted upon the occurrence of various tax events. The statutory provisions pertaining to partnership interests illustrate this concept. Section 705(a) provides the starting point for determining a partner's outside basis and identifies some of the events that cause the adjustment of this basis. A partner's initial outside basis is "the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests)." I.R.C. § 705(a). A partner's basis is subsequently increased, *inter alia*, by his distributive share of the partnership's taxable and tax-exempt income. *Id.* § 705(a)(1)(A) & (B). His basis is decreased, *inter alia*, by partnership distributions as provided in I.R.C. § 733 and by his distributive share of partnership losses. *Id.* § 705(a)(2). Similarly, a partner's outside basis is increased by any increase in his share of partnership liabilities and by any increase in his individual liabilities resulting from his assumption of partnership liabilities. I.R.C. §§ 722, 752(a). A partner's outside basis is decreased by any decrease in his share of the partnership liabilities and by any decrease in his individual liabilities by reason of the partnership's assumption of them. *Id.* §§ 731, 752(b).

In short, neither the open transaction doctrine nor the provisions of § 1233 (relating to the character of gain or loss realized on short sales) has anything to do with the controlling and correct conclusion in this case that Alpha's fixed obligation to replace the Treasuries borrowed from PaineWebber was a liability under § 752 of the Code.

**B. The IRS's consistent position is that when, as here, an obligation creates or increases the basis of any of the obligor's assets, that obligation is a "liability" under I.R.C. § 752.**

The IRS has consistently maintained that when, as here, an obligation creates or increases the basis of the obligor's assets, that obligation is a "liability" under § 752. The IRS espoused this position as early as 1988. In Rev. Rul. 88-77, 1988-2 C.B. 128, 129, it defined "liability" under § 752 to "include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to any immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest."

In 1989, the Treasury Department promulgated a temporary regulation containing a similar definition of "liability" under § 752. Temp. Treas. Reg. § 1.752-1T(g), 1989-1 C.B. 180, 192, provided as follows:

> [U]nder section 752, an obligation is a liability of the obligor for purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to--
>
> (1) The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);
>
> (2) A deduction that is taken into account in computing the taxable income of the obligor; or
>
> (3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.[4]

[4] In 2003, the IRS issued a proposed regulation containing a similar definition, which was adopted in 2005. Prop. Treas. Reg. § 1.752-1(a)(1)(ii), 68 Fed. Reg. 37434, 37436 (2003); Treas. Reg. § 1.752-1(a)(4), T.D. 9207, 2005-1 C.B. 1344, 1354. Under Treas. Reg. § 1.752-1(a)(4)(i)(A), an obligation is a "liability" under § 752 if, *inter alia*, incurring the obligation "[c]reates or increases the basis of any of the obligor's assets (including cash)." In addition, an "obligation" is "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code" and includes an obligation under a short

For reasons that are unclear, the final regulations did not contain a definition of "liability."

In Rev. Rul. 95-26, 1995-1 C.B. 131, the IRS, relying, in part, on Rev. Rul. 88-77, ruled that a partnership's short sale of securities creates a partnership liability under § 752. The IRS reasoned that a short sale creates an obligation on the part of the seller to return the borrowed property. In addition, the short sale produces cash, and the cash is a partnership asset that increases the partnership's basis in its assets. Therefore, the short sale creates a "liability" under § 752, and the partners' bases in their partnership interests were increased under § 722 to reflect their shares of the liability under § 752.[5] *Accord* Rev. Rul. 95-45, 1995-1 C.B. 53 ("The initial proceeds of an open short sale are . . . an asset of the short seller, increasing the aggregate adjusted basis of its total assets by the amount of the proceeds. Because the obligation on the part of the seller to return the borrowed securities resulted in an increase in the adjusted basis of its assets, the obligation is treated as a liability").

In *Salina* and *COLM*, the only reported cases on the question whether an obligation to close a short sale is a "liability" under § 752, the Courts, citing Revenue Ruling 95-26, agreed with the Commissioner that the obligation to close a short sale by replacing the Treasury bills that were borrowed represented a partnership liability within the meaning of section 752. *Salina*, 80 T.C.M. at 700; *COLM*, 460 F.Supp. 2d at 717. The courts relied on the "plain and ordinary meaning" of the term "liability," as elucidated in Black's Law Dictionary, and on the partnership's "legally enforceable financial obligation to return the borrowed Treasury bills." *Salina*, 80 T.C.M. at 700; *COLM*, 460 F.Supp. 2d at 715. *Salina* has received critical approval.

---

sale. Treas. Reg. § 1.752-1(a)(4)(ii). The new definition applies to liabilities incurred or assumed by a partnership on or after June 24, 2003 (*id.* § 1.752-1(a)(4)(iv)), and, therefore, is inapplicable here.

[5] In Rev. Rul. 95-26, the Commissioner correctly cited *Deputy v. du Pont*, 308 U.S. 488 (1940), for the principle that a short sale creates an obligation. *See id.* at 497 ("Clearly respondent owed an obligation to the Delaware Company").

*See* Robert Bird & Alan Tucker, *Tax Sham or Prudent Investment: Deconstructing the Government's Pyrrhic Victory in Salina Partnership v. Commissioner*, 22 Va. Tax Rev. 231, 253 (2002) ("The Court Properly Concluded that Salina's Short Sale Constituted a 'Liability' Pursuant to Section 752").[6]

### C. Revenue Rulings 88-77 and 95-26, which contain the IRS's interpretation of the term "liability," are entitled to *Chevron* deference.

As this Court has recognized, revenue rulings are entitled to some deference because they are the Internal Revenue Services interpretation of its own regulations. *Schlumberger Technology Corp. v. United States*, 55 Fed.Cl. 203, 212, fn.5 (2003). We submit, however, that here they should be entitled to the higher level of deference set out in *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Chevron* requires a court to follow an agency's interpretation of a statute unless that interpretation is arbitrary, capricious, or manifestly contrary to the statute. 467 U.S. at 844. In *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Court, refining its *Chevron* analysis, determined that *Chevron* deference was available to any administrative implementation of a statutory provision "when it appears that Congress delegated authority to the agency generally to make such rules carrying the force of law," and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226-227. It is well settled that Treasury Regulations (both legislative and interpretative) are entitled to *Chevron* deference. *Atlantic Mut. Ins. Co. v. Commissioner*,

---

[6] Plaintiffs attempt to minimize *Salina* by urging (P.MSJ, p. 26) that Tax Court memorandum opinions have no precedential value. That memorandum opinions are not precedent in the Tax Court merely means that one Tax Court judge is not bound by another judge's memorandum opinion, just as one circuit court of appeals is not bound by the decision of another circuit court of appeals. But that hardly means that memorandum opinions do not have persuasive value. It is significant to note that plaintiffs themselves rely extensively (Br. 27-29, 31) on a memorandum opinion -- *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975) -- notwithstanding their criticism of the Government for doing so.

523 U.S. 382, 387-89 (1998). We submit that revenue rulings -- like treasury regulations -- satisfy the standard for *Chevron* deference set out in *Mead*.

In terms of deference, revenue rulings and IRS interpretative regulations should be treated the same. Both forms of agency interpretation are issued pursuant to the same congressional mandate. *See* I.R.C. § 7805(a) (providing that the "Secretary shall prescribe all needful rules and regulations for the enforcement of this title"). Both are ultimately authorized at the same level of the IRS and the Department of Treasury. *See* Treas. Order 111-2, 1981-1 C.B. 698, 699 (delegating responsibility for "final determination of the Treasury Department's position" on Treasury Regulations and published revenue rulings from the Secretary to the Assistant Secretary (Tax Policy)); Treas. Directive 27-10, 55 Fed. Reg. 42532-02 (1990) (Assistant Secretary (Tax Policy) develops and reviews regulations and rulings; Office of Tax Legislative Counsel assists in the development of regulations and rulings). Both are published. Treas. Reg. § 601.601(d)(2)(i)(a). And both are designed to provide precedent, binding on the IRS, for all taxpayers. Treas. Reg. § 601.601(d)(2)(v)(d).

The only material distinction between the Commissioner's interpretive regulations and his revenue rulings is that the latter are not issued pursuant to notice-and-comment procedures. The Supreme Court made clear in *Mead*, however, that, while notice-and-comment rulemaking and formal adjudication almost always assure *Chevron* deference, the absence of such formalities in the rulemaking process does not preclude such deference, so long as it appears (as it does with revenue rulings) that Congress intended to grant the agency the power to make binding rules. 533 U.S. at 230-231.

But even if this Court were to conclude that revenue rulings are not entitled to *Chevron* deference, they are certainly highly persuasive precedent that should be followed unless unreasonable. *See Foil v. Commissioner*, 920 F.2d 1196, at 1202-1203 (5th Cir. 1990);

*Omohundro v. United States*, 300 F.3d 1065, 1067-1069 (9th Cir. 2002); *Ammex, Inc. v. United States*, 367 F.3d 530, 535 (6th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005).

Fully consistent with § 752, Revenue Rulings 88-77 and 95-26 contain a more-than-reasonable interpretation of the term "liability." It makes perfect sense to require a partner who has included an asset in his outside basis to reduce his basis by the obligation that created this asset because the legally-enforceable obligation diminishes the value of his partnership interest. Just as a corporation who borrows money to buy real estate must, on its balance sheet, treat the real estate as an asset and the mortgage as a liability, so too should a partner take into account both the asset and the liability in computing his outside basis.

The regulatory realities also support the IRS's treatment of the obligation to close the short sale as a liability under § 752. Regulation T[7] requires a short seller to have a margin account and to maintain margin levels exceeding the value of any short-selling activity. *See* 12 C.F.R. § 220.12(c)(1); Zachary Knapper, *Future-Priced Convertible Securities and the Outlook for "Death Spiral" Securities Fraud Litigation*, 26 Whittier L. Rev. 359, 371 & n.79 (2004); *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 240 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998). *Cf.* Rev. Rul. 95-26, 1995-1 C.B. at 132 (noting that after the short sale, the investor "leaves the cash proceeds from the sale with the broker-dealer as collateral and deposits additional cash as further collateral with the broker-dealer").

To treat the proceeds of the short sale as if they were unencumbered and freely transferable, as plaintiffs do, flies in the face of reality. These margin requirements prevent the short seller from transferring the proceeds of the short sale until the underlying indebtedness is satisfied or until he substitutes other collateral. Thus, as Fred Luedke (plaintiffs' PaineWebber

[7] Regulation T is a Federal Reserve Board regulation governing customer cash accounts and the amount of credit that brokerage firms and dealers may extend to customers to purchase securities.

broker) testified here, plaintiffs could not have withdrawn the proceeds of the short sale from the brokerage account. (App-B-163) Since Revenue Ruling 95-26 is supported by the economic and regulatory realities, it should be followed. *See Foil*, 920 F.2d at 1202-1203.

Plaintiffs criticize Revenue Ruling 95-26 as nothing more than a one page restatement of the IRS's litigating position. While brief, the rationale espoused in the revenue ruling is as relevant and persuasive today as it was when it was issued more than six years prior to when plaintiffs entered into the tax avoidance scheme now at issue. It makes perfect sense to require a partner who has included an asset in his outside basis to reduce his basis by the obligation that created this asset because the legally-enforceable obligation diminishes the value of his partnership interest. To do otherwise, leads to the obvious distortion of basis now proposed by plaintiffs. Further, it ignores the inescapable reality that the underlying basis flows from the sale of borrowed property.

There is also no merit to plaintiffs' further contention that the IRS, by treating the obligation to close the short sale as a "liability" under § 752, unreasonably forces taxpayers to attempt to estimate the amount of the obligation at the time the obligation is contributed to the partnership. Because the investor's obligation to replace the borrowed property is fixed when the short sale has occurred, the IRS has determined that the amount of the liability, for basis purposes, equals the proceeds of the short sale. *See* Rev. Rul. 95-45, 1995-1 C.B. at 53. Therefore, no estimation of the amount of the obligation to replace the borrowed property is necessary.

**D. The authorities on which plaintiffs rely are inapposite.**

Plaintiffs attempt to minimize the effect of Revenue Ruling 95-26 by arguing that it represents a change in the IRS's long-standing position that a contingent obligation is not considered in determining the basis of a partnership interest. Plaintiffs argument, however,

assumes the critical matter in dispute, *i.e.*, whether the borrower's obligation to return property is a contingent or fixed obligation. As we have demonstrated, that obligation is a fixed one and, as such, constitutes a liability under § 752. Thus, the purported "change" in position by the IRS alleged by plaintiffs does not exist. As indicated above, the IRS consistently has stated that an obligation that creates or increases the basis of an obligor's asset is a "liability" under I.R.C. § 752.

The authorities on which plaintiffs rely are not in point. Some of them pertain to unrelated computation issues. *See, e.g.*, Rev. Rul. 79-294, 1979-2 C.B. 305 (addressing the computation of gross receipts realized by a small business corporation from trading in commodity futures); G.C.M. 37,860 (Feb. 16, 1979) (same). The other authorities on which plaintiffs rely are also distinguishable. Rev. Rul. 57-29, 1957-1 C.B. 519, presented the question of the basis of an "executory contract to buy or sell securities which has cost the taxpayer nothing." *Id.* at 520. *Long v. Commissioner*, 71 T.C. 1, 8 (1978), *rev'd in part on other grounds*, 660 F.2d 416 (10th Cir. 1981), and *La Rue v. Commissioner*, 90 T.C. 465 (1988), presented the question whether unliquidated claims against a partnership increased a partner's outside basis. The claims in *Long* arose from structural defects in a building that the partnership had erected. The claims in *La Rue* arose from a partnership's contractual obligation to replace missing securities or money. Neither of these cases involves obligations that created or increased the basis of the partnership's assets, and they, therefore, furnish no support for plaintiffs' contention that an obligation to close a short sale is not a "liability" under § 752.

In both Rev. Rul. 73-301, 1973-2 C.B. 215, and *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), on which plaintiffs also rely, the partnerships had received assets which did not give rise to any partnership obligation. In Rev. Rul. 73-301, the partnership had received progress payments on a contract but had no obligation to return them or perform any additional

services to retain them. These payments, therefore, were not a "liability" under § 752. In *Helmer*, the partnership had received option payments pursuant to an agreement giving a corporation the option to purchase certain real estate. Since "[t]he option agreement, however, created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future," the Tax Court "h[e]ld that no liability arose under section 752. . . ." 34 T.C.M. at 731. Here, plaintiffs did have an obligation -- an unconditional obligation to close the short sale by replacing the borrowed Treasuries. *Helmer* and Revenue Ruling 73-301 are, therefore, distinguishable.

Plaintiffs also rely on IRS employee Richard Starke's notes from internal IRS meetings in 1995 in an attempt to show that the Government knew that, under existing rulings, a short sale did not create a liability under § 752. Starke's notes, prepared in conjunction with his work on Revenue Ruling 95-45,[8] were for his own purposes only and therefore, should not be considered. *See Siddell v. Commissioner*, 225 F.3d 103, 111 (1st Cir. 2000) ("Because these internal memoranda represent the personal views of the authors, not the official position of the agency, they do not figure in our decisional calculus").

Moreover, Starke's notes do not bear the weight plaintiffs seek to place upon them. One of the meetings summarized in Starke's notes referred to Revenue Ruling 88-77 in support of the conclusion that a short sale is a "liability" under § 752 :

> Review of P&SI's briefing memo for 3/7/95 meeting with Brown.
> Executive summary.
> Issue: does short sale by partnership create partnership liability under § 752?
> RR 88-77: § 752 liabilities include an obligation to extent incurring it creates or increases basis of any partnership assets (including cash attributable to borrowings).

[8] Revenue Ruling 95-45 addresses short sale obligations assumed by corporations.

> The cash received in the short sale increases the partnership's asset basis.
> Hence short sale creates a liability.
> Recommendation: issue the RR.[[9]]

Thus, Starke's notes, to the extent they have any relevance at all, tend to show that the IRS has consistently taken the position that an obligation that creates or increases an obligor's assets is a liability under § 752.

**E. Even if Revenue Ruling 95-26 reflects a change in the IRS's interpretation of § 752, the validity of the ruling would be unaffected.**

As we have demonstrated, Revenue Ruling 95-26 does not reflect a change in the IRS's position. But even if it did, such a change would have no effect on the validity or applicability of the ruling. *See Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007).

In *Long Island Care*, the Supreme Court unanimously upheld an agency's change in its interpretation of the meaning of the term "domestic service" employment. That case presented the question whether a domestic worker who provided "companionship services" to the elderly and infirm as an employee of a third-party agency was entitled to minimum wages and overtime under the Fair Labor Standards Act ("FLSA"). This Act exempted "any employee employed in domestic service employment to provide companionship services" for the elderly and infirm from minimum wages and maximum hour rules. 29 U.S.C. § 213(a)(15).

The Department of Labor had two conflicting regulations. One regulation defined exempt "domestic service" employment as services performed in and about a private home of the employer. Under the second regulation, at issue in *Long Island Care*, companionship workers for a third party, *i.e.*, an employer other than the household using their services, were exempt

[9] Starke characterized as "very loose notes" the notes of the meeting at which Chief Counsel Stuart Brown was purportedly "reluctant to say a short sale generates a liability."

from minimum wages and maximum hours. The Court upheld the validity and applicability of the second regulation. 127 S. Ct. at 2348. Noting that in the FLSA, Congress had explicitly left gaps in the scope and definition of "domestic service employment" and "companionship services" for the agency to fill, the Court explained that "[w]hen an agency fills such a 'gap' reasonably, and in accordance with other applicable (e.g., procedural) requirements, the courts accept the result as legally binding." *Id.* at 2345-2346.

The Court further held that "as long as interpretive changes create no unfair surprise . . . the change in interpretation alone present[ed] no separate ground for disregarding the Department's present interpretation." 127 S. Ct at 2349. Indeed, the Court gave the Department of Labor's most recent interpretation legal effect even though this interpretation was set forth in the form of internal guidance and was in response to litigation. The Court reasoned that the "agency's course of action indicates that the interpretation . . . reflects its considered views. . . ." *Id.*

In the present case, the IRS's position -- that the obligation to close a short sale is a liability under § 752 -- represents its "considered views."[10] The IRS took this position in Rev. Rul. 95-26, in *Salina*, and in Treas. Reg. § 1.752-1(a)(4)(ii). This interpretation should have created no "unfair surprise"[11] to plaintiffs herein. More than ten years before the transactions in issue, the IRS, in Revenue Ruling 88-77, defined "liability" under § 752 to "include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets. . . ." 1988-2 C.B. at 129. More than five years before the transactions in issue, the IRS applied Revenue Ruling 88-77 to short sales and ruled

---

[10] *Long Island Care*, 127 S. Ct. at 2349.

[11] *Id.*

that short sales of securities by partnerships create partnership liabilities for purposes of I.R.C. § 752. Rev. Rul. 95-26, *supra*. Accordingly, if any change in interpreting § 752 occurred, "the change in interpretation alone presents no separate ground for disregarding the [IRS's] present interpretation." *Long Island Care*, 127 S. Ct. at 2349.

## II. IN THE ALTERNATIVE, TREAS. REG. § 1.752-6 REQUIRES THE SANDS HEIRS TO REDUCE THEIR BASES IN ALPHA AND ALPHA TO REDUCE ITS BASIS IN BETA BY THE AMOUNT OF THE OBLIGATION TO CLOSE THE SHORT SALE.

### A. Introduction

Treas. Reg. § 1.752-6 applies to a partnership's assumption of a liability occurring after October 18, 1999, and before June 24, 2003, if I.R.C. §§ 752(a) and (b) do not apply to that liability. Treas. Reg. § 1.752-6, Appendix A, *infra*, provides:

> If, in a transaction described in section 721(a), a partnership assumes a liability (defined in section 358(h)(3)) of a partner (other than a liability to which section 752(a) and (b) apply) , then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount . . . of the liability.

This Regulation thus requires a partner, in a transaction described in § 721(a), to reduce his basis in his partnership interest by the amount of any liability, as defined in I.R.C. § 358(h)(3), that the partnership assumes. Section 358(h)(3) defines "liability" to "include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title." Accordingly, under Treas. Reg. § 1.752-6, a partnership's assumption of a contingent liability results in a partner's outside basis being reduced. This regulation is retroactive, applying to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003. Treas. Reg. § 1.752-6(d)(1).

If this Court were to hold that I.R.C. §§ 752(a) and (b) do not apply to an obligation to close the short sale, then Treas. Reg. § 1.752-6 applies. This means that the Sands Heirs' bases in Alpha was reduced by the short sale liability assumed by Alpha, and likewise Alpha's basis in Beta was reduced when the short sale position was transferred to Beta and it assumed the liability. Specifically, Alpha, in a transaction described in § 721(a), assumed the Sands Heirs's obligation to close the short sale and the assumption occurred after October 18, 1999, and before June 24, 2003. In these circumstances, Treas. Reg. § 1.752-6 requires the Sands Heir's bases in Alpha to be reduced by the amount of that liability. Thus, the Sands Heirs' bases in Alpha equaled the cost of the Yahoo and Corning stock (approximately $1.2 million) and the short sale proceeds ($44,000,000), reduced by the amount of the short sale liability as of the date of the assumption ($44,000,000), or a basis of approximately $1.2 million.[12] Similarly, Alpha's basis in Beta was reduced to its actual cost of the Yahoo and Corning stock. As it was intended to do Treas. Reg. § 1.752-6 eliminates the basis inflation that lies at the heart of the Son of BOSS tax shelter.[13]

**B. Treas. Reg. § 1.752-6 is a legislative regulation and has the force and effect of law.**

Treas. Reg. § 1.752-6 was promulgated pursuant to § 309(c) of the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763A-587. T.D. 9062, 2003-2 C.B. 46, 67. In the Community Renewal Tax Relief Act, Congress enacted I.R.C. § 358(h) to address

---

[12] The operation of this regulation differs from I.R.C. § 752(a) and (b). I.R.C. § 752(b) reduces a partners' outside basis by the amount of the partnership's assumption of his personal liability, and I.R.C. § 752(a) allows the partner to increase his basis by his share of the liability that the partnership assumed. Treas. Reg. § 1.752-6 has no provision corresponding to I.R.C. § 752(a).

[13] Because Treas. Reg. § 1.752-6 applies only when § 752 is inapplicable, a taxpayer to whom the regulation applies decreases his basis in his partnership interest by the amount of any liability, fixed or contingent, assumed by the partnership, but does not increase his amount realized by the amount of this liability when the buyer of his partnership interest assumes the liability.

certain situations in which property is transferred to a corporation in exchange for both stock and the corporation's assumption of certain obligations of the transferor. In transactions involving so-called contingent liability tax shelters, transferors took the position that the assumed obligations were not liabilities within the meaning of § 357(c) or that they were described in § 357(c)(3), and, therefore, the obligations did not reduce the basis of the transferor's stock in the transferee corporation. *See Coltec Industries, Inc. V. Commissioner*, 454 F.3d 1340, at 1350-1351 (Fed. Cir. 2006). These assumed obligations, however, had the effect of reducing *pro tanto* the market value of the transferee corporation's stock. The transferors, as was the plan all along, sold the stock and reported enormous, but wholly artificial losses, on the sales. *Id*. Congress responded to these shelters by enacting § 358(h), which provides that, after the application of § 358(d), the basis in stock received in certain exchanges must be reduced by the amount of any liability assumed in the exchange. T.D. 9062, 2003-2 C.B. at 61. "Liability" was defined to "include any fixed or contingent obligation to make payment. . . ." I.R.C. § 358(h)(3).

When it enacted § 358(h), Congress also "recognized that taxpayers were attempting to use partnerships . . . to carry out the same types of abuses that section 358(h) was designed to deter." T.D. 9062, 2003-2 C.B. at 61. Congress therefore directed the Secretary of the Treasury to "prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code . . . in transactions involving partnerships." Community Renewal Tax Relief Act of 2000, § 309(c)(1). Treas. Reg. § 1.752-6 was enacted pursuant to this statutory directive and is, therefore, a legislative regulation. Legislative regulations have controlling weight unless they are arbitrary, capricious, or manifestly contrary to the underlying statute. *Chevron*, 467 U.S. at 843-844; *Fransen v. United States*, 191 F.3d 599, 600 (5th Cir. 1999).

Treas. Reg. § 1.752-6 is fully consistent with the underlying statute -- § 309(c)(1) of Community Renewal Tax Relief Act. Indeed, it implements the Congressional intent to put an end to tax shelters designed to inflate the basis in assets through the use of assumed liabilities and then to generate large, but wholly artificial, losses on the sale of the inflated-basis assets. *See* H.R. Conf. Rep. No. 106-1033 at 1017 (2000), *reprinted in* 2000-3 C.B. 304, 347. Treas. Reg. § 1.752-6 prevents tax abuse caused by the creation of artificial losses by requiring the reduction of a partner's basis by the amount of the liability that his partnership assumed. Moreover, the wording of Treas. Reg. § 1.752-6 closely tracks § 358(h), which requires a reduction in a shareholder's basis in stock by the amount of any liability, fixed or contingent, assumed by the corporation in certain exchanges. Because Treas. Reg. § 1.752-6 is consistent with the underlying statute, it is controlling here.[14] *See Chevron*, 467 U.S. at 844 ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency") (footnote omitted).

---

[14] In *Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006), a district court held that Treasury exceeded the Congressional grant of authority in adopting Treas. Reg. § 1.752-6 and that the regulation was, therefore, an interpretive regulation, rather than a legislative regulation. *Id.* at 621-622. The Court relied on the lack of reference to § 752 in either the Community Renewal Tax Relief Act or its legislative history and on Treasury's promulgation of Treas. Reg. § 1.358-7 under the authority granted to it by § 309 of the Act.

The court erred in so holding. In § 309 of the Act, Congress directed Treasury to prescribe rules to provide "adjustments under subchapter K of chapter 1 of the Code to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in Section 358(h)(3) . . . in transactions involving partnerships." Because § 752 is in subchapter K, Treas. Reg. § 1.752-6 is a direct fulfillment of the explicit mandate from Congress in the Act.

Furthermore, in its mandate, Congress expressly sought to prevent tax abuse resulting from the use of assumed liabilities to create inflated bases in assets that could then be sold to generate fictitious losses. H.R. Conf. Rep. No. 106-1033 at 1017, *reprinted in* 2000-3 C.B. at 347. Simply because Congress could not anticipate every manner in which unscrupulous individuals would try to manipulate the Internal Revenue Code to secure tax advantages never intended by the Code does not mean that it did not intend the Treasury, acting under its express mandate, to prevent such abuse.

**C. Treas. Reg. § 1.752-6 must be given the retroactive effect for which Congress explicitly provided.**

Although regulations generally are not retroactive (I.R.C. § 7805(b)(1)), there are exceptions to that rule. For example, § 7805(b)(3) authorizes Treasury to "provide that any regulation may take effect or apply retroactively to prevent abuse." In addition, the statutory presumption against retroactive regulations "may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation." *Id.* § 7805(b)(6).

These two exceptions apply here and validate the retroactivity of Treas. Reg. § 1.752-6. In adopting Treas. Reg. § 1.752-6, "the Secretary [of the Treasury] has determined that a retroactive effective date is appropriate to prevent abuse." T.D. 9207, 2005-1 C.B. at 1347. Abuse is patent in Son of Boss tax shelters, which are designed to generate paper tax losses where no comparable economic losses have occurred. The present case is a perfect illustration of that abuse; the participants in the transactions attempted to turn an actual, economic gain of $90,018 into a tax loss of $44,000,000. Thus, under I.R.C. § 7805(b)(3) the Secretary was authorized to make Treas. Reg. § 1.752-6 retroactive.

Section 7805(b)(6) also authorizes the retroactivity because the Community Renewal Relief Tax Act expressly provides that regulations adopted pursuant to § 309(c) "shall apply to assumption of liabilities after October 18, 1999, or such later date as may be prescribed in such rules." Community Renewal Tax Relief of 2000, § 309(d)(2).

The District Court in *Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006), however, recently held that the Commissioner abused his discretion in making Treas. Reg. § 1.752-6 retroactive prior to August 11, 2000. First, we note that the transactions in these cases occurred after that date. Second, we submit that, in *Klamath*, the

court failed to consider I.R.C. §§ 7805(b)(3) and 7805(b)(6), which validate the retroactivity of the regulation. Instead, the court erroneously relied on case law decided under a prior version of I.R.C. § 7805(b).

Before the enactment in 1996 of the Taxpayer Bill of Rights 2, Pub. L. No. 104-168, 110 Stat. 1452, I.R.C. § 7805(b) gave the Treasury Department wide latitude in prescribing regulations with retroactive effect by providing, "The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."

In order to prevent Treasury from having *carte blanche* authority in determining retroactivity, this Court considered four factors in determining whether the Commissioner had abused his discretion in making a regulation retroactive. These factors are:

> (1) whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law;
>
> (2) the extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative reenactment of the pertinent Code provisions;
>
> (3) whether retroactivity would advance or frustrate the interest in equality of treatment among similarly situated taxpayers; and
>
> (4) whether according retroactive effect would produce an inordinately harsh result. [Footnote omittedl]

*Snap-Drape, Inc. v. Commissioner*, 98 F.3d 194, 202 (5th Cir. 1996); *Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 981 (5th Cir. 1977).

The Taxpayer Bill of Rights 2 included a section entitled "Relief from retroactive application of Treasury Department Regulations." Taxpayer Bill of Rights 2, § 1101. This statute amended § 7805(b) to provide a presumption *against* retroactivity. *See* I.R.C. § 7805(b)(1). The amended statute, however, also contained limited exceptions to this

presumption. *See* I.R.C. § 7805(b)(2) (promptly-issued regulations); § 7805(b)(3) (prevention of abuse); §7805(b)(4) (correction of procedural defects) § 7805(b)(5) (regulations relating to internal Treasury Department policies); § 7805(b)(6) (Congressional authorization); § 7805(b)(7) (taxpayer election to apply retroactively). Because the amended version of § 7805(b) generally restricts the Commissioner's discretion to adopt retroactive regulations, but contains specific exceptions to this general restriction, and because this amended statute applies to Treas. Reg. § 1.752-6, the case law interpreting the pre-1996 statute, on which the District Court relied in *Klamath*, is inapposite. *See Kandi v. United States*, 2006 WL 83463 at *3 (W.D. Wash. 2006), *appeal docketed*, No. 06-35209 (9th Cir. March 14, 2006). The District Court in *Klamath* erred in failing to consider the current version of § 7805(b) and the specific exceptions to the general prohibition against retroactivity and consequently erred in holding that the Commissioner abused his discretion in making Treas. Reg. § 1.752-6 retroactive.

## III. PLAINTIFFS ARE LIABLE FOR THE ACCURACY RELATED PENALTIES.

In the United States' Motion for Summary Judgment, the United States set out the four penalties that were applied by the IRS to the transactions at issue. However, the United States only addressed the 40% penalty for a gross valuation misstatement pursuant to § 6662(b)(3) and (h) because it is the highest percentage applicable and there is no stacking of penalties. *See* Treas. Reg. § 1.6662-2(c). The gross valuation misstatement is simply a mathematical calculation and, since it is supported by the summary judgment evidence, there was no reason to address the alternative lesser penalties. However, since the plaintiffs challenge the remaining three penalties in their brief, the United States will respond to their arguments.

### A. 20% Substantial Understatement of Tax Penalty – The plaintiffs did not have substantial authority for the positions taken on their returns.

Generally, there is a substantial understatement of income tax for a non-corporate taxpayer if the amount of the understatement exceeds the greater of ten percent of the tax required to be shown on the return or $5,000.00. I.R.C. § 6662(d)(1)(A). Whether the applicable threshold underpayment of tax has been met with respect to a partner is a determination to be made in a partner level proceeding, not a partnership level proceeding. Treas. Reg. § 301.6221-1(d); *Fears v. Commissioner*, 129 T.C. 2 (2007). Accordingly, this Court only has jurisdiction to determine whether or not the plaintiffs had substantial authority for the positions taken on the partnership returns. If this Court determines that the plaintiffs did not have substantial authority for the positions taken on the partnership returns, application of the substantial understatement of tax penalty will be made at the partner level.

If an item is attributable to a tax shelter (such as here)[15], the understatement can only be reduced by an item that is supported by substantial authority and if the taxpayer reasonably believed the treatment of the item was more likely than not the proper treatment. *See* I.R.C. § 6662(d)(2)(C)(i).[16] Clearly, the opinion letters were just an attempt to afford credibility to a tax avoidance scheme that Robert Sands and Richard Sands had already implemented to avoid tax on capital gain. While the Lewis Rice tax opinion letters provide lip-service to *Salina*, Notice 2000-44 and Rev. Rule 95-26, this blatant attempt to find refuge in a "more likely than not" tax opinion letter should be rejected by the Court. Here, the authority applicable at the time of the transaction expressly rejected the manipulation of basis attempted by plaintiffs.

---

[15] For this purpose, the term "tax shelter" means a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. I.R.C. § 6662(d)(2)(C)(iii).

[16] The substantial authority standard is an objective standard that requires an application of the law to relevant facts. Treas. Reg. § 1.6662-4(d)(2). There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. The weight accorded an authority depends on relevance, persuasiveness, and source. Treas. Reg. § 1.6662-4(d)(3)(ii).

The position taken by the plaintiffs flies in the face of both statutory authority and the existing case law. Revenue Ruling 95-26 specifically states that a short sale obligation is a partnership liability under § 752. Further, the facts presented here fall squarely within Notice 2000-44, issued August 13, 2000 (published 09/5/2000), and the *Salina* case (published in 2000). Both were published prior to the transactions now at issue and any attempt by plaintiffs to downplay their significance should be summarily rejected. Thus, the plaintiffs did not have substantial authority for the positions taken on their returns. The application of the 20% penalty imposed by the FPAA is appropriate and it should be affirmed. However, if this Court holds that the 40% gross valuation misstatement is applicable, then the application of the 20% penalty will not be warranted since the stacking of penalties is not allowed.

**B. 20% Negligence Penalty - The Plaintiffs did not have a reasonable basis for the positions taken on their returns.**

I.R.C. §6662(a) and (b) impose a 20% penalty when an underpayment of tax is attributable to negligence or disregard of rules or regulations. Negligence has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967); *Neely v. Commissioner*, 85 T.C. 934, 947 (1985). Unquestionably, any reasonable person would have known that artificially inflating the basis of the Corning and Yahoo stock by nearly 3700% to eliminate tax on capital gains was impermissible.

Under Section 6662(c), disregarding rules and regulations includes disregarding a notice issued by the Service. Treas. Reg. § 1.6662-2. Here, the transactions occurred after the IRS issued Notice 2000-44, which describes Son of BOSS tax shelters and rejects the artificial inflation of partnership assets to avoid taxation. As early as the second meeting with Heritage personnel, Robert Sands and Richard Sands were advised that the IRS had issued Notice 2000-

44 and that some shelter promoters had stopped peddling the type of shelter being offered by Heritage. (App-B-28).

A Son of BOSS tax shelter involves the partnership contribution of encumbered property in which the associated obligation is expressly assumed by the partnership yet completely ignored for tax purposes. The omission of this liability and the resulting overstatement of the partner's investment is the source of the artificial tax benefits claimed in a Son of BOSS tax shelter. As in the BOSS shelter, the Son of BOSS scheme uses a series of contrived steps (in this case involving interests in a partnership) to generate artificial tax losses designed to offset income from other transactions. The tax shelters used by plaintiffs clearly meet this criteria.

The transactions now at issue occurred after the issuance of Notice 2000-44, and well after the issuance of Rev. Rule 95-26. Rev. Rule 95-26 specifically states that the obligation to replace borrowed securities in a short sale transaction is a liability under I.R.C. §752. Plaintiffs' position in these cases is squarely in conflict with this ruling.

Plaintiffs further failed to exercise reasonable diligence to determine the correctness of their position. First, it is clear from the transcripts between Robert and/or Richard Sands and Heritage personnel that the Sands were shelter shopping. (App-B-1-129). More specifically, they were shopping for a shelter that would eliminate all, rather than just part, of their capital gain. (App-B-12-13, 21, 270). Second, Marilyn Sands and Andrew Stern testified that they had not dealt with Lewis, Rice and did not know the nature of the "financial plan" addressed in the tax opinion letters issued to them. (App-B-167-68, 171-73). Third, William Falk, an attorney with Lewis, Rice, states that the "background, education, investment sophistication and experience of the Sands family were impressive." (Plaintiffs' MSJ, App.B.1370-72).

Plaintiffs had no reasonable basis for taking the positions on their returns that the short sale obligations were not liabilities for § 752 purposes. The plaintiffs' position disregards Notice

2000-44, Rev. Rul. 95-26 and the *Salina* decision. Furthermore, plaintiffs' purported belief that they could manufacture and use artificial losses at will is nothing short of absurd. The plaintiffs had no realistic possibility of prevailing on the merits and, therefore, the underpayment resulting from the position is attributable to a disregard of rules and regulations under Section 6662(c).

**C. Substantial/Gross Valuation Misstatement Penalty**

The plaintiffs also argue that the "substantial valuation misstatement" penalty and the "gross valuation misstatement" penalty cannot apply because a partnership return is not a return of tax imposed by chapter 1. Plaintiffs' argument is erroneous. A partnership is required to file an annual information return pursuant to the requirements of chapter 61 of the Internal Revenue Code. Under Treas. Reg. §301-7701-15(c)(1)(i), "a return of tax under subtitle A also includes an information return filed by or on behalf of a person or entity that is not a taxable entity and which reports information which is or may be reported on the return of a taxpayer of tax under subtitle A."[17] As such, an information return filed by a partnership is "a return of tax imposed by chapter 1." Moreover, the Service has consistently applied the substantial/gross valuation misstatement penalty to partnerships.[18] Accordingly, the valuation misstatement penalty applies to an overstatement of basis because a partnership return is a return of tax imposed by chapter 1.

**D. Plaintiffs' reasonable cause arguments must be rejected.**

1. <u>TEFRA jurisdiction – generally</u>

This case is governed by TEFRA—the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), I.R.C. §§ 6221-6233, which was enacted to "improve the auditing and adjustments of income tax items attributable to partnerships." *Alexander v. United States*, 44 F.3d 328, 330 (5th

---

[17] See also *Harlan v Commissioner*, 116 T.C. 31 (2001) (stating that the partnership return must be read as an adjunct with the individual partner's return in determining the total gross income stated on the individual's return).
[18] See *Long Term Capital Holdings v. U.S.*, 330 F.Supp.2d 122 (D.Conn 2004); *Santa Monica Pictures, LLC v. Comm'r*, 89 T.C.M. (CCH) 1157 (2005).

Cir. 1995). TEFRA sets forth the Court's jurisdiction to review adjustments to a partnership return. Under TEFRA, the tax treatment of any "partnership item" must be determined in a single proceeding at the partnership level. I.R.C. § 6221. *See also Weiner v. United States,* 389 F.3d 152, 154 (5th Cir. 2004). However, the Court's jurisdiction in a TEFRA proceeding is *limited* to that treatment of partnership items. It is limited by § 6226(f), which provides:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

"While TEFRA defines a 'partnership item' in technical terms, the provision generally encompasses items more appropriately determined at the partnership level than at the partner level." *Weiner*, 389 F.3d at 154 (internal quotation omitted). Under the legislative regulations the "partnership item" includes items of income, gain, loss, deduction, or credit of the partnership, tax-exempt income of the partnership, partnership liabilities, and nondeductible partnership expenditure. Treas. Reg. §301.6231(a)(3)-1(a)(1). The term "partnership item" also encompasses factors affecting the determination of partnership items, such as "accounting practices and the legal and factual determinations that underlie the determination of the amount, timing and characterization of items of income, credit, gain, loss, deduction, etc." All other items are defined as nonpartnership items. *Weiner*, 389 F.3d at 154; I.R.C. § 6231(a)(4). As discussed fully below, nonpartnership items, including "partner level items," cannot be decided in a TEFRA proceeding because the Court lacks jurisdiction over them.

2. The Court does not have jurisdiction in this TEFRA proceeding to determine whether the Sands Heirs may be excused from penalties under I.R.C. § 6664(c).

The Sands Heirs cannot argue in this TEFRA proceeding that they should be excused from penalties under the "reasonable cause" defense found in I.R.C. § 6664(c). Section 6664(c) provides an affirmative defense to accuracy and fraud related penalties for taxpayers who can show there was reasonable cause for their underpayment, and that they acted in good faith. Although this Court has jurisdiction over all partnership items arising from the partnerships' 2001 and 2002 tax years, and the initial application of penalties, it does not have jurisdiction over partner-level defenses to those penalties. *See* I.R.C. §§ 6621, 6226(e) and 6230(c)(1)(4).

Section 6226(e) limits the Court's jurisdiction to determine the "applicability of any penalty... which relates to an adjustment to a partnership item." This gives the Court jurisdiction to determine whether the initial elements for the application of a penalty have been met, but does not give the Court jurisdiction to determine defenses to the application of that penalty which are based on an individual partner's circumstances (partner level defenses). This rule is made explicitly clear by similar language in § 6230(c)(1)(4) which preserves the right of partners to file refund suits after a proceeding under § 6226 has been completed in order to challenge the application of penalties to their personal returns using defenses that are personal to them rather than to the partnership.

For tax years beginning on or after October 4, 2001, Treasury Regulation § 301.6226(f)-1 was enacted, which provides, in relevant part:

> (c) Penalties determined at partnership level. Any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be determined at the partnership level. Partner-level defenses to such items can only be asserted through refund actions following assessment and payment. Assessment of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be made based on partnership-level determinations. Partnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty, addition to tax, or additional amount, other than partner-level defenses specified in paragraph (d) of this section.

> (d) Partner-level defenses. Partner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment. See section 6230(c)(4). Partner-level defenses are limited to those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level. Examples of these determinations are whether any applicable threshold underpayment of tax has been met with respect to the partner or whether the partner has met the criteria of section 6664(b) (penalties applicable only where return is filed), or section 6664(c)(1) (reasonable cause exception) subject to partnership-level determinations as to the applicability of section 6664(c)(2).

Treas. Reg. § 301.6226(f)-1 (effective for tax year beginning after Oct. 4, 2001).[19]

This Court does not have jurisdiction to rule upon an I.R.C. §6664(c) defense to accuracy and fraud related penalties. The tax opinion letters relied on by the Sands Heirs are addressed to the Sands Heirs in their individual capacities, not in their capacities as partners of Alpha and Beta. Therefore, the reasonable cause defense is personal to each of the Sands Heirs and can only be asserted in a partner level proceeding.

3. <u>Even if this Court has jurisdiction to review the "reasonable cause" defense, fact issues preclude the Court from granting summary judgment at this time.</u>

The United States is still conducting fact discovery in this case and recently received documents produced in the Heritage bankruptcy which contradict the deposition testimony and affidavits attached to the plaintiffs' motion for summary judgment. Therefore, the material facts are in dispute. The newly discovered evidence shows that the Sands were aware that this was a listed transaction under Notice 2000-44 before they participated in this scheme, and that they wanted a money back guarantee from Heritage that if they did not get the capital gains

[19] *See also* § 301.6221-1T (effective January 26, 1999), 64 FR 3837, 1999-1 C.B. 682 (the same statutory provision as § 301.6221(f)-1). The tax years for Alpha and Beta did not begin until after October 4, 2001, but even if they began earlier they would be covered by the temporary regulation. (*See* United States' Motion for Summary Judgment, App-A-000214 and App-A-000269).

elimination that they sought, their 25% fee to Heritage would be refunded. (App-B-24, 28-29). Richard Sands also discussed with Gary Kornman the chance they would be audited and was advised that the IRS rarely audited high income taxpayers because the agents had to be a certain grade level to do that. (App-B-62).

Both Robert and Richard Sands had selective memory during their recent depositions. (App-B-175-90). For example, neither had any specific recollection regarding their meetings with Heritage personnel. While both agreed that there was some discussion regarding potential tax savings, Richard emphatically stated "that it was not a goal to eliminate totally capital gains tax" and that the number one reason for entering into the Heritage transactions was profit. With respect to the Lewis Rice tax opinion letters, Robert stated that Lewis Rice contacted Marilyn Sands and Andrew Stern, whereas Marilyn and Andrew denied ever having any contact with Lewis Rice. Also, the United States has encountered difficulty in obtaining the deposition testimony of representatives of Heritage and may need to file a motion to compel Gary Kornman's compliance with his deposition subpoena.

The United States' expert will opine that there was no reasonable expectation of profit by participating in the Treasury short sale transactions. The United States will prove that the transactions lacked economic or business purpose other than to avoid taxes. These facts would be relevant to reasonable cause, if the Court has jurisdiction to consider the defense. The deadline for expert reports is not until October 29, 2007; therefore, Plaintiffs' attempt to determine reasonable cause at this point in time is premature.

4. Even if this Court has jurisdiction to review the "reasonable cause" defense, the plaintiffs did not have reasonable cause for taking the positions on their returns.

Plaintiffs' reasonable cause defense hinges on the tax opinion letters that they obtained from Lewis, Rice. However, it is clear that plaintiffs were not looking for an independent,

objective, and unbiased analysis of their tax shelter. What they were instead seeking – and received – was "penalty insurance" – *i.e.*, a piece of paper to show the IRS in the event they got audited. The Sands did not have their own personal lawyers write an opinion letter, instead they were referred to Lewis, Rice by Heritage.

Moreover, these so-called legal opinions were worthless since their ultimate conclusions are based on false representations. The Sands represented that they had a reasonable expectation that they would have gains that would exceed the fees and costs including the massive fees paid to Heritage, which were based not on economic performance of investments but, instead, on 25% of the taxes that could be eliminated. Pl. App-B-1038, ¶20. The fees that the Sands paid to Heritage were in excess of $4 million; they did not expect to make more than that amount by taking short positions in U.S. Treasuries for two weeks. In fact, at the time they entered into the Second Shelter, they had lost money on the short sale positions of Treasuries in the First Shelter. (R,R,M & C Complaint, para. 29.) Also, the Sands represented that this was a multiyear strategy, but again they only held the positions for two weeks--both in the First Shelter and the Second Shelter. (R,R,M & C Complaint, paras. 20 and 29; Alpha Complaint, paras. 18 and 30.) The tax opinion letters presuppose a legitimate purpose for the transactions at issue. Here, the transactions, like the tax opinion letters themselves, were merely an end to a clearly defined purpose, the elimination of tax on capital gain. (App-B-1-134).

In fact, the initial conversation between Heritage and Richard Sands did not even discuss investments–it focused entirely on taxes–income, state and estate taxes. On May 10, 2001, Chester Decker, of Heritage, contacted Richard Sands by telephone to discuss a strategy to eliminate federal and state capital gain tax entirely. (App-B-1-2). At that time, Decker explained that Heritage would be paid a contingency fee, based on a "percentage of tax dollars you would have paid." (App-B-3). After being assured that the Heritage strategy would

"eliminate the capital gains tax," Richard Sands arranged for a May 31, 2001 office meeting with Heritage personnel. (App-B-3). The entire May 10, 2001 conversation dealt with the elimination of capital gains tax. At one point, Richard Sands even states that he had previously used a strategy of [Jonathan] Blattmachr, commenting that Blattmachr's strategy hadn't eliminated the capital gain tax to zero. (App-B-12-13). (United States' Supplemental Summary Judgment Exhibit 26). In another conversation, Richard Sands asked if he could get a referral fee for sending other taxpayers to Heritage. (App-B-118-19).

On May 31, 2001, Tim Seaberg, of Heritage, met with Richard Sands and Robert Sands at the Constellation, Inc. office. During the meeting, Richard Sands stated that they were interested in "diversifying out of Constellation a small amount like maybe $30 million in stock." (App-B-19). During the meeting, Richard sought assurances that 'this is not a tax deferral this is a complete elimination ...." (App-B-21). Richard also asked Seaberg if Heritage would guarantee results and he was told that "there would be no economic substance if we said if it doesn't work you get all your money back." Notwithstanding this statement, Seaberg went on to explain a "deal" where all of the tax savings could be put into escrow for three years drawing interest. After three years at the end of the statute of limitations, if the escrowed money didn't have to be used for the taxes, it would be split 50/50. (App-B-24). Richard also asked if Heritage would pay defense costs, stating that "there are some law firms that are selling similar type arrangements [that] are paying defense costs." Richard also stated that "[d]eals that we've done we usually get defense costs through the appeal level." (App-B-22). (United States' Supplemental Summary Judgment Exhibit 27).

At the May 31st meeting, Seaberg explained that the Sands would get a "[m]ore likely than not" opinion letter from a Top 200 law firm. Seaberg later explained that the opinion letter would cost $100,000 to $150,000. (App-B-32). Seaberg further explained that if the "worst case

scenario happens and you've got to pay all the taxes" "you've basically got a loan from the government for 8% for 8 to 10 years." (App-B-26). (United States' Supplemental Summary Judgment Exhibit 27).

Richard Sands asked Seaberg about the proprietary nature of the transaction, stating that "there's a lot of these things floating around." (App-B-27). Seaberg explained that "the combination and the way we set it up is proprietary." Seaberg went on to state that some people stopped doing the transaction when a "treasury not[ic]e known as 2000-44 that came out last year that um dealt with I guess a similar area of the tax code and it caused some people to stop doing it."(App-B-28). Richard Sands was very insistent that the strategy eliminate capital gains. During the May 31st meeting, Richard proposed an example using zero basis stock that they might initiate now but not sell for six months. (App-B-29-30). Seaberg explained that they were essentially "creating a loss that offsets the gain." (App-B-31). (United States' Supplemental Summary Judgment Exhibit 27).)

The May 31st meeting concluded by setting up a second meeting on June 13, 2001, which would be attended by Heritage founder Gary Kornman. (App-B-43-44). (United States' Supplemental Summary Judgment Exhibit 27).

On June 13, 2001, Tim Seaberg and Gary Kornman, of The Heritage Organization, L.L.C., met with Richard Sands and Robert Sands at the Constellation, Inc. office. During the meeting, much of the discussion concerned avoiding estate and gift taxes. When the topic turned to capital gains, Kornman explained that their transaction would "give you as much basis as you want to be used any time in the future." Richard Sands specifically asked about and was assured by Kornman that they could shelter both long term and short term capital gains. (App-B-62). As Kornman later explained, "[w]e're going to create something with basis so that you can use that basis, as you need year by year to create an offsetting loss."(App-B-83). Near the conclusion of

the meeting, a subsequent meeting was scheduled for June 27, 2001. (App-B-26). (United States' Supplemental Summary Judgment Exhibit 28).

On June 27, 2001, Tim Seaberg and Gary Kornman met with Robert Sands and Jim Locke at the Constellation, Inc. office. Locke was an attorney with Nixon, Peabody. (App-B-100). During the meeting, Robert said to Kornman that "elimination of the capital gains on the sale of the stock that's probably the first thing that we would embark upon with you." Robert elaborated, [t]his is the first level of importance because we're thinking of selling [?] stock." (App-B-110). Kornman later tells Robert "we can set it up to do exactly what you want to do. I mean [?] capital gains long or short it doesn't make a difference. We can eliminate the tax." (App-B-115). Later still, Kornman explains that "if you ever get audited and our agreement is part of what they'll see there's a business purpose built into the original engagement agreement. Uh obviously when you sign this thing it won't have the bold E that says what we're really doing it for is capital gains." (App-B-121). (United States' Supplemental Summary Judgment Exhibit 29).

Given the overwhelming evidence that the Robert and Richard Sands knew that the Heritage plan was a gambit to eliminate all of their capital gains tax, they cannot rely on the Lewis, Rice opinions. Nor can Marilyn Sands or Andrew Stern rely on the opinions. In fact, there were no communications between Lewis Rice and Andrew Stern and/or Marilyn Sands. (App-B-167-68, 171). Neither Andrew Stern nor Marilyn Sands made any affirmative representations of fact to Lewis, Rice before or after the opinions were provided. (App-B-167-68, 171).

As discussed above, the reason why plaintiffs entered into the transactions was to eliminate tax on capital gains. (App-B-12-13, 21 & 270). The courts have repeatedly upheld the imposition of penalties in tax shelter transactions where the advice, as here, was simply an

integral part of the overall scheme. *See e.g. Nicole Rose Corp. v. Commissioner*, 320 F.3d 282, at 285 (2nd Cir. 2002). *Neonatology Associates, P.A., v. Comm'r*, 299 F.3d 221, 234 (3d Cir. 2002); *Long Term Capital*, 330 F. Supp. 2d at 206. The transcriptions of statements made by Richard Sands and Robert Sands during their meetings with Heritage personnel tell it all. The Sands were shelter shopping and they were not going to be satisfied with a reduction in capital gains tax, they wanted something that would eliminate the tax. (App-B-12-13, 21 & 270).[20]

Plaintiff sought to inflate their basis in Corning and Yahoo stock by the entire $44,000,000 of short sale proceeds; however, they contend that they only used $7,811,557 of it during the year in issue. We agree that their liability for penalties is computed on the amount of the artificial losses used. They apparently intended to use the remainder of the inflated basis in later years. The Court should remember that in the First Shelter they used over $85 million of artificial basis to eliminate the capital gain from the sale of their Constellation Brands stock. The Court should also be cognizant that the amount of penalties will be calculated later at the partner level.

Clearly, here, the penalties are manifestly warranted here and the reasonable cause exception has no applicability in these circumstances.

---

[20] Plaintiffs' reliance on *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990), which has been rejected in several circuits is misplaced. *See, Merino v. Commissioner*, 196 F. 3d. 147, 157-160 (3rd Cir. 1999); *Zfass v. Commissioner*, 118 F.3d 184, 190-191 (4th Cir. 1997); *Illes v. Commissioner*, 982 F. 2d 163, 166-167 (6th Cir. 1992); *Massengill v. Commissioner*, 876 F. 2d 616 (8th Cir). *Heasley* has no possible application here. The Plaintiffs' attempted 3700% overstatement of basis falls squarely within the definition of gross valuation misstatement under the statute. Here, the tax benefits hinge on the inflation of basis from a failure to account for the short sale obligations as liabilities under § 752.

**CONCLUSION**

The Short Sale Obligations at issue are liabilities under §752. As previously noted, two Courts have already concluded that I.R.C. §752 requires that the obligation to replace borrowed Treasury securities be treated as a liability. *COLM Producer*, 460 F. Supp.2d at 715; *Salina*, 2000 (RIA) T.C. Memo ¶2000-352, at 2013. The FPAAs before the Court adjust the plaintiffs' various partnerships' returns consistent with this requirement. Accordingly, the United States is entitled to summary judgment sustaining the FPAAs issued to plaintiffs Alpha, Beta, MLRR and Mickey, L.P., and that part of the CWC FPAA related to the December 2001 short sales. The United States is also entitled to summary judgment sustaining the related penalties in the FPAAs.

Respectfully submitted,

/s/ Thomas M. Herrin
THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney

APPENDIX A

Internal Revenue Code of 1986 (26 U.S.C.):

**Sec. 752. Treatment of Certain Liabilities.**

**(a) Increase in Partner's Liabilities.—**Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

**(b) Decrease in Partner's Liabilities.—**Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

**(c) Liability to Which Property is Subject.—**For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

**(d) Sale or Exchange of an Interest.—**In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

Treasury Regulations on Income Tax (26 C.F.R.):

**§ 1.752-6 Partnership assumption of partner's section 358(h)(3) liability after October 18, 1999, and before June 24, 2003.**

**(a) In general.** If, in a transaction described in section 721(a), a partnership assumes a liability (defined in section 358(h)(3)) of a partner (other than a liability to which section 752(a) and (b) apply), then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For purposes of this section, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under §§ 1.752-1 through 1.752-5.

**(b) Exceptions–(1) In general.** Except as provided in paragraph (b)(2) of this section, the exceptions contained in section 358(h)(2)(A) and (B) apply to this section.

**(2) Transactions described in Notice 2000-44.** The exception contained in section 358(h)(2)(B) does not apply to an assumption of a liability (defined in section 358(h)(3)) by a partnership as part of a transaction described in, or a transaction that is substantially similar to the transactions described in, Notice 2000-44 (2000-2 C.G. 255). See § 601.601(d)(2) of this chapter.

* * * * *

**(d) Effective date—(1) In general.** This section applies to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003.

**(2) Election to apply § 1.752-7.** The partnership may elect, under § 1.752-7(k)(2), to apply the provisions referenced in § 1.752-7(k)(2)(ii) to all assumptions of liabilities by the partnership occurring after October 18, 1999, and before June 24, 2003. Section 1.752(k)(2) describes the manner in which the election is made.