Witness: Fred "Fritz" Luedke



IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 06-407T
(Into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

CONDENSED TRANSCRIPT

ALPHA I, L.P. BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER, )
Plaintiff, )
VS. ) No. 06-407T
THE UNITED STATES, )
Defendant, )

BETA PARTNERS, L.L.C., BY AND THROUGH Alpha I, L.P., A NOTICE PARTNER, )
Plaintiff, )
VS. ) No. 06-408T
THE UNITED STATES, )
Defendant, )

R,R,M & C PARTNERS, L.L.C., BY AND THROUGH R,R,M & C GROUP, L.P., A NOTICE PARTNER, )
Plaintiff, )
VS. ) No. 06-409T
THE UNITED STATES, )
Defendant, )

R,R,M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER, )



PENGAD-Bayonne, N.J. GOVERNMENT EXHIBIT 33

VS. ) No. 06-410T
THE UNITED STATES, )
Defendant, )
______________________ )
CWC PARTNERSHIP I, BY AND )
THROUGH TRUST FBO ZACHARY )
STERN U/A FIFTH G, ANDREW )
STERN AND MARILYN SANDS, )
TRUSTEES, A NOTICE )
PARTNER, )
Plaintiff, )
VS ) No 06-411T
THE UNITED STATES, )
Defendant, )
______________________ )
MICKEY MANAGEMENT, L.P., )
BY AND THROUGH MARILYN )
SANDS, A NOTICE PARTNER, )
Plaintiff, )
VS. ) No 06-810T
UNITED STATES OF AMERICA, )
Defendant. )
______________________ )
M, L, R & R, BY AND )
THROUGH RICHARD E. Sands, )
TAX MATTERS PARTNER, )
Plaintiff, )
VS ) No 06-811T
UNITED STATES OF AMERICA, )
Defendant )
______________________ )



**************************************************

ORAL DEPOSITION OF
FRED "FRITZ" LUEDKE
JULY 17, 2007
VOLUME 1

**************************************************

ORAL DEPOSITION OF FRED "FRITZ" LUEDKE, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 17th day of July, 2007, from 1:26 p.m. to 5:03 p.m., before Lisa C. Hundt, CSR in and for the State of Texas, reported by machine shorthand, at the offices of the DOJ, located at 717 North Harwood, Suite 400, Dallas, Texas, in accordance with the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES

FOR THE PLAINTIFFS:
Ms. Julie P. Bowling
And
Mr. Thomas A. Cullinan
SUTHERLAND, ASBILL & BRENNAN
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
404.853.8075
404.853.8806 (Fax)

FOR THE DEFENDANT:
Ms. Michelle C. Johns
And
Mr. Thomas M. Herrin
DEPARTMENT OF JUSTICE
717 N. Harwood
Suite 400
Dallas, Texas 75201
214.880.9721
214.880.9741 (Fax)

FOR THE WITNESS:
Mr. Steven Berry
BERRY, ODOM & RABINOWITZ
611 9th Avenue
Fort Worth, Texas 76104
817.850.9100
817.546.3210 (Fax)



INDEX

Appearances ............................Page 4
Exhibit Index ..........................Page 6
Examination by MS. BOWLING .............Page 8
Examination by MS. JOHNS ...............Page 85
Further Examination by MS. BOWLING .....Page 126
Further Examination by MS. JOHNS .......Page 131
Signature and Changes ..................Page 133
Reporter's Certificate .................Page 134

Page 94

seeing them here at this price. Well, I'll see if we'll match it. There might be that, but that's normal trading. But there was no negotiation of commissions or margins. Margins stated, commission happens. Those are facts.

Q. How is your commission determined, let's say, on a short sale of the Treasury notes?

A. On any transaction, there is a -- there is two components of commission. You -- I guess corporate securities, there's a standard commission and then a mark. What you mark -- if you mark a plus or a 30 second, you get part of that and the company takes 80 percent of it. There's -- there's a standard commission and a mark. And that -- that is what you negotiate with the company and trader.

Q. This is -- if you'll turn to Plaintiff's Exhibit 3. It's in your stack somewhere.

(Sotto voce conversation.)

Q. We've already looked at this letter once. I just want to touch on some of these starred points. If you can just give me a general explanation of what each one means and what you're trying to notify the client about. The first one talks about "net worth is sufficient to withstand the financial demand required to engage in repo tax transactions" [as read].

Page 95

What is that referring to?

A. First of all, I want to emphasize I didn't write this letter. This is a standard thing the branch manager sends out, so I -- I'd be speculating, but I suspect they are saying that you're -- you're wealthy enough and sophisticated enough to do a repo transaction.

Q. The third one, it says, "you fully understand the risks associated with doing repo transactions" [as read].

Do you know what kind of risks they're referring to?

A. It's exactly what Julie and I were talking about, or I was trying to explain. When you're going short or long on a bond, you've got market risks. It can up and down. It's like buying a stock, there's risk. You're not guaranteed anything. You're at risk.

Q. The fourth bullet says, "You fully understand that the open positions held are marked to market daily, which may result in margin market calls or repo repricing" [as read]. What does that paragraph refer to?

A. That is -- every day they -- they -- not even day, intra day, actually -- they'll take a look at a position and you -- if you -- if you're making money, everything's peachy. If you're losing money and cut through your margin, they want to keep padding so UBS's

Page 96

book is not exposed -- UBS is on the bottom line -- they'll make a margin call. So repricing these things on a -- often to make sure that there's enough cushion left in the trade that UBS is not at risk. It's not UBS's investment; it is -- it is the account's investment. That's standard.

Q. How many -- you said intra daily, I think is the word you used to do the repricing?

A. I want to restate that. I was speculating. I don't know how often they do it. I can't guarantee it's done daily. I just know if the markets move, that's when your margin calls happen. I don't know how often it happens, but they -- my impression is, they keep a close eye on all margin accounts in every -- every realm of the securities.

Q. Okay. That's all the questions I have about that one.

Sort of on that point, I know we talked about these Bloomberg trade tickets. If you want, you can just look at Exhibit 9 or whichever one's on top. And you mentioned these are information. Is this something where if I wanted to call you and say, Fritz, what's IBM selling at, you type it into Bloomberg and pull up the price?

A. I just punch "IBM go," trading at 49 1/2.

Page 97

MR. BERRY: Through the Bloomberg system though?

A. No, no. Well, Bloomberg can do it, but I've got three different machines, and I wouldn't send you what IBM was worth.

What's your question? I'm sorry. I'm sorry for rambling. If you call me up and said, what's IBM trading at, I'd say 49 1/2.

Q. Okay.

A. And I'd use my internal machine or Bloomberg and get where it's been forever and where analysts think it's going and everything else. But I typically would not send a Bloomberg ticket for something like that. This is for transactions. If you said to me, hey, Fritz, if -- never mind.

Q. If I say to you, hey, Fritz, I'm open on the short sales and I'd like to know today at 2 o'clock what it will cost, could you tell me that?

A. If I sold the bonds at par 25 plus, could you tell me how much money I would get? And I'd say, yeah. I'd probably use this and, say, if you sold 23 million U.S. Treasury bonds today, at par 25 plus -- which is where they are bid right now -- I can't guarantee you that price, but you would get 23,451,562.50total money. That's where I might use this. I wouldn't send it

Page 98

because it would imply a trade, but I would use this to price that.

Q. But you could price the cost to close or cover that open short sale at any minute of the day?

A. A short sale, I could. A margined trade, where there's a margin cost that's rolling day-to-day, that's another calculation. That's -- that takes a while to go back and price the cost and the accrued interest and everything else. It could be done. I'd do it if asked, but it would take a while.

Q. Just generally, the cost to cover the short sale could be priced at any day?

A. Very easy.

Q. Do you know whether -- we've mentioned margin. Do you know whether UBS -- let me ask specifically about the Sands -- and I'm not sure you're going to know this -- but did UBS solely rely on the margin accounts to cover any potential short sale liability or was there any other collateral agreements?

A. I don't understand, I'm sorry.

Q. Well, if you don't understand, then you probably don't know the answer.

A. How UBS covered -- operates financially?

Q. Okay.

A. That's way over my head. That's done in Swiss

Page 99

franks, not dollars.

MR. BERRY: She's asking about cross collateral agreements.

A. I'm sorry.

Q. (BY MS. JOHNS) I'm not sure you'd know that answer.

A. I'm confused.

Q. If you're confused, that means you probably don't know it.

Now, when you were having your conversations with Heritage regarding the Sands transactions, did the Sands or anyone at Heritage tell you, prior to entering into these short sales, that the short sales would have to close within a certain time period?

A. No. Well, let me say I don't recall. I don't recall. They wouldn't say, we're going to have this open for two weeks, because that would imply they knew where rates were going to be in two weeks. I don't recall them saying anything like that.

Q. You said in your past testimony that you had done short sales for some of Heritage's clients before of U.S. treasuries?

A. I'm not sure if this was the first account relationship or not. There were other accounts at

Page 100

Heritage, and elsewhere, I've done short sales. This could have been the first relationship. I don't know.

Q. But you had more than the Sands as Heritage clients doing short sales of Treasury notes?

A. I believe so.

Q. Do you recall, typically, how long these short sales stayed open for Heritage clients?

A. No.

Q. Did anyone with the Sands family ever seek your advice on the timing of opening the short sales of treasuries?

A. I don't recall so. I want to say no, but it could have been in a conversation they said -- asked my opinion of the market. I don't recall, but they could have asked me about what I thought rates were going to do. That would be normal chatter.

Q. Did anyone with the Sands or Heritage seek your advice on the timing of the closing of the short sales; do you recall?

A. Same thing. Heritage made up their own mind, but if they asked my opinion, I'd give it. I just don't recall having any weight in the decision, but I'm sure they -- I sit on a desk all day long staring at a screen, so I'm sure we talked about it but I don't recall specifically.

Page 101

Q. Do you remember who gave you the orders or the directions to close the short sales in this case?

A. No, I don't.

Q. Would the direction to close the short sale have been via a telephone call or written authorization?

A. No. It would be telephone call typically.

Q. Let me ask you one thing about Heritage. You had mentioned when Julie was asking you questions that Heritage were the advisors who were driving the trades?

A. Uh-huh.

Q. What did you mean by that?

A. They're designing the -- they seemed to have a handle on the net worth of the person and -- oh, let me think. They were -- they were my contact. They're in Dallas here, and they were who I ultimately had to look to to make sure everything was being correct -- done correctly. They were the advisors to the transactions. And they would say that, well, we're considering a short sale or long sale or we're going to be delivering a block of stock to you and sell it over the -- they were driving the estate planning.

Q. Do you recall whether or not it was a representative from Heritage who made the determination to close the short sales when they were closed?

A. I don't recall. Typically, they would be --

Page 110

from another account maybe? Balance forward, so maybe it's taken from -17 and given to -18.
Q. But you don't know whether, by looking at the statement, whether it's a margin amount?
A. No. I have no idea where that dollar came from, no. I have no idea.
Q. Okay. And when someone sells a Treasury short, they receive cash for that?
A. Yes.
Q. Where -- can you tell me on this statement where you see that cash from the sale of the Treasury?
A. This one, 7445, right?
Q. 7445, right.
A. The third item down on 12/12 what looks to me to be a sale of 1 million, 995 of the Treasury of the September 30, '03. I think that's just an outright sale. So he sold those at -- at -- he sold at a million, 995 at a dollar price of 99,703, and with accrued interest, he's going to get two million odd bucks. I bet that's what that is. I can't say for sure.
Q. Okay.
A. He sold a million, 995 and got two million bucks in cash.
Q. Do you know whether Zachary Stern Trust could have withdrawn the $2 million they received from the

Page 111

short sale of the account?
A. At that very moment?
Q. Yes, that very moment.
A. No, they could not have. Because all securities -- they can't take -- because the transaction has to happen simultaneously and the securities have to be held in-house; otherwise, people would take 2 million and run and say, see ya. So it's standard short practice -- stocks, bonds, everything -- you don't -- you make sure you can cover before you -- with a repo contract, the trades are done simultaneously; otherwise, crime would be rampant.
Q. If you look once again at Sands 7444, which is that same page, the two you see there are two sales on December 12, it would be entry number 1 and 3.
A. Okay.
Q. Okay. And number 1, there was a price of 101?
A. Yes.
Q. Okay. And then entry number 3, there was a price of 99?
A. Right.
Q. Okay. Then if you look at 12/14, there are once again two sales at different prices?
A. The repo contracts, right?
Q. Right.

Page 112

A. Right.
Q. Do you know why the prices --
A. Yes, because they include accrued interest. That's done -- calculated by the desk. It's an automatic transaction.
Q. So the pricing includes the accrued interest in it?
A. Yeah.
Q. Okay.
A. Yes. In fact, not yeah, kinda; yes, it does. It includes -- pricing a repo includes the value. You buy a million bonds, it's not just worth a million bonds it might be a million, 250 because it's got a lot of accrued interest in it.
Q. Okay. And you see on -- continuing with that statement, on 12/17, there were two "receives" down towards the bottom. Do you know what those receive activities indicate? I think we kind of talked about this before with respect to another statement?
A. Yeah. Again, I don't mean to be blank, but the transfer receipts and... I would assume this account received -- the same securities as -- 1 and 2 line up with the bottom.
Q. Do you know whether or not these received activities indicate a closing out of the short sale?

Page 113

A. No, because that would be sold. I believe that would be sold. I'm sorry. These are foreign to me.
Q. That's fine.
A. And I'm not even sure, but I think -- buy and sell, I understand, but the receive and transfers...
Q. If you'll turn to the next page, which is Sands 7456.
A. Yes.
Q. You'll see it says "unsettled transaction activity" up top. Do you see that?
A. Okay.
Q. What do these entries underneath unsettled transaction activity represent?
A. I do not know.
Q. Okay.
MR. BERRY: Settlement date...
(Sotto voce conversation.)
MR. BERRY: Settlement date's the 31st, and I don't know what the date of this statement is
THE WITNESS: 31st and settled Jan 1, maybe. I'm sorry. I shouldn't -- let me think. Trade date, unsettled transaction activity. They're both repos. Oh -- oh, I betcha -- when a repo is taken off, it settles. A repo is an open transaction; when it's taken off, it's settled. So unsettled would mean that

99 -- 100 bucks right now, 100 par. And I say, I'll pay you 100, and he can say, okay, you're done, you're done. But if he calls back in five minutes, and what will you pay me now? Well, I can only pay you 99 bucks now. That's how much the market moves. And you literally have the trader on the line, live, to confirm a transaction. Done or not done, done or not done. What I mean is, you can't guarantee a price. The markets move all the time. Think of it as a share of IBM. You can get out of it at 49 1/2 or you call a minute later and it's 50. It's the same thing -- exactly the same thing. The market's always in fluctuation.

Q. So the cost to cover is going to be contingent on what the market does?

A. Exactly.

Q. Secondly, Ms. Johns mentioned the term "liability," and I don't know that you used that before. Were you testifying that the obligation to close a short sales was a liability, or were those her words?

A. I don't know what you mean by "liability."

Q. Okay.

A. Asset liability is something that you -- I don't know what you mean. On a balance sheet, you're short. It's -- you're not long, you're short. So it's asset liability. I guess it is -- I showed my prowess in



accounting, but I'm saying I guess technically it could be considered a liability. I wouldn't use that term though. I would say you're short.

Q. Last question, I think. We were talking about the -- when the client short sells the Treasury notes and they get cash in their account, do they have to use that cash to purchase covering securities or can they get the securities in another way?

A. No. They could buy the -- buy the securities with other monies and put it in the account, and then they're flat. That wouldn't make any sense, but they could do that. I shouldn't say that. They could close it out the same day if they delivered security in from somewhere else. If they're short 10 million and deliver 10 million, then they just have the money from the sale.

Q. So if they could get the securities cheaper from somewhere else, would that make sense to do that?

A. They can do whatever they want. They can shop competitively all day long. There are hundreds of market makers.

MS. BOWLING: I have nothing further.

FURTHER EXAMINATION

BY MS. JOHNS:

Q. I've just got one clean-up question about the



commission.

A. Sure.

Q. You and your attorney looked at the confirms. Is the commission built into the price?

A. Yes.

Q. When you say -- you used the term net-net.

A. Institutional, when I say a price, that includes everything. All institutional trades are done that way.

Q. Okay.

A. It's not like stock markets where it's 5/10s per share or X cents per share. Every bond trade is done net.

Q. So the commission is built into the price?

A. Yes.

MS. JOHNS: Okay. That's my -- was my final question.

MS. BOWLING: I have nothing further.

I believe the court reporter will send you a copy of your deposition to review and if you see any errors or anything in that, you'll need to mark those and then you can sign it and return it to her.

THE WITNESS: Thank you.

(Proceedings concluded at 5:03 p.m.)



CHANGES AND SIGNATURE

WITNESS NAME:FRED LUEDKE DATE OF DEPOSITION:07/17/01

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I, FRED "FRITZ" LUEDKE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________

FRED "FRITZ" LUEDKE

THE STATE OF ________)
COUNTY OF __________)

Subscribed and sworn to before me by the said witness, FRED "FRITZ" LUEDKE, on this the ____ day of ____________, 2007

________________________

NOTARY PUBLIC IN AND FOR
THE STATE OF ______________
COMMISSION EXPIRES: ____________

STATE OF TEXAS )
COUNTY OF DALLAS )

I, LISA C. HUNDT, a Certified Shorthand Reporter in and for the State of Texas, hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 17th day of July, A.D., 2007, at 1:26 p.m., at the office of the DOJ, located at 717 North Harwood, Suite 400, in the City of Dallas, State of Texas, the following named person, to-wit: FRED "FRITZ" LUEDKE, who was by me duly cautioned and sworn to testify to the truth, the whole truth, and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows:

MS. BOWLING - 2 hours, 7 minutes,
MS. JOHNS - 1 hour, 5 minutes;

I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken,



and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that before the completion of the deposition, __X___ the Deponent, and/or _______ the Plaintiff/Defendant, ___X___ did _______ did not request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this _______ day of ____________________, A.D. 2007.

Lisa Hundt
LISA C. HUNDT, CSR, RPR
Texas CSR No. 6533
Expiration Date 12/31/08

HUNDT REPORTING, LLC
Firm Registration No. 347
703 McKinney Avenue, Suite 207
Dallas, Texas 75202
214.220.1122

Original Copy of E-Transcript
This was electronically signed
using LegalEdge Technology.

Taxable Cost: $________________