IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407T

(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

- - - - - - - - - - - - - - - - - X

ALPHA I, L.P., by and through )
ROBERT SANDS, a notice partner, )
Plaintiff )Case No. 06-407T
-vs- )
THE UNITED STATES, )
Defendant )

- - - - - - - - - - - - - - - - - X

Deposition of ANDREW STERN taken pursuant to notice at Constellation Brands, 370 Woodcliff Drive, Suite 300, Fairport, New York on Tuesday, July 31, 2007 commencing at 2:00 p.m.

Reported by:
COMPUTER REPORTING SERVICE
Amy M Condon, CSR, RPR
270 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614 (585) 325-3170





APPEARANCES

SUTHERLAND, ASBILL & BRENNAN
By THOMAS A. CULLINAN, Esq.
JULIE BOWLING, Esq
1275 Pennsylvania Avenue, N W
Washington, D.C., 20004
Attorneys for plaintiff.

U.S DEPARTMENT OF JUSTICE
By: THOMAS M. HERRIN, Esq.
717 North Harwood Street, Suite 400
Dallas, Texas 75201
Attorneys for defendant.





INDEX

Andrew Stern
Examination by Mr Herrin 4 - 30

ANDREW STERN EXHIBITS
No. 1 - Letter 9
No. 2 - Letter 22





ANDREW STERN

called herein as a witness, being duly sworn testified as follows:

EXAMINATION BY MR HERRIN:

**Q. Dr. Stern, have you ever given a deposition before?**

**A. Yes.**

**Q. You know basically I'm going to ask questions, you'll give answers.**

**Your attorney may have things that he has to say during the testimony. You know, if he says something you probably should stop talking, let him have what he has to say said, get it on the record and then we can pick up.**

**I'll try to wait until you finish your answer before I ask the next question. I always won't make it, but I'll try my best. If you try to wait for me to finish my question before you answer it makes it easier for the court reporter. If you can answer verbally so the court reporter can get it down we'll be in good shape.**

**If you don't understand anything, I'm going to fast, just say so, I'll move back. It won't be the first time I've been told that.**



PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT
34

Q. Are you familiar with the CWC charitable remainder trust, unitrust?
A. Again, sort of.
Q. What do you know about that?
A. You know, I'm not sure I can really say. I know that there has been estate planning to benefit the family including my children, but I really can't say much more about it than that.
Q. That planning is not something that you would have been actively participating in?
A. No, no.
Q. Do you recall if you've purchased any Yahoo or Corning stock in the past?
A. Well, I have -- I have seen on family records Yahoo and Corning stock noted. I don't believe I have personally purchased any or that any was purchased for me personally, but I could be wrong.
Q. If it had been purchased for you, who would have made those purchases?
A. Richard and Rob I would assume, and with a brokerage firm of some kind.
Q. Do you know Gloria Robinson?
A. Freddy's mother?
Q. Yes, that'll be the one.





A. I know Gloria Robinson.
Q. Do you know if you've engaged in business transactions with Ms. Robinson?
A. Never to my knowledge.
Q. I'm going to ask you to take a look at what was identified this morning as Marilyn Sands Deposition Exhibit No. 8.
Start with the back, is that your signature on the last page?
A. Yes.
Q. Are you familiar with this document?
A. No.
Q. Are you familiar with law firm Lewis, Rice & Fingersh?
A. No.
Q. Do you know why you would have been asking for legal advisor services from them?
A. Sort of.
Q. Why don't you explain.
A. I had a conversation with Richard, and I do remember this took place in a car in a parking lot, that he -- and he brought a bunch -- he called me and said, I need to meet you and I have a bunch of papers for you to sign, and we met in the car, I remember





that, and he said it was about a transaction that was going to take place, and I remember him saying that he had gotten a legal opinion about it. That it was legal. That is all I can tell you.
Q. Okay.
A. And I presume there was some question in someone's mind whether it was legal or not or no one would have bothered with a legal opinion, but not my field, that's all I can speculate.
Q. Did he tell you who he had got the opinion from?
A. No. If he did I certainly can't remember.
Q. Okay. Did he tell you any of the specifics about the transaction?
A. No. He was very eager to tell me or wanted to talk more about it and I said, I don't want to hear.
Q. Is there any reason why you would be reluctant to hear about the transaction?
A. Yes.
Q. What would that be?
A. I was having a big fight with Richard about nothing to do with this at the time, that's why we met in a car in a parking lot because I did not want to go to his house. This was personal family feuding. I can





tell you more about that if you want to hear. You probably don't.
Q. We probably do but it's not relevant.
A. I was mad at him. I was good and mad at him, that's why. No, I don't want to hear.
Q. On this specific document --
A. Sorry to interrupt. I should say that Richard and Rob have both initiated transactions before either on my behalf or asked me did I want to be involved. So it wasn't unusual, you know, there's a transaction we need your signatures, and I would -- as I mentioned, I would come down here and sign it or whatever. So it wasn't really out of the norm. They really do handle my investments.
Q. Do you have any idea who prepared this letter?
A. No.
Q. Would it have been something that was just handed for you to sign or would it have been a signature page for you to sign?
A. I don't recall.
Q. Would it have been unusual for them to just hand you a signature page?
A. Yes. Yes, there would be a document.

the earlier document and I believe is in all the documents I'm about to show you, so would it be your understanding where that sentence is put to these things it probably would have been with Richard, his representations you would have been relying on?

A. Absolutely, yes.

Q. Is it a fair statement that the representations contained in these letters are more likely Richard's representations rather than yours?

A. Yes.

MR. CULLINAN: Hold on. I'm sorry. That's overbroad.

There are a lot of representations in the letter. There's got to be five thousand facts stated in here.

I'm not sure that -- it's your deposition, but it's an overbroad question. He obviously knows some of the facts in here, the identity of the family members, some of the relationships.

BY MR. HERRIN:

Q. Yes. But the representations themselves, you didn't actually make them or dictate them to somebody to put into this letter, did you?

A. I did not dictate the letter, no.





Q. And you don't really know who did, right?

A. No.

Q. Have you ever engaged Lewis, Rice & Fingersh to do legal work for you on your behalf?

A. Not that I'm aware of.

Q. Do you know if you ever paid them for legal services?

A. Not that I recall.

(Exhibit No. 2 - letter - marked for identification.)

THE WITNESS: It ends on page 6.

BY MR. HERRIN:

Q. You don't have page 7?

A. No.

Q. All right. Then I guess I should give you my page 7. Why don't we go ahead and staple that.

Now on the page 7 that I no longer have, could you tell me if that's your signature?

A. Yes.

Q. Okay. Do you recall requesting this -- sending this letter to Lewis, Rice?

A. No.

Q. And again, with regard to the financial plan that's referenced, do you have any idea what that financial plan is?





A. No.

Q. On number eight on the third page, it says, I became interested in it and ultimately decided to adopt the financial plan to do six different objectives.

In 2002 were you interested in those things?

A. One by one?

Q. Sure.

A. Identify my short term, intermediate term and long-term objectives. I can't even --

MR. CULLINAN: Read the whole thing and then his question is were you interested in accomplishing any of these objectives.

THE WITNESS: With respect to 8.1 I was not part of the discussions to even define what the objectives were. So I have a hard time saying that I was interested in these issues. I have no recall about this at all. So I -- I mean, they sound good as I read them right now, but I became interested in the first clause of section eight, I don't believe I became interested in these things personally.

Could someone have been interested in these things for me? Maybe.

BY MR. HERRIN:

Q. Would that basically be true of 8.2 through





8.6 as well?

A. I'm reading them.

Q. All right.

A. Same, I was not personally interested in realizing investment profits. I mean, I -- profits I'm always interested in, but this was not something I discussed at the time that I have any memory of and probably never discussed.

And I would say that applies to the rest also.

Q. If you turn to page 4 then, 11.1 through 11.11 there are some details as to elements of the financial plan.

Looking this over do you recall any of these transactions? Does this help your recollection any with regard to whether you have any knowledge of the financial plan?

A. What's BLC? GL -- I would say no.

MR. CULLINAN: Hold on, are you saying no because you don't recognize GLW and BLC and the other terminology?

THE WITNESS: There is none of this that is familiar.

BY MR HERRIN:

Q. All right.

A. Not all -- they both have a general power of attorney for me; that is how much I trust them. So many investments are made and I have no knowledge of it at all.
Q. All right. How old are your children now?
A. 25 and 26.
Q. So in 2000 they would have both been over 18 I guess that works out, right?
A. One would have been 18. Twenty-five minus seven, 18. Depends on what month I suppose, right.
Q. As far as the Abigail and Zachary trust did either of your children come into any type of capacity that allowed the trust to be terminated when they turned 18 or where they had say over it?
A. I believe the answer to that is no.
Q. Okay. So if any actions were taken on behalf of those trusts around that time frame it would still have to be done through the trustees?
A. Again, I believe --
MR. CULLINAN: I'll object to the extent it calls for a legal conclusion, but you can answer it.
THE WITNESS: I believe the answer to that is yes, but I am not sure that that's correct.
MR. HERRIN: All right. No further





questions. Thank you for coming in.

* * *

REPORTER CERTIFICATE

I, Amy M Condon, CSR, RPR, do hereby certify that I did report in stenotype machine shorthand the proceedings held in the above-entitled matter;

Further, that the foregoing transcript is a true and accurate transcription of my said stenographic notes taken at the time and place hereinbefore set forth.

Dated

At Rochester, New York

______________________

Amy M. Condon, CSR, RPR





WITNESS CERTIFICATE

STATE OF NEW YORK )
COUNTY OF MONROE )

I, ANDREW STERN, do hereby certify that I have read the transcript of my testimony as taken under oath on July 31, 2007 and that said transcript is a true, complete and correct record of what was asked, answered and said during said deposition, and that the answers on record therein, and as may be modified in conformity with the attached errata sheet, are true and correct.

______________________

Subscribed and sworn to before me
this _______ day of ___________, 2007
Notary Public





In the Matter of

```
- - - - - - - - - - - - - - - - - X
ALPHA I, L.P., by and through     )
ROBERT SANDS, a notice partner,   )
     Plaintiff                    )Case No  06-407T
     -vs-                         )
THE UNITED STATES,                )
     Defendant                    )
- - - - - - - - - - - - - - - - - X
```

Errata sheet for the Deposition of ANDREW STERN taken on July 31, 2007.

| PAGE | LINE | REMARKS |
|---|---|---|