IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407T

(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

- - - - - - - - - - - - - - - - - X

ALPHA I, L.P., by and through )
ROBERT SANDS, a notice partner, )
Plaintiff )Case No. 06-407T
-vs- )
THE UNITED STATES, )
Defendant )

- - - - - - - - - - - - - - - - - X

Deposition of RICHARD SANDS taken pursuant to notice at Constellation Brands, 370 Woodcliff Drive, Suite 300, Fairport, New York on Tuesday, June 12, 2007 commencing at 9:30 a.m.

Reported by:
COMPUTER REPORTING SERVICE
Amy M. Condon, CSR, RPR
270 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614 (585) 325-3170





APPEARANCES:

SUTHERLAND, ASBILL & BRENNAN, LLP
By: KENT L. JONES, Esq.
JULIE BOWLING, Esq
1275 Pennsylvania Avenue, N.W.
Washington, D.C., 20004
Attorneys for plaintiff.

U.S. DEPARTMENT OF JUSTICE
By: MICHELLE C. JOHNS, Esq.
THOMAS M. HERRIN, Esq.
717 North Harwood Street, Suite 400
Dallas, Texas 75201
Attorneys for defendant.





INDEX

Richard Sands
Examination by Ms. Johns 4 - 117

UNITED STATES EXHIBITS

No. 1 - Letter 18
No. 2 - Nondisclosure agreement 29
No. 3 - Invoice 45
No. 4 - Invoice 46
No. 5 - Accounting statement 56
No. 6 - Fiscal statement 88
No. 7 - Financial statement 90
No. 8 - E-mail 91
No. 9 - Spread sheet 99
No. 10 - Time line 100
No. 11 - Time line 100
No 12 - Letter 103
No. 13 - Letter 103

GOVERNMENT EXHIBIT 36
CARDELS 800-783-0399





RICHARD SANDS
called herein as a witness, being duly sworn
testified as follows:

EXAMINATION BY MS. JOHNS:

**Q. Mr. Sands, can you state your full name for the record?**
**A. Richard Sands.**
**Q. Have you ever taken a deposition before?**
**A. Yes.**
**Q. What context, what sort of cases?**
**A. Insurance cases, those types of things.**
**Q. So you understand how depositions work. Try to answer audibly for the court reporter.**
**A. Yes.**
**Q. If I ask you a question that you don't understand and you'd like me to rephrase it, just ask me and I'll try to do so. Okay?**
**A. Okay.**
**Q. Have you prepared in anticipation of your deposition today?**
**A. Yes.**
**Q. What did you do in preparation?**
**A. Briefly reviewed some of the case and documents.**

A. Yes.
Q. What does it do today?
A. It I believe is an investor in Alpha today.
Q. And are you one of the shareholders of RRM&C Management Corp?
A. Yes.
Q. Are you familiar with the Marvin Sands master trust?
A. Yes.
Q. And are you a trustee of that trust?
A. Yes.
Q. We mentioned before the trust created for the benefit of Andrew Stern, Zachary Stern and Abby Stern.
Are you a trustee of any of those trusts, all of them, do you know?
A. I believe I'm a trustee of all of them, but I could be incorrect.
Q. Okay. I think that's all the entities, except for the charitable remainder trusts that we'll talk about later on.
Now, are you familiar with an entity called The Heritage Organization, LLC?
A. I'm uncertain as to really what your question is.





Q. Let me show you something that may refresh your memory.
A. I don't know what it means to be familiar with an LLC.
Q. Well, let's start this way. I'll show you this letter, and Tom, do you want to go ahead and pull it out and we'll mark it.
This has a government exhibit on it because it was attached to our MSJ and we'll mark it Exhibit 1 for the deposition.
(U.S. Exhibit No. 1 - letter - marked for identification.)
BY MS. JOHNS:
Q. This is a letter dated March 29th, 2001 addressed to you from someone named Chet Decker.
Do you recall -- do you want to take a minute to look at this letter?
MR. JONES: I'll note for the record this isn't a signed copy, and you said it comes from your files?
MS. JOHNS: I think it does, yeah.
MR. JONES: So it's an unsigned perhaps draft of a letter.
THE WITNESS: Okay.





BY MS. JOHNS:
Q. Do you recall this letter?
A. No.
Q. Do you recall receiving it?
A. No.
Q. Do you think this is the first time you've seen it or do you think you might have seen it back in March of 2001 or you just don't remember it?
A. From reading the first paragraph it looks to me as if this is a follow-up to cold calls that Heritage placed to me.
Q. Okay.
A. Which I receive thousands of.
Q. So let's start from your very first interaction with The Heritage Organization. You said you got some cold calls?
A. I got a cold call.
Q. Do you remember when that was? Just generally. I don't need an exact date.
A. Early 2001.
Q. Okay. What did they say on the call?
A. I don't remember to be quite honest.
Q. And how many times did they call you?
A. I think once, twice maybe. Again, I could be





correct -- incorrect.
Q. At what point did you decide you wanted to actually have a face to face meeting with Heritage?
A. I never decided that.
Q. Okay. Did you -- let me ask this: Did you ever have a face to face meeting with Heritage?
A. Yes. I was involved in a face to face meeting with Heritage.
Q. And when was that meeting?
A. I don't remember.
Q. Was it in 2001?
A. I would suspect so.
Q. Okay. How many face to face meetings with Heritage did you have?
A. I don't recall.
Q. Now, you said that the cold calls -- at some point the cold calls --
A. Call.
Q. Cold call?
A. Potential call.
Q. Became a face to face meeting. Who made that decision to finally say, okay, let's meet with Heritage?
A. My brother.

Q. Robert?
A. Uhm-uhm.
Q. In that first face to face meeting, was it here?
A. I don't recall.
Q. Do you remember flying to Dallas for the meeting?
A. I don't recall.
Q. Okay. Who was at this first face to face meeting with Heritage?
A. I really don't recall specifically anyone, but I believe Gary Kornman was certainly there, but I could be incorrect.
Q. So the only person from the Heritage side you remember being there was Gary?
A. That's not what I said. I said I don't recall at all who was there.
MR. JONES: Let me advise the witness that you should not speculate on answering the questions.
THE WITNESS: Very good. I don't recall who was there.
BY MS JOHNS:
Q. Who from your family was at the meeting?
A. I don't recall.





Q. Now, how many -- I don't think I asked you this already, but how many face to face meetings with Heritage did you have?
A. No idea, I don't recall.
Q. And you don't ever remember traveling to Dallas to meet with Heritage?
A. I don't recall traveling to Dallas to meet with Heritage.
Q. At this first meeting that we talked about, this first face to face meeting with Heritage in 2001, what was discussed?
A. I don't recall. I don't recall any specifics of any meetings.
Q. Okay. Would reviewing this letter refresh your memory at all about maybe what was discussed at the meeting?
A. Not one bit.
Q. Can you say today why Heritage -- why would Heritage contact you, why would they make a cold call to you, do you know?
A. I can't speculate about why they would do anything.
Q. Do you know why Robert finally agreed to meet with Heritage?





A. Yes.
Q. Why was that?
A. We had discussed a potential sale of family owned Constellation stock along with some estate planning and philanthropic plans along with certain uncertainties that we would face once we started the process of selling family stock. And I told Rob as I believe, okay -- this is really reconstruction - of the fact that this group had called me and talked about similar things. That's what I believe, but that may not be precise. That's the connection.
Q. Okay. In your meeting with Heritage and in the time leading up to the implementation of these transactions, what were your goals for the transactions that are at issue in this litigation?
A. One, to make a profit; two, to diversify our holdings which were very concentrated in Constellation stock. These are not in order of priority necessarily. Three, to do some estate planning work; four, to provide for the philanthropic needs that we would be having at the time and in the future. I think that's basically, you know, a basic family business plan or financial plan you would call.
Q. Now, this letter I've shown you that I marked





as Exhibit 1 states in the fourth paragraph entitled capital gains, it says, we offer strategies that can eliminate the total tax liability on capital gains.
Was one of your goals to eliminate the total tax liability on capital gains?
MR. JONES: I'm going to object to the form of the question only because you refer to this as a letter. It's an unsigned copy of something and it hasn't been established that it was sent or received.
So I object to the characterization that it's a letter. It's not supported by the record. You can answer the question if you understood it.
THE WITNESS: Could you repeat the question?
BY MS. JOHNS
Q. This letter states that Heritage offers strategies that can eliminate the total tax liability on capital gains.
Was one of the these goals on these transactions to eliminate the total tax liability on capital gains with respect to the sale of the Constellation stock?
A. The question is not clear to me. If the question is -- was it the goal to eliminate totally capital gains tax?
Q. Right. Well, that's --

A. No.
Q. Well, why are you -- why do you disagree with that?
A. Because it was not a goal to eliminate totally capital gains tax.
Q. Okay. Now, before the transactions at issue in this litigation happened, did you know what the tax effects would have been of an outright sale of your Constellation stock?
A. Yes.
Q. Can you tell me what that would have been?
A. Normal payment of tax against the gain.
Q. So you understand the concept of basis?
A. Yeah.
Q. And do you remember what the basis of your Constellation stock was around the year 2001?
A. No.
Q. But was -- do you recall whether the basis of the stock was low relative to the overall value of the stock?
A. Oh, yes.
Q. So you understood if you hadn't entered into these transactions you would have had to have paid a capital gains tax on the sale of the stock?





A. Yes.
Q. And do you understand that as a result of the transactions at issue in this litigation that you pay little to no tax in connection with the sale of the Constellation stock?
A. Yes.
Q. Now, back to the meetings with Heritage. I know you say you don't recall much. Let me ask my questions and if you don't recall just say that.
Do you remember whether there were any -- what we would call a wipe board presentation at the Heritage meeting, something similar to that?
A. I don't recall.
Q. What about a power point presentation?
A. On a screen?
Q. Sure.
A. I don't recall.
Q. Other than the two transactions that are at issue in this litigation, did Heritage advise you regarding any other sort of strategies or planning techniques?
A. Yes.
Q. What strategies or planning techniques were those?





A. We had very, very broad conversations about estate planning, family partnerships, inner family loaning, creating trusts, you know, hedging strategies against concerns that we had, noncorrelated investment strategies to our concentrated position, diversification strategies. Boy, you know, philanthropic discussions.
Q. Okay.
A. I mean, those are broad topics.
Q. That's fine.
A. I don't recall specifics in each one of those, but very, very broad discussions about family financial planning and how families function.
Q. Okay. Other than the two transactions that are at issue in this litigation, did you enter into any of these other Heritage strategies that you just talked about? Did you implement any of these Heritage ideas or strategies.
A. Over the long-term, yes.
Q. Did you implement those with help of Heritage?
A. I don't know what help means.
Q. Well, for instance, in these two transactions we know that Heritage helped with preparation of





documentation and documentation and implementation. In the other strategies that we're talking about, other than the two at issue in this litigation, did Heritage help you with implementation?
MR. JONES: I'll object to the question because I think it's confusing. We're talking very broadly, but if you understand the question, please answer it.
THE WITNESS: Well, if you would rephrase the question. Did Heritage implement for us other strategies?
BY MS. JOHNS:
Q. That's exactly what I'm asking you. You got it right there. Other than the two at issue in this litigation.
A. Did Heritage implement through preparing documentation or anything of that nature, no.
Q. Thank you. Do you recall signing a nondisclosure agreement with Heritage?
A. Yes, because I've reviewed it.
Q. Okay. What was your understanding of this nondisclosure agreement?
A. What was my understanding, you said?
Q. Right.

Q. Like, did you get any references is kind of what I'm referring to.
A. I believe Rob may have.
Q. But you didn't personally?
A. No.
Q. At the meeting that you had with Heritage did anyone from Heritage associate these two strategies, the two transactions, with the potential amount of taxes to be saved?
A. At the meeting?
Q. The meeting.
A. The meeting? I don't know.
Q. The one face to face meeting that you do recall having in 2001 --
A. Wait. I said to you I do not recall the specifics of any meetings that I had, but I assume I had meetings and more than one.
Q. Okay. So if I ask you any question about what was discussed at those meetings your answer is going to be you don't remember anything; is that correct?
A. That is correct.
Q. Okay.
A. Now -- that is correct. I have a very bad





memory and I really do. I can't remember anything.
Q. That's fine. I just have to ask the questions.
A. It's okay. I hope you don't mind the answer.
Q. No.
Do you know who primarily dealt with Heritage on behalf of your family?
A. Rob.
Q. Okay.
A. I need to correct that. I mean, I was present. I dealt with them. I just don't remember anything.
Q. Do you think Robert had more contact with Heritage than you did?
A. I can't speculate.
Q. Okay.
A. I'm withdrawing my answer when I said Rob, because I don't know who primarily dealt with them. We both dealt with Heritage.
Q. Do you recall whether Andrew Stern ever met with Heritage or spoke with Heritage on the phone?
A. I don't recall whether he ever met with Heritage or spoke to Heritage.
Q. What about your mother Marilyn, do you recall





whether --
A. She never met Heritage or spoke to Heritage.
Q. Okay. Like I said, I'm going to ask you these questions. If you don't remember, that's fine. But I have to at least ask them.
A. It's okay.
Q. At the meeting with Heritage or meetings that you may have had, did anyone discuss any sort of time line that the strategies would need to generate the results?
A. I don't recall.
Q. Okay. Was there any discussion about profit potential from the transactions at the meetings?
A. I believe so in that that was our number one motive is to make money.
Q. Now, we're talking about the transactions, the first and the second transaction.
What were the sources of profit that you believed existed with respect to these transactions?
A. Well, one, I believe we made short sales of treasuries, highly leveraged short sales of treasuries which can result in a huge return on your investment.
We had in the second transaction purchased Yahoo and Corning which as I recall were at all time low. So





those have great profit potential. And there were many other investments -- transactions you could say, investment transactions, I really should say that had profit potential.
Q. What other investment transactions are you referring to?
A. Buy other stocks, go long on treasuries, go short on treasuries.
Q. You don't mean specific to these transactions. Are you talking in general?
A. Yeah, in general.
Q. I was referring to these two specific transactions and what kind of profit potential you saw in these transactions.
MR. JONES: When you use the word transaction it's unclear to me, I don't know if it's clear to the witness. It's unclear to me whether you're talking about these specific historical transactions included excluding everything else or you're talking about the organizations that conducted those transactions. There's a built in ambiguity. I know you're doing it in shorthand. I'm not trying to interfere with your questioning but there's a built in ambiguity in that question.

would pay capital gains ta‹ against.

Q. So we talked about there was a profit potential and you just mentioned there was a tax benefit.

A. Uhm-uhm.

Q. Would the primary motivation for entering into the Heritage transaction be the tax savings or the profit potential?

A. Profit potential.

Q. So -- go ahead.

A. I need to clarify something. You gave me a choice. I gave you many reasons why we were doing what we were doing. And you gave me a choice. I'm going to retract what I said and go back to what I said initially. We had multiple motives; profit, diversification, estate planning, philanthropy, and you can add to it minimizing taxes.

Q. Was --

A. There is no primary.

Q. That was going to be my question.

A. Okay. You gave me a didactic choice.

Q. I understand. So if the Heritage transactions, the first partnership and the second partnership, didn't have any tax benefit at all do you





think you still would have entered into the transactions that are at issue in this litigation?

A. Say that again?

Q. Let's say that the two Heritage transactions that we're talking about today, the first set of partnerships and the second set of partnerships, if there was no tax benefit at all would you have still entered into the transactions of Heritage?

A. Well, the question is very confusing because what do transactions mean? Do the transactions mean the investments? Do the transactions mean the creation of partnerships? Please restate the question and clarify it.

Q. What I mean is the creation of the partnerships, the entering into of the short sales, would you have entered into those transactions if there wasn't any tax benefit at all?

A. We would consider having made short sales, okay, for the benefits that it provided and we routinely create partnerships to invest family assets, cash, money, to make profits. I mean, day in and day out. We continue to do so.

MR. JONES: We've been going about an hour. Do you want to take a short break or do you want to





keep going?

MS. JOHNS: No. We can take a break. It might be good.

MR. JONES: We'll take a five minute break.

(Recess taken.)

BY MS. JOHNS:

Q. Prior to the break we were talking about - and I don't want to say something that you didn't say - we were talking about the fact that you used family partners, you and your family used family partnerships quite a lot. And we talked about short sales and your investments and that sort of thing.

A. Uhm-uhm.

Q. Let me ask this, and excuse me if it's kind of inartful, I'll try my best to ask it, but was there a need to use Heritage to structure these transactions? I assume -- let me say this: I assume you have other legal counsel, investment advisors. Why use Heritage?

A. You are correct. We have many investment advisors and legal advisors, accounting advisors, but we're always bringing on new advisors and sometimes eliminating them. So the question is not answerable in the form that you've asked it.

Q. Okay. Do you know how the fees that you were





to pay Heritage were determined?

A. I know it because I read it in this agreement that you put in front of me.

Q. Exhibit 2?

A. Yes.

Q. And do you recall how it was determined?

A. Well, I read it.

Q. What does it say?

A. Well --

Q. I seem to have misplaced mine.

A. Am I supposed to say what --

MR. JONES: Just refer to the paragraph.

THE WITNESS: Paragraph 4.1.

BY MS. JOHNS:

Q. And it says that the principles shall pay a fee of 25 percent of all present and future taxes that would have been incurred as projected for the principals.

What did that paragraph mean to you?

A. Exactly what it says.

Q. So you knew when you signed this agreement that the fee you paid Heritage was based on tax savings?

A. Correct.

Q. Okay.
A. Are we done with these?
Q. Yes. I think so.
Did you obtain any legal advice about this transaction?
A. Yes.
Q. From whom did you obtain that advice?
A. You said this transaction. Which transaction?
Q. We have the first set of partnerships and the second set of partnerships. If it differs let me know or if it's the same --
A. Yep. I believe we obtained legal opinions from Lewis, Rice and Milbank Tweed from what's his name, Jonathan Blattmachr.
Q. And the first firm is Lewis, Rice?
A. Yes.
Q. How was Lewis, Rice referred to you?
A. I don't know.
Q. Do you know if Heritage referred Lewis, Rice to you?
A. I don't know. I don't pick our lawyers. My brother does.
Q. Do you know whether you had any legal





relationship with Lewis, Rice prior to the Heritage transaction?
A. I don't know.
Q. What about after the Heritage transaction?
A. If they wrote an opinion I guess you have a relationship. I don't know. I don't know the definition of a relationship.
Q. Have they ever done any legal work for you other than the legal work associated with the first and second partnerships?
A. I don't know. You'd need to ask my brother.
Q. Besides Lewis, Rice and Milbank Tweed, did any other law firm write a tax opinion for you with respect to this transaction?
A. I don't believe so, but I could be incorrect.
Q. Do you recall whether you executed an engagement letter with Lewis, Rice.
A. I don't recall.
Q. Do you recall if you executed an engagement letter with Milbank Tweed?
A. I don't recall.
Q. Do you recall who referred you to Milbank Tweed?
A. My brother.





(U.S. Exhibits Nos. 12 and 13 - marked for identification.)
BY MS. JOHNS:
Q. We'll start with Exhibit 12 first. Do you recognize this letter?
A. Yes.
Q. And did you prepare this letter?
A. No.
Q. Who prepared this letter?
A. Lewis, Rice.
Q. If you'll turn to the last page, is that your signature?
A. Yes.
Q. Okay. So Lewis, Rice prepared this letter for you. How did they go about preparing it, did you have telephone conversations with him?
A. I don't recall.
Q. Did you ever meet face to face with any of the attorneys at Lewis, Rice?
A. I don't recall.
Q. Did you have a specific named attorney at Lewis, Rice that you dealt with?
A. I don't recall.
Q. How did Lewis, Rice obtain the information





that's in this letter?
A. I don't recall.
Q. Now, a lot of the stuff in the letter is stuff we already talked about so I don't want to rehash a lot of those topics.
But if you'll turn to page 3.
A. I'm there.
Q. Paragraph seven.
A. I'm there.
Q. I don't know if you want to take a minute to read it.
A. I will do whatever you want me to do.
Q. My question is: Do you know where Lewis, Rice obtained this information that's in paragraph seven?
A. Well, this is the information that I discussed before about what had happened with interest rates. This is available to anybody in the world, certainly was available to me. So I may have provided it to my brother. I may have provided it directly to them. I don't know.
Q. And the same question with paragraph eight, do you know how Lewis, Rice obtained this information?
A. I again would give the exact same answer.

COPY



WITNESS CERTIFICATE

STATE OF NEW YORK )
COUNTY OF MONROE )

I, RICHARD SANDS, do hereby certify that I have read the transcript of my testimony as taken under oath on Tuesday, June 12, 2007 and that said transcript is a true, complete and correct record of what was asked, answered and said during said deposition, and that the answers on record therein, and as may be modified in conformity with the attached errata sheet, are true and correct.

[signature]

Subscribed and sworn to before me
this 26 day of July, 2007
Notary Public
[signature]

KAREN J SORCE
Notary Public, State of New York
No. 01S05037146
Qualified in Ontario County
Commission Expires December 19, 20_

COPY



In the Matter of:

| | |
|---|---|
| ALPHA I, L.P., by and through ROBERT SANDS, a notice partner, Plaintiff -vs- THE UNITED STATES, Defendant | Case No. 06-407T |

Errata sheet for the Deposition of RICHARD SANDS taken on Tuesday, June 12, 2007.

| PAGE | LINE | REMARKS |
|---|---|---|
| 8 | 7 | "legation" should be "litigation" |
| 69 | 4 | "as a unrecognizable name to entity" should be "as a unrecognizable named entity" |
| 78 | 1 | "it" should be "is" |
| 99 | 8 | "Sax" should be "Sachs" |
| 100 | 2, 9, 23, 25 | "Nope" should be "No" |
| 54 | 24 | "yep" should be "yes" |
| 89 | 3 | "yep" should be "yes" |
| 101 | 14 | "yep" should be "yes" |
| 111 | 2 | "yep" should be "yes" |