IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407T

(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

- - - - - - - - - - - - - - - - - X

ALPHA I, L P., by and through )
ROBERT SANDS, a notice partner, )
Plaintiff )Case No 06-407T
-vs- )
THE UNITED STATES, )
Defendant )

- - - - - - - - - - - - - - - - - X

Deposition of ROBERT SANDS taken pursuant to notice at Constellation Brands, 370 Woodcliff Drive, Suite 300, Fairport, New York on Wednesday, June 13, 2007 commencing at 9:30 a.m.

Reported by·
COMPUTER REPORTING SERVICE
Amy M. Condon, CSR, RPR
270 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614 (585) 325-3170





APPEARANCES·

SUTHERLAND, ASBILL & BRENNAN, LLP
By: KENT L JONES, Esq.
JULIE BOWLING, Esq
1275 Pennsylvania Avenue, N W.
Washington, D.C., 20004
Attorneys for plaintiff.

U.S. DEPARTMENT OF JUSTICE
By: THOMAS M. HERRIN, Esq.
MICHELLE C. JOHNS, Esq.
717 North Harwood Street, Suite 400
Dallas, Texas 75201
Attorneys for defendant.





INDEX

Robert Sands
Examination by Mr. Herrin 4 - 151

UNITED STATES EXHIBITS

No. 14 - Agreement 44
No 15 - Representation letter 132
No. 16 - Representation letter 148

GOVERNMENT EXHIBIT 37

CARDELLS 800-783-0399





ROBERT SANDS

called herein as a witness, being duly sworn testified as follows

EXAMINATION BY MR. HERRIN:

Q. Mr. Sands, since your an attorney as well, I'm going to skip a lot of the formalities. You know basically, this testimony can be used in court. It is under oath.

Probably the only caution I'll give you is, you know, the court reporter has to be able to take everything down so please answer with a yes or a no or full statement, whatever, as opposed to a nod or uhm-uhm type thing.

And then since she can only take down one person's talking at one time, and I intend to keep talking when I shouldn't and jump in when other people are, let's all try to finish what we're saying and let the other person talk.

I will caution you though that if Mr. Jones has something to say he usually doesn't want you talking at that time so please stop, let him make his objection and we'll pick up from there. Is that applicable?

A. Yes.

Q. Would you please state your name and address

MR. JONES: Same instruction. Have you — did you look at any documents at our request or in our presence, you don't have to answer that question. But if you looked at documents other than our request or in our presence, then you can answer the question.

THE WITNESS: I think I already answered that. I didn't look at anything beyond what you requested or in your presence and therefore, there is nothing further I can say on this topic.

BY MR. HERRIN:

Q. Okay. Because I think we're entitled to know what you did in preparation, I will have to ask you those specific questions, to say I'm not answering on advice of counsel because I don't know whether it will be an issue or not. I want to clear this, you are refusing to answer on the instruction of counsel.

I just want to ask the question again, I know it's been asked but I want an answer in the proper format.

MR. JONES: Actually he did answer based on my instructions. He didn't refuse to answer. He answered it with my instruction not to reveal documents that we asked him to review or documents that he reviewed in our presence, he said he reviewed no other documents.





MR. HERRIN: All right. I can live with that.

BY MR. HERRIN.

Q. How many meetings did you attend with Heritage Personnel?

A. I don't know.

Q. Approximately?

A. I don't know.

Q. More than one?

A. Yes.

Q. More than five?

A. I don't know.

Q. As far as actual meetings, not telephone conversations, did the meetings that you attended, were they conducted here in New York, Rochester, were they in Dallas or someplace else?

A. Rochester.

Q. The initial meeting, do you recall when that happened? Again, I'm dealing just with meetings, not telephone calls.

A. No.

Q. All right. Do you recall who attended?

A. Are you asking do I recall everyone who attended the first meeting?





Q. Yes.

A. I don't really recall the first meeting.

Q. Okay. Do you recall anything about the first meeting?

A. Not really, no.

Q. The purpose of it?

A. To discuss, you know, various ideas that they had relative to financial planning and other concepts.

Q. Okay. Was this meeting different from subsequent meetings in terms of how it evolved, what they were presenting?

A. I don't really remember the first meeting other than —

Q. Just having a meeting?

A. — there was a meeting and I know that we discussed various financial planning type concepts. That's all I remember about the first meeting.

Q. I want to go a little bit deeper. Just as far as in terms of yourself and your family members, do you recall who would have attended that meeting?

A. I believe Richard attended that meeting.

Q. Richard and yourself or just Richard?

A. I assume you're talking about a meeting that I was at?





Q. Yes. But you said Richard attended so I had to be sure.

A. I am assuming Richard attended that meeting. I believe he attended that meeting, let me put it that way.

Q. All right. As far as — tell me the meetings that you recall. Let's go with that. Your recollection.

A. There were a number of meetings and I really have a very vague recollection of the specific meetings. I mean, you know, we're talking quite a few number of years ago and I just don't recall all of the meetings with Heritage.

Q. All right.

A. I'm not trying to be difficult but, you know.

Q. I understand. There's a time frame issue here.

As far as again the meetings that were held, who attended any of the meetings with regard to yourself and your family and I'm going to include Andrew Stern in terms of family.

A. I don't recall him attending any meetings.

Q. How about your mother, did she ever attend any of the meetings?

dealings with Heritage?

MR. JONES: Pardon me. I'm simply objecting to the form of the question because counsel is testifying but you can answer the question which I believe was after 2002 has Heritage -- have you had dealings with Heritage; is that correct?

MR. HERRIN: That's acceptable.

THE WITNESS: Dealings?

BY MR. HERRIN:

Q. Business dealings, transactions where they acted as advisors to you for business transactions.

A. They acted as advisors to us beyond 2002.

Q. In what capacity?

A. Advisors.

Q. What type of advice were they providing?

A. Business advice.

Q. What type of investments were they encouraging you to become involved with?

A. What kind of investments were they -- we talked about, you know, numerous types of things that -- are you asking me did we do anything with them?

Q. I was going there but we can jump to it, yes.

A. No.

Q. All right. Do you have other investment





advisors that you use besides Heritage?

A. Yes.

Q. What was it about Heritage that stands out in your mind, why you chose to deal with them as opposed to these other advisors?

THE WITNESS: You're okay with that?

MR. JONES: The question is vague and confusing. If you can answer it, go ahead. If it's too vague to answer then --

THE WITNESS: I thought they had good ideas.

BY MR. HERRIN:

Q. In particular, what type of ideas that you thought were good?

A. Ideas about investments, ideas about partnerships, entities. Ideas about, you know, confidentiality protection. Ideas about many things related to our financial and estate planning concerns.

Q. All right. As far as the investments, what investment opportunities did you take advantage of at the direction of Heritage?

A. At the direction? They didn't direct us to do anything.

Q. As a financial advisor, as an investment advisor what investments did you get into pursuant to





their advice?

A. We purchased stocks, we sold short treasuries, we formed entities that we continue to use for investment purposes, things of that nature.

Q. As far as buying stocks, you purchased stocks before Heritage came along, didn't you?

A. Yeah, uhm-uhm.

Q. And I presume afterwards as well?

A. Yes.

Q. How about selling treasuries short, had you done that before the Heritage transactions?

A. I'm not sure only in that -- I'm not sure.

Q. How about afterwards?

A. After -- well, the Heritage transactions, are we --

MR. JONES: Could we have a time frame when you say after?

MR. HERRIN: We only have between 2002 and the present.

THE WITNESS: And I'm not sure is the answer to the question so we'll leave it at that.

MR. HERRIN: Thank you.

BY MR. HERRIN:

Q. During the meetings with Heritage was one of





the points that they were promoting that they could eliminate capital gains on the sale of stock?

MR. JONES: If you find the question confusing as phrased you can answer it with different phrasing or you can ask him to clarify.

THE WITNESS: I do find the question confusing.

BY MR. HERRIN:

Q. All right. Was one of the selling points of the Heritage transactions that they would eliminate or help you eliminate capital gains on the sale of Constellation stock?

A. I wouldn't put it that way so, no, that's not how I would describe it.

Q. All right. Did they promote that as a potential realization of their transactions?

A. I would not put it that way, that's my answer to the question.

MR. HERRIN: Can you mark this please?

(U.S. Exhibit No. 14 - marked for identification.)

BY MR. HERRIN:

Q. I'd ask you to take a minute and review this document. I don't need you to read it all in detail unless you think you need to to get comfortable.

explained the potential savings to you?
A. I'm not sure if savings, I agree with that terminology, but so -- so you might want to restate your question.
Q. All right. Tax reduction, is that better?
A. I would restate the question.
MR. JONES: How about just tax issues?
BY MR. HERRIN:
Q. We'll try tax issues. Only reason I'm hesitant is was Heritage providing you legal advice?
A. They were not acting as our attorneys.
Q. All right. We'll try it. As far as tax issues, who on behalf of Heritage discussed tax issues with you?
A. Gary Prinbly (phonetic.)
Q. Anybody else?
A. You know, all the ones that -- I don't recall specifically who said what. So it's hard to know beyond Gary, but let's say Gary Kornman for sure.
Q. And what were those issues that were discussed?
A. Well, we talked about taxation in general and what our tax status was and, you know, what our taxes might be under a variety of circumstances.





Q. Okay. At that time what was the tax status that you spoke about as you understood it?
A. Well, when I say tax -- personally when I say tax status, we talked about our taxes.
Q. All right.
A. As opposed to, you know, whether we're a not for -- we talked about our individual tax circumstances, how is that?
Q. All right. As far as what you describe as what they might be, what were those discussions?
A. You know, as I said, we talked about a whole variety of matters, whether it would be estate matters and other matters.
Q. Well, let's start with the estate matters. What were the discussions with regard to the estate matters?
A. We talked about, you know, the fact that we could have significant taxable estates that, you know, there is tax planning that could go on that could be helpful in that regard, things to this effect.
Q. All right. As far as being helpful, how was it to be helpful for that estate planning purposes, what was the discussion about, how did they say they could help you?





A. By doing things that potentially would result in less estate taxation than more estate taxation.
Q. What type of things?
A. Well, you know, I don't remember the -- I don't remember the specifics of the conversation to tell you the truth.
Q. Well, generally do you recall what types of things you agreed to do in furtherance of trying to minimize the taxes?
A. Well, clearly at one point we must have talked about CRUTS.
Q. Okay. What was the -- tell me what you recall from those conversations.
A. Well, first of all, you know, there were other attorneys -- there were attorneys present who were advising us, you know, on some of the estate taxation matters as well.
As I said, Gary was not advising us with respect to legal matters per se, but, you know, we talked about how things like CRUTS work and how they might be used to fulfill our estate tax as well as income tax objectives as well as our charitable objectives for our -- as an example.
Q. And I'm not dealing with the attorneys,





but --
A. But I don't remember the specifics of those conversations.
Q. That's fine.
But generally speaking, what did Heritage say they could do with regard to the estate planning aspects for you?
A. What did they -- I don't remember the specifics of the conversation.
Q. Well, generally though?
A. They thought they could be helpful to us in structuring things that could be, you know, beneficial to us from an estate planning point of view in general. Whether it was tax or other objectives that we might be able to -- that we were trying to accomplish in our estate planning.
Q. And specifically with regard to taxes, how did they say they could be beneficial?
A. Depending on what our other objectives were there may be favorable tax consequences versus other things, i.e., give all your money to your wife, there is no tax if you die, if you predecease your wife. On the other hand, if you left your money to somebody else there might be taxes under those circumstances. Things

two?

MR. JONES: I'm going to object to the form of the question. You're asking the witness to invent your question for you. Why don't you tell him what you think the differences are and then ask --

MR. HERRIN: Then I get accused of testifying for him.

MR. JONES: What you've done is asked a question that lacks any foundation on the record so I'll object on that basis. If you understand the question, you can answer it.

Can you tell us exactly what the question is you want answered? We can have it read back.

BY MR. HERRIN:

Q. It's your testimony earlier that pursuant to the contracts or whatever contract that was -- Heritage got paid based upon a percentage of the tax savings, correct?

MR. JONES: Object to the form of the question. Misstates his testimony. His testimony was they got paid based on Section 4.1 in that agreement you had in front of him.

BY MR. HERRIN:

Q. Let's just pull back 4.1. We're going to pin





that point down and we're going to spend the next hour before the bus leaves doing so.

All I want him to do is commit that he says, yes, I agree to pay Heritage 25 percent with the current and future tax savings in accordance with 4.1.

MR. JONES: He agreed to do whatever 4.1 says.

MR. HERRIN: He won't tell us what 4.1 says.

MR. JONES: I don't know what's your problem, the document speaks for itself as far as what the agreement was.

MR. HERRIN: All right.

BY MR. HERRIN:

Q. How much input did you have into the preparation of this letter?

A. Significant.

Q. What is significant?

A. I reviewed it several times and discussed it with the law firm to ensure that these were, in fact, my representations and that I believe that they were correct.

Q. Did the discussion -- first discussion with regard to these facts come before or after you presented a draft of the letter?





A. What letter?

Q. This letter. You say you reviewed drafts of the letter and you had discussions --

A. Oh, first -- give me the question again.

Q. Did you get a draft of the letter before you had the discussions?

A. No.

Q. So you had general discussions, you got a draft of the letter and then --

A. No, they were detail discussions about the representations before I received the draft of the letter.

Q. Okay. These discussions, who were they with at Lewis, Rice, do you know the name of the attorney?

A. I believe they were with Jamie Mendez.

Q. And did Mr. Mendez ask you questions to solicit the facts or did you provide the facts on your own?

A. Both.

Q. Similar letters were going to have been prepared with regard to your mother and with regard to Andrew Stern. Do you know, did somebody from Lewis, Rice contact those two individuals or were those discussions held between yourself and them and Lewis,





Rice?

A. I believe they contacted those individuals.

Q. All right. Let's move on.

MR. HERRIN: Can you mark this please?

(U.S Exhibit No 16 - marked for identification.)

BY MR HERRIN

Q. Please take a moment to look over that document.

A. Okay.

Q. Okay. What is this document?

A. I believe it is the second representation letter provided to Lewis, Rice.

Q. So this would have been in connection with the second transactions, the Alpha and Beta transactions; is that correct?

A. It was in connection with transactions that involved Alpha and Beta.

Q. All right. And in the first one, Deposition Exhibit No. 15, that was in connection with the RRM&C Group and those entities, those transactions?

A. I believe that the second letter is in connection with all transactions up to that point in time and the first letter was prior to Alpha and Beta.

Q. All right. Was the first letter in

COPY



WITNESS CERTIFICATE

STATE OF NEW YORK )
COUNTY OF MONROE )

I, ROBERT SANDS, do hereby certify that I have read the transcript of my testimony as taken under oath on Wednesday, June 13, 2007 and that said transcript is a true, complete and correct record of what was asked, answered and said during said deposition, and that the answers on record therein, and as may be modified in conformity with the attached errata sheet, are true and correct.

[signature]

Subscribed and sworn to before me
this 21st day of July, 2007
Notary Public

[signature] Karen J Sorce

KAREN J SORCE
Notary Public, State of New York
No. 01SO5037146
Qualified in Ontario County
Commission Expires December 19, 2010

COPY



In the Matter of:

```
- - - - - - - - - - - - - - - - -  X
ALPHA I, L.P., by and through      )
ROBERT SANDS, a notice partner,    )
     Plaintiff                     )Case No. 06-407T
     -vs-                          )
THE UNITED STATES,                 )
     Defendant                     )
- - - - - - - - - - - - - - - - -  X
```

Errata sheet for the Deposition of ROBERT SANDS taken on Wednesday, June 13, 2007.

| PAGE | LINE | REMARKS |
| --- | --- | --- |