IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: September 14, 2007)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION TO STRIKE**

Plaintiffs hereby move to strike certain inadmissible evidence proffered by defendant in support of its Response to Plaintiffs' Cross-Motion for Summary Judgment, specifically Exhibits 26 through 29 of the Appendix to Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment ("exhibits" or "transcripts"). Exhibits 26 through 29 purport to be transcripts of telephone conversations and in-person meetings between employees of The Heritage Organization, LLC ("Heritage") and members of the Sands family. Both Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment ("Defendant's Response")[1] and Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Fact ("Defendant's Facts")[2] rely on these inadmissible exhibits to support their respective arguments and proposed facts.

Defendant produced these transcripts to plaintiffs on July 31, 2007, some eight months after they came into defendant's possession, and after plaintiffs had filed their cross-motion and response to defendant's motion for summary judgment. Defendant used the transcripts as exhibits in Defendant's Response when they had not been verified or authenticated by any

[1] References to Exhibits 26 through 29 in Defendant's Response are found at pp. 2, 27-28, and 32-38.

[2] References to Exhibits 26 through 29 in Defendant's Facts are found at pp. 3, Response to ¶ 1; 4-6, Response to ¶ 4; 7, Responses to ¶¶ 5-6; 9, Responses to ¶¶ 13 and 15; 19, Response to ¶ 41; 21, Response to ¶ 48; 22, Response to ¶ 49, and 23-28, Response to ¶¶ 52-58.

witnesses. In this Court, evidence that would not be admissible at trial is excluded when offered to support motions for summary judgment. *Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 444-50 (2000). Grounds for striking inadmissible evidence include that the evidence has not been authenticated or that it does not meet a hearsay exception. *Id.*; *Allstates Air Cargo, Inc. v. United States*, 42 Fed. Cl. 118, 122-23, 125 (1998) (striking evidence, affidavit, and references to either because they were inadmissible evidence entitled to no weight on a motion for summary judgment).

The transcripts at issue here should be stricken for a variety of reasons discussed in detail below. First, the transcripts are inadmissible because they have not been and cannot be authenticated as accurate representations of the conversations that occurred. For Exhibits 26 and 29, the tapes from which the transcripts purportedly were made no longer exist, and the witnesses involved in the conversations cannot testify to the accuracy of the transcripts. For Exhibits 27 and 28, the transcripts cannot be authenticated. The tapes themselves are suspect and inadmissible because they are generally incomprehensible and contain serious gaps. The chain of custody for the transcripts and tapes cannot be established, and several employees of Heritage have testified that Gary Kornman, Heritage founder, erased parts of tapes. Second, the transcripts contain inadmissible hearsay. Finally, plaintiffs have been prejudiced by defendant's belated production of the transcripts on July 31, 2007; therefore the transcripts should be excluded as a discovery sanction.

**FACTS**

Defendant proffered four exhibits, Exhibits 26 through 29, in support of Defendant's Response and Defendant's Facts. The exhibits are transcripts of purported conversations or meetings between Richard Sands, Robert Sands, and personnel of Heritage. Rita Daugherty, an IRS employee designated to testify for the government regarding its review of the Heritage

documents pursuant to Ct. Fed. Cl. R. 30(b)(6), testified that defendant obtained access to these transcripts and other Heritage documents on November 29, 2007 pursuant to an IRS summons served on the bankruptcy trustee for Heritage. Ex. 1 at 14-15. Excerpts from Ms. Daugherty's deposition are attached hereto as Exhibit 1.[3] Ms. Daugherty was asked to keep a lookout for documents relating to certain taxpayers, including the Sands, during the course of her review. She was asked to let IRS Counsel Elaine Harris know if she found anything relating to the particular taxpayers. Sometime between December 4 and 14, 2006, Ms. Daugherty informed Ms. Harris that documents pertaining to the Sands, including transcripts and tapes, were included in the Heritage boxes. Ex. 1 at 26-27.

Ms. Daugherty then requested funding for copying of the documents, but did not attempt to expedite receipt of funding in order to have the documents subject to discovery obligations copied. Ex. 1 at 38-39. When she received funding to have all the Heritage documents copied on February 12, 2007, she did not have them sent to a vendor for copying until March 29, 2007, more than six weeks later. Ex. 1 at 38-40. The IRS had copies of all the Heritage documents (including the transcripts) in April 2007 and an index of the documents completed by May 23, 2007. Ex. 1 at 40-42. IRS attorneys failed to tell the IRS employees reviewing the Heritage documents that the documents were subject to discovery requirements until July 13, 2007. Ex. 1 at 21. Defendant finally produced the transcripts to plaintiffs on July 31, 2007, the date discovery was originally scheduled to close in this case.

Exhibit 26 is a transcript of a purported telephone conversation between Chester Decker, a Heritage employee, and Richard Sands on May 10, 2001. Excerpts of Mr. Decker's deposition are attached hereto as Exhibit 2. Decker testified that Exhibit 26 was not accurate and that he

---

[3] The final version of Ms. Daugherty's deposition transcript was not available at the time of filing. The excerpts attached as Exhibit 1 are from the rough copy of the deposition transcript.

believed the transcribers cut corners and were sloppy in their transcription, though he believed that the transcript captured the gist of the conversation. Ex. 2 at p. 40, 44-45. Decker stated that he could tell the statements were not recorded the way that he would have spoken. There is no tape of this purported May 10 conversation.

Exhibit 27 is a transcript of a purported meeting between Tim Seaberg, a Heritage employee, and Richard Sands and Robert Sands on May 31, 2001. Excerpts of Mr. Seaberg's deposition are attached hereto as Exhibit 3. When compared against the tape from which it was supposedly transcribed, Exhibit 27 contains words that are not on the tape, the tape contains words that are not on the transcript, and the tape contains gaps that are not indicated on the transcript. Ex. 3 at 81-83, 108, 114-16, 137-38, 148-50. When listening to the tape while reading along on the transcript, Seaberg testified that he still could not understand significant portions of the tape. Ex. 3 at 127-28, 131, 135. The tape is difficult to understand at best and impossible to decipher in numerous places. *Id.* Seaberg could not distinguish between the voices of Richard Sands and Robert Sands on the tape. Ex. 3 at 109. The transcript has several pages that are not on the tape, and a gap of 15 seconds or more on the tape is not indicated at all in the transcript. Ex. 3 at 114-16, 137-38.

Exhibit 28 is a transcript of a purported meeting between Tim Seaberg, Gary Kornman, Robert Sands and Richard Sands on June 13, 2001. Seaberg could not confirm the accuracy of the transcript. Ex. 3 at 94-95. When compared against the tape from which it was supposedly transcribed, Exhibit 28 contains words that are not on the tape, the tape contains words that are not on the transcript, and the tape contains gaps that are not indicated on the transcript. Ex. 3 at 145-50. The tape is difficult to understand at best and impossible to decipher in numerous places. Seaberg could not distinguish between the voices of Richard Sands and Robert Sands on the tape. Ex. 3 at 109.

Exhibit 29 is a transcript of a purported meeting between Tim Seaberg and Gary Kornman of Heritage and Richard Sands, Robert Sands, and their attorney Jim Locke. Seaberg did not remember specific phrases from Exhibit 29 being said in meetings and could not confirm the accuracy of the transcript. Ex. 3 at 94-95. The tape from which Exhibit 29 was purportedly produced does not exist.

All of the transcripts described above contain indications that individuals were cross-speaking or question marks for words, phrases, sentences, or paragraphs that the transcribers could not understand. Ex. 2 at 39-40, Ex. 3 at 83-85. No one involved in the purported conversations has stated that the transcripts accurately reflect what was discussed. Both Decker and Seaberg testified that they typically did not go back and review the transcripts for accuracy after they were made. Ex. 2 at 21-22, Ex. 3 at 81. Richard and Robert Sands previously testified that they do not recall the specifics of the conversations they had with Heritage personnel. Ex. 4 at 22, 27, 32-33, Ex. 5 at 34-35.

The four transcripts described above do not provide the whole picture of the Sands' discussions, negotiations, and interactions with Heritage because they had other phone calls and meetings with Heritage personnel that were not recorded or transcribed. Ex. 2 at 30-32, Ex. 6 at 20-21, 175-76. The transcripts cover purported conversations which focused on the tax benefits to be achieved by the transactions entered by the Sands family. It is undisputed that other conversations and meetings between the Sands and Heritage took place where numerous other benefits from these transactions were discussed. Ex. 6 at 97-102. They discussed the fluctuation of interest rates and how such fluctuations could provide the possibility for profiting in short sales of Treasury notes or affect Constellation stock. *Id.* They also discussed the ability to provide for philanthropic interests through the Heritage financial plan. *Id.* These discussions

either took place during the gaps in the existing transcripts, or during one or more of the many other calls and meetings between the Sands and Heritage employees.

Heritage personnel have testified that they sometimes tape-recorded their conversations with clients or potential clients. The tapes were then provided to a marketing department where employees with no special training transcribed the tapes. Ex. 3 at 18-19. Heritage's "taping policy" was not enforced and not followed at all times by Heritage employees. Not all conversations were recorded, and not all tapes were transcribed. Ex. 2 at 30-32, Ex. 6 at 82-83, Ex. 7 at 28-29.

Richard Sands and Robert Sands recalled learning of a number of benefits from the investment strategy such as making a profit, providing for philanthropic interests, and diversifying their holdings. Unfortunately no tapes or transcripts from these other meetings exist or were retained by Heritage, even though the evidence is undisputed that these discussions took place. The potential tax benefit was only one of several reasons the Sands entered these transactions, including making a profit, providing for philanthropic interests, and diversifying their holdings. Ex. 4 at 23-24, 41.

## ARGUMENT

### I. The Transcripts Have Not Been and Cannot Be Authenticated.

To satisfy Fed. R. Evid. 901, defendant must present evidence sufficient to support a finding that the exhibits are what defendant claims them to be: accurate transcriptions of conversations between Richard Sands, Robert Sands, and Heritage personnel.

Courts have determined that establishing proper foundation for admission of tape-recorded conversations requires showing that the device was capable of recording accurately, that the operator of the recording device was competent to operate it, that the recording is authentic and correct, that changes, additions, and deletions have not been made to the recording,

that the recording has been preserved in acceptable manner, that the speakers are identified, and that the conversation was voluntary and without inducement. *Butler v. United States*, 649 A.2d 563, 566-68 (D.C. Ct. App. 1994); *United States v. Sandoval*, 709 F.2d 1553, 1553-54 (D.C. Cir. 1983); *State v. Fletcher*, 948 S.W.2d 436 (Mo. Ct. App. 1997). The possibilities of misidentification and adulteration of the tapes must be eliminated, "not absolutely, but as a matter of reasonable probability." *Butler*, 649 A.2d at 567 (citations omitted). "[M]ore so than photographs or other demonstrative evidence, sound recordings are susceptible to alterations that may be impossible to detect." *Id.* (citations omitted). The proponent of the recording must "produce clear and convincing evidence of authenticity and accuracy" as foundation for the admission of the recording. *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977), *cert. denied*, 434 U.S. 959 (1977). Tape recordings are admissible only if they are reliable, meaning that they accurately reproduce the conversations that took place, and are authentic and trustworthy. *United States v. Thompson*, 130 F.3d 676 (5th Cir. 1997), *cert. denied*, 524 U.S. 920 (1998).

Defendant has not met and cannot meet these standards for the transcripts or the existing tapes. All of the transcripts contain indications that the transcriber could not understand significant portions of what was recorded, generally denoted by a question mark or by noting that there was cross-speaking. Ex. 2 at 39-40, Ex. 3 at 84-85, 127-129. None of the witnesses have been able to accurately determine what was said during those gaps. Ex. 2 at 39-40, Ex. 3 at 81-83, 108, 114-16, 137-38, 148-50. Decker and Seaberg both testified that they did not review the transcripts of their conversations or meetings for errors. Ex. 2 at 21, Ex. 3 at 81. For Exhibits 26 and 29, transcripts for which no tapes exist, defendant cannot show that the transcripts accurately and correctly evidence a conversation that took place. Richard Sands and Robert Sands have both testified that they do not recall the specific conversations they had with Heritage

representatives. Ex. 4 at 22, 27, 32-33, Ex. 5 at 34-35. Decker testified that Exhibit 26 was not accurate and that he believed the transcribers cut corners and were sloppy in their transcription, though he agreed that the transcript captured the gist of the conversation. Ex. 2 at 40, 44-45. Decker stated that he could tell the statements were not recorded the way he spoke. Ex. 2 at 45-46. Neither Tim Seaberg nor Gary Kornman could authenticate Exhibit 29. Ex. 3 at 94-95. Seaberg could not remember what exactly was said during the meeting or whether the transcript accurately reflected the conversation that took place.

In a 2001 case with similar facts to this instance, a New York district court determined that because the plaintiffs were unable to show that a transcript was a verbatim transcript, it had to be excluded. *Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y. 2001). The transcript at issue in *Bank Brussels* was a transcript of an interview of a witness by two attorneys. The tape was transcribed by the secretarial staff at the law office of the attorneys, and then one of the attorneys edited and revised the transcript to make it more readable and to take out extra words. The original tapes and the transcription by the secretarial staff were no longer available and all that remained was the revised transcript. The witness was never asked to review the transcript and testified that it contained numerous errors and that it was impossible to reconstruct what was actually said at that point in the future. One of the attorneys testified that the transcript was accurate, though not verbatim, and that it captured the gist of the conversation. The court determined that the plaintiffs did not present enough evidence to support a finding that the transcript was a verbatim transcript, and therefore the transcript was not authenticated as representing the statements of the witness. Based on *Bank Brussels*, a witness's belief that a transcript only evidences the "gist" of a conversation is not enough to authenticate the transcript as an accurate recording of a conversation.

As to Exhibits 27 and 28 for which tapes exist, the transcripts are not the best evidence of the purported conversations. Fed. R. Evid. 1002. When compared against the tapes, Exhibits 27 and 28 contain words that are not on the tapes, the tapes contain words that are not on the transcripts, and the tapes contain gaps that are not indicated on the transcript. Ex. 3 at 81-83, 108, 114-16, 137-38, 148-50. Furthermore, even when listening to the tape while reading along on the transcript, Seaberg testified that he still could not understand significant portions of the tape. Ex. 3 at 127-28, 131, 135. Based on the number of errors that appeared in Exhibits 27 and 28, it is certain that Exhibits 26 and 29 suffer from similar problems.

The tapes themselves are untrustworthy which further calls the authenticity and accuracy of the transcripts into question. The tapes were made by the use of a mini-cassette recorder inside a pants or jacket pocket of a Heritage employee at the meeting. Ex. 3 at 73-74; Ex. 8 at 24-25. The tapes are difficult to understand at best and impossible to decipher in numerous places. *Id.* Seaberg could not distinguish between Richard Sands and Robert Sands on the tape. Ex. 3 at 109. Furthermore, there are indications that the tapes have been tampered with – at least one transcript has several pages that are not on the tape and a second gap of 15 seconds or more. Ex. 3 at 114-16, 137-38.

In *McAlinney v. Marion Merrell Dow, Inc.*, 992 F.2d 839, 842 (8th Cir. 1993), the Eighth Circuit upheld a district court's exclusion of tapes evidencing poor sound quality from excess background noise and garbled, unintelligible conversations. In *McAlinney*, the plaintiff recorded the majority of the conversations with a micro-cassette recorder hidden in his sock. The tapes he proffered, like those here, in addition to their poor sound quality, also contained gaps and blank spots – raising serious issues concerning whether changes, additions, or deletions had been made. *McAlinney*, 992 F.2d at 842.

Neither the tapes nor the transcripts have been verified by a Heritage custodian of records. It is unclear who had the tapes prior to and after their transcription by the marketing department. No chain of custody for the tapes and transcripts can be established prior to their receipt by the bankruptcy trustee in 2004. Ex. 7 at 20-21, 47-49.

The purpose of chain of custody testimony is to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with. McCormick on Evidence (2d ed.) § 212. What is particularly problematic here is that Ralph Canada, President of Heritage, testified (in another case unrelated to this proceeding) that he had seen Gary Kornman erase portions of tapes.[4] He commented that he would not trust anything that had been in the Kornman group's possession for four or five years. Ex. 9 at 72. Because the whereabouts of the tapes and transcripts cannot be verified and because of Kornman's history of altering and reusing tapes, there is a significant possibility that the tapes were altered during that period of time.

The transcripts contain inaccuracies, errors, and gaps which cannot be filled. The transcripts were made by Heritage employees without special training, who did sloppy work, and who guessed when they could not understand words on the tapes. The transcripts are based on tapes of poor quality which cannot be easily understood and which contain gaps. The tapes could easily have been tampered with or corrupted during the period for which their whereabouts cannot be determined. Because of all these failings, the transcripts have not been authenticated and should be stricken from the record in this case.

---

[4] Plaintiffs received portions of Canada's prior depositions in a production from the government in connection with this case.

## II. The Transcripts Contain Inadmissible Hearsay

The transcripts are also inadmissible because they contain hearsay statements that do not fall into an exception to the hearsay rule. Hearsay is defined as "a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. Hearsay is inadmissible unless it falls within an exception to the hearsay rule. Fed. R. Evid. 802. Hearsay within hearsay (or double hearsay) is inadmissible unless each part of the combined statements conforms with an exception to the hearsay rule. Fed. R. Evid. 805. If either the first or second layer of hearsay fails to fall under any hearsay exceptions, the statement is inadmissible.

Here, the transcripts contain two layers of hearsay that do not fall within any recognized exceptions to the hearsay rule. The first layer of hearsay contained in the transcripts are the purported statements of Heritage employees Chester Decker, Tim Seaberg, and Gary Kornman and of two partners of plaintiffs, Richard Sands and Robert Sands. The second layer of hearsay comes from the transcripts themselves. Someone from Heritage made the transcripts – asserting that the purported statements were made and were contained on a tape of the conversation. Both the statements and the transcripts of the statements must meet a hearsay exception for the statements to be admissible.

The statements by Chester Decker, Tim Seaberg, and Gary Kornman do not qualify as admissions by party opponents under Fed. R. Evid. 801(d) or as statements against interest under Fed. R. Evid. 804(b)(3). Under Fed. R. Evid. 801(d), an admission by a party opponent is a statement that is offered against a party and that is:

> (A) the party's own statement, in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during



AO 1755693.1

> the existence of the relationship, or (E) a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy.

Chester Decker, Tim Seaberg, and Gary Kornman are not parties to this case, were not authorized by the Sands to make statements on any subjects, and were not agents or servants of the Sands making statements concerning a matter within the scope of their agency or employment. At the time the purported statements were made, the Sands had not engaged Heritage to provide them any services. The Sands did not adopt the statements of the Heritage employees, and no criminal conspiracy took place. Therefore, the statements of Decker, Seaberg, and Kornman cannot be admitted as admissions by a party opponent.

Fed. R. Evid. 804 contains hearsay exceptions for statements made by unavailable declarants. The exceptions allowed for statements made by unavailable declarants include:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Chester Decker and Tim Seaberg have both been deposed and therefore, are not unavailable. Their statements cannot be admitted as statements against interest under this rule. While Kornman might be considered unavailable because he invoked his Fifth Amendment right not to testify on certain matters, his purported statements included in Exhibits 28 and 29 were not statements against interest at the time they were made. Kornman discussed investment strategies and estate planning opportunities with prospective clients, including the possible tax benefits of those investments and plans. His statements regarding the investment transactions and strategies offered by Heritage were not the sort of statements to subject him to civil or criminal liability or that were against his interest. At the time Kornman purportedly made the statements, he was making a sales pitch in an attempt to gain a client (and a fee) for his company. It was in his

interest to convince the Sands to engage Heritage to provide them more information and eventually coordinate investment transactions and financial planning for them.

Even if the purported statements of the Heritage employees and Robert Sands and Richards Sands in the transcripts would constitute admissions by party opponents, the subsequent hearsay created by the transcribers makes the statements inadmissible because no exception applies to this second layer of hearsay. The transcripts do not qualify as business records. Under Fed. R. Evid. 803, an exception to the hearsay rule is provided for:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The transcripts do not qualify under this rule. Most importantly, the sources of the information and the method of preparation evidence a complete lack of trustworthiness. The transcripts were made from mini-cassette recorder tapes. The tapes of conversations in meetings were made by the use of a mini-cassette recorder inside a pants or jacket pocket of a Heritage employee at the meeting. Heritage employees have noted that the quality of the tapes was not very good; they were difficult and in some cases impossible to understand, particularly when the person taping moved. Ex. 3 at 73-74, 113, Ex. 8 at 25. Because the tapes were difficult to understand, marketing employees making transcripts often guessed as to what words they were hearing. Ex. 3 at 83. The marketing employees who made the transcripts had no special training and did sloppy work. Ex. 2 at 45, Ex. 3 at 81. In this case, for two of the transcripts, the tapes from which they were allegedly made no longer exist. These transcripts are particularly untrustworthy because at least one Heritage employee has testified that he saw Gary Kornman erasing portions of tapes. The only tapes of the other transcripts that still exist contain gaps

which could be the result of someone erasing portions of the tape. Furthermore, the two transcripts for which tapes still exist conflict with the tapes. The transcripts contain words that are not on the tapes and fail to indicate the gaps in the tapes. The tapes contain words that are not part of the transcript.

Besides their untrustworthiness, the transcripts do not meet the technical requirements of the rule. They were not made at or near the time of the conversations they purported to portray. The transcripts were made several days or weeks after the meetings they purported to depict. Ex. 2 at 24-26. Furthermore, it is clear that it was not the regular practice of Heritage to record and transcribe all conversations and meetings with clients or potential clients. At least one phone conversation with Richard Sands and several meetings between the Sands and Heritage personnel were not recorded. Ex. 2 at 30-32, Ex. 6 at 20-21, 175-76. It is undisputed that during these other conversations and meetings between the Sands and Heritage (or during the gaps in the transcripts) numerous other benefits from these transactions were discussed. Ex. 6 at 97-102. Because transcripts of those conversations do not exist, the Sands would be deeply prejudiced if the Court were to allow defendant to rely on transcripts which indisputably only tell part of the story.

Vickie Walker, a former Heritage employee, testified that recorded conversations were not always transcribed and not all conversations were recorded:

> Q. We have a recording of a conversation between a Heritage personnel and a member of the Sands family. Was it the Heritage's business practice to record -- or to transcribe those recordings?
> A. I don't know. I don't know what the criteria for transcription was. I do not believe that all tapes got transcribed, and I don't know what the criteria for determining which ones did and which ones did not was.
> Q. All right. But there was a criteria, and so some of the tapes would be transcribed?
> A. Some of the tapes would be transcribed, yes.

Ex. 7 at 31-32. Because the transcripts themselves do not meet the business records exception, they are inadmissible hearsay and should be excluded.

## III. The Transcripts Should Be Excluded as a Discovery Sanction Under Rule 37

As an alternative argument, plaintiffs request the Court to exclude the transcripts as a discovery sanction against defendant under Ct. Fed. Cl. R. 37 for defendant's delay in producing the transcripts to plaintiffs. Rule 37(c) of the Rules of the Court of Federal Claims states that "[a] party that without substantial justification fails to disclose information required by Rule 26(a)... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." A showing of bad faith is *not* required in order for sanctions to be imposed under the analogous Federal Rule of Civil Procedure. *See, e.g.*, *Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006).

In determining whether evidence should be excluded under Rule 37, courts consider factors such as 1) the danger of unfair prejudice to plaintiffs; 2) the length of the delay and its potential impact on judicial proceedings; 3) the reason for the delay, including whether it was within the reasonable control of the proponent of the evidence; 4) the importance of the particular evidence, and if vital to the case, whether a lesser sanction would adequately address the other factors to be considered and also deter future violations of the court's scheduling orders, local rules, and the federal rules of procedure; and 5) whether defendant was diligent in seeking an extension of time, or in supplementing discovery, after an alleged need to disclose new evidence became apparent. *Finisar Corp. v. DirecTV Group, Inc.*, 424 F. Supp. 2d 896, 899-900 (E.D. Tex. 2006); *see also Phillips v. City of Victoria*, 2006 U.S. Dist. LEXIS 18053, at *19 (S.D. Tex. 2006).

The transcripts, which came into defendant's possession on November 29, 2006, should have been formally disclosed on December 15, 2006, when Initial Disclosures were required under Rule 26(a)(1) of the Court of Federal Claims. Instead, counsel for defendant misleadingly told plaintiffs on December 15, 2006 that IRS employees were going through Heritage "documents" from the bankruptcy trustee and that defendant would produce any further relevant documents when its counsel received them. In reality, defendant at that time had already identified documents pertaining to the Sands that it intended to rely upon in this case, and it knew those documents contained the purported transcripts at issue. Yet, defendant did not tell plaintiffs the transcripts existed until it surprised them with this information in the summer of 2007. Defendant finally produced the transcripts to plaintiffs on July 31, 2007, the day before discovery was originally scheduled to expire in this case.

Defendant unreasonably delayed informing plaintiffs of the transcripts and producing them to plaintiffs. Defendant knew in December 2006 that the bankruptcy trustee had documents in the Heritage files pertaining to the Sands. Rita Daugherty, an IRS employee designated to testify for the government regarding its review of the Heritage documents pursuant to Ct. Fed. Cl. R. 30(b)(6), testified that she was asked to keep a lookout for documents relating to certain taxpayers, including the Sands, and let IRS Counsel Elaine Harris know if she found anything. She informed Ms. Harris that documents pertaining to the Sands, including transcripts, were included in the Heritage boxes sometime between December 4 and 14, 2006. Ex. 1 at 26-27.

Defendant was not diligent in providing the transcripts to plaintiffs or even informing plaintiffs of their existence once defendant knew they existed. IRS Counsel Elaine Harris was informed in December 2006 that there were transcripts pertaining to the Sands and knew that the case was already in litigation. At no time during defendant's review of the documents did

defendant or its counsel request the IRS employees to expedite their review and produce the relevant documents which should have been produced as part of defendant's Rule 26(a) disclosures and in response to plaintiffs' discovery requests. Ms. Daugherty did not request expedited funding for copying of the documents. When she received funding to have all the Heritage documents copied on February 12, 2007, she did not have them sent to a vendor for copying until March 29, 2007, more than six weeks later. Defendant had copies of all the Heritage documents (including the transcripts) in April 2007 and an index of the documents was completed by May 23, 2007. IRS attorneys failed to tell the IRS employees reviewing the Heritage documents that they were subject to discovery requirements until June 13, 2007. Nothing kept defendant from expediting the documents relevant to this case to meet its discovery obligations in a timely fashion, and nothing excuses defendant's delay in informing plaintiffs of these documents and its intent to rely on them.

In addition to being unjustified, defendant's delay in producing the transcripts has prejudiced both plaintiffs and this Court. Plaintiffs have been prejudiced by defendant's delay in producing the transcripts because the information on which defendant now seeks to rely was not available to plaintiffs while preparing their Cross-Motion for Summary Judgment and Proposed Findings of Fact. *See Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607-08 (S.D.N.Y. 2004). Plaintiffs were also prejudiced because defendant's belated production left plaintiffs little time to find evidence and witnesses to rebut defendant's "new" evidence. *See Finwall v. City of Chicago*, 239 F.R.D. 504, 507 (N.D. Ill. 2006) ("[L]ate disclosure is not harmless within the meaning of Rule 37 simply because there is time to reopen discovery.") Defendant's belated production resulted in unfair surprise to plaintiffs. Defendant had access to the transcripts eight months before providing them to plaintiffs. As for the Court, it has a legitimate interest in managing cases before it to ensure prompt and orderly litigation. *Finwall*, 239 F.R.D. at 507.

The Court extended discovery and moved other deadlines to give defendant time to depose witnesses in an attempt to authenticate these transcripts.

Because of defendant's unreasonable delay and the prejudice such delay has caused, plaintiffs request the Court to exclude the transcripts as a sanction for discovery violations.

* * * *

For the reasons set forth above, plaintiffs respectfully request this Court to strike Exhibits 26 through 29 of the Appendix to Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment and any references thereto in Defendant's Response or in Defendant's Facts.

Respectfully submitted this 14th day of September, 2007.

s/ Lewis S. Wiener
LEWIS S. WIENER
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: (202) 383-0140
Fax: (202) 637-3593
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
Tel: (404) 853-8000
Fax: (404) 853-8806

Kent L. Jones
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: (202) 383-0732
Fax: (202) 637-3593
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Motion to Strike has been made on September 14, 2007 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
thomas.m.herrin@usdoj.gov

s/ Lewis S. Wiener
LEWIS S. WIENER