PROCEEDINGS

RITA DAUGHERTY,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. CULLINAN:

Q. Can you state your name for the record please.

A. Rita Daugherty.

Q. Ms. Daugherty, you're appearing here today in response to a deposition notice issued by the plaintiffs in this case; is that correct?

MR. HERRIN: For the record, Ms. Daugherty is appearing as a representative under the 30(b)6 notice and her appearance is limited to the request pertaining to the Heritage documents that were obtained from the bankruptcy trustee.

MR. CULLINAN: And that is Exhibit -- we'll make this --

(Exhibit No. 88 was marked.)

MR. HERRIN: More specifically it will be the records that were obtained by the Service pursuant to a summons issued on the trustee and not the documents that were obtained pursuant to a subpoena issued by the office in connection with this case.

MR. CULLINAN: All right.

Q. (BY MR. CULLINAN:) So if we're looking at what

EXHIBIT
tabbies
1

subject to various discovery requirements?
A. At that point in time?
Q. Yes.
A. No.
Q. When were you informed that they were subject to discovery requirements?
A. On the 13th of July 2007. There was e-mail sent to Peter Brokus, with a carbon copy to me, that said identify, review these --
THE WITNESS: Am I okay?
MR. HERRIN: That's fine. Go ahead.
THE WITNESS: Review -- for Peter to review these documents to make that there was only Sands documents on that disk. That's when I knew there was discovery probably going on.
Q. (BY MR. CULLINAN:) Who sent the e-mail?
A. Elaine Harris.
Q. And attached -- there was some type of attachment to the e-mail then?
A. No. She -- no.
Q. I thought you testified just review the documents on this disk to make sure they only pertained to the Sands. So where did disk --
A. Because she mailed the disk to him. She didn't e-mail the data to him. It's too big (indicating).

Q. And I believe you testified that Ms. Harris asked you to keep a special eye out for documents that pertain to the Sands Family; is that right?

A. Yes.

Q. And did you do that?

A. Yes.

Q. Okay. So what did you do with those transcripts when you found them in the 372 boxes of data?

A. I marked it as one of the 66 box es to be photocopied.

Q. Did you alert Ms. Harris that you had found documents that pertain directly to the Sands Family?

A. I guess indirectly, yes.

Q. I don't understand what you mean by indirectly?

A. I told her I had transcripts. I told her I had transcripts of phone conversations. I told her I had e-mails. But whether I mentioned Mr. and Mrs. Sands or not I don't know. That's what I'm saying.

Q. Well without --

A. So she -- she could assume.

Q. She could assume?

A. I mean I never said I have them for Mr. and Mrs. Sands.

Q. What did you dell her?

A. That I had them that. I had found in those

boxes transcripts of phone conversations where Heritage recorded and then transcribed.

Q. Did Ms. Harris ask you -- I don't want you to identify any other taxpayers -- did Ms. Harris ask you to keep an eye out for tapes and transcripts pertaining to other taxpayers aside from the Sands?

A. Yes.

Q. So when you told Ms. Harris that you would found tapes -- you had found tapes and transcripts, were you telling her that you had found tapes and transcripts with respect to all of the taxpayers that she had asked you the keep a special eye out for?

A. Yes.

Q. Okay. And when was that?

A. During the two weeks that we looked through the 372 boxes, which would have been December 4th through December the 14th, 2006.

Q. Out of the people that were reviewing the boxes you've given me a couple of names. Was anybody especially assigned to look for these specific documents, the ones that you were asked to keep an eye out or was it just as you go them if you come across them you mark them or something else altogether?

A. You mean the indexing process?

Q. No. In looking for the documents that you'd

A. Yes, there were.

Q. Who did you have phone conversation with about the documents?

A. My manager and Elaine Harris.

Q. Anybody else?

A. No. Well, Lain Faulkner's people.

Q. Anybody else from the IRS?

A. No.

Q. Anybody from the Department of Justice?

A. Never.

Q. So you have ever spoken to anybody at the Department of Justice about these documents before getting prepared for this deposition?

A. No.

Q. All right. The next entry December 29th 2006, let's see -- well, over the next couple of entries you're looking for approval to photocopy; is that right?

A. That's correct.

Q. What do you mean on the February 12, receive the approval for the funding of the summons.

What does that mean?

A. Well, I sent the memo up through channels. And I didn't know the volume of paper that was in a box. So I guessed that I need $7,000. Okay. So that meant that my manager's Kim Tung, territory manager is Denise

Jennings, the DFO, director of --

Q. Field operations?

A. -- field operations. Thank you. Sergio Alreno. It's his level that approves it. So when it was supposed to be $7000, I received his signature on the 12th of February that I could spend $7000.

Q. Okay. I'm sorry. I was confused when it said received the approval for the funding of the summons. But you're still pertaining to funding of the photocopy cost?

A. Yes.

Q. Okay. And then we've got several additional entries here, again, pursuant to your request to get photocopying. And it looks like we -- go down to March 28, 2007. And is it that point in time when the next day that you began to actually get the boxes copied, right?

A. Yes.

Q. And you said that you got them scanned into electronic form, right?

A. And a hard copy.

Q. What did you do with the electronic form?

A. We made copies and distributed to agents.

Q. To Internal Revenue agents?

A. Yes.

Q. Do you know to what agents copies of the

electronic copy of the Sands documents were distributed?
A. Peter Brokus.
Q. When did that occur?
A. July the 13th.
Q. Okay. Going back to the chronological. The scanning began around March 29th and was completed April 10th; is that right?
A. Yes. Delivered April 11.
Q. On the 12th --
A. I opened a couple to see what how much work, what resources I was going to need.
Q. Okay. The entry on April 19th, counsel IT creating ten copies of discs for distribution of electronic copies. What does that mean?
A. We only got one copy of -- of the scanned documents, the whole 90,000.
Q. You mean the electronic copy, the disk?
A. Yeah, we only got one. We have numerous agents that's going to need the data. So there were ten copies made.
Q. Okay. What is counsel IT?
A. I -- IT is like our -- I can't think of what IT means. But our commuter technology people, our computerized specialist, they're computer gurus. IT.
Q. Okay.

A. Technology.
Q. And what's the reference to counsel? Do they work for IRS counsel or --
A. Well, just about every division has their own IT people.
Q. All right. You received the disk back on the 27th?
A. Yes.
Q. And then on the 30th, you're talking about how the spreadsheet would be presented. Does the spreadsheet refer to the index?
A. Yes.
Q. The portion of which we have in Exhibit 90?
A. Right.
Q. And then you have agents arriving on the 1st to assist you with indexing. You said they were eight agents that assisted you in the process?
A. Over the course of that week, yes.
Q. And they you say: Continued to work on the summonsed documents.
At that point what you're doing is just indexing them on May 2nd and May 3rd; is that right?
A. Right.
Q. Same thing on the 4th?
A. Right.

Q. Then there's a gap between the 4th and the 23rd. Was any work done during that point in time?

A. Yes. But me alone.

Q. Just you alone. You were continuing to work on the indexing?

A. Right. The partial boxes. So I only entered the last day I -- when I -- it was done and that was May 23rd (indicating).

Q. Okay. And now on the 5th you said you received the database and spreadsheet index of summonsed documents.

What does that mean?

A. You have to understand this spreadsheet was a huge spreadsheet. Okay. And no one computer could handle the volume of this spreadsheet. Okay. So we had a CAS take everybody's piece of the spreadsheet and put it together and make a searchable -- make it searchable. So that if you wanted all the documents that belonged to Mr. and Mrs. Sands, you went in there in description and you hit -- and you typed in Sands and wha la all of them showed up.

Q. So that was --

A. That was what I received.

Q. That was on June 5th it became searchable.

A. Yes. Right. Up until that point it was a whole