UNITED STATES COURT OF FEDERAL CLAIMS

ALPHA I, L.P., )
BY AND THROUGH )
ROBERT SANDS, )
A NOTICE PARTNER, )
)
Plaintiffs, )
)
V. ) No. 06-407-T
)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

COPY

**********************************************************

ORAL DEPOSITION OF
CHET DECKER
AUGUST 28, 2007
VOLUME I

**********************************************************

ORAL DEPOSITION OF CHET DECKER, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of August, 2007, from 3:13 to 4:15 p.m., before Stacey R. Cruz, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Department of Justice, Tax Division, located at 717 North Harwood Street, Suite 400, Dallas, Texas, in accordance with the United States Court of Federal Claims and the provisions stated on the record or attached hereto.

EXHIBIT
2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THOMAS A. CULLINAN
SUTHERLAND, ASBILL & BRENNAN, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996
404.853.8075
404.853.8806 (Fax)

FOR THE DEFENDANT:

MS. MICHELLE C. JOHNS
-AND-
MR. THOMAS HERRIN
U.S. Department of Justice
Tax Division
717 North Harwood Street
Suite 400
Dallas, Texas 75201
214.880.9762
214.880.9741 (Fax)

INDEX

Appearances ............................Page 2
Exhibit Index ..........................Page 4
Stipulations ...........................Page 5
Examination by Ms. Johns ...............Page 5
Examination by Mr. Cullinan ............Page 29
Further Examination by Ms. Johns .......Page 46
Signature and Changes ..................Page 48
Reporter's Certificate .................Page 49

we'll talk about it afterwards. I can't remember whether it's that part or whether it's the stuff that we got under the subpoena. I think it's the stuff we got under the subpoena.

MR. CULLINAN: Okay. But it's something that you guys produced to us?

MR. HERRIN: Yeah. Oh, yeah.

MR. CULLINAN: Okay. That's all I'm asking.

Q. (BY MS. JOHNS) Was there ever a time when you were recording a telephone conversation with a client that you would turn off the tape, for any reason?

A. Not that I can recall.

Q. Okay. Now, once you turned in the tape to the transcription department, and they transcribed the tape, what would happen with the transcription record?

A. I guess it would be funneled up the chain of command.

Q. Did you ever receive a copy of the transcription yourself for -- for your review?

A. I don't believe so. I -- I don't re- -- I don't remember if we -- if we did or not.

Q. But do you ever recall reviewing the transcripts for accuracy or...

A. Not any of them in particular, no.

Q. Okay. And then what would happen to the actual tapes?

A. They would erase them and recycle them.

Q. Okay.

A. And we would -- there was just, like, a bin of empty tapes that we'd go to if we needed more tapes if we needed more tapes that were previously used tapes.

Q. Okay. Do you know how long -- you -- you turned in your tapes at the end of the day or at the end of each phone call or...

A. Both. I think -- well, actually, I think somebody would come by our office, if I remember correctly, every 45 minutes to an hour, and if we had a report and a tape, they would -- they would pick it up and take it, if I remember correctly.

But I also seem to remember sometimes dropping it off at that department, as well, so that -- that's a tough one to answer. I believe it was both.

Q. Just to the best of your memory. That's fine.

A. I think it was both. You know, they had people come by to check, Hey, do you have one to turn in or not, or if we had one, then -- then we would turn one in if somebody hadn't stopped by, I guess.

Q. And do you know how long it would typically take the transcription department to actually transcribe

Q. Okay.
A. So -- but, yeah, I do recall this.
Q. And do you know who -- you see the initials -- that's "CRD"? Is that your initials?
A. That would be me.
Q. And "MML," do you know who that is?
A. That's probably the transcriber.
Q. Do you know, in particular, who "MML" is?
A. No.
Q. And it says, This is a debrief of a phone conversation with Richard Sands of March 19th of 2001. Do you see that up top?
A. Yes.
Q. And then down at the bottom, you'll see MML's initials again, with the date of March 29th, 2001.
Do you know if that's when the transcription occurred?
A. Possibly. I -- I don't know.
Q. Okay. Do you -- do you recognize this copyright information on the bottom of the page?
A. I -- I guess, yes.
Q. Have you -- have you ever seen that copyright information before on other Heritage documents?
A. Yes, probably.
Q. Okay.

A. More than likely.

Q. Now, was -- this debrief that we just looked at, was that a type of document that was -- that Heritage normally kept in the regular course of its business?

A. Yes.

Q. And was this debrief made in accordance with the normal business practices of Heritage?

A. Yes.

Q. Okay. We will move on to your transcript, which is on page -- which is Exhibit 3. And this is a transcription of a meeting set with PC Richard Sands.

What does "PC" stand for? Is that prospective client?

A. It -- it could be.

Q. Okay. And date is May 10th, 2001. And once again, you see your initials, CRD, and colon, ALK.

A. Yes.

Q. Do you know who "ALK" is?

A. That would, again, probably be the transcriber.

Q. Okay. And once again, this is of a conversation dated May 10th of 2001, and at the bottom it says, ALK: May 15th, 2001.

Do you see that? I'm sorry, at the very bottom?

A. Yes, I do.
Q. I'm trying to go fast.
A. That's okay.
Q. Because I know your car --
A. Yeah, that's all right. Yes.
Q. Is -- do you think this date refers to the date it was transcribed?
A. I guess it could have been.
Q. Okay.
A. It seems to make sense. It's continuity with the other letter.
Q. Uh-huh. Okay.
Now, is this -- you -- you've -- have you seen any of the transcripts that Heritage prepared in the past while you were working for Heritage? Have you ever seen what they actually looked like when you were working for Heritage?
A. We may have seen samples for training purposes, maybe for critique purposes, if something was said or grammar was not appropriate, I guess, and then they may pull it aside and -- or point something out --
Q. Okay.
A. -- too.
Q. Looking at this transcript in front of you that's been marked as Exhibit 3, is this the type of

client, and you had some discussion of tax savings opportunities; is that correct?

A. Yes.

Q. And that was your pitch. Did you describe to them the transaction in any detail?

A. No.

Q. Would the potential clients ever ask you about any other aspect of the transaction aside from tax savings, such as, you know, well, can you make money, are there any other benefits to it, or did you ever get into that with a client or prospective client?

A. It's possible that questions like that may have been asked, but we were required to follow a set script, so based on the questions that they would ask us, we had had prescribed answers that we would go by.

Q. What would be your prescribed answer to a question such as, Well, can you make money from doing the transaction?

A. Can you make money from doing the transaction? I -- what -- what exactly do you mean?

Q. Can the transaction result in a profit aside from any tax savings that you're discussing? What would be your response to a question like that?

A. Probably, that -- that I don't know.

Q. Okay. I want to go back to Exhibit 18.

A. (Witness complies.)
Q. That's your debrief of a telephone call you had with Richard Sands; is that correct?
A. Yes.
Q. And you say that you spoke with Richard to PC about capital gains, and says, He showed mild interest.
A. Yes.
Q. And I think your testimony is that all of these calls were transcribed?
A. Correct.
Q. Okay. Do you know where the transcript is of this telephone call?
A. I believe it's the former exhibit.
Q. Well, before we go there, let's look at the date on page -- of Exhibit 18. What's the date of that call?
A. It should be March 19th.
Q. Okay. Now, let's go to exhibit -- back to Exhibit 3.
A. (Witness complies.)
Q. What's date of that call?
A. It appears to be May 10th.
Q. And in fact, on that very first page, let's see. You tell Mr. Sands that you open up with the -- the pitch to Mr. Sands, and Mr. Sands responds, You

talked -- you talked to me personally one day. Isn't that what it says?

A. That -- yes, that's what it says.

Q. And then you said, Did we, and Mr. Sands, Yeah, uh-huh, I asked you a little bit about it, and you were as vague as can be, and I expressed little interest, period. Is that right?

A. Okay.

Q. So does that seem to indicate that another call between you and Mr. Sands had occurred?

A. Yeah.

Q. And might Exhibit 18, your debriefing notes, be that call, or a debrief of that call?

A. Could Exhibit 18 be the debrief of the -- of the first conversation or the previous conversation?

Q. Yeah. Yes.

A. Yes.

Q. Now, let's go to Exhibit 14.

A. (Witness complies.)

Q. I understand that you're not familiar with this document, but other witnesses have testified about it, and it purports to be catalog or, in part, a catalog of contacts with the client, and I want you to look at the last page, page 7, which is THO-000232, and if you go down the left-hand side of the column, you see,

Q. And that's limited by what the Heritage organization told you about the transaction?
A. Correct.
Q. But it's possible that, at least in this first March call, that Mr. Sands asked you questions about the benefits of -- other benefits of the transaction, and you just couldn't respond?
A. It's possible that he did ask me, and that I would just be responding with a prescribed script.
Q. Okay. This transcript of this call on May 10th, 2001, did that occur five years -- six years ago now?
A. Yes.
Q. Ms. Johns asked you some questions about the ability to confirm its accuracy.
I want you to go to -- to the third page.
A. (Witness complies.) Okay.
Q. The first time that your initials are there, CRD, at the end it says, End, open parenthetical, cross-speaking, closed parenthetical, and an ellipsis. What does "cross-speaking" mean to you?
A. Maybe he was trying to speak at the same time I was, that's what my guess is. I -- I don't put the cross-speaking in there. That was something added later by the transcriber.

Q. And then, again, the next paragraph that you're speaking at the end it says "cross-speaking"?

A. Yes.

Q. And then again at the next time you're -- you're talking, and then again, it says, "cross-speaking"?

A. Correct.

Q. Okay. Do you recall what was said at all those times?

A. Not at all.

Q. Ms. Johns asked you some questions, I think, generally about whether you reviewed these transcripts for accuracy after they were transcribed, but I want to ask you, specifically: Do you recall reviewing this particular transcript after it was transcribed to insure that it was accurate?

A. Back in 2001?

Q. Yes.

A. No, I didn't -- did not.

Q. Well, let me ask you today: Are you sure today that this transcript is accurate?

A. I would say it covers the gist of the conversation, but I -- I do notice some -- some inaccuracies, as far as it being word-for-word. Is that helpful?

Q. So everybody reported to him?

A. Correct.

Q. What'd you think of Mr. Kornman?

A. I never met him, never formally met him. We were on different floors in the office building.

Q. Do you know who Ralph Canada is?

A. I knew Ralph. I met Ralph.

Q. What'd you think of Ralph?

A. Seemed like an okay guy.

Q. I'm going to go back to -- it's going to be -- she's got the exhibits -- Exhibit 54. I'll tell you what. I can read it to you.

A. Fifty-four, I don't think I have 54 -- it's on the bottom. Here we go. It's always the last one.

Q. Okay. This is -- and I'll ask you to -- this a transcript of a deposition of Ralph Canada. And page 72 --

A. Okay.

Q. -- line 12, there's discourse about whether Mr. Kornman might have manipulated or altered documents or some of these recordings, and you can read it, and if you want to disagree with my characterization, please do so, but essentially, Mr. Canada says that it's very possible that Mr. Kornman would alter or delete or manipulate recordings.

Do you have any reason to agree with that testimony?

A. I'd have no reason to agree or disagree.

Q. Okay.

A. I would have no knowledge if he did or not.

Q. Okay. So you just really have no knowledge about what happened to these tapes or transcripts or -- well, you know the tapes were recycled. But you just have no knowledge of what happened to the transcripts after they left your possession?

A. No. They just would go up the chain of command. Richard Turner, the -- the boss of the initiators, would review those, and from that point forward, I don't know what happened to them after that.

Q. Mr. Canada, in that same transcript at page 95, 96, talks about the qualifications in the work product of the people who did the transcriptions, and he testified that a lot of the work from them was extremely sloppy, and that's at page 96.

Would you agree with that testimony?

A. Based on -- yes, I agree based on the transcript that I saw of my conversation. That's -- kind of was my opinion of it. I don't feel that it followed the conversation, you know, specifically word-for-word.

I mean, I can -- I can tell just by reading some of the way that my sentences were -- were recorded, I just -- I don't talk in that manner. So from -- from my opinion, yeah, I would -- I would think that they might have cut some corners.

MR. CULLINAN: I'll pass the witness.

FURTHER EXAMINATION

BY MS. JOHNS:

Q. You just testified that you think maybe they might have cut some corners in these transcripts.

A. Yes.

Q. And while maybe they -- you've testified they may not be word-for-word, but is the gist of the conversation, the substance of the conversation that's shown and set out in this transcript that's Government Exhibit 3, is there any reason that you would doubt that the substance of the conversation occurred as it did, based on this transcript?

A. No. It does capture the gist of the conversation, but it just, in -- based on what his question was, the transcribers were supposed to do it exactly word-for-word, every cough, every hiccup, I mean, anything was supposed to be included, and just based on my memory of the conversation and reading how -- how I spoke, I -- I'd have to say that that just