COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407T

(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

- - - - - - - - - - - - - - - - X

ALPHA I, L.P., by and through )
ROBERT SANDS, a notice partner, )
Plaintiff )Case No. 06-407T
-vs- )
THE UNITED STATES, )
Defendant )

- - - - - - - - - - - - - - - - X

Deposition of RICHARD SANDS taken pursuant to notice at Constellation Brands, 370 Woodcliff Drive, Suite 300, Fairport, New York on Tuesday, June 12, 2007 commencing at 9:30 a.m.

Reported by:
COMPUTER REPORTING SERVICE
Amy M. Condon, CSR, RPR
270 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614 (585) 325-3170

EXHIBIT
tabbies
4

APPEARANCES:

SUTHERLAND, ASBILL & BRENNAN, LLP
By: KENT L. JONES, Esq.
JULIE BOWLING, Esq.
1275 Pennsylvania Avenue, N.W.
Washington, D.C., 20004
Attorneys for plaintiff.

U.S. DEPARTMENT OF JUSTICE
By: MICHELLE C. JOHNS, Esq.
THOMAS M. HERRIN, Esq.
717 North Harwood Street, Suite 400
Dallas, Texas 75201
Attorneys for defendant.

Q. Now, how many -- I don't think I asked you this already, but how many face to face meetings with Heritage did you have?
A. No idea, I don't recall.
Q. And you don't ever remember traveling to Dallas to meet with Heritage?
A. I don't recall traveling to Dallas to meet with Heritage.
Q. At this first meeting that we talked about, this first face to face meeting with Heritage in 2001, what was discussed?
A. I don't recall. I don't recall any specifics of any meetings.
Q. Okay. Would reviewing this letter refresh your memory at all about maybe what was discussed at the meeting?
A. Not one bit.
Q. Can you say today why Heritage -- why would Heritage contact you, why would they make a cold call to you, do you know?
A. I can't speculate about why they would do anything.
Q. Do you know why Robert finally agreed to meet with Heritage?

A. Yes.
Q. Why was that?
A. We had discussed a potential sale of family owned Constellation stock along with some estate planning and philanthropic plans along with certain uncertainties that we would face once we started the process of selling family stock. And I told Rob as I believe, okay -- this is really reconstruction - of the fact that this group had called me and talked about similar things. That's what I believe, but that may not be precise. That's the connection.
Q. Okay. In your meeting with Heritage and in the time leading up to the implementation of these transactions, what were your goals for the transactions that are at issue in this litigation?
A. One, to make a profit; two, to diversify our holdings which were very concentrated in Constellation stock. These are not in order of priority necessarily. Three, to do some estate planning work; four, to provide for the philanthropic needs that we would be having at the time and in the future. I think that's basically, you know, a basic family business plan or financial plan you would call.
Q. Now, this letter I've shown you that I marked

as Exhibit 1 states in the fourth paragraph entitled capital gains, it says, we offer strategies that can eliminate the total tax liability on capital gains.

Was one of your goals to eliminate the total tax liability on capital gains?

MR. JONES: I'm going to object to the form of the question only because you refer to this as a letter. It's an unsigned copy of something and it hasn't been established that it was sent or received.

So I object to the characterization that it's a letter. It's not supported by the record. You can answer the question if you understood it.

THE WITNESS: Could you repeat the question?

BY MS. JOHNS:

Q. This letter states that Heritage offers strategies that can eliminate the total tax liability on capital gains.

Was one of the these goals on these transactions to eliminate the total tax liability on capital gains with respect to the sale of the Constellation stock?

A. The question is not clear to me. If the question is -- was it the goal to eliminate totally capital gains tax?

Q. Right. Well, that's --

A. We had very, very broad conversations about estate planning, family partnerships, inner family loaning, creating trusts, you know, hedging strategies against concerns that we had, noncorrelated investment strategies to our concentrated position, diversification strategies. Boy, you know, philanthropic discussions.

Q. Okay.

A. I mean, those are broad topics.

Q. That's fine.

A. I don't recall specifics in each one of those, but very, very broad discussions about family financial planning and how families function.

Q. Okay. Other than the two transactions that are at issue in this litigation, did you enter into any of these other Heritage strategies that you just talked about? Did you implement any of these Heritage ideas or strategies.

A. Over the long-term, yes.

Q. Did you implement those with help of Heritage?

A. I don't know what help means.

Q. Well, for instance, in these two transactions we know that Heritage helped with preparation of

Q. Do you know someone by the name of Rodney Johnson?

A. I don't recall.

Q. Other than Gary did you have any other contacts with any Heritage personnel that you can remember?

A. I had contact with other personnel, but I don't remember who.

Q. Okay. Did you ever have a telephone conversation with Brian Czerwinski?

A. Probably so.

Q. Do you recall what was discussed in those conversations?

A. I don't.

MR. JONES: Excuse me. Could you spell Czerwinski for us?

MS. JOHNS: It's C-z-e-r-w-i-n-s-k-i.

MR. JONES: Thank you.

BY MS. JOHNS:

Q. Did you ever have any discussions with anyone regarding Heritage's experience with financial or investment matters prior to entering into these transactions?

A. With anyone?

Q. Like, did you get any references is kind of what I'm referring to.
A. I believe Rob may have.
Q. But you didn't personally?
A. No.
Q. At the meeting that you had with Heritage did anyone from Heritage associate these two strategies, the two transactions, with the potential amount of taxes to be saved?
A. At the meeting?
Q. The meeting.
A. The meeting? I don't know.
Q. The one face to face meeting that you do recall having in 2001 --
A. Wait. I said to you I do not recall the specifics of any meetings that I had, but I assume I had meetings and more than one.
Q. Okay. So if I ask you any question about what was discussed at those meetings your answer is going to be you don't remember anything; is that correct?
A. That is correct.
Q. Okay.
A. Now -- that is correct. I have a very bad

would pay capital gains tax against.

Q. So we talked about there was a profit potential and you just mentioned there was a tax benefit.

A. Uhm-uhm.

Q. Would the primary motivation for entering into the Heritage transaction be the tax savings or the profit potential?

A. Profit potential.

Q. So -- go ahead.

A. I need to clarify something. You gave me a choice. I gave you many reasons why we were doing what we were doing. And you gave me a choice. I'm going to retract what I said and go back to what I said initially. We had multiple motives; profit, diversification, estate planning, philanthropy, and you can add to it minimizing taxes.

Q. Was --

A. There is no primary.

Q. That was going to be my question.

A. Okay. You gave me a didactic choice.

Q. I understand. So if the Heritage transactions, the first partnership and the second partnership, didn't have any tax benefit at all do you