UNITED STATES COURT OF FEDERAL CLAIMS

ALPHA I, L.P., )
BY AND THROUGH )
ROBERT SANDS, )
A NOTICE PARTNER, )
)
Plaintiffs, )
)
V. ) No. 06-407-T
)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

*********************************************************

ORAL DEPOSITION OF
BRIAN CZERWINSKI
AUGUST 28, 2007
VOLUME I

*********************************************************

ORAL DEPOSITION OF BRIAN CZERWINSKI, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of August, 2007, from 9:06 a.m. to 2:49 p.m., before Stacey R. Cruz, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Department of Justice, Tax Division, located at 717 North Harwood Street, Suite 400, Dallas, Texas, in accordance with the United States Court of Federal Claims and the provisions stated on the record or attached hereto.

EXHIBIT 6

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THOMAS A. CULLINAN
SUTHERLAND, ASBILL & BRENNAN, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996
404.853.8075
404.853.8806 (Fax)

FOR THE DEFENDANT:

MS. MICHELLE C. JOHNS
-AND-
MR. THOMAS HERRIN
U.S. Department of Justice
Tax Division
717 North Harwood Street
Suite 400
Dallas, Texas 75201
214.880.9762
214.880.9741 (Fax)

Q. So Tim Seaberg, as a contractor, he would go out and meet with the clients just to sort of give them a general idea of what Heritage did?

A. Yes.

Q. Okay. And do you know how long Tim Seaberg worked with Heritage?

A. I don't.

Q. Okay. Do you remember your first contact with members of the Sands Family? Do you remember when that was?

A. No.

Q. Do you recall ever having a telephone conversation with the Sands?

A. Yes.

Q. Okay. Let's start from there.

Do you remember if it was Robert or Richard?

A. I mean, I think I spoke to both of them at various times.

Q. How many times do you think had you telephone conversations with Robert Sands?

A. I mean, I'd have no -- no way of remembering.

Q. More than ten?

A. Possible.

Q. Okay. I think I just asked you about Robert.

What about Richard Sands? Do you recall?
A. No.
Q. Okay. Did you ever have any face-to-face meetings with either Robert or Richard Sands?
A. Yes.
Q. How many times did you have a face-to-face meeting?
A. I mean, there was quite a few, but I don't know how many.
Q. Were the meetings in Dallas, or were they in New York?
A. They were in New York.
Q. And so when you went to these meetings, who else from Heritage would be present?
A. Mr. Kornman and, I think, on occasion, Tim Seaberg, and maybe Gary's son, Michael.
Q. Uh-huh. And who -- who from the Sands Family would be present at these meetings?
A. Richard and Robert.
Q. Okay. Did you ever meet Marilyn Sands?
A. No.
Q. Did you ever meet Andrew Stern?
A. No.
Q. And do you recall what was discussed at these meetings with Heritage and the Sands?

A. Well, I think anytime you -- you do something that's not -- or do something that's more sophisticated or complicated, there's the possibility of -- of an audit. I don't guess I'm -- I'm not sure I understand your question.

Q. I think you've answered it. That's fine.

During your time with Heritage, were you aware that Heritage was tape recording conversations with clients?

A. Yes.

Q. And what was the -- what was the policy -- what was Heritage's policy regarding recording conversations?

A. Well, I don't know -- I don't know if I necessarily knew the pol- -- because there's -- I guess there's different components of who was recording calls and who wasn't. So I don't know -- I don't know what Heritage dictated to everyone within the company.

Q. Were you under any sort of obligation to record conversations with clients?

A. Yes -- yes and no, I guess. Yeah, I don't think I was ever specifically told, you have to record every conversation, or did I record. I recorded very few conversations during all my time there, and I had a -- you know, a list of, I guess, states -- you know,

specific rules, I guess, from each state that says you can or can't record, or -- and I had that thing above my phone that would tell me whether I could or couldn't record. But it was very rare they would ever record a conversation.

Q. Do you know -- let me ask you this. Did Heritage have a transcript department who would transcribe the recorded tapes?

A. Yes.

Q. And how many people were in that transcription department?

A. I -- I don't know. I think it was part of -- you call it "transcription department." I think it was marketing support, so it did -- it did other things other than transcription, but that was one of the -- one of the -- I guess, their job responsibilities was to transcribe tapes.

Q. Was there a supervisor of the transcription group?

A. Not that I was aware of.

Q. So if you had a tape that you had recorded of a -- a client meeting, how -- what would do you with your tape?

A. Of a client meeting?

Q. Right.

to invest in short sales?

A. I don't have any recollection of them specifically communicating to me why they were doing this.

Q. I think you earlier testified that at these meetings that Heritage would have with prospective clients and clients, there would be some discussion of tax benefits, correct?

A. Yes.

Q. And you've now also told us that there would also be discussion of potential profits from the short sales; is that correct?

A. Yes.

Q. Let's turn to Exhibit 1 in the binder that Ms. Johns has put together.

MR. CULLINAN: And I do apologize for that.

MS. JOHNS: All right. I'll forgive you.

Q. (BY MR. CULLINAN) Please turn to the page that's marked THO-021312.

A. (Witness complies.) Okay.

Q. What is that page captioned?

A. "A group of strategies to maximize capital preservation and provide investment profits for the Sands Family" with a subheading, "And business purposes of transactions."

Q. Okay. What is the first item listed on the page?

A. "Investments are made in an attempt to profit from fluctuations in interest rates by shorting U.S. Treasury securities."

Q. And I think your earlier testimony was that this would have been discussed -- that this presentation would have been shown -- or a presentation like it would have been shown to the Sands before they engaged in the transaction?

A. That's correct.

Q. What's the second topic on the page?

A. "Brokerage accounts are open in order to increase diversification of holdings and tract short sales which serve as a hedge versus current holdings."

Q. What does that mean, do you know?

A. I think it was typically believed that as interest rates rose, there would be short-term depreciation in the value of marketable securities while -- you know, so you'd lose money in your -- your marketable securities, but a rising interest rate would create a potential profit and falling bond prices.

Q. So another possible purpose of this transaction that would have been discussed with the Sands is its ability to hedge against fluctuations and interest

rates; is that a fair statement?

A. Yes.

Q. What's the third item on the page?

A. "A limited partnership is formed as an investment control entity to provide consolidation and control of diversified investments with the flexible structure and tax benefits of a partnership."

Q. What does that mean?

A. Well, they could put -- you know, the formation of a partnership they could consolidate a verify of holdings into one place, and then use that partnership -- you know, you get the benefits of having liability protection from the existence of a partnership, and then the ability to use those partnership interests in future planning, whether it's estate planning or something like that.

Q. Do you know whatever became of the Alpha partnership that we've been discussing?

A. I -- I don't recall.

Q. If I told you that Alpha was still in existence today, and had roughly $60 million of assets inside it and had generated gains of millions of dollars, would that reflect at all what's being described here in this third possible benefit?

A. Yes.

Q. And what's the fourth item on this page?

A. "A management corporation is formed to manage the investments within the investment control entity and insure continuity of management while the equity ownership of the investment control entity may change."

Q. Okay. And what does that mean?

A. Well, it's, I guess twofold. It was another layering of the formation of a management company and it gave the general partner of the partnership the ability to control that entity while they'd add the flexibility to transfer value, you know, whether it was through estate planning or something like that, they could transfer the partnership interest while still retaining control until they wanted to give up control of the assets within the structure.

Q. Okay. Next -- flip the page, please.

A. (Witness complies.)

Q. Item 5. You don't need to read it all. The document says what it says. But if you could tell me what it means -- or if it helps you read it out loud, please do.

A. Well, I think it's the idea that you could create a -- an entity that would engage in higher risk investments than your -- typically owning -- buying and holding a marketable security, you could segregate its

value away from those investments so that you were at risk for what was within that entity versus having all the assets at risk. And you could bring in other parties who would want to participate in those type of investments.

Q. Suppose one of those other parties was a friend of the family.

Could this be used to allow individuals that were close to a family to participate with the family in making certain investments?

A. Yes.

Q. What's the next item on the page?

A. The LLC combines the tax advantages of the partnership with liability protection of the corp while not having the ownership restrictions of an S-Corp.

Q. What does that mean?

A. Again, what the LLC would provide, you know, a further segregation of liability, and would give the partners or the members of that entity the opportunity to participate in higher risk investments while being limited to whatever their capital investment was.

Q. And the last item?

A. Last item deals with, you know, using the entities for estate planning means.

Q. One thing in your testimony confused me.

It seemed to me that Gloria Robinson was -- it was decided that Gloria Robinson would be used as an investor very late, but you said that this was shown to the Sands before they ever even decided to engage in the transaction.

Would -- are you certain that it was this specific PowerPoint that was shown to the Sands before they made the decision to engage in it, or could it have been something that was just very much like this?

A. It could have been something like it.

Q. Okay. And let's turn to Exhibit 2.

A. (Witness complies.)

Q. Flip to the third page, which is marked THO-021353.

A. Okay.

Q. What's the copyright at the bottom of the page?

A. 2002.

Q. When did the transactions at issue in this case occur?

A. I believe 2001.

Q. All right. So if this is copyrighted 2002. Is it possible for this document to have been shown to the Sands before they decided to engage in the transaction?

A. It's unlikely this would have been.

Q. So it's more likely that something that perhaps

A. Okay.

Q. Let's look back at your handwritten notes; it's Exhibit 11, and look at THO-713.

A. (Witness complies.)

Q. And this was the -- these are the notes dated 8/16/01, and, I think, Mr. Cullinan had asked you if you were sure or not whether or not the Sands were actually present at this meeting.

A. Right.

Q. You testified there's no way you could be sure of that.

A. (Nods head.)

Q. If you'll turn to Exhibit 14, if you see down at the bottom, very, very bottom of the page, it's -- there's a debrief tracking info, and it says, Day, 8/16/2001, Rep, BLC, meeting with PC in Fairport, New York. Do you see that, at the very bottom?

A. Yes.

Q. Would that indicate that, in fact, on August 16th of 2001, you were in Fairport, New York meeting with the Sands?

A. Yes.

Q. So does that refresh your memory at all about this August 16th, 2001 meeting about whether or not the Sands were actually present?

A. Well, we wouldn't have gone to a meeting in Fairport without the Sands being present.

Q. So I'll ask you again: The meeting -- the notes from the meeting dated August 16th of 2001, is it -- were the -- Richard Sands and Robert Sands present at that meeting?

A. I believe so.

Q. Okay. Now, I'm going to go back and ask you some questions regarding Exhibit 25, which was probably the very bottom of this stack, because it was first one Mr. Cullinan asked you about.

And I think he asked you about the third page, which is marked CH-0045. And just so I understand this page, because I don't to ask anything that's too confusing. Is what this page is saying -- it says, in the middle of the page, it says, Total result realized from utilization of Heritage strategies, $889,000.

Can you tell me what that line and number mean?

A. Well, it's a hypothetical -- it's a hypothetical scenario based on a change, and the interest rates, and it's actually saying the best case scenario, given the historical data from the prior three years, that if you had a rise in interest rates identical to what had historically been the best