IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | CASE 04-35574-BJH-11 |
| THE HERITAGE | ) | (Chapter 11) |
| ORGANIZATION, L.L.C. | ) | |
| Debtor. | ) | |
| | | |
| MERALEX, L.P. AND HOWARD | ) | |
| M. JENKINS, | ) | |
| Plaintiffs, | ) | ADVERSARY NO. 05-03699 |
| | ) | Transferred from the |
| VS. | ) | United States District |
| | ) | Court, Northern |
| THE HERITAGE | ) | District of Texas |
| ORGANIZATION, L.L.C., et | ) | Civil Action No. |
| al., | ) | 3-03CV0991-B |
| Defendants. | ) | |
| | | |
| THE HERITAGE | ) | |
| ORGANIZATION, L.L.C., et | ) | |
| al., | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| W. RALPH CANADA, | ) | |
| Third-Party Defendant. | ) | |

---

ORAL DEPOSITION OF
W. RALPH CANADA
FEBRUARY 22, 2006
Volume 1

---

EXHIBIT
9

ORAL DEPOSITION OF W. RALPH CANADA, Volume 1, produced as a witness at the instance of the Plaintiffs,

A. Well, I have lots of reasons to dispute the accuracy of anything that was in the control of the Kornman group for four or five years so --

Q. Explain.

A. I mean, the whole process of litigating with them they, you know, withheld documents until the last second. I mean, there were a lot of documents we should have gotten, we never got. A lot of things may have been manipulated during that time period. So, I mean, just generally I don't vouch for anything that came from them.

Q. Are you aware of instances where Gary Kornman manipulated or altered documents?

A. No, not specifically.

Q. Or manipulated or altered any of the transcripts?

A. Yeah. I -- yeah. I mean, there were -- there were times like in in-house meetings at Heritage he would just simply run the recorders back and erase things before they were given to someone to transcribe. So, I mean, I saw him do things like that in my presence.

These are surprisingly free of what I would call verbal garbage, that is, people, you know, saying uh-huh, huh-uh, stuff like that, and also

surprisingly free of colorful language, shall we say. So at some point they have been -- I think they have been cleaned up.

Q. In any material manner as far as you know?

A. Again, not as far as I can tell at this point.

Q. Would you look at Exhibit 63?

A. Yes, sir.

Q. And that's a transcript of a call with you and Ed Ahrens?

A. Yes, sir.

Q. Do you believe that you were the recorder on this conversation?

A. It's logical to assume since I'm the only other -- I'm the only Heritage person on the call.

Q. And just so I understand, I mean, was this -- was this recording equipment that would automatically tape a call or did it require some activity on your part?

A. You had to press the button to record.

Q. How did you make others aware that you were recording of -- that they were being recorded?

A. On occasion we told them and other than that they weren't aware.

Q. Okay. Did -- did Mr. Kornman ever give you any instructions about telling third parties they were

device?
A. I mean, again, if the transcript's accurate, I'm the only person at Heritage on there so it would be logical to assume.
Q. Do you have any reason to dispute the accuracy of the transcript in Exhibit 71?
A. Not other than what I've told you.
Q. And what you've told me is that it omits some uh-huhs and maybe some colorful language that you recall generally?
A. And generally that I don't discuss -- I don't -- that generally I would not be sure of the authenticity of anything that was in Gary's sole possession for a number of years before being turned over to someone -- someone else.
Q. Would you look at Exhibit 81.
A. Yes, sir.
Q. Do you believe you were the person operating the recording device?
A. Again, for the same reasons I would say I probably was.
Q. Okay. Any reason to dispute the accuracy of Exhibit 81?
A. Not other than what I've already told you.
Q. Would you look at Exhibit 82?

inconsistent with your memory?

A. No, sir.

Q. Do you have any reason to dispute its accuracy?

A. Not other than what I've already told you.

Q. Then last Exhibit 89, does that appear to be a transcript of a conversation between you and Mr. Howard?

A. Yes, sir.

Q. And does it appear that you were the person operating the recording device?

A. Again, it would be my assumption that I was.

Q. And do you have any reason to dispute the accuracy of the transcripts in 89?

A. Not other than what I've already told you.

Q. Okay. For each of the transcripts that we just reviewed, are you aware of any malfunction with your taping -- taping device during those conversations?

A. Not aware of any, no, sir.

Q. And were the people at Heritage who were tasked with transcribing these recordings, as far as you know, competent in their abilities to transcribe tape recordings?

A. Now that's a tough one.

Q. Let's take it one by one. Who transcribed the recordings for you?

A. I couldn't tell you. I mean, there's no initials on these. If it was my assistant, you know, at any given point in time, they would have been competent.

Q. Who was your assistants or who were your assistants in the '98/'99 time frame?

A. I don't -- don't specifically remember. I think probably Mary Gross. I don't recall when she left. But if these were given to the marketing support department to do, as I said, there was considerable turnover in there and a lot of the work from them was extremely sloppy so --

Q. Do the transcripts that you just looked at, 62, 63, 71, 73, 81, 82, 89 appear to be sloppily transcribed in the way you just referred to the marketing department or more competently transcribed as you were with familiar with Ms. Gross's work?

A. Well, I mean, they look -- they look nice now so --

Q. Is this format how you -- is this format the same or different than the format of the transcriptions by Heritage when you worked there?

A. It -- it looks the same except for the -- you know, the Bates number on the bottom. It looks like the form they used. Well, I will say, except I really thought there were initials on these somewhere as to who