IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: September 14, 2007)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | |
|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-810 T |

M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

06-811 T

**PLAINTIFFS' RESPONSE TO UNITED STATES' ALTERNATIVE PROPOSED FINDINGS OF FACT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, Plaintiffs hereby respond to the alternative facts alleged by Defendant in its Response to Plaintiffs' Proposed Findings of Uncontroverted Fact.

## I. General Objections

Plaintiffs object to any facts alleged by Defendant based on Exhibits 26 through 29 of Appendix B to Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment. Plaintiffs have separately filed a Motion to Strike these exhibits from the record. As discussed more fully in Plaintiffs' Motion to Strike, the cited exhibits, unauthenticated and erroneous transcripts of purported conversations between Richard and Robert Sands and various employees of The Heritage Organization LLC ("Heritage"), fail to provide an accurate or complete picture of the negotiations and discussions between the Sands and Heritage, lack any guarantee of trustworthiness, and are inadmissible as evidence for summary judgment purposes because they cannot be authenticated.

First, Exhibits 26 through 29 fail to provide a complete and accurate picture of the negotiations and discussions between the Sands family members and Heritage. At least one conversation occurred before the dates of the conversations supposedly recorded in the

transcripts. Pls. Ex. 60, App. B at pp. 4-6. During this first call from Chester Decker, Richard Sands expressed little interest in Heritage's investment strategies when Decker could not provide answers to his questions. Pls. Ex. 60 and 64, App. B at pp. 4-6, 72. Several meetings and numerous conversations occurred after the dates of the recorded conversations. Pls. Ex. 61, App. B at pp. 13-14, 36-37. These other conversations and meetings apparently were not recorded or transcribed. In these later meetings with Heritage, the Sands discussed a number of benefits of the investment strategy such as making a profit, providing for philanthropic interests, and diversifying their holdings. Pls. Ex. 57, App. B at pp. 1394, 1397A and Pls. Ex. 61, App. B at pp. 16-21. The combination of all of these benefits, including any potential tax benefit, led the Sands family to engage in the financial plan. Pls. Ex. 57, App. B at pp. 1394, 1397A.

Second, the transcripts cannot be trusted. The tapes from which Exhibits 27 and 28 were supposedly transcribed also contain significant gaps which the witnesses involved in the conversations could not fill. Pls. Ex. 62, App. B at pp. 47-48, 50-51. The chain of custody for the tapes and transcripts from the time they were recorded or transcribed until they were delivered to the bankruptcy trustee in 2004 cannot be determined. Pls. Ex. 70, App. B at pp. 146-50. Some Heritage employees have testified that Mr. Kornman had a history of deleting or revising tapes. Pls. Ex. 61, App. B at p. 35. Heritage employees have testified that the tapes were difficult to understand and that the transcribers with no special training cut corners doing their work. Pls. Ex. 60 and 61, App. B at pp. 9-10, 30-31. Furthermore, for at least two transcripts, tapes have been lost or destroyed or did not exist. Therefore a significant possibility exists that the tapes or transcripts were altered or corrupted before they were received by the IRS.

The exhibits cannot be authenticated, and as inadmissible evidence, must be excluded by this Court in making summary judgment determinations. *Coast Fed. Bank, FSB v. United States*,

48 Fed. Cl. 402, 444-450 (2000). The Heritage employees involved in the conversations at issue failed to review the transcripts for their accuracy at or near the time they were recorded and testified that the transcripts did not accurately reflect the substance of the conversations. Pls. Ex. 60 and 62, App. B at pp. 3, 44. Both Richard Sands and Robert Sands testified that they do not remember the specific conversations that occurred during their meetings with Heritage personnel. Pls. Ex. 63 and 66, App. B at pp. 62, 65-67, 116-17. Only two tapes still exist, and the transcripts contain errors, gaps, and discrepancies when compared against those tapes. Pl. Ex. 62, App. B at pp. 49-55. The failure to authenticate the transcripts, the lack of trustworthiness, and the inaccuracy and incompleteness of the transcripts point to only one conclusion – such evidence would be inadmissible at trial. Furthermore, the transcripts also contain hearsay within hearsay statements that do not fall within any exception to the hearsay rule, and Plaintiffs have been prejudiced by defendant's untimely production of the transcripts which were in its possession in November 2006.

Because Exhibits 26 though 29 would be inadmissible at trial, they cannot be considered here and cannot provide a foundational basis for the additional facts Defendant has alleged. Plaintiffs have responded below to Defendant's statements of fact based on these transcripts; however, Plaintiffs' responses in no way constitute admissions that the transcripts are admissible evidence.

Plaintiffs also object to Defendant's repeated characterization of the transactions entered by Plaintiffs as "tax shelters" or "a tax avoidance scheme." Defendant does not define the term "tax shelter" or cite to any evidence to support the purported facts that the investments at issue were "tax shelters." Rather, Defendant uses this self-serving and inflammatory terminology throughout its Response to Plaintiffs' Proposed Findings of Uncontroverted Fact in complete disregard for Ct. Fed. Cl. R. 56(e) and 56(h)(1). As stated in Plaintiffs' Proposed Findings of

Fact filed in support of their cross-motion for summary judgment, Plaintiffs made the investments at issue in this case for valid business reasons. Accordingly, Plaintiffs' responses in no way constitute an admission as to the validity of such characterizations by Defendant.

## II. Specific Responses

### Contact with Heritage

1. On May 10, 2001, Chester Decker, of The Heritage Organization, L.L.C., contacted Richard Sands by telephone to discuss a strategy to eliminate federal and state capital gain tax entirely. App-B-1-2. At that time, Decker explained that Heritage would be paid a contingency fee, based on a "percentage of tax dollars you would have paid." App-B-3. After being assured that the Heritage strategy would "eliminate the capital gains tax," Richard Sands arranged for a May 31, 2001 office meeting with Heritage personnel. App-B-3. The entire May 10, 2001 conversation dealt with the elimination of capital gains tax. At one point, Richard Sands even states that he had previously used a strategy of [Jonathan] Blattmachr, commenting that Blattmachr's strategy hadn't eliminated the capital gain tax to zero. App-B-12-13.

**Response:** As to defendant's assertions that various statements were made during the May 10 conversation between Chester Decker and Richard Sands, plaintiffs do not agree that Exhibit 26 ("the transcript") accurately or completely reflects the conversation between Decker and Richard Sands. As described above, the transcript cannot be authenticated, is untrustworthy, contains hearsay and is inadmissible for purposes of summary judgment. The work of the transcribers was sloppy and Exhibit 26 is not an accurate transcription of the conversation between Decker and Richard Sands. Pls. Ex. 60, App. B at pp. 9-10. Plaintiffs' agreement below regarding whether the transcript is correctly quoted in no way constitutes an admission that the quoted statements were actually made or that they were transcribed correctly.

Plaintiffs agree that Chester Decker contacted Richard Sands on or about May 10, 2001 by telephone to discuss an investment strategy that could also reduce federal and state capital gains. Plaintiffs disagree that the purpose of the strategy was to entirely eliminate capital gains tax. Pls. Ex. 63, App. B at pp. 63-64.

As described above in plaintiffs' general objections, the conversation purportedly set forth in Exhibit 26 does not provide a complete picture of the negotiations or discussions between Richard Sands and Heritage. The May 10 call was not the first contact Decker had with Richard Sands. Pls. Ex. 60 and 64, App. B at pp. 4-6, 72. During Decker's first call, Richard Sands expressed little interest in Heritage's investment strategies when Decker could not provide answers to his questions. Pls. Ex. 60 and 64, App. B at pp. 4-6, 72. In later meetings with Heritage, the Sands discussed a number of benefits of the investment strategy such as making a profit, providing for philanthropic interests, and diversifying their holdings. Pls. Ex. 57, App. B at pp. 1394, 1397A and Pls. Ex. 61, App. B at pp. 16-21. The combination of all of these benefits, including any potential tax benefit, led the Sands family to engage in the financial plan. Pls. Ex. 57, App. B at pp. 1394, 1397A.

Plaintiffs agree that according to Exhibit 26, Decker stated that Heritage would be paid a contingency fee based on a "percentage of the tax dollars you would have paid." As stated in Plaintiffs' general objections above, Plaintiffs do not agree that the transcript accurately reflects the conversation between Decker and Richard Sands and therefore cannot agree that Decker made those exact statements regarding the Heritage fee during the May 10 conversations. Decker testified that Exhibit 26 is not an accurate transcription of the conversation he had with Richard Sands. Pls. Ex. 60, App. B at pp. 9-10.

Plaintiffs agree that according to Exhibit 26, Decker stated that the investment strategy would entirely eliminate capital gains taxes. Plaintiffs do not agree that Exhibit 26 accurately

reflects the conversation between Decker and Richard Sands and therefore cannot agree that Mr. Decker stated that Heritage's investment strategy could entirely eliminate capital gains during the May 10 conversation. Decker testified that Exhibit 26 is not an accurate transcription of the conversation he had with Richard Sands. Pls. Ex. 60, App. B at pp. 9-10. Plaintiffs agree that Richard Sands arranged to meet with Heritage personnel on or about May 31, 2001, though Plaintiffs cannot confirm that such meeting was set during the purported May 10 conversation between Richard Sands and Mr. Decker.

Plaintiffs disagree that the entire alleged May 10 conversation dealt with elimination of capital gains tax. Defendant's Exhibit 26 includes discussion of other topics including the Heritage fee and estate planning techniques. Def. Ex. 26, App. B at pp. 3, 9-11. Furthermore, as plaintiffs have described above, plaintiffs do not agree that the transcript accurately reflects the conversation between Decker and Richard Sands. There are gaps in the transcript that Mr. Decker could not fill. Pls. Ex. 60, App. B at pp. 7-8.

Plaintiffs agree that according to Exhibit 26, Richard Sands stated that he used a strategy of Jonathan Blattmachr that didn't reduce the capital gain to zero. Plaintiffs do not agree that Exhibit 26 accurately reflects the conversation between Decker and Richard Sands and therefore cannot agree that Richard Sands made such a statement. Furthermore, there is a gap in that portion of Exhibit 26 (App. B at pp 12-13) for which Decker could not provide the missing words. Pls. Ex. 60, App. B at pp. 7-8.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:**

Chester Decker contacted Richard Sands in March 2001. Pls. Ex. 60, App. B at pp. 4-6. During that conversation, Richard asked questions regarding the transactions Decker was

discussing, but received only vague answers. According to Decker's debrief of the conversation, Richard showed only "mild interest." Pls. Ex. 60 and 64, App. B at pp. 4-6, 72.

During the second call with Decker and subsequent May and June meetings with Heritage representatives, Richard and Robert learned that Heritage's investment transactions could result in tax savings, provide other advantages including diversification of assets, or assist them in family estate planning. To find out how the transactions worked or whether they provided sufficient benefits for the family to engage in them, the Sands had to sign a confidentiality agreement with Heritage and pay a $22,500 retainer fee. Pls. Ex. 61, App. B at pp. 31-34.

Before signing such an agreement or paying any fees to Heritage, Robert Sands asked Jonathan Blattmachr of Milbank, Tweed, Hadley & McCloy LLP to provide him Jonathan's impression of Heritage and some background information on Gary Kornman, one of the principals of Heritage. Robert Sands also requested references from Heritage and contacted those references. Pls. Ex.1, 2, 52 and 53, App. B at pp. 1-5, 1350-1351, 1357.

After signing the agreement and paying the $22,500 fee, a relatively small amount when compared to the short sales involved in these cases or the profits earned by Alpha since it was formed in 2001, the Sands had other meetings and calls with Heritage personnel which apparently were not recorded, transcribed, or retained by Heritage. In these later meetings and conversations, Heritage personnel spent a significant amount of time explaining all of the benefits of their financial plans to the Sands. They discussed the fluctuation of interest rates and how such fluctuations could provide the possibility for profiting in short sales of Treasury notes or affect Constellation stock. Pls. Ex. 61, App. B at pp. 16-21. They also discussed the ability to provide for philanthropic interests through the Heritage financial plan. Pls. Ex. 61, App. B at pp. 16-21. Richard Sands and Robert Sands recalled learning of a number of benefits from the

investment strategy such as making a profit, providing for philanthropic interests, and diversifying their holdings. Pls. Ex. 57, App. B at pp. 1394, 1397A. The combination of all of these benefits, including any potential tax benefit, led the Sands family to engage in the financial plan. Pls. Ex. 57, App. B at pp. 1394, 1397A.

4. On May 31, 2001, Tim Seaberg, of The Heritage Organization, L.L.C., met with Richard Sands and Robert Sands at the Constellation, Inc. office. During the meeting, Richard Sands stated that they were interested in "diversifying out of Constellation a small amount like maybe $30 million in stock." App-B-19. During the meeting, Richard sought assurances that 'this is not a tax deferral this is a complete elimination …." App-B-21. Richard also asked Seaberg if Heritage would guarantee results and he was told that "there would be no economic substance if we said if it doesn't work you get all your money back." Notwithstanding this statement, Seaberg went on to explain a "deal" where all of the tax savings could be put into escrow for three years drawing interest. After three years at the end of the statute, if the escrowed money didn't have to be used for the taxes, it would be split 50/50. App-B-24. Richard also asked if Heritage would pay defense costs, stating that "there are some law firms that are selling similar type arrangements [that] are paying defense costs. Richard also stated that "[d]eals that we've done we usually get defense costs through the appeal level." App-B-22.

At the May 31st meeting, Seaberg explained that the Sands would get a "[m]ore likely than not" opinion letter from a Top 200 law firm. (Seaberg later explained that the opinion letter would cost $100,000 to $150,000. App-B-32. Seaberg further explained that if the "worst case scenario happens and you've got to pay all the taxes" "you've basically got a loan from the government for 8% for 8 to 10 years." App-B-26.

Richard Sands asked Seaberg about the proprietary nature of the transaction, stating that "there's a lot of these things floating around." App-B-27. Seaberg explained that "the combination and the way we set it up is proprietary." Seaberg went on to state that some people stopped doing the transaction when a "treasury not[ic]e known as 2000-44 that came out last year that um dealt with I guess a similar area of the tax code and it caused some people to stop doing it." App-B-28. Richard Sands was very insistent that the strategy eliminate capital gains. During the May 31 meeting, Richard proposed an example using zero basis stock that they might initiate now but not sell for six months. App-B-29-30. Seaberg explained that they were essentially "creating a loss that offsets the gain." App-B-31.

The May 31st meeting concluded by setting up a second meeting on June 13, 2001, which would be attended by Heritage founder Gary Kornman. App-B-43-45.

On June 13, 2001, Tim Seaberg and Gary Kornman, of The Heritage Organization, L.L.C., met with Richard Sands and Robert Sands at the Constellation, Inc. office. During the meeting, much of the discussion concerned avoiding estate and gift taxes. When the topic turned to capital gains, Kornman explained that their transaction would "give you as much basis as you want to be used any time in the future." Richard Sands specifically asked about and was assured by Kornman that they could shelter both long term and short term capital gains. App-B-62. As Kornman later explained, "[w]e're going to create something with basis so that you can use that basis, as you need year by year to create an offsetting loss." App-B-83. Near the conclusion of the meeting a subsequent meeting was scheduled for June 27, 2001. App-B-92.

On June 27, 2001, Tim Seaberg and Gary Kornman met with Robert Sands and Jim Locke at the Constellation, Inc. office. Locke was an attorney with Nixon, Peabody.

App-B-100. During the meeting, Robert said to Kornman that "elimination of the capital gains on the sale of the stock that's probably the first thing that we would embark upon with you." Robert elaborated, [t]his is the first level of importance because we're thinking of selling [?] stock." App-B-110. Kornman later tells Robert "we can set it up to do exactly what you want to do. I mean [?] capital gains long or short it doesn't make a difference. We can eliminate the tax." App-B-115. Later still, Kornman explains that "if you ever got audited and our agreement is part of what they'll see there's a business purpose built into the original engagement agreement. Uh obviously when you sign this thing it won't have the bold E that says what we're really doing it for is capital gains." App-B-121.

**Response:** As to defendant's assertions that various statements were made during alleged the May 31, June 13, or June 27 meetings between Heritage personnel Tim Seaberg and Gary Kornman and Richard Sands, Robert Sands, and/or their attorney, Plaintiffs do not agree that Exhibits 27 through 29 ("the transcripts") accurately or completely reflect the conversations between the Heritage employees and the Sands. Richard Sands and Robert Sands have both testified that they do not remember the conversations they had with Heritage employees in detail. Pls. Ex. 63 and 66, App. B at pp. 62, 65-67, 116-17. The transcripts of the conversations between the Heritage personnel and the Sands contains numerous gaps that Seaberg could not fill and indications that the transcribers could not understand what was being said. Pls. Ex. 62, App. B at pp. 44-47, 49-54. Seaberg could not verify the accuracy of the transcripts and noted that the tapes were hard to hear and that sometimes the staff guessed as to what was said. Pls. Ex. 62, App. B at pp. 44-46, 56. Regarding Exhibits 27 and 28, some words on the transcript were not on the tapes, and some words heard on the tapes were not included in the transcripts. Pls. Ex. 62, App. B at pp. 49-52, 57-59. Plaintiffs' agreement below regarding whether the transcripts are

correctly quoted in no way constitutes an admission that the quoted statements were actually made or that they were transcribed correctly. As Plaintiffs have described above, the transcripts are unauthenticated, untrustworthy, and contain hearsay, making them inadmissible evidence for purposes of summary judgment. Plaintiffs also disagree with Defendant's characterizations of statements found in the transcripts because Defendant has pulled quotes from the transcripts out of context and left out surrounding statements in order to draw its incorrect conclusions.

Plaintiffs agree that Tim Seaberg met with Richard Sands and Robert Sands on or about May 31, 2001. Plaintiffs agree that according to Exhibit 27, Richard Sands expressed an interest in "diversifying out of Constellation a small amount like maybe $30 million in stock." Plaintiffs disagree that according to Exhibit 27 Richard Sands sought assurance that "this is not a tax deferral this is a complete elimination." According to Exhibit 27, Richard Sands questioned whether "this is not a tax deferral this is a complete elimination - are there any negatives?" Def. Ex. 27, App. B at p. 21. Plaintiffs agree that according to Exhibit 27, Richard Sands asked **how** Heritage would guarantee its results and that Seaberg responded that Heritage offered a couple of methods and comes as close to a guarantee as it can but that "there would be no economic substance if we said if it doesn't work you get all your money back." Def. Ex. 27, App. B at p. 24. Plaintiffs agree that according to Exhibit 27, Seaberg explained a deal for putting the tax savings in escrow for three years and if the money did not have to be used for taxes after three years it would be split 50/50. Plaintiffs disagree with any implication that they agreed to such a deal (they did not) and note that according to Exhibit 27, Seaberg also discussed a second, more common "general deal" in which Heritage received 25% of the potential tax savings and the client received 75%. Def. Ex. 27, App. B at p. 24.

Plaintiffs agree that according to Exhibit 27, Richard Sands stated that "there are some firms that are selling similar type arrangements are paying defense costs," and "Deals that we've

done we usually get defense costs through the appeal level." Plaintiffs disagree that Exhibit 27 supports the statement that Richard asked if Heritage would pay defense costs because no such request was made.

Plaintiffs agree that according to Exhibit 27, Seaberg stated that the Sands would get a "more likely than not" opinion letter from a Top 200 law firm. Plaintiffs agree that according to Exhibit 27, Seaberg stated that if they had to pay the entire amount of tax back, they would have received a loan from the government for 8% for 8 to 10 years. Plaintiffs agree that Seaberg estimated the cost of an opinion letter at $100,000 to $150,000. Plaintiffs disagree with any implication that Heritage was involved in setting or determining the fee the Sands paid Lewis Rice. The Sands paid $300,000 to Lewis Rice for their services, significantly more than the amount purportedly estimated by Seaberg. Pls. Ex. 65, App. B at pp. 73-113.

Plaintiffs agree that according to Exhibit 27 Richard Sands asked about the proprietary nature of the transaction, and stated that "there's a lot of these things floating around." In the context of Exhibit 27, Richard's questions related to when the Heritage confidentiality agreement would apply if the Sands found out about the transaction from someone else. Def. Ex. 27, App. B at p. 27-28.

Plaintiffs disagree with Defendant's characterization of Seaberg's comments relating to Notice 2000-44. Based on Exhibit 27, Seaberg did not say people stopped doing *Heritage's* transaction because of Notice 2000-44. According to Exhibit 27, Seaberg made the following statement "We've heard of people doing similar portions of it poorly and have now stopped doing it cause they weren't doing it right." According to Exhibit 27, he then went on to state that "There was a treasury note [sic] known as 2000-44 that came out last year that um dealt with I guess a similar area of the tax code and it caused some people to stop doing it uh what they were doing."

Plaintiffs disagree that Richard Sands was insistent that the strategy eliminate capital gains and disagree that Exhibit 27 supports such a statement. Plaintiffs agree that according to Exhibit 27, Richard proposed a hypothetical example using zero basis stock that they sell six months after doing the transaction. Plaintiffs agree that according to Exhibit 27, during the discussion of how the transaction works, Seaberg stated that it would essentially create a loss that offsets the gain. Plaintiffs agree that according to Exhibit 27, the May 31 meeting concluded by setting up a meeting on June 13, 2001 with Gary Kornman.

As described above, Plaintiffs do not agree that Exhibit 27 accurately reflects the conversation between Seaberg, Richard Sands, and Robert Sands and therefore cannot agree that the statements quoted or paraphrased above from Exhibit 27 were actually made or transcribed correctly.

Plaintiffs agree that on or about June 13, 2001, Richard and Robert Sands met with Seaberg and Gary Kornman. Plaintiffs disagree that much of the discussion during that meeting "concerned avoiding estate and gift taxes." According to Exhibit 28, part of the discussion concerned what estate planning the Sands had already done and what other estate planning might be possible. Furthermore, Exhibit 28, like the other transcripts, contains gaps and indications that the transcribers could not understand what was being said. Pls. Ex. 62, App. B at pp. 56-59. Seaberg could not verify the accuracy of the transcripts and noted that the tape was hard to hear and that sometimes the staff guessed as to what was said. Pls. Ex. 62, App. B at pp. 44-47, 56. It is unknown what topics were discussed during the gaps and portions of the tape that could not be understood.

Plaintiffs disagree with Defendant's characterization that the conversation "turned to capital gains." Plaintiffs agree that according to Exhibit 28, Kornman stated that "we give you as much basis as you want to be used anytime in the future." Plaintiffs disagree that according to

Exhibit 28, Richard Sands asked about sheltering long term and short term capital gains. First, the transcript contains indications of "cross-talking" and question marks on page 63 of Defendant's Appendix, in the part of the conversation where the questions may have occurred. Second, Exhibit 28 indicates that "RS," previously defined as Robert Sands, asked the questions regarding long term and short term capital gains.

Plaintiffs agree that according to Exhibit 28, Kornman stated that "We're going to create something with basis so that you can use that basis, as you need year by year to create an offsetting loss." Plaintiffs agree that according to Exhibit 28, a subsequent meeting was scheduled for June 27, 2001.

As described above, Plaintiffs do not agree that Exhibit 28 accurately reflects the conversation between Seaberg, Richard Sands, and Robert Sands and therefore cannot agree that the statements quoted or paraphrased above from Exhibit 28 were actually made or transcribed correctly.

Plaintiffs agree that on or about June 27, 2001, Seaberg and Kornman met with Robert Sands, Richard Sands, and Jim Locke. Plaintiffs agree that Jim Locke was an attorney with Nixon Peabody.

Plaintiffs agree that according to Exhibit 29, Robert Sands told Kornman that "elimination of the capital gains on the sale of the stock that's probably the first thing that we would embark upon with you" and "This is the first level of importance because we're thinking of selling [?] stock." As described above, Plaintiffs disagree that these statements were actually made because the transcripts contain numerous gaps and errors. Furthermore, Robert Sands' statement in the transcript contains a question mark indicating that his entire statement could not be determined by the transcribers. Pls. Ex. 62, App. B at pp. 44-46.

Plaintiffs agree that according to Exhibit 29, Kornman stated that "we can set it up to do exactly what you want to do. I mean [?] capital gains long or short it doesn't make a difference. We can eliminate the tax." Again, Plaintiffs disagree that this statement was actually made or was correctly transcribed as it contains a question mark. Pls. Ex. 62, App. B at pp. 44-46.

Plaintiffs agree that according to Exhibit 29, Kornman stated that "if you ever got audited and our agreement is part of what they'll see there's a business purpose built into the original engagement agreement. Uh obviously when you sign this thing it won't have the bold E that says what we're really doing it for is capital gains." Plaintiffs disagree that this statement was actually made or that Kornman's statement reflects the Sands motives and intentions for entering the transaction. Plaintiffs' goals for participating in the investment transactions included making a profit, diversifying their holdings which were concentrated in Constellation stock, accomplishing estate planning goals, and providing for philanthropic interests, in addition to obtaining any potential tax benefit. Pls. Ex. 57, App. B at pp. 1394, 1397A.

As described above, Plaintiffs do not agree that Exhibit 29 accurately reflects the conversation between Seaberg, Richard Sands, and Robert Sands and therefore cannot agree that the statements quoted or paraphrased above from Exhibit 29 were actually made or transcribed correctly.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:**

Please see Plaintiffs' proposed alternative statement of fact in response to Paragraph 1.

**The Transactions**

20. The purchase of the Yahoo and Corning stock was part of the tax avoidance scheme seeking to inflate the value of the Yahoo and the Corning stock and to improperly generate artificial losses. App-B-131-134.

**Response:** Plaintiffs disagree with this statement of purported fact on multiple grounds. Plaintiffs disagree that the purchase of the Yahoo and Corning stock was part of a tax avoidance scheme seeking to inflate the value of the Yahoo and Corning stock. The Sands believed that Yahoo and Corning would be good investments. Pls. Ex.63 and 66, App. B at pp. 68-71, 118. Furthermore, plaintiffs' goals for participating in investment transactions, including the purchase of the Yahoo and Corning stock, included making a profit, diversifying their holdings which were concentrated in Constellation stock, accomplishing estate planning goals, and providing for philanthropic interests, in addition to obtaining any potential tax benefit. Pls. Ex. 57, App. B at pp. 1394, 1397A.

Plaintiffs also disagree that the purpose of the purchase of the Yahoo and Corning stock was to improperly generate artificial losses. Plaintiffs properly reported their transactions under the Internal Revenue Code and there was nothing "artificial" about those consequences; the tax result is simply what the Code required.

22. The use of Gloria Robinson was part of the tax avoidance scheme seeking to inflate the value of the Yahoo and the Corning stock and to improperly generate artificial losses. App-B-131-134.

**Response:** Plaintiffs disagree with this statement of purported fact on multiple grounds. First, Plaintiffs disagree that Gloria Robinson was "used" as "part of the tax avoidance scheme seeking to inflate the value of the Yahoo and Corning stock and to improperly generate artificial losses." Alpha and Gloria Robinson agreed to form Beta as a limited liability company. Pls.' Resp. to Def.'s Prop. Findings of Fact, pp.13-14, ¶ 20.

Plaintiffs' goals for participating in investment transactions, including the purchase of the Yahoo and Corning stock, included making a profit, diversifying their holdings which were concentrated in Constellation stock, accomplishing estate planning goals, and providing for

philanthropic interests, in addition to obtaining any potential tax benefit. Pls. Ex. 57, App. B at pp. 1394, 1397A.

Plaintiffs also disagree that the purpose of Gloria Robinson's investment in Beta was to improperly generate artificial losses. Plaintiffs properly reported their transactions under the Internal Revenue Code and there was nothing "artificial" about those consequences; the tax result is simply what the Code required.

34. The purchase of the Yahoo and Corning stock was part of the tax avoidance scheme seeking to inflate the value of the Yahoo and the Corning stock and to improperly generate artificial losses. App-B-131-134.

**Response:** Please see Plaintiffs' response to Defendant's same proposed statement of fact at paragraph 20 above

39. According to William Falk, an attorney with Lewis, Rice & Fingersh, the background, education, investment sophistication and experience of the Sands family were impressive. (Plaintiffs' Summary Judgment Ex. 55).

**Response:** Plaintiffs agree with the above statement; however, plaintiffs disagree that such statement should replace Plaintiffs' Proposed Finding of Uncontroverted Fact at paragraph 39. Just because Robert Sands' background, education, investment sophistication and experience were impressive does not make him an expert on the proper tax treatment of sophisticated investments. Robert Sands, though an attorney, does not practice tax law. He is not a certified public accountant ("CPA") and has had no special tax training beyond a basic income tax course in law school. Pls. Ex. 52, App. B at p. 1350.

45. Lewis Rice was already actively involved in implementing the Heritage tax shelters when Robert Sands purportedly conducted his due diligence of the firm. App. B-131-158.

**Response:** As stated above in Plaintiffs' general objections, Plaintiffs disagree with Defendant's characterization of the activities and investments of Alpha or its limited partners as a tax shelter. Plaintiffs disagree that Lewis Rice was involved in implementing tax shelters when Robert Sands conducted his due diligence of the firm. Plaintiffs also disagree that the sources cited by Defendant support such a statement. Defendant cites an email from Heritage to Richard Sands dated November 14, 2001 and the engagement letters between Lewis Rice and the Sands family members. None of these documents support Defendant's statement that Lewis Rice implemented "tax shelters" before Robert Sands conducted his due diligence of the firm or at any other time.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:**

Robert Sands investigated Lewis Rice on behalf of his family. Pls. Ex. 48 and 52, App. B at pp. 1272 -1280, 1352. Based on that investigation, the Sands family engaged Lewis Rice to assist them in implementing their investment transactions and in determining the correct tax treatment of the transactions. Pls. Ex. 49 and 55, App. B at pp. 1281-1294, 1369. Lewis Rice did not pay or receive any referral fees from Heritage, nor was there any agreement between them to split any fees. Pls. Ex. 55, App. B at p. 1369 and Pls. Ex. 61, App. B at p. 15.

47. Lewis Rice was already actively involved in implementing the Heritage tax shelters when Robert Sands purportedly conducted his due diligence of the firm. App-B-131-158.

**Response:** Please see Plaintiffs' response to Defendant's same proposed statement of fact at paragraph 45 above.

49. The use of Lewis, Rice was part of the tax avoidance scheme from the beginning. During the May 31, 2001 meeting with Heritage personnel, Richard Sands specifically asked if Heritage would pay defense costs, stating that "there are some law firms that are selling

similar type arrangements [that] are paying defense costs. Richard also stated that "[d]eals that we've done we usually get defense costs through the appeal level." App-B-22. Tim Seaberg answered that the Sands would get a "[m]ore likely than not" opinion letter from a Top 200 law firm. Seaberg later explained that the opinion letter would cost $100,000 to $150,000. App-B-32.

**Response:** Plaintiffs disagree with this statement of purported fact on multiple grounds. First, plaintiffs disagree that Lewis Rice was "used" as "part of the tax avoidance scheme." Defendant has presented no evidence to rebut Plaintiffs' statement of fact on this point.

Second, as to Defendant's assertions that various statements were made during the May 31st conversation between Timothy Seaberg and Richard and Robert Sands, Plaintiffs do not agree that Exhibit 27 ("the transcript") accurately or completely reflects the conversation between Seaberg and the Sands. The transcript of the conversation between Seaberg and the Sands contains numerous gaps that Mr. Seaberg could not fill and indications that the transcribers could not understand what was being said. Pls. Ex. 62, App. B at pp. 44-46. Seaberg could not verify the accuracy of the transcript and noted that the tapes were hard to hear and that sometimes the staff guessed as to what was said. Pls. Ex. 62, App. B at pp. 40-42, 44-46.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:**

Lewis Rice was independent of Heritage. Lewis Rice did not pay or receive any referral fees from Heritage, nor was there any agreement between them to split any fees. Pls. Ex. 55, App. B at p. 1369 and Pls. Ex. 61, App. B at p. 15. Lewis Rice independently determined the fee the firm would seek from the clients for their services, and they were paid for their services by the partners of Plaintiffs Alpha I, L.P. and R, R, M & C Group, L.P. Plaintiffs' Exhibits 50 and

55, App. B at p. 1295-1315, 1369. The partners of Plaintiffs Alpha I, L.P. and R, R, M & C Group, L.P. paid $300,000 to Lewis Rice for their services over the course of the engagement, a significantly larger amount than that allegedly quoted by Mr. Seaberg. Pls. Ex. 65, App. B at pp. 73-113.

52. Lewis Rice was paid pursuant to a flat rate fee agreement with the Sands. App-B-135-158. Lewis Rice was able to quote a fee for the services to be rendered, including preparing opinion letters, because the services to be rendered were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

**Response:** Plaintiffs agree that Lewis Rice was paid pursuant to a flat rate as set forth in the engagement letters between Lewis Rice and the Sands family members; however, Plaintiffs disagree that Defendant's statement of fact should be substituted for Plaintiffs' original statement at Paragraph 52 of Plaintiffs' Findings of Uncontroverted Fact. Defendant has not provided any evidence to refute the facts that ten Lewis Rice personnel were involved in representing the Sands family and that Mr. Mulligan and Mr. Falk spent approximately 122 hours and 258 hours respectively over the course of that engagement. Pls. Ex. 55, App. B at p. 1369.

As stated above in Plaintiffs' general objections, Plaintiffs disagree with Defendant's characterization of the activities and investments of Alpha or its limited partners as a tax shelter. Plaintiffs disagree that the services provided by Lewis Rice to the Sands were part of a prearranged agreement to facilitate and implement Heritage tax shelters. Lewis Rice was independent of Heritage. Lewis Rice did not pay or receive any referral fees from Heritage, nor was there any agreement between them to split any fees. Pls. Ex. 55, App. B at p. 1369 and Pls. Ex. 61, App. B at p. 15. Lewis Rice independently determined the fee the firm would seek from the clients for their services, and they were paid for their services by the partners of Plaintiffs

Alpha I, L.P. and R, R, M & C Group, L.P. Plaintiffs' Exhibits 50 and 55, App. B at p. 1295-1315, 1369.

53. The factual representations prepared by Lewis Rice and signed by the Alpha limited partners contained material misrepresentations. The services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158. Furthermore, Lewis, Rice did not contact either Marilyn Sands or Andrew Stern. App-B-167-168, 171.

**Response:** Plaintiffs disagree that the factual representations prepared by Lewis Rice and signed by the Alpha limited partners contained material misrepresentations. Defendant has cited no evidence in the record to support its statement.

As stated above in Plaintiffs' general objections, Plaintiffs disagree with Defendant's characterization of the activities and investments of Alpha or its limited partners as a tax shelter. Plaintiffs disagree that the services provided by Lewis Rice to the Sands were part of a prearranged agreement to facilitate and implement Heritage tax shelters. Lewis Rice was independent of Heritage. Lewis Rice did not pay or receive any referral fees from Heritage, nor was there any agreement between them to split any fees. Pls. Ex. 55, App. B at p. 1369 and Pls. Ex. 61, App. B at p. 15. Lewis Rice independently determined the fee the firm would seek from the clients for their services, and they were paid for their services by the partners of Plaintiffs Alpha I, L.P. and R, R, M & C Group, L.P. Pls. Ex. 50 and 55, App. B at pp. 1295-1315, 1369.

Plaintiffs agree that Lewis Rice did not contact Andrew Stern. Plaintiffs disagree that Lewis Rice did not contact Marilyn Sands. Mrs. Sands testified at her deposition that she did not recall speaking to anyone from Lewis Rice. Pls. Ex. 67, App. B at p. 121. Mr. Falk determined

from his review of the Sands files that he spoke with Marilyn Sands in conducting his due diligence for the opinions issued by Lewis Rice. Pls. Ex. 71, App. B at p. 153.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:**

Lewis Rice was fully informed of all the relevant facts necessary for issuing their opinions. Lewis Rice conducted due diligence interviews of certain members of the Sands family and requested the necessary information for drafting the factual representations from the Sands and from Heritage personnel. Pls. Ex. 55, App. B at p 1371; Pls. Ex 61, and 71, App. B at pp. 22-23, 28-29, 153. Lewis Rice was provided everything they requested from Heritage and the Sands for drafting the factual representations. Pls. Ex. 71, App. B at p. 153. Lewis Rice implemented major components of the Sands investment plan: the firm drafted partnership agreements, formed business entities, and drafted documents relating to asset transfers. Pls. Ex. 55, App. B at p. 1368-1369. Lewis Rice personnel and Heritage personnel corresponded frequently while implementing the investment transactions to make sure everything was done correctly. Pls. Ex. 61, App. B at pp. 24-27. All of the other partners in Alpha testified that they relied on Robert and Richard for investment advice in general and in entering into these transactions in particular. Pls. Ex. 67 and 68, App. B. at pp. 121, 124-25.

The family's use of Alpha for investments has continued since 2001. Alpha has made over $20 million in profits as a family investment partnership since 2001. Pls. Ex. 52 and 53, App. B at pp. 1352, 1359. Furthermore, it is clear that a potential tax benefit was not the sole purpose for partners of plaintiffs to engage in these transactions. Heritage presented the Sands a variety of possible benefits to engaging in the transactions including the following: making a profit, providing for philanthropic interests, diversifying their holdings, and hedging against the impact of movements in interest rates on the stock holdings in Constellation Brands. Pls. Ex. 57,

App. B at pp. 1394, 1397A and Pls. Ex. 61, App. B at pp. 16-21. The combination of all of these benefits, including any potential tax benefit, led the Sands family to engage in the financial plan. Pls. Ex. 57, App. B at pp. 1394, 1397A.

54. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

**Response:** As stated above in Plaintiffs' general objections, Plaintiffs disagree with Defendant's characterization of the activities and investments of Alpha or its limited partners as a tax shelter. Plaintiffs disagree that the services provided by Lewis Rice to the Sands were part of a prearranged agreement to facilitate and implement Heritage tax shelters. Lewis Rice was independent of Heritage. Lewis Rice did not pay or receive any referral fees from Heritage, nor was there any agreement between them to split any fees. Pls. Ex. 55, App. B at p. 1369 and Pls. Ex. 61, App. B at p. 15. Lewis Rice independently determined the fee the firm would seek from the clients for their services, and they were paid for their services by the partners of Plaintiffs Alpha I, L.P. and R, R, M & C Group, L.P. Plaintiffs' Exhibits 50 and 55, App. B at p. 1295-1315, 1369.

55. The Alpha limited partners were not entitled to rely on the Lewis, Rice tax opinion letters since the factual representations provided by the Sands Family to Lewis, Rice contained material misrepresentations. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

**Response:** Please see Plaintiffs' response to Defendant's same proposed fact at paragraph 53 above.

56. The Alpha limited partners were not entitled to rely on the Lewis, Rice tax opinion letters since the factual representations provided by the Sands Family to Lewis, Rice contained material misrepresentations. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

**Response:** Please see Plaintiffs' response to Defendant's same proposed statement of fact at paragraph 53 above.

57. The Alpha limited partners were not entitled to rely on the Lewis, Rice tax opinion letters since the factual representations provided by the Sands Family to Lewis, Rice contained material misrepresentations. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. App-B-1-158.

**Response:** Please see Plaintiffs' response to Defendant's same proposed statement of fact at paragraph 53 above.

58. The Alpha limited partners were not entitled to rely on the Lewis, Rice tax opinion letters since the factual representations provided by the Sands Family to Lewis, Rice contained material misrepresentations. The Services rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters. As Alpha's limited partners had entered into the Heritage transactions with the primary intent of generating artificial tax losses, the opinion letters constitute nothing more than window dressing. App-B-1-158.

**Response:** Please see Plaintiffs' response to Defendant's same proposed statement of fact at paragraph 53 above.

Additionally, Plaintiffs disagree that Alpha's limited partners entered into the Heritage investment transactions with the primary intent of generating artificial tax losses. As described above in Plaintiffs' general objections, the conversations set forth in Exhibits 26 through 29 do not provide a complete picture of the negotiations or discussions between the Sands and Heritage. In other meetings with Heritage, the Sands discussed a number of benefits of the investment strategy such as making a profit, providing for philanthropic interests, and diversifying their holdings. Pls. Ex. 57, App. B at pp. 1394, 1397A and Pls. Ex. 61, App. B at pp. 16-21. The combination of all of these benefits, including any potential tax benefit, led the Sands family to engage in the financial plan. Pls. Ex. 57, App. B at pp. 1394, 1397A.

Plaintiffs also disagree that the tax opinions issued by Lewis Rice "constitute nothing more than window dressing." The tax opinions represent the work of a number of Lewis Rice personnel who conducted extensive legal research and due diligence into the background of the Sands family members and the facts relating to the transactions in which they engaged. Pls. Ex. 55, App. B at pp. 1369-70. Plaintiffs properly retained Lewis Rice to ensure that they correctly reported the consequences of their transactions for tax purposes. Pls. Ex. 52 and 53, App. B at 1352-1353, 1359-1360.

Respectfully submitted this 14th day of September, 2007.

s/ Lewis S. Wiener
LEWIS S. WIENER
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: (202) 383-0140
Fax: (202) 637-3593
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
Tel: (404) 853-8000
Fax: (404) 853-8806

Kent L. Jones
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: (202) 383-0732
Fax: (202) 637-3593
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Response to United States' Alternative Proposed Findings of Fact has been made on September 14, 2007 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
thomas.m.herrin@usdoj.gov

s/ Lewis S. Wiener
LEWIS S. WIENER