IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: September 14, 2007)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE AND REPLY TO UNITED STATES' RESPONSE TO PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT AND TO PLAINTIFFS' REPLY TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE(S)**

INTRODUCTION ....................................................................................................1

ISSUES PRESENTED....................................................................................................3

ARGUMENT ....................................................................................................4

I. THE OBLIGATION TO COVER A SHORT SALE IS NOT A LIABILTY FOR PURPOSES OF SECTION 752. ....................................................................4

A. Defendant does not dispute the long-settled legal principle that contingent obligations are not liabilities for purposes of section 752. ........4

B. There is no longer any dispute that the partners' cost to cover their short sale obligations was contingent. ..............................................5

C. Defendant has acknowledged that Colm Producer, Inc. was incorrectly decided. ....................................................................................7

D. An obligation to return property where the cost of acquiring that property is contingent, is not, and never has been, a "liability" for purposes of section 752. ..............................................................10

E. Defendant's assertion that the IRS' position has consistently been that an obligation is a "liability" under section 752 whenever it creates or increases the basis of any of the obligors' assets is misleading. ...............15

F. The Tax Court's Memorandum Decision In Salina ..............................17

G. Rev. Rul. 95-26 is not entitled to any deference. ...................................18

II. THE RETROACTIVE REGULATION IS INVALID. ....................................22

A. The Treasury Department did not have authority to promulgate the Retroactive Regulation. ............................................................24

1. Standard of Review ...........................................................26

2. Act section 309(c) did not give the Treasury Department authority to promulgate the Retroactive Regulation. .....................26

B. The Treasury Department failed to comply with the requirements of the Administrative Procedure Act when promulgating the Retroactive Regulation. ..............................................................................32

C. The Retroactive Regulation violates due process and fundamental notions of fair government and is an abuse of the Commissioner's discretion. ....35

D. Klamath Strategic Investment Fund, LLC v. United States....37

III. NO PENALTIES ARE APPLICABLE OR WARRANTED. ....38

A. Plaintiffs had substantial authority for their tax positions. ....38

B. Plaintiffs were not negligent. ....40

C. There was no valuation misstatement. ....44

D. Plaintiffs had reasonable cause and good faith for taking the tax positions at issue. ....45

1. The Court has jurisdiction over plaintiffs' penalty defenses. ....45

2. Plaintiffs have demonstrated their reasonable cause and good faith. ....50

CONCLUSION....50

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Albany Car Wheel Co. v. Comm'r*, 40 T.C. 831 (1963), *aff'd*, 333 F.2d 653 (2d Cir. 1964).....4, 39

*Alcaraz v. Block*, 746 F.2d 593 (9th Cir. 1984) ....................................................................33

*American Fed'n of Gov't Employees v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) ..........................33

*American Iron & Steel Inst. v. Envtl. Prot. Agency*, 568 F.2d 284 (3d Cir. 1977) ........................34

*B.F. Goodrich Co. v. United States*, 94 F.3d 1545 (Fed. Cir. 1996) ............................................18

*Beneficial Corp. v. United States*, 814 F.2d 1570 (Fed. Cir. 1987)..............................................26

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ..............................................26, 35, 37

*Brountas v. Comm'r*, 692 F.2d 152 (1st Cir. 1982), cert. denied, 462 U.S. 1106 (1983) ..........4, 39

*Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir.1971) ................................35, 37

*The Coalition for Common Sense in Gov't Procurement v. Sec'y of Veteran Affairs*, 464 F.3d 1306 (Fed. Cir. 2006)................................................................................................32

*Colm Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006).......................................................................1, 2, 7, 8, 9, 10, 18, 40

*Compaq Computer Corp. v. Comm'r*, 277 F.3d 778 (5th Cir. 2001)...........................................44

*Deputy v. du Pont*, 308 U.S. 488 (1940)...................................................................13, 14, 39

*Farmar v. United States*, 689 F.2d 1017 (Ct. Cl. 1982), rev'd on other grounds, 464 U.S. 206 (1984)...............................................................................................................18, 19

*Gibson Prods. Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981) ....................................5, 8, 38

*Glass City Bank v. United States*, 326 U.S. 265 (1945)...........................................................32

*Gregory v. Helvering*, 293 U.S. 465 (1935) ..........................................................................44

*Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975)................................4, 8, , 15, 16, 17, 21, 22, 38

*Henry v. Comm'r*, 170 F.3d 1217 (9th Cir. 1999)....................................................................40

*IES Indus. v. United States*, 253 F.3d 350 (2001)...................................................................44

*Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006) ........................................3, 14, 17, 21, 22, 35, 37, 40, 48

*Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885 (E.D. Tex. 2007) ........................................48

*La Rue v. Comm'r*, 90 T.C. 465, 1988 WL 23562 (1988) ........................................8, 10, 11, 38

*Lemery v. Comm'r*, 52 T.C. 367 (1969), *aff'd on other grounds*, 451 F.2d 173 (9th Cir. 1971) ........................................4, 39

*Long v. Comm'r*, 71 T.C. 1, 1978 WL 3318 (1978)........................................4, 8, 16, 38

*Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004) ................48

*Ludwig v. Comm'r*, 68 T.C. 979 (1977) ........................................37

*Mobil Oil Corp. v. Dep't of Energy*, 610 F.2d 796 (Temp. Emer. Ct. App. 1979)........................33

*National Fed'n of Fed. Employees v. Devine*, 671 F.2d 607 (D.C. Cir. 1982) ..............................33

*New Jersey, Dep't of Envtl. Prot. v. United States Envtl. Prot. Agency*, 626 F.2d 1038 (D.C. Cir. 1980) ........................................33

*Rice's Toyota World, Inc. v. Comm'r*, 81 T.C. 184 (1983), *affd. on this issue*, 752 F.2d 89 (4th Cir. 1985)........................................44

*Rite Aid Corp. v. United States*, 255 F.3d 1357 (Fed. Cir. 2001) ........................................25, 26

*Salina Partnership v. Comm'r*, 80 T.C.M. 686 (2000) ........................................15, 17, 18, 39

*Santa Monica Pictures, LLC v. Comm'r*, 89 T.C.M. (CCH) 1157 (2005)....................................48

*Schlumberger Tech. Corp. v. United States*, 55 Fed. Cl. 203 (2003) ................................18, 20, 44

*Texas Food Indus. Assoc. v. United States Dep't of Agric.*, 842 F. Supp. 254 (W.D. Tex. 1993) ........................................34

*Trainer v. United States*, 800 F.2d 1086 (Fed. Cir. 1986) ........................................20

*United States v. Carlton*, 512 U.S. 26 (1994) ........................................35, 36

*United States v. Garner*, 767 F.2d 104 (5th Cir. 1985) ........................................33

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ........................................19

*United States v. Rainbow Family*, 695 F. Supp. 294 (E.D. Tex. 1988) ..................................33, 34

*Vinson v. Comm'r*, 38 T.C.M. (CCH) 740 (1979)....................................................................37

*Xerox Corp. v. United States*, 41 F.3d 647 (Fed. Cir. 1995)..........................................................20

*Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995) ...................................................................33

**STATUTES**

5 U.S.C. §§ 553(b) ..............................................................................................32

5 U.S.C. § 553(b)(B)...........................................................................................32

26 U.S.C. § 358(h)(1) ..........................................................................................29

26 U.S.C. § 358(h)(2) ..........................................................................................30

26 U.S.C. § 358(h)(3) ..........................................................................................29

26 U.S.C. § 6664.................................................................................................47

Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000)..........................................................................................................24

**RULES AND REGULATIONS**

Treas. Reg. § 1.1233-1(a)(1)...................................................................................38

Treas. Reg. § 1.358-7...........................................................................28, 29, 30

Treas. Reg. §1.6662-3..........................................................................................40

Treas. Reg. § 1.662-3(b) .......................................................................................44

Treas. Reg. § 1.752-1(a)(4)(i) .................................................................................23

Treas. Reg. § 1.752-1(a)(4)(ii)................................................................................22

Treas. Reg. § 1.752-6(a) ..................................................................................22, 23

Treas. Reg. § 1.752-6(b)(2)....................................................................................30

Treas. Reg. § 1.752-6(d) .......................................................................................35

Treas. Reg. § 1.752-7..........................................................................................24, 31

Treas. Reg. § 1.752-7(b)(3)....................................................................................22

Treas. Reg. § 1.752-6...............................................................................2, 3, 22, 23

Rev. Rul. 73-301, 1973-2 C.B. 215 ........................................................................15, 21

Rev. Rul. 88-77, 1988-2 C.B. 129 ..........................................................................16, 18

Rev. Rul. 95-26, 1995-1 C.B. 131 ..............................................................18, 19, 20, 39

**MISCELLANEOUS**

1997 FSA (Nov. 21, 1997) at 1997 W.L. 33313960.................................................5, 11, 16, 39

Assumption of Partner Liabilities, 68 Fed. Reg. 37,414, 37,416
(June 24, 2003)..................................................................17, 22, 24, 31, 32, 34, 36

*Chief Counsel Notice 2003-020 (June 25, 2003),* 2003 WL 24016805 .......................................37

David F. Shores, *Deferential Review of Tax Court Decisions: Dobson Revisted*, 49 Tax
Law 629 (1996).......................................................................................................49

H.R. Rep. No. 105-148 at 594 (1997).........................................................................46

Industry Specialization Program Coordinated Issue, *"Basis Shifting" Tax Shelter*, 2002
WL 32351285 (Dec. 3, 2002) ....................................................................................47

Industry Specialization Program Coordinated Issue, *Notional Principal Contracts*, 2005
WL 43711 (Jan. 6, 2005) .........................................................................................47

I.R.S. Notice 2000-44 ..........................................................................................39, 40

I.R.S. Notice 2001-17 ...............................................................................................27

John F. Coverdale, *Court Review of Tax Regulations and Revenue Rulings in the Chevron Era*, 64 Geo. Wash. L. Rev. 35, 87 (1995) ............................................18, 19, 20

Letter from the American Institute of Certified Public Accounts to Commissioner Mark
Everson, *AICPA Comments on Proposed and Temporary Regulations on Assumption of Partner Liabilities Under I.R.C. Section 752,* 83 DTR G-7 (April
30, 2004) ..................................................................................................................24

Letter from Fred Goldberg, Jr. (former IRS Chief Counsel, Commissioner of IRS, and
Assistant Secretary of the Treasury for Tax Policy) to IRS, *Goldberg Suggests Son of Boss Regs Will Diminish Settlement Prospects*, 2003 Tax Notes Today
219-47 (Nov. 13, 2003)...............................................................................................24

Letter from New York State Society of Certified Public Accountants to Mr. Horace
Howells at IRS, *CPAs Comment On Proposed Definition of Partnership Liabilities*, 2003 Tax Notes Today 195-16 (Sept. 15, 2003) ...........................................24

Robert Bird & Alan Tucker, *Tax Sham or Prudent Investment: Deconstructing the Government's Pyrrhic Victory in Salina Partnership v. Commissioner*, 22 Va. Tax Rev. 231, (2002) ....................17

STAFF OF JT. COMM. ON TAX'N, 105TH CONG., GENERAL EXPLANATION OF TAX LEGISLATION ENACTED IN 1997 377 (Jt. Comm. Print 1997) ("1997 Blue Book")...........46

WEBSTER'S THIRD NEW INT'L DICTIONARY 1798 (3d ed. 1968). ....................33

## INTRODUCTION

The central legal issue raised in the parties' cross motions for summary judgment is whether the obligation to cover a short sale is a "liability" for purposes of section 752. While defendant goes to great lengths to cloud the issue, there is no dispute that the answer to this question depends on whether the obligation to cover the short sale with replacement securities is contingent or, instead, is fixed and determinable. If the obligation is contingent it is not a liability for purposes of section 752. Conversely, if the obligation is fixed and determinable, then it is a liability for purposes of section 752.[1]

There have been several important developments since the parties filed their opening briefs. First, the parties deposed Mr. Fritz Luedke, the broker at UBS Paine Webber who facilitated the short sale trades at issue in this case. Mr. Luedke testified that the obligation to cover a short sale is contingent because the cost to acquire covering securities cannot be known until the covering securities are actually acquired and the short sale is closed. Mr. Luedke's testimony is undisputed, and it reflects the accepted understanding of a short sale both in the investment community and in existing legal authority.

Second, defendant has now retreated from the decision of the district court in *Colm Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006), which defendant asked this Court to follow in defendant's opening brief. In *Colm*, the district court held, precisely contrary to the government's position here, that the obligation to cover a short sale position *is* a contingent obligation. However, the district court in *Colm* also held that the obligation *in that case* became fixed and determinable and, therefore, a "liability" for purposes of section 752, *when the partners in the partnership (which held the short sale position) sold their partnership*

---

[1] Unless otherwise noted, all references to "section" or "Code" are to the Internal Revenue Code of 1986, as amended.

*interests to a third party* (because at that time the amount of the obligation could then be calculated for purposes of computing the partners' bases in the partnership). Defendant has now conceded that the district court erred in this latter conclusion, leaving only the district court's initial determination that the obligation to cover a short sale position is a contingent obligation.

Mr. Luedke's testimony and defendant's retreat from *Colm* has left defendant in an untenable position. The law is clear that contingent obligations do not constitute liabilities for purposes of section 752, and the evidence is clear that the obligation to cover a short sale is contingent in amount. In response, defendant makes a contrived argument: that the obligation to close the short sale is fixed and determinable (and therefore a "liability" for purposes of section 752) in the sense that the borrower knows at the outset what type and how many securities will have to be delivered to the lender to close the short sale, even though the borrower cannot know in advance how much it will cost to acquire those covering securities. As plaintiffs explain herein, defendant's effort to create a new framework of tax law that would determine basis by reference to abstract property rights and obligations, instead of cost, must be rejected.

Evidently recognizing that its interpretation of section 752 is deeply flawed, defendant now seeks to raise an entirely new ground in support of its motion for summary judgment. Defendant now argues that even if the obligation to cover a short sale is not a liability for purposes of section 752, then it must be treated as a liability under the alternative framework of Treas. Reg. § 1.752-6. That regulation (hereinafter sometimes referred to as the "Retroactive Regulation"), which was promulgated in 2003, purports to retroactively change the definition of a "liability" for purposes of section 752 to include the very contingent obligations that defendant has historically and consistently argued are **not** liabilities for purposes of section 752. The Retroactive Regulation is nothing more than an effort by defendant to buttress its litigating position in current cases, and has properly been held invalid by the only court to have considered

it. *Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 621-22 (E.D. Tex. 2006).

Finally, on July 31, 2007, the day that discovery was initially scheduled to expire in this case, defendant produced to plaintiffs a number of inaccurate and incomplete documents that defendant had in its possession since at least December of 2006. These documents contained what purport to be transcripts of conversations between employees of The Heritage Organization "Heritage" and members of the Sands family. Defendant relied on these purported transcripts in its response brief to assert that it has properly asserted penalties against plaintiffs. However, defendant did not submit these transcripts under the affidavit of any witness with personal knowledge of their content. The parties have since deposed several participants to these conversations, and none of these witnesses could authenticate the transcripts, establish them as business records, or establish a chain of custody. Plaintiffs have filed contemporaneously with this brief a motion to strike these purported transcripts from defendant's response. Regardless, defendant makes too much of these purported transcripts: the Sands have never disputed the fact that taxes were an important part of their decision-making process. However, the undisputed evidence clearly establishes that the Sands considered several important non-tax purposes when they decided to engage in these transactions and that tax savings was not their "sole motivation" as defendant now claims.

## ISSUES PRESENTED

In addition to the issues presented in plaintiffs' opening brief, defendant's response raises the following additional issue:

Whether Treas. Reg. § 1.752-6 applies to reduce the partners' basis in Alpha and Alpha to reduce its basis in Beta by the "amount" of the contingent obligation to close the short sale?

# ARGUMENT

## I. THE OBLIGATION TO COVER A SHORT SALE IS NOT A LIABILTY FOR PURPOSES OF SECTION 752.

### A. Defendant does not dispute the long-settled legal principle that contingent obligations are not liabilities for purposes of section 752.

In their opening brief, plaintiffs discussed several of the many cases and authorities which universally hold that contingent obligations are not treated as "liabilities" for purposes of section 752. (Pls.' Resp. and Cross-Mot. Summ. J. 14-21.) Defendant has never disputed the validity of this legal principle. To the contrary, defendant has consistently advocated this very position, as it has historically worked to its benefit, and has been instrumental in creating this body of law.

To put the issue beyond any doubt, plaintiffs direct the Court's attention to many other cases, aside from the trilogy of *Helmer*, *Long* and *LaRue*, all of which cases have consistently held that contingent obligations do not constitute liabilities for purposes of section 752. In *Lemery v. Comm'r*, 52 T.C. 367, 377-378 (1969), *aff'd on other grounds*, 451 F.2d 173 (9th Cir. 1971), the Tax Court held that a purchaser's obligation to pay the seller $200,000 out of the purchaser's "net profits" for a covenant not to compete was too contingent and indefinite to be included in the purchaser's cost basis. In *Albany Car Wheel Co. v. Comm'r*, 40 T.C. 831 (1963), *aff'd*, 333 F.2d 653 (2d Cir. 1964), the Tax Court held that the purchaser's obligation under a union contract which was in effect prior to the purchase of the assets and which required the purchaser to give written notice or severance pay to employees with one and five years' service was too speculative to be included in the basis of the purchased assets. In *Brountas v. Comm'r*, 692 F.2d 152 (1st Cir. 1982), cert. denied, 462 U.S. 1106 (1983), the First Circuit Court of Appeals held that a partner's obligation under nonrecourse notes, which would be paid out of oil and gas production or not at all, were too contingent or speculative to be included in the partner's

basis for purposes of section 752. In *Gibson Prods. Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981), the Fifth Circuit Court of Appeals held that a partnership's liability under nonrecourse notes which would be paid out of possible future oil and gas production was too contingent to be treated as a liability for purposes of section 752. The IRS analyzed these same cases in 1997 and concluded that "contingent liabilities which are too contingent to value are generally not added to basis until they become fixed." 1997 FSA (Nov. 21, 1997) at 1997 WL 33313960 (Pls. Ex. 8, App. A at p. 2).[2]

It is therefore undisputed that the partners' obligations to cover the short sale positions at issue in this case are not to be treated as "liabilities" for purposes of section 752, as we submit, these obligations were contingent in nature or amount.

**B. There is no longer any dispute that the partners' cost to cover their short sale obligations was contingent.**

On December 11, 2001, each of the Alpha limited partners executed short sales of Treasury Notes through brokerage accounts at UBS PaineWebber. To effectuate the short sales, each of the limited partners borrowed Treasury Notes from UBS PaineWebber and sold them on the open market for cash. Specifically, the limited partners borrowed an aggregate face amount of $30,800,000 U.S. Treasury notes bearing coupon interest of 2.75% due 9/30/03 and an aggregate face amount of $13,200,000 U.S. Treasury notes bearing coupon interest of 4.625% due 5/15/06, and they sold all of those Treasury Notes for cash.

As is true in any short sale, the limited partners as the borrowers were obligated to return to UBS PaineWebber as the lender the property that they had borrowed. Thus, the limited partners were obligated to return to UBS PaineWebber an aggregate face amount of $30,800,000

[2] In fact, plaintiffs' description of these cases in this brief is taken almost verbatim from the IRS description of them in the 1997 Field Service Advisory.

U.S. Treasury notes bearing coupon interest of 2.75% due 9/30/03 and an aggregate face amount of $13,200,000 U.S. Treasury notes bearing coupon interest of 4.625% due 5/15/06. However, the limited partners had discretion as to when they would close the short sale as there was no fixed timetable for settlement. Pls. Ex. 69, App. B at p. 142. The partners would earn a profit on these short sales if the price of these Treasury Notes declined by the time that the replacement notes were acquired and delivered back to UBS PaineWebber. (Pls.' Resp. and Cross-Mot. Summ. J. 8-9); Pls. Ex. 69, App. B at pp. 136-38.

The parties deposed Mr. Fritz Luedke, a Senior Vice President at UBS PaineWebber on July 17, 2007. Mr. Luedke obtained his MBA from the Wharton School of Business in 1979, and after working for Solomon Brothers and Merrill Lynch for several years, has been working at UBS PaineWebber since the late 1980's. Mr. Luedke specializes in fixed income securities, such as Treasury Notes. Pls. Ex. 69, App. B at pp. 132-35. Mr. Luedke's testimony is highly instructive on the contingency point:

Q. When a customer executes a short sale of Treasury notes for example, can you tell them how much it will cost to close short sale?

A. Heavens no.

Q. Why not?

A. To close it out?

Q. Uh-huh.

A. It is – it's unforseeable [sic]. There's no way on earth you could. If interest rates go up, they'll make money, if interest rates go down, they'll lose money. You're making an interest call.

….

Q. But when the customer executes the short sale of Treasury notes, they don't know then what it's going to cost to cover the short sale?

MR. BERRY: To close?

A. To close the transaction? Absolutely not. Of course, not – let me think. When you buy a stock, you know what it's going to be in a week? No. And it's similar to that. You don't know. That's the market.

Q. When do you know what it will cost?

A. When they close the transaction, when they cover their short.

Q. How is the price of Treasury notes determined; do you know?

A. No. If I knew that… I've been pondering that for 28 years.

Q. Do you know any of the factors that relate?

A. What moves the markets.

….

Q. So the cost to cover is going to be contingent on what the market does?

A. Exactly.

Pls. Ex. 69, App. B. at pp. 139-41, 143. Mr. Luedke's testimony is undisputed. Thus, there is no longer any question in this case that the limited partners' cost to acquire notes to close their short sale positions was contingent and could not be determined when they executed the short sales. The only remaining dispute on the section 752 issue is defendant's new found position that the obligations to cover the short sales – while contingent in amount – are fixed and determinable (and purportedly therefore liabilities for purposes of section 752) in the sense that the borrower is required to return specific property to the lender. Plaintiffs address this contention below, but believe it is instructive to set the stage by revisiting the *Colm* case which defendant relied on in its opening brief.

**C. Defendant has acknowledged that Colm Producer, Inc. was incorrectly decided.**

In its opening brief defendant directed this Court's attention to *Colm Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006), and argued that this Court should follow the *Colm* decision. (Def.'s Mot. Summ. J. 15-16, 19.) However, defendant has since

acknowledged that the district court wrongly decided *Colm*, and what is left of the *Colm* decision now directly supports plaintiffs' position in this case.

As in this case, the partners in the Colm partnership executed short sales and then contributed those brokerage accounts to the partnership. Unlike in this case, the partners in the Colm partnership then sold their interests in the partnership (which had not yet closed the short sales) to an unrelated buyer. The issue in *Colm* was otherwise the same as that here: whether the obligation to close the short sale positions should be treated as a liability for purposes of calculating the partners' bases in their partnership interest under section 752. The district court concluded as follows:

> Although COLM correctly states that "liability" within the meaning of section 752 does not encompass contingent obligations, COLM erroneously concludes that the obligation to replace the borrowed T-Notes constitutes a contingent obligation. **The cases on which COLM relies stand for the proposition that liabilities that are contingent as to the obligation itself or as to the amount of the obligation do not qualify as "liabilities" for purposes of section 752.** [FN1] However, the obligation to close a short sale by replacing the borrowed T-Notes is not contingent in this way. First, the existence of the obligation to replace the borrowed T-Notes was not itself contingent; the obligation existed as a legally enforceable obligation when GMK sold Valiant to Czerwinski. Second, **the amount of the obligation became fixed at the moment GMK sold Valiant because at that time GMK could determine its gain or loss on the short sale transaction according to the current market rates for T-Notes**; any future fluctuations in the interest rates affected the gain or loss of the short sale transaction only as to Czerwinski, not GMK.
>
> FN1. *See La Rue v. Comm'r* 90 T.C. 465, 479, 1988 WL 23562 (1988) (clarifying that a fixed and definite contractual liability does not amount to a "liability" under section 752 until the cost of that obligation becomes fixed in amount); *Long v. Comm'r,* 71 T.C. 1, 7, 1978 WL 3318 (1978) (stating that "although [the claims at issue] may be considered 'liabilities' in the generic sense of the term, contingent or contested liabilities are not 'liabilities' for [section 752 purposes] at least until they become fixed or liquidated"); *Helmer v. Comm'r,* 34 T.C.M. (CCH) 727 (1975) (holding that partnership's receipt of option payments from a third party under an option agreement for purchase of property did not give rise to a section 752 liability because the partnership's obligation to credit the payments against the purchase price was contingent upon the third party's exercise of the option); *see also Gibson Prods. Co. v. U.S.*, 637 F.2d 1041 (5th Cir. 1981) (finding that promissory note did not constitute a liability for purposes of section

> 752 when the partnership's liability on the note depended upon future oil and gas production under the oil and gas lease).

460 F.Supp. 2d at 716 (emphasis added).

Neither party in this case disputes the district court's conclusion in *Colm* that a "'liability' within the meaning of section 752 does not encompass contingent obligations". Indeed, this principle is now so well-established in the case law that it is beyond dispute. And the district court plainly and correctly concluded that the obligations to cover the short sale positions *were contingent in amount when the short sales were executed*. This is the very issue facing this Court, and the district court in *Colm* plainly decided it in plaintiffs' favor.

The district court in *Colm* then determined that the amount of the obligation to cover the short sale became fixed and determinable *when the partners in the partnership holding the short sale positions sold their partnership interests*, such that the amount of the obligation could then be calculated. However, as plaintiffs explained in their opening brief, the fact that the obligation may have become fixed and determinable **after** it was assumed by the partnership would not result in any adjustment to the partners' basis under section 752. (Pls.' Resp. and Cross-Mot. Summ. J. 31-32.) Defendant now understands this. In its brief on the appeal of *Colm* to the Fifth Circuit defendant disavowed the conclusion reached by the district court:

> We agree with appellants that the District Court erred in using, *sua sponte*, the date of sale of a partnership interest to determine whether a partnership obligation is fixed or contingent. The proper time for determining whether an obligation is fixed is the date the obligation becomes a partnership obligation.

Pls. Ex. 9, App. A. at p. 5. It is curious that much of defendant's response brief in this case is quoted verbatim from its brief to the Fifth Circuit, but defendant neglected to inform this Court of the concession it has made in the Fifth Circuit. It is disingenuous for defendant to ask this Court to follow *Colm* while at the same time distancing itself from that decision in the Fifth Circuit.

In the *Colm* appeal, defendant is now making the same desperate and novel argument that it is making in this case: that the obligation to cover a short sale is fixed and determinable when the short sale is first executed because the borrower knows how much and what type of property must be returned to the lender, even though the borrower cannot anticipate what it will ultimately cost to acquire that property. As plaintiffs discuss next, defendant's effort (here and on appeal in *Colm*) to salvage its position under section 752 is misguided and wrong.

**D. An obligation to return property where the cost of acquiring that property is contingent, is not, and never has been, a "liability" for purposes of section 752.**

Defendant's argument – that an obligation to return specific property is a liability for purposes of section 752 even though the cost of acquiring that property is unknown – is almost comical because this is precisely the argument that was made by the taxpayer and disputed by defendant and rejected by the Tax Court in *La Rue v. Comm'r*, 90 T.C. 465 (1988). In *La Rue*, the taxpayer was a general partner in Goodbody & Co., which at the time was one of the largest stock brokerage firms in the country. Unfortunately, Goodbody "encountered logistical problems due to a failure of their record keeping technology to keep up with trading volume," which were known as back office problems. Some of these problems resulted in Goodbody owing money to its customers, but many of the failures left Goodbody liable for missing or overbought securities. The Service argued, and the Tax Court agreed, that while Goodbody's obligations to replace missing securities was fixed in the sense that the taxpayer was under an obligation to replace those securities for its customers, that obligation did not constitute a liability for purposes of section 752 because the cost of acquiring those securities was contingent on the market. The Tax Court wrote:

> Once the 'back office' failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the NYSE rules. Goodbody was under an obligation to replace any missing securities or money. . . . All of petitioners' witnesses testified that these were transactions

> for which the partnership was liable. There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.
>
> Petitioners have not shown that these amounts were determinable with reasonable accuracy. . . . [T]he exact amount of loss or gain was not determinable until actual purchase or sale. Valuation of the claims may be a purely ministerial matter because of the ready market for securities, but is not readily determinable until purchase or sale occurs. The additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates. Accrual accounting requires that the amount be determinable with 'reasonable accuracy.' A loss is not determinable until the securities are actually purchased or sold, and the transaction closed. We accordingly hold that because the reserves were not a fixed obligation of the partnership sufficiently determinable in amount in 1970, they cannot be included in the partners' bases in that year.

*LaRue*, 90 T.C. at 479-80 (footnotes omitted).

The obligation at issue in *LaRue* – to replace identified missing securities – is indistinguishable from the obligation of the Alpha partners to cover their short sales of Treasury notes. In *LaRue*, the Tax Court clearly held that, despite the existence of a ready market from which the securities could be obtained or priced, the **amount** of the obligation remained contingent and speculative and such an obligation therefore could not represent a "liability" under section 752. *La Rue* has been followed and positively discussed in several dozen cases, IRS pronouncements, and scholarly articles. And, the IRS conducted a careful analysis of *La Rue* and the other contingent liability cases discussed in this brief and concluded – in stark contrast to defendant's position here – that "contingent liabilities which are **too contingent to value** are generally not added to basis until they become fixed." 1997 FSA (Nov. 21, 1997) (emphasis added) (Pls. Ex. 8, App. A at p.2). The conclusion reached by the Tax Court in *La*

*Rue* should control in this case, and the government has offered no explanation for its self-interested abandonment of its victory in *La Rue*.[3]

In any event, defendant's position here is simply wrong for a number of reasons. To begin with, defendant's theory is nothing more than an effort to distinguish obligations to deliver property from obligations to deliver cash. However, an obligation to deliver an unknown amount of cash and an obligation to deliver property, where the cost of acquiring the property is unknown, are contingent in precisely the same manner. In either case, the obligor simply does not know how much it will cost to satisfy the obligation. Indeed, defendant's theory fails to account for the possibility that the borrower and lender in a short sale may agree to "cash settle" the transaction.

Defendant's position in this case is also directly contrary to how defendant requires taxpayers to calculate gain or loss on short sales under section 1233. As explained by plaintiffs in their opening brief, the law is clear that taxpayers are precluded from recognizing gain or loss on a short sale precisely because the amount it will cost the taxpayer to acquire covering securities is contingent. (Pls.' Resp. and Cross-Mot. Summ. J. 8-13.) Neither the courts nor defendant have ever accepted the position for purposes of section 1233 that defendant advocates here: that the obligation to cover a short sale should be considered "fixed and determinable" because the borrower is obligated to deliver replacement securities at some point in the future. Defendant's brief wholly fails to explain how the same exact obligation can be "contingent" for purposes of section 1233 but "fixed and determinable" for purposes of section 752.

[3] On the bottom of page 6 of its response brief, defendant asserted that "plaintiffs have cited no authority holding that an unconditional obligation to replace borrowed property borrowed from a third party is a contingent liability." *La Rue* is such an authority.

Indeed, defendant fails to offer any support (aside from its own Revenue Ruling) as to how the amount of the liability should be quantified. Defendant now argues that the amount of the "liability" in a short sale equals the amount received on the sale of the borrowed securities. But everyone agrees that such amount will almost certainly not be accurate, which is why the "open transaction doctrine" and section 1233 defer the recognition of gain or loss. Defendant does not explain how taxpayers should account for changes in the "amount" of the "liability" as what would be the cost to close the position changes from day-to-day.

Defendant's theory would also open up a Pandora's Box. If the obligation to return specific property is a liability for purposes of section 752, then partners in partnerships will be able to shift basis at will. Assume a partnership has two equal partners, each with a $1,000 basis in their partnership interests. Partner A wants to "shift" $500 of his basis to Partner B. Under defendant's theory, Partner A can simply borrow a piece of property worth $1,000 and contribute it to the partnership. If the obligation to return the property is a "liability," as defendant argues here, then Partner A has his basis reduced by the $1,000 obligation assumed by the partnership, *see* section 752(b), but both partners then have their bases increased by their equal shares of the new partnership liability under section 752(a). Defendant is asking the Court to set a very dangerous precedent.

Defendant's position is also directly contrary to *Deputy v. du Pont*, 308 U.S. 488 (1940). In *du Pont*, the taxpayer borrowed stock and agreed to return it within ten years, and also agreed in the interim to pay the lender all dividends that he received on the borrowed shares. The taxpayer then sold the stock to nine du Pont executives (*i.e.*, he sold it short). In 1931, the taxpayer paid the lender $567,648 in dividends that had been paid on the stock, and he deducted that amount as "interest paid or accrued . . . on indebtedness" under former section 23(b) (the predecessor to current section 163). The Service contended that an obligation to cover a short

sale was not "indebtedness" and disallowed the deduction. The Supreme Court decided the issue under a plain meaning approach. It determined that "indebtedness" meant "borrowed money" and "interest on indebtedness" meant "compensation for the use or forbearance of money." The Court held that while the requirement to cover the short sale was an "obligation," it was not "borrowed money," and could not therefore be "indebtedness." *Id*. at 497-98. Obviously, defendant's argument here – that the obligation to return a fixed amount of property is a "liability" – is directly contrary to the decision of the Supreme Court that the obligation to return property does not constitute "indebtedness."

To recap, defendant's position is that: (1) taxpayers are not entitled to deduct losses on short sales until the short sale is closed because the amount of the obligation is contingent; (2) taxpayers are not allowed to deduct as interest amounts paid to borrow securities in a short sale, because the obligation to return property is not "indebtedness"; but (3) taxpayers must, to their detriment, account for any obligation to cover a short sale position as a liability for purposes of section 752 because the obligation to return property is fixed and determinable, even though the amount of that obligation is contingent. Plaintiffs respectfully submit that the only common policy evident in these inconsistent positions is a beaurocratic desire to maximize revenue for the Treasury at any cost to the statutory scheme. The district court in *Klamath* made this very point:

> The only difference between the 752 Cases regarding liability and this case is that the taxpayer is receiving the benefit rather than the IRS.
>
> It is clear from the record that the government has often and consistently relied on the principle that a "liability" under Section 752 does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed). This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). This Court's analysis of "liability" under Section 752 will not vary in meaning simply based on whose ox is being gored.

440 F. Supp. 2d at 619.

**E. Defendant's assertion that the IRS' position has consistently been that an obligation is a "liability" under section 752 whenever it creates or increases the basis of any of the obligors' assets is misleading.**

Defendant devotes an entire section of its brief to arguing that the IRS has "consistently maintained that when, as here, an obligation creates or increases the basis of the obligor's assets, that obligation is a liability under § 752." (Def.'s Resp. to Pls.' Cross-Mot. Summ. J. 9-11.) That has only been true – if it is true at all – when the "obligation" is fixed and determinable. On the other hand, when the obligation is contingent – as is the case here – the IRS' position (until *Salina*) has unfailingly been that the obligation is **NOT** a liability for purposes of section 752, regardless of whether the obligation results in the creation of, or increase in, the basis of any property owned by the obligor.

Defendant conveniently forgets that the obligations at issue in several of the cases and IRS pronouncements discussed in plaintiffs' opening brief gave rise to "the creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings)," which is the test quoted by defendant in its brief. For example, in *Helmer* the partnership received cash for giving the development corporation an option to acquire property. If the IRS policy was to treat obligations as liabilities whenever the obligation (e.g., the option in *Helmer*) results in the creation of cash or basis, as defendant alleges, then the IRS should have allowed the Helmer brothers to increase their bases in their partnership interest. But the IRS did not allow the brothers to increase their bases. *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727, 730-31 (1975).[4] The IRS took the same inconsistent position in Rev. Rul. 73-301, 1973-2 C.B. 215

---

[4] Although defendant tries to distinguish *Helmer* later in its brief (at page 15) by arguing that the partnership in that case was not obligated to return that cash, that is clearly wrong – for the partnership was obligated to apply the amount received against the purchase price for the property if the development corporation exercised its option (i.e., it was a contingent obligation).

(ruling that progress payments received by a partnership are not liabilities even though they gave rise to basis inside the partnership).

Defendant's citation to Rev. Rul. 88-77, 1988-2 C.B . 129 to support its suggestion that the IRS is not being inconsistent in this case is shocking, because in that Ruling the IRS determined that unpaid expenses and accounts payable of a cash basis partnership, although binding obligations, did **NOT** constitute liabilities for purposes of section 752. In fact, the IRS has described Rev. Rul. 88-77 as holding that "a liability that is too contingent to give rise to an immediate deduction is not a partnership liability." 1997 FSA (Nov. 21, 1997) (Pls. Ex. 8, App. A at p. 2).

Perhaps the best evidence of the inconsistency in defendant's position is its practical application. In *Helmer*, *Long*, *La Rue*, and the other cases cited by plaintiffs earlier in this brief, defendant argued that partners in various partnerships could not increase their bases in these partnerships by their share of contingent partnership obligations. In each of those cases, the partnerships had incurred obligations that were contingent in some sense. In each case, the partners desired to increase their bases in their partnership interests, and the partners argued those contingent obligations should constitute liabilities for purposes of section 752, such that the partners' were entitled to increase their bases in their partnership interests by their share of these partnership liabilities pursuant to section 752(a). Defendant's position that a short sale obligation is a liability under section 752 defies all of those cases. Under defendant's new position, taxpayers can increase their bases in their partnership interests at will. A partner only needs to have the partnership enter into a short sale. If, as defendant proposes, the obligation to cover the short sale position is a liability for purposes of section 752, then such a partner will increase his basis under section 752(a) by his share of the new partnership liability.

The truth is that defendant did **not** consider contingent obligations to be liabilities until 2003, when it first issued temporary Treasury regulations that purport to change the definition of the term "liability" for purposes of section 752 to now include contingent obligations. Unlike the brief filed by defendant in this case, the preamble to these new regulations concisely recognizes that this new concept of a "liability" set out in these regulations does **NOT** follow the result that the Service advocated, and obtained, in *Helmer* and related cases. *See* Assumption of Partner Liabilities, 68 Fed. Reg. 37,434, 37,436 (June 24, 2003). Defendant's brief is itself internally inconsistent on this point, for it cannot reconcile the fact that the new regulations purport to change the definition of the term "liability" with its argument here that it is not taking a position inconsistent with prior law. When the government made this same contrived argument to the district court in *Klamath*, that court rightfully and squarely rejected it:

> Further, if there was not a change in law, as the government posits, there would have been no need to promulgate the Regulation. Indeed, from this Court's view, the promulgation – and the statements made in conjunction with the promulgation – is compelling evidence that the IRS knew it was seeking to change settled law to bar, retroactively, the transactions engaged in by the Plaintiffs.

440 F. Supp. 2d at 620.

### F. The Tax Court's Memorandum Decision In Salina

Plaintiffs explained in their opening brief the many shortcomings in the Tax Court's memorandum decision in *Salina Partnership v. Comm'r*, 80 T.C.M. 686 (2000). Defendant did not directly respond to any of these arguments, other than to assert that the *Salina* case received critical approval by Robert Bird & Alan Tucker, *Tax Sham or Prudent Investment: Deconstructing the Government's Pyrrhic Victory in Salina Partnership v. Commissioner*, 22 Va. Tax Rev. 231, 252 (2002). (Def.'s Resp. to Pls.' Cross-Mot. Summ. J. 10-11.) Plaintiffs offer two brief points in response to this "critical approval." First, Dr. Tucker is an economist (not a tax lawyer or tax scholar) who served as an expert witness for the government in the

*Salina* case. *Id.* at n.aa1. It is therefore hardly surprising that he would write an article in support of the court's conclusion. Second, Dr. Tucker argued in his article that the Tax Court correctly decided that the short sale obligation was not contingent because of his opinion that the cost to cover the obligation, while variable, could be determined by obtaining prices on the open market at any point while the short sale was open (i.e., he appeared to contemplate a type of mark-to-market approach). However, this is the exact position that the government has now conceded is **wrong** in its brief to the Fifth Circuit in the *Colm* case. The government's new position is that the obligation is fixed and determinable at the time the short sale is executed and that the cost to close the position can be reasonably calculated by assuming it will equal the proceeds received on the sale of the borrowed securities. Given that Dr. Tucker wrote that the cost to cover would vary over time, it seems unlikely that he would concur with the government's new position.

**G. Rev. Rul. 95-26 is not entitled to any deference.**

In the end, defendant has nothing left to argue in this case except the assertion that the position espoused in Rev. Rul. 95-26, 1995-1 C.B. 131, should be offered *Chevron* deference. (Def.'s Resp. to Pls.' Cross-Mot. Summ. J. 11-15, 17-19.)[5] However, this Court and the Federal Circuit do not grant *Chevron* deference to revenue rulings. *B.F. Goodrich Co. v. United States*, 94 F.3d 1545, 1550 (Fed. Cir. 1996) ("We recognize, however, that IRS Revenue Rulings have no binding effect on this court."); *Schlumberger Tech. Corp. v. United States*, 55 Fed. Cl. 203, 212 (2003) (determining that revenue rulings are not entitled to *Chevron* deference but only have the power to persuade); *Farmar v. United States* 689 F.2d 1017, 1024 n.12 (Ct. Cl. 1982)

[5] Defendant also argues that Rev. Rul. 88-77 is entitled to deference. However, as discussed above, that ruling offers no support to defendant in this case, as it only applies to obligations that are fixed and determinable, which begs the question at issue.

("Revenue rulings are not binding on this court. They are not accorded a presumption of correctness but must be analyzed for consistency with the statute.") (citations omitted), rev'd on other grounds, 464 U.S. 206 (1984).

Defendant's brief cites *United States v. Mead Corp.*, 533 U.S. 218 (2001) in support of its argument that revenue rulings, in general, should be entitled to *Chevron* deference and should be followed unless their interpretation of a statute is arbitrary, capricious, or manifestly contrary to the statute. (Def.'s Resp. to Pls.' Cross-Mot. Summ. J. 11.) Defendant argues that although revenue rulings are not formed through notice-and-comment rulemaking or formal adjudication, they should still be given *Chevron* deference so long as it appears that Congress intended to grant the agency power to make binding rules. Defendant's interpretation of *Mead*, though novel, has no support in the case law.

Defendant's argument ignores the **standard** set forth in *Mead* for determining the deference (if any) due an agency's interpretation of a statute contained in an informal rulemaking. The deference required under *Mead* for informal rulemaking (that is not based on notice-and-comment rulemaking or formal adjudication) is determined based on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade." 533 U.S. at 228. The poorly reasoned, single page statement of the IRS's litigating position set out in Rev. Rul. 95-26 cannot receive significant deference under this standard, for it lacks thorough consideration of the issues, is not consistent with earlier IRS positions, and has no power to persuade.

Defendant further states that "[t]he only material distinction between the Commissioner's interpretive regulations and his revenue rulings is that the latter are not issued pursuant to notice-and-comment procedures." (Def.'s Resp. to Pls.' Cross-Mot. Summ. J. 12.) This "material

distinction" requires materially different treatment. Practically, Courts do not grant *Chevron* deference to informally promulgated rules because:

> Application of Chevron to Revenue Rulings would upset the balance between the values of participation and administrative expediency. Close judicial scrutiny of Revenue Rulings serves as an offset to the absence of notice-and-comment rulemaking in the promulgation of Revenue Rulings. Chevron deference to Revenue Rulings would give the Treasury excessive discretion without the counterweight of public participation. This would be especially lamentable with regard to tax because of the enormous impact of the tax system on large numbers of citizens and the importance, in a system of voluntary compliance, of assuring citizens that the tax collector does not have the last word on the application of the tax laws.

John F. Coverdale, *Court Review of Tax Regulations and Revenue Rulings in the Chevron Era*, 64 GEO. WASH. L. REV. 35, 87 (1995).

Contrary to Defendant's argument, revenue rulings are not given the same deference as Treasury regulations that are promulgated by notice-and-comment procedures. *Xerox Corp. v. United States*, 41 F.3d 647, 657 (Fed. Cir. 1995) (noting that, although revenue rulings are entitled to some weight when they reflect the Commissioner's interpretation of a regulation, they do not have the same force as a regulation); *Trainer v. United States*, 800 F.2d 1086, 1090 (Fed. Cir. 1986) ("In any event, Rev. Rul. 78-61 is not binding on this court; and, although Treasury Regulations are of greater force and effect than Revenue Rulings, 26 C.F.R. § 1.901-2 was not issued until after the years involved here.") This Court has determined that revenue rulings do not have the force of law because they have not been subject to notice and comment procedures. *Schlumberger*, 55 Fed. Cl. at 212.[6]

Plaintiffs explained in their opening brief why Rev. Rul. 95-26 is deeply flawed and should accordingly be given no deference. (Pls.' Resp. and Cross-Mot. Summ. J. 22-26.)

---

[6] Defendant also argues that Rev. Rul. 95-26 is entitled to *Chevron* deference even if it represents a change in agency position. (Def.'s Resp. to Pls.' Cross-Mot. Summ. J. 17-19.) Since this Court and the Federal Circuit have repeatedly held that Revenue Rulings are not entitled to *Chevron* deference regardless of whether they represent a change in agency position, plaintiffs will not otherwise respond to this argument.

Defendant does not respond to plaintiffs' explanation, but instead offers two reasons to support the revenue rulings, both of which are also flawed. First, defendant self-servingly states that "[i]t makes perfect sense to require a partner who has included an asset in his outside basis to reduce his basis by the obligation that created this asset because the legally enforceable obligation diminishes the value of his partnership interest," and to do otherwise would lead to an obvious distortion between inside and outside basis. (Def.'s Resp. to Pls.' Cross-Mot. Summ. J. 13-14.) But if that is true, then the converse should also be true: a taxpayer should be allowed to increase his outside basis by the amount of any partnership obligation (whether contingent or not) that gave rise to an asset. Yet, as discussed above, the IRS argued precisely the opposite in *Helmer* and Rev. Rul. 73-301. It is clear that defendant only points to this "policy" when it serves to maximize taxes owed, and it should be rejected for that reason. *See Klamath*, 440 F. Supp. 2d at 619 (rejecting the same argument made by defendant in that case because "[t]he positions the government took in the 752 Cases resulted in the same disparity between inside and outside basis that it protests will occur here under Plaintiffs' position.").

Second, defendant argues that, as an economic matter, the borrower in a short sale is prohibited from transferring the proceeds. Plaintiffs do not understand what relevance defendant believes this point may hold. It appears that defendant may be trying to argue that the obligation is effectively collateralized by the margin account. Yet the fact that the taxpayer in *La Rue* had set up reserves for the contingent obligations in that case did not alter the conclusion reached by defendant and the Tax Court that the obligations were not liabilities for purposes of section 752 because they were contingent in amount. In any event, whatever point defendant may be trying to make is moot because defendant's premise is incorrect. Defendant has already admitted that the Alpha partners transferred their brokerage accounts (including the proceeds from the short

sale) to Alpha, and then Alpha transferred them again to Beta. (Def.'s Resp. to Pls.' Prop. Findings of Fact at 11, 13.)

## II. THE RETROACTIVE REGULATION IS INVALID.

On June 24, 2003 – long after the transactions involved in this case occurred – the Treasury Department attempted to **retroactively** change the law by revising the regulations that govern the definition of a "liability" for purposes of section 752. In a complete reversal of its prior administrative and litigating position (which had received repeated court approval), the Treasury promulgated new regulations under section 752 that purport to expand the definition of the term "liability" to include "**any fixed or contingent obligation to make payment** without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code." Treas. Reg. § 1.752-1(a)(4)(ii) (emphasis added); *see also* Treas. Reg. § 1.752-6(a); Treas. Reg. § 1.752-7(b)(3). The preamble to these new regulations specifically recognizes that the new concept of a "liability" set out in these regulations does **not** follow the result that the Service advocated, and obtained, in *Helmer* and related cases. *See* Assumption of Partner Liabilities, 68 Fed. Reg. 37434, 37436 (June 24, 2003).

In an effort to buttress its litigating position in this and similar cases, the Treasury Department purported to make this change retroactive. *See* Treas. Reg. § 1.752-6 (the "Retroactive Regulation"). The Retroactive Regulation purports to apply to all assumptions of "liabilities" (as newly defined in the Retroactive Regulation) by partnerships occurring after October 18, 1999 and before June 24, 2003 (i.e., the Retroactive Regulation applies only to assumptions of "liabilities" by partnerships that took place **before** the Retroactive Regulation was promulgated). As discussed below, the only court to have considered the Retroactive Regulation has declared it invalid, concluding that the Treasury Department exceeded its authority in promulgating it. *Klamath*, F. Supp. 2d at 621-22.

The Retroactive Regulation expressly applies only to "liabilities" that are **not** treated as "liabilities" under section 752. This is because the Retroactive Regulation is expressly based on a definition of "liability" that is broader than its established and longstanding definition, as the new definition purports to encompass "any fixed **or contingent** obligation to make payment." Treas. Reg. § 1.752-6(a) (emphasis added). The new definition of "liability" in the Retroactive Regulation is thus consciously broader than the preexisting definition of the term "liability" under section 752 (which did not include contingent obligations).[7]

If valid, the Retroactive Regulation would require a partner to reduce his basis in his partnership interest by the amount of any contingent obligation assumed by the partnership between October 18, 1999 and June 24, 2003, but would not allow the partner to increase his basis for the share of the new partnership liability. Treas. Reg. § 1.752-6. This would effect a drastic revision of the longstanding interpretation and application of section 752 and its underlying regulations and, according to the FPAA, would require a major adjustment to the tax positions taken by Alpha, Beta, and their partners.[8]

The Retroactive Regulation is drafted in this novel manner because it is expressly targeted at the transactions attacked by the Service in its Notice 2000-44, and is an obvious

---

[7] The new regulatory regime also **prospectively** redefines a "liability" for purposes of section 752 as any "fixed or contingent obligation to make payment." However, that prospective change is more limited than the retroactive change, because under the prospective change liabilities include fixed or contingent obligations only to the extent that incurring the obligation:

> (A) Creates or increases the basis of any of the obligor's assets (including cash);
> (B) Gives rise to an immediate deduction to the obligor; or
> (C) Gives rise to an expense that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.

*See* Treas. Reg. § 1.752-1(a)(4)(i).

[8] Under the normal rules of section 752, a partner's basis in his partnership interest is reduced under section 752(b) to the extent that the partnership assumes his personal "liability." Section 752(a), however, also allows the partners to **increase** their bases in their partnership interests by their shares of the liability that the partnership has assumed. (See discussion in Part III). The Retroactive Regulation has no parallel provision. When a partnership assumes a liability subject to the Retroactive Regulation, the partners are therefore not allowed to increase their basis by their proportionate share of such liability. This is a major difference between the operation of the Retroactive Regulation and the normal rules of section 752.

attempt to buttress the government's litigating position against such transactions. Indeed, the Preamble to the Retroactive Regulation focuses specifically on Notice 2000-44. *See* Assumption of Partner Liabilities, 68 Fed. Reg. 37,414, 37,416 (June 24, 2003) ("These temporary regulations are necessary to prevent abusive transactions of the type described in the Notice 2000-44").[9]

### A. The Treasury Department did not have authority to promulgate the Retroactive Regulation.

The Retroactive Regulation is invalid because the Treasury Department did not have authority to issue it.[10] The Treasury Department relied on section 309(c) of the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000) (the "Act") as the source of its rulemaking authority to promulgate the Retroactive Regulation. *See* Assumption of Partner Liabilities, 68 Fed. Reg. 37,414, 37,415. There are three parts to Act section 309 which are relevant here. First, that section added section 358(h) to the Internal Revenue Code to combat the tax results of a corporate transaction described in Notice 2001-17, which involved the

---

[9] The Treasury Department proposed and adopted an entirely different set of rules to govern the assumption of non-section 752 "liabilities" by partnerships occurring on or after June 24, 2003. *See* Treas. Reg. § 1.752-7 (hereinafter the "Prospective Regulation"). The Prospective Regulation, like the Retroactive Regulation, only applies to the extent the "liability" at issue does not constitute a liability for purposes of section 752, and also like the Retroactive Regulation uses the new expansive definition of the term "liability" for its purpose. However, the Prospective Regulation, unlike the Retroactive Regulation, does not require an immediate reduction to basis for the amount of the liabilities assumed by the partnership. Instead, the Prospective Regulation sets forth a complex scheme for determining when basis must be reduced. *See* Treas. Reg. § 1.752-7.

[10] When the Retroactive Regulation was first issued, numerous commentators argued that the Treasury Department had plainly exceeded its statutory authority. *See, e.g.*, Letter from the American Institute of Certified Public Accountants to Commissioner Mark Everson, *reprinted in AICPA Comments on Proposed and Temporary Regulations on Assumption of Partner Liabilities Under I.R.C. Section 752,* 83 DTR G-7 (April 30, 2004) (Reproduced in Appendix A) ("[T]he AICPA is concerned that these regulations appear to exceed the underlying statutory authority."); Letter from New York State Society of Certified Public Accountants to Mr. Horace Howells at IRS, *reprinted in CPAs Comment On Proposed Definition of Partnership Liabilities*, 2003 Tax Notes Today 195-16 (Sept. 15, 2003) (Reproduced in Appendix A) (noting that the Retroactive Regulation cannot be reconciled with existing precedent, and expressing concern about the ability of taxpayers to rely on settled law); Letter from Fred Goldberg, Jr. (former IRS Chief Counsel, Commissioner of IRS, and Assistant Secretary of the Treasury for Tax Policy) to IRS, *reprinted in Goldberg Suggests Son of Boss Regs Will Diminish Settlement Prospects*, 2003 Tax Notes Today 219-47 (Nov. 13, 2003) (Reproduced in Appendix A) ("[W]e believe that the IRS has significant litigation risks respecting the validity of the Temporary Regulation.").

acceleration and duplication of a loss relating to certain liabilities by transferring assets and those liabilities to a corporate subsidiary. Second, Act section 309(c) then directed the Treasury Department to promulgate "comparable rules" for partnerships:

> (c) APPLICATION OF COMPARABLE RULES TO PARTNERSHIPS AND S CORPORATIONS. – The Secretary of the Treasury or his delegate –
> (1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships . . . .

Finally, Act section 309(d) dictated that the rules prescribed under Act section 309(c) "shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules."

In Act section 309(c), Congress gave the Treasury Department authority to promulgate rules "comparable" to those contained in new section 358(h) to provide "appropriate adjustments . . . to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) . . . in transactions involving partnerships." By this grant of authority Congress intended only for the Treasury Department to promulgate rules applicable to partnerships *which were shareholders in corporations that engaged in transactions subject to section 358(h).* The Retroactive Regulation exceeds this authority because it is targeted at transactions that do not involve a corporate formation or restructuring or section 358(h), but that instead involve only partnerships and their partners and basis determinations under section 752. Accordingly, Act section 309(c) cannot serve as a basis for the Department's authority to promulgate the Retroactive Regulation. *See, e.g., Rite Aid Corp. v. United States*, 255 F.3d 1357, 1360 (Fed. Cir. 2001) ("In our view, there is no requirement that a taxpayer acquiesce in a regulation promulgated outside the authority delegated by Congress.").

1. *Standard of Review*

It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Rite Aid Corp.*, 255 F.3d at 1359 ("A regulation is manifestly contrary to the statute if it is outside the scope of authority delegated under the statute."); *Beneficial Corp. v. United States*, 814 F.2d 1570, 1574 (Fed. Cir. 1987) ("[I]f the agency interpretation contravenes clearly discernible legislative intent or is otherwise unreasonable, it should not stand.") (internal citations omitted).

Regulations that purport to apply retroactively are judged under a particularly stringent standard. Retroactive legislative rules are not permitted unless there is an express grant of such authority from Congress. As the Supreme Court made clear in striking retroactive regulations in *Bowen*, "[r]etroactivity is not favored in the law [and] a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." 488 U.S. at 208. No such express grant of retroactive authority exists in this case.

2. *Act section 309(c) did not give the Treasury Department authority to promulgate the Retroactive Regulation.*

To understand Congress' direction in Act section 309(c), it is important to first understand the purpose and operation of section 358(h). The Joint Committee on Taxation's General Explanation of new section 358(h) illustrates the purpose of the new provision:

> The Congress was concerned about a type of transaction in which taxpayers seek to *accelerate*, and potentially *duplicate*, deductions involving certain liabilities. As an example, assume a transferor corporation transfers assets with a fair market value basis in exchange for preferred stock of the transferee corporation, plus the transferee's assumption of a contingent liability that is deductible in the future. The transferor claims a basis in the stock received equal to the basis of the assets. However, the value of the stock is reduced by the amount of the liability, creating a potential loss. The transferor may then attempt to *accelerate* the deduction that would be attributable to the liability by selling or

> exchanging the stock. Furthermore, the transferee might take the position that it is entitled to deduct the payments on the liability, effectively *duplicating* the deduction attributable to the liability.

STAFF OF JT. COMM. ON TAX'N, 106TH CONG., GENERAL EXPLANATION OF TAX LEGISLATION ENACTED IN THE 107TH CONGRESS 154 (Jt. Comm. Print 2001) (emphasis added). The IRS identified, and "listed," this type of corporate transaction in I.R.S. Notice 2001-17. Section 358(h) served its purpose by requiring that the basis of stock received in this type of corporate transaction would be reduced by the amount of any "liability" assumed in the exchange, which was broadly defined for this limited purpose to include any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Code.

The text of Act section 309 and the circumstances surrounding its enactment make clear that Congress intended only for Treasury *to promulgate rules applicable to partnerships that were shareholders in corporations that engaged in corporate level transactions, such as the one described in Notice 2001-17*. It is thus clear that Congress did not intend for Treasury to use the authority in Act section 309(c) to promulgate a rule governing basis adjustments for partnership interests under section 752. If Congress had intended for Treasury to make a retroactive revision to section 752, it would necessarily have said so expressly, but it did not. The Act and its legislative history do not even mention section 752. Moreover, the legislation that became Act section 309 was proposed on October 19, 1999, well before the Service issued Notice 2000-44 on August 11, 2000, *see* Joint Committee on Taxation, *Description of Modified Chairman's Mark Relating to Expiring Tax Provisions* (JCX-73-99), October 19, 1999 (describing provision designed to "Prevent Duplication or Acceleration of Loss Through Assumption of Certain Liabilities"), and nothing in the Act or its legislative history suggests that Congress was even aware of the partnership transactions described in Notice 2000-44 when the legislation that

became Act section 309 was proposed. The only congressional intent that can be gleaned from the statute and the legislative history is for Treasury to adopt a special rule for partnerships that were shareholders in corporations that engaged in the type of transactions that were described in the Joint Committee Report and addressed in the text of the statute.

Indeed, the Treasury Department promulgated precisely such a limited rule in Treas. Reg. § 1.358-7 on June 24, 2003, the same day it promulgated the Retroactive Regulation. Treas. Reg. § 1.358-7, titled "Transfers by partners and partnerships to corporations," addresses contributions of assets and liabilities by partnerships to corporations in which they are shareholders. This is the rule that Congress intended for the Treasury to promulgate in Act section 309(c). Indeed, in promulgating Treas. Reg. § 1.358-7, the Treasury Department relied on Act section 309(c) – the same source of authority it invoked to promulgate the Retroactive Regulation. As shown below, the Treasury Department correctly applied Congress' directive in Act section 309(c) when it promulgated Treas. Reg. § 1.358-7. Act section 309(c), however, did not vest any greater authority in the Treasury Department that would allow it to promulgate the Retroactive Regulation.

The strongest proof that Congress did not intend for Treasury to promulgate a rule like the Retroactive Regulation is found in the text of the Act itself. The language used by Congress in Act section 309(c) **cannot** be reconciled with its application to transactions that do not involve partnerships as shareholders in corporations, for it expressly directs the Treasury Department to promulgate rules "comparable" to those contained in new section 358(h) to provide "appropriate adjustments . . . to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) . . . in transactions involving partnerships." The Retroactive Regulation violates this mandate in several different ways: (i) it does not apply to "liabilities described in section 358(h)(3)," (ii) it does not prevent

the "acceleration or duplication of losses," (iii) it is not "comparable" to section 358(h), and (iv) it does not provide for "appropriate adjustments" when applied to partnership transactions that do not involve corporations.

Despite the express direction in Act section 309(c) that Treasury promulgate a rule of application to "liabilities described in section 358(h)(3)," the Retroactive Regulations purports to apply only to liabilities that are **not** described in that section. Section 358(h)(3) by its own terms limits its application to liabilities that are assumed in connection with certain corporate exchanges.[11] The Retroactive Regulation does not purport to apply to any liability that is assumed in connection with such a corporate transaction. It instead purports to operate on "liabilities" assumed in connection with the contribution of property *to a partnership*. Although the Retroactive Regulation defines the term "liability" for partnership purposes *by reference* to the definition that is used in section 358(h)(3), that does not change the fact that the partnership liabilities at which the Retroactive Regulation is targeted are not, and never will be, "liabilities described in section 358(h)(3)." On the other hand, the directive in Act section 309(c) **can** be reconciled with a rule like Treas. Reg. § 1.358-7 that makes adjustments to basis where a partnership is a shareholder in a corporation that engages in a corporate transaction like that described in Notice 2001-17, because the liabilities assumed by the corporation would be "liabilities described in section 358(h)(3)."

The Retroactive Regulation also cannot be reconciled with the congressional directive that Treasury promulgate rules to "*prevent the acceleration or duplication of losses* . . . in transactions involving partnerships" (emphasis added). A partner's contribution to a partnership of an obligation like that described in the Retroactive Regulation **does not** present a potential for

---

[11] A "liability described in Section 358(h)(3)" is a liability that is assumed only in connection with one of the corporate transactions involving exchanges "to which section 351, 354, 355, 356, or 361 applies." *See* 26 U.S.C. § 358(h)(1), referencing 26 U.S.C. § 358(h)(3).

accelerated or duplicated losses. For example, the investments described in Notice 2000-44, at which the Retroactive Regulation is targeted, do not, like transactions described in Notice 2001-17 at which section 358(h) is targeted, accelerate or duplicate any loss. Transactions described in Notice 2000-44 instead result in only a single tax loss and that loss is not accelerated. On the other hand, a partnership's contribution of a contingent obligation to a corporation in which it is a shareholder **does** present the potential for accelerating and duplicating losses. Indeed, this is exactly the predicament that is resolved by Treas. Reg. § 1.358-7. Thus, once again the text of Act section 309(c) can be harmonized with Treas. Reg. § 1.358-7, but not with the Retroactive Regulation.

The Retroactive Regulation is also infirm because it does not contain rules "*comparable*" to section 358(h). Section 358(h) contains two important exceptions to its general rule of basis reduction. It provides that its rule of basis reduction does not apply to any liability if:

> (A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or
> (B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

26 U.S.C. § 358(h)(2). Although the Retroactive Regulation incorporates these exceptions, it makes the second exception inapplicable to any transaction that is substantially similar to the transaction described in Notice 2000-44. *See* Treas. Reg. § 1.752-6(b)(2). Section 358(h) does not contain any similar exclusion, nor does Treas. Reg. § 1.358-7. The Retroactive Regulation is thus at odds with, rather than "comparable" to, the rule contained in section 358(h).

Congress' command that Treasury promulgate a rule "comparable" to section 358(h) to provide "*appropriate adjustments*" "in transactions involving partnerships" also necessitates a finding that Congress intended only for Treasury to promulgate a rule like Treas. Reg. § 1.358-7, because applying a rule like section 358(h) in the pure partnership context, as the Retroactive Regulation purports to do, produces bizarre and draconian results. Almost unbelievably,

Treasury conceded in the preamble to the new regulations that it is not possible to make an appropriate adjustment in the pure partnership context using a rule like section 358(h):

> In the corporate context, section 358(h) prevents the duplication and acceleration of loss with respect to obligations not encompassed by section 358(d) by reducing the transferor shareholder's basis in corporate stock received in the exchange. **Treasury and the IRS do not believe that this is the best approach for partnerships given their passthrough nature.** Ultimately, the partners' shares of a partnership's deductions are limited by the partners' bases in their partnership interests (their outside bases). If, at the time of an assumption of a § 1.752-7 liability by a partnership from a partner (the § 1.752-7 liability partner), the partner's outside basis were reduced by the amount of the § 1.752-7 liability, then the partner would not have sufficient outside basis to absorb any deduction with respect to the § 1.752-7 liability that passed through the partnership.
>
> For this reason, these proposed regulations do not reduce the outside basis of the § 1.752-7 liability partner upon the partnership's assumption of the § 1.752-7 liability.

Assumption of Partnership Liabilities, 68 Fed. Reg. 37,434, 37,436–37 (emphasis added). The preamble recognizes that the immediate basis reduction that would be appropriate in the corporate setting is not appropriate in the partnership setting because it has the inappropriate result of insuring that no deduction is ever allowed for a true economic loss. Yet that is precisely what the Retroactive Regulation would require.

Since the Retroactive Regulation cannot be reconciled with its purported source of legislative authority, it is invalid. It is clear that Congress did not, in Act section 309(c), contemplate a rule like the Retroactive Regulation. The Treasury's promulgation, on the eve of litigation, of a regulation that is unrelated to the statute on which it relies and which has only retroactive effect is nothing more than an improper attempt to bolster its litigating position in an effort to reverse the longstanding rule that "contingent" obligations do not constitute "liabilities" under section 752. The ends do not justify the means. Having succeeded (when it was to the agency's benefit) in contending that "contingent" obligations are not "liabilities" under section 752, if the Service now desires to change the rule that it fought for, its recourse is to Congress,

not to the Courts. *See Glass City Bank v. United States*, 326 U.S. 265, 268 (1945) ("the wisdom of [tax] legislation is a question for Congress.").

**B. The Treasury Department failed to comply with the requirements of the Administrative Procedure Act when promulgating the Retroactive Regulation.**

The Administrative Procedure Act requires agencies to give public notice of proposed rulemaking and to allow for interested persons to comment before a proposed rule is adopted. 5 U.S.C. §§ 553(b), (c). Rules that are not promulgated in accordance with the notice and comment requirements are invalid, unless such rules are exempted from those procedures. *The Coalition for Common Sense in Gov't Procurement v. Sec'y of Veteran Affairs*, 464 F.3d 1306, 1318-19 (Fed. Cir. 2006) ("An agency's failure to comply with notice and comment procedures is grounds to set aside an agency rule."). In addition to not having any legislative authority to promulgate the Retroactive Regulation, the Treasury Department, in its effort to quickly bolster its litigating position, failed to comply with the requirements of the APA because the Retroactive Regulation was made immediately effective without the required pre-promulgation notice and opportunity for public comment. The Retroactive Regulation is therefore also invalid for that separate and independent reason.

The Treasury Department purportedly relied on an exception that allows agencies to dispense with notice and comment requirements when the agency for "good cause" finds that notice and comment would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The Treasury Department stated that there was good cause for dispensing with the notice and comment requirements because the Retroactive Regulation was "necessary to prevent abusive transactions of the type described in the Notice 2000-44." Assumption of Partner Liabilities, 68 Fed. Reg. 37,414, 37,416.

It is well settled, however, that the "good cause" exception to the notice-and-comment requirements mandated by the APA "is to be read narrowly," *United States v. Garner*, 767 F.2d 104, 120 (5th Cir. 1985), and is only to be "reluctantly countenanced." *United States v. Rainbow Family*, 695 F. Supp. 294, 304 (E.D. Tex. 1988). The exception is to be "narrowly construed," *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984) (quoting *New Jersey, Dep't of Envtl. Prot. v. United States Envtl. Prot. Agency*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)), and its use "should be limited to emergency situations, so that the section does not become an all-purpose escape clause." *National Fed'n of Fed. Employees v. Devine*, 671 F.2d 607, 610 (D.C. Cir. 1982) (citing *American Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)).

The Treasury Department's stated premise – that it had good cause to dispense with notice and comment because the Retroactive Regulation was "necessary to prevent abusive transactions" – is obviously untenable. The Retroactive Regulation plainly could not have been designed to "prevent" any abusive transactions since, under its own terms, it purports to apply **only** to the assumption of liabilities by partnerships after October 18, 1999 and **before** the date the regulation was promulgated on June 24, 2003.[12] Rather, the Retroactive Regulation could only provide guidance as to how transactions that had already occurred should be treated, but that rationale does not satisfy the requirements of the good cause exception. See *Mobil Oil Corp. v. Dep't of Energy*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979) ("[A] desire to provide immediate guidance, without more, does not suffice for good cause . . . . [Such an] exception to the notice requirement . . . would swallow the rule."); *Zhang v. Slattery*, 55 F.3d 732, 747 (2d Cir. 1995) ("[T]he notice and comment requirement would be a dead letter if compliance could

[12] The relevant definition of "prevent" means to "keep from happening." WEBSTER'S THIRD NEW INT'L DICTIONARY 1798 (3d ed. 1968).

be excused whenever the beneficial effect would . . . be accelerated [by dispensing with notice and comment].")

It is also important to remember that, on June 24, 2003, the Treasury Department separately promulgated the Prospective Regulation which purports to govern the assumption of liabilities not otherwise covered by section 752 by partnerships that occur on or after June 24, 2003. *See* 68 Fed. Reg. 37,434 (June 24, 2003). Unlike the Retroactive Regulation, however, the Prospective Regulation was **not** immediately made effective. Instead, it was properly first subjected to notice and comment procedures. The fact that the Department did not invoke the "good cause" exception in an effort to make the Prospective Regulation immediately effective to govern **future** conduct belies its assertion that immediate promulgation of the Retroactive Regulation, which purports to govern only **past** conduct, was necessary to "prevent" any abuse.

Moreover, the Treasury Department cannot have good cause for bypassing notice and comment procedures to immediately effectuate a regulation when it waited fully three years before issuing that regulation. *See, e.g., American Iron & Steel Inst. v. Envtl. Prot. Agency*, 568 F.2d 284, 292 (3d Cir. 1977) (the Environmental Protection Agency was not justified in relying on good cause exception when Congress mandated that it promulgate regulations on November 15, 1973, but the agency waited until March of 1976 to promulgate); *Rainbow Family*, 695 F. Supp. at 302-06 (explaining that the Forest Service's two year delay in promulgating a rule made the conclusion "inescapable" that the agency lacked good cause); *Texas Food Indus. Assoc. v. United States Dep't of Agric.*, 842 F. Supp. 254, 260 (W.D. Tex. 1993) ("[W]hen a federal agency creates time pressures upon itself as a result of its own lack of immediate action, such conduct further supports a finding that no good cause existed to depart for the standard rulemaking procedures.") The Treasury Department has cited a statute that was enacted by Congress in 2000 as its authority for promulgating the Retroactive Regulation on June 24, 2003,

and the Service had begun challenging the reporting of these transactions as early as August of 2000 when it published Notice 2000-44.

Finally, the Court should reject defendant's "good cause" argument for another reason. Plaintiffs have made repeated attempts to conduct discovery into defendant's reasons for promulgating the Retroactive Regulation, and defendant has consistently obstructed those efforts. In fact, that is one of the topics listed in plaintiffs Rule 30(b)(6) notice for which defendant has filed a motion seeking a protective order (which is still pending before the Court). Defendant should not be allowed to argue that the Retroactive Regulation was necessary to "prevent abuse" while it refuses to allow plaintiffs to conduct any discovery into defendant's reasons' for promulgating that very regulation. *See* Rule 56(f). This is particularly true when the only court to have considered this regulation has concluded that defendant's **true** reasons for promulgating the regulation was to buttress its litigating position:

> Finally, the Court cannot help but note that the Regulation applies only to conduct that occurred before June 24, 2003, and after October 18, 1999. *See* Treas. Reg. § 1.752-6(d). The Service then issued a different regulation to govern liabilities for conduct that occurred after June 24, 2003. A narrow time frame, coupled with conduct that the Service specifically calls out in the preamble of the Regulation, is a strong indication that the promulgation of the Regulation was to buttress the government litigation position in this and similar cases. *See, e.g., Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *see also Chock Full O'Nuts Corp. v. United States,* 453 F.2d 300, 303 (2d Cir.1971) ("[T]he Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulation.").

*Klamath*, 440 F. Supp. 2d at 625.

### C. The Retroactive Regulation violates due process and fundamental notions of fair government and is an abuse of the Commissioner's discretion.

Even if the Act authorized the Retroactive Regulation, the agency's power to promulgate it is subject to both constitutional and administrative limitations. In *United States v. Carlton,* 512

U.S. 26, 32-33 (1994), the Supreme Court held that, under the Due Process Clause of the Constitution, Congress may adopt retroactive tax rules only when they are rationally related to a valid government purpose and only when the period of retroactivity is "modest." Certainly, the Treasury Department is subject to the same due process constraints in promulgating its rules and regulations.

The Retroactive Regulation fails to comport with these requirements. There is no basis for the government to claim that the Retroactive Regulation did not change prior settled law. The preamble to these regulations specifically acknowledged that the "definition of a liability contained in these proposed regulations does not follow *Helmer v. Comm'r*, T.C. Memo 1975-60." Assumption of Partner Liabilities, 68 Fed. Reg. 37,434, 37,436. As shown in the introductory section of this memorandum, the Service for many years consistently took the position that contingent obligations, or known obligations that were contingent in amount, were not "liabilities" for purposes of section 752. The Service successfully advocated that position to the benefit of the Treasury in *Helmer*, *Long*, *La Rue*, and similar cases. Taxpayers, including the plaintiffs, were certainly entitled to rely on the position of the Service, which had been accepted by the courts to the detriment of other taxpayers, for their tax planning. The decision retroactively to apply a regulatory change which treats "any contingent obligation" as a liability is an abuse of discretion and therefore invalid.

In addition, Treasury waited until June 23, 2003 to promulgate the Retroactive Regulation, which reaches back to impact transactions consummated as early as October 18, 1999. Treasury did not give taxpayers any notice between December 15, 2000 and June 23, 2003 that it was considering this type of regulatory change. This lengthy period of retroactivity is more than "modest" and therefore violates due process under *United States v. Carlton*, 512 U.S. at 32-33.

Finally, the Retroactive Regulation was promulgated in a transparent attempt to revise and improve the litigating position of the Service. It was not until June 25, 2003 – the day after the Retroactive Regulation was promulgated – that the Service released the first of two Chief Counsel Notices that set forth its arguments against the tax results for investments described in Notice 2000-44. *See* Chief Counsel Notice 2003-020 (June 25, 2003), 2003 WL 24016805. The Supreme Court has made clear that deference to such a rule that "appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. at 213.[13]

**D. Klamath Strategic Investment Fund, LLC v. United States**

The only court to have considered the Retroactive Regulation concluded it was invalid. *Klamath*, 440 F. Supp. 2d at 621-22. In *Klamath*, the district court concluded after a thorough analysis that the Act did not provide the Treasury Department with any authority to promulgate the regulation, and the Department's authority for promulgating it must come, if at all, under its general rulemaking authority in section 7805. The district court then applied existing law to determine that the Department had abused its discretion in attempting to make the regulation retroactive. Plaintiffs fully agree with the decision in *Klamath*.

Defendant argues that if the Retroactive Regulation is, as the *Klamath* court concluded, only an interpretive regulation, then the test for determining whether it can be retroactively applied is found in section 7805(b). While defendant acknowledges that section 7805 contains a presumption against retroactive tax regulations, defendant points to exceptions to this rule that

---

[13] *See, e.g., Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971) ("[T]he Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulations."); *Vinson v. Comm'r*, 38 T.C.M (CCH) 740, 743 (1979) ("[R]espondent may not by a unilateral ruling bootstrap himself into the result he seeks in a litigated case."); *Ludwig v. Comm'r*, 68 T.C. 979, 985, n.4 (1977) ("The courts have not looked with favor upon bootstrapping revenue rulings issued shortly prior to the initiation of litigation.").

would allow it to apply the regulation retroactively. Specifically, defendant argues that it may apply the regulation retroactively under section 7805 either because: (1) Congress provided the Treasury with an express delegation of authority to prescribe the regulations' effective date, or (2) retroactivity is necessary "to prevent abuse." Neither of these positions has any merit.

First, defendant's argument that Congress delegated authority to the Department to prescribe the effective date is circular and begs the question. If this Court determines that the Act provided defendant with authority to promulgate the Retroactive Regulation, than there is no question that Congress authorized defendant to make it retroactive, *see* Act section 309(d), and the only questions are whether the regulation violates due process or the APA. Plaintiffs explained why defendant's second justification under section 7805(b) for making the regulation retroactive – that it was necessary to "prevent abuse" – is wrong in their discussion of defendant's claim that it had "good cause" to forego the notice and comment required by the APA, and they incorporate that discussion here by reference. Summarily stated, a regulation that has only retroactive effect cannot "prevent" anything.

## III. NO PENALTIES ARE APPLICABLE OR WARRANTED.

Plaintiffs demonstrated in their opening brief that, even if their interpretation of section 752 ultimately proves to be incorrect, no penalty is warranted for any resulting underpayment of tax.

### A. Plaintiffs had substantial authority for their tax positions.

Plaintiffs had substantial authority for taking the position that the obligation to cover a short sale position is not a liability for purposes of section 752. Indeed, at the time they engaged in the transactions, the law on this was extraordinarily one-sided in their favor. *See* Treas. Reg. 1.1233-1(a)(1); *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975); *Long v. Comm'r*, 71 T.C. 1, 1978 WL 3318 (1978); *La Rue v. Comm'r*, 90 T.C. 465 (1988); *Gibson Prods. Co. v. United*

*States*, 637 F.2d 1041 (5th Cir. 1981); *Deputy v. du Pont*, 308 U.S. 488 (1940); *Lemery v. Comm'r*, 52 T.C. 367 (1969), *aff'd on other grounds*, 451 F.2d 173 (9th Cir. 1971); *Albany Car Wheel Co. v. Comm'r*, 40 T.C. 831 (1963), *aff'd*, 333 F.2d 653 (2d Cir. 1964)**;** *Brountas v. Comm'r*, 692 F.2d 152 (1st Cir. 1982), *cert. denied*, 462 U.S. 1106 (1983).

Defendant ignores these cases in asserting that plaintiffs did not have substantial authority for their reporting position. However, the IRS considered these authorities, and several others, in 1997 when it assessed whether the obligation to close a short is a liability for purposes of section 752, and the IRS concluded that it had "litigating hazards" on this issue. 1997 FSA (Nov. 21, 1997) (Pls. Ex. 8, App. A at p. 3). It is disingenuous for defendant to assert a penalty against taxpayers while at the same time concluding that it has litigating hazards on the issue.

Defendant cites the *Salina* case, Rev. Rul. 95-26, and IRS Notice 2000-44 to support its argument that plaintiffs did not have substantial authority for their reporting position. However, Rev. Rul. 95-26 and IRS Notice 2000-44 merely reflect defendant's litigating position on this issue. Neither offers any cogent reasoning for their conclusions, and neither is entitled to any deference. With respect to *Salina*, plaintiffs respectfully maintain that they were entitled to rely on the majority of courts which have held that contingent obligations are not liabilities for purposes of section 752. Plaintiffs respectfully believe that their disagreement with the minority position in *Salina* was reasonable, given that: (a) *Salina* was published as a non-binding memorandum opinion, and (b) it ignored decades of jurisprudence on the meaning of the specialized term "liability" for purposes of section 752, departing from the well-established precedent that contingent obligations are not liabilities under section 752.

Perhaps the best evidence that plaintiffs' had substantial authority for their position under section 752 is defendant's promulgation of the Retroactive Regulation. Defendant promulgated that regulation to buttress its litigating position on this exact issue precisely because it was

concerned that taxpayers such as plaintiffs did have substantial authority on their side. *See Klamath*, 440 F. Supp. 2d at 625 ("Indeed, from this Court's view, the promulgation [of the retroactive regulation] – and the statements made in conjunction with the promulgation – is compelling evidence that the IRS knew it was seeking to change settled law to bar, retroactively, the transactions engaged in by plaintiffs.")

And, the two courts to have addressed section 752 in the context of transactions similar to those described in IRS Notice 2000-44 have both concluded that taxpayers correctly determined that contingent obligations are not liabilities for purposes of section 752. *Id.* at 625; *Colm Producer*, 460 F. Supp. 2d at 716. Finally, the *Klamath* court easily found that the taxpayers in that case had substantial authority for taking a position very similar to that which is at issue here and rejected the government's efforts to impose penalties in that case.

**B. Plaintiffs were not negligent.**

Negligence is defined in Treas. Reg. §1.6662-3 as "any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Plaintiffs were not negligent under this standard. The taxpayers (partners of plaintiffs) though sophisticated investors, were not tax practitioners or experts in tax law; therefore they acted reasonably in consulting with experienced tax advisors to assist them in determining the proper tax treatment of their transactions. *See, e.g., Henry v. Comm'r*, 170 F.3d 1217, 1220-1221 (9th Cir. 1999) (holding that negligence penalties should not be sustained when the sophisticated taxpayer acted reasonably in consulting his long-time accountant).

The Internal Revenue Code and the Treasury Regulations are complex, covering thousands of pages of complicated rules. The Heritage Organization, LLC ("Heritage") presented the Sands a complicated financial plan that had economic and personal benefits along

with potential tax advantages. As the undisputed evidence shows, the taxpayers did what any reasonable, prudent taxpayer would do: they requested and received the views of their advisors – Freddy Robinson of their customary CPA firm Bernard Robinson & Company, L.L.P. ("Bernard Robinson") and Jonathan Blattmachr, their long-time attorney at Milbank Tweed Hadley & McCloy LLP ("Milbank Tweed") – on the financial plans presented by Heritage before entering into any such plans. The taxpayers requested references from Heritage and contacted those references. The taxpayers also relied on the advice and assistance of Lewis Rice & Fingersh, a national law firm with significant tax expertise, to implement the transactions at issue in these cases. Lewis Rice personnel spent some 549 hours in their representation of the partners of plaintiffs.

Lewis Rice issued opinions to the taxpayers that determined that it was more likely than not correct to not treat the contingent obligations to cover the short sale positions as liabilities for purposes of section 752. Those opinions were reflected in the tax treatment exhibited in the tax returns prepared by Bernard Robinson for plaintiffs and their partners. The opinions issued by Lewis Rice were based on the research and analysis of the applicable law and authorities and the experience, professional judgment, and assessment of the probable outcome of litigation or other adversarial proceedings by Lewis Rice.

Defendant has argued that plaintiffs were not entitled to rely on the opinions issued by Lewis Rice because Lewis Rice and Heritage had a prearranged agreement to facilitate the implementation of tax shelters and because plaintiffs' representations to Lewis Rice contained material misrepresentations of fact. (Def.'s Resp. to Pls.' Prop. Findings of Fact at 24). Defendant has provided no evidence to support these assertions. In fact, neither assertion is true. Lewis Rice exercised its independent judgment as one of the leading law firms in the nation with full knowledge of all relevant facts.

The undisputed evidence clearly shows that Lewis Rice was independent from Heritage. Lewis Rice did not pay or receive any referral fees from Heritage, nor was there any agreement between them to split any fees. Pls. Ex. 55, App. B at p. 1369 and Pls. Ex. 61, App. B at p. 15. Lewis Rice independently determined the fee the firm would seek from the clients for their services, and they were paid for their services by the partners of Plaintiffs Alpha I, L.P. and R, R, M & C Group, L.P. Pls. Ex. 50 and 55, App. B at p. 1295-1315, 1369. The engagement agreements with Lewis Rice were independent of any agreements with Heritage. Pls. Ex. 49 and 55, App. B at pp. 1281-1294, 1369. Lewis Rice made an independent evaluation whether to enter into attorney-client relationships with the Sands family members. Pls. Ex. 55, App. B at p. 1369. Lewis Rice independently determined the fee it would seek directly from the Sands family for its services, based upon its estimate of the amount of time and complexity of the services and based upon the factors expressly permitted under the applicable rules of professional conduct in Missouri. The fee was not dependent upon the outcome of any transaction, nor was it a percentage of an amount invested.

Furthermore, there is no evidence that the representations that the partners of plaintiffs made to Lewis Rice contained material misrepresentations. Lewis Rice was fully informed of all the relevant facts necessary for issuing their opinions. Lewis Rice conducted due diligence interviews of members of the Sands family and requested the necessary information for drafting the factual representations from the Sands and from Heritage personnel. Pls. Ex. 55, App. B at p 1371; Pls. Ex. 61 and Ex. 71, App. B at pp. 22-23, 153. Lewis Rice was provided everything they requested from Heritage and the Sands for drafting the factual representations. Pls. Ex. 71, App. B at p. 153. Lewis Rice implemented major components of the Sands investment plan: the firm drafted partnership agreements, formed business entities, and drafted documents relating to asset transfers. Pls. Ex. 55, App. B at pp. 1368-69. Lewis Rice personnel and Heritage

personnel corresponded frequently while implementing the investment transactions to make sure everything was done correctly. Pls. Ex. 61, App. B at pp. 26-27.

Defendant argues that the Sands misrepresented their expectation of profit and that they were implementing a multi-year strategy. (Def.'s Resp. to Pls.' Cross-Mot. Summ. J. 34.) Defendant argues that the Sands could only have reasonable expectation of a profit exceeding fees and costs based on the 25% of the taxes that could be eliminated. (*Id.*) However, defendant fails to account for the other benefits considered by members of the Sands' family, which are discussed below. Plaintiffs do not understand defendant's suggestion that the Sand's representation to Lewis Rice that they were engaging in a multi-year strategy was somehow inaccurate. To the contrary, the plaintiffs have provided uncontroverted evidence of the over $20 million in profits Alpha I has made as a family investment partnership since 2001.

Defendant incorrectly argues that plaintiffs' sole purpose in engaging in the Heritage investment transactions was to seek tax benefits and, because of this purpose, plaintiffs should be regarded as negligent. First, it is clear that a potential tax benefit was not the sole purpose for partners of plaintiffs to engage in these transactions. Heritage presented the Sands a variety of possible benefits to engaging in the transactions including: (i) making a profit, (ii) providing for philanthropic interests, (iii) diversifying their holdings, and (iv) hedging against the impact of movements in interest rates on the stock holdings in Constellation Brands. Pls. Ex. 57, App. B at pp. 1394, 1397A and Pls. Ex. 61, App. B at pp. 33-34. It was the combination of these benefits, including any potential tax benefit that led the Sands family to engage in the financial plan. Pls. Ex. 57, App. B at pp. 1394, 1397A.

Plaintiffs do not deny that they considered the tax benefits when they decided to engage in these transactions. However, plaintiffs had other purposes as well, and were entitled to achieve those purposes in the most tax-efficient manner. *See Gregory v. Helvering*, 293 U.S.

465 (1935); *Rice's Toyota World, Inc. v. Comm'r*, 81 T.C. 184, 196 (1983), *aff'd. on this issue* 752 F.2d 89 (4th Cir. 1985). It is well established that, so long as taxes are not the only purpose, the taxpayers' choice of form should be respected.

As described above, the taxpayers had substantial authority for their position. Under Treas. Reg. § 1.662-3(b), a return position that has a reasonable basis (a lesser standard than substantial authority) is not attributable to negligence. Defendant's reliance on Notice 2000-44 as proof that plaintiffs did not have a reasonable basis for the tax positions taken on their returns is misplaced. IRS notices are not law and do not establish law. *Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 785 (5th Cir. 2001) (determining that the Commissioner had provided no reason to endorse his approach in Notice 95-8 for determining expected economic profit when such approach conflicted with established law); *IES Indus. v. United States*, 253 F.3d 350 (2001) (determining that the law supported the taxpayer's determination of the economic benefit); *Schlumberger Tech. Corp. v. United States*, 55 Fed. Cl. 203, 212 (2003) (determining that revenue rulings and general counsel memoranda do not have the force of law because they are not subject to notice and comment procedures). In *Compaq* and *IES Indus.*, the IRS had issued Notice 95-8, which (like Notice 2000-44) declared a particular transaction to be a "listed transaction" which the IRS would challenge. Both appellate courts sustained the taxpayers' transactions on the merits and gave no deference to Notice 95-8.

Because plaintiffs and their partners acted reasonably in relying on their advisors and had a reasonable basis for the tax positions taken on their returns, the negligence penalty under section 6662 is inapplicable.

**C. There was no valuation misstatement.**

In our opening brief, plaintiffs gave two different reasons why the valuation misstatement penalties do not apply: (1) the penalty cannot apply because any alleged overstatement of basis

was not reported on a return of tax imposed by chapter 1, and (2) no underpayment of tax would be "attributable" to any such overstatement of basis. Defendant responded to only the former of those arguments, and plaintiffs are therefore entitled to judgment on the latter.

Defendant's response to plaintiffs' first argument also misses the mark. Defendant does not contest that the statute only applies this penalty when the misstatement – in this case an alleged overstatement of basis – occurs on "a return of tax imposed by chapter 1." Section 6662(e). Nor does defendant contest that a partnership tax return is not a return of tax imposed by chapter 1. Instead, defendant argues that its regulations **treat** an information return filed by a partnership **as though** it is a return of tax imposed by chapter 1. This bootstrapping assertion adds nothing to the argument. As plaintiffs pointed out in their opening brief, defendant lacks authority to apply these statutory rules to **treat** a partnership return of tax **as though** it is "a return of tax imposed by chapter 1" for purposes of asserting penalties. A statute that expressly applies only to "a return of tax imposed by chapter 1" cannot be "deemed" applicable to returns that are **not** for a "tax imposed by chapter 1." The agency cannot make "blue" into "yellow" by "deeming" it to be so.

### D. Plaintiffs had reasonable cause and good faith for taking the tax positions at issue.

#### 1. *The Court has jurisdiction over plaintiffs' penalty defenses*.

Prior to 1997, penalties were treated as "affected items" within the TEFRA procedural scheme. Under the old scheme, trial courts considering a TEFRA partnership case (such as this case) were limited to determining "partnership items" (which did not include penalties) and whether any adjustments made by defendant to a partnership return should be sustained. If the trial court sustained defendant's adjustments in any given case, the applicability of any penalty would then be determined in subsequent proceedings on a partner-by-partner basis. However, many TEFRA partnerships have hundreds (or even thousands) of partners, and requiring

defendant to demonstrate penalties on a case-by-case basis was inefficient (for both defendant and the courts), and often led to conflicting results (*e.g.*, Court A refuses to sustain the penalty against Taxpayer A, while Court B upholds the penalty against similarly situated Taxpayer B).

Congress recognized that this system was inefficient:

> Many penalties are based upon the conduct of the taxpayer. With respect to partnerships, the relevant conduct often occurs at the partnership level. In addition, applying penalties at the partner level through the deficiency procedures following the conclusion of the unified proceeding at the partnership level increases the administrative burden on the IRS and can significantly increase the Tax Court's inventory.

H.R. Rep. No. 105-148 at 594 (1997). Congress accordingly changed the law in 1997 so that now "the applicability of any penalty . . . which relates to an adjustment to a partnership item . . . shall be determined at the partnership level." *See* section 6221.

Partners in TEFRA partnerships will, like any taxpayer, avoid accuracy-related penalties if they can demonstrate that they acted in good faith and had reasonable cause for a tax position that leads to an underpayment. *See* section 6664(c). Since the applicability of the penalty is to be determined at the partnership-level, and that result is binding on all partners regardless of their participation, Congress preserved the right of partners to pursue individual defenses to penalties either during or after conclusion of the partnership-level proceeding:

> The Act provides that the partnership-level proceeding is to include a determination of the applicability of penalties at the partnership level. However, the provision allows partners to raise any partner-level defenses in a refund forum.

STAFF OF JT. COMM. ON TAX'N, 105TH CONG., GENERAL EXPLANATION OF TAX LEGISLATION ENACTED IN 1997 377 (Jt. Comm. Print 1997) ("1997 Blue Book"). This change was effectuated in section 6230(c)(4), which provides, in relevant part:

> [T]he determination under the final partnership administrative adjustment or under the decision of the court (whichever is appropriate) concerning the applicability of any penalty . . . which relates to an adjustment to a partnership

> item shall also be conclusive. Notwithstanding the preceding sentence, the partner **shall be allowed** to assert any partner level defenses that may apply . . . .

Section 6230(c)(4) (emphasis added).

In its response, defendant reads the new statutory scheme as being mandatory rather than permissive. That is, defendant believes that section 6230(c)(4) **precludes** individual partners from raising their penalty defenses in the partnership case, as opposed to merely **permitting** individual partners to subsequently raise their individual defenses. Defendant further asserts that an individual partner may only mount a defense to any penalty that is determined in the partnership case after the partnership case is concluded, the partner pays the resulting penalty, and the partner files a "refund action."

Defendant's construction of section 6221 in this brief is incorrect, as is demonstrated by its conflict with defendant's own published guidance. Although defendant has asserted in its response that individual partners are not allowed to raise penalty defenses in partnership proceedings, it has taken the precisely opposite position on several occasions. For example, on at least two separate occasions the IRS National Office has provided guidance to the field on penalties like those at issue here. In both cases, the IRS National Office wrote:

> Good faith and reasonable cause of individual investors pursuant to I.R.C. § 6664 would be the type of partner level defense that can be raised in a subsequent partner-level refund suit. **However, to the extent that the taxpayer effectively acted as the general partner and that the intent of the general partner is determined at the partnership level, it is likely that such partnership level determinations may also dispose of partner-level defenses under the unique facts of each case.**

*See* Industry Specialization Program Coordinated Issue, Notional Principal Contracts, 2005 WL 43711 (Jan. 6, 2005) (emphasis added) (Pls. Ex. 14, App. A at pp. 31-32); Industry Specialization Program Coordinated Issue, "Basis Shifting" Tax Shelter, 2002 WL 32351285 (Dec. 3, 2002) (emphasis added) (Pls. Ex. 13, App. A at pp. 28-29). Thus, defendant itself does not apply the rule that its attorneys advocate in this case. In addition, the cases cited by

defendant relied on this precise principle to consider the partners' defenses to penalties. *See Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 200-12 (D. Conn. 2004); *Santa Monica Pictures, LLC v. Comm'r*, 89 T.C.M. (CCH) 1157, 1229-36 (2005). Moreover, the district court rejected the same argument that defendant is making here in *Klamath* in deciding that it was appropriate to consider the partner's penalty defenses. *Klamath*, 472 F. Supp. 2d 885, 903-04 (E.D. Tex. 2007).

Here, Robert and Richard Sands are, through their total ownership of RRMC Corp, the general partners in Alpha. Moreover, all of the other partners in Alpha testified that they relied on Robert and Richard in taking these tax positions. Pls. Ex. 67 and Ex. 68, App. B. at pp. 121, 124-25. Thus, under defendant's own published guidance and the decided case law, this Court has jurisdiction to consider the partners' penalty defenses.

Plaintiffs are uncertain why defendant is seeking to avoid its own published position, but the interpretation of TEFRA that it is offering here is clearly wrong. Section 6221 states that the "applicability of any penalty" "**shall** be determined at the partnership level." (emphasis added). The accuracy-related penalties that defendant has asserted in this case (negligence, substantial understatement, or gross valuation misstatement) may be imposed, if at all, under Section 6662. However, Section 6664(c) provides that "**[n]o penalty shall be imposed** under this part [which includes Section 6662] . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." (emphasis added). There is no ambiguity in this scheme: in order for a court to determine whether a penalty applies, the court must determine **both** whether the elements of Section 6662 exist **and** whether the taxpayer had reasonable cause and good faith under Section 6664(c).

To the extent that any ambiguity may exist in this statutory scheme, defendant's construction of it is manifestly unreasonable because it is directly contrary to Congress' long-standing mandate – in effect **since 1924** - that taxpayers be allowed to challenge asserted deficiencies in tax and penalties without prepayment.[14] Section 6213(a) sets forth the right of a taxpayer to challenge an alleged deficiency prior to assessment and **precludes** defendant from assessing any deficiency (which includes both tax and penalties) while the taxpayer is contesting the asserted deficiency in the Tax Court. Without so much as a hint of authority from Congress, defendant now purports to remove TEFRA penalty cases from this longstanding scheme. According to defendant, partners in TEFRA partnerships may now only raise partner-level defenses to penalties **after** the penalty has been assessed and paid. Under this construct, taxpayers would not have the right to raise defenses to those penalties in **any** court prior to assessment and payment, which is a clear violation of Section 6213. And, since the jurisdiction of the Tax Court is dependant upon an asserted deficiency, *see* Tax Court Rule 13, taxpayers would no longer have **any** right to assert partner-level penalty defenses in the Tax Court – that court simply would not have jurisdiction over such cases. Thus, defendant also purports to strip jurisdiction from the very court specially created by Congress to deal with tax cases. And defendant's scheme would require the parties to reintroduce much of the same evidence considered in the partnership-level case in their own partner-level cases, which may take place in dozens or even hundreds of courts all across the country, leading to the same inefficiencies and

[14] Prior to 1924, taxpayers could only contest tax deficiencies through refund suits in the district courts after such taxes were paid. However, after numerous investigations, and in response to public discontent, Congress created the Board of Tax Appeals in 1924 (the predecessor to the Tax Court) as a forum where taxpayers could challenge asserted deficiencies without prepayment. *See* David F. Shores, *Deferential Review of Tax Court Decisions: Dobson Revisited*, 49 Tax Law 629, 632-33 (1996) (describing history of the Tax Court). Today, taxpayers have the right to challenge (without prepayment) asserted deficiencies in the United States Tax Court.

inconsistent results that Congress sought to avoid. That is a patently ridiculous construction of Sections 6221 and 6230(c)(4).

2. *Plaintiffs have demonstrated their reasonable cause and good faith*.

Defendant relies principally on inadmissible transcripts to support its argument that plaintiffs did not have reasonable cause for the positions taken on their returns and did not act in good faith. Because such evidence is inadmissible, defendant has provided nothing to contest the facts set forth by plaintiffs. Even if such evidence was admissible, it does not change the fact that plaintiffs have set forth uncontroverted facts demonstrating their reasonable cause and good faith. The taxpayers here relied upon the skilled professional advice of highly qualified attorneys at Lewis Rice and obtained the advice of their trusted personal advisors. The facts demonstrating the reasonable reliance of plaintiffs on their advisors are set forth in the context of the negligence penalty discussion above and in Plaintiffs' Cross-Motion for Summary Judgment at pages 43 to 48. Reliance on this formidable quantity of accumulated advice was entirely reasonable and easily meets the standard of due care. Because plaintiffs acted reasonably and in good faith, penalties are not applicable in this case.

## CONCLUSION

Plaintiffs respectfully request an Order that their contingent obligations to cover the short sale positions involved in the Alpha, Beta, M,L,R&R and Mickey Management, L.P. cases are not liabilities for purposes of section 752.

Plaintiffs also request an Order (if necessary) that they are not liable for any penalties asserted by defendant with respect to any underpayment of tax that might result from Alpha, M,L,R&R or Mickey Management, L.P. overstating basis in the shares of Yahoo and Corning stock that they sold during 2001 and 2002, as a result of plaintiffs failure to treat the contingent obligations to cover as tax "liabilities."

Respectfully submitted this 14th day of September, 2007.

s/ Lewis S. Wiener
LEWIS S. WIENER
Sutherland, Asbill & Brennan
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0140
Fax: (202) 637-3593
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 853-8000
(404) 853-8806 (fax)

Kent L. Jones
Sutherland, Asbill & Brennan
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0732
Fax: (202) 637-3593
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Response and Reply to United States' Response to Plaintiffs' Cross Motion for Summary Judgment and to Plaintiffs' Reply to United States' Motion for Summary Judgment has been made on September 14, 2007 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, TX 75201
thomas.m.herrin@usdoj.gov

s/ Lewis S. Wiener
LEWIS S. WIENER