UNITED STATES COURT OF FEDERAL CLAIMS

ALPHA I, L.P., )
BY AND THROUGH )
ROBERT SANDS, )
A NOTICE PARTNER, )
)
Plaintiffs, )
)
V. ) No. 06-407-T
)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

COPY

**************************************************************

ORAL DEPOSITION OF
BRIAN CZERWINSKI
AUGUST 28, 2007
VOLUME I

**************************************************************

ORAL DEPOSITION OF BRIAN CZERWINSKI, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of August, 2007, from 9:06 a.m. to 2:49 p.m., before Stacey R. Cruz, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Department of Justice, Tax Division, located at 717 North Harwood Street, Suite 400, Dallas, Texas, in accordance with the United States Court of Federal Claims and the provisions stated on the record or attached hereto.

**APP-B-11**

EXHIBIT
tabbies
61

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THOMAS A. CULLINAN
SUTHERLAND, ASBILL & BRENNAN, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996
404.853.8075
404.853.8806 (Fax)

FOR THE DEFENDANT:

MS. MICHELLE C. JOHNS
-AND-
MR. THOMAS HERRIN
U.S. Department of Justice
Tax Division
717 North Harwood Street
Suite 400
Dallas, Texas 75201
214.880.9762
214.880.9741 (Fax)

**APP-B-12**

Q. So Tim Seaberg, as a contractor, he would go out and meet with the clients just to sort of give them a general idea of what Heritage did?

A. Yes.

Q. Okay. And do you know how long Tim Seaberg worked with Heritage?

A. I don't.

Q. Okay. Do you remember your first contact with members of the Sands Family? Do you remember when that was?

A. No.

Q. Do you recall ever having a telephone conversation with the Sands?

A. Yes.

Q. Okay. Let's start from there.

Do you remember if it was Robert or Richard?

A. I mean, I think I spoke to both of them at various times.

Q. How many times do you think had you telephone conversations with Robert Sands?

A. I mean, I'd have no -- no way of remembering.

Q. More than ten?

A. Possible.

Q. Okay. I think I just asked you about Robert.

What about Richard Sands? Do you recall?
A. No.
Q. Okay. Did you ever have any face-to-face meetings with either Robert or Richard Sands?
A. Yes.
Q. How many times did you have a face-to-face meeting?
A. I mean, there was quite a few, but I don't know how many.
Q. Were the meetings in Dallas, or were they in New York?
A. They were in New York.
Q. And so when you went to these meetings, who else from Heritage would be present?
A. Mr. Kornman and, I think, on occasion, Tim Seaberg, and maybe Gary's son, Michael.
Q. Uh-huh. And who -- who from the Sands Family would be present at these meetings?
A. Richard and Robert.
Q. Okay. Did you ever meet Marilyn Sands?
A. No.
Q. Did you ever meet Andrew Stern?
A. No.
Q. And do you recall what was discussed at these meetings with Heritage and the Sands?

opinion letters? Did they have phone calls with Lewis, Rice or write letters or...?

A. I don't know.

Q. Okay. Do you know whether Lewis Rice ever received a referral fee from the Heritage organization?

A. Not that I was ever aware of.

Q. Do you know whether Lewis, Rice ever paid or agreed to pay a referral fee or split any sort of fees with Heritage?

A. Not that I'm aware of.

Q. Do you know whether Heritage had any sort of ownership interest in Lewis, Rice during 2001 or 2002?

A. Not that I'm aware of.

MS. JOHNS: Are these questions familiar?

MR. CULLINAN: No, that last one was funny.

Q. (BY MS. JOHNS) Did Lewis, Rice have an ownership interest in Heritage in 2001 or 2002?

A. Not to my knowledge.

Q. Okay. I'm going to have you look at -- let me make sure that's right. Take a look at Exhibit 10.

A. (Witness complies.)

(Witness reviewed document.)

Q. And you've already once -- you've already looked at this e-mail once.

But you'll see -- we already talked about

to invest in short sales?

A. I don't have any recollection of them specifically communicating to me why they were doing this.

Q. I think you earlier testified that at these meetings that Heritage would have with prospective clients and clients, there would be some discussion of tax benefits, correct?

A. Yes.

Q. And you've now also told us that there would also be discussion of potential profits from the short sales; is that correct?

A. Yes.

Q. Let's turn to Exhibit 1 in the binder that Ms. Johns has put together.

MR. CULLINAN: And I do apologize for that.

MS. JOHNS: All right. I'll forgive you.

Q. (BY MR. CULLINAN) Please turn to the page that's marked THO-021312.

A. (Witness complies.) Okay.

Q. What is that page captioned?

A. "A group of strategies to maximize capital preservation and provide investment profits for the Sands Family" with a subheading, "And business purposes of transactions."

Q. Okay. What is the first item listed on the page?

A. "Investments are made in an attempt to profit from fluctuations in interest rates by shorting U.S. Treasury securities."

Q. And I think your earlier testimony was that this would have been discussed -- that this presentation would have been shown -- or a presentation like it would have been shown to the Sands before they engaged in the transaction?

A. That's correct.

Q. What's the second topic on the page?

A. "Brokerage accounts are open in order to increase diversification of holdings and tract short sales which serve as a hedge versus current holdings."

Q. What does that mean, do you know?

A. I think it was typically believed that as interest rates rose, there would be short-term depreciation in the value of marketable securities while -- you know, so you'd lose money in your -- your marketable securities, but a rising interest rate would create a potential profit and falling bond prices.

Q. So another possible purpose of this transaction that would have been discussed with the Sands is its ability to hedge against fluctuations and interest

rates; is that a fair statement?

A. Yes.

Q. What's the third item on the page?

A. "A limited partnership is formed as an investment control entity to provide consolidation and control of diversified investments with the flexible structure and tax benefits of a partnership."

Q. What does that mean?

A. Well, they could put -- you know, the formation of a partnership they could consolidate a verify of holdings into one place, and then use that partnership -- you know, you get the benefits of having liability protection from the existence of a partnership, and then the ability to use those partnership interests in future planning, whether it's estate planning or something like that.

Q. Do you know whatever became of the Alpha partnership that we've been discussing?

A. I -- I don't recall.

Q. If I told you that Alpha was still in existence today, and had roughly $60 million of assets inside it and had generated gains of millions of dollars, would that reflect at all what's being described here in this third possible benefit?

A. Yes.

Q. And what's the fourth item on this page?

A. "A management corporation is formed to manage the investments within the investment control entity and insure continuity of management while the equity ownership of the investment control entity may change."

Q. Okay. And what does that mean?

A. Well, it's, I guess twofold. It was another layering of the formation of a management company and it gave the general partner of the partnership the ability to control that entity while they'd add the flexibility to transfer value, you know, whether it was through estate planning or something like that, they could transfer the partnership interest while still retaining control until they wanted to give up control of the assets within the structure.

Q. Okay. Next -- flip the page, please.

A. (Witness complies.)

Q. Item 5. You don't need to read it all. The document says what it says. But if you could tell me what it means -- or if it helps you read it out loud, please do.

A. Well, I think it's the idea that you could create a -- an entity that would engage in higher risk investments than your -- typically owning -- buying and holding a marketable security, you could segregate its

value away from those investments so that you were at risk for what was within that entity versus having all the assets at risk. And you could bring in other parties who would want to participate in those type of investments.

Q. Suppose one of those other parties was a friend of the family.

Could this be used to allow individuals that were close to a family to participate with the family in making certain investments?

A. Yes.

Q. What's the next item on the page?

A. The LLC combines the tax advantages of the partnership with liability protection of the corp while not having the ownership restrictions of an S-Corp.

Q. What does that mean?

A. Again, what the LLC would provide, you know, a further segregation of liability, and would give the partners or the members of that entity the opportunity to participate in higher risk investments while being limited to whatever their capital investment was.

Q. And the last item?

A. Last item deals with, you know, using the entities for estate planning means.

Q. One thing in your testimony confused me.

It seemed to me that Gloria Robinson was -- it was decided that Gloria Robinson would be used as an investor very late, but you said that this was shown to the Sands before they ever even decided to engage in the transaction.

Would -- are you certain that it was this specific PowerPoint that was shown to the Sands before they made the decision to engage in it, or could it have been something that was just very much like this?

A. It could have been something like it.

Q. Okay. And let's turn to Exhibit 2.

A. (Witness complies.)

Q. Flip to the third page, which is marked THO-021353.

A. Okay.

Q. What's the copyright at the bottom of the page?

A. 2002.

Q. When did the transactions at issue in this case occur?

A. I believe 2001.

Q. All right. So if this is copyrighted 2002. Is it possible for this document to have been shown to the Sands before they decided to engage in the transaction?

A. It's unlikely this would have been.

Q. So it's more likely that something that perhaps

(Off the record from 12:16 to 12:27 p.m.)

(Exhibits 26 through 50 marked.)

Q. (BY MR. CULLINAN) Mr. Czerwinski, regarding your -- your interaction with Lewis, Rice, were you providing them with information so that they could write their legal opinion?

A. Yes.

Q. Were you functioning as the Sands agent in providing Lewis, Rice with that information?

A. I guess, I don't know what that really means.

Q. Well, why were you providing it to Lewis, Rice?

A. Well, we were working with the -- with the Sands Family in communicating information to their lawyers so that they would be -- they would have all the facts of everything that was going on.

Q. Did you withhold any information from Lewis, Rice?

A. Not that I'm aware of.

Q. So you provided them with all the information that they asked for?

A. Yes.

Q. Who prepared the statement of facts for these opinions?

A. I don't know if I remember the statement of facts. Could you show them to me.

Q. Sure. I've got one in a set here. We'll get there then. We'll get back to that.

Did you or -- or to your knowledge, anyone at the Heritage organization ever communicate to Lewis, Rice the fee structure that the Heritage organization charged its clients?

A. I don't recall.

Q. How was -- was Lewis, Rice paid for its services by the client?

A. Yes.

Q. And I think you testified before, about this but just to make sure. Did Heritage pay Lewis, Rice at all?

A. Not to my knowledge.

Q. You testified that the Heritage organization chose Lewis, Rice, and I want to make sure I'm clear what you meant by that.

Did you mean the Heritage organization chose Lewis, Rice as a firm that it would recommend to its clients, or that the -- that the Heritage organization chose Lewis, Rice as the firm that would be giving the opinion to the Sands?

A. No, Heritage referred Lewis, Rice to the Sands, and the Sands could choose or not choose whether or not they wanted to hire Lewis, Rice.

documents that are listed here in the indices, if you can take a minute to glance through them, do they appear to reference documents that were used to implement the transactions?

A. Yes.

Q. Before I lose track, with respect to the last several documents that we've looked at, Exhibits 26, 27, 28, 29, 30, 31 and 32, the e-mails and the letters and the attachments or the indices, are these the types of documents that the Heritage organization would keep in the ordinary course of business?

A. Yes.

Q. Did you receive these e-mails and letters in the ordinary course of your business?

A. Yes.

Q. Let's look at 33 -- before we go on to 33 -- 29, 30, what was the purpose, if you know, of Lewis, Rice sending you the closing binders?

A. I think the purpose was so that Heritage had a -- had a -- you know, a complete record and file of the transactions.

Q. Let me show you what's been marked as Exhibit 33. Can you identify that document for me?

A. This is a fax from myself to Jaime Mendez, and behind it is trade tickets related to the bond positions

that the Sands had taken.

Q. Where'd you get the trade tickets from?

A. They're from Fritz Luedke at UBS PaineWebber.

Q. And do you know what these trade tickets represent?

A. I -- I'm not sure. They in- -- they indicate a sale of a position in a specific bond, but I don't know if they're, like, the actual trade tickets, or if they're just valuing the trade positions while they were open.

Q. And why did you send it to Jaime Mendez at Lewis, Rice?

A. It would have been just been sent to keep him apprized of -- if it's -- if it was while the positions were open, to keep him apprized of what the positions were doing, and if it was prior to close so that he would have a record of what the trading desk at PaineWebber had closed the positions at.

Q. Thirty-four. And what is this doc- -- do you recognize this document?

A. It's an e-mail from Jaime Mendez to myself. It includes copies of the applications for EINs, and then the IRS's assignment of EINs for a few of the Sands Family entities.

Q. And I'm sorry. Did you say it's an e-mail or

is it a fax?
A. It's a fax. I'm sorry.
Q. And what's the purpose of this document?
A. To provide us with copies of all this stuff.
Q. You can probably get a flavor with some of these last documents that I'm just confused as exactly the role that Lewis, Rice played in implementing the transactions, vis-a-vis, the -- the role that you and the analytical department at Heritage organization played in implementing the transactions.
There are these faxes and e-mails going back and forth between you and Lewis, Rice; some of them are going to you, some of them are going from you.
A. Uh-huh.
Q. Can you describe, for me, in some detail, the respective roles of each in terms of implementing the transactions. Who was -- who was charged with doing what?
A. Well, with respect -- or with regards to implementing the transactions, the analytical department, and in this case, myself and probably some people underneath me, would have been kind of in charge of quarterbacking it in the sense that, you know, the lawyers are doing everything related to the legal aspect of the transaction, whether it's forming entities,

drafting legal documents, ultimately writing the opinion letter, rendering the legal advice for the client, the accountants are, you know, preparing the account -- the tax returns, the accounting information, the bond people are -- are putting the trades on, doing that, and analytical and myself would be communicating to the clients, to the accountants, to the law firm, to the bond traders, each aspect of what was going on, and implementing the transaction so that, at the beginning, let's say that the Sands said, Okay, we're going to do this, we want to implement all this stuff, the lawyers would -- would need to form entities, so someone from analytical would make sure that the lawyers were doing what they were, you know, charged to do by the client, you know, and then that would go on with respect to each piece of it that, essentially, we would be making sure that what the client wanted to transpire would be transpired.

Q. Okay. I'm going to show you 35.

Can you identify that document for me?

A. It's an e-mail from Jaime to analytical, specifically, myself, and he's stating that he reviewed his files, and he's missing some information related to funding of the brokerage accounts.

Q. So this -- did Jaime -- let me back up.

representations they're making to Lewis, Rice regarding the financial plan.

Q. And what's the purpose of you sending this document to Mike Mulligan -- or let me -- is it -- based on the first page of the document, does it appear that you sent this document to Mike Mulligan?

A. Yes.

Q. Why did you send a document to Mike Mulligan?

A. Don't recall.

Q. Do you recall -- did you prepare the document?

A. No.

Q. Who's handwriting's on the document?

A. It looks like my handwriting.

Q. In your experiences, is this statement of facts the type of document that would have initially been prepared by somebody at Lewis, Rice?

A. Yes.

Q. So is it safe to assume, then, that Lewis, Rice sent you a draft of the statement of facts?

A. It appears to have.

Q. And then you marked up those facts with the corrections?

A. I don't know if they're corrections.

Q. Suggestions? Whatever terminology you want to use. What were -- well, you tell me.

What -- what were you trying to tell Mike Mulligan in this document?

A. I have no recollection.

Q. Well, in looking at it now? And I'm not asking for specifics that -- you know, you might have gotten a specific fact wrong or -- or that you thought it could have been phrased better, I'm just asking, in general, what was the purpose of your sending this to Mike Mulligan?

A. Well, he was ultimately -- I mean, he was one of the attorneys at the law firm that were writing an opinion letter, so if we were making comments on the facts section of this thing, they might consider whatever those comments were in the final drafting of what the documents were going to be.

Q. All right. So Mr. Mulligan was trying to verify the accuracy of the facts that he was relying on for his opinion; is that fair?

A. Yes.

Q. And as part of your representation of the Sands, you were working with him to verify the accuracy of those facts?

A. Yes.

Q. And is this the type of document that the Heritage organization would keep in the ordinary course

those conversations, sir, but sometimes you reused the tapes?

A. Yes.

Q. Did Claudia transcribe all of your tapes, do you know?

A. It would have -- no, I don't know. It would have been Claudia, or someone in a similar capacity as Claudia, that wasn't connected to the rest of the com- -- it would have been someone who was underneath Gary that wasn't part of, I guess -- I don't know how to describe it -- but the -- the side of the company that had access to sort of all the -- the public information.

Q. Again, who is -- you said that -- and I think this is what you're testifying now, that people in marketing would record the tapes of conversations with people before they became clients; is that right?

A. I believe that's the case.

Q. Did you know any of those people in the marketing department that would do that?

A. Well, I guess -- yes, I knew some members of -- of the marketing side of the company, so...

Q. Did you know the people that were transcribing some of these calls?

A. One, maybe.

Q. Do you know if these people -- were they

professional -- were they court reporters, were they certified? Were they professional transcribers?

A. I don't -- I don't think they were.

Q. You said that once someone became a client, information became more guarded. Once somebody signed an engagement letter, did that mean that they were committed to going through the -- whatever strategy or whatever transaction? Or what did that mean?

A. It just meant that they had agreed to be shown -- Heritage was going to show them the information that they had, and that's all -- they were obligated to pay some small fee, like, $20,000 or $15,000, whatever it was, and in return, they would be shown all the information.

Q. Did anybody ever decide not to go through with somebody, or not -- not to follow Heritage's advice after having signed the engagement letter?

A. Yes.

Q. Can you tell me, roughly, what percentage?

A. Maybe -- I don't know 40, 50 percent maybe.

Q. So the conversations that -- I think you called them contractors -- let me ask you this: You mentioned principals and contractors.

Did the -- the person who made the initial phone call, did that person have a title?

A. That was an initiator.
Q. What do initiators do?
A. They were basically cold callers that would take names from a database and cold call them and try and establish a meeting for a contractor to come out and introduce Heritage to the potential client.
Q. Did they explain the transaction to these potential clients, the initiators? Did they explain --
A. No.
Q. Why not?
A. I don't think the initiators had any knowledge of any of the strat- -- Heritage's strategies.
Q. And so at that point, then, the -- the clients -- potential clients would not have signed an engagement letter while they're in discussions with initiators?
A. That's correct.
Q. Okay. What about the contractors? So a contractor comes out and tells the prospective client about the Heritage organization, and then tries to set up another meeting for the principal, is what you testified; is that right?
A. That's correct.
Q. So at that point, there still is another engagement letter?
A. That's correct.

Q. And at that point, does the contractor know about all the different transactions and strategies, investments? Is he explaining anything, in any detail, to the potential client?

A. No.

Q. And then a principal comes out to a meeting with the potential client, and then works towards getting the client to sign an engagement letter?

A. Yes.

Q. And it's after the engagement letter is signed, then they get into a full discussion of the -- well, let's ask it this way: Would this -- the documents in Exhibit 1 and Exhibit 2, would they have been shown to the Sands before they signed an engagement letter?

A. No.

Q. The conversations that in initiators and -- would the -- the initiators and contractors be constrained in the types of information that they could share with the Sands until an engagement letter had been signed?

A. Yes.

Q. Let me just take a for instance.

I think one of the things that we had talked about as a possible benefit of these transactions was hedging, hedging against interest rate fluctuations.

If an initiator or a contractor started telling a prospective client about the benefits of -- of getting into a short sale, which might hedge against interest rates, might that be giving away too much? I mean, would they be allowed to share that information at the front end?

A. I don't think they'd have that knowledge or information to share with the potential client.

Q. All right. So at least while an initiator and a contractor are dealing with a prospective client, at that point, after they're -- they've gotten a client to sign an engagement letter, at that point, all the client is committed to doing is paying, you said, $15- or $20,000?

A. Yeah, it was some -- and I think it varied over time. But it was some small amount of money, and then they would be shown the strategies.

Q. And then the client is shown the strategy is something like in Exhibit 1 or Exhibit 2, and then there's a full discussion about the strategy and all the different possible benefits, and at that point, the client can decide to either go through with it or walk away?

A. Yes.

Q. And you said as many as 40 or 50 percent did

decide to walk away?
A. I think that's about right.
Q. Let's go back to Exhibit 13.
Did you prepare that document?
A. It wouldn't be typical that I would.
Q. Okay. Exhibit -- just give me one minute.
MR. CULLINAN: We can go off for a minute, and I think I'm done.
(Off the record from 2:22 to 2:24 p.m.)
(Exhibit 54 marked.)
Q. (BY MR. CULLINAN) This is 54. Do you know who Ralph Canada is?
A. Yes.
Q. Who is he?
A. He was the president -- he was the president and he may have had another title -- the principal at Heritage for about six years, I think.
Q. I'd like to you turn to page 72 --
A. (Witness complies.)
Q. -- in that testimony, APP-1491, bottom right.
A. Okay.
Q. Beginning at line 12, this is the deposition of Mr. Canada, so Mr. -- this is Mr. Canada's testimony. And he's asked, Are you aware of instances where Gary Kornman manipulated or altered documents, no not

A. Okay.

Q. Let's look back at your handwritten notes; it's Exhibit 11, and look at THO-713.

A. (Witness complies.)

Q. And this was the -- these are the notes dated 8/16/01, and, I think, Mr. Cullinan had asked you if you were sure or not whether or not the Sands were actually present at this meeting.

A. Right.

Q. You testified there's no way you could be sure of that.

A. (Nods head.)

Q. If you'll turn to Exhibit 14, if you see down at the bottom, very, very bottom of the page, it's -- there's a debrief tracking info, and it says, Day, 8/16/2001, Rep, BLC, meeting with PC in Fairport, New York. Do you see that, at the very bottom?

A. Yes.

Q. Would that indicate that, in fact, on August 16th of 2001, you were in Fairport, New York meeting with the Sands?

A. Yes.

Q. So does that refresh your memory at all about this August 16th, 2001 meeting about whether or not the Sands were actually present?

A. Well, we wouldn't have gone to a meeting in Fairport without the Sands being present.

Q. So I'll ask you again: The meeting -- the notes from the meeting dated August 16th of 2001, is it -- were the -- Richard Sands and Robert Sands present at that meeting?

A. I believe so.

Q. Okay. Now, I'm going to go back and ask you some questions regarding Exhibit 25, which was probably the very bottom of this stack, because it was first one Mr. Cullinan asked you about.

And I think he asked you about the third page, which is marked CH-0045. And just so I understand this page, because I don't to ask anything that's too confusing. Is what this page is saying -- it says, in the middle of the page, it says, Total result realized from utilization of Heritage strategies, $889,000.

Can you tell me what that line and number mean?

A. Well, it's a hypothetical -- it's a hypothetical scenario based on a change, and the interest rates, and it's actually saying the best case scenario, given the historical data from the prior three years, that if you had a rise in interest rates identical to what had historically been the best