COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407T

(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

\- - - - - - - - - - - - - - - - X

ALPHA I, L.P., by and through )
ROBERT SANDS, a notice partner, )
Plaintiff )Case No. 06-407T
-vs- )
THE UNITED STATES, )
Defendant )

\- - - - - - - - - - - - - - - - X

Deposition of RICHARD SANDS taken pursuant to notice at Constellation Brands, 370 Woodcliff Drive, Suite 300, Fairport, New York on Tuesday, June 12, 2007 commencing at 9:30 a.m.

Reported by:
COMPUTER REPORTING SERVICE
Amy M. Condon, CSR, RPR
270 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614 (585) 325-3170

APP-B-60



EXHIBIT
tabbies
63

APPEARANCES:

SUTHERLAND, ASBILL & BRENNAN, LLP
By: KENT L. JONES, Esq.
JULIE BOWLING, Esq.
1275 Pennsylvania Avenue, N.W.
Washington, D.C., 20004
Attorneys for plaintiff.

U.S. DEPARTMENT OF JUSTICE
By: MICHELLE C. JOHNS, Esq.
THOMAS M. HERRIN, Esq.
717 North Harwood Street, Suite 400
Dallas, Texas 75201
Attorneys for defendant.

Q. Now, how many -- I don't think I asked you this already, but how many face to face meetings with Heritage did you have?

A. No idea, I don't recall.

Q. And you don't ever remember traveling to Dallas to meet with Heritage?

A. I don't recall traveling to Dallas to meet with Heritage.

Q. At this first meeting that we talked about, this first face to face meeting with Heritage in 2001, what was discussed?

A. I don't recall. I don't recall any specifics of any meetings.

Q. Okay. Would reviewing this letter refresh your memory at all about maybe what was discussed at the meeting?

A. Not one bit.

Q. Can you say today why Heritage -- why would Heritage contact you, why would they make a cold call to you, do you know?

A. I can't speculate about why they would do anything.

Q. Do you know why Robert finally agreed to meet with Heritage?

as Exhibit 1 states in the fourth paragraph entitled capital gains, it says, we offer strategies that can eliminate the total tax liability on capital gains.

Was one of your goals to eliminate the total tax liability on capital gains?

MR. JONES: I'm going to object to the form of the question only because you refer to this as a letter. It's an unsigned copy of something and it hasn't been established that it was sent or received.

So I object to the characterization that it's a letter. It's not supported by the record. You can answer the question if you understood it.

THE WITNESS: Could you repeat the question?

BY MS. JOHNS:

Q. This letter states that Heritage offers strategies that can eliminate the total tax liability on capital gains.

Was one of the these goals on these transactions to eliminate the total tax liability on capital gains with respect to the sale of the Constellation stock?

A. The question is not clear to me. If the question is -- was it the goal to eliminate totally capital gains tax?

Q. Right. Well, that's --

A. No.

Q. Well, why are you -- why do you disagree with that?

A. Because it was not a goal to eliminate totally capital gains tax.

Q. Okay. Now, before the transactions at issue in this litigation happened, did you know what the tax effects would have been of an outright sale of your Constellation stock?

A. Yes.

Q. Can you tell me what that would have been?

A. Normal payment of tax against the gain.

Q. So you understand the concept of basis?

A. Yeah.

Q. And do you remember what the basis of your Constellation stock was around the year 2001?

A. No.

Q. But was -- do you recall whether the basis of the stock was low relative to the overall value of the stock?

A. Oh, yes.

Q. So you understood if you hadn't entered into these transactions you would have had to have paid a capital gains tax on the sale of the stock?

A. We had very, very broad conversations about estate planning, family partnerships, inner family loaning, creating trusts, you know, hedging strategies against concerns that we had, noncorrelated investment strategies to our concentrated position, diversification strategies. Boy, you know, philanthropic discussions.

Q. Okay.

A. I mean, those are broad topics.

Q. That's fine.

A. I don't recall specifics in each one of those, but very, very broad discussions about family financial planning and how families function.

Q. Okay. Other than the two transactions that are at issue in this litigation, did you enter into any of these other Heritage strategies that you just talked about? Did you implement any of these Heritage ideas or strategies.

A. Over the long-term, yes.

Q. Did you implement those with help of Heritage?

A. I don't know what help means.

Q. Well, for instance, in these two transactions we know that Heritage helped with preparation of

Q. Do you know someone by the name of Rodney Johnson?
A. I don't recall.
Q. Other than Gary did you have any other contacts with any Heritage personnel that you can remember?
A. I had contact with other personnel, but I don't remember who.
Q. Okay. Did you ever have a telephone conversation with Brian Czerwinski?
A. Probably so.
Q. Do you recall what was discussed in those conversations?
A. I don't.
MR. JONES: Excuse me. Could you spell Czerwinski for us?
MS. JOHNS: It's C-z-e-r-w-i-n-s-k-i.
MR. JONES: Thank you.
BY MS. JOHNS:
Q. Did you ever have any discussions with anyone regarding Heritage's experience with financial or investment matters prior to entering into these transactions?
A. With anyone?

Q. Like, did you get any references is kind of what I'm referring to.
A. I believe Rob may have.
Q. But you didn't personally?
A. No.
Q. At the meeting that you had with Heritage did anyone from Heritage associate these two strategies, the two transactions, with the potential amount of taxes to be saved?
A. At the meeting?
Q. The meeting.
A. The meeting? I don't know.
Q. The one face to face meeting that you do recall having in 2001 --
A. Wait. I said to you I do not recall the specifics of any meetings that I had, but I assume I had meetings and more than one.
Q. Okay. So if I ask you any question about what was discussed at those meetings your answer is going to be you don't remember anything; is that correct?
A. That is correct.
Q. Okay.
A. Now -- that is correct. I have a very bad

whether --

A. She never met Heritage or spoke to Heritage.

Q. Okay. Like I said, I'm going to ask you these questions. If you don't remember, that's fine. But I have to at least ask them.

A. It's okay.

Q. At the meeting with Heritage or meetings that you may have had, did anyone discuss any sort of time line that the strategies would need to generate the results?

A. I don't recall.

Q. Okay. Was there any discussion about profit potential from the transactions at the meetings?

A. I believe so in that that was our number one motive is to make money.

Q. Now, we're talking about the transactions, the first and the second transaction.

What were the sources of profit that you believed existed with respect to these transactions?

A. Well, one, I believe we made short sales of treasuries, highly leveraged short sales of treasuries which can result in a huge return on your investment.

We had in the second transaction purchased Yahoo and Corning which as I recall were at all time low. So

those have great profit potential. And there were many other investments -- transactions you could say, investment transactions, I really should say that had profit potential.

Q. What other investment transactions are you referring to?

A. Buy other stocks, go long on treasuries, go short on treasuries.

Q. You don't mean specific to these transactions. Are you talking in general?

A. Yeah, in general.

Q. I was referring to these two specific transactions and what kind of profit potential you saw in these transactions.

MR. JONES: When you use the word transaction it's unclear to me, I don't know if it's clear to the witness. It's unclear to me whether you're talking about these specific historical transactions included excluding everything else or you're talking about the organizations that conducted those transactions. There's a built in ambiguity. I know you're doing it in shorthand. I'm not trying to interfere with your questioning but there's a built in ambiguity in that question.

second set of partnerships?
A. No.
Q. Okay. Do you recall whether the Marvin Sands master trust participated in the first set of partnerships?
A. I don't believe so, but I could be incorrect.
Q. I'm going to ask you the same question. Do you have any recollection why the trust, Marvin Sands master trust would have participated in the second set of partnerships but not the first?
A. I'm going to give you the same answer. We form many partnerships to attend to the differences in the group and partnership interest.
Q. Okay. This second set of partnerships, there was an investment in Yahoo and Corning stock. Do you recall that?
A. Yes.
Q. Who made the decision to purchase Yahoo and Corning?
A. I do not recall who, whether it be an individual or more than one individual specifically made the decision.
Q. Do you recall why it was determined that the entities should purchase -- the entities purchase Yahoo

or Corning?

A. They had reached historic lows compared to their history. I guess that is redundant. They looked cheap, good profit potential.

Q. Once again, in this second set of partnerships you all entered into short sales of treasury notes. Did you enter into those short sales of treasury notes in your individual capacities?

A. I believe so, but I could be incorrect.

Q. At some point were those short sales of treasury notes transferred or contributed to Alpha?

A. I believe so.

Q. Why did you choose to transfer -- contribute those short sales to Alpha?

A. To make one vehicle for the whole group of family members to use as an investment partnership for those individual transactions and future transactions.

Q. Okay. At some point did Alpha contribute the short sales of treasury notes to Beta?

A. I believe so, but I could be incorrect.

Q. Do you know why that contribution took place, from Alpha to Beta?

A. From Alpha to Beta? We need to back up.

Q. Go ahead.