UNITED STATES COURT OF FEDERAL CLAIMS

ALPHA I, L.P., BY AND THROUGH *
ROBERT SANDS, A NOTICE *
PARTNER, *
*
Plaintiffs, *
*
vs. * NO. 06-407-T
*
UNITED STATES OF AMERICA, *
*
Defendant. *

*****************************************************************

ORAL DEPOSITION OF VICKIE A. WALKER

*****************************************************************

ANSWERS AND DEPOSITION OF VICKIE A. WALKER, produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 29th day of August, 2007, A.D., beginning at 10:21 a.m. before Andrea Reed, a Certified Shorthand Reporter in and for the State of Texas, in the offices of United States Department of Justice, located at 717 North Harwood, Suite 400, Dallas, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

EXHIBIT
tabbies
70

APPEARANCES

FOR THE PLAINTIFFS:

MR. THOMAS A. CULLINAN
Sutherland Asbill Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996
(404)853-8075
(404)853-8806 (fax)

FOR THE DEFENDANT:

MR. THOMAS M. HERRIN
United States Department of Justice
Tax Division
717 North Harwood Street, Suite 400
Dallas, Texas 75201
(214)880-9745
(214)880-9742 (fax)

MS. MICHELLE C. JOHNS
United States Department of Justice
Tax Division
717 North Harwood Street, Suite 400
Dallas, Texas 75201
(214)880-9762
(214)880-0741 (fax)

FOR THE WITNESS:

MR. JOHN VOLNEY
Lynn Tillotson & Pinker, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, Texas 75201
(214)981-3815
(214)981-3839 (fax)

ALSO PRESENT:

Mr. Gary M. Kornman

WITNESS ADDRESS:

1694 Batts Lane
Prosper, Texas

A. May '04.

Q. May '04. So where were those records between May '04 and July '05?

A. Different places at different points in time.

Q. Okay. Could you tell us what different places and what different points in times, please?

A. From May '04 -- actually probably from April -- from the end of April '04 to -- I cannot give you the time frame. They went from the offices at Heritage out to a hangar at Addison Airport. Some of the records were subsequently taken from there over to a storage unit.

Q. Okay.

A. Subsequently, some of them were taken to a climate-controlled warehouse where they could be sorted through, and that's -- then they were subsequently turned over to the trustee.

Q. All right. Now, were all the records at that time -- well, I guess all of them weren't records -- all of them weren't turned over. You said at that point, July '05, you turned over a truck worth of documents.

Subsequent to that, were there other documents that were turned over to the trustee?

A. Yes. Both prior and subsequent to that day, yes.

Q. All right. If they were turned over prior to that day, is it safe to say that the documents were gathered from

one of the places that you say that they were at and then
turned over to the trustee from those places.
You said that they were at a warehouse. They
were at a climate-control place. They were at a hangar.
A. Well, I think the trustee was appointed like on a
Friday in August. On the following Monday, which was somewhere
around August 15th-ish, the trustee and some people from his
office, and I believe their attorney, Lee Morris, was there,
came to an executive suite where Heritage was -- that was
Heritage's office at that point. So they came there. They got
the keys to that suite, which had records in it. They got --
they had keys to a storage unit, which had records in it. So
they immediately got those things.
Then at some point in time between August '04
and July '05, they -- there was, I know, one delivery of
documents that went from a storage unit to the trustee.
Then -- so, yes, after that, after the initial turnover where
he got the keys to the executive suite and the storage units,
then, yes, records went from various storage units or the
warehouse or the hangar to the trustee and/or to the trustee
through Tillotson.
Q. Okay. Now, you said at the claimant-control
warehouse you sorted through them. I assume at that time -- is
it correct, then, at that time some of those records that you
sorted through were turned over to the trustee and some of them

protected.

Q. When you say to "make them more secure," were they -- what do you mean by "more secure"? What was the security like prior to that point in time?

A. Well, we had security there. We actually had armed guards there most of the time.

Q. By "there," do you mean after --

A. At the hangar.

Q. Okay. So after they were moved?

A. Yes.

Q. Okay. And beforehand?

A. Before they were moved?

Q. Yes, ma'am.

A. Well, various records were stored in various places that had various security measures. For the most part, I think most of the client files were files -- or files that contained client information were in a locked area that had very restricted access.

Q. Okay. With respect to the documents, again, that are marked as Exhibits 3 through 9, do you know if those specific documents were maintained in the Sands client files?

A. Well, first of all, I don't know that these were ever in the Sands client files.

Q. That's my question.

A. I don't know where these came from. I don't know --

if there were transcripts of recordings, then they should have been part of the client's file.

Q. How many people would have had access to those files?

A. I don't know.

Q. Roughly, between 2001 and April and May of 2004. And let me back up. Let me make sure I understand.

It was April or May of 2004 that those client files would have been moved to the hangar?

A. Yes.

Q. And you were involved in that process?

A. Yes.

Q. Did you have any involvement in maintaining those client files prior to April or May of 2004?

A. No.

Q. So there's gap in the chain of custody of those files between 2000 -- again, if these are actually recordings of the Sands family members' conversations with The Heritage Organization, there's a gap between 2001 and between April or May of 2004 when you took control; is that correct?

A. When you say "there's a gap" --

Q. With respect to your personal knowledge of what -- how these documents were maintained, you don't know how they were maintained before April or May of 2004?

A. That's correct.

Q. And you said you don't know how many people would

have had access to those tapes.

But can you just give me a rough estimate -- or excuse me -- not to the tapes. To the client files.

Can you give me a rough estimate as to how many people would have had access to the client files between, let's say, the end of 2001 or April or May of 2004?

A. The number of people? At any given time or --

Q. In total.

A. In total. I would say -- if I had to guess, I would say 15 or less.

Q. I want to try and clarify some testimony you gave regarding alterations. At one point earlier in your testimony, I thought you testified that you didn't think that any of these documents would have been altered. But then later you said that you really -- you had no idea whether things had been altered when they were not in your possession.

So with respect to the earlier testimony, did you mean to say that you wouldn't believe that any of these documents have been altered once you took possession of them? Do you have -- let me ask it a different way.

Do you have any way of knowing whether these documents were altered before you took possession of them?

A. So prior to April or May of 2004?

Q. Yes, ma'am.

A. No.