IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: October 15, 2007)

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-409 T |

R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER

Plaintiff,

v. 06-410 T

THE UNITED STATES,

Defendant.

CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,

Plaintiff,

v. 06-411 T

THE UNITED STATES,

Defendant.

MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,

Plaintiff,

v. 06-810 T

THE UNITED STATES,

Defendant.

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO PLAINTIFFS' MOTION TO STRIKE**

Respectfully submitted,

THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

RICHARD T. MORRISON
Acting Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney

## TABLE OF CONTENTS


I. The transcripts have been authenticated and they constitute proper summary judgment evidence . . . . 2

(a) Chet Decker . . . . 4
(b) Timothy Seaburg . . . . 5
(c) Vickie Walker . . . . 6
(d) Brian Czerwinski . . . . 7
(e) Plaintiffs' contention that the transcripts cannot be authenticated is unfounded . . . . 7

II. The Transcripts Do Not Contain Inadmissible Hearsay . . . . 8

(a) The statements on the transcripts made by Richard Sands and Robert Sands are not hearsay . . . . 8
(i) Admissions by a party-opponent in accordance with Fed. R. Evid. 801(d)(2) are not hearsay . . . . 8
(ii) The statements made by the Sands meet the hearsay exception of Fed. R. Evid. 803(3) . . . . 11
(b) The transcripts meet the "business records" exception of Fed. R. Evid. 803(6) . . . . 12
(i) Transcript of May 10, 2001 Telephone Call . . . . 13
(ii) Transcripts of the May 31, 2001, June 13, 2001 and June 27, 2001 Meetings . . . . 14
(c) The statements on the transcripts by Heritage personnel meet several exceptions to the hearsay rule . . . . 15
(d) Statements by Heritage employees are not hearsay since they are not offered in evidence to prove the truth of the matter asserted . . . . 17

III. The transcripts should not be stricken as a sanction . . . . 18

(a) Plaintiffs are not unfairly prejudiced by the admission of the transcripts . . . . 19
(b) The timing of the production of the transcripts was reasonable . . . . 21
(c) The importance of the particular evidence . . . . 24
(d) Defendant was diligent in seeking an extension of time . . . . 24

CONCLUSION . . . . 25

**CITATIONS**

Cases:

*Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y) . . . . . . . . . . . 8
*Butler v. United States*, 649 A.2d 563 (D.C.Ct. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . 7
*Cabot v. United States*, 35 Fed.Cl. 80 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
*Grogg v. Missouri Pacific Railroad*, 841 F.2d 210 (8th Cir. 1988) . . . . . . . . . . . . . . . . . 16
*Hill v. Manning*, 236 F.Supp.2d 1292 (M.D. Ala. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 2,3
*In re The Heritage Organization, L.L.C.*, 2007 W.L. 2539351, p.2 (Bankr. N.D. Tex.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,12,21
*McAlinney v. Marion Dow, Inc.*, 992 F.2d 839 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 8
*Rosie D. v. Romney*, 256 F.Supp. 2d 115 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 18
*United States v. Baker*, 693 F.2d 183 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*United States v. Fuentes*, 563 F.2d 527 (2nd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8
*United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*United States v. Hogan*, 986 F.2d 1364 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
*United States v. Knox*, 1998 WL 777986 (6th Cir. 1998)(unpublished) . . . . . . . . . . . . . . . 17
*United States v. Maddox*, 444 F.2d 148 (2nd Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*United States v. Maxwell*, 383 F.3d 437 (2nd Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . 2
*United States v. Polk*, 56 F.3d 613 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*United States v. Robinson*, 275 F.3d 371 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*United States v. Rochan*, 563 F.2d 1246 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statutes:

26 U.S.C.:

§ 165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 165(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
§ 6103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,23

Miscellaneous:

Fed. R. Evid.:
801(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,12,16
803(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
803(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13,16
Federal Rules of Civil Procedure, Rule 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
McCormick on Evidence, § 324.1, pg. 369 (4th ed. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 16
Treas. Reg. § 1.701-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## INTRODUCTION

On August 14, 2007, the United States filed a combined response to plaintiffs' cross-motion for summary judgment/reply to plaintiffs' response to the United States' motion for summary judgment. Attached to this pleading were transcripts of conversations between Richard and/or Robert Sands and employees of The Heritage Organization, LLP ("Heritage"). Heritage was the entity which sold to the Sands' family, and implemented on behalf of the Sands' family, the tax shelters at issue in these consolidated cases. The transcribed conversations established that the Sands family was tax shelter shopping for a vehicle which would eliminate the tax on their capital gains. These transcripts had been transcribed by Heritage employees from conversations recorded by a Heritage employee participating in the recorded meetings or telephone conversation with Richard and/or Robert Sands. They were offered by the United States to counter plaintiffs' contention that plaintiffs acted reasonably in implementing the tax shelters and in reporting the artificially inflated bases on their tax returns, and that they, therefore, should be relieved from the statutorily imposed penalties.

Plaintiffs argue that the transcripts should be stricken because: (1) they cannot be authenticated; (2) they constitute hearsay; and (3) plaintiffs are prejudiced by their admission. As shown below, the transcripts can and have been authenticated. Further, to the extent that part of the transcripts constitute hearsay, the transcripts still fall within an exception to the hearsay rule. Finally, while it is true that Robert and Richard Sands' candid statements show a blatant intent to acquire a tax shelter to eliminate income tax on capital gains, this painful fact, while devastating to plaintiffs' litigation position, does not justify excluding the transcripts as summary judgment evidence.

## I. The transcripts have been authenticated and they constitute proper summary judgment evidence.

In a motion for summary judgment, the court may consider a hearsay statement if that statement could be reduced to admissible form at trial. *Hill v. Manning*, 236 F.Supp.2d 1292, 1297 (M.D. Ala. 2002)(unauthenticated transcripts of tape recorded conversations were proper summary judgment evidence since the Court presumes transcripts can be reduced to admissible form at trial). Further, transcribed recordings between a party and a non-party can, as is the case here, be authenticated by the recording party to the conversation. *Id.* Additionally, the Court should construe those portions of the transcripts attributable to a party as a party admissions and not as hearsay. *Id.* In either instance, the transcripts constitute proper summary judgment evidence.

The accuracy of a transcript from a tape recording presents a best evidence question. *United States v. Maxwell*, 383 F.3d 437, 442 (2nd Cir. 1967). Where the original tape had not been lost, destroyed or become otherwise unavailable through the fault of the proponent, and provided the transcript does not otherwise appear untrustworthy, a properly authenticated transcript of a recording is admissible. *Id.* In fact, the deletion of the inaudible, irrelevant and repetitive portions of a tape will not render the transcript inadmissible. *Id.*

The Federal Rules of Evidence provide that the requirement of authentication is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims. *United States v. Polk*, 56 F.3d 613, 631 (5th Cir. 1995)(transcripts authenticated by individual transcribing tape recordings sufficient to authenticate transcripts). Here, the United States asserts, and plaintiffs do not challenge, that these transcripts show at least part of what was said during initial meetings between Robert and Richard Sands and Heritage employees.

At issue here are four transcripts of taped telephone and in-person meetings between Robert and/or Richard Sands and Heritage personnel. Foundation for the authentication of the transcripts

can be laid, as it was here, through one of the participants to the conversations. *United States v. Hogan*, 986 F.2d 1364, 1376 (11th Cir. 1993); *United States v. Rochan*, 563 F.2d 1246, 1252 (5th Cir. 1997); *see also Hill*, 236 F.Supp.2d at 1297. That same participant to the conversation is also competent to testify that the transcript faithfully reproduced the taped conversation. *Rochan*, 563 F.2d at 1251.

The first transcript memorializes a May 10, 2001 telephone conversation between Richard Sands and Chet Decker. The call, initiated by Decker, was placed to gauge the Sands' interest in a Heritage strategy to eliminate federal and state capital gain tax entirely. (App-B-1-2, to Docket Entry 52[1]). The remaining three transcripts memorialize follow-up meetings with Richard and/or Robert Sands and Timothy Seaberg.[2] These transcripts show that the Sands' true motivation for entering into the Heritage transactions was to eliminate all of the capital gains attributable to the sale of their Constellation Brands stock and to create additional capital losses to be used in the future. As Richard Sands so candidly states at the May 31st, meeting, the Sands family was interested in "a complete elimination" rather than just "a tax deferral." (App-B-21, to Docket Entry 52). Plaintiffs do not deny making the statements on the transcripts. In fact, as shown later in this pleading, both Robert and Richard Sands testified at their depositions and in an IRS interview that they remembered little or nothing regarding their meetings with Heritage.

Because the transcripts were not available at the time of Richard and Robert Sands' depositions, the United States has authenticated the transcripts through the deposition testimony of

---

[1] United States' Response to Plaintiff' Cross-motion for Summary Judgment and to Plaintiffs' Reply to United States' Motion for Summary Judgment.

[2] Seaberg and Robert Sands participated in all three meetings, while Richard Sands participated in the May 31, 2001 and June 13, 2001 meetings and Gary Kornman participated in the June 13, 2001 and the June 27, 2001 meeting.

Decker and Seaberg. These transcripts are further authenticated as business records by former Heritage employees Vickie Walker and Brian Czerwinski.

(a) Chet Decker

Chet Decker was employed with Heritage from March 2001 through August or September 2001. His job title was an initiator and he was responsible for calling a prescribed list of individuals each day to try to set up an appointment for the senior principals of Heritage to meet with these individuals. (App-A-2). This testimony is consistent with the Bankruptcy Court's findings in the Court's August 31, 2007 Opinion confirming Heritage's Chapter 11 bankruptcy plan of reorganization. *In re The Heritage Organization, L.L.C.*, 2007 W.L. 2539351, p.2 (Bankr. N.D. Tex.).[3]

Decker testified that after reviewing the transcript of his May 10, 2001 telephone conversation with Richard Sands that the transcript correlates with his memory of the conversation he had with the Sands. (App-A-11-12). He further testified that he does not have any reason to doubt that the substance of the conversation occurred as it did based on the transcript. (App-A-13). Decker testified that the transcript is the type of document that was kept by Heritage in the regular course of its business and that the transcripts were made in accordance with normal business practices and that it was the regular practice of Heritage to make these sort of transcription records on a regular basis. (App-A-8-10).

Every tape that Decker had from a phone conversation with a potential client was transcribed and then the tapes were recycled. (App-A-4). There was never a time that Decker would turn off the tape when he was recording a telephone conversation with a potential client. (App-A-5). Decker

[3] In a lengthy opinion, the Bankruptcy Court addressed the general nature of the Heritage transactions and the difficulties in obtaining the Heritage records. References will be made herein as that opinion is specifically relevant to this case.

recalled that someone would come by his office every 45 minutes or so to pick up his reports and tapes, but he also remembered having to drop tapes off at the transcription department if someone had not stopped by. (App-A-6).

(b) Timothy Seaberg

Timothy Seaberg worked for Heritage from 1997 through 2004. At the time of the conversations at issue, Seaberg was a contractor with Heritage. (App-A-16-17). As a contractor, Seaberg was responsible for setting up and attending the initial meeting with the clients.

Timothy Seaberg participated in three of the taped conversations. During Seaberg's deposition, the United States played a recording from one of the recorded conversations and Seaberg recognized his voice on the tape. (App-A-25). After reviewing the transcript of the May 31, 2001 tape-recorded meeting with Richard Sands, Seaberg testified that there was no reason for him to believe that this was not a transcription of the May 31st meeting. (App-A-20). Seaberg further testified that the tapes were made as part of the business practice of Heritage and that the transcriptions were made in the regular course of Heritage's business. The transcriptions and debriefs were kept by Heritage as part of its files during its normal course of business and that it was the regular practice of Heritage to record these conversations, transcribe them and maintain the transcriptions in the Heritage files. (App-A-23-24).

According to Seaberg, he would take the recorded tapes and give them to the transcription department at Heritage, who would transcribe it and then place it in the client file. (App-A-19). The practice was to place a micro recorder in a vest or coat pocket during the meeting. (App-A-20). Seaberg also testified that he never erased tapes. (App-A-19). He further testified that he never would have altered the recording or deleted parts of the recording and that he did not know of anyone ever altering tapes. He also stated that he never would have altered the transcripts and he

was not aware of anyone at Heritage who would have altered the transcripts. (App-A-21-22 & 24).

(c) Vickie Walker

Vickie Walker was employed with Heritage in 2002 as the Secretary and Treasurer and mostly in charge of the accounting department. (App-A-27). Walker had access to all of the Heritage documents and records after the Chapter 11 trustee was appointed and Walker was involved in turning over these Heritage documents and records to the Chapter 11 trustee pursuant to a request from the bankruptcy trustee or a court directive. (App-A-28).

Walker testified that the records she turned over to the Heritage bankruptcy trustee were records in the possession of Heritage and were related to Heritage's business. (App-A-28). In April 2004, the Heritage documents were moved from the Heritage' offices to a hanger at the Addison, Texas, airport. Subsequently, the documents were moved to various places to make them more secure and more environmentally protected. Some of the records were taken to a climate controlled warehouse where they could be sorted and turned over to the trustee. There were armed guards protecting the documents. Also, the client files were in a locked area that had very restricted access. (App-A-29 & 31).

Finally, Walker testified that she has no reason to believe that any of the Heritage documents were altered from the time the bankruptcy was filed until the time the documents were turned over to the trustee. (App-A-30). According to Walker, Gary Kornman would not have altered documents or tapes, nor would he have directed any Heritage employees to alter documents or tapes. (App-A-32-33).

(d) Brian Czerwinski

Brian Czerwinski worked for Heritage from March of 1995 through April 2004 as a member of the analytical department (App-A-35). He testified that the transcriptions that he would typically

see would be in the marketing files for the clients and the transcriptions could be used to gather information on the clients prior to the meetings. (App-A-36).

(e) Plaintiffs' contention that the transcripts cannot be authenticated is unfounded.

Plaintiff effectively prevented the United States from offering the testimony of the Heritage employees in support of the United States' motion for summary judgment by opposing the United States' request for a continuance to respond to plaintiffs' motion for summary judgment until after depositions of the Heritage employees had been concluded. The United States, instead, introduced the transcripts as Heritage's business records, obtained through Heritage's bankruptcy trustee.

Plaintiffs rely on a series of cases dealing with the admission of tape recordings (rather than transcriptions of tape recordings) as authority that the transcriptions offered by the United States should not be admitted as summary judgment evidence. In *Butler v. United States*, 649 A.2d 563, 566-68 (D.C.Ct. App. 1994), the Court held that a redacted tape recording, which had not been authenticated by either a participant to the conversation or another individual who heard the conversation, was inadmissible since the Court could not tell by clear and convincing evidence that the tape was accurate. *Id.* at 568. In contrast, in *United States v. Fuentes*, 563 F.2d 527, 532 (2nd Cir. 1977)(also dealing with a tape recording and relied on by plaintiffs at p. 7 of their motion), the Court found no requirement that the tapes be put in evidence through a person who made the recording or, for that matter, a contemporary witness to the conversation. *Id.* The *Fuentes* Court also summarily rejected, as speculative, an argument that the tapes may have been altered, holding that, in any event, such argument went toward the weight to be given the tapes rather than to their admissibility. *Id.* Plaintiffs' reliance on *McAlinney v. Marion Dow, Inc.*, 992 F.2d 839 (8th Cir. 1993) is also misplaced. Again, *McAlinney* deals with the admission of tapes rather than transcripts. In his employment discrimination suit, McAlinney offered selected portions of recorded

conversations compiled on to eight tapes from numerous recordings made by McAlinney. The Court excluded the tapes, finding that the admission of the tapes might confuse or mislead the jury, both because many conversations were inaudible and difficult to track, and because a proper foundation for the tapes had not been laid. *Id.* at 842. More importantly, the Court held that playing the tapes were unnecessary since none of the statements on the tapes had been controverted at trial. *Id.* at 842. Plaintiffs' reliance on *Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y) is similarly misplaced. *Bank Brussels* deals with the pre-trial exclusion of an "edited, non-verbatim non-final draft transcript" of a witness interview. *Id.* At 57. More importantly, the Court made no ruling on whether the transcripts were admissible as a statement by a party opponent. *Id.* at 61.

## II. The Transcripts Do Not Contain Inadmissible Hearsay

### (a) The statements on the transcripts made by Richard Sands and Robert Sands are not hearsay

#### (i) Admissions by a party-opponent in accordance with Fed. R. Evid. 801(d)(2) are not hearsay.

Fed. R. Evid. 801(d)(2) provides that a statement is not hearsay if the statement is offered against a party and is the party's own statement, in either an individual capacity or a representative capacity. In this case, clearly the statements on the transcripts made by Richard Sands and Robert Sands are admissions by a party opponent and are not hearsay. In fact, at no time, either in the plaintiffs' Response/Reply to Motions for Summary Judgment or in this Motion to Strike have Richard Sands or Robert Sands denied that they were the individuals speaking on the tapes and the transcripts.

Similarly, the statements by Decker, Seaberg and Kornman also meet the 801(d)(2)(B) exception as statements in which Robert and/or Richard Sands manifested an adoption or belief in

the truth of those statements. When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that an innocent defendant would normally be induced to respond and whether there are sufficient foundational facts from which a jury could infer that the defendant heard, understood and acquiesced in the statement. *United States v. Robinson*, 275 F.3d 371, 382-83 (4th Cir. 2002). This manifestation can be in any number of ways, including through words, conduct, or silence. *Id.* The Sands' manifestation is shown through their words and through their subsequent conduct. It is clear from the offered transcripts that the Sands family was shopping for a tax shelter that would eliminate tax on capital gain. The discussions memorialized by the transcripts make this fact abundantly clear.

In the May 10, 2001 telephone conversation between Decker and Richard Sands, Richard expressly asked if the Heritage strategy would eliminate the capital gain tax entirely. (App-B- 1, to Docket Entry 52). Decker explained that it would and that Heritage would be paid a contingency fee, based on a "percentage of tax dollars you would have paid." (App-B- 2-3, to Docket Entry 52). Later in the conversation, Richard states that he had previously used a strategy of Jonathan Blattmachr, commenting that Blattmachr's strategy hadn't eliminated the capital gain tax to zero. (App-B-12-13, to Docket Entry 52).

During the May 31, 2001 meeting between Seaberg and Richard and Robert Sands, Richard stated that they were interested in "diversifying out of Constellation a small amount like maybe $30 million in stock" and he sought assurances that the Heritage strategy was not a tax deferral but, instead, a complete elimination ...." (App-B-21, to Docket Entry 52). Richard also asked if Heritage would guarantee results and he was told that "there would be no economic substance if we said if it doesn't work you get all your money back. Richard Sands was very insistent that the strategy eliminate capital gains and during the May 31st meeting, Richard proposed an example using zero

basis stock that they might initiate now but not sell for six months. (App-B-29-30, to Docket Entry 52). Seaberg explained that they were essentially "creating a loss that offsets the gain." (App-B-31, to Docket Entry 52).

In the June 13, 2001 meeting with Tim Seaberg, Gary Kornman and Richard and Robert Sands, Kornman explained that their transaction would "give you as much basis as you want to be used any time in the future." Richard Sands specifically asked about and was assured by Kornman that they could shelter both long term and short term capital gains. (App-B-62, to Docket Entry 52). Kornman later states, "[w]e're going to create something with basis so that you can use that basis, as you need year by year to create an offsetting loss."(App-B-83, to Docket Entry 52).

During the June 27, 2001, Robert Sands states that "elimination of the capital gains on the sale of the stock that's probably the first thing that we would embark upon with you." Robert elaborated, [t]his is the first level of importance because we're thinking of selling [?] stock." (App-B-110, to Docket Entry 52). Kornman later tells Robert "we can set it up to do exactly what you want to do. I mean [?] capital gains long or short it doesn't make a difference. We can eliminate the tax." (App-B-115, to Docket Entry 52).

Clearly Robert and Richard Sands did far more than acquiesce to the statements made by Decker, Seaberg and Kornman with respect to Heritage's proposal to eliminate tax on capital gains. They actively engaged in the conversations, pressing Decker, Seaberg and Kornman on this desired end. Furthermore, they subsequently purchased and implemented the Heritage shelters. Richard Sands was apparently so impressed with the Heritage representations that he asked if he could get a referral fee for sending other taxpayers to Heritage. (App-B-118-19, to Docket Entry 52).

(ii) The statements made by the Sands meet the hearsay exception of Fed. R. Evid. 803(3).

The statements by the Sands also meet the hearsay exception of Fed. R. Evid. 803(3) with respect to then existing mental or emotional condition. This exception provides that a statement of the declarant's then existing state of mind or emotion, such as intent, plan, motive, design, or mental feeling, is admissible and is not hearsay. Here, the statements by the Sands on the transcripts are evidence of their motive and intent with respect to entering into the transactions at issue in this litigation. Intent of the taxpayer plays a role in many of the legal issues in this case. The economic substance doctrine requires that this Court look to the intent of the taxpayer and whether there existed a tax independent business purpose for the transaction. Intent and motive also are important in analyzing issues related to the application of penalties, the partnership anti-abuse rules of Treas. Reg. § 1.701-2[4] and 26 U.S.C. § 165[5], all of which require some analysis of the taxpayer's intent for entering into the specific transactions at issue. The transcripts are evidence of the Sands' intent and motives for entering into these transactions, and accordingly, meet the hearsay exception of Fed. R. Evid. 803(3).

(b) The transcripts meet the "business records" exception of Fed. R. Evid. 803(6)

The plaintiffs assert that the transcripts at issue do not fall into an exception to the hearsay rule. However, the United States has established through depositions of Chet Decker and Timothy Seaberg that the four transcripts at issue meet the "business records" exception to hearsay contained

---

[4] Treas. Reg. § 1.701-2 provides that a partnership must be bona fide and each partnership transaction must be entered into for a substantial business purpose. Accordingly, taxpayer's intended business purpose or motive is important in determining the application of the partnership anti-abuse rules.

[5] 26 U.S.C. § 165(c)(2) only permits a deduction for losses which are incurred in any transaction entered into for profit. Accordingly, taxpayer's intent regarding whether they entered in a transaction for profit is a part of the analysis.

in Fed. R. Evid. 803(6). Mr. Decker was a participant in the May 10, 2001, recorded telephone call with the Sands and Mr. Seaberg was a participant in the recorded meetings with the Sands on May 31, 2001, June 13, 2001 and June 27, 2001.

The "business records" exception provides that,

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness...

Fed. R. Evid. 803(6). As corroborated by the Bankruptcy Court, Heritage taped many of its conversations with third parties. *In re The Heritage Organization, L.L.C.*, 2007 W.L. 2539351, p.21.[6]

(i) Transcript of May 10, 2001 Telephone Call

Decker, who was a participant in the transcribed telephone conversation occurring on May 10, 2001, was deposed by the parties on August 28, 2007. As part of the business practices of Heritage, Decker was required to record all conversations, whether incoming or outgoing, with potential clients. A standard tape recorder was set up at his desk and routed through the phone system. (App-A-3). Every tape that Decker had from a phone conversation with a potential client was transcribed and then the tapes were recycled. (App-A-4). Decker testified that the transcript is the type of document that was kept by Heritage in the regular course of its business and that the transcripts were made in accordance with normal business practices and that it was the regular practice of Heritage to make these sort of transcription records on a regular basis. (App-A-9-10). Decker further testified that the transcript correlated with his memory of the conversation he had

[6] Heritage turned over 5000 tapes in March and April 2006 and an additional 3,000 tapes a year later. *In re The Heritage Organization, L.L.C.*, 2007 W.L. 2539351, p.21.

with the Sands (App-A-11-12) and that he does not have any reason to doubt that the substance of the conversation occurred as reflected by the transcript. (App-A-13).

(ii) Transcripts of the May 31, 2001, June 13, 2001 and June 27, 2001 Meetings

Timothy Seaberg, who was a participant in three of the taped conversations, was deposed by the parties on August 29, 2007. Seaberg testified that Heritage routinely recorded meetings with clients. (App-A-18-19). Seaberg would take the recorded tapes and give them to the transcription department at Heritage, who would transcribe it and then place it in the client file. (App-A-19). Seaberg testified that the tapes were made as part of the business practice of Heritage and that the transcriptions were made in the regular course of Heritage's business. The transcriptions and debriefs were kept by Heritage as part of its files during its normal course of business and that it was the regular practice of Heritage to record these conversations, transcribe them and maintain the transcriptions in the Heritage files. (App-A-23-24).

Accordingly, based on the deposition testimony of Mr. Decker and Mr. Seaberg, the transcripts meet the "business records" exception to hearsay contained in Fed. R. Evid. 803(6).

Plaintiffs argue that the transcripts were not made at or near the time of the recorded conversations. In fact, Decker testified in his deposition that it would normally take the transcription department at Heritage 24 to 48 hours to transcribe a tape. (App-A-6-7). The testimony that plaintiffs refer to for support of their position that it would take "several days or weeks" is Decker's testimony that it is possible that a date on the transcript may refer to a date of transcription. Decker's telephone conversation of May 10th may not have been transcribed until May 15th, although Decker was unsure of whether that date did indeed refer to a transcription date. Regardless, a 5 day delay in transcription provides absolutely no support for plaintiffs' contention that the transcripts were not made at or near the time of the recorded conversations.

Plaintiffs also argue that it was not the regular practice of Heritage to record and transcribe all conversations and meetings with clients or potential clients since other phone conversations and meetings with the Sands were not recorded. However, just because the bankruptcy trustee was only able to provide 4 transcripts does not mean that other conversations with the Sands were not recorded. It is possible that many more conversations with the Sands were recorded and transcribed, however, the bankruptcy trustee only had possession of these transcripts. The plaintiffs assert that since transcripts of other conversations do not exist, the Sands would be "deeply prejudiced" if the Court were to allow the United States to rely on transcripts which tell only part of the story. The United States asserts that the Sands may testify as to the other parts of the story and fill in the blanks for this court. However, that may be difficult since they have selective memory as to the meetings with Heritage personnel.

When questioned about contact with Heritage, Richard Sands repeatedly stated that he did not remember the phone calls or the meetings. When asked about times and places of meetings, Richard Sands repeatedly could not remember. In the course of 4 pages of deposition questioning regarding this topic, Richard Sands answered with an "I don't know" or "I don't recall" at least 15 times. (App-A-38-39). Richard Sands could only remember broad conversations about the meetings, but did not remember any specifics. (App-A-40 & 43). When asked about whether he remembered specific individuals or meeting with these individuals at Heritage, Richard Sands stated that he did not recall at least 8 times. (App-A-41). Mr. Sands stated: "I have a very bad memory and I really do. I can't remember anything." (App-A-42). When asked whether he knew who in his family primarily dealt with Heritage, Mr. Sands testified that "I mean, I was present. I dealt with them. I just don't remember anything." (App-A-42).

When asked about meetings with Heritage personnel, Robert Sands could not recall who attended the meetings and how many meetings there were. Robert Sands did not recall anything that

happened at the first meeting. (App-A-45). Robert Sands repeatedly testified that he could not remember the specifics of any meetings with Heritage. (App-A-46).

Marilyn Sands testified that she never met with or spoke with anyone from Heritage. (App-A-48). Ms. Sands further testified that she did not know what she was paying Heritage to do. (App-A-48).

Further, the Contractor Training Manual (App-A-62-72) prepared by Heritage has specific instructions regarding taping conversations with clients and ensuring that these conversations are transcribed. In fact, employees were subject to possible fines if an employee of Heritage spoke with a potential client in a state where the conversation could be recorded, but the employee failed to record the meeting. Accordingly, it was common practice at Heritage to record conversations and meetings and it was expected that it be done.

(c) The statements on the transcripts by Heritage personnel meet several exceptions to the hearsay rule

The plaintiffs assert that the statements by Heritage personnel on the transcripts must also meet a hearsay exception for the statements to be admissible. Plaintiffs assert that the transcripts contain multiple levels of hearsay – the first level being the actual statements by the Heritage personnel on the transcripts and the second level being the actual transcripts. However, courts have held that,

> [d]ouble hearsay exists when a business record is prepared by one employee from information supplied by another employee. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6).

*United States v. Baker,* 693 F.2d 183, 188 (D.C. Cir. 1982). *See also, United States v. Gurr,* 471 F.3d 144, 151-152 (D.C. Cir. 2006); *Grogg v. Missouri Pacific Railroad*, 841 F.2d 210, 213-214 (8th Cir. 1988); *United States v. Maddox,* 444 F.2d 148, 150-151 (2nd Cir. 1971).

Treatises also state this basic rule of evidence:

> An oft-recurring version of multiple hearsay involves a primary hearsay exception in the form of a regularly kept business record which includes a further hearsay statement. If both the primary and the included statements are by persons acting in the routine of the business, then both are admitted under the regularly kept records exception, and no further exception need be invoked. However, if the person whose statement is included is not acting in the routine of the business, resort must be had to a further exception.

McCormick on Evidence, § 324.1, pg. 369 (4th ed. 1992).

Here, clearly the transcripts meet the business records exception of Fed. R. Evid. 803(6). As such, since Seaberg, Kornman and Decker were employees of Heritage and acting in the routine of the business during these telephone conversations and meetings, then their statements as well meet the business records exception to hearsay of Fed. R. Evid. 803(6).

The statements by Heritage personnel also meet the hearsay exception of Fed. R. Evid. 803(3) with respect to then existing mental or emotional condition. As discussed above, the transcripts are evidence of the Sands' intent for entering into this transaction as well as evidence of Heritage's motives and intent in peddling these types of transactions. This evidence is especially important since Gary M. Kornman, head of Heritage, refused to testify and instead invoked his 5th Amendment right against self-incrimination in his deposition given in this case on August 28, 2007. Finally, the statements of Decker and Seaberg meet the exception of Fed. R. Evid. 803(5) as recorded recollection made or adopted by the witnesses.

(d) <u>Statements by Heritage employees are not hearsay since they are not offered in evidence to prove the truth of the matter asserted.</u>

If this Court determines that the transcripts are not business records, the United States asserts that the statements by Heritage employees on the transcripts are not hearsay since they are not being offered to prove the truth of the matter asserted. In *United States v. Knox*, 1998 WL 777986 (6th Cir. 1998)(unpublished), the United States wished to introduce into evidence a tape recording of a

conversation between the defendant Knox and a third-party named Spencer. The tape recorded conversation was one of Spencer and Knox discussing a drug delivery. Knox's part of the conversation was not hearsay because it qualified as an admission of a party opponent. The government only wished to introduce Spencer's half of the conversation "simply to make Knox's half of the conversation intelligible, not to convince a jury that the substance of what Spencer said was correct." The court agreed that Spencer's statements were not hearsay since the United States was not introducing it to prove the truth of Spencer's statements. Similarly, here, the statements of Decker, Seaberg and Kornman are necessary to provide context to Robert and Richard Sands' statements. Certainly the United States is not offering the statements for the truth of the underlying statements. Rather, it is offering the statements to show that they were made and to provide context to the Sands' statements. These consolidated suits have been filed because the United States maintains that the representations themselves were not truthful.

Accordingly, the statements by Heritage personnel on the transcripts do not qualify as hearsay since the United States is not presenting those statements to prove the truth of the matter asserted, but is instead presenting those statements to make the Sands' statements on the tapes intelligible.

**III. The transcripts should not be stricken as a sanction.**

Plaintiffs have the audacity to ask that the transcripts be stricken because they are prejudiced by the timing of their production. First, it must be emphasized that, despite the privity between plaintiffs and Heritage, plaintiffs apparently made no attempt of their own to secure the Heritage material. It is incontrovertible that Heritage acted as plaintiffs' agent in implementing the underlying tax shelters for the Sands' family and, in fact, initiated most of the underlying transactions involved. The fact that Heritage was a direct source of documentation relevant to this case could not possibly have escaped the plaintiffs' attention. More likely, plaintiffs deliberatively

chose to ignore Heritage as a source of relevant documents fearing what they might find. This ostrich-like behavior, however, did not relieve them of their Rule 34 production obligations, which they apparently chose to disregard. *See Rosie D. v. Romney*, 256 F.Supp. 2d 115, 119 (D. Mass. 2003) (Control may be established by the existence of a principal-agent relationship.); *Cabot v. United States*, 35 Fed.Cl. 80, 83 (1996) (Control comprehends not only possession but also the right, authority, or ability to obtain the documents and if a producing party has the legal right or practical ability to obtain the documents, then it is deemed to have control over the documents.)

Regardless, plaintiffs did not produce the documents to the United States during the course of this litigation. Instead, they were obtained indirectly through Heritage's bankruptcy trustee. Upon learning that the IRS was reviewing documents obtained from Heritage's bankruptcy trustee pursuant to an IRS summons, the undersigned secured the relevant documents and, within days of receiving them from the IRS, provided these documents to plaintiff. More importantly, the United States provided this material in a timely response to plaintiffs' document production requests and nearly one month prior to the depositions of the Heritage personnel who taped the conversations.

Plaintiffs raise the following five factors, which they believe, warrant the preclusion of the transcripts as summary judgment evidence.

(a) Plaintiffs are not prejudiced by the admission of the transcripts

Plaintiffs had to have known that Heritage had a wealth of documentation relevant to these proceedings, yet it apparently chose to ignore this source of material. Plaintiffs candidly admit that the United States advised them at an early stage that the IRS was examining the Heritage documents held by the bankruptcy trustee. Plaintiffs failed to independently pursue the same material.

As plaintiffs acknowledge, the undersigned obtained the Heritage documents from the IRS, which had served a summons on the Heritage Trustee. Pursuant to the summons, the Trustee produced over 372 boxes of documents, which the IRS spent thousands of hours reviewing and

segregating by Heritage client. After the documents had been reviewed and segregated to avoid disclosure issues, they had to be copied at a significant expense and then reviewed again to ensure that only the materials related to the Sands transactions were being provided to the undersigned for production in these consolidated cases.

In mid-June 2007, the United States deposed Richard and Robert Sands. Since Government counsel did not receive the Heritage material until late July 2007, the United States, rather than the plaintiffs, was prejudiced by its inability to question these deponents regarding the statements made in the transcribed conversations.

In mid-May 2007, plaintiffs served their first request for production of documents on the United States. Document Production Request No. 13 sought:

> any documents or information relating to the audits of plaintiffs or their members summonsed or otherwise obtained from any third party, including any law firm, accounting firm, financial institution, or investment advisory firm, as well as any firm that the IRS construes as a "promoter" of the transaction.

In response to this discovery request, the United States again advised plaintiffs that:

> the Trustee in The Heritage Organization bankruptcy proceeding has documents related to The Heritage Organization in its possession. The Internal Revenue Service is currently reviewing these documents and, if any of the documents are relevant to the matters at issue in these cases, the United States will provide copies of those documents as soon as practicable.

On July 24, 2007, the IRS completed its review and segregation of the Sands' related documents from the other documents provided by the Heritage Trustee, and it forwarded the Sands' related material to the undersigned. On July 31, 2007, the United States provided these documents, which included the transcripts, to plaintiffs. On August 1, 2007, the United States sought, in part, to extend discovery to take depositions needed to authenticate the transcripts now at issue. On August 2, 2007, the Court extended discovery until August 29, 2007. Depositions of the Heritage

personnel participating in the transcribed conversations were taken August 28th and 29th, 2007. Plaintiffs participated in these depositions.

As participants in the transcribed conversations, Robert and Richard Sands had actual knowledge of those conversations. Whether through selective memory, or otherwise, plaintiffs failed to share the content of these conversations with the United States.

While it may be true that plaintiffs were shocked to find out that their discussions with Heritage personnel were being recorded and these recordings transcribed, it was the United States, and not plaintiffs, who was "surprised" by the statements made during the conversations. Owing to more than just a little luck, the United States was able to locate and depose the Heritage participants to the conversations within the Court's extended discovery. Plaintiffs' real complaint is simply that it is unfair that the United States was able to uncover the truth in time to use it against them in this case. Unfortunately for plaintiffs, this does not justify the exclusion of the transcripts documenting plaintiffs' true purpose in entering into the tax shelters now at issue.

(b) <u>The timing of the production of the transcripts was reasonable</u>

Ms. Daugherty testified that it took from December 2006 until July 24, 2007 to complete the process of reviewing and segregating the Sands documents because of the volume and the number of persons and entities unrelated to the Sands. Ms. Daugherty testified that "it all had to be segregated. It all had to be separated. Because under 6103 if we made an inadvertent disclosure, there were ten agents out there who have civil and criminal penalties, loss of pension, jail, whatever. I mean we have to be extremely careful." (App-A-61).

Plaintiffs claim that they were prejudiced by not receiving these documents earlier. However, it is important to remember that the United States attorneys litigating this case also did not have copies of these documents. In fact, counsel for the United States would have benefitted from having these transcripts available for the depositions of Richard Sand and Robert Sands. Nor

were the transcripts available to the United States in preparing its Motion for Summary Judgment.

In plaintiffs' Motion to Strike, plaintiffs gloss over the amount of work, resources and costs the IRS expended in obtaining these Heritage documents from the bankruptcy trustee. Also, some of the information from the Heritage trustee was not provided to the IRS until May or June of 2007. (App-A-50-51). The Bankruptcy Court corroborates that Heritage did not willingly cooperate in producing its files to the Chapter 11 Trustee. *In re The Heritage Organization, L.L.C.*, 2007 W.L. 2539351, p.14. As the Court notes, only after the Trustee filed a motion for contempt did Heritage turn over boxes of documents and tapes not previously produced. *Id.* The Bankruptcy Court further noted that Heritage continues to turn over documents "on a time-table that appears only to suit Heritage's former principals." *Id.*

A discussion of the amount of work involved will be helpful this Court. This timeline and information was obtained from the deposition of IRS Agent, Rita Daugherty, who was the primary agent in charge of the Heritage document summons.

On October 12, 2006, the IRS issued the summons to the bankruptcy trustee. The trustee responded on November 29, 2006 with 372 boxes available for review at the trustee's office (App-A-50). The IRS spent approximately 10 full days reviewing each box for relevant information. (App-A-50). It is important for this Court to understand that only a small proportion of the documents produced by the Trustee was relevant to the Sands' shelters. Tens of thousands of pages produced by the Trustee had no relationship to the shelters utilized by the Sands. After the initial review of all of the documents produced was completed, the IRS whittled the 372 boxes down to a total of 66 boxes which they believed contained relevant information covered by the IRS summons. (App-A-52). However, the IRS had to obtain budget approval to have any of the relevant

documents copied.[7] (App-A-53). Daugherty estimated the copying expenses to be around $7,000 and requested only this amount in her request for approval memo. (App-A-56). When it was determined that the copying expenses would total approximately $23,000, Daugherty was required to get additional budget approval for this higher amount. Between budget approval issues and the time it took for photocopying the 66 boxes of documents, it was not until April 11, 2007, that the photocopied boxes arrived at the IRS office. (App-A-52).[8]

After reviewing the voluminous amount of documents at the trustee's office and photocopying of the relevant documents, the IRS still had to review the copied documents (now condensed into 28 boxes) to properly index these documents (which totaled 89,994 bates stamped pages). (App-A-52 & 54). After the documents were copied, the documents relating to each taxpayer were NOT segregated, nor was the disc containing the electronic version of the documents searchable. (App-A-60). Thus, indexing of these documents was required in order to segregate the documents. This indexing project required the manpower of 8 IRS agents and took 1 month to complete. (App-A-54). It took each agent one day to properly index one box of documents. (App-A-55). The indexing of these documents was necessary for the IRS to have some sort of spreadsheet showing the types of documents involved and showing what taxpayers were involved. This was also necessary to prevent inadvertent disclosure of taxpayer information pursuant to 26 U.S.C. § 6103.

---

[7] Plaintiffs counsel questioned Ms. Daugherty in her deposition regarding why she did not segregate Sands documents during her review of the 372 documents so these documents could be produced in this litigation. Ms. Daugherty responded that she did not "have authority to approve paying for a copy without funding approval. And there was huge amount of volume of documents." (App-A-59). Further, the trustee, who was merely a third party record keeper, would not permit the IRS to just walk off with documents. (App-A-60). It should also be noted that the Sands are not the only Heritage clients involved in litigation with the United States. It was impossible for the IRS to segregate all documents relating to all Heritage investors and expedite all matters related to all Heritage investors.

[8] It is misleading for the plaintiffs to assert that the transcripts came into defendant's possession on November 29, 2006 (see pg. 16 of Plaintiffs' Motion). At a minimum, the documents were not in possession of the IRS until April 11, 2007. (App-A-60). However, simply because Daugherty finally had physical possession of the 66 boxes of documents on April 11, 2007, did not mean that the Sands' related documents were in an identifiable form that could be delivered to the undersigned and, in turn, be delivered to plaintiffs.

After the documents were indexed, for the first time, they could be sorted into specific files dealing with each particular taxpayer. The first date that the 28 boxes were searchable and indexed so that someone could segregate the Sands' documents from the unrelated taxpayer documents was June 5, 2007. (App-A-60). Once the documents were segregated by taxpayer, the documents related to each of these separate taxpayers were burned onto a disc and the discs were outsourced to various IRS agents for review to ensure that every document contained on the disc belonged to that specific taxpayer. (App-A-57 & 60). The disc containing the Sands documents was sent to the IRS Agent responsible for the Sands audit, Peter Brokus, in July 2007 and Mr. Brokus completed his review on July 24, 2007. (App-A-60). Mr. Brokus' review of the Sands' disc revealed that there were indeed some documents on the Sands' disc that related to different taxpayers. (App-A-60). Thus, this indexing and final review of documents was necessary to ensure that documents relating to different taxpayers were not inadvertently disclosed. (App-A-58).

(c) The importance of the particular evidence

The plaintiffs seek to exclude transcripts of recorded meetings between the Sands and Heritage personnel. These transcripts are crucial to the penalty aspect of the United States' case as they are evidence of the Sands' intent in entering into the tax shelters at issue in this case. One of the United States' legal theories is that the transactions in this case lacked economic substance. One of the factors to look at in determining whether a transaction lacked economic substance is the subjective intent of the taxpayer as to whether there was a non-tax business purpose for entering into the transactions. The taxpayer's intent and mind set is also important to the application of penalties in this case and whether the taxpayers reasonably relied on the tax opinion letters at issue in this case. Accordingly, the transcripts at issue are important to establish the taxpayers' intent in this case.

The IRS interviewed the Sands during the audit process and the United States deposed Richard Sands, Robert Sands, Marilyn Sands and Andrew Stern during the discovery process. Since the Sands testified repeatedly that they could not remember what was discussed at meetings with Heritage personnel, the transcripts are important evidence of the Sands' intent at the time they entered into the Heritage tax shelters.

(d) Defendant was diligent in seeking an extension of time.

The United States requested a 60-day extension of discovery deadlines on July 31, 2007, in order to give both sides time to review the materials and to take additional depositions if necessary. However, the plaintiffs opposed this request for extension of the discovery deadlines (See Docket #43). Accordingly, the Court only granted a 30-day extension of discovery deadlines. During this 30-day extension, the United States was able to locate Chet Decker and Tim Seaberg, who were participants in the taped recorded telephone conversations and meetings, and take their depositions in order to properly authentic the transcripts and tapes. The plaintiffs were also allowed to cross-examine Mr. Decker and Mr. Seaberg at these depositions. The plaintiffs were certainly not prejudiced any more than the United States since plaintiffs had the same amount of time to prepare for the depositions and they were allowed to question these individuals regarding the tapes and transcripts.

## CONCLUSION

Plaintiffs' efforts to suppress the truth and to exclude the most reliable and best evidence of their communications with Heritage must be rejected. Plaintiffs' Motion to Strike be denied.

Respectfully submitted,

/s/ Thomas M. Herrin

THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

RICHARD T. MORRISON
Acting Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney