Witness: Chet Decker



UNITED STATES COURT OF FEDERAL CLAIMS

ALPHA I, L.P., )
BY AND THROUGH )
ROBERT SANDS, )
A NOTICE PARTNER, )
)
Plaintiffs, )
)
V. ) No. 06-407-T
)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

Certified Copy

*****************************************************

ORAL DEPOSITION OF
CHET DECKER
AUGUST 28, 2007
VOLUME I

*****************************************************

ORAL DEPOSITION OF CHET DECKER, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of August, 2007, from 3:13 to 4:15 p.m., before Stacey R. Cruz, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Department of Justice, Tax Division, located at 717 North Harwood Street, Suite 400, Dallas, Texas, in accordance with the United States Court of Federal Claims and the provisions stated on the record or attached hereto.

PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT
1

A. I'd say roughly six months.
Q. And what was that -- what was that time period? Do you remember?
A. I believe I went there from March of '01 through, probably -- maybe August or September.
Q. Okay. And what was your job title with Heritage?
A. Initiator.
Q. And what does an "initiator" do?
A. We were to call through a prescribed list of individuals each day and attempt to engage them in conversation, talk to them, and set up an appointment for the senior principals of the firm to go meet with them.
Q. And what -- what was Heritage selling? What were you talking to these people about?
A. Tax strategies.
Q. Do you -- can you give me a better description of "tax strategies"?
A. Well, I would say estate planning and capital gains.
Q. Okay. Were you discussing the elimination of capital gains tax with these people?
A. Yes.
Q. And how many phone calls would you make in a --

telephone conversations with clients?

A. We had to record all conversations, whether they were incoming or outgoing, with the exception of the states that have no record laws. I think there's five states; I don't remember all five, but we had it posted there so if a call was coming in, and the person's name came up on a screen, we could see what state they were in and then determine there whether or not we were supposed to record the conversation.

Q. Did you have to actually hit a button on your phone that would start recording then?

A. They had a recording system set up. It was a standard tape recorder set up, just a standard tape recorder set up at your desk that was routed through the phone system.

Q. Okay. So every telephone call that you made or received with a client was recorded?

A. Yes.

Q. Did you ever have any in-person meetings with clients?

A. No.

Q. All -- so you only had telephonic meetings with clients?

A. Correct.

Q. Okay. What would you do with the tape after

Richard Sands or the Sands Family?
A. More than likely, it probably was.
Q. Okay.
A. Yes.
Q. So -- okay. When you -- when you got the tape, you said you labeled it. What did you label it with?
A. A little sticker --
Q. But what did you write on it?
A. -- like, the stickers that would come with the tape. Ghee, like I'm -- I'm --
Q. Would you write the name or the PC ID number or...
A. Maybe both -- probably both.
Q. Okay.
A. I'm -- I'm trying to remember. It's been several years. But whatever they required us to do, that's -- that's what I would have done, because, like I said, every little thing that we did was -- was checked by someone.
Q. Was every tape that you had from a phone conversation with a client actually transcribed?
A. From what I could tell, yes --
Q. You never --
A. -- to the best of my knowledge, and then those tapes would be recycled.

we'll talk about it afterwards. I can't remember whether it's that part or whether it's the stuff that we got under the subpoena. I think it's the stuff we got under the subpoena.

MR. CULLINAN: Okay. But it's something that you guys produced to us?

MR. HERRIN: Yeah. Oh, yeah.

MR. CULLINAN: Okay. That's all I'm asking.

Q. (BY MS. JOHNS) Was there ever a time when you were recording a telephone conversation with a client that you would turn off the tape, for any reason?

A. Not that I can recall.

Q. Okay. Now, once you turned in the tape to the transcription department, and they transcribed the tape, what would happen with the transcription record?

A. I guess it would be funneled up the chain of command.

Q. Did you ever receive a copy of the transcription yourself for -- for your review?

A. I don't believe so. I -- I don't re- -- I don't remember if we -- if we did or not.

Q. But do you ever recall reviewing the transcripts for accuracy or...

A. Not any of them in particular, no.

Q. Okay. And then what would happen to the actual tapes?

A. They would erase them and recycle them.

Q. Okay.

A. And we would -- there was just, like, a bin of empty tapes that we'd go to if we needed more tapes if we needed more tapes that were previously used tapes.

Q. Okay. Do you know how long -- you -- you turned in your tapes at the end of the day or at the end of each phone call or...

A. Both. I think -- well, actually, I think somebody would come by our office, if I remember correctly, every 45 minutes to an hour, and if we had a report and a tape, they would -- they would pick it up and take it, if I remember correctly.

But I also seem to remember sometimes dropping it off at that department, as well, so that -- that's a tough one to answer. I believe it was both.

Q. Just to the best of your memory. That's fine.

A. I think it was both. You know, they had people come by to check, Hey, do you have one to turn in or not, or if we had one, then -- then we would turn one in if somebody hadn't stopped by, I guess.

Q. And do you know how long it would typically take the transcription department to actually transcribe

a tape?
A. Exactly how long, no.
Q. Just an estimate.
A. If I was to estimate, 24 to 48 hours, probably.
Q. Okay. And you mentioned a debrief, and I think I have a copy of your -- one of your debriefs here.
If you'll look at Exhibit 18.
A. (Witness complies.) Okay.
Q. Now, is this -- are you familiar with this document?
A. Yes, I just read it.
Q. Is this what you mean, what you refer to as a debrief?
A. Yes, but I think ours were handwritten, and this might be a transcription of that.
Q. So you would handwrite a debrief, and then they would copy it?
A. Yes, if -- if memory -- in fact, I don't know -- I think we spoke that into the recorder.
Q. Okay. Because that's why -- it says "end" here, which makes me think it --
A. Yeah, I'm -- again, I'm just going from memory. I know that we had to do some type of debrief, maybe -- maybe we handwrote it and then spoke it into the recorder, and then that was it.

A. More than likely.

Q. Now, was -- this debrief that we just looked at, was that a type of document that was -- that Heritage normally kept in the regular course of its business?

A. Yes.

Q. And was this debrief made in accordance with the normal business practices of Heritage?

A. Yes.

Q. Okay. We will move on to your transcript, which is on page -- which is Exhibit 3. And this is a transcription of a meeting set with PC Richard Sands.

What does "PC" stand for? Is that prospective client?

A. It -- it could be.

Q. Okay. And date is May 10th, 2001. And once again, you see your initials, CRD, and colon, ALK.

A. Yes.

Q. Do you know who "ALK" is?

A. That would, again, probably be the transcriber.

Q. Okay. And once again, this is of a conversation dated May 10th of 2001, and at the bottom it says, ALK: May 15th, 2001.

Do you see that? I'm sorry, at the very bottom?

A. Yes, I do.

Q. I'm trying to go fast.

A. That's okay.

Q. Because I know your car --

A. Yeah, that's all right. Yes.

Q. Is -- do you think this date refers to the date it was transcribed?

A. I guess it could have been.

Q. Okay.

A. It seems to make sense. It's continuity with the other letter.

Q. Uh-huh. Okay.

Now, is this -- you -- you've -- have you seen any of the transcripts that Heritage prepared in the past while you were working for Heritage? Have you ever seen what they actually looked like when you were working for Heritage?

A. We may have seen samples for training purposes, maybe for critique purposes, if something was said or grammar was not appropriate, I guess, and then they may pull it aside and -- or point something out --

Q. Okay.

A. -- too.

Q. Looking at this transcript in front of you that's been marked as Exhibit 3, is this the type of

transcript that was kept by Heritage in the regular course of its business?
A. It appears to be, yes.
Q. And were these -- was this transcript made in accordance with the normal business practices of Heritage?
A. It looks to be.
Q. And was it the regular practice of Heritage to make these sort of transcription records?
A. You mean would they do it regularly?
Q. Yes.
A. Yes.
Q. That's exactly what I mean. Thank you.
Did you notify the clients that they were being taped when you had the phone conversations with them?
A. No.
Q. Was it a policy of Heritage to not tell the clients they were being recorded?
A. Absolutely.
Q. Okay. And was there a reason given or...
A. Well, I -- I guess they probably wouldn't want somebody -- somebody probably wouldn't want to talk to you if you make them feel very uncomfortable if they were going to know that the conversation's recorded.

Q. Okay.

A. So the way they explained it to us, as long as one person in a conversation knows that it's being recorded, then it's not illegal --

Q. Okay.

A. -- is what we were told.

Q. And this is the type of document that was generated in connection -- that would have been generated in connection with your work at Heritage?

A. Yes.

MR. HERRIN: Give us 30 seconds.

MR. CULLINAN: Sure.

MS. JOHNS: We'll go off the record for 30 seconds.

(Off the record for less than one minute.)

Q. (BY MS. JOHNS) Mr. Decker, you have had a chance to look at the transcript that I faxed to you.

Have you -- or have you had a chance --

A. Yes.

Q. -- to look at the transcription that I faxed to you?

A. Yes, I have.

Q. Okay. And after reviewing it, does it correlate with your -- or does it -- with your memory of the conversation that you with the Sands?

A. It does.

Q. Okay. Yeah, and I'm refer- -- what I'm referring to is the -- Government Exhibit 3.

So, yeah, you're -- you're looking at the right thing.

A. Okay.

Q. But I just want to make sure, as far as your memory goes, that it's -- relates to the conversation you had with the Sands that was a part of this -- made part of this transcript.

A. Yes.

Q. Okay.

MS. JOHNS: I guess we don't have anything else.

MR. CULLINAN: Okay. I'll jump right in, unless you want to --

MS. JOHNS: No, go ahead.

MR. CULLINAN: I should be about 15 minutes, so hopefully --

MS. JOHNS: So we might make it.

MR. HERRIN: Okay.

EXAMINATION

BY MR. CULLINAN:

Q. When you contacted a prospective client, did they ever ask you -- well, you contact a prospective

I mean, I can -- I can tell just by reading some of the way that my sentences were -- were recorded, I just -- I don't talk in that manner. So from -- from my opinion, yeah, I would -- I would think that they might have cut some corners.

MR. CULLINAN: I'll pass the witness.

FURTHER EXAMINATION

BY MS. JOHNS:

Q. You just testified that you think maybe they might have cut some corners in these transcripts.

A. Yes.

Q. And while maybe they -- you've testified they may not be word-for-word, but is the gist of the conversation, the substance of the conversation that's shown and set out in this transcript that's Government Exhibit 3, is there any reason that you would doubt that the substance of the conversation occurred as it did, based on this transcript?

A. No. It does capture the gist of the conversation, but it just, in -- based on what his question was, the transcribers were supposed to do it exactly word-for-word, every cough, every hiccup, I mean, anything was supposed to be included, and just based on my memory of the conversation and reading how -- how I spoke, I -- I'd have to say that that just

wasn't done.

MS. JOHNS: Okay. Nothing else.

(Proceedings concluded at 4:15 p.m.)