Witness: Timothy Seaberg



UNITED STATES COURT OF FEDERAL CLAIMS

CONDENSED TRANSCRIPT

ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER, *
Plaintiffs, *
vs. * NO. 06-407-T
UNITED STATES OF AMERICA, *
Defendant. *

**************************************************************

ORAL DEPOSITION OF TIMOTHY SEABERG

**************************************************************

ANSWERS AND DEPOSITION OF TIMOTHY SEABERG, produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 29th day of August, 2007, A.D., beginning at 1:05 p.m. before Andrea Reed, a Certified Shorthand Reporter in and for the State of Texas, in the offices of United States Department of Justice, located at 717 North Harwood, Suite 400, Dallas, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

PENGAD-Bayonne, N.J. GOVERNMENT EXHIBIT 2

Page 6

The cardinal rule is let's try to keep it down to one person talking at a time. So if he has something, if you'll stop and let him say it and then pick back up again. If I'm asking a question, you probably will wait till I finish before you answer. I probably won't wait till you finish answering before I ask the next one, but I'll try and that way the court reporter can get everything down. And then if you could answer verbally as opposed to a nod or something so the court reporter can get that recorded as well.

Will that be all right with you?

A. Yes.

Q. All right. Let's start off with some basics.

Could you state your full name and your address, please.

A. Timothy William Seaberg, 9421 Blackthorn Trail, Frisco, Texas 75034.

Q. Okay. And could you tell me your education from after high school on?

A. I've got a bachelor's degree in marketing from Iowa State University, and an MBA from the University of North Texas.

Q. And what years did you receive those in, please?

A. BBA was in '91 and the MBA in '92.

Q. Okay. Now, do you hold any professional licenses?

A. I don't know if they're current at the moment. I

Page 7

have had in the past a Group 1 life insurance and a Series 6 securities license.

Q. And how about professional associations, do you belong to any right now?

A. I don't think so.

Q. Would you have belonged to any back in, say, 2000, 2001?

A. I can't think of any that I would have belonged to.

Q. Okay. How are you currently employed?

A. I'm currently employed by Financial Marketing Services.

Q. And what does that company do?

A. It does financing for consumer electronic items.

Q. Okay. Is that company somehow connected to Gary Kornman?

A. It's connected with his family.

Q. Okay. In what respects?

A. I assume one of his family entities owns the company.

Q. All right. And how long have you been working for that company?

A. I've been working for the family for ten years.

Q. All right. And by the family, again, one company own -- a company owned somehow by one of the family organizations?

A. Right. Correct.

Q. So which companies have you worked for in the last

Page 8

ten years?

A. The Heritage Organization, and The Oak Group.

Q. Okay. Now, from what years to what years did you work for The Heritage Organization?

A. Heritage was, I believe -- I think it was '97. '97 to 2004.

Q. Okay. And is that -- you worked for them up until the time that Heritage went into bankruptcy?

A. Uh-huh.

Q. And then you shifted over to The Oak Group?

A. Uh-huh.

Q. All right. And then you stayed at The Oak Group till what time?

A. Till around December of '05.

Q. Okay. Now, the events that we're going to focus on here are going to happen between 2000, 2002, but I still need to go back a little bit further as far as your work with Heritage.

So when you went to work for Heritage, what did you go to work doing?

A. I was making phone calls to set appointments.

Q. All right. How did you happen to get that job? Was it just something you applied for?

A. Yes, I just answered an ad in the newspaper.

Q. Okay. And we had a gentleman in yesterday name of

Page 9

Chester Decker. Are you familiar with Mr. Decker?

A. Somebody asked me that. I don't remember his name.

Q. All right.

A. I mean, it sounds vaguely familiar, but I really don't remember.

Q. Okay. Well, I think he testified that was what he did, is he made phone calls for basically to solicit clients.

A. Okay.

Q. Is that something that you were doing when you started for Heritage?

A. Yes.

Q. And how long did you do that?

A. About a year.

Q. Okay. During that year, what did that job entail?

A. The scheduling appointments position?

Q. Was it scheduling appointments, or was it actually calling for prospective clients?

A. Well, it was calling prospective clients to schedule appointments.

Q. And by calling a prospective client, was it more or less -- as I understand it from what Mr. Decker, he said, well, not a complete cold call. You had some idea that these people might be interested. But you were approaching them first. They had not contacted Heritage?

A. Yeah, I would say that it was pretty cold.

Page 10

Q. Okay. So a typical phone call, walk me through how that happened.
A. We would just -- basically had a list of people to call. It was pretty straightforward. You just made phone calls and try to get people on the phone. We clearly took a lot of phone calls to get those kind of people on the phone.
Q. Okay. And would those phone calls be recorded?
A. If they were in a state where you could record phone calls, yes.
Q. And was that typical practice for Heritage? Were you supposed to record all of your phone calls?
A. Only the ones that were in states where you could record, yes.
Q. And, again, I'll take that as a given. I'm not trying to suggest that you were violating any state laws.
A. Right.
Q. During that time frame, what actually was Heritage doing? What was its business?
A. Estate planning.
Q. And what would you be contacting these prospective clients about, asking them to?
A. Just asking for a meeting to discuss estate planning.
Q. And I apologize for that, but in this room it always comes through. I don't know if we can turn it off.
All right. Now, when you went to work for

Page 11

Heritage to make these phone calls, what did they tell you about the company business?
A. It was -- at that time, it was pretty much just we do estate tax planning, sophisticated estate tax planning for wealthy people.
Q. And did they provide you with detailed background as to the nature of that business, or was this more or less a scripted thing that they provided you enough information to try to get the other -- the prospective client interested?
A. Yes, it was very scripted.
Q. All right.
A. It was not much background given at all.
Q. Okay. And you say you did that for about a year?
A. Uh-huh.
Q. And then what did you do?
A. Then I started going out on the road having initial meetings with people that were -- who decided to meet with us.
Q. All right. Now, is that just something that the one job evolved into the other, or was there like an internal -- you applied for the job -- tried doing it, that type of work?
A. Well, there was still a group of people making phone calls, so I was promoted, I guess, to that position.
Q. All right. And in this going out on the road, what did they call your position then?
A. Contractor.

Page 12

Q. Okay. Now, what did a contractor do? You say going out on the road.
A. Okay.
Q. But what did a contractor do?
A. Just went out and the primary job was to have an initial meeting with someone that we had a cold call appointment scheduled with.
Q. Okay. So the person who was making the phone calls doing what you had done before would set up a meeting with a client, and then Heritage would send a contractor like yourself out to meet with the clients?
A. Correct.
Q. And what was your purpose in going out to meet with that client?
A. Basically to -- the main purpose was to gather information, to find out, you know, as much information as possible about the client's current estate tax planning situation, family situation, their business, what they'd done as far as tax planning.
Q. Now, how much information were you given at that point -- how much more information were you given with respect to what Heritage actually did or what product it was promoting?
A. Well, I was never given information about the methods of achieving results. I was only given information about what the results would be or what we could do.

Page 13

Q. Okay. And we'll get into that in just a second. To prepare for one of these meetings, what would you do?
A. There was a file created by the research department that just researched public information about the individual or the family, and so I would just read the file.
Q. Would there be anything else in that file?
A. No. Usually it was just -- it was a cold call, so we didn't really have any information other than public information.
Q. Okay. What about the call itself, would you have that information available to you?
A. No. There would be -- I'm trying to remember if there was a -- I can't remember. There may have been a transcript in there of the phone call, but I don't think there was in all the files.
Q. Okay. Well, we'll look further into that. Now, you would go out to this prospective client.
Would you go out to more than one meeting for this client, or would it vary? How would that work?
A. For one particular client?
Q. Yes.
A. I would go to the initial meeting. And if I convinced them to meet with us again, I would bring somebody else back to come with me to the second meeting.
Q. And this somebody else, what capacity with Heritage

Page 14

would that person be in?
A. Like a principal.
Q. Okay. And for Heritage, what was a principal?
A. It was somebody that was the lead on the case that would do the -- you know, everything from the second meeting through the implementation.
Q. All right. And I presume the principal would have the ability to actually contract with the clients?
A. Yes.
Q. And did you have that ability, or did you need the principal for that?
A. No, I did not have that ability.
Q. Okay.
A. I just went to the meetings up until the point where there was a contract signed, and then I didn't go to meetings after that.
Q. Now, was it more or less just to be the liaison to introduce the principal to the client, or did it go actually beyond that?
A. No. It was a liaison position, and I was responsible for calling them back to set meetings up until the point that the agreements were signed.
Q. All right. So it could actually be a couple of meetings before you could get a -- oh, I'm sorry. You said you might be setting up the meetings, but you might not necessarily

Page 15

go back out to the other meetings?
A. I might go back to a couple more meetings, yeah. It depended.
Q. All right. And that was probably because you had a rapport with the prospective --
A. Yeah, it was just kind of a handoff.
Q. All right.
A. Yeah. I didn't really say much at all after the first meeting in the meetings.
Q. All right. Now, you say that initially that Heritage work was mostly estate type work.
Did that evolve into something else, say, in time frame of about 2000, 2001?
A. Yeah, it went to capital gains estate planning.
Q. Okay. Now, what was your understanding as to what Heritage was promoting on capital gains planning?
A. The contractor's understanding was that there was a way that we could show someone to reduce or eliminate their capital gains taxes.
Q. Okay. And how much information did Heritage give you with regard to what you were out there promoting?
A. Not that much. I was never allowed in the analytical department. There was a fingerprint code, and I couldn't get in there. So the idea was that the contractor didn't know what it was that achieved the results that he told people about.

Page 16

Q. So how was it that you could get a client interested? What type of information would you be telling them?
A. Well, again, it was -- mainly, it was trying to get information from them. But it wasn't much. It was basically we have a way to eliminate or reduce your capital gains taxes. It really was -- some of the meetings were 15 minutes.
Q. And you say you didn't really know how they were eliminating or reducing the taxes?
A. No. I was never involved in any of the meetings passed the point of the contract being signed, and there was never a discussion of the methods until after the contracts were signed.
Q. In the meetings that you would have attended, would the emphasis have been more on eliminating or more on reducing capital gains taxes?
A. I don't really know how to answer that. I mean, it was a general discussion about, you know -- I mean, I don't think we ever promised in those meetings that we could completely get it all the way to zero. And, I mean, I think I said in the initial meeting we can reduce or eliminate.
Q. Uh-huh.
A. And so I think it was just reduce or eliminate.
Q. All right. And we've got a couple of transcripts we can look at in a few minutes, and maybe that'll help refresh your memory. But -- so you say you would go through the file,

Page 17

the research file, before going out to these meetings, as I recall. You're not sure whether or not it would be a transcript from the cold call.
When you got to the meetings sites, is there anything special that you would have to do before you engaged the meeting -- went into the meeting? More specifically, did you record the meetings?
A. Some of the meetings were recorded.
Q. Okay. And was the determination on whether to record them or not record them based upon whether state law permitted a recording in that state?
A. Yes.
Q. So if it was the state where it was permitted, was it the customary practice to go ahead and record the conversation?
A. It wasn't always recorded.
Q. Okay. In what instances would you make the decision to or not to record?
A. I'm just trying to remember. Sometimes if it just was more of a -- if I didn't think there was going to be any significant material discussed in the meeting, if it was just a lunch meeting or a short meeting that, you know, I didn't anticipate being a -- having a lot of value, I guess, sometimes I wouldn't do it.
Q. So it was kind of a judgment call on you going into it?

Page 18

A. Right.
Q. And would it more than likely that you would choose not to record it, or that you would choose to record it and then erase it?
A. No, I would never erase it.
Q. Okay. So you either recorded it or you didn't record it?
A. Right. Yeah.
Q. Okay. And then after that meeting -- let's just deal with meetings where they were recorded.
What would happen when you got back from the meeting?
A. I would turn in a -- the tape to the marketing support department.
Q. Okay. And let me backtrack just a second.
Was it important to Heritage that these meetings be recorded, that the conversations be recorded? Was some emphasis placed on that?
A. Yeah. I mean, it was -- yeah, it was expected that it was to be done in important meetings.
Q. So it was standard practice; is that correct?
A. It was commonly done, yes.
Q. All right. If it was not done, it would be a deviation from standard practice?
A. It was one of those policies that, you know, it was

Page 19

sort of there for a long time, but it didn't always happen. Okay. I wouldn't say that it was strictly enforced. I don't remember anybody being punished for not recording.
Q. Do you recall -- do you know what the Contractor Training Manual was for Heritage?
A. I mean, it was the -- I'm not sure I understand the question. It was a --
Q. And you're familiar with that document, right?
A. Yeah. I haven't seen it in years, but --
Q. And it actually is quite voluminous, correct, you know, several hundred pages?
A. Maybe. It may have evolved since I was trained.
Q. All right. Do you recall provisions in that manual that actually said that a fine would be imposed if the conversations were not recorded?
A. No, I didn't -- I don't remember reading it in detail.
Q. All right. Would that surprise you, though?
A. I've never -- I don't think anyone was ever fined.
Q. Okay.
A. I don't remember anybody being fined for anything actually.
Q. All right. Now, I'm sorry. Let's go back then. Now, you say you would come back with your tape, and you'd hand it off to people to transcribe it.

Page 20

A. Right.
Q. Was there a transcription department? How did that work?
A. Well, there was sort of a secretarial department. I mean, they weren't referred to as a transcription department. That was one of their jobs.
Q. Okay. And they would take the tape and then transcribe it?
A. Yes.
Q. And then what would happen to the transcripts?
A. It would just be added to someone's file.
Q. Would it be returned to you afterwards to review it?
A. No.
Q. Okay.
THE REPORTER: I'm sorry. Did he say, "Huh-uh"?
THE WITNESS: I said, No.
Q. (BY MR. HERRIN) Okay. And I'm sorry. I mean, I'm guilty as you, but she caught you, so --
Did you have any other responsibilities with regard to that meeting when you got back to the office?
A. No, just turn in the tape. If there was a follow-up meeting scheduled, to get it on the calendar.
Q. Would you do a debrief of those meetings?
A. Oh, yeah, I would do a debrief.
Q. And what was a debrief?

Page 21

A. It was just a recollection of the meeting basically.
Q. Okay. And how soon after you completed the meeting would you do your debrief?
A. Yeah, that can be anywhere from ten minutes to a couple of days.
Q. All right. Would you -- if you were going to do it in ten minutes, I presume you'd be out of the office.
Would that be something that you would tape-record?
A. Yes.
Q. And that would just be turned over to transcription to be transcribed?
A. Uh-huh.
Q. You need to say, "yes." I'm sorry.
A. Yes. Sorry.
Q. And after that was transcribed, what would happen to that debrief?
A. Same thing. It would just go in the file.
Q. Okay. Would you look at the debrief before it went into the file?
A. No.
Q. Now, if you were going out on a subsequent meeting with the client, what would you do to prepare at that time? Would you go back and read these things in the file or what?
A. Generally, yeah. Usually not the transcripts.

Page 26

presentation of these.
Q. Okay. Do you have any knowledge of how the presentations were handled as far as preparing documents and submitting to clients that kind of stuff?
A. Huh-uh. No, I really wasn't exposed to that.
Q. All right. If you could turn to Exhibit No. 3, please.
A. (Witness complies.)
Q. And let me represent to you that yesterday, Mr. Decker identified this document -- the CRD being Chester or Chet Decker, his initials. And I'm sorry. He probably told us -- he might have told us who ALK was, but I don't remember.
Do you know who ALK is?
A. Somebody in the -- obviously, someone in the transcription department. But I can't remember which person it really was.
Q. Well, I can't even remember whether he told us yesterday, so you're not doing any worse than I am.
Could you take a look at this document. Just -- well, just quickly, the question is going to be, first off, do you remember seeing this before? And the second question is, is this something that you might have seen before you went out and did your first meeting with the Sands?
A. I don't remember if I saw it. I didn't normally read through the entire transcript. A lot of times I just read

Page 27

the -- whatever memo is in there from the initiator.
Q. And does this look like a typical transcript that would have been prepared by an initiator -- or I mean, a transcript -- a recording of the initiator's conversation? Is this kind of typical?
A. Yeah. I mean --
Q. Obviously, the conversation would --
A. Right.
Q. Would you say you were fairly scripted, right?
A. It was fairly scripted in what minimal results the initiators could talk about. So, I mean, just like he says there -- how much we can say initially.
Q. If you'd look at the very last entry on this -- going on into the next page -- and it's Mr. Sands saying, Okay. And are we eliminating the capital gain tax entirely? Followed by Mr. Decker saying, Entirely. Mr. Sands saying, Zero.
A. I'm sorry. Where are you at?
Q. I'm sorry. This is the --
A. Oh, okay. Bottom of the page. Okay.
Q. And Mr. Decker saying again, Zero.
Is that the kind of information that would typically be told during an initiated call?
A. Well, I don't remember if they were instructed to say reduce or eliminate at that time. If they were instructed to say reduce or eliminate, I suppose, you know, a lot of them

Page 28

just skipped the reduce part --
Q. Okay.
A. -- to increase their chances of getting in. I don't remember what the instruction was at that time.
Q. At some point, did it evolve to a point where they were supposed to say zero?
A. Not that I recall.
Q. All right. If you would turn, then, to Exhibit No. 4.
A. (Witness complies.)
Q. And this is another transcript. It's got the initials TWS.
Does that stand for yourself, Tim Seaberg?
A. Yes.
Q. RLB. Do you have any idea who RLB was?
A. I have no idea.
Q. Okay. I hate to hit you cold on this thing, but if you'd take a look at this and tell me if there's any reason why you would think this is not a transcription of the meeting that you had on May 31st with Richard Sands?
A. It seems like -- I don't see any reason so far.
Q. All right. And we're going to ask some specific questions. If something changes, we can either take it up then. Or if you want to hear the tape itself, we can do that as well. But for a little background purposes, Richard Sands

Page 29

is listed as PC.
What does "PC" stand for?
A. Potential client.
Q. Potential client. All right. I wasn't sure whether it was prospective, potential or something else altogether.
A. All right.
Q. Obviously, the meeting appears to have been recorded, so typically how would you have gone about recording the conversation of this meeting?
A. Oh, just put a recorder in my pocket.
Q. Okay. And was it a little micro recorder, was it a standard recorder? How would that work?
A. Yeah, it was just a small one that would fit in your pocket.
Q. And it would be like a vest pocket, a coat pocket?
A. Normally, yeah.
Q. I'm just curious. This is --
A. Yeah, just in your pocket, you know.
Q. Like in your shirt pocket or something. So I just didn't know whether --
A. Shirt or coat, either one. It didn't really make any difference.
Q. All right. And how long would the tapes typically run?
A. Maybe two hours, I suppose, depending on the speed

Page 30

that you set your recorder on.
Q. Okay. So they could be a variable speed.
A. Probably, yeah. Yeah.
Q. And did these tapes automatically start -- reverse and start recording the backside?
A. Yeah. It seems like they lasted two hours, so usually not.
Q. All right. If, in fact, the tape ran out before the meeting ended, how would you handle that?
A. You just wouldn't have the end of the meeting.
Q. All right. So you wouldn't change the tape during the meeting or excuse yourself?
A. No.
Q. All right. With regard to this transcript, when you would have gotten back to the office or anytime thereafter, would there be some reason to alter the recording itself, delete parts of it, leave parts of it on?
A. No.
Q. Okay. When you got the transcript back, would there be reasons that you'd go in there and alter the transcribed portions, or would the transcript just stay as it was transcribed?
A. I usually didn't ever look at the transcriptions.
Q. Okay. You're not aware of anybody who would go in and alter the transcripts afterwards, right, or are you?

Page 31

A. No, I don't think so. No.
Q. Okay. Now, in this time frame, which is May of 2001, do you recall if it was the practice of the contractor at this time to tell the prospective client or potential client that you could eliminate capital gains as opposed necessarily reducing them?
A. No, I don't remember.
Q. Okay. If you would turn to --
A. I'm sure it's in here.
Q. -- Page 21 of the transcript at the top. And the very first entry, if you'll read that, it says, That we can eliminate the capital gains.
A. 21?
Q. Yes. I'm sorry. You're looking -- Oh, wait a second. We got -- oh, I see.
Is the page different?
A. Oh, you're talking about this number?
MS. JOHNS: Which number are you talking about?
MR. HERRIN: Well, I was looking at APP 21.
Q. (BY MR. HERRIN) You're looking at APP 34. So hopefully, you're on a different page.
MS. JOHNS: Which one do you want?
MR. HERRIN: 21.
Q. Oh, I see, you're on --
MR. CULLINAN: Now I'm confused. Where are we?

Page 32

MR. HERRIN: At the -- 21. So of the transcript itself, it's Page 8. I hadn't picked up on that page number.
MS. JOHNS: Why don't you use the THO number.
MR. HERRIN: All right. We'll use the THO numbers.
A. All right.
Q. (BY MR. HERRIN) So that's 350.
A. Yeah.
Q. We're all on the same page?
Okay. TWS, again, that would be yourself?
A. Correct.
Q. Okay. When it says, We can eliminate the capital gains taxes on that, any reason to believe that's not what you told Mr. Sands?
A. Unless it was altered, no. I don't have any knowledge it was being altered.
Q. Well, I mean, would that be inconsistent with what you would have done -- what you might have said?
A. You know, like I said, I can remember reduce or eliminate, so I don't really remember why I would have said just eliminate as opposed to reduce or eliminate.
Q. Well, would you be more inclined to talk about eliminating the capital gains tax if that's what the client was particularly interested in?
A. Well, I mean, I didn't want to get myself in a

Page 33

position where we couldn't, you know, do what I said we could do. So I would think that I would have rather said reduce or eliminate. Clearly I said eliminate here.
Q. There's some discussion in this transcript where Mr. Sands -- well, I tell you what, let's just go to THO 353.
A. (Witness complies.)
Q. And about the middle of the page, Mr. Sands asks, Do you guarantee your results?
Do you see that?
A. Yeah.
Q. Typically, without looking at the transcript, if somebody asked you to guarantee your results, what would you tell them?
A. I would generally say that we don't.
Q. Okay. Would you expand on that if they wanted a guarantee?
A. No, I certainly wasn't authorized to give anybody a guarantee.
Q. Okay. Well, if you'd take a look, you actually said what they'll propose down at the bottom of the page where you say, Typically, the deal is 25/75 split, but if you want more than that, there was a system where you could put 50 percent of the potential tax savings into an escrow, and if you didn't get audited, Heritage would keep that 50 percent plus any interest.
Do you recall --

Page 34

A. Yeah, that sounds vaguely familiar. I don't think anybody ever did it, though. I think it was -- it was unsuccessfully used.
Q. All right. That was something that was to throw out in case the client wanted more assurances. But you said, typically, I guess, without exception, nobody really wanted to pay the 50 percent?
A. Right.
Q. But you do recall making that type of a pitch?
A. Well, now I see it here, so clearly --
Q. But it's not a pitch that you're unfamiliar with?
A. I mean, I vaguely recall.
Q. Okay.
A. I don't -- I know that I never had any success with it, so --
Q. Okay.
A. I knew no one was going to like it, so I didn't like to talk about it because I thought they were going to think I was an idiot, but --
Q. I don't suppose anybody at Heritage has told you that they'd just assume have something that they could reject, but at least you put it out there?
A. I suppose, yeah.
Q. There's some discussion over the next page or so where you discuss the fact that if you gave an absolute

Page 35

guarantee, there might not be economic substance to the deal.
Do you recall making pitches like that?
A. An explanation of why we couldn't guarantee?
Q. Right.
A. That seems like the explanation -- the best one for why we couldn't give a guarantee.
Q. Do you recall making those kind of pitches if somebody had asked?
A. I mean, it's hard to answer that question. It sounds familiar. I don't recall specific situations where I said -- you know, where I used that.
Q. If it was -- says those basically to that effect in this transcript, you don't have any reason to believe you didn't do it here, do you?
A. Right.
Q. All right. On 351, you mentioned the name Jonathan Blotmocker (phonetic).
Are you familiar with Jonathan Blotmocker (phonetic)?
A. I am familiar with his name. I've never -- I don't think I've ever met him.
Q. And what is basically your knowledge of Mr. Blotmocker (phonetic)?
A. He's an estate planning attorney, I think is his reputation.

Page 36

Q. And why would his name come up in a meeting where you were trying to promote a Heritage product?
A. I don't know if they brought his name up first or -- no, I think -- well, according to what I'm reading -- it was in the -- somehow I had that information when I went into the meeting.
Q. All right. It wasn't something typically that would have come up?
A. No.
Q. Okay. And you weren't coached ahead of time about if certain names come up, have certain responses?
A. Well, no, I don't --
Q. All right. Well, I'll leave it at that. But you say some of this stuff was scripted because they only gave you certain information --
A. Right.
Q. -- rolling out of these things?
A. Right.
Q. On Page 353, two references. First off there, about, oh, the eighth line down, Mr. Sands asks you whether or not you can eliminate entirely the capital gains. And, again, I think I asked this before, but do you recall that being an emphasis of his main interest?
A. I certainly don't recall any of those, no.
Q. Do you have any reason to think that the tape would

Page 37

have been altered to -- or the transcript would have been altered to change the words that he would have said?
A. I don't know of anyone altering any of the tapes.
Q. Okay. You see also a little bit lower down -- or I'm sorry. Your response is that absolutely you could eliminate. And then it asks, Do you guarantee results? And your answer is basically you don't want to guarantee, so we could come as close to it as we can.
Would that be something you think you might have said?
A. I mean, obviously, I did. It's in here apparently.
Q. All right.
A. I mean, I don't -- obviously, I don't recall saying it.
Q. And I understand. This is a long time ago and --
A. I just don't want to say I remember saying when I clearly don't remember anything I said during that year.
Q. Do you recall in general what you would tell a client -- a prospective client if he asked you what's our audit risk?
A. Do I -- I'm sorry.
Q. What would you normally -- if a client asked you, What's going to happen? What's our audit risk here? Are we going to get caught? Did you have something that you would call them and tell them?

Page 62

A. Yes, because that's what happened. It would have been an exception.
Q. Well, the note would have been for you for your benefit, correct?
A. Well, the note is not to me. It's to marketing support.
Q. But the reason for it is so that you can go back and reread the transcript and update the debrief?
A. That's what the note says.
Q. Okay. Well, support wouldn't have written the note. It would have been something you put in it, correct?
A. Correct.
Q. Okay. And would this possibly be a situation where you did your -- strike that.
If you'd turn to 252, please.
A. (Witness complies.)
Q. The first paragraph, there's some discussion about the Sands wanting some involvement by Nixon Peabody.
Do you recall the conversations or this being brought up in the meeting?
A. No.
Q. On a general basis, if somebody suggested to you during a meeting that we want to get our attorneys to look at this thing, what would your response be?
A. Just to try to get another meeting without their

Page 63

attorneys.
Q. Okay. And why was that?
A. Just to keep it from getting too complicated too fast.
Q. Did the people back at Heritage tell you to try to discourage getting the -- from getting other attorneys -- outside attorneys involved?
A. Well, in the second meeting. We tried to have second meetings without other attorneys involved.
Q. All right. And the reason for that, again, would be so that it wouldn't get too complicated?
A. Yeah, just to keep it simpler in the beginning of the process. I mean, we knew that they would be involved eventually.
Q. Okay. There's an entry on Page 252, TWS, bring copies of new court cases out of Missouri and have it at the next meeting.
Would you typically bring court cases? And I presume -- would this fall into presentation type material?
A. That's not very typical right there.
Q. All right. Since it's not typical, do you recall -- does it stand out that you can remember it because this was an exception or --
A. No, I don't remember it.
Q. Was there ever an instance in one of your meetings

Page 64

with a client where the tape did something, the machine did something that caused the client to be informed that he was being taped? You know, I don't know, making a whistling noise or something like that?
A. Not that I remember.
Q. All right. And do you know what Heritage would do with the tapes after you brought them back and they were transcribed, what would happen to them?
A. No, I have no idea.
Q. Okay. And if you wanted to look at the transcripts afterwards, you say they would be in the client file? Is that where they would be maintained?
A. Yes.
Q. Okay. Let's take a quick break, and then I got a few follow-up ones or we'll get back to you.
A. All right.
Q. Or we'll turn you over to Mr. Cullinan.
A. All right.
(Break was taken at 2:34 p.m. to 2:40 p.m.)
Q. (BY MR. HERRIN) Once again, I want to look back at Exhibits 5, 6 -- 4, 5 and 6. Now, those are going to be the transcripts of the meetings between -- that you attended with the Sands. And specifically, I think you told me that you did this in the ordinary course, and that you -- well, let me just specifically ask the questions.

Page 65

Were the tapes -- was taping itself done in the regular course of your work for Heritage?
A. What do you mean? I'm not sure.
Q. Did you tape them as part of your business practice working for Heritage?
A. Right.
Q. Okay. And you took them back to the office and transcriptions were made in the regular course of Heritage's business? They were made for your --
A. Correct.
Q. -- continued use?
All right. And then those were kept by Heritage as part of its file during its normal course of business?
A. That was the process, yes.
Q. Okay. And it's your understanding that those transcripts then were maintained in the Heritage files in accordance with their normal business practices?
A. Uh-huh. Yes.
Q. Thank you. And it's your understanding that that was a regular practice of Heritage to record these conversations, transcribe them and then maintain the transcriptions in their files?
A. That was the process, yes.
Q. Okay. Now, if you'd look at Exhibits 7, 8 and 9, the debriefs, and specifically it was the general practice of

Page 66

Heritage that you go back and be debriefed -- or do a debrief when you got back to the office from one of these meetings?
A. Yes.
Q. And that these debriefs would then be transcribed, and the transcription kept into the Heritage's client files?
A. Yes.
Q. And then -- and that was just the day-to-day business practice of Heritage, right, that you would tape-record, you transcribe, they'd make a transcription and keep it in the files, correct?
A. Correct.
Q. All right. Do you know of any instance where these type of transcriptions -- or the tapes the transcriptions were made for would have been altered by somebody on behalf of Heritage? Heritage would have gone back in and said -- or Gary Kornman would have said these things need to be changed and, therefore, they were changed?
A. I don't remember that happening.
Q. All right. As far as today's deposition, how did you prepare for it?
A. I didn't.
Q. And did you have any meetings or conversations with Mr. Cullinan or his office prior to today's deposition?
A. One conversation maybe.
Q. And could you tell me briefly what was discussed

Page 67

during that conversation?
A. That, I -- it was very brief. I think there was a question related to what you just asked me.
Q. All right. About whether or not the tapes would have been altered or something?
A. Well, no, just whether -- I think it was -- honestly, I don't remember. Whether the -- I attended the meetings and whether I did these debriefs, I think.
Q. All right.
MR. HERRIN: Pass the witness.
MR. CULLINAN: Thank you.
EXAMINATION
BY MR. CULLINAN:
Q. Good afternoon, Mr. Seaberg.
A. Hello.
Q. You testified that you've been deposed before. When was that?
A. Oh, let's see. When was I deposed?
Q. And let me limit that. If it's more than, say, ten years ago, I don't care.
A. Oh, I was deposed by the SEC in Gary Kornman's case. I was deposed by the Justice Department for the same case briefly.
Q. Was that it?
A. I think that's it.

Page 68

Q. What were the topics that were covered during those depositions?
A. Just issues relating to the case that they had against Gary at that time, which was -- I mean, it was a six-hour deposition with the SEC, so it was long.
Q. Did any of the questions cover the Heritage Organization's recording conversations?
A. Uh-huh. Yes.
Q. Can you describe for me in -- the circumstances behind that recording or those recordings?
A. The circumstances behind them? I'm not sure --
Q. Well, what conversations were recorded?
A. There was discussions about conversations that were related to the case that was involved.
Q. And those conversations were recorded by the Heritage Organization?
A. Correct.
Q. So there were tapes of -- or were those tapes of recordings or transcripts of recordings?
A. Well, they were tapes made, and then they were transcribed.
Q. And were both the tapes and transcripts in existence -- are they still in existence, do you know?
A. Oh, I don't have no idea.
Q. Do you know what the SEC was alleging in that case?

Page 69

A. Insider trading, I guess. I'm not sure what the specific --
Q. Were they alleging that Mr. Kornman was trading in securities based on nonpublic information?
A. You know, I really can't say what the actual charge was. I mean, I really don't know. I don't remember what the -- it may have been more than one. I don't know.
Q. Where did Mr. Kornman get the inside information, do you know?
A. I'm not saying he --
Q. Where did the SEC allege that he got the inside information from, do you know?
A. Meetings, I guess.
Q. Meetings that he personally attended?
A. That I personally attended?
Q. That he personally attended?
A. Yes.
Q. Do you know, did they also allege that he obtained information from transcripts of recordings that employees of the Heritage Organization have with clients?
A. I don't know if they alleged that or not. I'm not sure about that one.
Q. I want to talk a bit about your time as an initiator before you were a contractor where you were making these phone calls.

Page 102

Q. All right. And so what they would be doing is they'd tell you, Hey, I don't have it all. Would that be, if you'd turn to Exhibit No. 4, why, for instance, on the first page there, you might have a question mark or an ellipsis?
A. Yes.
Q. I mean, they would leave it out as opposed to put their own words in?
A. Well, that I can't say.
Q. All right.
A. I never was there when they did it, so I don't know.
Q. I mean, is there -- do you think the transcribers would fabricate conversations to put on the transcriptions?
A. You mean, maliciously? Or I'm not sure what you mean "fabricated."
Q. Well, I don't know whether it would be maliciously. You know, whole statements attributed to one of the parties here that they would have made up in transcription as opposed to trying to transcribe from the tape?
A. I'm sure that -- that it varied by transcriber. But, you know, if they're straining to hear what somebody is saying, I'm sure some of them would have been more likely to put a question mark and some would have been more likely to try and, you know, kind of interpolate what was said.
Q. All right. So an interpretation not a fabrication?
A. Well, I think interpretation would be more accurate

Page 103

than fabrication. Fabrication would just be completely making up when they couldn't hear anything, I guess.
Q. Right. Okay. I'm going to -- I'm going to take you through the tapes that we have. Actually, they're partial tapes of the May 31st and the June 13th meetings.
MR. HERRIN: For the purposes of this record, I'm going to ask the court reporter while we're playing the transcription simply to write down "tape playing," and then we will include a copy of the transcripts disks themselves in the record as exhibits, and we will ask the court reporter as part of her transcription duties to go in and also transcribe those.
So it'll be extra work for you, but I guess you get paid by the page, right?
THE REPORTER: (Affirms.)
MR. HERRIN: So that'll be something that we'll ask you to do. And that is something that you're able to do, right? You'll be able to sit there and play them?
THE REPORTER: It depends on the quality.
MR. HERRIN: Well, right. I mean, you should be able to play them. Well, if you can't transcribe them, can we have it for the record that you'll put in a question mark or something, that you won't be adding your own words?
THE REPORTER: The court reporter's job is to put in inaudible.
MR. HERRIN: All right. That will work. So we

Page 104

will handle it that way for purposes of the deposition.
Q. (BY MR. HERRIN) I'm going to stop this transcript as we go along just to ask you whether or not there's been anything that you would change on the transcripts. And I'm going to represent to you that I've listened to the first one. I went to Alaska and missed the second one, but Ms. Johns has heard it.
At the beginning, it starts. Then you have a considerable period of time where there's nothing going on, so I'm going to move it forward to that point and pick it up again.
Okay. Now, this, for the record, will be Exhibit No. -- if you'll turn to Exhibit No. 4, the 5/31 transcripts.
A. (Witness complies.)
Q. And, again, this actually starts before the meeting, so I'm going to start you there. Like I said, we'll stop and go.
(Tape is playing at 3:57 p.m. for less than a minute.)
Q. Okay. Now, I paused that so I can find these controls. I'm going to have to -- and then start over again.
But for the record, do you recognize that as your voice?
A. Yes.

Page 105

Q. Okay. Now, I'm going to go ahead and try to fast forward this now.
(Tape is playing at 3:58 for less than a minute.)
(Off the record at 3:59 p.m. to 4:00 p.m.)
(Tape is playing at 4:01 p.m. for less than a minute.)
Q. (BY MR. HERRIN) For the record, I've moved this forward about 40 minutes, which is something the court reporter will need to know whenever she's trying to transcribe it, too.
And this 40-minute gap, Mr. Seaberg, would that be indicative of the fact that you started the tape prior to the meeting, and it took perhaps that long for the meeting to begin?
A. That would make sense.
Q. Okay.
MR. CULLINAN: So it's going to start with, "Hello"?
MR. HERRIN: It should start with, "Hello." Again, I'm going to start this thing. I'm close enough now, and I don't know exactly where it begins. We may have a minute of chitchat with the receptionist or something. I don't know.
(Tape is playing at 4:01 p.m. for less than a minute.)
Q. (BY MR. HERRIN) Don't get concerned. I think this