Witness: Vickie A. Walker



UNITED STATES COURT OF FEDERAL CLAIMS

ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER,

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.

CONDENSED TRANSCRIPT

NO. 06-407-T

*****************************************************************

ORAL DEPOSITION OF VICKIE A. WALKER

*****************************************************************

ANSWERS AND DEPOSITION OF VICKIE A. WALKER, produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 29th day of August, 2007, A.D., beginning at 10:21 a.m. before Andrea Reed, a Certified Shorthand Reporter in and for the State of Texas, in the offices of United States Department of Justice, located at 717 North Harwood, Suite 400, Dallas, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

GOVERNMENT EXHIBIT 3

PENGAD-Bayonne, N. J.

Page 6

Would that be okay?
A. Sure.
Q. Although we covered this in another deposition, this is a different case. We need to go through the same drill. I need to get a little bit of background information on you.
Could you give me your name and your address, please.
A. Vickie A. Walker.
Do you mean my home address?
Q. Might as well. I mean, we already have it. We served you there.
A. 1694 Batts Lane, Prosper, Texas.
Q. Okay. And could you tell us your educational background, please.
A. I have a high school education. I got my diploma from Cheatham County Central High School.
Q. And when was that, please?
A. 1977.
Q. All right. And since that time, what has your employment been?
A. From '77 to '80, I worked for a company called Kornman & Associates, Inc. From '80 to '88, I believe, I worked for a company named Whitehall Group, Inc. From '88 to '95, I was employed by the Heritage Organization, Inc. From '95 to 2004, I was employed by the Heritage Organization,

Page 7

L.L.C., and -- I'm sorry -- till August of 2004. And from September '04 to currently, I'm employed by Flagstone Management, L.L.C.
Q. Now, were all of those employment -- all those companies related to Gary Kornman one way or the other?
A. Yes.
Q. Okay. Well, we're going to focus in on the period between 2000 and 2002 because that's what's relevant to this lawsuit.
And during that time period, specifically, again, who were you working for and what were your duties or positions that you held with that company?
A. From 2000 to 2004?
Q. 2000, 2002.
A. 2002. I was employed by the Heritage Organization, L.L.C., and I was the secretary and treasurer and mostly in charge of the accounting department.
Q. All right. Now, have you held other positions with Heritage, L.L.C., officer positions?
A. Officer positions?
Q. Yes.
A. I don't think so.
Q. All right. What was your understanding of the Heritage's business during 2001 and 2002? What did it do?
A. Provided management consulting services, along with

Page 8

some educational type services.
Q. Okay. What was the nature of the management consulting services?
A. Well, we provided management consulting. We did various -- it depended on the particular client and what their needs were, but possibly accounting, that kind of thing. Just various management type services.
Q. Was that local or national, or how -- what was that that you provided the services?
A. When you say "local or national," do you mean --
Q. Were the clients -- clients in the Dallas area -- all in the Dallas area, or did you have national clients?
A. It was pretty much in the Dallas area.
Q. Okay. How about the educational services that you provided, what was that?
A. What was that?
Q. Yeah, what was it?
A. I wasn't involved in that, so I do not know.
Q. Okay. Who was involved?
A. Various people at various times.
Q. But who would be able to tell me what the nature of those services were?
A. Well Mr. Kornman, for example.
Q. Okay. Would that be Gary Kornman?
A. Yes.

Page 9

Q. Are you familiar with the litigation that's at issue in this case, the Alpha I suit involving the Sands family?
A. No.
Q. Are you familiar with the Sands family, that would be Robert Sands, Richard Sands and Marilyn Sands from New York?
A. I have heard those names, but depends on what your definition of "familiar with." That's pretty much the extent of my familiarity.
Q. Well, it may not be easy. So what do you know about those people?
A. Nothing.
Q. And who would you have heard the names from?
A. Probably more accurately, I may have seen them, as opposed to when I said I've heard the names. That also includes I would have seen the names. And I've seen the names, but I don't recall that anybody specifically mentioned those names.
Q. Okay. And in what respect -- how would you have seen the names? Would it have been on documents, or in what regard did you see the names?
A. I believe I've seen the names in various documents.
Q. Okay. Now, what type of documents?
A. I believe there was a -- an engagement agreement, an engagement -- I'm not sure if that's the exact name of it, but there was an agreement between some of those parties and The

Page 10

Heritage Organization.
Q. Okay. And that was basically an engagement from the Sands to retain or to acquire services from Heritage?
A. Well, it would be whatever that agreement says.
Q. Okay. And do you know where that agreement would be today?
A. The original agreement, I believe the trustee has that.
Q. Okay. And do you know how that came in the trustee's possession?
A. It was -- it would have been given to him through -- probably through attorneys. We may get into legal issues that I'm not actually prepared to -- to talk about. But they would have been -- the trustee would have gotten them probably through an attorney from me.
Q. All right. Now, the trustee -- let's just break it down. The trustee would be the Chapter 11 bankruptcy trustee for the Heritage Organization, L.L.C.; is that correct?
A. Yes.
Q. Okay. And the attorney would either be Jeff Tillotson or somebody in his office?
A. Probably.
Q. Okay. And by getting these documents from you, would these have been turned over by you in -- with respect to a -- a request or a requirement by the trustee to deliver the Heritage

Page 11

documents?
A. Well, either a request by the trustee or a directive from the court or something to that effect, yes.
Q. All right. And why would it have been you in particular that would have been the person providing the documents to the trustee? Is that something that you did in your capacity as a secretary/treasurer at Heritage or, again, why would it have been you?
A. Well, that particular agreement that we were talking about, that I called the engagement agreement, I would have had in -- under my control while I was an employee of Heritage. But after the trustee was appointed, then I basically had access to all of the documents and records. So I was involved in turning the stuff over to attorneys, yeah, subsequently to the trustee.
Q. Okay. And with regard to the Heritage records, when those were turned over by the trustee -- or turned over to the trustee, were you selective in turning them over, or did you turn over all of the records that Heritage had at the time?
A. Well, he got various records at various times for various reasons. But at this point, as we sit here today, I believe that all of the records of Heritage have been turned over to the trustee.
Q. All right. Now, if there were any other records out there, where would they be and who would know about them?

Page 12

A. Other than what?
Q. Other than what's already been turned over.
A. Well, we don't --
Q. Heritage records.
A. Well, we don't believe there are any. We've been through all the records, and we've turned other everything that is Heritage's records to the trustee.
Q. Okay. And as far as "we," again, we're talking about that was something that either you did or that was done at your direction?
A. Yes, I was charge of that.
Q. And with regard to the records that were turned over to the trustee, again, those were Heritage records? Those were records that Heritage had maintained during the course of its business?
A. Say that again.
Q. The records that you turned over, the Heritage records, those were records that Heritage had maintained during the course of its business?
A. Well, I guess it depends on your definition of "maintained." They would have been records that were in the possession of Heritage, and some may or may not have been created by Heritage or -- but they were in Heritage's possession, and they had something to do with Heritage's business.

Page 13

Q. Okay. And if they had something to do with Heritage's business and they were being held by Heritage, is it safe to say Heritage was maintaining those for one business reason or another?
A. I suppose.
Q. Okay. You testified earlier that you had seen the names of the Sands.
Just to pin it down, have you ever spoken to either Robert Sands, Richard Sands or Marilyn Sands?
A. Not that I recall, no.
Q. How about Andrew Stern?
A. No.
Q. You also testified that you weren't familiar with the educational side of Heritage.
Do you know whether the documents or the services that the Sands purchased from Heritage fell into that category?
A. I don't know. First of all, I don't know that your statement that the Sands purchase services from Heritage is correct. And second of all, I have no knowledge whatsoever about any transaction or anything that occurred between Heritage and the Sands other than if there's a document, an engagement agreement, that kind of thing or if there might have been invoices or, you know, that kind of transaction.
Q. Okay. I think we're going to look at a couple of the

Page 18

Q. Okay. Let's take a look at Exhibit No. 20. This is going to be, I'll represent to you, an opinion letter written by Lewis, Rice & Fingersh, and a transmittal letter requesting the opinion letter. It's pretty lengthy, which is why identified it to you.

But are you familiar with this opinion letter or the request for it?

A. No.

Q. Okay. Are you familiar with Exhibit No. 21?

A. No.

Q. Okay. Are you familiar with Exhibit No. 22?

A. No.

Q. Are you familiar generally with these type of implementation lists on behalf of Heritage -- that Heritage would have used for each of its clients?

A. I have seen similar documents, but I don't know that I've ever seen anything like this for Sands.

Q. Okay. And in what capacity would you have seen similar documents?

A. Most recently would have been when I went through the files and documents in order to give them over to the trustee.

Q. And prior to that?

A. Probably not.

Q. Okay. How about Exhibit No. 23, are you familiar with that document?

Page 19

A. No.

Q. Okay. Let's go back to the documents that you turned over to the trustee.

Where have those documents been maintained from the time that Heritage went into bankruptcy until you turned them over to -- I presume it was your -- you turned them over to Mr. Tillotson's office who then turned them over to the trustee?

A. Sometimes. Sometimes. I mean, I -- for example, there was one point where we delivered a semi-truck down to the trustee --

Q. All right.

A. -- directly -- that did not go through Mr. Tillotson. It went straight from us to them -- from me to them.

Q. And in what time frame was that in?

A. It was June '0 -- no, it was July. When it was actually delivered, it was July '05. I think it was '05.

Q. All right. And you say it was a semi-truck, so it was quite a large amount of documents?

A. Yes. Documents -- various things. Documents, supplies, all kinds of stuff.

Q. Were there tape recordings in there as well?

A. Could have been.

Q. Okay. Heritage went into bankruptcy sometime in 2004; is that correct?

Page 20

A. May '04.

Q. May '04. So where were those records between May '04 and July '05?

A. Different places at different points in time.

Q. Okay. Could you tell us what different places and what different points in times, please?

A. From May '04 -- actually probably from April -- from the end of April '04 to -- I cannot give you the time frame. They went from the offices at Heritage out to a hangar at Addison Airport. Some of the records were subsequently taken from there over to a storage unit.

Q. Okay.

A. Subsequently, some of them were taken to a climate-controlled warehouse where they could be sorted through, and that's -- then they were subsequently turned over to the trustee.

Q. All right. Now, were all the records at that time -- well, I guess all of them weren't records -- all of them weren't turned over. You said at that point, July '05, you turned over a truck worth of documents.

Subsequent to that, were there other documents that were turned over to the trustee?

A. Yes. Both prior and subsequent to that day, yes.

Q. All right. If they were turned over prior to that day, is it safe to say that the documents were gathered from

Page 21

one of the places that you say that they were at and then turned over to the trustee from those places.

You said that they were at a warehouse. They were at a climate-control place. They were at a hangar.

A. Well, I think the trustee was appointed like on a Friday in August. On the following Monday, which was somewhere around August 15th-ish, the trustee and some people from his office, and I believe their attorney, Lee Morris, was there, came to an executive suite where Heritage was -- that was Heritage's office at that point. So they came there. They got the keys to that suite, which had records in it. They got -- they had keys to a storage unit, which had records in it. So they immediately got those things.

Then at some point in time between August '04 and July '05, they -- there was, I know, one delivery of documents that went from a storage unit to the trustee. Then -- so, yes, after that, after the initial turnover where he got the keys to the executive suite and the storage units, then, yes, records went from various storage units or the warehouse or the hangar to the trustee and/or to the trustee through Tillotson.

Q. Okay. Now, you said at the claimant-control warehouse you sorted through them. I assume at that time -- is it correct, then, at that time some of those records that you sorted through were turned over to the trustee and some of them

Page 22

were not turned over?
A. Yes.
Q. Okay. Subsequent to that time, the documents that had not been turned over, were they turned over to the trustee?
A. If they belonged to Heritage, yes.
Q. If they were related to Heritage, they were turned over?
MR. VOLNEY: Objection; form.
A. It would depend on how you mean "related to Heritage."
Q. (BY MR. HERRING) Well, let's split it up a couple of ways. First, what is your understanding of the court's directive to Heritage for turning over documents? What's your understanding of what that is?
A. That the records and documents that belong to Heritage get turned over to the trustee.
Q. And it's your belief that you've done so; is that correct?
A. Yes.
Q. Okay. Now, with regard to the documents that have not been turned over because you've gone through this sorting process, what was withheld? What type of documents?
A. Document --
MR. CULLINAN: Objection; I think she's testified that she produced everything that belonged to

Page 23

Heritage Organization. You're mischaracterizing her prior testimony.
MR. HERRIN: Well, again, I don't think I mischaracterized it, but I'll repeat my question.
Q. (BY MR. HERRIN) With regard to the ones that were retained as not belonging to Heritage, what type of documents were withheld?
A. Documents that didn't belong to Heritage, records and documents of other parties that did not belong to Heritage. They didn't belong to Heritage.
Q. All right. Subsequent to Heritage going into bankruptcy and these documents being moved around and then turned over to the trustee, do you believe any of these documents were altered during that course of time?
MR. VOLNEY: Objection; form.
A. Do I believe that any of these documents were altered.
Between what time?
Q. (BY MR. HERRIN) From the time that the bankruptcy was filed until they were turned over to the trustee, do you have any reason to believe that they were altered?
A. The preexisting documents --
Q. Yes.
A. -- were altered? No.
Q. You are aware that there were a number of tape

Page 24

recordings in Heritage's possession that were turned over to the trustee, are you not?
A. I know there were a number of tapes that were turned over to Jeff Tillotson. Beyond that, I don't know what happened to that.
Q. All right. Up to the time that they were turned over to Mr. Tillotson, do you have any reason to believe that they were altered?
A. No.
Q. Generally speaking, are you aware that -- I think I asked this before, but I'll ask it again -- that Heritage recorded conversations between its personnel and other people, clients, people on the telephone?
A. I know there were various tape recordings. What exactly was on them, I have no idea.
Q. Do you know why they were being recorded?
A. No.
Q. Do you know if there was a company policy with regard to recording conversations?
A. I don't know.
Q. Okay. With regard to the questions that I've asked you and you've told me that you do not know, who would be more likely to have the answer to those questions?
A. It depends on which particular question we're talking about.

Page 25

Q. Okay. Well, would Mr. Kornman pretty much have knowledge of all of the questions that I asked you with regard to Heritage and the Sands?
MR. VOLNEY: Objection; form.
A. You're going to have to be more specific.
Q. (BY MR. HERRIN) All right.
A. I mean, isn't this whole thing about Heritage and the Sands? I mean --
Q. Well, yes, it is actually.
A. Then you've got to be more specific.
Q. All right. The documents that you looked through earlier that you said you didn't have any familiarity with, who in Heritage would probably be familiar with these documents or be likely to be familiar?
A. You're talking about the ones in this book?
Q. Yes.
A. Various people. I mean, I'm just going off what I saw that --
Q. Could you give me some names?
A. You know, it would be whoever created the document or whoever got the document or -- so it would be various people, I believe, as regard to various items.
Q. All right. With regards -- let's go back through it then. With regards to No. 1 and 2, which are some presentations made to the Sands family -- or appear to be

Page 46

Q. So it's just a matter of sometimes they were recorded, and sometimes they weren't and you don't know why?
A. I don't know -- yes. I mean, some -- I know there were recordings. I don't know what their criteria was when a recording was required or when it was not or subsequently when the transcript was required or not.
Q. If a conversation between an employee of The Heritage Organization and a member of the Sands family had been recorded during 2001 -- and I want to ask this question both with respect to the actual tape and then the purported transcript that was made from the tape. I want to make sure I understand your testimony as to when you took -- would have taken control of those documents for purposes of producing them to the bankruptcy trustee.
At what point in time would you have taken control of those documents and tapes if you view that as something other than a document?
A. Well, everything -- you say "taken control." I mean, in April of 2004, prior to that time, Heritage had offices in an office building. Okay. So in April of 2004, April and May, everything was removed from those offices, and all the -- all the paper or the majority of the paper and documents and that kind of thing was taken to a hangar at Addison Airport. And then subsequently, they were moved to various places to either make them more -- more secure or more environmentally

Page 47

protected.
Q. When you say to "make them more secure," were they -- what do you mean by "more secure"? What was the security like prior to that point in time?
A. Well, we had security there. We actually had armed guards there most of the time.
Q. By "there," do you mean after --
A. At the hangar.
Q. Okay. So after they were moved?
A. Yes.
Q. Okay. And beforehand?
A. Before they were moved?
Q. Yes, ma'am.
A. Well, various records were stored in various places that had various security measures. For the most part, I think most of the client files were files -- or files that contained client information were in a locked area that had very restricted access.
Q. Okay. With respect to the documents, again, that are marked as Exhibits 3 through 9, do you know if those specific documents were maintained in the Sands client files?
A. Well, first of all, I don't know that these were ever in the Sands client files.
Q. That's my question.
A. I don't know where these came from. I don't know --

Page 48

if there were transcripts of recordings, then they should have been part of the client's file.
Q. How many people would have had access to those files?
A. I don't know.
Q. Roughly, between 2001 and April and May of 2004. And let me back up. Let me make sure I understand.
It was April or May of 2004 that those client files would have been moved to the hangar?
A. Yes.
Q. And you were involved in that process?
A. Yes.
Q. Did you have any involvement in maintaining those client files prior to April or May of 2004?
A. No.
Q. So there's gap in the chain of custody of those files between 2000 -- again, if these are actually recordings of the Sands family members' conversations with The Heritage Organization, there's a gap between 2001 and between April or May of 2004 when you took control; is that correct?
A. When you say "there's a gap" --
Q. With respect to your personal knowledge of what -- how these documents were maintained, you don't know how they were maintained before April or May of 2004?
A. That's correct.
Q. And you said you don't know how many people would

Page 49

have had access to those tapes.
But can you just give me a rough estimate -- or excuse me -- not to the tapes. To the client files.
Can you give me a rough estimate as to how many people would have had access to the client files between, let's say, the end of 2001 or April or May of 2004?
A. The number of people? At any given time or --
Q. In total.
A. In total. I would say -- if I had to guess, I would say 15 or less.
Q. I want to try and clarify some testimony you gave regarding alterations. At one point earlier in your testimony, I thought you testified that you didn't think that any of these documents would have been altered. But then later you said that you really -- you had no idea whether things had been altered when they were not in your possession.
So with respect to the earlier testimony, did you mean to say that you wouldn't believe that any of these documents have been altered once you took possession of them? Do you have -- let me ask it a different way.
Do you have any way of knowing whether these documents were altered before you took possession of them?
A. So prior to April or May of 2004?
Q. Yes, ma'am.
A. No.

Page 54

MR. HERRIN: Give me just a minute. Let's go off the record.

(Break was taken at 11:41 a.m. to 11:45 a.m.)

FURTHER EXAMINATION

BY MR. HERRIN:

Q. Ms. Walker, was it Heritage's practice to hire incompetent people?

A. Not if we could help it.

Q. Didn't Heritage actually pride itself on bringing its employees through a battery of tests for qualifications, aptitude, that kind of stuff?

A. Yes.

Q. Do you believe that Mr. Kornman would direct somebody to alter a tape recording that had been made of a meeting that he attended?

A. Of course not.

Q. Do you think Mr. Kornman would direct Heritage employees to do so?

A. Of course not.

Q. Okay. Are you familiar with Ralph Canada? Do you know him?

A. Yeah, I know him.

Q. Mr. Canada worked for Heritage at one time, did he not?

A. He did.

Page 55

Q. And, in fact, he was an officer?

A. At one point, he was the president, yes.

Q. When did Mr. Canada leave Heritage?

A. I believe it was July 2002.

Q. Is it your understanding that he left on less than favorable circumstances?

A. It's my understanding that he left.

Q. Okay. Are you aware that Mr. Canada and -- has been pretty much involved in litigation with Heritage since that time?

A. I know that Mr. Canada filed an arbitration immediately -- I believe immediately prior to the date that he left.

Q. Okay.

A. And we've -- that's been ongoing, I believe.

Q. Okay. Do you believe that Mr. Kornman would direct a Heritage personnel to alter transcriptions made from recordings of conversations between Heritage personnel and clients?

A. No.

Q. Okay. I want to mark a new exhibit. I think we are now up to 55.

(Deposition Exhibit No. 55 was marked.)

A. Are we done with this?

Q. We're done. Well, let's --

A. Okay.

Page 56

Q. Are you familiar with Heritage's Contractor Training Manual?

A. No.

Q. I'm going to ask you to take a look at -- these are excerpts from that manual. The first page there, could you read the second sentence aloud, please.

A. Every conversation you have with a PC, every letter that you send and every meeting that you set will require its own green sheet.

Q. Okay. And I'm sorry. Read the first sheet talking about green sheets.

A. I'm sorry. The --

Q. The first --

A. Oh, the first sentence. The green sheet is the form used to request tape transcription or a letter or both from marketing support.

Q. Okay. Does this make it appear that Heritage wanted its conversations recorded and transcribed?

A. I can only tell you what this says. I could read it again for you, but, I mean, it just says what it says.

Q. All right. Let's go to the second page there talking about tapes and green sheets.

Read the first sentence, please.

A. Obviously whenever meetings are set, it is important to have the conversation transcribed.

Page 57

Q. Any reason to think Heritage personnel deviated from its policy?

A. I have no reason to think one thing or the other.

Q. Okay. If you'll go to the next page, then, under Paragraph A. Read that aloud, please.

A. If you speak to a PC in a state where the conversation can be recorded but fail to record the conversation, paren, or any part of the conversation, close paren, you are subject to a $50 fine.

Q. Are you familiar with that policy?

A. Not specifically, no.

Q. Are you familiar with a policy in general to fine Heritage employees for not recording conversations?

A. I know there were at various times various fines instituted, but specifically what they were for, I don't know.

Q. Okay. The ones that you recall, what were they for?

A. I don't know.

Q. Okay. The last page, could you read that first sentence, please -- aloud, please.

A. One thing that is extremely useful to our contractors as they attend a meeting are transcripts of conversations, especially those transcripts that ultimately resulted in a meeting being scheduled.

Q. Okay. Based on what you've seen here, does it appear that it was important to Heritage that it have these meetings

Page 58

transcribed and recorded?
MR. VOLNEY: Objection; form.
A. If -- well, I can only tell you that this says what it says. I don't, again, know where it came from. There obviously are gaps.
Q. (BY MR. HERRIN) You're welcome to look through the manual if you'd like if you think that's going to make a difference.
A. I still don't know where it came from.
Q. So do you think the gaps, that you don't see all the pages, make a difference to your testimony?
A. Well, I have no idea one way or the other.
Q. Okay. In that case, let me let you take a look through this and you can decide what --
A. I would still not know where it came from --
Q. All right.
A. -- or --
Q. Do you have any reason to believe that this did not come from a Heritage Contractor Training Manual?
A. I have no reason to believe one way or the other.
Q. Okay. Do you have any reason to believe that this was not consistent with Heritage's practices?
A. Again, I would have no way of knowing.
Q. Who would have knowledge of The Heritage Contractor Training Manual and its practices?

Page 59

A. Well, I would say that the contractors would know what -- what they were expected to do and what their procedures were.
Q. Would this manual have been prepared by the contractors?
A. I have no way of knowing that.
Q. Okay. Yesterday in a different deposition -- it wasn't today -- but the suggestion was made that Heritage and Mr. Kornman -- and the suggestion was made by Mr. Canada in a deposition not connected to this proceeding, that Heritage and Mr. Kornman would alter Heritage's records. And so specifically, that's why we asked those questions earlier. Let me just one more time hit on it.
Mr. Kornman -- do you believe Mr. Kornman would alter Heritage's records?
A. Not -- no, just to alter the records. If, for example, something were incorrect and needed to be corrected, then that's different to me than altering. I mean, when you say "alter," that means -- to me that's something sinister and that you change something that is -- that was already correct.
Does that make sense?
Q. It does actually. It's one of the few times we agree. So if you've got a record and he's looking at a transcription and there's a word that's wrong or out of place, he might have corrected that. But he wouldn't come in and say,

Page 60

Delete ten minutes from this tape or change the context?
A. No. No, I don't believe so. No.
Q. Okay. And, again, you don't believe that he would have directed anyone at Heritage to do so on his behalf?
A. No.
MR. HERRIN: Okay. Pass the witness.
FURTHER EXAMINATION
BY MR. CULLINAN:
Q. I just have two quick follow-up points. Going back to this --
MR. CULLINAN: What is this marked as?
MR. HERRIN: That is 55.
Q. (BY MR. CULLINAN) Going back to Exhibit 55. On the -- what's marked here as Page 33, it's got a bunch of numbers on it -- or APP 2409, the third paragraph begins, The best way to avoid?
A. Yes.
Q. What does the last sentence in that paragraph say?
A. Then if you do not have an important conversation, you rewind the tape and begin again.
Q. What does that suggest to you, if anything?
A. Well, I don't know if I only read that sentence.
Q. Well, might it suggest that it leaves it to the contractor's discretion to determine what's an important conversation and whether the tape needs to be maintained or it

Page 61

should be recorded over?
A. Yeah. If you go back to the beginning of the paragraph, what it says to do is record everything. And then once you're done, if you don't have an important conversation, you rewind the tape and begin again. So --
Q. So what does that mean to you?
A. So it means that whoever this is directed to, whoever is doing this, yes, gets to determine if there was anything significant. And if not, they rewind the tape and go to the next thing.
Q. Okay. Mr. Herrin asked you some questions about altering tapes. And I agree, that's a fairly sinister term.
Let's assume that we have a recording that has gaps in it. Perhaps you couldn't hear what was said. The tape isn't clear. Perhaps the tape ran out. Maybe the batteries went dead. Any of those things.
Would it shock you to hear that Mr. Kornman or other employees at The Heritage Organization filled in from their memory what was said?
A. Would it shock me? No. Do I know that it happened? No.
Q. Okay. Do you know whether it happened or not?
A. I don't know.
Q. Okay. And now let's take the flip side. Let's say that we've got ten hours of tape, nine hours of which is just