Witness: Brian Czerwinski



UNITED STATES COURT OF FEDERAL CLAIMS

CONDENSED TRANSCRIPT

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER, Plaintiffs, | ) | |
| V. | ) | No. 06-407-T |
| UNITED STATES OF AMERICA, Defendant. | ) | |

*******************************************************

ORAL DEPOSITION OF
BRIAN CZERWINSKI
AUGUST 28, 2007
VOLUME I

*******************************************************

ORAL DEPOSITION OF BRIAN CZERWINSKI, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of August, 2007, from 9:06 a.m. to 2:49 p.m., before Stacey R. Cruz, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Department of Justice, Tax Division, located at 717 North Harwood Street, Suite 400, Dallas, Texas, in accordance with the United States Court of Federal Claims and the provisions stated on the record or attached hereto.

PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT 4

Page 6

BRIAN CZERWINSKI,
having been first duly sworn, testified as follows:
EXAMINATION
BY MS. JOHNS:
Q. Will you state your name for the record, please.
A. Brian Czerwinski.
Q. And will you spell that for the court reporter.
A. Czerwinski, C as in cat, Z as in zebra, E-R-W-I-N-S-K-I.
Q. Now, Brian, we've met before when you came here to do a deposition in the Coldon Producer case [phonetic], but my name's Michelle Johns. I'm with the Department of Justice Tax Division, and we've discussed a few minutes before the deposition got started, that you've had some experience giving depositions.
A. Yes, ma'am.
Q. So you understand the rules; answer audibly so the court reporter can get your answer down, and we'll try to not talk over each other, and wait for me to finish asking my question, and I'll wait for you to finish answering the question before we speak again; is that okay?
A. Okay.
Q. Have you prepared in anticipation of your

Page 7

testimony today in anyway?
A. No.
Q. Have you spoken with any of the attorneys for the Sands Family --
A. Yes.
Q. -- prior to this deposition? And who was that?
A. I don't even recall -- there's been three different guys who've called, and I only spoke to them briefly. And I don't -- I don't know, specifically, which one I spoke to. There's three of them that have called, Tom Cullinan.
Q. Okay. And this is Mr. Cullinan, by the way. I don't know if you got introduced.
A. Right. Joe -- Joe Du- --
Q. DePuet [phonetic].
A. -- DePuet, and I think there was a third guy.
Q. Ken Jones, maybe?
A. That name doesn't sound familiar.
Q. Okay. And what was the topic of the conversations that you've had?
A. Well, originally, they called to see if I would speak to them in advance of the deposition that was previously scheduled, and I had arranged a time to speak to them the following Monday, and then when the deposition was moved, I didn't hear back from them, and

Page 8

then they've left two voice messages; one yesterday, and one Friday or over the weekend.
Q. And did you return those messages, return -- with return phone calls?
A. No.
Q. Okay. So you -- have you had any substantive conversations with them regarding the Sands case?
A. No.
Q. Okay. What is your home address?
A. 3572 Corkwood Drive, Frisco, 75034.
Q. Can you briefly give me a description of your educational background from high school on?
A. From high school on, I went to Austin College in Sherman, Texas, and I have a bachelor of arts in economics and business administration, and then after that, I went to work.
Q. And where did you work out of college? What was your first job out of college?
A. With Hancock Financial Services, and that was briefly; I don't think I ever actually made any money, and I waited tables at a couple of restaurants, and then in March of 1995, went to work for Heritage.
Q. Okay. And what was your job title when you went to work with Heritage in March of 1995?
A. Just a member of the analytical department.

Page 9

Q. And how long did your employment last with Heritage?
A. Through April of 2004.
Q. And did you resign from Heritage in April 2004?
A. No, my employment was terminated.
Q. Okay. Was there a specific reason why your employment was terminated?
A. I think everyone at the company was let go.
Q. Okay. And then what happened in April 2004, as far as employment? Did you find another job, at that point?
A. I was unemployed until beginning of July of '04.
Q. Uh-huh. And then what happened in July of '04?
A. I went to work for Mr. Kornman, Gary Kornman --
Q. Uh-huh.
A. -- for another company of his.
Q. And what was the name of that company?
A. Eagleview Capital Management.
Q. And how long did your employment last with Eagleview Capital Management?
A. I think, including -- I think it changed its name somewhere in the interim, but that lasted until February or March of '06.
Q. And then what happened in February or March of

Page 86

A. I don't know.
Q. Generally, what was your understanding regarding what conversations would or would not be recorded?
A. Typically, the only time that I would have recorded a conversation on my own, would have been if the conversation was going to be discussing, in some way, the fee that would be paid to Heritage, because I never wanted to be, I guess -- since I wasn't authorized to establish the fee to Heritage, I didn't want to be in a situation where someone could say, Well, Brian told us the fee $2 million, in reality, it should have been $2 and-a-half, and so I just wanted to the make sure that Heritage, and specifically Gary and the principals, knew that I wasn't telling the client that a fee was X dollars. It was -- whatever the fee was going to be, was what the fee was from the agreement.
Q. Okay. And what about, not specifically with respect to you, but generally, the Heritage policy? What was your understanding about the Heritage policy regarding what conversations would be recorded and what conversations would not be recorded?
A. I mean, I guess I don't -- I mean, again, I don't know what -- I don't know what the policy was for every given department, and with respect to the

Page 87

analytical department, I'm not sure if we were supposed to be recording all these calls and we just never did, because we didn't, or if, you know, there was a specific policy with respect to -- to us. I just don't remember. I just not that, typically, I never recorded phone calls.
In my normal day-to-day functioning and my responsibilities at Heritage, I didn't record many conversations at all over the six or seven years this was going on.
Q. Did you, at the me- -- you said you attended some face-to-face meetings with the Sands.
A. Yes.
Q. Do you know whether those meetings were recorded by someone at Heritage?
A. I don't know.
Q. Do you know what use Heritage would make of the transcriptions?
A. Well, the transcriptions that -- that -- you know, I typically would see would be in the -- in the marketing file that would be for meetings, you know, before the client signed and you could use it to get -- to get information out, you know, that was being communicated back and fourth between the contractor, whoever was there, and the -- the potential client.

Page 88

Q. Okay. I'm going to ask you one last question, and then I think I'll be finished with you.
A. Okay.
Q. Was the strategy that Heritage implemented for the Sands that we've just been discussing in this deposition, was it designed to eliminate capital gains tax?
A. It was designed to give the opportunity to potentially eliminate capital gains tax.
MS. JOHNS: Okay. We'll pass the witness.
MR. CULLINAN: Great. Thanks.
MR. HERRIN: Tom, I assume you'd rather not break for lunch? I doubt if he wants to stay here, but I thought I'd throw it out there.
MR. CULLINAN: Well, let's go off the record for a minute.
(Off the record for one minute.)
EXAMINATION
BY MR. CULLINAN:
Q. Good morning, Mr. Czerwinski.
Have you ever been interviewed before by the IRS?
A. Interviewed or deposed?
Q. Interviewed.
A. I don't think so.

Page 89

Q. Okay. Have you ever been deposed by the Department of Justice?
A. Yes.
Q. How many times?
A. Once.
Q. And that was the Comb case?
A. Yes.
Q. Have you ever been deposed in any other proceeding?
A. Yes.
Q. And what were those proceedings?
A. Let's see if I can remember them all. There was, I think, Carl Berg suing Heritage.
Q. B-E-R-G?
A. B-E-R-G. Penske versus Lewis, Rice & Fingersh, Penske, P-E-N-S-K-E. Give me just a second. I mean, there's several, so -- I can't remember right now. They'll -- they'll come to me, but there's mul- -- there's multiple depositions that I've given.
Q. Any other depositions taken by the government?
A. I don't think so.
Q. You testified you worked at the analytical department at the Heritage organization; is that accurate?
A. Yes.