COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407T

(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)

- - - - - - - - - - - - - - - - X

ALPHA I, L.P., by and through )
ROBERT SANDS, a notice partner, )
Plaintiff )Case No. 06-407T
-vs- )
THE UNITED STATES, )
Defendant )

- - - - - - - - - - - - - - - - X

Deposition of RICHARD SANDS taken pursuant to notice at Constellation Brands, 370 Woodcliff Drive, Suite 300, Fairport, New York on Tuesday, June 12, 2007 commencing at 9:30 a.m.

Reported by:
COMPUTER REPORTING SERVICE
Amy M. Condon, CSR, RPR
270 Reynolds Arcade Building
16 East Main Street
Rochester, New York 14614 (585) 325-3170

GOVERNMENT EXHIBIT 5

PENGAD-Bayonne, N. J.

A. Yes.
Q. What does it do today?
A. It I believe is an investor in Alpha today.
Q. And are you one of the shareholders of RRM&C Management Corp?
A. Yes.
Q. Are you familiar with the Marvin Sands master trust?
A. Yes.
Q. And are you a trustee of that trust?
A. Yes.
Q. We mentioned before the trust created for the benefit of Andrew Stern, Zachary Stern and Abby Stern.
Are you a trustee of any of those trusts, all of them, do you know?
A. I believe I'm a trustee of all of them, but I could be incorrect.
Q. Okay. I think that's all the entities, except for the charitable remainder trusts that we'll talk about later on.
Now, are you familiar with an entity called The Heritage Organization, LLC?
A. I'm uncertain as to really what your question is.





Q. Let me show you something that may refresh your memory.
A. I don't know what it means to be familiar with an LLC.
Q. Well, let's start this way. I'll show you this letter, and Tom, do you want to go ahead and pull it out and we'll mark it.
This has a government exhibit on it it because it was attached to our MSJ and we'll mark it Exhibit 1 for the deposition.
(U.S. Exhibit No. 1 - letter - marked for identification.)
BY MS. JOHNS:
Q. This is a letter dated March 29th, 2001 addressed to you from someone named Chet Decker.
Do you recall -- do you want to take a minute to look at this letter?
MR. JONES: I'll note for the record this isn't a signed copy, and you said it comes from your files?
MS. JOHNS: I think it does, yeah.
MR. JONES: So it's an unsigned perhaps draft of a letter.
THE WITNESS: Okay.





BY MS. JOHNS:
Q. Do you recall this letter?
A. No.
Q. Do you recall receiving it?
A. No.
Q. Do you think this is the first time you've seen it or do you think you might have seen it back in March of 2001 or you just don't remember it?
A. From reading the first paragraph it looks to me as if this is a follow-up to cold calls that Heritage placed to me.
Q. Okay.
A. Which I receive thousands of.
Q. So let's start from your very first interaction with The Heritage Organization. You said you got some cold calls?
A. I got a cold call.
Q. Do you remember when that was? Just generally. I don't need an exact date.
A. Early 2001.
Q. Okay. What did they say on the call?
A. I don't remember to be quite honest.
Q. And how many times did they call you?
A. I think once, twice maybe. Again, I could be





correct -- incorrect.
Q. At what point did you decide you wanted to actually have a face to face meeting with Heritage?
A. I never decided that.
Q. Okay. Did you -- let me ask this: Did you ever have a face to face meeting with Heritage?
A. Yes. I was involved in a face to face meeting with Heritage.
Q. And when was that meeting?
A. I don't remember.
Q. Was it in 2001?
A. I would suspect so.
Q. Okay. How many face to face meetings with Heritage did you have?
A. I don't recall.
Q. Now, you said that the cold calls -- at some point the cold calls --
A. Call.
Q. Cold call?
A. Potential call.
Q. Became a face to face meeting. Who made that decision to finally say, okay, let's meet with Heritage?
A. My brother.

Q. Robert?
A. Uhm-uhm.
Q. In that first face to face meeting, was it here?
A. I don't recall.
Q. Do you remember flying to Dallas for the meeting?
A. I don't recall.
Q. Okay. Who was at this first face to face meeting with Heritage?
A. I really don't recall specifically anyone, but I believe Gary Kornman was certainly there, but I could be incorrect.
Q. So the only person from the Heritage side you remember being there was Gary?
A. That's not what I said. I said I don't recall at all who was there.
MR. JONES: Let me advise the witness that you should not speculate on answering the questions.
THE WITNESS: Very good. I don't recall who was there.
BY MS. JOHNS:
Q. Who from your family was at the meeting?
A. I don't recall.





Q. Now, how many -- I don't think I asked you this already, but how many face to face meetings with Heritage did you have?
A. No idea, I don't recall.
Q. And you don't ever remember traveling to Dallas to meet with Heritage?
A. I don't recall traveling to Dallas to meet with Heritage.
Q. At this first meeting that we talked about, this first face to face meeting with Heritage in 2001, what was discussed?
A. I don't recall. I don't recall any specifics of any meetings.
Q. Okay. Would reviewing this letter refresh your memory at all about maybe what was discussed at the meeting?
A. Not one bit.
Q. Can you say today why Heritage -- why would Heritage contact you, why would they make a cold call to you, do you know?
A. I can't speculate about why they would do anything.
Q. Do you know why Robert finally agreed to meet with Heritage?





A. Yes.
Q. Why was that?
A. We had discussed a potential sale of family owned Constellation stock along with some estate planning and philanthropic plans along with certain uncertainties that we would face once we started the process of selling family stock. And I told Rob as I believe, okay -- this is really reconstruction - of the fact that this group had called me and talked about similar things. That's what I believe, but that may not be precise. That's the connection.
Q. Okay. In your meeting with Heritage and in the time leading up to the implementation of these transactions, what were your goals for the transactions that are at issue in this litigation?
A. One, to make a profit; two, to diversify our holdings which were very concentrated in Constellation stock. These are not in order of priority necessarily. Three, to do some estate planning work; four, to provide for the philanthropic needs that we would be having at the time and in the future. I think that's basically, you know, a basic family business plan or financial plan you would call.
Q. Now, this letter I've shown you that I marked





as Exhibit 1 states in the fourth paragraph entitled capital gains, it says, we offer strategies that can eliminate the total tax liability on capital gains.
Was one of your goals to eliminate the total tax liability on capital gains?
MR. JONES: I'm going to object to the form of the question only because you refer to this as a letter. It's an unsigned copy of something and it hasn't been established that it was sent or received.
So I object to the characterization that it's a letter. It's not supported by the record. You can answer the question if you understood it.
THE WITNESS: Could you repeat the question?
BY MS. JOHNS:
Q. This letter states that Heritage offers strategies that can eliminate the total tax liability on capital gains.
Was one of the these goals on these transactions to eliminate the total tax liability on capital gains with respect to the sale of the Constellation stock?
A. The question is not clear to me. If the question is -- was it the goal to eliminate totally capital gains tax?
Q. Right. Well, that's --

A. No.
Q. Well, why are you -- why do you disagree with that?
A. Because it was not a goal to eliminate totally capital gains tax.
Q. Okay. Now, before the transactions at issue in this litigation happened, did you know what the tax effects would have been of an outright sale of your Constellation stock?
A. Yes.
Q. Can you tell me what that would have been?
A. Normal payment of tax against the gain.
Q. So you understand the concept of basis?
A. Yeah.
Q. And do you remember what the basis of your Constellation stock was around the year 2001?
A. No.
Q. But was -- do you recall whether the basis of the stock was low relative to the overall value of the stock?
A. Oh, yes.
Q. So you understood if you hadn't entered into these transactions you would have had to have paid a capital gains tax on the sale of the stock?





A. Yes.
Q. And do you understand that as a result of the transactions at issue in this litigation that you pay little to no tax in connection with the sale of the Constellation stock?
A. Yes.
Q. Now, back to the meetings with Heritage. I know you say you don't recall much. Let me ask my questions and if you don't recall just say that.
Do you remember whether there were any -- what we would call a wipe board presentation at the Heritage meeting, something similar to that?
A. I don't recall.
Q. What about a power point presentation?
A. On a screen?
Q. Sure.
A. I don't recall.
Q. Other than the two transactions that are at issue in this litigation, did Heritage advise you regarding any other sort of strategies or planning techniques?
A. Yes.
Q. What strategies or planning techniques were those?





A. We had very, very broad conversations about estate planning, family partnerships, inner family loaning, creating trusts, you know, hedging strategies against concerns that we had, noncorrelated investment strategies to our concentrated position, diversification strategies. Boy, you know, philanthropic discussions.
Q. Okay.
A. I mean, those are broad topics.
Q. That's fine.
A. I don't recall specifics in each one of those, but very, very broad discussions about family financial planning and how families function.
Q. Okay. Other than the two transactions that are at issue in this litigation, did you enter into any of these other Heritage strategies that you just talked about? Did you implement any of these Heritage ideas or strategies.
A. Over the long-term, yes.
Q. Did you implement those with help of Heritage?
A. I don't know what help means.
Q. Well, for instance, in these two transactions we know that Heritage helped with preparation of





documentation and documentation and implementation. In the other strategies that we're talking about, other than the two at issue in this litigation, did Heritage help you with implementation?
MR. JONES: I'll object to the question because I think it's confusing. We're talking very broadly, but if you understand the question, please answer it.
THE WITNESS: Well, if you would rephrase the question. Did Heritage implement for us other strategies?
BY MS. JOHNS:
Q. That's exactly what I'm asking you. You got it right there. Other than the two at issue in this litigation.
A. Did Heritage implement through preparing documentation or anything of that nature, no.
Q. Thank you. Do you recall signing a nondisclosure agreement with Heritage?
A. Yes, because I've reviewed it.
Q. Okay. What was your understanding of this nondisclosure agreement?
A. What was my understanding, you said?
Q. Right.

A. I don't recall what my understanding was at the time.
Q. Do you have an understanding of that agreement now?
A. Yes.
Q. What is that understanding now?
A. That's too far broad of a question for me to answer. I mean, could you be more specific please?
Q. From what I recall from the agreement you were I guess forbidden from disclosing it to other individuals. I hate to paraphrase.
MR. JONES: I object to the form of the question. Counsel is testifying.
MS. JOHNS: I can show you the agreement if you'd like. That might make things easier.
THE WITNESS: Whatever you'd like.
(U.S Exhibit No. 2 - nondisclosure agreement - marked for identification.)
BY MS. JOHNS:
Q. Does this agreement look familiar to you?
A. Yes.
Q. Okay. I don't know if you want to take a minute to review it. It's kind of wordy, but --
A. Why don't you point out what you'd like me to





look at.
Q. It would be on the third page, Article 7, and it's 7.3.
A. Okay.
Q. Essentially what I was describing before, it appears to be basically a two million dollar penalty if you reveal the transaction to anyone.
Is that what your understanding was?
A. Yes, that's what my understanding is.
Q. Okay. My question is: Did you ever --
A. I believe I understood it at the time also.
Q. Okay. Did you ever discuss the transactions with anyone other than Heritage?
A. Yes, other advisors.
Q. Do you know whether they also signed an agreement similar to this when reviewing the Heritage strategies?
A. I don't know.
Q. I'm going to come back to this agreement, but we'll leave it for the time being.
A. Okay.
Q. Now, I think -- I just want to talk about some people with Heritage, and you may have never met them. I don't know. I just want to ask the questions.





We talked about Gary Kornman.
A. Uhm-uhm.
Q. I think you said you maybe recalled meeting him once?
A. Well, I recall Gary, yes.
Q. How many times did you --
A. I don't know specifically how many times I met with him.
Q. Did you talk to Gary on the telephone?
A. I did.
Q. Do you recall approximately how many times you might have spoken with him on the phone?
A. No.
Q. When was the last time you spoke with Gary?
A. Years and years ago. I don't know.
Q. Did you -- do you know someone named Ralph Canada.
A. I don't recall.
Q. He would have been a Heritage employee. No?
A. I don't know. I mean, I don't recall.
Q. Do you recall meeting someone named Brian Czerwinski?
A. I recall the name. I do not remember whether I met him or didn't meet him.





Q. Do you know someone by the name of Rodney Johnson?
A. I don't recall.
Q. Other than Gary did you have any other contacts with any Heritage personnel that you can remember?
A. I had contact with other personnel, but I don't remember who.
Q. Okay. Did you ever have a telephone conversation with Brian Czerwinski?
A. Probably so.
Q. Do you recall what was discussed in those conversations?
A. I don't.
MR. JONES: Excuse me. Could you spell Czerwinski for us?
MS. JOHNS: It's C-z-e-r-w-i-n-s-k-i.
MR. JONES: Thank you.
BY MS. JOHNS:
Q. Did you ever have any discussions with anyone regarding Heritage's experience with financial or investment matters prior to entering into these transactions?
A. With anyone?

Q. Like, did you get any references is kind of what I'm referring to.
A. I believe Rob may have.
Q. But you didn't personally?
A. No.
Q. At the meeting that you had with Heritage did anyone from Heritage associate these two strategies, the two transactions, with the potential amount of taxes to be saved?
A. At the meeting?
Q. The meeting.
A. The meeting? I don't know.
Q. The one face to face meeting that you do recall having in 2001 --
A. Wait. I said to you I do not recall the specifics of any meetings that I had, but I assume I had meetings and more than one.
Q. Okay. So if I ask you any question about what was discussed at those meetings your answer is going to be you don't remember anything; is that correct?
A. That is correct.
Q. Okay.
A. Now -- that is correct. I have a very bad





memory and I really do. I can't remember anything.
Q. That's fine. I just have to ask the questions.
A. It's okay. I hope you don't mind the answer.
Q. No.
Do you know who primarily dealt with Heritage on behalf of your family?
A. Rob.
Q. Okay.
A. I need to correct that. I mean, I was present. I dealt with them. I just don't remember anything.
Q. Do you think Robert had more contact with Heritage than you did?
A. I can't speculate.
Q. Okay.
A. I'm withdrawing my answer when I said Rob, because I don't know who primarily dealt with them. We both dealt with Heritage.
Q. Do you recall whether Andrew Stern ever met with Heritage or spoke with Heritage on the phone?
A. I don't recall whether he ever met with Heritage or spoke to Heritage.
Q. What about your mother Marilyn, do you recall





whether --
A. She never met Heritage or spoke to Heritage.
Q. Okay. Like I said, I'm going to ask you these questions. If you don't remember, that's fine. But I have to at least ask them.
A. It's okay.
Q. At the meeting with Heritage or meetings that you may have had, did anyone discuss any sort of time line that the strategies would need to generate the results?
A. I don't recall.
Q. Okay. Was there any discussion about profit potential from the transactions at the meetings?
A. I believe so in that that was our number one motive is to make money.
Q. Now, we're talking about the transactions, the first and the second transaction.
What were the sources of profit that you believed existed with respect to these transactions?
A. Well, one, I believe we made short sales of treasuries, highly leveraged short sales of treasuries which can result in a huge return on your investment.
We had in the second transaction purchased Yahoo and Corning which as I recall were at all time low. So





those have great profit potential. And there were many other investments -- transactions you could say, investment transactions, I really should say that had profit potential.
Q. What other investment transactions are you referring to?
A. Buy other stocks, go long on treasuries, go short on treasuries.
Q. You don't mean specific to these transactions. Are you talking in general?
A. Yeah, in general.
Q. I was referring to these two specific transactions and what kind of profit potential you saw in these transactions.
MR. JONES: When you use the word transaction it's unclear to me, I don't know if it's clear to the witness. It's unclear to me whether you're talking about these specific historical transactions included excluding everything else or you're talking about the organizations that conducted those transactions. There's a built in ambiguity. I know you're doing it in shorthand. I'm not trying to interfere with your questioning but there's a built in ambiguity in that question.

won't mark this as an exhibit.
A. Which is the first?
Q. Yes, the first one. There is really no need to mark it. This says that the short sale was closed and a net loss of $424,000 was recognized.
A. Okay.
Q. Would you agree with that after seeing the complaint?
A. Well, yeah, I guess so.
Q. Okay.
MR. JONES: The right way to start that question is do you have any reason to doubt that.
THE WITNESS: I have no reason to doubt it.
BY MS. JOHNS:
Q. And this is the -- let me just clarify for the record, this is the Alpha I, LP complaint and in paragraph 30 it states that the short sales were closed and a gain was recognized of ninety thousand dollars. Do you have any reason to doubt that?
A. No.
Q. And this Alpha transaction was the second set of partnerships that we've talked about.
A. Okay.
Q. So we mentioned the fees paid to Heritage





were somewhere - and I'm just talking about you now - one point three million, and the -- there was essentially a net loss on the short sales of the treasuries between the first and the second set of partnerships. Would you agree with that? Do you have any reason to doubt that after what we just looked at?
A. I don't have any reason to doubt it.
Q. Okay. So let me ask you this: Do you consider that the fees that you paid to Heritage to be high compared to the amount of profit that you earned on these transactions?
A. I don't look at the fees that way.
Q. How do you look at the fees?
A. I look at the fees on profit potential, not on actual.
Q. Can you give me a better explanation of what you mean by profit potential?
A. Sure. When you make a highly leveraged transaction, whether it be a short sale or a purchase especially of treasuries which I think only require two, three percent margin, small fluctuations in interest can result in millions of dollars of gain.
Q. Okay. Was that what you were anticipating would happen here?





A. That is what one always desires to happen is to make a profit. There are no guarantees.
Q. Were there other fees that were also associated with the first set of partnerships and the second set of partnerships other than the fees you paid to Heritage? For instance, let me give you some examples, some appraisal fees. Do you recall whether there were any fees related to any appraisals?
A. Well, I recall that in the first transactions there were appraisals. So -- I don't recall the fee though.
Q. What about any other legal fees? Do you recall paying any additional legal fees?
A. I don't recall any specific fees.
Q. So those are the types of fees I'm talking about. Can you recall any other fees?
A. I don't recall any other fees. I need to just stop you. I mean, we are a family. We are a business. We are paying lawyers, accountants, advisors, all the time.
Q. Okay.
A. Okay. I don't recall specifics to this transaction. It doesn't mean that there weren't others.





Q. I'm going to ask you this question. I understand if you don't recall, but I have to ask it anyway.
A. Okay.
Q. In your meetings with Heritage did you -- did Heritage discuss with you all the steps necessary to implement the first set of partnerships and the second set of partnerships?
A. I do not recall the specifics of any of the meeting or meetings.
Q. Okay. Do you recall today as we're talking the steps necessary to implement the first set of transactions and the second set of transactions?
A. The steps?
Q. Creation of the partnerships, transfer of the short sales.
A. I recall from having reviewed, okay, the partnerships we created.
MR. JONES: I think we need a more specific question if you have one.
BY MS. JOHNS:
Q. Well, this is my ultimate question. I'm not sure it's going to be more specific but let me ask it anyway.