Witness: Rita Daugherty



Page 2

CWC PARTNERSHIP I, BY AND )
THROUGH TRUST FBO ZACHARY )
STERN U/A FIFTH G, ANDREW ) No. 06-411T
STERN AND MARILYN SANDS, )
TRUSTEES, A NOTICE PARTNER, )
Plaintiff, )
)
VS. )
)
THE UNITED STATES, )
Defendant. )

MICKEY MANAGEMENT, LP, BY AND)
THROUGH MARILYN SANDS, A )
NOTICE PARTNER, )
Plaintiff, )
) No. 06-810T
VS. )
)
UNITED STATES OF AMERICA, )
Defendant. )

M.L.R & R, BY AND THROUGH )
RICHARD E. SANDS, TAX MATTERS)
PARTNER, ) No. 06-811T
Plaintiff, )
)
VS. )
)
UNITED STATES OF AMERICA, )
Defendant. )

**************************

ORAL DEPOSITION OF
RITA DAUGHERTY
AUGUST 30, 2007
Volume No. 1

**************************

Page 3

ORAL DEPOSITION of RITA DAUGHERTY, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 30th of August, 2007, from 1:59 p.m. to 3:36 p.m., before Sherry Folchert, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Department of Justice, Tax Division, 717 North Harwood, Suite 400, Dallas, Texas, pursuant to the Texas Rules of Civil Procedure.

Page 4

APPEARANCES

FOR THE PLAINTIFFS:
Thomas A. Cullinan
SUTHERLAND ASBILL & BRENNAN, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996
404-853-8075
tom.cullinan@sablaw.com

FOR THE DEFENDANT:

Thomas Herrin and Michelle C. Johns
US DEPARTMENT OF JUSTICE
717 North Harwood Street, Suite 400
Dallas, Texas 75201
214-880-9762
Michelle.C.Johns@usdoj-gov
And
Elaine Harris
INTERNAL REVENUE SERVICE
4050 Alpha Road, Suite 1300
Dallas, Texas 75244
972-308-7980

Page 5

INDEX


| | PAGE |
|---|---|
| Appearances | 4 |
| Stipulations | 6 |
| RITA DAUGHERTY | |
| Examination by Mr. Cullinan | 7 |
| Examination by Mr. Herrin | 52 |
| Further Examination by Mr. Cullinan | 60 |
| Further Examination by Mr. Herrin | 67 |
| Signature and Changes | 68 |
| Reporter's Certificate | 70 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 88 | Notice of Intent | 7 |
| 89 | Time Line | 25 |
| 90 | Index | 32 |


GOVERNMENT EXHIBIT 8

PENGAD-Bayonne, N. J.

HUNDT REPORTING
214-220-1122

Page 14

investors, not names.
MR. HERRIN: That's fine.
THE WITNESS: And so I got like their agreements, their contracts, their -- copies of debriefings, e-mails, phone conversation transcripts. I got magnetic tapes from computers and computer hard drives. And little video cassette tapes that I couldn't read because my -- they -- there was no cassette player that would read them. A lot of dust. Old beat-up boxes that were busted. Folders, notebooks, their little promotional gifts, calendars, handwritten notes.
Do you want me to keep going?
Q. (BY MR. CULLINAN:) No, I'm getting the gist. And you said you issued the summons October 12, 2006 or is that when you --
A. That's when I delivered it.
Q. That's when you delivered it.
A. I delivered it at 2:25 that day.
Q. And you remember that why?
A. Because I have to write it down on my summons.
Q. All right. And when did -- who responded to the summons?
A. Dennis Faulkner.
Q. Who is Dennis Faulkner?
A. Dennis Faulkner is the Lain & Faulkner. He's

Page 15

Faulkner of Lain & Faulkner. It's the bankruptcy trustee for the Heritage Organization.
Q. What is Lain & Faulkner?
A. It's a law firm I guess.
MR. HERRIN: I will tell you from my understanding, I don't know whether it's a law firm or an accounting firm. But it's one of those two.
Q. (BY MR. CULLINAN:) And when did Mr. Faulkner respond?
A. 11/29/2006.
Q. And that's when he produced all of these items that you were describing before, the gifts, investor data, debriefings, all that?
A. Yes.
Q. It was the volume of the response?
A. 372 boxes of data.
Q. How was it produced? Did they just give you access to a room? Did they drop it off in semi-truck or?
A. They stored a lot of it in the basement. And down there was also their other clients. So they wouldn't grant us access to the basement. When we would finish whatever they trolleyed up, we would tell them it was finished and they would take it down and bring us up another load.
Q. And this is -- when you say the basement, this

Page 16

is the basement of Lain & Faulkner?
A. Building, yes. Well, it's not their building. But the building that they're in.
Q. Who assisted in you terms -- if anyone, who assisted you in reviewing the materials that you were -- that you received or are now being given access to?
A. Everybody?
Q. Yes.
A. Well, the first day we went Elaine Harris and Kim Tung were with me. Kim Tung is my manager. Elaine left right soon after. So Kim and I looked at them for a couple of hours. Then on the 4th of December I -- I was back again and I started my review and it looked like I was never going to get finished so Kim Tung assigned Darla Hunter, another revenue agent in my group, to assist me. She wasn't there every day, but she was there quite a bit. And we finished -- we finished our review on December the 14th.
Q. What was the date? Excuse me.
A. The 14th of December.
Q. That's 2006?
A. Yes.
Q. Were there any subsequent productions to you from Mr. Faulkner?
A. What do you mean?

Page 17

Q. Well, you said there was a huge batch of stuff delivered to you or that you were given access to on November 29, 2006. And that there were 372 boxes of data. And you completed your review on December 14, 2006.
What I'm asking is did the bankruptcy trustee grant you access to any additional documents past that date, or deliver any additional documents past that date or is that the universe?
MR. HERRIN: Answer if you know.
THE WITNESS: He granted us access to the Tillostin boxes, which is the name I give them.
Q. (BY MR. CULLINAN:) Okay. What are the Tillostin boxes?
A. They're an additional 75.
Q. Boxes?
A. That came from Mr. Tillostin's offices and finally arrived at the Lain Faulkner's office.
Q. And what was in these Tillostin boxes?
A. More investor data.
Q. Such as?
A. Debriefings and phone conversations and contracts and stuff.
Q. And when were you granted -- were you granted access to the Tillostin boxes in the same manner that you

Page 18

were with the initial 372 boxes that were kept in the basement of the building and they were just hauled up or were these actually physically delivered to you?
A. They were just in that room.
Q. So it was the same process?
A. Except they didn't keep these in the basement. They were just all stacked in that room that I used.
Q. And when were you granted access to these Tillostin boxes?
A. I don't have the exact date for that one. So if I say May or June will you be upset because I didn't keep track of the date.
MS. HARRIS: Just to the best of your recollection.
MR. CULLINAN: Yeah.
THE WITNESS: May or June.
Q. (BY MR. CULLINAN:) Of 2007?
A. Yes.
Q. Prior to the materials issued -- regarding these -- or provided in response to these summonses, did you issue any Information Document Request to the Heritage Organization or --
MR. HERRIN: I'm going to object. That's beyond the scope of 30(b)6 inquiry. And I'm going to limit her to the testimony requested pursuant to the

Page 19

Supplemental Request No. 9 here. Category No. 9.
Q. (BY MR. CULLINAN:) Are you aware that the Heritage Organization appear to have taped conversations with members of the Sands Family?
A. I don't know the Sands Family. I'm aware they taped conversations. Because I saw them in the boxes. Okay. The cassette tapes. I never listened to them because I couldn't read them -- I couldn't -- my cassette player and no cassette player I could get access to could play them. So did I witness it, no. I'm not sure what else you want to know.
Q. Were these tapes in the box -- the first 372 boxes of data or in the Tillostin boxes?
A. They were in both. But they were mostly in the first set.
Q. You said that the first time that you became -- well, let me ask again, I don't want the mischaracterize what you said.
When did you first become aware of the lawsuit that's captioned on Deposition Exhibit 88?
A. Well, with all the names of all the partners and things, when I got the notice to show up for the deposition. Which would have been while I was on vacation last week I guess. I knew the Sands were litigating their Son of Boss transaction.

Page 20

Q. When did you know that?
A. Because when I went to review the 372 boxes, I was asked to look in there for Sands information.
Q. You were. Okay. Who asked you to do that?
A. Elaine Harris.
Q. When was that?
A. The day I was there in December.
Q. So that's December --
A. 2006.
Q. -- 4th or --
A. Probably the 4th.
Q. Okay.
A. But I'll have to say probably.
Q. Okay.
A. It was early on in it for sure.
Q. Maybe that November 29th date, someplace between November 29th and December 4th, 2006?
A. Right. Yeah. Give or take.
Q. Did Ms. Harris tell you why you should be looking for documents pertaining to the Sands Family?
A. Because there was litigation. And Sands was unagreed.
Q. I'm sorry. I didn't catch your answer.
A. And Sands was unagreed.
Q. Were you informed that those documents might be

Page 21

subject to various discovery requirements?
A. At that point in time?
Q. Yes.
A. No.
Q. When were you informed that they were subject to discovery requirements?
A. On the 13th of July 2007. There was an e-mail sent to Peter Brokus, with a carbon copy to me, that said identify, review these --
THE WITNESS: Am I okay?
MR. HERRIN: That's fine. Go ahead.
THE WITNESS: Review -- for Peter to review these documents to make sure that there was only Sands documents on that disk. That's when I knew there was discovery probably going on.
Q. (BY MR. CULLINAN:) Who sent the e-mail?
A. Elaine Harris.
Q. And attached -- there was some type of attachment to the e-mail then?
A. No. She -- no.
Q. I thought you testified just review the documents on this disk to make sure they only pertained to the Sands. So where did disk --
A. Because she mailed the disk to him. She didn't e-mail the data to him. It's too big (indicating).

Page 22

Q. When you went through the initial production of data and you learned that these boxes contained what appeared to be transcripts of conversations and tape recordings, did you bring that information to the attention of anybody else?
A. My manager and Elaine Harris.
Q. And who is your manager?
A. Kim Tung, T-U-N-G.
Q. And what were you instructed to do -- or what was Mr. Brokus instructed to do in the July 13th e-mail?
A. I can't do a verbatim. Okay. Review the pages and make sure they all belonged to Sands and not to another party.
Q. And then do what with it?
A. Give that information to Elaine Harris (indicating).
Q. Do you know when the documents on that disk first came into the possession of the IRS?
A. I don't understand.
Q. Well, there's a disk?
A. Right.
Q. There are documents on it that pertain to the Sands Family?
A. Right.
Q. Well, let's lay a foundation. Did those

Page 23

documents come -- did any of those documents come out of 372 boxes of data that were reviewed in late November?
A. I think what you did was jump a whole bunch of steps. There were 372 boxes of documents. We whittled that down to 66 full or partial boxes that had -- that we, Darla Hunter or I identified as data that we may or may not need. Okay. Then we went through a process where we got permission to pay a whole lot of money to get them photocopied and electronically copied. Because we got hard copies and electronic copy.
Q. Okay.
A. Then it took the vendor a while to do that. So then on April 11, 2007, the vendors delivered to 405 Alpha Road where I work 28 boxes and the electronic copy. 28 boxes of hard copies and the electronic copy.
Q. That date was, I'm sorry?
A. April 11th. So if your question was when was it in the hands of IRS I guess you want April 11th. Right?
Q. Well, initial -- that came from the same -- the documents that the vendor delivered to you on April 11th essentially were the documents that --
A. We selected.
Q. -- that you had in your possession in late November, early December of 2006?
A. It was partial. We didn't want all of them.

Page 24

Q. All right.
A. So the 28 boxes they delivered was the copies that we wanted of the data we selected.
Q. Documents you thought to be important?
A. Right.
Q. Were those documents indexed in any form?
A. No, not then.
Q. When did they become indexed?
A. On April the 30th I began to review them. On May the 1st some other agents arrived to assist me. And by February -- by May 23rd we completed the indexing and by June the 5th, a spreadsheet was completed that was searchable, or our index.
Q. You're referring to a document as you're answering my questions. What document is it that you are --
A. This is a time line that I created because there's no way I was going to remember all these dates.
MR. CULLINAN: Can I have a copy of the time line please?
THE WITNESS: I only have one copy.
MR. HERRIN: Want to take a break and we'll make one.
MR. CULLINAN: Sure. Take a break.
(A break was taken 2:27 p.m.

Page 25

to 2:31 p.m.)
(Exhibit No. 89 was marked.)
Q. (BY MR. CULLINAN:) I want to circle back to my question again which is with respect to the tapes and transcripts or purported transcripts of the tapes that are at issue in this case. Do you know what I'm referring to when I say that?
A. I assume you're referring to the transcripts of the phone conversations that had various Heritage employees and investors talking.
Q. Okay. Are you aware of one specifically that purports to be transcript conversations with members of the Sands Family?
A. I never read them.
Q. Do you know what I'm referring to?
A. Yes.
Q. Okay. Do you know whether those transcripts were in the 372 boxes of documents that you were given access to on November 29 --
A. Yes.
Q. -- of 2004?
A. Yes.
Q. They were?
A. (Witness indicates.)
Q. And I believe you testified that Ms. Harris

Page 26

asked you to keep a special eye out for documents that pertain to the Sands Family; is that right?
A. Yes.
Q. And did you do that?
A. Yes.
Q. Okay. So what did you do with those transcripts when you found them in the 372 boxes of data?
A. I marked it as one of the 66 boxes to be photocopied.
Q. Did you alert Ms. Harris that you had found documents that pertain directly to the Sands Family?
A. I guess indirectly, yes.
Q. I don't understand what you mean by indirectly?
A. I told her I had transcripts. I told her I had transcripts of phone conversations. I told her I had e-mails. But whether I mentioned Mr. and Mrs. Sands or not I don't know. That's what I'm saying.
Q. Well without --
A. So she -- she could assume.
Q. She could assume?
A. I mean I never said I have them for Mr. and Mrs. Sands.
Q. What did you tell her?
A. That I had them. That I had found in those boxes transcripts of phone conversations where Heritage

Page 27

recorded and then transcribed.
Q. Did Ms. Harris ask you -- I don't want you to identify any other taxpayers -- did Ms. Harris ask you to keep an eye out for tapes and transcripts pertaining to other taxpayers aside from the Sands?
A. Yes.
Q. So when you told Ms. Harris that you would found tapes -- you had found tapes and transcripts, were you telling her that you had found tapes and transcripts with respect to all of the taxpayers that she had asked you to keep a special eye out for?
A. Yes.
Q. Okay. And when was that?
A. During the two weeks that we looked through the 372 boxes, which would have been December 4th through December the 14th, 2006.
Q. Out of the people that were reviewing the boxes you've given me a couple of names. Was anybody especially assigned to look for these specific documents, the ones that you were asked to keep an eye out or was it just as you go through them if you come across them you mark them or something else altogether?
A. You mean the indexing process?
Q. No. In looking for the documents that you'd been asked to keep an eye out for?

Page 28

A. Do the question again.
Q. Was somebody especially assigned to look for those documents?
A. No. We were just going through the documents looking for what we needed. For matters unrelated to the Sands and to the Sands.
Q. Now, if you would walk me through the process from beginning to end of what happened once you located the documents that Ms. Harris asked you to keep an eye out for regarding the Sands. I'm not asking about these other taxpayers. Those specific documents regarding to the Sands what did you do with them?
A. So if I opened a box and saw a document that had Sands in it, that's what you want to know?
Q. Yes.
A. If I opened a box and it belongs to Mr. Sands, then I -- I didn't read every page. You're talking 372 boxes. Okay. A lot of boring information. Things that I may or may not need. So I skimmed through it (indicating). If it was all Mr. Sands, I marked the whole box. If there was data in there that didn't -- wasn't material to what I needed, I would just mark a portion of the box. And I put it in the boxes to be -- photocopied pile.
Q. Were these boxes that you marked with respect to

Page 29

the Sands treated any differently than the other material that you thought needed to be copied?
A. No. It was all stacked. It was all stacked on that one side and waiting for permission to photocopy it and get the funds to pay (indicating).
Q. How do you obtain permission to photocopy something?
A. It was work. I had to prepare and mail to my manager a memo. Okay. In which I not only put how much I needed but the justification for it. All right. Then it -- depending on how much money you need it has to go through the layers of management until you reach the level of the manager that can sign off on that amount. And when they approve it, the money's set aside by the budget people and you go out and blow the bucks (indicating).
Q. How much of this material pertained -- how much of the material that you marked for copying pertained to the Sands?
A. That's a good question. And there's no way I can tell you the exact number of pages.
Q. Rough approximation?
A. Thousands. Hundreds. I don't know.
Q. About a box? Two boxes?
A. A bunch. There's 28 boxes and whole lot of

Page 30

people. And I can tell you how many exactly. There were 89,994 Bates stamped documents.
Q. How much?
A. 89,994.
Q. To be clear that's -- doesn't all pertain to the Sands?
A. No, no.
Q. How were they Bates stamped?
A. One through 89,994.
Q. Did they have a special designation?
A. You mean on the Bates stamp?
Q. Yes.
A. I just called it THO 1 through 89,994.
Q. With respect to the smaller subset of Sands material within that production -- and would you have needed permission to just get that smaller subset copied?
A. I needed permission to get one copy.
Q. You needed permission to copy a single page?
A. Yes. I have no authority to sign for funding of summons costs. Managers have to do that.
Q. Did you ever personally provide any of the documents that pertain to Sands to the Department of Justice?
A. No.
Q. Did you provide them to anybody else other than

Page 31

Ms. Harris?
A. No -- well, wait a minute. Depends on how you mean that. I gave access to 28 boxes to all the agents that indexed it. But I didn't -- they didn't take -- I didn't provide it. I mean they had access to help me do it.
Q. How many agents had access to these documents?
A. All in all... I can only tell you about the indexing process.
Q. Okay. Tell me about that.
A. Rita, Darla, Denise, Judy, David, Randy, that other David guy, Nick. Eight.
Q. So eight agents assisted with the indexing process?
A. Right.
Q. When did the indexing process take place?
A. From April the 30th through -- well, there was two different sections of it. April 30th through to May 4 when I had all the help. But when they all left, there were partial boxes that were incomplete. I personally finished it on May the 23rd.
Q. Okay. When was it finalized?
A. Don't know what that means.
Q. Have you completed the index at this point in time?

Page 32

A. Yes.
Q. Okay. You said partially finalized it on May 23rd?
A. I finished all the partial boxes that were left when the other agents left.
Q. Oh, okay. I thought you said you had partially finalized it. You completed the process on May 23rd?
A. Yes.
Q. Okay.
(Exhibit No. 90 was marked.)
THE WITNESS: You want me to look at it?
MR. CULLINAN: Yes, ma'am.
THE WITNESS: Sorry.
Q. (BY MR. CULLINAN:) Can you identify that document?
A. Well, this is our index. When the agents were there we created this index. So this is our index.
Q. So this index was created then sometime prior to May 23rd of 2007?
A. Well, depends on how you -- I don't know -- I'm not sure about that question. Okay. All I can tell you is that all of us showed up and on April the 30th we decided what the index was going to look like. And this is how we decided we were going to type all that stuff together. So we had a column for the investor. We had a

Page 33

column for the description of what it was we saw when we scanned through the boxes (indicating). And document types, we didn't put dates on it. And we had the THO -- like 6 through 9 was based upon the Bates stamps that were assigned to each document (indicating). So the agents created how it was going to look.
Q. All right. So the index would have gone from THO 0001 all the way to THO 89,994?
A. 89,994.
Q. And as you go through this you'll note that -- and by this I mean Exhibit 90, there are various Bates ranges within that 1 to 89,000 that pertain to the Sands?
A. Right.
Q. Is that correct?
A. Right.
Q. Including the -- it looks like the very first documents THO 0001, right?
A. Right.
Q. So those were the first documents to actually get indexed were the Sands documents?
A. They were in box one.
Q. Okay.
A. We -- each agent that indexed got a box. One -- one got one. One got two. One got three. One got four. And they went through their box. When they finished that

Page 34

box whatever was next in line -- like if eight agents were there, you picked up Box 9 when you finished Box 1. We just kept them in order.
Q. How long would it take you to complete a box?
A. A whole day.
Q. And when you completed the -- let's see. On there, Deposition Exhibit 90, it looks like the Sands documents or documents that pertain to Sands kind of run straight through at least all the way to THO 2043; is that accurate?
A. It's looking good so far. Yeah. I agree with that.
Q. Did you alert anyone once you had completed this portion of the index that we've got some of the Sands documents and they've been indexed?
A. No. My process was indexing. I didn't alert anybody to anything. Just completing the 28 boxes was my goal.
Q. Okay. You didn't separate out the Sands and expedite your work with respect to Sands?
A. No. They were all the same to me.
Q. Okay.
A. Everybody was all the same.
Q. All right. So nobody told you to expedite the -- or did anybody ever ask you to expedite the Sands

Page 35

materials or your review of the Sands materials?
A. No.
Q. Anybody ever ask you to expedite the copy of the Sands materials?
A. No.
Q. Anybody ever ask you to expedite the indexing of the Sands materials?
A. No.
Q. I want to go through what we've marked as Deposition Exhibit 89 just so I understand your time line here and your remarks. And the first question is, you created this document?
A. Yes.
Q. So these are your notes?
A. Yes.
Q. What did you review to create this document?
A. Everything in my files. E-mails, my history sheet. Everything in my files.
Q. Okay. Well, let's go through it date by date and I think some of this -- some of it will be self-explanatory. The first entry is October 12, 2006. That's the date that you served the summons on the bankruptcy trustee?
A. Right.
Q. November 29th you went to the trustee's office

Page 36

and you were given access to the 372 boxes of documents?
A. Yes.
Q. You -- did you at that point in time review any of the boxes or just come check out and see what's there and figure out what kind of resources you're going to need?
A. Yes. But I did look at boxes.
Q. You did review some of the boxes on that date?
A. Right.
Q. Who was with you at that point in time? Again, it was Ms. Harris and Ms. Tung.
A. (Witness indicates.)
Q. Anybody else?
A. Mark O'Leary.
Q. Anybody else?
A. Well, there were people from Lain Faulkner.
Q. Okay. Anybody from the IRS?
A. No.
Q. Anybody from the Department of Justice?
A. No.
Q. Anybody else from the Government?
A. Not that I know of.
Q. And did Ms. Harris, Mr. O'Leary and Ms. Tung also review boxes on November 29th?
A. Ms. Tung did. Ms. Harris did. I don't remember

Page 37

what Mark did.
Q. You testified earlier that it was at some point in this range November 29, December 4th that Ms. Harris asked you to keep a special eye out for documents that pertain to the Sands. Looking at this do you know if it was November 29th or the next entry on December 4th?
A. I can't tell you.
Q. Next entry December 4, 2006, you began a box-by-box review of documents at the trustee's office?
A. Right.
Q. That was you and Ms. Hunter?
A. Yes.
Q. Anybody else?
A. No.
Q. Was Ms. Harris there with you?
A. No.
Q. All right. So then is it --
A. We were the Lone Rangers.
Q. Does it make it more likely then that she asked you to keep an eye out for the Sands documents on November 29th?
A. I don't know. Okay. Give me a break.
Q. Were there phone conversations about the documents?
A. Yes, there were.

Page 38

Q. Who did you have phone conversations with about the documents?
A. My manager and Elaine Harris.
Q. Anybody else?
A. No. Well, Lain Faulkner's people.
Q. Anybody else from the IRS?
A. No.
Q. Anybody from the Department of Justice?
A. Never.
Q. So you have ever spoken to anybody at the Department of Justice about these documents before getting prepared for this deposition?
A. No.
Q. All right. The next entry December 29th, 2006, let's see -- well, over the next couple of entries you're looking for approval to photocopy; is that right?
A. That's correct.
Q. What do you mean on the February 12, receive the approval for the funding of the summons.
What does that mean?
A. Well, I sent the memo up through channels. And I didn't know the volume of paper that was in a box. So I guessed that I need $7,000. Okay. So that meant that -- my manager's Kim Tung, territory manager is Denise Jennings, the DFO, director of --

Page 39

Q. Field operations?
A. -- field operations. Thank you. Sergio Alreno. It's his level that approves it. So when it was supposed to be $7,000, I received his signature on the 12th of February that I could spend $7,000.
Q. Okay. I'm sorry. I was confused when it said received the approval for the funding of the summons. But you're still pertaining to funding of the photocopy cost?
A. Yes.
Q. Okay. And then we've got several additional entries here, again, pursuant to your request to get photocopying. And it looks like we -- go down to March 28, 2007. And is it at that point in time when the next day that you began to actually get the boxes copied, right?
A. Yes.
Q. And you said that you got them scanned into electronic form, right?
A. And a hard copy.
Q. What did you do with the electronic form?
A. We made copies and distributed to agents.
Q. To Internal Revenue agents?
A. Yes.
Q. Do you know to what agents copies of the

Page 40

electronic copy of the Sands documents were distributed?
A. Peter Brokus.
Q. When did that occur?
A. July the 13th.
Q. Okay. Going back to the chronological. The scanning began around March 29th and was completed April 10th; is that right?
A. Yes. Delivered April 11.
Q. On the 12th --
A. I opened a couple to see what -- how much work, what resources I was going to need.
Q. Okay. The entry on April 19th, counsel IT creating ten copies of disks for distribution of electronic copies. What does that mean?
A. We only got one copy of -- of the scanned documents, the whole 90,000.
Q. You mean the electronic copy, the disk?
A. Yeah, we only got one. We have numerous agents that's going to need the data. So there were ten copies made.
Q. Okay. What is counsel IT?
A. I -- IT is like our -- I can't think of what IT means. But our commuter technology people, our computerized specialists, they're computer gurus. IT.
Q. Okay.

Page 41

A. Technology.
Q. And what's the reference to counsel? Do they work for IRS counsel or --
A. Well, just about every division has their own IT people.
Q. All right. You received the disk back on the 27th?
A. Yes.
Q. And then on the 30th, you're talking about how the spreadsheet would be presented. Does the spreadsheet refer to the index?
A. Yes.
Q. The portion of which we have in Exhibit 90?
A. Right.
Q. And then you have agents arriving on the 1st to assist you with indexing. You said there were eight agents that assisted you in the process?
A. Over the course of that week, yes.
Q. And then you say: Continued to work on the summonsed documents.
At that point what you're doing is just indexing them on May 2nd and May 3rd; is that right?
A. Right.
Q. Same thing on the 4th?
A. Right.

Page 42

Q. Then there's a gap between the 4th and the 23rd. Was any work done during that point in time?
A. Yes. But me alone.
Q. Just you alone. You were continuing to work on the indexing?
A. Right. The partial boxes. So I only entered the last day I -- when I -- it was done and that was May 23rd (indicating).
Q. Okay. And now on the 5th you said you received the database and spreadsheet index of summonsed documents.
What does that mean?
A. You have to understand this spreadsheet was a huge spreadsheet. Okay. And no one computer could handle the volume of this spreadsheet. Okay. So we had a CAS take everybody's piece of the spreadsheet and put it together and make a searchable -- make it searchable. So that if you wanted all the documents that belonged to Mr. and Mrs. Sands, you went in there in description and you hit -- and you typed in Sands and whalah all of them showed up.
Q. So that was --
A. That was what I received.
Q. That was on June 5th it became searchable.
A. Yes. Right. Up until that point it was a whole

Page 43

bunch of pieces that had to be -- I'm not very good at terms -- but glued together. You know, made one whole thing. Either -- or a person would have to search Sands through eight different spreadsheets.
Q. And then on June 6th this index database was sent to other agents. That's the ten other agents that were involved?
A. Yes.
Q. So on June 6th all ten of those IRA agents had access to this index database?
A. If they were in the office and got it, yes.
Q. Was it on a disk that can you sent out?
A. No. That was an e-mail.
Q. Okay. And then on June 7th it says: Counsel requested assistance using index to isolate documents relating to different taxpayers due to disclosure concerns.
I don't want you to talk about other taxpayers. I think before you told me that Ms. Harris asked you on July 13th to segregate out documents that pertained to the Sands. So I want to make sure. Were you asked as of June 7th to segregate out documents that pertained to Sands or was it July 13th?
A. Counsel requested assistance. I didn't do it.
Q. You didn't do it?

Page 44

A. I didn't personally didn't do it.
Q. Who did it?
A. Whoever counsel got assistance from.
Q. Explain to me what you mean by this entry on June 7th. Counsel requested assistance using an index to isolate documents relating to different taxpayers due to disclosure concerns.
What does that mean?
A. Counsel had somebody do a search for Sands documents and then copy them over to its own private disk (indicating).
Q. Okay. And that occurred on June 7th?
A. Right.
Q. Okay. What happened between June 7th and June 19th? Anything or just working on something else?
A. Yeah, I have ten cases. I work on all kinds -- I don't just work on...
Q. Same here. Although sometimes I doubt that, working with Mr. Herrin over here.
So between June 7th and June 19th you were working on unrelated matters? And the only reason I ask is because there was a gap in your dates here before where you just listed May 23rd as the last date of your completion. So I'm just trying --
A. Like I said I got ten cases.

Page 45

Q. I'm just trying to make sure. So you didn't do anything else between June 7th and June --
A. Not on the Sands.
Q. Were you working on Heritage documents during that period of time?
A. I don't know.
Q. June 19, budget analyst classified $781 paid for electronic copies as illegal procurement.
July 10th. On July 10 you have an entry here: Counsel advised agents regarding disclosure issues relating to docs.
What does that mean?
A. Some of the agents got full disks of the whole 90,000 things. The reason they did was they had matters which required them access to all of it. But if they were going to close some case -- okay, their case, they couldn't put the whole ten-disk set in their work papers because they would have docs for beaucoups people or companies. So they had -- they were advised they had to do what counsel did for the Sands documents, pull them out, make their own set and put that in the case file (indicating).
Q. Was Mr. Brokus was one of the agents that got the full ten-disk set?
A. I don't know.

Page 46

Q. All right. Next entry is July 13th, segregated disks -- does that mean you segregated disks and distributed to other agents?
A. No, the segregated disk means that if Peter Brokus got the Sands thing, he didn't get it with something else in it.
Q. Okay.
A. Unless it accidentally got on there. Because that's why it says identify inadvertent disclosures.
Q. Okay. And then so on that date you sent a specific disk pertaining to the Sands documents to Peter Brokus? Is that what that means, the Sands disk?
A. The disk was sent to Peter Brokus, but I didn't send it.
Q. Elaine Harris sent it?
A. I don't know that for sure. But I assume so, yes.
Q. Okay. And you mentioned before an e-mail that you were copied on from Ms. Harris to Mr. Brokus and that e-mail was July 13th as well?
A. Say that again.
Q. So you mentioned earlier that you were copied on an e-mail from Ms. Harris to Mr. Brokus asking that he review a disk to ensure the documents on the disk only pertained to Sands?

Page 47

A. Yes. Yes.
Q. And that was also on that July 13th date?
A. Right. When you said copied, my mind went off into hard copy. Sorry.
Q. July 19th, 2007, some of the discrepancies in the database index are corrected.
Did any of those discrepancies relate to Sands?
A. To be truthful with you I got several e-mails in that period of time in which different agents had different things that had been misclassified. So I can't tell you exactly if a Sands or not. Okay. But there was discrepancies noted and they were corrected. Okay.
Q. Okay. Then July 24th, Mr. Brokus finished review of the Sands document and sent corrections to index to avoid inadvertent disclosure.
What does that mean?
A. He must have -- he had misclassified documents and that was fixed.
Q. Okay. And at that point did you retake possession of this disk or all you did was just correct the index?
A. Corrected the index.
Q. Did you inform anybody that the index had been corrected?

Page 48

A. No.
Q. When you correct the index, you'd already distributed the searchable index to several other agents. So how did they get corrected copies?
A. They didn't.
MR. CULLINAN: I think I'm just about done. Why don't we take a break and let me make sure.
(A break was taken from 3:05 p.m. to 3:11 p.m.)
MR. CULLINAN: Back on the record.
Q. (BY MR. CULLINAN:) Ms. Daugherty, I asked you about a lot of dates and I've kind of lost track myself. I want to be clear on one date.
When did you tell Ms. Harris that you had found tapes and transcripts that pertained to the taxpayers she asked you to keep an eye out for documents?
A. Pretty much every day that I was there we talked on the phone. So I don't know.
Q. Is this -- but this is back in the November 29th to December --
A. 14th area, was what you're talking about, right?
Q. Yes. So you would have told her back in November 29 --
A. Yeah. Pretty much we talked most days. I'm not going to say every day.

Page 49

Q. But would have been during that 11/29 to 12/14/2006 time frame?
A. Yes.
Q. I'm going to show you what's been marked as Deposition Exhibits -- a couple of them in a series. But Deposition Exhibit 3. Are you familiar with that document?
A. I looked at 90,000 sheets of paper.
Q. Are you familiar --
A. So I didn't memorize it.
Q. The Bates Stamp, you see there's a couple Bates stamps there, but that --
A. The THO --
Q. Is that yours?
A. Yeah.
Q. So if we were to go back to Exhibit 90 and if I were to look at THO --
A. 379.
Q. 379, that's going to be the same THO 379 that's here on your index that says transcript?
A. Yes.
Q. Okay. And Deposition Exhibit 4, same thing. That's THO-000343, that's going to be the same 343 that's here on your --
A. Yes.

Page 50

Q. -- index?
A. Yes.
Q. Show you what's been marked as Deposition Exhibit 5, same question, THO 000261 --
A. You mean 291.
Q. I can't read upside down.
A. That's okay. I'll give you a break on that one. Yes, it's marked "transcript".
Q. Okay. And Deposition Exhibit 6, can you read for me the Bates stamp number.
A. 260.
Q. That's your Bates stamp number again?
A. Yes.
Q. Is that indexed here on your index?
A. Yes. Yes.
Q. Okay. Deposition No. 7?
A. 176. I have a No. 176.
Q. That's your number?
A. Yes. Potential client meeting.
Q. Is that the document that's on the index?
A. Yes.
Q. Okay. Deposition Exhibit 8?
A. 174.
Q. For the record when we went through Exhibit 3, 4, 5, 6, 7 and 8, can we agree that all we're talking

Page 51

about is the first number of -- the Bates stamped series. We can go back if you want to look through the --
MR. HERRIN: We'll stipulate to that.
MR. CULLINAN: So we'll stipulate.
THE WITNESS: I don't know what that meant. Thank you.
MR. CULLINAN: We'll stipulate that the series of pages within Deposition Exhibit 3, 4, 5, 6, 7 and 8 correspond to the indexing -- the -- the Bates stamping on the index.
MR. HERRIN: I think the stipulation took longer than the fact, but yes.
MR. CULLINAN: Okay. It may have.
Q. (BY MR. CULLINAN:) Deposition Exhibit No. 9, do you see that the Bates stamp number's there?
A. That's our number.
Q. That's your Bates stamp. Is that on the index?
A. 251. Yes.
Q. I think that might be it. That's it.
If Ms. Harris had asked that you keep a special eye out for these documents, why weren't they produced in piecemeal fashion? When you came across documents that pertained to the Sands, why weren't they just either scanned in or copied and mailed off or somehow directed out to the people who needed them?

Page 52

A. Immediately?
Q. Yes.
A. I explained before I don't have authority to approve paying for a copy without funding approval. And there was a huge amount of volume of documents. I mean you don't know how many documents are in 90,000 sheets of paper.
Q. Believe me I do.
A. So -- and I also couldn't ask Lain Faulkner to do it without incurring a cost from them. So I couldn't do that until somebody said I could spend that money.
Q. So you just made her aware that they were there and then just waited for direction or --
A. Yes.
Q. Okay.
MR. CULLINAN: I'm done.

EXAMINATION

BY MR. HERRIN:
Q. Ms. Daugherty, when you first served the summons and were given access to the Heritage documents it says on 11/29 you went and saw 372 boxes of documents. Is that correct?
A. Yes. Well, I didn't see them. I knew they were there. Okay. They're in the basement.
Q. There were a bunch of boxes?

Page 53

A. A bunch of boxes. Yeah.
Q. And between the work on the 14th of December you went through those boxes and you pulled folders out of that 372 boxes and ended up with a total number of boxes of what?
A. 66.
Q. 66 boxes?
A. There were full or partial boxes that needed copied.
Q. Now, the other documents and the other boxes they remained at the trustee's, right? They all technically remained --
A. I guess they all remained at the trustee's office. But they were segregated in a special room away from the rest of them. Is that what you mean?
Q. What was your criteria in pulling out the -- 66? 68? 66 boxes from the 372 boxes?
A. My criteria? If I actually explained my criteria, I would be discussing matters unrelated to the Sand.
Q. All right. But is part of that criteria would the Sands documents have been included?
A. Yes.
Q. Okay. So now you've got 60 some-odd boxes of Heritage documents, which to the best of your belief

Page 54

include the Heritage -- the Sands material in the trustees -- Heritage files, correct?
A. Right.
Q. Now, those 66 boxes you then had to have them copied. The trustee wasn't going to let you just walk off with any of those pages, was he?
A. No. They don't own them. They're just a third-party record keeper.
Q. Okay.
A. They can't grant me that.
Q. And the IRS didn't own those documents, did they?
A. No.
Q. Over the next couple of months you had to make arrangements to get funding to have the 60 some-odd boxes copied; is that correct?
A. Right.
Q. So is it accurate that the first time the IRS actually had possession, physical possession of the documents was April 11, 2007?
A. Yes.
Q. And at that time it was 28 boxes of documents. Are those going to be full boxes?
A. Except for the last one.
Q. All right. And at the same time you also

Page 55

received electronic copy of what was in the boxes, so presumably they were scanned in at the same time they were copied?
A. Yes.
Q. Now, at that time were the Sands documents -- documents related to Sands segregated from all the other documents?
A. The hard copies?
Q. Yes.
A. No.
Q. Could you have taken that disk and immediately said, okay, these are all the Sands documents and gathered them together?
A. No. Not until the index was created.
Q. Okay. So then you had a period of time creating the index?
A. Right.
Q. Now, the purpose of the index was so that you could tell what documents in those 28 boxes were attributable to which individuals or investors?
A. Right.
Q. Okay. And that would have included the Sands, right?
A. Right.
Q. So the first time that those 28 boxes would have

Page 56

been searchable and indexed so that you could segregate the Sands documents from the rest of documents that would be which date?
A. June 5th.
Q. June 5th. Now, at that point -- well, let's see -- and I believe your earlier testimony was on June 7th counsel asked that an index be created to isolate the Sands documents from other documents; is that correct?
A. Not an index. Using the index they searched out the Sands documents and then put them over on a separate disk.
Q. All right. So the document -- as the index would have identified them as a Sands document they were pulled from the wealth of documents out there and combined onto one disk?
A. Its own separate disk.
Q. Its own separate disk. And then that one disk, what had to be done with that disk before it could be turned over to DOJ?
A. We had to make sure that every document on it belonged to Mr. and Mrs. Sands.
Q. And is that what Mr. Brokus was asked to do?
A. Yes.
Q. So that disk was sent out to Mr. Brokus sometime in -- well, June of 2007?

Page 57

A. July.
Q. July of 2007, right? And then he had to review all the documents on that disk to make sure there wasn't somebody else's document contained in that?
A. Right.
Q. And when does it say that Mr. Brokus completed that review?
A. July 24th.
Q. And is it your understanding by the fact that he sent corrections that he determined that there were documents on that disk did not -- were not attributable to Sands?
A. Yes.
Q. So it would have been after his review of the documents and culling out the nonSands-related documents that for the first time there would have been a disk of documents that related solely to Sands?
A. Yes. With the corrections made.
Q. Do you know what Mr. Brokus did with that disk after he had the corrections?
A. He sent it to Elaine.
Q. Do you know what Ms. Harris did with it?
A. She gave it to you -- or the Department of Justice. I assume you.
Q. At any time prior to when Ms. Harris sent us

Page 58

that disk around September 24th, 25th of -- I'm sorry. July 24th, 25th of 2007, were any of these documents provided to the Department of Justice?
A. Before that date?
Q. Before that date.
A. No.
Q. And could they been provided to us without the risk of disclosure?
A. Prior to July the 24th?
Q. Yes.
A. No. There would be a risk of disclosure.
Q. And basically it took from the time you initially got the boxes back in -- access to the boxes back in December 2006 until July 24, 2007, to complete the process of reviewing and segregating the Sands documents?
A. Yes. Because of the volume and the number of persons and entities unrelated to the Sands. It all had to be segregated. It had to be separated. Because under 6103 if we made an inadvertent disclosure, there were ten agents out there who have civil and criminal penalties, loss of pension, jail, whatever. I mean we have to be extremely careful.
Q. Now, with respect to the time that you'd been over at the trustee office looking at documents, I

Page 59

presume that's pretty much off and on since December since you testified earlier that you have the Tillostin documents that had you had to look at later?
A. Yes.
Q. And have, in fact, the Tillostin documents been segregated yet?
A. Well, I'm still trying to get funding approval.
Q. I'll take that as a no. But during the time that you've been back and forth with the trustee's office has anybody else asked for access to the Heritage documents so that they can inspect and copy them, to your knowledge?
A. Yes.
Q. Do you have any information that the Sands or their counsel asked to inspect those document and make their own review of the Heritage documents with Sands material?
A. I thought it was Sands. But I have never gone back and talked to Lain Faulkner to confirm. Because there was conversations and, you know, you're busy doing all this stuff and people come in and talk to you.
Q. Is it your understanding -- because I don't want to suggest something that may not be correct there -- you told us last week that you thought somebody had requested the Sands documents and when we checked it it turned out

Page 60

that it was somebody with a name that was similar enough to the Sands that it was probably somebody else?
A. Right. I did do that.
Q. So to your knowledge the Sands haven't actually gone to the trustee with their own request to see the documents, have they?
A. Not to my knowledge (indicating).
Q. All right.
MR. HERRIN: I'll pass the witness.

FURTHER EXAMINATION

BY MR. CULLINAN:
Q. Mr. Herrin just asked you a series of questions going through your time lines and saying you had to do this, you had to do this, you had to do this, as if you were following the procedure with respect to this huge volume of information to ensure that it was accurately indexed, accurately disseminated among the right people, that it was reviewed to make sure that there wasn't an inadvertent disclosure.
When you initially went through these documents back in late November of 2006 and early December of 2006, if Mr. Herrin or Ms. Harris had asked you and said, listen, when you're going through these documents I want you to take anything that pertains Sands and just put it over in a separate corner, could you have

Page 61

done that?
A. Well, I guess.
Q. If they had said here, here's a couple hundred dollars to go out and copy all those documents, could you have done that?
A. No.
Q. Why not?
A. 200 wouldn't have covered all these documents.
Q. All right. Several hundred dollars. There was -- what I'm trying to ask, there was nothing preventing you, the IRS or anybody else from actually segregating and copying those documents in November 2006 or December of 2006; isn't that true?
A. No, I don't think that is true.
Q. Please explain.
A. The way we safeguard a taxpayer's privacy is to make sure that all the rules and all the approvals are in place. And you can call it government red tape or you can call it whatever it is. But we can't -- I didn't have approval -- you don't jump a gun. You have to (indicating) -- A has to -- A is before B and C and if -- if Elaine told me to segregate the Sands, I believe that she and I had would have had a conversation with Kim Tung, territory manager and a lot of people would have gotten involved because my job was to secure and review