IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: February 29, 2008)

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-409 T |

| | |
|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE**

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ....................................................................................................................1

ARGUMENT.........................................................................................................................2

I. The Purported Transcripts Have Not Been and Cannot Be Authenticated......................2

II. The Purported Transcripts Contain Inadmissible Hearsay. .............................................8

III. The Purported Transcripts Should be Excluded as a Discovery Sanction Under RCFC 37. ..........................................................................................................................12

CONCLUSION.....................................................................................................................18

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Allstates Air Cargo, Inc. v. United States*, 42 Fed. Cl. 118 (1998)....................1

*Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y. 2001)....................3, 5

*Butler v. United States*, 649 A.2d 563 (D.C. Ct. App. 1994)....................5

*Charleswater Prods. Inc. v. Nevamar Corp.*, 1998 U.S. App. LEXIS 31011 (Fed. Cir. 1998)....................1

*Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402 (2000)....................1

*Ebewo v. Martinez*, 309 F. Supp. 2d 600 (S.D.N.Y. 2004)....................17

*Finwall v. City of Chicago*, 239 F.R.D. 504 (N.D. Ill. 2006)....................17

*Glaxo, Inc. v. Boehringer Ingelheim Corp.*, 1996 U.S. Dist. LEXIS 17828 (D. Conn. 1996)....................13

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 U.S. Dist. LEXIS 22090 (D. Kan. 2007)....................13

*Sithon Maritime Co. v. Holiday Mansion*, 1998 U.S. Dist. LEXIS 5432 (D. Kan. 1998)....................13

*United States v. Maxwell*, 383 F.2d 437 (2d Cir. 1967)....................3, 6

*United States v. Polk*, 56 F.3d 613 (5th Cir. 1995)....................7

*United States v. Rochan*, 563 F.2d 1246 (5th Cir. 1977)....................2, 3

*United States v. Sandoval*, 709 F.2d 1553 (D.C. Cir. 1983)....................5

*United States v. Williams*, 445 F.3d 724 (4th Cir. 2006), *cert. denied* 127 S. Ct. 314 (2006)....................8, 9

**REGULATION**

Treas. Reg. § 1.752-6....................12

**MISCELLANEOUS**

RCFC 26(a)....................15, 16, 17

RCFC 30(b)(6)....................12

RCFC 33 ..........15

RCFC 34 ..........15

RCFC 37 ..........1, 12, 17

FED. R. EVID. 801(d)(2)(B) ..........8

FED. R. EVID. 803(5) ..........9

FED. R. EVID. 803(6) ..........2, 7, 10

FED. R. EVID. 901 ..........5

FED. R. EVID. 901(11) ..........8

## INTRODUCTION

Plaintiffs filed a Motion to Strike certain inadmissible evidence proffered by Defendant in support of its Response to Plaintiffs' Cross-Motion for Summary Judgment, specifically Exhibits 26 through 29 of the Appendix to Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment. The exhibits, purported transcripts of conversations between members of the Sands family and representatives of the Heritage Organization, should be stricken for the following reasons: 1) the purported transcripts have not been and cannot be authenticated; 2) the purported transcripts contain inadmissible hearsay; and 3) alternatively, the purported transcripts should be excluded under RCFC 37 as a discovery sanction.

Defendant's Response to Plaintiffs' Motion to Strike ("Defendant's Response") fails to address the major reasons the so-called transcripts are inadmissible. What Defendant's Response seems primarily intended to do is to wave Defendant's view of these documents in the Court's face in the hopes that even if they are not admissible, the taint of them will stick and somehow prejudice Plaintiffs' case. Defendant's belief these transcripts are essential to its case does not thereby transform them into admissible evidence.

The Court of Federal Claims excludes evidence that would not be admissible at trial, such as the transcripts at issue here, when such evidence is offered to support a motion for summary judgment. *Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 444-50 (2000); *Allstates Air Cargo, Inc. v. United States*, 42 Fed. Cl. 118, 122-23, 125 (1998); *see also Charleswater Prods. Inc. v. Nevamar Corp.*, 1998 U.S. App. LEXIS 31011 (Fed. Cir. 1998) (affirming district court's decision to exclude a statement that would not be admissible at trial and stating that "[e]vidence must be admissible at trial in order to be properly considered when deciding a summary judgment motion."). Defendant ignores the law of this court and instead cites a case from the Middle District of Alabama to argue that the court should presume that the unauthenticated

transcripts can be reduced to admissible form at trial. (Def.'s Resp. 2.) Though Defendant might wish it to be so, this Court does not "presume" that evidence presented in support of summary judgment will be admissible at trial.

Had Defendant tried to address the lack of trustworthiness of the transcripts and the tapes from which they were supposedly transcribed, the reasons for their inadmissibility would have been apparent, as discussed in further detail below. The transcripts have not been authenticated, include numerous errors and inconsistencies, and are based on tapes of poor quality that include blank gaps and inaudible portions. Defendant's attempt to merge the authentication requirement with exceptions to the hearsay rule (Def.'s Resp. 2, 8) does not avoid the requirement to authenticate the transcripts. The transcripts include inadmissible hearsay statements, notwithstanding Defendant's complete disregard of the explicit requirement of trustworthiness in the business records exception found in FED. R. EVID. 803(6) and other arguments to the contrary. Yet even if, as Defendant has argued, the statements in the transcripts are not inadmissible hearsay, Defendant must still meet the requirement of authentication. Additionally, the transcripts should also be excluded as a sanction for Defendant's unreasonable delay in producing them and the prejudice resulting to Plaintiffs from that delay.

## ARGUMENT

### I. The Purported Transcripts Have Not Been and Cannot Be Authenticated.

Defendant has not presented evidence sufficient to support a finding that Exhibits 26 through 29 are what Defendant claims them to be: accurate transcriptions of conversations between Richard Sands, Robert Sands, and Heritage personnel. Authentication of transcripts is a matter of the accuracy of the transcripts. *United States v. Rochan*, 563 F.2d 1246 (5th Cir. 1977) ("But the issue in the authentication of supplemental transcripts [transcripts provided to assist the jury in understanding a tape recording] is not who made them; the issue is whether they are

accurate.") Defendant cites *Rochan* for the proposition that foundation for authentication of transcripts can be laid by a participant to the conversation (Def.'s Resp. 3), but ignores the standard for authentication set forth in *Rochan*. There must be some evidence that the transcripts are accurate – "that the words are accurately reproduced and the voices accurately identified." *Rochan*, 563 F. 2d at 1251; *Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y. 2001) (finding that the transcript was not authenticated as representing the statements of the witness where plaintiffs did not present enough evidence to support a finding that the transcript was a verbatim transcript). A witness's belief that a transcript evidences the "gist" of a conversation is not enough to authenticate the transcript as an accurate recording of a conversation. *Bank Brussels*, 168 F. Supp. 2d at 59-60 (contrasting the situation with that in *United States v. Maxwell*, 383 F.2d 437, 441-43 (2d Cir. 1967), in which there was testimony that the transcript accurately represented a recording).

Defendant's Response does not cite any deposition testimony stating that the purported transcripts were accurate and that the speakers in the transcripts were accurately identified. The affirmative responses by Chester Decker that the purported transcript of his telephone conversation with Richard Sands "correlates with his memory of the conversation" and "relates to the conversation" are not testimony as to the *accuracy* of Exhibit 26. In fact, Decker specifically testified that he did not "feel that it [the transcript] followed the conversation, you know, specifically word-for-word." (Pls.' Ex. 2 at 45.)[1] Based on his memory of the conversation and knowledge of how he spoke, he believed the transcribers cut corners rather than transcribing the conversation word-for-word. (Pls.' Ex. 2 at 46.) Decker could tell that the statements were not recorded the way he would have spoken. (Pls.' Ex. 2 at 45-46.) Decker did

[1] All Plaintiffs' Exhibits cited in this Reply are exhibits to Plaintiffs' Motion to Strike, Document No. 62, unless they are attached hereto as additional Exhibits.

not at any time state that Exhibit 26 accurately represented the conversation he had with Richard Sands.

Defendant's statement (Def.'s Resp. 5) that Seaberg testified that there was no reason for him to believe that Exhibit 27 was not a transcription of the meeting he had with Richard Sands on May 31 is not a testimony as to the *accuracy* of Exhibit 27. Though he could pick out his own voice on the tape of Exhibit 27, Seaberg could not distinguish between the voices of Richard Sands and Robert Sands. (Pls.' Ex. 3 at 109.) It is difficult to see how the transcribers, who had never even met the Sands, could determine who was speaking if a party to the purported conversation could not do so. Seaberg specifically testified that he could not confirm the accuracy of Exhibits 28 and 29:

> Q. Going on to Exhibit 5, can you confirm the accuracy of this transcript?
> A. I would have no way to do that.
> Q. Do you know whether it's been changed?
> A. No, I do not know.
> Q. Do you know whether anything has been added to it?
> A. No, I do not know.
> Q. Do you know whether anything has been deleted from it?
> A. No, I don't know.
> Q. All right. Going on to Exhibit 6. Can you confirm the accuracy of this transcript?
> A. No, I cannot.
> Q. Do you know if anything has been added to it?
> A. I do not know.
> Q. Anything changed?
> A. I do not know.
> Q. Anything deleted from it?
> A. I do not know.

(Pls.' Ex. 3 at 94-95.)[2] Defendant has provided no response to Seaberg's testimony that he could not confirm the accuracy of Exhibits 28 and 29. Moreover, both Decker and Seaberg testified that they did not review the transcripts for accuracy after they were made.

[2] Deposition Exhibits 5 and 6 discussed on pages 94-95 of Plaintiffs' Exhibit 3 are the same as Exhibits 28 and 29 at issue in this motion.

Defendant argues that *Bank Brussels* is not applicable because it dealt with the pre-trial exclusion of an "edited, non-verbatim non-final draft transcript" of a witness interview. (Def.'s Resp. 8.) Plaintiffs disagree. According to the testimony of participants to the purported conversations, the transcripts at issue here are edited, non-verbatim transcripts. Because no parties to the conversation and no one who transcribed the conversations have testified that the transcripts accurately reproduced the conversations they purported to transcribe, Defendant has not met the authentication requirement of FED. R. EVID. 901. Because the transcripts are not authentic, they are inadmissible.

Defendant argues that Plaintiffs reliance on cases dealing with the admission of tape recordings is misplaced. Plaintiffs disagree as neither the transcripts nor the two existing tapes from which two of the transcripts were supposedly transcribed have been authenticated. Therefore, the standard for authentication of tape recordings is also relevant here.

Regarding the tapes from which Exhibits 27 and 28 were purportedly transcribed, Defendant has not shown that the device used by the Heritage personnel was capable of recording properly, that the recordings are authentic and correct, that changes, additions, and deletions have not been made to the recordings, that the recordings were preserved in an acceptable manner, and that the speakers were identified. *See Butler v. United States*, 649 A.2d 563, 566-68 (D.C. Ct. App. 1994); *United States v. Sandoval*, 709 F.2d 1553, 1553-54 (D.C. Cir. 1983). The tapes are inaudible in numerous places and difficult to decipher in others, due to the fact that Heritage employees made the tapes by use of a mini-cassette recorder inside a pants or jacket pocket. (Pls.' Ex. 3 at 73-74.) The tapes may have been tampered with – at least one transcript has several pages that are not on the tape and the tape has another gap of 15 seconds or more. (Pls.' Ex. 3 at 114-16, 137-38.) Even counsel for Defendant acknowledged that the tapes had errors and gaps. (Pls.' Ex. 3 at 108, 114-115.)

Furthermore, the chain of custody for the tapes and transcripts has not been established – no one can account for the whereabouts of the tapes or transcripts prior to their receipt by the bankruptcy trustee for Heritage in 2004. (Pls.' Ex. 7 at 20-21, 47-49.) Vickie Walker's testimony that "she has no reason to believe that any of the Heritage documents were altered from the time the bankruptcy was filed until the time the documents were turned over to the trustee" does not establish where the tapes were and who had access to them during the three years between the time they were made and the time they were received by the bankruptcy trustee.

Defendant cites *United States v. Maxwell*, 383 F.3d 437 (2d Cir. 1967) to support its argument that the transcripts should be admitted as evidence in this case. *Maxwell* is distinguishable from the instant case. In *Maxwell*, the transcript at issue was created by a shorthand stenographer, and then the Customs agent who made the recording of the conversation reviewed the transcript against the recording to verify its accuracy. The Customs agent testified that the transcript accurately represented the recording. The original wire recording and the tape were reused because the Customs Agent did not believe Maxwell would be tried again. In *Maxwell*, the transcript appeared trustworthy, as one of the individuals involved in the conversation reviewed the transcript for its accuracy and testified to its accuracy at trial.

Here, no one involved in the taped conversations reviewed the transcripts of the conversations for their accuracy, and no one has testified that the transcripts accurately portrayed the words in the conversations of the speakers or that the transcripts accurately identified the speaker of each statement. Here, the transcripts were created by Heritage employees with no special training who cut corners in their work. Moreover, in *Maxwell*, the tape itself was not challenged. Here, the tapes from which two of the transcripts were made contain inaudible portions, gaps, and are of poor quality. When compared against those two tapes, Exhibits 27 and

28 contain words that are not on the tapes, the tapes contain words that are not on the transcripts, and the tapes contain gaps that are not indicated on the transcript. The tapes are difficult to understand at best and impossible to decipher in numerous places.

Defendant relies on another case that is distinguishable from the instant case. Defendant's reliance on *United States v. Polk*, 56 F.3d 613 (5th Cir. 1995) is misplaced. In *Polk*, the lower court allowed the jury to use transcripts while listening to the tapes, but allowed them to have only the tapes during their deliberations. The Fifth Circuit determined that the transcripts were adequately authenticated based on testimony of an agent who monitored the transaction over the body wire of his information as it was occurring. 56 F. 3d at 632. He would watch the transaction and simultaneously listen to what was occurring over the wire. *Id.* He testified that he prepared the transcripts after listening to the tapes numerous times and testified that "each transcript was an accurate representation of the conversation he had heard over the wire." *Id.* Unlike the present case, in *Polk*, the person who transcribed the conversations testified that the transcripts were accurate representations of the recorded conversations. Here, there has been no testimony by the transcribers or the participants that the transcripts accurately reflect the conversations that occurred.

Defendant seems to ignore the authentication requirements in arguing that Defendant "introduced the transcripts as Heritage's business records, obtained through Heritage's bankruptcy trustee." (Def.'s Resp. 7.) Defendant seems to believe that if Defendant provided evidence that the transcripts were business records of Heritage (which Plaintiff contests) that the authentication requirement is satisfied. Plaintiffs do not agree that the witnesses deposed by defendant established the requisite foundation for FED. R. EVID. 803(6), the business records exception to the hearsay rule, but even if they had, that does not mean the transcripts have been authenticated as to the accuracy of the words and the identification of the voices. For business

records to be self-authenticating, the records must be certified by their custodian or other qualified person as required under FED. R. EVID. 901(11). No such certification has been made or likely could be made in regard to Exhibits 26 through 29.

Because of these failings, the transcripts have not been authenticated and are therefore inadmissible.

**II. The Purported Transcripts Contain Inadmissible Hearsay.**

The purported transcripts are also inadmissible because they contain hearsay statements that do not fall into an exception to the hearsay rule. Defendant argues that the purported statements of Chester Decker, Timothy Seaberg, and Gary Kornman contained in Exhibits 26 through 29 constitute adoptive admissions of the Sands and are admissible as such under FED. R. EVID. 801(d)(2)(B). (Def.'s Resp. 8-9.) Defendant's response simplifies the requirements courts have used to determine whether statements or actions constitute adoptive admissions to reach its incorrect conclusion that *all* of the statements of the Heritage employees contained in the four transcripts constitute adoptive admissions of either Richard or Robert Sands. Even if the Sands adopted one or two statements of the Heritage employees (a fact that Plaintiffs contest) they certainly did not adopt *every* statement of the Heritage employees contained in the four transcripts such that the statements of the Heritage employees should be treated as statements of the Sands.

"When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *United States v. Williams*, 445 F.3d 724 (4th Cir. 2006), *cert. denied* 127 S. Ct. 314 (2006). This requirement thus necessitates that for an adoptive admission to occur, there must first be a statement to which

a person would be induced to respond. Courts require an accusatory question in order for a person's failure to respond to constitute an adoptive admission. *See Williams*, 445 F.3d at 734-35 (determining that no adoptive admission occurred when there was no accusatory statement that the defendant could have adopted by remaining silent).

Contrary to Defendant's argument, the statements of the Heritage employees do not constitute adoptive admissions of Richard Sands or Robert Sands. They were not the sort of accusatory statements to which a response of words or silence would constitute an admission. Moreover, neither Richard Sands nor Robert Sands manifested an adoption or belief in the truth of the statements made by the Heritage employees such that they would become their own statements. They did exactly what any businessman would do when listening to an investment presentation - they asked questions and sought further information. Defendant's characterization and view of the conversations set forth in the transcripts as evidence that "the Sands family was shopping for a tax shelter" is both incorrect and irrelevant to the determination of whether the statements of the Heritage employees constitute adoptive admissions.

Defendant has also argued that the statements of the Heritage employees meet the hearsay exception found in FED. R. EVID. 803(5) for recorded recollection made or adopted by the witness. The exception for recorded recollection allows admission of a "memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly." It is difficult to imagine how the transcripts were "made or adopted" by Seaberg or Decker when the conversations were fresh in their memories as neither of them reviewed the transcripts for accuracy after the transcripts were made. The statements of Seaberg and Decker included in the transcripts clearly do not meet this exception to the hearsay rule.

The transcripts do not meet the business records exception to the hearsay rule. Defendant's response did not address, and in fact failed to mention (Def.'s Resp. 12) the explicit trustworthiness requirement imbedded in the business records exception to the hearsay rule. FED. R. EVID. 803(6). If "the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness," a record that would otherwise qualify as a business record is not admissible.

The sources of the information and the method of preparation evidence a complete lack of trustworthiness for the transcripts Defendant has offered as evidence. The transcripts were made from mini-cassette recorder tapes. The tapes of conversations in meetings were made by the use of a mini-cassette recorder inside a pants or jacket pocket of a Heritage employee at the meeting. Heritage employees have noted that the quality of the tapes was not very good; they were difficult and in some cases impossible to understand, particularly when the person taping moved. (Pls.' Ex. 3 at 73-74, 113; Pls.' Ex. 8 at 25.) Because the tapes were difficult to understand, marketing employees making transcripts often guessed as to what words they were hearing. (Pls.' Ex. 3 at 83.) The marketing employees who made the transcripts had no special transcription training and did sloppy work. (Pls.' Ex. 2 at 45; Pls.' Ex. 3 at 81.) In this case, for two of the transcripts, the tapes from which they were allegedly made no longer exist. These transcripts are particularly untrustworthy because at least one Heritage employee has testified that he saw Gary Kornman erasing portions of tapes. The only tapes of the other transcripts that still exist contain gaps which could be the result of someone erasing portions of the tape. Furthermore, the two transcripts, for which tapes still exist, conflict with the tapes. The transcripts contain words that are not on the tapes and fail to indicate the gaps in the tapes. The tapes contain words that are not part of the transcript.

Because Defendant has no answer to the problems with the preparation and source of the information included in the transcripts, Defendant instead attempts to write the requirement out of the rule. The transcripts do not qualify as business records because of their lack of trustworthiness and because they fail to meet the technical requirements of the rule. It was not the regular practice of Heritage to record and transcribe all conversations and meeting with clients or potential clients. (Pls.' Ex. 6 at 82-83; Pls.' Ex. 7 at 31-32.) Defendant relies on a training manual prepared by Heritage that stated employees would be subject to fines for failing to record conversations, but this does not mean that employees taped all conversations. In fact, Seaberg testified that this rule was not enforced. Pls.' Ex 3 at 18-19. Moreover, it is clear that at least one phone conversation with Richard Sands and several meetings between the Sands and Heritage personnel were not recorded. (Pls.' Ex. 2 at 30-32; Pls.' Ex. 6 at 20-21, 175-76.)

Defendant argues that just because transcripts of these other conversations were not in the possession of the bankruptcy trustee does not mean they were not recorded. (Def.'s Resp. 14.) However, Defendant ignores the testimony of Brian Czerwinski, a Heritage employee who participated in several meetings with the Sands, who stated that he never recorded a client meeting. Pls.' Ex. 10, App. at pp. 3-4. Czerwinski testified that he participated in several meetings with the Sands. (Pls.' Ex. 6 at 97-102.) It is undisputed that during these other conversations and meetings between the Sands and Heritage (or during the gaps in the transcripts) numerous other benefits from these transactions were discussed. (Pls.' Ex. 6 at 97-102.)

Defendant scoffs at the prejudice Plaintiffs would suffer if Defendant is allowed to rely on transcripts which indisputably only tell part of the story and accuses the Sands of having "selective memory" as to the meetings with Heritage personnel that occurred more than six years ago. (Def.'s Resp. 14.) Defendant's argument is simply absurd. In 2001, Richard Sands and

Robert Sands were two of the principal officers of Constellation Brands, Inc. and spent the majority of their time conducting the business of the company. That they recall generally what was discussed at the meetings with Heritage personnel is more than most people remember after one year, much less six. Because their memory of several conversations or meetings they had *six years ago* does not comport with Defendant's theory does not at all mean they intentionally "forgot" what was discussed. They have consistently stated their reasons for entering into the transactions at issue in these cases, based on the number of potential benefits from the investment strategy, including making a profit, providing for philanthropic interests, diversifying their holdings, and potentially obtaining a tax benefit. (Pls.' Ex. 4 at 23-24, 41.) Contrary to Defendant's assertion, Plaintiffs would be prejudiced by admission of inaccurate and incomplete transcripts that do not fairly represent the discussions and negotiations the Sands had with the Heritage personnel.

The transcripts contain inadmissible hearsay statements that do not fall within any exception. Moreover, even if the Court were to determine that the statements of the Heritage personnel fell into a hearsay exception or were otherwise admissible, the transcripts should not be admitted for the lack of trustworthiness and unfair prejudice their admission would place on Plaintiffs.

## III. The Purported Transcripts Should be Excluded as a Discovery Sanction Under RCFC 37.

Defendant attempts to shift the spotlight on its improper actions[3] to Plaintiffs by suggesting that Plaintiffs could have and should have obtained the transcripts from Heritage but

---

[3] This is not the first discovery violation that Defendant has committed. Plaintiffs are currently attempting to work with Defendant to reach an agreeable remedy for Defendant's failure to produce a properly prepared RCFC 30(b)(6) witness to testify on designated topics. In addition, Defendant has repeatedly refused to answer questions in Plaintiffs' interrogatories and requests for production of documents. For example, Defendant refused to allow Plaintiffs to conduct discovery into the reasons for its promulgation of Treas. Reg. § 1.752-6, but then put that reason directly at issue by insisting in its summary judgment briefs that the regulation was promulgated to "prevent

chose to ignore Heritage as a source of documents relevant to this case. Nothing could be further from the truth.

First, Defendant incorrectly asserts that because Heritage acted as Plaintiffs' agent in providing investment advice and assisting in implementing the transactions at issue in this case, Plaintiffs had an obligation to obtain documents from Heritage pertaining to their investments and produce them to Defendant. However, Defendant fails to note that Heritage was no longer serving as either an agent or an independent contractor of Plaintiffs once the transactions were implemented and Heritage's fees were paid. Plaintiffs had no "right, authority, or ability" to obtain Heritage's internal documents under the agreement between Plaintiffs and Heritage and no "right or authority" to assert against the bankruptcy trustee once Heritage went into bankruptcy. The particular documents at issue were not created at the request of Plaintiffs or on their behalf, and Plaintiffs did not have control over Heritage. *See, e.g, Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 U.S. Dist. LEXIS 22090 (D. Kan. 2007) (determining that defendants did not have the requisite control over certain non-party entities such that defendants could be required to produce documents of the non-party entities where defendants had ownership interests, common owners, or intermingling of officers, directors, or employees but did not control the entities or their documents); *Sithon Maritime Co. v. Holiday Mansion*, 1998 U.S. Dist. LEXIS 5432 , *17-18 (D. Kan. 1998) (determining that defendant did not have the requisite control over documents in possession of non-parties where the facts did not show that the individual non-party was more than an independent contractor and where defendant could not order the non-party to surrender the documents to it); *Glaxo, Inc. v.*

---

abuse." Plaintiffs are attempting to secure the information sought in their interrogatories and requests for production of documents from Defendant without this Court's intervention, but believe it is likely that Plaintiffs will have to resort to a Motion to Compel.

*Boehringer Ingelheim Corp.*, 1996 U.S. Dist. LEXIS 17828 (D. Conn. 1996) (determining that plaintiffs did not establish that defendants had control over documents in the possession of a parent or sister corporation where the only evidence of control was the relationship between defendants and the non-parties).

Plaintiffs did not have the summons power of the IRS or the ability of the bankruptcy trustee to require Heritage principals to produce the documents to them. It is interesting that Defendant believes Plaintiffs could have obtained these documents when Defendant repeatedly notes in its Response (Def.'s Resp. 4, 18, 21) that the Bankruptcy Trustee and Defendant had difficulty in obtaining the purported transcripts. The Trustee had to file a motion for contempt, and Defendant relied on its summons power to obtain the documents.

Second, Defendant's assertion that Plaintiffs deliberately chose to ignore Heritage as a source of documentation is completely without merit. Contrary to Defendant's assertion, Plaintiffs did attempt to obtain records from Heritage. In June 2004, counsel for Plaintiffs asked representatives of Heritage what information had been produced to the IRS regarding the Sands. Pls.' Ex. 11, App. at 7. The Heritage representatives agreed to provide Plaintiffs everything they had given the IRS. No one from or representing Heritage indicated that purported transcripts of conversations between Heritage personnel and the Sands existed or that other such documents relating to Plaintiffs were in the files of Heritage. Some time after that conversation, Plaintiffs received a CD of documents pertaining to the Sands that Heritage produced to the IRS from IRS Counsel Elaine Harris. Nothing in those documents indicated that further Heritage documents relating to Plaintiffs existed. Pls.' Ex. 11, App. at 7.

Plaintiffs had no idea that these purported transcripts existed until just before Defendant produced them to Plaintiffs. Pls.' Ex. 11, App. at 8. Contrary to Defendant's suppositions, Plaintiffs did attempt to obtain the purported transcripts, upon learning that Heritage documents

other than duplicates of the documents they had already obtained from the IRS might exist. Plaintiffs made repeated requests to Jeff Tillotson, counsel for several former Heritage employees, beginning in mid-July 2007 to determine whether any purported transcripts of conversations with the Sands existed and to obtain copies of those purported transcripts. Pls.' Ex. 11, App. at 8. On July 30, the day before Defendant produced the purported transcripts to Plaintiffs, Plaintiffs received the purported transcripts from Tillotson but were not informed of the existence of any purported tapes of the Sands. Pls.' Ex. 11, App. at 8.

Defendant argues that Defendant, rather than Plaintiffs, was prejudiced because its trial counsel did not receive the Heritage materials until July 2007 and the documents were not available during Defendant's depositions of Richard Sands and Robert Sands. Defendant attempts to draw a distinction between its trial counsel and the IRS, though they are both part of the Defendant United States. While such a distinction might be appropriate where trial counsel does not know that the IRS has further documents subject to RCFC 26(a) and responsive to interrogatories or requests for production of documents, it is an entirely different matter for trial counsel to know of such documents and to disregard its obligations under RCFC 26(a) and RCFC 33 and 34. Defendant's trial counsel knew that the Heritage documents existed in December 2006, but failed to secure, review, and produce them to Plaintiffs in a timely manner. For Defendant to claim prejudice for its own lack of diligence is ridiculous.

Plaintiffs were prejudiced because Defendant knew in December 2006 that purported transcripts of conversations between the Sands and Heritage representatives existed. (Pls.' Ex. 1 at 26-27.) Defendant was more than seven months late in producing the purported transcripts of portions of conversations between members of the Sands family and employees of The Heritage Organization. These purported transcripts form the core of Defendant's reply on the issues raised in its summary judgment motion. Yet Defendant did not produce the purported transcripts

to Plaintiffs until the day that discovery was initially scheduled to end, which was **after** Defendant had deposed members of the Sands family and **after** Plaintiffs had filed their initial brief in response to Defendant's motion for summary judgment. Defendant's belated production left Plaintiffs with little time to find evidence and witnesses to rebut defendant's "new" evidence.

Defendant argues that its delay in producing these documents was reasonable because the IRS had to review them and segregate them so as to avoid inadvertent disclosure of taxpayer information and cites the long process the IRS went through to gather the documents and organize them. But Defendant does not answer why it was reasonable for Rita Daugherty to wait six weeks after receiving funding authorization to send the documents to a vendor for copying or why no one informed the IRS employees that the documents were subject to discovery requirements until June 13, 2007. Defendant's counsel did not request the IRS to expedite its review of these documents upon learning that some of them might pertain to the Sands, and nothing kept Defendant from expediting the documents relevant to this case to meet its discovery obligations in a timely fashion. Moreover, even if it took a significant period of time to index all of the documents, a number of the documents relating to the Sands (and all of the transcripts) were in the first 400 pages of the 80,000 pages of documents. The purported transcripts were reviewed and indexed long before the entire project was completed and could have been provided to Plaintiffs at that time.

Defendant argues that the importance of the documents to its case should favor admission of the purported transcripts. (Def.'s Resp. 23.) Defendant states that they are "crucial to the penalty aspect of the United States' case as they are evidence of the Sands' intent" in entering the transactions at issue in this case. Yet this "crucial" evidence is on a point that Defendant has argued should not even be considered in this case – whether Plaintiffs acted with reasonable cause and in good faith in entering the transactions at issue and in relying on their advisors in

taking the positions reported on their returns. (Def.'s Resp. and Reply to Pls.' Cross-Mot. Summ. J. 30-32.)

Finally, Defendant's failure to timely supplement its disclosures evidences a lack of diligence. Defendant cites its request to extend discovery as evidence of its diligence, but extending discovery does not indicate diligence in supplementing the RCFC 26(a) disclosures that were due in December 2006. Defendant made no efforts to expedite the production of the Heritage documents to Plaintiffs and should not be allowed to profit from its delay by surprising Plaintiffs with the evidence in the middle of summary judgment briefing.

Plaintiffs respectfully request the Court to apply RCFC 37 to prohibit Defendant from relying on any of the documents it obtained from The Heritage Organization in late 2006 that it did not produce to plaintiffs with its RCFC 26(a) disclosures. This is particularly true given the import that defendant has given to these documents in its summary judgment briefing and its evasive answers to plaintiffs' discovery requests where defendant failed to even describe the nature of these documents. *See Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607-08 (S.D.N.Y. 2004) (excluding evidence proffered by the plaintiff where plaintiff's delay in providing evidence until after defendant's summary judgment motion was filed prejudiced defendant and was "the type of sandbagging that Rule 37(c)(1) was designed to prevent."); *Finwall v. City of Chicago*, 239 F.R.D. 504, 507 (N.D. Ill. 2006) ("[L]ate disclosure is not harmless within the meaning of Rule 37 simply because there is time to reopen discovery.").

**CONCLUSION**

For the reasons set forth above and in Plaintiffs' Motion to Strike, Plaintiffs respectfully request this Court to strike Exhibits 26 through 29 of the Appendix to Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment and any references thereto in Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment or in Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Fact.

Respectfully submitted this 29th day of February, 2008.

s/ Lewis S. Wiener
LEWIS S. WIENER
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 telephone
202.637.3593 facsimile
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
404.853.8000 telephone
404.853.8806 facsimile

Kent L. Jones
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Ave., NW
Washington, DC 20004
202.383.0732 telephone
202.637.3593 facsimile

Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Reply in Support of Plaintiffs' Motion to Strike has been made on February 29, 2008 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
thomas.m.herrin@usdoj.gov

s/ Lewis S. Wiener
LEWIS S. WIENER