IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: July 2, 2008)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT IN**
**CAUSE NOS. 06-409T, 06-410T AND 06-411T**

# TABLE OF CONTENTS

ISSUES PRESENTED . . . . . 2

STATEMENT OF THE CASE . . . . . 2

ARGUMENT . . . . . 8

UNDER SECTION 752, THE SHORT SALE OBLIGATIONS MUST BE INCLUDED IN PARTNERSHIP LIABILITIES . . . . . 8

THE SANDS HEIRS CANNOT ESCAPE TAXATION ON THE GAIN FROM THE SALE OF $75,000,000 IN CONSTELLATION STOCK THROUGH THEIR SHORT TERM USE OF FOUR CRUTS . . . . . 11

A. What is a Charitable Remainder Unitrust ("CRUT") and how is it taxed? . . . . . 11

B. The transfers to the CRUTs should be disregarded for federal tax purposes . . . . . 13

1. Substance over Form/Assignment of Income . . . . . 15

2. The transfers to the CRUTS should be disregarded because the CRUTs do not qualify as charitable remainder unitrusts under I.R.C. §664 . . . . . 20

3. The Partnership Anti-Abuse Regulation Applies . . . . . 22

4. The Step-Transaction Doctrine . . . . . 26

PLAINTIFFS GROSSLY MISSTATED THE BASIS OF THE CONSTELLATION STOCK AND THE 40% PENALTY ASSESSED UNDER 26 U.S.C. §6662 SHOULD BE SUSTAINED . . . . . 27

CONCLUSION. . . . . . 28

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Applestein v. Commissioner*, 80 T.C. 331 (1983) ........................................................ 18

*Cemco Investors, L.L.C. v. United States*, 515 F.3d 749 (7th Cir. 2008) ....................... 10

*COLM Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006) ......... 10, 28

*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945) .................................... 15, 16

*Ferguson v. Commissioner*, 174 F.3d 997 (9th Cir. 1999) ........................................... 18

*Gregory v. Helvering*, 293 U.S. 465 (1935) ................................................................ 15

*Hallowell v. Commissioner*, 56 T.C. 600 (1971) .............................................. 15, 17, 20

*Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (Ct. Cl. 2007) ............................... 28

*Kornman & Associates, Inc. v. United States*, 527 F.3d 443 (5th Cir. 2008) ........................................................................................ 10, 28

*Malkin v. Commissioner*, 54 T.C. 1305 (1970) ...................................................... 16, 17

*Minnesota Tea Co. v. Helvering*, 302 U.S. 609 (1938) .......................................... 15, 16

*Provost v. United States*, 269 U.S. 443 (1926) ............................................................. 3

*Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652 (5th Cir. 1968) ............................. 26

*Salina Partnership v. Commissioner*, 2000 (RIA) T.C. Memo ¶2000-352 ..................... 28

*True v. United States*, 190 F.3d 1165 (10th Cir. 1999) ................................................. 26

*Usher v. Commissioner*, 45 T.C. 205 (1965) ................................................................ 18

## FEDERAL STATUTES

I.R.C. § 752 .................................................... 2, 3, 5,8, 9, 10, 14, 19, 25, 28

I.R.C. § 170(f)(2)(A) .................................................... 12

I.R.C. § 664 .................................................... 11, 14, 22

I.R.C. § 664(b) .................................................... 11

I.R.C. § 664(b)(1) .................................................... 11

I.R.C. § 664(b)(2) .................................................... 11

I.R.C. § 664(b)(3) .................................................... 11

I.R.C. § 664(b)(4) .................................................... 11

I.R.C. § 664(c) .................................................... 21

I.R.C. § 664(c)(1) .................................................... 11

I.R.C. § 664(d)(2) .................................................... 11

I.R.C. § 664(d)(2)(A) .................................................... 11

I.R.C. § 752 .................................................... 2, 3, 5,8, 9, 10, 14, 19, 25, 28

I.R.C. § 6662 .................................................... 2, 27

I.R.C. § 6662(a) .................................................... 27

I.R.C. § 6662(b)(1) .................................................... 27

I.R.C. § 6662(b)(2) .................................................... 27

I.R.C. § 6662(b)(3) .................................................... 27

I.R.C. § 6662(c) .................................................... 27

I.R.C. § 6662(d) .................................................... 27

I.R.C. § 6662(e) .................................................... 27

I.R.C. § 6662(h) .................................................... 27, 28

Treas. Reg. § 1.664-1(a)(4) .......... 20

Treas. Reg. § 1.664-4 .......... 12

Treas. Reg. § 1.6662-2(c) .......... 27

Treas. Reg. § 1.701-2 .......... 26

Treas. Reg. § 1.701-2(a) .......... 22

Treas. Reg. § 1.701-2(b) .......... 22, 26

Treas. Reg. § 1.701-2(c) .......... 23, 24

Treas. Reg. § 1.701-2(c)(1) .......... 24

Treas. Reg. § 1.701-2(c)(2) .......... 24

Treas. Reg. § 1.752-6 .......... 10

Notice 94-78, 1994-2 C.B. 555 .......... 14

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT IN CAUSE NOS. 06-409T, 06-410T AND 06-411T**

In these seven consolidated tax cases, heirs of the late Marvin Sands ("Marvin") are claiming more than $125 million in artificial tax benefits attributable to their participation in partnership tax shelters, commonly known as Son of BOSS.[1] Approximately $85 million of artificial losses are at issue in the cases addressed in this summary judgment motion.

Marvin founded the Canandaigua Wine Company--predecessor of the conglomerate now known as Constellation Brands, Inc. ("Constellation"). Since his death, the company continues to be controlled by his family (most notably his widow Marilyn and their two sons, Richard and Robert) and trusts for the benefit of his family (Abigail's Trust and Zachary's Trust) (collectively the "Sands Heirs"). (PF 1-4). During 2001, the Sands Heirs, as a group, engaged in two Son of BOSS tax shelters promoted by The Heritage Organization, L.L.C. ("Heritage"), for the purpose of eliminating taxes on built-in capital gains. (PF 7-11). By this motion, the United States requests summary judgment as to all issues relating to the first of the Heritage shelters initiated by the Sands (the "First Shelter").

Specifically, the United States requests summary judgment sustaining the disallowance of the artificial tax benefits attributable to the First Shelter in the cases involving R,R,M & C Group. L.P. ("Group") R,R,M & C Partners, L.L.C. ("Partners") and CWC Partnership I ("CWC"). M,L,R & R ("MLRR"), Mickey Management, L.P. ("Mickey L.P."), Alpha I, L.P. ("Alpha") and Beta Partners, L.L.C. ("Beta") participated only in the second shelter (the "Second Shelter") which is the subject of a summary judgment motion filed June 4, 2007. That shelter is only addressed herein as

[1] "BOSS" stands for Bond and Option Sales Strategy.

background information. While CWC participated in both the First and Second Shelters, this motion addresses only CWC's involvement in the First Shelter. If granted, this motion will dispose of all issues in the Case Nos. 06-409-T and 06-410-T, as well as CWC's (Case No. 06-411-T) participation in the First Shelter.

**ISSUES PRESENTED**

1. Whether the short sale obligations assumed by the partnerships are "liabilities" for purposes of 26 U.S.C. § 752?

2. Whether, through their short term use of four CRUTs, the Sands Heirs are entitled to escape taxation on the gain realized from their sale of approximately $75,000,000 in Constellation stock?

3. Whether the 40% or 20% accuracy-related penalty under section 6662 apply to the resulting underpayments of tax relating to the First Shelter?

**STATEMENT OF THE CASE**

The facts of this case are set out in detail in the United States' Proposed Findings of Uncontroverted Fact and they can be summarized as follows:

The Sands Heirs are wealthy individuals who anticipated receiving very substantial amounts of capital gain income primarily from their sale of Constellation stock in 2001 and later years. (PF 1-4 & 6). In their attempt to shelter that income from taxation, they engaged in two Son of BOSS tax shelters promoted to them by Heritage, agreeing to pay Heritage 25% of their present and future tax savings realized by their participation in the tax shelters. (PF 50). Between the two shelters, the Sands Heirs paid fees to Heritage totaling $6,586,287. (PF 50).

As structured by Heritage, the First Shelter had two parts: (1) the partnership contribution of open short sale positions in approximately $85,000,000 in U.S. Treasury notes; and (2) the use of four charitable remainder unitrusts. (PF 13 & 16). It is clear that the Sands intended either aspect of the First Shelter, standing alone, to be sufficient to shelter all of the $74,862,863 in gain realized from the October 1, 2001 sale of 2,002,002 shares of Constellation stock. Nevertheless, the Sands employed both the vehicles in the First Shelter, presumably to increase their chances that the hocus-pocus nature of the underlying transactions would not be discovered by the IRS.[2]

**The Short Sales**

A short sale is a sale of securities that are not owned by the seller. *Provost v. United States*, 269 U.S. 443,450-51 (1926). Securities are borrowed (usually from a brokerage house) and then sold on the open market. The seller has the proceeds from the sale but is required to replace the borrowed property in kind (referred to as "closing out" the short sale) at some future date. Although the short sale obligations were assumed by the partnerships here, the obligations to close the short sales were improperly omitted as partnership liabilities under section 752.[3] (PF 23-24, 26-29, 41). The resulting overstatement of their investment is one of the two alternative reasons that the Sands Heirs' claimed the artificial tax benefits, the other being the use of the charitable remainder unitrusts which is discussed later. (PF 29 & 36).

In the First Shelter, the Sands Heirs made partnership contributions of open short sale positions of approximately $85 million of U.S. Treasury notes and claimed artificial tax benefits

---

[2] Only the Short Sale structure was used by the Sands in the subsequent Second Shelter.

[3] Except as otherwise indicated, section references in the text refer to sections of the Internal Revenue Code of 1986, as amended, or the regulations thereunder.

equal to the short sale proceeds on the partnership returns filed by RRMC Group and RRMC Partners. (PF 13-24 & 41).

The amount of the Short Sales was arrived at based on the amount of potential basis that could be applied. To potentially eliminate the tax on the sale of $75 million in stock with a $10 million basis, then $65 million would be the size of the Short Sales. (PF 10). Even though the Short Sales resulted in a relatively small economic loss of $425,565, plaintiffs claimed losses of approximately $85 million on the transaction. (PF 25 & 45) This artificial purported loss flowed from their use of a pre-arranged artifice that improperly ignored or misinterpreted certain provisions of the Internal Revenue Code relating to partnerships. That artifice was as follows:

As already noted, on August 21, 2001, the Sands Heirs entered into the Short Sales. (PF 13-16). On August 28, 2001, the Sands Heirs contributed to the newly formed Group, their brokerage accounts (which held the proceeds of the Short Sales), the corresponding obligation to close the Short Sales, 2,000,000 shares of Constellation stock and some additional cash. (PF 17, 22-23). Group's general partner was the newly formed R,R,M &C Management Corporation ("RRMC Corp."), which was owned by Robert and Richard. (PF 20).

Group, on August 31, 2001, contributed its assets (including the proceeds from the Short Sales and the Constellation stock) to the newly formed Partners. The obligation to cover the Short Sales was also delegated to Partners. (PF 21, 24). On September 6, 2001, Partners closed the Short Sales and recognized a net loss of $425,565. (PF 25). On September 10, 2001, Group acquired the interest of Gloria Robinson, which had the effect of terminating Partners. (PF 26).

At this time, Group improperly allocated the $85,000,000 basis in Partners attributable to the Short Sales Proceeds, to its Constellation shares, thereby artificially inflating basis in these shares

by approximately 900% (the "Inflated Stock Basis"). (PF 26 & 45). This inflated basis was reported on Group's 2001 Form 1065 Federal Tax Return.[4] Similarly, Partners' Form 1065 for 2001 reported a tax basis in the Constellation stock of $94,757,364 and CWC overstated its basis in Group by more than $15 million. (PF 41).

Plaintiffs employ a specious interpretation of 26 U.S.C. §752 of the Internal Revenue Code to maintain that the basis in the Constellation stock is not reduced by the obligation to cover the Short Sales. (PF 29). Under 26 U.S.C. §752, when Partners closed the Short Sales, Group should have reduced its basis in Partners by $85,649,182 (the net proceeds from the Short Sales) since the obligation to close the Short Sales no longer existed. This reduced basis should have carried over to CWC. Plaintiffs' interpretation of § 752 is wrong as a matter of law.

**<u>The CRUTs</u>**

As a back-up means of avoiding the capital gain on the sale of the Constellation stock, the Sands Heirs also created four twenty-year term Charitable Remainder Unitrusts ("CRUTs"), which they prematurely terminated after only five months. (PF 27 & 34). During the CRUTs' brief existence, the Sands Heirs temporarily parked in the CRUTs their interests in Group (which first held the Constellation stock and then the proceeds from the sale of that stock). The Sands Heirs now claim that this pre-arranged artifice, which is described in greater detail below, still entitles them to not recognize the gain realized on the sale of the Constellation stock even if their Section 752 scheme fails.

On September 21, 2001, Robert, Richard, Marilyn and CWC purportedly transferred their respective interests in Group to four newly created CRUTs: Robert transferred his interest to the

[4] Group reported its basis in the Constellation stock as $94,890,987 rather than $9,108,119.

Robert Sands Charitable Remainder Unitrust - 2001; Richard transferred his interest to the Richard Sands Charitable Remainder Unitrust - 2001; Marilyn transferred her interest to the Marilyn Sands Charitable Remainder Unitrust - 2001; and CWC transferred its interest to the CWC Charitable Remainder Unitrust - 2001 (the "CRUTS Partners"). (PF 27) At this time, Group held $359,290 in cash and 2,002,002 shares of Constellation stock valued at $71,421,421. (PF 27). The CRUT Partners obtained an appraisal, for gift tax purposes, valuing their respective partnership interests at $5,198,897 each. Each of the CRUT Partners claimed charitable deductions of $519,935 for the remainder interests in their respective CRUTs. On October 1, 2001, Group sold the 2,002,002 shares of Constellation stock for $74,862,863. (PF 30)

On January 28, 2002, each of the CRUT Partners designated the "Sands Supporting Foundation" as the charitable beneficiary to receive the remainder of his or her respective trust. (PF 31). On Friday, February 22, 2002, the CRUT Partners revoked their earlier charity designations to the Sands Supporting Foundation and, instead, named the newly created Educational and Health Support Fund (the "Support Fund") as a charitable beneficiary of each trust. (PF 32). Five days later, on Wednesday, February 27, 2002, Robert, Richard, Marilyn and CWC purchased the remainder interest in their respective CRUTs from the Support Fund, paying a purchase price of approximately $550,000 for his or her remainder interest for a total of slightly more than $2 million. (PF 34). At the time that they purportedly purchased the remainder interests from their respective CRUTs, an updated appraisal was obtained valuing their respective partnership interests at $5,482,334 (for a total $21,951,288), even though Group's assets consisted of $75,694,095 in cash. (PF 35).

Robert and Richard were the grantors of the Support Fund. The Support Funds' trustees were Freddy H. Robinson ("Robinson"), James A. Locke, III ("Locke") and Wesley M. Stallings ("Stallings"). Robinson is the head of Bernard Robinson & Co. LP, a Greensboro, North Carolina accounting firm that served as the Sands Heirs long-time accounting firm. Robinson is also the son of Gloria Robinson. Stallings is an accountant at Bernard Robinson. Locke is an attorney with Nixon Peabody, L.P., and a member of the board of Directors of Constellation Brands. (PF 32-33). On September 25, 2003, Richard and Robert, as grantors of the Support Fund, appointed themselves to trustee positions with the Support Fund. (PF 40).

The purchase of the remainder interests by Richard, Robert, Marilyn and CWC was treated by the parties as causing the termination of each trust. Each trust grantor thus became the outright owner of an interest in a partnership holding assets, primarily cash, amounting in the aggregate to approximately $75 million. Richard, Robert, Marilyn and CWC treated the termination of their respective CRUTS as a tax free distribution of the CRUTs' assets. (PF 36-37). In essence, each of the Sands Heirs took a $520,000 charitable deduction in 2001 in connection with the purported transfer of their interests in Group to the CRUTs. They each, in turn, purportedly paid approximately $550,000 in 2002 to acquire tax-free their respective interests in the $75 million in cash held by Group.

But for plaintiffs' claim that the distributions resulting from the purchase of the CRUT remainder interests were tax free, the transaction itself would appear to present little more than a wash transaction and a timing issue - a combined charitable deduction of $2,080,000 in 2001 and an actual payment to the charity in 2002 of $2,200,000. However, nothing could be farther from the truth. In addition to involving a charitable organization (even one controlled by the Sands) in a tax

avoidance scheme, the Sands Heirs attempted several tax subterfuges. First, they sought to delay the recognition of the gain on the sale of the Constellation stock into a later year (an immediate tax deferral), while, at the same time, claiming over $2 million in charitable deductions. The savings that the Sands Heirs received alone, by pushing the tax recognition on a $65 million gain into a later year, more than offsets the $2 million that the charity ultimately received. According to the Goerig reappraisal, the value of Group's net assets increased by $3,913,384 between September 21, 2001 and January 21, 2002 (PF 35) - an additional amount the CRUT Partners claim they received tax free through their premature purchase of the CRUTs' remainder interests. Effectively, the Sands Heirs are letting the Federal Government fund the $2 million that the charity received while, themselves, claiming the charitable deduction. Second, the CRUT Partners claimed a combined $19,890,987 loss on the Constellation stock sale when, in reality, the stock sale resulted in a gain of approximately $65 million. Ultimately, however, the Sands Heirs' primary motivating factor has to be the tax avoidance on the gain realized by the Constellation stock sale.

## ARGUMENT

### UNDER SECTION 752, THE SHORT SALE OBLIGATIONS MUST BE INCLUDED IN PARTNERSHIP LIABILITIES.

The artificially high bases Plaintiffs claim in this case depends, in part, on the untenable argument that their obligation to cover the Short Sales, that is to replace the $85 million of borrowed Treasury notes, was not a liability for purposes of § 752. Plaintiffs treat their contribution of the $85 million in proceeds from the Short Sale as a contribution of unencumbered funds; however, plaintiffs fail to account for their liability to close the Short Sales under § 752. Plaintiffs claim that the tax basis of the Constellation stock was increased by $85 million – from the original cost basis to the

Inflated Stock Basis – by the Sands Heirs' participation in the First Shelter. The difference between the original cost basis and the Inflated Stock Basis is the same $85 million in artificial tax benefits created by the omission of the Short Sale obligations from partnership liabilities under § 752. If the Short Sale obligations are included in partnership liabilities under that section, the tax basis of the Constellation stock is decreased to its original cost basis and Plaintiffs will not achieve the non-economic losses that they sought by entering into this tax shelter.

A short sale is a transaction in which an investor sells borrowed securities, generally in anticipation of a price decline, and is required to return an equal amount of shares at some point in the future. On August 23, 2001, the Sands Heirs sold short U.S. Treasury notes in the approximate amount of $85,000,000. Their controlled partnership, Partners, subsequently covered the Short Sales with U.S. Treasury notes that it purchased on September 6, 2001 - 14 days later.

Plaintiffs admit that the Short Sale obligations were assumed by their partnerships and that the Short Sale obligations were in fact paid by Partners purchasing replacement securities at the closing of the Short Sales. Furthermore, they cannot dispute that, if § 752 applies to the Short Sale obligations, the tax basis of the Constellation stock is equal to the original cost basis of the stock. Plaintiffs also cannot deny that their interpretation of § 752 would permit any partner to create artificial tax benefits virtually at will in amounts limited only by his ability to leverage his assets. Notwithstanding all that, plaintiffs incorrectly maintain that the definition of partnership liabilities under § 752 should not include Short Sale obligations.

This issue has been fully briefed in the Motion for Summary Judgment filed by the United States on June 4, 2007 in connection with the Second Shelter. The legal issue is the same and the Court's ruling on the § 752 issue will be dispositive for both shelters. Rather than restate the earlier

brief's argument, the United States incorporates the earlier argument into this pleading. The United States directs the Court's attention, however, to the recent affirmance of the *COLM Producer* case relied on by the United States in its earlier motion for summary judgment. This decision specifically addresses the § 752 issue in a Heritage Son of BOSS shelter and it concludes that the obligation to close a short sale is a liability for purposes of § 752. *Kornman & Associates, Inc. v. United States*, 527 F.3d 443, 462 (5th Cir. 2008)(affirming *COLM Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006)).[5] In *Kornman*, the Court equates the parties' premeditated attempt to transform a short sale transaction (which is essentially a wash transaction for economic purposes) into a windfall for tax purposes as reminiscent of an alchemist's attempt to transmute lead into gold. *Id.* at 456. The Court further finds that a party's failure to treat its relief from the obligation to cover a short sale as an additional amount realized produces an unwarranted aberration in the amount of loss realized. *Id.* at 461.

The obligation to close a short sale is a liability for purposes of § 752 and any claim by plaintiffs to the contrary should be summarily rejected. To hold otherwise would be to adopt a definition of liability that would defeat the manifest intent of Congress and would allow the Sands Heirs to continue their conspicuous raid on the Treasury through the use of this tax shelter. (*See Kornman*, 527 F.3d at 455-456).

---

[5] While the *Kornman* Court notes that *Cemco Investors, L.L.C. v. United States*, 515 F.3d 749, 752-53 (7th Cir. 2008) recently held that the offsetting option variant of a Son of BOSS tax shelter was invalid under retroactive Treasury Regulation § 1.752-6, it correctly concludes that Treas. Reg. § 1.752-6 is inapplicable where 26 U.S.C. § 752 applies. *Kornman*, 527 F.3d at 462.

## THE SANDS HEIRS CANNOT ESCAPE TAXATION ON THE GAIN FROM THE SALE OF $75,000,000 IN CONSTELLATION STOCK THROUGH THEIR SHORT TERM USE OF FOUR CRUTS

### A. <u>What is a Charitable Remainder Unitrust and how is it taxed?</u>

A CRUT is a trust to which the donor transfers property (here, a partnership interest in Group) to a trustee to be held and managed for the benefit of the beneficiaries of the trust. I.R.C. § 664. The trustee makes distributions to the current income beneficiaries for the term of the trust, at the end of which the remaining trust property is distributed to the remainder beneficiary, which must be a qualified charitable organization. I.R.C. § 664(d)(2). The CRUT makes payments to the income beneficiaries, which vary from year to year, equal to a fixed percentage of the value of the trust property, as determined annually. The trust may continue for the life or lives of its current beneficiaries, or it may continue for a stated number of years (not more than twenty). I.R.C. § 664(d)(2)(A).

A CRUT is generally exempt from federal income taxes. I.R.C. § 664(c)(1). Instead, the income of a CRUT is taxable to its current beneficiaries when it is distributed to them. I.R.C. § 664(b). Such distributions are taxed on the basis of a four-tier system. Distributions received by a current beneficiary for a given taxable year are taxable first as ordinary income, to the extent of the trust's ordinary income for the year plus all undistributed ordinary income from prior years. I.R.C. § 664(b)(1). If distributions exceed those amounts, they are next taxed as capital gain to the extent of all current or undistributed capital gain of the trust. I.R.C. § 664(b)(2). Any remaining excess will then be taxed as other (tax-exempt) income. I.R.C. § 664(b)(3). Only when all of these first three tiers are exhausted will any distribution be considered corpus. I.R.C. § 664(b)(4). Thus,

over time, all or most of the income received by a CRUT will be taxed in the hands of its current beneficiaries.

The creator of a CRUT is entitled to a federal income tax deduction equal to the actuarial value of the charitable remainder interest in the trust. I.R.C. § 170(f)(2)(A). This value is determined by multiplying the fair market value of the property transferred to the trust by the percentage set forth in IRS actuarial tables which take into account the payout rate of the trust, the term of the trust (based upon either the life expectancy of the beneficiary or beneficiaries, or the stated term of a term-of-years trust), and the official interest rate for the month of the transfer (or, at the option of the donor, the rate for either of the two preceding two months) under section 7520 of the Internal Revenue Code. Treas. Reg. § 1.664-4. Here, plaintiffs used the Goerig appraisal to determine the value of the charitable remainder interest in the CRUTs.

In the present situation, the CRUTS were purportedly created for a 20 year term. (PF 27). Group generated capital gains income from the sale of the Constellation Brands stock it owned. This capital gain flowed through to the CRUTs where the tax on that gain was deferred. If the CRUTs had continued to their full 20 year term, then the capital gains flowing to the CRUTs would have been taxed to the income beneficiaries when the unitrust amounts were distributed to the income beneficiaries of the CRUTs over the 20-year term of the CRUTs. Here, however, the income beneficiaries (the Sands Heirs) purchased the remainder beneficiary's interest in the CRUTs, and prematurely terminated the CRUTs after only 5 months. While plaintiffs concede that the, as yet, untaxed proceeds from the sale of the Constellation stock (held by Group) were distributed to the Sands Heirs at the time the CRUTs were terminated, plaintiffs now argue that the gain realized by the stock sale escapes taxation because the gain occurred while the CRUTs were still in existence

rather than after the CRUTs' termination. Such a result is absurd. While it is true that the CRUTs themselves would not be taxed on the gain realized at the time the Constellation stock was sold, once the sales proceeds (held by Group) were distributed to the Sands Heirs, either through normal CRUT distributions or, as here, upon the CRUTs termination, that deferred gain is recognized and taxed.

Here, the CRUTs were terminated in 2002, and the Group partnership interest (which held the untaxed proceeds from the sale of the Constellation stock) was distributed to the CRUT Partners at termination. Under normal circumstances, the taxable event (distribution after termination) is in the 2002 tax year, a year not at issue in the three consolidated cases addressed by this summary judgment motion. With respect to the 2001 tax year, at issue in this litigation, however, the transfers to the CRUTs should be disregarded for federal tax purposes and the gain from the October 1, 2001 stock sale should be recognized in 2001.

**B. <u>The transfers to the CRUTs should be disregarded for federal tax purposes</u>**

The United States submits that the Sands Heirs' use of the CRUTs is nothing more than a charade. Using little more than smoke and mirrors, the Sands Heirs hope to escape the taxation on the nearly $75 million they ultimately received from the sale of the Constellation stock. As stated before, this result is absurd and, for the reasons stated below, the transfers to the CRUTs should be disregarded for federal tax purposes and the Sands Heirs taxed on the gain realized from the Constellation stock sale at the time of its sale.

Gary Kornman (the founder and one of the principals of Heritage) and Jonathan Blattmachr (a partner with the law firm of Milbank, Tweed, Hadley & McCloy LLP and the author of the opinion letters provided to the Sands Heirs in connection with the CRUT aspect of the First Shelter) worked together to devise the strategies used by the Sands. (PF 6). The transcript of the December

5, 2000 conversation between Kornman, Blattmachr and a potential investor (not one of the Sands), provides a shocking insight into the shell game later played out by the Sands. This conversation candidly discusses both the § 752 and the CRUT strategies, stressing how the combination of both strategies serves to minimize the chance of an IRS audit.

Kornman and Blattmachr frankly discuss how the use of a charitable remainder trust camouflages the underlying transaction and virtually guarantees that the transaction will escape notice by the IRS. (PF 6). They further outline the use of a controlled trust to insure the trust's premature termination. (PF 12). Finally, they brazenly discuss how using the charitable trust, coupled with various pass-through entities, effectively hides the true substance of the underlying transactions. Better still, according to Blattmachr and Kornman, their structuring enhances charitable deductions and minimizes what the charity receives through the use of excessive valuation discounts. (PF 38).

The United States notes that, while the technique employed by the Sands Heirs is unquestionably brazen in nature, this is not the first time that CRUTs have been misused as part of an abusive tax scheme. In Notice 94-78, 1994-2 C.B. 555, the IRS addressed an abuse involving so-called "accelerated charitable remainder trusts." Both there, as here, the ultimate goal was the same – converting appreciated assets to cash while avoiding a substantial portion of the tax on the gain. In rejecting a potential abuse of the charitable remainder trusts, the IRS stated that several different legal doctrines could be employed to challenge the use of a CRUT in an abusive tax scheme: (i) substance over form; (ii) assignment of income doctrine; and (iii) failure of the CRUT to qualify as a charitable remainder trust under I.R.C. § 664. Those same legal doctrines are equally

applicable in this case to the Sands Heirs' attempted abuse of the tax laws designed to foster charitable giving.

(1) Substance over Form/Assignment of Income

The "substance over form" doctrine and the "assignment of income" doctrine are closely related. Both seek to tax income to the party who benefitted from the income. There is an extensive body of case law holding that in certain circumstances, a transfer of appreciated property followed by a sale of such property by the transferee will be treated for tax purposes as a sale by the transferor and that the gain realized on the sale will be taxed to the transferor. In these types of cases, the transferee is commonly referred to as "conduit" through which the transferor has passed title to the property sold. *Hallowell v. Commissioner*, 56 T.C. 600 (1971). In these types of cases, the transferor "assigns" the income to the conduit, with the hope that the conduit will be taxed on the gain. In reality, the substance of the transaction is quite different from the actual form of the transaction.

The substance over form doctrine is premised on the long-accepted concept that the tax results of an arrangement must be determined based on its underlying substance rather than an evaluation of the formal steps by which the arrangement was undertaken. The Supreme Court has held that a "given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938).

Since the Supreme Court's seminal articulation of the substance over form doctrine in *Gregory v. Helvering*, 293 U.S. 465 (1935), there have been a host of federal cases utilizing the principles articulated by the Supreme Court in order to disregard conduits or intermediaries on facts similar to those of this case. In *Commissioner v. Court Holding Co.*, 324 U. S. 331 (1945), a

corporation had orally agreed to sell its only asset, an apartment house, to a third party purchaser. Subsequently, the corporation learned of the double tax that would arise if it first sold the property and then distributed the proceeds of the sale to its shareholders. Accordingly, rather than consummate the sale, the corporation transferred the assets to its two shareholders as a liquidating dividend, and they in turn formally conveyed it to the purchaser with which the corporation had originally negotiated. In finding that the substance of the transaction was a sale by the corporation, the Supreme Court disregarded the participation of the intermediary conduit. In so finding, the Court stated:

> The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

324 U.S. at 334.

Likewise, the Supreme Court in *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613-614 (1938) also decried the use of conduits, noting disdainfully that "the preliminary distribution to the stockholders was a meaningless and unnecessary incident in the transmission of the fund to the creditors, all along intended to come to their hands, so transparently artificial that further discussion would be a needless waste of time. The relation of the stockholders to the matter was that of a mere conduit." *Id.*

Taxpayers have attempted to use trusts and/or charitable organizations as a way to shelter or avoid gain on appreciated assets for years. In *Malkin v. Commissioner*, 54 T.C. 1305 (1970), the

taxpayer owned almost 90,000 shares of stock of General Transistor Corp. In April of 1958, the taxpayer decided to sell his stock. Prior to the sale of the stock, the taxpayer established four trusts for his family and transferred some of the stock to the trusts. The stock was then sold by the trusts. While there was no dispute that gain was realized from the sale of the stock; the question was who realized the gain, the trusts or the taxpayer? The Commissioner argued that, while in form, the trusts may have sold the stock, in substance, the taxpayer sold the stock and realized the gain. The Court held that "[a] sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." *Id.* at 1312. In holding for the Commissioner, the Court used an analogy of a closely held corporation who, manipulated by its shareholders, distributes property with the knowledge that it will be immediately sold as part of a scheme to avoid taxes and the corporation then plays an active role in the subsequent disposal. In cases like this, the sale in substance is made by the corporation. The Court held that "this same principle should ... apply to transactions involving trusts created by a taxpayer with a view to their serving as conduits of title in effectuating a sale to a third party." *Id.* at 1313.

The Court decided that it was important to focus its examination "on the realities of the transaction rather than the refinements of legal title, the verbiage of written instruments, or the chronological order of formal events." *Id.* at 1313. Accordingly, the Court found that, in substance, the taxpayer sold all of the shares.

In another case, *Hallowell v. Commissioner*, 56 T.C. 600 (1971), the taxpayers transferred IBM shares to their family-controlled corporation, Chatham Bowling Center, Inc., which sold the IBM stock shortly after the transfer. The reason why the taxpayers transferred the IBM shares to Chatham was due to Chatham's net operating loss carryovers, since much of the gains derived from

the sales would not increase Chatham's total income tax liability. The Commissioner argued that although in form, Chatham was the seller of the IBM stock, in substance, it was the taxpayer who sold the stock and must be taxed on the gain. The Court and the Commissioner also noted that Chatham made substantial distributions to the taxpayers roughly in line with the amount of gain derived annually from the sales of the IBM stock. The Court agreed with the Commissioner and held that the taxpayer, not Chatham, should be charged with the gain derived from the sales of the stock. The fact that there was no prior contract or prearranged plan for the subsequent sales of the IBM stock was of relatively minor importance. The Court also stated that "the persistent pattern, extending for over a 2-year period, of transfers of stock to Chatham, followed by Chatham's sales of such stock and by substantial distributions to or for the benefit of petitioners, strongly suggests to us that the transactions in question were preconceived" ... and that the "sales were made for the benefit of Hallowell and his wife." *Id.* at 608-609. *See also Applestein v. Commissioner*, 80 T.C. 331 (1983) (holding that taxpayer to be taxed on gain resulting from the merger exchange of stock, even though stock transferred to taxpayer's children); *Usher v. Commissioner*, 45 T.C. 205 (1965) (holding that in substance sale was made by taxpayer through a trust as a conduit and that the taxpayer is taxable on the full amount of the gain realized on sale); *Ferguson v. Commissioner*, 174 F.3d 997 (9th Cir. 1999) (holding that creator of a charitable foundation was taxable on capital gains realized by the foundation since creator's right to the sales proceeds from stock was found to have become fixed before the transfer to the charitable foundation).

Like in the cases discussed above, here, the circuitous path taken by the Sands Heirs was motivated solely by tax purposes. Acting under the guise of a charity, the Sands Heirs sought to manipulate the Tax Code and subvert "that which the statute intended" and to produce a different result from what really occurred. Plainly stated, the Sands Heirs sought to cheat the Government

out of the tax due from the capital gains realized from the sale of approximately $75 million in low-basis appreciated stock.

The CRUTs were intended to piggy-back and serve as a back-up to the Sands Heirs' earlier attempt to manipulate § 752 as it applied to short sales. All of the transactions were predetermined and all entities involved, including the CRUTs were structured and controlled, either directly or defacto, by the Sands Heirs. So intent were the Sands Heirs to accomplish their tax avoidance schemes, that they were willing to pay advisors nearly $7 million to orchestrate their devious plans.[6] Furthermore, they apparently had no qualms with using purported charitable trusts to essentially launder the approximately $75 million of built-in gain in the Constellation Brands stock.

Unquestionably, the CRUTs were part of a prearranged, and elaborately diagramed, tax-avoidance scheme. Although purportedly created for a 20 year term, the early termination of the CRUTs was discussed prior to their creation. The CRUTs themselves were only in existence for less than 6 months, even though they were structured as 20-year term CRUTs. The initial remainder beneficiary of the CRUTs was the Sands Supporting Foundation, an entity for which Robert and Richard purported to be "Independent Trustees." Less than one week before the sale of the CRUTs' remainder interests, this charitable designation was changed to the Support Fund.

The Support Fund was created by or on behalf of the Sands Heirs on the eve of the sale of the remainder interests (five days prior to that sale). This sale, which was purportedly consummated in less than one week, enabled the Sands Heirs to reacquire a partnership holding approximately $75 million in cash in return for a mere $2 million. The three trustees of the Support Fund, who approved the asset sale, were agents of the Sands – two were members of an accounting firm for the Sands Heirs and one was an attorney who sat on the board of Constellation Brands. So great is

[6] The United States readily acknowledges that these payments were for implementing both of the tax shelters at issue in these consolidated proceedings.

the Sands' control over the Support Fund that they arranged for Robert and Richard's placement as trustees for the Support Fund shortly after the CRUTs were terminated.

The appraisal of the Group partnership interests transferred to the CRUTs was unusual to say the least. Normally, donors to CRUTs seek a large valuation since they will receive a larger charitable contribution deduction. By contrast, the appraisal used by the CRUT Partners employed very large discounts to create a lower valuation of the gift of the Group partnership interest to the CRUTs. Presumably, this was done to create a lower value for the prearranged purchase by the CRUT Partners of the remainder interests in the CRUTs 5 months later. One can further speculate that placing the creation of the CRUTs and the purchases of the remainder interest, although only five months apart, in two different taxable years, was designed to further disguise the transaction.[7]

Here, similar to *Hallowell*, the Sands Heirs, transferred stock to an entity controlled by them, which then sold the stock. The Sands Heirs, like the Hallowells, received distributions from the CRUTs in line with what they would have received had they simply sold the stock themselves rather than through the elaborate contrivances set up to disguise the true nature of the sale. As in *Hallowell*, and the other authorities cited above, the given result at the end of the deviously circuitous path followed by the Sands Heirs does not differ from the given result had the Sands Heirs followed the straight path. The gain on the sale of the Constellation stock must be recognized by the Sands Heirs in tax year 2001, consistent with the October 1, 2001 sale of the stock by Group.

(2) <u>The transfers to the CRUTS should be disregarded because the CRUTs do not qualify as a charitable remainder unitrusts under I.R.C. § 664</u>

Treas. Reg. § 1.664-1(a)(4) requires that "in order for a trust to be a charitable remainder trust, it must meet the definition of and function exclusively as a charitable remainder trust from the

[7] As illustrated at Stage 8 of the flow chart diagraming the First Shelter, the contemplated purchase of the remainder interest was intended to be in the year after the taxable gain on the sale of the Constellation stock was realized.

creation of the trust." While on paper the CRUTs may have qualified for tax-exempt status, by operation, the CRUTs did not function exclusively as charitable remainder trusts from their creation. Here, the CRUTs were structured and operated as a contrivance created by the Sands Heirs in their attempt to avoid the tax realized on the capital gain generated by the sale of the Constellation stock, which had been deferred from recognition under § 664(c) pending distribution of the sales proceeds to the Sands Heirs. This use of a CRUT is inconsistent with the requirement that the trust function exclusively as a charitable remainder trust. Accordingly, the transfers to the CRUTs should be disregarded since the CRUTs did not operate exclusively as charitable remainder trusts, and, accordingly, none of the CRUTs' income qualifies as exempt under § 664(c).

From the outset, the Sands Heirs intended to prematurely terminate the CRUTs shortly after their creation and receive the bulk of the proceeds generated from the sale of the Constellation Brands stock. The Sands Heirs used the CRUTs solely to launder the $75 million of gain generated by the sale of the Constellation Brands stock. The fact that, in 2002, the Support Fund ended up with approximately $2 million does not alter the fact that the transfers to the CRUTs should be disregarded. The Sands Heirs had already, in 2001, each claimed a $519,935 charitable tax deduction at the time Group was purportedly transferred to the CRUTs.

As concluded by the Government's expert, Jerry McCoy, the trusts were used by their creators as temporary partners in Group during a period when Group realized large amounts of capital gain income from sales of Constellation stock and other securities. Normally, the beneficiaries would have paid tax over the twenty-year trust term on these gains realized by the CRUTs, under the four-tier system of tax applicable to CRUT beneficiaries. The CRUTs were terminated almost immediately after their remainder interests were purchased, so that the beneficiaries received only two partial distributions. The current beneficiaries acquired nearly $75

million in assets as a result of their payments of approximately $2 million for the remainder interests. If the Sands Heirs had indeed wanted to make a $2 million donation to the Support Fund, the donation could have been made without the use of the CRUTs. The only need for the CRUTs was to shelter the capital gains tax on the sale of the Constellation Brands stock. This use is not consistent with the requirement that the trust function exclusively as a charitable remainder trust and, therefore, the transfers to the CRUTs should be disregarded since the CRUTs do not qualify as charitable remainder trusts under § 664.

(3) The Partnership Anti-Abuse Regulation Applies

Treas. Reg. § 1.701-2(a), the partnership anti-abuse rule, provides in pertinent part that subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are the following requirements:

(1) The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose;

(2) The form of each partnership transaction must be respected under substance over form principles; and

(3) Except as otherwise provided, the tax consequences under subchapter K to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partners' economic agreement and clearly reflect the partner's income.

Treas. Reg. § 1.701-2(b) provides that the provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in Treasury Regulation Section 1.701-2(a). Accordingly, if a partnership is formed or availed of in connection with a transaction, a principal purpose of which is to reduce substantially the present

value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Service can recast the transaction for federal tax purposes as appropriate to achieve tax results that are consistent with the intent of subchapter K in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Service can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K: (1) the purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners; (2) one or more of the purported partners of the partnership should not be treated as a partner; (3) the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income; (4) the partnership's items of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified.

Treas. Reg. § 1.701-2(c) provides that whether a partnership was formed or availed of with a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is determined based on all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. Treas. Reg.§ 1.701-2(c) lists factors that may be considered in making the determination. One such factor indicative of a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is that the present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership assets and conducted the partnership's activities directly. Treas. Reg. § 1.701-2(c)(1).

Another factor listed in Treas. Reg. § 1.701-2(c), which would indicate a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K, is that the present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions designed to achieve a particular end result are integrated and treated as a single transaction. For example, this analysis may indicate that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest in the partnership was liquidated or disposed of (in whole or in part) would be a partner only temporarily in order to provide the claimed tax benefits to the remaining partners. Treas. Reg. § 1.701-2(c)(2).

Considering the facts and circumstances, the Sands Heirs purported to assign their interests in Group to the CRUTs in anticipation of the sale of Constellation stock held by Group, with the principal purpose of substantially decreasing the aggregate present value of the Sands Heirs' aggregate tax liability in a manner inconsistent with Subchapter K. The CRUTs' transitory ownership of Group, from September 2001 until February 2002 did not serve any legitimate purpose. In that six-month period, the Sands Heirs' purported to contribute their interests in Group to the CRUTs, Group sold its shares of Constellation stock, the Sands Heirs made, revoked, and re-designated a controlled charitable organization as remainderman, and within 6 days of designating that charity, the CRUTS were terminated by the Sands Heirs purported purchase of the remainder interests. This resulted in the Sands Heirs' reacquisition of their original Group partnership interests one day before Group was terminated and distributed $75 million in sales proceeds to the Sands Heirs. As a result, the Sands Heirs received distributions of exactly the same amount of cash that they would have received if no transfers to the CRUTs had ever occurred. The only economic effect and the real purpose of interposing the purported CRUTs was to give the Sands Heirs a back-up

argument for avoiding recognition of gain on the sale of the Constellation stock if their Section 752 scheme (the Short Sale transactions) failed.[8]

This case involves the use of purportedly separate transactions to achieve a substantially smaller aggregate federal tax liability than if the transactions were integrated. Plaintiffs' embarked on a planned series of separate steps that were in substance part of a single transaction designed to reduce their tax liability. In fact, the Sands Heirs sought to totally eliminate the capital gain on the sale of approximately $75 million in Constellation stock. Each of these steps, including the use of the CRUTs, were contemplated from the time that the Sands Heirs first began their implementation of the Heritage Strategies involving the sale of the Constellation stock. (PF 9) This fact is also reflected by the brief duration of the CRUTs' ownership of Group and the coordinated sale of the remainder interests in the CRUTs after the sale of the Constellation stock. (PF 11, 1227-36). Here, the interposition of the CRUTs as transitory partners in Group, followed by the coordinated reacquisition by the Sands Heirs of their original partnership interests, produced a far different tax result than had there been one integrated transaction—the Sands Heirs retaining their original interests in Group for the duration of the sale of the Constellation stock and distribution of the proceeds to the Sands Heirs without interposing the purported CRUTs.

The interposition of the CRUTs in furtherance of the Sands Heirs' tax avoidance transactions does not provide a clear reflection of their income. The economic consequences to the Sands Heirs of interposing the purported CRUTs were the same as if the Sands Heirs had retained their interests in Group. However, the tax consequences claimed by the Sands Heirs from the interposition of the purported CRUTs are vastly inconsistent with the economic consequences of the transactions. Treas. Reg. § 1.701-2(b) gives the Service broad authority to recast a transaction or series of

---

[8] Obviously any attempt to camouflage the Section 752 transaction by coupling that transaction with a CRUT also failed by virtue of the fact that the Short Sale transaction was uncovered by the IRS.

transactions in the event that a partnership is formed or availed of in connection with a transaction, a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. In light of this, the partnership anti-abuse rule should be applied by disregarding the CRUTs as partners of Group, or disregarding the purported transfers of partnership interests to the purported CRUTs, so that the tax consequences of the transaction will be consistent with the economic consequences to the Sands Heirs, who received the same economic benefits they would have received from holding their interests in Group for the duration.

(4) The Step-Transaction Doctrine

In addition to disregarding either the CRUTs as partners in Group or the transfer of the Group interests to the CRUTs under Treas. Reg. § 1.701-2, the interposition of the CRUTs in Group for the duration of the Constellation stock sale should be disregarded under the step transaction doctrine. Where a series of formally separate steps lacks any reasoned economic justification for standing alone, application of the step transaction doctrine on summary judgment is appropriate. *See True v. United States*, 190 F.3d 1165 (10th Cir. 1999). Where a taxpayer has embarked on a series of transactions that are in substance a single, unitary, or indivisible transaction, the courts have disregarded the intermediary steps and have given credence only to the completed transaction. *See Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 654 (5th Cir. 1968). In this case, the purported contribution by the Sands Heirs of the Group interests to the CRUTs followed shortly thereafter by the termination of the CRUTs in a coordinated sale are steps that served no stand-alone economic effect or rationale. Therefore, the interposition of the CRUTs as transitory partners in Group should be disregarded under the step transaction doctrine.

**PLAINTIFFS GROSSLY MISSTATED THE BASIS OF THE CONSTELLATION STOCK AND THE 40% PENALTY ASSESSED UNDER 26 U.S.C. §6662 SHOULD BE SUSTAINED.**

The IRS properly determined that the following penalties are applicable against the Group, Partners and CWC:

(1) a 40% penalty for a gross valuation misstatement (§ 6662(b)(3) and (h));[9]

(2) a 20% penalty for substantial valuation misstatement (§ 6662(e));

(3) a 20% penalty for substantial understatement of income tax (§ 6662(a), (b)(2) and (d)); and

(4) a 20% penalty for negligence or disregard of rules and regulations (§ 6662 (a), (b)(1) and (c)).

A gross valuation misstatement exists if the value or *adjusted basis* of property claimed on the return is 400% more than the amount determined to be the correct amount of such value or *adjusted basis*. (§6662 (e) and (h)). Here, Group and Partners overstated the basis of the Constellation stock by more than 900%. (PF 41). Similarly, CWC overstated its basis in the Constellation stock by nearly 4500%. (PF 41). Thus, the 40% gross valuation penalty applies. The IRS properly calculated the applicable penalties at the 40% level for shelter participants' 2001 tax returns.

As such, the 40% penalty imposed by the Group, Partners and CWC FPAAs is appropriate and it should be sustained."[10] This Court has held as such in the case of *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (Ct. Cl. 2007). In *Jade Trading*, the Court held that based on its determination that the transaction lacked economic substance, and that the basis in each partnership

---

[9] Because there is no stacking of penalties, the maximum penalty is either 20% or 40% of the underpayment of tax, even if an underpayment is attributable to more than one type of misconduct. *See* Treas. Reg. § 1.6662-2(c).

[10] Some of the penalty assessment made against CWC relates to the Second Shelter. Between its two motions for summary judgment, the United States seeks summary judgment on all of the penalty assessments proposed against CWC.

interest must be substantially reduced, the IRS's 40% penalty under Section 6662(h) for a gross valuation misstatement was applicable. The Court stated that "[o]nce a gross valuation misstatement has occurred, the penalty applies mechanically, regardless of the intent of the taxpayers in executing the transaction or their reliance on legal authority." *Id.* at 54.

**CONCLUSION**

The Short Sale Obligations at issue are liabilities under §752. Two Courts have already concluded that 26 U.S.C. §752 requires that the obligation to replace borrowed Treasury securities be treated as a liability. *Kornman & Associates, Inc. v. United States*, 527 F.3d 443 (5th Cir. 2008)(affirming *COLM Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006)); *Salina*, 2000 (RIA) T.C. Memo ¶2000-352, at 2013. Furthermore, the Sands Heirs are not permitted to avoid recognizing the tax on the capital gains generated by the sale of the Constellation stock through their contrived use of the CRUTs. The FPAAs before the Court adjust the plaintiffs' various

partnerships' returns consistent with this requirement. Accordingly, the United States is entitled to summary judgment sustaining the FPAAs issued to Group, Partners and CWC. The United States is also entitled to summary judgment sustaining the 40% penalties in the FPAAs.

Respectfully submitted,

/s/ Thomas M. Herrin
THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

DAVID GUSTAFSON
Chief, Court of Federal Claims Section

LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney