Witness: Brian Czerwinski



UNITED STATES COURT OF FEDERAL CLAIMS

CONDENSED TRANSCRIPT

ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER, )
Plaintiffs, )
v. ) No. 06-407-T
UNITED STATES OF AMERICA, )
Defendant. )

**************************************************

ORAL DEPOSITION OF
BRIAN CZERWINSKI
AUGUST 28, 2007
VOLUME I

**************************************************

ORAL DEPOSITION OF BRIAN CZERWINSKI, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of August, 2007, from 9:06 a.m. to 2:49 p.m., before Stacey R. Cruz, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Department of Justice, Tax Division, located at 717 North Harwood Street, Suite 400, Dallas, Texas, in accordance with the United States Court of Federal Claims and the provisions stated on the record or attached hereto.



GOVERNMENT EXHIBIT 1

Page 22

A Specifically or generally?
Q. Let's start with generally.
A Generally, we would have been presenting to them -- or showing them strategies related to capital gains tax minimization.
Q. Do you remember any specific conversations at these meetings?
A. No
Q Were you -- when you became in- -- when you were invited to go along to these personal face-to-face meetings with the Sands, was this only after the Sands had agreed to enter into a transaction with Heritage?
A. That was typically the case I wouldn't see potential clients I would only be present once the engagement agreement was signed, or that it was going to be signed at that given meeting that I was attending.
Q Okay
A But I don't recall specifically in the Sands case, whether that -- whether I was there at the time they signed or afterwards
Q In -- during the initial meetings with the Sands that we've just talked about, what was the emphasis of Heritage's presen- -- presentation to the Sands?
A The possible elimination of capital gains tax.

Page 23

Q Okay. In these meetings with the Sands, did the Sands ever tell you what their goals were for the transactions?
A. I don't recall
Q Do you recall whether -- at these meetings, whether the Sands had a desire to sell Constellation brand stock?
A Yes
Q And do you recall whether it was their goal to eliminate the capital gains that would result from the sale of the Constellation brand stock?
A. Yes
Q Do you recall whether they wanted to minimize the capital gains that would result from the sale, or totally eliminate the capital gains that would result from the sale?
A I don't recall
Q. Okay Other than the capital gains tax issue, were any other tax issues discussed at these meetings, that you recall?
A Yes
Q And what were those?
A Estate tax
Q. And what were their goals, as far as estate tax?

Page 24

A I don't remember, specifically.
Q. Do you remember any general?
A I mean, I guess, in -- in general, anyone could -- talking about estate taxes is looking to transfer wealth to the next generation at the least amount of cost that they can, under the -- the tax rules. But I don't recall specifically if they conveyed exactly what they were wanting to accomplish.
Q. Okay Do you recall whether there was a discussion at these meetings about the basis of the Constellation stock being low compared to the relative value the stock?
A Yes
Q. And what was the conversation about the basis?
A. I think, in -- in -- I mean, I think that it was near zero, if I remember, and the stock had -- at that time, was worth substantially more than zero
Q. Okay. At these meetings with the Sands, who from Heritage did most of the talking?
A Mr. Kornman.
MR CULLINAN Can I clarify? Is that Michael or --
MS. JOHNS Oh, good point
A Gary Kornman.
Q (BY MS. JOHNS) Do you recall, at these

Page 25

meetings with the Sands, how much time at the meeting was devoted to the tax strategies to eliminate capital gains versus the non-tax or financial aspects of the strategies?
A I don't recall
Q Was there any discussion at these meetings about assuring the Sands that they would have the desired tax savings that they were seeking?
A I'm sorry, what's -- what were?
Q Did anyone at the meetings discuss with the Sands that they would be guaranteed the desired tax savings that they were seeking as a result of these strategies?
A No
Q Do you recall whether anyone discussed anything about audit risk with the IRS, and how to eliminate an audit risk?
A. I don't recall
Q Did you recall -- do you recall whether there were any discussions at these meetings about the profit potential that could be generated from entering into these transactions with Heritage?
A Specifically, no
Q. Specifically, you -- no, you don't recall, or --

Page 26

A Yeah, specifically, I don't recall. Generally, there would have been those conversations, but I don't re- -- I don't recall them.

Q. Okay. Do you recall whether the Sands ever mentioned in these meetings what their primary motive was for entering into these transactions with Heritage?

A I don't remember.

Q. I'm not sure whether you remember this, but the two -- the Sands entered into two strategies with Heritage, they both involved short sales of treasury notes Do you recall that?

A. Yes

Q Okay Were there ever discussions at these meetings with the Sands about the profit potential from the short sale of treasury notes?

A I believe there were.

Q. Do you remember what the specifics of those conversations would be?

A Well, I mean, I guess I remember, generally, how Heritage presented the stuff, but I don't remember that presentation specifically to the Sands Family.

Q Okay

A So I don't -- I don't know how you want me to --

Q No, that's --

Page 27

A. -- how I need to answer

Q. That's fine.

A Okay

Q. Would you agree that the primary benefit to the short sale of treasury notes was the anticipated tax benefit that could result?

A. Yes

MR CULLINAN Well, I'm -- I'm going to object I mean, maybe you can answer from your personal view, but I don't think he can answer as to how the Sands viewed the primary benefit

Q (BY MS JOHNS) You can go ahead and answer as to how you viewed the transaction

A Yes

Q. Okay So let me repeat it just so we have a clear record

Would you agree that the primary benefit to these short sales strategies was the anticipated tax benefit that could result?

A Yes

Q Do you know whether that's how it was promoted to clients?

A. I mean, it was packaged up as part of a structuring of the affairs in such a way that the tax savings were a possibility if things were structured in

Page 28

sort of the package that was shown to them.

Q Would you have recommended the short sale of treasury notes to someone as a pure investment vehicle if there were no tax benefits at all associated with it?

A. Well, I don't -- I'm not a registered investment advisor, so I don't think I could make that recommendation to anybody.

Q. Okay Do you know how much the Sands ultimately paid to Heritage as a fee to participate in these strategies?

A. I don't recall.

Q. And do you recall whether -- besides the 25 percent fee that Heritage received, do you recall whether there were any other fees that were paid by the Sands for this transaction?

A. Not that I recall.

Q Do you recall whether there were any fees paid for a tax opinion letter?

A Yes

Q Okay Do you recall how much the -- those fees were?

A No

Q What about for an appraisal of some partnership interests? Do you recall if there was a fee paid for that?

Page 29

A I don't recall.

Q. Now, both of these transactions that the Sands entered into with Heritage, involved a series of tiered partnerships. Are you familiar with that?

A Yes

Q We mentioned Alpha and Beta being one of -- one of those partnership structures

A Yes

Q Okay Would you agree that all of these partnerships were set up for purposes of the Heritage transaction?

A Yes

MR CULLINAN Can I just ask for clarification?

MS JOHNS Uh-huh

MR. CULLINAN What is the "Heritage transaction"?

MS JOHNS Well, when I'm talking about the "Heritage transactions," there were two of them that they entered into The first one we'll call Alpha Beta, and the second one, I'll refer to it as the R,R,M & C Group But he said he wasn't even -- didn't really remember that one, so .

MR. CULLINAN Your question, I thought, was confusing You asked, were the partnerships set up

Page 30

as part of the Heritage transaction. Well, if the Heritage transaction encompasses the partnership, your question's kind of circular, that's why I didn't understand your question

MS. JOHNS. Well, he -- he answered it, so...

MR. CULLINAN: Okay.

MS JOHNS. I might get back to it later.

Q (BY MS JOHNS) Was there was ever any discussion at the meetings with the Sands regarding whether the IRS might subsequently challenge the transactions entered into by the Sands with Heritage?

A I mean, I don't recall, specifically. That was -- typically, again, that would have be addressed in meetings

Q. I'm going to -- your -- you have your binder next to you that has all your exhibits.

I'm going to go ahead and have you look at Exhibit No 1, which is the first one in your -- in your book

(Witness reviewed document )

Q All right. Have you seen this document before, or is this familiar to you?

A Yes.

Q Is this something you would have prepared at

Page 31

Heritage?

A. It would have been prepared by the analytical department

Q Which you were a part of, right?

A Yes

Q Did you direct, then, the preparation of this, if you didn't, in fact, prepare it yourself?

A It's possible

Q. And can you tell me what this document is?

A This is a graphical representation, a general explanation of structuring -- putting the structures in place to realize possible tax savings

Q When were these graphics typically prepared? My question is --

A I guess, they're -- they would typically be prepared after the client had signed the engagement agreement with Heritage, and typically after there had been some communication of, I guess, what the specific situation was with regards to that client

Q So prior to the actual transactions being consummated, this graphical presentation would be prepared?

A Yes

Q Okay Was this presentation ever presented to the clients in a meeting as sort of a PowerPoint slide

Page 32

show?

A Yes

Q. Do you recall whether it was ever presented to the Sands?

A Specifically, no, but I can't imagine that it wouldn't have been.

Q Were you -- you don't recall being present when it was presented to the Sands?

A. I mean, I just don't recall the meetings, themselves.

Q Okay.

A. But I know they took place, and that would be a typical pattern of what would have transpired in the meetings.

Q So typically, prior to anyone setting up a partnership or executing a short sale, these graphical presentations would be prepared and shown to the clients?

A Yes

Q So would you agree, that based on this Exhibit No 1, this graphical presentation, that there was a plan in place to implement all of these steps prior to the time that anything was ever actually executed?

A. I think it was all sort of laid out and discussed to as to if you went through each one of

Page 33

these, as they're identified here on stages, that at the end, the result could be that you -- you might have tax savings from doing it

Q Would you agree that in the Sands case, that this graphical presentation or plan was followed through precisely from the beginning to the end?

A I don't know if I could recall if it was precisely followed through They did implement something with Her- -- or they implemented strategies that were presented by Heritage.

Q And this PowerPoint presentation is an example of a strategy that the Sands would have implemented?

A Well, I guess the -- the essence of what's in here, they would have implemented

Q Okay Now, if the -- the Sands wanted to deviate at all from this proposed structure, would they have been able to believe do that without Heritage's, approval?

A. Yes, because they -- I mean, they could have -- their lawyers that were giving them legal advice on this, they could have deviated from this if their lawyers had told them -- you know, if the lawyers had structured it differently, or advised them to do something differently than they could have.

Q Was there a concern that if they deviate at all

from this structure, that they might not achieve the tax results that they were seeking?

MR. CULLINAN: Who was concerned?

MS JOHNS The Sands Was there --

MR. CULLINAN. I'll object.

MS JOHNS I'm sorry

MR. CULLINAN: He can answer if he knows.

MS. JOHNS: Yeah, no. What I was going to say was --

Q. (BY MS. JOHNS) Was Heritage concerned, that if the Sands deviated from this structure, that they weren't going to achieve the tax results that the Sands were seeking?

A Not that I recall

Q. Okay. Take a look at Exhibit No 2, also This is a similar graphical presentation. Will you just take a look at that and see if you're familiar with that document

(Witness reviewed document.)

A Yes.

Q. And is this the same sort of graphical presentation as we looked at, Exhibit No 1?

A. Yes.

Q And this would have been prepared by the analytical department, as well, at Heritage?



A Yes.

Q And once again, did this outline, the strategy, that was to be implemented for the Sands to receive the tax results that they -- that they desired?

A. Yes.

Q Okay And once again, was this graphical presentation prepared in advance of the Sands executing any sort of short sale or partnership agreement in this transaction?

A I believe it would have been

Q. Okay Do you recall whether if the Sands had entered into just the short sale of treasury notes without contributing those treasury notes to all of these -- the partnerships that are shown in this graphical presentation, would they have received the tax results that they desired?

MS. JOHNS I'm sorry. Can you repeat your question?

Q (BY MS JOHNS) If the Sands had merely entered into short sales of treasury notes, individually, and they hadn't contributed those short sales to the partnerships, as set out in this graphical presentation, would they have rec- -- achieved the desired tax results that they were seeking?

A. I don't believe so



Q Thank you. If the Sands had merely entered into the short sales in their individual brokerage accounts, and without transferring the short sales to the partnerships, would they have received the increased basis in their Constellation stock?

A. I don't believe so.

Q. Do you recall or do you know why the use of partnerships in this transaction was critical to the Heritage planning structure?

A. It tied into the interpretation of what a liability was under Code Section 752

Q Okay. Would you agree that the transactions shown in these graphical presentations in Deposition Exhibits 1 and 2 were entered into just to generate a basis increase in the Constellation stock?

A. That was a component of it, yes

Q. I'm going to ask you to turn to -- let me see what exhibit it's at Let's look at Exhibit 14 -- hold on, not 14. Sorry, 15

A (Witness complies )

Q Do you -- can you take a look at this document and tell me if you are familiar with it.

(Witness reviewed document )

A I guess -- I don't remember it, but I recog- -- I mean, I see what it is



Q The first page shows that it's a -- it's a fax from you to Jaime Mendez?

A Yes

Q All right Who's Jaime Mendez?

A He is a lawyer at Lewis, Rice & Fingersh

Q. Okay Is the next page, which is the Sands -- it's called the Sands Transaction Calendar, is that something that is normally prepared by Heritage?

A I don't know if -- if "normally" -- I don't recall if this was prepared on a regular basis, or if -- who prepared this

Q So you don't recall preparing it?

A No

Q Okay. And do you re- -- do you know whether or not this is something the analytical department of Heritage might have prepared?

A It's possible.

Q If you turn to the next two pages, it's a fax cover sheet and then another Sands Transaction Calendar.

(Witness reviewed document )

Q Do you recognize that handwriting?

A No

Q It's not your handwriting?

A. I don't believe so.

Q. Okay. Do you have any idea when this

Witness: Brian Czerwinski





transaction calendar would have been prepared?
My question is. Would it have been prepared prior to the transactions being entered into?
A Yes.
Q Okay. Both of these fax cover sheets indicate that it's at a fax to Jaime Mendez who was with Lewis, Rice, you testified, correct?
A. Yes
Q Would Lewis, Rice have been apprised of the various steps set out in this calendar at the beginning of the transactions?
A. Yes.
Q. Now, if you'll look at Exhibit 22, will you take a minute and familiarize yourself with it
(Witness reviewed document.)
A Okay
Q. Are you familiar with this document?
A. Yes.
Q Can you tell me what it is?
A It is a -- an outline of the events that occurred regarding the implementation of the strategies by the Sands Family
Q Is this something that you would have prepared?
A Myself or someone in analytical
Q When was this implementation list normally



prepared for a transaction like this?
A Either before or during, you know, while the transaction was being implemented
Q. Was it something where -- you see there's a column called, "Date of Event"? Were the steps set up in advance, and then maybe a date put in as the steps were implemented? How did that normally work?
A Well, the -- the structuring -- or, I guess, the -- the structuring of the entities and things were, you know, already laid out in the graphical presentation, and so I guess this -- this would have been sort of the consummation of whatever was ultimately decided on from, you know, back what we looked at earlier on the graphical stuff
So it would have been -- this would have been used to keep track of -- of where we were at in the process of implementing the strategies
Q. Okay One of the -- the first strategies that the Sands entered into with Heritage involved -- it took place in about August of 2001. Is that familiar to you?
A 2001 sounds familiar
Q Okay. And the first strategy involved the sale of Constellation brand stock Does that sound familiar?
A Yes
Q Okay It involved some partnerships, and it



also involved some charitable -- charitable remainder unitrusts Is that familiar?
A. Yes
Q Okay I just want to make sure we know what we're talking about before I start asking you questions
A. Okay.
Q. That transaction, this first transaction, also involved the short sale of treasury notes in approximately the amount of about $75 million, are you familiar with that?
A I don't recall that amount
Q Do you -- let me ask you this: Do you know how the amount of the short sale was determined?
A. I don't remember
Q. Do you recall whether it had any relationship to the basis of the Constellation stock?
A The basis of the stock?
Q. Uh-huh.
A I mean, I don't -- I don't recall, specifically, in this situation
Q. Do you recall generally in these sort of transactions using the short sale of treasury notes how the short sale amount was normally determined?
A. Usually, the amount of short sale that was arrived at was, you know, based on the -- the amount of



-- of, you know, the potential basis that could be applied or used or somehow created through structuring like this
Q So in this case, for example, let's say that the Sands wanted to sell $75 million in Constellation stock, and it had about a $10 million basis, would the short sale usually have been decided to be about $65 million because of that need to increase the basis?
A Well, it would have been dependant upon, you know, whatever the client's ultimate goals were. If -- if the client was wanting to possibly eliminate all of the tax, then $65 million plus 75 minus ten would be the size of the short sales
Q Okay. In this transaction, the Sands entered into these short sales in their individual brokerage accounts, and then they contribute them -- contributed these accounts that held the short sales to certain partnerships; one of them is R,R,M & C Group.
Do you know why the contribution of those brokerage accounts with the short sales were contributed to the partnership, R,R,M & C Group?
A I mean, it was all part of the -- the structuring of their affairs in this manner.
Q. It was part of the plan?
A. Yes

Page 46

to determine whether or not they were making money or losing money?
A Typically, someone within Heritage did, whether it was me or I think there was a bond consultant, at one point, and then the clients, themselves, would have been determin- -- you know, would have been contacting to find out if they were making money or losing money
Q. If you'll look at Exhibit 23 You want to take a minute to read it?
(Witness reviewed document )
A Okay.
Q. Are you familiar with this letter?
A. I don't remember it
Q. Is this -- the letter speaks to the current gain and the position being approximately $54,000?
A Yes.
Q. Is this -- in -- is this letter an indication that maybe you were monitoring the short sales to determine what the gain or loss in the transaction was?
A It indicates that, yeah, it was at least one of the people doing it
Q. Okay. Is this normal, in these sort of transactions, where you might write the client a letter and say how the -- how the positions were doing?
A. I don't recall. This -- I mean, this may have

Page 47

been something that Richard asked for on a regular basis or something
Q. Okay We mentioned Gloria Robinson being a partner in R,R,M & C Partners
Was it determined in advance of these transactions that her interest would be bought out?
MR CULLINAN Objection, vague
Determined by who?
Q (BY MS. JOHNS) Determined by Heritage as part of the structure, as part of the plan that's set out in these graphical presentations
A Well, I think, yes, it would have been -- it would have been illustrated that the redemption or the buyout or -- or some disposal of that third party's interest would have been a -- I guess, a triggering event or something that would allow for the potential tax savings
Q Okay Now, we mentioned that in this transaction involving R,R,M & C Group and R,R,M & C Partners, that there were also charitable remainder unitrusts involved in this transaction
Were you familiar -- are you familiar with this charitable remainder unitrusts?
A Vaguely
Q. Was this part of the transaction something that

Page 48

Heritage designed?
A I believe so
Q Are you familiar with someone named Jonathan Blattmachr?
A Yes.
Q. Was Heritage maybe working with Jonathan Blattmachr in the CRUT part of this transaction?
A Yes.
Q Okay What role did Heritage play with respect to the charitable remainder unitrusts?
A I don't really remember
Q Do you recall whether you specifically had any involvement with the charitable remainder unitrusts in setting them up?
A. I mean, it's -- it's likely that I was communicating to someone, or involved somehow in the process, but I guess the -- the entities would have been set up probably by Mr Blattmachr.
Q. Okay. What role would he, Mr. Blattmachr have had in the setting up or the forming of the charitable remainder unitrusts?
A Well, he would have been the Sands legal representation regarding their charitable activity there
Q Prior to the Sands transactions, had you met

Page 49

Mr Blattmachr before?
A Yes
Q. And did he have a regular business relationship with Heritage?
A I believe so
Q If you'll take a look at Exhibit 11.
A (Witness complies )
Q Now, this exhibit contains a bunch of handwritten notes Can you flip through them, take five minutes, and -- because I'm going to ask you if it's your handwriting, or if they're familiar to you at all. And then a have a specific question about some of them
(Witness reviewed document )
MR CULLINAN. Let's go off the record while he's doing that
MS JOHNS. Yeah.
(Off the record from 10 13 to 10 25 a m )
Q (BY MS JOHNS) Mr Czerwinski, you've had a chance to review what's been marked as Exhibit 11, which is pages of handwritten notes.
It'd probably be easier for you to tell us which pages of these are not your notes
A Okay I believe 712
Q Okay
A 724, 725, part of 741, and 748 are not my

Page 50

notes
Q. If you'll look at 741, is the part that's not your handwriting part that says "Brian," and there's a note from Lisa?
A Yes.
Q Okay Is everything else on this page your handwriting?
A I believe so.
Q Okay. So other than the pages we've just discussed, these handwritten pages contained in Government -- or Deposition Exhibit 11 are your handwritten notes?
A I believe so
Q. Now, would these handwritten notes have been taken at meetings with the Sands Family?
A. It's likely.
Q. Okay I'm going to refer you to a couple of specific pages.
The first one is, if you look at the bottom, it's THO-713, and it's dated August 16th, 2001. Do you see that at the top?
A Yes.
Q Okay. And this -- is this a page of notes that you would have taken at a meeting involving the Sands transaction?

Page 51

A Yes
Q Okay Do you happen to recall who would have been at this meeting on August 16th of '01?
A Well, with certainty, Gary Kornman, and likely, Richard and Robert, but beyond that, no
Q Can you tell by looking at these notes whether this meeting took place in Dallas or in New York?
A From looking at the notes, no, but --
Q From your memory?
A From my memory, I don't think there were any meetings that took place in Dallas with the Sands
Q Did Jonathan Blattmachr attend any of the meetings that Heritage had with the Sands?
A I don't remember
Q Now, we had talked prior to our break about the charitable remainder unitrusts, which is I'll just call them CRUTs for short, and the CRUTs were formed, in this case, in September of 2001, and they were terminated five months later in February of 2002
If you look at the first -- your first handwritten line here, which -- in your notes, which says, "Can pay off purchase of remainder interest with six-month note to provide liquidity for Rich and Rob," [as read] Do you recall what that sentence refers to?
A No

Page 52

Q. Let me show you -- if you'll turn to page THO 719
A. (Witness complies ) Okay
Q. And this, once again, is a -- called Sands Meeting 10/10/01. And this -- you'll see under the arrow that says, "Supporting organization," there's two more arrows, one of them says, "Purchase remainder interest in mid-January, then give interest to them this year, buy back next year" [as read].
A. Yes, I see it
Q. Okay. Do you recall what that note means?
A. No
Q He -- in this case, the charitable remainder trusts that were created in February, the Sands purchased the remainder interest in the charitable remainder trust, which effectively terminated the trust, the CRUTs.
A. Okay
Q. Do you recall whether or not the -- at these meetings, there was a discussion about purchasing this remainder interest of the CRUTs?
A I don't remember
Q If you -- do you recall whether purchasing the remainder interest in the CRUTs was part of the Heritage plan from the beginning?

Page 53

MR CULLINAN Objection, vague I don't understand what the "Heritage plan" is
Q (BY MS JOHNS) The use of the R,R,M & C Group partnership, the use of the R,R,M & C Partners, partnership, the short sale of the treasury notes, the use of the CRUTs
A I just don't remember much at all about this CRUT -- this CRUT piece of this
Q These notes of yours, if you were present at the meeting and you were taking notes, is it fair to assume that your notes were an accurate note of what occurred at the meeting?
A Well, my notes could have been conversations that were occurring, or they could have been thoughts in my head resulting from conversations occurring So there could be something on here that's -- that's me writing something that's not necessarily being discussed
Q Is it -- is it fair to say, then, that there was some thought or some discussion in August of 2001 -- and I'm back to that other page, which is 713
Is it fair to say that in August 2001, there was some thought or some discussion of purchasing the remainder interest of that charitable remainder unitrust, because it's in your notes?

Page 54

MR CULLINAN: Objection; compound question.

A. I mean, I think it's safe to assume that there was you know, at least that -- the possibility of purchasing it would have been discussed

Q. Okay Thank you.

And there were two meetings; there's the meeting that is referenced on seven -- the date is August 16th of '01, and that's the Bates No. 713, and then there is the meeting of October 10th of '01, which is Bates No. 719.

Were the Sands present, Richard and Robert, were they present at each of these meetings; do you recall?

A Not specifically, but I think Richard and Rob were always at the meetings together

Q Okay And I'm going to ask you the same question about this 719 page, which I think is in front of you

A Okay.

Q Is it safe to assume, then, at this October 10th, 2001 meeting, there was some thought or some discussion about purchase be the remainder interest of the CRUT in mid-January?

A Yes

Page 55

Q Do you have any recollection of why the use of the CRUTs was necessary in this transaction?

MR CULLINAN Objection, assumes facts not in evidence

Q (BY MS JOHNS) Do you have any recollection of why the CRUTs were used in this transaction?

A No, I mean, I think -- well, no

Q Okay The second transaction in this case was done in about December of 2001, and that transaction involved the entities called Alpha and Beta that we've already briefly mentioned

A Yes

Q And it involved Corning stock and Yahoo stock

Is that stock transaction familiar to you?

A Yes

Q Do you recall why the Sands entered into this second transaction with Heritage?

MR CULLINAN I'm going to object to the extent you're asking him the Sands' personal knowledge Unless the Sands told him I'm not sure how he could know why the Sands did something

Q Did the Sands tell you why they were entering into this second transaction with Heritage?

A I don't recall

Q And this transaction involved we mentioned the

Page 56

Yahoo stock and the Corning stock.

Do you know who made the decision to use Yahoo stock?

A Well, ultimately -- I guess the ultimate decision was Richard and Robert, because they were buying it with their money

Q. Would that answer be the same with respect to the Corning stock?

A. Yes

Q. Do you recall whether Heritage had any role in choosing Yahoo and Corning stock?

A. Yes.

Q And what would that role have been?

A. I think that, if I remember right, we looked at -- we looked at different stocks that were businesses that, you know, had been high flyers at one point, and then had had their share values depressed at that time I think this was after -- well, this would have been after 9/11 and stuff So there were opportunities to buy stocks at low values.

Q The second transaction with Alpha and Beta also involved some short sale of treasury notes Do you recall -- it was about $44 million in short sales

Do you recall why that amount was chosen?

A I don't remember

Page 57

Q Do you recall how much was paid for each share of Corning and each share of Yahoo? Do you recall, approximately?

A I think they were less than ten bucks a share

Q Do you recall whether the purpose of this Alpha Beta transaction and the Corning and stock transaction, do you recall whether the purpose of this was to increase the basis in the Corning and the Yahoo stock?

MR. CULLINAN· Objection; vague Whose purpose?

Q (BY MS JOHNS) Heritage's purpose, the Sands' purpose

A I mean, again, it was a component of structuring everything in that way that would create that possibility, but the shares of those stock could have a higher basis

Q How did this transaction, the Alpha Beta transaction, how did it operate to increase the basis of the Corning and Yahoo stock?

A. The -- the shares of Yahoo and Corning would have been placed into an LLC along with open short positions in U S. treasuries, and then there would have been some -- some event that resulted in that LLC becoming a single member LLC, and then the -- the allocation of the outside basis in the partnership would

MR CULLINAN. I've got about a minute-and-a-half of follow up.

MS. JOHNS: It'll never end.

MR. CULLINAN. Yeah, never end.

FURTHER EXAMINATION

BY MR. CULLINAN:

Q. What -- in response to Ms John's questions about knowledge about the tax code, might the Sands brothers -- well, I don't think that you actually specified their level of knowledge, but with respect to knowledge that they did have of the tax code, might that not have been obtained from their advisors, Lewis, Rice, Jonathan Blattmachr, even from Heritage organization's own presentations?

A Yes

Q Okay Their questions about the first two exhibits, Exhibit 1, as of the bottom of the page, a copyright 2001 is running throughout it

A Yes

Q. Was the Heritage's organization and Mr Kornman pretty careful about these copyrights, stamping this on all their materials?

A It was standard practice that we'd put a copyright on the bottom of any types of presentations like this



Q What's the likelihood of something being stamped, copyright 2002, if we were still in the 2001 year?

A I mean it's possible, because the files would have been the -- they could have been being created from a file that was -- you know, a file created in '02 may have been created from a file in '01 and the copyright was never changed

Q But then how -- wouldn't it have a copyright of '01 on it? I'm asking both --

A. Oh, you're going the other direction?

Q I'm going the other way, yeah

Would you ever state --

A That would -- it'd be much harder to mistake being a year forward than a year backwards

Q All right I'll represent to you that in 2002 -- well, let's back up.

In 2001, the Sands gifted their interest in R,R,M & C Group to a series of four CRUTs; do you recall that?

A I'm beginning to, yes

Q And in 2002, they bought back their interest, or that they actually bought back the remainder interest from the charitable organization that had been designated to receive the remainder interest Do you



recall that?

A Yes

Q Okay. With respect to this slide show in Exhibit 2 that's got a copyright at the bottom of 2002, is there any reason to believe that that was shown to the Sands anytime earlier than 2002?

A I mean, the specialty presentation, no

Q. Okay

MR. CULLINAN: That -- that's it

MS. JOHNS I don't have anything else.

(Proceedings concluded at 2:49 p.m )



CHANGES AND SIGNATURE

WITNESS NAME ____________ DATE OF DEPOSITION ________

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I, BRIAN CZERWINSKI, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above

______________________________

BRIAN CZERWINSKI

THE STATE OF __________)

COUNTY OF ____________)

Subscribed and sworn to before me by the said witness, BRIAN CZERWINSKI, on this the _____ day of ____________, 2007

______________________________

NOTARY PUBLIC IN AND FOR

THE STATE OF ______________

COMMISSION EXPIRES ____________

Page 190

STATE OF TEXAS )
COUNTY OF DALLAS)

I, Stacey R. Cruz, a Certified Shorthand Reporter in and for the State of Texas, hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 28th day of August, A D, 2007, at 9 06 a m., at the office of Department of Justice, Tax Division, located at 717 North Harwood Street, Suite 400, in the City of Dallas, State of Texas, the following named person, to-wit BRIAN CZERWINSKI, who was by me duly cautioned and sworn to testify to the truth, the whole truth, and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause, and that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision, that the deposition is a true record of the testimony given by the witness, same to be sworn and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties, and that the amount of time used by each party at the deposition is as follows

MS JOHNS - 2 hours, 33 minutes,
MR HERRIN - 0 hours, 0 minutes
MR CULLINAN - 2 hours, 31 minutes

I further certify that I am neither attorney nor

Page 191

counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action

I further certify that before the completion of the deposition, ___X___ the Deponent, and/or _______ the Plaintiff/Defendant, ___X___ did _______ did not request to review the transcript

In witness whereof, I have hereunto set my hand and affixed my seal this _______ day of ____________________, A.D. 2007

________________________________
STACEY R CRUZ, CSR
Texas CSR No 8209
Expiration Date 12/31/07

HUNDT REPORTING, LLC
Firm Registration No 347
703 McKinney Avenue, Suite 207
Dallas, Texas 75202
214 220 1122

Taxable Cost· $________________

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

7/30/02

Page No.


1 Cover Page
2 Disclaimer
3 - 5 Acknowledgment
6 Index

PLAN GRAPHICS

7 COVER PAGE
8 - 9 BUSINESS PURPOSES OF TRANSACTIONS

Stage 1
10 Open Margin Accounts
11 - 17 Execute Securities Transactions Utilizing a Short Sale
18 Strategies Related to a Short Sale Transaction - Text
19 Strategies Related to a Short Sale Transaction - Summary

Stage 2
20 Contributions Into CWC-I
21 Formation of Alpha I, L.P. Ownership Summary
22 Overview of Effect on Limited Partner's Bases
23 Strategies Related to an Investment Control Enitity - Text
24 Strategies Related to an Investment Control Enitity - Summary

Stage 3
25 Purchase of Shares of Corning, Inc. and Yahoo, Inc. by Alpha I, L.P.
26 - 28 Formation of Beta Partners, L.L.C.
29 Overview of Effect on Alpha I, L.P.'s Basis
30 Summary of Plan Structure
31 Strategies Related to an Investment Trading Entity - Text
32 Strategies Related to an Investment Trading Entity - Summary

Stage 4
33 Purchase U.S. Treasuries to Cover Settlement Obligations
34 - 35 Strategies Related to Covering Settlement Obligations - Text
36 Strategies Related to Covering Settlement Obligations - Summary

Stage 5
37 Purchase of Gloria Robinson's Interest
38 Results of Termination of Beta Partners, L.L.C.
39 Overview of Basis Allocation at Termination of Beta Partners, L.L.C.
40 Strategies Related to Termination of Beta Partners, L.L C. - Text
41 Strategies Related to Termination of Beta Partners, L.L C. - Summary


GOVERNMENT EXHIBIT 2

DEPOSITION EXHIBIT 1

THO-021310

# Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Business Purposes of Transactions

I. Investments are made in an attempt to profit from fluctuations in interest rates by shorting U.S. Treasury securities.

II. Brokerage accounts are opened in order to increase diversification of holdings and transact short sales which serve as a hedge versus current holdings.

III. A limited partnership is formed as an Investment Control Entity to provide consolidation and control of diversified investments with the flexible structure and tax benefits of a partnership.

IV. A Management Corporation is formed to manage the investments within the Investment Control Entity and ensure continuity of management while the equity ownership of the Investment Control Entity may change.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Business Purposes of Transactions

V. An Investment Trading Entity is formed as a limited liability company to provide a vehicle for creating a larger pool of capital through the involvement of other investors in high risk investments while providing maximum liability protection for the Investment Control Entity.

VI. The Limited Liability Company combines the tax advantages of a partnership with the liability protection of a corporation while not having the ownership restrictions of an S-Corporation.

VII. Use of these entities also allows the individuals to implement estate planning techniques to effect their dispositive intent involving transfers of assets for the benefit of descendants while protecting those beneficiaries from significant market risks.

Copyright 2001 The Heritage Organization, L.L.C.


Stage 1
Open Margin Accounts at Brokerage Firm or Fund Existing Accounts
Robert Sands
Andrew Stern
Marilyn Sands
Marvin Sands Living Trust
Zac Stern Trust U/W Laurie Sands
Abigail Stern Trust U/W Laurie Sands
Richard Sands
$ 195 K Cash
$ 360 K Cash
$ 285 K Cash
$ 78 K Cash
$ 86.25 K Cash
$ 240 K Cash
$ 86.25 K Cash
BROKER
Each Individual or Trust Will Need a Margin Account and Will Contribute Cash for Required Margin
Copyright 2001 The Heritage Organization, L.L.C.

THO-021314


A Group of Strategies to Maximize Capital Preservation
and Provide Investment Profits for The Sands Family
Stage 1
Execute a Securities Transaction Utilizing A Short Sale
Richard Sands
Account TX-63915 & TX-63916
Borrow U.S. Treasuries
Settlement Obligation
Execute Short Sale of U.S. Treasuries
Cash Proceeds of $8,002,955.57
Broker
Market
Copyright 2001 The Heritage Organization, L.L.C.

THO-021315

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 1

## Execute a Securities Transaction Utilizing A Short Sale




Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 1

## Execute a Securities Transaction Utilizing A Short Sale




Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 1

## Execute a Securities Transaction Utilizing A Short Sale




Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 1

## Execute a Securities Transaction Utilizing A Short Sale




Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 1

## Execute a Securities Transaction Utilizing A Short Sale




Copyright 2001 The Heritage Organization, L.L.C.

THO-021320

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 1

## Execute a Securities Transaction Utilizing A Short Sale




Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 1: Text

## Strategies Related to a Short Sale Transaction

Strategy 1. Margin accounts with a brokerage firm are opened for the purpose of enacting security transactions (e.g., short sales of U.S. Treasury Securities).

Strategy 2. A short sale is essentially a contractual arrangement under which the seller is obligated to make delivery of a specified amount of specified property at some date in the future.

The usual form of a short sale transaction is the seller's borrowing of property from a broker which is immediately sold on the open market. After the sale of the borrowed property, the proceeds (or collateral of substantially equal value) are retained by the broker to secure the seller's obligation to return the borrowed property.

Strategy 3. For income tax purposes, a short sale is not deemed to be consummated until delivery of property to close the short sale under I.R.C. § 1233, and specifically Treas. Reg. 1.1233-1(a)(1) .

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 1: Summary

## Strategies Related to Short Sale Transaction

Stage 1: In this analysis, it is assumed that Richard Sands, Robert Sands, Marilyn Sands, Andrew Stern, the Marvin Sands Living Trust, the Zac Stern Trust, and the Abigail Stern Trust will open margin accounts with a brokerage firm (or utilize existing accounts) and execute short sales of U.S. Treasury Securities. Each participant will contribute cash into the margin accounts for the required margin.

A short sale of U.S. Treasury Securities will likely result in a profit if interest rates rise while the short position is open. This occurs because as interest rates rise, there is a decreasing cost of the bonds needed to replace those previously borrowed and sold. Contrarily, if interest rates fall while the short position is open, a net loss will likely occur due to an increasing cost of the bonds.

Multiple transactions may be executed in the accounts, depending upon market conditions, in an attempt to maximize profits.

Copyright 2001 The Heritage Organization, L.L.C.


Stage 2: A
Contributions Into CWC-I
Abigail Stern Trust U/W Laurie Sands
Zac Stern Trust U/W Laurie Sands
Contribution of Assets of Margin Account
Contribution of Assets of Margin Account
CWC - I
Account TX-63921 & TX-63922
Copyright 2001 The Heritage Organization, L.L.C.


Stage 2:B
Formation of Alpha I, L.P.
Ownership Summary
Marilyn Sands
Richard Sands
Marvin Sands Living Trust
Robert Sands
Andrew Stern
CWC - I
Each Partner Contributes Assets of Margin Account and Pro-Rata Cash Amount
Limited Partnership Interest Received Based on Capital Contribution
Account TX-64438 & TX-64439
Cash
General Partnership Interest
R, R, M & C Management Corporation
Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 2

Overview of Effect on Limited Partner's Basis Due to Contribution of Assets of Margin Accounts, Cash and Stock

Assumes that the Collective Transaction for Partners is $ 44MM with 3.0% Margin Required

| Effect on Basis | | Asset Contributed |
|---|---|---|
| $ | 2,579,111 | Cash Contributions by Limited Partners |
| $ | 44,293,087 | Cash Proceeds From Short Sale |
| $ | 0 | Unknown Value of Obligation to Return 44,000 U.S. Treasuries |
| $ | 46,872,198 | Total Basis in Alpha I, L.P. Received by Limited Partners |

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

### Stage 2: Text

## Strategies Related to an Investment Control Entity

Strategy 4. An entity (i.e., a limited partnership or limited liability company) is formed with an S-Corporation as its managing general partner and with Individuals, Entities and Trusts as holders of its other equity interests.

Strategy 5. Assets in the form of stock, marketable securities, cash and/or real estate are contributed to the entity (i.e., a limited liability company or limited partnership). The capital contribution is an exchange of one asset (cash, stock, real estate, interests in partnerships, and/or marketable securities) for another (Partnership Interests) and thus does not create a taxable event.

Strategy 6. The Individuals and Entities receive an outside basis in the partnership equal to their cash contributions plus any prior basis on the assets that are contributed. The short sale obligations are not liabilities in accordance with I.R.C. § 752 and, hence, do not reduce outside basis.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 2: Summary

## Strategies Related to an Investment Control Entity

Stage 2: In this analysis, Alpha I, L.P., a limited partnership, is formed with capital contributions by Richard Sands, Robert Sands, Marilyn Sands, Andrew Stern, the Marvin Sands Living Trust and CWC-I of the Assets in each of their margin accounts plus additional pro-rata cash contributions in return for Limited Partnership Interests. Their respective basis in their Partnership Interests is increased by the cash proceeds received from the short sale of U.S. Treasuries, the required margin, plus the additional cash contribution. The outstanding obligations to return the U.S. Treasuries do not affect basis due to the fact that the obligations are not fixed and determinable.

R. R. M & C Management Corporation, an S-Corporation equally owned by Richard and Robert Sands, contributes a small amount of cash in return for General Partnership Interest.

Alpha I, L.P. is used for the consolidation of assets held by The Sands Family in order to simplify their estate structure, enhance their ability to effect a coordinated wealth preservation and wealth transfer strategy, while providing some liability protection.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 3

## Purchase of Shares of Corning, Inc. and Yahoo, Inc. by Alpha I, L.P.




Copyright 2001 The Heritage Organization, L.L.C.


A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family
Stage 3
Formation of Beta Partners, L.L.C.
L.L.C. Equity Interest
Alpha I, L.P.
PW Account TX-64438 & TX-64439
ML Account # 70C-07P67
99.0043% Equity Interest
Contribution of 67,525 Shares of Corning, Inc., 33,400 Shares of Yahoo, Inc., & Assets of PW Margin Account
Beta Partners, L.L.C.
PW Account TX-64436 & TX-64437
Shares of GLW & YHOO
Copyright 2001 The Heritage Organization, L.L.C.


A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family
Stage 3
Formation of Beta Partners, L.L.C.
L.L.C. Equity Interest
Gloria Robinson
.9957 % L.L.C. Equity Interest
Contribution of Cash
Beta Partners, L.L.C.
PW Account TX-64436 & TX-64437
Shares of GLW & YHOO
Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 3

## Formation of Beta Partners, L.L.C.

## Ownership Summary of L.L.C.




Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 3

Overview of Effect on Alpha I, L.P.'s Basis Due to Contribution of Margin Account and Stock

Assumes that the Collective Transaction is $ 44MM with 3% Margin Required

| Effect on Basis | Asset Contributed |
|---|---|
| $ 1,343,554 | Cash Contributed for Required Margin |
| $ 44,293,087 | Cash Proceeds From Short Sale |
| $ 0 | Unknown Value of Obligation to Return 44,000 U.S. Treasuries |
| $ 1,199,341 | Shares of Yahoo, Inc. & Corning, Inc. |
| $ 46,835,982 | Total Basis in Beta Partners, L.L.C. Received by Alpha I, L.P. |

Copyright 2001 The Heritage Organization, L.L.C.


Stage 3
Summary of Plan Structure
Richard Sands
Robert Sands
Corporate Stock
R, R, M & C Management Corporation
1% G.P. Interest
Gloria Robinson
.9957 % L.L.C. Equity Interest
AS
RSS
RES
MS
CWC-I
MSLT
99.9% L.P. Interest
99.0043% Equity Interest
Beta Partners, L.L.C.
PW Account TX-64436 & TX-64437
Shares of YHOO & GLW
Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 3: Text

## Strategies Related to an Investment Trading Entity

**Strategy 7.** An entity (i.e., a limited liability company) is formed with two or more members as owners of its equity interests.

**Strategy 8.** Assets in the form of stock, marketable securities, cash and/or real estate are contributed to the entity (i.e., a limited liability company). The capital contribution is an exchange of one asset (cash, stock, real estate, interests in partnerships, and/or marketable securities) for another (Partnership Interests) and thus does not create a taxable event.

**Strategy 9.** An entity (i.e., a limited liability company) with more than one member, should be designated for partnership taxation at formation. The entity (i.e., a limited liability company) should be formed in a state which allows for a single member L.L.C.

**Strategy 10.** The members receive outside basis in the entity equal to their cash contributions plus any prior basis on the stock, real estate and marketable securities that are contributed. The short sale obligations are not liabilities in accordance with I.R.C. § 752 and, hence, do not reduce outside basis.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 3: Summary

## Strategies Related to an Investment Trading Entity

Stage 3: In this analysis, Beta Partners, L.L.C. is formed to isolate speculative investments from other assets held, while limiting the risk of Alpha I. L.P. to the amount of assets originally contributed for required margin.

Beta Partners. L.L.C.. a limited liability company, is formed with a capital contribution by Alpha I. L.P. of the assets of its margin account, 67.525 shares of Corning Inc., and 33,400 shares of Yahoo, Inc. in return for 99.0043% of the L.L.C. Equity Interests. The basis in the L.L.C. Interests received is equal to the cash proceeds received from the short sale of U.S. Treasuries and the required margin, plus any prior basis in the shares of Corning Inc. and Yahoo, Inc. The outstanding obligations to return the U.S. Treasuries do not affect basis because the obligations are not fixed and determinable.

Gloria Robinson contributes cash in return for .9957% of the L.L.C. Equity Interests. Robert and Richard Sands, through Alpha I. L.P. will serve as the managing member of Beta Partners. L.L.C.

In the event a future capital call is made by Beta Partners, L.L.C., failure by any member to satisfy the call would result in a redemption of that member by Beta Partners, L.L.C.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 4

## Purchase U.S. Treasuries to Cover Settlement Obligations




Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 4: Text

## Strategies Related to Covering Settlement Obligations

**Strategy 11.** After sale of the borrowed property for cash, the seller incurred an obligation to return the borrowed property on an unspecified future date. The short seller will repay the borrowed property to the lender with property the seller held at the time of the short sale or with property the seller purchases in the market, whichever it chooses.

**Strategy 12.** The act of delivering property to the lender in repayment for the borrowed property is referred to as "closing" the short sale.

**Strategy 13.** The taxable event following a short sale does not occur when the sales agreement was made, nor when the borrowed property was delivered to the purchaser, but only when the seller delivers stock to the lender to "close" the sale.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 4: Text

## Strategies Related to Covering Settlement Obligations

**Strategy 14.** Gain or loss from "closing" the sale is dependent upon the difference between the amount realized from the sale of the borrowed property and the cost of the property used to "close" the sale.

**Strategy 15.** The limited liability company's purchase and delivery of Treasury securities to close its short sale is different from the type of expenditures contemplated under I.R.C. § 705(a)(2)(B) and therefore does not cause a downward adjustment in the tax basis of an interest in the Partnership under I.R.C. § 705.

**Strategy 16.** In addition, the purchase and delivery of Treasury securities to close out a short sale should not be deemed an expenditure for purposes of I.R.C. § 705(a)(2)(B) because such purchase and delivery of Treasury securities in and of itself does not give rise to an expense, deduction or loss to the limited liability company which is disallowed by a specific section of the Code.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 4: Summary

## Strategies Related to Covering Settlement Obligations

Stage 4: In this analysis, Beta Partners, L.L.C., a limited liability company, purchases identical U.S. Treasury Securities to those previously sold short to cover the short sale obligations.

Beta Partners, L.L.C. repays the borrowed property to the lender with the U.S. Treasury Securities it purchases. This "closes" the short sales.

After closing the short sales, Beta Partners, L.L.C. holds 67,525 shares of Corning, Inc., 33,400 shares of Yahoo, Inc., the initial cash contributed for the required margin, plus or minus the performance of any transactions in the margin accounts, plus the capital contribution made by Gloria Robinson.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 5

## Purchase of Gloria Robinson's Interest Results in Termination of Beta Partners, L.L.C.




Copyright 2001 The Heritage Organization, L.L.C.


A Group of Strategies to Maximize Capital Preservation
and Provide Investment Profits for The Sands Family
Stage 5
Results of Termination of Beta Partners, L.L.C.
Alpha I, L.P.
Liquidating Distribution of Assets - Basis Adjustment under I.R.C. § 732
Basis in Shares of Public Company Stock are Adjusted Upwards
Beta Partners, L.L.C.
PW Account TX-64436 & TX-64437
Shares of CLW & YHOO
Copyright 2001 The Heritage Organization, L.L.C.

THO-021342

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 5

Overview of Basis Allocation at Termination of Beta Partners, L.L.C.

Assumes that the Collective Transaction is $ 44MM with 3% Margin Required

| Basis Allocation | | Asset Receiving Basis Allocation |
|---|---|---|
| $ | 46,958,591 | Total Basis in L.L.C. at Termination After Taking Into Account Purchase Price Paid & Income Attributed to Alpha I, L.P. |
| $ | 1,466,135 | Cash (Plus or Minus Performance of Trade) |
| $ | 22,262,095 | 67,525 Shares of Corning, Inc. |
| $ | 23,230,361 | 33,400 Shares of Yahoo, Inc. |
| $ | 46,958,591 | Total Basis Allocated to Assets at Termination |

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 5: Text

## Strategies Related to Termination of Beta Partners, L.L.C.

Strategy 17. The purchase by one member of the equity interests of all other members of a limited liability company being taxed as a partnership results in the termination of the limited liability company for tax purposes.

Strategy 18. Following the termination of the limited liability company, all assets held by the limited liability company may be distributed to its remaining member. Under I.R.C. § 732 (b) the basis of property distributed by a partnership to a partner in liquidation of the partner's interest shall be an amount equal to the adjusted basis of such partner's interest in the partnership reduced by any money distributed in the same transaction. If the assets are not distributed, a deemed distribution and re-contribution to a limited liability company now taxed as a sole proprietorship occurs.

Strategy 19. Any future sale of the assets will result in recognized gain on any amount in excess of the assets' adjusted basis, as determined at the time of the termination.

Copyright 2001 The Heritage Organization, L.L.C.

# A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for The Sands Family

## Stage 5 : Summary

## Strategies Related to Termination of Beta Partners, L.L.C.

Stage 5: In this analysis. Alpha I. L.P. purchases Investment Partner's Member Interests in Beta Partners, L.L.C. for cash. The purchase of Investment Partner's Interest would result in a single member limited liability company. Since the limited liability company is taxed as a partnership. and a partnership cannot exist with only one member, a termination of the limited liability company would occur.

Upon becoming a single member L.L.C., Beta Partners. L.L.C. would be terminated for federal income tax purposes and the basis of the partnership property (Shares of Corning, Inc. and Yahoo, Inc.) may be adjusted in accordance with I.R.C. § 732 (b).

Anytime thereafter that shares of Corning, Inc. and/or Yahoo, Inc. are sold. capital gains will be incurred on any amount in excess of their adjusted basis. Capital losses would occur if the sales price of the sold shares is less than the adjusted basis in these shares. These gains or losses will flow through to the partners of Alpha I. L.P. depending upon their respective ownership interests.

Copyright 2001 The Heritage Organization, L.L.C.