GOERIG & ASSOCIATES, L.L.C.

George E. Goerig
Laurie Beth Gregory

1007 West 3rd Avenue, Suite 301
Anchorage, Alaska 99501
Telephone (907) 278-9926
Facsimile (907) 279-9926

February 26, 2002

Mr. Brian Czerwinski
The Heritage Organization, L.L.C.
Suite 800, East Tower
5001 Spring Valley Road
Dallas, TX 75244-3942

RE: Updated appraisal of the R, R, M & C Group Limited Partnership

Dear Mr. Czerwinski:

This letter is in response to your inquiry regarding updating the prior appraisal of R, R, M & C Group Limited Partnership as of February 27, 2002.

Based on methodology I used in determining the value of discount on R, R, M & C Group Limited Partnership on my prior evaluation, and based on current marketability and empirical data that exists on February 27, 2002, the discount of 42% of net asset value and the discount of 50% for marketability, are still valid as of February 27, 2002.

Very truly yours,

George E. Goerig

GEG/rja

GOVERNMENT EXHIBIT 23

SANDS9077

DATE 8/24/07 EX. 3
WITNESS Goerig
METRO COURT REPORTING (907) 276-3876

**<u>Expert Witness Report</u>**

My name is Jerry J. McCoy and I am a practicing attorney based in Washington, DC, specializing in charitable tax planning. I have been retained by the US Department of Justice to comment on only one issue presented in Alpha I v. United States and related cases (US Court of Federal Claims Case Nos. 06–407T through 06–411 T, 06–810T, and 06–811T). That issue relates to the tax effect of the transfer of certain partnership interests to four charitable remainder unitrusts, and the termination of those trusts shortly thereafter by purchase of the charitable remainder interests by the taxpayers. I have not been asked to consider any other issue presented by these cases, and have no opinion with respect to any such other issues.

PERSONAL EXPERIENCE

I have practiced in this area exclusively for the last 10 years, and I have specialized in this area for more than 25 years, representing both donors to charitable organizations and the charitable organizations themselves. I have written numerous articles in professional journals on charitable topics, and frequently speak at tax and estate planning seminars on this subject. I teach graduate level law school courses in charitable planning at two law schools (Georgetown University and the University of Miami) and I edit (and write for) two professional charitable newsletters (*Charitable Gift Planning News* and *Family Foundation Advisor*). I am co-author of <u>Family Foundation Handbook</u> (2008 edition) published by CCH. Attached is a copy of my professional resume.

Charitable remainder trusts constitute a significant factor in my practice. In January of 2008, I spoke at the University of Miami Heckerling Institute on Estate Planning, the largest estate planning institute in the United States, on the fundamentals of charitable remainder trusts.

PROCEDURAL STATEMENTS

In connection with this undertaking, I have reviewed the following items: the complaint filed in one of these consolidated cases, including exhibits; the charitable remainder unitrust documents described above; assignment and assumption of partnership interest; two designations of charitable remainder beneficiaries for the trusts; the agreement for purchase of the remainder interest in the trusts; a letter of February 26, 2002 from The Heintzberger Company providing calculations for the trusts; an opinion letter dated June 21, 2002 from Milbank Tweed; the government's response to plaintiff's motion to substitute parties and dismiss certain causes of action in one of the consolidated cases; tax returns filed for the trusts and for the charitable remainder beneficiary of the trusts; several exhibits and depositions in the case, with attachments; and an appraisal by Goerig & Associates of the partnership interests that are the focus of this case. In addition, I consulted public information on the website of Constellation Brands; tax returns filed by Education and Health Support Fund from <u>www.guidestar.org</u>; and

PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT
24

websites of organizations designated as recipients of grants from Education and Health Support Fund.

In accordance with FRCP 26(a)(2)(B), I have not testified as an expert at trial or by deposition in any other cases during the previous four years, and my compensation for the study and testimony in this case will be paid at the rate of $600 per hour, in accordance with my contract with the US Department of Justice.

PART 1 – CHARITABLE REMAINDER TRUSTS

Charitable Remainder Trust Basics

A charitable remainder trust ("CRT") involves a trust relationship whereby the donor transfers property to a trustee to be held and managed for the benefit of the beneficiaries of the trust. The trustee makes distributions to the current beneficiaries for the term of the trust, at the end of which the remaining trust property is distributed to the remainder beneficiary, which must be a qualified charitable organization. (Alternatively, the property may be held in further trust for the benefit of the remainder beneficiary after the expiration of the trust term.)

A CRT must be either an annuity trust, providing payments of a fixed amount annually to the current beneficiaries for the term of the trust, or a unitrust, providing payments which vary from year to year equal to a fixed percentage of the value of the trust property, as determined annually. The term of the trust may take either of two forms. The trust may continue for the life or lives of its current beneficiaries, or it may continue for a stated number of years (not more than twenty).

A CRT is generally exempt from federal income taxes (but only if it has no unrelated business income). Instead, the income of a CRT is taxable to its current beneficiaries when it is distributed to them. Such distributions are taxed on the basis of a four-tier system, under which distributions are considered to come in turn from ordinary income, then capital gains, then other (tax-exempt) income, and finally tax-free return of principal. Distributions received by a current beneficiary for a given taxable year are deemed to come first from ordinary income, to the extent of the trust's ordinary income for the year plus all undistributed ordinary income from prior years. If distributions exceed those amounts, they are next considered capital gain to the extent of all current or undistributed capital gain of the trust. Any remaining excess will then be considered other (tax-exempt) income, and only when all of these first three tiers are exhausted will any distribution be considered corpus. Thus, over time, all or most of the income received by a CRT will be taxed in the hands of its current beneficiaries.

For example, assume that a charitable remainder unitrust is created in 2008 with $1 million worth of stock, and that it is required to pay out 6% annually. Assume further that during 2008 the trust realizes a capital gain of $400,000 upon the sale of its stock, as well as dividends and interest amounting to $5,000. For 2008 the trust would distribute 6% of the $1 million corpus, or $60,000, to its current beneficiary. That $60,000 would

be taxable to the beneficiary first as ordinary income to the extent of the trust's ordinary income, or $5,000. The remaining $55,000 would be taxed as capital gain. The same treatment would apply the next year and each year throughout the term of the trust, until the trust's $400,000 gain from 2008 had been reported in full by the current beneficiaries.

The creator of a CRT is entitled to a federal income tax deduction equal to the actuarial value of the charitable remainder interest in the trust. This value is determined by multiplying the fair market value of the property transferred to the trust by the percentage set forth in IRS actuarial tables which take into account the payout rate of the trust, the term of the trust (based upon either the life expectancy of the beneficiary or beneficiaries, or the stated term of a term-of-years trust), and the official interest rate for the month of the transfer (or, at the option of the donor, the rate for either of the two preceding two months) under section 7520 of the Internal Revenue Code.

Uses and Applications for CRTs

Normal Usage

The CRT is a popular charitable planning device, normally used by individuals who wish to secure an income stream for themselves (and/or one or more other beneficiaries) and simultaneously provide for an eventual charitable transfer. It is a very flexible device, and fits a variety of planning situations.

The charitable deduction allowed for the donor's transfer to the trusts is based on the fair market value of the property transferred. Where noncash property is transferred the donor has an incentive to maximize the value of that property since a higher value will produce a larger deduction; in addition, for a CRT that is structured as a unitrust, a higher initial value for the trust property will also lead to larger distributions to the current beneficiaries. Any property other than cash or publicly traded securities will normally have to be appraised, resulting in a natural human tendency for donors to seek as high a valuation as possible from the appraiser.

The overwhelming majority of CRTs are created by donors acting upon a dual motivation; they wish to benefit a favorite charity, but in addition they need or desire to retain a right to income from the property transferred. Typical planning situations in which a charitable remainder trust is useful (assuming the individual in question has charitable intent) include the following:

- Providing a source of retirement income for the donor and his/her spouse.
- Deferral of capital gain on the sale of a business or a major investment. If the donor transfers the property in question to a CRT, the trustee may sell it and reinvest the full proceeds, because the trust is exempt from capital gains tax. By contrast, if the donor had sold the property, a capital gains tax would have to be paid for the year of the sale, leaving only the after-tax proceeds available for reinvestment.

- Advancement of a planned charitable bequest, thereby providing the donor with both a current income tax deduction and an income stream for life, in addition to the eventual transfer to charity.
- Providing an income stream to an aged dependent, domestic helper, or other person to whom the donor does not wish to make a permanent gift of corpus.

Virtually all charitable remainder trusts continue in existence for the full trust term provided in the governing instrument. Based upon my experience, I would estimate that relatively few CRTs – probably 1% or less – are caused to terminate before the termination date. Where such an early termination does occur, it normally results from external considerations, and not by prearrangement. Over the last few years, a number of IRS private letter rulings have approved the early termination of CRTs. Most of these have appeared to be the result of unfavorable financial results, such as those that resulted from the fallout in tech stocks in the early 2000's. Such results often cause the donor/beneficiary to conclude that the trust is too small, or otherwise not sufficiently viable, to justify its continuation. In other instances, divorcing spouses have sought to terminate a joint CRT, or to divide it into two separate trusts. I have never known or heard of a donor creating a CRT with an intention at the outset to terminate it early.

Abusive Applications

Because CRTs are exempt from federal income taxes, they have sometimes attracted the attention of financially motivated tax planners seeking to help their clients take advantage of this aspect of the CRT, even when such clients have no charitable motivation. The premier example of this occurred in the mid-1990s, when an abusive tax scheme known as the "accelerated charitable remainder trust" emerged. This consisted of a standard charitable remainder unitrust which provided for a two-year term and a payout rate of 80%. Thus, for each year such a trust would pay out to individual beneficiaries an amount equal to 80% of the value of the corpus at the beginning of the year. At the time, the applicable income tax regulations allowed CRT to make its distribution to current beneficiaries after the close of the year to which the distribution related.

The trustee of an accelerated CRT would hold the property originally contributed to the trust until after the close of the trust's initial taxable year. At that point, during the trust's second taxable year, the trustee would sell the property and use the proceeds to make the distribution called for with respect to the trust's first taxable year. Because the trust would incur the capital gain on the property during its second year, and would receive no income during its first year, the beneficiary would take the position that such distribution represented a tax-free return of corpus.

For example, assume that on January 1, 1995, a donor created an accelerated CRT with a two year term and an 80% payout rate, and funded it with property worth $100 million, having a zero basis in the hands of the donor. For 1995, this trust would be required to distribute $80 million to the donor/beneficiary. The trustee would delay the sale of this property until January of 1996. At that time, $80 million of the $100 million sales proceeds would be distributed to the donor/beneficiary, as his distribution for 1995. The

donor/beneficiary would take the position on his 1995 tax return that this distribution was tax-free. The remaining $20 million would constitute the remaining trust corpus, and for 1996, the trust would have a required distribution of $16 million (80% of the $20 million corpus). At the end of 1996, the trustee would distribute that $16 million to the donor/beneficiary, distribute the remaining $4 million to the charitable remainder beneficiary, and the trust would terminate since its two-year term was over.

Thus, if this scheme worked, utilization of the accelerated CRT would permit the donor to receive $96 million of the $100 million transferred to the trust, and pay tax (at capital gains tax rates) on only $16 million of that amount. This result was considerably more advantageous than simply arranging a sale of the asset and paying tax on the $100 million gain.

This accelerated CRT concept was extremely controversial in charitable circles, as it appeared to offer large scale tax avoidance that was certain to attract the attention of Congress. In fact, that did happen, and Congress changed the applicable statute (section 664 of the Internal Revenue Code) to provide that (1) a CRT could not have a payout rate in excess of 50%, and (2) a CRT would not be qualified if the actuarial value of the charitable share at inception was less than 10% of the total value of the trust property. That latter change effectively eliminated a number of potentially abusive uses of the charitable remainder trust. In addition, while Congress was deliberating those changes, the Internal Revenue Service changed the regulations, requiring in many cases that CRT distributions could not be made after the close of the taxable year. Thus, as a result of all these changes, the accelerated CRT is no longer a viable tax device.

Subsequently, aggressive tax planners even developed another CRT device, dubbed the "son-of-accelerated CRT," which used borrowed funds for the first year's distribution rather than waiting for proceeds of a deferred sale of trust property. This plan slipped through the safeguards adopted to block the accelerated CRT, necessitating another change in the regulations.

When the accelerated CRT device first appeared, the IRS promptly warned taxpayers of its opposition to this device and its intention to challenge its use. In Notice 94-78, the IRS pointed out that "Depending on the particular facts of each case, the Service will challenge transactions of this type based on one or more legal doctrines. A mechanical and literal application of the regulations that would yield a result inconsistent with the purposes of the charitable remainder trust provisions may not be respected. The tax consequences to the donor vary with the legal doctrine that is applied. * * * In addition, the donor and the trustee are likely to prearrange a delay by the trustee of the sale of the trust assets. This creates a transaction that is different in substance than in form." Those words are relevant for purposes of the present case. This warning was widely supported by charitable organizations and persons who work with them.

Charitable organizations normally react to schemes of this type with uniform and very vocal criticism of those who abuse charitable devices. Their criticism reflects a concern that such schemes could lead Congress to overreact and curtail or eliminate the

availability of the CRT -- an important estate planning device. Whenever tax planners come up with ways in which persons who have no charitable intent attempt to utilize charitable devices to achieve unintended tax benefits, charities have openly opposed such devices. This opposition is based upon a belief that, regardless of any short-term benefits they might derive from donors responding to such tax benefits, their long-term interests are better served by avoiding any impression in Congress or elsewhere that the benefits available for charitable contributions constitute a tax abuse that should be curtailed. Similarly, most organizations believe that persons who lack a charitable motivation should not create CRTs.

## PART 2 - ALPHA I v. U.S. AND RELATED CASES

### Facts

For purposes of my report, the following are the relevant facts:

1. On September 21, 2001, the four limited partners in R,R,M,&C Group, LP ("Group"), a Missouri Limited partnership with its principal place of business in Fairport, New York, transferred those partnership interest to four charitable remainder unitrusts ("the unitrusts") created on that same day. Each trust was created by one of the four partners of Group. Those partners were three members of the Sands Family of Rochester, New York (Richard Sands, Robert Sands, and Marilyn Sands), and CWC Partnership I (an entity whose partners were trusts created to hold the interests of the children of a fourth Sands sibling, the late Laurie Sands Stern).

2. Brian Czerwinski, an employee of the Heritage Organization, LLC (which marketed to the Sands the arrangement that is the subject of the litigation) reported that he attended two meetings with Richard Sands and Robert Sands at which the purchase of the remainder interests in the unitrusts was discussed. Those meetings took place on August 16, 2001, and October 1, 2001.

3. The partners claimed income tax charitable deductions for the transfers to the unitrusts. The values used for these transfers were based upon an appraisal prepared by George E. Goerig, of Goerig & Associates, an appraisal firm located in Anchorage, Alaska. That appraisal started with the asset value of R,R,M,&C Group ($71,780,711) then applied two discount factors to arrive at a final valuation of $20,816,406 for the partnership and $5,198,897 for a 24.975% interest therein (the amount transferred by each of the four partners). The 42% discount was based upon a review of various publicly traded partnership factors. The second discount of another 50% was applied after that to reflect the lack of marketability and the resultant illiquidity. The appraisal states that it was prepared for the sole purpose of establishing the fair market value of a 24.975% limited partnership interest "for gifting purposes."

4. Four months later, each of the trust creators designated "Sands Supporting Foundation" as the charitable beneficiary of his or her trust. Each trust filed an information tax return (IRS Form 5227) reporting distributions of $166,477 to its beneficiaries for the portion of 2001 for which it was in existence. This entity played no role in the subsequent transactions, and there is no evidence that it was ever formed.

5. On October 1, 2001, Group sold Constellation stock for total proceeds of $74,862,863. I understand that a principal issue in the subject litigation is the amount of basis allowable to offset the gain realized on such sale.

6. On Friday, February 22, 2002, the following events took place:

   a. Richard and Robert Sands caused a charity called "Educational and Health Support Fund" to be formed; and
   b. The grantors of the four charitable remainder unitrusts executed irrevocable designations naming Educational and Health Support Fund as a charitable beneficiary of each trust.

7. Five days later, on Wednesday, February 27, 2002, each of the charitable remainder unitrust grantors purchased the remainder interest in his or her charitable remainder unitrust from the new charitable remainder beneficiary, Educational and Health Support Fund. Each paid a purchase price of approximately $500,000 for his or her remainder interest, for a total of slightly more than $2 million. The appraiser who prepared the initial appraisal supplied a supplementary letter stating that the valuation as of September 21, 2001, was still valid as of February 27, 2002.

8. Educational and Health Support Fund reported the receipt of the purchase price payments from each of the charitable remainder unitrust grantors as contributions on Schedule B of its Form 990 for 2002. On page 1, line 1a of that return, the total received ($2,200,298) was listed as "direct public support" rather than as proceeds of sales of assets.

9. The purchase of the remainder interests by the current beneficiaries of the trusts was treated by the parties as causing the termination of each trust. Each trust grantor thus became the outright owner of an interest in a partnership holding assets, primarily cash, amounting in the aggregate to approximately $75 million.

10. According to their terms, the trusts in question would make annual payments in an amount calculated under a formula set forth in the trust agreements that would produce a remainder value equal to the minimum amount permissible for charitable remainder trusts, 10% of the initial corpus value. Each of these four trusts named its grantor/creator both as the recipient of trust distributions for the trust term, and (with one of the other Group partners) as trustee. The Alaska Trust Company was named as "Administrative Trustee." At the end of the stated

20-year trust term, the remaining trust assets were to be distributed to a charitable organization to be designated by the person designated to receive trust distributions, or selected by the trustees in their discretion if no such designation was made.

11. The trusts were used by their creators as temporary partners in Group during a period when Group realized large amounts of capital gain income from sales of Constellation stock and other securities. A qualified charitable remainder trust is exempt from federal income tax under section 664(c) of the Internal Revenue Code, and as such would not be taxable on the share of Group capital gains or other taxable income passed through to it as a partner in Group. Normally, the beneficiaries would have paid tax over the twenty-year trust term on these gains realized by the trusts, under the four-tier system of tax applicable to CRT beneficiaries. The Sands trusts were terminated almost immediately after their remainder interests were purchased, so that the beneficiaries received only two partial distributions. The current beneficiaries acquired nearly $75 million in liquid assets as a result of their payments of approximately $2 million for the remainder interests.

12. Four months later, on June 21, 2002, each of the trust grantors obtained an opinion letter from the New York law firm of Milbank Tweed addressing three specific issues:

    a. Whether the remainder interest in his or her trust may be assigned under the applicable state law (that of Alaska);
    b. Whether the trust will terminate if the grantor purchases the remainder interest; and
    c. Whether the purchase of the remainder interest and the termination of the trust will be a recognition event for federal income tax purposes.

13. The Milbank Tweed opinion letter was based on representations by each of the trust grantors that the trusts would be validly administered as charitable remainder trusts, that Educational and Medical Support Fund (sic) was a public charity, and that the purchases of the remainder interests "will be at fair market value and that there was no plan, prearrangement or understanding with the charity for the purchase of the remainder prior to its designation as the charitable remainderman." Those representations were not accurate and the presence of a plan, prearrangement or understanding is unmistakable. The purchases of the CRT remainder interests were discussed and planned even before the trusts were formed. Moreover, those purchases were concluded four months before the date of the Milbank Tweed opinion letter.

14. According to tax returns (Form 990) filed by Educational and Health Support Fund for calendar years 2004 through 2006, the co-trustees of that organization are Freddy H. Robinson and Wesley M. Stallings, both of Greensboro, North Carolina, and James A. Locke of Rochester, New York. Freddy Robinson is

Executive Partner, and Wesley M. Stallings is a tax partner, of Bernard Robinson & Co. LLP, a Greensboro, North Carolina accounting firm that prepared the tax returns for all of the Sands Group charitable remainder trusts. In addition, the address of such accounting firm listed on those trust returns (Forms 1041-A and 5227) is the same as the address for Educational and Health Support Fund as listed on that organization's Form 990 tax returns. James A. Locke is an attorney, a partner in the firm of Nixon Peabody LLP, and a member of the board of Directors of Constellation Brands. His firm's website indicates that he was one of two lead partners for the firm in its representation of Constellation Brands in its acquisition of a Swedish vodka brand in 2007 and another acquisition in 2006.

15. Although the tax returns described above list only three trustees for Educational and Health Support Fund, the Board of Trustees was increased to five members on September 25, 2003. On that date, Richard Sands and Robert Sands, as Grantors of Educational and Health Support Fund, appointed themselves as Co-Trustees to fill the vacancies created by such expansion of the Board. None of the returns for the organization that I saw reflect the presence of the Sands on the Board.

16. For 2004 and 2005, all the grants made by Educational and Health Support Fund (a total of $600,000 for each year) were made to organizations located in Rochester or Canandaigua, New York. These included grants amounting to $200,000 each year to each of three grantees: FF Thompson Foundation, The Harley School, and Rochester General Hospital Foundation. The Sands family plays a prominent role in all of these grantees. Marilyn Sands is on the board of the FF Thompson Foundation, and Robert Sands is on the board of Thompson Health, an affiliated organization. Robert S. Sands is Trustee Emeritus and an alumnus of The Harley School. Robert Sands is Chair of the Board of Directors of ViaHealth, an entity affiliated with Rochester General Hospital

17. For 2006, Educational and Health Support Fund again made grants of $200,000 each to FF Thompson Foundation and Rochester General Hospital Foundation. In addition, it also granted $332,500 to The Harley School, and $50,000 to Rochester City Ballet. Nancy Sands serves as Chair of the Rochester City Ballet Board of Directors.

18. The tax returns of Educational and Health Support Fund for years before 2004 are not available on the Guidestar.org website.

Conclusion

It is my opinion that based upon the facts presented, the charitable remainder unitrusts created by members of the Sands Group should be disregarded as mere interim steps in a larger plan to sell Constellation Brands stock at a profit and retain substantially all the pretax proceeds realized.

Discussion

I believe that the facts surrounding the Sands charitable remainder trusts demonstrate that the various steps in the Sands family transaction made use of charitable remainder trusts as temporary partners in Group, serving in that capacity only long enough for completion of the sale of a large block of Constellation Brands stock on behalf of the Sands family. When this series of interrelated steps was concluded, the individuals who created Group (and transferred that block of stock to it) then transferred their interests in Group to the charitable remainder trusts. After the sale, they took back the sales proceeds, nearly $75 million, at a discounted value by purchasing the remainder interests from the trusts for a total of only $2 million.

All told, these trusts existed for only 102 days in 2001 and 58 days in 2002 – a total of less than half a year – spread over two different taxable years This short life convinces me that they were never intended by their creators to have the 20-year duration provided in their governing instruments.

There is no evidence of any external event or concern suggesting that the idea of purchasing the remainder interests in the CRTs arose after the creation of the trusts. Rather, all the facts I have seen indicate to the contrary that the remainder beneficiary was formed to complete the sale of the CRT remainder interests to the Sands family members. The deposition of Brian Czerwinski, commenting on his handwritten notes, indicates that Mr. Czerwinski attended meetings with Richard and Robert Sands on August 16, 2001, before the CRTs were created, and on October 10, 2001, shortly after the unitrusts were created. At both of those meetings, the attendees discussed the creation of the CRTs and the subsequent purchases of the remainder interests therein.

It exceeds reasonable comprehension to believe that this newly-created organization, ostensibly run by Sands family advisors, could independently negotiate an arms' length sale of those interests to the Sands family members and consummate that sale between the Friday on which it was formed and the following Wednesday. I have never seen a transaction of this magnitude conceived and completed between independent parties within a five day period. It was only the prearrangement of all the steps – creation of the unitrusts, transfer of the partnership interests, sale of the Constellation Brands stock by the partnership, the termination of the trusts, and appropriation of the proceeds by the original Constellation shareholders – that made it possible to conclude this complicated transaction in just five days.

These transactions were all structured and controlled by the Sands Group and its advisors, and none were conducted at arm's length. Consider the following:

- The charity, Educational and Health Support Fund ("EHSF"), that sold the remainder interests to the Sands family members was created by or on behalf of the Sands family on the eve of the sale of the remainder interests (five days prior to that sale).

- The three trustees of EHSF were subservient to the Sands interests – two members of an accounting firm serving members of the Sands family and an attorney who served the Sands business interests and sat on the board of Constellation Brands, the Sands family business.
- Subsequently, in the year after the year in which the CRT transactions were completed, Robert Sands and Richard Sands even appointed themselves trustees of EHSF, although that was not reported on the EHSF tax returns.
- EHSF was based in the North Carolina office of the Sands family accountants who serve on its Board. Subsequently, Richard Sands and Robert Sands appointed themselves to the Board.
- All of the grants paid by EHSF, at least in years from 2004 through 2006, went solely to organizations in upstate New York for which Sands family members served as directors or principal officers.

By any objective standard, EHSF was not at any time independent of the Sands family. To characterize the sales of its remainder interests in the charitable remainder trusts to Sands family members as arm's length transactions with independent third parties is to ignore the obvious reality of the situation.

It is my opinion that the transitory participation of the Sands CRTs as transitory partners to receive the sales proceeds of the Constellation stock sales should be ignored for tax purposes. To respect those transactions would approve a new tax avoidance device that is as abusive and inappropriate as the accelerated CRT and its progeny.

Several other factors likewise demonstrate that, in substance, the sale of the Constellation Brands stock was engineered by the Sands family and its advisors with the sole intention of securing for them the benefit of a tax free sale. First, as previously noted, the timing of the transactions indicates that there could not have been any real discussions or negotiations between the parties. EHSF was created on Friday, February 22, 2002, by Richard and Robert Sands, and on that same day was irrevocably designated the charitable remainder beneficiary of all the Sands family CRTs. Just five days later, on Wednesday, February 27, all four members of the Sands Group purchased the remainder interests in their respective trusts from EHSF.

In my experience, it is unlikely that even a truly independent charitable organization would be able to consider and consummate a transaction of that magnitude in a five day period. The fact that a weekend intervened makes that all the more unlikely, unless the sales of the remainder interests were planned, managed and overseen by a single coordinator, in the same manner as the other transfers in question.

Second, the trusts themselves were not in existence for their stated 20-year terms, but rather all four trusts went out of existence after just 160 days, as soon as they had served their purpose of providing the bulk of the proceeds from the Constellation Brands stock sale to the Sands Group. I have never in my 40 years of practice known a charitable remainder trust to terminate in such a short period of time. Nor have I seen an

instance in which trust were formed with an existing intention that they would be terminated earlier than the stated end of the trust term.

If the trusts had had been allowed to continue until their stated termination date, the trust beneficiaries would have been subjected to tax on all or most of the capital gains realized by the unitrusts, as they received the trusts' annual distributions. By terminating the trusts early, almost immediately after their creation, the beneficiaries attempted to circumvent the statutory scheme and inappropriately avoid those taxes altogether.

In addition, the overall context of these complicated transfers and the manner in which they were conceived and carried out indicates that the true purpose of these trusts and the related transactions was to serve the beneficiaries' tax avoidance purpose and not to accomplish the family's charitable goals.

- This was a tax shelter deal purchased from tax shelter promoters and carried out by professionals related to those promoters.
- The eventual purchase of the remainder interests in the CRTs was discussed in the early stages of the plan.
- The appraisal of the partnership interests transferred to the CRTs was out of line with the usual appraisal for a charitable transfer. Normally, in such a situation the appraisal will be structured to support the largest value that can be realistically justified, since this is the basis for the client's charitable contribution deduction. By contrast, the Sands appraisals sought to maximize the discounts applied, much like a valuation prepared for estate tax or gift tax purposes. My conclusion is that this must have been done to bolster the lowest possible value for the eventual purchase of the remainder interests in the CRTs. The fact that those purchases occurred only five months later bolsters that conclusion.
- Although not conclusive, the external trappings of the transaction seem calculated to present a misleading appearance. For example, rather than complete the remainder transaction with "The Sands Supporting Foundation," the initial charitable beneficiary of the CRTs designated on January 28, 2002, a new charity with a more independent sounding name was created and designated as beneficiary 25 days later. The latter entity was placed in North Carolina, far from the Sands family base in upstate New York. Sands family members were not on the original Board of Trustees of that charity, but were apparently added a year later (although that fact was not reflected on Form 990 returns).
- The 2002 tax returns of that new entity reported the sales proceeds from the remainder sale as contributions.
- Similarly, the creation of the unitrusts and the purchases of the remainder interests therein, although only five months apart, were arranged so to occur in two different taxable years, thus enhancing the apparent time between the two events. Placing distance between these two events, making the trusts appear more "old and cold" with respect to the later purchases, superficially bolsters the appearance of independence and the

argument that these were unrelated events. The existence of evidence that the purchases were discussed even before the unitrusts were created disproves that appearance and establishes the relationship between the two events.

Finally, this use of CRTs to accomplish tax avoidance on a massive scale by persons who had only limited, if any, charitable motives is exactly the sort of abuse that causes great concern within the charitable community. I believe that any experienced charitable tax planner would have warned the participants that the transaction would be subject to tax in accordance with its substance – a sale by the Sands family of the Constellation Brands stock – rather than its form. The Milbank Tweed opinion letter implicitly recognized this when it conditioned its conclusion on a set of facts that were demonstrably absent – a lack of any plan, prearrangement or understanding with the charity for the purchase of the remainder prior to its designation as the charitable remainderman. There was such a plan and the purchases were discussed with Richard and Robert Sands even before the unitrusts were created or the remainderman was designated or created.

The unitrusts were not intended to function as charitable remainder trusts at all, but rather as mere accommodation parties in an attempt to accomplish the sale of that stock on a tax-free basis. The success of the plan depended upon its not being detected upon IRS audit. The end result envisioned by the Sands family and its advisors – tax free receipt of $75 million in liquid assets for a purchase price of only $2 million – was in fact a result too good to be true

Signed,

Jerry J. McCoy
Law Office of Jerry J. McCoy
PO Box 66491
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20035-6491
[202] 466-6941

# APPOINTMENT OF CO-TRUSTEES

Pursuant to the terms of subparagraphs 5(c)(ii) and 5(f) of Article III of The Educational and Health Support Fund, U/T/A dated February 22, 2002, and as amended, we, Richard Sands and Robert Sands, the Grantors of said Trust, hereby appoint Richard Sands and Robert Sands to fill the vacant Co-Trustee positions created pursuant to the above increase in the number of Co-Trustees.

This Appointment of Co-Trustees may be executed through the use of multiple original counterparts.

DATED this 25th day of September, 2003.

Richard Sands

Robert Sands

"Grantors"



PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT 25

1

# TELEPHONE MEETING WITH [redacted]

# AND JONATHAN BLATTMACHR

12/05/00

(GMK, AJB, [redacted]):jms

Q 312

#35

GOVERNMENT EXHIBIT 26

PENGAD-Bayonne, N. J.

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

# TELEPHONE MEETING WITH [redacted]

# AND JONATHAN BLATTMACHR

**12/05/00**

**(GMK, AJB, [redacted]):jms**

Copyright 2000 The Heritage Organization, L L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: Hello?

JGB: Hey Gary, how are you doing?

GMK: Doing good, [redacted]. How are you?

JGB: Gary we were talking a little about the details of this CRT and I told [redacted] that if he does anything this year with the CRT he'll only do what he wants to sell this year.

GMK: Right.

JGB: And if he wants to do more next year and if he wants to use the CRT because it looks good, we'll do another CRT.

GMK: Right. That's exactly right.

JGB: And we're going to keep the CRT a life for a very short period of time, which minimizes what he could be potentially taxed on.

GMK: That's exactly right.

JGB: And he understands that there are two benefits of the CRT: One, is a huge net of camouflage because there is no program to audit them; and number two, even if they attack the 752 transaction they also have to attack the CRT.

GMK: That's exactly right.

JGB: So those are two enormously high hurdles for them and also I think the chances of them even finding out about the CRT are exceptionally remote.

GMK: Right. I totally agree with you. I mean that's the whole point, [redacted], as far as cosmetics go this is probably the -- besides the fact that it works is it adds another thing that they would have to overcome on some type of audit. It further -- capital gains are never audited and capital gains inside a CRT are just absolutely never audited.

[redacted]: Uh-huh. Would one put in high basis stock into the CRT?

Copyright 2000 The Heritage Organization, L.L.C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

**GMK:** Yes. In other words, once the basis is stepped up see then you have the belt and suspenders. In other words, if you every got challenged on any of this, which once you have these two transactions in place, I think the chances of you even getting looked at are two or three percent at best, at most.

If you ever got challenged they'd have to look at you and say, Okay -- first they'd have to overcome a valid tax transaction and stepped up the basis and then they would have to overcome the fact that you did a valid transaction with the CRT. And so you would have two valid transactions that they would have to overcome to get you to ever pay any tax. And the chance of them wanting to take that one to court and expose that to the light of day are just non-existent. They have to beat you at both issues, which are totally unrelated. And the advantages of the CRT, [redacted] -- we haven't really spent a lot of time talking about it -- but advantages of the CRT is it does not have to have a business purpose or any economic purpose.

**JGB:** Right. I told [redacted]. These are just rules that Congress has put out. And you could go into court and say, Your Honor, I did this to save income taxes. But everybody that does a CRT is to save income taxes.

**GMK:** That's right.

**JGB:** Then Congress just said, These are the rules. You don't need a business purpose, you don't need a charitable motive. You create your CRT. This way you have a valid CRT.

**GMK:** That's right. So they have an uphill battle beyond belief.

**JGB:** Have you done this before, Gary?

**GMK:** Have we put these two together, no. The CRT thing that -- we've just recently gotten through researching that so it's fairly new. We've used other CRTs like this but not this particular one.

**JGB:** Right. And Gary, I told [redacted] I did this in 1994 with my one client who did the short term CRT who panicked when the notice came out.

Copyright 2000 The Heritage Organization, L.L.C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: Right.

JGB: But Gary that was with a major university. The guy and I went to the president and he was tickled pink. Even though he had to wait only two years for the money, he was tickled pink to sellout now. This guy also --

[redacted]: Was that a long-term CRT?

JGB: It was a two-year CRT.

GMK: Very short term.

JGB: And yet the president --

[redacted]: Why does the --

JGB: [redacted], because the president wanted to please his donor.

GMK: These are not people who are business people, [redacted]. They just want to take the money and make some money --

JGB: But he also wanted to please the donor.

GMK: Right. That's what I'm saying. They want to make the donors happy because they may give them more money.

JGB: Right. In fact, Gary, we can even designate -- first of all, I told [redacted] we can test the charity by giving it a little bit; but number two, we can make the designation revocable and provide it prior to the time that the interest -- before charity gets it's interest by sale or termination, he can change it.

GMK: Right.

JGB: You name little Red Cross or the supporting org, whatever it is, and if they say, Nope. We're really not really interested. Thanks, but we're not really interested in selling. Guess what, you're off the list. But nobody is that dumb.

[redacted]: Well, if we're going to do this year then I'd have to hustle around and find a charity pretty quick.

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

JGB: No you don't. We're going to do it next year.

[redacted]: But you name it next year but you sell the stock this year.

JGB: Yeah, that's correct.

GMK: So [redacted], this is just putting it in place if the stock gets up to a price -- I mean the market should start rallying around somewhere in this area, somewhere between 23 and 25 hundred.

[redacted]: I wouldn't mind selling, even at these levels, some AT&T.

GMK: Okay.

JGB: Because it's almost at 25.

JGB: Yeah.

GMK: So the nice thing about it is you get the first one in place and then you just get successive ones every time you want to sell. You don't have to use the same CRT; you can use a different one. It's like a cookie cutter.

[redacted]: So what would be the entity that we create, a new partnership, a new LLC?

GMK: Well, what we'll do is -- what I'm looking at right now, [redacted], and Jonathan and I are talking about this -- the best thing to do is make one of these beneficiaries of this thing a supporting organization.

JGB: Well, no. [redacted] is talking about, Gary, what is he going to contribute to the CRT? Are we terminating the trading company?

GMK: No. No. Yeah, we're terminating the trading company and he'll contribute partnership units.

JGB: Partnership units in --

GMK: In [redacted] Investments.

JGB: Okay. In [redacted] Investments. And [redacted] Investments now has a high basis.

Copyright 2000 The Heritage Organization, L L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L.C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: Right.

JGB: And it's AT&T.

GMK: Right.

[redacted]: So I contribute some units of the LP; [redacted] Investments?

GMK: Right.

JGB: And that's an old and cold partnership. The IRS can't argue that it doesn't exist. It doesn't matter if it exist or not. Then [redacted] Investments will sell and in fact, Gary, I'm just thinking, we're going to want.

[redacted]: The trouble is if [redacted] Investments sell --

GMK: By the way, let me say one other.

[redacted]: -- I think we want that stock in a new partnership.

GMK: Wait just a second. Wait just a second. Let's talk about something. Once we get the transaction done for the CRT it would be better not to use [redacted] Investments. It would be better to distribute the stock out.

JGB: Well, what we'll do, Gary I think is to put a new pass through -- because we won't even have to represent it -- L.L.C into the trust. That will hold units in [redacted] Investment. Then we'll redeem those units tax free because there will be no gain.

GMK: Right.

JGB: Then the new L.L.C., which will be a tax pass through or maybe we'll make it a real one, will own AT&T shares directly.

GMK: Right.

JGB: The new L.L.Cs will sell them. The L.L.C. is going to give a K-1 to the partnership which is going to slow minimal gain or loss.

GMK: Right.

Copyright 2000 The Heritage Organization, L L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

JGB: And then that CRT is going to give a K-1 to [redacted] showing minimal gain or loss.

GMK: Right. And you would redeem the partnership units by using the AT&T stock, right?

JGB: Correct.

GMK: Okay. That works for me. That way you get --

[redacted]: Why wouldn't you just distribute the -- liquidate the [redacted] Investments, LP, designate stock and then I take whatever I need. Say for example, AT&T Stock and put it into a new limited partnership.

JGB: You could. It's just additional camouflage.

GMK: Yeah. [redacted], by keeping all this stuff off your returns and stuff, we're just better off. What Jonathan says makes good sense.

[redacted]: Well, we wouldn't have anything in my returns the way I set it -- shares year of [redacted] Investments LP, right?

JGB: Well.

[redacted]: There is no gain there or loss.

GMK: Well, cosmetically, [redacted] --

[redacted]: What?

GMK: Cosmetically it looks better if you don't pull the shares right back out of the partnership. I think that's where Jonathan was going.

JGB: Right. And also all the trust is ever owned are interest in the new L.L.C. and we can claim a discount with the charity we're buying out. All we've ever held is these unmarketable L.L.C. interest. Do you want some or not?

GMK: Yeah. That way --

[redacted]: Let me write down the steps one after another. Okay. We end the --

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: Go through them again, Jonathan.

[redacted]: You end the [redacted] trading.

JGB: Yeah. You terminate [redacted] trading and the shares of stock are distributed to [redacted] Investments, LP.

[redacted]: Okay.

JGB: Then you, [redacted], contribute an appropriate number of units in [redacted] L.L.C. to new L.L.C.

[redacted]: Let me write that down. Okay.

JGB: Then you contribute your interest in new L.L.C. to this CRT.

[redacted]: I'll contribute --

JGB: The membership units or the non-voting membership units --

[redacted]: Uh-huh.

JGB: -- in the new L.L.C. to the CRT.

GMK: Right.

[redacted]: Okay.

JGB: So now let's stop and see what happens. The CRT owns the non-voting units, representing 99.9 percent the equity in new L.L.C.. You will be the managing member of that owning a tiny, tiny interest. The new L.L.C. in turn will own some units in [redacted] Investments and [redacted] Investments will own --

[redacted]: So CRT owns 99 percent of the --

JGB: 99.9 percent.

[redacted]: 99.9 percent of the equity and new L.L.C.

JGB: Right. All non-voting.

[redacted]: Right.

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

JGB: New L.L.C. owns a million dollars of units in [redacted] Investments, LP.

[redacted]: New L.L.C. owns how much?

JGB: A million dollars.

GMK: Whatever you want to contribute. Whatever the AT&T you want to sell is.

JGB: Let's say it's a million dollars worth of units.

[redacted]: What I want to sell this year is AT&T not Liberty.

JGB: Don't worry about it we're going to get there. We're going to get there.

GMK: How much that do you want to sell, [redacted]?

JGB: Let's say it's a million.

[redacted]: I have no idea.

JGB: Let's just say for purpose of discussion it's a million dollars.

[redacted]: Uh-huh.

JGB: So you want to take a million dollars worth of the units in [redacted] Investments and contribute it to the L.L.C. and contribute the non-voting interest and the L.L.C. to the CRT.

[redacted]: You're going too fast.

JGB: You're going to take a million dollars worth of units in [redacted] Investments.

[redacted]: New L.L.C. owns a million dollars of units in [redacted] Investments. Okay.

JGB: Right.

[redacted]: And it does what? What happens next?

JGB: Then you contribute the non-voting interest in [redacted] L.L.C., the new

Copyright 2000 The Heritage Organization, L.L.C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

L.L.C., to the CRT.

[redacted]: Okay.

JGB: So at the end of the day now, [redacted], let's take a look. The CRT owns 99.9 percent of the units in the new L.L.C.. You own the tiny interest, which is control. The new L.L.C. owns a million dollars worth of units in [redacted] Investments and [redacted] Investments owns the Liberty Media and AT&T stock.

[redacted]: Right.

GMK: The only thing I'd do different, Jonathan.

JGB: Uh-huh.

GMK: Is rather than have [redacted] own that little bit, I'd have a new corporation be the managing member.

JGB: Nine.

GMK: Just so we have a S Corp going through his K-1.

JGB: That's fine. But [redacted], you'll control.

GMK: Right.

JGB: Right. Now you want to sell some stock. So [redacted] Investments will redeem out the [redacted] Investment units held by the new L.L.C. and it'll buy it out by giving it a million dollars worth of AT&T; no Liberty Media.

GMK: And that stock has basis, [redacted].

JGB: Right. But regardless of whether it has basis or not it's just going to buy it out with these units.

GMK: Right.

[redacted]: Redeem the units for AT&T stock.

JGB: Right. A million dollars of AT&T stock.

Copyright 2000 The Heritage Organization, L L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

[redacted]: Okay.

JGB: Now the CRT still owns the 99.9 percent interest in the new L.L.C. and the new L.L.C. owns a million dollars of AT&T and it sells it.

[redacted]: The CRT owns 99.9 percent. And what was your point?

JGB: The CRT owns 99.9 percent of the new L.L.C.

[redacted]: Right.

JGB: And the new L.L.C. owns a million dollars worth of --

[redacted]: A million dollars.

JGB: Of AT&T and its brokerances sell.

[redacted]: Okay.

JGB: And the brokerage firms records are going to show virtually no gain or loss because at the time you open up the account with the AT&T -- because now we're transferring it from [redacted] Investments over to a new taxpayer, the new L.L.C., the brokerage firm is going to say, What is the basis --

[redacted]: They don't get involved in that.

JGB: Well, some of them do.

GMK: If they do ask, all you do is tell them and they type it in.

JGB: Right.

[redacted]: Nobody has ever asked me.

JGB: They have asked me.

[redacted]: Is that right?

GMK: Sometimes they do, [redacted]. Sometimes they do and they include it in your statement.

[redacted]: Do they have to?

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: No.

JGB: Nope.

GMK: No. But it's good for them to because the basis is going to be the basis that it is and it's just more --

JGB: It's just more paperwork in your favor.

[redacted]: It's some info you provide them.

JGB: Yeah, but it's a record.

GMK: That's right.

JGB: It's a record.

[redacted]: It doesn't mean anything.

JGB: You bet it doesn't mean anything but it's a good record.

[redacted]: Okay. So --

JGB: So now the CRT still owns the 99.9 percent interest in the new L.L.C. and the new L.L.C. now has a million dollars in cash.

[redacted]: What kind of deduction to I get this year for that?

JGB: You get a deduction of a hundred thousand dollars.

[redacted]: You really think it's worth going through all this trouble to --

JGB: [redacted] you've got to make up your mind. I mean again, the two reasons -- again for all this massinations is one huge net of camouflage. They can't see your tank from the air.

GMK: That's exactly right. Talk about stealth, [redacted], you say you never want to be audited. This guarantees that it'll never be found.

[redacted]: Well.

JGB: And in addition if the IRS trying to attack the 752 --

Copyright 2000 The Heritage Organization, L L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L.L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

[redacted]: They'll audit it. Speak about being audited, have you heard about this Marshall Fields audit, Gary?

GMK: No, [redacted], I don't think I have. I'm not sure but I don't think I have.

JGB: I haven't heard about it either but I'm going to call some lawyers in Chicago and see if I can't answer the question for [redacted].

GMK: What's the question?

[redacted]: Apparently they are after him for 138 million dollars for back taxes for using aggressive tax avoidance schemes.

GMK: Well, that doesn't mean anything.

JGB: I'm glad they are after him rather than you. But I told [redacted] something good, Gary.

GMK: Right.

JGB: When George Bush takes over, as he is certain to do, he is going to neuter the IRS.

GMK: Right. I agree with you. They don't have any money. They got two hundred million dollars last -- appropriated to them. Do you know how much two million dollars will buy in computer systems?

JGB: Very little.

[redacted]: Well, I think they out to go after these companies that don't pay any — taxes.

JGB: That's where they are going. That's where the money is. That's why only one, I think in 63 -- in fact, you know, when I mentioned Gary Kornman -- this past week I was down in Florida and I met with a guy from Arthur Anderson I do a fair amount of work with, Randy McPherson. And Randy -- I said, Would you like a new client? I didn't even describe [redacted], but he said, Yeah, I'd like to work more with you Jonathan, and stuff. But I asked him, I said, How many of your individuals -- I mean really high level individuals are getting audited these days? And he said, Virtually none.

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: Well, [redacted] has been a high level individual for a lot of years.

[redacted]: Yeah, I haven't been audited.

GMK: Yeah. I know. Nobody has.

[redacted]: They have just asked a few questions.

JGB: Right. They are really putting their effort in -- I mean, Sony, for example comes into this country or Mitsubishi or Toyota comes into this country and they allocate all the taxable income away from the United States and they also allocate it a way from Japan. And it's a huge problem; an enormous problem. We do a little work for Tyson Foods and they have like eight full time agents who work in offices at their company; full time.

[redacted]: Yeah.

JGB: They have even have them on the company baseball team.

GMK: That's funny.

[redacted]: How much go Tyson Foods ship the government every year?

JGB: Well, I don't know.

[redacted]: I'm sure it's not pocket change.

JGB: I don't know but they have eight people working there I think they told me.

[redacted]: Yeah.

JGB: Full time. First they treated them really mean. It was of the summer time and they bought them a really old mobile home with no air conditioning but they finally took pity on them and figured that they'd make them into a -- they'd give them the meals and they'd put them on the baseball team and they became buddies; and usually you don't want to screw your buddies. So it's all a psychology game.

[redacted]: Well, this seems like a lot of word and some risk if I can't find a --

Copyright 2000 The Heritage Organization, L L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

JGB: It is, [redacted]. There is a risk. If out of the million public charities out there, including the new one you will form or Gary will form as a supporting org --

GMK: Right.

JGB: -- you can't find one.

GMK: [redacted], we --

JGB: I'm going to tell you, as a practical matter that isn't going to happen; but yeah, as a practical matter they ain't going to happen. But yeah, you take a risk.

GMK: [redacted], we have a law firm working for us drafting a new type of supporting org for you. When you see it you'll go, This is so simple it's ridiculous because you'll have a choice of so many things.

[redacted]: See, I don't really understand supporting orgs and how they work.

GMK: I understand that. That's why when have it for you we will go through it with you.

[redacted]: How soon are you going to have that?

GMK: Tell be probably another two weeks.

JGB: And [redacted] I'm not going to push you on this. We can also do this next year. It's only if you want to sell something this year and use this additional strategy. I need a little while to get this together. The trust is drafted and we are going to send it to Gary today. Take a look at it; it's plain vanilla. It's a valid charitable remainder trust and if you want to use it, that's great.

[redacted], I want to emphasize, you know, except for a little bit of time now -- and I've got plenty of work to do here -- I'm not getting paid any more for doing this. And you know, Gary is charging you the same whether you do it or not and this is a lot more work for him.

[redacted]: Why is it more work for him?

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

JGB: Because he's --

GMK: Because we have to make sure all this works.

JGB: Yeah.

GMK: We check everything.

JGB: Believe me, I'm sending him the trust this afternoon and he'll call me back and he'll vet the opinion letter that we will do and everything. So it's a lot more work for him. Yeah, you're going to wind up paying me a few -- you'll probably end up paying us 25 thousand dollars or 30 thousand dollars more for doing this. But [redacted], the scope here at Milbank Tweed with 15 hundred people working here, that's not even a consideration. I want you to do what you think is --

GMK: Well, wait a minute.

JGB: Best for you.

GMK: It is but --

[redacted]: Well, it might be a way of getting a foot in the water and testing the water and seeing if it's a good strategy or not.

JGB: Yeah. You could do it a little bit this year.

GMK: [redacted], this was the whole thing I think one of the reasons you hired us is because we didn't come in with one little cookie cutter idea. We came in with a bunch of things that work together.

[redacted]: Yeah.

GMK: And for you not to do this I think would be unwise and because I think you're giving up the best camouflage there is.

[redacted]: It's going to cost me some money. It's going to cost me at least four cents on the -- I mean, I'm going to get about four cents on the buck that I put in it's going to cost me.

GMK: Yeah, but this is going into your supporting org to support the charities you're going to support, which you are going to do anyhow.

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

You're going to support charities.

[redacted]: So the four cents is going to go into my supporting org?

GMK: Yeah.

JGB: Yeah.

[redacted]: So I don't have to go to Red Cross and say, I'm going to give I four cents on the --

GMK: No. No. No.

[redacted]: -- on the buck that's in here if you go along with me.

GMK: That's right. It's not a specific charity. You're going to have a whole bunch of charities named, Community foundations and you're going to have so many people -- you're not going to have a problem. This is not going to be something you're going to have to worry about.

[redacted]: I don't want to hold Jonathan up that much longer. Do you want to, Gary, give me a call and go over the supporting org and who will be the trustees and how it would work?

GMK: Can you wait -- Okay. I can give you the details.

[redacted]: I don't have to do it now.

GMK: Okay. If you're in a rush for it, I'd rather wait until it's done and show it to you but if you just want generalities I can call you back right now.

[redacted]: Well, if we're going to move forward wife only got so many days left in a year, right?

GMK: Right.

[redacted]: To set this up.

GMK: Jonathan?

JGB: Yes, sir.

Copyright 2000 The Heritage Organization, L L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L C without the express written approval of the Chief Executive of The Heritage Organization, L L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: He's what I'm thinking -- so let's just go through it, [redacted] and explain to you how the trustees will work. We'll set up a supporting org and it will be a Type One supporting org where certain named charities that it supports elect six directors. Those six directors -- there will be a total of 11 directors.

JGB: Okay.

GMK: You will have five [redacted], that will be your family members; so you're the minority.

[redacted]: Can't it be a smaller number?

GMK: Well, let me explain to you why. I mean, yeah, it could be but let me explain the purpose of this. The way the vote is set up, you and any anyone of those six directors control the Board; your family. Your five plus one control the Board.

[redacted]: Okay.

GMK: And all you have to do is have one of those six charitably named directors agree with you. Well, strangely enough since you control the Board and control who gets the money, I don't think you're going to have a bit of trouble doing that because your supporting org will support whatever charity the Board votes to support.

So if you understand that voting system, which is the main thing, you now have the control. So let's just say your side of the Board is you, your three kids and Stephanie.

[redacted]: Do I put money into this thing at this point in time?

GMK: You'll put a little bit in to set it up. You can put in 50 thousand dollars or something.

[redacted]: Uh-huh.

GMK: And it will be the remainder beneficiary of this CRT.

[redacted]: The supporting org will be the --

Copyright 2000 The Heritage Organization, L L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: Yes. And all your beneficiaries that you want will be named in the supporting org plus there will be what I call some general places like -- what, donor directed accounts, Jonathan, and that type stuff?

JGB: Yep.

[redacted]: The supporting org will be the remainder beneficiary of what?

GMK: That's right.

[redacted]: Of what?

GMK: Of your charitable remainder trust. That's where your money goes when this is over.

[redacted]: Okay.

GMK: And it's that Board that you buy it from.

JGB: Indeed you could have it go to a [redacted] family fund in a Community foundation and your family, in essence, will run that like a private foundation.

GMK: That will be just one of the places that the supporting org can support, [redacted].

JGB: Right. One of several.

[redacted] Could you repeat that, I'm sorry.

JGB: One of the organizations that your supporting org will support is a [redacted] family fund at a Community foundation. A Community foundation.

[redacted]: The charity.

JGB: Right. And they'll take whatever money --

[redacted]: The supporting org will --

JGB: The supporting org will give a million dollars and give it to the [redacted] Community foundation and they'll put it into a [redacted]

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

family fund.

[redacted]: [redacted] who?

JGB: Community foundation or the Palm Beach Community foundation or the New York Community foundation, or the Fidelity --

[redacted]: What is that?

GMK: Explain that to him, Jonathan.

JGB: Yeah. Okay.

[redacted]: [redacted] Community foundation?

JGB: Yeah. Almost ever area in the United States and Milbank represents the largest two, which are here in New York, has what is called a Community foundation. And the Community foundation has it's own money and that Board decides where it's going to go that year, you know, to the extent that they want to distribute it. But other individuals, companies and individuals create their own funds there. And because it's controlled by this big public charity, it's treated as a public charity, even though the money sits in a fund with your name on it. And it's like a private foundation within the Community foundation. And each year you, and after your death, your wife, and after your wife's death, your kids and after your kid's death, your grandchildren, will advise the foundation how much of the money in the account it wants to go and where.

[redacted]: Who does, the supporting org?

GMK: You.

JGB: No. No. You individually.

GMK: The supporting org makes the contribution to the Community foundation.

JGB: Which goes into the [redacted] Family Fund there.

GMK: And you can name -- there are so many Community foundations,

Copyright 2000 The Heritage Organization, L L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L.C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

[redacted]. I've literally had clients have 20 Community foundations named.

[redacted]: They have a foundation within the foundation?

GMK: Look at it this way, here's how it goes: Your money from the charitable remainder trust is left to your supporting organization which can be distributed among 50 different charities. The 50 different charities can be -- let's say five of them are Community foundations which have these accounts that are donor advised directed.

So basically, [redacted], it's like an amoeba. It starts out in the supporting org, which splits up into 50 charities, of which Community foundations, each of them have a [redacted] fund. And you don't have to give it to all of them. Your pick is all or none. You can spread it around however you want. You know each year you give money out of your foundation?

[redacted]: Yeah. That I do understand.

GMK: Okay. All right. It works the same way; it's just done in layers. It just moves from one place to the next. It goes to the CRT, it goes to the supporting org and then it goes out to wherever you want it to go from there. And if you want it to go any further, the advantage to the Community foundations is that they give you more flexibility because then they can give it to virtually any other public charity.

[redacted]: You've got me totally lost.

GMK: You just --

JGB: Let me give you a snapshot. You put money in a supporting org. The supporting org can give it to one of 20 charities.

[redacted]: Right.

JGB: One of those charities will be a Community foundation.

[redacted]: Uh-huh.

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

JGB: The Community foundation like New York Community foundation, there is one on Long Island and there is one in [redacted]; we're counsel to them all. And we'll put it into an account with your family's name on it.

[redacted]: Uh-huh.

JGB: And every year you and your wife, or kids, whoever you designate can go to the charity and say, We want the money to go to the following charities: Williams College, Harvard University, Columbia University, New York And Services Hospital, the Red Cross.

[redacted]: Yeah, what is the advantage ever using this Community foundation?

JGB: Well, it's a public charity.

[redacted]: Yeah.

JGB: And you don't have to distribute the five percent a year and you IRS is not going to audit it.

[redacted]: You don't have to distribute five percent?

JGB: No. You do not.

[redacted]: Why not?

GMK: Because it's a public charity. Only private foundations have to distribute five percent.

GMK: And it gives you the advantage, [redacted] of being able to change what you want to give money to easily. In other words, let's just say you started off with 20 charities and you have five more down the road somewhere and you had a particular grandchild that had a particular illness and they weren't named as one of the 20, these community-type foundations will allow your special fund to give to that charity.

[redacted]: So you can name who you want the money to go to ever year.

GMK: That's exactly right.

[redacted]: Just like my charitable trust account.

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: That's exactly right.

JGB: Now in theory, if you looked at the partnerships it would say you can't direct it, you can only advise. Now [redacted], we have been counsel to the largest Community foundations in the world for over 80 years. I know of no instance where they failed to do exactly what the family wanted, not one.

[redacted]: Uh-huh.

JGB: May be if you said you wanted to go to the Church of Scientology -- which believe it or not is an IRS approved church -- they'd say so. They don't care where you give it to Williams or Harvard or Yale the Girl Scouts or the Brownies, Autobaun Society --

[redacted]: How about The Heritage Foundation which promotes free enterprise?

JGB: Of course.

GMK: Yes.

JGB: Absolutely.

[redacted]: So what money is left out of the theoretical million dollars that you put in?

JGB: Let's take the worst case scenario on the economics for you. You put in a million dollars, you get a hundred thousand dollar income tax deduction that saves you 40 thousand bucks. You go to charity and say, I'll pay you a hundred thousand for your remainder interest. You now get the million dollars back that's in the trust, and we believe, tax free. You wind up -- you put a million in and you get a million back and you got this tax saving of 40 thousand but charity has gotten a hundred thousand.

[redacted]: You got a hundred thousand dollars tax deduction and you pay a hundred thousand dollars --

JGB: To charity.

[redacted]: To buy back.

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

JGB: Right

(Side 2.)

(In progress.)

GMK: Hen I just have to go shopping for some more -- I have to go shopping for some more charities reps.

GMK: Yeah.

JGB: Yeah.

[redacted]: That would be agreeable.

GMK: Yep. And God knows --

[redacted]: And before I ask him I think you have to have an understanding here and say, Would you be agreeable to such and such a thing.

JGB: Right. But you're not even going to form the supporting org, [redacted], or designate it until next year.

[redacted]: Right.

JGB: And as Gary said you can form more than one. Hell, Gary, maybe he can even use yours with an understanding that you know, you wind up being the lucky chosen one that you'll hand the Board over to [redacted] and his family.

GMK: Whatever. I mean we can do whatever he wants. That seems a little complicated but we can set up as many of them as he wants.

JGB: Right. Gary, have we any idea when Betsy is going to come up with her money?

GMK: We did it Jonathan, so there's a note. When we actually closed the transaction she already signed a note.

JGB: Oh, Betsy has?

GMK: Yes.

Copyright 2000 The Heritage Organization, L L C
This document and the information contained In it are Confidential Information owned by The Heritage Organization, L.L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L.C only in the normal performance of their duties as an employee of The Heritage Organization, L L.C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

JGB: Oh, okay. I'm sorry. My wife tells me nothing.

GMK: So when we have the exact amount we'll be able to use the note.

Hold on a second let me make sure this is not long distance.

JGB: Guys, unfortunately I am now an hour late for another conference call.

GMK: [redacted], does that answer your questions?

[redacted]: Partially.

GMK: Will you like me to call you back?

[redacted]: Yeah, why don't you give me a call.

JGB: And if you guys need me I'll be around all day.

GMK: Okay. That will be fine.

JGB: See you later.

GMK: Call you right back, [redacted]

(Second phone call.)

GMK: [redacted]?

[redacted]: Yeah. Hi.

GMK: All right.

[redacted]: So say I've put in a million dollars, right?

GMK: Right.

JGB: I've put it in this year, right?

GMK: Yes. Yes. Whatever you want to sell you put that in this year.

[redacted]: And then I get a hundred thousand dollar deduction and so forth.

GMK: Right.

Copyright 2000 The Heritage Organization, L.L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

[redacted]: But then next year, assuming I want to do a supporting org, right?

GMK: Uh-huh.

[redacted]: I mean I don't want this to look too fishy, okay? How do I do this? Like I say, I'm forming a supporting org, which is like a charitable. I'm just mimicking what I would be saying to some guy that maybe I know or maybe I don't know at The Red Cross.

GMK: Right. Well you want people on the Board that you know, [redacted]. Let me explain one thing to you. Even though Red Cross would appoint the director --

[redacted]: Yeah.

GMK: -- they don't have to appoint one of their administrative bureaucrats.

[redacted]: Uh-huh.

GMK: They can appoint a friend of yours. For example, they could appoint me, just to use an example.

[redacted]: Uh-huh.

GMK: The Red Cross could say that Well, Gary Kornman is our supportive on the Board representing the Red Cross in the Flinn supporting organization.

[redacted]: Uh-huh.

GMK: Now, they've named me and the kicker is that you're going to give them money and they know that and they are going to do what you want. I mean, you're going to name people that you're already giving money to right now.

[redacted]: Uh-huh.

GMK: So worse than not being given any new money, they could lose what they are getting from you already, right?

[redacted]: Say what?

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: They have the risk of losing what you're already giving them.

[redacted]: Yeah.

GMK: So they'll do whatever you ask them to do.

[redacted]: So I could name people who would be rep -- okay, say I just name five guys who are friends of mine. Tell them you are going to rep Red Cross, you're going to rep -- .

GMK: Right. That's exactly right.

[redacted]: You're going to rep that.

GMK: Right.

[redacted]: Do they all actually have to meet?

GMK: Oh, yeah, they'll be telephonic meetings.

[redacted]: Telephonic?

GMK: Yeah.

[redacted]: Okay. So I get these guys lined up. What is it that they specifically do?

GMK: They determine where -- the Board votes on where the money goes.

[redacted]: They vote each year where the -- that's not a problem, determining where the money goes.

GMK: No, I know it. You send out a list before the telephonic meeting and say, This the list that we think this supporting org should give to this year. All in favor vote I.

[redacted]: What if one of them is supposedly is representing the Red Cross and The Red Cross gets chump change?

GMK: Oh, that's just the way it is. If there's 20 charities the supporting org can divide it the way you want to do it. However the Board votes is the way it goes.

Copyright 2000 The Heritage Organization, L L.C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

[redacted]: But at some point I want to control this thing.

GMK: You do control it.

[redacted]: How do I?

GMK: You got five, right?

[redacted]: Yeah.

GMK: Okay. Hold on one second, I'm going to do some quick math. Nine times six is 54, right? Each one of those people have nine votes. Hold on a second, [redacted], let me get rid of this call.

(GMK takes call.).

GMK: Okay. So [redacted], they have nine votes. Each one of those six people have nine votes and your family has 46. So nine plus 46 is 55 percent. So anyone -- and that's the way it's set up. Each one of those independent directors, so to speak, which control the Board have nine percent the vote and your family has 46. So you get any one of them and you got 55.

[redacted]: Uh-huh.

GMK: Okay? Now with that in mind --

[redacted]: You don't have to do that. Each person gets one vote, right ?

GMK: Yes, you could say that but the reason I don't want you to do it that way is because you may want to be the only director. You could have 46 percent of the votes yourself all by yourself.

[redacted]: That would be fine with me.

GMK: Okay. So you can do that. You don't have to have your family in it.

[redacted]: Oh.

GMK: You can appoint one director who has 46 percent of the vote.

[redacted]: That could be me.

Copyright 2000 The Heritage Organization, L L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L.L C without the express written approval of the Chief Executive of The Heritage Organization, L L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: Yeah, that could be you. That's the reason I just wanted to explain to you that you could have an uneven number -- you could have six directors with nine votes and one director with 46 votes.

[redacted]: Uh-huh. Six directors of --

GMK: With nine percent ; with nine votes a piece and one director with 46 votes. And you can be able to delegate your 46 votes. So if something happens to you you want to delegate them among your kids, you can split them up.

[redacted]: Uh-huh.

GMK: So you control --

[redacted]: So what about this getting one of these directors? How do you do that?

GMK: Well, you just go to a buddy of yours and say, Look, I'd like you to serve as a director on my supporting org and basically it's not going to be a big deal. Once a year we'll meet my telephone and I'll have a list of the places I'd like the money to go and we'll vote on it. And I'd appreciate it -- you're going to be appointed by the Red Cross but we're going to decide where the money goes each year and it's going to be among a whole bunch of different charities.

[redacted] I don't know.

GMK: Well, I mean, let me put it this way, it works just fine and all you have to do is get -- if you want me to serve on it, I'll serve on it with you and all you need is five other shlamiles because I'll vote with you every time.

[redacted]: (Laughing). Okay. I was just saying that the YPO guys who are friends of mine -- you know they are all heads of their own companies.

GMK: Sure.

[redacted]: I'm in a forum group with a bunch of those guys and we help each other in our problems.

Copyright 2000 The Heritage Organization, L.L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: Sure.

[redacted]: And I'm sure they'd be delighted to serve on something like this.

GMK: Yeah.

[redacted]: On the other hand, they have their own minds.

GMK: Okay. I'm pretty mindless, [redacted]. You know what a push over I am.

[redacted]: Yeah, okay. So Gary --

GMK: By the way, I serve in this capacity for a lot of clients where we want to get them down to a minority position in their company --

[redacted]: Uh-huh.

GMK: -- and I serve as a minority stockholder holding a little piece of the stock.

[redacted]: I see.

GMK: And I may serve in there with their kids or somebody but they always wonder, Well, gee, what if my kids get pissed off at me or something.

[redacted]: Like you have a fight with them, yes.

GMK: Right. The only thing it always does -- since it's always these management corporations that are S corps, the only thing it always does is it add another K-1 to my tax return I never get until October.

[redacted]: Uh-huh.

GMK: So I don't even -- when April 15th comes around I just yawn because I know I don't have the forms I need.

[redacted]: Right. So I understand how -- I think I understand how this is the supporting org -- how that structure works.

GMK: Right.

[redacted]: But let's just -- so say I put a million bucks in this year, then next year

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

-- and I get cash and I sell the stock --

GMK: Uh-huh.

[redacted]: And I want to get the money to me. How do I do that?

GMK: You're going to go to the Board of the supporting organization and say, You know, you've got a hundred thousand dollars worth of units in an L.L.C. that is never going to produce any income and is never going to do anything else.

[redacted]: Uh-huh.

GMK: And I'd like to buy your charitable remainder interest because it's a charitable remainder trust, right? At the end of 20 years they are going to get the money. It's real simple; you go to somebody who has an actuarial table that uses a different interest rate than the IRS uses because they only use seven percent.

[redacted]: Uh-huh.

GMK: And you say, Gee, what is this money worth 20 years from now? And they say, Gee, we really think we can do better than seven percent even though that's the IRS table. And now twenty years out it's worth 50 cents on the dollar if you use --

[redacted]: Where do you get this table?

GMK: Well, you use a commercial interest rate. The IRS table is right out of the regulations. In other words, the value of your remainder interest.

[redacted]: Uh-huh.

GMK: The 10 percent is all calculated. In other words, your going to get -- remember how a CRT works. It gives you a certain amount of income each year for the next 20 years and at the end of 20 years the remainder goes to charity.

[redacted]: Okay. How much income?

GMK: Well, I don't have the table memorized but it'll be around -- I think, 10

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

or 11 percent.

[redacted]: I think -- well -- I sort of was messed around with that at one point. The more it gives you the less of a deduction you get.

GMK: That's right.

[redacted]: And you can play around with that. But I think they optimize at around eight percent or something like that.

GMK: That's right. Well, the question is: Is it an annuity trust or remainder trust in infancy? Or, I mean, is it an annuity trust or a unit trust? And so you set it the way you want to do it. And the long and short of it is is it will probably be an annuity trust because the annuity trust fixes your pay out.

[redacted]: Uh-huh.

GMK: And so that annuity trust has this -- whatever this interest is -- let's call it 10 percent, okay? So you'd have an income of 10 percent a year and there would be a 10 percent remainder value. What Jonathan says is you construct a formula -- what the code says when they changed it to get rid of Jonathan Wizbang's capital gains deal was they changed it to say -- because there were private letter rulings when we used this thing that he created. There were private letter rulings that said that the value of the remainder interest could be one thousandth of one percent. Now, is that low enough?

[redacted]: Uh-huh.

GMK: Well, they came back and said, Well, ah-hah, we'll fix that by saying that the value the remainder interest under the table -- in other words, after you subtract the income interest, it has to be at least 10 percent.

[redacted]: Uh-huh.

GMK: Because charities knew they wanted to get something but charities didn't want to make it so much that people didn't give them anything.

[redacted]: Uh-huh.

Copyright 2000 The Heritage Organization, L.L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: So consequently most charitable remainder trusts are done for tax benefits. Just like Jonathan said. You can go into court ask say Yeah, Judge, I followed the rules and I did it because I got tax benefits.

[redacted]: Yeah, it's a way of getting out of low cost basis stock and having a nice income all your life and managing your money the way you want to.

GMK: That's exactly right.

[redacted] And when you die the CRT has very little left.

GMK: That's right. But the key thing here is that most people don't want to tie up their money and lose control of it. That's the reason why this whole thing of buying back the remainder interest is so nifty; you get the money back.

[redacted]: Yeah.

GMK: And remember one --

[redacted]: Would you say to these guys that before you nominated them to be on -- say, Hey, listen, I'm planning on buying back interest. Would you have any objection to that?

GMK: Right. That's exactly that you say. Here's what you'd say: You'd say, After this is done I'm thinking about --

[redacted]: After what is done?

GMK: Excuse me?

[redacted] After what is done?

GMK: I'm going to set up a charitable remainder trust and I'm going to make the supporting org to be the final beneficiary but I really don't want the supporting org to have to wait 20 years to have the money to send out to people. So what I'm going to do is I'm going to eventually -- I might come back in and buy the supporting orgs interest in the trust so it gets the money up front that we can distribute now. Would that be okay with you?

Copyright 2000 The Heritage Organization, L L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C. only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

[redacted]: Uh-huh.

GMK: What do you think they are going to say? No, don't do that? It makes you sound like a hero, not a shmuck.

[redacted]: But then they're going to say, Well, how much are you going to pay for that?

GMK: Well, say, We'll just get it appraised. I'll pay the appraised value.

[redacted]: Then who appraises it?

GMK: Any appraiser is going to appraise it. They are going to take discounts for the L.L.C. interest and they are going to take discounts for time.

[redacted]: Have you done this before?

GMK: No. Sorry. You'll always hear the truth, [redacted]. Hold on a second I got another call, [redacted].

[redacted]: Yeah.

GMK: You know, I always say there is three answers to every question: Yes, no, and I don't know but I'll find out.

[redacted]: Yeah.

GMK: That was a definite no.

[redacted]: Okay. What if you don't want to get it appraised? You want to just say, Well, I'm going to buy it out for --

GMK: [redacted], we need it appraised.

[redacted]: You do?

GMK: Yeah, you need it appraised. And the reason is because if you ever get challenged on that thing, you want to have some good reason. You know you are going to get an appraisal for less than face value.

[redacted]: Which is 10 percent.

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: Yeah. And you've gotten four back and you're down to six. So if they discount the 10 percent by three percent, then your cost is only three percent. If they discount it by half, it's practical zero.

[redacted]: You mean take 30 percent off of 10 percent?

GMK: Yeah. If they discount it by 10 --

[redacted]: Let me get a pen.

GMK: But you've already gotten back -- it's only cost you six. In other words, it's cost you six and you put up 10 and you bought it back for seven and you got a tax savings of four.

[redacted]: Hold on. You put up a million.

GMK: Okay. Put up a million. So your remainder interest was worth a thousand.

[redacted]: Uh-huh.

GMK: That tax deductions saved you -- you bought that hundred thousand dollars back at let's just call it a 30 percent discount, okay? So that means you bought it back for 70 and you deducted the hundred and so you've now saved 40. So 70 minus 40 is 30. So your true cost for having 70 thousand dollars in your supporting organization is only 30 thousand dollars.

[redacted]: You put up a million and you got a hundred thousand dollar deduction. You --

GMK: You buy it back for 70.

[redacted]: So cash is worth 40 thousand.

GMK: Well, don't do the tax deduction first, do the purchase first.

[redacted]: Purchase what?

GMK: In other words, you're going to buy that hundred thousand dollars back for 70, right?

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

[redacted]: No. No. No. So far I put up a million dollars.

GMK: Right. You're there.

[redacted]: I got a hundred thousand dollar deduction.

GMK: Right. But that's how much under the IRS table the valuable of the remainder interest in 20 years.

[redacted]: Okay.

GMK: But when you go to an appraiser and they appraise it at something more than seven percent and for lack of liquidity and all the other negatives that are there, then you get a --

[redacted]: But I still get a hundred thousand dollars tax deduction, didn't I?

GMK: Yes. You still got the hundred thousand dollar tax deduction but when you buy it back you only buy it back for 70 because they are getting the money now instead of having to wait 20 years at seven percent.

[redacted]: Well, my point is is that when you're talking cash --

GMK: I'm going to show you cash.

[redacted]: All right.

GMK: So the cash that you put out is 70 thousand to buy it back, right? Because that's all the charity got. In other words, the tax deduction was a hundred but the charity only got a remainder interest which the IRS table said was worth a hundred but you bought back for 70.

[redacted]: Uh-huh.

GMK: So you've now gotten 90 percent of the money that you put into the CRT, right?

[redacted]: Well, let's not talk percent. Let's just talk dollars. I put up a million -- let's talk cash. I put up a million and the tax deduction is worth 40 thousand to me.

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: Okay. So now you've got -- the charity -- you've now put up --

[redacted]: And then I --

GMK: So you're now a million 40 thousand.

[redacted]: I have a minus of 70.

GMK: Wait. Let's just do this: Let's do it cash. You put up a million and subtract 40 and you're now at 960.

[redacted]: Okay.

GMK: So you got that back. You've got -- I'm sorry, you have to add 40 because the million comes back to you.

[redacted]: All right. A million --

GMK: So it's a million and 40 thousand. You've gotten benefit out of putting out the million.

[redacted]: Okay.

GMK: Now, you buy the hundred thousand dollar remainder interest for 70. So subtract 70 thousand from a million 40 and that's your net cost.

[redacted]: So it's 970.

GMK: Yep.

[redacted]: Hold on a second, okay?

GMK: Yep.

[redacted]: Hello?

GMK: Yes.

[redacted]: So 970 is the net cash I get back.

GMK: Right. So now you've gotten 70 thousand dollars into your supporting org and it's only cost you 30.

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

[redacted]: Right. I started out with a million.

GMK: Right.

[redacted]: And --

GMK: You gained 40 thousand from tax savings.

[redacted]: The net cash I get back is 970.

GMK: That's right.

[redacted]: So it's cost me 30 thousand dollars.

GMK: Right. Out of your pocket and where did the money go? Where did the cash go?

[redacted]: There is no other cash. The 970 came back to me.

GMK: No. No. That's right. All that 970 came back to you but remember there was a million 40 on the table. So 70 thousand dollars after you bought back the remainder interest ended up over in your supporting org. Well, where could you put out 30 thousand dollars and get 70 into your charitable foundation?

[redacted]: Well, let's see. I buy for 70 the remainder interest in the supporting org.

GMK: Uh-huh.

[redacted]: So the 70 thousand stays there in the supporting org, right?

GMK: Right. And you manage it. You distribute out however much you want every year. It's a terrific deal. From just meeting your own things that you want to do for charity over time --

[redacted]: Uh-huh.

GMK: It's a terrific deal.

[redacted]: Yeah, but it'd not going to cost me a lot, is it?

Copyright 2000 The Heritage Organization, L.L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

GMK: No.

[redacted]: It's pretty management intensive for a small --

GMK: It's not -- [redacted], honest to God it's not that management intensive.

[redacted]: Well, I just worry about -- if I set this thing up it can really be a disaster if these trustees -- do you call these calls trustees?

GMK: Yes.

[redacted]: If they wouldn't let me buy it out.

GMK: Well.

[redacted]: They said, Oh, we have second thoughts on this, [redacted].

GMK: [redacted], how many trustees are you going to have?

[redacted]: We're going to have six.

GMK: Okay. Can I be one of them?

[redacted]: Yeah.

GMK: Okay. I promise to vote.

[redacted]: I guess we have control now.

GMK: (Laughing.)

[redacted]: (Laughing.) Okay.

GMK: Okay.

[redacted]: Majority rules.

GMK: Right.

[redacted]: Okay.

GMK: The Golden Rule: He who has the goal makes the rules.

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

[redacted]: Uh-huh. Then I can name six little 10 years olds. (Laughing.).

GMK: (Laughing.) I think they have to be age of majority, [redacted].

[redacted]: (Laughing). Oh, okay. And we'd meet once a year or something like that, right?

GMK: Right. By phone.

[redacted]: I'll just have a presentation to them as to how much we're giving on the phone and to who?

GMK: Right. You send out a fax saying, I think the supporting org -- as Chairman of the Board of the supporting org I think we should give this money to these things. All in favor, say I.

[redacted]: Uh-huh.

GMK: You know you can't have a hand vote by phone. Nobody can see whose holding their hand up until we have video conferencing.

[redacted]: You cannot have a vote by phone?

GMK: I'm joking. You can't have a hand vote by phone because --

[redacted]: (Laughing.) I understand. Right. All in favor say "I.". Okay. I think that can work.

GMK: Oh, it's easy.

[redacted]: The only question is this buy out thing. So who would be the appraiser?

GMK: We'd get some official appraiser company so if the IRS ever came in and asked, I mean it would be some real appraisal company. There are a number of them.

[redacted]: Are there?

GMK: Oh, yeah, lots of them.

[redacted]: I used to know someone who would do that kind of thing.

Copyright 2000 The Heritage Organization, L L C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C. only in the normal performance of their duties as an employee of The Heritage Organization, L L.C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: Oh, well, there's Lamat, which we use a lot. There's Empire Appraisal up your way. There's a bunch of them.

[redacted]: You've used them?

GMK: Oh, yeah.

[redacted]: Okay. All right, well, I guess I just have to figure out -- it looks like I am not going to be able to really seriously go after the 250 -- setting up that 250 of losses this year the way the market conditions are right now.

GMK: Right. I understand.

[redacted]: Maybe I could do it with the AT&T stock.

GMK: Well, that will give you some of it.

[redacted]: Yeah.

GMK: But you know, the question is --

[redacted]: 130.

GMK: Hold on one second, [redacted], while you're figuring it. Let me get this call

(GMK gets another call).

GMK: [redacted]?

[redacted]: Yeah.

GMK: Okay.

[redacted]: When we get an appraisal on this and these guys think they are involved in a tax scheme.

GMK: This is not a tax scheme, [redacted]. This is a way for you to get some money into the is supporting org so you can give it out earlier. Isn't that nice of you?

Copyright 2000 The Heritage Organization, L L.C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

[redacted]: Yeah. Real generous.

GMK: It is.

[redacted]: If I, for example -- if that didn't work I could always go and skip the supporting org and go directly with the charity and say, How would you like to get some money real quick without waiting 20 years?

GMK: Right. This is not hard, [redacted]. Now remember one thing though.

[redacted]: Yeah.

GMK: For me serving as a director there is a fee. You told me you would take me on a ride on the G-5 with all this money you're saving.

[redacted]: You're going to have a G-5.

GMK: No. No. No. Speaking of moan, which I hate to be crass about, but would you please send us our money?

[redacted]: Okay. I'll focus on that today.

GMK: I'd appreciate it.

[redacted]: Are you going to be around if I have any questions?

GMK: Yes. I'll be home.

[redacted]: Is that based on what the closing price is that day we started or what?

GMK: Yes. That is based on the 1.59. Whatever we did it was based on the size of the transaction.

[redacted]: Yeah, I know. But then you have to figure out -- like if we did it with today's prices it would be a lot lower because the price of the stock has gone down.

GMK: No. It's not the price of the stock, it's the amount of the tax benefit created; that's based on the value of the bonds.

[redacted]: Oh, that's based on value of the bonds. The bonds have gone down, too. No, they have gone up.

Copyright 2000 The Heritage Organization, L L.C.
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: (Laughing.) they have gone up. You don't want to go there.

[redacted]: By the way, I haven't gotten my report from Andy last night, the buy back and all that.

GMK: Okay. I will see what happened. That was he that was just calling me on the other line. I'll call him back and make sure he faxes it to you.

[redacted]: Would you have him call me and see what's going on?

GMK: I'll do it. Now I'm at my office at home, which is 214 --

[redacted]: Hold on.

GMK: 361 --

[redacted]: Yeah.

GMK: -- 9935. Let me ask you a question: I know you are as good as I am about putting papers in safe places. Do you want us to send you another invoice and another wire transfer instructions to make it easy on you?

[redacted]: Well, when you gave me the invoice you gave me the wire instructions, didn't you?

GMK: Yes.

[redacted]: That's okay. I think I have all that.

GMK: That's fine. I've been known to put stuff in a big pile of safe places.

[redacted]: (Laughing.) Well, that does happen sometimes, I guess.

GMK: I understand.

[redacted]: All right. If you hear anything about this Marshall Fields --

GMK: Okay. I will see what -- where did you see this, [redacted]?

[redacted]: Somebody mentioned it to me at a dinner last night. I had a little wine so I don't remember who it was.

Copyright 2000 The Heritage Organization, L L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

GMK: Let me just tell you, there are some transactions out there that are really, really flaky. I mean, I hate to say it, but I mean, they just don't make any sense. We see them every day.

[redacted]: Yeah.

GMK: I mean, you never know what happened but you have to understand one other thing: If you look at the -- oh, who was the family that had the big publishing company? Connast.

[redacted]: Oh, Neuhouse.

GMK: Neuhouse, that was the one. Okay. They had a tax court case that went on for years where the IRS assessed massive amount of penalties. They went on and on and on. In fact, the Neuhouse case was the case that prompted Congress to put in the opinion rules. Because the IRS in an attempt to club them assessed such massive penalties that they went to court and the IRS lost.

So just because somebody has had some kind of assessment against them, it doesn't mean a damn thing. In the Fulcom case, they assessed the tax against Turner. Understand that doesn't mean a damn thing. Having the tax assessed doesn't mean a thing. The question is how does it end up. And I can tell you how yours is going to end up, you're not going to pay any tax.

[redacted]: Well, frankly, to me --

GMK: Hold on one second will you? I'm sorry.

(GMK takes another call)

[redacted]: To me it's pretty clear that when you look at the transactions, it's not designed to make money. It's a tax avoidance scheme.

GMK: Tax avoidance is okay, [redacted]. If you sell a stock 364 days, it's short term capital gain. If you hold it two more days it's long-term capital gain. That is pure tax avoidance. You didn't think it was going to dramatically increase in two days, more than likely. If something asked you why you sold that stock and held it that extra two days, you could say I wanted to pay long-term capital gain instead of short term

Copyright 2000 The Heritage Organization, L L C
This document and the information contained in it are Confidential Information owned by The Heritage Organization, L L.C The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L L C only in the normal performance of their duties as an employee of The Heritage Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L.C is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law

capital gain. There is nothing wrong with tax avoidance if there are other legitimate business purposes. And there are legitimate business purposes to everything you are doing here. You are doing it to make a profit. You are not hedged.

[redacted]: I'm (Inaudible.).

GMK: (Laughing.) You're really at risk, you know that. You wouldn't argue that with anybody, would you?

[redacted]: How much -- have Andy call me. Are you getting ready to call him back?

GMK: Yeah. I'll call Andy right now.

[redacted]: Okay. Talk to you later.

GMK: Okay.

[redacted]: Bye.

GMK: Bye.

(End of phone meeting.)

Copyright 2000 The Heritage Organization, L.L.C
This document and the information contained in it are Confidential Information owned by The Heritage Organ removal, copying or disclosure of this document and the information contained in it by anyone, other than an a employee of The Heritage Organization, L.L.C only in the normal performance of their duties as an employee o Organization, L L C without the express written approval of the Chief Executive of The Heritage Organization, L.L prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the

GOERIG & ASSOCIATES, L.L.C.

1007 West 3rd Avenue, Suite 301
Anchorage, Alaska 99501
Telephone (907) 278-9926
Facsimile (907) 279-9926

George E. Goerig
Laurie Beth Gregory

February 25, 2002 VIA FASCIMILE & CERTIFIED MAIL

Mr. Brian Czerwinski
The Heritage Organization, L.L.C.
Suite 800, East Tower
5001 Spring Valley Road
Dallas, TX 75244-3942

RE: Updated appraisal of the R, R, M & C Group Limited Partnership

Dear Mr. Czerwinski:

This letter is in response to your inquiry regarding updating the prior appraisal of R, R, M & C Group Limited Partnership as of January 31, 2002. My research has indicated that the empirical data that I used in the original appraisal is still valid relating to the discounts applied to the net asset value of the partnership as of January 31, 2002. The empirical data used to establish the marketability discount and the prior appraisal is still valid for a re-appraisal as of January 31, 2002.

However, there has been an increase of $3,913,384.00 to the net asset value of the Partnership from September 21st, 2001 through January 21st, 2002. Thus the adjusted net asset value of the R, R, M & C Group Limited Partnership is $75,694,095.00 as of January 31st, 2002.

Based on my analysis of the R, R, M & C Group Limited Partnership and all of the factors affecting its value, it is my opinion that the fair market value of a 24.975% interest in the business's Limited Partnership units as of January 31, 2002 is $5,482,334 and is calculated as follows:

| | |
|---|---|
| Adjusted net asset value of LP | $75,694,095 |
| Less: Discount established by the public market (42%) | ($31,791,520) |
| Fair market value prior to marketability discount | $43,902,575 |
| Less: Lack of marketability discount (50%) | ($21,951,288) |
| Fair Market Value of 100% interest in | |

GOVERNMENT EXHIBIT 27
PENGAD-Bayonne, N.J.

Feb-25-2002 02:59pm From- T-479 P.002/003 F-093

| | |
|---|---|
| The R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001 | $21,951,287 |
| Limited Partners gift value ($20,816,406 x 24.975%) | <u>$5,482,334</u> |

If you have any questions regarding my findings please do not hesitate to contact me.

Very Truly Yours,

George E. Goerig

GEG:amg

**Merrill Lynch**

# PRIORITY CLIENT WCMA® ACCOUNT

**Total Account Value As Of 02/28/2002 $10,080.03**

R, R, M & C GROUP, LP
C/O CONSELLATION BRANDS
300 WILLOWBROOK OFFICE PARK
FAIRPORT, NY 14450-4222

YOUR FINANCIAL ADVISOR:
CANANDAIGUA GROUP
(800) 848-7658

Your Merrill Lynch Office:
25 NORTH STREET
CANANDAIGUA NY 14424

FOR CUSTOMER SERVICE QUESTIONS: 1-800-MERRILL (1-800-637-7455)

**Monthly Portfolio Summary**

| Asset | 01/31/02 Value | % | 02/28/02 Value | % |
|---|---|---|---|---|
| Cash/Money Accounts | 49 | 100 | 10,080 | 100 |
| CD's/Equivalents | | | | |
| Government Securities | | | | |
| Corporate Bonds | | | | |
| Municipal Bonds | | | | |
| Equities | | | | |
| Mutual Funds | | | | |
| Options | | | | |
| Other | | | | |
| **Long Market Value** | 49 | | 10,080 | |
| Short Market Value | | | | |
| Estimated Accrued Interest | | | | |
| Debit Balance | | | | |
| **Net Portfolio Value** | 49 | | 10,080 | |

**Income Summary**

| | This Statement | Year-to-Date |
|---|---|---|
| Money Fund Dividends | 2.68 | 2.73 |
| Tax-Exempt Funds | | |
| Tax-Exempt Interest | | |
| Reportable Interest | | |
| Reportable Dividends | | |
| Income Not Reported | | |
| Total | 2.68 | 2.73 |

**Items for Attention**

| Security | Message | Date |
|---|---|---|
| | No Items For Attention | |

**Purchasing Power** 10,080

**Financial Market Indicators**

| | This Statement | Last Statement | Previous Year-End |
|---|---|---|---|
| Dow Jones Industrial Average | 10106.13 | 9920.00 | 10021.64 |
| Three-Month Treasury Bills | 1.75% | 1.75% | 1.71% |
| Long-Term Treasury Bonds | 5.42% | 5.43% | 5.47% |

**NEWS**

The Merrill Lynch Business Center provides the tools, tips and information that can help you run your business. Visit www.businesscenter ml.com to access your business account online, read featured articles, view SBTV's 'The Money Channel' for business tips and insights and learn about the products and services that Merrill Lynch has to offer.

GOVERNMENT EXHIBIT 28
PENGAD-Bayonne, N. J.

PLEASE SEE REVERSE SIDE

0019199

Page 2 of 11 Statement Period 02/01/02 TO 02/28/02 Account No [redacted]

016015 1005

Merrill Lynch

PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

## Cash Flow Summary

| Activity Summary | This Statement | Year-to-Date |
|---|---|---|
| Opening Balance Cash & Money Accounts | 49.54 | |
| Net Credits & Debits | 10,030.49 | 10,030.54 |
| Closing Balance Cash & Money Accounts | 10,080.03 | |

| Credits | This Statement | Year-to-Date |
|---|---|---|
| Sales | 43,267.50 | 43,267.50 |
| Income | 2.68 | 2.73 |
| Funds Received | | |
| Electronic Tfrs | | |
| Other | 151,206,098.69 | 151,206,098.69 |
| Total Credits | 151,249,368.87 | 151,249,368.92 |

| Debits | This Statement | Year-to-Da |
|---|---|---|
| Purchases | 43,267.50 | 43,267. |
| Withdrawals | | |
| Electronic Tfrs | | |
| Other | 151,196,070.88 | 151,196,070. |
| Total Debits | 151,239,338.38 | 151,239,338. |

## Current Portfolio

| Quantity | Security Description | Date Acquired | Adjust/Unit Cost Basis | Total Cost Basis | Estimated Market Price | Estimated Market Value | Unrealized Gain or (Loss) | Estimated Accrued Interest | Estimated Annual Income | Curren Yield % |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash and Money Accounts | | | | | | | | | | |
| 10,080 | CMA MONEY FUND | | 1.00 | 10,080 | 1.00 | 10,080 | | | 171 | 1.70 |
| Total Cash and Money Accounts | | | | 10,080 | | 10,080 | | | 171 | 1.70 |
| Total of Long Portfolio | | | | 10,080 | | 10,080 | | | 171 | 1.70 |

## Monthly Activity

| Date | Transaction | Quantity | Description | | Price | Debit | Credit |
|---|---|---|---|---|---|---|---|
| Security Transactions | | | | | | | |
| 02/11 | Reclaim | 1,350 | MBNA CORP | COM | | 43,267.50 | |
| 02/19 | Journal Entry | -1,350 | MBNA CORP<br>ADJUST RECLAIM<br>AS OF 02/11/02<br>VS [redacted] UNIT 512<br>BATCH # = 14215372266 | COM | | | 43,267.50 |

Merrill Lynch

PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

*Monthly Activity*

| Date | Transaction | Quantity | Description | Price | Debit | Credit |
|---|---|---|---|---|---|---|
| **Net Total** | | | | | | |
| **Dividends and Interest** | | | | | | |
| 02/13 | Cash Dividend | | CMA MONEY FUND FROM 01-31 THRU 02-12 | | | .02 |
| 02/27 | Cash Dividend | | CMA MONEY FUND FROM 01-31 THRU 02-26 | | | 2.66 |
| **Net Total** | | | | | | 2.68 |
| **Other Activity** | | | | | | |
| 02/14 | Journal Entry | | TR FROM [redacted] N/O MRS MARILYN D SANDS VS [redacted] UNIT 41W BATCH # = 00030160800 | | | 1,000.00 |
| 02/14 | Journal Entry | | TR FROM [redacted] N/O CWC PARTNERSHIP I VS [redacted] UNIT 16P BATCH # = 00030211070 | | | 1,000.00 |
| 02/14 | Journal Entry | | TR FROM [redacted] N/O R, R, M & C MGT CORP VS [redacted] UNIT 16P BATCH # = 00030211080 | | | 5.00 |
| 02/14 | Journal Entry | | TR FROM [redacted] N/O MR ROBERT SCOTT SAND VS [redacted] UNIT 16P BATCH # = 00030211100 | | | 1,000.00 |
| 02/14 | Journal Entry | | TR FROM [redacted] N/O MR RICHARD ELLIOT SA VS [redacted] UNIT 16P BATCH # = 00030211110 | | | 1,000.00 |
| 02/19 | Journal Entry | | TR FROM [redacted] N/O MRS MARILYN D SANDS VS [redacted] UNIT 41W BATCH # = 00030183868 | | | 1,507.00 |
| 02/19 | Journal Entry | | TR FROM [redacted] N/O CWC PARTNERSHIP I VS [redacted] UNIT 16P BATCH # = 00030242118 | | | 1,507.00 |

+ PLEASE SEE REVERSE SIDE

Merrill Lynch

PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

*Monthly Activity*

| Date | Transaction | Quantity | Description | Price | Debit | Credit |
|---|---|---|---|---|---|---|
| **Other Activity** | | | | | | |
| 02/19 | Journal Entry | | TR TO [redacted] N/O R, R, M & C MGT CORP VS [redacted] UNIT 16P BATCH # = 00030242128 | | 5.00 | |
| 02/19 | Journal Entry | | TR FROM [redacted] N/O MR RICHARD ELLIOT SA VS [redacted] UNIT 16P BATCH # = 00030242168 | | | 1,507.00 |
| 02/20 | Journal Entry | | TR FROM [redacted] N/O MR ROBERT SCOTT SAND VS [redacted] UNIT 16P BATCH # = 00030241259 | | | 1,507.00 |
| 02/26 | Journal Entry | | ML PREMIER | | 75,263,048.00 | |
| 02/26 | Journal Entry | | TR TO [redacted] N/O RICHARD SANDS TTEE VS [redacted] UNIT 16P BATCH # = 00030256509 | | 166,477.40 | |
| 02/26 | Journal Entry | | TR TO [redacted] N/O ROBERT SANDS TTEE VS [redacted] UNIT 16P BATCH # = 00030256509 | | 166,477.40 | |
| 02/26 | Journal Entry | | TR TO [redacted] N/O CWC PARTNERSHIP I TT VS [redacted] UNIT 16P BATCH # = 00030256509 | | 166,477.40 | |
| 02/26 | Journal Entry | | TR TO [redacted] N/O MARILYN SANDS TTEE VS [redacted] UNIT 16P BATCH # = 00030256509 | | 166,477.40 | |
| 02/26 | Journal Entry | | TR FROM [redacted] N/O R, R, M & C PARTNERS VS [redacted] UNIT 16P BATCH # = 00030256519 | | | 75,928,957.40 |
| 02/27 | Journal Entry | | ML PREMIER | | | 75,267,108.29 |
| 02/27 | Journal Entry | | TR TO [redacted] N/O RICHARD SANDS TTEE VS [redacted] UNIT 16P BATCH # = 00030241254 | | 94,307.04 94,313.60 | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 94,307.04 | |

PLEASE SEE REVERSE SIDE



G060D 11-01

Merrill Lynch

PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

*Monthly Activity*

| Date | Transaction | Quantity | Description | Price | Debit | Credit |
|---|---|---|---|---|---|---|
| **Other Activity** | | | | | | |
| | | | N/O ROBERT SANDS TTEE<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241264 | | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O CWC PARTNERSHIP I TT<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241274 | | 94,307.04 | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O MARILYN SANDS TTEE<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241284 | | 94,307.04 | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O MR RICHARD ELLIOT SA<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241294 | | 18,703,680.15 | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O MR ROBERT SCOTT SAND<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241304 | | 18,703,680.15 | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O CWC PARTNERSHIP I<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241314 | | 18,703,680.15 | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O R, R, M & C MGT CORP<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241324 | | 75,159.52 | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O MICKEY SANDS LIFE ES<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241334 | | 18,703,680.15 | |
| **Net Total** | | | | | | 10,027.81 |

PLEASE SEE REVERSE SIDE

APP-A--000331

Merrill Lynch

PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

*Monthly Activity*

| Date | Transaction | Quantity | Description | Price | Debit | Credit |
|---|---|---|---|---|---|---|
| **Other Activity** | | | | | | |
| | | | N/O ROBERT SANDS TTEE<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241264 | | | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 94,307.04 | |
| | | | N/O CWC PARTNERSHIP I TT<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241274 | | | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 94,307.04 | |
| | | | N/O MARILYN SANDS TTEE<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241284 | | | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 18,703,680.15 | |
| | | | N/O MR RICHARD ELLIOT SA<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241294 | | | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 18,703,680.15 | |
| | | | N/O MR ROBERT SCOTT SAND<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241304 | | | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 18,703,680.15 | |
| | | | N/O CWC PARTNERSHIP I<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241314 | | | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 75,159.52 | |
| | | | N/O R, R, M & C MGT CORP<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241324 | | | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 18,703,680.15 | |
| | | | N/O MICKEY SANDS LIFE ES<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241334 | | | |
| **Net Total** | | | | | | 10,027.81 |



DOJ-004969

DOJ-004970

APP-A--000332

Merrill Lynch

# PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

## Daily Activity Review

| Date | Transaction | Quantity | Description | Price | Amount | Cash Balance | Money Account Balance |
|---|---|---|---|---|---|---|---|
| 01/31 | Opening Balance | | | | | .54CR | 49 |
| 02/11 | Reclaim | 1,350 | MBNA CORP COM | | 43,267.50 | 43,266.96 | 49 |
| 02/12 | Sale | -49 | CMA MONEY FUND | | 49.00CR | | |
| | | | REDEMPT AS OF 02/11/2002 | | | 43,217.96 | |
| 02/13 | Cash Dividend | | CMA MONEY FUND | | .02CR | | |
| | | | FROM 01-31 THRU 02-12 | | | 43,217.94 | |
| 02/14 | Journal Entry | | TR FROM [redacted] | | 1,000.00CR | | |
| | | | N/O MRS MARILYN D SANDS | | | | |
| | | | VS [redacted] UNIT 41W | | | | |
| | | | BATCH # = 00030160800 | | | | |
| 02/14 | Journal Entry | | TR FROM [redacted] | | 1,000.00CR | | |
| | | | N/O CWC PARTNERSHIP I | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030211070 | | | | |
| 02/14 | Journal Entry | | TR FROM [redacted] | | 5.00CR | | |
| | | | N/O R, R, M & C MGT CORP | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030211080 | | | | |
| 02/14 | Journal Entry | | TR FROM [redacted] | | 1,000.00CR | | |
| | | | N/O MR ROBERT SCOTT SAND | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030211100 | | | | |
| 02/14 | Journal Entry | | TR FROM [redacted] | | 1,000.00CR | | |
| | | | N/O MR RICHARD ELLIOT SA | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030211110 | | | 39,212.94 | |
| 02/19 | Journal Entry | | TR FROM [redacted] | | 1,507.00CR | | |
| | | | N/O MRS MARILYN D SANDS | | | | |
| | | | VS [redacted] UNIT 41W | | | | |
| | | | BATCH # = 00030183868 | | | | |
| 02/19 | Journal Entry | | TR FROM [redacted] | | 1,507.00CR | | |
| | | | N/O CWC PARTNERSHIP I | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030242118 | | | | |
| 02/19 | Journal Entry | | TR TO [redacted] | | 5.00 | | |
| | | | N/O R, R, M & C MGT CORP | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030242128 | | | | |
| 02/19 | Journal Entry | | TR FROM [redacted] | | 1,507.00CR | | |

\+ PLEASE SEE REVERSE SIDE

APP-A--000333

Merrill Lynch

PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

**Daily Activity Review**

| Date | Transaction | Quantity | Description | Price | Amount | Cash Balance | Money Account Balance |
|---|---|---|---|---|---|---|---|
| | | | N/O MR RICHARD ELLIOT SA | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030242168 | | | | |
| 02/19 | Journal Entry | -1,350 | MBNA CORP COM | | 43,267.50CR | | |
| | | | ADJUST RECLAIM | | | | |
| | | | AS OF 02/11/02 | | | | |
| | | | VS [redacted] UNIT 512 | | | | |
| | | | BATCH # = 14215372266 | | | 8,570.56CR | |
| 02/20 | Journal Entry | | TR FROM [redacted] | | 1,507.00CR | | |
| | | | N/O MR ROBERT SCOTT SAND | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030241259 | | | | |
| 02/20 | Purchase | 8,570 | CMA MONEY FUND | | 8,570.00 | 1,507.56CR | 8,570 |
| 02/21 | Purchase | 1,507 | CMA MONEY FUND | | 1,507.00 | .56CR | 10,077 |
| 02/26 | Journal Entry | | ML PREMIER | | 75,263,048.00 | | |
| 02/26 | Journal Entry | | TR TO [redacted] | | 166,477.40 | | |
| | | | N/O RICHARD SANDS TTEE | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030256509 | | | | |
| 02/26 | Journal Entry | | TR TO [redacted] | | 166,477.40 | | |
| | | | N/O ROBERT SANDS TTEE | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030256509 | | | | |
| 02/26 | Journal Entry | | TR TO [redacted] | | 166,477.40 | | |
| | | | N/O CWC PARTNERSHIP I TT | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030256509 | | | | |
| 02/26 | Journal Entry | | TR TO [redacted] | | 166,477.40 | | |
| | | | N/O MARILYN SANDS TTEE | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030256509 | | | | |
| 02/26 | Journal Entry | | TR FROM [redacted] | | 75,928,957.40CR | | |
| | | | N/O R, R, M & C PARTNERS | | | | |
| | | | VS [redacted] UNIT 16P | | | | |
| | | | BATCH # = 00030256519 | | | | |
| 02/26 | Sale | -10,077 | CMA MONEY FUND | | 10,077.00CR | 10,077.36CR | |
| 02/27 | Journal Entry | | ML PREMIER | | 75,267,108.29CR | | |
| 02/27 | Journal Entry | | TR TO [redacted] | | 94,307.04 | | |
| | | | N/O RICHARD SANDS TTEE | | | | |
| | | | VS [redacted] UNIT 16P | | | | |

+ PLEASE SEE REVERSE SIDE



DOL-004971

Merrill Lynch

PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

**Daily Activity Review**

| Date | Transaction | Quantity | Description | Price | Amount | Cash Balance | Money Account Balance |
|---|---|---|---|---|---|---|---|
| | | | BATCH # = 00030241254 | | | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O ROBERT SANDS TTEE<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241264 | | 94,307.04 | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O CWC PARTNERSHIP I TT<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241274 | | 94,307.04 | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O MARILYN SANDS TTEE<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241284 | | 94,307.04 | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O MR RICHARD ELLIOT SA<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241294 | | 18,703,680.15 | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O MR ROBERT SCOTT SAND<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241304 | | 18,703,680.15 | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O CWC PARTNERSHIP I<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241314 | | 18,703,680.15 | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O R, R, M & C MGT CORP<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241324 | | 75,159.52 | | |
| 02/27 | Journal Entry | | TR TO [redacted]<br>N/O MICKEY SANDS LIFE ES<br>VS [redacted] UNIT 16P<br>BATCH # = 00030241334 | | 18,703,680.15 | | |
| 02/27 | Cash Dividend | | CMA MONEY FUND<br>FROM 01-31 THRU 02-26 | | 2.66CR | 10,080.03CR | |
| 02/28 | Purchase | 10,080 | CMA MONEY FUND | | 10,080.00 | | |
| 02/28 | **Closing Balance** | | | | .03CR | .03CR | 10,080 |

PLEASE SEE REVERSE SIDE

DOJ-0004973

Merrill Lynch

PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

**Customer Service** For information about your account, please call 1-800-MERRILL (1-800-637-7455) To report Lost or Stolen Visa Cards or Checks, please call 1-800-262-5678. When requested, enter your Access Code 31-702-07759

PLEASE SEE REVERSE SIDE

0019207

| Page | Statement Period | Account No |
|---|---|---|
| 10 of 11 | 02/01/02 TO 02/28/02 | [redacted] |

015015 1005

Merrill Lynch

# PRIORITY CLIENT WCMA® ACCOUNT

R, R, M & C GROUP, LP

**Agreement Regarding Your Securities Account and Other Important Information**
You, the Client, and we, Merrill Lynch, Pierce, Fenner & Smith Inc., agree as follows:
(1) We will direct your order for a multi-listed security or option to the market place we consider to be the primary market for that security, unless you give us specific instructions to direct the order elsewhere.
(2) We will hold bonds and preferred stocks in bulk segregation (except for those held in custodian accounts). In the event of a call for less than an entire issue or series of those securities, the securities to be called will be automatically selected on a random basis from those held in bulk. The probability that your holdings will be selected is proportional to the amount of your holdings relative to those of other customers.
(3) If you have any obligations to us we can, subject to applicable rules and regulations of regulatory bodies, without notifying you, take any of the following actions with any or all securities in your account, including securities you may acquire or deposit to secure your account.
* We can pledge, repledge, hypothecate, or rehypothecate the securities They may be commingled with securities carried for the accounts of other customers
* We can lend the securities.
* We can deliver the securities on contracts for other customers even if we do not have in our possession and control a like amount of similar securities for delivery.

We can take any of these actions until you have discharged all your obligations to us The amount involved in these actions may be more or less than the amount you owe us.
(4) We are not responsible for the loss or destruction of securities that are placed in the custody of a foreign bank or broker or other custodian, and are lost or destroyed as a result of war, civil commotion, enemy action, government acts or any other causes beyond the control of the depository or us.
(5) This statement of account shall be deemed conclusive if not objected to within ten (10) days
(6) We can transfer your account to anyone by assignment, merger, consolidation or otherwise, unless you give us written notice to the contrary at the time. This agreement will inure to the benefit of anyone to whom we transfer the accounts. Nothing contained in this paragraph shall affect your right to transfer your account under NYSE Rule 412.

**Insurance**
The Securities Investor Protection Corporation (SIPC) protects securities and cash in Merrill Lynch accounts for up to $500,000 per client for securities (including up to $100,000 for cash) Merrill Lynch has obtained coverage in excess of the SIPC limits SIPC and the excess-SIPC protection do not cover assets that are not securities or assets that are not held at Merrill Lynch. Cash on deposit at depository institutions ( through programs such as Merrill Lynch Banking Advantage℠ program, Retirement Asset Savings Program℠ and ISA® program) or certificates of deposit purchased through Merrill Lynch are held at the depository institution, not at Merrill Lynch, and are protected by the Federal Deposit Insurance Corporation (FDIC) rather than by SIPC or excess-SIPC bond. Deposits held in different categories, such as individual, joint, trust, or retirement are separately insured by the FDIC up to $100,000 per depositor in each bank. For details, refer to the Program Description for your account, if applicable, or speak with your Financial Advisor.

**Other Important Information**
(1) We receive a fee from participating institutions of up to 2% per annum of the average daily balances in the ISA program. In the RASP℠ and MLBA℠ programs, this fee is up to .50% and is paid by our affiliated banks.
(2) You will have the right to vote full shares, and we will solicit instructions concerning the voting of full shares held in your account. If such instructions are not received by us on a timely basis, the voting shares in your account will be governed by the rules and policies of the New York Stock Exchange and the Securities and Exchange Commission then in effect.

Merrill Lynch, Pierce, Fenner & Smith Inc
World Financial Center
North Tower
New York, N.Y. 10281-1332
Member, Securities Investor Protection Corporation (SIPC)

**Other Important Information (Continued)**
(3) This statement serves as a confirmation of purchases that result from automatic reinvestment transactions, as well as your AIPS transactions, during the statement period
(4) Insurance policy information is based on data from the insurer that issued the policy. Merrill Lyn is not responsible for the calculation of policy values Policies are generally not held in your Merrill Lynch account. If Merrill Lynch as custodian or trustee holds a policy that is a security, SIPC protection and excess SIPC protection applies
(5) As an option customer, please advise your Financial Advisor promptly of any material change in your investment objectives or financial condition. Individual options commission charges have been included in your confirmation, however, a summary of this information will be made available to you upon request.
(6) Our financial statement is available for your personal inspection at our office, or a copy of it will mailed upon your written request

**Special Note:** If your records differ from this information, please notify your Financial Advisor in writing with a copy of the statement noting the discrepancy and, if appropriate, any necessary adjustments will be made.

**WCMA Loan Account Activity**
Reports important information from Merrill Lynch Business Financial Services Inc (MLBFS) through which the WCMA Line of Credit is made available. Includes information on your Line of C Loan Balance, Interest Accrued, and Loan Interest Paid Year-to-Date Interest charges accrue daily during the statement period with each day being deemed to constitute 1/360 of a year Refer to the WCMA Agreement and documents required by MLBFS for details

**Managed Trust Units**
Information for RCMA for Business Retirement Plan clients on units of the Merrill Lynch GIC Managed Trust is reported from information supplied by the Merrill Lynch Trust Company or its ag Neither the Trust nor its units are held in your Merrill Lynch, Pierce, Fenner & Smith Inc account a therefore, are not subject to SIPC protection An annual report will be furnished separately.

**Symbols and Abbreviations**

| | |
|---|---|
| II | Interest reported to IRS by Merrill Lynch as required by law |
| * | Gross Proceeds reported to the IRS by Merrill Lynch as required by law |
| * | Dividends reported to the IRS by Merrill Lynch as required by law. |
| ** | Merrill Lynch maintains a fundamental opinion on this company |
| . | Transactions reported to IRS |
| # | Transaction you requested required same-day payment - MLPF &S retained last day's dividend to offset cost of advancing payment on your behalf . |
| A | This transaction was effected through a specialist which is our affiliate. In connection with its market making activity, such specialist may have a long or short position in this stock or in options on this stock and may be on the other side of public orders executed on the exchange. Such specialists may have profited or lost in connection with this transaction |
| N/A | Value and/ or cost data not available |
| N/C | Not calculated. |
| N/N | Non-negotiable securities. |
| N/N N/O | Non-negotiable securities held registered in your name. |
| N/O | Held registered in your name. |
| NOCC | Options Clearing Corporation |
| N/O CUST | Non-negotiable Custodian Registration |
| NPC | Interests in assets not registered in the name of nor held by us or our nominees and held by you or registered in your name with the issuer or its agent Merrill Lynch, Pierce, Fenner & Smith Inc. does not control or act as custodian for these investments. |
| RD | Bonds are changeable from coupon to registered and vice versa without charge |
| RG | Bonds registered for both principal and interest |

*** END OF STATEMENT ***

Merrill Lynch Investment Managers

Merrill Lynch Funds For Institutions

PO Box 8118 Boston, MA 02266-8118 (800) 225-1576

Merrill Lynch Premier Institutional Fund

Cumulative Statement for 02/01/2002 - 02/28/2002

Account Number
[redacted]

R R M & C GROUP LP
C/O CONSELLATION BRANDS
300 WILLOWBROOK OFFICE PARK
FAIRPORT NY 14450-4222

Financial Advisor
The Lenz Group
(--70C07P59)

Account Value As Of 02/28/2002
$0.00

Dividends

| 02/01/2002 - 02/28/2002 | Year To Date |
|---|---|
| $4,060.29 | $4,060.29 |

> *ON FRIDAY, MARCH 29, THE MERRILL LYNCH FUNDS FOR INSTITUTIONS WILL BE CLOSED IN OBSERVANCE OF GOOD FRIDAY*

> *THE AVERAGE NET ANNUALIZED YIELD FOR THE MONTH OF FEBRUARY WAS 1 99% THE TRADING DEADLINE ON MARCH 28 IS 3 00 P M ET*

## Account Activity

| Confirm Date | Trade Date | Transaction Description | Dollar Amount of Transaction | Share Price | Balance After Transaction |
|---|---|---|---|---|---|
| | | Beginning Balance | | | $0 00 |
| 02/26/2002 | 02/26/2002 | Shares Purchased By Wire | $75,263,048.00 | $1.00 | $75,263,048.00 |
| 02/27/2002 | 02/27/2002 | Shares Redeemed By Wire | $75,263,048.00 | $1.00 | $0.00 |
| 02/27/2002 | 02/27/2002 | Dividend Cash | $4,060.29 | $1.00 | $0.00 |
| | | Ending Balance | | | $0.00 |

519574