IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: July 2, 2008)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | |
|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

* * *

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, the United States submits these Proposed Findings of Uncontroverted Fact.[1] These facts rely on allegations in plaintiffs' amended complaints, various trial pleadings, documents produced in plaintiffs' initial disclosures or through discovery, and a declaration of Thomas M. Herrin with exhibits, attached hereto as Appendix A. These facts are proposed here as uncontroverted solely for purposes of summary judgment. The defendant otherwise reserves the right to dispute them. Accordingly, other than for summary judgment purposes, the adoption of terms such as "partnership," "partner," contribution," "distribution," and others consistent with petitioners' characterization of events does not reflect an admission by the defendant that petitioner's characterization of events is correct under applicable local law or for federal income tax purposes.

* * *

[1] On June 4, 2007, the United States filed a set of proposed findings of uncontroverted fact in connection with a motion for summary judgment filed that same day. As stated in the June 4, 2007 motion for summary judgment, the Sands participated in two separate transactions, or sets of transactions, to shelter income from federal taxation. The June 4, 2007 motion addressed the second shelter which was initiated in December 2001. The facts presented here, and discussion in the accompanying motion for summary judgment, address the earlier shelter which was initiated in August 2001.

**UNITED STATES'**
**SECOND SET OF PROPOSED FINDINGS OF UNCONTROVERTED FACT**

## I. THE TAX SHELTER PARTICIPANTS

1. In 2001 and 2002, Robert Sands ("Robert"), Richard Sands ("Richard), Marilyn Sands ("Marilyn") and the Trusts for Abigail ("Abigail's Trust") and Zachary ("Zachary's Trust") Stern engaged in a tax strategy promoted by The Heritage Organization, L.L.C. ("Heritage") to eliminate the capital gains on approximately $75 million in Constellation Brand, Inc. ("Constellation") stock sold October 1, 2001 (the "First Shelter"). Abigail's Trust and Zachary's Trust participated in the transaction though an entity known as CWC Partnership I. Robert, Richard, Marilyn and CWC (the "Sands Heirs"), in turn, participated in the Heritage Strategy through two flow-through entities: R,R,M &C Group, L.P. ("Group") and R,R,M & C Partners, L.L.C. ("Partners"). (App-A-48-104). Although the Sands Heirs were the ultimate recipients of the tax benefits generated by the Heritage Strategy, the adjustments directly at issue in these consolidated proceedings are those made to the various partnerships used by the Sands Heirs as part of the Heritage Strategy. (FPAAs attached to Docket Entries 97 - 103).

2. During the period at issue, Constellation was a leader in the production and marketing of branded beverage alcohol products in North America and the United Kingdom. For the company's fiscal year ending February 28, 2001, Constellation's gross sales exceeded $3 billion. (Docket Entry 34, p. 4, II. 1& 2).[2]

3. Constellation was founded by the late Marvin Sands ("Marvin"). Marilyn is Marvin's widow. Richard and Robert are Marvin and Marilyn's surviving children. Andrew Stern

---

[2] Docket Entry 34 is Plaintiffs' Response to Defendants' Proposed Findings of Uncontroverted Fact, filed July 5, 2007.

("Andrew") is the widower of Marvin and Marilyn's deceased daughter Laurie ("Laurie"). Laurie and Andrew's children are Abigal ("Abigail") and Zachary ("Zachary") Stern. (Docket Entry 34, p. 4-5, II.3,4 &8).

4. During 2001 and 2002, Richard was the Chief Executive Officer, President, and Chairman of the Board of Constellation, and Robert was a Director and Group President of Constellation. (Docket Entry 34, p. 6, II.12).

## II. THE HERITAGE TAX SHELTERS

5. On May 10, 2001, Chet Decker, on behalf of Heritage, contacted Richard to promote a strategy that could reduce federal and state capital gains. Richard and Robert subsequently met with Heritage personnel on May 31, 2001, June 13, 2001 and on June 27, 2001. (Docket Entry 63, pgs. 5 & 10-14).[3]

6. During these meetings, Robert and Richard discussed the elimination of capital gains tax. Specifically, Robert and Richard's goal was to eliminate the capital gains that would result from their sale of Constellation brand stock. (App-A-2; Docket Entry 50, p. 4-6). At these meetings, Heritage stressed the low probability that the transaction would be discovered and audited by the IRS. (Docket Entry 52 in App. B pp. 23-24 & 62).[4] Minimizing the potential of an audit was a goal of Heritage. This theme is equally present in a Heritage transcript of a December 5, 2000 conversation between a different potential investor (not one of the Sands Heirs), Gary Kornman and

---

[3] Docket Entry 63 is Plaintiffs' Response to United States' Alternative Proposed Findings of Fact, filed September 14, 2007.

[4] Docket Entry 50 is the United States' response to the proposed findings submitted by plaintiffs in connection with their MSJ filed July 6, 2007. The specific reference in that pleading is supported by transcripts attached to that pleading. Reference is made to the earlier filing to avoid cluttering the record with duplicate filings. If plaintiffs object to this method, the United States will seek leave to supplement its MSJ Appendix to include the previously tendered transcripts.

Jonathan Blattmachr (the“Blattmacher Transcript”).[5] (App-A-278-323) . Gary Kornman, the founder and one of the principals of Heritage, and Jonathan Blattmachr, a partner with the law firm of Milbank, Tweed, Hadley & McCloy LLP (“Milbank Tweed”) and the author of the opinion letters provided to the Sands Heirs in connection with the CRUT aspect of the First Shelter, worked together to devise the strategies used by the Sands. (App-A-7). In the Blattmachr Transcript, Kornman and Blattmachr discuss both the § 752 and the CRUT strategies with another potential investor and they explain how the use of a charitable remainder trust will minimize the chance of an IRS audit. . In this conversation, Blattmachr states:

> “[T]here are two benefits of the CRT: One, is a huge net of camouflage because there is no program to audit them; and number two, even if they attack the 752 transaction they also have to attack the CRT.” (Blattmachr Transcript p.2).
>
> “So those are two enormously high hurdles for them and also I think the chances of them even finding out about the CRT are exceptionally remote.” (Blattmachr Transcript p.2).
>
> “These are just the rules that Congress has put out. And you could go into court and say, Your Honor, I did this to save income taxes. But everyone that does a CRT is to save income taxes.” (Blattmachr Transcript p.3).
>
> “You don’t need a business purpose, you don’t need a charitable motive. You create your CRT. This way you have a valid CRT.” (Blattmachr Transcript p.3).
>
> “It’s just additional camouflage.” (Blattmachr Transcript p.4).
>
> “[A]gain for all the massinations is one huge net of camouflage. They can’t see your tank from the air.” (Blattmachr Transcript p.12).
>
> “I met with a guy from Arthur Anderson I do a fair amount of work with .... I asked him, I said, How many of your individuals -- I mean really high level individuals are getting audited these days? And he said, Virtually none.” (Blattmachr Transcript p.13).

---

[5] Both the name of the potential investor and any entity references which could serve to identify this individual have been excised from the transcript.

> "There is a risk. If out of the million public charities out there, including the one you will form or Gary will form as a supporting org –
>
> * * *
>
> I'm going to tell you, as a practical matter that isn't going to happen; but yeah, as a practical matter they aint going to happen. But yeah, you take a risk." (Blattmachr Transcript p.15).

In this same conversation, Kornman similarly played down any audit potential stating:

> "Right I totally agree with you. I mean that's the whole point, **(deleted)**, as far as cosmetics go this is probably the – besides the fact that it works is it adds another thing that they would have to overcome on some type of audit. It further – capital gains are never audited and capital gains inside a CRT are just absolutely never audited." (Blattmachr Transcript p.2).
>
> "[O]nce the basis is stepped up see then you have the belt and suspenders. In other words, if you every got challenged on any of this, which once you have these two transactions in place, I think the chances of you even getting looked at are two or three percent at best, at most." (Blattmachr Transcript p.3).
>
> "That's exactly right. Talk about stealth, **(deleted)**, you say you never want to be audited. This guarantees that it'll never be found." (Blattmachr Transcript p.12).
>
> "And for you not to do this I think would be unwise and because I think you're giving up the best camouflage there is." (Blattmachr Transcript p.16)

7. After Robert and Richard's meetings with Heritage personnel, the Sands Heirs engaged in two strategies with Heritage both of which involved a series of tiered partnerships and the short sale of treasury notes. Prior to the Sands Heirs engaging in these two strategies, Heritage prepared and provided the Sands Heirs detailed graphical presentations outlining the steps that needed to be taken in order to possibly realize the tax savings promoted by Heritage. (App-A-4-5; App-A-12-104).

8. The implementation of the first strategy began in August 2001 (the"First Shelter"), and the implementation of the second began in December of 2001 (the "Second Shelter").[6] In both

[6] As previously noted, the second shelter has been addressed in a summary judgment motion filed June 4, 2007.

instances, partnerships were set up for the purposes of the specific Heritage strategy. The primary purpose of both the partnerships and the short sales was the anticipated tax benefit that could result. (App-A-3 & 5).

9. Each step of the two strategies was detailed on a transaction calender prepared prior to the execution of any of the short sale transactions. Moreover, Lewis, Rice & Fingersh, L.C. ("Lewis Rice"), the law firm who wrote one of the two sets of tax opinion letters relied on by the Sands Heirs in these proceedings, was apprised of the various steps set out in the transaction calenders at the beginning of the strategy's implementation. (App-A-5-6; App-A-105-128).

10. The amount of each strategy's short sale was arrived at based on the amount of potential basis that could be applied. If the Heritage client wanted to possibly eliminate all of the tax on the sale of $75 million in stock with a $10 million basis, then $65 million would be the size of the short sales. (App-A-6).

11. The First Shelter also involved the use of four Charitable Remainder Unitrusts ("CRUTs"). Although the CRUTs specified that their terms were for 20 years, the purchase of the remainder interests in the CRUTs and the CRUTs early termination was discussed prior to the time the CRUTs were formed. (App-A-7-9; App-A-48-104; App-A-130-131).

12. The early termination of the CRUT was central to this Heritage Strategy. Blattmachr explains the reasons for early CRUT termination in the Blattmachr Transcript, stating:

> "[W]ere going to keep the CRT a life for a very short period of time, which minimizes what he could be potentially taxed on." (Blattmachr Transcript p.2).
>
> "[F]irst of all, ... we can test the charity by giving it a little bit; but number two, we can make the designation revocable and provide it prior to the time that the interest – before charity gets it's interest by sale or termination, he can change it." (Blattmachr Transcript p.4).

> (JGB) "You name little Red Cross or the supporting org, whatever it is, and if they say Nope. We're really not really interested. Thanks, but we're not really interested in selling. Guess what, your off the list. But nobody is that dumb." (Blattmachr Transcript p.4).

Similarly, Kornman states in the December 5, 2000 conversation:

> "[L]et's just go through it, **deleted** and explain to you how the trustees will work. We'll set up a supporting org. and it will be a Type One supporting org. where certain named charities that it supports elect six directors. Those six directors – there will be a total of 11 directors.
>
> (Kornman) You will have five **deleted**, that will be your family members; so you're the minority.
> (**deleted**) Can't it be a smaller number?
> (Kornman) Well, let me explain to you why. I mean, yeah, it could be but let me explain the purpose of this. The way the vote is set up, you and anyone of those six directors control the Board; your family. Your five plus one control the Board.
> (**deleted**) Okay.
> (Kornman) And all you have to do is have one of those six charitably named directors agree with you. Well strangely enough since you control the Board and control who gets the money, I don't think you're going to have a bit of trouble doing that because your supporting org will support whatever charity the Board votes to support."
>
> * * *
>
> (**deleted**) The supporting org will be the remainder beneficiary of what?
>
> * * *
>
> (Kornman) Of your charitable remainder trust. That's where your money goes when this is over.
> (**deleted**) Okay.
> (Kornman) And it's that Board that you buy it from." (Blattmachr Transcript p.18-19).
>
> (Kornman) "But the key is that most people don't want to tie up their money and lose control of it, That's the reason why this whole thing of buying back the remainder interest is so nifty; you get the money back." (Blattmachr Transcript p.33).

## III. STRUCTURING THE FIRST SHELTER

### A. The Short Sales

13. The first Heritage strategy implemented by the Sands Heirs, involving the short sale of approximately $85,000,000 in U.S. Treasuries, the use of the four CRUTs and the October 1, 2001 sale of 2,002,002 shares of Constellation stock, is diagramed in a document captioned “A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for the Sands Family 7/30/02.” (App-A-48-104).

14. On August 21, 2001, Robert, Richard, Marilyn, Abigail’s Trust and Zachary’s Trust each opened one or more brokerage accounts at UBS PaineWebber, Inc. (“PaineWebber”), infusing each account with several hundred thousand dollars. (Partners Amended Complaint, ¶19 - Docket Entry 99).

15. On August 23, 2001, Robert, Richard, Marilyn, the Abigail Trust and the Zachary Trust each borrowed U.S. Treasury securities from PaineWebber and sold the securities on the open market (the “Short Sales”). The net proceeds of the Short Sales were transferred to their respective brokerage accounts at PaineWebber. (Partners Amended Complaint, ¶20).

16. The net proceeds received from the Short Sales is as follows:

| | | |
|---|---|---|
| Robert | - | $23,451,562.50 |
| Richard | - | $23,451,562.50 |
| Marilyn | - | $23,451,562.50 |
| Abigail Trust | - | $ 7,647,248.65 |
| Zachary Trust | - | $ 7,647,248.65 |

(App-A-48-104).

17. Group was formed August 23, 2001. Group's general partner was R,R,M & C Management Corporation ("RRMC Corp.") and its limited partners were Robert, Richard Marilyn and CWC. (App-A-132-161).

18. On August 27, 2001, both the Abigail Trust and the Zachary Trust assigned their interests in their respective PaineWebber Accounts to CWC. At this time, they also delegated to CWC the responsibility to cover their portions of the Short Sales. (Partners Amended Complaint, ¶21 & ¶22).

19. CWC is a general partnership and its partners are Abigail's Trust, Zachary's Trust, Robert and Richard. (CWC Amended Complaint, ¶2 - Docket Entry 101).

20. RRMC Corp. was incorporated on August 23, 2001. RRMC Corp.'s shareholders were Robert and Richard, each of whom contributed 1,001 shares of Constellation stock. (App-A-162-166).

21. Also on August 23, 2001, Partners was incorporated. (App-A-167-169). The initial members of Partners were Group and Gloria Robinson. (Partners' Amended Complaint, ¶2). [7]

22. Partnership contributions were made to Group on August 28, 2001, as follows:

| | | |
|---|---|---|
| RRMC Corp. | - | 2002 shares of Constellation Brands stock,<br>(with a market value of approximately $84,784.70) |
| Marilyn | - | 500,000 shares of Constellation Brands stock<br>(with a market value of approximately $21,175,000)<br>PaineWebber account, market value $24,310,024.53 |

[7] For purposes of this motion, Gloria Robinson's purported interest in Partners is largely ignored as *de minimus*. The United States notes that to the extent that Gloria Robinson actually held an interest in Partners, that interest was held for less than three weeks when Group purportedly purchased that interest to terminate Partners. (Partners Amended Complaint, ¶30). Gloria Robinson has been diagnosed with a "chronic and progressive neurologic disorder" making her incompetent to testify in a legal proceeding. (App-A-172).

| | | |
|---|---|---|
| Richard | - | 500,000 shares of Constellation Brands stock<br>(with a market value of approximately $21,175,000)<br>PaineWebber account, market value $24,310,024.53 |
| Robert | - | 500,000 shares of Constellation Brands stock<br>(with a market value of approximately $21,175,000)<br>PaineWebber account, market value $24,310,024.53 |
| CWC | - | 500,000 shares of Constellation Brands stock<br>(with a market value of approximately $21,175,000)<br>PaineWebber account, market value $16,150,083.36 |

(App-A-160-161). The cost basis in the contributed Constellation stock was $9,108,119. (Group Amended Complaint ¶¶ 33 & 37 - Docket Entry 100).

23. The responsibility to cover each of the Short Sales was delegated to Group at the time that the PaineWebber accounts containing the Short Sales proceeds were contributed to Group. (Partners Amended Complaint, ¶23 - ¶27).

24. On August 31, 2001, Group contributed the 2,002,002 shares of Constellation stock and the $88,634,419 from the PaineWebber accounts (and the requirement to cover the Short Sales) to Partners for a 99.7163% interest in Partners. Robinson contributed $250,000 for her interest in Partners. (Partners Amended Complaint, ¶28; App-A-178-179).

## IV. INFLATING THE BASIS OF THE CONSTELLATION STOCK

25. On September 6, 2001, Partners closed the Short Sales and recognized a net loss of $425,565. (Partners Amended Complaint, ¶¶ 29).

26. On September 10, 2001, Group purchased Gloria Robinson's interest in Partners. This purchase had the effect of terminating Partners and distributing Partner's assets to Group. (Partners Amended Complaint, ¶30 & 31). Partners reported a tax basis in the Constellation stock as $94,757,364. (App-A-181; Docket Entry 21, p. 5). After the constructive liquidation of Partners, Group allocated its outside basis, including the basis initially attributable to the Short

Sales proceeds, among Partners' remaining assets, claiming an aggregate adjusted tax basis in the Constellation stock of $94,757,364.

27. On September 21, 2001, Robert, Richard, Marilyn and CWC (the "CRUTS Partners") purportedly transferred their respective interests in Group to four charitable remainder trusts: Robert transferred his interest to the Robert Sands Charitable Remainder Unitrust - 2001; Richard transferred his interest to the Richard Sands Charitable Remainder Unitrust - 2001; Marilyn transferred her interest to the Marilyn Sands Charitable Remainder Unitrust - 2001; and CWC transferred its interest to the CWC Charitable Remainder Unitrust - 2001. (Partners Amended Complaint, ¶7). The CRUTs had been established that same day with the grantors designated as the recipient of the mandatory annual payments over the 20 year term of the CRUTs. (App-A-193-228). At this time, Group held $359,290 in cash and 2,002,002 shares of Constellation stock. (Docket Entry 21, p. 5).[8]

28. On October 1, 2001, Group sold the 2,002,002 shares of Constellation stock for $74,862,863. Group reported capital losses from the sale of the stock totaling $19,894,501. (Group' Amended Complaint, ¶32; App-A-171). Group's cost basis in the Constellation stock, which was derivative of its partners' basis in the stock, was $9,108,119. Correspondingly, Partners' basis in the stock was derivative of Group's basis. (Group Amended Complaint, ¶32; Partners Amended Complaint, ¶32; Ex. 1 to Group and Partners' Amended Complaints).

29. Group's inflated basis in the Constellation stock was premised on the proposition that Group's basis in its assets was equal to the partners' cash contributions (primarily the proceeds from the Short Sales unreduced by the liability associated with the obligation to close

[8] Docket Entry 21 is Plaintiffs' Motion to Substitute Certain Parties and to Dismiss.

the Short Sales), plus any prior basis in their contributed Constellation stock. (App-A-48-104). A similar assertion is made in plaintiffs' summary judgment motion with respect to the second Heritage strategy engaged in by the Sands Heirs. (Docket Entry 35, at Fact 5, pgs. 6-7).

30. Heritage, on behalf of the Sands Heirs, obtained an appraisal valuing, for gift tax purposes, the respective partnership interests in Group, as of September 21, 2001 (the date of the purported transfers to the CRUTs) at $5,198,897 each. This appraisal was done by George E. Goerig, an attorney in Alaska. The appraisal applied a 50% discount for marketability, on top of a 42% discount for public market, to the value of Group. In 2001, the CRUT Partners each claimed a charitable deduction of $519,935 attributable to the remainder interests in the CRUTs. At this point, the assets of Group were 2,002,002 share of Constellation stock (valued at $71,421,421) and $359,290 in cash. Goerig's discounted fair market value for Group was $20,816,406. (App-A-182-187; Docket Entry 21, p. 5).

31. On January 28, 2002, each of the CRUT Partners designated the "Sands Supporting Foundation" as the charitable beneficiary of each CRUT. Robert and Richard were named as the "Independent Trustees" of this foundation. (App-A-188-189).[9]

32. On Friday, February 22, 2002, the CRUT Partners revoked their earlier charity designations to the Sands Supporting Foundation and, instead, named the Educational and Health Support Fund (the "Support Fund") as a charitable beneficiary of each trust. The Support Fund had been created on February 22, 2002. Robert and Richard were the grantors of the

---

[9] For all material respects, the designations by the CRUT Partners are identical. To avoid cluttering the record with unnecessary documents, only the designation for Richard has been included in the United States' Appendix. If plaintiffs object to this method, the United States will supplement its Appendix with the additional documents.

Support Fund. The Support Funds' trustees were Freddy H. Robinson ("Robinson"), James A. Locke, III ("Locke") and Wesley M. Stallings ("Stallings"). (App-A-190-228).[10]

33. Robinson is the head of Bernard Robinson & Co. LP, a Greensboro, North Carolina accounting firm that served as the Sands Heirs long-time accounting firm. Robinson is also the son of Gloria Robinson. (App-A-229-234). Wesley Stallings is an accountant at Bernard Robinson. (App-A-235-239). Locke is an attorney with Nixon Peabody, L.P., and a member of the board of Directors of Constellation. (App-A-235-241).

34. Five days after creating the Support Fund, on Wednesday, February 27, 2002, Richard, Robert, Marilyn and CWC purchased the remainder interest in their respective CRUTs from the Support Fund. Each paid a purchase price of approximately $550,000 for his or her remainder interest, for a total of slightly more than $2 million. (App-A-256-258). After Richard, Robert, Marilyn and CWC purchased the remainder interests in the CRUTs, Group is terminated and CWC reported its basis attributable to its former interest in Group (and correspondingly to its interest in the Constellation stock) at approximately $15,000,000 (the amount realized from the August 23, 2001 short sales by Abigail's and Zachary's Trust). (App-A-262).

35. At the time that they purportedly purchased the remainder interests from their respective CRUTs, an updated appraisal was obtained valuing their respective partnership interests at $5,482,334 (for a total $21,951,288), even though Group's assets consisted of $75,694,095 in cash. According to the updated appraisal, the value of Group's assets increased

---

[10] For all material respects, the revocations/designations by the CRUT Partners are identical. To avoid cluttering the record with unnecessary documents, only the designation for Richard has been included in the United States' Appendix. If plaintiffs object to this method, the United States will supplement its Appendix with the additional documents.

by $3,913,384 between September 21, 2001 and January 21, 2002. (App-A-262; App-A-324-325).

36. The February 27, 2001 purchase of the CRUT remainder interests by Richard, Robert, Marilyn and CWC was treated by the parties as causing the termination of each CRUT. Each CRUT Partner thus became the outright owner of an interest in a partnership holding assets, primarily cash, amounting in the aggregate to approximately $75 million. (App-A-48-104). On February 27, 2001, $75,267,108.29 was credited to Group's Merrill Lynch account. On the same day, the entire $75,267,108.29 was paid out by Group as follows: $18,797,987.19 each to Robert, Richard, Marilyn and CWC and $75,159.52 to RRMC Corp. (App-A-326-337).

37. According to the Heritage Strategy, the termination of the CRUTS and the distribution of their assets was not a taxable event. (App-A-48-104).

38. Once again, the Blattmachr Transcript provides greater insight to the structuring of the Heritage tax avoidance scheme, including the use of discounts to minimize any amount paid to the charity for the remainder interest. As Blattmachr and Kornman state, therein:

> (Blattmachr) "Well, what we'll do, Gary I think is to put a new pass through – because we won't even have to represent it – L.L.C. into the trust. That will hold units of **deleted**. Then we'll redeem those units tax free because there will be no gain." (Blattmachr Transcript p.4).
>
> (Blattmachr) "Then the new L.L.C. Will sell them. The L.L.C. is going to give a K-1 to the partnership which is going to slow minimal gain or loss." (Blattmachr Transcript p.4).
>
> (Blattmachr) "And the that CRT is going to give a K-1 to **deleted** showing minimal gain or loss." (Blattmachr Transcript p.4).
>
> (Kornman) "Cosmetically it looks better if you don't pull the shares right back out of the partnership. I think that's where Jonathan was going."
> (Blattmachr) "Right. And also all the trust is ever owned are interest in the new L.L.C. and we can claim a discount with the charity we're buying out. All we've ever held is these unmarketable L.L.C. interest." (Blattmachr Transcript p.4).

(Blattmachr) "And the brokerage firms records are going to show virtually no gain or loss because at the time you open up the account with the **deleted** because now we're transferring it from **deleted** over to a new taxpayer, the new L.L.C., the brokerage firm is going to say, What is the basis --
(**deleted**) They don't get involved in that.
(Blattmachr) Well, some of them do.
(GMK) If they do, all you do is tell them and they type it in.

* * *

(Blattmachr) It's just more paperwork in your favor.

* * *

(Blattmachr) [I]t doesn't mean anything but it's a good record. (Blattmachr Transcript p.11-12).

(Blattmachr) "Let's take the worst case scenario on the economics for you. You put in a million dollars, you get a hundred thousand dollars income tax deduction that saves you 40 thousand bucks. You go to a charity and say, I'll pay you a hundred thousand for your remainder interest. You now get a million dollars back that's in the trust, and we believe, tax free. You wind up – you put a million in and you get a million back and you got this tax savings of 40 thousand but the charity has gotten a hundred thousand." Blattmachr Transcript p.23).

(**deleted**) "[H]ow much are you going to pay for [the remainder interest]?
(Kornman) Well, say, "we'll just get it appraised. I'll pay the appraised value.
(**deleted**) Then who appraises it?
(Kornman) Any appraiser is going to appraise it. They are going to take discounts for the L.L.C. interest and they are going to take discounts for time.

* * *

(Kornman) Yeah, you need to get it appraised. And the reason is because if you ever get challenged on that thing, you want to have some good reason. You know you are going to get an appraisal for less than face value." (Blattmachr Transcript p.34).

39. According to United States' expert Jerry McCoy, the trusts were used by their creators as temporary partners in Group during a period when Group realized large amounts of capital gain income from sales of Constellation stock and other securities. Normally, the beneficiaries would have paid tax over the twenty-year trust term on these gains realized by the trusts, under the four-tier system of tax applicable to CRUT beneficiaries. The CRUTs were terminated almost immediately after their remainder interests were purchased, so that the beneficiaries received only two partial distributions. The current beneficiaries acquired nearly

$75 million in assets as a result of their payments of approximately $2 million for the remainder interests. (App-A-271).

40. On September 25, 2003, Richard and Robert, as grantors of the Support Fund, appointed themselves to trustee positions with the Support Fund. (App-A-277).

## V. CLAIMING THE INFLATED BASIS

41. Maintaining that its basis in the 2,002,002 of Constellation stock was $94,757,364, Group reported a total loss on the sale of this stock of $19,894,501. Group's cost basis in the Constellation stock was $9,108,119. (Group Amended Complaint, ¶32; Partners Amended Complaint, ¶32; App-A-171; Docket Entry 21, p. 5). Partners reported a tax basis in the Constellation stock of $94,757,364. (App-A-181). CWC overstated its basis in Group by more than $15,000,000. (App-A-262; Exhibit 1 to CWC Amended Complaint).

## VI. THE FPAA ADJUSTMENTS

42. On December 22, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustments of Group's partnership items for 2001 ("Group FPAA"). The primary adjustment in the Group FPAA reduces the reported basis in Constellation stock from $94,538,125 to $9,108,119, resulting in a long-term capital gain of $65,539,019 and a reduction in short-term capital loss of $219,239. For federal income tax purposes, the FPAA also disregards both the existence of Group and Partners (as well as the contributions to either) and the transfer of the partnership interests in Group to the CRUTs. The FPAA also asserts a 40% accuracy-related penalty against Group or, alternatively, a 20% accuracy-related penalty. (Group Amended Complaint ¶ 11-12 and 33; Exhibit A to Group Amended Complaint).

43. On December 22, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustments of Partners' partnership items for 2001 ("Partners FPAA"). One of

the two primary adjustments in the Partners FPAA increases Partners' liabilities by $85,649,245 (the proceeds of the Short Sales). The other primary adjustment disallows the $424,565 loss claimed on the closing of the Short Sales because the Short Sales lacked a primary profit motive. The FPAA also asserts that both the partnership and the contributions to it should be disregarded for federal income tax purposes. The FPAA also asserts a 40% accuracy-related penalty against Partners or, alternatively, a 20% accuracy-related penalty. (Partners Amended Complaint ¶ 11-12 and 34: Exhibit A to Partners Amended Complaint).

44. On December 28, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustments of CWC's partnership items for 2001 ("CWC FPAA"). On the CWC FPAA, the IRS's primary adjustment was to reduce the capital contributed by $21,032,464 and to increase partnership liabilities by the amount of $21,032,464 (the amount of the proceeds from both the first and the second Short Sales), which adjustment reflects CWC's participation in the First and Second Shelters. The FPAA also asserts that the contribution of the Short Sales to CWC should be disregarded for federal income tax purposes. The FPAA also asserts a 40% accuracy-related penalty against CWC or, alternatively, a 20% accuracy-related penalty. (CWC Amended Complaint ¶ 11-12 and 28; Exhibit A to CWC Amended Complaint).

**VII. PLAINTIFFS' AMENDED COMPLAINTS**

45. Group concedes that Group erroneously claimed a net long-term capital loss of $19,890,987 instead of reporting a long-term capital gain of $65,539,019 and that it also erroneously claimed a net short-term capital loss of $426,875 instead of a net short-term capital loss of $207,636. (Group Amended Complaint, ¶37).

46. Group maintains that the IRS erred by disregarding the CRUT Partners' transfers of their Group partnership interests to the CRUTs. However, it further asserts that the Court

lacks jurisdiction over this issue. Group also asserts that it is a valid partnership for federal income tax purposes and that neither Group nor its partners are subject to the penalties asserted in the FPAA. (Group Amended Complaint, ¶38-¶45).

47. Partners concedes that Group erroneously claimed a net short-term capital loss of $424,565 instead of a net short-term capital loss of $-0-. (Partners Amended Complaint, ¶37).

48. Partners maintains that the IRS erred, for federal income tax purposes, in disregarding both the partnership's existence and the contributions to it. Partners also asserts that neither Partners nor its partners are subject to the penalties asserted in the FPAA. (Partners Amended Complaint, ¶38-¶45).

49. CWC only maintains that neither CWC nor its partners are subject to the penalties asserted in the FPAA. (Group Amended Complaint, ¶38-¶45).

## VIII. COSTS ASSOCIATED WITH THE HERITAGE TRANSACTIONS

50. The Sands Heirs agreed to pay Heritage 25% of all "projected" present and future taxes that would have been incurred but were not incurred due to the implementation of the Heritage strategies. In 2001 and 2002, the Sands Heirs paid Heritage $6,586,287. (Docket Entry 34, p. 7; App-A-246-248).

51. The Sands Heirs paid the Lewis Rice firm $300,000. (Docket Entry 63, p. 12; App-A-249-251).

52. The Sands Heirs did not make any payment to the Milbank Tweed firm. (App-A-252-253).

53. The CRUT Partners paid Goerig & Associates $13,542.34 for the partnership appraisals. (App-A-254-255).

54. Marilyn, Robert, CWC and Richard each paid $550,074.56 to purchase the remainder interests in their CRUTS. (App-A-256-257).

Respectfully submitted,

/s/ Thomas M. Herrin
THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

DAVID GUSTAFSON
Chief, Court of Federal Claims Section
LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney