IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: August 4, 2008)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' SECOND MOTION TO STRIKE**

# TABLE OF CONTENTS

PAGE(S)

FACTS ..........3

I. Facts Relating to Exhibit 24. ..........3

II. Facts Relating to Exhibit 26. ..........5

ARGUMENT ..........7

I. Exhibit 24 Should Be Stricken From the Record in This Case. ..........7

A. The Report Impermissibly Presents Defendant's View of the Facts. ..........8

B. The Report Impermissibly Opines On the Business Purposes, Motivations and States of Mind of the Sands Family Members. ..........10

C. The Report Impermissibly Applies an Unstated Legal Standard in Reaching its Conclusion. ..........12

D. The Report Impermissibly Renders An Opinion on a Legal Issue. ..........14

E. The Report Fails to Meet the Standard for Expert Testimony in Fed. R. Evid. 702.15

II. Exhibit 26 Should Be Stricken From the Record in This Case. ..........16

A. The Purported Transcript Has Not Been Authenticated. ..........16

B. The Purported Transcript is Irrelevant. ..........19

C. The Purported Transcript Contains Inadmissible Hearsay. ..........19

D. The Purported Transcript Should be Excluded as a Discovery Sanction Under RCFC 37. ..........22

CONCLUSION ..........25

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Allstates Air Cargo, Inc. v. United States*, 42 Fed. Cl. 118 (1998)....................2

*Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y. 2001)....................17

*Casper v. SMG*, 389 F. Supp. 2d 618 (D. N.J. 2005)....................12

*Charleswater Prods. Inc. v. Nevamar Corp.*, 1998 U.S. App. LEXIS 31011 (Fed. Cir. 1998)....................2

*Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402 (2000)....................2

*Comm'r v. Court Holding Co.*, 324 U.S. 331 (1945)....................13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)....................7

*DePaepe v. Gen. Motors Corp.*, 141 F.3d 715 (7th Cir. 1998)....................11

*Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006)....................23

*Ebewo v. Martinez*, 309 F. Supp. 2d 600 (S.D.N.Y. 2004)....................24

*Enbridge Energy Co. v. United States*, 553 F. Supp. 2d 716 (S.D. Tex. 2008)....................13

*Finisar Corp. v. DirecTV Group, Inc.*, 424 F. Supp. 2d 896 (E.D. Tex. 2006)....................23

*Finwall v. City of Chicago*, 239 F.R.D. 504 (N.D. Ill. 2006)....................24

*Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273 (S.D. Ala. 2006)....................8, 10

*Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003)....................11

*Nieves- Villanueva v. Soto-Rivera*, 133 F.3d 92 (1st Cir. 1997)....................14, 15

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983)....................12

*Phillips v. City of Victoria*, 2006 U.S. Dist. LEXIS 18053 (S.D. Tex. 2006)....................23

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................8, 10

*The Pinal Creek Group v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037 (D. Ariz. 2005)....................15

*United States v. Curtis*, 782 F.2d 593 (6th Cir. 1986)....................15

*United States v. Rochan*, 563 F.2d 1246 (5th Cir. 1977) ........ 16, 17

**RULES**

RCFC 26(a) ........ 23, 24

RCFC 269(a)(1) ........ 24

RCFC 37 ........ 23

RCFC 37(c) ........ 23

Fed. R. Evid. 401 ........ 19

Fed. R. Evid. 402 ........ 19

Fed. R. Evid. 403 ........ 19

Fed. R. Evid. 702 ........ 1, 7, 15, 16

Fed. R. Evid. 801 ........ 19, 20

Fed. R. Evid 801(d) ........ 20

Fed. R. Evid. 802 ........ 20

Fed. R. Evid. 804 ........ 20

Fed. R. Evid. 804(b)(3) ........ 20

Fed. R. Evid. 803 ........ 21

Fed. R. Evid. 804(b)(3) ........ 20

Fed. R. Evid. 901 ........ 16, 17, 18

**MISCELLANEOUS**

4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.03[3] (2d Ed. 2007) ........ 10

**PLAINTIFFS' SECOND MOTION TO STRIKE**

Plaintiffs hereby move to strike certain inadmissible evidence proffered by defendant in support of its Motion for Summary Judgment in Cause Nos. 06-409T, 06-410T and 06-411T ("Defendant's MSJ"), specifically Exhibits 24 and 26 of Appendix A to Defendant's MSJ, as well as all references to these exhibits included in Defendant's MSJ and Defendant's Second Set of Proposed Findings of Uncontroverted Fact ("Defendant's PFUF). Plaintiffs also seek to strike references to Exhibits 26 through 29 of the Appendix to Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment for the reasons described in still pending September 14, 2007 Plaintiffs' Motion to Strike.[1]

Exhibit 24 is the expert report of Jerry McCoy containing his opinion of the tax effect of gifts of certain limited partnership interests by the Sands to certain charitable remainder unitrusts ("the CRUTs") and the later termination of those trusts. Plaintiffs seek to exclude Mr. McCoy's report because it offers nothing more than his own legal conclusion based on his and defendant's one-sided view of the facts in this case, without reference to any of the testimony of plaintiffs or other individuals involved in the transactions at issue in this case. The report impermissibly opines on the state of mind of the taxpayers in this case and presents defendant's view of the evidence as fact. Mr. McCoy's report improperly attempts to usurp the role of this Court in determining the facts, applicable law, and applying that law to the facts. Mr. McCoy's report thus utterly fails to meet the standard of Fed. R. Evid. 702 as it would not assist the trier of fact to understand the evidence or determine a fact in issue, is not based on sufficient facts or data, is

[1] On September 14, 2007, plaintiffs filed a motion to strike Exhibits 26-29 and references thereto in Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment and Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Fact. Plaintiffs' motion to strike has been fully briefed by the parties, and any ruling thereon would be equally applicable to the use of the same inadmissible evidence by defendant in Defendant's MSJ and related filings.

not the product of reliable principles and methods, and does not reliably apply any principle or method to the facts of the case. Thus, it should be excluded.

Exhibit 26 is a transcript of a purported conversation between Gary Kornman, principal of the Heritage Organization, LLC ("Heritage"), Jonathan Blattmachr, a partner with Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") in New York, and an unidentified individual unrelated to the Sands family who was not involved in any of the transactions at issue in this case. Defendant belatedly produced this transcript to plaintiffs on December 21, 2007, some thirteen months after it came into defendant's possession, and some five months after the close of discovery. Defendant used the transcript as an exhibit in Defendant's MSJ when it had not been properly verified or authenticated as required by Fed. R. Evid. 901.

The Court of Federal Claims excludes evidence that would not be admissible at trial, such as the transcript at issue here, when such evidence is offered to support a motion for summary judgment. *Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 444-50 (2000); *Allstates Air Cargo, Inc. v. United States*, 42 Fed. Cl. 118, 122-23, 125 (1998); *see also Charleswater Prods. Inc. v. Nevamar Corp.*, 1998 U.S. App. LEXIS 31011 (Fed. Cir. 1998) (affirming district court's decision to exclude a statement that would not be admissible at trial and stating that "[e]vidence must be admissible at trial in order to be properly considered when deciding a summary judgment motion."). Grounds for striking inadmissible evidence include that the evidence has not been authenticated or that it does not meet a hearsay exception. *Coast Fed. Bank*, 48 Fed. Cl. at 444-50; *Allstates Air Cargo* 42 Fed. Cl. at 122-23, 125 (striking evidence, affidavit, and references to either because they were inadmissible evidence entitled to no weight on a motion for summary judgment).

The transcript at issue here should be stricken for a variety of reasons discussed in detail below. First, the transcript is inadmissible because it has not been authenticated as an accurate representation of the conversation that purportedly occurred; defendant has not provided any testimony or affidavits from any witnesses in an effort to authenticate the transcript. Moreover, plaintiffs challenge the accuracy of the transcript based on prior testimony and review of other Heritage transcripts. As described in Plaintiffs' prior motion to strike, many transcripts obtained from the Heritage bankruptcy trustee were purportedly made from tapes which no longer exist, and the witnesses involved in the conversations could not testify to the accuracy of the transcripts. The tapes that did exist were generally incomprehensible and contained gaps of varying lengths. The chain of custody for the transcripts and tapes cannot be established, and several employees of Heritage have testified that Gary Kornman, Heritage founder, erased parts of tapes. Second, the transcript is irrelevant as it involves a purported conversation with an individual who is not related to the Sands family and was not involved in any of the events at issue in this case. Third, the transcript contains inadmissible hearsay. Finally, plaintiffs have been prejudiced by defendant's belated production of the transcript on December 21, 2007; therefore the transcript should be excluded as a discovery sanction.

## FACTS

### I. Facts Relating to Exhibit 24.

Defendant proffered Exhibit in support of 24 Defendant's MSJ and Defendant's PFUF. Exhibit 24 is the expert report of Jerry J. McCoy. Mr. McCoy's report includes his opinion of a legal issue – that the four CRUTs involved in the pending case "should be disregarded as mere interim steps in a larger plan to sell Constellation Brands stock at a profit and retain substantially all the pretax proceeds realized." Pls.' Ex. 1, App. at p. 9. Mr. McCoy could not articulate any standard under which the CRUTs should be disregarded. Pls.' Ex. 2, App. at pp. 20-26. Mr.

McCoy based this opinion on the facts he determined from reviewing selected exhibits provided by defendant, which did not include discussions with any of the Sands or the trustees of the Educational Health and Support Fund from which they purchased the remainder interests in the four CRUTs, or the review of any depositions of the Sands. Pls.' Ex. 2, App. at pp. 27-30. Defendant never deposed any of the trustees of the Educational and Health Support Fund.

Though Mr. McCoy understands that he is not the fact finder in this case (Pls.' Ex. 2, App. at p. 29), Mr. McCoy's expert report is replete with his determinations of the intent of the Sands in creating the CRUTs and giving their limited partnership interests to them and their purported "control" over the trustees of the Educational and Health Support Fund:

- "The trusts were used by their creators as temporary partners in Group during a period when Group realized large amounts of capital gain income from sales of Constellation stock and other securities." Pls.' Ex. 1, App. at p. 8.

- "Those representations [given to Milbank Tweed for the opinion it rendered] were not accurate and the presence of a plan, prearrangement or understanding is unmistakable. The purchases of the CRT remainder interest were discussed and planned even before the trusts were formed." Pls.' Ex. 1, App. at p. 8.

- "This short life convinces me that they [the CRUTs] were never intended by their creators to have the 20-year duration provided in their governing instruments." Pls.' Ex. 1, App. at p. 10.

- "It exceeds reasonable comprehension to believe that this newly-created organization, ostensibly run by Sands family advisors, could independently negotiate an arms' length sale of those interests to the Sands family members and consummate that sale between the Friday on which it was formed and the following Wednesday." Pls.' Ex. 1, App. at p. 10.

- "By any objective standard, EHSF was not at any time independent of the Sands family." Pls.' Ex. 1, App. at p. 11.

- "Several other factors likewise demonstrate that, in substance, the sale of the Constellation Brands stock was engineered by the Sands family and its advisors with the sole intention of securing for them the benefit of a tax free sale." Pls.' Ex. 1, App. at p. 11.

- "In addition, the overall context of these complicated transfers and the manner in which they were conceived and carried out indicates that the true purpose of these

> trusts and the related transactions was to serve the beneficiaries' tax avoidance purpose and not to accomplish the family's charitable goals." Pls.' Ex. 1, App. at p. 12.

Mr. McCoy speculated regarding each and every such "fact" included in his report. Pls.' Ex. 2, App. at p.37. He determined, without speaking to the Sands or reading their deposition testimony, that they intended to terminate the CRUTs early. Pls.' Ex. 2, App. at pp. 40-42. He determined that there were discussions between the Sands and the trustees of the Educational and Health Support Fund, though he had no actual evidence of such discussions. Pls.' Ex. 2, App. at p. 38. He admitted that he determined their intent based on what in his view was "the appearance of prearrangement." Pls.' Ex. 2, App. at p.44. In reaching these factual conclusions, Mr. McCoy relied on defendant's version of the facts as stated in its Response to Plaintiffs' Motion to Substitute. Pls.' Ex. 2, App. at pp. 31-32. Defendant, however, never provided Mr. McCoy with plaintiffs' statements of facts as stated in their Motion to Substitute or Reply in support thereof. Pls.' Ex. 2, App. at pp. 31-32.

## II. Facts Relating to Exhibit 26.

Defendant proffered Exhibit 26 in support of Defendant's MSJ and Defendant's PFUF. Exhibit 26 is a transcript of a purported conversation between Gary Kornman, Jonathan Blattmachr, and an individual unrelated to the Sands or any of the events at issue in this case. Defendant belatedly produced Exhibit 26 to plaintiffs on December 21, 2007, long after fact discovery in this case closed on August 29, 2007.

Rita Daugherty, an IRS employee designated to testify for the government regarding its review of the Heritage documents pursuant to Ct. Fed. Cl. R. 30(b)(6), testified that defendant obtained access to Heritage documents on November 29, 2007 pursuant to an IRS summons served on the bankruptcy trustee for Heritage. Pls.' Ex. 3, App. at pp. 50-51. The IRS had copies of all the Heritage documents (which apparently included Exhibit 26) in April 2007 and

an index of the documents completed by May 23, 2007. Pls.' Ex. 3, App. at pp. 52-54. IRS attorneys failed to tell the IRS employees reviewing the Heritage documents that any of the Heritage documents were subject to discovery requirements until July 13, 2007. Defendant finally produced purported transcripts relating to plaintiffs on July 31, 2007, the date discovery was originally scheduled to close in this case. Exhibit 26 was not included in that production, but was instead provided to plaintiffs another five months later in December 2007.

Defendant attached this purported transcript to its motion without any affidavit or testimony necessary for authentication. In any event, based on the testimony of Heritage employees regarding other Heritage transcripts, the errors contained in those other transcripts for which tapes exist, and the poor quality and gaps in the tapes from which those other transcripts were purportedly transcribed, plaintiffs challenge the accuracy of Exhibit 26. Chester Decker, a Heritage employee, testified that he believed the transcribers at Heritage cut corners and were sloppy in their transcription. Pls.' Ex. 4, App. at pp. 66-68. Tim Seaberg, another Heritage employee, testified that, while reading along with a transcript, he still could not understand significant portions of a tape of a purported conversation between him and Richard Sands and Robert Sands. When those other transcripts were compared against the tapes from which they were supposedly transcribed, the transcripts contained words that were not on the tape; the tapes contained words that were not on the transcripts; and the tapes contained gaps that were not indicated on the transcripts. Pls.' Ex. 5, App. at pp. 76-78, 81, 83-93. At least one of those transcripts had several pages that were not on the tape, and a gap of 15 seconds or more on the tape was not indicated at all in the transcript. Pls.' Ex. 5, App. at pp. 83-87. To be clear, neither Mr. Seaberg nor Mr. Decker nor any witness has testified regarding Exhibit 26. Plaintiffs are

providing this information only to show the Court that this unauthenticated transcript is untrustworthy in any event.

Heritage personnel have testified that they sometimes tape-recorded their conversations with clients or potential clients. The tapes were then provided to a marketing department where employees with no special training transcribed the tapes. Pls.' Ex. 5, App. at pp. 71-72. Heritage's "taping policy" was not enforced and not followed at all times by Heritage employees. Not all conversations were recorded, and not all tapes were transcribed. Pls.' Ex. 4, App. at pp. 63-65; Pls.' Ex. 6, App. at pp. 96-97, Ex. 7, App. at pp. 102-103.

Exhibit 26 contains indications that part of the conversation was left out or the transcribers could not understand certain words and phrases. *See, e.g.,* Ex. 26, Def. App. A at 302, 323. No one involved in the purported conversation has stated that Exhibit 26 accurately reflects what was discussed at an actual conversation or that Exhibit 26 represents an accurate transcription of a tape. Moreover, because the transcript actually pertains to a transaction involving a taxpayer unrelated to the Sands who is not involved in this case, defendant has redacted portions of the transcript in an effort to protect that taxpayer's identity.

## ARGUMENT

### I. Exhibit 24 Should Be Stricken From the Record in This Case.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597, (1993) the Supreme Court instructed trial judges to act as gatekeepers with respect to expert testimony. Federal Rule of Evidence 702 sets forth the standard for expert opinions to be admitted:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In this case, Mr. McCoy's report would not assist the Court in understanding the evidence or determining a fact in issue because it impermissibly invades the Court's function in determining the facts, determining the applicable law, and applying that law to the facts. Additionally, Mr. McCoy's report was not based upon sufficient facts and data, failed to articulate any standard for its conclusion that the CRUTs should be disregarded, and thus could not reliably apply its standard to the facts.

A. The Report Impermissibly Presents Defendant's View of the Facts.

Experts are not permitted to become partisan advocates by providing, in the guise of expert "opinion," a summary or overview of otherwise admissible factual evidence. *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 280 (S.D. Ala. 2006) (noting that an expert report that "offers a synopsis of facts . . . does not state expert opinions at all, but simply provides the witness's slant on facts."); *In re Rezulin Prods. Liab. Litig*., 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (determining that historical narrative of facts was inadmissible expert testimony because it was "merely a narrative of the case which a juror is equally capable of constructing").

In *Fisher*, as in this case, the expert report read "like the fact section of a brief, not the report of an expert witness." *Id.* at 281. The court's task was not assisted by the "one-sided recitation of record facts" contained in the report, and the court could not determine how the expert report differed from a supplemental brief submitted by another lawyer. As such, the court excluded the report. *Id.*

Here, Mr. McCoy's 13-page report contains a 4-page recitation of defendant's view of the facts in this case. The narrative is not based on his personal knowledge of the case, and is not based on all the evidence in the record. It is based on documentary evidence provided by

defendant to Mr. McCoy, which failed to include any testimony by the Sands or the trustees of the Educational and Health Support Fund, but which did include defendant's recitation of the facts (from defendant's response to Plaintiffs' Motion to Substitute) in this case. Pls.' Ex. 2, App. at p. 32. The report reads like a legal brief, offering defendant's "spin" on the evidence and exaggerating and coloring the facts to support defendant's slant:

- It exceeds reasonable comprehension to believe that this newly-created organization, ostensibly run by Sands family advisors, could independently negotiate an arms' length sale of those interests to the Sands family members and consummate that sale between the Friday on which it was formed and the following Wednesday." Pls.' Ex. 1, App. at p. 10.
- "By any objective standard, EHSF was not at any time independent of the Sands family." Pls.' Ex. 1, App. at p. 11.
- "Several other factors likewise demonstrate that, in substance, the sale of the Constellation Brands stock was engineered by the Sands family and its advisors with the sole intention of securing for them the benefit of a tax free sale." Pls.' Ex. 1, App. at p. 11.

In fact, in reaching these factual conclusions, Mr. McCoy reviewed defendant's response to Plaintiffs' Motion to Substitute. Pls.' Ex. 2, App. at p. 31-32. Defendant, however, never gave Mr. McCoy plaintiffs' Motion to Substitute and Reply in support thereof. Thus, Mr.McCoy did not have the benefit of ever hearing how plaintiffs described the events at issue.

During his deposition, Mr. McCoy shed further light on his determination as to the control the Sands had over the Educational and Health Support Fund. For example, he first stated that the Sands "were the principals. They were the trustees. They were on both sides of the transaction." Pls.' Ex. 2, App. at p. 34. Based on this view, Mr. McCoy determined that "it's very hard to have anything other than an understanding or prearrangement where the same parties are buying and selling and it's happening within a period of five days." But then Mr. McCoy changed his mind:

Q. So then how was it that the Sands were both the buyer and the seller?

> A. Well, okay. I may have misspoken on that. They were trustees of the charitable remainder trust, but they weren't -- the charitable remainder trust did not sell. You're correct.

Pls.' Ex. 2, App. at p. 35. Moreover, in his deposition, Mr. McCoy continued asserting defendant's view that the Sands controlled the trustees of the Educational and Health Support Fund, again with no input from the people actually involved in the transaction:

> Q. I understand that. But the trustees could have blown up the entire deal; yes?
> A. Yes. Say: Absolutely not. We're going to hold on for 20 years because we want to get the 75 million at the end.
> Q. So if that was the best choice for them, in terms of fulfilling their fiduciary duty, did the Sands have any recourse, any legal recourse, under these documents to unilaterally dictate early termination?
> A. If they had, I doubt if they would all be serving the Sands' family interest today.
> Q. I'm sorry. That's not responsive.
> A. The accounting firm would no longer be on the case, and I think Mr. Locke probably wouldn't be on the board.

Presenting a litigant's version of the facts is the responsibility of counsel, through the appropriate witnesses with first-hand knowledge and through the use of documentary evidence. Narrating facts based on review of documents does not involve the application of scientific or other specialized knowledge. Mr. McCoy's opinion improperly presents defendant's version of the facts here and should be excluded, as were the opinions in *Fisher* and *In re Rezulin*.

B. <u>The Report Impermissibly Opines On the Business Purposes, Motivations and States of Mind of the Sands Family Members.</u>

A person's state of mind is an issue on which an expert may not opine because determinations as to state of mind are "committed exclusively to the finder of fact." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.03[3] (2d Ed. 2007). The rationale for this rule is that determining state of mind or intent does not require scientific, technical, or other specialized knowledge. *See, In re Rezulin*, 309 F. Supp. at 541 ("Examples of 'expert' testimony that courts have excluded on this basis include factual narratives and

interpretations of conduct or views as to the motivation of the parties.”); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (excluding expert testimony where the report and deposition testimony made clear that the witness “was going to do his best to persuade the jury that the “business purpose” of the transactions in question was an improper one.”); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (determining that a witness “could not testify *as an expert* that GM had a particular motive) (emphasis in original).

In *Lippe*, the expert opined in his report that “the primary purpose for these transactions was to remove assets from the reach of Keene’s asbestos creditors” and that “the only logical motivating factor in these transactions was the attempt to remove assets from the reach of Keene’s asbestos creditors.” 288 B.R. at 682 (n.1). The court excluded his testimony, noting that determining motivations is not the function of an expert witness: “Carney’s views as to the credibility of defendant’s witnesses and defendant’s “real” motivations are simply not relevant.” *Lippe*, 288 B.R. at 688.

Though Mr. McCoy understands that he is not the fact finder in this case (Pls.’ Ex. 2, App. at p.29), he determined that the Sands intended to terminate the CRUTs early and that their primary motive in doing so was tax avoidance:

> Q. Again, back to page 12. You have some language here, the second half of that sentence: "By terminating the trusts early, almost immediately after their creation, the beneficiaries attempted to circumvent the statutory scheme and inappropriately avoid those taxes altogether." And then going on: "In addition, the overall context of these complicated transfers and the manner in which they were conceived and carried out indicates that the true purpose of these trusts and the related transactions was to serve the beneficiaries' tax avoidance purpose and not to accomplish the family's charitable goals." I think even before that, the carryover language, you say -- well, I guess you're referring to something different. How important is your determination of the Sands' intent to your report?
>
> A. Well, I don't even have any direct evidence of their intent other than it's just circumstantial from the overall -- the appearance of prearrangement.

> Q. So is it possible to judge somebody's intent, you know, in a purchase type transaction without speaking to either the buyer or the seller?
>
> A. I think it is.

Pls.' Ex. 2, App. at pp. 43-44. Mr. McCoy admitted that he determined their intent based on what in his view was "the appearance of prearrangement." Pls.' Ex. 2, App. at p. 44. Mr.McCoy's findings of intent form the basis for his conclusion that the transfers should be disregarded. Pls.' Ex. 2, App. at pp. 44-45.

As described in the facts section above, Mr. McCoy's report is replete with statements opining on the Sands' intent. Mr. McCoy's subjective determinations of the Sands' intent and motivations are not helpful to the trier of fact and are inappropriate determinations for an expert witness. As such, Mr. McCoy's report should be excluded from the record.

C. The Report Impermissibly Applies an Unstated Legal Standard in Reaching its Conclusion.

In addition to providing a one-sided version of the facts in this case (without ever even reading or considering plaintiffs' explanations) and making factual findings that are reserved for the Court, Mr. McCoy's report also improperly applied an amorphous and unstated legal standard to those "facts" to conclude that the CRUTs should be disregarded.

Mr. McCoy's ultimate conclusion is that the CRUTs should be disregarded. Pls.' Ex. 1, App. at p. 9. Testimony that consists of legal conclusions (i.e. the application of law to facts), however, is inadmissible because it does not assist the trier of fact, but instead, impermissibly invades the role of the Court. *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) ("allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant."); *Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D. N.J. 2005) (rejecting proposed expert testimony of law professor who relied on case law and statutes and applied them to documents and testimony to reach legal conclusions).

Disregarding an entity for tax purposes requires the application of a legal theory to the specific facts of the case. *See Enbridge Energy Co. v. United States*, 553 F. Supp. 2d 716 (S.D. Tex. 2008) (disregarding an entity under the conduit theory after discussing relevant law and applying it to the facts of the case); *Comm'r v. Court Holding Co.*, 324 U.S. 331 (1945) (affirming Tax Court's disregard of an intermediary under the facts of the transaction). Nonetheless, Mr. McCoy's determination that the CRUTs should not be respected for tax purposes is a legal conclusion that attempts to usurp this Court's authority as the arbiter of the application of the law to the facts.

While Mr. McCoy's report does not explain the standard he applied to determine that the CRUTs should be disregarded, his deposition sheds some light on this. In his deposition, Mr. McCoy stated that the CRUTs could be disregarded under a variety of legal theories:

> Q. Are you applying the step transaction doctrine to make that determination?
> A. I think it would apply; but what I was asked to do was to put this in the context of my experience in planning charitable transactions and representing charities and donors.
> Q. I understand that. What I'm trying to understand from you is what standard that you applied. I mean, is it just because you say so? I mean, is there -- is this an economic substance analysis? Is it a sham transaction analysis? Is it a step transaction analysis? Normally a court would pick one to say that something should be disregarded. So on what basis are you saying that the CRUTs should be disregarded?
> A. I think on the basis of all of those, in light of my experience; that this is the sort of thing that I have never seen planned. I have never planned one like this; and I can only suspect that that's the result, that it should be disregarded.
>
> * * *
>
> Q. Okay. What standards did you apply to determine that the CRUTs were shams?
> A. I don't know that I could state a standard. It's a factual thing; and all of the facts that are listed in here, several times, suggest that it wasn't treated in a normal fashion the way a charitable trust normally would be dealt with.
> Q. Are you aware of the difference between a sham in fact and a sham in substance?
> A. I'm not.

Q. Are you aware of the appropriate test for determining whether something is a sham in the Second Circuit?
A. No, I'm not. I wasn't aware that "sham" was a technical term that would be different in different circuits and that sort of thing. I think it's generally a factual conclusion or is the taxpayer usually loses when something is a sham.
Q. But isn't it true that -- it is a factual conclusion, but you have to analyze those facts under some type of standard; correct?
A. I guess, yes.

* * *

Q. What version of the step transaction doctrine would you say that these CRUTs should be disregarded under?
MR. HERRIN: Objection to the form. You are asking for a legal conclusion; and although he is an expert witness, that's going to be a determination for the Court to make. Now, if he knows, he can certainly answer the question.
THE WITNESS: I don't know. I was going to ask you what are my choices. I have never heard it broken down that way.
BY MR. CULLINAN: (Resuming)
Q. So you don't know what different versions of the step transaction doctrine exist.
A. I could not state them, no.
Q. Okay.
A. My understanding of it is that it is a rather permeable concept; that it's -- it's primarily factual, and it varies as facts do. So I would not know -- can you give me some subdivisions? I could learn something here.

Pls.' Ex. 2, App. at pp. 22-25. Mr. McCoy made assertions regarding why the CRUTs should be disregarded: "Because they were intermediate steps in a prearranged plan" (Pls.' Ex. 2, App. at p. 21); and because the CRUTs were "more or less" shams Pls.' Ex. 2, App. at p. 23. Yet even he realizes that determining where to draw the line on recognizing a CRUT is the Court's function. Pls.' Ex. 2, App. at p. 43. Because Mr. McCoy's report impermissibly applies an unstated legal standard to the "facts" determined by Mr. McCoy, it should be stricken from the record in this case.

D. <u>The Report Impermissibly Renders An Opinion on a Legal Issue.</u>

"In our legal system, purely legal questions . . . [are] exclusively the domain of they judge. Accordingly, expert testimony on such purely legal issues is rarely admissible." *Nieves-*

*Villanueva v. Soto-Rivera*, 133 F.3d 92 (1st Cir. 1997).[2] Additionally, "[e]xperts are supposed to interpret and analyze factual evidence. They do not testify about the law because the judge's special knowledge is presumed to be sufficient . . ." *United States v. Curtis*, 782 F. 2d 593 (6th Cir. 1986). "The principle that legal opinion evidence concerning the law is inadmissible is so well-established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle." *The Pinal Creek Group v. Newmont Mining Corp*., 352 F. Supp. 2d 1037, 1042 (D. Ariz. 2005) (internal quotation marks omitted) (rejecting testimony from a law professor regarding law on piercing the corporate veil in Maine because it constituted inadmissible legal opinion).

Mr. McCoy's report includes his opinion of a legal issue – that the four CRUTs involved in the pending case "should be disregarded as mere interim steps in a larger plan to sell Constellation Brands stock at a profit and retain substantially all the pretax proceeds realized." Because Mr. McCoy's report impermissibly asserts a legal conclusion, by applying the "law" to the "facts" determined by Mr. McCoy, it should be stricken from the record in this case.

E. The Report Fails to Meet the Standard for Expert Testimony in Fed. R. Evid. 702.

Even aside from the failings described above, Exhibit 24 fails to meet the standard for expert testimony found in Fed. R. Evid. 702. Mr. McCoy's recitation of the facts in this case and his review of pertinent materials completely ignores the statements or recollections of any of the individuals actually involved in the transactions at issue in this case. Mr. McCoy admitted in his deposition that he did not consider all the facts in the case:

> Q. Why didn't you speak with anyone who had firsthand knowledge of the facts?
> A. I didn't understand that to be my role. I'm not the fact finder here.

---

[2] The one recognized exception to the rule is the issue of foreign law, which has no bearing here. *Nieves-Villanueva*, 133 F.3d at 99.

> Q. All right. Well, now I'm confused because you say you're not the fact finder here; but you have determined that the CRUTs should be disregarded based on, as I think you called it, all the facts. So how did you determine that there were – that they should be disregarded if you're not the fact finder?
> A. The facts that were in the record that I saw were sufficient for me to judge mine. I thought it was improper for me to talk to anyone about the case.

Pls.' Ex. 2, App. at pp. 29-30. Mr. McCoy repeatedly stated that he speculated or assumed information in reaching his factual determinations. Pls.' Ex. 2, App. at pp. 33, 36-37, and 46.

Moreover, Mr. McCoy noted that he would have to reconsider his opinion if "there was no plan, prearrangement, or understanding with the charity for the purchase of the remainder prior to its designation as a charitable remainderman" (Pls.' Ex. 2, App. at p. 39) and plaintiffs have submitted affidavits from the parties (whose testimony Mr. McCoy failed to consider) and trustees indicating that there was no such plan, prearrangement, or understanding. Additionally, Mr. McCoy failed to articulate (in his report and in his deposition) what standard he used to determine the CRUTs should be disregarded. An expert cannot reliably apply an unknown standard to incomplete facts and reach a conclusion that can appropriately be relied on to assist the trier of fact. Fed. R. Evid. 702. Because Mr. McCoy's report does not meet the standard of Fed. Rul. Evid 702, it should be excluded.

## II. Exhibit 26 Should Be Stricken From the Record in This Case.

### A. <u>The Purported Transcript Has Not Been Authenticated.</u>

Defendant has not presented any evidence sufficient to support a finding under Fed. R. Evid. 901 that Exhibit 26 is what Defendant claims it to be: an accurate transcription of a conversation between Gary Kornman, Jonathan Blattmachr, and another unidentified individual.

Authentication of transcripts is a matter of the accuracy of the transcripts. *United States v. Rochan*, 563 F.2d 1246 (5th Cir. 1977) ("But the issue in the authentication of supplemental transcripts [transcripts provided to assist the jury in understanding a tape recording] is not who

made them; the issue is whether they are accurate.") In *Rochan*, the court required some evidence that a transcript is accurate – "that the words are accurately reproduced and the voices accurately identified." *Rochan*, 563 F. 2d at 1251; *Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y. 2001) (finding that the transcript was not authenticated as representing the statements of the witness where plaintiffs did not present enough evidence to support a finding that the transcript was a verbatim transcript).

Defendant has provided absolutely no evidence to meet the standard of Fed. R. Evid. 901. Defendant attached no affidavits or testimony of any of the individuals involved in the purported conversation stating that they reviewed the transcript, that it accurately transcribed a conversation that occurred, or that the voices of the speakers are accurately identified. Defendant has provided no evidence that any of the participants of the purported conversation reviewed the transcript for its accuracy at or near the time of the conversation. (Heritage employees have previously testified that they did not routinely review the transcripts for accuracy after they were made. Pls.' Ex. 4 and 5, App. at pp. 59 and 79-80. (Defendant has provided no evidence that the transcriber(s) carefully and accurately transcribed and accurately identified the speakers from an actual tape of this purported conversation. To plaintiffs' knowledge, there is no deposition testimony stating that Exhibit 26 is accurate and that the speakers in the transcript were accurately identified. In short, defendant has provided no testimony or affidavits that would meet the standard of Fed. R. Evid. 901 for admission of this transcript. For this reason alone, Exhibit 26 and all references thereto should be stricken from the record.

In any event, based on the testimony of Heritage employees regarding other Heritage transcripts (not Exhibit 26), the errors contained in those other transcripts for which tapes exist,

and the poor quality and gaps in the tapes from which those other transcripts were purportedly transcribed, plaintiffs have significant concerns regarding the accuracy of Exhibit 26. Pls.' Ex. 4, App. at pp. 66-68; Pls.' Ex. 5, App. at pp. 76-78, 81, 83-93.

Furthermore, the chain of custody for the transcript and the tape from which it was purportedly made has not been established – no one can account for the whereabouts of the Heritage tapes or transcripts prior to their receipt by the bankruptcy trustee for Heritage in 2004. Pls.' Ex. 7, App. at pp. 100-01 and 106-08. The purpose of chain of custody testimony is to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with. McCormick on Evidence (2d ed.) § 212. What is particularly problematic here is that Ralph Canada, President of Heritage, testified (in another case unrelated to this proceeding) that he had seen Gary Kornman erase portions of tapes.[3] He commented that he would not trust anything that had been in the Kornman group's possession for four or five years. Pls.' Ex. 8, App. at p. 110. Because the whereabouts of the tapes and transcripts cannot be verified and because of Kornman's history of altering and reusing tapes, there is a significant possibility that the tapes were altered during that period of time.

Because defendant has provided nothing to support its assertion that Exhibit 26 is what it purports to be and because no parties to the conversation and no one who transcribed the conversation have testified that the transcript accurately reproduced the conversation it purported to transcribe, Defendant has not met the authentication requirement of Fed. R. Evid. 901 for Exhibit 26. Because the transcript has not been authenticated, it is inadmissible.

---

[3] Plaintiffs received portions of Canada's prior depositions in a production from the government in connection with this case.

B. The Purported Transcript is Irrelevant.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. Irrelevant evidence is not admissible, and even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. Fed. R. Evid. 402 and 403.

The purported transcript involves a conversation between witnesses in this case (not parties) and a completely unrelated individual who has nothing to do with the Sands or any of the events at issue here. The purported conversation occurred long before the Sands were contacted by Heritage regarding its financial plans. It has absolutely no relevance to any fact of consequence in this case. The relevant intent in this case is that of the Sands, not that of peripheral witnesses or of an unrelated individual. The relevant time period involved in this case is 2001 and 2002, not 2000. The relevant transactions are those entered by the Sands, not those discussed by the Sands' advisors with other unrelated taxpayers.

Because the transcript is irrelevant to the issues in this case, it should be excluded.

C. The Purported Transcript Contains Inadmissible Hearsay.

The purported transcript is also inadmissible because it contains hearsay statements that do not fall into an exception to the hearsay rule. Hearsay is defined as "a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. The statements by Gary Kornman, Jonathan Blattmachr, and the unidentified individual contained in Exhibit 26 constitute hearsay. They are purported statements of the individuals offered by defendant to prove the purpose of the transactions described therein (and by defendant's inference the purpose of different transactions entered by different taxpayers).

Hearsay is inadmissible unless it falls within an exception to the hearsay rule. Fed. R. Evid. 802.

The statements by Gary Kornman, Jonathan Blattmachr, and the unidentified individual do not qualify as admissions by party opponents under Fed. R. Evid. 801(d) or as statements against interest under Fed. R. Evid. 804(b)(3). Under Fed. R. Evid. 801(d), an admission by a party opponent is a statement that is offered against a party and that is:

> (A) the party's own statement, in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy.

None of the individuals who purportedly had the conversation are parties to this case, nor were they authorized by the Sands to make statements on any subjects, nor were they agents or servants of the Sands making statements concerning a matter within the scope of their agency or employment. At the time the purported statements were made, the Sands had not even spoken to anyone at Heritage! The Sands have not adopted the statements in the purported transcript, and no criminal conspiracy took place. Therefore, the statements of Mr. Kornman, Mr. Blattmachr, and the unidentified individual cannot be admitted as admissions by a party opponent.

Fed. R. Evid. 804 contains hearsay exceptions for statements made by unavailable declarants. The exceptions allowed for statements made by unavailable declarants include:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Mr. Blattmachr is not unavailable; thus his statements cannot be admitted as statements against interest under this rule. While Mr. Kornman might be considered unavailable because he

invoked his Fifth Amendment right not to testify on certain matters, his purported statements included in Exhibit 26 were not statements against interest at the time they were made. Mr. Kornman discussed investment strategies and estate planning opportunities with prospective clients, including the possible tax benefits of those investments and plans. His statements regarding the investment transactions and strategies offered by Heritage were not the sort of statements to subject him to civil or criminal liability or that were against his interest. At the time Mr. Kornman purportedly made the statements, he was making a sales pitch in an attempt to gain a client (and a fee) for his company. It was in his interest to convince the unidentified individual to engage Heritage to coordinate investment transactions and financial planning.

Nor does the transcript qualify as a business record. Under Fed. R. Evid. 803, an exception to the hearsay rule is provided for:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The sources of the information and the method of preparation of the transcript evidences a complete lack of trustworthiness. Heritage transcripts were made from microcassette recorder tapes. Pls.' Ex. 5, App. at p. 73. The tapes of conversations in meetings were made by the use of a microcassette recorder inside a pants or jacket pocket of a Heritage employee at the meeting. Pls.' Ex. 5, App. at pp. 73-74. The tapes of telephone conversations were made with a tape recording device attached to the phone. Pls.' Ex. 4, App. at p. 58. Heritage employees have noted that the quality of the tapes was not very good; they were difficult and in some cases impossible to understand, particularly when the person taping moved. Pls.' Ex. 5, App. at pp.

74-75 and 82; Pls.' Ex. 9, App. at p. 113. Because the tapes were difficult to understand, marketing employees making transcripts often guessed as to what words they were hearing. Pls.' Ex. 5, App. at p. 78. The marketing employees who made the transcripts had no special training and did sloppy work. Pls.' Ex. 4, App. at p. 68; Pls.' Ex. 5, App. at p. 76.

Here, the tape from which the transcript was allegedly apparently no longer exists. This transcript is particularly untrustworthy because at least one Heritage employee has testified that he saw Gary Kornman erasing portions of tapes. Pls.' Ex. 8, App. at p. 110. Moreover, as with the other Heritage transcripts, Exhibit 26 contains indications that part of the conversation was left out or the transcribers could not understand certain words and phrases. *See, e.g.*, Ex. 26, Def. App. A at 302, 323.

Besides its untrustworthiness, the transcript does not meet the technical requirements of the rule. It has no indication of whether it was made at or near the time of the conversation it purported to portray. In general, transcripts were made several days or weeks after the meetings they purported to depict. Pls.' Ex. 4, App. at pp. 60-62. Furthermore, it is clear that it was not the regular practice of Heritage to record and transcribe all conversations and meetings with clients or potential clients. Vickie Walker, a former Heritage employee, testified that recorded conversations were not always transcribed and not all conversations were recorded. Pls.' Ex. 7, App. at pp. 104-05. It is clear the transcript does not qualify as a business record.

Because the transcript contains inadmissible hearsay statements that do not fall within any exception, it must be excluded.

D. The Purported Transcript Should be Excluded as a Discovery Sanction Under RCFC 37.

As an alternative argument, plaintiffs request the Court to exclude the transcript as a discovery sanction against defendant under Ct. Fed. Cl. R. 37 for defendant's delay in producing

the transcript to plaintiffs. Rule 37(c) of the Rules of the Court of Federal Claims states that "[a] party that without substantial justification fails to disclose information required by Rule 26(a)... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." A showing of bad faith is *not* required in order for sanctions to be imposed under the analogous Federal Rule of Civil Procedure. *See, e.g.*, *Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006).

In determining whether evidence should be excluded under Rule 37, courts consider factors such as 1) the danger of unfair prejudice to plaintiffs; 2) the length of the delay and its potential impact on judicial proceedings; 3) the reason for the delay, including whether it was within the reasonable control of the proponent of the evidence; 4) the importance of the particular evidence, and if vital to the case, whether a lesser sanction would adequately address the other factors to be considered and also deter future violations of the court's scheduling orders, local rules, and the federal rules of procedure; and 5) whether defendant was diligent in seeking an extension of time, or in supplementing discovery, after an alleged need to disclose new evidence became apparent. *Finisar Corp. v. DirecTV Group, Inc.*, 424 F. Supp. 2d 896, 899-900 (E.D. Tex. 2006); *see also Phillips v. City of Victoria*, 2006 U.S. Dist. LEXIS 18053, at *19 (S.D. Tex. 2006).

The transcript, which came into defendant's possession on November 29, 2006, should have been formally disclosed on December 15, 2006, when Initial Disclosures were required under Rule 26(a)(1) of the Court of Federal Claims, rather than in December 2007, some thirteen months later. Instead, counsel for defendant misleadingly told plaintiffs on December 15, 2006

that IRS employees were going through Heritage "documents" from the bankruptcy trustee and that defendant would produce any further relevant documents when its counsel received them.

At no time during defendant's review of the documents did defendant or its counsel request the IRS employees to expedite their review and produce the documents which should have been produced as part of defendant's Rule 26(a) disclosures and in response to plaintiffs' discovery requests. Ms. Daugherty did not request expedited funding for copying of the documents. When she received funding to have all the Heritage documents copied on February 12, 2007, she did not have them sent to a vendor for copying until March 29, 2007, more than six weeks later. Defendant had copies of all the Heritage documents (including Exhibit 26) in April 2007 and an index of the documents was completed by May 23, 2007. IRS attorneys failed to tell the IRS employees reviewing the Heritage documents that they were subject to discovery requirements until June 13, 2007. Nothing excuses defendant's delay in informing plaintiffs of this document and its intent to rely on it.

In addition to being unjustified, defendant's delay in producing the transcript has prejudiced both plaintiffs and this Court. Plaintiffs have been prejudiced by defendant's delay in producing the transcript because the information on which defendant now seeks to rely was not available to plaintiffs. *See Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607-08 (S.D.N.Y. 2004). Because defendant produced the purported transcript after the close of discovery, plaintiffs have been unable to interview witnesses who could rebut defendant's "new" evidence or provide information regarding the transcription and the tape on which the purported conversation was based. Defendant had access to the transcript for thirteen months before providing it to plaintiffs. As for the Court, it has a legitimate interest in managing cases before it to ensure prompt and orderly litigation. *Finwall v. City of Chicago*, 239 F.R.D. 504, 507 (N.D. Ill. 2006).

The Court extended discovery and moved other deadlines to give defendant time to depose witnesses in an attempt to authenticate other transcripts, but defendant had not produced this transcript at that time so plaintiffs were unable to ask questions of those witnesses regarding Exhibit 26.

Moreover, the evidence is not vital to defendant's case such that a different remedy should be provided. The purported transcript does not contain any information regarding the Sands family members or the transactions in which they engaged. It involves a purported conversation between peripheral witnesses and an individual completely unrelated to the Sands.

Because of defendant's unreasonable delay, the prejudice such delay has caused, and the irrelevance of the purported transcript plaintiffs request the Court to exclude the Exhibit 26 as a sanction for discovery violations.

## **CONCLUSION**

For the reasons set forth above, plaintiffs respectfully request this Court to strike Exhibits 24 and 26 and any references thereto (as well as any references to Exhibits 26 through 29 of the Appendix to Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment) in Defendant's Motion for Summary Judgment or in Defendant's Second Set of Proposed Findings of Uncontroverted Fact.

Respectfully submitted this 4th day of August, 2008.

s/ Lewis S. Wiener
LEWIS S. WIENER
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 telephone
202.637.3593 facsimile
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
404.853.8000 telephone
404.853.8806 facsimile

Kent L. Jones
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Ave., NW
Washington, DC 20004
202.383.0732 telephone
202.637.3593 facsimile

Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Second Motion to Strike has been made on August 4, 2008 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
thomas.m.herrin@usdoj.gov

s/ Lewis S. Wiener
LEWIS S. WIENER