**Expert Witness Report**

My name is Jerry J. McCoy and I am a practicing attorney based in Washington, DC, specializing in charitable tax planning. I have been retained by the US Department of Justice to comment on only one issue presented in Alpha I v. United States and related cases (US Court of Federal Claims Case Nos. 06–407T through 06–411 T, 06–810T, and 06–811T). That issue relates to the tax effect of the transfer of certain partnership interests to four charitable remainder unitrusts, and the termination of those trusts shortly thereafter by purchase of the charitable remainder interests by the taxpayers. I have not been asked to consider any other issue presented by these cases, and have no opinion with respect to any such other issues.

PERSONAL EXPERIENCE

I have practiced in this area exclusively for the last 10 years, and I have specialized in this area for more than 25 years, representing both donors to charitable organizations and the charitable organizations themselves. I have written numerous articles in professional journals on charitable topics, and frequently speak at tax and estate planning seminars on this subject. I teach graduate level law school courses in charitable planning at two law schools (Georgetown University and the University of Miami) and I edit (and write for) two professional charitable newsletters (*Charitable Gift Planning News* and *Family Foundation Advisor*). I am co-author of Family Foundation Handbook (2008 edition) published by CCH. Attached is a copy of my professional resume.

Charitable remainder trusts constitute a significant factor in my practice. In January of 2008, I spoke at the University of Miami Heckerling Institute on Estate Planning, the largest estate planning institute in the United States, on the fundamentals of charitable remainder trusts.

PROCEDURAL STATEMENTS

In connection with this undertaking, I have reviewed the following items: the complaint filed in one of these consolidated cases, including exhibits; the charitable remainder unitrust documents described above; assignment and assumption of partnership interest; two designations of charitable remainder beneficiaries for the trusts; the agreement for purchase of the remainder interest in the trusts; a letter of February 26, 2002 from The Heintzberger Company providing calculations for the trusts; an opinion letter dated June 21, 2002 from Milbank Tweed; the government's response to plaintiff's motion to substitute parties and dismiss certain causes of action in one of the consolidated cases; tax returns filed for the trusts and for the charitable remainder beneficiary of the trusts; several exhibits and depositions in the case, with attachments; and an appraisal by Goerig & Associates of the partnership interests that are the focus of this case. In addition, I consulted public information on the website of Constellation Brands; tax returns filed by Education and Health Support Fund from www.guidestar.org; and



PLAINTIFF'S EXHIBIT 1

PENGAD 800-631-6989

websites of organizations designated as recipients of grants from Education and Health Support Fund.

In accordance with FRCP 26(a)(2)(B), I have not testified as an expert at trial or by deposition in any other cases during the previous four years, and my compensation for the study and testimony in this case will be paid at the rate of $600 per hour, in accordance with my contract with the US Department of Justice.

## PART 1 – CHARITABLE REMAINDER TRUSTS

### Charitable Remainder Trust Basics

A charitable remainder trust ("CRT") involves a trust relationship whereby the donor transfers property to a trustee to be held and managed for the benefit of the beneficiaries of the trust. The trustee makes distributions to the current beneficiaries for the term of the trust, at the end of which the remaining trust property is distributed to the remainder beneficiary, which must be a qualified charitable organization. (Alternatively, the property may be held in further trust for the benefit of the remainder beneficiary after the expiration of the trust term.)

A CRT must be either an annuity trust, providing payments of a fixed amount annually to the current beneficiaries for the term of the trust, or a unitrust, providing payments which vary from year to year equal to a fixed percentage of the value of the trust property, as determined annually. The term of the trust may take either of two forms. The trust may continue for the life or lives of its current beneficiaries, or it may continue for a stated number of years (not more than twenty).

A CRT is generally exempt from federal income taxes (but only if it has no unrelated business income). Instead, the income of a CRT is taxable to its current beneficiaries when it is distributed to them. Such distributions are taxed on the basis of a four-tier system, under which distributions are considered to come in turn from ordinary income, then capital gains, then other (tax-exempt) income, and finally tax-free return of principal. Distributions received by a current beneficiary for a given taxable year are deemed to come first from ordinary income, to the extent of the trust's ordinary income for the year plus all undistributed ordinary income from prior years. If distributions exceed those amounts, they are next considered capital gain to the extent of all current or undistributed capital gain of the trust. Any remaining excess will then be considered other (tax-exempt) income, and only when all of these first three tiers are exhausted will any distribution be considered corpus. Thus, over time, all or most of the income received by a CRT will be taxed in the hands of its current beneficiaries.

For example, assume that a charitable remainder unitrust is created in 2008 with $1 million worth of stock, and that it is required to pay out 6% annually. Assume further that during 2008 the trust realizes a capital gain of $400,000 upon the sale of its stock, as well as dividends and interest amounting to $5,000. For 2008 the trust would distribute 6% of the $1 million corpus, or $60,000, to its current beneficiary. That $60,000 would

be taxable to the beneficiary first as ordinary income to the extent of the trust's ordinary income, or $5,000. The remaining $55,000 would be taxed as capital gain. The same treatment would apply the next year and each year throughout the term of the trust, until the trust's $400,000 gain from 2008 had been reported in full by the current beneficiaries.

The creator of a CRT is entitled to a federal income tax deduction equal to the actuarial value of the charitable remainder interest in the trust. This value is determined by multiplying the fair market value of the property transferred to the trust by the percentage set forth in IRS actuarial tables which take into account the payout rate of the trust, the term of the trust (based upon either the life expectancy of the beneficiary or beneficiaries, or the stated term of a term-of-years trust), and the official interest rate for the month of the transfer (or, at the option of the donor, the rate for either of the two preceding two months) under section 7520 of the Internal Revenue Code.

Uses and Applications for CRTs

Normal Usage

The CRT is a popular charitable planning device, normally used by individuals who wish to secure an income stream for themselves (and/or one or more other beneficiaries) and simultaneously provide for an eventual charitable transfer. It is a very flexible device, and fits a variety of planning situations.

The charitable deduction allowed for the donor's transfer to the trusts is based on the fair market value of the property transferred. Where noncash property is transferred the donor has an incentive to maximize the value of that property since a higher value will produce a larger deduction; in addition, for a CRT that is structured as a unitrust, a higher initial value for the trust property will also lead to larger distributions to the current beneficiaries. Any property other than cash or publicly traded securities will normally have to be appraised, resulting in a natural human tendency for donors to seek as high a valuation as possible from the appraiser.

The overwhelming majority of CRTs are created by donors acting upon a dual motivation; they wish to benefit a favorite charity, but in addition they need or desire to retain a right to income from the property transferred. Typical planning situations in which a charitable remainder trust is useful (assuming the individual in question has charitable intent) include the following:

- Providing a source of retirement income for the donor and his/her spouse.
- Deferral of capital gain on the sale of a business or a major investment. If the donor transfers the property in question to a CRT, the trustee may sell it and reinvest the full proceeds, because the trust is exempt from capital gains tax. By contrast, if the donor had sold the property, a capital gains tax would have to be paid for the year of the sale, leaving only the after-tax proceeds available for reinvestment.

- Advancement of a planned charitable bequest, thereby providing the donor with both a current income tax deduction and an income stream for life, in addition to the eventual transfer to charity.
- Providing an income stream to an aged dependent, domestic helper, or other person to whom the donor does not wish to make a permanent gift of corpus.

Virtually all charitable remainder trusts continue in existence for the full trust term provided in the governing instrument. Based upon my experience, I would estimate that relatively few CRTs – probably 1% or less – are caused to terminate before the termination date. Where such an early termination does occur, it normally results from external considerations, and not by prearrangement. Over the last few years, a number of IRS private letter rulings have approved the early termination of CRTs. Most of these have appeared to be the result of unfavorable financial results, such as those that resulted from the fallout in tech stocks in the early 2000's. Such results often cause the donor/beneficiary to conclude that the trust is too small, or otherwise not sufficiently viable, to justify its continuation. In other instances, divorcing spouses have sought to terminate a joint CRT, or to divide it into two separate trusts. I have never known or heard of a donor creating a CRT with an intention at the outset to terminate it early.

Abusive Applications

Because CRTs are exempt from federal income taxes, they have sometimes attracted the attention of financially motivated tax planners seeking to help their clients take advantage of this aspect of the CRT, even when such clients have no charitable motivation. The premier example of this occurred in the mid-1990s, when an abusive tax scheme known as the "accelerated charitable remainder trust" emerged. This consisted of a standard charitable remainder unitrust which provided for a two-year term and a payout rate of 80%. Thus, for each year such a trust would pay out to individual beneficiaries an amount equal to 80% of the value of the corpus at the beginning of the year. At the time, the applicable income tax regulations allowed CRT to make its distribution to current beneficiaries after the close of the year to which the distribution related.

The trustee of an accelerated CRT would hold the property originally contributed to the trust until after the close of the trust's initial taxable year. At that point, during the trust's second taxable year, the trustee would sell the property and use the proceeds to make the distribution called for with respect to the trust's first taxable year. Because the trust would incur the capital gain on the property during its second year, and would receive no income during its first year, the beneficiary would take the position that such distribution represented a tax-free return of corpus.

For example, assume that on January 1, 1995, a donor created an accelerated CRT with a two year term and an 80% payout rate, and funded it with property worth $100 million, having a zero basis in the hands of the donor. For 1995, this trust would be required to distribute $80 million to the donor/beneficiary. The trustee would delay the sale of this property until January of 1996. At that time, $80 million of the $100 million sales proceeds would be distributed to the donor/beneficiary, as his distribution for 1995. The

donor/beneficiary would take the position on his 1995 tax return that this distribution was tax-free. The remaining $20 million would constitute the remaining trust corpus, and for 1996, the trust would have a required distribution of $16 million (80% of the $20 million corpus). At the end of 1996, the trustee would distribute that $16 million to the donor/beneficiary, distribute the remaining $4 million to the charitable remainder beneficiary, and the trust would terminate since its two-year term was over.

Thus, if this scheme worked, utilization of the accelerated CRT would permit the donor to receive $96 million of the $100 million transferred to the trust, and pay tax (at capital gains tax rates) on only $16 million of that amount. This result was considerably more advantageous than simply arranging a sale of the asset and paying tax on the $100 million gain.

This accelerated CRT concept was extremely controversial in charitable circles, as it appeared to offer large scale tax avoidance that was certain to attract the attention of Congress. In fact, that did happen, and Congress changed the applicable statute (section 664 of the Internal Revenue Code) to provide that (1) a CRT could not have a payout rate in excess of 50%, and (2) a CRT would not be qualified if the actuarial value of the charitable share at inception was less than 10% of the total value of the trust property. That latter change effectively eliminated a number of potentially abusive uses of the charitable remainder trust. In addition, while Congress was deliberating those changes, the Internal Revenue Service changed the regulations, requiring in many cases that CRT distributions could not be made after the close of the taxable year. Thus, as a result of all these changes, the accelerated CRT is no longer a viable tax device.

Subsequently, aggressive tax planners even developed another CRT device, dubbed the "son-of-accelerated CRT," which used borrowed funds for the first year's distribution rather than waiting for proceeds of a deferred sale of trust property. This plan slipped through the safeguards adopted to block the accelerated CRT, necessitating another change in the regulations.

When the accelerated CRT device first appeared, the IRS promptly warned taxpayers of its opposition to this device and its intention to challenge its use. In Notice 94-78, the IRS pointed out that "Depending on the particular facts of each case, the Service will challenge transactions of this type based on one or more legal doctrines. A mechanical and literal application of the regulations that would yield a result inconsistent with the purposes of the charitable remainder trust provisions may not be respected. The tax consequences to the donor vary with the legal doctrine that is applied. * * * In addition, the donor and the trustee are likely to prearrange a delay by the trustee of the sale of the trust assets. This creates a transaction that is different in substance than in form." Those words are relevant for purposes of the present case. This warning was widely supported by charitable organizations and persons who work with them.

Charitable organizations normally react to schemes of this type with uniform and very vocal criticism of those who abuse charitable devices. Their criticism reflects a concern that such schemes could lead Congress to overreact and curtail or eliminate the

availability of the CRT -- an important estate planning device. Whenever tax planners come up with ways in which persons who have no charitable intent attempt to utilize charitable devices to achieve unintended tax benefits, charities have openly opposed such devices. This opposition is based upon a belief that, regardless of any short-term benefits they might derive from donors responding to such tax benefits, their long-term interests are better served by avoiding any impression in Congress or elsewhere that the benefits available for charitable contributions constitute a tax abuse that should be curtailed. Similarly, most organizations believe that persons who lack a charitable motivation should not create CRTs.

PART 2 - <u>ALPHA I v. U.S.</u> AND RELATED CASES

<u>Facts</u>

For purposes of my report, the following are the relevant facts:

1. On September 21, 2001, the four limited partners in R,R,M,&C Group, LP ("Group"), a Missouri Limited partnership with its principal place of business in Fairport, New York, transferred those partnership interest to four charitable remainder unitrusts ("the unitrusts") created on that same day. Each trust was created by one of the four partners of Group. Those partners were three members of the Sands Family of Rochester, New York (Richard Sands, Robert Sands, and Marilyn Sands), and CWC Partnership I (an entity whose partners were trusts created to hold the interests of the children of a fourth Sands sibling, the late Laurie Sands Stern).

2. Brian Czerwinski, an employee of the Heritage Organization, LLC (which marketed to the Sands the arrangement that is the subject of the litigation) reported that he attended two meetings with Richard Sands and Robert Sands at which the purchase of the remainder interests in the unitrusts was discussed. Those meetings took place on August 16, 2001, and October 1, 2001.

3. The partners claimed income tax charitable deductions for the transfers to the unitrusts. The values used for these transfers were based upon an appraisal prepared by George E. Goerig, of Goerig & Associates, an appraisal firm located in Anchorage, Alaska. That appraisal started with the asset value of R,R,M,&C Group ($71,780,711) then applied two discount factors to arrive at a final valuation of $20,816,406 for the partnership and $5,198,897 for a 24.975% interest therein (the amount transferred by each of the four partners). The 42% discount was based upon a review of various publicly traded partnership factors. The second discount of another 50% was applied after that to reflect the lack of marketability and the resultant illiquidity. The appraisal states that it was prepared for the sole purpose of establishing the fair market value of a 24.975% limited partnership interest "for gifting purposes."

4. Four months later, each of the trust creators designated "Sands Supporting Foundation" as the charitable beneficiary of his or her trust. Each trust filed an information tax return (IRS Form 5227) reporting distributions of $166,477 to its beneficiaries for the portion of 2001 for which it was in existence. This entity played no role in the subsequent transactions, and there is no evidence that it was ever formed.

5. On October 1, 2001, Group sold Constellation stock for total proceeds of $74,862,863. I understand that a principal issue in the subject litigation is the amount of basis allowable to offset the gain realized on such sale.

6. On Friday, February 22, 2002, the following events took place:

   a. Richard and Robert Sands caused a charity called "Educational and Health Support Fund" to be formed; and
   b. The grantors of the four charitable remainder unitrusts executed irrevocable designations naming Educational and Health Support Fund as a charitable beneficiary of each trust.

7. Five days later, on Wednesday, February 27, 2002, each of the charitable remainder unitrust grantors purchased the remainder interest in his or her charitable remainder unitrust from the new charitable remainder beneficiary, Educational and Health Support Fund. Each paid a purchase price of approximately $500,000 for his or her remainder interest, for a total of slightly more than $2 million. The appraiser who prepared the initial appraisal supplied a supplementary letter stating that the valuation as of September 21, 2001, was still valid as of February 27, 2002.

8. Educational and Health Support Fund reported the receipt of the purchase price payments from each of the charitable remainder unitrust grantors as contributions on Schedule B of its Form 990 for 2002. On page 1, line 1a of that return, the total received ($2,200,298) was listed as "direct public support" rather than as proceeds of sales of assets.

9. The purchase of the remainder interests by the current beneficiaries of the trusts was treated by the parties as causing the termination of each trust. Each trust grantor thus became the outright owner of an interest in a partnership holding assets, primarily cash, amounting in the aggregate to approximately $75 million.

10. According to their terms, the trusts in question would make annual payments in an amount calculated under a formula set forth in the trust agreements that would produce a remainder value equal to the minimum amount permissible for charitable remainder trusts, 10% of the initial corpus value. Each of these four trusts named its grantor/creator both as the recipient of trust distributions for the trust term, and (with one of the other Group partners) as trustee. The Alaska Trust Company was named as "Administrative Trustee." At the end of the stated

20-year trust term, the remaining trust assets were to be distributed to a charitable organization to be designated by the person designated to receive trust distributions, or selected by the trustees in their discretion if no such designation was made.

11. The trusts were used by their creators as temporary partners in Group during a period when Group realized large amounts of capital gain income from sales of Constellation stock and other securities. A qualified charitable remainder trust is exempt from federal income tax under section 664(c) of the Internal Revenue Code, and as such would not be taxable on the share of Group capital gains or other taxable income passed through to it as a partner in Group. Normally, the beneficiaries would have paid tax over the twenty-year trust term on these gains realized by the trusts, under the four-tier system of tax applicable to CRT beneficiaries. The Sands trusts were terminated almost immediately after their remainder interests were purchased, so that the beneficiaries received only two partial distributions. The current beneficiaries acquired nearly $75 million in liquid assets as a result of their payments of approximately $2 million for the remainder interests.

12. Four months later, on June 21, 2002, each of the trust grantors obtained an opinion letter from the New York law firm of Milbank Tweed addressing three specific issues:

   a. Whether the remainder interest in his or her trust may be assigned under the applicable state law (that of Alaska);
   b. Whether the trust will terminate if the grantor purchases the remainder interest; and
   c. Whether the purchase of the remainder interest and the termination of the trust will be a recognition event for federal income tax purposes.

13. The Milbank Tweed opinion letter was based on representations by each of the trust grantors that the trusts would be validly administered as charitable remainder trusts, that Educational and Medical Support Fund (sic) was a public charity, and that the purchases of the remainder interests "will be at fair market value and that there was no plan, prearrangement or understanding with the charity for the purchase of the remainder prior to its designation as the charitable remainderman." Those representations were not accurate and the presence of a plan, prearrangement or understanding is unmistakable. The purchases of the CRT remainder interests were discussed and planned even before the trusts were formed. Moreover, those purchases were concluded four months before the date of the Milbank Tweed opinion letter.

14. According to tax returns (Form 990) filed by Educational and Health Support Fund for calendar years 2004 through 2006, the co-trustees of that organization are Freddy H. Robinson and Wesley M. Stallings, both of Greensboro, North Carolina, and James A. Locke of Rochester, New York. Freddy Robinson is

Executive Partner, and Wesley M. Stallings is a tax partner. of Bernard Robinson & Co. LLP, a Greensboro, North Carolina accounting firm that prepared the tax returns for all of the Sands Group charitable remainder trusts. In addition, the address of such accounting firm listed on those trust returns (Forms 1041-A and 5227) is the same as the address for Educational and Health Support Fund as listed on that organization's Form 990 tax returns. James A. Locke is an attorney, a partner in the firm of Nixon Peabody LLP, and a member of the board of Directors of Constellation Brands. His firm's website indicates that he was one of two lead partners for the firm in its representation of Constellation Brands in its acquisition of a Swedish vodka brand in 2007 and another acquisition in 2006.

15. Although the tax returns described above list only three trustees for Educational and Health Support Fund, the Board of Trustees was increased to five members on September 25, 2003. On that date, Richard Sands and Robert Sands, as Grantors of Educational and Health Support Fund, appointed themselves as Co-Trustees to fill the vacancies created by such expansion of the Board. None of the returns for the organization that I saw reflect the presence of the Sands on the Board.

16. For 2004 and 2005, all the grants made by Educational and Health Support Fund (a total of $600,000 for each year) were made to organizations located in Rochester or Canandaigua, New York. These included grants amounting to $200,000 each year to each of three grantees: FF Thompson Foundation, The Harley School, and Rochester General Hospital Foundation. The Sands family plays a prominent role in all of these grantees. Marilyn Sands is on the board of the FF Thompson Foundation, and Robert Sands is on the board of Thompson Health, an affiliated organization. Robert S. Sands is Trustee Emeritus and an alumnus of The Harley School. Robert Sands is Chair of the Board of Directors of ViaHealth, an entity affiliated with Rochester General Hospital.

17. For 2006, Educational and Health Support Fund again made grants of $200,000 each to FF Thompson Foundation and Rochester General Hospital Foundation. In addition, it also granted $332,500 to The Harley School, and $50,000 to Rochester City Ballet. Nancy Sands serves as Chair of the Rochester City Ballet Board of Directors.

18. The tax returns of Educational and Health Support Fund for years before 2004 are not available on the Guidestar.org website.

<u>Conclusion</u>

It is my opinion that based upon the facts presented, the charitable remainder unitrusts created by members of the Sands Group should be disregarded as mere interim steps in a larger plan to sell Constellation Brands stock at a profit and retain substantially all the pretax proceeds realized.

Discussion

I believe that the facts surrounding the Sands charitable remainder trusts demonstrate that the various steps in the Sands family transaction made use of charitable remainder trusts as temporary partners in Group, serving in that capacity only long enough for completion of the sale of a large block of Constellation Brands stock on behalf of the Sands family. When this series of interrelated steps was concluded, the individuals who created Group (and transferred that block of stock to it) then transferred their interests in Group to the charitable remainder trusts. After the sale, they took back the sales proceeds, nearly $75 million, at a discounted value by purchasing the remainder interests from the trusts for a total of only $2 million.

All told, these trusts existed for only 102 days in 2001 and 58 days in 2002 – a total of less than half a year – spread over two different taxable years. This short life convinces me that they were never intended by their creators to have the 20-year duration provided in their governing instruments.

There is no evidence of any external event or concern suggesting that the idea of purchasing the remainder interests in the CRTs arose after the creation of the trusts. Rather, all the facts I have seen indicate to the contrary that the remainder beneficiary was formed to complete the sale of the CRT remainder interests to the Sands family members. The deposition of Brian Czerwinski, commenting on his handwritten notes, indicates that Mr. Czerwinski attended meetings with Richard and Robert Sands on August 16, 2001, before the CRTs were created, and on October 10, 2001, shortly after the unitrusts were created. At both of those meetings, the attendees discussed the creation of the CRTs and the subsequent purchases of the remainder interests therein.

It exceeds reasonable comprehension to believe that this newly-created organization, ostensibly run by Sands family advisors, could independently negotiate an arms' length sale of those interests to the Sands family members and consummate that sale between the Friday on which it was formed and the following Wednesday. I have never seen a transaction of this magnitude conceived and completed between independent parties within a five day period. It was only the prearrangement of all the steps – creation of the unitrusts, transfer of the partnership interests, sale of the Constellation Brands stock by the partnership, the termination of the trusts, and appropriation of the proceeds by the original Constellation shareholders – that made it possible to conclude this complicated transaction in just five days.

These transactions were all structured and controlled by the Sands Group and its advisors, and none were conducted at arm's length. Consider the following:

- The charity, Educational and Health Support Fund ("EHSF"), that sold the remainder interests to the Sands family members was created by or on behalf of the Sands family on the eve of the sale of the remainder interests (five days prior to that sale).

- The three trustees of EHSF were subservient to the Sands interests – two members of an accounting firm serving members of the Sands family and an attorney who served the Sands business interests and sat on the board of Constellation Brands, the Sands family business.
- Subsequently, in the year after the year in which the CRT transactions were completed, Robert Sands and Richard Sands even appointed themselves trustees of EHSF, although that was not reported on the EHSF tax returns.
- EHSF was based in the North Carolina office of the Sands family accountants who serve on its Board. Subsequently, Richard Sands and Robert Sands appointed themselves to the Board.
- All of the grants paid by EHSF, at least in years from 2004 through 2006, went solely to organizations in upstate New York for which Sands family members served as directors or principal officers.

By any objective standard, EHSF was not at any time independent of the Sands family. To characterize the sales of its remainder interests in the charitable remainder trusts to Sands family members as arm's length transactions with independent third parties is to ignore the obvious reality of the situation.

It is my opinion that the transitory participation of the Sands CRTs as transitory partners to receive the sales proceeds of the Constellation stock sales should be ignored for tax purposes. To respect those transactions would approve a new tax avoidance device that is as abusive and inappropriate as the accelerated CRT and its progeny.

Several other factors likewise demonstrate that, in substance, the sale of the Constellation Brands stock was engineered by the Sands family and its advisors with the sole intention of securing for them the benefit of a tax free sale. First, as previously noted, the timing of the transactions indicates that there could not have been any real discussions or negotiations between the parties. EHSF was created on Friday, February 22, 2002, by Richard and Robert Sands, and on that same day was irrevocably designated the charitable remainder beneficiary of all the Sands family CRTs. Just five days later, on Wednesday, February 27, all four members of the Sands Group purchased the remainder interests in their respective trusts from EHSF.

In my experience, it is unlikely that even a truly independent charitable organization would be able to consider and consummate a transaction of that magnitude in a five day period. The fact that a weekend intervened makes that all the more unlikely, unless the sales of the remainder interests were planned, managed and overseen by a single coordinator, in the same manner as the other transfers in question.

Second, the trusts themselves were not in existence for their stated 20-year terms, but rather all four trusts went out of existence after just 160 days, as soon as they had served their purpose of providing the bulk of the proceeds from the Constellation Brands stock sale to the Sands Group. I have never in my 40 years of practice known a charitable remainder trust to terminate in such a short period of time. Nor have I seen an

instance in which trust were formed with an existing intention that they would be terminated earlier than the stated end of the trust term.

If the trusts had had been allowed to continue until their stated termination date, the trust beneficiaries would have been subjected to tax on all or most of the capital gains realized by the unitrusts, as they received the trusts' annual distributions. By terminating the trusts early, almost immediately after their creation, the beneficiaries attempted to circumvent the statutory scheme and inappropriately avoid those taxes altogether.

In addition, the overall context of these complicated transfers and the manner in which they were conceived and carried out indicates that the true purpose of these trusts and the related transactions was to serve the beneficiaries' tax avoidance purpose and not to accomplish the family's charitable goals.

- This was a tax shelter deal purchased from tax shelter promoters and carried out by professionals related to those promoters.
- The eventual purchase of the remainder interests in the CRTs was discussed in the early stages of the plan.
- The appraisal of the partnership interests transferred to the CRTs was out of line with the usual appraisal for a charitable transfer. Normally, in such a situation the appraisal will be structured to support the largest value that can be realistically justified, since this is the basis for the client's charitable contribution deduction. By contrast, the Sands appraisals sought to maximize the discounts applied, much like a valuation prepared for estate tax or gift tax purposes. My conclusion is that this must have been done to bolster the lowest possible value for the eventual purchase of the remainder interests in the CRTs. The fact that those purchases occurred only five months later bolsters that conclusion.
- Although not conclusive, the external trappings of the transaction seem calculated to present a misleading appearance. For example, rather than complete the remainder transaction with "The Sands Supporting Foundation," the initial charitable beneficiary of the CRTs designated on January 28, 2002, a new charity with a more independent sounding name was created and designated as beneficiary 25 days later. The latter entity was placed in North Carolina, far from the Sands family base in upstate New York. Sands family members were not on the original Board of Trustees of that charity, but were apparently added a year later (although that fact was not reflected on Form 990 returns).
- The 2002 tax returns of that new entity reported the sales proceeds from the remainder sale as contributions.
- Similarly, the creation of the unitrusts and the purchases of the remainder interests therein, although only five months apart, were arranged so to occur in two different taxable years, thus enhancing the apparent time between the two events. Placing distance between these two events, making the trusts appear more "old and cold" with respect to the later purchases, superficially bolsters the appearance of independence and the

argument that these were unrelated events. The existence of evidence that the purchases were discussed even before the unitrusts were created disproves that appearance and establishes the relationship between the two events.

Finally, this use of CRTs to accomplish tax avoidance on a massive scale by persons who had only limited, if any, charitable motives is exactly the sort of abuse that causes great concern within the charitable community. I believe that any experienced charitable tax planner would have warned the participants that the transaction would be subject to tax in accordance with its substance – a sale by the Sands family of the Constellation Brands stock – rather than its form. The Milbank Tweed opinion letter implicitly recognized this when it conditioned its conclusion on a set of facts that were demonstrably absent – a lack of any plan, prearrangement or understanding with the charity for the purchase of the remainder prior to its designation as the charitable remainderman. There was such a plan and the purchases were discussed with Richard and Robert Sands even before the unitrusts were created or the remainderman was designated or created.

The unitrusts were not intended to function as charitable remainder trusts at all, but rather as mere accommodation parties in an attempt to accomplish the sale of that stock on a tax-free basis. The success of the plan depended upon its not being detected upon IRS audit. The end result envisioned by the Sands family and its advisors – tax free receipt of $75 million in liquid assets for a purchase price of only $2 million – was in fact a result too good to be true.

Signed,

Jerry J. McCoy
Law Office of Jerry J. McCoy
PO Box 66491
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20035-6491
[202] 466-6941

# JERRY J. McCOY

Office:

1050 Connecticut Avenue, N.W., Suite 1250
P.O. Box 66491
Washington, D.C. 20036
(202) 466-6941 [fax (202) 466-6942]
mccoylaw@aol.com

Home:

3560 Winfield Lane, N.W.
Washington, D.C. 20007

Professional Associations

Private Practice, Washington, D.C. (Since 1994)

Diversified tax practice with heavy specialization in tax-exempt organizations, charitable tax planning and estate planning. Clients include colleges and universities, national and international charitable organizations, private foundations and related organizations, both publicly- and closely-held businesses, and private individuals.

Reid & Priest
Washington, D.C. (1992-94)

Silverstein and Mullens
Washington, D.C. (1968-1992)

Charitable Gift Planning News, a monthly newsletter published by Little, Brown & Co., Boston, Mass. until June, 1990, now published by the co-editors (Co-Founder and Co-Editor, 1983 to date)

Co-founder and co-author of monthly newsletter on tax and other considerations affecting charitable giving; circulation includes development officers for educational institutions and other charitable organizations, as well as attorneys, accountants, financial planners, life underwriters, and other donee advisors.

Family Foundation Advisor, a monthly newsletter published by Civic Research Institute, New York (Co-Founder and Co-Editor, 2002 to date)

Co-founder and co-editor of bi-monthly newsletter for advisors and managers of family foundations, designed to complement the Family Foundation Handbook (listed below).

Professional Organizations

American Bar Association, Section of Real Property, Probate and Trust Law (Washington Coordinator for the Probate and Trust Division; Group Chairman for Committees on Charitable

Planning and Exempt Organizations)

American Bar Association, Section of Taxation (Co-Chairman, Subcommittee on Community Foundations of Exempt Organizations Committee; former Chairman of Legislative Recommendations Committee)
Fellow of The American College of Trust and Estate Counsel (Past Chairman, Charitable Planning and Exempt Organizations Committee; 1990-91 Editor of Probate Notes)

Fellow of The American College of Tax Counsel

Member, American Law Institute

Adjunct Faculty, Georgetown University Law Center (coinstructor for charitable tax planning course in the Master of Laws in Taxation Program, 1996-date)

Adjunct Faculty, University of Miami Law School (coinstructor for charitable tax planning course in the Master of Laws in Estate Planning Program, 1983-date)

Founding Faculty, American Institute of Philanthropic Studies, California State University, Long Beach

Named in Who's Who in America and Who's Who in American Law (Marquis), and The Best Lawyers in America (published by Woodward/White)

Other Memberships and Positions

Member, Board of Directors, National Committee on Planned Giving (1992-1994)

Assistant Treasurer, National Park Foundation (1972-1993)

Treasurer and Co-Counsel, Commission on Private Philanthropy and Public Needs [The Filer Commission] (1973-1976)

Member, Advisory Committee, Philip E. Heckerling Institute on Estate Planning, University of Miami, 1978 to date

Member, BNA Tax Management Estates, Gifts, and Trusts Advisory Board (1972-date)

Advisory Board, The Exempt Organization Tax Review (a Tax Analysts publication)

Board of Advisers, The Journal of Taxation of Exempt Organizations (a Warren, Gorham & Lamont publication)

Publications and Lectures

Co-Author (with Kathryn W. Miree), Family Foundation Handbook, (2007 edition), published by Commerce Clearing House (A Wolters Kluwer Company), New York.

Author, United States chapter in International Charitable Giving: Laws and Taxation, (Carole Shelbourn George, ed.), Published 1994 by Graham & Trotman/Martinus Nijhoff (Kluwer Academic Publishers Group), London/Dordrecht.

Author of articles on tax, estate planning, and charitable subjects in various professional publications (in addition to the institutes listed above), including Trusts & Estates, The Journal of Taxation of Exempt Organizations, Tax Law Review, TAXES - The Tax Magazine, Taxation for Accountants, Taxation for Lawyers, The Practical Tax Lawyer, and numerous publications of Tax Management, Inc. (a division of the Bureau of National Affairs, Inc.)

Speaker at national, regional and local meetings on tax and estate planning subjects, including the following:

Philip E. Heckerling Institute on Estate Planning, (University of Miami)
New York University Institute on Taxation
Southern Federal Tax Institute
American Bar Association (Annual Meetings)
Tulane Tax Institute
Midwest Tax & Business Planning Institute
Duke Estate Planning Conference
UCLA/CEB Estate Planning Institute
Georgetown Law Center/D.C. Bar Institutes
Notre Dame Estate Planning Institute
National Conference on Planned Giving
American College of Trust and Estate Counsel (Annual Meetings)
ALI/ABA National Institutes
Various State Bar Meetings, Local Planned Giving Councils, Estate Planning Councils and Community Foundations Nationwide

Education

LL.M. (in Taxation), New York University School of Law, New York, N.Y. (1967)

LL.B., Duke University School of Law, Durham, N.C. (1966)

B.S. in Business Administration, West Virginia University, Morgantown, W.Va. (1963)