IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407-T

(into which have been consolidated Nos. 06-408-T, 06-409-T, 06-410-T, 06-411-T, 06-810-T, 06-811-T)

Judge Emily C. Hewitt

- - - - - - - - - - - - - - - - - - - - - X
:
ALPHA I, LP, by and through :
ROBERT SANDS, a notice partner, :
Plaintiff, :
v. : 06-407-T
THE UNITED STATES, :
Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - X
:
BETA PARTNERS, LLC, by and through :
ROBERT SANDS, a notice partner, :
Plaintiff, :
v. : 06-408-T
THE UNITED STATES, :
Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - X
:
R, R, M & C PARTNERS, LLC, by and through :
R, R, M & C GROUP, LP, a notice partner, :
Plaintiff, :
v. : 06-409-T
THE UNITED STATES, :
Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - X
:
R, R, M & C GROUP, LP, by and through :
ROBERT SANDS, a notice partner, :
Plaintiff, :
v. : 06-410-T
THE UNITED STATES, :
Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - X

PLAINTIFF'S EXHIBIT 2

PENGAD 800-631-6989

(Caption Continued)

- - - - - - - - - - - - - - - - - - - - - X
:
CWC PARTNERSHIP I, by and through :
TRUST FBO ZACHARY STERN U/A :
FIFTH G. ANDREW STERN AND MARILYN SANDS, :
TRUSTEES, a notice partner, :
Plaintiff, :
v. : 06-411-T
THE UNITED STATES, :
Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - X
:
MICKEY MANAGEMENT, LP, by and through :
MARILYN SANDS, a notice partner, :
Plaintiff, :
v. : 06-810-T
THE UNITED STATES, :
Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - X
:
M, L, R & R, by and through :
RICHARD E. SANDS, tax matters partner, :
Plaintiff, :
v. : 06-811-T
THE UNITED STATES, :
Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.

Wednesday, May 14, 2008

DEPOSITION OF JERRY J. McCOY, the witness herein, called for examination by counsel for the plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DEBORAH S. CUBBAGE, a notary public in and for

the District of Columbia, at the law offices of Sutherland, Asbill & Brennan, 1275 Pennsylvania Avenue, N.W., Washington, D.C., commencing at 9:45 a.m., the proceedings being recorded by stenotype by DEBORAH S. CUBBAGE of DSC Reporting, Inc., and transcribed under her direction.

APPEARANCES:

On behalf of the plaintiff:

THOMAS A. CULLINAN, ESQUIRE
JULIE P. BOWLING, ATTORNEY
Sutherland, Asbill & Brennan
999 Peachtree Street, N.E.
Atlanta, Georgia 30309-3966
Phone: (404) 853-8000
E-mail: tom.cullinan@sutherland.com
E-mail: julie.bowling@sutherland.com

On behalf of the defendant:

THOMAS M. HERRIN, ESQUIRE
MICHELLE C. JOHNS, ATTORNEY
Tax Division
Department of Justice
Suite 400
717 N. Harwood
Dallas, Texas 75201
Phone: (214) 880-9745
E-mail: thomas.m.herrin@usdoj.gov
E-mail: michelle.c.johns@usdoj.gov

Q. Did you conclude anything else in your report?
A. I'm not sure how to respond to that question.
I mean, there were a lot of points considered and the like.
I'm not sure which ones you would classify as a conclusion and which would --
Q. Well, what are you opining upon?
A. I was asked to address the question of the -- whether the tax exclusion for charitable remainder trust would be applicable, whether the trust would be respected for tax purposes.
Q. And your ultimate conclusion is what's stated on page nine.
A. Yes.
Q. Do you stand by that conclusion?
A. I do.
Q. Is this a conclusion that is based on factual determinations?
A. Yes.
Q. Is there any legal aspect to your conclusion?
A. Not really. It's a legal proceeding, but mine is a factual.
Q. Under what standard or what standard did you use to

determine that given the facts as you found them dictated that the CRUTs should be disregarded?

A. Would you clarify that?

I'm sorry. It's a long --

Q. Sure.

Did you determine that the CRUTs were shams?

A. "Sham" is a pejorative term, especially if it's a mere sham. Then you know it's one that didn't work.

No. It's based on my experience as a charitable person, a person active with a chair -- planning charitable transfers, working with donors and donee organizations, that this was out of step with my experience over some 30-40 years of doing that.

Q. When you say that they should be disregarded, are you saying that they should be treated as though they never existed?

A. I think that's true, yes.

Q. Okay. Well --

A. Because they were intermediate steps in a prearranged plan.

Q. Are you familiar with the step transaction doctrine?

A. I am.

Q. Are you applying the step transaction doctrine to make that determination?

A. I think it would apply; but what I was asked to do was to put this in the context of my experience in planning charitable transactions and representing charities and donors.

Q. I understand that.

What I'm trying to understand from you is what standard that you applied.

I mean, is it just because you say so?

I mean, is there -- is this an economic substance analysis?

Is it a sham transaction analysis?

Is it a step transaction analysis?

Normally a court would pick one to say that something should be disregarded.

So on what basis are you saying that the CRUTs should be disregarded?

A. I think on the basis of all of those, in light of my experience; that this is the sort of thing that I have never seen planned.

I have never planned one like this; and I can only suspect that that's the result, that it should be disregarded.

Q. I understand what you believe the result should be.

I'm just trying to figure out what standard it is that you applied.

So you said all of those. So you believe that the CRUTs are shams.

A. Yes, I think more or less.

Q. Okay. What standards did you apply to determine that the CRUTs were shams?

A. I don't know that I could state a standard.

It's a factual thing; and all of the facts that are listed in here, several times, suggest that it wasn't treated in a normal fashion the way a charitable trust normally would be dealt with.

Q. Are you aware of the difference between a sham in fact and a sham in substance?

A. I'm not.

Q. Are you aware of the appropriate test for determining whether something is a sham in the Second Circuit?

A. No, I'm not.

I wasn't aware that "sham" was a technical term that would be different in different circuits and that sort of thing.

I think it's generally a factual conclusion or is the taxpayer usually loses when something is a sham.

Q. But isn't it true that -- it is a factual conclusion, but you have to analyze those facts under some type of standard; correct?

A. I guess, yes.

Q. All right. And when you said "all of them" a couple of questions back in response to my question about step transaction, economic substance, and sham -- let's move on to step transaction.

So do you also believe that the CRUTs should be disregarded under the step transaction doctrine?

A. I guess, yes, I would say so.

Q. What version of the step transaction doctrine would you say that these CRUTs should be disregarded under?

MR. HERRIN: Objection to the form.

You are asking for a legal conclusion; and although he is an expert witness, that's going to be a determination for the Court to make.

Now, if he knows, he can certainly answer the question.

THE WITNESS: I don't know. I was going to ask you what are my choices. I have never heard it broken down that way.

BY MR. CULLINAN: (Resuming)

Q. So you don't know what different versions of the step transaction doctrine exist.

A. I could not state them, no.

Q. Okay.

A. My understanding of it is that it is a rather permeable concept; that it's -- it's primarily factual, and it varies as facts do.

So I would not know -- can you give me some subdivisions?

I could learn something here.

Q. Well, what specific expertise do you have in judging what standard should be applied to determine whether the CRUTs should be disregarded?

A. I am a lawyer working in this area with many years of experience; and I know that there are situations that I would not go forward with because of the likelihood that, if discovered on audit, that it would be put aside.

And I would think this would be one of them.

Q. Let me make sure I understand this; and correct me if I misstate anything here.

But it is your skill as a legal practitioner that you have gained over so many years of working this area that you are using to just assess the facts as you understand them

to determine that the CRUTs should be disregarded.
A. I guess I'm not sure about the "legal practitioner" part because I think there are a lot of people who are active in the charitable planning area that are not lawyers.
We're talking about the practice of charitable remainder trusts and what one would or would not think would hold water.
Q. Why is it -- what -- do you feel that you have any particular skills that lend themselves to assessing the facts in this case?
A. I think experience.
Q. Experience as what?
A. Experience as a charitable gift planner.
Q. What did you do to reach the opinion or your opinion that the CRUTs should be disregarded?
A. What did I do?
Q. Yes.
A. I reviewed a lot of materials to try to extract what the facts were here.
Q. Okay.
A. Was that --
Q. Did you do anything other than review materials?
A. I thought about it. I mean, I analyzed them, wrote

them down, tried to summarize what had happened.
I'm not sure I understand that question.
Q. Who did you speak with about the opinion that you have given in this case?
A. Who did I speak with?
Q. Um-hmm.
A. No one other than counsel for the government.
Q. Did you speak with Robert Sands?
A. No, I did not.
Q. Did you speak with Richard Sands?
A. Of course not.
Q. Did you speak with Marilyn Sands?
A. I spoke to no one Sands; no one on the defendant's side or anywhere else other than these two.
MR. HERRIN: For the record, that would be the plaintiff's side; but just to clarify.
THE WITNESS: Oh, excuse me.
Did I say "Defendant"?
MR. HERRIN: Yes.
BY MR. CULLINAN: (Resuming)
Q. Well, I'm going to go through this just to get it on the record.
Who are the trustees of the Educational and Health

Support Fund?

A. Two accountants for the Sands family; a lawyer named -- I don't remember the names; and there is some confusion as to whether or not the Sands reappointed themselves after a year. I saw documents saying they did, but they did not report that on the tax returns.

So I'm not sure whether there are three or five trustees.

Do you know that answer, incidentally?

Q. I'm not the one being deposed.

A. I understand that.

Q. For the relevant year, 2001 and 2002 -- or relevant years, I'll say -- who were the trustees?

A. It was the three -- the two accountants and the lawyer.

Q. Okay. And I think you said two accountants from the Sands family.

What did you mean by that?

A. No; for the Sands family.

Q. For the Sands family.

A. People who served -- yes.

Q. Do you remember the --

A. The names?

I do not.

One is called Freddy. They are with an accounting firm in North Carolina.

Q. Freddy Robinson?

A. Yes, I think that's right.

Q. Wes Stallings?

A. That's right.

Q. Jim Locke?

A. Locke is the lawyer with the Nixon Peabody law firm in Rochester.

Q. Did you speak with any of them in preparing your report?

A. No. I spoke with no one.

Q. Why didn't you speak with anyone who had firsthand knowledge of the facts?

A. I didn't understand that to be my role.

I'm not the fact finder here.

Q. All right. Well, now I'm confused because you say you're not the fact finder here; but you have determined that the CRUTs should be disregarded based on, as I think you called it, all the facts.

So how did you determine that there were -- that they should be disregarded if you're not the fact finder?

A. The facts that were in the record that I saw were sufficient for me to judge mine.

I thought it was improper for me to talk to anyone about the case.

In fact, I believe that was in my employment agreement, was it not, that I would not discuss it with any --

MR. HERRIN: There would be disclosure issues. I will state that for the record.

BY MR. CULLINAN: (Resuming)

Q. Did you ask counsel whether you could speak with those people?

A. No, I didn't.

I took that for granted.

I can't imagine, unless they would deny some of the things that were in the record, that you or your co-counsel put in.

Q. Are you aware that Richard Sands was deposed by the Department of Justice?

A. No, not specifically.

Q. Are you aware that Robert Sands was deposed by the Department of Justice?

A. I don't know what depositions have been taken other than Czerwinski.

Q. So you have not brought any documents that are not listed on Exhibit 2.

A. I don't believe I did.

Q. Okay. Who selected the documents that you reviewed that are listed out on Exhibit 2?

A. Counsel for the government supplied them to me --

Q. Did you --

A. -- with the exception of the Web site.

Q. Did you ask counsel for the government for access to any other documents?

A. You mean the items I had requested but was refused?

Q. Yes.

A. No.

Q. I note on your list that you reviewed a response to a motion filed by the plaintiffs in this case in the Court of Federal Claims, and that's the government's response.

It's on the second page.

It says, "United States' response to Plaintiffs' motion to substitute parties and to dismiss certain causes of action for lack of jurisdiction and supporting brief."

A. Yes.

Q. So you reviewed that document.

A. Yes.

That was to provide me with a detailed listing of the facts, which are quite confusing for someone such as me.

Q. Did you -- did you review the plaintiffs' motion?

A. No.

Q. Did you review the plaintiffs' reply to the United States' response?

A. No, I did not.

Q. So you --

A. Nor did I read the brief part of this material.

I was just looking at the factual statements.

Q. So you reviewed the United States' recitation of the facts.

A. Yes.

Q. Okay. Did you plan to review anything -- any additional materials prior to the trial in this case?

A. No, I'm not -- I don't have any right now that I am aware of.

Q. Okay. So you believe your report to be complete --

A. Yes.

Q. -- and accurate.

A. Yes.

Q. Do you plan to speak with anybody else about your report prior to trial, aside from Mr. Herrin and Ms. Johns?

Q. Did you review the Marilyn Sands CRUT formation documents?

A. Not to the extent that I would know if there was a difference.

I assumed that they were all about the same.

I went in detail through one of the files but -- either Robert or Richard Sands, I forget which one it was; but the others were more or less identical.

I think he's going to tell me that they weren't.

(The following document referred to was marked as McCoy Deposition Exhibit No. 5 for identification.)

BY MR. CULLINAN: (Resuming)

Q. Go to page -- what's been Bates stamped Sands-0416.

Can you tell me from the top whose been named as the trustees?

A. Yes.

Richard and Robert were apparently the independent trustees of Marilyn's trust.

Q. So is your factual conclusion in paragraph 10 accurate?

A. No.

remainder prior to its designation" --

A. I would read that as -- may I interrupt for a minute?

Q. No. Let me finish the question, please.

"There was no plan, prearrangement, or understanding with the charity for the purchase of the remainder prior to its designation as the charitable remainderman."

How was that untrue?

A. What I wanted -- when I interrupted, what I was going to say was that there was no plan, there was no prearrangement, or there was no understanding with the charity.

I think there was an overall plan here.

Q. By who?

A. By or on behalf of the Sands.

Q. What do you mean by that?

What do you mean by "on behalf of"?

A. The Sands were the principals. They were the trustees. They were on both sides of the transaction. They were trustees of the trust, and they were -- I think it's very hard to have anything other than an understanding or prearrangement where the same parties are buying and selling

Q. All right.

A. But we were still on the question about why there was correspondence.

Q. I'm going back there.

A. Again, but not now.

Q. Who were the trustees of the supporting organization?

A. At that time, Freddy Robinson, Wesley Stallings, and James Locke.

Q. And wasn't the supporting organization the seller?

A. Yes. It was the charitable beneficiary.

Q. So then how was it that the Sands were both the buyer and the seller?

A. Well, okay. I may have misspoken on that.

They were trustees of the charitable remainder trust, but they weren't -- the charitable remainder trust did not sell. You're correct.

Q. Okay. So the Sands were the buyers, and the supporting organization was the seller.

A. Right; because it had been designated a day or two before as the charitable beneficiary.

Q. Okay.

A. The original one in the document -- you have been

compromised him in that regard.

Q. So you have no way of knowing whether Mr. Locke exercised his fiduciary duties to the supporting fund independently or not, do you?

A. No; just the timing of the transactions.

Q. All right. So your basis in determining that this representation -- going back to the representation -- that there was no plan, prearrangement, or understanding with the charity for the purchase of the remainder prior to its designation as the charitable remainderman -- your determination that that representation is false is based solely on the timing of the transaction.

A. No. No.

It's on the overall situation.

Q. Okay. Well, what do you mean by "the overall situation"?

A. The charities -- well, this is in my report.

There were a number of other things.

The trustees had served the Sands family interest.

I assumed, but I don't know for -- the extent of it. I assumed they were important clients.

A client that stays around for five years is usually an important client in any law firm.

charities that the grantor has an interest in?
How is that --
A. The point I was making is that they chose these North Carolina accountants as the trustees.
The draft documents that were in the file that I was given that was produced, I guess, in response to discovery showed that the -- originally this was going to be called the Sands Supporting Organization; and that's the name that was in the original charitable remainder trust documents.
Q. And what relevance do you ascribe to that fact?
A. I can only speculate, so --
Q. All right. And you did speculate in your report; correct?
A. Yes.
Q. Okay. So your speculation isn't grounded in any fact, is it?
A. Yes. It's in the fact that --
Q. Other than the objective fact that the name was changed; but you don't have any other evidence to support your determination in your report that the reason that they did it was to make it more difficult for the IRS to challenge the transaction.
A. It is yet another of the 10 or so facts that I

A. There couldn't have been one before it existed.

I suppose maybe, in that if there were discussions with the people that were ultimately named as the trustees.

Q. Do you have any evidence to suggest that those discussions ever took place?

A. No. Just circumstantial is all.

Q. Okay. The next sentence you say, "The purchases of the CRT remainder interests were discussed and planned even before the trusts were formed."

Okay. Discussed by who?

A. Those meetings that were referred to in the Czerwinski deposition.

Q. But you don't know who attended those meetings.

A. I can't name who all was there.

It would have been someone from the Sands side and someone from the Heritage side.

Q. Okay. Planned by who?

A. Presumably by the Sands or on their behalf by their professionals.

I don't know.

You had an Alaskan trust company, you had an Alaskan appraiser, you had a Boise law firm, and you had Milbank Tweed in New York, and presumably Locke and his lawyer

Q. Is there any way that when Milbank rendered its opinion that it would not have known that the CRUTs had already terminated?

A. I don't know. I have no idea what they knew.

Q. Because you didn't speak with anybody at Milbank Tweed.

A. No. No, I didn't.

But it was four months after the termination had occurred.

Q. If there was no plan, prearrangement, or understanding with the charity for the purchase of the remainder prior to its designation as a charitable remainderman, how would that affect your opinion in this case?

A. I would have to reconsider it.

Q. Well, would you otherwise agree with Milbank's opinion as the tax consequences?

A. If we took as a fact that there was no plan, prearrangement, or understanding with the charity?

Q. Yes.

A. There is still these other facts, but it would -- as I say, I would have to reconsider it.

I'm not -- wouldn't just sit here and say, "Oh, absolutely, it's out the window."

Q. But you haven't been involved in the actual decision-making process as to whether that ruling is granted or not.

A. Only as an advocate on the outside trying to get the ruling.

I think the last sentence there is one you should get to get the full story, that "I have never known or heard of a donor creating a CRT with an intention at the outset to terminate it early."

Q. Okay. Well, let's talk about that.

How do you judge what somebody's intent was without speaking to them?

A. Well, I'm talking here about people I did speak with, in my practice and my experience; not your class of --

Q. You -- well, you say -- the sentence that you're pointing me to now says, "I have never known or heard of a donor creating a CRT with an intention at the outset to terminate it early."

So you are presupposing that or are you presupposing that the Sands had the intention at the outset to terminate it early?

A. This sentence doesn't address the Sands' situation.

I am just talking about I have never seen that

happen.

Q. Well, what's the relevance of this sentence to your report?

A. Well, I think that's the case here; that they did -- there was a discussion at the outset before the trusts were created about terminating.

Q. Was there an intention at the outset?

A. There must have -- they talked about that as a possible action.

Q. Okay. So they talked about it as a possible action.

A. We can mince words as to whether it's an intention or a possibility or something like that; but my statement here is that, in my experience, I have never heard anyone even talk about it.

I am saying "terminate," but I have never heard it come up.

Q. Sir --

A. I would discharge a client who had that in mind and got me on the hook with a situation without telling me that that was an intention.

Q. Sir, your statement in your report says, "I have never known or heard of a donor creating a CRT with an

intention at the outset to terminate it early."

A. Right.

Q. So are you implying that the Sands had an intention at the outset to terminate it early?

That's your word, "intention." It's not mine.

If you want to back away from it now --

A. That's my sentence, and I stand by it a hundred percent.

I'm not relating that sentence to the Sands in the report.

I'm saying -- we're talking of -- it's a tag sentence in a paragraph that's talking about terminating trusts early.

Q. All right. And that just doesn't relate to the Sands.

A. It doesn't specifically relate to the Sands.

Q. Okay.

A. I think they discussed it, as we have gone over.

Q. All right. Do you have any evidence -- strike that.

Let's go on to the rest of your report here.

You talk about some abusive CRT transactions.

A. Um-hmm.

BY MR. CULLINAN: (Resuming)

Q. Different how?

A. Different in it would have been a long period of time. The two events would have looked, you know, more independent.

This is the other extreme from when you said what if it all happened on a Friday afternoon.

Your next question is going to be where in between is the line.

Q. Yeah.

Where is the line?

A. One never knows.

Q. How are you better equipped than a judge to assess where the line is?

A. That is the judge's function. I'm clear on that.

I have a view of it, though; and I think that they are on this side of the line at the five-month mark.

Q. Again, back to page 12.

You have some language here, the second half of that sentence: "By terminating the trusts early, almost immediately after their creation, the beneficiaries attempted to circumvent the statutory scheme and inappropriately avoid those taxes altogether."

And then going on: "In addition, the overall context of these complicated transfers and the manner in which they were conceived and carried out indicates that the true purpose of these trusts and the related transactions was to serve the beneficiaries' tax avoidance purpose and not to accomplish the family's charitable goals."

I think even before that, the carryover language, you say -- well, I guess you're referring to something different.

How important is your determination of the Sands' intent to your report?

A. Well, I don't even have any direct evidence of their intent other than it's just circumstantial from the overall -- the appearance of prearrangement.

Q. So is it possible to judge somebody's intent, you know, in a purchase type transaction without speaking to either the buyer or the seller?

A. I think it is.

Q. You think it is.

Based on the trust documents as you've construed them, how does the Sands' intent matter?

And your assumption of their intent is that they always intended to buy back the remainder interest; correct?

How does that intent matter unless the trustees, who control the seller, were complicit in that, that they were just going to go along with it and sell out?

A. Well, once again, we're picking at little individual parts of it; but I think the overall pattern suggests one of prearrangement.

Q. I understand that.

But the trustees could have blown up the entire deal; yes?

A. Yes.

Say: Absolutely not. We're going to hold on for 20 years because we want to get the 75 million at the end.

Q. So if that was the best choice for them, in terms of fulfilling their fiduciary duty, did the Sands have any recourse, any legal recourse, under these documents to unilaterally dictate early termination?

A. If they had, I doubt if they would all be serving the Sands' family interest today.

Q. I'm sorry. That's not responsive.

A. The accounting firm would no longer be on the case, and I think Mr. Locke probably wouldn't be on the board.

Q. But did the Sands have any right to force the early termination of the trust?

and Health Support Fund."

Q. Do you have any firsthand knowledge as to why that was done?

A. No.

It's the only change in the instrument.

Q. So are you -- is this purely speculation then that you are assuming that the name was changed to --

A. I would call it "informed speculation."

Q. Informed on what?

What informed your decision, aside from the fact that the document itself was changed?

A. I don't know how to answer that.

Q. Well --

A. I mean, I -- it was changed; and this was, as I say -- although not conclusive, it changes the external arrangements. It reported the transactions happened in two taxable years.

Well, that's another part of the same thing, the appearances of it.

Was it old and cold?

Not really, because it was only five months; but it did show up in two different years' tax returns.

Q. You used the term "misleading appearance" in your