UNITED STATES COURT OF FEDERAL CLAIMS

ALPHA I, L.P., BY AND THROUGH *
ROBERT SANDS, A NOTICE *
PARTNER, *
*
Plaintiffs, *
*
vs. * NO. 06-407-T
*
UNITED STATES OF AMERICA, *
*
Defendant. *

*****************************************************************

ORAL DEPOSITION OF TIMOTHY SEABERG

*****************************************************************

ANSWERS AND DEPOSITION OF TIMOTHY SEABERG, produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 29th day of August, 2007, A.D., beginning at 1:05 p.m. before Andrea Reed, a Certified Shorthand Reporter in and for the State of Texas, in the offices of United States Department of Justice, located at 717 North Harwood, Suite 400, Dallas, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

PLAINTIFF'S EXHIBIT 5
PENGAD 800-631-6989

APPEARANCES

FOR THE PLAINTIFFS:

MR. THOMAS A. CULLINAN
Sutherland Asbill Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996
(404)853-8075
(404)853-8806 (fax)

FOR THE DEFENDANT:

MR. THOMAS M. HERRIN
United States Department of Justice
Tax Division
717 North Harwood Street, Suite 400
Dallas, Texas 75201
(214)880-9745
(214)880-9742 (fax)

MS. MICHELLE C. JOHNS
United States Department of Justice
Tax Division
717 North Harwood Street, Suite 400
Dallas, Texas 75201
(214)880-9762
(214)880-0741 (fax)

WITNESS ADDRESS:

9421 Blackthorn Trail
Frisco, Texas 75034

A. Right.
Q. And would it more than likely that you would choose not to record it, or that you would choose to record it and then erase it?
A. No, I would never erase it.
Q. Okay. So you either recorded it or you didn't record it?
A. Right. Yeah.
Q. Okay. And then after that meeting -- let's just deal with meetings where they were recorded.
What would happen when you got back from the meeting?
A. I would turn in a -- the tape to the marketing support department.
Q. Okay. And let me backtrack just a second.
Was it important to Heritage that these meetings be recorded, that the conversations be recorded? Was some emphasis placed on that?
A. Yeah. I mean, it was -- yeah, it was expected that it was to be done in important meetings.
Q. So it was standard practice; is that correct?
A. It was commonly done, yes.
Q. All right. If it was not done, it would be a deviation from standard practice?
A. It was one of those policies that, you know, it was

sort of there for a long time, but it didn't always happen. Okay. I wouldn't say that it was strictly enforced. I don't remember anybody being punished for not recording.

Q. Do you recall -- do you know what the Contractor Training Manual was for Heritage?

A. I mean, it was the -- I'm not sure I understand the question. It was a --

Q. And you're familiar with that document, right?

A. Yeah. I haven't seen it in years, but --

Q. And it actually is quite voluminous, correct, you know, several hundred pages?

A. Maybe. It may have evolved since I was trained.

Q. All right. Do you recall provisions in that manual that actually said that a fine would be imposed if the conversations were not recorded?

A. No, I didn't -- I don't remember reading it in detail.

Q. All right. Would that surprise you, though?

A. I've never -- I don't think anyone was ever fined.

Q. Okay.

A. I don't remember anybody being fined for anything actually.

Q. All right. Now, I'm sorry. Let's go back then. Now, you say you would come back with your tape, and you'd hand it off to people to transcribe it.

to dub it and get rid of the background noise in your teleconference with WRC last week, but it didn't work. Ralph said you should probably get a new recorder. And that looks like, Lisa.

Do you know who Lisa by any chance?

A. Probably Ralph's assistant.

Q. Ralph's assistant was named Lisa?

A. Yes.

Q. Do you know her last name?

A. Not off the top of my head.

Q. Who's Ralph?

A. He was the president of Heritage.

Q. Did you ever have problems with your -- and I'm referring now just to the telephone conferences as opposed to the in-meeting conferences, and I'll get to that.

But with respect to your teleconferences, did you ever have problems with your recorder?

A. I'm sure I did at one time or another.

Q. Did you review the tapes? Did you play them back to make sure that they were clear, that a transcriber would be able to hear them?

A. No.

Q. All right. Let's talk about now the meetings.

What type of device, again, did you use for the meetings -- to record the meetings?

A. A microcassette recorder.
Q. And did it have like an extension microphone type of thing, or did the whole device just fit right in your pocket?
A. Yeah, it just fits in your pocket.
Q. Was it designed to be able to record conversations through a coat pocket?
A. I doubt it, no.
Q. Did you play those tapes back and listen to the recordings? Well, strike that. I think before you testified that these recordings were muffled, and that the transcribers couldn't hear what you said when you were moving around.
Is that fair that you testified to that before?
A. Yes.
Q. How do you know that?
A. Because they frequently couldn't complete parts of, you know, what was on the tape.
Q. Okay. I'm going to mark this as --
MR. CULLINAN: What are we up to?
THE REPORTER: 56.
Q. (BY MR. CULLINAN) -- Exhibit 56. She's going to mark that and put an exhibit sticker on it for you.
(Deposition Exhibit No. 56 was marked.)
Q. Do you know that -- you testified that if you're moving around, it would be difficult for the transcribers to hear what was said.

Do you think it was also difficult for them to hear what was said because you had this recorder in your pocket?

A. Sure. That didn't help any.

Q. Do you know who John -- excuse me -- Joseph Van Voorhis is?

A. Yes.

Q. Who is he?

A. He was a contractor at the same time that I was.

Q. He was. Okay.

I've already put in front of you what's been marked as Exhibit 56. And this is a deposition that was taken of Mr. Van Voorhis in a nonrelated matter. But I'm going to refer you to Page 25.

And he was asked the question about whether the tape recorders that were used, either on the phones or in meetings, whether they were reliable. And I want to see if you agree with his testimony.

He says that it wasn't like he took the tape recorder out and put it on a table. He kept it in his coat pocket. It was muffled. He was moving around, so it was very difficult for the transcribers to hear what was going on.

Do you agree that it was just difficult for the transcribers to understand what was going on and to hear what was going on?

Q. Why is that?
A. It was later in the process that it was not really -- I mean, it just doesn't seem like at that point after having gotten to know someone that it would have been -- that it would have been done.
Q. Do you know what the qualifications were of the individuals working in the marketing department who transcribed these tapes? Were they qualified court reporters? Did they get any specific training?
A. I have no idea.
Q. Did you find their work to be sloppy?
A. Honestly, I didn't really have anything to compare it to. And I typically didn't go back and read the transcripts. Some of them are better than others.
Q. What do you mean by that?
A. Well, I mean, it's definitely true that when we did debriefs and did the cassette recorder, the marketing support person would have to -- they did a certain amount of -- they made it look pretty. And sometimes it could look ugly. You could get interrupted. You're driving in a car, you know, you hit pause, you hit start again, and you say, I'm not sure where I left off. This may be repeating myself. And when you read the debrief, it wouldn't generally say, I've just hit pause because I almost hit somebody in another car. I've not sure if I've already said this or not. So they would -- you know, they

wouldn't type everything that you spoke into the recorder.

Q. They would clean things up for you?

A. Yeah. They had to or else it would have looked horrible when it came out.

Q. I think you testified that you don't know who Chet Decker was, or you don't recall his name.

A. Well, clearly he was an initiator. I just didn't really know him.

Q. Well, he testified yesterday, I think -- well, before I tell you what he said, let me ask you directly. You seemed very surprised that -- looking at some of these transcripts the use of certain terminology. And just, for instance, let's turn back to Exhibit 3, if you would, Page 8. And there was a reference there to eliminate taxes. And I think you testified -- and it seemed to me before Mr. Herrin was asking you questions about that, you seemed to be surprised they used the term "eliminate" because typically you would say "reduce" or "eliminate." That would be your kind of standard.

A. That's my recollection. I mean, that's been a long time.

Q. And then when you looked at the transcript, though, it seemed like you were just taking the transcript for whatever it said to be true. I mean, is it possible that whoever transcribed the recording just didn't do a good job or made a mistake, used the wrong words, couldn't hear what you said?

A. Well, yeah, of course, it's possible.
Q. Okay. Well, now, I'll take you through what Mr. Decker said yesterday, and I want to see if you agree with that.
Mr. Decker did review his transcripts, and he thought that they were very sloppy. And he did not think that he used the words that the transcribers used at all.
MR. HERRIN: I'm going to object. I think that's mischaracterizing his testimony, but you may go ahead and answer.
Q. (BY MR. CULLINAN) Okay. But he did use the term that he said that he thought it captured the gist of what it was said, but he did not feel it to be word-for-word accurate.
In looking through your transcripts, do you agree with that characterization? Do you think that they're word-for-word accurate?
A. Well, like I said, I didn't go back and review my transcripts from the meetings of -- from the tapes of the meetings. I'm sure that there was more leeway taken in the debrief by the transcribing than there was in the -- well, I mean, they had to construct the debrief based on sort of the jumble of stuff that came out of our debriefs. But this is more a matter of, you know, not being able to hear shuffling around. And I know it was hard to hear on those things, so I'm sure they -- yeah. I'm sure they -- you know, they guessed

Q. Well, okay.
A. I mean, it's possible.
Q. So if it wasn't -- how then -- going to Deposition Exhibit No. 6, how would we have created --
A. You said we don't have a tape or you don't have a transcription?
Q. We don't have the actual tape.
A. Oh, well, if we have this, then apparently it was recorded. But I have no idea what happened to the tape. I never saw it after I gave it to marketing support.
Q. So is there a log that you're aware of, of these tapes, some way that they're kept track of?
A. I have no clue of how any of that system worked.
Q. Going on to Exhibit 5, can you confirm the accuracy of this transcript?
A. I would have no way to do that.
Q. Do you know whether it's been changed?
A. No, I do not know.
Q. Do you know whether anything has been added to it?
A. No, I do not know.
Q. Do you know whether anything has been deleted from it?
A. No, I don't know.
Q. All right. Going on to Exhibit 6.
Can you confirm the accuracy of this transcript?

A. No, I cannot.
Q. Do you know if anything has been added to it?
A. I do not know.
Q. Anything changed?
A. I do not know.
Q. Anything deleted from it?
A. I do not know.
Q. Are you familiar at all with the Sands having implemented or transferred interest in a partnership with the assistance of The Heritage Organization through a series of --
A. I have no knowledge of that.
Q. Are you familiar with the entity R, R, M & C Group, L.P.?
A. No.
Q. Do you know whether the Sands ended up gifting millions of dollars to charities for these transactions?
A. I don't know.
MR. CULLINAN: Why don't we go off the record for two or three minutes. I think I'm just about done.
(Break was taken at 3:30 p.m. to 3:44 p.m.)
MR. CULLINAN: Back on?
MR. HERRIN: Yes.
Q. (BY MR. CULLINAN) Did the Sands ever tell you what their goals were for participating in these transactions?
A. I don't recall.

Q. Okay. We're going to start now, and I think this will get you --

(Tape is playing at 4:06 p.m. for less than a minute.)

Q. All right. You heard Mr. Sands identify himself?

A. Yes.

MR. CULLINAN: I want to ask a question.

Immediately before he said, Hello, I'm Richard Sands, I thought I heard on that somebody say, Rob, we're ready.

Do you see that statement listed out here on the transcript?

THE WITNESS: I don't see that statement, no.

MR. CULLINAN: But did you hear that statement on the tape?

THE WITNESS: I may have the time before this when we played it.

MR. CULLINAN: Do me a favor and rewind it.

MR. HERRIN: I will stipulate that somebody did say something to that effect.

MR. CULLINAN: Okay. And it's not on the transcript.

MR. HERRIN: Right.

MR. CULLINAN: Okay. Thank you.

(Tape is playing at 4:07 p.m. for less than a

know about it. So we'll proceed that way. And, of course, Mr. Cullinan can do what he wants.

(Tape is playing at 4:12 p.m. to 4:14 p.m.)

Q. Okay. Up to this point, we've heard about two pages of the transcript.

Is there anything on this transcript that would be materially altered because you heard something in the conversation or didn't hear something in the conversation in the tape that's not reflected on this transcript?

A. Not in the last two paragraphs. I guess not since we just started to back up.

MR. CULLINAN: Generally speaking, what's your view on the quality of the tape -- the clarity of the recording?

THE WITNESS: Well, it's clearly muffled. It's not -- you know, it's not great quality.

MR. HERRIN: Do you want to go forward?

MR. CULLINAN: Yes.

(Tape is playing at 4:14 p.m. for less than a minute.)

A. I'm not sure what you want me to do here.

Q. (BY MR. HERRIN) I want you to read along as we play the tape. And we will stop it in about two pages and again ask you whether or not there's been anything that you think is materially misrepresented in this transcript.

A. Just materially misrepresented or missing words --

Q. If there's a word or two missing, or missing word, no, we don't -- I'm sorry. I told you I wouldn't do -- or told you I probably would.

A. All right.

Q. If there's a missing word and you think it's important and you want to stop me, just say something, I'll stop the tape. If it's not material, we'll just go forward and ask you whether you've got any material type changes. Again, about every two pages.

A. All right. I'll tell you when there's something material. Because I've heard a couple of words that were missing, but they weren't really material.

Q. Right. All right.

(Tape is playing at 4:16 p.m. for less than a minute.)

MR. CULLINAN: Did you just turn it off?

MR. HERRIN: I certainly hope not. Give it a minute.

(Tape is playing at 4:18 p.m. for less than a minute.)

MR. CULLINAN: All right. Stop. What was that?

MR. HERRIN: We'll let the record reflect that there was about a 15-second-gap, and I couldn't tell you why. I will represent that this is -- it must be on the -- it's

presumptively on the copy of the tape that we received.

MR. CULLINAN: Okay. To be clear for the record, it sounded to me like the tape clicked off and then clicked back on like 15 seconds later.

So, Mr. Seaberg, I'm going to ask you, is there any way that you can tell what was said during those 15 seconds?

THE WITNESS: No.

MR. CULLINAN: All right. Let's go back. If we would, replay those missing 15 seconds and see what's on the transcript, and let's see if Mr. Seaberg can explain how those words got on the transcript when they're not on the tape.

MS. JOHNS: Tom, if we could go off the record for a second.

MR. HERRIN: Let's go off the record.

(Off the record at 4:19 p.m. for less than a minute.)

(Tape is playing at 4:19 p.m. for less than a minute.)

MR. CULLINAN: I think we need to back up.

MR. HERRIN: Yeah, I'm trying.

(Tape is playing at 4:20 p.m. for less than a minute.)

MR. CULLINAN: Okay. Pause.

There, Mr. Seaberg, in my view, I'm trying to

follow along with this transcript, it appears that the transcript says at the point that the tape cut out, it says, A lot of times it's when a large network client comes in..

I didn't hear that at all on the tape when it came back in.

Did you?

THE WITNESS: There may have been some words missing there.

MR. CULLINAN: So there are words on the transcript that aren't on the tape?

THE WITNESS: Yeah, it appeared that the tape didn't include all the words.

MR. CULLINAN: So where would those words have come from?

THE WITNESS: I have no idea.

Q. (BY MR. HERRIN) Mr. Seaberg, is it possible while they were transcribing this thing moving it back and forth, they might have recorded the words from the tape and then they got erased during the process?

MR. CULLINAN: Well, that calls for pure speculation, but you can answer.

MS. JOHNS: I'd like to say for the record that I thought I heard something. I think it's kind of muffled, but maybe if we rewind it again.

MR. CULLINAN: I've listened to it twice, and I

A. The parts I could hear, yes.

MR. CULLINAN: I'm sorry. Let me clarify. So 95 percent of the parts that you could hear are accurately reflected on the transcript, but the parts that are denoted with question marks or whatever where you just can't hear what they're saying, you're not including that in your 95 percent computation?

THE WITNESS: Correct.

MR. CULLINAN: Okay.

(Tape is playing at 5:34 p.m. for less than a minute.)

MR. HERRIN: Can we go off the record just for a second.

(Off the record at 5:35 p.m. for less than a minute.)

MR. HERRIN: So let's let the record reflect that the tape copy that we received from the trustee in the audio ends at -- well, what's reflected on the tape is 90 minutes, 48 seconds, although, I think we reflected earlier that the tape itself didn't actually start until somewhere around 40 minutes into the tape.

Let me have the record also reflect that that's about the middle -- maybe not quite the middle of Page 29 of the transcript of the May 31st, 2001 meeting, and that the transcript goes on to a couple of lines on Page 33. So

essentially half of 29, all of 30, all of 31, all of 32, and two lines on 33 that are on the transcription does not have voice associated with it.

Do you have any problem with that statement?

MR. CULLINAN: No.

MR. HERRIN: All right.

MR. CULLINAN: I do have questions for the witness when you're done.

MR. HERRIN: That's fine.

Q. (BY MR. HERRIN) Up to the point where the tape stopped -- I know we had just asked a few minutes before that -- was there any problem with the transcription as it was transcribed?

A. Didn't it stop almost right after we asked the question?

Q. I think it was pretty close.

A. Yeah. So I -- seems like I don't remember what I heard in between the two.

Q. All right. Well, all right. Now, there are, as I stated for the record, about four or five pages more of transcription. If you'll take a look at that transcript from page -- take a look at the transcription from Page 371 through 375.

And my question is, would you agree that this appears to be a continual flow of a conversation to a

A. I would think so, yes.
Q. And we've just gone through, I guess, the first page of the transcript.
How much did you understand of what was on the tape?
A. Oh, it was -- it didn't start right away, I don't think.
Q. Were there --
A. We're still walking at that time, so --
Q. Okay. At the very beginning where it says, Tim: Yes. Hi, I'm Karen. Karen: Hi. Thank you. Question mark. Not sure --
THE REPORTER: I'm sorry. I can't understand you.
Q. (BY MR. CULLINAN) Okay. Back to page -- first page. It says, TWS: No shirt. Didn't were supposed to go through, question mark, through LaGuardia. And then there's just an ellipsis with the word "airport" with an ellipsis behind there.
I thought I heard on the tape a fair amount of conversation that there's nothing here on the transcript designating that, you know, conversation was missed.
Do you agree with that?
A. Well, I think that's what the ellipsis are for.
Q. So the ellipsis would also designate conversation being missed in addition to question marks and brackets?

A. Yeah, I think that's correct.
Q. Okay.
(Tape is playing at 5:58 p.m. for less than a minute.)
MR. HERRIN: Now, the last two things, other than the loud shuffling, do you recognize that as your voice?
THE WITNESS: Yes.
MR. HERRIN: Okay.
(Tape is playing at 6:00 p.m. for less than a minute.)
MR. CULLINAN: Can we pause? Is it me, or is there conversation going on that's not reflected on the transcript?
MR. HERRIN: Actually, I think we've jumped to the next page, but let's play it a little bit longer and find out.
(Tape is playing at 6:00 p.m. for less than a minute.)
Q. (BY MR. CULLINAN) All right. Mr. Seaberg, do you see where we are?
A. Bottom of Page 2, I think.
MR. HERRIN: We're actually still on -- yes, we're still -- looks like it was a lot of conversation there after. I'll get Rob. Now we're picking back up on the bottom of Page 2, which is 292. How are you? Good.

Q. (BY MR. CULLINAN) So, Mr. Seaberg, in between where it says, "I'll get Rob" and "How are you," was there conversation on the tape that did not get transcribed?

A. Yes.

Q. Okay. Why is that?

A. I guess the transcriptionist either couldn't hear it or didn't think it was relevant.

Q. All right. So the transcriber has some ability to decide what's relevant and what's not relevant?

A. Not to a large degree. But I don't know if they could hear that or not. If they could hear it, they clearly made a decision not to put it on there.

Q. Okay.

(Tape is playing a 5:01 p.m. for less than a minute.)

MR. CULLINAN: Can we pause again?

Q. (BY MR. CULLINAN) We're on the second page, that first sentence that says, TWS: Yeah, that's a popular piece of hardware. It's amazing. Thanks, Karen. I didn't think it got this hot up here, and apparently it does.

Did you hear that? Is that what you heard on the tape?

A. There's some stuff missing between, I think, "It's amazing" and "Thanks, Karen."

Q. Is there anything on the transcript that indicates

that something was missing?

A. No, there's not.

Q. Thank you.

(Tape is playing at 5:03 p.m. for less than a minute.)

MR. HERRIN: Prior to that last person starting to speak, do you recognize the voice before that as Gary Kornman?

THE WITNESS: Yes.

MR. HERRIN: Okay.

Q. (BY MR. CULLINAN) It appeared to me at the end of that paragraph that's on this transcript on 293 that it sounded like Gary Kornman said a bunch of words that are not on the transcript.

Would you agree with that, Mr. Seaberg?

A. Yes, he did.

Q. Is there anything on the transcript that denotes that there are missing words?

A. There doesn't appear to be.

MR. HERRIN: Do you see the question mark at the end of the sentence? I mean, I guess it could be, Could you kind of fill me in, question mark? But it also could be missing information?

THE WITNESS: I'm sorry. Where is the question mark you're talking about?

MR. HERRIN: At the very end.

THE WITNESS: Well, that appears to be a question.

MR. HERRIN: All right. I mean -- now, based on what you heard without having listened to the rest of the tape, you would agree, would you not, that a meeting took place with you and Gary present and the Sands -- with the Sands?

THE WITNESS: Yes.

MR. HERRIN: And would you have any reason to believe that the transcript that we have here as Exhibit 5 does not accurately reflect what could be heard from the recording of that -- of that meeting?

THE WITNESS: It -- I mean, it's the same thing. The parts I could understand seems to reflect -- I mean, the majority of what's written seems to be what was actually said.

MR. HERRIN: And, again, we've not heard the whole thing. And for time constraints, I don't think we're going to. However, after the conversation was done, completed, it would have been standard practice to take the tape back and have it transcribed?

THE WITNESS: Yes.

MR. HERRIN: And then my question is, is there anything that would lead you to believe that this transcription isn't an accurate representation of the tape at the time it was made?

THE WITNESS: No, none other than the fact that some things that are on the tape are not on here.

MR. HERRIN: And, again, as with the other tapes, there are going to be places where there are question marks, where there are ellipsis, where it says cross-talking. You're going to presume, based on what you've already heard, that that's probably going to be consistent and happen in this transcription as well?

THE WITNESS: Correct.

MR. HERRIN: I think with the understanding that we're going to have it transcribed as well as using this earlier testimony and the exhibits that we already have here, I see no point in sitting through the rest of this tape unless Mr. Cullinan wants to.

MR. CULLINAN: I don't see a point.

MS. JOHNS: That's fine with me.

MR. HERRIN: You feel like staying? I'll let you.

THE WITNESS: I know I don't.

MR. HERRIN: All right. Give me 30 seconds to confer with counsel, and then I think we can wind this thing up.

(Break was taken at 6:08 p.m. to 6:12 p.m.)

MR. HERRIN: Okay. I'll pass the witness.

MR. CULLINAN: I think we're ready to go home.