**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

No.06-407T
(into which have been consolidated Nos. 06-408T, 06-409T, 06-410T, 06-411T, 06-810T, 06-811T)
Judge Emily C. Hewitt
(E-Filed August 4, 2008)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | No. 06-407T |
| BETA PARTNERS, L.L.C, BY AND THROUGH ALPHA I, L.P., A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | No. 06-408T |
| R,R,M & C PARTNERS, L.L.C., BY AND THROUGH R,R,M & C GROUP, L.P., A NOTICE PARTNER,<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | No. 06-409T |

| | | |
|---|---|---|
| R,R,M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | ) | No. 06-410T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G, ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 06-411T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 06-810T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-811T |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN CAUSE NOS. 06-409T, 06-410T AND 06-411T**

# TABLE OF CONTENTS

**PAGE(S)**

TABLE OF AUTHORITIES ....................................................................................... iii

ISSUES PRESENTED ....................................................................................... 1

STATEMENT OF THE CASE ....................................................................................... 1

I. Introduction ....................................................................................... 1

II. Factual Background ....................................................................................... 3

ARGUMENT ....................................................................................... 8

I. THE COURT CANNOT CONSIDER DEFENDANT'S ARGUMENT THAT THE SHORT SALE OBLIGATIONS ARE "LIABILITIES" FOR PURPOSES OF SECTION 752 BECAUSE PLAINTIFFS HAVE ALREADY CONCEDED DEFENDANT'S CAPITAL GAINS ADJUSTMENTS ON ANOTHER GROUND. ....................................................................................... 8

A. Consideration of the Section 752 Issue Is Unnecessary and Would Result in an Improper Advisory Opinion ....................................................................................... 8

B. The Requirement to Cover a Short Sale Is Not a Liability for Purposes of Section 752. ....................................................................................... 9

II. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF THE VALIDITY OF THE TRANSFERS. ....................................................................................... 10

A. Defendant Lacked Authority to Adjust the Identity of the Partners of Group in its FPAA, and the Court Lacks Jurisdiction to Consider the Validity of the Transfers in This Proceeding ....................................................................................... 10

B. Because Genuine Issues of Material Fact Exist, Defendant is Not Entitled to Summary Judgment. ....................................................................................... 12

C. Defendant is Not Entitled to Summary Judgment as a Matter of Law. ....................................................................................... 14

1. The Substance Over Form, Step Transaction, and Assignment of Income Doctrines Do Not Apply Where, As Here, Appreciated Property is Validly Transferred to a Charitable Organization Prior to the Sale of the Property Giving Rise to Income. ....................................................................................... 14

2. The CRUTs Qualify as Charitable Remainder Unitrusts Under Section 664 ........ 19

3. Treas. Reg. § 1.701-2 Does Not Apply to Disregard the Transfers to the CRUTs. ........ 20

a. Treas. Reg. § 1.701-2 is Inapplicable. ........ 20

b. Treas. Reg. § 1.701-2 is Invalid. ........ 22

III. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO THE APPLICATION OF ACCURACY-RELATED PENALTIES. ........ 25

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**


*AMP Inc. v. United States*, 185 F.3d 1333 (Fed. Cir. 1999) ........................................................ 10

*Big Mama Rag, Inc. v. United States*, 631 F.2d 1030 (D.C. Cir. 1980) ....................................... 25

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ........................................................................ 25

*Connally v. Gen. Const. Co.*, 269 U.S. 385 (1926) ........................................................................ 25

*DeWitt v. United States*, 204 Ct. Cl. 274 (1974) ................................................................ 15, 16, 17

*Grigoraci v. Comm'r*, 84 T.C.M. 186 (2002) ................................................................................. 11

*Grove v. Comm'r*, 490 F.2d 241 (2d Cir. 1973) .................................................................. 15, 16, 18

*Hallowell v. Comm'r*, 56 T.C. 600 (1971) ...................................................................................... 19

*Handeland v. Comm'r*, 519 F.2d 327 (9th Cir. 1975) ....................................................................... 9

*Hang v. Comm'r*, 95 T.C. 74 (1990) ................................................................................................ 11

*Helvering v. Credit Alliance Corp.*, 316 U.S. 107 (1942) ............................................................. 24

*Jade Trading, LLC v. United States*, 81 Fed. Cl. 173 (2007) ........................................................ 27

*Klamath Strategic Inv. Fund, LLC*, 472 F. Supp. 2d 885 (E.D. Tex. 2007) ................................. 29

*Kornman & Assocs., Inc. v. United States*, 527 F.3d 443 (5th Cir. 2008) ..................................... 10

*Malat v. Comm'r*, 302 F.2d 700 (9th Cir. 1962) ............................................................................... 9

*Malkan v. Comm'r*, 54 T.C. 1305 (1970) ........................................................................................ 19

*Martin v. OSHRC*, 499 U.S. 144 (1991) .......................................................................................... 25

*McCrary v. Comm'r*, 92 T.C. 827 (1989) .......................................................................................... 9

*Morgan Guar. Trust Co. v. United States*, 218 Ct. Cl. 57 (1978) .................................................. 14

*Palmer v. Comm'r*, 62 T.C. 684 (1974) ........................................................................................... 15

*Pohl Corp. v. United States*, 22 Cl. Ct. 849 (1991) .......................................................................... 9

*RLC Indus. v. Comm'r*, 58 F.3d 413 (9th Cir. 1995) ...................................................................... 25

*Rauenhorst v. Comm'r*, 119 T.C. 157 (2002) .....15, 18

*Rite Aid Corp. v. United States*, 255 F.3d 1357 (Fed. Cir. 2001) .....24

*Sala v. United States*, 552 F. Supp. 2d 1167 (2008) .....29

*Sheppard v. United States*, 176 Ct. Cl. 244 (1966) .....15, 17

*Somerville v. United States*, 13 Cl. Ct. 287 (1987) .....10

*Stephenson Trust v. Comm'r*, 81 T.C. 283 (1983) .....24

*Western Co. of N. Am. v. United States*, 323 F.3d 1024 (Fed. Cir. 2003) .....10

**STATUTES**

26 U.S.C. § 72(e)(11)(A) .....24

26 U.S.C. § 108(c)(5) .....24

26 U.S.C. § 1274A(e) .....24

26 U.S.C. § 149(g)(5) .....24

26 U.S.C. § 163(i)(5)(B) .....24

26 U.S.C. § 165(c)(2) .....2

26 U.S.C. § 167(e)(6) .....24

26 U.S.C. § 170(f)(10)(I) .....24

26 U.S.C. § 465(b)(1) .....2, 8

26 U.S.C. § 723 .....2

26 U.S.C. § 731(c)(7) .....24

26 U.S.C. § 732(f)(8) .....24

26 U.S.C. § 743(d) .....24

26 U.S.C. § 752 .....2, 3, 8, 9, 10

26 U.S.C. § 864(d)(8) .....24

26 U.S.C. § 877(d)(4)(D) .....24

26 U.S.C. § 897(e)(2) .....24

26 U.S.C. § 901(k)(4)(c) .....24

26 U.S.C. § 936(a)(4)(B)(iii)(III) .....24

26 U.S.C. § 1001 .....2

26 U.S.C. § 6662 .....2

26 U.S.C. § 6662(c) .....29

26 U.S.C. § 6662(d)(2)(B) .....27

26 U.S.C. § 6662(d)(2)(C) .....29

26 U.S.C. § 6664 .....26

26 U.S.C. § 7701(f) .....24

Mo. Rev. Stat. § 359.411 (2008) .....18

**TREASURY REGULATIONS**

Treas. Reg. § 1.664-1(a)(4) .....19

Treas. Reg. § 1.6662-2(c) .....26

Treas. Reg. § 1.6662-3(b) .....28

Treas. Reg. § 1.6662-4(d)(2) .....30

Treas. Reg. § 1.6662-4(d)(3)(iii) .....28

Treas. Reg. § 1.6662-(g)(4)(i) .....29

Treas. Reg. § 1.701-2 ..... ii, 2, 20, 21, 22

Treas. Reg. § 1.701-2(a)(2) .....21

Treas. Reg. § 1.701-2(b) .....23

Treas. Reg. § 1.752-6 .....2

**ADMINISTRATIVE RULINGS**

I.R.S. Priv. Ltr. Rul. 200525014 (Mar. 30, 2005)....................20

I.R.S. Priv. Ltr. Rul. 200725044 (Mar. 27, 2007)....................20

I.R.S. Priv. Ltr. Rul. 200802033 (Oct. 16, 2007)....................20

I.R.S. Priv. Ltr. Rul. 200821024 (Feb. 25, 2008) ....................20

Rev. Rul. 91-21, 1991-11 I.R.B 5....................10

Rev. Rul. 95-26, 1995-14 I.R.B. 6....................29

**LEGISLATIVE MATERIALS**

Subchapter K Anti-Abuse Rule, 60 Fed. Reg. 23, 27 (Jan. 3, 1995)....................23

Subchapter K Anti-Abuse Rule, 60 Fed. Reg. 23, 26 (Jan. 3, 1995)....................25

**MISCELLANEOUS**

*ABA Tax Section Members Say Anti-abuse Rule is Not a Valid Exercise of IRS Authority*, 94 Tax Notes Today 146-50 (July 1, 1994)....................22

*Anti-Abuse Rule: What's Really Wrong with Reg. Section 1.701-2*, 95 Tax Notes Today 56-84 (Mar. 22, 1995)....................22

Sheldon I. Banoff, *Anatomy of an Anti-Abuse Rule: What's Really Wrong with Reg. Section 1.701-2*, 95 TAX NOTES TODAY 56-84 (Mar. 22, 1995)....................22

William H. Caudill, *ABA Tax Section Members Say Antiabuse Rule Is Not a Valid Exercise of IRS Authority*, 94 Tax Notes Today 146-50 (July 1, 1994) ....................22

James A. Gouwar, *The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its Authority*, 11 J. P'SHIP TAX'N 287 (1994)....................22

Letter from Donald C. Alexander, et al, to the Assistant Secretary for Tax Policy, *reprinted in Commentators Say Partnership Antiabuse Rule Doesn't Satisfy Fundamental Principles for a Workable Tax System*, 95 TAX NOTES TODAY 175-28 (Aug. 18, 1995)....................22

Letter from Douglas A. Antonio to the Internal Revenue Service, *reprinted in Partnership Antiabuse Regs. Should be Subject to Executive Order, Attorney Asserts*, 94 TAX NOTES TODAY 121-11 (June 23, 1994)....................22, 23

Letter from Coopers & Lybrand to Commissioner of the Internal Revenue Service, *reprinted in Coopers & Lybrand Urges Withdrawal Partnership Anti-abuse Rule*, 94 TAX NOTES TODAY 172-25 (Sept. 1, 1994) ....................22

Letter from Harvey L. Coustan to Commissioner of the Internal Revenue Service, *reprinted in* to *AICPA Calls For Changes in Partnership Anti-abuse Reg.*, 94 TAX NOTES TODAY 139-64 (Jul. 19, 1994) ....................22

Letter from Ernst & Young to Commissioner of the Internal Revenue Service, *reprinted in Ernst & Young Criticizes Partnership Anti-abuse Reg.*, 94 Tax Notes Today 141-32 (July 21, 1994) ....................22

Letter from Anthony Ilardi Jr. to Internal Revenue Service, *reprinted in Partnership Reg. Adds Confusion, Attorney Asserts*, 94 TAX NOTES TODAY 151-42 (Aug. 3, 1994). ..........23

Letter from Price Waterhouse to Commissioner of the Internal Revenue Service, *reprinted in Partnership Anti-abuse Reg. Is Overly Broad, Price Waterhouse Asserts*, 95 TAX NOTES TODAY 52-32 (Mar. 16, 1995) ....................22

Letter from Ronald A. Shellan to the Internal Revenue Service, *reprinted in Attorney sees 'Fatal Flaw' in Anti-Abuse Regs.*, 94 TAX NOTES TODAY 119-25 (May 23, 1994) ....................22

Letter from Barbara Spudis and James Barrett to Commissioner of the Internal Revenue Service *reprinted in Commentators Say Partnership Antiabuse Rule Should Be Withdrawn*, 94 TAX NOTES TODAY 152-37 (Aug. 4, 1994) ....................22

WILLIAM S. MCKEE, ET AL., FED. TAX'N OF P'SHIPS AND PARTNERS ¶ 1.05 (4th ed. 2008) ..........22

## ISSUES PRESENTED[1]

1. Whether the Court may consider defendant's argument that the short sale obligations assumed by CWC Partnership I ("CWC"), R, R, M & C Group, L.P. ("Group") and R, R, M & C Partners, LLC ("Partners") are "liabilities" for purposes of Section 752[2] where the resulting capital gains adjustments have been conceded on another ground?

2. Whether this Court has jurisdiction to consider whether the Sands' transfers of their limited partnerships in Group to the CRUTs were valid?

3. If yes, whether the transfers of limited partnership interests by the original limited partners of Group to their respective CRUTs were valid?[3]

4. If the transfers were not valid, whether accuracy-related penalties under § 6662 apply?

## STATEMENT OF THE CASE

### I. INTRODUCTION

These consolidated cases involve a financial plan used by members of the Sands family to facilitate gifts to various charities and to invest family wealth in a tax-efficient manner. Defendant's motion for summary judgment ("Defendant's Motion"), and plaintiffs' response to Defendant's Motion pertain to only three of these partnerships: Group, Partners, and CWC.[4]

---

[1] Under Rule 5.3(b)(3), plaintiff hereby incorporates by reference 24 pages (pages 8-32) of its Cross-Motion for Summary Judgment ("Plaintiffs' CMSJ") filed on July 6, 2007, which are included in the Appendix.

[2] All references to "Sections" or "§" are to Sections of the Internal Revenue Code of 1986, as amended (the "Code") unless otherwise noted.

[3] Defendant issued notices of Final Partnership Administrative Adjustment ("FPAAs") to the partnerships, seeking to adjust not only partnership items, but also the validity of the Sands' transfers of their limited partnership interests in Group, a non-partnership item that should not have been raised in an FPAA. Plaintiffs have not cross-moved for summary judgment on the validity of the transfer issue for two reasons. First, plaintiffs do not believe the Court has jurisdiction to decide that issue, as explained in Plaintiffs' Motion to Substitute Parties and to Dismiss Certain Causes of Action for Lack of Jurisdiction ("Motion to Substitute") filed March 29, 2007, which is still pending. Second, the parties are trying to resolve a discovery dispute involving defendant's failure to produce a witness at a scheduled RCFC 30(b)(6) deposition who was prepared to testify about the facts underlying the very positions that defendant is raising in this motion. Plaintiffs may seek permission to file a dispositive motion on the validity of the transfer issue on a later date depending on how these issues are resolved.

[4] Defendant's Motion should be treated as a motion for partial summary judgment with respect to CWC because it also was a partner in Alpha I, L.P., which is not at issue here.

Plaintiffs filed suit to contest the adjustments that defendant made to the partnerships' tax returns in the FPAAs issued to these three partnerships. Defendant adjusted the capital gains and losses of the partnerships based on several theories, including: § 1001, § 723, § 732, § 752, Treas. Reg. § 1.752-6, Treas. Reg. § 1.701-2, § 465(b)(1), § 165(c)(2), the economic substance doctrine, and the sham partnership doctrine. (Plaintiffs have since conceded these capital gains adjustments on the ground that none of the activities of the partnerships increased the amount at risk for purposes of § 465(b)(1).[5]) Next, in the FPAA issued to Group, defendant attempted to adjust the identity of the partners of Group by asserting that the limited partnership interests transferred by the original limited partners to charitable trusts created by them are owned by the transferor-partners (rather than the trusts) for federal income tax purposes. Defendant disregarded the transfers under the economic substance doctrine and reallocated tax items of Group to the transferor-partners. Defendant also asserted § 6662 accuracy-related penalties for any resulting deficiency attributable to these adjustments.

Defendant has moved for summary judgment as to whether the short sale obligations assumed by plaintiffs CWC, Group, and Partners are "liabilities" for purposes of § 752, whether the transfers from the original limited partners of Group to the CRUTs should be disregarded (under four theories not raised in defendant's FPAA) and whether the valuation misstatement penalty should be sustained. In so moving, defendant has relied primarily on conjecture, innuendo, and incorrect characterizations of the Sands family's investment activities as tax shelters, seeking to inflame the Court against plaintiffs with such statements.

Plaintiffs respectfully request the Court to deny Defendant's Motion as to each issue. Plaintiffs conceded defendant's capital gains adjustments on the ground that the activities of the partnerships did not increase the amount considered to be at risk under § 465(b)(1). The Court

[5] See Docket Entry 95, Plaintiffs' Motion for Leave to Amend Their Complaints, granted May 14, 2008.

may not determine an alternative ground for such adjustments (i.e. whether the short sale obligations assumed by the partnerships were liabilities for purposes of § 752) without issuing an improper advisory opinion. Regarding the validity of the transfers, the evidence relied on by defendant confirms that, as asserted by plaintiffs in their pending Motion to Substitute, such issue is not a partnership item properly determined in a partnership proceeding. The efficacy of the transfers and validity of the CRUTs hinge on factual information possessed by the original limited partners and the CRUTs themselves, rather than facts and information available to the partnership. Even if the Court had jurisdiction to consider defendant's argument, there are genuine issues of material fact and defendant is not entitled to summary judgment as a matter of law on any of its theories. Defendant is not entitled to summary judgment as to the applicability of penalties where, as here, a genuine issue of material fact exists because plaintiffs reasonably relied on their advisors and acted in good faith in taking the tax positions at issue. Additionally, the valuation misstatement penalties are inapplicable to plaintiffs as a matter of law as described in Plaintiffs' Motion for Partial Summary Judgment filed July 2, 2008 ("Plaintiffs' MPSJ"). Penalties for substantial understatement of income tax or negligence are also inapplicable because the taxpayers had substantial authority for the reporting positions taken on their returns.

## II. FACTUAL BACKGROUND

Defendant goes to great lengths in both Defendant's Motion and Defendant's Second Set of Proposed Findings of Uncontroverted Fact ("Def. PFUF") to bias the Court against Group. Defendant alleges (without citation to any supporting evidence) that Group was a "tax shelter" used by the Sands to avoid tax on $74 million received from the sale of Constellation Brands stock by Group in 2001. (Def.'s Mot. Summ. J. 2-3.) The clear record, however, shows that the transactions at issue resulted in the receipt of over $2 million by a charitable supporting organization and contributions of over $2.7 million to various charities from the supporting

organization. Plaintiffs have filed a separate document responding to defendant's PFUF ("Pls. Resp. to Def. PFUF")) to respond to these and other baseless assertions made by defendant, as required by Ct. Fed. Cl. R. 56(h)(2). Plaintiffs have also filed their Proposed Findings of Uncontroverted Fact ("Pls. PFUF") as a separate document in support of plaintiffs' response, in accordance with Ct. Fed. Cl. R. 56(h)(2). Plaintiffs will not restate all those facts here, but will briefly discuss the most critical facts.

In August 2001, certain Sands family members and trusts formed and invested in Group, a limited partnership. At its formation, Group had a general partner (R,R,M & C Management Corp.) and four equal limited partners: Robert Sands, Richard Sands, Marilyn Sands, and CWC[6] ("the original limited partners"). (Pls. PFUF ¶ 3.) On September 21, 2001, the original limited partners each formed a charitable remainder unitrust ("CRUT"), the terms of which complied with the requirements of § 664 and the related Treasury Regulations. (Pls. PFUF ¶¶ 13 and 15.) That day the original limited partners each transferred their respective limited partnership interests in Group to the four CRUTs as part of a charitable gift-giving plan ("the Transfers"). (Pls. PFUF ¶ 17.) Group held $359,290 and 2,002,002 shares of Constellation Brands, Inc. stock on September 21, 2001. (Pls. PFUF ¶ 10.) The original limited partners each claimed a current deduction on their 2001 tax returns for the present value of the remainder interest in their respective CRUTs (based on an appraisal from a qualified appraisal firm). The IRS has not contested these charitable deductions. (Pls. PFUF ¶ 23.)

In October 2001 Group sold the Constellation stock that it held for $74,862,863. (Pls. PFUF ¶ 25.) On its 2001 Form 1065, Group reported capital losses from the sale totaling $(19,894,501). (Pls. PFUF ¶ 25.) These capital losses were allocated to the CRUTs and to Group's general partner in accordance with Group's partnership agreement. (Pls. PFUF ¶ 26.)

[6] CWC is a partnership principally owned by trusts created for the benefit of minors in the Sands family.

In the FPAA that it issued to Group, defendant extinguished the losses claimed by Group and replaced them with large capital gains. Group conceded that on its 2001 Form 1065 it should have reported long term capital gain of $65,539,019 and short-term capital loss of ($207,636).[7] (Pls. PFUF ¶ 27.) Group and the other plaintiffs conceded the capital gains adjustments on the ground that none of the transactions of the partnerships increased the amount considered at-risk for an activity under § 465(b)(1) and that the at-risk rules would disallow losses and require the partnerships and their partners to recognize gain on the transactions as set forth in the FPAAs. (Pls. PFUF ¶ 27.) The capital gains from the sale of the Constellation stock were allocable to the CRUTs. (Pls. PFUF ¶ 28)

Recognizing that CRUTs do not pay income tax, the IRS asserted in the FPAA issued to Group that the Transfers should be disregarded, such that the original limited partners should be treated as the limited partners in Group when it sold the Constellation stock. In its motion, defendant has relied on its incorrect characterization of events subsequent to the Transfers to support its view that the Transfers were invalid. (Def. Mot. Summ. J. 3, 5-8, 19-20.) On February 22, 2002, the original limited partners each irrevocably designated The Educational and Health Support Fund (‘the Fund”) to receive the CRUTs’ remainder interests. (Pls. PFUF ¶ 29.) Contrary to defendant’s claim, the Fund’s trustees (James Locke, Freddy Robinson, and Wesley Stallings) were not agents of the Sands family, and the Sands family did not control their decisions as trustees. (Pls. PFUF ¶¶ 35 and 39.)

On February 27, 2002, the original limited partners entered into purchase agreements with the trustees of the Fund whereby (for $550,074.56 each or a total of $2,200,298.24) they

[7] Defendant is requesting the Court to decide one of the alternative grounds (that the obligations to close the short sales contributed to Group constitute liabilities for purposes of § 752) on which defendant based this adjustment. Plaintiffs dispute that the Court may consider this ground as plaintiffs have conceded defendant’s capital gains adjustment and deciding the § 752 issue would serve no purpose and would waste the Court’s resources.

purchased the remainder interests in their respective CRUTs from the Fund. (Pls. PFUF ¶ 36.) The trustees of the Fund exercised their independent judgment in agreeing to sell the remainder interests in the CRUTs to the original limited partners; they did not have any plan, prearrangement or understanding with the Sands family members that they would agree to such a sale prior to their appointment as trustees of the Fund. (Pls. PFUF ¶ 39.) The trustees determined that the Fund's best interests would be served by obtaining cash up front rather than waiting for up to 20 years to obtain the remainder interests in the CRUTs which were illiquid limited partnership interests which could fluctuate significantly in value during that time period. (Pls. PFUF ¶ 39.) Since 2002, the Fund has provided donations of $2,752,288 to a number of charitable organizations. (Pls. PFUF ¶ 44.)

The purchase of the remainder interests in the CRUTs by the original limited partners (who were the present beneficiaries of the CRUTs) terminated each CRUT, and the original limited partners each received a distribution of a 24.975% limited partnership interest in Group. (Pls. PFUF ¶ 40.) The Sands family members were advised that the distributions by the CRUTs were not taxable events. (Pls. PFUF ¶ 41.) Later on February 27, 2002, Group distributed all of its assets ($75,267,108.29) to its partners in proportion to their percentage interests in the partnership. (Pls. PFUF ¶ 42.)

In implementing the transactions described above and in determining the correct tax treatment, the Group limited partners engaged Lewis, Rice & Fingersh ("Lewis Rice") and Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") to provide legal services and advice. (Pls. PFUF ¶ 48.) Jonathan Blattmachr of Milbank Tweed had provided estate planning services to the Sands family since the 1990s. (Pls. PFUF ¶ 47.) The Group limited partners also relied on their long-time return preparers at Bernard Robinson & Company LLP ("Bernard

Robinson"). (Pls. PFUF ¶ 46.) The attorneys at Lewis Rice (Michael Mulligan, William Falk, and Lawrence Weltman) and Milbank Tweed (Jonathan Blattmachr) who assisted the Sands family members were recognized experts in tax law. (Pls. PFUF ¶ 55 and 64.) Attorneys at these firms spent significant time in implementing the transactions and in researching, analyzing, and drafting opinions regarding the tax consequences of these transactions. (Pls. PFUF ¶ 56 and 66.) Lewis Rice issued an opinion dated December 28, 2001 to each of the original limited partners. (Pls. PFUF ¶ 59.) The opinions concluded that it was more likely than not correct to not treat the contingent obligations to cover the short sale positions as liabilities for purposes of § 752. (Pls. PFUF ¶ 59.)

Milbank Tweed issued an opinion dated June 21, 2002 to each of the original limited partners. The opinions concluded that it was more likely than not that: (1) the remainder interests in the CRUTs were alienable; (2) the purchase of the remainder interest by the original limited partners of Group would terminate the CRUTs under Alaska law; (3) the purchase of the remainder interests and termination of the CRUTs would not cause the CRUTs to retroactively lose their status as charitable remainder trusts; (4) the termination of the CRUTs would not be an income tax recognition event to the Sands family members; (5) the purchasers would have a carryover basis in the assets distributed in satisfaction of the lead interest and a cost basis in the assets distributed in satisfaction of the remainder interest; and (6) the purchasers' holding period in the purchased remainder interest becomes the holding period in the assets distributed in satisfaction of the remainder interest, and the CRUTs' bases in the assets distributed in satisfaction of the lead interest becomes the purchasers' bases in those assets. (Pls. PFUF ¶ 68.)

Both firms stand behind the conclusions reached in the opinions based on the law in effect at the time they were given. (Pls. PFUF ¶ 61 and 70.) Bernard Robinson prepared tax

returns for plaintiffs and their partners consistent with the opinions provided by Lewis Rice and Milbank Tweed. (Pls. PFUF ¶ 73-74.) The Group limited partners relied on the opinions issued by Lewis Rice and Milbank Tweed in determining the proper tax treatment of the transactions. (Pls. PFUF ¶ 62 and 71.) The original limited partners trusted their advisors, in taking the tax positions at issue and had no reason to question their advice. (Pls. PFUF ¶ 75.)

## ARGUMENT

### I. THE COURT CANNOT CONSIDER DEFENDANT'S ARGUMENT THAT THE SHORT SALE OBLIGATIONS ARE "LIABILITIES" FOR PURPOSES OF SECTION 752 BECAUSE PLAINTIFFS HAVE ALREADY CONCEDED DEFENDANT'S CAPITAL GAINS ADJUSTMENTS ON ANOTHER GROUND.

#### A. Consideration of the Section 752 Issue Is Unnecessary and Would Result in an Improper Advisory Opinion.

Defendant's attempt to force this Court to determine an issue that is now immaterial in an effort to apply a 40 percent penalty against plaintiffs should be denied. Plaintiffs have conceded the capital gains adjustments by defendant on the ground that none of the transactions of the partnerships increased the amount considered at-risk for an activity under § 465(b)(1) and that the at-risk rules disallowed losses and required the partnerships and their partners to recognize gain on the transactions as set forth in the FPAAs. Defendant accepted plaintiffs' concession. However, defendant wants to waste the parties' and the Court's resources by asking the Court to determine one of the alternative grounds on which defendant premised those capital gains adjustments - that the short sale obligations contributed to plaintiffs CWC, Group, and Partners were liabilities for purposes of § 752.

The only reason defendant is asking this Court to determine the § 752 issue is an attempt to avoid the precedent described in Plaintiffs' MPSJ filed July 2, 2008 regarding the inapplicability of the valuation misstatement penalties to plaintiffs after their concession of defendant's capital gains adjustments on grounds unrelated to valuation or basis. As explained by

plaintiffs in that brief, courts have repeatedly refused to litigate the underlying issues in tax cases for purposes of determining whether this type of penalty should apply when the taxpayer has conceded the underlying issue. *See, e.g.*, *McCrary v. Comm'r*, 92 T.C. 827 (1989). Thus, defendant's motion for summary judgment on § 752 presents the very type of issue that courts have consistently refused to consider.

Moreover, consideration by the Court of the § 752 issue would result in an improper advisory opinion. In *Pohl Corp. v. United States*, 22 Cl. Ct. 849 (1991), this Court determined that it could not issue an opinion where the defendant United States conceded the taxpayer's claim for refund after trial but prior to the Court's issuance of an opinion because to do so would "run afoul of the prohibition of rendering advisory opinions." *Pohl*, 22 Cl. Ct. at 851. *See also Handeland v. Comm'r*, 519 F.2d 327, 329 (9th Cir. 1975) (affirming Tax Court's decision not to make additional findings once the Commissioner conceded that no tax was due); *Malat v. Comm'r*, 302 F.2d 700, 705 (9th Cir. 1962) (refusing to render an advisory opinion when the taxpayers conceded the adjustment).

### B. The Requirement to Cover a Short Sale Is Not a Liability for Purposes of Section 752.

Should the Court reach the issue of whether the requirement to cover a short sale is a liability for purposes of § 752, plaintiffs incorporate by reference their discussion of this issue in Plaintiffs' CMSJ filed July 6, 2007. Pls.' Ex. 1, App. L at pp. 1-25.

Defendant has raised one additional authority in its motion that plaintiffs did not discuss in the incorporated brief. In *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 452 (5th Cir. 2008), the Fifth Circuit reasoned that the obligation to close a short sale is a liability for purposes of § 752, and the value of this liability is equal to the initial proceeds of the short sale. *Kornman*, 527 F.3d at 452. The court reached this conclusion, not by interpreting the plain

language of the statute, but instead by adopting the reasoning espoused by the IRS in several revenue rulings and determining that such ruling were entitled to *Skidmore* deference because they were reasonable. *Id.*

This Court and the Federal Circuit, however, do not accord any deference to revenue rulings setting forth the litigating position of the IRS, but which contain little or no authority and espouse positions inconsistent with regulations and other pronouncements of the IRS. *See AMP Inc. v. United States*, 185 F.3d 1333, 1338-39 (Fed. Cir. 1999) (determining that Rev. Rul. 91-21 was not entitled to any deference); *Western Co. of N. Am. v. United States,* 323 F.3d 1024, 1032 (Fed.Cir.2003) ("[R]evenue rulings merely represent the position of the United States and do not bind this court," but may be instructive in the absence of controlling authority); *Somerville v. United States*, 13 Cl. Ct. 287 (1987). As explained in the attached 24 pages of Plaintiffs' Cross-Motion for Summary Judgment, the revenue ruling that the Fifth Circuit relied on conflicts with longstanding precedent, particularly precedent that the IRS helped create, and therefore is not entitled to any deference in this Court.

## II. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF THE VALIDITY OF THE TRANSFERS.

### A. Defendant Lacked Authority to Adjust the Identity of the Partners of Group in its FPAA, and the Court Lacks Jurisdiction to Consider the Validity of the Transfers in This Proceeding.

In Plaintiffs' Motion to Substitute, which is still pending, plaintiffs asked the Court to invalidate the portion of defendant's FPAA issued to Group wherein defendant determined that the Transfers should be disregarded because defendant lacked authority to adjust the identity of the partners of Group in its FPAA and thus, the Court does not have jurisdiction to consider the efficacy of the Transfers or the validity of the CRUTs in this proceeding. In that motion, plaintiffs pointed out that the identity of the partners and validity of a transfer of a partnership

interest is not a "partnership item" that may be adjusted in an FPAA because it is not "required to be taken into account for the partnership's taxable year under any provision of subtitle A" and has not been identified by the Secretary in a regulation as an item that is more appropriately determined at the partnership level than at the partner level. Plaintiffs also noted that as a practical matter, one reason the validity of the Transfers is not a partnership item is because its determination requires examination of facts and law pertaining to individual partners and their transferees, which would not be available or applicable to the partnership itself. *See Hang v. Comm'r*, 95 T.C. 74 (1990); *Grigoraci v. Comm'r*, 84 T.C.M. 186 (2002).

In their Motion to Substitute, plaintiffs predicted that defendant would attack the validity of these transfers through facts and theories that have nothing to do with the partnership, and Defendant's Motion proves the point. For example, defendant has asserted that the Transfers should be disregarded under assignment of income principles or because the CRUTs do not qualify as charitable remainder CRUTs. (Def. Mot. Summ. J. 15-22.) These arguments have <u>nothing</u> to do with Group and are perfect illustrations of why the validity of the Transfers is <u>not</u> a partnership item that defendant may raise in an FPAA. The determinations of whether the Transfers were completed gifts or whether the CRUTs were valid under § 664(c) do not involve information available to Group or required to be taken into account for the partnership's taxable year under Subtitle A. These are issues that should have been examined at the partner level - which the government recognized during in its examination of the partnership. The revenue agent who examined the partnerships, in providing supplemental responses to questions raised at his deposition, noted that facts relating to the qualification or existence of the CRUTs themselves were not included in the partnership-level adjustments and should have been audited, if at all, through separate audits of the CRUTs. (Pls.' Ex. 16, App. at p. 347.) Accordingly, the Court

should grant plaintiffs' Motion to Substitute, which would preclude it from even considering the remaining issues raised in Defendant's Motion.

**B. Because Genuine Issues of Material Fact Exist, Defendant is Not Entitled to Summary Judgment.**

Defendant's motion is premised on two "facts" both of which plaintiffs dispute. First, defendant asserts that the Transfers to the CRUTs and the later purchase of the remainder interests by the original limited partners was "part of a prearranged, and elaborately diagrammed, tax avoidance scheme." (Def. Mot. Summ. J. 19-20.) Second, defendant argues that the Sands exercised control over the trustees of the charitable remainder beneficiary, which ensured their ability to reacquire the remainder beneficiary's interest in the CRUTs. (Def. Mot. Summ. J. 19-22.) Defendant offers no admissible facts to support either of these theories, and even admits that much of its characterization of events is based on presumptions and speculation. (Def. Mot. Summ. J. 20.) While defendant alleges that the Fund's trustees were agents of the Sands, defendant provides no evidence whatsoever to support this claim. Because defendant has presented no evidence to support its "facts" it is not entitled to summary judgment.

The reason defendant did not support its motion with admissible evidence is because there is none. Had defendant bothered to depose any of the trustees, it would have learned, as stated in the affidavits plaintiffs have filed in support of this response, that the Sands had no plan, prearrangement or understanding with the trustees that they would agree to a sale of the Fund's remainder interests. Defendant would also have learned that these individuals faithfully exercised their fiduciary duties. That defendant would baselessly allege otherwise without even speaking with the trustees is shocking.

Since there is no factual support for defendant's position, defendant has relied on inadmissible and improper evidence to create "facts" for its motion, which evidence is the

subject of Plaintiffs' Motion to Strike filed concurrently with this response. (Def. Mot. Summ. J. 3, 5-8, 13-14, 19-22.) Defendant relied on an unauthenticated transcript of a purported conversation between Mr. Kornman, Mr. Blattmachr, and a taxpayer unrelated to the Sands or any of the transactions at issue in this case, and defendant's reliance on that transcript is both improper and irrelevant. Defendant also relied on the report of an expert witness who admittedly did not consider the testimony of anyone actually involved in the gifts of the partnership interests to the CRUTs or the purchase of the remainder interests from the Fund in concluding that the CRUTs were "used by their creators as temporary partners in Group during a period when Group realized large amounts of capital gain income from sales of Constellation stock and other securities." The expert report does not meet the standard required for expert testimony under Fed. R. Evid. 702. In any event, the affidavits attached to this motion clearly raise disputed facts sufficient to deny defendant's motion.

Finally, plaintiffs dispute defendant's assertion that plaintiffs' only purpose in entering the transactions was to eliminate the capital gains on the sale of Constellation Brands stock and repeated characterizations of the transactions as "tax shelters." (Def.'s Mot. at 5.) Plaintiffs have repeatedly confirmed (in depositions and affidavits) that they had several goals in entering the transactions at issue here – diversifying their investments, achieving charitable goals, profiting from movements in interest rates, estate planning, and potentially obtaining tax benefits. (Pls.' Ex. 52, 53 and 57, App. B at pp. 1352-53, 1359 and 1397a). To the extent their purpose matters, it cannot be determined on summary judgment.

## C. Defendant is Not Entitled to Summary Judgment as a Matter of Law.

Defendant argues that the Transfers should be disregarded based on four arguments not previously raised in defendant's FPAA or any pleading in this case.[8] Defendant bases these arguments primarily on its belief that the entire transaction was prearranged by the Sands who controlled its outcome and because the CRUTs were in existence for a little less than six months when the original limited partners purchased the remainder interests in the CRUTs from the charitable remainder beneficiary. (Def. Mot. Summ. J. 19-20.) However, as described above, the Sands did not control the trustees of the Fund and their decisions on the Fund's behalf. Moreover, the duration of the CRUTs does not, under any legal theory, compel a determination that the 2001 transfers should be disregarded. As described in detail below, none of defendant's legal arguments support a determination that the Transfers should be disregarded.

### 1. The Substance Over Form, Step Transaction, and Assignment of Income Doctrines Do Not Apply Where, As Here, Appreciated Property is Validly Transferred to a Charitable Organization Prior to the Sale of the Property Giving Rise to Income.

Defendant's argument that the substance over form, step transaction doctrine, and assignment of income principles require the Court to disregard the Transfers ignores a long line of precedent determining that the doctrines are not applicable when taxpayers donate appreciated property to a charity prior to the time a fixed right of income exists. *Morgan Guar. Trust Co. v. United States*, 218 Ct. Cl. 57, 66 (1978) ("There is nearly always a "reasonable probability" that income will be derived from a gift of appreciated property to a charitable organization. . . Indeed, the only way in which the charitable purpose could have been accomplished in each of those

[8] It is highly improper for defendant to raise these arguments for the first time on summary judgment when defendant's RCFC 30(b)(6) witness was not prepared to testify regarding the supporting "facts." At the Rule 30(b)(6) deposition, plaintiffs repeatedly asked defendant's representative to explain the facts underlying the assertion that the transfers were shams and that penalties should be imposed, but the representative was unprepared to answer those and other questions. (Pls.' Ex. 16, App. at pp. 346, 348, and 352.) It is improper for defendant to make these arguments to the Court while the parties are still attempting to amicably resolve defendant's failure to produce a knowledgeable witness at the Rule 30(b)(6) deposition as required.

cases was to convert the appreciated property to cash. That such a conversion occurred after the gift was made did not mean that the taxpayer assigned income which had already been earned.”). Courts have routinely held that the gain on appreciated property donated to a charity or charitable trust does not result in income to the donor so long as he gives the property away absolutely and before the property gives rise to income by way of a sale. *DeWitt v. United States*, 204 Ct. Cl. 274 (1974); *Sheppard v. United States*, 176 Ct. Cl. 244 (1966); *Rauenhorst v. Comm'r*, 119 T.C. 157 (2002); *Palmer v. Comm'r*, 62 T.C. 684 (1974); *Grove v. Comm'r*, 490 F.2d 241 (2d Cir. 1973). Additionally, so long as the gifts were complete prior to the existence of a fixed right to the income from the property, the courts have held that the transferors' preexisting intention to offer to repurchase the donated property is irrelevant. *See, e.g., DeWitt v. United States*, 204 Ct. Cl. 274 (1974); *Sheppard v. United States*, 176 Ct. Cl. 244, 252 (1966).

In *Grove*, much like defendant's position here, the Commissioner argued that the form of the taxpayers' donations of stock to an educational institution (“RPI”) and the later redemption of such stock by a corporation should be disregarded and recharacterized as a redemption of stock from the taxpayers by the corporation and a donation by them of the proceeds to the educational institution. *Grove*, 490 F.2d at 245. Similar to this case, the Commissioner argued that the “circumstances establish that Grove merely employed RPI as a convenient conduit for withdrawing the funds from the Corporation for his personal use without incurring tax liability.”

The Court was not persuaded:

> The Commissioner would have us **infer** from the systematic nature of the gift-redemption cycle that Grove and RPI **reached a mutually beneficial understanding**: RPI would permit Grove to use its tax-exempt status to drain funds from the Corporation in return for a donation of a future interest in such funds. We are not persuaded by this argument and the totality of the facts and circumstances lead us to a contrary conclusion.

*Grove*, 490 F.2d at 246-47 (emphasis added). The court understood that tax considerations played a role in Mr. Grove's planning but noted that "foresight and planning do not transform a non-taxable event into one that is taxable." *Id.* The court refused to recast the gift by Mr. Grove to RPI and the later redemption into fictional transactions that did not occur. *Id.* at 248.

This Court reached similar conclusions in *DeWitt v. United States*, 204 Ct. Cl. 274 (1974). In *DeWitt*, the taxpayer gifted eight shares of stock to an educational institution. At the time of the gift, the taxpayer planned to offer to repurchase the stock through his controlled corporation at a later time. The educational institution was not obligated to sell the stock to the taxpayer's corporation and did not enter into any agreement to hold the stock until such an offer materialized. The IRS viewed these facts as an indication that the gift was conditional. The Court rejected this view:

> This fact, however, is not particularly persuasive here, nor have similar facts had any determinative effect in analogous cases. Since the eight shares of stock were in a closely-held company, there was little, if any, market for them. Indeed, the only potential buyer was Mortgage Co., DeWitt's corporation. Thus, it is not surprising that the offer to purchase the stock came from the only likely source available.

*DeWitt*, 204 Ct. Cl. at 290 (internal citations omitted). The court relied instead upon the fact that after delivery of the stock, DeWitt no longer had dominion and control over it. The Court also noted that the taxpayers' consideration of the tax aspects of the gift and repurchase "sheds little light on the basic question of whether a valid gift was completed when DeWitt delivered the stock to the Academy." According to the Court, the focus generally is on the completion of the gift, not

> what a donee does with the gift thereafter, even if the gift is repurchased shortly after it is given by the donor's controlled corporation, providing there is no agreement between the donor and donee such as to render the gift a sham, and the donor risks the possibility, however small, that the donee may sell the gift elsewhere. Prearrangements, understandings, or tentative planning between the

> involved parties which do not impose legal obligations on them to either sell or purchase the gift after it is given, will not invalidate the gift.

*DeWitt*, 204 Ct. Cl. at 298-99.

In *Sheppard v. United States*, 176 Ct. Cl. 244 (1966), the taxpayers owned an interest in a breeding stallion. They donated the interest to two charities and claimed a charitable deduction for the fair market value of the interest. The taxpayer was president of a horse breeding operation that he caused to offer to purchase the charities' interests in the horse the day after he gifted the interests to the charities. They accepted his offer to purchase the interests for their fair market value. The government relied on the step transaction doctrine to require the taxpayer to recognize the gain on the purchase of his interest in the stallion by the horse breeding operation, ignoring the intervening gift by the taxpayer to the charities.

The Court rejected this argument:

> The court cannot agree that, in the circumstances of this case, it is permissible to **disregard what was done in fact** and **to substitute in its stead a fictitious, but taxable, transaction which never occurred**. . . .
>
> The proof is clear and convincing that there were no prearrangements or commitments entered into between taxpayer and the two charities, nor did he place any conditions upon or tie any strings to, his gifts. Legally speaking, the charities were as free to deal with their donated interests as any other owner would be. . . .
>
> Defendant asks too much of the step transaction doctrine when it says that, despite the reality of plaintiff's gifts and the subsequent purchase by The Farms, there was nonetheless a sale by plaintiff to The Farms of his entire interest in Star's Pride. Such an application of the doctrine **would twist two actual transactions into two transactions which never in fact occurred, a sort of "let's pretend" approach.** . . . Useful as the step transaction doctrine may be in the interpretation of equivocal contracts and ambiguous events, it cannot generate events which never took place just so an additional tax liability might be asserted.

*Sheppard*, 176 Ct. Cl. at 255-56 (emphasis added).

Moreover, the Tax Court has severely rebuked the government's attempt to apply the assignment of income doctrine in the context of completed gifts to charities prior to a

fixed right to income arising because it contradicts long-standing IRS revenue rulings. *See Rauenhorst*, 119 T.C. at 171-72 ("Respondent's position in this case directly contradicted his long-standing and clearly articulated administrative position as set forth in Rev. Rul. 72-539, 1972-2 C.B. 634, and reiterated in Rev. Rul. 83-183, 1983-2 C.B. 220. Respondent's counsel may not choose to litigate against the officially published rulings of the Commissioner without first withdrawing or modifying those rulings. The result of contrary action is capricious application of the law.")

These cases show that, whatever the guise of defendant's theory, be it "step transaction" or "assignment of income" or "substance over form," a completed gift by taxpayers will not be disregarded to reach more favorable tax consequences for defendant so long as the gift was made before the property gives rise to income by way of sale and the transferor had no preexisting agreement with or control over the transferee that would give it the legal right to reacquire the property. In this case, the original limited partners owned limited partnership interests in a partnership which held appreciated stock and which was going to sell the appreciated stock in October 2001. The original limited partners completely divested themselves of their interests in Group before the sale of the Constellation Brands stock.[9] As in *Grove*, *DeWitt*, and *Sheppard*, the gift was completed prior to any sale resulting in gains on the appreciated property. Finally, the defendant has failed to offer any evidence to support its baseless allegations that there was a plan or prearrangement between the Sands and the trustees of the Fund regarding the purchase of the remainder interests in the CRUTs or that the Sands effectively controlled the Trustees

[9] Defendant apparently agrees that the gifts were completed prior to Group's sale of the Constellation stock, but argues (inappropriately) that the gifts were shams. In any event, the original limited partners effectively transferred their limited partnership interests in Group to the CRUTs in accordance with Missouri law and ceased to be partners of Group under Missouri law upon assigning their interests in Group to the CRUTs. (Pls. PFUF ¶¶ 17-20); s*ee* MO. REV. STAT. § 359.411 (2008) ("Except as provided in the partnership agreement, a partner ceases to be a partner upon assignment of all his partnership interest.").

decision to sell the Fund's remainder interest in the CRUTs to them as opposed to some other party (assuming, for sake of argument, that the Fund could even find a different buyer). The evidence is indisputably to the contrary, as indicated in the affidavits of Robert Sands and trustees James A. Locke, III, Freddy Robinson, and Wes Stallings included in the Appendix.

Defendant's reliance on *Hallowell v. Comm'r*, 56 T.C. 600 (1971) and *Malkan v. Comm'r*, 54 T.C. 1305 (1970) is misplaced. (Def. Mot. Summ. J. 15-20.) Neither *Hallowell* nor *Malkan* involved a gift of appreciated property to a charity or charitable trust. In *Hallowell*, the taxpayers transferred the appreciated property to a company **they owned and controlled** and which had a pattern of providing substantial distributions to the taxpayers after similar previous transfers. In *Malkan*, the taxpayers transferred property to non-charitable trusts prior to its sale **and had agreed on all terms of the sale and the contract for the sale prior to the transfer to the trusts.** Essentially, the taxpayer in *Malkan* had a fixed right to the income on the property prior to the transfer of the property to the trusts. These cases are therefore inapposite.

**2. The CRUTs Qualify as Charitable Remainder Unitrusts Under Section 664.**

Defendant also argues that the CRUTs do not qualify as charitable remainder trusts, not from any failure to meet any of the statutory requirements, but from defendant's distorted interpretation of Treas. Reg. § 1.664-1(a)(4), which requires a CRUT to function "exclusively as a charitable remainder trust from the creation of the trust." (Def. Mot. Summ. J. 20-22.) Defendant has not pointed to any failure of the CRUTs to meet any of the requirements to qualify as CRUTs, and indeed there was no such failure. The CRUTs made the proper payouts for the periods they were in existence, which the Sands properly included in income. The CRUTs were set up to leave the applicable remainder amount (at least 10% of the net fair market value of the property contributed to the CRUTs) for the charitable remainder beneficiary. Defendant's

own expert testified that "[t]he CRUTs were fine. I mean, they were well drafted and all that sort of thing" when discussing the operating documents for the CRUTs. Pls.' Ex. 2, App. L at p. 29.

Defendant, however, argues that the CRUTs fail to qualify under § 664 because they purportedly were a "contrivance" in a plan to avoid the tax realized on the sale of the Constellation stock and because the CRUTs were terminated after 5 months. Regarding the first point, as described above, defendant has presented no evidence that there was an agreement with the trustees of the remainder beneficiary to terminate the CRUTs early when they were created or at any time before the trustees received an offer from the Sands. On the second point, the IRS has often approved the early termination of various charitable trusts and has not retroactively revoked their status as charitable trusts at the early termination. *See, e.g.,* I.R.S. Priv. Ltr. Rul. 200821024 (Feb. 25, 2008); I.R.S. Priv. Ltr. Rul. 200802033 (Oct. 16, 2007); I.R.S. Priv. Ltr. Rul. 200725044 (Mar. 27, 2007); I.R.S. Priv. Ltr. Rul. 200525014 (Mar. 30, 2005). And once again, defendant's expert testified that the early termination of a CRUT should not automatically invalidate it as a CRUT, rather, his concern was that the CRUTs in this case were terminated too soon. Pls.' Ex. 2, App. L at pp. 30-33.

### 3. Treas. Reg. § 1.701-2 Does Not Apply to Disregard the Transfers to the CRUTs.

Defendant is not entitled to summary judgment as to the validity of the transfers of limited partnership interests in Group to the CRUTs based on application of Treas. Reg. § 1.701-2 because the regulation does not apply, and even if it did apply, it is invalid.

#### a. Treas. Reg. § 1.701-2 is Inapplicable.

Treas. Reg. §. 1.701-2 purports to allow the Commissioner to recast a transaction for federal tax purposes "if a partnership is formed or availed of in connection with a transaction the <u>principal purposes</u> of which is to reduce substantially the present value of the partners' aggregate

federal tax liability in a manner that is inconsistent with the intent of subchapter K." (emphasis added). When this prerequisite it met, the regulation provides that the Commissioner can make certain determinations, including the only one possibly relevant here, that "one or more of the purported partners of the partnership should not be treated as a partner."

It is doubtful that Treas. Reg. § 1.701-2 could ever apply to gifts of partnership interests to charitable entities, and in particular charitable trusts, without calling into question the efficacy of every single such gift. A gift of a partnership interest to a charitable organization will always reduce the present value of a partners' federal tax liability (a reduction of tax liability clearly intended by Congress as shown in § 170). For the Commissioner to determine that such reduction is, in the Commissioner's view, "inconsistent with the intent of subchapter K" thwarts the will of Congress in allowing charitable deductions for gifts of property to charitable entities. Moreover, Treas. Reg. § 1.701-2 relies on the same "substance over form" principles (*see* Treas. Reg. § 1.701-2(a)(2)) that the Courts have repeatedly refused to follow in cases like this one, involving transfers of property to charitable organizations. Nothing in Treas. Reg. § 1.701-2 purports to make that common law doctrine applicable where it previously was not.

In any event, defendant has not provided **any** evidence to show that the principal purpose of the CRUTs was to reduce the Sands' taxes which is required for the regulation to apply. While the Sands have readily admitted that tax savings was a purpose, they have consistently testified that there were many other purposes for these transactions. (Pls.' Ex. 52 and 53, App. B. pp. 1352-53, 1359.). Defendant cannot simply assume that "tax avoidance" was the primary purpose of these transactions and be entitled to summary judgment.

Even if Treas. Reg. §1.701-2 could apply, it does not support defendant's attempt to change the partners of a partnership. The regulation specifically provides that the Commissioner

can determine that a partner should not be treated as a partner, but nowhere does it purport to allow the Commissioner to affirmatively name individuals as partners in a partnership. Treas. Reg. § 1.701-2 (b)(2). The Commissioner's ability to exclude partners is quite different than the ability to affirmatively turn a non-partner into a partner of a partnership who is then required to report a share of the partnership's income.

b. Treas. Reg. § 1.701-2 is Invalid.

Should the Court determine that Treas. Reg. § 1.701-2 could apply, plaintiffs assert in the alternative that the regulation is invalid. In its motion, Defendant for the first time invokes Treas. Reg. § 1.701-2 as a basis for disregarding the Sands transfers of their partnership interests to the CRUTS. This regulation was adopted under a storm of hostile criticism and has never been enforced by any court.[10] The regulation purports to allow the Commissioner to judge for himself

---

[10]Leading members of the federal tax bar, including the Tax Section of the American Bar Association, former Judges of the United States Tax Court, former Commissioners of the IRS, former IRS Chief Counsels, and the leading treatise on federal partnership taxation, have all concluded that this regulation is invalid. *See, e.g.*, William H. Caudill, *ABA Tax Section Members Say Antiabuse Rule Is Not a Valid Exercise of IRS Authority*, 94 TAX NOTES TODAY 146-50 (July 1, 1994); Letter from Donald C. Alexander (former Commissioner of the IRS), B. John Williams (former Tax Court Judge and IRS Chief Counsel), et al, to the Assistant Secretary for Tax Policy, *reprinted in Commentators Say Partnership Antiabuse Rule Doesn't Satisfy Fundamental Principles for a Workable Tax System*, 95 TAX NOTES TODAY 175-28 (Aug. 18, 1995) ("We do not believe that the best interest of either the Government or the taxpayers will be served by [the Regulation] or similar broad anti-abuse rules not grounded in or authorized by statutory provisions of the Code . . . ."); WILLIAM S. MCKEE (former Tax Legislative Counsel at the U.S. Treasury Department) & WILLIAM F. NELSON (former IRS Chief Counsel) ET AL., FED. TAX'N OF P'SHIPS AND PARTNERS ¶ 1.05 (4th ed. 2008), Pls.' Ex. 3, App. L at p. 34 ("Regulation § 1.701-2 was proposed in 1994 and finalized in 1995, over the protests of most practitioners, including the authors."). Many others have criticized the regulation and argued it is invalid. *See, e.g*., Letter from Coopers & Lybrand to Commissioner of the Internal Revenue Service, *reprinted in Coopers & Lybrand Urges Withdrawal Partnership Anti-abuse Rule*, 94 TAX NOTES TODAY 172-25 (Sept. 1, 1994); Letter from Harvey L. Coustan to Commissioner of the Internal Revenue Service, *reprinted in* to *AICPA Calls For Changes in Partnership Anti-abuse Reg.*, 94 TAX NOTES TODAY 139-64 (Jul. 19, 1994); Letter from Price Waterhouse to Commissioner of the Internal Revenue Service, *reprinted in Partnership Anti-abuse Reg. Is Overly Broad, Price Waterhouse Asserts*, 95 TAX NOTES TODAY 52-32 (Mar. 16, 1995); Letter from Ernst & Young to Commissioner of the Internal Revenue Service, *reprinted in Ernst & Young Criticizes Partnership Anti-abuse Reg.*, 94 Tax Notes Today 141-32 (July 21, 1994); Sheldon I. Banoff, *Anatomy of an Anti-Abuse Rule: What's Really Wrong with Reg. Section 1.701-2*, 95 TAX NOTES TODAY 56-84 (Mar. 22, 1995); James A. Gouwar, *The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its Authority*, 11 J. P'SHIP TAX'N 287, 305 (1994); Letter from Ronald A. Shellan to the Internal Revenue Service, *reprinted in Attorney sees 'Fatal Flaw' in Anti-Abuse Regs.*, 94 TAX NOTES TODAY 119-25 (May 23, 1994); Letter from Barbara Spudis and James Barrett to Commissioner of the Internal Revenue Service *reprinted in Commentators Say Partnership Antiabuse Rule Should Be Withdrawn*, 94 TAX NOTES TODAY 152-37 (Aug. 4, 1994); *ABA Tax Section Members Say Anti-abuse Rule is Not a Valid Exercise of IRS Authority*, 94 TAX NOTES TODAY 146-50 (July 1, 1994)); Letter from

whether the tax results of transactions involving partnerships are "consistent with the intent of subchapter K" (the partnership provisions of the Code). Treas. Reg. § 1.701-2(b). If the Commissioner believes that the tax treatment of a particular transaction is "inconsistent with the intent of subchapter K," *Id*. (emphasis added) the regulation would purport to give the Commissioner unfettered discretion to recast the transaction to achieve a tax result that he believes is more consistent with the intent of subchapter K – in this case, apparently, to treat the Sands as partners in Group even though they were not. And, under the text of this regulation, the Commissioner claims the right to exercise this authority even if the transaction unquestionably satisfies and is based on the plain meaning of the statutory provisions in question. *See* Treas. Reg. § 1.701-2(b) (allowing the Commissioner to recast a transaction "even though [it] may fall within the literal words of a particular statutory or regulatory provision").

Among its many defects, this regulation violates the fundamental notion that no branch of the government may intrude into the responsibilities of another. It is axiomatic that an administrative agency can act only within the bounds of authority delegated to it by Congress. Treasury claims, wrongly, that Congressional authority for the regulation rests in the entirety of subchapter K and in Treasury's general rule-making authority under Code section 7805(b).[11] Contrary to Treasury's assertion, no provision of subchapter K contains any delegation of authority for Treasury to promulgate a general subjective "anti-abuse" rule like the one at issue

---

Douglas A. Antonio to the Internal Revenue Service, *reprinted in Partnership Antiabuse Regs. Should be Subject to Executive Order, Attorney Asserts*, 94 TAX NOTES TODAY 121-11 (June 23, 1994); Letter from Anthony Ilardi Jr. to Internal Revenue Service, *reprinted in Partnership Reg. Adds Confusion, Attorney Asserts*, 94 TAX NOTES TODAY 151-42 (Aug. 3, 1994).

[11] Treasury claimed it had authority to promulgate the Regulation under both Code section 7805, which provides the Secretary with general rulemaking power, and under the entirety of subchapter K. *See* Subchapter K Anti-Abuse Rule, 60 Fed. Reg. 23, 27 (Jan. 3, 1995) (stating "Authority: 26 U.S.C.§ 7805 *** Section 1.701-2 is also issued under 26 U.S.C. § 701 through 761***").

here, let alone one that would vest such tremendous discretion in the Commissioner.[12] This is particularly true here because the rules codified in subchapter K are objective in that they contain defined standards that allow taxpayers certainty in structuring partnership transactions, whereas the regulation in question would apply a completely subjective standard. Moreover, any such standardless delegation would run counter to history, as Congress has in the past delegated authority to Treasury to issue rules on specific partnership issues only on a section-by-section or subsection-by-subsection basis. Treasury's effort to "codify" its *ad hoc* and unauthorized subjective test through this regulation thus plainly violates the separation of powers by usurping Congress' power to make the law. *See Helvering v. Credit Alliance Corp.*, 316 U.S. 107, 113 (1942) (rejecting a regulation that "not only was contradictory of the plain terms of the [statute] but attempted to add a supplementary legislative provision, which could only have been enacted by Congress"); *Rite Aid Corp. v. United States*, 255 F.3d 1357, 1359 (Fed. Cir. 2001); *Stephenson Trust v. Comm'r*, 81 T.C. 283, 294-98 (1983) (invalidating a general anti-abuse regulation similar to that at issue here).

The challenged regulation also intrudes on power reserved for the judiciary in that it purports to provide the Commissioner with the power to determine whether a partnership transaction conforms with his view of the "intent of subchapter K," and to take any remedial action that he deems necessary. Such power, however, is reserved for the courts. "'[M]aking authoritative findings of fact and . . . applying the Secretary's standards to those facts in making

[12] Congress has given the Treasury authority to promulgate an anti-abuse regulation only with respect to a single, specif-.
ic, provision in Subchapter K. *See* 26 U.S.C. § 732(f)(8). The Commissioner's creation of the all-encompassing generalized rule at issue, however, would make that specific delegation of authority meaningless. And, the specific delegation in 26 U.S.C. § 732(f)(8) certainly indicates that had Congress intended to allow the IRS broader discretion with respect to all of subchapter K, it would have made that explicit as it has done in the past. *See, e.g.,* 26 U.S.C. § 72(e)(11)(A); 26 U.S.C. § 108(c)(5); 26 U.S.C. § 149(g)(5); 26 U.S.C. § 163(i)(5)(B); 26 U.S.C. § 167(e)(6); 26 U.S.C. § 170(f)(10)(I); 26 U.S.C. § 731(c)(7); 26 U.S.C. § 743(d); 26 U.S.C. § 864(d)(8); 26 U.S.C. § 877(d)(4)(D); 26 U.S.C. § 897(e)(2); 26 U.S.C. § 901(k)(4)(c); 26 U.S.C. § 936(a)(4)(B)(iii)(III); 26 U.S.C. § 1274A(e); 26 U.S.C. § 7701(f).

a decision' are 'adjudicatory powers typically exercised by a *court* in the agency-review context.'" *RLC Indus. v. Comm'r*, 58 F.3d 413, 416 (9th Cir. 1995) (quoting *Martin v. OSHRC*, 499 U.S. 144, 154-155 (1991) (emphasis in original)).

The regulation not only violates separation of powers, but is unconstitutionally vague because it fails to provide taxpayers the required fair warning of what it prohibits. Instead, using an overly vague and broad standard, it prohibits tax treatment that is "inconsistent with the intent of subchapter K," as determined by the Commissioner on an *ad hoc* basis. It therefore is invalid on its face. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding invalid an ordinance that made it a crime to be "annoying to persons passing by" on the sidewalk); *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to it application, violates the first essential of due process of law."). Indeed, the Treasury has even **acknowledged** that there is substantial "uncertainty regarding the application of the regulation." Subchapter K Anti-Abuse Rule, 60 Fed. Reg. 23, 26 (Jan. 3, 1995). Nor does the regulation provide IRS officials with sufficient guidelines to avoid arbitrary and discriminatory enforcement, and it is unconstitutionally vague for that reason as well. See *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035-37 (D.C. Cir. 1980).

## III. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO THE APPLICATION OF ACCURACY-RELATED PENALTIES.13

In its motion, defendant asserts that the IRS properly determined the following penalties against Group, Partners, and CWC:

A) a 20% penalty for substantial understatement of income tax;
B) a 20% penalty for negligence of disregard of rules and regulations;

[13] It is unclear whether defendant is moving for summary judgment as to the 40 percent penalty or as to all accuracy-related penalties asserted. In an abundance of caution, plaintiffs have included in this response reasons why defendant is not entitled to summary judgment as to any of the asserted penalties.

C) a 20% penalty for substantial valuation misstatement; and
D) a 40% penalty for gross valuation misstatement.

(Def.'s Mot. Summ J. 27.)[14]

Even if defendant's view of the substantive law was accepted, defendant is not entitled to summary judgment as to the application of any accuracy-related penalties. The application of penalties is an inherently factual issue, particularly where, as here, the taxpayers are asserting the defense of reasonable cause and good faith, in addition to their arguments that the transfers to the CRUTs were valid and they had substantial authority for the positions taken on their returns. Even if one or more of the penalties could somehow apply under § 6662, § 6664 prohibits the assertion of any such penalty since plaintiffs acted reasonably and in good faith in taking the tax positions at issue. Plaintiffs relied on two well-regarded law firms and their long-time accounting firm in reporting the tax positions at issue in this case. The law firms assisted with implementing the transactions at issue and conducted extensive research and analysis into the tax treatment of the transactions. Plaintiffs' expert witness, Stuart Smith, opined that the opinions of those firms were in accordance with the standards of Circular 230, and they were the types of opinions on which plaintiffs could reasonably rely. Pls.' Ex. 4, App. L at p. 66. Plaintiffs have included the facts supporting their reasonable cause and good faith in their PFUF and Response to Defendant's PFUF filed herewith, along with supporting affidavits and copies of the opinions they received. Because of this disputed fact, defendant is not entitled to summary judgment as to the application of penalties.

Defendant is not entitled to summary judgment as to the valuation misstatement penalties because plaintiffs conceded defendant's capital gain adjustments on grounds unrelated to basis or value. Plaintiffs moved for summary judgment as to the inapplicability of the valuation

[14] As indicated by defendant, these are all alternative penalties in that if the Court sustains any one of these penalties, it cannot sustain any of the others. Treas. Reg. § 1.6662-2(c)

misstatement penalties in Plaintiffs' MPSJ filed on July 2, 2008 because plaintiffs' concession of defendant's capital gains adjustments under § 465(b)(1) eliminates the potential application of the valuation misstatement penalties as discussed in that motion and because a partnership return is not a return of tax under Chapter 1 of the Code. Those arguments are not restated here since plaintiffs moved for judgment on those grounds. Plaintiffs note that the one case cited by defendant, *Jade Trading, LLC v. United States*, 81 Fed. Cl. 173 (2007), also fails to support its argument. The Court in *Jade Trading* applied the penalty after a trial on all issues, including evidence presented as to the partnership's reasonable cause and good faith. In *Jade Trading*, this Court was faced with difficult issues of valuation as the plaintiffs did not concede the capital gains adjustments of defendant prior to trial. Contrary to defendant's assertion, this Court's decision in *Jade Trading* does not support summary judgment as to a gross valuation misstatement penalty in the very different posture of the present case.

The substantial understatement and negligence penalties are inapplicable because the taxpayers had substantial authority (and thus a reasonable basis) for the tax positions taken on their returns. The amount of any substantial understatement is to be reduced by that portion of the understatement which is attributable to the tax treatment of any item for which there was "substantial authority." 26 U.S.C. § 6662(d)(2)(B). Treasury Regulation § 1.6662-4(d)(2) sets for the substantial authority standard:

> The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662-3(b).

In turn, Treas. Reg. § 1.6662-3(b) provides: "If a return position is reasonably based on one or more of the authorities set forth in § 1.6662-4(d)(3)(iii) (taking into account the relevance and

persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662-4(d)(2).” The authorities described in Treas. Reg. § 1.6662-4(d)(3)(iii) include provisions of the Code, Treasury regulations, court cases, and certain IRS guidance and legislative history.

Defendant failed to support its motion with any facts or analysis that would show that the substantial understatement penalty is applicable. (Def. Mot. Summ. J. 27-28.) Plaintiffs have conceded that Group understated its tax liability; however, plaintiffs had substantial authority for taking the position that the obligations to cover the short sale positions were not liabilities for purposes of § 752. This authority is demonstrated by: (1) Plaintiffs’ discussion of the extensive authority for not treating the contingent cover obligations as liabilities for purposes of § 752 incorporated by reference herein; (2) The lengthy legal opinions plaintiffs received from the highly-regarded law firm of Lewis Rice, a sample of which is included in the appendix to this motion, in which the Lewis Rice firm conducted an extensive and thorough review of the relevant authorities, and concluded that the contingent cover obligations were not liabilities for purposes of § 752. The authorities discussed in these opinions also demonstrate that there was substantial authority for plaintiffs’ position. (Pls.’ Ex. 26, App. at pp. 490-91).); (3) an article written by Alice Welt-Cunningham titled *Short-Sale Obligations and Basis in Partnership Interests*, for Tax Notes Today, a major tax periodical, in 1996. Ms. Cunningham also examined the existing legal authorities and independently concluded that obligations to cover short sales should not be treated as liabilities for purposes of § 752, and that the IRS overreached when it ruled to the contrary in Rev. Rul. 95-26. (Pls.’ Ex.6, App. A at pp. 21-38.)

The legal authorities discussed in these documents all make clear that substantial authority existed for taking the position that the contingent cover obligations were not liabilities for purposes of § 752. At least two courts that have addressed this issue agreed. *See Klamath Strategic Inv. Fund, LLC*, 472 F.Supp.2d 885, 900-01 (E.D. Tex. 2007); *Sala v. United States,* 552 F. Supp. 2d 1167 (2008) (determining that the taxpayer correctly did not treat the obligation to close a short option as a liability). Defendant's promulgation of the "retroactive regulation" to retroactively change the definition of a "liability" for purposes of § 752 is also strong evidence that plaintiffs' initial position under § 752 was correct.

Even if the "more likely than not" standard of the former § 6662(d)(2)(C) applied here (which plaintiffs dispute), the record makes clear that plaintiffs reasonably believed that their tax position was more likely than not correct. With respect to the short sale issue, they relied on the advice given to them by Lewis Rice in the form of written legal opinions that unambiguously concluded that there was a greater than 50% likelihood of their position being upheld if challenged by the IRS. As to the issues involving the transfers to the CRUTs and the tax treatment of the termination of the CRUTs in 2002 (which is not before this Court), the taxpayers also reasonably relied on the advice given to them by Milbank Tweed which concluded that there was a greater than 50 percent likelihood of their position being upheld if challenged by the IRS. Plaintiffs have attached an affidavit from Robert Sands, one of the owners of the general partner in Group and a representative of the Sands family, in which he avers that they relied on the Lewis Rice opinion and the Milbank opinion in taking the tax positions at issue. Plaintiffs have thus satisfied the requirement in § 6662(d)(2)(B)(i) that they reasonably believed that the tax treatment was more likely than not the proper treatment. See Treas. Reg. § 1.6662-(g)(4)(i).

Additionally, plaintiffs were not negligent. Negligence is "any failure to make a reasonable attempt to comply with the provisions" of the Code. 26 U.S.C. § 6662(c). A taxpayer is not negligent if he has a "reasonable basis" for taking a tax position. The reasonable basis standard is lower than the substantial authority standard. Treas. Reg. § 1.6662-4(d)(2). As with the substantial understatement penalty, defendant seeks judgment on the negligence penalty, but fails to support its motion with any facts or analysis that would show that the penalty is applicable. (Def. Mot. Summ. J. 27-28.) Defendant's brief is devoid of any discussion of this penalty, aside from raising it as an issue and stating that the IRS properly asserted it. As defendant has failed to show that Group, Partners, or CWC or any of their partners were negligent in the tax reporting at issue in this case, defendant's motion should be denied. Plaintiffs had a "reasonable basis" for taking the position that the contingent cover obligations were not liabilities under § 752 for the same reasons discussed above with respect to substantial authority.

## CONCLUSION

Defendant is not entitled to summary judgment on any of the grounds asserted in its motion. Defendant cannot compel the Court to issue an advisory opinion as to whether the short sale cover obligations were liabilities for purposes of § 752 when plaintiffs have already conceded defendant's capital gain adjustments on another ground. The Court lacks jurisdiction to consider the validity of the Transfers because they are not partnership items properly determined in this proceeding. Even if the Transfers could be considered here, there are issues of material fact and none of defendant's arguments provide a legal basis for summary judgment. Defendant is not entitled to summary judgment as to penalties where, as here, a genuine issue of material fact exists because the plaintiffs reasonably relied on their advisors and acted in good faith in taking the tax positions at issue and where the penalties are inapplicable as a matter of law. Plaintiffs respectfully request the Court to deny Defendant's Motion.

Respectfully submitted this 4th day of August, 2008.

s/ Lewis S. Wiener
LEWIS S. WIENER
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 telephone
202.637.3593 facsimile
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
404.853.8000 telephone
404.853.8806 facsimile

Kent L. Jones
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Ave., NW
Washington, DC 20004
202.383.0732 telephone
202.637.3593 facsimile

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Motion for Summary Judgment has been made on August 4, 2008 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
thomas.m.herrin@usdoj.gov

s/ Lewis S. Wiener
LEWIS S. WIENER