## ARGUMENT

### I. THE REQUIREMENT TO COVER A SHORT SALE IS NOT A LIABILITY WITHIN THE MEANING OF SECTION 752.

When an investor borrows securities such as United States Treasury notes and then sells the borrowed securities (*i.e.*, a "short sale"), his investment is based on the economic assessment that the fair market value of the securities will fall before he has to acquire replacement securities and deliver them to the lender. *See, e.g., E.C. Allen v. A.G. Edwards & Sons, Inc.*, 606 F.2d 84, 85 (5th Cir. 1979). If the value **does** fall, the cost of the securities to cover the short sale will then be less than the amount for which the borrowed securities were sold, and the investor will





PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
1

have a profit. For tax purposes, the investor will recognize as gain (or loss, if the cost to cover increases) the difference between the proceeds received upon selling the borrowed securities and the cost, or "basis," of the replacement securities.

However, the investor obviously cannot know whether he will have a gain or a loss on the short sale until the date that he acquires the replacement securities to be delivered to the lender, because he cannot know in advance how much the replacement securities will cost. For that reason, under Treas. Reg. § 1.1233-1(a) and the "open transaction" doctrine, the investor does not recognize income or loss for tax purposes until he acquires and delivers the replacement securities to the lender, even though he earlier received proceeds upon the disposition of the borrowed securities.[8] The short sale is not closed until the replacement property is actually delivered to the lender, even if the borrower acquires and holds the replacement property in a separate account, because until delivery the borrower is free to use the replacement as he sees fit. *Richardson v. Comm'r*, 121 F.2d 1 (2d Cir. 1941).

Section 1233 and the open transaction doctrine reflect a broad, consistent theme in the Code that defers the recognition of contingencies until they become certain. While contingencies may have significant economic value or cost, the tax law generally does not allow taxpayers to take into account as certainties things that are actually unknown, regardless of their economic value or cost. This principle particularly permeates the provisions of the Code that control a partner's basis in his partnership interest. Applying this principle, the IRS and the courts have

---

[8] This rule often benefits the Service, because it prevents taxpayers from deducting losses until the transaction is complete. For example, in *Hendricks v. Comm'r*, 51 T.C. 235, 241-43 (1968), *aff'd*, 423 F.2d 485 (4th Cir. 1970), the taxpayer's broker purchased securities in December to cover a series of short sales, but such purchase was not settled until the following January. The taxpayer claimed a loss on his short sale positions in December because, in part, the cost of covering the short sale position was irrevocably fixed. The Commissioner nevertheless argued that the taxpayer could not deduct the loss until the following year (which began with January) because his purchase of the covering securities was not settled until that time. The Tax Court agreed with the Service finding that section 1233 and Treas. Reg. § 1.1233-1(a)(1) controlled the issue.

long held that taxpayers may not adjust their bases in partnerships to account for contingencies, just as they may not take into account gain or loss on transactions that are still open.

**A. The Interplay of Section 705 and Section 752**

The Code provides specific rules for how partners in partnerships are to account for income and loss from investments such as short sales, and it establishes a "pass through" regime under which a partnership acts as a conduit through which items of income and loss are passed to its partners. The partnership does not pay any tax on its income; rather, it is the partners who report their shares of the partnership income or loss on their own tax returns and pay tax or deduct losses accordingly. *See* Section 701.

Section 705 plays a critical role in making adjustments to the partners' tax basis in their partnership interests (known as their "outside bases"), to reflect the results of partnership operations. It provides, in relevant part:

> (a) General rule.--The adjusted basis of a partner's interest in a partnership shall . . . be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests)--
>
> (1) increased by the sum of his distributive share for the taxable year and prior taxable years of--
>
> (A) taxable income of the partnership as determined under section 703(a), . . .
>
> (2) decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of--
>
> (A) losses of the partnership . . . .

For example, assume a partnership has two partners, each with a 50% interest, and the partnership holds only an asset in which it has a basis of $100. If the partnership sells the asset for $160, the partnership will have a $60 gain (and $160 of cash), and it will report $30 of income to each of the two partners, which they must report on their tax returns, paying any resulting tax. Section 705 then requires each partner to increase her basis in the partnership by that $30 to avoid the double taxation that would otherwise result when she ultimately sells her

partnership interest (her 50% share is now worth $80) or the partnership distributes cash.[9] The mirror image is also true – section 705(a) also requires a partner to decrease his outside basis by his share of distributions from the partnership or his share of partnership losses (so he can deduct a loss only once). Under section 705(a), a partner's outside basis in a partnership is thus adjusted at the end of each year during which the partnership recognizes gain or loss.

Partnerships, like other taxpayers, do not recognize gain or loss on a short sale until replacement securities are acquired and delivered to the lender, and section 1233 accordingly defers the recognition of gain or loss until that time. *See* Treas. Reg. § 1.1233-1(a)(1) ("For income tax purposes, a short sale is not deemed to be consummated until delivery of property to close the short sale."); *see also Richardson*, 121 F.2d at 4 (stating that gain or loss on a short sale was "only realized when the borrowed stock was delivered, or at least not before the lender acquired an equitable interest in specific shares."). Thus, a partner's outside basis in a partnership that holds an open short sale position will be adjusted under section 705 to reflect the gain or loss on the short sale when the partnership acquires and delivers the securities to cover the short sale.

The Service used this very rule in Rev. Rul. 73-301, 1973-2 C.B. 215, where it held that section 705 governs when a partner's basis in a partnership is to be adjusted to account for "contingent" obligations, like the obligation to cover a short sale. The issue involved in that ruling -- whether interim payments received by a partnership in connection with a long-term contract constituted liabilities for purposes of section 752 -- is similar to the question here. In concluding that the interim payments were not "liabilities" within the meaning of section 752, the ruling stated that "[t]he income or loss from performance of the contract will affect the basis

[9] A partner must recognize gain to the extent the proceeds from a sale of her interest exceed her outside basis. *See* sections 741, 1001. A partner also must recognize gain on any distribution of money that she receives from a partnership in excess of her outside basis. *See* section 731(a)(1).

of the partnership interests of the partners, **as provided in section 705(a), when such income or loss is recognized** for Federal income tax purposes." *Id.* at 216 (emphasis added).

Defendant's position in this case, on the other hand, inconsistently treats the requirement to cover a short sale as a "liability" for purposes of section 752 **before** the partnership acquires and delivers the securities to cover the short sale, i.e., while the transaction is still open. Section 752, which governs the treatment of liabilities by partners and partnerships, provides:

> (a) Increase in partner's liabilities.--Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) Decrease in partner's liabilities.--Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.
>
> (c) Liability to which property is subject.--For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.
>
> (d) Sale or exchange of an interest.--In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

Under section 752(b), a partner must decrease his basis in the partnership to the extent that the partnership assumes the partner's individual "liabilities."[10] In turn, under section 752(a), all partners are then to increase their bases in their partnership interests for their share of the new "partnership" liability.[11]

In the next section of this brief, plaintiffs will show that the contingent cover obligations are not "liabilities' within the meaning of section 752, as that term has long been interpreted and applied by defendant and the courts. For now, however, it is important to understand the incongruity that defendant's position would create between sections 705 and 752. By treating a

[10] Section 752(b) treats a decrease in a partner's liabilities as a distribution of money to him from the partnership. The distribution of money from the partnership reduces basis dollar-for-dollar. *See* section 733.

[11] Section 752(a) treats an increase in a partner's share of partnership liabilities as a contribution of property to the partnership. The contribution increases the partner's basis in the partnership on a dollar-for-dollar basis. *See* section 722.

contingent cover obligation as a "liability" subject to section 752, the Service would require an estimated adjustment to the partners' bases in the partnership for the amount of the section 752 liability when the "liability" is assumed by the partnership, even though the Code precludes recognition of gain or loss on the transaction precisely because the cost to cover that is reflected in that "liability" cannot be anticipated. Thus, the amount of the section 752 liability cannot be quantified without prematurely treating the short sale as a closed transaction to derive a fixed and determinable liability in direct violation of Treas. Reg. § 1.1233-1(a)(1) and the open transaction doctrine.

By focusing on section 752 – and avoiding discussion of sections 705, 1233, and the open transaction doctrine – defendant's brief incorrectly describes only part of the story. Indeed, defendant's brief noticeably lacks any explanation of how taxpayers are to estimate the amount of a "liability" that is contingent for purposes of calculating their initial cost basis in a partnership. In the case of a short sale of Treasury notes, the cost to cover will depend on movements in interest rates, which will drive the cost to acquire covering securities up or down. No taxpayer, including plaintiffs, can estimate with any certainty the cost to cover such a short sale for purposes of calculating the "liability".

Defendant's position cannot be reconciled with Treas. Reg. § 1.1233-1(a)(1), which provides (emphasis added): "**For income tax purposes** a short sale is not deemed to be consummated until delivery of property to close the short sale." There is nothing in section 1233 or Treas. Reg. § 1.1233-1(a)(1) that indicates that open transaction treatment under this regulation "for income tax purposes" meant to say "for income tax purposes **except** under Code 752," which is the limitation that defendant now advocates. Defendant may not unilaterally add this restriction to the statute in disregard of its own regulations. An administrative agency "may not usurp the authority of Congress by adding restrictions to a statute which are not there."

*Stephenson Trust v. Comm'r*, 81 T.C. 283, 288 (1983) (quoting *Estate of Boeshore v. Comm'r*, 78 T.C. 523, 527 (1982)).

### B. The Requirement to Cover a Short Sale Is Not a Liability for Purposes of Section 752.

Defendant's position not only ignores sections 1233 and 705, it is also in direct conflict with well-settled precedent holding that the requirement to cover a short sale position is **not** a "liability" within the meaning of section 752.

In 1975 the Internal Revenue Service won a case in the United States Tax Court that governs this issue and that is directly on point. *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975) involved two partners in a partnership that sold an option to acquire property owned by the partnership to a development corporation. The development corporation paid upfront consideration for the option and also made annual payments that were to be applied to the purchase price of the property if the option were exercised. The partnership treated these payments as "liabilities" that increased the Helmers' basis in their partnership interests under sections 752(a) and 722 on the theory that the partnership would have to credit these payments against the purchase price **if** the development corporation decided to exercise the option. The Service, however, argued that the amount that the partnership received for giving the option was **not** a "liability" within the meaning of section 752. The resolution of this issue was important to the Helmers because the partnership distributed the option proceeds to them and, under section 731(a), the Helmers would have taxable gain to the extent the distributions exceeded their partnership bases (so they wanted to count the option payments as a liability to increase their bases). As is the case with short sales, the partnership could not, under the open transaction doctrine, recognize income on the option contract (which also would have increased outside basis) until the option either expired or was exercised. The court agreed with the Service and held that the option proceeds were not a liability for purposes of section 752 because the

obligation of the partnership to credit the payments to the development corporation was contingent upon the option being exercised. The Helmers were therefore not allowed to increase their bases in the partnership and, as a result, they had taxable gain on the distributions from the partnership.

The Service again successfully argued that "contingent" obligations are not "liabilities" within the meaning of section 752 in *Long v. Comm'r*, 71 T.C. 1 (1978), *motion for reconsideration*, 71 T.C. 724 (1979), *aff'd and remanded*, 660 F.2d 416 (10th Cir. 1981). In that case, the courts held that contingent or contested obligations are not "liabilities" for purposes of increasing partnership basis until the obligations become fixed or liquidated. The taxpayer in *Long* was the beneficiary of the estate of his deceased father. The decedent was a partner in a partnership that constructed buildings, and upon his death the estate took his place as a partner in the partnership. Two lawsuits, which sought millions of dollars in damages for construction-related claims, were pending against the partnership when the father died. Shortly thereafter, the partnership was liquidated and the taxpayer, as beneficiary of the estate, claimed a loss on the liquidation. The estate treated the construction claims against the partnership as "liabilities" for purposes of section 752, which would have increased its basis in the partnership allowing it to deduct the losses. But the Service refused to allow the taxpayer to include the estate's share of such "liabilities" in its outside basis because such liabilities were contingent. The court agreed:

> The treatment of the other claims is not so clear, however the generic sense of the term, **contingent or contested liabilities** such as the Kansas City Life-TWA and USF&G claims **are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated.** This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. We think that partnership liabilities should be treated in the same manner. We see no logical reason for distinguishing the above cases solely because the asset involved is an interest in a partnership, and neither party suggests such a distinction. Those liabilities are fixed or paid.

> The Kansas City Life-TWA and USF&G claims were too contingent at the death of the decedent to be included in the estate's initial computation of its basis in the decedent's partnership interest. Liability for those claims had not been established and was in fact contested. Moreover, the amounts of damages sought were by no means definite or fixed.

*Id.* at 7-8 (emphasis added) (citations omitted). The court in *Long* gave two independent reasons for holding that the claims were not liabilities for purposes of section 752: the obligations were contingent, and they were also indefinite in amount.

The Service has on many occasions ruled that contingent or executory obligations do not constitute liabilities under section 752. Most on point, in Rev. Rul. 57-29, 1957-1 C.B. 519, the taxpayer entered into a "when-issued" securities contract that gave the taxpayer the future right to receive a fixed payment in return for its contractual obligation to deliver specific securities to the buyer when and if such securities were issued. The Service ruled that:

> In computing the cost basis of assets for any purpose, the Internal Revenue Service does not recognize an obligation of a taxpayer reflected in an executory contract prior to the performance of the contract. Such an executory contract to buy or sell securities which has cost the taxpayer nothing has a basis of zero to him, for Federal income tax purposes, in computing his gain or loss on a subsequent sale or disposition thereof prior to performance on the contract.

*Id.* at 519-20. The "when-issued" security purchase agreements addressed in this Ruling are treated as short sales for tax purposes. *See* section 1233(e)(2)(A); Treas. Reg. §§ 1.1233-1(c)(1), 1.1233-1(c)(6) Ex. 6 (applying short sale rules to "when issued" securities); S. REP. NO. 81-2375, at 87 (1950) (providing that the entry into a contract to sell stocks or securities "when issued" shall be considered as a short sale and the performance of such contract or the assignment thereof for value shall be considered as a closing of such short sale) (reproduced in Appendix A); I.R.S. G.C.M. 37,332 (Nov. 25, 1977) ("when issued" sales contracts are treated as short sales subject to section 1233). Thus, in flat contrast to the position that defendant is taking in this case, the Service has already ruled that an executory obligation such as the obligation to cover a short sale is **not** to be treated as a liability for purposes of section 752.

The position adopted by the Service in Rev. Rul. 57-29 was reaffirmed in Rev. Rul. 79-294, 1979-2 C.B. 305. In Rev. Rul. 79-294, the Service stated that a commodity futures contract (including a short position under a commodity futures contract) is merely an executory contract and not a liability under section 752. *Id. See also* I.R.S. G.C.M. 37,971 (June 1, 1979) ("The Internal Revenue Service does not recognize an obligation of a taxpayer reflected in an executory contract prior to the performance of the contract."); I.R.S. G.C.M. 37,860 (Feb. 16, 1979) ("[I]n computing the cost basis of an executory contract **for any purpose** the Service does not recognize an obligation of a taxpayer reflected in an executory contract prior to performance of the contract.") (emphasis added); I.R.S. G.C.M. 38,237 (Feb. 15, 1980) ("[T]he Service does not recognize the obligation of a taxpayer reflected in an executory contract prior to performance of the contract.").

*Helmer* and *Long* and the cited IRS pronouncements all stand for the same fundamental proposition: contingent obligations (*i.e.*, those where the obligation itself is unmatured, executory, or speculative) are not "liabilities" for purposes of section 752. Obligations that are contingent in amount also are not "liabilities" for purposes of section 752, even if such obligations are "definite" in the sense that it is certain that the obligor will have to transfer at least some property to satisfy the obligation. In *La Rue v. Comm'r*, 90 T.C. 465 (1988), the Service argued, and the Court agreed, that obligations that are fixed in the sense that it is known that **some** amount will be paid, but that remain contingent in amount, do not constitute "liabilities" for purposes of section 752. The court stated the meaning of "liability" for purposes of section 752 was established in *Long* and that, even though a contract may create a definite obligation to replace securities, that obligation does not represent a "liability" under section 752 until the cost of that obligation becomes fixed in amount:

> Once the 'back office' failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the

> NYSE rules. **Goodbody was under an obligation to replace any missing securities or money.** Essentially, Goodbody's books were in error because of the back office problems and the Haskins report reflected estimated liability figures. All of petitioners' witnesses testified that these were transactions for which the partnership was liable. **There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.**
>
> **Petitioners have not shown that these amounts were determinable with reasonable accuracy.** As a result of the Haskins audit, Goodbody (and Merrill Lynch) knew which particular securities would have to be sold or purchased and how much money was missing from customer accounts. However, it was not certain upon which of these claims Goodbody would ultimately be liable, because the smaller the amount of the transaction the less likely the customer would be to claim it. In addition, **the exact amount of loss or gain was not determinable until actual purchase or sale. Valuation of the claims may be a purely ministerial matter because of the ready market for securities, but is not readily determinable until purchase or sale occurs.** The additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates. Accrual accounting requires that the amount be determinable with 'reasonable accuracy.' **A loss is not determinable until the securities are actually purchased or sold, and the transaction closed. We accordingly hold that because the reserves were not a fixed obligation of the partnership sufficiently determinable in amount in 1970, they cannot be included in the partners' bases in that year.**

*LaRue*, 90 T.C. at 479-80 (footnotes omitted) (emphasis added). *See also Long*, 71 T.C. at 8 (holding that the obligation was not a section 752 liability because, in part, "the amounts of damages sought were by no means definite or fixed"). The obligation at issue in *LaRue* – to replace identified missing securities and money – was an obligation substantially similar to plaintiffs' obligation to cover a short sale of Treasury notes and, in *LaRue*, the Tax Court clearly held that, despite the ready market from which the securities could be obtained, the amount of the obligation was contingent and speculative and therefore such obligation could not represent a "liability" under section 752.

The requirement to cover the short sale that is involved in the present case is contingent in the same manner as the obligations addressed in *Helmer*, *Long*, and *La Rue*. Although the

borrower in a short sale must eventually purchase like securities (in this case, Treasury notes) to cover the short sale, that obligation is open, executory and not fixed in amount. Even if the cover requirement matures, the taxpayer can not know how much it will cost to acquire the covering securities until they are actually acquired, and the obligation therefore remains contingent in amount until that time. For these reasons, the executory cover requirement can **not** be treated as a liability for purposes of section 752 under the settled precedents.

The conclusion that an obligation that is contingent in amount is not a "liability" also draws support from the ruling of the Supreme Court, again at the urging of the Service, that the obligation to cover a short sale is **not** an "indebtedness" because it does not require the repayment of money. In *Deputy v. du Pont*, 308 U.S. 488 (1940), the taxpayer borrowed stock and agreed to return it within ten years, and also agreed in the interim to pay the lender all dividends that he received on the borrowed shares. The taxpayer then sold the stock to nine du Pont executives (*i.e.*, he sold it short). In 1931, the taxpayer paid the lender $567,648 in dividends that had been paid on the stock, and he deducted that amount as "interest paid or accrued . . . on indebtedness" under former section 23(b) (the predecessor to current section 163). The Service contended that an obligation to cover a short sale was not "indebtedness" and disallowed the deduction. The Supreme Court decided the issue under a plain meaning approach. It determined that "indebtedness" meant "borrowed money" and "interest on indebtedness" meant "compensation for the use or forbearance of money." The Court held that while the requirement to cover the short sale was an "obligation," it was not "borrowed money," and could not therefore be "indebtedness." *Id.* at 497-98.

The ruling in *du Pont* is that a short sale involves the borrowing of property, not money, and that an obligation to return property does not qualify as "debt" for tax purposes. The Court's decision in *du Pont* illustrates that there are two independent components to a short sale that may

not be collapsed for tax purposes: the borrowing of a security and the sale of a security. The taxpayer in *du Pont* was not allowed to deduct his "interest" expense because he had not borrowed any money and incurred any "indebtedness" under the plain meaning of that term – he had instead only borrowed property. The cash received in a short sale is thus attributable to the sale of the borrowed property and is not attributed to any borrowing of funds.

The Service may not disregard the holding it advocated in *du Pont* to suit its different purposes in this case. Either the obligation to return property in a short sale is a "debt" for tax purposes or it is not. The Supreme Court, and Congress through legislative enactments,[12] have determined that the obligation to return property in a short sale is **not** a "debt" or a "borrowing" for tax purposes. An executory promise to return property in a short sale cannot be a "liability" for the same reason. The terms "liability," "debt" and "indebtedness" are synonymous. *See* THE NEW ROGET'S THESAURUS IN DICTIONARY FORM 126-27 (Norman Lewis, ed., Berkley Books rev. ed 1978) (1961). (Debt: "liability . . . indebtedness") (reproduced in Appendix A). Indeed, at one time defendant proposed a definition of "liability" for purposes of section 752 which would only apply to "debt", which under *du Pont* would not include obligations to cover a short sale.[13] Because there is no valid reason for defining a "liability" differently than "debt,"

---

[12] Congress has also recognized that the requirement to cover a short sale is not a "debt" for tax purposes. Several provisions of the Code have been enacted to treat a short sale position as debt only for specific purposes. *See, e.g.*, sections 163(d)(3)(C), 246A(d)(3)(B), 263(g)(2), 265(a)(5). These provisions make clear that, but for their existence, the requirement to cover a short sale would not otherwise constitute "debt" for tax purposes. The "bluebook" explanation of the legislative changes to sections 163, 246A, 263, and 265 also indicates that "a short sale was **not** treated as a borrowing" prior to these changes. Staff of the Joint Committee on Taxation, 98th Cong., GENERAL EXPLANATION OF THE REVENUE PROVISIONS OF THE DEFICIT REDUCTION ACT OF 1984 at 156-57 (Comm. Print 1985) (emphasis added) (reproduced in Appendix A).

[13] Temp. Treas. Reg. § 1.752-1T(k) (since withdrawn by the IRS but reproduced in Appendix A) provided (emphasis added):

> **(k) Examples.** The following examples illustrate the application of the rules of this section. Except as otherwise provided, ***these examples assume that*** . . . ***(2) partnership indebtedness constitutes debt for federal income tax purposes*** . . . .
>
> **Example 2(ii)** . . . As provided by paragraph (g) of this section [the definition of liability], ***an obligation that constitutes a debt for federal income tax purposes*** is a liability of the obligor only to the extent that incurring or holding such obligation gives rise to (1) the creation of, or an increase in, the basis of any property owned by the obligor . . . .

defendant is bound by that result until Congress amends the statute to provide for a different rule. *See Brown v. Helvering*, 291 U.S. 193, 200 (1934) ("Except as otherwise specifically provided by statute, a liability does not accrue as long as it remains contingent.").

Defendant failed to offer any explanation of why the contingent obligations to cover are to be treated as liabilities for purposes of section 752. Instead, in a "declare victory and walk away" moment, defendant in a footnote without any explanation merely states that the "liabilities in issue here . . . are not contingent." (Def.'s Mot. Summ. J. 15, n.17.) This is directly contrary to section 1233 and defendant's longstanding position that obligations to cover short sales **are** contingent. *See, e.g.,* I.R.S. G.C.M. 35,328 (May 4, 1973) (describing a short sale as "involving [an] obligation which would vary with changes in market values while the proceeds of the transaction remained fixed from the time it was entered"). The cost to cover the short sale is either contingent or it is not: defendant should not be allowed to treat the obligation to cover a short sale as open and contingent for purposes of deferring gain or loss, but as immediately closed and fixed and determinable for purposes of recognizing and quantifying a "liability." Defendant is necessarily bound by the same legal standards for computing basis that it has long imposed on taxpayers, both with respect to how basis is calculated under section 752 and for application of the open transaction doctrine.

The impracticality of defendant's position is also apparent. There is no provision in the Code or the Treasury regulations that speaks to how the amount of a short sale obligation is to be measured before it is closed. This should be expected, because the Code and regulations otherwise treat a short sale as an open position until the covering securities are delivered to the lender. *See* Treas. Reg. § 1.1233-1(a)(1) ("For income tax purposes, a short sale is not deemed to be consummated until delivery of property to close the short sale."). There is no realistic

method for determining the amount of the obligation until the cover transaction is concluded – for it is not possible to know today what the cost to cover will be tomorrow.

The lack of any meaningful method for estimating the amount of these contingencies is well-demonstrated by defendant's own motion. At first, defendant indicates that the amount of the "liability" at issue for purposes of section 752 is $44,000,000, which is the actual amount of cash that the Alpha limited partners received in the short sales (excluding accrued interest). (Def.'s Mot. Summ. J. 7, 10.) Later, however, defendant states that the amount of the liability should be a different amount – $44,293,087 – but does not explain the source of that calculation. (*Id.* at 17.) Defendant fails to explain why either number would be appropriate, presumably because no authority or guidance exists for **either** position.

**C. The Authorities Cited by Defendant Do Not Alter the Legal Principle that Contingent Obligations are not liabilities under section 752.**

Defendant cites three authorities to support its argument that an obligation to cover a short sale is a liability for purposes of section 752: Rev. Rul. 95-26; *Salina Partnership v. Comm'r*, 80 T.C.M. (CCH) 686 (2000); and *Colm Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006 (appeal pending, No. 06-11422 (5th Cir.)). Each of these are discussed below.

1. Rev. Rul. 95-26

Rev. Rul. 95-26, 1995-1 C.B. 131, is a one-page ruling virtually devoid of any analysis which the IRS used in self-serving fashion in an effort to reverse its long-standing position on section 752, by adopting the novel position that an obligation to cover a short sale position is a liability for purposes of section 752. Plaintiffs urge the Court to reject the notion that the Service may walk away from the body of law *that the Service helped create* in a result-oriented Revenue Ruling. The Internal Revenue Code is not a playground; it is a system of laws that must apply

equally to defendant and taxpayers. If the Service wants to now change the definition of the term "liability" for purposes of section 752, its recourse should be to Congress.

In any event, Revenue Ruling 95-26 is nothing more than a restatement of defendant's litigating position and is therefore not entitled to any deference:

> Revenue rulings lack the force of law, *see Western Co. of N. Amer. v. United States,* 323 F.3d 1024, 1032 (Fed.Cir.2003) ("[R]evenue rulings merely represent the position of the United States and do not bind this court."), although they may be instructive in the absence of controlling authority. *See, e.g., Sealy Power, Ltd. v. Commissioner of Internal Revenue,* 46 F.3d 382, 394-95 (5th Cir.1995) (applying certain factors employed in previous revenue rulings); *St. Louis Bank for Coop. v. United States,* 224 Ct.Cl. 289, 624 F.2d 1041, 1050 (1980) ("Revenue rulings ... can provide some guidance as to the types of transactions [in this case].").

*USA Choice Internet Service, LLC v. United States*, 73 Fed. Cl. 780, 792-93 (2006). *See also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *see also Chock Full O'Nuts Corp. v. United States,* 453 F.2d 300, 303 (2d Cir.1971).

The analysis in Revenue Ruling 95-26 is incredibly brief and is not persuasive:

> Section 752(a) provides that an increase in a partner's share of partnership liabilities is treated as a contribution of money by the partner to the partnership.
>
> Rev. Rul. 88-77, 1988-2 C.B. 129, provides that partnership liabilities for purposes of § 752 include an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings).
>
> A short sale creates an obligation on the part of the seller to return the borrowed securities. *See, e.g., Deputy v. du Pont*, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). In addition, the cash received in the short sale is an asset of the partnership. Thus, the basis of the partnership's assets is increased. Therefore, PRS's short sale creates a liability under § 752 . . . .

*Id.* at 132. The ruling's rationale is that an obligation automatically becomes a section 752 liability if incurring the obligation creates or increases the basis of a partnership asset. This position is fundamentally incorrect for at least four distinct reasons.

First, the Service's position is incompatible with *du Pont*. The Service cites *du Pont* for the proposition that a short sale does not create "indebtedness," but then inconsistently (and without any analysis) states that a short sale is nevertheless a "liability." As discussed earlier in this brief, those conflicting positions are not technically or logically reconcilable.

Second, the Service's position is in **direct conflict** with the holdings that it advocated in *Helmer* and *La Rue* and similar cases. The position of the Service, which the courts have adopted, is that obligations that are contingent in effect or in amount do **not** qualify as section 752 liabilities. An obligation to cover a short sale is executory and contingent in amount. Because the Service has long advocated this very rule, its inconsistent assertions in the ruling are plainly entitled to no deference.

Third, the conclusion of the Service is directly counter to the very reason **why** taxpayers must defer gain or loss on short sale positions until the covering securities are acquired and delivered to the lender. As discussed in detail earlier in this memorandum, taxpayers must, under the open transaction doctrine and Treas. Reg. § 1.1233-1(a)(1), defer recognition of gain or loss on open short sale transactions because the gain or loss cannot be calculated with any certainty until the transaction is closed. The same principle underlies *Helmer*, *La Rue*, and all the related authorities discussed earlier in this memorandum – a contingent obligation is not a liability under section 752 precisely because it is unclear whether the taxpayer will incur a cost to satisfy the obligation or what the amount of such cost may be. Rev. Rul. 95-26, however, purports to require taxpayers to somehow estimate the amount of the "liability" while the obligation remains contingent and uncertain. Defendant's position here – that the obligation to cover a short sale can be estimated with sufficient certainty to quantify the liability (although defendant fails to explain how) – is flatly inconsistent with the position embodied in his own

regulations that gain or loss on open short sale positions must be deferred until the transaction is closed because the gain or loss can **not** be estimated with any certainty.

Finally, the Ruling fundamentally misconstrues the true nature of a short sale. The sole support offered by the Ruling for its conclusion is that the partnership received cash as compensation for the short sale obligation. That premise is fundamentally flawed, however, because the partnership did not receive **any** cash as a result of incurring the short sale obligation; rather, the borrowing resulted in the partnership receiving only securities and that is all it was required to return to the lender. As discussed above, the borrowing of securities (*i.e.*, the obligation under *du Pont*) does not give rise to an asset that increases a partnership's basis in its assets. It is the **sale** of the borrowed securities that results in the cash proceeds, **not** the borrowing, and the sale of the securities does not create any obligation.[14]

The fallacy of the Service's reasoning in Rev. Rul. 95-26 is well-recognized. For example, one author wrote:

> [T]he commissioner's syllogism, which equates the short sale proceeds with increased basis in the partnership assets and therefore with a concomitant increase in partnership liabilities under section 752, confuses the sale, which produces the proceeds, with the securities borrowing. Because it is the sale, not the borrowing, that gives rise to the cash and creates additional basis, there is no liability to which section 752 status can attach.

ALICE WELT CUNNINGHAM, SHORT-SALE OBLIGATIONS AND BASIS IN PARTNERSHIP INTERESTS, 72 TAX NOTES 1663 (1996) (reproduced in Appendix A). The leading treatise on partnership taxation similarly provides:

---

[14] The Service appears to erroneously combine the receipt of the sale proceeds and the borrowing into one transaction, but that is precisely the construct rejected by the Supreme Court in *du Pont*. Indeed, if the borrowing and sale were to be collapsed into one transaction, then the Supreme Court in *du Pont* would have had no choice but to conclude that the taxpayer had effectively borrowed cash, by first borrowing securities and then selling them for cash. But that is not what underpins *du Pont*; it is instead the sale of the borrowed securities that gives rise to cash in a short sale transaction, and the tax consequences of that sale are deferred by section 1233 until the delivery of securities to replace those that were borrowed and sold. *See also Zlotnick v. TIE Communications*, 836 F.2d 818, 820 (3d Cir. 1988) ("'Selling short', therefore, actually involves two separate transactions: the short sale itself and the subsequent covering purchase . . . .").

> It is the sale, not the borrowing, that gives rise to an increase in the partnership's assets. Under the peculiar rules governing short sales, the "basis" of the securities that are sold is simply not relevant to the taxation of the transaction, because the tax consequences of the sale are deferred and ultimately determined by reference to the cost of the securities that are used to repay the loan (which are not the securities that were originally sold).

1 WILLIAM S. MCKEE ET AL., FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[1] at 7-6 to -7 (3d ed. 1997) (criticizing Rev. Rul. 95-26) (reproduced in Appendix A). .

2. Salina Partnership LP v. Commissioner

In *Salina Partnership v. Commissioner*, 80 T.C.M. (CCH) 686 (2000), Judge Jacobs of the Tax Court incorrectly determined in an informal opinion that a short sale obligation **is** a liability for purposes of section 752. That decision was issued as a "memorandum opinion" which, under Tax Court rules, has no precedential value. *See Nico v. Comm'r*, 67 T.C. 647, 654 (1977) ("[W]e consider neither revenue rulings nor Memorandum Opinions of this Court to be controlling precedent."), *aff'd in part, rev'd in part on other grounds*, 565 F.2d 1234 (2d Cir. 1977); *Stratmore v. Comm'r*, 48 T.C.M. (CCH) 1369, 1371 (1984) ("It is well settled that the Tax Court does not consider its Memorandum Opinions to be binding precedent."), *rev'd on other grounds*, 785 F.2d 419 (3d Cir. 1986). In any event, the decision in *Salina* cannot withstand scrutiny.[15]

At the outset, the court in *Salina* erred in relying on Rev. Rul. 95-26, which is itself entitled to no deference and is severely flawed for the reasons discussed above. More fundamentally, the court erred in *Salina* by assuming section 752 serves the purpose of "avoid[ing] distortions in the tax reporting of partnership items by promoting parity between a partnership's aggregate inside basis in its assets and its partners' outside bases in their partnership interests," which Judge Jacobs believed justified applying it in a manner that was inconsistent

---

[15] The parties settled *Salina* prior to resolution of the appeal, also making it of questionable value as precedent.

with the application of sections 1233 and 705. *Salina*, 80 T.C.M. (CCH) at 698. That assumption is in error for several reasons.

Most critically, the suggestion that an obligation must be treated as a liability under section 752 to equate the partners' collective bases in their partnership interests (i.e., "outside basis") and the partnership's basis in its assets (i.e., "inside basis") is incorrect. For example, in this case, the partners' outside bases in Alpha and Beta would approximate the partnerships' inside bases in their assets regardless of whether the contingent obligations to cover are treated as liabilities. Thus, the single-most important reason cited by Judge Jacobs for treating the contingent obligation to cover a short sale position simply does not apply in this case.

The *Salina* court erred, in any event, in suggesting that section 752 is intended to equate inside and outside basis. Defendant apparently failed to inform the court in *Salina* that defendant knew that the definition of "liability" it had successfully advocated - that it does not include contingent obligations - would cause disparities between inside and outside basis, but decided as a policy matter not to seek a change to that definition. Pls. Ex. 7, App. A at p. 81-82 (Starke notes).[16] Apparently, equating inside and outside basis is only of importance to defendant when that works to increase taxes owed. *See Klamath*, 440 F.Supp.2d at 619 ("The positions the government took in [*Long*, *Helmer*, and *LaRue*] resulted in the same disparity between inside and outside basis that it protests will occur here under Plaintiff's position . . . . The only difference between the 752 Cases regarding liability and this case is that the taxpayer is receiving the benefit rather than the IRS.").[17]

---

[16] Plaintiffs have reproduced in Appendix A testimony given by Richard Starke, an employee of the IRS, in Jade Trading, LLC v. United States, #03-2164T, presently pending before the Court of Federal Claims, as well as his notes admitted as an exhibit during his testimony. Plaintiffs discuss these notes in more detail later in this brief.

[17] Moreover, Congress has not, until very recently and well after the transaction at issue, made equality of inside and outside basis a significant priority. Indeed, the general rule under sections 734 and 743 is that "inside" basis is **not** adjusted as a result of sales of, or distributions with respect to, partnership interests, even though these transactions often create inequality of inside and outside basis. Code section 734(a), 743(a). Until recently, partnerships were given complete discretion in whether to equalize inside and outside basis in such situations by making an election to do so under section 754.

In addition, the court in *Salina* failed to recognize the scope of section 1233. On its face, section 1233 appears to provide only a rule that governs the characterization of the result of a short sale (*i.e.*, whether it is ordinary income or short-term or long-term capital gain). However, in *Hendricks v. Comm'r*, 423 F.2d 485, 486-87 (4th Cir. 1970), *aff'g* 51 T.C. 235, which was one of the few authorities relied on by Judge Jacobs in *Salina*, the Tax Court specifically held that section 1233 and Treas. Reg. § 1.1233-1(a)(1) required the conclusion for purposes of determining the timing of the gain or loss that a short sale is not deemed to be consummated until delivery of property to close the short sale. The court emphasized the point that the Regulation states that it applies "For income tax purposes." *Hendricks*, 51 T.C. at 241. Judge Jacobs did not explain why Treas. Reg. § 1.1233-1(a)(1) does not similarly apply for purposes of section 752 when it says it applies "for income tax purposes" without any limitation.

The *Salina* court also erred in rejecting the taxpayer's analogy between the cash proceeds of a short sale and the option proceeds in *Helmer*:

> Although the two transactions are both considered open transactions for purposes of application of the income tax, the transactions are materially different for purposes of analysis under section 752. The option payments that the partnership received in *Helmer v. Commissioner, supra*, represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services. In contrast, Salina's gain or loss on the sale of borrowed Treasury bills was dependent upon the cost to Salina of fulfilling its obligation to replace the borrowed Treasury bills. Consequently, we hold that *Helmer v. Commissioner, supra,* does not support petitioner's position in this case.

*Salina*, 80 T.C.M. (CCH) at 700. The conclusion that the option proceeds in *Helmer* "represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services" is flatly wrong. The option payments in *Helmer* were **not** for the sale of a partnership asset, they were for an ongoing option of the payor to purchase a partnership asset. The option payments in *Helmer* were also most certainly **not** "free and clear of any claim for repayment or demand," because the option proceeds were

required to be credited against the purchase price if the holder exercised the option and the transaction became a purchase, which would have required the partnership to transfer the property and recognize gain or loss (as happens when a short sale is closed). In any event, the court in *Salina* failed entirely to address how an obligation that is contingent in amount could be a liability for purposes of section 752 in light of *Long* and *La Rue*.

Judge Jacobs also erroneously deemed the taxpayer's reliance on *du Pont* "misplaced." The court stated that "the Supreme Court's rejection of the taxpayer's argument [in *du Pont*] was more firmly rooted in the Court's holding that the disputed payments did not constitute a payment of interest within the meaning of the statute." *Id.* (internal citation omitted). In *du Pont*, however, the Supreme Court disallowed the deduction for interest **only** on the basis of its determination that there was no indebtedness. That finding was central to the conclusion in *du Pont*, and it is now so well accepted that Congress enacts specific legislation when it desires a short sale obligation to be treated as debt for a specific purpose.[18]

The *Salina* court then undertook the ambitious task of trying to narrow the specific holding of the Supreme Court in *du Pont*, asserting:

> [T]he Supreme Court's statement . . . that "an obligation is not necessarily an 'indebtedness'" . . . does not constitute a blanket holding that a borrower's obligation to close a short sale by returning the borrowed securities to the lender will never be considered an indebtedness . . . .

*Id.* To the best of plaintiffs' knowledge, the *Salina* decision is the only case since *du Pont* to question what has long been the accepted rule that a short sale obligation is not an indebtedness. Even the Service recognized that a short sale is not indebtedness in Rev. Rul. 95-26, 1995-1 C.B. 131. Judge Jacobs cited no authority for this statement, and it is clearly wrong.

In short, the court's conclusion in *Salina* was inconsistent with (a) the "open transaction" treatment of short sales for every other purpose of the Code, *see, e.g.*, Treas. Reg. § 1.1233-

[18] See authorities cited in footnote 11.

1(a)(1); (b) defendant's position that tax-deferred receipts, such as at issue in *Helmer* and Rev. Rul. 73-301, do not create outside basis, notwithstanding the resulting imbalance between inside and outside basis, when such discrepancy works to defendant's advantage; (c) decades of case law which hold that contingent obligations are not section 752 liabilities; and (d) established jurisprudence that the obligation to replace the property borrowed in a short sale is not a "borrowing of money" that would create a "debt" or "indebtedness" for tax purposes.

Having rejected or ignored years of precedent embodied in *du Pont*, *Long*, *La Rue*, *Helmer*, and multiple pronouncements from the Service, the *Salina* court turned to Black's Law Dictionary to find a definition of the term "liability" for purposes of section 752. That dictionary contains the following definition for the term:

> 1. The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment. * * * 2. A financial or pecuniary obligation * * *.

The court stated that this definition was dispositive, stating:

> Based upon the aforementioned meaning of the term "liability", and consistent with the policy underlining section 752, we hold that Salina's obligation to close its short sale by replacing the Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the Treasury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN. Significantly, Salina reported the obligation as a liability on its opening balance sheet.

*Id.* Obviously, the use of a dictionary definition to ignore the controlling case law that interprets this statutory term is unjustified and inappropriate.[19]

3. Colm Producer, Inc.

[19] To the extent that the dictionary definition of the term "liability" were apt, it is still possible to harmonize it with the controlling case law such as *du Pont*. As quoted above, one of the definitions of the term "liability" provided by the dictionary is a "financial or pecuniary obligation". In *du Pont*, the Supreme Court determined that the obligation to cover a short sale is not "debt" because it is not an obligation to return money. Accordingly, such obligation also does not satisfy the dictionary definition of a "liability" as a financial or pecuniary obligation.

Although defendant relies on *Colm*, it directly supports plaintiffs' position in this case. In *Colm*, the United States District Court for the Northern District of Texas acknowledged that the IRS in Rev. Rul. 95-26 and Judge Jacob in *Salina* had both concluded that the obligation to cover a short sale position should be regarded as a "liability" for purposes of section 752. The district court in *Colm* nevertheless concluded that the term "'liability' within the meaning of section 752 does **not** encompass contingent obligations" and that *LaRue*, *Long* and *Helmer* "stand for the proposition that liabilities that are contingent as to the obligation itself or as to the amount of the obligation do not qualify as 'liabilities' for purposes of section 752." *Colm*, 460 F.Supp.2d. at 716.

The district court concluded however, that the obligation to cover the short sale positions in that case **ceased to be contingent** when the taxpayer sold the partnership that held the short sale position to an unrelated third-party. "[T]he amount of the obligation became fixed at the moment GMK sold Valiant because at that time GMK could determine its gain or loss on the short sale transaction according to the current market rates for T-notes; any future fluctuations in the interest rates affected the gain or loss of the short sale transaction only as to Czerwinski, not GMK." *Id.* The district court concluded in *Colm* that the obligation to cover the short sale **was contingent and *not a liability* for purposes of section 752, until the point in time when the partnership was sold and the amount of the liability became determinable.**

Defendant has ignored the actual holding of *Colm* and has made no effort to explain how *Colm* should apply in this case – for in this case, unlike in *Colm*, plaintiffs did not sell Alpha. While it is certainly true that the cost to cover the short sales became fixed and determinable in the present case when the sales were closed, that does not affect plaintiffs' tax reporting, because the cost to cover under the *Colm* rationale became a "liability" only when held by Beta. Even if section 752 became applicable at that moment in time, under section 752(a), Alpha and Gloria

Robinson, as the partners in Beta, would increase their bases in their partnership interests by their share of Beta's liability.[20] At the same time, the extinction of that liability through the closing of the short sale positions would require them to reduce their bases in Beta by the same amount under section 752(b). These adjustments are "a wash," leaving their tax reporting position unaffected. Thus, contrary to defendant's assertion, *Colm* provides no support for its position in this case.

---

[20] Plaintiffs have not found any authority to support the district court's proposition in *Colm* that basis should be recomputed under section 752 when the obligation becomes fixed and determinable. However, as indicated in the text, resolution of that issue is unnecessary because it does not make a difference in this case.

[21] As indicated by defendant, these are all alternative penalties in that if the Court sustains any one of these penalties, it cannot sustain any of the others. Treas. Reg. § 1.6662-2(c) (prohibiting "stacking" of accuracy-related penalties).