IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |



PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
4

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## DECLARATION OF STUART SMITH

I, Stuart Smith, declare as follows:

1. I have been retained by the plaintiffs as an expert to render my opinion in the above-referenced case.

2. A copy of my report, dated November 26, 2007, is attached, and describes my qualifications.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 31, 2008

Stuart A Smith

Stuart Smith

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' EXPERT REPORT OF STUART A. SMITH**

Stuart A. Smith
460 Park Avenue
New York, New York 10022
Tel.: 212-759-8285

I have been asked by counsel for the Plaintiffs in these federal income tax refund suits to review three different opinion letters, two of which were rendered by the St. Louis law firm of Lewis, Rice & Fingersh, L.C. (hereinafter "Lewis Rice"), and the other of which was rendered by the New York City law firm of Milbank, Tweed, Hadley & McCloy LLP (hereinafter "Milbank Tweed"). The opinions were issued to various members of the Sands family (or trusts for their benefit) (variously the "Sands" and the "Taxpayers") concerning the transactions at issue in this case. These opinion letters respectively analyze the Federal income tax consequences of certain partnership investment transactions described as the Financial Plan that were engaged in by the Sands, and other transactions engaged in by the Sands with respect to several Charitable Remainder Trusts.[1]

Specifically, I have been asked to address the question whether these two opinion letters are of the quality and character upon which Sands could reasonably rely in preparing his tax return.

This Lewis Rice Opinions conclude that there was substantial authority for the federal income tax treatment of the Financial Plan, and it was more likely than not that four identified positions sought by the Sands was proper. It is my understanding that the partnerships through which these transactions were conducted, and the Sands as a direct or indirect owner of an interest in each of these partnerships, prepared and filed their 2001 Federal income tax returns in accordance with the conclusions reached in these opinion letters.

[1] I have attached as Exhibit A to my report a list of these opinion letters, which shows the issuing firm, recipient, and date of each letter.

The Milbank Tweed Opinion Letters conclude, inter alia, that it was more likely than not that the Taxpayers could purchase the remainder interest in a charitable remainder trust that they had previously established without adverse tax consequences, either to themselves or to a charitable remainder trust. It is my understanding that the Sands in fact executed the transaction described in the Milbank Tweed letters and purchased the remainder interests from the Trusts at their fair market value.

For the reasons set forth in greater detail below, I am of the opinion that both the Lewis Rice and Milbank Tweed Opinion Letters are of the character and quality upon which the Taxpayers could reasonably rely in preparing their tax returns on the basis of the conclusions reached in the letters. In addressing this question, I am aware that the Internal Revenue Service has subsequently challenged the conclusions of these opinion letters and has disallowed the tax treatment claimed for the transactions in which the Taxpayers and the partnerships have been engaged. The fact that the Internal Revenue Service may challenge the Taxpayers' treatment of transactions is not inconsistent with the conclusions of the law firms' opinions that the Service is more likely than not incorrect in its position. Nevertheless, with the exception of the comments that follow, I will not attempt to determine the "correct" substantive tax treatment of the complex transactions in question. I will instead focus my discussion in this Report primarily upon the question whether the opinion letters received by the Taxpayers are of the type, and have the character and quality, on which a taxpayer could reasonably rely.

Pursuant to the requirements of F.R.Civ.P. 26(a)(2)(B), I set forth in Appendix A to this Report my resume, which describes my professional career and qualifications, and

the compensation to be paid for this Report and my testimony, and the cases in which I have testified as an expert at trial or by deposition within the preceding four years.

In reaching my conclusion, I have examined all of the statutory, judicial, and administrative authorities cited in my Report, the two opinion letters of Lewis Rice and Milbank Tweed, and the authorities cited therein, and the pertinent provisions of Treasury Circular 230, Appendix B, infra, that were extant in 2001 and 2002 and which prescribed the Internal Revenue Service's requirements for the issuance of tax opinions. I have also examined the objectives of the Financial Plan which Sands adopted, the contemplated elements of the Financial Plan, and Sands' representations to both law firms with respect to the particular transactions addressed by them in their opinions. I have also drawn upon my extensive experience as a tax lawyer for more than 40 years during which I have addressed, both in government service as Tax Assistant to the Solicitor General in the Department of Justice and in private practice, the tax consequences of comparable transactions and the reliability of written tax opinions for those transactions.

Moreover, I am fully familiar with the general type of transaction inherent in the Financial Plan that is addressed in the Lewis Rice Opinions and that is at issue in this case because I served as an expert witness for the Plaintiffs in Klamath Strategic Investment Fund v. United States, 2007 U.S. Dist. LEXIS 6939 (E.D. Tex.), decided January 31, 2007. The Klamath case involved a transaction with respect to which two law firms' tax opinions were rendered that employed analyses that were similar to the Lewis Rice Opinions in this case. In Klamath, the Court accepted the conclusions I reached in my Report and my testimony that the two law firms' tax opinions involved in that case complied with professional and Treasury standards and were objectively reasonable. It

therefore ruled that the taxpayers in that case were entitled to rely on the two law firms' opinions and accordingly relieved the taxpayers of civil penalties sought by the Internal Revenue Service. For the reasons set forth below, I reach the same conclusion with respect to the Lewis Rice Opinions addressing the tax treatment of the Financial Plan in this case.

I. Reliance Upon Professional Advice Is Both Reasonable and Necessary

The tax law is complex and is often difficult to understand and apply. Tax professionals therefore frequently provide written opinions to taxpayers to assist them in understanding and reporting the tax consequences of their transactions. And, it is common for taxpayers to look to the written advice and recommendations of attorneys who are versed in the tax law in planning and reporting their transactions. In light of the great complexities of the modern tax law, it is plainly reasonable for taxpayers to look to such professional advice in conducting their business affairs whenever such advice is of sufficient character and quality to warrant their reliance. Indeed, in view of the enormous complexities of the provisions of the Internal Revenue Code, there is no realistic alternative for individuals, partnerships or corporate taxpayers: reliance on properly prepared professional advice is not only reasonable, it is a fundamental necessity of modern life.

This basic, realistic fact has, of course, been widely recognized by the courts. As the Supreme Court reaffirmed in United States v. Boyle, 469 U.S. 241 (1985), a taxpayer

has the right to rely upon the substantive tax advice of an accountant or attorney to avoid the imposition of penalties. According to Boyle (469 U.S. at 250-251; citation omitted):

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a second opinion, or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place . . .. "Ordinary care and prudence" do not demand such actions.

To the same effect is Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995). There, the Fifth Circuit stated (id. at 733; footnote omitted):

> Taxpayers sought the advice of a tax expert about claiming the loss. The expert advised that there was "a good faith, supportable position" concerning the deductibility of the loss. The Tax Court erred in finding taxpayers negligent for claiming the loss. The record reflects no basis for a finding or conclusion that it was not reasonable for taxpayers to rely on the expert's advice. "To require the taxpayer to challenge the [expert], to seek a 'second opinion,' or to try to monitor [the expert] on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place." Because the taxpayers reasonably relied on the advice of a tax expert in claiming the loss, the negligence penalty should not have been imposed.

Accord: Durrett v. Commissioner, 71 F.3d 515, 518 (5th Cir. 1996); Streber v. Commissioner, 138 F.3d 216, 219-224 (5th Cir. 1998); Stanford v. Commissioner, 152 F.3d 450, 460-463 (5th Cir. 1998); Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994); McMurray v. Commissioner, 985 F.2d 36, 43 (1st Cir. 1993); Neptune Mut. Assn. v. United States, 13 Cl. Ct. 309, 322 (1987) (following Boyle), aff'd and vacated in part on another ground, 862 F.2d 1546 (Fed. Cir. 1988). Decleene v. Commissioner, 115 T.C. 457 (2000); Daoust v. Commissioner, T.C. Memo 1994-203 (1994); Wright v. Commissioner, T.C. Memo 1994-288; English v. Commissioner, T.C. Memo 1993-111 (1993).

II. The Opinions Involved in This Case Meet the Standards for Taxpayer Reliance

It is a common standard in the tax field that, in deciding whether to rely on professional advice, taxpayers are expected to choose qualified advisors and to obtain opinions from them that are both objectively and subjectively reasonable. For the reasons discussed below, those widely accepted standards are well satisfied in these cases.

The Treasury Department has also applied, in its internal administrative practice, a different and more complicated standard that addresses the conduct of practitioners who provide tax opinions. This standard is set forth in detail in the version of § 10.33 of Circular 230, Appendix B, infra, that was extant on August 21, 2000, the date of the first of the opinions involved in these cases.

For the reasons that follow, I believe that both the Lewis Rice Opinions and the Milbank Tweed Opinions involved in this case meet all five of the Treasury requirements adopted for its internal administrative practice in § 10.33 of Circular 230. While it is plainly not necessary for an opinion to satisfy the particular requirements of this Circular for a taxpayer to act reasonably in relying on it, it is nonetheless of interest that the opinions obtained by the Taxpayers in this case meet even the government's own internal standards.

Because the opinions involved in this case comply both with the standards common to the profession and also with the internal administrative standards established by Treasury Circular 230, those opinions unquestionably constitute opinions of the type and character upon which the Taxpayers could reasonably rely.

I first address the opinions rendered by Lewis Rice & Fingersh, with respect to the tax consequences of the Financial Plan.

A. <u>THE LEWIS RICE OPINIONS</u>[2]

(1) <u>Factual Matters</u>. One requirement contained in the Circular (that is not a component of the common professional standards of tax practitioners) is that the practitioner is to make inquiry as to all relevant facts and be satisfied that the material facts are accurately and completely described in the offering materials, and assure that any representations as to future activities are clearly identified, reasonable and complete.

The Lewis Rice Opinion Letters comply with this requirement. There is a detailed description in this letter that confirms that the opinion writer has inquired as to all relevant facts. This discussion is set forth at the outset of the opinion (pp. 1-7), which recite the facts and the Taxpayers' representations in a detailed and comprehensive manner. The opinions also recite a comprehensive list of Operative Documents that the opinion writer has reviewed (pp. 7-8). The opinions analyze the tax consequences of a series of transactions, all of which were completed by the end of 2001. Accordingly,

[2] For the sake of simplicity, this Report refers to the Lewis Rice Opinion issued to Robert Sands dated December 28, 2001. The other Lewis Rice Opinions issued to other Sands family members or trusts for their benefit are in all pertinent respects identical to the opinion issued to Robert Sands.

there are no representations as to future activities of the parties to the transactions.[3] In my view, Lewis Rice was therefore amply justified in accepting as true the Taxpayers' representations without an independent verification insofar as there is nothing about them that would appear to be untrue or unreasonable. See Treasury Circular 230, § 10.33(a)(1)(ii).

(2) Relate Law to Facts. The practitioner is also to relate the law to the actual facts and, when addressing issues based on future activities, clearly identify what facts are assumed. The opinion letter also complies with this requirement. For example, on pages 34-62 of the Lewis Rice Opinion, the opinion sets forth five different positions and concludes that it is more likely than not that they will be upheld if challenged by the Internal Revenue Service. Accordingly, the opinion concludes that the Taxpayer, as one of the limited partners of RLP (which transferred its assets to RLC, another limited partnership, in exchange for a 99.7163% interest in RLC), will be able to claim his aliquot share of the capital gain or loss on the sale by RLC of its Constellation stock in a registered underwritten public offering. The opinions also conclude that it is more likely than not that five different possible theories to limit the Taxpayer's claimed tax treatment will not be upheld if they are advanced by the Internal Revenue Service.

---

[3] The Sands represented, inter alia, that (a) it was their understanding that a short position in Treasury Notes was likely to rise in value as interest rates rose; (b) that the short sale of the Treasury Notes on margin presented an unhedged potential for non-tax economic profit and loss that would serve to offset a likely decline in the market price of Constellation, their company's stock, some of which was about to be sold in a secondary registered offering; (c) that they have implemented each element of the Financial Plan independently of the other elements; and (d) that at no time has there been a binding commitment to enter into all of the elements of the plan.

There is a comprehensive discussion on pages 11-33 of the Lewis Rice Opinion that closely and completely relates the applicable tax law to the facts of the case. This discussion thoroughly analyzes the Federal tax consequences of the transaction and concludes (pp. 8-33) that the Taxpayer's initial basis in his partnership interest in RLP will not be reduced by the obligation to return the Treasury Notes that were borrowed for the short sale of such Notes.

This conclusion is also objectively reasonable because it is squarely supported by the language of the applicable statutory provisions that were then extant. In particular, the central tax issue in this case concerns the treatment of "contingent" liabilities in determining the partners' "basis" in their ownership of their partnership interests under Section 752 of the Internal Revenue Code of 1986 (the "Code"). The determination of the opinion that the Taxpayer's obligation to return the Treasury Notes under the short sale is only a "contingent" liability, and that under the case law such a "contingent" liability does not reduce the partner's basis in his partnership interest, represented an objectively reasonable conclusion at the time the opinion was issued.

By contrast, the contrary conclusion of the Service lacks an objective appearance of reasonableness, because it appears to be based on a proposition that directly conflicts with its past position. Specifically, the Service took the opposite position in several cases that it won prior to 2000 that a "contingent" liability is <u>not</u> to be taken into account in partnership basis calculations when doing so would have had the effect of <u>decreasing</u> the taxpayer's taxes; here, however, the Service now claims that a "contingent" liability <u>is</u> to be taken into account in basis calculations when doing so would have the effect of <u>increasing</u> the taxpayer's tax liability. The Service's position of "heads I win and tails

you lose" is a position that appears to be inconsistent with the agency's duty to apply the tax laws neutrally and evenhandedly.

The opinions' conclusion that the obligation under the short sale was not a liability within the meaning of Section 752 and its conclusion with respect to the resulting basis of the Taxpayer's Partnership interest are the heart of the opinion insofar as they are the legal foundation for the Taxpayer's calculation of his basis in his partnership interest in RLP, and further eligibility for his claimed capital gain or loss on his share of the sale by RLC of its Constellation stock.

The objective reasonableness of the opinion's conclusion on the law extant in the year 2001 is reinforced by the actions of the Service taken long after the consummation of the transactions at issue in this case. On June 24, 2003, the Service promulgated temporary Regulations which apply retroactively to partnership transactions after October 19, 1999. It is noteworthy that the Service employed the extraordinary and legally questionable stratagem of issuing regulations that reach back more than three years in time in order to bootstrap its litigating position.[4] Moreover, as the cogent professional criticism pointedly observed, the legislation addressing basis adjustments in the corporate context provided no authority to the Service to issue regulations that apply in the pure partnership context. Hence, the "quick fix" the Service sought to impose was neither quick nor effective.

---

[4] The issuance of a retroactive Regulation in 2003 that related back to 1999 represents an explicit acknowledgment by the Service that it was attempting to change the law. It is highly questionable whether the Internal Revenue Service can issue retroactive regulations to alter the civil tax consequences of a pre-existing transaction.

Furthermore, the Section 752 legal analysis of the transactions set forth in the Lewis Rice Opinions was thereafter squarely upheld in Klamath Strategic Investment Fund LLC v. United States, 440 F.Supp. 2d 608 (E.D. Tex. 2006), involving a similar transaction. There, the Court flatly rejected the Service's attempt to change its position on the definition of "liability" under Section 752 of the Code and denied the government's motion for summary judgment. The legal analysis of the Klamath Court under Section 752 therefore provides solid support for the "more likely than not" conclusion of the Lewis Rice Opinions that were issued to the Taxpayers in this case. As the Klamath Court stated, in terms that eloquently support the analysis which formed the basis of the Lewis Rice Opinions in this case (440 F.Supp. 2d at 619):

> It is clear from the record that the government has often and consistently relied on the principle that a "liability" under Section 752 does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed). This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). The Court's analysis of "liability" under Section 752 will not vary in meaning simply based on whose ox is being gored.

After trial, the Court in Klamath rejected civil penalties sought by the IRS on the ground that the taxpayers relied in good faith upon the advice of accountants and tax lawyers who had issued comprehensive written opinions that were comparable to the Lewis Rice Opinions. See 2007 U.S. Dist. LEXIS 6939 (E.D. Tex.), decided January 31, 2007.

Finally, the Klamath Court has recently reaffirmed its ruling that the term "liability" under Section 752 of the Code does not include an obligation that is contingent and that the retroactivity of Treasury Reg. § 1.752-6 was ineffective to the taxpayers in that case. The Court therefore denied the government's motion to vacate its summary

judgment ruling on Section 752 as moot. The Court also held that the taxpayers could deduct the operational and interest expenses that were associated with the transactions in that case on the ground that the transactions had economic substance apart from the tax benefits. It therefore allowed the taxpayers to deduct the operational and interest expenses that were associated with transactions in that case. See 2007 U.S. Dist. LEXIS 24806, decided April 3, 2007.

(3) Identification of Material Issues. The practitioner is to ascertain that all material Federal tax issues have been considered, and that all of those issues which involve the reasonable possibility of a challenge by the Internal Revenue Service have been fully and fairly addressed.

The Lewis Rice Opinion Letters comply with this requirement. For example, as I have previously stated (supra, p. 8), the opinion identifies five different statutory and judicial theories which the Internal Revenue Service might invoke to disallow the taxpayers' claimed losses. The opinions conclude that there is a greater than 50 percent likelihood that the various arguments by the Internal Revenue Service would not be successful. The opinion sets forth a detailed discussion (pages 34-62) of various theories that the Internal Revenue Service might possibly advance. These include the substance over form, step transaction, and related judicial doctrines, the partnership anti-abuse rules, the possible applicability of IRS Notice 2000-44, then recent and pending litigation, and risk of adverse legislation. The opinion also concludes (pp. 65-67) that the Taxpayer would not be subject to accuracy-related penalties as a result of the described treatment on his federal income tax return arising from the various transactions of the Financial Plan because the opinion is supported by substantial authority and the

Taxpayers would have relied upon the opinion reasonably and in good faith. All of these possible theories are discussed in great detail in the opinion, which concludes that there is substantial authority for each stated conclusion in the opinion.

(4) Opinion On Each Material Issue. Where possible, the practitioner is to provide an opinion whether it is more likely than not that an investor will prevail on the merits of each material tax issue presented by the offering which involves a reasonable possibility of a challenge by the Internal Revenue Service.

The opinion letters comply with this requirement. The discussion of each material tax issue is accompanied by a conclusion that it is more likely than not that the federal income tax treatment of the Financial Plan as set forth below is proper.

In the Lewis Rice Opinion, the issue and the citation to the more likely than not conclusions are as follows:

1. The obligation to replace the Treasury Notes borrowed for the short sale will not be treated as a "liability" within the meaning of Section 752 of the Code. Consequently, the obligation to replace the borrowed securities will not reduce either the Sands' basis in his partnership interest in RLP or the basis of RLP in its membership interest in RLC (pp. 11-31).

2. RLC terminated under Section 708(b)(1)(A) of the Code upon the cash purchase by RLP of the 0.2837% interest of Gloria Robinson ("Robinson") in RLC because, after that purchase, only one of the members of RLC remained and, as a result, no part of the operations of RLC thereafter will be carried on by any of its partners in a partnership (pp. 32-33).

3. Upon the termination of RLC under Section 708(b)(1)(A) of the Code, RLC will be deemed to have made a liquidating distribution of all of its assets to RLP and Robinson, and following this distribution, RLP will be treated as purchasing the assets deemed to have been distributed to Robinson in liquidation of Robinson's interest in RLC. RLP will take a cost basis and a new holding period (beginning on the day immediately following the date of the sale) in those assets deemed to have been purchased from Robinson. Thereafter, RLP will be considered to have received a liquidating distribution of those assets attributable to RLP's former interest in RLC (pp. 32-33).

4. Pursuant to Section 731(a)(1) of the Code, RLP will be required to recognize gain (if any) in an amount equal to the excess of the money actually or constructively distributed to it over the adjusted tax basis of such partner's interest in the partnership. Pursuant to Section 731(a)(2) of the Code, RLP will not recognize a loss on the transaction unless the only property distributed consists of money, unrealized receivables (as defined in Section 751(c)), and inventory receivables (as defined in Section 751(d) of the Code). Under Section 732(b) of the Code, RLP will take a basis in the assets deemed to have been received in the liquidation of its interest in RLC equal to RLP's basis in its RLC interest, less any money actually or constructively distributed to such partner. Under Section 735(b) of the Code, RLP will take a holding period in the assets deemed to have been received in the liquidation of its interest in RLC that includes the holding period of the terminating partnership in those assets, as determined under Section 1223 of the Code (pp. 31-34).

5. Upon the sale by RLC (after its termination for federal income tax purposes) of shares of Constellation held as a capital asset, RLP will be deemed to have realized either: (a) capital gain in an amount equal to the excess (if any) of the amount realized on the sale of such stock over the adjusted basis of such stock determined as described above; or (b) capital loss in an amount equal to the excess (if any) of the adjusted basis of such stock determined as described above, over the amount realized on the sale of such stock (p. 9).

With respect to the application of certain limitation rules potentially affecting the tax treatment claimed by the Taxpayers in connection with the Transactions, the Lewis Rice Opinions conclude that it is more likely than not that:

6. The substance over form, business purpose, economic substance, and step transaction doctrines would not apply to the Transactions (pp. 35-42).

7. The partnership anti-abuse rules would not apply to the Transactions (pp. 42-50).

8. IRS Notice 2000-44 would not support disallowance of the loss arising from the Transactions (pp. 50-51).

9. The Internal Revenue Service would be unsuccessful in imposing an accuracy-related penalty under Section 6662 of the Code because the Lewis Rice Opinion is based upon substantial authority and the Taxpayer, to whom the opinion was issued, relied on the opinions reasonably and in good faith (pp. 65-67).

The Lewis Rice Opinion also concluded that:

10. No inference can be drawn from then recent litigation (pp. 52-62).[5]

---

[5] The Lewis Rice Opinion (pp. 52-62) refers to two Tax Court cases, each of which involved the question whether an obligation to close a short sale and replace borrowed securities constituted a liability with the meaning of Section 752. Both cases were settled. In Fulcrum Financial Partner v. Commissioner, No. 3944-96, the Tax Court did not issue an opinion. In Salina Partnership L.P. v. Commissioner, T.C.M. 2000-352, decided November 18, 2000, the court did issue an opinion holding that an obligation to return securities borrowed for a short sale is a liability under Section 752 of the Code. However, on September 26, 2001, the parties reached a settlement of all of the issues presented in Salina. Accordingly, the Tax Court entered a stipulated decision in Salina, rather than a decision that reflected the conclusion reached in its opinion. The precedential value of the court's unpublished opinion in Salina is therefore questionable.

At all events, the Salina opinion rests upon a fundamental misapprehension (based upon Rev. Rul. 95-26, 1995-1 C.B. 131) of the nature of a short sale of securities and fails to recognize that the amount of the short seller's obligation (the cost of the property used to cover the short sale) is uncertain and therefore contingent. See, e.g., Deputy v. DuPont, 308 U.S. 488, 497-498 (1940). Contrary to the rationale of Rev. Rul. 73-301, supra, Rev. Rul. 95-26, supra, takes the position that a short sale creates an obligation but not an indebtedness. It then reasons that this obligation is a Section 752 liability in the amount of the proceeds of the short sale even though that amount may prove not to be the amount necessary to cover the short sale.

The Salina opinion also fails to take into account the contrary open transaction treatment of a short sale under Section 1233 of the Code. See Rev. Rul. 73-301, 1973-2 C.B. 216. Since the amount realized in a short sale by a partnership is not currently taxable but is deferred in what is regarded as an open transaction until the transaction closes, a short sale does not generate income that increases partnership income and that gives rise to an increase in outside partnership basis under Section 705 of the Code.

Moreover, the Klamath court explicitly rejected the Tax Court's reading of Section 752 in the Salina unpublished memorandum decision, observing that the Tax Court took precisely the opposite position at the behest of the IRS in its previously published opinions in LaRue v. Commissioner, 90 T.C. 465 (1988), and Long v Commissioner, 71 T.C. 1 (1978). Accord: Helmer v. Commissioner, T.C.M. 1975-160; Gibson Products Co. v. Commissioner, 637 F.2d 1041 (5th Cir. 1981).

(footnote continued)

11. It is impossible to predict whether there is a significant risk of the enactment of adverse legislation that would apply to the Transactions (pp. 67-69).

(5) Overall Evaluation. Where possible, the practitioner is to provide an overall evaluation whether the material tax benefits in the aggregate more likely than not will be realized.

The opinion letters comply with this requirement. The Lewis Rice Opinions state (p. 8) as follows (footnote omitted): "Based upon the 'Facts' set forth above, the 'Analysis' set forth below, and subject to the 'Conditions and Limitations' set forth below, we are of the opinion that there is substantial authority for the federal income tax treatment of the Financial Plan in accordance with the [four enumerated] opinions below, and that it is more likely than not that the tax treatment of the Financial Plan as set forth in the opinions enumerated below is proper . . .."[6]

---

(footnote continued)

A recent district court decision held that a partnership's obligation to replace borrowed Treasury Notes was a liability under Section 752. See COLM Producer, Inc. v. United States, 460 F.Supp. 2d 713 (N.D. Tex. 2006). However, the case is distinguishable because the obligation there was not contingent. Rather, it became fixed and definite when the second partnership sold its interest in the first partnership to an outside third party. Accordingly, at that time, the amount of the obligation of the second partnership became fixed and the second partnership could determine its gain or loss on the short sale transaction. In these particularized circumstances, the court in COLM Producer held that the liability was not contingent as to the second partnership.

[6] This conclusion complies with § 10.33(a)(5)(ii) of Circular 230 which allows a practitioner to make an overall evaluation only when "it is based on a conclusion that substantially more than half the material tax benefits, in terms of their financial impact on a typical investor, more likely than not will be realized if challenged by the Internal Revenue Service." That condition has been met in these cases.

B. THE MILBANK TWEED OPINIONS[7]

As I previously stated (p. 1, supra), on June 21, 2002, the law firm of Milbank, Tweed, Hadley & McCloy issued opinions to the Taxpayers with respect to charitable remainder trusts they had previously established. For the reasons that follow, it is my opinion that the Milbank Tweed Opinion Letters conform with both professional standards and the internal administrative standards set forth in Treasury Circular 230.

The Milbank Tweed Opinion to Robert Sands recites that on September 21, 2001, the Taxpayer as Grantor and Richard Sands, as co-independent Trustee, and the Alaska Trust Company, as Administrative Trustee, created the Robert Sands Charitable Remainder Unitrust 2001 (the "Trust"). The Trust had a 20-year term, at the expiration of which the Trust remainder is to be distributed to charities designated by the Taxpayer. On February 22, 2002, the Taxpayer irrevocably appointed a specific charity as the designated remainder beneficiary. The Trust is governed by Alaska law. The Trust provides that the Taxpayer is entitled to be paid a Unitrust Percentage on December 1st of each year. The Taxpayer represented to the Milbank Tweed firm that the Trust has been administered in accordance with the charitable remainder trust rules, pursuant to the law firm's instructions. Furthermore, the Taxpayer represented to Milbank Tweed that his purchase of the remainder interest from the charity was at fair market value, and that there was no plan, prearrangement or understanding with the charity for the purchase of the remainder prior to its designation as the charitable remainderman.

---

[7] This Report refers to the Milbank Tweed Opinion letter dated June 21, 2002, to Robert Sands. The other Milbank Tweed Opinions issued to other Sands family members are in all pertinent respects identical to the opinion issued to Robert Sands.

The Milbank Tweed Opinion first concludes that it is more likely than not that the remainder interest in a charitable trust is alienable, and if purchased by the Taxpayer, it is more likely than not that the Trust will be terminated pursuant to Alaska state law because the lead interest and the remainder interest will both be owned by the Taxpayer. The opinion also concludes that it is more likely than not the Taxpayer's purchase of the remainder and the termination of the Trust will not cause the Trust retroactively to lose its status as a charitable remainder trust but will cause the Trust to cease to be a charitable remainder trust once the purchase of the remainder interest is effected.

Furthermore, the opinion concludes that it is more likely than not that the termination of the Trust will not be an income tax recognition event to the Taxpayer. In addition, Milbank Tweed opines that it is more likely than not that the Taxpayer will have a carryover basis in the assets distributed to him in satisfaction of the lead interest and a cost basis in the assets distributed in satisfaction of the remainder interest. Accordingly, the opinion concludes that the Taxpayer's holding period for the assets in the lead interest will include (tack on to) the Trust's holding period; conversely, the Taxpayer's holding period for the assets in the remainder interest will commence on the distribution date.

Finally, the opinion concludes that it is more likely than not that neither the substance over form doctrine nor the step-transaction doctrine will be successfully applied by the Internal Revenue Service to the proposed transaction.

I turn now to a detailed discussion of the Milbank Tweed Opinions in the context of the requirements of Treasury Circular 230. For the reasons that follow, it is my opinion that the Milbank Tweed Opinion Letters conform with the internal administrative requirements of Circular 230 and perforce the standards of the profession. Hence, the

Milbank Tweed Opinions are objectively reasonable and has the character and quality on which the Taxpayer could rely.

(1) Factual Matters. The opinion letter to Robert Sands complies with this requirement. It first sets forth a detailed chronological recitation (pp. 1-2) of the facts of the transaction. It also sets forth the opinion writer's assumptions and the Taxpayer's representations. The opinion also states the documents that the opinion writer has reviewed. The opinions address the tax consequences of a transaction that occurred, the various parts of which are entirely reasonable. In my view, Milbank Tweed was amply justified in accepting the Taxpayer's assumptions without an independent verification insofar as there is nothing about them that would appear to be untrue or unreasonable. See Treasury Circular 230, § 10.33(a)(i)(ii).

(2) Relate Law to Facts. The practitioner is also to relate the law to the actual facts and, when addressing issues based on future activities, clearly identify what facts are assumed. The opinion letters likewise comply with this requirement. For example, on page 20, the opinion sets forth six different positions and concludes that it is more likely than not that they will be upheld. Accordingly, the opinion concludes that the remainder interest is alienable under Alaska State law, that the Taxpayer will be able to purchase the remainder interest for its fair market value and thereby terminate the Trust without tax consequences, and that he will obtain a carryover basis in the assets distributed to him in satisfaction of the lead interest and a cost basis in the assets of the remainder interest. The opinion further concludes that the Taxpayer's holding period in the lead interest assets will tack on to the Trust's holding period, and the Taxpayer's holding period in the remainder interest assets will commence on the date of their distribution to him.

The opinion also concludes that it is more likely than not that two different possible theories to challenge the Taxpayer's claimed tax treatment with respect to the trust will not be successfully applied.

There is a comprehensive discussion on pages 4-7 that closely and completely relates the applicable state law and federal tax law to the facts of the case. The opinion therefore concludes that it is more likely than not that the Trust remainder interest is assignable under both Alaska State law and the federal tax provisions governing charitable remainder trusts and that the contemplated assignment of the remainder interest will not cause the Trust to lose its status as a charitable remainder trust for the period prior to the actual assignment. The opinion's conclusion, based upon a reading of the applicable statutes and a comparison with other types of trusts, is objectively reasonable.[8]

The opinion also concludes (p. 7) that the distributions from the Trust to the Taxpayer are not income tax recognition events because the grantor trust and the grantor are considered the same person for income tax purposes. After analyzing the applicable rulings, the opinion reasonably concludes that the IRS could not successfully recharacterize the transaction because the essential aspect of the transaction was the Taxpayer's purchase of the remainder interest for its fair market value.

---

[8] The Milbank Tweed Opinion states (p. 4) that it was unable to locate any Alaska statutory or decisional law governing the transfer of a trust remainder interest. Since the Trust instrument does not contain a nonassignment provision, the opinion concludes that it is more likely than not that an Alaska court would determine whether interests are assignable by applying common law rules. Under common law, such interests are assignable unless a state statute or the trust instrument prevents assignment. Here, neither condition is applicable. Hence, the conclusion of the opinion is objectively reasonable on this point.

The opinion also reasonably concludes (pp. 11-22) that the IRS should recognize that the termination of the Trust will occur upon the Taxpayer's purchase of the remainder interest.[9]

Furthermore, the opinion concludes (pp. 13-15) that there will be no tax consequences to the Taxpayer upon the termination of the Trust. The opinion's conclusions with respect to basis and holding period conform to the applicable statutory provisions and regulations promulgated thereunder. See Sections 1001(a), 1014, 1015, 1223(1) and (2).

(3) Identification of Material Issues. The practitioner is to ascertain that all material federal tax issues have been considered, and that all issues which involve the reasonable possibility of a challenge by the Internal Revenue Service have been fully and fairly addressed.

The opinion reasonably concludes that it is more likely than not that neither the substance over form nor the step transaction doctrine can be successfully applied by the IRS in this case. Here, the opinion fully discusses the fact that the Trust is a valid charitable remainder trust and the charity will receive an economic benefit equivalent to its remainder interest when the Taxpayer purchases that interest at an arm's length fair market value price. Accordingly, the opinion concludes that the transaction is imbued with a valid business purpose so that the substance of the transaction therefore fully conforms with its economic reality. The substance over form doctrine should not alter this conclusion.

---

[9] The opinion correctly interprets (p. 12) the import of the Supreme Court's decision in Commissioner v. Estate of Bosch, 387 U.S. 456 (1967). The opinion's misstatement of the date of the decision as 1987 rather than 1967 appears to be a typographical error that does not affect the analysis or the conclusions of the opinion.

The opinion likewise reasonably concludes (pp. 16-20) that the step transaction doctrine has no application to this case. Given the Taxpayer's representation that he had no prearranged plan with the charitable remainder beneficiary to purchase the remainder interest at the time he created the Trust, there is no occasion to apply the step transaction doctrine under any of the three tests developed by the courts. The Taxpayer's purchase of the remainder interest will put in the hands of the charity the present value of an equivalent amount of funds free of the strictures of the Trust. The Taxpayer's purchase of the remainder interest should therefore be respected for tax purposes and should not be viewed as a retroactive unwinding of the original settlement of the Trust by the Taxpayer.

(4) Opinion On Each Material Issue. Where possible, the practitioner is to provide an opinion whether it is more likely than not that an investor will prevail on the merits of each material tax issue presented by the offering which involve a reasonable possibility of a challenge by the Internal Revenue Service.

The opinion letter complies with this requirement. The discussion of each material tax issue is accompanied by a conclusion that it is more likely than not that the federal income tax treatment of the Taxpayer's purchase of the Trust's remainder interest is proper.

In the Milbank Tweed Opinion, the issue and the citation to the more likely than not conclusions are as follows:

1. An Alaska court would determine that the charitable remainder beneficiary could assign its interest in the Trust under common law rules (pp. 4-5).

2. The Trust remainder interest is assignable under the Federal tax provisions governing charitable remainder trusts (pp. 6-7).

3. The Taxpayer's purchase of the Trust's remainder interest will not cause the Trust to lose its income tax exempt status as a charitable remainder trust retroactively; rather, it will cease to be tax exempt prospectively as of the date of the Taxpayer's purchase (pp. 6-7).

4. The Taxpayer's purchase of the charitable trust remainder interest will not be successfully recharacterized by the Internal Revenue Service as a sale of his unitrust interest (pp. 7-10).

5. The Trust will be terminated when the Taxpayer purchases the remainder interest (pp. 10-11).

6. The Internal Revenue Service will recognize the termination of the Trust for federal tax purposes (pp. 11-12).

7. The Trust termination should not be an income taxable event for the Taxpayer (pp. 13-15).

8. The Taxpayer's basis in the lead interest assets will be a carryover basis from the Trust and his holding period will be tacked on to the Trust's holding period; conversely, his basis in the remainder interest assets will be his cost, and his holding period will commence anew upon distribution to him of the remainder interest assets (pp. 14-15).

9. The Internal Revenue Service will not successfully apply the substance over form doctrine to the transaction (pp. 15-16).

10. The Internal Revenue Service will not successfully apply the step transaction doctrine to the transaction (pp. 16-20).

(5) Overall Evaluation. Where possible, the practitioner is to provide an overall evaluation whether the material tax benefits in the aggregate more likely than not will be realized.

The opinion letter complies with this requirement. The Milbank Tweed Opinion conclusion states (p. 8) as follows (bracketed numbers added for clarity):

> [1] It is our view that it is more likely than not the remainder interest in a charitable remainder trust is alienable, and if purchased by you, it is more likely than not the Trust will be terminated pursuant to Alaska state law. [2] It is also our view that it is more likely than not the purchase of the remainder and the termination of the Trust will not cause the Trust to retroactively lose its status as a charitable remainder trust but will cause the Trust to no longer be a charitable remainder trust once the purchase of the remainder interest is effected. [3] It is our view that it is more likely than not the termination of the Trust will not be an income tax recognition event to you. [4] In our opinion, it is more likely than not that you will have a carryover basis in the assets distributed to you in satisfaction of the lead interest and a cost basis in the assets distributed in satisfaction of the remainder interest. [5] It is more likely than not, in our view, that your holding period in the purchased remainder interest becomes the holding period in the assets distributed in satisfaction of the remainder interest and the Trust's basis in the assets distributed in satisfaction of the lead interest becomes your basis in those assets. [6] Finally, we believe more likely than not that neither the substance over form doctrine nor the step-transaction doctrine will be successfully applied to the proposed transaction.[10]

---

[10] This conclusion complies with § 10.33(a)(5)(ii) of Circular 230 which allows a practitioner to make an overall evaluation only when "it is based on a conclusion that substantially more than half the material tax benefits, in terms of their financial impact on a typical investor, more likely than not will be realized if challenged by the Internal Revenue Service." That condition has been met in these cases.

III. Conclusion

In light of the above, it is my conclusion that the Lewis Rice and Milbank Tweed Opinion Letters are both objectively and subjectively reasonable and that they comply in all respects with the professional requirements common to the tax profession and also with the specific internal administrative practice requirements of Treasury Circular 230, § 10.33. In these circumstances, they constitute opinions upon which a taxpayer could reasonably rely in preparing and filing his tax return.

The quality and breadth of coverage of the opinions confirm the opinion writers' sophisticated knowledge of the relevant provisions of Federal tax law. The Taxpayer's representations also confirm the reasonableness and candor of his conduct vis-à-vis his advisor. These objective and subjective indications of the reasonableness of the opinions reinforce my conclusion that the opinion letters involved in this case were of sufficient quality and character that the Taxpayer in this case could reasonably rely on them. In light of the general complexity of the tax law and the specific complexity of the issues involved in this case, taxpayers such as the Trusts in these consolidated cases necessarily must seek and obtain such professional advice, and be permitted to rely upon it, in planning and reporting their transactions.

Respectfully submitted,

Stuart A. Smith

Stuart A. Smith

Dated: November 26, 2007

# EXHIBIT A

## SANDS FAMILY LEGAL OPINIONS

| OPINION ISSUED TO | OPINION ISSUED BY | DATE |
|---|---|---|
| Andrew Stern and Marilyn Sands, Trustees Trust F/B/O Abigail Stern | Lewis, Rice & Fingersh, L.C. | 12/28/2001 |
| Andrew Stern and Marilyn Sands, Trustees Trust F/B/O Zachary Stern | Lewis, Rice & Fingersh, L.C. | 12/28/2001 |
| Marilyn Sands | Lewis, Rice & Fingersh, L.C. | 12/28/2001 |
| Richard Sands | Lewis, Rice & Fingersh, L.C. | 12/28/2001 |
| Robert Sands | Lewis, Rice & Fingersh, L.C. | 12/28/2001 |
| Andrew Stern | Lewis, Rice & Fingersh, L.C. | 04/12/2002 |
| Andrew Stern and Marilyn Sands Trust F/B/O Zachary Stern | Lewis, Rice & Fingersh, L.C. | 04/12/2002 |
| Andrew Stern and Marilyn Sands, Trustees Trust F/B/O Abigail Stern | Lewis, Rice & Fingersh, L.C. | 04/12/2002 |
| Marilyn Sands | Lewis, Rice & Fingersh, L.C. | 04/12/2002 |
| Marilyn Sands, Robert Sands and Richard Sands, Trustees of the Marvin Sands Master Trust | Lewis, Rice & Fingersh, L.C | 04/12/2002 |
| Richard Sands | Lewis, Rice & Fingersh, L.C. | 04/12/2002 |
| Robert Sands | Lewis, Rice & Fingersh, L.C. | 04/12/2002 |
| Marilyn Sands | Milbank, Tweed, Hadley & McCloy LLP | 06/21/2002 |
| Richard Sands and Robert Sands, Managing Partners of CWC Partnership I | Milbank, Tweed, Hadley & McCloy LLP | 06/21/2002 |
| Robert Sands | Milbank, Tweed, Hadley & McCloy LLP | 06/21/2002 |
| Richard Sands | Milbank, Tweed, Hadley & McCloy LLP | 06/21/2002 |

# APPENDIX A

## STUART A. SMITH

460 Park Avenue
New York, New York 10022
Tel.: 212-759-8285
Fax: 212-759-4032

| | | |
|---|---|---|
| **EDUCATION** | Harvard Law School | LL.B., 1964 |
| | Columbia College | A.B., 1961 |

**PROFESSIONAL EXPERIENCE**

**PRIVATE LAW PRACTICE** New York, New York

1983 to present

Federal and State Taxation and Related Litigation

Represent corporations and individuals in controversies with the Internal Revenue Service and with state and local tax authorities in civil and criminal tax matters and in related trial and appellate litigation.
Extensive trial experience in Tax Court, Court of Federal Claims, District Court, and oral appellate argument.
Advise individuals with tax compliance problems both at federal and state level. Corporate and individual tax planning in both domestic and international contexts.
Transactional tax structuring, including acquisitions, mergers, liquidations, insolvency reorganizations, offshore tax matters, and foreign trusts. Expert testimony in complex tax litigation, and in arbitration involving tax consequences of offshore insurance companies.
Tax legislative representation, including appearances before the Treasury, members of Congress, and their staffs.

1973 to 1983

**THE SOLICITOR GENERAL, UNITED STATES DEPARTMENT OF JUSTICE** Washington, D.C.

Tax Assistant to the Solicitor General

Represented the United States in tax matters before the Supreme Court. Argued more than thirty cases before the

| | |
|---|---|
| | Supreme Court involving a broad range of issues including the constitutionality of the worldwide unitary method of state taxation, tax shelters, international and foreign taxation, inventory accounting, life insurance company taxation, bond discount, mineral extraction, pension regulation, occupational safety inspection, criminal tax and summons enforcement, and the attorney-corporate client privilege.<br>Coordinated all matters involving federal tax litigation with the Treasury and the Internal Revenue Service.<br>Established government litigation policy in tax cases by authorizing all appeals of adverse decisions to the Courts of Appeals and the Supreme Court. |
| 1966 to 1973 | Served in the Department of Justice in the Appellate Section of the Tax Division, briefing and arguing more than sixty tax cases in the Circuit Courts of Appeals. Two years of Washington, D.C. private practice. |
| **LAW TEACHING** | **ADJUNCT PROFESSOR OF LAW, GEORGETOWN UNIVERSITY LAW CENTER** Washington, D.C. |
| 1969 to 1977 | Course in State and Local Taxation |
| **JUDICIAL CLERKSHIP** | **THE HONORABLE JOHN W. KERN, UNITED STATES TAX COURT** Washington, D.C. |
| 1964 to 1966 | |
| **PROFESSIONAL ACTIVITIES** | American Law Institute: Tax Advisory Group, Federal Income Tax Project<br><br>ABA Tax Section: Past Chairman, Subcommittee on Incorporations, Corporate Tax Committee<br><br>New York State Bar Association: Former Member, Executive Committee, Tax Section<br><br>Association of the Bar of the City of New York: Former Member, Tax Committee |

Second Circuit Judicial Conference (1983-1996); Tax Club of the City of New York; various professional tax institutes

**PUBLICATIONS**

"Deferred Taxation of Gains Realized Upon Divestiture of Property to Avoid Conflicts of Interest: A Proposal," Federal Bar Journal (1989)

*How You Can Get the Most from the New Tax Law,* Bantam Books (1981)

"A View from the Solicitor General's Office: Procedures in Appealing Lower Court Decisions and Settlements," 35 N.Y.U. Tax Institute 35 (1977)

"Depreciation in the Year of Sale: An Analysis," 9 Tax Counselor's Quarterly (1965)

**BAR ADMISSIONS**

State of New York
District of Columbia

U.S. Supreme Court
All Federal Courts of Appeals
U.S. Tax Court
U.S. Court of Federal Claims
U.S. District Courts for the Southern and Eastern Districts of New York

**Compensation Statement of Stuart A. Smith**

| | |
|---|---|
| Fee for Expert Witness Report | $ 25,000 |
| Fee for testimony preparation and testimony | $ 500 per hour |

**Prior Expert Witness Testimony**

During the preceding four years, I have testified as an expert at deposition and at trial in Klamath Strategic Investment Fund v. United States, 2007 U.S. Dist. LEXIS 6939 (E.D. Texas), decided January 31, 2007.

**APPENDIX B**

Treasury Circular 230, 31 C.F.R. (2002)

**§ 10.33 Tax shelter opinions.—**

(a) *Tax shelter opinions and offering materials.* A practitioner who provides a tax shelter opinion analyzing the Federal tax effects of a tax shelter investment shall comply with each of the following requirements:

(1) *Factual matters.*--(i) The practitioner must make inquiry as to all relevant facts, be satisfied that the material facts are accurately and completely described in the offering materials, and assure that any representations as to future activities are clearly identified, reasonable and complete.

(ii) A practitioner may not accept as true asserted facts pertaining to the tax shelter which he/she should not, based on his/her background and knowledge, reasonably believe to be true. However, a practitioner need not conduct an audit or independent verification of the asserted facts, or assume that a client's statement of the facts cannot be relied upon, unless he/she has reason to believe that any relevant facts asserted to him/her are untrue.

(iii) If the fair market value of property or the expected financial performance of an investment is relevant to the tax shelter, a practitioner may not accept an appraisal or financial projection as support for the matters claimed therein unless:

(A) The appraisal or financial projection makes sense on its face;

(B) The practitioner reasonably believes that the person making the appraisal or financial projection is competent to do so and is not of dubious reputation; and

(C) The appraisal is based on the definition of fair market value prescribed under the relevant Federal tax provisions.

(iv) If the fair market value of purchased property is to be established by reference to its stated purchase price, the practitioner must examine the terms and conditions upon which the property was (or is to be) purchased to determine whether the stated purchase price reasonably may be considered to be its fair market value.

(2) *Relate law to facts.* The practitioner must relate the law to the actual facts and, when addressing issues based on future activities, clearly identify what facts are assumed.

(3) *Identification of material issues.* The practitioner must ascertain that all material Federal tax issues have been considered, and that all of those issues which involve the reasonable possibility of a challenge by the Internal Revenue Service have been fully and fairly addressed in the offering materials.

(4) *Opinion on each material issue.* Where possible, the practitioner must provide an opinion whether it is more likely than not that an investor will prevail on the merits of each material tax issue presented by the offering which involves a reasonable possibility of a challenge by the Internal Revenue Service.

(5) *Overall evaluation.*--(i) Where possible, the practitioner must provide an overall evaluation whether the material tax benefits in the aggregate more likely than not will be realized. Where such an overall evaluation cannot be given, the opinion should fully describe the reasons for the practitioner's inability to make an overall evaluation. Opinions concluding that an overall evaluation cannot be provided will be given special scrutiny to determine if the stated reasons are adequate.

(ii) A favorable overall evaluation may not be rendered unless it is based on a conclusion that substantially more than half of the material tax benefits, in terms of their financial impact on a typical investor, more likely than not will be realized if challenged by the Internal Revenue Service.

(iii) If it is not possible to give an overall evaluation, or if the overall evaluation is that the material tax benefits in the aggregate will not be realized, the fact that the practitioner's opinion does not constitute a favorable overall evaluation, or that it is an unfavorable overall evaluation, must be clearly and prominently disclosed in the offering materials.

* * *

(2) A "tax shelter," as the term is used in this section, is an investment which has as a significant and intended feature for Federal income tax or excise tax purposes either of the following attributes: (i) deductions in excess of income from the investment being available in any year to reduce income from other sources in that year, or (ii) credits in excess of the tax attributable to the income from the investment being available in any year to offset taxes on income from other sources in that year. Excluded from the term are municipal bonds; annuities; family trusts (but not including schemes or arrangements that are marketed to the public other than in a direct practitioner-client relationship); qualified retirement plans; individual retirement accounts; stock option plans; securities issued in a corporate reorganization; mineral development ventures, if the only tax benefit would be percentage depletion; and real estate where it is anticipated that in no year is it likely that deductions will exceed gross income from the investment in that year, or that tax credits will exceed the tax attributable to gross income from the investment in that year. Whether an investment is intended to have tax shelter features

depends of the objective facts and circumstances of each case. Significant weight will be given to the features described in the offering materials to determine whether the investment is a tax shelter.

(3) A "tax shelter opinion," as the term is used in this section, is advice by a practitioner concerning the Federal tax aspects of a tax shelter either appearing or referred to in the offering materials, or used or referred to in connection with sales promotion efforts, and directed to persons other than the client who engaged the practitioner to give the advice. The term includes the tax aspects or tax risks portion of the offering materials prepared by or at the direction of a practitioner, whether or not a separate opinion letter is issued or whether or not the practitioner's name is referred to in the offering materials or in connection with the sales promotion efforts. In addition, a financial forecast or projection prepared by a practitioner is a tax shelter opinion if it is predicated on assumptions regarding Federal tax aspects of the investment, and it meets the other requirements of the first sentence of this subparagraph. The term does not, however, include rendering advice solely to the offeror or reviewing parts of the offering materials, so long as neither the name of the practitioner, nor the fact that a practitioner has rendered advice concerning the tax aspects, is referred to in the offering materials or in connection with the sales promotion efforts.

(4) A "material" tax issue as the term is used in this section is (i) any Federal income or excise tax issue relating to a tax shelter that would make a significant contribution toward sheltering from Federal taxes income from other sources by providing deductions in excess of the income from the tax shelter investment in any year, or tax credits available to offset tax liabilities in excess of the tax attributable to the tax shelter investment in any year; (ii) any other Federal income or excise tax issue relating to a tax shelter that could have a significant impact (either beneficial or adverse) on a tax shelter investor under any reasonably foreseeable circumstances (e.g., depreciation or investment tax credit recapture, availability of long-term capital gain treatment, or realization of taxable income in excess of cash flow, upon sale or other disposition of the tax shelter investment); and (iii) the potential applicability of penalties, additions to tax, or interest charges that reasonably could be asserted against a tax shelter investor by the Internal Revenue Service with respect to the tax shelter. The determination of what is material is to be made in good faith by the practitioner, based on information available at the time the offering materials are circulated.

(d) For purposes of advising the Director of Practice whether an individual may have violated section 10.33, the Director of Practice is authorized to establish an Advisory Committee, composed of at least five individuals authorized to practice before the Internal Revenue Service. Under procedures established by the Director of Practice, such Advisory Committee shall, at the request of the Director of Practice, review and make recommendations with regard to alleged violations of section 10.33 [Reg. § 10.33; Circular 230.]