# APPRAISAL

# OF THE

# R, R, M & C GROUP, L.P.

(Dated September 21, 2001)

PLAINTIFF'S EXHIBIT 3

PENGAD 800-631-6989



SANDS8777

# APPRAISAL OF THE
# R, R, M & C GROUP LIMITED PARTNERSHIP

## TABLE OF CONTENTS

SECTION 1. INTRODUCTION
1.1 Description of the Assignment
1.2 Scope of the Assignment
1.3 Applicability of Revenue Ruling 59-60
1.4 Definitions
1.5 Principal Sources of Information
1.6 Assumptions and Limiting Conditions

SECTION 2. OVERVIEW OF NATIONAL ECONOMY
2.1 General Economic Overview
2.2 Consumer Spending and Tourism
2.3 Construction and Real Estate
2.4 Manufacturing
2.5 Banking and Finance
2.6 Labor Markets
2.7 Agriculture and Natural Resources

SECTION 3. SURVEY OF THE SUBJECT LIMITED PARTNERSHIP
3.1 History
3.2 Business Purposes of the Partnership
3.3 Prior Transactions
3.4 Nature of the Partnership's Assets
3.5 Terms of the Partnership

SECTION 4. SELECTION OF VALUATION METHODOLOGY
4.1 Rationale
4.2 Selection of Methodology

SECTION 5. ADJUSTED NET ASSET VALUE OF THE PARTNERSHIP
5.1 Book Value of the Partnership

**SECTION 6. ANALYZING THE MARKET PLACE FOR PUBLICLY-TRADED PARTNERSHIP INTERESTS**

6.1 Analyzing the Market Place for Publicly Traded Partnerships: 1994-1997
6.2 Discount and Yield Averages: 1998
6.3 Discount and Yield Averages: 1999
6.4 Discount and Yield Averages: 2000
6.5 Discount and Yield Averages: 2001
6.6 Empirical Data as it Relates to Family Limited Partnerships
6.7 Selection of a Publicly Traded Discount

**SECTION 7. ADJUSTMENTS FOR MARKETABILITY DISCOUNT**

7.1 Adjustment for Marketability Discount:
7.2 Studies of Restricted Stock and Public Offerings:
7.3 Other Studies and Discount Factors
7.4 The Latest Study - The Value of Marketability as Illustrated in Dot.Com IPOs: May 1997 – March 2000 by John D. Emory, Sr., F. R. Dengel and John D. Emory, Jr.
7.5 Selection of Marketability Discount
7.6 Value Conclusion

**SECTION 8. APPRAISER'S CERTIFICATION**

**ADDENDUM A APPRAISER'S QUALIFICATIONS**

**ADDENDUM B COPY OF R, R, M & C GROUP LIMITED PARTNERSHIP AGREEMENT**

# APPRAISAL OF THE
# R, R, M & C GROUP LIMITED PARTNERSHIP

## SECTION 1. INTRODUCTION

### 1.1 Description of the Assignment:

The subject of this appraisal report is a 24.975% interest in the R, R, M & C GROUP LIMITED PARTNERSHIP, a closely held Missouri limited partnership. The subject business' primary business activity is an open-ended investment company. The objective of this appraisal is to determine the fair market value of a 24.975% limited partnership interest in the R, R, M & C GROUP LIMITED PARTNERSHIP for the purpose of establishing a fair market value of the limited partnership interest. The date of valuation is defined as the appraisal effective date and is September 21, 2001.

### 1.2 Scope of the Assignment:

The scope of my assignment is limited to establishing the fair market value of a 24.975% limited partnership interest in the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001 for the sole purpose of establishing its fair market value for gifting purposes.

### 1.3 Applicability of Revenue Ruling 59-60:

Revenue Ruling 59-60 specifies the relevant factors which must be considered in the preparation of an appraisal report concerning an operating business entity for any purpose involving the Internal Revenue Service. More specifically, those factors include the following:

(a) The nature of the business and the history of the enterprise since inception.

# APPRAISAL OF THE
# R, R, M & C GROUP LIMITED PARTNERSHIP

## SECTION 1. INTRODUCTION

### 1.1 Description of the Assignment:

The subject of this appraisal report is a 24.975% interest in the R, R, M & C GROUP LIMITED PARTNERSHIP, a closely held Missouri limited partnership. The subject business' primary business activity is an open-ended investment company. The objective of this appraisal is to determine the fair market value of a 24.975% limited partnership interest in the R, R, M & C GROUP LIMITED PARTNERSHIP for the purpose of making gifts of the limited partnership interest. The date of valuation is defined as the appraisal effective date and is September 21, 2001.

### 1.2 Scope of the Assignment:

The scope of my assignment is limited to establishing the fair market value of a 24.975% limited partnership interest in the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001 for the sole purpose of establishing its fair market value for gifting purposes.

### 1.3 Applicability of Revenue Ruling 59-60:

Revenue Ruling 59-60 specifies the relevant factors which must be considered in the preparation of an appraisal report concerning an operating business entity for any purpose involving the Internal Revenue Service. More specifically, those factors include the following:

(a) The nature of the business and the history of the enterprise since inception.

(b) The economic outlook in general and the outlook for the specific industry in particular.

(c) The financial condition of the business and its book value.

(d) The earnings capacity of the company.

(e) The dividend paying capacity of the company.

(f) The value of intangible assets and goodwill, if any.

(g) Previous sales of the company's stock (or other ownership interest) and the size of the interest to be valued.

(h) The market value of companies or corporations engaged in the same or similar businesses, having their stocks actively traded in a free and open market, either on an exchange or over the counter.

**1.4 Definitions:**

(a) Fair market value is the cash or cash equivalent price at which the property would change hands between a willing buyer and a willing seller; neither being under a compulsion to buy or to sell and both having reasonable knowledge of all relevant facts.

(b) Goodwill is that intangible asset which arises as a result of name, reputation, customer patronage, location, products and similar factors that have not been separately identified and/or valued but which generate economic benefits.

(c) A "Going Concern" is an operating business enterprise.

(d) Non-Operating Assets and Liabilities are those assets and liabilities present in the business that are not necessary to the ongoing operations of the business.

**1.5 Principal Sources of Information:**

The principal sources of information used in this valuation analysis are the company's financial statements and income tax returns, interviews with the company's owners, IPO studies, market research studies from Partnership Profiles and Willamette Management Associates, as well as other studies cited in this report dealing with the marketability of limited partnership interests.

**1.6 Assumptions and Limiting Conditions:**

(a) This report is an appraisal report designed to give an opinion of fair market value. It is not an accounting report, and it should not be relied upon to disclose hidden assets or to verify financial reporting. It is an opinion of the value of a 24.975% interest in the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001.

(b) I have accepted the financial information of the R, R, M & C GROUP LIMITED PARTNERSHIP without testing their accuracy. The financial information/statements consist of balance sheets, income statements, assets statements and/or statements of cash flows. The accuracy of the financial statements is the sole responsibility of the management of the R, R, M & C GROUP LIMITED PARTNERSHIP.

(c) I have relied on representations made by the general partner(s) about the background and history of the business. The management of the R, R, M & C GROUP LIMITED PARTNERSHIP has acknowledged to me that the information they provided was complete and accurate. However, I assume no responsibility for the accuracy of the information provided to me by the business's management.

(d) All facts and data as set forth in this report were obtained from sources considered to be reliable. However, I assume no liability for the accuracy of the information provided to me by others.

(e) This valuation report is based upon facts and conditions existing as of the date of valuation. I have not considered subsequent events. Unless specifically requested by the client and agreed upon by us, I have no obligation to update my report for such events and conditions.

(f) The estimate of value opined to in this report applies only to the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001. In addition, my estimate of value is valid only for the purpose of establishing a fair market value of the limited partnership interest.

## SECTION 2. THE NATIONAL ECONOMY

### 2.1 General Economic Overview

Reports from Federal Reserve Districts generally indicated that overall economic activity remained sluggish in August and early September, with several suggesting that activity slowed further. Back-to-school buying gave retailers in some regions a boost in sales, but overall consumer spending generally was said to be flat to down. Residential real estate markets were described as "brisk," "strong," or "steady" in most reports, buoyed in large part by low mortgage rates. By contrast, demand for commercial space reportedly softened further in most Districts. Manufacturing activity remained weak in nearly all regions, and the softness appeared to be broad based. Lending activity was mixed. Demand remained strong for residential mortgages, while demand for business loans was flat to down in most Districts as many lenders continued to tighten standards on some commercial loans. Relatively soft labor markets persisted in most Districts, with a few reports

indicating further easing. Upward pressure on wages remained subdued, but contacts in some Districts continued to express concern about rising health insurance premiums. Upward price pressures were again restrained in nearly all Districts. Input cost pressures were said to be easing as well.

## 2.2 Consumers Spending and Tourism

Overall consumer spending remained soft in most of the country during August and early September, while upward pressures on retail prices were subdued. Over half of the District reports indicated that retail sales were flat to down in the reporting period. Atlanta and Minneapolis reported retail sales increases, as did Dallas but from very weak levels. In the important back-to-school segment, merchants in the Boston, Chicago, and St. Louis Districts noted strong sales, while those in the New York, Philadelphia, and Kansas City regions had mixed, less-than-expected, and flat results, respectively. Federal income tax rebates had only a limited effect on spending in August, with New York and Chicago indicating no significant impact, while the Atlanta report suggested that tax rebates (along with heavy discounting) boosted overall sales. Minneapolis noted that state sales tax rebates helped retail sales. Consumers in many areas remained value-conscious, and large discount stores continued to outperform general merchandisers in some regions. Merchants in over half the Districts expected either flat sales or only moderate growth for the remainder of the year, with one contact in the Boston region describing the retail outlook as "grim." Most Districts reported that retail inventories were in good shape. Total sales of new light vehicles were relatively soft in most regions, and the Cleveland and Dallas reports noted a shift toward used vehicles. Reports of tourism spending were mixed, while business travel generally remained soft. Upward pressure on

retail prices appeared to ease further in some regions, and Chicago and Dallas indicated that there were more reports of price decreases than increases.

## 2.3 Construction and Real Estate

Real estate and construction activity were mixed, as the residential side remained strong, while the commercial segment softened further. Residential sales were relatively steady at high levels in most of the country, even in the Districts that reported slightly softer sales activity--New York, Philadelphia, and Atlanta. Softness was noted, however, in the demand for high-end homes in some reports, while Kansas City and Dallas indicated that overall home sales were soft in a few high-tech intensive areas. Contacts in many regions attributed much of the strength to continued low mortgage rates. District reports indicated that commercial activity remained weak in nearly all regions, and softened further in most. Downward pressure mounted on office rental rates as available space continued to increase. The amount of sublease space becoming available picked up in the St. Louis and Minneapolis Districts, while it reportedly slowed in the Chicago and Dallas regions. Industrial real estate markets softened in one-third of the Districts, while retail development declined from high levels in the Atlanta and Chicago Districts. Hotel occupancy fell in a few regions, leading to decreased room rental rates.

## 2.4 Manufacturing

Overall manufacturing activity was weak again in August, but there were positive signs contained in a few District reports. Virtually all regions reported that new orders and production were weak, and nearly one-half suggested that conditions had deteriorated further. However, Boston, New York, Chicago, and Kansas City reported that the declines in manufacturing activity

appeared to be stabilizing, while Richmond's manufacturing sector expanded for the first time in a year. Capital equipment spending remained weak, as contacts in some Districts reported that businesses had a "wait and see" attitude. Nearly one-half of the Districts indicated that high-tech manufacturing industries generally softened further in August. Some contacts in the Dallas and San Francisco Districts, however, suggested that the sector may have bottomed. Most Districts reported that manufacturers continued to trim inventories and many suggested that further inventory reductions were in the offing. Soft demand and stiff competition, in many cases from foreign producers, kept downward pressure on selling prices, and most input prices were reportedly flat to down. Increases in new orders and production in machine tool and shipping/packaging materials were noted by Chicago and Minneapolis.

## 2.5 Banking and Finance

Overall lending activity was reported to be mixed, as household demand for loans remained strong in most areas while softness in business lending persisted. Over half of the district reports indicated that household lending activity remained relatively robust, with only Boston, New York, St. Louis, and San Francisco reporting a general softening. Low mortgage interest rates continued to buoy home buying and spur mortgage refinancing in many areas. Contacts in the Boston, Philadelphia, and Cleveland Districts suggested that consumer delinquencies increased in the latest period, and New York noted rising delinquencies on residential mortgages. Reports on business lending activity were mixed, but generally indicated soft demand. Only the Philadelphia and Kansas City reports alluded to a general pickup in business lending activity, but the increases were very modest. One-third of the districts noted a further deterioration in business loan quality, although

contacts indicated that banks were well positioned to weather the increases in nonperforming or problem loans. Banks in one-third of the regions continued to tighten standards on business loans. Deposit increases were noted by Boston, Kansas City, and Dallas, while St. Louis reported a slight decline.

## 2.6 Labor Markets

Labor markets continued to ease in most parts of the country in August with over half the District reports suggesting soft and/or softening demand for labor. Boston and St. Louis indicated that demand for high-tech workers continued to erode, while Atlanta suggested that potential employers had become much more selective and high-tech job searches had become longer. Staffing agency reports were mixed, but generally pointed to continued weaker demand. By contrast, New York reported that overall labor demand was stable, while St. Louis indicated that worker shortages persisted despite recent loosening of labor markets. Richmond, Kansas City, and Minneapolis noted a shortage of nurses. There were also signs of stabilization in manufacturing employment in a few regions. Boston noted an increase in weekly hours, and Chicago reported that a few manufacturers were calling back a small percentage of furloughed workers. There were scattered reports of moderately increasing wages but, for the most part, upward wage pressures continued to ease along with labor demand. In fact, the Cleveland report suggested that unions were trading off negotiated wage increases in exchange for job security provisions. Contacts in four Districts expressed concern over rising health insurance costs, while those in the Atlanta and Chicago regions also noted rising liability insurance costs.

## 2.7 Agriculture and Natural Resources

Agricultural conditions were reportedly mixed across the country. Districts that span the Plains or northern portions of the Corn Belt (Cleveland, Chicago, Minneapolis, Kansas City, and Dallas) reported inadequate moisture conditions in many areas that were expected to negatively affect corn, cotton, and soybean yields. Recent rains were expected to help the winter wheat crop in some areas and provide a boost to late soybean yields, but were too late to help corn yields. Districts covering the southern Corn Belt and the southeastern states (Richmond, Atlanta, and St. Louis) reported generally favorable conditions for the corn, cotton, soybean, and peanut crops. San Francisco recorded mostly favorable crop conditions but noted that continued low market prices were stressing some producers. Chicago and Minneapolis also indicated that some bankers expressed concern about low levels of farm-derived income and the financial health of their customers.

Extractive natural resource industries were reported to be operating at high levels in most cases. The active oil and gas rig count in August was reported level to slightly lower than July in the Dallas, Kansas City, and Minneapolis Districts. Kansas City noted that drilling activity remained constrained by a shortage of rig workers. Minneapolis observed that mining activity varied across the District. Most iron mines were back in full production, following a slowdown earlier in the summer, while several nonferrous metal facilities in Montana remained closed.

## SECTION 3. SURVEY OF THE SUBJECT BUSINESS

### 3.1 History

The R, R, M & C GROUP LIMITED PARTNERSHIP began business operations in the state of Missouri on August 23, 2001. The partnership has one (1) general partner and four (4) limited partners. The business operates from premises located at 500 North Broadway, Suite 2000, St. Louis, Missouri 63102. The partnership is basically an open-ended investment company.

### 3.2 Business Purposes of the Partnership

Section 2.3 of the Partnership agreement states that the Partnership will accomplish the following:

- The purpose of the Partnership is to own, manage, purchase, invest in or reinvest in, sell, finance, mortgage, encumber, and otherwise transact, directly or indirectly, in real estate, common or preferred stocks, options, bond and debentures of United States or foreign corporations or governmental entities, deeds of trust, mortgages, notes, shares or participations in any common fund, mutual fund, money market fund or other securities, investments and property and to engage in any and all activities related or incidental thereto, or such other business as may be agreed upon by the Partners. The Partnership may make purchases and sales, outright or financed, by way of short sales, puts, calls, straddles, and sales against the box, on margin or otherwise, covered or uncovered; and for the purpose of enabling the Partners to exercise the powers granted under this Section 2.3, to maintain and operate margin accounts, discretionary accounts, or any other type of brokerage accounts, and to pledge or mortgage partnership assets as security for loans or advances made to the Partnership in conjunction with any transaction permitted under this Section 2.3. Such business may be conducted through direct ownership or through indirect ownership by investing in other entitles, including other limited partnerships, which own, manage, purchase, invest in or reinvest in, sell, mortgage, encumber or otherwise transact in real estate, property, investments and securities.

### 3.3 Prior Transactions

There have been no fair market value transactions involving an interest in the R, R, M & C GROUP LIMITED PARTNERSHIP.

### 3.4 Nature of the Partnership's Assets

The assets held by the company are basically passive in nature. As a result, the elements of Revenue Ruling 59-60 must be applied within the context of the structure and purposes of an investment company which conducts its business in the form of a partnership.

### 3.5 Terms of the Partnership

The terms of the partnership agreement, executed August 23, 2001, establish that the primary purpose of the Partnership is to own, manage, purchase, invest in or reinvest in, sell, finance, mortgage, encumber, and otherwise transact, directly or indirectly, in real estate, common or preferred stocks, options, bond and debentures of United States or foreign corporations or governmental entities, deeds of trust, mortgages, notes, shares or participations in any common fund, mutual fund, money market fund or other securities, investments and property and to engage in any and all activities related or incidental thereto, or such other business as may be agreed upon by the Partners.

Subject to certain income tax considerations as detailed in the document, all profits and losses of the partnership shall be calculated in accordance with generally accepted accounting principles, consistently applied, (including each item of income, gain, loss or deduction entering into the computation thereof), and shall be allocated among the Partners in accordance with each Partner's share of Partnership interests. (See Section 5.3)

Under Section 3.6 a partner is not entitled to withdraw any part of his capital account or to receive any distributions from the partnership acceptance provided in the agreement.

Under Section 4.1 the general partner has complete authority over and exclusive control and management of the business and affairs of the partnership.

Under Section 4.3 the limited partners will take no part in, or at any time interfere in any manner with, the management, conduct, or control of the partnership's business and operations, and has no right or authority to act for or by the partnership in any manner.

Under Section 5.1 of the partnership agreement the net cash flow is to be distributed at such times and such amounts as the managing partner, in its sole discretion, deems appropriate.

Under Section 6.1, neither the admission to the partnership of any additional limited partner, nor the transfer of an interest by or an event of dissolution with respect to any limited partner, results in the termination or dissolution of the partnership or affects its continuance in any manner whatsoever.

Under Section 6.3 only three events will terminate the partnership. The first is an occurrence of an event of dissolution with the respect to a general partner but only if the partnership does not continue in accordance with the provisions of Sections 6.4 which allows remaining general partners to continue the business or, if there are no general partners, the limited partners have the right to continue if a majority in interest of them so elect. The second event is the written agreement of the general partner and a majority-in-interest of the limited partners. The final event would be expiration of the term provided in Section 2.5 which is December 31, 2051.

Under Section 7.3 (a), no limited partner may voluntarily resign or withdraw as a limited partner from the partnership.

Under Section 7.3 (b) provides that any transferee or assignee of an interest in the partnership has no right to become a substitute limited partner unless the general partner consents in writing to such substitution. Thus, without the consent of the general partner, a person acquiring a limited partnership interest becomes an assignee only, which merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled. (See Section 7.4)

## SECTION 4. SELECTION OF VALUATION METHODOLOGY

### 4.1 Rationale

Generally, a hypothetical willing buyer of a partnership interest will pay a much lower price than its "liquidation value," if the partnership agreement does not give a hypothetical willing buyer the unilateral right to liquidate.

Most ownership interests in family partnerships are worth less than liquidation value when valued by the income approach or net asset value approach. The reason is that most of the cash flow generated by a family business is reinvested rather than distributed. Consider that a buyer who obtains liquidation control will pay a much higher price for the access to retained cash than a buyer who does not acquire liquidation control will pay for the low distributable yield.

Tax case law supports a potentially substantial difference between liquidation value and the income approach or net asset value approach. The valuation of an ownership interest in a business for tax purposes is generally determined by reference to the price a hypothetical willing buyer would pay a hypothetical willing seller assuming that neither is under a compulsion to enter into the transaction and both are fully apprised of all relevant facts. In situations where a taxpayer does not

have unilateral liquidation control of a family partnership, and depending on its distributable cash flow, courts have found that the taxpayer's interest in the partnership may have a value 40% to 85% lower than if a hypothetical willing buyer had liquidation control. (For a more complete analysis of the valuation factors relevant for partnership interests see IRS Valuation Guide for Income, Estate and Gift Taxes - Valuation Training for Appeals Officers, 9-1 to 9-5 (CCH Federal Estate and Gift Tax Reports, Number 239, January 28, 1994).)

The income approach generally entails the capitalization of current earnings or the discounting of future earnings. In both approaches, the valuation expert selects the appropriate measure of earning power (net income, gross cash flow, net cash flow, operating cash flow or other measure) to capitalize it to discount future value. Generally, a capitalization of earnings method is used when there is no expected growth in earnings or the expected growth is consistent. A discounted cash flow method is used when future growth is predictable and varies significantly over the predicting period. Also, since statistical data from publicly traded companies are used in determining a capitalization rate or a discount rate, and since interests in closely-held companies do not have access to the ready market of a public company, a discount for marketability is applied to the capitalization of earnings valuation conclusion or the discounted future earnings conclusion and, if applicable, a minority discount is also applied.

The net asset value (which does not equate to either book value nor liquidation value) approach is generally used for valuing investment-holding partnerships owning financial securities, passive investments in oil and passive investments in timber or passive investments in real estate. Basically, under this valuation approach, the experts take the fair market value of the assets of the

partnership and subtract liabilities, and apply a marketability discount and, if applicable, a minority or lack of liquidation control discount.

Limited partnerships are usually formed for a specific investment purpose and in this regard they are similar in nature to an investment or holding company. Investment companies are business organizations that use the proceeds of the sale of their own securities, (or their capital account, in the case at hand,) to invest and manage a diversified portfolio of stocks, bonds, real estate or other assets which are generally passive in nature. In some cases the partnership will hold investments in operating businesses such as the R, R, M & C GROUP LIMITED PARTNERSHIP.

The R, R, M & C GROUP LIMITED PARTNERSHIP is an open-ended investment company. The terms of the partnership agreement include no language that would preclude any of the partners from making additional contributions of capital for investment purposes (see Article III of the agreement).

It is a well-established fact that the fair market value for open-ended investment company securities is their redemption, or net asset, value. Furthermore, the market generally applies substantial discounts to the net asset value of these securities. Despite the fact that limited partnership interests are often unsellable, a market value for the interest must be determined. In addition, despite obvious factual and financial differences, the regulations of the Internal Revenue Code treat the valuation of partnership interests and closely held corporate stock similarly.

### 4.2 Selection of Methodology

Based on a review of the preliminary valuation conclusions, I have selected the net asset value as the primary representation of the fair market value for the R, R, M & C GROUP LIMITED

PARTNERSHIP. The net asset value, or adjusted book value, method is used primarily to value holding companies, companies that have no good will value, or companies whose value is primarily intrinsic to its assets. In my opinion, the net asset value, or adjusted book value, is appropriate in the valuation of the R, R, M & C GROUP LIMITED PARTNERSHIP because it is a holding company with no appreciable operating assets. Therefore, prior to any adjustments for marketability or minority discounts, it is my opinion that the fair market value of R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001 was the adjusted net asset value of the Partnership.

**SECTION 5. ADJUSTED NET ASSET VALUE OF THE PARTNERSHIP**

**5.1 Fair Market Value of the Partnership**

| | Asset | Value |
|---|---|---|
| 1. | 2,002,002 nonvoting common shares of Constellation Brands Inc. (STZ) at $35.675 per share | $71,421,421 |
| 2. | Cash | 359,290 |
| | TOTAL NET ASSET VALUE | $71,780,711 |

**SECTION 6. ADJUSTMENTS FOR DISCOUNTS ESTABLISHED BY THE PUBLIC MARKET.**

In determining the fair market value of the R, R, M & C GROUP LIMITED PARTNERSHIP as of September 21, 2001, it is my opinion that a discount be applied to the valuation of the R, R, M & C GROUP LIMITED PARTNERSHIP, based on the discount established by the public market.

**6.1 Analyzing the Market Place for Publicly Traded Partnership Interests: 1994-1998**

Good guideline-company market data is essential to documenting discounts from net asset value for valuations of interests in holding companies. There is, at the present time, increasing data

and studies that support the theoretical discounts from underlying partnership liquidation value that experts have testified to in court proceedings. Six of the more complete and better known of these studies are those performed in 1992 through 1997, by Partnership Profiles, Inc. editor Spencer Jefferies. See Partnership Profiles, Inc., "LP Secondary Market Discounts: How Much?" *The Perspective* (May/June 1992): 1-2; and Partnership Profiles, Inc., "LP Secondary Market Discounts: An Update?" *The Perspective* (May/June 1993): 1-4; and Partnership Profiles, Inc., "The Low-Down Secondary Market Discounts," *The Perspective* (May/June 1994).

In all three studies, actual trading prices of investment units on the secondary market were compared with valuations of those units established by the general partners or by independent appraisers. The 1992 studies found that secondary market discounting averaged 44%; the 1993 studies concluded that this figure increased to 46% and the 1994 studies found this figure increased to 48%. See Mark S. Thompson, Ph.D. and Eggert Dagbjartsson, "Market Discounting of Partial Ownership Interests," The Appraisal Journal (October 1994): 536. The study commissioned by the Investment Program Association in 1992 found an average discount from estimated values of 48%. Those studies were of publicly offered partnerships that were not publicly traded.

It is clear that the discounts would be greater for the typical family limited partnership because there does not exist any secondary market for those interests and in many cases the cash distributions are extremely low. According to an article in the Appraisal Journal, a careful analysis of those 1992 and 1993 studies by Partnership Profiles would indicate that in a no cash flow, or low cash flow situation, discounts were as high as 70% to 90%:

> An important finding of the 1992 and 1993 studies by Partnership Profiles is the importance of cash distributions to investors in the pricing of these investment units;

that is, the greater the annual cash flow to the holders of the units as percentage of net asset value, the less the discount applied in the marketplace. For partnerships with no cash flow, discounts have averaged nearly 70% and have, at times, risen to as high as 90%. For some partnerships, no buyers could be found at any price suggesting that the discount was 100%. These latter partnerships were excluded from the 1993 study. (See Mark S. Thompson, Ph.D. and Eggert Dagbjartsson, "Market Discounting of Partial Ownership Interests" The Appraisal Journal (October 1994).)

Another leading valuation expert analyzed the Partnership Profiles, Inc. studies, and had the following comments in his outline:

Last June, Partnership Profiles, Inc. published its third annual study on limited partnership, secondary market price-to-value discounts. Unit net asset values for 143 publicly registered but nontraded real estate partnerships were compared to the prices at which investors acquired these interests in the secondary market during the period ended May 31, 1994. The average discount to net asset value in the current study was 48 percent, which compared to 46 and 44 percent in the 1993 and 1992 studies, respectively.

Results of the 1994 study by category are indicated below.

| **Category** | **# of Partnerships** | **Average Discount** |
|---|---|---|
| Equity - Distributing | 71 | 49% |
| Equity - Non-Distributing | 17 | 76% |
| Equity/Mortgage Hybrids | 23 | 54% |
| Triple-Net-Lease | 22 | 19% |
| Mortgages - Insured | 4 | 28% |
| Mortgages - Uninsured | 6 | 53% |

In a November article in Shannon Pratt's Newsletter Charles L. Elliott and Alex W. Howard made the following observations:

It is the IRS predisposition that the value of a partnership interest is equal to a pro rata share of its net asset value (NAV). This flies in the face of both rational analysis and market evidence.

First, consider the rationale for a discount from NAV, applicable to limited partnership interests: (1) **No access to assets.** The limited partner has no ability to control the disposition or hypothecation of partnership assets; (2) **No management**

**participation.** Limited partners are excluded from participation in management; and (3) **Lack of Marketability.** There is no existing market for most limited partnership interests. Lack of marketability is further exacerbated by transfer restrictions in many limited partnership agreements.

The above rationale suggests that both minority interest and lack of marketability discounts are applicable to limited partnership interests, as well as to corporate securities. Generally speaking, in the corporate securities context: (1) Minority interest discounts, as a subtraction from enterprise value may range from 20 and 40 percent, and (2) The marketability discount typically may reduce the minority value (the as-if-publicly traded value) by 30 to 50 percent.

A total discount from NAV would reflect both the minority and lack of marketability factors. Since the above discounts are considered in sequence, a 40 percent minority discount followed by a 50 percent marketability discount would result in a total discount from NAV of 70 percent. (See Shannon Pratt's "Business Valuation Update," Vol.1, No. 2, November 1995.)"

The article gave three examples of how empirical data was useful in reaching settlements with the IRS.

(1) **General partnership owning 1200 acres of real estate.** Two 16 percent interests were gifted and the NAV was discounted by 35 percent. On audit the IRS contended no discount but the authors contended a 60 percent discount based on empirical data. The 35 percent discount was accepted by the IRS.

(2) **Estate owning 40 percent of corporation owning three large ranches.** IRS initially proposed a 30 percent discount from NAV. Empirical data indicated a 62 percent discount which, coupled with an additional lack of marketability discount, yielded a 77 percent discount from NAV at the IRS appellate level.

(3) **Estate owning 1 percent general and 72 percent limited partnership interest in ranching company.** Again with strong empirical evidence a 58 percent discount from NAV was accepted by the IRS.

It is clear from the empirical evidence the nondistributing partnerships command a substantially larger discount than distributing partnerships. The following are the 1995 statistics compiled by the "*Partnership Spectrum*," May/June, 1995.

| Category | # of Partnerships | Average Discount |
|---|---|---|
| Equity - Distributing | 87 | 41% |
| Equity - Non-Distributing | 32 | 64% |
| Equity/Mortgage Hybrids | 24 | 42% |
| Triple-Net-Lease | 26 | 20% |
| Mortgages - Insured | 14 | 19% |
| Mortgages - Uninsured | 6 | 44% |

*Partnership Spectrum's* 1996 study of 1,970 transactions in 167 real estate partnerships shows an average price to underlying NAV discount of 38%. This compares with comparable average discounts of 41% and 48% in 1995 and 1994, respectively.

As in previous studies, the most important factor influencing the unit price is whether the partnership is paying regular cash distributions. The partnerships were broken down into six categories, with average discounts as follows:

| Category | # of Partnerships | Average Discount |
|---|---|---|
| Equity - Distributing | 77 | 37% |
| Equity - Non-Distributing | 33 | 56% |
| Equity/Mortgage Hybrids | 15 | 37% |
| Triple-Net-Lease | 27 | 22% |
| Mortgages - Insured | 12 | 25% |
| Mortgages - Uninsured | 3 | 66% |

Jefferies explains that, "The study breaks down the 77 equity distributing partnerships into 11 categories, first by type of property, and then within each property type, by the amount of debt financing employed. The partnerships with little or no debt traded at significantly lower discounts compared to partnerships utilizing significant leverage.

"The type of real estate owned is also a factor in the discount equation. A matrix included in the study shows, for example, that unleveraged mini-warehouse partnerships traded at an average discount of 32%, while similarly financed partnerships owning mobile home parks traded at an average discount of 43%."

In the study Jefferies says, "For non-distributing partnerships, the most important factor determining the amount of price-to-value discount is the partnership's prospects for resuming regular cash distribution in the near future."

The study backs up this statement with specific examples of partnerships that appear to be on the verge of resuming distributions and several with no real prospects of resuming cash distributions for the foreseeable future.

The 1995 year-end net asset values reported by the sample group of 167 partnerships were compared to the weighted average prices at which investors purchased units in the secondary market during the 60-day period ending May 30, 1996. Jefferies considers the April/May transaction period to be appropriate because most year-end net asset value reports are available to investors by then.

According to *The Partnership Spectrum*, the study reflects actual transactions reported by 12 secondary market firms that act as intermediaries in matching up buyers and sellers of non-traded public partnerships.

In 1997, the real estate gold rush had officially spilled over into the secondary market for real estate partnerships where buyers of "used" partnership units are paying higher prices than ever before in terms of discounts to net asset values.

According to the 1997 study by *The Partnership Spectrum*, investors tapping the partnership secondary market for their real estate fix are buying units of real estate partnerships at an average price-to-value discount of 30%. This compares to the results of similar studies published in that newsletter in 1996 and 1995, which reported average price-to-value discounts of 38% and 41%, respectively.

While values for many real estate partnerships have improved in recent years as the nationwide real estate recovery has continued, secondary market prices have outpaced these gains, causing price-to-value discounts to shrink. A study published in the January/February 1997 issue of *The Partnership Spectrum* revealed that prices for a sample group of 200 real estate partnerships rose an average of 35% during the year ended January 31, 1997.

Higher secondary market prices reflect investor optimism about real estate in general, a perception supported by increasing cash flows and property values for most partnerships, and the potential for near-term liquidations in particular. While secondary market buyers certainly factor current distribution yields into their pricing models, the potential for reaping near-term capital gains from partnership liquidations is even more appealing than quarterly distributions which help pass the time until the big check arrives in the mail at liquidation time.

The 1998 price-to-value discount study features 130 real estate partnerships owning real estate assets ranging from insured mortgages to debt-laden apartment complexes. This represents a decrease from the 167 partnerships in the 1997 discount study, due primarily to partnership liquidations in the past year. Since price-to-value discounts tend to shrink considerably when a

partnership announces definitive, near-term liquidation plans, efforts were made to exclude such partnerships from the discount study.

For purposes of the 1997 study, the 130 partnerships were grouped into five categories instead of the six categories used in prior studies. The results of the 1997 study are as follows:

| Category | # of Partnerships | Average Discount |
|---|---|---|
| Equity - Distributing (low or no debt) | 48 | 28% |
| Equity – Distributing (moderate to high debt) | 24 | 37% |
| Equity - Non-Distributing | 27 | 42% |
| Triple-Net-Lease | 19 | 16% |
| Mortgages - Insured | 12 | 20% |

Despite the continuing run-up in prices for "used" units of real estate partnerships, price-to-value discounts have changed very little during 1998 as improving unit values have managed to keep pace with rising prices.

According to a new study by *The Partnership Spectrum,* investors in the relatively obscure partnership secondary market are purchasing units of limited partnerships at an average price-to-value discount of 29%. This figure is virtually unchanged compared to the results of a similar study published in that newsletter last year which reported an average discount of 30%.

As some investors abandoned the partnership secondary market during the past year due to concerns that this market had become too "pricey" in terms of price-to-value discounts, the latest crop of unit values has given this market something of a shot-in-the-arm. Based upon the results of a study published in the March/April 1998 issue of *The Partnership Spectrum* that compared year-end 1997 unit values for 131 real estate partnerships to their corresponding values for 1996, the average increase in unit value was a whopping 21%. Excluding one partnership in the study which

experienced an incredible eleven-fold jump in unit value, the 130 other partnerships in the study reported unit values that were an average of 13% higher for 1997 compared to 1996.

The higher unit values reported earlier this year by most real estate partnerships – especially equity-based programs which are the bread-and-butter of the partnership secondary market – have held in check price-to-value discounts for these partnerships which have dwindled over the past five years. Unless next year's crop of partnership values is as stellar as the 1998, however, it could be that the decline in discounts has been staved off only temporarily. This assumes, of course, that secondary market trading prices will continue to rise which seems very likely as product becomes more scarce due to partnership liquidations.

The 1998 price-to-value discount study features 114 partnerships owning real estate assets ranging from insured mortgages to restaurants to hotels. This sample group represents a decline from the 130 partnerships in the 1997 study and 167 partnerships in the 1996 study, due primarily to partnership liquidations. Because price-to-value discounts typically shrink considerably when a partnership announces definitive, near-term liquidation plans, efforts were made to exclude such partnerships from the study. The 1998 sample group of partnerships was bolstered, however, due to the inclusion of a number of partnerships that have reported unit values in recent months as a result of tender offers, but which have not otherwise reported unit values over the years.

All of the partnerships included in the 1998 price-to-value discount study are publicly-registered with the Securities and Exchange Commission, though none of the partnerships are publicly-traded on any recognized securities exchange. Instead, units of the partnerships are bought and sold in the so-called limited partnership secondary market. This market is comprised of ten to

twelve independent securities brokerage firms that act primarily as intermediaries in matching up buyers and sellers of units in non-listed partnerships of all types.

In the 1998 price-to-value discount study, the most recent unit values reported by the sample group of 114 partnerships were compared to the weighted average prices at which investors purchased units in these partnerships in the partnership secondary market during the two-month period of April and May 1998. The study incorporates a total of 700 actual purchase transactions reported to *The Partnership Spectrum* by the ten secondary market firms listed on the back page of the May/June 1998 issue. These firms report transaction data on a bi-monthly basis to *The Partnership Spectrum* which is compiled and reported in the "Secondary Spectrum" section.

The partnership unit values used in the study have been reported by the partnerships and represent either (i) valuations prepared internally by general partners, (ii) independent valuations prepared by third-party appraisers retained on behalf of the partnerships, or (iii) some combination of the two. Each unit value generally represents an estimate of the total amount of cash that would be distributed to limited partners on a per unit basis, based upon a hypothetical sale of the partnership's real estate assets at current market values and the liquidation of the partnership.

The results of the 1998 price-to-value discount study are consistent with previous studies reported in *The Partnership Spectrum* in that the two most important factors considered by secondary market buyers in pricing units of real estate partnerships are (i) whether the partnership is consistently paying periodic distributions and (ii) the degree of debt financing utilized by the partnership. This is evidenced by the relatively low price-to-value discounts of debt-free insured mortgage and triple-net-lease programs which consistently deliver high distribution yields to buyers.

At the other end of the discount spectrum are debt-laden partnerships that are unable to pay cash distributions on a current basis and have no real prospects for doing so in the foreseeable future.

### 6.2 Discount and Yield Averages: 1998

As with the 1997 price-to-value discount study, the 1998 study includes cash distribution data for each of the 114 partnerships. This data provides evidence that there is a clear link between discounts and cash distribution yields, and vice versa.

For the purposes of the study, the 114 partnerships were grouped into five categories. These categories and the average discount and distribution yield for each group of partnerships is provided in the table below.

| Partnership Category | Number of Partnerships | Average Discount | Average Yield |
|---|---|---|---|
| Equity – Distributing (low or no debt) | 34 | 27% | 8.0% |
| Equity – Distributing (moderate-to-high debt) | 29 | 36% | 6.7% |
| Equity – Non-Distributing | 21 | 43% | 0.0% |
| Triple-Net-Lease | 20 | 17% | 9.7% |
| Insured Mortgages | 10 | 12% | 9.8% |

### 6.3 Discount and Yield Averages: 1999

As with the 1998 price-to-value discount study, the 1999 study includes cash distribution data for each of the 95 partnerships. This data provides evidence that there is a clear link between discounts and cash distribution yields, as buyers are willing to accept lower discounts in exchange for higher current distribution yields, and visa versa.

The partnerships in the 1999 study were grouped into six categories, compared to five categories in previous studies. The new category in the current study includes partnerships holding

undeveloped land. The addition of undeveloped land partnerships to the study was made possible because, for the first time ever, the land partnerships sponsored by Inland Real Estate Corporation reported unit values in 1999 based upon independent appraisals.

The six categories and the average discount and distribution yield for each group of partnerships is provided in the table below.

| **Partnership Category** | **Number of Partnerships** | **Average Discount** | **Average Yield** |
|---|---|---|---|
| Equity - Distributing (low or no debt) | 27 | 25% | 8.8% |
| Equity - Distributing (moderate-to-high debt) | 17 | 35% | 6.9% |
| Equity - Non-Distributing | 15 | 46% | 0% |
| Undeveloped Land | 4 | 46% | 0% |
| Triple-Net-Lease | 22 | 14% | 9.5% |
| Insured Mortgages | 10 | 14% | 11.8% |

## 6.4 Discount and Yield Averages: 2000

As the informal secondary market for "used" units of otherwise non-traded limited partnerships continues to shrink due to liquidations, so have the price-to-value discounts at which buyers in this off-beat market are pricing the units of those partnerships still around.

According to a new study by *The Partnership Spectrum*, investors in the relatively obscure partnership secondary market are purchasing units of real estate partnerships at an average price-to-value discount of 25%. This compares to the results of similar studies published in the newsletter in recent years which reported average discounts of 27% (1999), 29% (1998) and 30% (1997).

To be sure, price-to-value discounts for the units of real estate partnerships have been on the decline since 1994 when a study reported an average price-to-value discount of 48%. While most of the decline in discounts from 1994 to 1997 is probably attributable to the real estate recovery and

the increased efficiency of the partnership secondary market, in more recent years the decline is apparently due to buyers anticipating near-term liquidations, even for those partnerships that have not announced any such plans. This has caused buyers to "pay up" for the units of many partnerships, based upon their perception of a partnership's prospects for liquidating in the next one to two years, thereby resulting in a relatively quick capital gain.

A veritable avalanche of partnership liquidations in recent years has given secondary market buyers good reason for factoring relatively short holding periods into their pricing models. Indeed, the flood of partnership liquidations that began as a trickle in 1996 has changed the partnership landscape significantly. During 1999 some 100 publicly-registered partnerships sold all of their remaining assets, adding to the 115 partnerships that did likewise in 1998. But the real liquidation tsunami is expected to occur this year as a whopping 200 public partnerships are expected to dispose of their remaining assets, according to information compiled by the newsletter.

As would be expected, this liquidation activity has taken a heavy toll on the partnership secondary market which experienced its heyday in terms of trading volume in 1996 at around $225 million. Trading volume for 1999 of about $110 million was roughly half of what it was in 1996. Based upon trading volume reported in the "Secondary Spectrum" section of the newsletter during the first half of this year, trading volume for all of 2000 will dip to around $75 million.

Partnership liquidations have resulted in a gradual decline in the number of partnerships included in the "Re-Sale Discount Studies" published in the newsletter over the years. The 2000 study features 87 real estate partnerships owning real estate assets ranging from apartment complexes to restaurants to insured mortgages. This sample group represents a decline from the 95

partnerships in the 1999 study and the 114 partnerships in the 1998 study, primarily due to partnership liquidations. Partnerships included in the 1999 study that have since sold all or substantially all of their assets include: Copley Realty Income Partners 3; Drexel Burnham Lambert Real Estate III; First Capital Institutional Properties 4: First Capital Income & Growth Fund XII; and Windsor Park Properties 3 and 6. At the time the 1999 discount study was published it seemed likely that the popular "CNL Income Fund" series of triple-net-lease partnerships would have been liquidated by now, but a plan to merge these partnerships into an affiliated REIT was abandoned earlier this year.

As with previous price-to-value discount studies published in *The Partnership Spectrum,* efforts were made to exclude from the current study any partnerships that have announced definitive, near-term liquidation plans. These partnerships are excluded from the study because price-to-value discounts typically shrink considerably once a partnership has announced near-term liquidation plans as buyers are willing to pay more for the units of these partnerships. Although the discounts are smaller, the high likelihood of realizing these smaller discounts through near-term liquidations makes for a worthwhile investment play.

A study that was published in the March/April 2000 issue of the newsletter found that the average price-to-value discount on *liquidating* partnerships is a mere 16%. This study included a total of 70 partnerships that sold their remaining assets form 1996 through April 2000. The sample group included 59 real estate partnerships and 11 partnerships that owned cabled television systems. The study indicated that, once definitive liquidation plan has been announced, price-to-value discounts shrink more for the units of non-distributing partnerships than for partnerships making

regular distributions. Nevertheless, with respect to the partnerships in this study, the units of distributing partnerships continued to be priced at lower discounts than non-distributing partnerships (16% vs. 22%), probably because if the liquidation plan falls apart or gets put on hold, these partnerships would be able to resume distributions to their limited partners while they wait for the next liquidation opportunity.

The 87 partnerships selected for the 2000 price-to-value discount study are all publicly-registered with the Securities and Exchange Commission, though none of the partnerships are publicly-traded on any recognized securities exchange. Instead, units of the partnerships are bought and sold in the so-called limited partnership secondary market. This market is comprised of ten to twelve independent securities brokerage firms that act primarily as intermediaries in matching up buyers and sellers of units in non-listed partnerships of all types.

In the 2000 study, the most recent unit values reported by the partnerships in the sample group were compared to the weighted average prices at which investors purchased units in these partnership in the secondary market during a two-month trading period. For 77 of the partnerships in the study, this trading period was April 1 through May 31, 2000. For the other 10 partnerships, it was necessary to use the two-month period of February 1 through March 31, 2000, since no trades were reported to the newsletter for these partnerships during April or May.

The current study incorporates a total of 564 actual purchase transactions reported to *The Partnership Spectrum* by the secondary market firms listed on the back page of the newsletter. These firms report transaction data on a bi-monthly basis to the newsletter which is compiled and

reported in the "Secondary Spectrum" section of each issue. The number of transactions in the new study is up from 508 in the 1999 study, despite there being eight fewer partnerships in the new study.

The partnership unit values used in the study have been reported by the partnerships and represent either (i) valuations prepared internally by general partners, (ii) independent valuation prepared by third-party appraisers retained on behalf of the partnerships, or (iii) some combination of the two. Each unit value generally represents an estimate of the total amount of cash that would be distributed to limited partners on a per unit basis, based upon a hypothetical sale of the partnership's real estate asset at current market values and the liquidation of the partnership, after payment of all related costs.

Consistent with the 1999 price-to-value discount study, the partnership in the new study were grouped into six categories based upon certain characteristics. While the average discount of 25% for the partnerships in the current study is down only slightly compared to 27% last year, within certain categories the average discount has changed significantly compared to last year. For instance, the average discount for equity-based partnerships that do not pay operating distribution has dropped from 46% to 35%. On the other hand, the average discount for triple-net-lease and insured mortgage partnerships has moved from 14% to 21%.

Nevertheless, the results of the 2000 price-to-value discount study are consistent with prior studies in that the two most important factors considered by secondary market buyers when pricing units of real estate partnerships continue to be (i) whether the partnership has the ability to pay operating distributions and (ii) the degree of debt financing utilized by the partnership. This is evidenced by the fact that the units of debt-free partnerships paying high distribution yields change

hands in the secondary market at the lowest price-to-value discounts, while non-distributing partnerships owning undeveloped land or debt-laden income properties typically trade at the highest discounts.

The six categories and the average discount and distribution yield for each group of partnerships is provided in the table below.

| Partnership Category | Number of Partnerships | Average Discount | Average Yield |
|---|---|---|---|
| Equity – Distributing (low or no debt) | 24 | 24% | 9.2% |
| Equity – Distributing (moderate-to-high debt) | 18 | 26% | 7.7% |
| Equity – Non-Distributing | 9 | 35% | 0.0% |
| Undeveloped Land | 3 | 40% | 0.0% |
| Triple-Net-Lease | 24 | 21% | 10.5% |
| Insured Mortgages | 9 | 21% | 12.5% |

### 6.5 Discount and Yield Averages: 2001

After declining steadily for the last six years, price-to-value discounts for the units of real estate partnerships changing hands in the informal limited partnership secondary market seem to have finally bottomed out. This will certainly come as good news to secondary market buyers, at least those who are still around.

According to a new study by *The Partnership Spectrum*, secondary market buyers are purchasing minority interest in publicly-held real estate partnerships at an average price-to-value discount of 28%. This figure is up slightly compared to the results of a similar study published in the May/June 2000 issue of the newsletter which reported an average price-to-value discount of 25%.

The results of this new study turn back the trend – at least temporarily – of gradually declining price-to-value discounts over the past several years as reported in prior years' discount

studies published in this newsletter. From 1994 through 2000, the average price-to-value discounts for the real estate partnerships included in these studies have been 48% (1994), 41% (1995), 38% (1996), 30% (1997), 29% (1998), 27% (1999) and 25% (2000).

While the average discount of 28% in the new study is up compared to last year, it would be far-fetched to assume that discounts are now headed in the other direction after years of thinning down. More than anything else, the results of this latest study simply indicate that discounts have finally bottomed out. At least so it seems.

To be sure, the higher average discount in this year's study is due to the composition of partnerships in the current study as opposed to a changed in pricing methodology by secondary market buyers. While price-to-value discounts for equity-based partnerships paying cash distributions, triple-net-lease programs and undeveloped land partnerships changed very little compared to the results of last year's study, discounts attributable to insured mortgage programs and non-distributing, equity-based partnerships are materially higher in the new study compared to last year. (The six categories of real estate partnerships included in this study are discussed in detail below.)

While some of the steep decline in price-to-value discounts over the past several years is certainly attributable to the increased efficiency of the partnership secondary market and the extended real estate boom, the primary reason for this decline is the fact that secondary market buyers have been factoring ever shorter anticipated holding periods into their pricing models. For instance, in 1993 and 1994, when average discounts for real estate partnerships were 46% and 48%,

respectively, secondary market buyers had no reason to expect that they were in for anything less than a long-term hold scenario of, say, eight to ten years.

This long-term scenario began to change, however, in 1995 and 1996 when some of the larger real estate partnership sponsors such as the Balcor Company and Merrill Lynch began to liquidate their partnerships. This liquidation spark became something of a wildfire in 1997 and 1998 when partnerships began to vanish from the scene like never before. In 1998, for instance, at least 115 publicly-registered partnerships sold all of their assets, followed by another 100 or so partnerships in 1999.

With real estate partnerships being liquidated left and right, secondary market buyers began to shorten the holding period assumptions in their pricing models, even for those partnerships that had not announced any liquidation plans whatsoever. Indeed, what had once been an 8 to 10 year anticipated holding period had now become more like a 3 to 5 year hold, maybe less.

With the prospect of reaping significant capital gains from partnership liquidations occurring in the relatively near future as opposed to some indefinite point at least 8 to 12 years out, secondary market buyers began to "pay up" for the units of real estate partnerships. This caused price-to-value discounts to decline as buyers bet on much shorter holding periods. These bets have paid off for the most part as hundreds of partnerships have been added to the liquidation scrap-heap in recent years.

The flood of partnership liquidations that began as a trickle in 1995 has transformed the partnership secondary market into a shadow of its former self. When this market reached its zenith in 1996, annual trading volume was about $225 million. Based upon trading volume reported in the "Secondary Spectrum" section of this newsletter during the first half of this year, trading volume for

all of 2001 will be in the range of only $60 to $65 million. The secondary market pickings have become so slim in the past few years that many buyers have left this market in search of greener pastures. They've also left his market with a lot more green in their wallets than they came with.

Partnership liquidations have caused a gradual decline in the number of partnerships included in the "Re-Sale Discount Studies" published in this newsletter over the years. This year's study features 75 partnerships owning real estate assets ranging form office buildings to restaurants to insured mortgages. This sample group is down form 87 partnerships in last year's study and 95 partnerships in the 1999 report, due primarily to partnership liquidations. Partnerships included in last year's study that have since sold all or substantially all of their real estate assets include: Capital Source I and II; Copley Pension Properties VII; John Hancock Realty Income Fund III; New England Life Pension Properties III, IV and V; and Windsor Park Properties 5 and 7. In addition to these liquidations, High Equity Partners 85, 86 and 88 were converted into individual, publicly-traded REITs earlier this year.

As with previous price-to-value discount studies published in *The Partnership Spectrum,* efforts were made to exclude from the current study any partnerships that have announced definitive, near-term liquidation plans. These partnerships are excluded from the study because price-to-value discounts typically shrink considerably once a partnership has announced near-term liquidation plans as buyers are willing to pay more for the units of these partnerships. Although the discounts are smaller, the high likelihood of realizing these discounts through near-term liquidations still makes a worthwhile investment play.

A study that was published in the March/April 2000 issue of this newsletter found that the average price-to-value discount on *liquidating* partnerships is a mere 16%. This study includes a total of 70 partnerships that sold their remaining assets from 1996 through April 2000. The sample group included 59 real estate partnerships and 11 partnerships that owned cable television systems. The study indicated that, once a definitive liquidation plan has been announced, price-to-value discounts shrink more for the units of non-distributing partnerships than for partnerships making regular distributions. Nevertheless, with respect to the real estate partnerships in this study, the units of distributing partnerships continued to be priced at lower discounts than non-distributing partnerships (16% versus 22%), probably because if the liquidation plan falls apart or gets put on hold, these partnerships would be able to resume distributions to their limited partners while they wait for the next liquidation opportunity.

A well-known real estate partnership that has been included in previous discount studies published in this newsletter but which is now in liquidation mode is Aetna Real Estate Associates. With all four of its remaining properties being marketed for sale, this partnership's units are being priced in the secondary market at about an 18% to 19% price-to-value discount. This is well below the average discount of 25% for the group of debt-free, equity-based partnerships paying regular distributions as reported in this new study.

It could be that the price-to-value discount for Aetna Real Estate Associates will dwindle further as this partnership moves ever closer to final liquidation. But as the results of the study on liquidating partnerships noted above suggest, secondary market buyers have set something of a "floor discount" for these partnerships that they are unwilling to go below.

The 75 partnerships selected for this year's price-to-value discount study are all publicly-held and publicly-registered with the Securities and Exchange Commission, though none of the partnerships are publicly-traded on any recognized securities exchange. Instead, units of the partnerships are bought and sold in the so-called limited partnership secondary market. This market is comprised of ten to twelve independent securities brokerage firms that act primarily as intermediaries in matching up buyers and sellers of units in non-listed partnerships of all types.

In this year's study, the most recent unit values reported by the partnerships in the sample group were compared to the weighted average prices at which investors purchased units in these partnerships in the secondary market during a two-month trading period. For 70 of the partnerships in the study, this trading period was April 1 through May 31, 2001. For the other 7 partnerships, it was necessary to use the two-month period of February 1 through March 31, 2001, since no trades were reported to this newsletter for these partnerships during April or May.

The current study incorporates a total of 312 actual purchase transactions reported to *The Partnership Spectrum* by the secondary market firms listed on the back page of this newsletter. These firms report transaction data on a bi-monthly basis to this newsletter which is compiled and reported in the "Secondary Spectrum" section of each issue.

The partnership unit values used in this study have been reported by the partnerships and represent either (i) valuations prepared internally by general partners, (ii) independent valuations prepared by third-party appraisers retained on behalf of the partnerships, or (iii) some combination of the two. Each unit value generally represents an estimate of the total amount of cash that would be distributed to limited partners on a per unit basis, based upon a hypothetical sale of the

partnership's real estate assets at current market values and the liquidation of the partnership, after payment of all related costs.

### 6.5.1 Discount & Yields by Sector

Consistent with previous price-to-value discount studies published in this newsletter, the partnerships in the new study were grouped into six categories based upon certain key attributes. While the overall average discount for the 75 partnerships featured in this study is 28%, discounts can vary significantly from one partnership to the next depending on debt structure and cash distribution ability.

The be sure, the results of this year's price-to-value discount study are entirely consistent with previous studies in that the two most important factors considered by secondary market buyers when pricing units of real estate partnerships that have not announced definitive liquidation plans continue to be (i) whether the partnership has the ability to pay operating distributions and (ii) the degree of debt financing utilized by the partnership. This is evidenced by the fact that the units of debt-free partnerships paying high distributions yields change hands in the secondary market at the lowest price-to-value discounts, while non-distributing partnerships owning undeveloped land or debt-laden income properties typically trade at the highest discounts.

The six categories and the average discount and distribution yield for each group of partnerships is provided in the table below, followed by a discussion of each group (actual data for each partnership by category begins on page 12):

| Partnership Category | Number of Partnerships | Average Discount | Average Yield |
|---|---|---|---|
| Equity – Distributing (low or no debt) | 16 | 25% | 9.5% |
| Equity – Distributing (moderate-to-high debt) | 14 | 26% | 6.1% |
| Equity – Non-Distributing | 9 | 42% | 0% |
| Undeveloped Land | 3 | 38% | 0% |
| Triple-Net-Lease | 26 | 24% | 10.9% |
| Insured Mortgages | 7 | 28% | 12.3% |

### 6.5.2 Equity – Distributing (Average Discount: 26%)

The 30 partnerships in this group own equity interests in income-producing real estate ranging from apartments to parking garages to shopping centers. The amount of debt financing utilized by the partnerships in this category can vary dramatically from one partnership to the next, from debt-free to highly leveraged.

The average price-to-value discount of 26% for the partnerships in this group is up ever so slightly compared to the average discount of 25% for the 42 partnerships in this group in last year's study. The average discount in the 1999 study for the partnerships in this category was 29%.

Although the number of partnerships in this category has declined in recent years due to liquidations, the average discount for this group has remained quite consistent. This seems to indicate that secondary market buyers have established something of a "floor discount" for partnerships that have not announced definitive liquidation plans, even though they believe that the will do so in the foreseeable future.

This category of partnerships includes 16 partnerships that are either debt-free or employ very low levels of debt financing. For these 16 partnerships, the average price-to-value

discount is 25%, and the average cash distribution yield is 9.5%. This is relatively unchanged compared to the results of last year's study which reported an average discount of 24% and an average distribution yield of 9.2% for a sample group of 24 partnerships with similar capital structures. In the 1999 study, the average discount was 25% and the average distribution yield was 8.8% for the 27 partnerships in this category.

The 14 partnerships in this group that employ significant debt financing traded at an average price-to-value discount of 26% which is unchanged compared to the results of last year's study. While the results of previous discount studies published in this newsletter indicate that secondary market buyers factor in higher discounts for partnerships having significant debt financing on the books, this no longer seems to be the case when it comes to distributing partnerships.

It's not clear why the discount gap that existed for years between distributing partnerships with no debt versus high leverage has all but closed. The best explanation is that, as secondary market buyers have shortened the anticipated partnership liquidation horizons in their pricing models, they have become less concerned about the greater risks associated with significant debt financing. This outlook could change, or course, if the economy goes south to the extent these partnerships are forced to cut back or eliminate cash distributions to meet debt service and keep up their properties in the face of declining or stagnant revenues.

The average distribution yield for the partnerships in this category that employ significant debt financing is 6.1%, which is well below the yield of 9.5% for those partnerships utilizing little or no debt financing. It is important to consider, however, that many of the leveraged partnerships in this study that pay operating distributions do so on a sporadic basis instead of on a

regular monthly, quarterly or semi-annual basis. This makes both the timing and amounts of the operating distributions from these partnerships quite unpredictable. This also makes it very difficult, if not impossible, to measure the average distribution yield of leveraged partnerships with any statistical significance.

Although the discount gap has closed with respect to leveraged versus non-leveraged partnerships that pay operating distributions, there still exists trade-offs between discounts and distribution yields, as investors are willing to accept lower discounts in exchange for higher distribution yields, and vice versa. Consider, for example, the two Uniprop partnerships included in this category. While units of Uniprop I traded at a high discount of 47%, the distribution yield is only 3.4%. Conversely, units of its sister partnership, Uniprop II, traded at a much lower discount of 36% but at a much higher distribution yield of 7.9%.

### 6.5.3 Equity – Non-Distributing (Average Discount: 42%)

Consistent with the results of prior discount studies, units of non-distributing partnerships continue to trade at a significantly higher discounts compared to distributing partnerships. While these partnerships are usually unable to pay operating distributions due to high debt loads and/or property improvement funding needs, it may be that the general partner – who has total discretion over distribution decisions – has simply decided to cut off operating distributions for no compelling reason. Such is the authority granted to the general partners of most publicly-held limited partnerships.

The average discount of 42% for the nine partnerships in this group is up from last year's study which reported an average discount of 35%. The results of the new study are more in

line with the 1999 and 1998 discount studies which reported average discounts of 46% and 43%, respectively, for non-distributing partnerships.

As so many formerly non-distributing partnerships have either been liquidated or been able to resume distributions in recent years, the universe of non-distributing, equity-based real estate partnerships for which net asset value information is available has declined dramatically. In fact, six of the nine non-distributing partnerships in last year's study have either begun paying distributions or been liquidated since last year. As these partnerships continue to fade away, it will become even more difficult to determine how secondary market buyers are pricing these partnerships in terms of discounts.

At an average discount of 42%, the non-distributing partnerships in this year's study are purely equity-based, with the exception of Resources Pension Shares 5. This partnership is a "hybrid" since it owns real estate and holds mortgage loans.

### 6.5.4 Undeveloped Land (Average Discount: 38%)

The smallest group of partnerships in this year's study, these three partnerships were formed to acquire undeveloped land on an all-cash basis. The investment objective of these partnerships is to enhance the value of their land holdings through pre-development activities such as rezoning, annexation and land planning. The partnerships periodically pay cash distributions as parcels are sold to developers, assuming such proceeds are not needed to fund pre-development costs at other parcels such as utility access, installation of roads and other infrastructure. All of these partnerships are debt-free, except for Inland Land Appreciation Fund I which has borrowed an

amount equal to about 19% of the cost basis of its land parcels from its general partner to pay predevelopment costs at certain parcels.

The average price-to-value discount of 38% for these partnerships in the new study is down slightly from an average discount of 40% last year. The best explanation for this decline is that these partnerships re now one year closer to being liquidated compared to last year, resulting in secondary market buyers pricing them accordingly. In the 1999 study, the average discount for these partnerships was 46%.

Although with only three partnerships this makes for a very small group, the average price-to-value discounts for these partnerships fall into a very narrow range of 37% to 39%. This was also the case with these same three land partnerships in last year's study which traded in a tight discount range of 39% to 40%.

The three land partnerships in this study are managed by Chicago-based Inland Real Estate Corp. which has no indicated that it has any current plans for a near-term liquidation of these partnerships. Instead, the partnerships sell off land parcels on a piece-meal basis to developers as opportunities arise.

The land held by these partnerships generally produces enough income to pay property taxes, insurance and other miscellaneous expenses. Most of this income is derived from farming or other leasing activities. For instance, of the 2,122 acres owned by Inland Land Appreciation Fund I at the end of last year, 1,940 acres were leased to local farmers. While this income covers some of the partnerships' operating expenses, it's not sufficient to pay operating distributions to the limited partners.

Although the Inland land partnerships do not pay operating distributions, they do pay special distributions form time to time consisting of proceeds from property sales. In the past few years, these partnerships have paid annual cash distributions in differing amount. If not for these distributions, the price-to-value discounts for these partnerships would no doubt be much higher since investors would have to wait until all the land has been sold and the partnership liquidated before they receive anything bank for their investment. Appraisers using discount data from the land partnerships in this study to value a minority interest in farm land or other undeveloped land should keep this in mind, especially when the holder of the minority interest being valued is not expected to received any distributions until *all* of the land is sold.

**6.5.5 Triple-Net-Lease Programs (Average Discount: 24%)**

All or substantially all of the real estate properties owned by the 26 partnerships in this group are net-leased to tenants pursuant to long-term lease agreements, whereby the lessees are obligated to pay all insurance, taxes and day-to-day maintenance expenses associated with the properties. Unlike other real estate partnerships which actively manage their properties, triple-net-lease programs generally act as landlord only. While restaurants are the most common property type owned by these programs, other types of real estate include industrial/warehouse facilities, hotels and office buildings.

The average price-to-value discount for the net-lease programs in this year's study is 24%. This represents a slight increase over the average discount of 21% for the 24 partnerships in this group in last year's study.