**Robert Sands**
c/o Constellation Brands
300 Willowbrook Office Park
Fairport, New York 14450-4222

December 28, 2001

Lewis, Rice & Fingersh, L.C.
500 North Broadway, Suite 2000
St. Louis, Missouri 63102

**Re: Representations with respect to the Financial Plan**[1]

Ladies and Gentlemen:

I submit this letter in connection with my request for your opinion with respect to certain federal income tax consequences of the Financial Plan. Based upon my personal knowledge, it was and is my understanding and belief that the following facts were true, correct, and complete in all respects at the beginning of the implementation of the Financial Plan, and that the following facts are and will continue to remain true, correct, and complete on the date as of which you issue your legal opinion and thereafter through the completion of the Financial Plan unless I provide written notice to you to the contrary.[2]

1. I am Group President and a member of the Board of Directors of Constellation. I first joined Constellation in 1986 as General Counsel. I was made Vice President and appointed to the Board of Directors in June 1990. After overseeing numerous acquisitions, I was appointed Executive Vice President and General Counsel in October 1993, overseeing the expansion of Constellation's legal department. In 1998, I was appointed to the role of Chief Executive Officer International after I spearheaded the acquisition of Constellation's United Kingdom division. I was named Group President in early 2000, and assumed the management of the Canandaigua Wine Company and Matthew Clark divisions. I am a graduate of the Skidmore College in Saratoga Springs, New York. I hold a J.D. from Pace University School of Law in New York City, New York.

PLAINTIFF'S EXHIBIT 25
PENGAD 800-631-6989

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by Mr. Robert Sands having the duration, purposes, and components discussed in this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "IRS" refers to the Internal Revenue Service, (iv) "RMC" refers to R,R,M&C Management Corporation, (v) "RLP" refers to R,R,M&C Group, L.P., (vi) "RLC" refers to R,R,M&C Partners, L.L.C., (vii) "Constellation" or "Company" refers to Constellation Brands, Inc., (viii) "CWC-I" refers to CWC Partnership-I, (ix) "MLRR" refers to M, L, R & R, (x) "PaineWebber" refers to UBS PaineWebber, Inc., and (xi) "Treasury Notes" refers to United States Treasury Notes.

[2] Accordingly, use of the past tense in these representations should be deemed also to refer to the present unless the text or context indicates otherwise.

2. As of September 4, 2001, I was the beneficial owner[3] of 1,724,654 shares of Constellation class A common stock. If I had been the beneficial owner of those Constellation shares from January 1, 2001, through September 4, 2001, the aggregate value of those holdings would have varied from a high of $79,351,330.54 to a low of $46,187,958.77, as shown by the following table:

| Stock | High close (01/01/01 to 09/04/01) | Total value of holdings at high | Low close (01/01/01 to 09/04/01) | Total value of holdings at low |
|---|---|---|---|---|
| STZ | $46.010 | $79,351,330.54 | $26.781 | $46,187,958.77 |

As these figures indicate, Constellation stock has been volatile, and it was one of my principal investment assets.

3. During my employment by Constellation, I have accumulated a significant investment in the Company's stock. The Sands family is the Company's largest shareholder. Members of my family and I conduct many collective investment activities through MLRR. Over the years, MLRR has worked to maintain a well-diversified investment portfolio. Through MLRR, I have invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities, (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merge, acquisition, or disposition), and (iii) directional arbitrage (investing in long/and or short positions in a security). These activities have resulted in an unconventional portfolio that, I believe, enhances return and decreases volatility. The Financial Plan is, in part, an extension of the above described investment strategy.

4. On June 20, 2001, Constellation announced that it had filed a Shelf Registration Statement on Form S-3 with the Securities and Exchange Commission. That shelf registration allowed Constellation to issue various types of securities, including debt, Class A common stock and preferred stock, from time to time, up to an aggregate of $750 million. An officer of Constellation explained that the registration helped the Company maintain financial flexibility, provided efficient access to the capital markets, supported its growth, and permitted it to refinance debt when market conditions were favorable.

5. On September 4, 2001, Constellation announced that it had filed a pre-effective amendment to its $750 million Shelf Registration Statement to authorize the sale of up to 2.15 million shares of Constellation's Class A Common Stock beneficially owned by members of the Sands family (the "Secondary Offering"). Constellation's announcement explained that the sale of these shares would accomplish certain objectives of the Sands family, including portfolio diversification, estate planning and charitable giving. Nevertheless, Constellation explained, the Sands family would remain the largest shareholder of Constellation stock following the completion of the sale.

APP-449

[3] See Pre-Effective Amendment to Form S-3 of Constellation, filed with the Securities and Exchange Commission on September 3, 2001, at page S-45 with respect to computation of the number of shares reflected in text.

6. I had a substantial unrealized profit in the stock of Constellation that I held at the inception of the Financial Plan. I decided to sell some of my Constellation stock in the Secondary Offering for the reasons noted above. I decided to do so before and independently of deciding to implement the Financial Plan. I would have sold those Constellation shares irrespective of whether I decided to effect the short sales of Treasury Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

7. At the time of the SEC filings referenced above, I believed that the United States economy had slowed materially. At that time, I was aware that the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on seven separate occasions in 2001 by a total of 300 basis points. Thus, the Federal Funds Rate on September 4, 2001, was 3.50%, rather than 6.50%, the rate on January 1, 2001. Nevertheless, I believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. I viewed this prospect as both a concern and an opportunity. I believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

8. I deemed a short sale of Treasury Notes to be an attractive investment opportunity, presenting a reasonable prospect for a significant profit, even if it presented no tax benefits, particularly when considered in conjunction with my ownership of Constellation stock. I discussed such an investment with an investment advisor, who concurred with that evaluation. Even so, I recognized that there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately three percent (3%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can recognize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change. The short sale of Treasury Notes was a transaction independent of the sale of Constellation stock and had its own separate business purpose.

9. Other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

10. I adopted a Financial Plan to effect several objectives, including:

10.1. Identify my short-term, intermediate-term, and long-term investment objectives, and set priorities among competing objectives including wealth preservation, current income generation, principal growth, investment risk reduction, diversification, and opportunistic short-term investing.

10.2. Realize investment profits on dispositions of Constellation stock.

10.3. Increase the diversification of my investment holdings.

10.4. Provide greater liquidity in my investment portfolio.

10.5. Realize investment profits by taking one or more short positions in Treasury Notes.

10.6. Identify my wealth-transfer objectives, determine in what ways and over what period I seek to achieve them, and implement a plan to realize those objectives.

10.7. Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock.

10.8. Enhance the privacy and confidentiality of my family's financial information and, correlatively, reduce risks to our personal safety and security.

11. The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of my investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale and the disposition of Constellation stock, the enhancement of my ability to effect my wealth-transfer objectives, the improvement to my family's privacy and personal security, and the anticipated tax benefits, all contributed to my determination to adopt the Financial Plan.

12. I have used limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss both in my investment activities and in my business dealings, and I have caused several entities to be formed to effect the Financial Plan over the next few years.

13. I have implemented and intend to continue to implement each element of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. To effect the purposes of the Financial Plan set forth above, the contemplated elements of the Financial Plan are:

13.1. Incorporation of RMC on August 23, 2001, the issuance to me, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to me, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by me to RMC of 1,001 shares of Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001;

13.2. Formation of RLP on August 23, 2001;

13.3. The opening of a brokerage account at PaineWebber by me on August 21, 2001, the transfer of $725,000 cash by me to the brokerage account at PaineWebber on

August 23, 2001, and the execution of a short sale of Treasury Notes on August 23, 2001;

13.4. To effect this short sale, I borrowed Treasury Notes from PaineWebber, thereby incurring an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds of the short sale in my account pending my acquisition and delivery to PaineWebber of Treasury Notes to close the transaction. Specifically, the Treasury Notes were in the total face amount of $23,000,000 due 11/15/2003 at 4.25%. The net proceeds of the short sales totaled $23,451,562.50, comprising $23,183,281.25 of principal and $268,281.25 of accrued interest;

13.5. Richard Sands, Marilyn Sands, CWC-I, and I contributed assets to RLP on August 28, 2001, each in exchange for a 24.975% limited partner interest; and RMC contributed assets to RLP on August 28, 2001, in exchange for a 0.1% general partner interest. More specifically, I transferred the PaineWebber brokerage account noted above, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by each of Richard Sands and Marilyn Sands consisted of a PaineWebber brokerage account that contained assets essentially identical to those held in my PaineWebber account as noted above, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by CWC-I consisted of a PaineWebber brokerage account holding the proceeds of a short sale on August 23, 2001, of $15,000,000 of Treasury Notes dated 11/15/98 with a coupon rate of 4.25%, due 11/15/03, together with 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by RMC to RLP consisted of 2,002 shares of Class A common stock of Constellation, and $3,403.40 of cash;

13.6. Formation of RLC on August 23, 2001;

13.7. RLP contributed assets to RLC on August 31, 2001, in exchange for a 99.7163% membership interest; and Gloria S. Robinson ("Robinson") contributed assets to RLC on August 10, 2001, in exchange for a 0.2837% membership interest. More specifically, the assets transferred by RLP to RLC consisted of 906,977 shares of Class A common stock of Constellation, and PaineWebber brokerage accounts holding 1,095,025 shares of Class A common stock of Constellation and the proceeds of open short sales of Treasury Notes described above. The assets transferred by Robinson to RLC consisted of cash in the amount of $250,000;

13.8. On September 6, 2001, RLC closed the short sale of Treasury Notes at a cost of $86,073,750, comprising $84,958,125 of principal and $1,115,625 of accrued interest;

13.9. On October 1, 2001, RLC sold all 2,002,002 shares of Class A Stock it owned in a registered underwritten public offering at a public offering price of $38.75 per share; and

13.10. At such intervals and in such increments as market conditions indicate could be profitable and appropriate, RLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

14. In addition to the elements of the Financial Plan noted above, the following events have occurred:

14.1. On September 10, 2001, after the closing of the short sale of Treasury Notes at a loss, RLP and Robinson agreed to, and closed, a purchase by RLP of the membership interest of Robinson in RLC for a cash purchase price of $227,278.

15. No part of the property held by RLC at the time of RLP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of RLC, as those terms are defined in Code section 751 and its related regulations;

16. Having been the General Counsel, Chief Executive Officer International, Group President and a member of the Board of Directors of Constellation, I am accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently verifying such data. I am familiar with and comfortable taking business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and upon which I am relying in pursuing the Financial Plan.

17. Over the years, I have both relied on advice from investment advisors and have made independent investment decisions. I have invested in publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States treasury obligations, municipal obligations, mutual funds, and compensatory and non-compensatory stock options. I have used a variety of entities in my investments, including general partnerships, limited partnerships, and limited liability companies. I have used a variety of investment techniques, including short sales, short sales against the box, hedging transactions, and margin accounts. In managing the Company and in making my personal investments, I have monitored a variety of economic indicators including interest rates, housing starts, the Consumer Price Index, United States Treasury obligation yields, developed country market returns, emerging country market returns and currency values as related to the United States dollar.

18. I regularly monitor current developments in business and economics. I regularly read the Wall Street Journal, the New York Times, Fortune, Business Week, the Financial Times, various newsletters, and other publications with a general-investment orientation. I also read several publications geared specifically to the alcoholic beverage business.

19. Despite my transfer of the brokerage account to RLP, and the subsequent transfer of that account by RLP to RLC, I retained (through those entities) a significant potential for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

20. No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on the transaction receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges the contemplated tax consequences of the transaction.

21. Neither I nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by RLC of Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

22. At all times, RLP, RLC, and I have held all of the assets and interests related to the Financial Plan, including, without limitation, the long position in Constellation stock, and the short position in Treasury Notes, as capital assets, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in these transactions participated for investment purposes and for his/her/its own account, not as agent, nominee, or "straw party" for another.

The undersigned is authorized to make the foregoing representations on behalf of RMC, RLP, and RLC. The foregoing representations also reflect my knowledge of the transactions discussed above. I understand that you will rely on the foregoing in connection with the issuance of the opinion I have requested with respect to the Financial Plan. You are hereby authorized to rely upon the representations made above without undertaking any independent verification of any such representation.

Very truly yours,

Robert Sands

**Richard E. Sands**
c/o Constellation Brands
300 Willowbrook Office Park
Fairport, New York 14450-4222

December 28, 2001

Lewis, Rice & Fingersh, L.C.
500 North Broadway, Suite 2000
St. Louis, Missouri 63102

**Re: Representations with respect to the Financial Plan**[1]

Ladies and Gentlemen:

I submit this letter in connection with my request for your opinion with respect to certain federal income tax consequences of the Financial Plan. Based upon my personal knowledge, it was and is my understanding and belief that the following facts were true, correct, and complete in all respects at the beginning of the implementation of the Financial Plan, and that the following facts are and will continue to remain true, correct, and complete on the date as of which you issue your legal opinion and thereafter through the completion of the Financial Plan unless I provide written notice to you to the contrary. [2]

1. I am President, Chairman of the Board, and Chief Executive Officer of Constellation. I joined Constellation in 1979. After serving in various positions involving wine production, finance, and sales & marketing, I was appointed Executive Vice President in 1982. I was named President and Chief Operating Officer in 1986, and assumed the management of Constellation's domestic and worldwide operations with my appointment to Chief Executive Officer in 1993. In September 1999, I was elected Chairman of the Board. I am a graduate of the University of Vermont. I hold an M.A. and a Ph.D. in social psychology from the University of North Carolina.

2. As of September 4, 2001, I was the beneficial owner[3] of 1,694,657 shares of Constellation class A common stock. If I had been the beneficial owner of those Constellation shares from January 1, 2001, through September 4, 2001, the aggregate

---

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by Mr. Richard Sands having the duration, purposes, and components discussed in this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "IRS" refers to the Internal Revenue Service, (iv) "RMC" refers to R,R,M&C Management Corporation, (v) "RLP" refers to R,R,M&C Group, L.P., (vi) "RLC" refers to R,R,M&C Partners, L.L.C., (vii) "Constellation" or "Company" refers to Constellation Brands, Inc., (viii) "CWC-I" refers to CWC Partnership-I, (ix) "MLRR" refers to M, L, R & R, (x) "PaineWebber" refers to UBS PaineWebber, Inc., and (xi) "Treasury Notes" refers to United States Treasury Notes.

[2] Accordingly, use of the past tense in these representations should be deemed also to refer to the present unless the text or context indicates otherwise.

[3] See Pre-Effective Amendment to Form S-3 of Constellation, filed with the Securities and Exchange Commission on September 3, 2001, at page S-45 with respect to computation of the number of shares reflected in text.

value of those holdings would have varied from a high of $77,971,169 to a low of $45,384,609, as shown by the following table:

| Stock | High close (01/01/01 to 09/04/01) | Total value of holdings at high | Low close (01/01/01 to 09/04/01) | Total value of holdings at low |
|---|---|---|---|---|
| STZ | $46.010 | $77,971,169 | $26.781 | $45,384,609 |

As these figures indicate, Constellation stock has been volatile, and it was one of my principal investment assets.

3. During my employment by Constellation, I have accumulated a significant investment in the Company's stock. The Sands family is the Company's largest shareholder. Members of my family and I conduct many collective investment activities through MLRR. Over the years, MLRR has worked to maintain a well-diversified investment portfolio. Through MLRR, I have invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities, (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merge, acquisition, or disposition), and (iii) directional arbitrage (investing in long/and or short positions in a security). These activities have resulted in an unconventional portfolio that, I believe, enhances return and decreases volatility. The Financial Plan is, in part, an extension of the above described investment strategy.

4. On June 20, 2001, Constellation announced that it had filed a Shelf Registration Statement on Form S-3 with the Securities and Exchange Commission. That shelf registration allowed Constellation to issue various types of securities, including debt, Class A common stock and preferred stock, from time to time, up to an aggregate of $750 million. An officer of Constellation explained that the registration helped the Company maintain financial flexibility, provided efficient access to the capital markets, supported its growth, and permitted it to refinance debt when market conditions were favorable.

5. On September 4, 2001, Constellation announced that it had filed a pre-effective amendment to its $750 million Shelf Registration Statement to authorize the sale of up to 2.15 million shares of Constellation's Class A Common Stock beneficially owned by members of the Sands family (the "Secondary Offering"). Constellation's announcement explained that the sale of these shares would accomplish certain objectives of the Sands family, including portfolio diversification, estate planning and charitable giving. Nevertheless, Constellation explained, the Sands family would remain the largest shareholder of Constellation stock following the completion of the sale.

6. I had a substantial unrealized profit in the stock of Constellation that I held at the inception of the Financial Plan. I decided to sell some of my Constellation stock in the Secondary Offering for the reasons noted above. I decided to do so before and independently of deciding to implement the Financial Plan. I would have sold those Constellation shares irrespective of whether I decided to effect the short sales of Treasury

Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

7. At the time of the SEC filings referenced above, I believed that the United States economy had slowed materially. At that time, I was aware that the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on seven separate occasions in 2001 by a total of 300 basis points. Thus, the Federal Funds Rate on September 4, 2001, was 3.50%, rather than 6.50%, the rate on January 1, 2001. Nevertheless, I believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. I viewed this prospect as both a concern and an opportunity. I believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

8. I deemed a short sale of Treasury Notes to be an attractive investment opportunity, presenting a reasonable prospect for a significant profit, even if it presented no tax benefits, particularly when considered in conjunction with my ownership of Constellation stock. I discussed such an investment with an investment advisor, who concurred with that evaluation. Even so, I recognized that there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately three percent (3%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can recognize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change. The short sale of Treasury Notes was a transaction independent of the sale of Constellation stock and had its own separate business purpose.

9. Other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

10. I adopted a Financial Plan to effect several objectives, including:

10.1. Identify my short-term, intermediate-term, and long-term investment objectives, and set priorities among competing objectives including wealth preservation, current income generation, principal growth, investment risk reduction, diversification, and opportunistic short-term investing.

10.2. Realize investment profits on dispositions of Constellation stock.

10.3. Increase the diversification of my investment holdings.

10.4. Provide greater liquidity in my investment portfolio.

10.5. Realize investment profits by taking one or more short positions in Treasury Notes.

10.6. Identify my wealth-transfer objectives, determine in what ways and over what period I seek to achieve them, and implement a plan to realize those objectives.

10.7. Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock.

10.8. Enhance the privacy and confidentiality of my family's financial information and, correlatively, reduce risks to our personal safety and security.

11. The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of my investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale and the disposition of Constellation stock, the enhancement of my ability to effect my wealth-transfer objectives, the improvement to my family's privacy and personal security, and the anticipated tax benefits, all contributed to my determination to adopt the plan.

12. I have used limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss both in my investment activities and in my business dealings, and I have caused several entities to be formed to effect the Financial Plan over the next few years.

13. I have implemented and intend to continue to implement each element of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. To effect the purposes of the Financial Plan set forth above, the contemplated elements of the Financial Plan are:

13.1. Incorporation of RMC on August 23, 2001, the issuance to me, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to me, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by me to RMC of 1,001 shares of Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001;

13.2. Formation of RLP on August 23, 2001;

13.3. The opening of a brokerage account at PaineWebber by me on August 21, 2001, the transfer of $725,000 cash by me to the brokerage account at PaineWebber on August 23, 2001, and the execution of a short sale of Treasury Notes on August 23, 2001;

13.4. To effect this short sale, I borrowed Treasury Notes from PaineWebber, thereby incurring an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds of the short sale in my account pending my acquisition and delivery to

PaineWebber of Treasury Notes to close the transaction. Specifically, the Treasury Notes were in the total face amount of $23,000,000 due 11/15/2003 at 4.25%. The net proceeds of the short sales totaled $23,451,562.50, comprising $23,183,281.25 of principal and $268,281.25 of accrued interest;

13.5. Robert Sands, Marilyn Sands, CWC-I, and I contributed assets to RLP on August 28, 2001, each in exchange for a 24.975% limited partner interest; and RMC contributed assets to RLP on August 28, 2001, in exchange for a 0.1% general partner interest. More specifically, I transferred the PaineWebber brokerage account noted above, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by each of Robert Sands and Marilyn Sands consisted of a PaineWebber brokerage account that contained assets essentially identical to those held in my PaineWebber account as noted above, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by CWC-I consisted of a PaineWebber brokerage account holding the proceeds of a short sale on August 23, 2001, of $15,000,000 of Treasury Notes dated 11/15/98 with a coupon rate of 4.25%, due 11/15/03, together with 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by RMC to RLP consisted of 2,002 shares of Class A common stock of Constellation, and $3,403.40 of cash;

13.6. Formation of RLC on August 23, 2001;

13.7. RLP contributed assets to RLC on August 31, 2001, in exchange for a 99.7163% membership interest; and Gloria S. Robinson ("Robinson") contributed assets to RLC on August 10, 2001, in exchange for a 0.2837% membership interest. More specifically, the assets transferred by RLP to RLC consisted of 906,977 shares of Class A common stock of Constellation, and PaineWebber brokerage accounts holding 1,095,025 shares of Class A common stock of Constellation and the proceeds of open short sales of Treasury Notes described above. The assets transferred by Robinson to RLC consisted of cash in the amount of $250,000;

13.8. On September 6, 2001, RLC closed the short sale of Treasury Notes at a cost of $86,073,750, comprising $84,958,125 of principal and $1,115,625 of accrued interest;

13.9. On October 1, 2001, RLC sold all 2,002,002 shares of Class A Stock it owned in a registered underwritten public offering at a public offering price of $38.75 per share; and

13.10. At such intervals and in such increments as market conditions indicate could be profitable and appropriate, RLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

14. In addition to the elements of the Financial Plan noted above, the following events have occurred:

14.1. On September 10, 2001, after the closing of the short sale of Treasury Notes at a loss, RLP and Robinson agreed to, and closed, a purchase by RLP of the membership interest of Robinson in RLC for a cash purchase price of $227,278.

15. No part of the property held by RLC at the time of RLP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of RLC, as those terms are defined in Code section 751 and its related regulations;

16. Having been the President, Chairman of the Board, and Chief Executive Officer of Constellation, I am accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently verifying such data. I am familiar with and comfortable taking business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and upon which I am relying in pursuing the Financial Plan.

17. Over the years, I have both relied on advice from investment advisors and have made independent investment decisions. I have invested in publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States treasury obligations, municipal obligations, mutual funds, and compensatory and non-compensatory stock options. I have used a variety of entities in my investments, including general partnerships, limited partnerships, and limited liability companies. I have used a variety of investment techniques, including short sales, short sales against the box, hedging transactions, and margin accounts. In managing the Company and in making my personal investments, I have monitored a variety of economic indicators including interest rates, housing starts, the Consumer Price Index, United States Treasury obligation yields, developed country market returns, emerging country market returns and currency values as related to the United States dollar.

18. I regularly monitor current developments in business and economics. I regularly read the Wall Street Journal, the New York Times, Fortune, Business Week, the Financial Times, various newsletters, and other publications with a general-investment orientation. I also read several publications geared specifically to the alcoholic beverage business.

19. Despite my transfer of the brokerage account to RLP, and the subsequent transfer of that account by RLP to RLC, I retained (through those entities) a significant potential for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

20. No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on the transaction receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges the contemplated tax consequences of the transaction.

21. Neither I nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by RLC of

Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

22. At all times, RLP, RLC, and I have held all of the assets and interests related to the Financial Plan, including, without limitation, the long position in Constellation stock, and the short position in Treasury Notes, as capital assets, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in these transactions participated for investment purposes and for his/her/its own account, not as agent, nominee, or "straw party" for another.

The undersigned is authorized to make the foregoing representations on behalf of RMC, RLP, and RLC. The foregoing representations also reflect my knowledge of the transactions discussed above. I understand that you will rely on the foregoing in connection with the issuance of the opinion I have requested with respect to the Financial Plan. You are hereby authorized to rely upon the representations made above without undertaking any independent verification of any such representation.

Very truly yours,

Richard E. Sands

APP-461



SANDS 9673

**Marilyn Sands**
c/o Constellation Brands
300 Willowbrook Office Park
Fairport, New York 14450-4222

December 28, 2001

Lewis, Rice & Fingersh, L.C.
500 North Broadway, Suite 2000
St. Louis, Missouri 63102

**Re: Representations with respect to the Financial Plan**[1]

Ladies and Gentlemen:

I submit this letter in connection with my request for your opinion with respect to certain federal income tax consequences of the Financial Plan. Based upon my personal knowledge or upon sources I deemed to be trustworthy and accurate—principally the advice of my sons—it was and is my understanding and belief that the following facts were true, correct, and complete in all respects at the beginning of the implementation of the Financial Plan, and that the following facts are and will continue to remain true, correct, and complete on the date as of which you issue your legal opinion and thereafter through the completion of the Financial Plan unless I provide written notice to you to the contrary.[2]

1. Over the years, I have relied completely on the business and investment advice of family members: initially the advice of my late husband Marvin and, since his death, the advice of my sons Richard and Robert. All references in the following paragraphs to my knowledge, my beliefs, and my decisions should be taken as references to my understanding of the knowledge and beliefs of my sons and decisions made based on the knowledge, beliefs, advice, and recommendations of my sons.

2. As of September 4, 2001, I was the beneficial owner[3] of 1,755,558 shares of Constellation class A common stock. If I had been the beneficial owner of those Constellation shares from January 1, 2001, through September 4, 2001, the aggregate

---

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by Marilyn Sands having the duration, purposes, and components discussed in this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "IRS" refers to the Internal Revenue Service, (iv) "RMC" refers to R,R,M&C Management Corporation, (v) "RLP" refers to R,R,M&C Group, L.P., (vi) "RLC" refers to R,R,M&C Partners, L.L.C., (vii) "Constellation" or "Company" refers to Constellation Brands, Inc., (viii) "CWC-I" refers to CWC Partnership-I, (ix) "MLRR" refers to M, L, R & R, (x) "PaineWebber" refers to UBS PaineWebber, Inc., and (xi) "Treasury Notes" refers to United States Treasury Notes.

[2] Accordingly, use of the past tense in these representations should be deemed also to refer to the present unless the text or context indicates otherwise.

[3] See Pre-Effective Amendment to Form S-3 of Constellation, filed with the Securities and Exchange Commission on September 3, 2001, at page S-45 with respect to computation of the number of shares reflected in text.

value of those holdings would have varied from a high of $80,773,223.58 to a low of $47,015,598.80, as shown by the following table:

| Stock | High close (01/01/01 to 09/04/01) | Total value of holdings at high | Low close (01/01/01 to 09/04/01) | Total value of holdings at low |
|---|---|---|---|---|
| STZ | $46.010 | $80,773,223.58 | $26.781 | $47,015,598.80 |

As these figures indicate, Constellation stock has been volatile, and it was one of my principal investment assets.

3. I have accumulated a significant investment in the Company's stock. The Sands family is the Company's largest shareholder. My sons have directed my investments, some through the use of partnerships, including investment activities through MLRR. It is my understanding that, over the years, MLRR has worked to maintain a well-diversified investment portfolio. Through MLRR, I have invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities, (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merge, acquisition, or disposition), and (iii) directional arbitrage (investing in long/and or short positions in a security). These activities have resulted in an unconventional portfolio that enhances return and decreases volatility, and the Financial Plan is, in part, an extension of the above described investment strategy.

4. On June 20, 2001, Constellation announced that it had filed a Shelf Registration Statement on Form S-3 with the Securities and Exchange Commission. That shelf registration allowed Constellation to issue various types of securities, including debt, Class A common stock and preferred stock, from time to time, up to an aggregate of $750 million. An officer of Constellation explained that the registration helped the Company maintain financial flexibility, provided efficient access to the capital markets, supported its growth, and permitted it to refinance debt when market conditions were favorable.

5. On September 4, 2001, Constellation announced that it had filed a pre-effective amendment to its $750 million Shelf Registration Statement to authorize the sale of up to 2.15 million shares of Constellation's Class A Common Stock beneficially owned by members of the Sands family (the "Secondary Offering"). Constellation's announcement explained that the sale of these shares would accomplish certain objectives of the Sands family, including portfolio diversification, estate planning and charitable giving. Nevertheless, Constellation explained, the Sands family would remain the largest shareholder of Constellation stock following the completion of the sale.

6. I had a substantial unrealized profit in the stock of Constellation that I held at the inception of the Financial Plan. I decided to sell some of my Constellation stock in the Secondary Offering for the reasons noted above. This decision was made before and independently of my decision to implement the Financial Plan. I would have sold those Constellation shares irrespective of whether I decided to effect the short sales of Treasury

Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

7. At the time of the SEC filings referenced above, I believed that the United States economy had slowed materially. I was aware that the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on seven separate occasions in 2001 by a total of 300 basis points. Thus, the Federal Funds Rate on September 4, 2001, was 3.50%, rather than 6.50%, the rate on January 1, 2001. Nevertheless, I believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. Although I viewed this prospect as both a concern and an opportunity, I believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

8. I deemed a short sale of Treasury Notes to be an attractive investment opportunity, presenting a reasonable prospect for a significant profit, even if it presented no tax benefits, particularly when considered in conjunction with my ownership of Constellation stock. Even so, I also recognized that there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately three percent (3%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can recognize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change. The short sale of Treasury Notes was a transaction independent of the sale of Constellation stock and had its own separate business purpose.

9. Other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

10. I adopted the Financial Plan to effect several objectives, including:

10.1. Identify my short-term, intermediate-term, and long-term investment objectives, and set priorities among competing objectives including wealth preservation, current income generation, principal growth, investment risk reduction, diversification, and opportunistic short-term investing.

10.2. Realize investment profits on dispositions of Constellation stock.

10.3. Increase the diversification of my investment holdings.

10.4. Provide greater liquidity in my investment portfolio.

10.5. Realize investment profits by taking one or more short positions in Treasury Notes.

10.6. Identify my wealth-transfer objectives, determine in what ways and over what period I seek to achieve them, and implement a plan to realize those objectives.

10.7. Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock.

10.8. Enhance the privacy and confidentiality of my family's financial information and, correlatively, reduce risks to our personal safety and security.

11. The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of my investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale and the disposition of Constellation stock, the enhancement of my ability to effect my wealth-transfer objectives, the improvement to my family's privacy and personal security, and the anticipated tax benefits, all contributed to my determination to adopt the Financial Plan.

12. As discussed earlier, I have invested with my sons using limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss both in my investment activities and in my business dealings, and my sons have caused several entities to be formed to effect the Financial Plan over the next few years.

13. I have implemented and intend to continue to implement each element of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. To effect the purposes of the Financial Plan set forth above, the contemplated elements of the Financial Plan are:

13.1. Incorporation of RMC on August 23, 2001, the issuance to each of my sons, Richard Sands and Robert Sands, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to my sons, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by my sons to RMC of 1,001 shares of Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001;

13.2. Formation of RLP on August 23, 2001;

13.3. The opening of a brokerage account at PaineWebber by me on August 21, 2001, the transfer of $725,000 cash by me to the brokerage account at PaineWebber on August 23, 2001, and the execution of a short sale of Treasury Notes on August 23, 2001;

13.4. To effect this short sale, I borrowed Treasury Notes from PaineWebber, thereby incurring an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds

of the short sale in my account pending my acquisition and delivery to PaineWebber of Treasury Notes to close the transaction. Specifically, the Treasury Notes were in the total face amount of $23,000,000 due 11/15/2003 at 4.25%. The net proceeds of the short sales totaled $23,451,562.50, comprising $23,183,281.25 of principal and $268,281.25 of accrued interest;

13.5. Richard Sands, Robert Sands, CWC-I, and I contributed assets to RLP on August 28, 2001, each in exchange for a 24.975% limited partner interest; and RMC contributed assets to RLP on August 28, 2001, in exchange for a 0.1% general partner interest. More specifically, I transferred the PaineWebber brokerage account noted above, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by each of Richard Sands and Robert Sands consisted of a PaineWebber brokerage account that contained assets essentially identical to those held in my PaineWebber account as noted above, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by CWC-I consisted of a PaineWebber brokerage account holding the proceeds of a short sale on August 23, 2001, of $15,000,000 of Treasury Notes dated 11/15/98 with a coupon rate of 4.25%, due 11/15/03, together with 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by RMC to RLP consisted of 2,002 shares of Class A common stock of Constellation, and $3,403.40 of cash;

13.6. Formation of RLC on August 23, 2001;

13.7. RLP contributed assets to RLC on August 31, 2001, in exchange for a 99.7163% membership interest; and Gloria S. Robinson ("Robinson") contributed assets to RLC on August 10, 2001, in exchange for a 0.2837% membership interest. More specifically, the assets transferred by RLP to RLC consisted of 906,977 shares of Class A common stock of Constellation, and PaineWebber brokerage accounts holding 1,095,025 shares of Class A common stock of Constellation and the proceeds of open short sales of Treasury Notes described above. The assets transferred by Robinson to RLC consisted of cash in the amount of $250,000;

13.8. On September 6, 2001, RLC closed the short sale of Treasury Notes at a cost of $86,073,750, comprising $84,958,125 of principal and $1,115,625 of accrued interest;

13.9. On October 1, 2001, RLC sold all 2,002,002 shares of Class A Stock it owned in a registered underwritten public offering at a public offering price of $38.75 per share; and

13.10. At such intervals and in such increments as market conditions indicate could be profitable and appropriate, RLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

14. In addition to the elements of the Financial Plan noted above, the following events have occurred:

14.1. On September 10, 2001, after the closing of the short sale of Treasury Notes at a loss, RLP and Robinson agreed to, and closed, a purchase by RLP of the membership interest of Robinson in RLC for a cash purchase price of $227,278.

15. No part of the property held by RLC at the time of RLP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of RLC, as those terms are defined in Code section 751 and its related regulations;

16. My sons have indicated to me that, as officers and directors of Constellation, they are accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently verifying such data. Furthermore, they are familiar with and comfortable taking business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and upon which they are relying in recommending that I pursue the Financial Plan.

17. Over the years, in reliance upon the advice of my sons, I have invested in publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States treasury obligations, municipal obligations, mutual funds, and stock options. I have made those investments through a variety of entities, including general partnerships, limited partnerships, and limited liability companies. With my sons as general partners or managers, it is my understanding that the entities in which I have invested have used a variety of investment techniques, including short sales, short sales against the box, hedging transactions, and margin accounts.

18. Despite my transfer of the brokerage account to RLP, and the subsequent transfer of that account by RLP to RLC, I retained (through those entities) a significant potential for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

19. No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on the transaction receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges the contemplated tax consequences of the transaction.

20. Neither I nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by RLC of Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have

substantially the same effect as a transaction described in any of the preceding subparagraphs.

21. At all times, I have held all of the assets and interests related to the Financial Plan, including, without limitation, the long position in Constellation stock, and the short position in Treasury Notes, as capital assets, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in these transactions participated for investment purposes and for his/her/its own account, not as agent, nominee, or "straw party" for another.

The foregoing representations also reflect my knowledge of the transactions discussed above. I understand that you will rely on the foregoing in connection with the issuance of the opinion I have requested with respect to the Financial Plan. You are hereby authorized to rely upon the representations made above without undertaking any independent verification of any such representation.

Very truly yours,

Marilyn Sands

Marilyn Sands

**Andrew Stern and Marilyn Sands,**
**Trust F/B/O Abigail Stern U/W Laurie Sands**
c/o Constellation Brands
300 Willowbrook Office Park
Fairport, New York 14450-4222

December 28, 2001

Lewis, Rice & Fingersh, L.C.
500 North Broadway, Suite 2000
St. Louis, Missouri 63102

**Re: Representations with respect to the Financial Plan**[1]

Ladies and Gentlemen:

On behalf of the Trust, we submit this letter in connection with our request for your opinion with respect to certain federal income tax consequences of the Financial Plan. Based upon the personal knowledge of the undersigned or upon sources we deem to be trustworthy and accurate, it was and is our understanding and belief that the following facts were true, correct, and complete in all respects at the beginning of the implementation of the Financial Plan, and that the following facts are and will continue to remain true, correct, and complete on the date as of which you issue your legal opinion and thereafter through the completion of the Financial Plan unless we provide written notice to you to the contrary.[2] All references in this letter to the undersigned, including without limitation, all uses of the words "we" and "our," refer to each of the undersigned in his or her capacity as a Trustee unless the contrary is stated expressly.

1. The assets of the Trust consist of a 49.5% Class 2 Partners interest in CWC-I and a 49.5% Class 2 Partners interest in CWC-II. CWC-I and CWC-II are general partnerships formed under the laws of the State of New York. The Managing Partners of CWC-I and CWC-II are Richard Sands and Robert Sands. The Managing Partners have the discretion to make distributions of available cash to Class 2 Partners in proportion to the balances in a Class 2 Partners' capital account. The principal investment of both CWC-I and CWC-II is shares of Constellation common stock.

---

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by the Trust F/B/O Abigail Stern U/W Laurie Sands ("Trust") having the duration, purposes, and components discussed in this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "IRS" refers to the Internal Revenue Service, (iv) "RMC" refers to R,R,M&C Management Corporation, (v) "RLP" refers to R,R,M&C Group, L.P., (vi) "RLC" refers to R,R,M&C Partners, L.L.C., (vii) "Constellation" or "Company" refers to Constellation Brands, Inc., (viii) "CWC-I" refers to CWC Partnership-I, (ix) "CWC-II" refers to CWC Partnership-II, (x) "MLRR" refers to M, L, R & R, (xi) "PaineWebber" refers to UBS PaineWebber, Inc., and (xii) "Treasury Notes" refers to United States Treasury Notes.

[2] Accordingly, use of the past tense in these representations should be deemed also to refer to the present unless the text or context indicates otherwise.

2. As of September 4, 2001, CWC-I was the beneficial owner[3] of 766,092 shares of Constellation class A common stock. If CWC-I had been the beneficial owner of those Constellation shares from January 1, 2001, through September 4, 2001, the aggregate value of those holdings would have varied from a high of $35,247,892.92 to a low of $20,516,709.85, as shown by the following table:

| Stock | High close (01/01/01 to 09/04/01) | Total value of holdings at high | Low close (01/01/01 to 09/04/01) | Total value of holdings at low |
|---|---|---|---|---|
| STZ | $46.010 | $35,247,892.92 | $26.781 | $20,516,709.85 |

As these figures indicate, Constellation stock has been volatile, and it was CWC-I's principal investment asset.

3. Over the years, we have both consulted with Richard Sands and Robert Sands, in their capacity as Managing Partners of CWC-I, in connection with the investment of the assets of CWC-I and relied on their knowledge, advice, and investment decisions. All references in the following paragraphs to our knowledge, our beliefs, and our decisions should be taken as references to our understanding of the knowledge and beliefs of the Managing Partners of CWC-I and decisions we made based on the our understanding of the knowledge, beliefs, advice, and recommendations of the Managing Partners of CWC-I.

4. The Sands family is the Company's largest shareholder. Members of the Sands family and the Trust, through its interest in CWC-I, conduct many collective investment activities through MLRR, of which CWC-I is a general partner. Over the years, MLRR has worked to maintain a well-diversified investment portfolio. Through the interest of CWC-I in MLRR, the Trust has invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities, (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merge, acquisition, or disposition), and (iii) directional arbitrage (investing in long/and or short positions in a security). These activities have resulted in an unconventional portfolio that enhances return and decreases volatility, and the Financial Plan is, in part, an extension of the above described investment strategy.

5. On June 20, 2001, Constellation announced that it had filed a Shelf Registration Statement on Form S-3 with the Securities and Exchange Commission. That shelf registration allowed Constellation to issue various types of securities, including debt, Class A common stock and preferred stock, from time to time, up to an aggregate of $750 million. An officer of Constellation explained that the registration helped the Company maintain financial flexibility, provided efficient access to the capital markets, supported its growth, and permitted it to refinance debt when market conditions were favorable.

6. On September 4, 2001, Constellation announced that it had filed a pre-effective amendment to its $750 million Shelf Registration Statement to authorize the sale of up to

[3] See Pre-Effective Amendment to Form S-3 of Constellation, filed with the Securities and Exchange Commission on September 3, 2001, at page S-45 with respect to computation of the number of shares reflected in text.

2.15 million shares of Constellation's Class A Common Stock beneficially owned by members of the Sands family (the "Secondary Offering"). Constellation's announcement explained that the sale of these shares would accomplish certain objectives of the Sands family, including portfolio diversification, estate planning and charitable giving. Nevertheless, Constellation explained, the Sands family would remain the largest shareholder of Constellation stock following the completion of the sale.

7. The Trust, through its interest in CWC-I, had a substantial unrealized profit in the stock of Constellation that CWC-I held at the inception of the Financial Plan. Richard Sands and Roberts Sands, as Managing Partners of CWC-I, indicated to us that they decided to sell some of CWC-I's Constellation stock in the Secondary Offering for the reasons noted above. Richard Sands and Robert Sands have advised us that they decided to do so before and independently of us deciding to implement the Financial Plan. Richard Sands and Robert Sands also advised us that they would have sold those Constellation shares irrespective of whether we decided to effect the short sales of Treasury Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

8. At the time of the SEC filings referenced above, we believed the United States economy had slowed materially. At that time, the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on seven separate occasions in 2001 by a total of 300 basis points. Thus, the Federal Funds Rate on September 4, 2001, was 3.50%, rather than 6.50%, the rate on January 1, 2001. Nevertheless, we believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. Although we viewed this prospect as both a concern and an opportunity, we believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

9. We deemed a short sale of Treasury Notes to be an attractive investment opportunity, presenting a reasonable prospect for a significant profit, even if it presented no tax benefits, particularly when considered in conjunction with the Trust's beneficial ownership of Constellation stock through its interest in CWC-I. Even so, there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately five percent (5%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can recognize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change. The short sale of Treasury Notes was a transaction independent of the sale of Constellation stock and had its own separate business purpose.

10. Other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

11. The significant objectives of the Financial Plan were and are:

11.1. Realize investment profits by taking one or more short positions in Treasury Notes or similar investments.

11.2. Increase the diversification of the Trust's investment holdings.

11.3. Provide greater liquidity in the Trust's investment portfolio.

11.4. Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock.

11.5. Enhance the privacy and confidentiality of the Sands family's financial information and, correlatively, reduce risks to the personal safety and security of beneficiaries of the Trust.

12. The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of the Trust's investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale and the disposition of Constellation stock, the improvement to the Sands family's privacy and personal security, and the anticipated tax benefits, all contributed to our determination to adopt the Financial Plan.

13. The Trust has used limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss in the Trust's investment activities, and Richard Sands and Roberts Sands have caused several entities to be formed to effect the Financial Plan for the Trust over the next few years.

14. We have implemented and intend to continue to implement each element of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. To effect the purposes of the Financial Plan set forth above, the contemplated elements of the Financial Plan are:

14.1. Incorporation of RMC on August 23, 2001, the issuance to each of Richard Sands and Robert Sands, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to each of Richard Sands and Robert Sands, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by each of Richard Sands and Robert Sands to RMC of 1,001 shares of Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001;

14.2. Formation of RLP on August 23, 2001;

14.3. The opening of a brokerage account at PaineWebber by the Trust on August 21, 2001, the transfer of $362,500 cash by the Trust to the brokerage account at PaineWebber on August 23, 2001, and the execution of a short sale of Treasury Notes on August 23, 2001;

14.4. To effect this short sale, the Trust borrowed Treasury Notes from PaineWebber, thereby incurring an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds of the short sale in the Trust's account pending the Trust's acquisition and delivery to PaineWebber of Treasury Notes to close the transaction. Specifically, the Treasury Notes were in the total face amount of $7,500,000 due 11/15/2003 at 4.25%. The net proceeds of the short sales totaled $7,647,248.65, comprising $7,559,765.63 of principal and $87,483.02 of accrued interest;

14.5. The Trust contributed its PaineWebber account noted above to CWC-I;

14.6. Robert Sands, Richard Sands, Marilyn Sands, and CWC-I contributed assets to RLP on August 28, 2001, each in exchange for a 24.975% limited partner interest; and RMC contributed assets to RLP on August 28, 2001, in exchange for a 0.1% general partner interest. More specifically, the assets transferred by each of Robert Sands, Richard Sands and Marilyn Sands consisted of a PaineWebber brokerage account that contained the proceeds of a short sale on August 23, 2001, of $23,000,000 of Treasury Notes dated 11/15/98 with a coupon rate of 4.25%, due 11/15/03, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by CWC-I consisted of 500,000 shares of Class A common stock of Constellation, $125,000 of cash, and the Trust's PaineWebber brokerage account noted above, which was also holding the proceeds of another short sale on August 23, 2001, of $7,500,000 of Treasury Notes dated 11/15/98 with a coupon rate of 4.25%, due 11/15/03. The assets transferred by RMC to RLP consisted of 2,002 shares of Class A common stock of Constellation, and $3,403.40 of cash;

14.7. Formation of RLC on August 23, 2001;

14.8. RLP contributed assets to RLC on August 31, 2001, in exchange for a 99.7163% membership interest; and Gloria S. Robinson ("Robinson") contributed assets to RLC on August 10, 2001, in exchange for a 0.2837% membership interest. More specifically, the assets transferred by RLP to RLC consisted of 906,977 shares of Class A common stock of Constellation, and PaineWebber brokerage accounts holding 1,095,025 shares of Class A common stock of Constellation and the proceeds of open short sales of Treasury Notes described above. The assets transferred by Robinson to RLC consisted of cash in the amount of $250,000;

14.9. On September 6, 2001, RLC closed the short sale of Treasury Notes at a cost of $86,073,750, comprising $84,958,125 of principal and $1,115,625 of accrued interest;

14.10. On October 1, 2001, RLC sold all 2,002,002 shares of Class A Stock it owned in a registered underwritten public offering at a public offering price of $38.75 per share; and

14.11. At such intervals and in such increments as market conditions indicate could be profitable and appropriate, RLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

15. In addition to the elements of the Financial Plan noted above, the following events have occurred:

15.1. On September 10, 2001, after the closing of the short sale of Treasury Notes at a loss, RLP and Robinson agreed to, and closed, a purchase by RLP of the membership interest of Robinson in RLC for a cash purchase price of $227,278.

16. No part of the property held by RLC at the time of RLP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of RLC, as those terms are defined in Code section 751 and its related regulations;

17. The Managing Partners of CWC-I have indicated to us that, as officers and directors of Constellation, they are accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently verifying such data. Furthermore, they are familiar with and comfortable taking business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and upon they are relying in recommending that we pursue the Financial Plan.

18. Over the years, we have both relied on advice of the Managing Partners of CWC-I and have made independent investment decisions. Through CWC-I, the Trust has invested in publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States treasury obligations, municipal obligations, mutual funds, and stock options. Through CWC-I, the Trust has used a variety of entities in my investments, including general partnerships, limited partnerships, and limited liability companies, and the Trust has also used a variety of investment techniques, including short sales, short sales against the box, hedging transactions, and margin accounts.

19. Despite the Trust's transfer of the brokerage account to CWC-I, and the subsequent transfer of that account by CWC-I to RLP and RLP to RLC, the Trust retained (through those entities) a significant potential for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

20. No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on the transaction receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges the contemplated tax consequences of the transaction.

21. Neither the Trust nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by RLC of Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

22. At all times, CWC-I, RLP, RLC, and the Trust have held all of the assets and interests related to the Financial Plan, including, without limitation, the long position in Constellation stock, and the short position in Treasury Notes, as capital assets, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in these transactions participated for investment purposes and for his/her/its own account, not as agent, nominee, or "straw party" for another.

The undersigned are authorized to make the foregoing representations on behalf of the Trust. The foregoing representations also reflect our knowledge of the transactions discussed above. We understand that you will rely on the foregoing in connection with the issuance of the opinion we have requested with respect to the Financial Plan. You are hereby authorized to rely upon the representations made above without undertaking any independent verification of any such representation.

Very truly yours,

TRUST F/B/O ABIGAIL STERN U/W LAURIE SANDS

By: ______________________
Andrew Stern, Trustee

By: ______________________
Marilyn Sands, Trustee

**Andrew Stern and Marilyn Sands,**
**Trust F/B/O Zachary Stern U/W Laurie Sands**
c/o Constellation Brands
300 Willowbrook Office Park
Fairport, New York 14450-4222

December 28, 2001

Lewis, Rice & Fingersh, L.C.
500 North Broadway, Suite 2000
St. Louis, Missouri 63102

**Re: Representations with respect to the Financial Plan**[1]

Ladies and Gentlemen:

On behalf of the Trust, we submit this letter in connection with our request for your opinion with respect to certain federal income tax consequences of the Financial Plan. Based upon the personal knowledge of the undersigned or upon sources we deem to be trustworthy and accurate, it was and is our understanding and belief that the following facts were true, correct, and complete in all respects at the beginning of the implementation of the Financial Plan, and that the following facts are and will continue to remain true, correct, and complete on the date as of which you issue your legal opinion and thereafter through the completion of the Financial Plan unless we provide written notice to you to the contrary.[2] All references in this letter to the undersigned, including without limitation all uses of the words "we" and "our," refer to each of the undersigned in his or her capacity as a Trustee unless the contrary is stated expressly.

1. The assets of the Trust consist of a 49.5% Class 2 Partners interest in CWC-I and a 49.5% Class 2 Partners interest in CWC-II. CWC-I and CWC-II are general partnerships formed under the laws of the State of New York. The Managing Partners of CWC-I and CWC-II are Richard Sands and Robert Sands. The Managing Partners have the discretion to make distributions of available cash to Class 2 Partners in proportion to the balances in a Class 2 Partners' capital account. The principal investment of both CWC-I and CWC-II is shares of Constellation common stock.

---

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by the Trust F/B/O Zachary Stern U/W Laurie Sands ("Trust") having the duration, purposes, and components discussed in this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "IRS" refers to the Internal Revenue Service, (iv) "RMC" refers to R,R,M&C Management Corporation, (v) "RLP" refers to R,R,M&C Group, L.P., (vi) "RLC" refers to R,R,M&C Partners, L.L.C., (vii) "Constellation" or "Company" refers to Constellation Brands, Inc., (viii) "CWC-I" refers to CWC Partnership-I, (ix) "CWC-II" refers to CWC Partnership-II, (x) "MLRR" refers to M, L, R & R, (xi) "PaineWebber" refers to UBS PaineWebber, Inc., and (xii) "Treasury Notes" refers to United States Treasury Notes.

[2] Accordingly, use of the past tense in these representations should be deemed also to refer to the present unless the text or context indicates otherwise.

2. As of September 4, 2001, CWC-I was the beneficial owner[3] of 766,092 shares of Constellation class A common stock. If CWC-I had been the beneficial owner of those Constellation shares from January 1, 2001, through September 4, 2001, the aggregate value of those holdings would have varied from a high of $35,247,892.92 to a low of $20,516,709.85, as shown by the following table:

| Stock | High close (01/01/01 to 09/04/01) | Total value of holdings at high | Low close (01/01/01 to 09/04/01) | Total value of holdings at low |
|---|---|---|---|---|
| STZ | $46.010 | $35,247,892.92 | $26.781 | $20,516,709.85 |

As these figures indicate, Constellation stock has been volatile, and it was CWC-I's principal investment asset.

3. Over the years, we have both consulted with Richard Sands and Robert Sands, in their capacity as Managing Partners of CWC-I, in connection with the investment of the assets of CWC-I and relied on their knowledge, advice, and investment decisions. All references in the following paragraphs to our knowledge, our beliefs, and our decisions should be taken as references to our understanding of the knowledge and beliefs of the Managing Partners of CWC-I and decisions we made based on the our understanding of the knowledge, beliefs, advice, and recommendations of the Managing Partners of CWC-I.

4. The Sands family is the Company's largest shareholder. Members of the Sands family and the Trust, through its interest in CWC-I, conduct many collective investment activities through MLRR, of which CWC-I is a general partner. Over the years, MLRR has worked to maintain a well-diversified investment portfolio. Through the interest of CWC-I in MLRR, the Trust has invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities, (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merge, acquisition, or disposition), and (iii) directional arbitrage (investing in long/and or short positions in a security). These activities have resulted in an unconventional portfolio that enhances return and decreases volatility, and the Financial Plan is, in part, an extension of the above described investment strategy.

5. On June 20, 2001, Constellation announced that it had filed a Shelf Registration Statement on Form S-3 with the Securities and Exchange Commission. That shelf registration allowed Constellation to issue various types of securities, including debt, Class A common stock and preferred stock, from time to time, up to an aggregate of $750 million. An officer of Constellation explained that the registration helped the Company maintain financial flexibility, provided efficient access to the capital markets, supported its growth, and permitted it to refinance debt when market conditions were favorable.

6. On September 4, 2001, Constellation announced that it had filed a pre-effective amendment to its $750 million Shelf Registration Statement to authorize the sale of up to

[3] See Pre-Effective Amendment to Form S-3 of Constellation, filed with the Securities and Exchange Commission on September 3, 2001, at page S-45 with respect to computation of the number of shares reflected in text.

2.15 million shares of Constellation's Class A Common Stock beneficially owned by members of the Sands family (the "Secondary Offering"). Constellation's announcement explained that the sale of these shares would accomplish certain objectives of the Sands family, including portfolio diversification, estate planning and charitable giving. Nevertheless, Constellation explained, the Sands family would remain the largest shareholder of Constellation stock following the completion of the sale.

7. The Trust, through its interest in CWC-I, had a substantial unrealized profit in the stock of Constellation that CWC-I held at the inception of the Financial Plan. Richard Sands and Roberts Sands, as Managing Partners of CWC-I, indicated to us that they decided to sell some of CWC-I's Constellation stock in the Secondary Offering for the reasons noted above. Richard Sands and Robert Sands have advised us that they decided to do so before and independently of us deciding to implement the Financial Plan. Richard Sands and Robert Sands also advised us that they would have sold those Constellation shares irrespective of whether we decided to effect the short sales of Treasury Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

8. At the time of the SEC filings referenced above, we believed the United States economy had slowed materially. At that time, the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on seven separate occasions in 2001 by a total of 300 basis points. Thus, the Federal Funds Rate on September 4, 2001, was 3.50%, rather than 6.50%, the rate on January 1, 2001. Nevertheless, we believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. Although we viewed this prospect as both a concern and an opportunity, we believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

9. We deemed a short sale of Treasury Notes to be an attractive investment opportunity, presenting a reasonable prospect for a significant profit, even if it presented no tax benefits, particularly when considered in conjunction with the Trust's beneficial ownership of Constellation stock through its interest in CWC-I. Even so, there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately five percent (5%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can recognize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change. The short sale of Treasury Notes was a transaction independent of the sale of Constellation stock and had its own separate business purpose.

10. Other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

11. The significant objectives of the Financial Plan were and are:

11.1. Realize investment profits by taking one or more short positions in Treasury Notes or similar investments.

11.2. Increase the diversification of the Trust's investment holdings.

11.3. Provide greater liquidity in the Trust's investment portfolio.

11.4. Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock.

11.5. Enhance the privacy and confidentiality of the Sands family's financial information and, correlatively, reduce risks to the personal safety and security of beneficiaries of the Trust.

12. The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of the Trust's investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale and the disposition of Constellation stock, the improvement to the Sands family's privacy and personal security, and the anticipated tax benefits, all contributed to our determination to adopt the Financial Plan.

13. The Trust has used limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss in the Trust's investment activities, and Richard Sands and Roberts Sands have caused several entities to be formed to effect the Financial Plan for the Trust over the next few years.

14. We have implemented and intend to continue to implement each element of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. To effect the purposes of the Financial Plan set forth above, the contemplated elements of the Financial Plan are:

14.1. Incorporation of RMC on August 23, 2001, the issuance to each of Richard Sands and Robert Sands, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to each of Richard Sands and Robert Sands, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by each of Richard Sands and Robert Sands to RMC of 1,001 shares of Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001;

14.2. Formation of RLP on August 23, 2001;

APP-479



SANDS 9988

14.3. The opening of a brokerage account at PaineWebber by the Trust on August 21, 2001, the transfer of $362,500 cash by the Trust to the brokerage account at PaineWebber on August 23, 2001, and the execution of a short sale of Treasury Notes on August 23, 2001;

14.4. To effect this short sale, the Trust borrowed Treasury Notes from PaineWebber, thereby incurring an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds of the short sale in the Trust's account pending the Trust's acquisition and delivery to PaineWebber of Treasury Notes to close the transaction. Specifically, the Treasury Notes were in the total face amount of $7,500,000 due 11/15/2003 at 4.25%. The net proceeds of the short sales totaled $7,647,248.65, comprising $7,559,765.63 of principal and $87,483.02 of accrued interest;

14.5. The Trust contributed its PaineWebber account noted above to CWC-I;

14.6. Robert Sands, Richard Sands, Marilyn Sands, and CWC-I contributed assets to RLP on August 28, 2001, each in exchange for a 24.975% limited partner interest; and RMC contributed assets to RLP on August 28, 2001, in exchange for a 0.1% general partner interest. More specifically, the assets transferred by each of Robert Sands, Richard Sands and Marilyn Sands consisted of a PaineWebber brokerage account that contained the proceeds of a short sale on August 23, 2001, of $23,000,000 of Treasury Notes dated 11/15/98 with a coupon rate of 4.25%, due 11/15/03, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by CWC-I consisted of 500,000 shares of Class A common stock of Constellation, $125,000 of cash, and the Trust's PaineWebber brokerage account noted above, which was also holding the proceeds of another short sale on August 23, 2001, of $7,500,000 of Treasury Notes dated 11/15/98 with a coupon rate of 4.25%, due 11/15/03. The assets transferred by RMC to RLP consisted of 2,002 shares of Class A common stock of Constellation, and $3,403.40 of cash;

14.7. Formation of RLC on August 23, 2001;

14.8. RLP contributed assets to RLC on August 31, 2001, in exchange for a 99.7163% membership interest; and Gloria S. Robinson ("Robinson") contributed assets to RLC on August 10, 2001, in exchange for a 0.2837% membership interest. More specifically, the assets transferred by RLP to RLC consisted of 906,977 shares of Class A common stock of Constellation, and PaineWebber brokerage accounts holding 1,095,025 shares of Class A common stock of Constellation and the proceeds of open short sales of Treasury Notes described above. The assets transferred by Robinson to RLC consisted of cash in the amount of $250,000;

14.9. On September 6, 2001, RLC closed the short sale of Treasury Notes at a cost of $86,073,750, comprising $84,958,125 of principal and $1,115,625 of accrued interest;

14.10. On October 1, 2001, RLC sold all 2,002,002 shares of Class A Stock it owned in a registered underwritten public offering at a public offering price of $38.75 per share; and

14.11. At such intervals and in such increments as market conditions indicate could be profitable and appropriate, RLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

15. In addition to the elements of the Financial Plan noted above, the following events have occurred:

15.1. On September 10, 2001, after the closing of the short sale of Treasury Notes at a loss, RLP and Robinson agreed to, and closed, a purchase by RLP of the membership interest of Robinson in RLC for a cash purchase price of $227,278.

16. No part of the property held by RLC at the time of RLP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of RLC, as those terms are defined in Code section 751 and its related regulations;

17. The Managing Partners of CWC-I have indicated to us that, as officers and directors of Constellation, they are accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently verifying such data. Furthermore, they are familiar with and comfortable taking business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and upon they are relying in recommending that we pursue the Financial Plan.

18. Over the years, we have both relied on advice of the Managing Partners of CWC-I and have made independent investment decisions. Through CWC-I, the Trust has invested in publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States treasury obligations, municipal obligations, mutual funds, and stock options. Through CWC-I, the Trust has used a variety of entities in my investments, including general partnerships, limited partnerships, and limited liability companies, and the Trust has also used a variety of investment techniques, including short sales, short sales against the box, hedging transactions, and margin accounts.

19. Despite the Trust's transfer of the brokerage account to CWC-I, and the subsequent transfer of that account by CWC-I to RLP and RLP to RLC, the Trust retained (through those entities) a significant potential for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

20. No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on the transaction receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges the contemplated tax consequences of the transaction.

21. Neither the Trust nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by RLC of Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

22. At all times, CWC-I, RLP, RLC, and the Trust have held all of the assets and interests related to the Financial Plan, including, without limitation, the long position in Constellation stock, and the short position in Treasury Notes, as capital assets, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in these transactions participated for investment purposes and for his/her/its own account, not as agent, nominee, or "straw party" for another.

The undersigned are authorized to make the foregoing representations on behalf of the Trust. The foregoing representations also reflect our knowledge of the transactions discussed above. We understand that you will rely on the foregoing in connection with the issuance of the opinion we have requested with respect to the Financial Plan. You are hereby authorized to rely upon the representations made above without undertaking any independent verification of any such representation.

Very truly yours,

TRUST F/B/O ZACHARY STERN U/W LAURIE SANDS

By: ______________________
Andrew Stern, Trustee

By: ______________________
Marilyn Sands, Trustee