# LEWIS, RICE & FINGERSH, L.C.

ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM

TEL (314) 444-7600

FAX (314) 241-6056


December 28, 2001

Mr. Robert Sands
c/o Constellation Brands
300 Willowbrook Office Park
Fairport, New York 14450-4222

PLAINTIFF'S EXHIBIT 26

PENGAD 800-631-6989

Re: Federal income tax consequences of the Financial Plan[1]

Dear Mr. Sands:

You have requested our opinion with respect to certain Federal income tax consequences of the Financial Plan, as described in the section entitled "Facts."

## FACTS

Mr. Sands is Group President and a member of the Board of Directors of Constellation. He first joined Constellation in 1986 as General Counsel. He was made Vice President and appointed to the Board of Directors in June 1990. After overseeing numerous acquisitions, he was appointed Executive Vice President and General Counsel in October 1993, overseeing the expansion of Constellation's legal department. In 1998, he was appointed to the role of Chief Executive Officer International after spearheading the acquisition of Constellation's United Kingdom division. He was named Group President in early 2000, and assumed the management of the Canandaigua Wine Company and Matthew Clark divisions. He is a graduate of the Skidmore College in Saratoga Springs, New York. He hold a J.D. from Pace University School of Law in New York City, New York. During his employment by Constellation, Mr. Sands has accumulated a significant investment in the Company's stock. The Sands family is the Company's largest shareholder.

APP-483

[1] Each reference in this letter to (i) the "Financial Plan" relates to that plan implemented by Mr. Robert Sands ("Mr. Sands") having the duration, purposes, and components discussed in the "Facts" section of this letter, (ii) "Code" relates to the referenced section of the Internal Revenue Code of 1986, as amended, (iii) "Reg." relates to the referenced section of the regulations issued under the Code as set forth in Title 26 of the Code of Federal Regulations, (iv) "IRS" refers to the Internal Revenue Service, (v) "RMC" refers to R,R,M&C Management Corporation, (vi) "RLP" refers to R,R,M&C Group, L.P., (vii) "RLC" refers to R,R,M&C Partners, L.L.C., (viii) "Constellation" or "Company" refers to Constellation Brands, Inc., (ix) CWC-I refers to CWC Partnership-I, (x) "MLRR" refers to M, L, R & R, a general partnership (xi) "PaineWebber" refers to UBS PaineWebber, Inc., and (xii) "Treasury Notes" refers to United States Treasury Notes. Although this letter is directed to Mr. Sands, he is generally referred to in the third person herein to assure clarity of reference.

Over the years, Mr. Sands has both relied on advice from investment advisors and has made independent investment decisions. He has invested in publicly traded stock, stock that is not traded publicly, corporate bonds, convertible bonds, United States treasury obligations, municipal obligations, mutual funds, and compensatory and non-compensatory stock options. He has used a variety of entities in his investments, including general partnerships, limited partnerships, and limited liability companies. He has used a variety of investment techniques, including short sales, short sales against the box, hedging transactions, and margin accounts. In managing the Company and in making his personal investments, he has monitored a variety of economic indicators including interest rates, housing starts, the Consumer Price Index, United States Treasury obligation yields, developed country market returns, emerging country market returns and currency values as related to the United States dollar.

Mr. Sands regularly monitors current developments in business and economics. He regularly reads the Wall Street Journal, the New York Times, Fortune, Business Week, the Financial Times, various newsletters, and other publications with a general-investment orientation. He also reads several publications geared specifically to the alcoholic beverage business.

Mr. Sands and members of his family conduct many collective investment activities through MLRR. Over the years, MLRR has worked to maintain a well-diversified investment portfolio. Mr. Sands, through MLRR, has invested in a number of hedge funds and engaged in various forms of arbitrage known as (i) statistical arbitrage (taking advantage of temporary anomalies in the pricing of certain related securities, (ii) event driven arbitrage (taking advantage of anomalies relating to a specific event, such as a bankruptcy, or a merger, acquisition, or disposition), and (iii) directional arbitrage (investing in long/and or short positions in a security). These activities have resulted in an unconventional portfolio that, Mr. Sands believes, enhances return and decreases volatility. The Financial Plan is, in part, an extension of the above described investment strategy.

On June 20, 2001, Constellation announced that it had filed a Shelf Registration Statement on Form S-3 with the Securities and Exchange Commission. That shelf registration allowed Constellation to issue various types of securities, including debt, Class A common stock and preferred stock, from time to time, up to an aggregate of $750 million. An officer of Constellation explained that the registration helped the Company maintain financial flexibility, provided efficient access to the capital markets, supported its growth, and permitted it to refinance debt when market conditions were favorable.

On September 4, 2001, Constellation announced that it had filed a pre-effective amendment to its $750 million Shelf Registration Statement to authorize the sale of up to 2.15 million shares of Constellation's Class A Common Stock beneficially owned by members of the Sands family (the "Secondary Offering"). Constellation's announcement explained that the sale of these shares would accomplish certain objectives of the Sands family, including portfolio diversification, estate planning and charitable giving. Nevertheless, Constellation explained, the

LEWIS, RICE & FINGERSH, L.C.



Sands family would remain the largest shareholder of Constellation stock following the completion of the sale.

Mr. Sands had a substantial unrealized profit in the stock of Constellation that he held at the inception of the Financial Plan. Mr. Sands decided to sell some of his Constellation stock in the Secondary Offering for the reasons noted above. He decided to do so before and independently of deciding to implement the Financial Plan. He would have sold those Constellation shares irrespective of whether he decided to effect the short sales of Treasury Notes discussed below, and without regard to the tax consequences of either the disposition of Constellation stock or the short sales of Treasury Notes.

As of September 4, 2001, Mr. Sands was the beneficial owner[2] of 1,724,654 shares of Constellation class A common stock. If he had been the beneficial owner of those Constellation shares from January 1, 2001, through September 4, 2001, the aggregate value of those holdings would have varied from a high of $79,351,331 to a low of $46,187,959, as shown by the following table:

| Stock symbol | High close (01/01/01 to 09/04/01) | Total value of holdings at high | Low close (01/01/01 to to 09/04/01) | Total value of holdings at low |
|---|---|---|---|---|
| STZ | $46.010 | $79,351,331 | $26.781 | $46,187,959 |

As these figures indicate, Constellation stock has been volatile, and it was one of Mr. Sands' principal investment assets.

At the time of the SEC filings referenced above, Mr. Sands believed that the United States economy had slowed materially. At that time, Mr. Sands was aware that the Open Market Committee of the Federal Reserve Board had reversed its 1999-2000 course of six successive increases (totaling 175 basis points over two years) in the Federal Funds Rate, and had reduced the Federal Funds Rate on seven separate occasions in 2001 by a total of 300 basis points. Thus, the Federal Funds Rate on September 4, 2001, was 3.50%, rather than 6.50%, the rate on January 1, 2001. Nevertheless, Mr. Sands believed that, in the very near future, there was a realistic prospect of an increase in interest rates on Treasury Notes, or a reduction in such rates by a smaller increment than what the market was expecting. Such a development had not been taken into account completely in the pricing of Treasury Notes. He viewed this prospect as both a concern and an opportunity. In addition, Mr. Sands believed that a short position in Treasury Notes was likely to rise in value as interest rates began to rise again.

Mr. Sands deemed a short sale of Treasury Notes to be an attractive investment opportunity, presenting a reasonable prospect for a significant profit, even if it presented no tax benefits, particularly when considered in conjunction with his ownership of Constellation stock.

[2] See Pre-Effective Amendment to Form S-3 of Constellation, filed with the Securities and Exchange Commission on September 3, 2001, at page S-45 with respect to computation of the number of shares reflected in text.

He discussed such an investment with an investment advisor, who concurred with that evaluation. Even so, he recognized that there was also a reasonable prospect for a significant loss on a short sale of Treasury Notes if interest rates declined. Effecting such transactions on margin of approximately three percent (3%) of the value of the Treasury Notes sold short significantly increases the amount of profit or loss one can realize on a given trade, and magnifies the potential gain or loss related to a particular Treasury Note yield change. The short sale of Treasury Notes was a transaction independent of the sale of Constellation stock and had its own separate business purpose.

Mr. Sands believed that, other things being equal, an increase in interest rates would tend to (a) diminish the profitability of Constellation, (b) diminish the stock price of Constellation, (c) make it more expensive to effect a leveraged acquisition of Constellation, and (d) diminish the market value of the stock or assets of Constellation.

Mr. Sands adopted a Financial Plan to effect several objectives, including:

- Identify his short-term, intermediate-term, and long-term investment objectives, and set priorities among competing objectives including wealth preservation, current income generation, principal growth, investment risk reduction, diversification, and opportunistic short-term investing.

- Realize investment profits on dispositions of Constellation stock.

- Increase the diversification of his investment holdings.

- Provide greater liquidity in his investment portfolio.

- Realize investment profits by taking one or more short positions in Treasury Notes.

- Identify his wealth-transfer objectives, determine in what ways and over what period he seeks to achieve them, and implement a plan to realize those objectives.

- Reduce, to the extent possible, the income tax due as a result of dispositions of Constellation stock.

- Enhance the privacy and confidentiality of his family's financial information and, correlatively, reduce risks to their personal safety and security.

The anticipated benefits of the Financial Plan relating to the enhancement of the diversification and liquidity of his investments, the management of market risk, the realization of potential profits from the Treasury Notes short sale and the disposition of Constellation stock, the enhancement of his ability to effect his wealth-transfer objectives, the improvement to his

LEWIS, RICE & FINGERSH, L.C.



family's privacy and personal security, and the anticipated tax benefits, all contributed to Mr. Sands' determination to adopt the Financial Plan.

Mr. Sands has used limited liability entities (corporations, limited partnerships, and limited liability companies) to limit risk of loss both in his investment activities and in his business dealings, and has caused several such entities to be formed to effect the Financial Plan over the next few years.

Mr. Sands has implemented certain elements, and intends to continue to implement each remaining element, of the Financial Plan independently of the other elements. Each such element has independent economic reality and effect on the rights and obligations of the parties involved. At no time has there been a "binding commitment" to enter into all of the elements of the Plan. The only element that creates a binding commitment to take another action is the short sale of Treasury Notes, which gives rise to an obligation to close the short sale by purchasing Treasury Notes. The contemplated elements of the Financial Plan are:

- Incorporation of RMC on August 23, 2001, the issuance to Mr. Sands, as of August 23, 2001, of 50 shares of voting common stock in exchange for a capital contribution in the amount of $275, and the issuance to Mr. Sands, as of August 23, 2001, of 9,950 shares of non-voting common stock in exchange for a capital contribution in the amount of $54,725, the transfer by Mr. Sands to RMC of 1,001 shares of Constellation as an additional capital contribution effective August 28, 2001, and the election by RMC to be taxed under Subchapter S of the Code, effective August 23, 2001.

- Formation of RLP on August 23, 2001.

- Opening of a brokerage account at PaineWebber by Mr. Sands on August 21, 2001, the transfer of $725,000 cash by Mr. Sands to the brokerage account at PaineWebber on August 23, 2001, and the execution of a short sale[3] of Treasury Notes[4] on August 23, 2001.

- Contribution of assets[5] by Mr. Sands, by Richard Sands, by Marilyn Sands, and by CWC-I to RLP on August 28, 2001, each in exchange for a 24.975% limited partner interest;

[3] To effect this short sale, Mr. Sands borrowed in kind Treasury Notes from PaineWebber, thereby incurred an obligation to return identical Treasury Notes, and sold the borrowed Treasury Notes on the open market for cash. PaineWebber held the cash proceeds of the short sale in Mr. Sands' account pending his acquisition and delivery to PaineWebber of Treasury Notes to close the transaction.

[4] The Treasury Notes were in the total face amount of $23,000,000 due 11/15/2003 at 4.25%. The net proceeds of the short sales totaled $23,451,562.50, comprising $23,160,000 of principal and $268,281.25 of accrued interest. These proceeds were held in the Mr. Sands' brokerage account at PaineWebber.

[5] The assets transferred by Mr. Sands consisted of the PaineWebber brokerage account noted above, 500,000 shares of Class A common stock of Constellation, and $125,000 of cash. The assets transferred by each of Richard Sands and Marilyn Sands consisted of a PaineWebber brokerage account that contained assets essentially identical to those held in Mr. Sands' PaineWebber account as noted above, 500,000 shares of Class A common stock of Constellation,

and the contribution of assets[6] by RMC to RLP on August 28, 2001, in exchange for a 0.1% general partner interest.

- Formation of RLC on August 23, 2001.

- Contribution of assets[7] by RLP to RLC on August 31, 2001, in exchange for a 99.7163% membership interest; and the contribution of assets[8] by Gloria S. Robinson ("Robinson") to RLC on August 10, 2001, in exchange for a 0.2837% membership interest.

- Closing of the short sale of Treasury Notes by RLC on September 6, 2001, at a cost of $86,073,750, comprising $84,958,125 of principal and $1,115,625 of accrued interest.

- Sale by RLC of all 2,002,002 shares of Constellation Class A Stock it owned on October 1, 2001, in a registered underwritten public offering at a public offering price of $38.75 per share.

- At such intervals and in such increments as market conditions indicate could be profitable and appropriate, RLC will implement and close additional short sales of Treasury Notes or other appropriate securities, and purchase and sell other investment assets.

In addition to the elements of the Financial Plan noted above, the following events have occurred:

- On September 10, 2001, after the closing of the short sale of Treasury Notes at a loss, RLP and Robinson agreed to, and closed, a purchase by RLP of the membership interest of Robinson in RLC for a cash purchase price of $227,278.

No part of the property held by RLC at the time of RLP's purchase of the membership interest of Robinson was "unrealized receivables" or "inventory items" of RLC, as those terms are defined in Code section 751 and its related regulations.

Having been the General Counsel, Chief Executive Officer International, Group President and a member of the Board of Directors of Constellation, Mr. Sands is accustomed to receiving, and relying and acting upon, forecasts and historic data relating to the economy in general, the industry in which Constellation operates, and Constellation itself, without independently

---

and $125,000 of cash. The assets transferred by CWC-I consisted of a PaineWebber brokerage account that proceeds of a short sale on August 23, 2001, of $15,000,000 of Treasury Notes dated 11/15/98 with a coupon rate of 4.25%, due 11/15/03, together with 500,000 shares of Class A common stock of Constellation, and $125,000 of cash.

[6] The assets transferred by RMC consisted of 2,002 shares of Class A common stock of Constellation, and $3,403 of cash.

[7] The assets transferred by RLP consisted of 906,977 shares of Class A common stock of Constellation, and PaineWebber brokerage accounts holding 1,095,025 shares of Class A common stock of Constellation and the proceeds of open short sales of Treasury Notes described above.

[8] The assets transferred by Robinson consisted of cash in the amount of $250,000.

verifying such data. He is familiar with, and comfortable taking, business risks similar to those presented in the Financial Plan, and with receiving, and relying and acting upon, economic forecasts similar to those upon which the profit potential of the Financial Plan is based and upon which he is relying in pursuing the Financial Plan.

Despite his transfer of the brokerage account to RLP, and the subsequent transfer of that account by RLP to RLC, Mr. Sands retained (through those entities) a significant potential for profit and risk of loss on the short sale and was not protected against loss by a hedge or other mechanism.

No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on the transaction receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenges the contemplated tax consequences of the transaction.

Neither Mr. Sands, nor any "related person" as defined in Code section 1259(c)(4), owned at the inception of the Financial Plan, or acquired at any time before the purchase by RLC of Treasury Notes to close the short sale described above, any of the following (a) Treasury Notes or substantially identical property, (b) a so-called "swap agreement" or other notional principal contract with respect to Treasury Notes or substantially identical property, (c) a futures or forward contract to acquire Treasury Notes or substantially identical property, or (d) one or more other transactions (or positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

At all times, RLP, RLC, and Mr. Sands have held all of the assets and interests related to the Financial Plan, including, without limitation, the long position in Constellation stock, and the short position in Treasury Notes, as capital assets, not as property held for sale to customers in the ordinary course of business or as a dealer in securities. In addition, each party involved in these transactions participated for investment purposes and for his/her/its own account, not as agent, nominee, or "straw party" for another.

In rendering the opinions set forth in the section entitled "Opinions of Counsel" below, we have reviewed various documents (collectively, the "Operative Documents"). The Operative Documents include, but are not limited to, the following:

- Articles of Incorporation of RMC dated August 23, 2001;

- Certificate of Incorporation of RMC dated August 23, 2001;

- Election by a Small Business Corporation (Form 2553) of RMC effective August 23, 2001, dated August 23, 2001;

- Certificate of Limited Partnership of RLP, dated August 23, 2001;
- Agreement of Limited Partnership of RLP dated as of August 23, 2001;
- Transfer and Assignment dated August 28, 2001, by Mr. Sands to RLP;
- Transfer and Assignment dated August 28, 2001, by Richard Sands to RLP;
- Transfer and Assignment dated August 28, 2001, by Marilyn Sands to RLP;
- Transfer and Assignment dated August 28, 2001, by CWC-I to RLP;
- Articles of Organization of RLC, dated August 23, 2001;
- Certificate of Organization of RLC, dated August 23, 2001;
- Limited Liability Company Operating Agreement of RLC, dated August 30, 2001;
- Stock Power dated as of August 31, 2001, by RLP in favor of RLC;
- Transfer and Assignment dated August 31, 2001, by RLP to RLC;
- PaineWebber statement for account TX63943FL of RLC as of August 31, 2001;
- Limited Liability Interest Purchase Agreement dated September 10, 2001, between RLP and Robinson;
- Wire transfer to Robinson on September 10, 2001.

## OPINIONS OF COUNSEL

Based upon the "Facts" set forth above, the "Analysis" set forth below, and subject to the "Conditions and Limitations" set forth below, we are of the opinion[9] that there is substantial authority for the Federal income tax treatment of the Financial Plan in accordance with the opinions enumerated below, and that it is more likely than not that the Federal income tax treatment of the Financial Plan as set forth in the opinions enumerated below is proper:

1. The obligation to replace the Treasury Notes borrowed for the short sale will not be treated as a "liability" within the meaning of Code section 752. Consequently, the

[9] In issuing these opinions, we have determined the weight of the authorities as required by the Regulations regarding the "substantial authority" and "more likely than not" standards under Code section 6662 and related Regulations, as discussed below.

obligation to replace the borrowed securities will not reduce either the basis of Mr. Sands in his partnership interest in RLP or the basis of RLP in its membership interest in RLC.

2. RLC terminated under Code section 708(b)(1)(A) upon the purchase by RLP of the interest of Robinson in RLC because, after that purchase, only one of the members of RLC remained and, as a result, no part of the operations of RLC thereafter will be carried on by any of its partners in a partnership.

3. Upon the termination of RLC under Code section 708(b)(1)(A), RLC will be deemed to have made a liquidating distribution of all of its assets to RLP and Robinson, and following this distribution, RLP will be treated as purchasing the assets deemed to have been distributed to Robinson in liquidation of Robinson's interest in RLC. RLP will take a cost basis and a new holding period (beginning on the day immediately following the date of the sale) in those assets deemed to have been purchased from Robinson. Thereafter, RLP will be considered to have received a liquidating distribution of those assets attributable to RLP's former interest in RLC.

4. Pursuant to Code section 731(a)(1), RLP will be required to recognize gain (if any) in an amount equal to the excess of the money actually or constructively distributed to it over the adjusted tax basis of such partner's interest in the partnership. Pursuant to Code section 731(a)(2), RLP will not recognize a loss on the transaction unless the only property distributed consists of money, unrealized receivables (as defined in Code section 751(c)), and inventory receivables (as defined in Code section 751(d)). Under Code section 732(b), RLP will take a basis in the assets deemed to have been received in the liquidation of its interest in RLC equal to RLP's basis in its RLC interest, less any money actually or constructively distributed to such partner. Under Code section 735(b), RLP will take a holding period in the assets deemed to have been received in the liquidation of its interest in RLC that includes the holding period of the terminating partnership in those assets, as determined under section 1223.

5. Upon the sale by RLC (after its termination for Federal income tax purposes) of shares of Constellation held as a capital asset, RLP will be deemed to have realized either (a) capital gain in an amount equal to the excess (if any) of the amount realized on the sale of such stock over the adjusted basis of such stock determined as described above, or (b) capital loss in an amount equal to the excess (if any) of the adjusted basis of such stock determined as described above, over the amount realized on the sale of such stock.

In connection with these opinions, we note that, on November 14, 2000, the United States Tax Court issued a memorandum opinion in *Salina Partnership, LP v. Commissioner*,[10] holding that an obligation to replace United States Treasury Bills borrowed for a short sale was a "liability" within the meaning of Code section 752. We believe that the Court's conclusion on that issue is incorrect, would be reversed on appeal, and would not be followed if the issue were presented to a different court. However, the parties settled the issues presented in *Salina* and certain related cases by documents filed with the court on September 24, 2001 A more detailed analysis of *Salina* is set forth below in the section entitled "***Recent litigation: Salina***."

## ANALYSIS

### *Opinion standards*

In issuing the opinions set forth above and in analyzing the potentially-applicable legal authorities, we have used the "substantial authority" and "more likely than not" terminology and related standards as set forth in Code sections 6662 and 6664 and related Regulations.

The "more likely than not" standard[11] requires that there be a greater than fifty percent chance of success. Accordingly, each opinion stated above on a more likely than not basis means that, in the opinion of this firm, there is a greater than fifty percent (50%) likelihood that the Federal income tax treatment with which the opinion deals will be upheld if challenged by the IRS.

By contrast, the substantial authority standard[12] requires that the weight of authorities supporting the treatment be substantial in relation to the weight of authorities supporting contrary treatment.[13] Although the substantial authority standard is less demanding than the more likely than not standard, it requires more than a mere reasonable basis.[14] The Regulations specify not only the authorities considered for this purpose,[15] but also certain operating rules in establishing

---

[10] T.C. Memo. 2000-352 (November 14, 2000) ("*Salina*") (citations to *Salina* herein use the pagination of the Court's slip opinion).
[11] Reg. § 1.6662-4(d)(2).
[12] *Id.*
[13] Reg. § 1.6662-4(d)(3)(i).
[14] Reg. § 1.6662-4(d)(2).
[15] Reg. § 1.6662-4(d)(3)(iii) states that for purposes here relevant:

> only the following are authority for purposes of determining whether there is substantial authority for the tax treatment of an item: applicable provisions of the Internal Revenue Code and other statutory provisions; proposed, temporary and final regulations construing such statutes; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; General Explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book);

the weight of the authorities.[16] Generally, the weight of an authority depends on its relevance and persuasiveness, type (e.g., statute, regulation, published ruling, private letter ruling, et al.), factual and logical specificity, and age. Accordingly, each opinion stated above with respect to the existence of "substantial authority" for a stated conclusion means that, in the opinion of this firm, the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment, each determined in accordance with the principles stated in the applicable statutes and Regulations, and as summarized above.

***Federal income tax status of short sale obligations***

*Statute and regulations*

Code section 752 provides, in pertinent part, that

> (a) INCREASE IN PARTNER'S LIABILITIES.--Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) DECREASE IN PARTNER'S LIABILITIES.--Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

Any such deemed contribution or distribution as a result of an increase or decrease in a partner's share of partnership liabilities will increase or decrease the partner's adjusted basis in his partnership interest and, if the deemed distribution exceeds the partner's adjusted basis, will result in gain recognition.[17]

Neither Code section 752 nor the Regulations promulgated thereunder defines the term "liability" or describes the characteristics of a "liability." Similarly, neither Code section 752 nor the Regulations thereunder indicates whether the obligation of an individual who has engaged in a short sale transaction will be characterized as a "liability" under Code section 752.

---

private letter rulings and technical advice memoranda issued after October 31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); Internal Revenue Service information or press releases; and notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin. Conclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority. The authorities underlying such expressions of opinion where applicable to the facts of a particular case, however, may give rise to substantial authority for the tax treatment of an item.

[16] Reg. § 1.6662-4(d)(3)(ii).

[17] Code sections 705, 731.

A temporary regulation issued in December 1988 included the following definition of a "liability" as that term is used in Code section 752:

> Except as otherwise provided in the regulations under section 752, an obligation is a liability of the obligor for purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to--
>
> (1) *The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);*
>
> (2) A deduction that is taken into account in computing the taxable income of the obligor; or
>
> (3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital. [18]

Without explanation, the Treasury Department excluded this definition when it issued final regulations in December 1991.[19]

Many sections of the Code in addition to section 752 use the term "liability," frequently in the context of a tax liability under the Code, but no section defines the term generally. Code section 357 uses the term in requiring gain recognition on certain asset transfers to a corporation in which "liabilities" are assumed or the transferee corporation receives assets subject to certain "liabilities" of the transferor. Neither Code section 357 nor the Regulations promulgated thereunder defines the term "liability" or describes the characteristics of a "liability." Similarly, neither Code section 357 nor the Regulations thereunder indicates whether the obligation of an individual who has engaged in a short sale transaction will be characterized as a "liability" under Code section 357. After courts considering whether *accounts payable* constituted liabilities under section 357 reached inconsistent conclusions,[20] Congress enacted Code section 357(c)(3)[21] in 1978, in order "to resolve the ambiguity as to whether for purposes of sections 357(c) and 358(d)

---

[18] Treas. Reg. § 1.752-1T(g), T.D. 8237, 1989-1 C.B. 180 (emphasis added).
[19] T.D. 8380 (Dec. 20, 1991).
[20] *Compare Bongiovanni v. Commissioner*, 470 F.2d 921 (2d Cir. 1972) (payables of a cash-method taxpayer were not liabilities for purposes of section 357(c); observing that "Section 357(c) was meant to apply to what might be called 'tax' liabilities, i.e., liens in excess of tax costs, particularly mortgages encumbering property transferred in a Section 351 transaction"); *and Focht v. Commissioner*, 68 T.C. 223 (1977), *acq.* 1980-2 C.B. 1 (obligation is not a liability for purposes of section 357 to the extent that the obligation would have been deductible if paid); *with Thatcher v. Commissioner*, 533 F.2d 1114, 1117 (9th Cir. 1976) (same issue, opposite conclusion, observing that "(i)n its ordinary meaning, the term 'liability' means 'that which one is under an obligation to pay ... debt ... [as] opposed to assets.' Webster's New International Dictionary (2d ed. 1941)").
[21] In enacting this provision, however, Congress made it clear that it was "not intended to affect the definition of the term liabilities for any other provision of the Code, including sections 357(a) and 357(b)." *Id.* Six years later, in adopting amendments to the partnership-tax sections of the Code relating to contributed property, the House Ways and Means Committee commented that "The committee intends that, similar to the amendments recently made to section 357(c) (and contrary to Rev. Rul. 60-345, 1960-2 C.B. 211), these accrued but unpaid items should not be treated as partnership liabilities for purposes of section 752." H.R. Rep. No. 98-861, 98th Cong., 2nd Sess. 856-57 (1984), 1984-3 C.B. (Vol. 2) 1, 110-11.

**LEWIS, RICE & FINGERSH, L.C.**



the term 'liabilities' includes deductible liabilities of a cash basis taxpayer."[22] Code section 357(c)(3) reads:

> (c)(3)(A) IN GENERAL.--If a taxpayer transfers, in an exchange to which section 351 applies, a liability the payment of which either--
>
> (i) would give rise to a deduction, or
>
> (ii) would be described in section 736(a),
>
> then, for purposes of paragraph (1), the amount of such liability shall be excluded in determining the amount of liabilities assumed.
>
> (c)(3)(B) EXCEPTION.--Subparagraph (A) shall not apply to any liability to the extent that the incurrence of the liability resulted in the creation of, or an increase in, the basis of any property.

Code section 1233, Reg. § 1.1233-1, and IRS revenue rulings[23] treat a short sale as a taxable event upon the delivery of property to close the short sale. The gain or loss is the difference between the sale proceeds received (upon executing the short sale) and the cost of the property used to close the transaction.[24] Although the IRS generally asserts that "open transaction" treatment applies only in "rare and extraordinary cases,"[25] and has successfully challenged some taxpayers' efforts to defer gain recognition by applying that doctrine,[26] it is clear that with limited statutory exceptions,[27] short sales are not taxable during the period in which they are open.

Most recently, Congress adopted and then President Clinton signed into law the Community Renewal Tax Relief Act of 2000 (the "CRTR Act") as a part of appropriations legislation[28] for fiscal year 2001. One of the administrative and technical corrections provisions included in the CRTR Act states:

---

[22] S. Rep. No. 95-1263, 95th Cong., 2nd Sess. 185 (1978), 1978-3 C.B. (Vol. 1) 315, 483. Code section 358(d) causes the basis of stock received in an exchange transaction to which Code section 351, 354, 355, 356, or 361 applies to be reduced by the amount of certain liabilities assumed by the corporation as part of the exchange consideration, with the exception of liabilities excluded under section 357(c)(3).

[23] Rev. Rul. 72-478, 1972-2 C.B. 487; Rev. Rul. 73-524, 1973-2 C.B. 307.

[24] Reg. § 1.1233-1(c)(6).

[25] *E.g.*, Reg. § 1.1001-1(a); Temp. Reg. § 15A.453-1(d)(2)(iii).

[26] *E.g.*, *Waring v. Commissioner*, 412 F.2d 800 (3d Cir. 1969); *McCormac v. United States*, 424 F.2d 607 (Ct. Cl. 1970).

[27] For example, Code section 1259, enacted in 1997, generally deems an appreciated financial position to be constructively sold if the taxpayer engages in certain transactions that substantially eliminate both risk of loss and opportunity for gain on the appreciated financial position. Congress adopted this legislation to terminate, among other things, the tax benefits associated with the so-called "short sale against the box transaction." In such a transaction, a taxpayer sells a security short while holding a long position in the identical security. Prior to the enactment of Code section 1259, a taxpayer did not recognize gain under the short against the box transaction until the year in which the short position was closed. By its terms, the new provision applies only to transactions that substantially eliminate any risk of loss or opportunity for gain. A short sale of property that the taxpayer does not currently own does not substantially eliminate the risk of loss or opportunity for gain from ownership of the property.

[28] The Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 106th Cong. 2nd Sess. (2000).

SEC. 309. PREVENTION OF DUPLICATION OF LOSS THROUGH ASSUMPTION OF LIABILITIES GIVING RISE TO A DEDUCTION.

(a) IN GENERAL.--Section 358 (relating to basis to distributees) is amended by adding at the end the following new subsection:

"(h) SPECIAL RULES FOR ASSUMPTION OF LIABILITIES TO WHICH SUBSECTION (d) DOES NOT APPLY.--

"(1) IN GENERAL.--If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability--

"(A) which is assumed in exchange for such property, and

"(B) with respect to which subsection (d)(1) does not apply to the assumption.

"(2) EXCEPTIONS.--Except as provided by the Secretary, paragraph (1) shall not apply to any liability if--

"(A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or

"(B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

"(3) LIABILITY.--For purposes of this subsection, the term 'liability' shall include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title."

(b) DETERMINATION OF AMOUNT OF LIABILITY ASSUMED.--Section 357(d)(1) is amended by inserting "section 358(h)," after "section 358(d),".

(c) APPLICATION OF COMPARABLE RULES TO PARTNERSHIPS AND S CORPORATIONS.--The Secretary of the Treasury or his delegate--

(1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships, and

(2) may prescribe rules which provide appropriate adjustments under subchapter S of chapter 1 of such Code in transactions described in paragraph (1) involving S corporations rather than partnerships.

(d) EFFECTIVE DATES.--

(1) IN GENERAL.--The amendments made by this section shall apply to assumptions of liability after October 18, 1999.

(2) RULES.--The rules prescribed under subsection (c) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules.

To the extent that this legislation is either self-executing[29] or is implemented by Treasury Regulations, it does not adversely affect, and appears to provide additional support for, the

---

[29] Many decided cases deem the issuance of regulations to be a condition to the application of statutes providing consequences "only to the extent provided in regulations prescribed by the Secretary," unless the statute is intended to provide a rule favorable to taxpayers that would be thwarted by the application of that general principle. *See Estate of Maddox v. Comm'r*, 93 T.C. 228, 233-234 (1989); *First Chicago Corp. v. Comm'r*, 88 T.C. 663, 676-677

opinion stated above that the obligation to replace the Treasury Notes borrowed for the short sale will not be treated as a "liability" within the meaning of Code section 752. The reasons for this conclusion include the following:

- The legislation does not yet apply to partnerships as the Treasury Department has not yet issued the implementing regulations authorized by Section 309(c)(1) of the CRTR Act. Although the legislation provides that the Treasury Department "shall prescribe" the subject rules, it is uncertain what form those rules may take, what exceptions they may provide, how quickly, if ever, the Treasury Department will exercise its regulatory authority, and whether the Treasury Department will choose to make the regulations effective on October 18, 1999, or on some later date as it is authorized to do under Section 309(d)(2) of the CRTR Act, and whether valid regulations can be issued with such a retrospective effective date.

- Second, the legislation directs the issuance of regulations "to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in" Code section 358(h)(3). It is not clear what Congress had in mind in crafting this language, but the transactions that constitute the Financial Plan cannot reasonably be characterized as ***accelerating or duplicating losses***. It is uncertain how the IRS will give effect to this language in drafting regulations. Although any regulation issued by the IRS would likely be applied by a court consistently with the plain meaning of the words it used, this statutory language could be taken into account if the regulation is either inconsistent with the statute or is ambiguous, diminishing the possibility that this legislation could require a basis reduction for obligations such as those involved in the Financial Plan.

- Third, the statute provides, in general, that any fixed or contingent obligation to make payment is deemed to be a "liability," without regard to whether it is otherwise characterized as a liability for purposes of Federal income taxation. In common

---

(1987), *aff'd*, 842 F.2d 180 (7th Cir. 1988); *Occidental Petroleum Corp. v. Comm'r*, 82 T.C. 819, 829 (1984). In other circumstances, particularly where the regulation is to provide "how" the statute is to apply, courts examine the text of the statute, the related legislative history, and other pertinent evidence to determine whether the statute should not be effective until the issuance of regulations. *Schwalbach v. Commissioner*, 111 T.C. 215, 226 (1998). If the court does not conclude that the statute should be regarded as ineffective until the issuance of regulations, the statute "may be interpreted in light of all pertinent evidence, textual and contextual, of its meaning." *Id. citing Commissioner v. Soliman*, 506 U.S. 168, 174 (1993); *Crane v. Commissioner*, 331 U.S. 1, 6-7 (1947); *Old Colony R.R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932), *Trans City Life Ins. Co. v. Commissioner*, 106 T.C. at 299-300; *Estate of Neumann v. Commissioner*,106 T.C. 216 (1996); *H Enters. Intl., Inc. v. Commissioner*, 105 T.C. 71, 81-85 (1995). *Compare* Code section 108(e)(4) (stating that "to the extent provided in regulations prescribed by the Secretary" certain acquisitions of debt by persons related to the debtor are treated as acquisitions of the debt by the debtor) *with* T.D. 8460, 1993-1 CB 19 (issuing regulations under Code section 108(e)(4) and commenting that "It remains the position of the Service and Treasury that section 108(e)(4) is effective from the date of its enactment. The statutory language of section 108(e)(4) is reasonably clear in its primary application.").

parlance, "making payment" denotes the satisfaction of a ***pecuniary*** obligation.[30] By limiting the definition of "liability" to obligations "to make payment," Congress effectively excluded from the "liability" definition the obligation of a short seller ***to replace in kind*** the Treasury Notes borrowed to effect a short sale.

- Fourth, to determine the basis of stock received from a corporation in exchange for a capital contribution to that corporation (or the basis of a partnership interest received from a partnership in exchange for a capital contribution to that partnership, if applicable to partnerships), the statute sets forth a general rule and two important exceptions.
  - The general rule is that if, after taking into account other applicable limitations, the basis of the stock (or of the partnership interest, if applicable to partnerships) received exceeds its fair market value, then that basis is to be reduced (but not below its fair market value) by the amount of the assumed[31] liabilities, determined as of the date of the exchange.
  - Two exceptions—the "trade or business transfer" exception and the "substantially all of the assets transfer" exception—exclude obligations that otherwise would be characterized as liabilities under the definition stated above and would reduce the basis of the stock (or of the partnership interest, if applicable to partnerships) received in the exchange. More specifically, if the trade or business with which an obligation is associated is transferred to the person assuming the liability as part of the exchange, or if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation, then such obligations will not reduce the basis of the stock (or the partnership interest, if applicable to partnerships) received in the exchange. ***Nevertheless, Congress expressly authorized the Treasury Department to issue regulations limiting these exceptions.*** The Conference Committee report on the Consolidated Appropriations Act included this observation about these exceptions:

> The exceptions for transfers of a trade or business, or of substantially all the assets, with which a liability is associated, are intended to obviate the need for

---

[30] *See, e.g.*, THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE (Fourth Ed. 2000) ("TRANSITIVE VERB : 1. To give money to in return for goods or services rendered: "pay the cashier." ... INTRANSITIVE VERB : 1. To give money in exchange for goods or services."), *republished at* http://www.bartleby.com/61/49/P0124900.html.

[31] The Conference Committee report provides that, for this purpose, "The determination whether a liability (as more broadly defined for purposes of this provision) has been assumed is made in accordance with the provisions of section 357(d)(1) of the Code. Under the standard of 357(d)(1), a recourse liability is treated as assumed if, based on all the facts and circumstances, the transferee has agreed to and is expected to satisfy such liability (or portion thereof), whether or not the transferor has been relieved of the liability. ... Similarly, a nonrecourse liability is treated as assumed by the transferee of any asset subject to such liability." H.R. Rep. 106-1033, 106th Cong., 2nd Sess. 1019 (2000).

LEWIS, RICE & FINGERSH, L.C.



> valuation or basis reduction in such cases. The exceptions are not intended to apply to situations involving the selective transfer of assets that may bear some relationship to the liability, but which do not represent the full scope of the trade or business, (or substantially all the assets) with which the liability is associated.

- Finally, Congress chose in the waning days of 2000 to adopt this legislation that had been introduced in substantially similar form in 1998 and 1999. During those years, the Congress, the Treasury Department, the IRS, and the tax bar have devoted substantial amounts of time and attention to the best ways to address certain so-called "tax shelter" transactions, at least one of which represented "tax avoidance using artificially high basis."[32] Taking into account the recent legislative, regulatory, and enforcement efforts dedicated to such matters, this legislation represents the judgment of Congress on when a contingent obligation should be characterized as a "liability" in determining the basis of a partnership interest. As Congress decided generally to exclude an obligation from this definition if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation, and to apply this definition retroactively to October 19, 1999, the IRS and the courts thereafter should defer to that liability definition.

In summary, Congress decided that, for this purpose, an obligation is a "liability" that reduces the basis of a partnership interest if

(a) the Treasury Department issues implementing regulations to apply the corporate basis statute to partnerships, and
(b) the obligation is an "obligation to make payment," and
(c) the obligation is assumed by the partnership in a transfer in which the partnership issues a partnership interest, and
(d) the obligation is ***not*** assumed in connection with the transfer to the partnership of either a trade or business or substantially all of the assets with which the obligation is associated, unless Treasury Regulations supersede the generally-applicable exception with respect to an obligation assumed in connection with such a transfer.

The transactions effected as part of the Financial Plan involve an obligation to replace Treasury Notes borrowed to effect a short sale. That obligation is not a liability under this definition for several reasons. First, the obligation to replace the borrowed Treasury Notes is not an "obligation to make payment" as required by the statute. Second, although the assumption of the obligation to replace the borrowed Treasury Notes to close the short sale occurs in a transfer in which the partnership issues a partnership interest, that assumption is part of a transfer in full of the brokerage account—including the proceeds of sale of the borrowed Treasury Notes, the margin deposit, and the obligation to replace the borrowed Treasury Notes. Accordingly, under the CRTR Act, unless and until the Treasury Department issues valid regulations to the contrary, that obligation is not a "liability" triggering the basis reduction rule. Finally, the Treasury

[32] IRS Notice 2000-44, I.R.B. 2000-36, 255.

Department has not issued implementing regulations to apply the corporate liability definition statute to partnerships and, although any regulations ultimately issued may be retroactive, this letter applies the law as it exists today.

After the enactment of the CRTR Act, the IRS issued Notice 2001-17, entitled "Contingent Liability Tax Shelter." In that Notice, the IRS described the structure of the transaction in pertinent part, as follows:

> These transactions take several forms but, in all cases, involve the transfer of a high basis asset (i.e., an asset with a basis that approximates its fair market value) to a corporation purportedly in exchange for stock of the transferee corporation, and the transferee corporation's assumption of a liability (such as a liability for deferred compensation or other deferred employee benefits or an obligation for environmental remediation) that the transferor has not yet taken into account for federal income tax purposes. The transferor typically remains liable on the underlying obligation. The basis and fair market value of the transferred asset, which may be a security of another member of the same affiliated group of corporations, are generally only marginally greater than the present value of the assumed liability. Therefore, the value of the stock of the transferee received by the transferor is minimal relative to the basis and fair market value of the asset transferred to the transferee corporation.
>
> . . .
>
> The transferor typically sells the stock of the transferee corporation for its fair market value within a relatively short period of time after the purported §351 exchange and claims a tax loss in an amount approximating the present value of the liability assumed by the transferee corporation. In the case of a transaction involving members of an affiliated group that has elected to file a consolidated return, the transaction is structured with the intention of avoiding the loss disallowance rule of §1.1502-20 of the Income Tax Regulations. In addition to the transferor's purported loss on the sale of the stock of the transferee corporation, the transferee corporation may claim a §162 deduction with respect to payments on the liability.[33]

The IRS declared its belief that "***any business purposes*** taxpayers may assert for certain aspects of these transactions are far outweighed by the purpose to generate deductible losses for federal income tax purposes,"[34] and asserted its intent to disallow losses claimed with respect to these transactions. The basis for such intended disallowances varied, however.

> For transfers on or before October 18, 1999, as well as for transfers after October 18, 1999, that are not subject to §358(h), the Service will disallow such losses for one or more reasons, including but not limited to the following: (1) that the purported §351 exchange lacks sufficient business purpose to qualify as a §351 exchange; (2) that the transfer of the asset to the transferee corporation is not, in substance, a transfer of property in exchange for stock within the meaning of §351, but instead is either an agency arrangement for the transferor or simply a payment to the transferee for its assumption of a liability; (3) that the purported §351 exchange constitutes an acquisition of control of the transferee corporation for the principal purpose of tax avoidance within the meaning of §269(a) and thus the purported loss should be disallowed under §269(a); (4) that the principal purpose of the transferee's assumption of the liability was a purpose

---

[33] IRS Notice 2001-17, *reprinted in Daily Tax Report* (January 19, 2001) at L-16.
[34] *Id.* (emphasis added).

> to avoid federal income tax or was not a bona fide business purpose within the meaning of §357(b)(1), and thus the assumption of the liability should be treated as money received by the transferor that reduces its basis in the transferee stock; (5) that the purported loss on the sale of the stock of the transferee corporation is disallowed or limited by the loss disallowance rules of §1.1502-20, including the anti-avoidance rule in §1.1502-20(e) and the duplicated loss rule in §1.1502-20(c); (6) that the purported loss on the sale of the stock of the transferee corporation is not a bona fide loss actually sustained by the transferor, as required by §1.165-1(b); and (7) that the overall transaction lacks sufficient economic substance to be respected for federal income tax purposes, see ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir. 1998), cert. denied, 526 U.S. 1017 (1999).[35]

The IRS observed that it "may impose penalties on participants in these transactions, or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under §6662, the return preparer penalty under §6694, the promoter penalty under §6700, and the aiding and abetting penalty under §6701," and that "(t)ransactions that are the same as or substantially similar to those described in this Notice 2001-17 (***including transactions utilizing partnerships***) are identified as "listed transactions" for the purposes of §1.6011-4T(b)(2) of the Temporary Income Tax Regulations and §301.6111-2T(b)(2) of the Temporary Procedure and Administration Regulations."[36]

The IRS position stated in Notice 2001-17 with respect to transactions after October 18, 1999, is inconsistent with the requirements of current law for several reasons. First, the IRS states generally that such losses are disallowed under Code section 358(h), described above. In stating this position, it did not analyze that section and, in particular, it did not analyze or state its intention with respect to the content of regulations to be issued under that section dealing with the "substantially all of the assets transfer" exception or the application of the new legislation to partnerships. As a result, it is unclear how the IRS will avoid the application of that exception in general and, more particularly, how it will avoid that exception for all such transactions without nullifying the legislative exception by regulation, an action that would suggest strongly the invalidity of the regulation.

Second, as discussed above, the IRS declared that it would rely on seven stated grounds in disallowing losses claimed with respect to "transfers after October 18, 1999, that are not subject to §358(h)." Where Congress specifically considers a subject and enacts comprehensive legislation to solve the problems presented, courts have declined thereafter to apply Federal common law principles, finding that Congressional action preempted the area.[37] The position of the IRS in Notice 2001-17 represents an attempt to apply the new law beyond the limits set forth

---

[35] *Id.*

[36] *Id.* (emphasis added).

[37] *See, e.g., City of Milwaukee v. States of Illinois and Michigan*, 451 U.S. 304 (1981) (Federal environmental legislation preempted Federal common law of nuisance); *Smith v. Commissioner*, 78 T.C. 350, 388 (1982) (declining to apply a nonstatutory wash sale analysis to deny losses claimed on commodity straddle transactions and commenting that "we do not believe it is within the province of this Court to attempt to draft our own novel straddle integration provision" where (1) the statutory wash sale provisions did not apply, and (2) Congress recently had adopted legislation dealing with the issue prospectively.)

by Congress. Moreover, to the extent the new law does not provide the restriction sought by the IRS, the IRS attempts improperly to supplement the new law with Federal common law, ignoring tax and nontax decisions to the contrary. As noted above, the IRS and the courts should defer to the new liability definition adopted by Congress, generally retroactive to October 19, 1999, that generally excludes an obligation if substantially all of the assets with which the obligation is associated are transferred to the person assuming the obligation.

*Cases—in general*

In *Deputy v. du Pont,*[38] Pierre du Pont borrowed 9,000 shares of du Pont stock for a 10-year period and, in connection with the borrowing of the stock, undertook to pay the lender of the shares all dividends paid by the corporation during the 10-year period. The Supreme Court rejected du Pont's argument that the payment of such amounts should be deductible as interest expense under section 23(b) of the Revenue Act of 1928, the predecessor of the current authority for the deduction of interest expense, Code section 163. The Court explained its reasoning as follows:

> ***Clearly respondent owed an obligation to the Delaware Company. But although an indebtedness is an obligation, an obligation is not necessarily an "indebtedness" within the meaning of §23(b).*** Nor are all carrying charges "interest." In *Old Colony Railroad Co. v. Commissioner*, 284 U. S. 552, this Court had before it the meaning of the word "interest" as used in the comparable provision of the 1921 Act (42 Stat. 227). It said, p. 560, "* * * as respects 'interest', the usual import of the term is the amount which one has contracted to pay for the use of borrowed money." It there rejected the contention that it meant "effective interest" within the theory of accounting or that "Congress used the word having in mind any concept other than the usual, ordinary and everyday meaning of the term." p. 561. It refused to assume that the Congress used the term with reference to "some esoteric concept derived from subtle and theoretic analysis." p. 561.
>
> We likewise refuse to make that assumption here. It is not enough, as urged by respondent, that "interest" or "indebtedness" in their original classical context may have permitted this broader meaning. We are dealing with the context of a revenue act and words which have today a well-known meaning. In the business world "interest on indebtedness" means compensation for the use or forbearance of money. In absence of clear evidence to the contrary, we assume that Congress has used these words in that sense. In sum, we cannot sacrifice the "plain, obvious and rational meaning" of the statute even for "the exigency of a hard case."[39]

In *Hendricks v. Commissioner,*[40] the Fourth Circuit deemed a short sale to be closed in the year of the settlement date of the transaction in which stock was acquired by the taxpayer and delivered by their broker to the party from which stock had been borrowed to effect the short sale. The court rejected the taxpayer's argument that the date of the order to cover should

[38] 308 U.S. 488 (1940).
[39] *Id.* at 497-498 (emphasis added, citations and footnotes omitted).
[40] 423 F.2nd 485 (4th Cir. 1970), *aff'g per curiam,* 51 T.C. 235 (1968); T.C. Memo. 1970-13.

control, even though the taxpayer had sufficient funds in his account to cover the purchase at the time of the order.

In *Helmer v. Commissioner*,[41] a partnership granted a third party ("X") an option to purchase real estate owned by the partnership. X had to make an initial payment of $150,000 and annual payments of $75,000 for the option. So long as the option was outstanding, the partnership retained the right to remain in possession of the property and to retain the profits therefrom. The only restriction on the option payments was that they be applied against the purchase price of the property if X should exercise its purchase option. The partnership received option payments for three years and distributed them to its partners. Under Code section 731, cash distributions to partners are subject to tax to the extent the amount distributed exceeds the distributee's partnership interest adjusted basis. That basis includes the partner's share of partnership liabilities under Code section 752. Among the issues decided by the Tax Court was whether the partnership's receipt of option payments gave rise to a partnership liability under Code section 752, as the taxpayer contended in that case. The court rejected that contention. Even though the option payments had not yet been recognized for income tax purposes pending the exercise or lapse of the purchase option, the receipt of such payments did not give rise to a section 752 liability because the option agreement "created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future."

In *Long v. Commissioner*,[42] the Tax Court addressed the issue of contested liabilities arising from a contract that was the subject of litigation. Two parties sued a partnership for damages resulting from structural defects in a building constructed by the partnership. Another party sued the partnership on its performance bond. One of the partners died before the suits were settled, and the estate claimed the contingent damage amounts as liabilities to be included in the decedent's basis in the partnership interest. In resolving this issue, the court observed:

> Although they may be considered "liabilities" in the generic sense of the term, contingent or contested liabilities such as the Kansas City Life-TWA and USF&G claims are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated. ***This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset.*** *See, e.g., Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 179 (1973); *Lemery v. Commissioner*, 52 T.C. 367, 377 (1969), *aff'd per curiam*, 451 F.2d 173 (9th Cir. 1971); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), *aff'd per curiam*, 333 F.2d 653 (2d Cir. 1964). ***We think that partnership liabilities should be treated in the same manner.*** *See generally* McKee, Nelson & Whitmire, FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[2] (1977). We see no logical reason for distinguishing the above cases solely because the asset involved is an interest in a partnership, and neither party

---

[41] T.C. Memo. 1975-160.

[42] 71 T.C. 1 (1978), *supplemented on reconsideration*, 71 T.C. 724 (1979), *aff'd on this issue*, 650 F.2nd 416 (10th Cir. 1981).

> suggests such a distinction. Those liabilities should be taken into account only when they are fixed or paid. Cf. *Albany Car Wheel Co. v. Commissioner, supra* at 841.[43]

In *LaRue v. Commissioner,*[44] the Tax Court considered the income tax liabilities of former partners of a failed securities brokerage business ("Goodbody"). One issue presented was when it is appropriate to recognize (for purposes of Code section 752) a liability to customers resulting from "back office problems." The court reviewed the *Long* decision, discussed above, commenting that

> The test used in *Long* focused on the fact of liability and whether the amount of the liability was definite or fixed. This test is similar, if not identical, to the "all-events" test for deduction of accrued expenses. Because an accrual basis partnership uses the "all-events" test to determine when an expense is deductible, we think that test may be properly used to determine when the corresponding liability is includable in basis.[45]

The court then analyzed the obligation resulting from Goodbody's back office problems, discussing the tax characteristics of its obligation to replace securities, like the obligation of a short seller to replace borrowed securities:

> Once the "back office" failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the NYSE rules. Goodbody was under an obligation to replace any missing securities or money. Essentially, Goodbody's books were in error because of the back office problems and the Haskins report reflected estimated liability figures. All of petitioners' witnesses testified that these were transactions for which the partnership was liable. There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.
>
> Petitioners have not shown that these amounts were determinable with reasonable accuracy. As a result of the Haskins audit, Goodbody (and Merrill Lynch) knew which particular securities would have to be sold or purchased and how much money was missing from customer accounts. However, it was not certain upon which of these claims Goodbody would ultimately be liable, because the smaller the amount of the transaction the less likely the customer would be to claim it. In addition, the exact amount of loss or gain was not determinable until actual purchase or sale. Valuation of the claims may be a purely ministerial matter because of the ready market for securities, but is not readily determinable until purchase or sale occurs. The additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates. Accrual accounting requires that the amount be determinable with "reasonable accuracy." A loss is not determinable until the securities are actually purchased or sold, and the transaction closed. We accordingly hold

---

[43] *Id.* at 7-8 (emphasis added); *see also* LTR 7704269550A (April 26, 1977) (holding a nonrecourse obligation was not includable as a Code section 752 liability unless the taxpayer demonstrated that the note was not contingent, citing a similar set of authorities).
[44] 90 T.C. 465 (1988).
[45] *Id.* at 478 (citations omitted).

LEWIS, RICE & FINGERSH, L.C.



> that because the reserves were not a fixed obligation of the partnership sufficiently determinable in amount in 1970, they cannot be included in the partners' bases in that year. [46]

*IRS pronouncements*

In Rev. Rul. 73-301,[47] the IRS considered the situation of a partnership, using the completed contract method of accounting, which incurred costs not deducted currently and received progress payments not included in income currently. It booked the progress payments as debits to cash and credits to deferred income. It then made a cash distribution to a partner in excess of his positive capital account balance. The partnership agreement provided that, on withdrawal from the partnership or upon its liquidation, any indebtedness of a partner to the partnership was to be deducted from the amount otherwise distributable to that partner. The IRS ruled that the progress payments were unrealized receivables under Code section 751(c), not liabilities for purposes of Code section 752, and that the distribution to the partner in excess of his positive capital account balance was properly regarded as a distribution, not a loan, as it did not create an unconditional and legally enforceable obligation to pay a sum certain at a determinable date. The IRS reasoned that the progress payments "represent amounts received on account of services performed on the contract not yet reported as gross income."[48]

In Rev. Rul. 88-77,[49] the IRS determined that accrued expenses of a cash-basis partnership are not Code section 752 liabilities, reasoning:

> For purposes of section 752 of the Code, the terms "liabilities of a partnership" and "partnership liabilities" include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to an immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest. The preceding sentence uses the term "assets" to include capitalized items that are properly allocable to future periods, such as organizational expenses and construction period expenses.[50]

This ruling demonstrates that even though such accounts payable are liabilities within the financial accounting meaning of the term, the IRS would not regard them as such if incurred by a taxpayer using the cash receipts and disbursements method of accounting.

In 1995, the IRS issued three revenue rulings addressing the treatment of short sales in different contexts. The first such ruling, Rev. Rul. 95-8,[51] held that the income or loss from a short sale is not unrelated debt-financed income under Code section 514. The IRS observed that income from a short sale can only be unrelated debt-financed income if the exempt organization incurs "acquisition indebtedness," and observed that "in *Deputy v. du Pont*, 308 U.S. 488, 497-

---

[46] *Id.* at 479-480 (footnote omitted).
[47] 1973-2 C.B. 216.
[48] *Id.* at 216.
[49] 1988-2 C.B. 129.
[50] *Id.* at 129.
[51] 1995-1 C.B. 107.

98 (1940), 1940-1 C.B. 118, 122, the Supreme Court held that although a short sale created an obligation, it did not create ***indebtedness*** for purposes of the predecessor of §163."[52]

Several weeks later, in Rev. Rul. 95-26,[53] citing *Deputy v. du Pont*, the same case it had relied upon in Rev. Rul. 95-8 in determining that a short sale did not create indebtedness resulting in unrelated debt-financed income, the IRS concluded that a short sale does create a liability for purposes of Code section 752, reasoning:

> A short sale creates an obligation on the part of the seller to return the borrowed securities. See, e.g., *Deputy v. du Pont*, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). In addition, the cash received in the short sale is an asset of the partnership. Thus, the basis of the partnership's assets is increased. Therefore, [the partnership]'s short sale creates a liability under §752, and the adjusted bases of the partnership interests of *A* and *B* are increased under §722 to reflect their shares of the liability under §752.[54]

The ruling also cited Rev. Rul. 88-77 for the proposition that a "liability" includes an obligation "to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings)."[55]

Finally, in Rev. Rul. 95-45,[56] again citing *Deputy v. du Pont*, the IRS held that a corporation's assumption of a shareholder's obligation to provide replacement securities to a broker-dealer pursuant to a short sale was the assumption of a liability for purposes of Code sections 357 and 358, reasoning:

> A short sale creates an obligation on the part of the seller to return the borrowed securities. See, e.g., Deputy v. du Pont, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118, 122 (a short sale creates an obligation although not an indebtedness). The initial proceeds of an open short sale are not currently taxed to the short seller, but nonetheless are an asset of the short seller, increasing the aggregate adjusted basis of its total assets by the amount of the proceeds. Because the obligation on the part of the seller to return the borrowed securities resulted in an increase in the adjusted basis of its assets, the obligation is treated as a liability. See S. Rep. No. 1263, 95th Cong., 2d Sess. 183-185 (1978), 1978-3 C.B. 481-483 (an obligation that creates basis is treated as a liability); Rev. Rul. 95-26, 1995-14 I.R.B. 6; and Rev. Rul. 88-77, 1988-2 C.B. 128. Therefore, for purposes of §§357 and 358, the assumption by *S* of the obligation to deliver replacement securities constitutes the assumption of a liability, and the amount of the short-sale liability is the amount of basis to which the short sale gave rise.[57]

In December 1998, the IRS National Office issued a field service advice memorandum with respect to a case in which a partnership had effected a short sale of two-year Treasury Notes, and had terminated pursuant to Code section 708(b)(1)(B) while the short sale position

---

[52] *Id.* at 108 (emphasis added).
[53] 1995-1 C.B. 131.
[54] *Id.* at 132.
[55] *Id.*
[56] 1995-1 C.B. 53.
[57] *Id.* at 53.

remained open. The memorandum addressed whether Code section 1233 supported the partnership's position that its obligation to close the short sale was not a "liability" for purposes of Code section 752. The National Office concluded it did not, reasoning:[58]

> Neither I.R.C. §1233 nor Reg. §1.1233-1(a)(1) prescribe or suggest when the obligation that arises in a short sale transaction is included in basis of the partnership assets. In addition, there is nothing in the legislative history of I.R.C. §1233 or in the history of Reg. §1.1233-1(a)(1) to suggest such a rule exists. *See generally*, Staff of Joint Comm. on Internal Revenue Taxation, 83d Cong., 2d Sess., *Summary of the New Provisions of the Internal Revenue Code of 1954* 104 (Comm. Print 1955); S. Rep. No. 1622, 83d Cong., 2d Sess. 113, 436 (1954); H.R. Rep. No. 1337, 83d Cong., 2d Sess. 83, A277 (1954), and; T.D. 6207 , 1956-2 C.B. 529.
>
> Our position is that the only provisions which govern the determination of when the value of an obligation is included in the basis of the partnership assets are the partnership rules under Subchapter K, specifically, I.R.C. §§752 , 732 and 722.[59]

Outside the short sale arena, the IRS has provided additional guidance on the meaning of "liability" for purposes of section 752 in the form of technical advice[60] in 1998.[61] The situation with respect to which the IRS issued that determination involved a partnership that distributed cash to the partners that the partners asserted was nontaxable because it did not exceed their bases in their partnership interests. In computing their bases, the partners had included as a liability certain prepaid subscription income of the partnership that had been deferred under Code section 455. The IRS concluded that such deferred income was a liability under Code section 752, reasoning:

> Similarly, Partnership's liability to deliver a magazine arises when Partnership receives prepaid subscription payments from its subscribers. Upon receipt of the payments, Partnership incurs an obligation to furnish a certain number of magazines to its subscriber. If Partnership fails to deliver the magazines, it is obligated to refund the prepaid amounts. The receipt of the payment increases Partnership's basis in cash, one of its assets, by the amount of the payment. Accordingly, under the definition of liability relied on in Rev. Rul. 88-77 and Rev. Rul. 95-26, the advance subscriber payments represent a partnership liability for purposes of §752.[62]

---

[58] Field Service Advice is not a ruling or technical advice memorandum from the IRS, but rather direction from IRS National Office to IRS field agents with respect to legal positions to take in an examination and the factual development required in connection with such positions. Field Service Advice memoranda are not included in the list of documents characterized as "authority" in Reg. § 1.6662-4(d)(3)(iii) for purposes of weighing whether "substantial authority" exists for a tax return position.
[59] Field Service Advice 199913016 (Dec. 23, 1998).
[60] Technical advice memoranda typically provide the current IRS analysis of an issue. They are applicable only to the taxpayer to whom the advice is directed and cannot be relied on by other taxpayers.
[61] Tech. Adv. Mem. 9823002 (Feb. 5, 1998).
[62] *Id.*; *but see* Rev. Rul. 73-301, *supra* (concluding that progress payments received by a taxpayer but not currently includible in income under its method of accounting were not Code section 752 liabilities but were Code section 751 unrealized receivables).

*Synthesis and conclusion*

Taken together, the statutes, regulations, cases, and IRS pronouncements establish that:

- Neither the Code nor the regulations defines the term "liability" for purposes of Code section 752. Although sections of the Code other than section 752 use the term "liability," no such section defines the term generally. When conflicting interpretations of the term in Code section 357 gave rise to administrative concerns, Congress amended Code section 357 to resolve them. Congress did not authorize the IRS to define "liability" on a case-by-case basis.[63]

- The CRTR Act (1) provided that for purposes of Code section 358(h), the term "liability" includes "any ... contingent obligation to make payment," (2) excluded any such contingent obligation if it is assumed in connection with a transfer of substantially all of the assets with which the obligation is associated, and (3) directed the IRS to issue regulations to prevent the acceleration or duplication of losses through the assumption of liabilities described in section 358(h)(3) of such Code in transactions involving partnerships. For the reasons discussed above, to the extent that the CRTR Act applies and the IRS does not issue valid regulations to the contrary, the obligation to replace Treasury Notes borrowed to effect the short sale is not a "liability," and the transactions effected as part of the Financial Plan should be excluded from the basis reduction rule by the substantially all of the assets transfer exception.

- Since the Supreme Court's 1940 decision in *Deputy v. du Pont*, there has been no question that the obligation of a short seller to return the borrowed shares is not "indebtedness" as that term is used in the interest expense deduction provisions of the Code.

- None of the 1995 revenue rulings has yet been the subject of a final judicial decision,[64] and two of such rulings[65] conflict both with the third ruling[66] and with *Deputy v. du Pont*, the Supreme Court decision each ruling cites.

---

[63] *See* W. McKee, W. Nelson & R. Whitmire, FEDERAL INCOME TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[1] (1997) (the omission of the definition of the term "liability" from the final regulations under Code section 752 was unfortunate, as it "leaves both the Service and taxpayers in a position to argue in close cases either that policy considerations should bend the dictionary definition of the term 'liabilities' or, in the alternative, that the term used in the statute should be accorded its plain meaning.")

[64] See, however, the discussion entitled ***Recent litigation: Salina**, infra*, with respect to a Tax Court opinion issued in November 2000, in a group of cases settled by the parties after issuance of that opinion but before the preparation of computations. Accordingly, neither party will have the opportunity to appeal the reasoning or conclusions of the court.

[65] Rev. Rul. 95-26, *supra*; and Rev. Rul. 95-45, *supra*.

[66] Rev. Rul. 95-8, *supra*.

- Cases such as *Long* and *LaRue*[67] have deemed obligations that are "contingent and indefinite" not to be "liabilities" as that term is used in Code section 752. Accordingly, it is clear that not every obligation is a "liability," just as the Supreme Court determined that not every obligation is indebtedness.

The position of the IRS as stated in revenue rulings, field service advice, and technical advice, has varied over the years and has utilized the following principal considerations: (1) whether there was an unconditional and legally enforceable obligation to pay a sum certain at a determinable date,[68] and (2) whether incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to an immediate deduction to the partnership or, under Code section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest.[69] A close review of the positions of the IRS on this issue is necessary, taking into account the principle that

> IRS revenue rulings are not binding precedent on this court. "Unlike treasury regulations, which are promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act, revenue rulings 'do not have the force and effect of law' and therefore are 'accorded less weight than regulations.'" *American Stores Co. v. American Stores Co. Retirement Plan*, 928 F.2d 986, 994 (10th Cir. 1991) (quoting *Flanagan v. United States*, 810 F.2d 930, 934 (10th Cir. 1987)). Revenue rulings do not have the force and effect of regulations and may not be used to alter the plain language of a statute. *C.I.R. v. Schleier* 515 U.S. 323, 336, 115 S. Ct. 2159, 2167 n. 8, 132 L.Ed.2nd 294 (1995).
>
> Revenue rulings are given considerable weight when they are issued contemporaneously with the enactment of the statute and have been in long use, and the statutory language has been reenacted without change, indicating apparent congressional satisfaction with the prevailing interpretation. *See Davis v. United States*, 495 U.S. 472, 481-85, 110 S.Ct. 2014, 2020-22, 109 L.Ed.2nd 457 (1990) (legislative reenactment doctrine as applied to revenue rulings). *See generally* Linda Galler, *Emerging Standards for Judicial Review of IRS Revenue Rulings*, 72 B.U.L. REV. 841 (1992).[70]

The IRS position in Rev. Rul. 73-301—that the progress payments at issue there were not liabilities for purposes of Code section 752 because they did not create an unconditional and

---

[67] A short seller's obligation to return borrowed securities closely resembles the "back office" obligation to replace missing securities discussed in *LaRue*. In each case, the amount of the obligation cannot be determined with reasonable accuracy until the acquisition of the securities to be used to replace the borrowed or missing instruments.
[68] Rev. Rul. 73-301, *supra*.
[69] Rev. Rul. 88-77, *supra*; Rev. Rul. 95-26, *supra*.
[70] *ABC Rentals of San Antonio, Inc. v. Commissioner*, 142 F.3rd 1200, 1205 (10th Cir. 1998); *see also Christenson v. Harris County*, 529 U.S. 576, 146 L.Ed.2nd 621 (2000) (interpretations set forth in agency opinion letters, policy statements, agency manuals, and enforcement guidelines all lack the force of law, do not warrant judicial deference, but are entitled to respect only to the extent of their power to persuade); *Stark v. Commissioner*, 86 T.C. 243, 250-251 (1986) (absent special circumstances, a revenue ruling merely represents the Commissioner's position with respect to a specific factual situation); *Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2nd 1142, 1146-47 (5th Cir. 1971) ("A ruling is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on the Secretary or the courts. It does not have the effect of a regulation or a Treasury Decision."), *citing with approval United States v. Bennett*, 186 F.2nd 407, 410 (5th Cir. 1951) (a ruling has "no more binding or legal force than the opinion of any other lawyer…").

legally enforceable obligation to pay a sum certain at a determinable date—is in harmony with the classic definition[71] of a debt for Federal income tax purposes, with the "all events test" cited by the Tax Court in *LaRue*, and with the Supreme Court's opinion in *Deputy v. du Pont.*

The IRS position in Rev. Rul. 88-77 that the accrued expenses of the cash basis partnership in that ruling were not liabilities within the meaning of Code section 752 was based on the following rationale:

> The present issue is similar to that arising under section 357(c) of the Code when property and liabilities are contributed to a controlled corporation in exchange for stock. For purposes of determining the basis of the stock received in the exchange under section 358 and any gain that must be recognized on the exchange under section 357(c), section 357(c)(3) provides that the term "liabilities" shall not include obligations the payment of which would give rise to a deduction or that would constitute a guaranteed payment under section 736(a). This rule is subject to an exception found in section 357(c)(3)(B) for liabilities the incurrence of which resulted in the creation of, or an increase in, the basis of any property. Section 357(c)(3) was added by the Revenue Act of 1978.
>
> The legislative history accompanying the amendment to section 704(c) made by the Tax Reform Act of 1984 explicitly rejected the conclusion reached in Revenue Ruling 60-345 in favor of an interpretation of section 752 that is consistent with section 357(c). See H.R. Rep. No. 861, 98th Cong., 2d Sess. 856-857 (1984), 1984-3 (Vol. 2) C.B. 110, 111.[72]

The report of the Conference Committee adopted in connection with the amendments to Subchapter K as part of the Deficit Reduction Act of 1984 supports the narrow holding of Rev. Rul. 88-77, as the committee stated: "The committee intends that, similar to the amendments recently made to section 357(c) (and contrary to Rev. Rul. 60-345, 1960-2 C.B. 211), these accrued but unpaid items should not be treated as partnership liabilities for purposes of section 752."[73] However, Rev. Rul. 88-77 goes on to observe that

> Under *P*'s method of accounting, *P*'s obligations to pay amounts incurred for interest and services are not deductible until paid. For purposes of section 752 of the Code, the terms "liabilities of a partnership" and "partnership liabilities" include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to an immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest. The preceding sentence uses the term "assets" to include capitalized items that are properly allocable to future periods, such as organizational expenses and construction period expenses.
>
> The liabilities incurred by *P* for interest expense and services do not create or increase the basis of a partnership asset or give rise to a deduction when incurred. Therefore, for purposes of computing

---

[71] *Gilbert v. Commissioner*, 248 F.2d 399, 402 (2d Cir. 1957) (a "debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof").
[72] 1988-2 C.B. at 129.
[73] 1984-2 C.B. (Vol. 2) at 110-11.

> *A*'s adjusted basis in *P*, *A* may not treat *P*'s accrued expenses and accounts payable as a liability of the partnership.[74]

The narrow conclusion of Rev. Rul. 88-77—that the accrued expenses and accounts payable of the cash-basis partnership should not be treated as partnership liabilities for purposes of Code section 752—is supported by the authorities it cites. No authority cited by the IRS supports the "definition" of a partnership liability suggested by the IRS, as quoted above. Moreover, such a definition was not necessary to the conclusion of the ruling. The weight accorded this *dictum* definition should reflect these considerations.

Rev. Rul. 95-26 reached its conclusion that a "short sale of securities described in this ruling creates a partnership liability under §752"[75] as follows:

> Rev. Rul. 88-77, 1988-2 C.B. 129, provides that partnership liabilities for purposes of §752 include an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings).
>
> A short sale creates an obligation on the part of the seller to return the borrowed securities. See, e.g., *Deputy v. du Pont*, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). In addition, the cash received in the short sale is an asset of the partnership. Thus, the basis of the partnership's assets is increased. Therefore, [the partnership's] short sale creates a liability under §752, and the adjusted bases of the partnership interests of *A* and *B* are increased under §722 to reflect their shares of the liability under §752.[76]

Although Rev. Rul. 95-26 cites *Deputy v. du Pont* and accurately summarizes its holding, it then ignores that holding. The essential rationale of Rev. Rul. 95-26 rests on the unsupported principle that an obligation is a liability if incurring the obligation creates or increases the basis of partnership assets. Both the rationale and the conclusion of Rev. Rul. 95-26 should be rejected for several reasons.

- First, as noted above, although Rev. Rul. 88-77 does ***state*** the principle for which Rev. Rul. 95-26 cites it, that principle was *dictum*: neither necessary to the conclusion reached in Rev. Rul. 88-77 nor supported by any authority cited in Rev. Rul. 88-77. Accordingly, the citation of Rev. Rul. 88-77 does not ***support*** the principle for which it is cited in Rev. Rul. 95-26.

- Second, the determination in Rev. Rul. 95-26 that the partnership's short sale creates a liability under Code section 752 because "partnership liabilities for purposes of §752 include an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings)" is inconsistent with the Supreme Court's determination in *Deputy v. du*

---

[74] 1988-2 C.B. at 129.
[75] 1995-1 C.B. at 132.
[76] *Id.*

*Pont* that the obligation of a short seller to replace the borrowed securities is not "indebtedness." Rev. Rul. 95-26 makes no attempt to reconcile its determination or rationale with either the *du Pont* decision or the determination of the IRS in Rev. Rul. 95-8 that the obligation of a short seller is not "indebtedness."

- Third, the assertion in Rev. Rul. 95-26 that the partnership's short sale creates a liability under Code section 752 is inconsistent with cases such as *Long* and *LaRue* and with Rev. Rul. 73-301 rejecting such classification for obligations that are contingent and indefinite, as is the obligation of a short seller to replace the borrowed securities.[77] In addition, the characterization of the obligation to replace Treasury Notes borrowed to effect the short sale as a "liability" is also inconsistent with the provisions of the CRTR Act, discussed above, to the extent it is applicable to partnership obligations.

- Fourth, to the extent that Rev. Rul. 95-26 implies that the obligation of a short seller to replace the borrowed securities is determinable with reasonable accuracy so as to avoid the obstacles in *Long*, *LaRue*, and Rev. Rul. 73-301, it is also inconsistent with the general statutory pattern in Code section 1233 of deferring the taxation of short sales until their closing, as expressly admitted in Rev. Rul. 95-45.[78]

- Finally, Rev. Rul. 95-26 appears fundamentally to misconceive or misconstrue the nature of a short sale, deeming it incorrectly to be a single operation in which taxpayer A who does not own security X obtains cash from a broker in exchange for a promise to provide security X to that broker in the future. Rather, as the U.S. Supreme Court has recognized, the opening of the short encompasses two transactions. In the first, A borrows in kind security X from the broker and incurs an obligation to return identical securities to the broker. A then sells security X on the open market for cash. Thus, contrary to the implication of Rev. Rul. 95-26, the borrowing of the security creates only an obligation to replace the borrowed security. There are no loan proceeds. It is the sale of the borrowed security that gives rise to the partnership's receipt of cash, but the tax consequences of that sale are deferred by Code section 1233 until the delivery of securities to replace those borrowed and sold.[79]

---

[77] The facts recited in Rev. Rul. 95-26 do not indicate that the short seller in that ruling was protected against loss on the transaction in any way.

[78] *But see* Field Service Advice 199913016 (setting forth the IRS litigation position that the deferral of taxation of short sales under Code section 1233 "does not apply to the determination of when the obligation is able to be included in the basis of partnership assets" and that "the only provisions which govern the determination of when the value of an obligation is included in the basis of the partnership assets are the partnership rules under Subchapter K, specifically, I.R.C. §§752 , 732 and 722.").

[79] A. Cunningham, *Short-Sale Obligations and Basis in Partnership Interests*, 72 TAX NOTES 1663, 1669-1670 (September 23, 1996). In *Provost v. United States*, 269 U.S. 443, 453 (1926), the Court recited the following as the "four separate steps" of a completed short sale transaction: "(1) the sale of the stock by the person effecting the short sale, followed by the transfer and delivery of the certificates for the borrowed stock to the purchaser's broker; (2) the transfer of the shares from the lender to the borrower, who uses them for delivery on the customer's short sale; (3)