LEWIS, RICE & FINGERSH, L.C.



The preceding critique of Rev. Rul. 95-26 is particularly relevant to the weighing of authorities required in arriving at legal opinions in general and, in particular, in determining whether "substantial authority" exists for a legal proposition. Even though Rev. Rul. 95-26 is relatively recent and deals directly with the classification under Code section 752 of the borrowing of a security for a short sale, it is best viewed as a conclusory statement of IRS position, unsupported by the authorities it purports to cite, rather than a reasoned analysis supported by existing precedent. Accordingly, the other authorities reviewed above should be accorded more weight than Rev. Rul. 95-26. Weighing the relevant authorities, there is substantial authority for the position that the obligation of a short seller to return borrowed securities is not a liability under Code section 752, and it is more likely than not that the obligation of a short seller to return borrowed securities is not a liability under Code section 752, even after the issuance of the Tax Court opinion in *Salina*, as discussed in more detail below in the section entitled "***Recent litigation: Salina.***"

***Investment partnership status of RLC***

Under Code section 731, the in-kind distribution of property (other than money) by partnerships to partners generally is not an event requiring the recognition of income by the distributee partner. Code section 731(c) modifies this general rule, providing that the term "money" includes marketable securities, and that such securities are to be taken into account at their fair market value at the date of the distribution. When this modification applies, a partner who receives a distribution of marketable securities is taxed as though he had received cash, generally recognizing gain in an amount equal to the excess of the cash and the fair market value of the marketable securities distributed over such partner's adjusted tax basis in his partnership interest immediately prior to the distribution. Such a recharacterization can be burdensome as it can require the payment of income tax on transactions that produce no cash with which to satisfy such a liability.

The recharacterization of marketable securities as money under Code section 731(c) is subject to a number of exceptions, two of which are particularly important in the present analysis. First, Code section 731(c)(3)(A)(i) and related regulations provide that the general rule does not apply to the distribution to a partner of a security contributed to the partnership by such partner.

Second, Code section 731(c)(3)(A)(iii) and related regulations provide that the general rule does not apply to a distribution of marketable securities by an "investment partnership" to an "eligible partner" of such a partnership. The Code defines an investment partnership as

> any partnership which has never been engaged in a trade or business and substantially all of the assets (by value) of which have always consisted of

---

the purchase by the borrowing broker of the stock required to repay the loan; and (4) the transfer and delivery by the borrower to the lender of the certificates for the purchased shares to replace the shares borrowed."

> (i) money, (ii) stock in a corporation, (iii) notes, bonds, debentures, or other evidences of indebtedness, (iv) interest rate, currency, or equity notional principal contracts, (v) foreign currencies, (vi) interests in or derivative financial instruments (including options, forward or futures contracts, short positions, and similar financial instruments) in any asset described in any other subclause of this clause or in any commodity traded on or subject to the rules of a board of trade or commodity exchange, (vii) other assets specified in regulations prescribed by the Secretary, or (viii) any combination of the foregoing.[80]

The statute also makes it clear that a partnership is not treated as being engaged in a trade or business by reason of activities done as an investor, trader, or dealer in any of the assets listed above. The statute defines its other key term—eligible partner—as any partner who did not contribute to the partnership any property other than assets of the types listed above before the date of the distribution in question.[81]

Applying these standards to RLC, all, or substantially all, of the assets of the partnership will be those assets listed above permitted to be held by an investment partnership. In addition, the activities of RLC are limited to those activities listed above permitted to be effected by an investment partnership. The only contributions RLC will receive will consist solely of assets listed above permitted to be held by an investment partnership. Accordingly, RLC will be classified as an investment partnership and each partner will be an eligible partner of an investment partnership, as those terms are used in Code section 731(c). As a result, Code section 731(c) will not cause the recognition[82] of gain upon the (constructive) distribution of its marketable securities upon its liquidation, as discussed below. Code section 731(c)(3)(A)(i) also applies in that the assets deemed to be distributed to RLP upon the liquidation were those it contributed to RLC.

***Tax termination of RLC; tax basis of assets deemed distributed in liquidation***

Following the purchase by RLP of the membership interest of Robinson in RLC, RLC terminated pursuant to Code section 708(b)(1)(A), which provides that termination occurs when "no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership." In general, regulations provide that a Section 708(b)(1)(A) termination is deemed to occur when "the winding up of the partnership affairs is completed."[83] RLC continued to exist as a matter of state law, and neither effected nor intends to

---

[80] Code section 731(c)(3)(C)(i).

[81] Code section 731(c)(3)(C) (the statute provides further that "the transferor or transferee in a nonrecognition transaction involving a transfer of any portion of an interest in a partnership with respect to which the transferor was not an eligible partner" is not an "eligible partner").

[82] Similarly, Code section 737 does not cause the taxation of the "net precontribution gain" in the marketable securities constructively distributed in liquidation because such assets were constructively distributed to the partner who contributed such assets to the partnership. Code section 737(d)(1).

[83] Reg. §1.708-1(b)(3)(i).

effect a winding up of that entity or its affairs. Rather, it will continue to exist but to be characterized thereafter as a disregarded entity pursuant to Accordingly, RLC will terminate for tax purposes when the winding up of the partnership affairs is completed.

Neither Code section 708(b)(1)(A) nor the related regulations provides a clear explanation of what occurs or is deemed to occur upon the termination of a partnership pursuant to that section.[84] Nonetheless, both common sense and commentary[85] indicate that upon the termination of RLC, or any other two-person partnership, pursuant to Code section 708(b)(1)(A), the remaining person (the person who purchased the interest of his former partner) is deemed to receive a distribution of all of the remaining assets in liquidation of his interest in the terminated partnership.

In determining the Federal income tax treatment of RLP, Rev. Rul. 99-6[86] prescribes that RLC is deemed to make a liquidating distribution of all of its assets to RLP and Robinson, and following this distribution, RLP is treated as purchasing the assets deemed to have been distributed to Robinson in liquidation of Robinson's interest in RLC. RLP's basis in the assets attributable to Robinson's former interest in RLC is the purchase price paid by RLP to Robinson. RLP's holding period for these assets begins on the day immediately following the date of the sale.

Upon the termination of RLC, RLP is considered to receive a distribution of those assets attributable to RLP's former interest in RLC. RLP must recognize gain or loss, if any, on the deemed distribution of the assets to the extent required by section 731(a). Specifically, RLP will recognize gain (if any), in an amount equal to the excess of the money actually or constructively distributed to such partner over the adjusted tax basis of such partner's interest in the partnership[87]. RLP will not recognize a loss on the transaction unless the only property distributed consists of money, unrealized receivables (as defined in Code section 751(c), and inventory receivables (as defined in Code section 751(d).[88] RLP's basis in the assets received in the deemed liquidation of its interest in RLC is determined under Code section 732(b), specifically RLP's basis in its partnership interest, less any money actually or constructively distributed to such partner.[89]. Correlatively, pursuant to Code section 735(b), RLP will take a holding period in the property received that includes the holding period of the terminating partnership in those assets, as determined under section 1223.

---

[84] By comparison, Reg. §1.708-1(b)(1)(iv) provides that upon a termination under Code section 708(b)(1)(B), a specific series of events is deemed to occur.
[85] *See* W. McKee, W. Nelson & R. Whitmire, FEDERAL INCOME TAXATION OF PARTNERSHIPS AND PARTNERS ¶12.05[3] (3rd Ed. 1997).
[86] 1999-1 CB 432.
[87] Code section 731(a)(1).
[88] Code section 731(a)(2).
[89] Code section 732(b). This aggregate basis is allocated among the assets in accordance with rules prescribed in Code section 732(c).

***Substance over form, step transaction, and related judicial doctrines***

It has been recognized at least since the 1934 decision in *Helvering v. Gregory*[90] that

> Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.[91]

Nevertheless, there are limits to such arrangements. For almost as long as there has been a Federal income tax, there has been a tension in the administration of the law between the determination of tax liability based upon the form of transactions effected by taxpayers, on one hand, and efforts by the IRS and occasionally by taxpayers, on the other hand, to override form so as to tax the substance of what—if anything—a taxpayer has done. In effecting the latter sort of analysis, the IRS and the courts have crafted several different but related doctrines. Briefly stated, those doctrines are:

- The so-called "substance over form," "sham transaction," "economic substance," and "economic reality" doctrines, under which a transaction will be given effect for Federal income tax purposes only if it has non-tax[92] economic substance.[93]

- The so-called "step transaction doctrine," under which transactions that are separate in form will be integrated and taxed as a single transaction if (a) they are "component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result,"[94] (b) the steps were "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series,"[95] or (c) following the first step, there was a binding commitment to take the later steps.[96] As a result of the development of these alternative criteria examining different factors with potentially-conflicting results, there is some uncertainty as to which test a court may apply when the step transaction doctrine is invoked.[97]

---

[90] 69 F.2d 809 (2d Cir. 1934), *aff'd* 293 U.S. 465 (1935).
[91] *Id.* at 810.
[92] *Gregory v. Helvering*, 293 U.S. 465, 469 (1935) (refusing to recognize a transaction as a reorganization after examining "what actually occurred" and finding "[s]imply an operation having no business or corporate purpose – a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character….")
[93] *Knetch v. United States*, 364 U.S. 361, 366 (1960) (quoting *Gilbert v. Commissioner*, *supra*, 411) (holding a transaction to have been a sham because it "did 'not appreciably affect his beneficial interest except to reduce his tax' … for it is patent that there was nothing of substance to be realized by Knetch from this transaction beyond a tax deduction.")
[94] *King Enterprises, Inc. v. United States*, 418 F.2d 511, 516 (Ct. Cl. 1969) (quotations and footnote omitted).
[95] *American Bantam Car Co. v. Commissioner*, 11 T.C. 397, 405 (1948), *aff'd per curiam*, 177 F.2d 513 (3rd Cir 1949), *cert. denied*, 339 U.S. 920 (1950).
[96] *Commissioner v. Gordon*, 391 U.S. 83 (1968).
[97] *E.g., McDonald's Restaurants of Illinois, Inc. v. Commissioner*, 688 F.2nd 520 (7th Cir. 1982).

*Substance*

Many courts cite the Supreme Court decision in *Frank Lyon Co. v. United States*[98] as the seminal authority on the attributes of a transaction that will be recognized for Federal income tax purposes:

> [W]here ... there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes.[99]

Many courts have applied this standard since the Supreme Court issued the decision in 1978. One such effort—the Fourth Circuit's 1985 decision in *Rice's Toyota World, Inc. v. Commissioner*[100]—influenced subsequent decisions substantially. The Fourth Circuit noted:

> The tax court read *Frank Lyon Co. v. United States*, 435 U. S. 561, 98 S.Ct. 1291, 55 L.Ed.2[nd] 550 (1978), to mandate a two-pronged inquiry to determine whether a transaction is, for tax purposes, a sham. To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists. *Rice's Toyota*, 81 T. C. at 209; *see also Hilton v. Commissioner* 74 T. C. 305, 349-50 (1980), *aff'd per curiam* 671 F.2[nd] 316 (9[th] Cir. 1982). We agree that such a test properly gives effect to the mandate of the Court in *Frank Lyon* that a transaction cannot be treated as a sham unless the transaction is shaped solely by tax avoidance considerations. *See* 435 U.S. at 583-84, 98 S.Ct. at 1303-04.[101]

The Fourth Circuit summarized the elements of the test as follows: "The business purpose inquiry simply concerns the motives of the taxpayer in entering the transaction. ... [T]he economic substance inquiry ... requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits."[102] After reviewing the record, the court affirmed the Tax Court's determination on this issue, making the following comment on business purpose:

> Rice's failure seriously to evaluate the likely residual value of the computer, its willingness to pay an inflated purchase price, and its use of nonrecourse debt that would facilitate abandonment of the transaction provide ample support for the tax court's finding that Rice did not have profit motivation apart from tax benefits.[103]

---

[98] 435 U.S. 561 (1978) ("*Frank Lyon*").
[99] *Id.* at 583-584.
[100] 752 F.2[nd] 89 (4[th] Cir. 1985) ("*Rice's*").
[101] *Id.* at 91-92.
[102] *Id.* at 92, 94.
[103] *Id.* at 94.

Since the decision in *Rice's*, most of the courts of appeals have had occasion to consider comparable issues. In each such instance, the court in question has followed *Rice's*, although in some cases refining the bifurcated analysis required by the Fourth Circuit's opinion.[104]

Characteristic of the current analysis of this issue is the Third Circuit's opinion in *ACM Partnership v. Commissioner.*[105] In that case, the Third Circuit summarized the required inquiry as follows:

> In applying these principles, we must view the transactions "as a whole, and each step, from the commencement . . . to the consummation . . . is relevant." The inquiry into whether the taxpayer's transactions had sufficient economic substance to be respected for tax purposes turns on both the "objective economic substance of the transactions" and the "subjective business motivation" behind them. However, these distinct aspects of the economic sham inquiry do not constitute discrete prongs of a "rigid two-step analysis," but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes.[106]

In applying the "objective economic substance" review, the court considered "whether the transaction has any practical economic effects other than the creation of income tax losses."[107] In evaluating the "subjective business motivation" for the transaction, the court affirmed the Tax Court's reliance "on evidence that the transactions were not intended to serve any 'useful non-tax purpose' and were not reasonably expected to generate a pre-tax profit."[108]

The transaction involved in the *ACM Partnership* case related to the Colgate-Palmolive Company ("Colgate"). Colgate had reported over $100 million in long-term capital gain in 1988 as a result of selling a wholly-owned subsidiary. It had considered and rejected several proposals to reduce the liability related to that gain. In May 1989, a Merrill Lynch representative presented a proposal to Colgate for an investment partnership that would generate capital losses that Colgate could use to offset some of its 1988 capital gains. Colgate consulted a law firm with respect to the proposal. The law firm summarized the transaction as follows:

> A (a foreign entity), B, and C form the ABC Partnership (ABC) on June 30, 1989 with respective cash contributions of $75, $24 and $1. Immediately thereafter, ABC invests $100 in short-term securities which it sells on December 30, 1989, to an unrelated party. The fair market value and

[104] *ACM Partnership v. Commissioner*, 157 F.3d 231, 247 (3d Cir. 1998); *Horn v. Commissioner*, 968 F.2d 1229, 1233 (DC Cir. 1992); *Gardner v. Commissioner*, 954 F.2d 836 (2d Cir. 1992); *Bohrer v. Commissioner*, 945 F.2d 344 (10th Cir. 1991); *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990); *Shriver v. Commissioner*, 899 F.2d 724, 725 (8th Cir. 1990); *Dewees v. Commissioner*, 870 F.2d 21, 32 (1st Cir. 1989); *Friedman v. Commissioner*, 869 F.2d 785, 792 (4th Cir. 1989); *Killingsworth v. Commissioner*, 864 F.2d 1214 (5th Cir. 1989); *Kirchman v. Commissioner*, 862 F.2d 1486, 1492 (11th Cir. 1989); *Ratliff v. Commissioner*, 865 F.2d 97 (6th Cir. 1989); *Yosha v. Commissioner*, 861 F.2d 494 (7th Cir. 1988).

[105] 157 F.3rd 231 (3rd Cir. 1998), *aff'g, rev'g in part, and remanding* T.C. Memo. 1997-115, *cert. denied*, 526 U.S. 1017 (1999).

[106] *Id.* at 247 (citations omitted).

[107] *Id.* at 248 (quotations omitted).

[108] *Id.* at 253.

> face amount of the short-term securities at the time of the sale is still $100. In consideration for the sale, ABC receives $70 cash and an installment note that provides for six semiannual payments .... Each payment equals the sum of a notional principal amount multiplied by the London Interbank Offering Rate (LIBOR) at the start of the semiannual period. ABC uses the $70 cash and the first payment on the installment note to liquidate A's interest in ABC and uses the subsequent interest payments to purchase long-term securities.[109]

The Third Circuit summarized the law firm's advice on the transaction as follows:

> The law firm advised that the sale of the short-term securities would be reported as a contingent installment sale under the installment method which governs "dispositions[s] of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs," I.R.C. §453, and the ratable basis recovery rule .... Temp. Treas. Reg. §15a.453-1(c)(3)(i). Thus, the law firm advised, ABC would recover $25 of its basis in each of the 4 taxable years from 1989 through 1992, and ABC would recognize gain to the extent that the payments received in any year exceeded the $25 or loss to the extent that the payments fell below the $25, but only if the loss were carried over to a year with sufficient reported gains against which to offset that loss.[110]

A representative of the foreign partner testified that the transaction:

> would create a capital gain and in a later stage a capital loss, and that ... depending on the percentage of your participation, you would either take part in the gain or the loss. So by having us being the majority partner at the start, we would take the majority of the gain, while in a later stage one of the other partners would take the loss.[111]

From a business perspective, Colgate considered using the proposed partnership to invest in its own debt in order to reduce its vulnerability to a decline in interest rates and to offset a decline in the value of that debt that had followed rumors of Colgate's being a likely target for a hostile takeover or leveraged buyout.[112] In doing so, however, the plan contemplated that the partnership's assets would be "fully hedged" against changes in value due to interest rate fluctuations.[113]

Reviewing the Tax Court's objective economic consequences of the transaction, the Third Circuit observed:

> ACM sold the Citicorp notes "for consideration equal to [their] purchase price" and thus did not realize any gain or loss in the notes' principal value. Moreover, as the court observed, the lack of change in principal value was not merely coincidental, but was inherent in the terms of the notes and of the transactions in which they were traded. Likewise, the court found that the interest income generated by the notes could not have a material effect on ACM's financial position because the Citicorp notes paid interest at a rate that varied only nominally from the rate that

---

[109] *Id.* at 234 (footnote omitted).
[110] *Id.* (citations and footnote omitted).
[111] *Id.* at 237 (quotations omitted).
[112] *Id.*
[113] *Id.*

> ACM's cash contributions "were already earning . . . in . . . deposit accounts before the notes were acquired," resulting in only a $3,500 difference in yield over the 24-day holding period, a difference which was obliterated by the transaction costs associated with marketing private placement notes to third parties.
>
> These findings, which are amply supported by the record, demonstrate a lack of objective economic consequences arising from ACM's offsetting acquisition and virtually immediate disposition of the Citicorp notes. On November 3, 1989, ACM invested $175 million of its cash in private placement Citicorp notes paying just three basis points more than the cash was earning on deposit, then sold the same notes 24 days later for consideration equal to their purchase price, in a transaction whose terms had been finalized by November 10, 1989, one week after ACM acquired the notes. These transactions, which generated the disputed capital losses by triggering the application of the ratable basis recovery rule, offset one another with no net effect on ACM's financial position. Examining the sequence of ACM's transactions as a whole as we must in assessing their economic substance, we find that these transactions had only nominal, incidental effects on ACM's net economic position.[114]

Moving to the subjective business motivation for the transaction, the Third Circuit:

- Rejected ACM's argument that the Tax Court erred in reviewing the subjective business purposes and profit motives for the transaction, the Court finding that even if the pertinent statute has no express business-purpose requirement, the economic-substance cases supported the Tax Court's review to determine whether the transaction was "'entered into without expectation of economic profit and [with] no purpose beyond creating tax deductions;'"[115]

- Analyzed ACM's interim investment in Citicorp notes, finding no error in the Tax Court's finding that such investment "was motivated by the pursuit of the tax advantages of a contingent installment sale rather than by a need for an interim investment pending its acquisition of Colgate debt;"[116]

- Analyzed and rejected ACM's contemporaneously-documented, non-tax reasons for acquiring the notes accounted for on a contingent installment sale basis, concluding that those reasons "cannot withstand scrutiny in light of the stated purposes behind the partnership itself, because the investment in the Citicorp notes impeded rather than advanced ACM's professed goal of making its cash available to acquire Colgate debt issues, just as the investment in the LIBOR notes impeded rather than advanced the professed goal of acquiring partnership assets that would hedge against Colgate's exposure to declining interest rates outside the partnership;"[117]

---

[114] *Id.* at 249 (citations and footnotes omitted).
[115] *Id.* at 253 (quoting *Wexler v. Commissioner*, 31 F.3rd 117, 123-24 (3rd Cir. 1994)).
[116] *Id.* at 255.
[117] *Id.* at 256.

- Observed that (1) the documents outlining the proposed transactions explained the contemplated tax consequences in detail, but did not detail the expected rate of return on the instruments themselves, (2) Colgate did not attempt to determine whether the transactions would be profitable taking into account transaction costs approximating $3 million, and (3) the plan required ACM to hold the "LIBOR notes" for two years in which time their value was likely to decline if interest rates declined as Colgate predicted and as actually occurred;

- Concluded that "neither ACM nor any of its partners reasonably anticipated any profits resulting from the relevant transactions, which entailed an economically inconsequential investment in Citicorp notes and a decidedly unprofitable investment in LIBOR notes whose value would be expected to decline under contemporaneously predicted market conditions."[118]

In the final analysis, although it denied the contingent installment sale treatment sought by Colgate, the Third Circuit's decision determined that "ACM's possession of the LIBOR notes, although not intended to serve non-tax purposes, had significant non-tax economic effects, consisting of several million dollars in actual economic losses."[119] It reversed the decision of the Tax Court denying the actual losses suffered on the disposition of those notes.[120]

In *ASA Investerings Partnership v. Commissioner,*[121] the District of Columbia Circuit affirmed a Tax Court decision denying the tax benefits of another contingent installment sale note transaction designed by Merrill Lynch. In *ASA*, both the Tax Court and the Court of Appeals took a different approach than the courts took in *ACM*, neither reaching the economic substance issue. Each court concluded that the facts and circumstances—principally the partnership agreement and the conduct of Merrill Lynch and the "partners" in planning, considering, and implementing the transaction—demonstrated that there was no partnership recognizable for Federal income tax purposes. Responding to ASA's argument that the controlling Supreme Court authority[122] required recognition of the partnership if (1) its purpose is the equivalent of business activity, or (2) it conducts business activities, the Court of Appeals stated:

> We agree if engaging in business activity were sufficient to validate a partnership ASA would qualify. It was infused with a substantial amount in capital ($1.1 billion), and invested it in PPNs, LIBOR notes, and other short-term notes over a period of two years. In fact, however, courts have understood the "business activity" reference in *Moline* to exclude activity whose sole purpose is tax avoidance. ... Thus, what the petitioner alleges to be a two-pronged inquiry is in fact a unitary

---

[118] *Id.* at 258.
[119] Id. at 262.
[120] *Id.* at 261-263.
[121] 201 F.3rd 505 (D.C. Cir. 2000) ("*ASA*"), *aff'g* T.C. Memo. 1998-305, *cert. denied* 148 L.Ed. 2nd 117 (October 2, 2000).
[122] *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943) ("*Moline*").

> test—whether the 'sham' be in the entity or the transaction—under which the absence of a nontax business purpose is fatal.[123]

In its decision not to respect the partnership, and to characterize the relationship as being that of debtor and creditor, the Tax Court noted the following considerations:

- divergent business goals of the "partners,"
- conduct of the parties as to income allocations, guaranteed return, and loss allocations did not conform to the partnership agreement, but to a preliminary business agreement of the parties (the "Bermuda Agreement"),
- the only ASA asset with a significant potential to fluctuate in value was "perfectly" hedged,
- although ABN, the second "partner," bore the risk of loss attributable to the potential bankruptcy of the issuers of its debt instruments, that risk was de minimis due to the creditworthiness of those issuers,
- Allied Signal was obligated to and did in fact pay all expenses of ASA (a fact in conformity with the Bermuda Agreement but in conflict with the partnership agreement),
- despite ABN's voting rights under the partnership agreement, Allied Signal made all of the critical decisions required to be made by the partnership,
- Allied Signal's conduct toward ABN and, more generally, toward the selection of its foreign "partner," more closely resembled the conduct of a borrower toward a potential lender, and
- ABN's consideration of the transaction was handled in the same manner as any large corporate loan.[124]

Upon its review of the Tax Court decision, the Court of Appeals affirmed, finding no clear error in these findings of fact.

A United States District Court for the District of Columbia recently issued its decision in a third case, *Boca Investerings Partnership v. United States,*[125] dealing with the proposed rejection of tax consequences claimed in connection with a contingent installment sale note transaction (similar to those discussed in *ACM* and *ASA* above) designed by Merrill Lynch, the client in this case being American Home Products Corporation. Unlike *ACM* and *ASA*, the court in *Boca* concluded that Boca had established by a preponderance of the evidence that the IRS had erred and, as a result, entered judgment for Boca. The court's key conclusions, based primarily on factual findings, were that the IRS erred in determining that:

---

[123] *Id.* at 512 (footnote omitted).
[124] *ASA Investerings Partnership v. Commissioner*, T.C. Memo. 1998-305.
[125] Civil Action No. 97-0602 (PLF), U.S. District Court (D.D.C. October 5, 2001), *reprinted in* Daily Tax Report (October 11, 2001) ("*Boca*").

- Boca (the partnership organized by American Home Products Corporation and unrelated foreign investors) should not be recognized as a partnership for federal income tax purposes on the theory that the parties did not intend to form a partnership and did not form a partnership for purposes of federal income tax,
- the transactions financing the purchase and sale of the private placement notes (the instruments purchased and then sold on an installment basis) should not be recognized for federal income tax purposes on the theory that the transactions lacked economic substance, were prearranged and predetermined, and had no legitimate business purpose,
- Syringa and Addiscombe (the foreign investors) were not partners in Boca on the theory that Syringa and Addiscombe made loans rather than capital contributions to the partnership,
- the transactions undertaken by Boca with respect to the purchase and sale of private placement notes should be collapsed so that no gain or loss is recognized for federal income tax purposes on the theory that, under the step transaction doctrine, transitory steps occurring as part of a plan may be disregarded if they add nothing of substance to the completed transaction,
- Boca's sales of the private placement notes should be disqualified from installment sale reporting under Code section 453 on the theory that the steps necessary to create a market for the LIBOR notes were taken at the time the notes were issued, and
- the allocation of the installment tax gain lacked substantial economic effect under Code section 704(b) and should be reallocated to American Home Products.

Although the *Boca* decision is subject to appeal to the Court of Appeals for the District of Columbia Circuit—the Circuit that affirmed the pro-government decision in *ASA*—it is one of several setbacks[126] the IRS has suffered recently in its tax shelter litigation efforts. It remains to be seen whether it will be appealed to the District of Columbia Circuit and, if so, how that court will deal with the District Court's fact-intensive decision. More significantly, several commentators[127] have suggested that these losses could prompt a reexamination of the IRS tax shelter litigation strategy.

<u>*Synthesis and conclusion*</u>

Weighing the relevant authorities, and taking into account the pertinent facts and circumstances, there is substantial authority for the position that the judicial "substance over form" and "step transaction" doctrines will not alter the Federal income taxation of the Financial Plan, and it is more likely than not that such doctrines will not alter the Federal income taxation

---

[126] *See United Parcel Service of America v. Commissioner*, 254 F.3rd 1014 (11th Cir. 2001); *IES Industries v. United States*, 253 F.3rd 350 (8th Cir. 2001).
[127] *Government's Loss in Boca Partnership Case Seen Suggesting Need to Rethink Litigation*, Daily Tax Report (October 11, 2001).

of the Financial Plan. In reaching this conclusion, we rely in part on the following considerations:

- First, the transactions at issue were part of a Financial Plan, described in the Facts section of this letter, undertaken for legitimate investment, estate-planning, and privacy/security purposes. Although the tax consequences of the Financial Plan were a consideration, there were significant non-tax economic purposes for which the Financial Plan was designed including, without limitation, realizing profits on short sales of Treasury Notes and on dispositions of Constellation stock, and increasing the diversification of Mr. Sands' holdings.

- Second, the short sales of Treasury Notes in the transactions at hand were completely unhedged. As a result, depending on how interest rates might fluctuate, RLC had a significant economic potential for either profit or loss.

- Third, although the transactions comprise individual events that occurred in a short span of time,[128] these events were not mutually interdependent, effected pursuant to a "binding commitment" to enter into all of the transactions, or component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.

We observe that, in *Salina*, the Tax Court dealt with an economic substance attack by the IRS on a transaction somewhat similar to the one addressed in this opinion. The facts of that case, and the Court's reasoning in resolving the economic substance issue in favor of the taxpayer in that case, are set forth below in a section entitled "***Recent litigation: Salina.***"

***Partnership anti-abuse regulations***

*Regulations*

So-called anti-abuse regulations adopted in 1995 assert that the intent of the partnership tax provisions of the Code—"Subchapter K"—is to permit taxpayers to conduct joint business and investment activities through a flexible arrangement without incurring an entity-level tax. The regulations condition this on the satisfaction of three requirements. First, the partnership must be bona fide, and each partnership transaction or series of related transactions must be entered into for a substantial business purpose. Second, the form of each partnership transaction must be respected under substance over form principles. Third, except as otherwise provided in

---

[128] If the transactions are extremely close in time, courts are more likely to regard them as an integrated whole. Some courts have given this test very little weight. *See, e.g., Hinricksen v. Braicks*, 137 F.2d 632 (9th Cir. 1943) (one-half hour apart separate transactions); *H.B. Zachry Co. v. Commissioner*, 49 T.C. 73, 82 (1967 (three days)). In fact, some courts have held that if each transaction has independent economic substance, the transactions should not be integrated even if the subsequent transactions are planned at the outset. *See, e.g., Turner Broadcasting System, Inc. v. Commissioner*, 111 T.C. 315, 325-329 (1998).

Subchapter K, the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income.

Under the anti-abuse regulations, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate Federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast[129] the transaction for Federal tax purposes so as to achieve tax results that are consistent with the intent of subchapter K.

The determination of whether a partnership has been formed or availed of with a forbidden principal purpose must be based upon a review of "all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction."[130] The regulations list the following as non-exclusive factors to be considered in this review:

> (1) The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly;
>
> (2) The present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated and treated as steps in a single transaction. For example, this analysis may indicate that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest in the partnership was liquidated or disposed of (in whole or in part) would be a partner only temporarily in order to provide the claimed tax benefits to the remaining partners;
>
> (3) One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities (through distribution preferences, indemnity or loss guaranty agreements, or other arrangements), or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital;
>
> (4) Substantially all of the partners (measured by number or interests in the partnership) are related (directly or indirectly) to one another;
>
> (5) Partnership items are allocated in compliance with the literal language of Reg. §§1.704-1 and 1.704-2 but with results that are inconsistent with the purpose of section 704(b) and those regulations. In this regard, particular scrutiny will be paid to partnerships in which income or gain is specially allocated to one or more partners that may be legally or effectively exempt from

---

[129] Should a "recasting" be indicated, Reg. §1.701-2(b) authorizes the IRS to take several types of action "to achieve tax results that are consistent with the intent of subchapter K…." These include (1) disregarding the partnership as a separate entity; (2) deeming one or more purported partners not to be partners for Federal tax purposes; (3) adjusting the accounting method used by the partnership or by a partner to reflect clearly the income of the partnership or the partner; (4) reallocating the partnership's items of income, gain, loss, deduction, or credit, and (5) otherwise adjusting or modifying the partner's or the partnership's claimed tax treatment. *Id.*

[130] Reg. §1.701-2(c).

> federal taxation (for example, a foreign person, an exempt organization, an insolvent taxpayer, or a taxpayer with unused federal tax attributes such as net operating losses, capital losses, or foreign tax credits);
>
> (6) The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or related party); or
>
> (7) The benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distributee partner (or related party).[131]

Even if a partnership satisfies the anti-abuse tests summarized above, the regulations include an alternative rule regarding "abuse of entity treatment." Under that provision, the IRS "can treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Internal Revenue Code or regulations promulgated thereunder" unless a separate provision of the Code or regulations provides for treatment of the partnership as an entity.[132]

The "intent of Subchapter K" portion of the anti-abuse regulations includes thirteen examples. In one such example, a person ("X") who is not a partner desires to acquire and hold indefinitely certain land owned by partnership PRS. The property has a value of $95*x* and a tax basis of $5*x*. Pursuant to a plan a principal purpose of which is to permit X to recover for tax purposes a substantial portion of the purchase price for the land, X contributes $100*x* to PRS for a partnership interest. Subsequently, but when the value of the partnership's assets have not changed materially, PRS distributes to X in liquidation of its interest in PRS the land and another asset with a value and basis to PRS of $5*x*. As a result of this transaction, X's $100*x* basis in his partnership interest is allocated among the two assets in proportion to their bases, resulting in a basis of $50 in each asset. X then sells the asset worth $5 and recognizes a loss of $45. The IRS explained its view of the transaction as follows:

> Although section 732 recognizes that basis distortions can occur in certain situations, which may produce tax results that do not satisfy the proper reflection of income standard of paragraph (a)(3) of this section, the provision is intended only to provide ancillary, simplifying tax results for bona fide partnership transactions that are engaged in for substantial business purposes. Section 732 is not intended to serve as the basis for plans or arrangements in which inconsequential or immaterial assets are included in the distribution with a principal purpose of obtaining substantially favorable tax results by virtue of the statute's simplifying rules. The transaction does not properly reflect X's income due to the basis distortions caused by the distribution that result in shifting a significant portion of X's basis to this inconsequential asset. Moreover, the proper reflection of income standard contained in paragraph (a)(3) of this section is not treated as satisfied, because, taking into account all the facts and circumstances, the application of section 732 to this arrangement, and the ultimate tax consequences that would thereby result, were not clearly contemplated by that provision of subchapter K. In addition, by using a partnership (if respected), the partners'

[131] *Id.*
[132] Reg. §1.701-2(e).

> aggregate federal tax liability would be substantially less than had they owned the partnership's assets directly (see paragraph (c)(1) of this section). On these facts, PRS has been formed and availed of with a principal purpose to reduce the taxpayers' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under applicable judicial principles and statutory authorities, such as the disguised sale rules under section 707, see paragraph (h) of this section), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.[133]

In issuing the final regulations, the IRS responded to comments on the proposed regulations that questioned the scope of the regulations and their relationship to established legal doctrines (e.g., business purpose, substance over form, step transaction, sham transaction). The IRS commented:

> The final regulation confirms certain fundamental principles that must, in all cases, be satisfied in applying the provisions of subchapter K to partnership transactions, to assure that those provisions are not used to achieve inappropriate tax results. While the fundamental principles reflected in the regulation are consistent with the established legal doctrines, those doctrines will also continue to apply.
>
> So viewed, the uncertainty regarding the application of the regulation reflects the uncertainty that already exists in properly evaluating transactions under current law, including the proper application of existing legal doctrines. As a result, the regulation should not impose any undue administrative burdens on either taxpayers or the IRS.[134]

One must consider not only how the anti-abuse regulations should be applied to the transaction at issue, but—as a threshold issue—whether the anti-abuse regulations are valid.

*Possible invalidity of regulations*

Although some prominent commentators have remarked that "it appears doubtful that the overall landscape of Subchapter K has changed meaningfully by reason of this Regulation,"[135] other prominent commentators have observed that the regulations represent an appropriation of legislative authority that is both radical[136] and startling.[137] In the view of such commentators, the regulations are of questionable validity,[138] at best.[139]

---

[133] Reg. §1.701-2(d), example 11(ii).
[134] T.D. 8588, 1995-1 C.B. 109, 112.
[135] A. Willis, J. Pennell, P. Postlewaite, PARTNERSHIP TAXATION ¶1.03[6] (6th Ed. 2000).
[136] R. Lipton, *The Partnership Anti-Abuse Regs. Revisited: Is There Calm After The Storm?*, 83 J. TAX. 68, 74 (1995).
[137] W. Nelson, *The Limits Of Literalism: The Effect Of Substance Over Form, Clear Reflection And Business Purpose Considerations On The Proper Interpretation Of Subchapter K*, 73 TAXES 641, 658 (1995).
[138] R. Lipton, *supra*, 74; S. Banoff, *Anatomy of an Antiabuse Rule: What's Really Wrong with Reg. Section 1.701-2*, 95 TNT 56-84 (March 20, 1995) ("the courts are likely to question the validity of such anti-abuse regulations").
[139] W. Nelson, *supra* (the anti-abuse regulation "cannot be defended as either a statement of preexisting law or as an application of normal interpretive rules"); C. Allison, *The Section 701 Final Regulation: Does It Have A Foundation*

Code section 7805(a) authorizes the Secretary to issue "all needful rules and regulations ... as may be necessary by reason of any alteration of law in relation to internal revenue." In accordance with controlling judicial authority, in determining the validity of a tax regulation, one must make several determinations:

- First, one must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. ... [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[140] In determining whether Congress has spoken directly to the issue, the Supreme Court has directed a broad inquiry, taking into account (1) the context not only of the words or phrases in controversy, but also of their place in the overall statutory scheme, (2) other Federal legislation, particularly later and more specific legislation on the subject, and (3) common sense.[141]

- Second, one must determine whether the regulation was issued under the Code section 7805(a) general authority to "prescribe all needful rules and regulations" or under a specific statutory grant of authority. If the former, a reviewing court will accord such a regulation "less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision."[142]

- Third, one must consider whether the regulation "'harmonizes with the plain language of the statute, its origin, and its purpose,'"[143] taking into account "whether the regulation 'is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent.' *National Muffler Dealers Assn. v. United States*, *supra*, at 477; and '[i]f the regulation dates from a later period, the manner in which it evolved merits inquiry.' *Ibid.* We also consider, if pertinent, 'the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent reenactments of the statute.' *Ibid.*"[144]

---

*Of Rock Or Sand?*, 54 N.Y.U. INST. ON FEDERAL TAXATION §7.05 (1996) ("there is an ample basis for a court to hold the Final Regulation invalid").

[140] *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984).

[141] *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 146 L.Ed.2[nd] 121 (2000).

[142] *Rowan Companies, Inc. v. United States*, 452 U. S. 247, 253 (1981)

[143] *Id.* (quoting *National Muffler Dealers Assn. v. United States*, 440 U. S. 472, 477 (1979))

[144] *Id.*

Ultimately, the courts will uphold the validity of tax regulations if they "implement the congressional mandate in some reasonable manner."[145]

In *Helvering v. Credit Alliance Corp.*,[146] the Supreme Court refused to enforce a regulation dealing with the dividends-paid credit available at that time, reasoning that "the regulation [at issue] not only was contradictory of the plain terms of the [statute] but attempted to add a supplementary legislative provision, which could only have been enacted by Congress."[147] The IRS may not ignore the literal meaning of a statute even if there are unintended consequences of legislation.[148] In *Crooks v. Harrelson*, the Court stated:

> It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts.[149]

In *Edward L. Stephenson Trust v. Commissioner*,[150] the Tax Court considered an IRS regulation permitting IRS consolidation of multiple trusts, and concluded:

> Our review of the history of subchapter J and the restrictions on multiple trusts convinces us that the consolidation regulation is invalid because it adds restrictions not contained in the statute nor contemplated by Congress. The grounds for our conclusion are: First, Congress consciously enacted clear rules in 1969 to eliminate some, but not all, of the tax benefits associated with multiple trusts. The consolidation regulation goes beyond the statute by eliminating *all* of the tax benefits of multiple trusts. Second, the consolidation regulation takes a subjective approach to the multiple trust issue. This approach conflicts with the objective approach adopted by Congress. Third, the regulation extends beyond the statute and exceeds congressional intent by purporting to overrule the *Morris Trusts* case.[151]

---

[145] *United States v. Correll*, 389 U. S. 299, 307 (1967).
[146] 316 U.S. 107 (1942).
[147] *Id.* at 113. A regulation is out of "harmony" with the statute's origin and purpose and therefore invalid if it purports to add restrictions not enacted by Congress to a statute. *Estate of Boeshor v. Commissioner*, 78 T.C. 523, 527 (1982).
[148] *Crooks v. Harrelson*, 282 U.S. 55 (1930); *Hanover Bank v. Commissioner*, 369 U.S. 672, 688 n. 23 (1962) (quoting *Fabreeka Products Co. v. Commissioner*, 294 F.2nd 876, 879 (1st Cir. 1961)) ("'[g]ranting the government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the Congressional thumb, not the court's"); *Busse v. Commissioner*, 479 F.2d 1147, 1152 (7th Cir. 1973) ("However much the statute, in operation, may offend the Commissioner's sense of symmetry and propriety, we cannot say that the results it causes are either absurd or unintended by Congress. Courts have no power (just as the Commissioner has no power in his capacity as an administrative official) to rewrite legislative enactments to give effect to their 'ideas of policy and fitness or the desirability of symmetry in statutes.'") (quoting *U.S. v. Shirah*, 253 F.2d 798, 800 (4th Cir. 1958))).
[149] 282 U.S. at 60.
[150] 81 T.C. 283 (1983).
[151] *Id.* at 294-95 (footnote omitted).

Congress has previously reviewed many provisions of the Code and enacted revisions or expressly authorized the issuance of regulations to eliminate or deter potential abuses.[152] If Congress intended that partnership transactions be subject to the "principal purpose" test set forth in the anti-abuse regulations, it could enact such a provision, as it has done with the fourteen provisions referenced in footnote 152. It did not do so, although it has enacted and repealed tax-avoidance-oriented provisions as a part of subchapter K. By way of example:

- Congress enacted Code section 704(b), relating to the effectiveness of allocations of items of partnership income, gain, loss, deduction, and credit as part of the Internal Revenue Code of 1954. That section provided,[153] in part, that allocations of tax items would be made in accordance with the partners' interests in the partnership where the avoidance or evasion of any tax was the principal purpose of the agreement of the parties on such determinations. Congress removed that principal purpose test from Code section 704(b) in 1976, replacing it with a substantial economic effect test.

- In 1999, Congress enacted Code section 732(f), requiring an adjustment to the basis of corporate stock distributed to a partner that is a corporation (other than the issuer of the distributed stock). As a part of that provision, Congress authorized the IRS to issue regulations "as may be necessary to carry out the purposes of this subsection, including regulations to avoid double counting and to prevent the abuse of such purposes."[154]

In the corporate context, Congress has provided in Code section 357(b) that where a liability assumption occurs in the context of a transaction the income from which is, in general, not presently subject to taxation, the assumption is taxed as though cash had been received if the principal purpose of the taxpayer with respect to the assumption was to avoid Federal income tax on the transaction, or was otherwise not a bona fide business purpose. Had Congress favored a

---

[152] Each of the following sections either sets forth or authorizes issuance of regulations to set forth anti-abuse or anti-avoidance provisions: Code sections 72(e)(11), 108(c)(5), 197(f)(9)(F), 338(e)(3), 361(b)(3), 732(f)(8), 860L(h), 877(d)(4)(D), 901(k)(4)(C), 953(e)(7), 954(h)(7), 1274A(e)(2), 1397F(2), and 6255(g)(1). Not only has the Congress not enacted a statute making a specific grant of authority to issue anti-abuse or anti-avoidance provisions in the partnership setting, it has not even granted authority to issue regulations to effect the purposes of subchapter K as it has done in implementing many provisions of the Code. *See, e.g.*, Code section 777 (authorizing the issuance of regulations "as may be appropriate to carry out the purposes" of sections 771 through 776, dealing with certain electing large partnerships).

[153] Code section 704(b)(2). Prior to the amendment, section 704(b) read as follows:

> A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if
>
> (1) the partnership agreement does not provide as to the partner's distributive share of such item, or
>
> (2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

[154] Code section 732(f)(8).

broad principal-purpose/anti-abuse rule for partnership transactions, it would have included in Code section 752 a provision similar to section 357(b).

In summary, there are significant indications that the partnership anti-abuse regulation is invalid to the extent that it attempts to do more than simply codify into regulation the judicial doctrines of substance over form, sham transaction, economic substance, economic reality, and step transaction.

*Application on the merits*

Even if the partnership anti-abuse regulation is deemed to be valid, the taxation of the Financial Plan transactions as contemplated in this opinion letter is consistent with the three requirements of that regulation. As noted above, those requirements are first, the partnership must be bona fide and each partnership transaction or series of related transactions must be entered into for a substantial business purpose; second, the form of each partnership transaction must be respected under substance over form principles; and third, except as otherwise provided in Subchapter K, the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income. The reasons supporting this conclusion are essentially the same reasons advanced above in support of the conclusion that the judicial "substance over form" and "step transaction" doctrines will not alter the Federal income taxation of the Financial Plan.

First, the transactions at issue were part of a Financial Plan, described in the Facts section of this letter, undertaken for legitimate investment, estate-planning, and privacy/security purposes. Although the tax consequences of the Financial Plan were a consideration, there were significant non-tax economic purposes for which the Financial Plan was designed including, without limitation, realizing profits on short sales of Treasury Notes and on dispositions of Constellation stock, and increasing the diversification of his holdings.

Second, the short sales of Treasury Notes in the transactions at hand were completely unhedged. As a result, depending on how interest rates might fluctuate, RLC had both a significant potential for profit as well as the economic risk of loss.

Third, although the transactions comprise individual events that occurred in a short span of time, these events were not mutually interdependent, effected pursuant to a "binding commitment" to enter into all of the transactions, or component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.

Fourth, the partnership agreement of RLP and the operating agreement of RLC in form and in operation accurately reflect the partners' economic agreements. No allocations in such agreements lack substantial economic effect.

Fifth, although the Tax Section of the New York State Bar Association proposed[155] in a formal comment on the proposed anti-abuse regulation that the IRS include an example that would address specifically a pattern similar to the transactions comprising the Financial Plan, the IRS chose not to include such an example even though it did include thirteen examples, four of which concluded that the facts presented required a recasting of the transaction.

*Conclusion*

Weighing the relevant authorities, and taking into account the pertinent facts and circumstances, there is substantial authority for the position that the partnership anti-abuse rules set forth in Reg. § 1.701-2 will not alter the Federal income taxation of the Financial Plan, and it is more likely than not that such rules[156] will not alter the Federal income taxation of the Financial Plan.

***IRS Notice 2000-44***

On August 14, 2000, the IRS issued Notice 2000-44. That notice describes two transactions. The IRS describes the second transaction (the one relevant to the instant analysis) as follows:

> In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities. ... On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.
>
> The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of §165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under §752, or under §1.701-2 or other

[155] N.Y. St. B.A. Tax Sec. Comm. on Partnerships, Report on the Proposed Anti-Abuse Rule 79-82, Ex. 13 (July 1, 1994).

[156] From a procedural perspective, the IRS has recognized that the some discretion must be exercised in asserting violations of the anti-abuse rule. In Announcement 1994-27, the IRS advised that it was establishing a partnership team as part of its Industry Specialization Program, and that an Issue Specialist on that team

> will be designated to provide expertise to field examiners on all issues raised under proposed regulation 1.701-2 ... once the regulation has been finalized. In addition, as a §1.701-2 issue is considered in an examination, ***the appropriateness of the §1.701-2 determination must be coordinated with the Issue Specialist and the National Office.***

*Id.* (emphasis added).

anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under §165(c)(2). *See Fox v. Commissioner*, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.

IRS Notice 2000-44 identifies the transactions it describes and other "substantially similar" transactions as "listed transactions" for purposes of the transaction-disclosure and document-retention provisions of Reg. §1.6011-4T(b)(2) and the investor-list requirements of Reg. §301-6112-1T (A-4). That designation subjects persons effecting such transactions to the return-disclosure and record-keeping requirements[157] of Code section 6011 and Reg. §1.6011-4T, and the confidential corporate tax shelter registration and investor-list maintenance provisions of Code sections 6111(d) and 6112. The Notice raises the possibility that such transactions were subject to those requirements prior to issuance of the Notice. In addition, the Notice asserts that persons who were required to register such transactions and maintain such lists[158] but who failed to do so may be subject to penalties under Code sections 6707 and 6708.

The transaction described in the Notice presents only a slight potential for (non-tax) economic profit or loss in that, as described, it is fully hedged, being a purchase and sale of call options with the same expiration date with "slightly" different strike prices. As a result, any change in the price of the security that is the subject of the options should result in an increase in the price of one option and a substantially offsetting decrease in the price of the other option. As presented in the Notice, there is no apparent motive for the transaction relating to any security or property other than the call options purchased and sold.

By contrast, the present transaction was motivated in part by a desire to reduce the interest-rate fluctuation risk associated with pre-existing appreciation in other assets, specifically the Constellation stock. Viewed apart from the Constellation stock, the short sale presented an unhedged potential for nontax economic profit and loss, which was enhanced substantially by effecting the short sale on margin. Viewed together with the Constellation stock, the short-sale transaction not only presented an opportunity for investment profit, but it also protected a substantial pre-existing profit, particularly during a period of market uncertainty. Despite a theoretical similarity to the way in which the transfer of the brokerage account in the present transaction increases basis, the transaction addressed in the recent IRS Notice presents a significantly different nontax economic profile than the present transaction.

---

[157] Such requirements, by their terms, apply only to taxpayers "required to file a return for a taxable year with respect to a tax imposed under section 11, 594, 801, or 831 . . . ." Those sections impose tax on corporations, mutual savings banks, life insurance companies, and non-life insurance companies, respectively.

[158] Generally, the organizers, managers, and vendors of a tax shelter are responsible for such actions.

***Recent litigation: Fulcrum***

The IRS issued Notices of Final Partnership Administrative Adjustments to two partnerships in 1996, each presenting the issue of whether an obligation to close a short sale constitutes a liability for purposes of Code section 752. The parties settled one case on March 8, 2000. [159] The other case was *Salina*, discussed below in the section ***entitled "Recent litigation: Salina."***

Fulcrum was a partnership that (1) borrowed two-year Treasury Notes with an aggregate face amount of approximately $140 million from a broker pursuant to a "forward repurchase agreement," (2) sold short the borrowed Treasury Notes to unrelated purchasers, (2) deposited the proceeds (approximately $142 million) from the sale in the partnership's brokerage account, and (3) invested the proceeds of the short sale in the forward repurchase agreement, which was treated as an asset of (loan by) the partnership for Federal income tax purposes. At the same time, Fulcrum (y) purchased five-year Treasury Notes with an aggregate face amount of approximately $110 million from an unrelated party for approximately $112 million, and (z) financed the purchase of the five-year Treasury Notes by entering into a reverse repurchase agreement with an unrelated party, which was treated as a loan to the partnership for Federal income tax purposes.

A partner in Fulcrum then sold a 98 percent interest in the partnership, causing a technical termination of the partnership under Code section 708(a)(1)(B). Under the regulation then in effect, following this technical termination, Fulcrum was deemed to have made a distribution of all of its assets to its partners, who were deemed to contribute those assets to a successor partnership. A partner who receives a (deemed) liquidating distribution allocates his adjusted tax basis in the partnership interest being liquidated among the assets (deemed to be) received. Fulcrum asserted that its obligation to replace the borrowed securities under the short sale was not a liability under Code section 752 and therefore did not contribute to the basis of the assets deemed to have been received in the liquidation under the regulation.[160]

Finally, the partnership deemed to have been the successor to Fulcrum closed out its short sale position and the forward repurchase agreement by purchasing two-year Treasury Notes for approximately $143 million, delivering those notes to the forward repurchase agreement counterparty and receiving approximately $144 million from that counterparty. The partnership deemed to have been the successor to Fulcrum also closed out its reverse repurchase agreement transaction and its long position in five-year Treasury Notes by repaying approximately $114 million due the reverse repurchase agreement counterparty, receiving the five-year Treasury

[159] *Fulcrum Financial Partners v. Commissioner*, U.S. Tax Court Docket No. 3944-96 ("*Fulcrum*").

[160] The taxpayer and the IRS took unusual positions in Fulcrum, the taxpayer advocating a position leading to a larger gain on the transaction as a result of excluding the short-sale obligation from its partnership interest basis, and the IRS arguing for inclusion of the obligation in basis and a correlatively smaller gain.

Notes from that counterparty, and selling the five-year Treasury Notes for approximately $114 million.

Fulcrum's partners reported capital gain of approximately $135 million on the transactions described above for the calendar year 1991. Of that amount, approximately $125 million was reported as gain by TIC Leasing Corp. ("TIC"), an affiliate of Turner Broadcasting System, Inc. ("TBS"). TBS sold the stock of TIC in 1994 and reported a capital loss on that sale of approximately $131 million.

Relying upon Rev. Rul. 88-77 and the temporary regulations under Code section 752,[161] the IRS took the position that the short sale obligation was a "liability." It distinguished Rev. Rul. 73-301, *Helmer*, and *LaRue*, ultimately stating its rationale as follows:

> Here, the short sale is an integral part of the investment position that [the purchaser of the partnership interest] is acquiring. All of the short sale proceeds have been invested in forward repurchase agreements. Under these agreements the taxpayer has "purchased" substantially similar securities which are held as collateral for the short sale obligation. The taxpayer knows how much they will receive upon the "reselling" of the securities. Thus, it can be argued that the value of the securities held as collateral represent the amount of the liability on the short sale with reasonable accuracy.[162]

By Stipulation of Settlement filed November 16, 1999, and a related closing agreement, the parties resolved the Fulcrum case. In pertinent part, the parties agreed that Fulcrum's capital gain for tax year 1991 was approximately $81 million (rather than approximately $135 million reported on its tax return), and that TBS' capital loss on the sale of the TIC stock was approximately $83 million (rather than approximately $131 million reported on its tax return).

***Recent litigation: Salina***

As noted above, the United States Tax Court issued its opinion in *Salina* on November 14, 2000. As noted above at page 10, the parties settled the issues presented in *Salina* and certain related cases by documents filed with the court on September 24, 2001. Accordingly, even though *Salina* never became a final decision, making the precedential value of the Tax Court opinion uncertain, this letter will discuss the court's analysis in some detail.

In 1992, an investment banker at Goldman Sachs & Co. ("Goldman Sachs") developed an investment strategy with the acronym STAMPS (Special Treasury and Mortgage Partnership Units) to provide above-market returns to corporate or institutional clients and also to provide certain accounting and tax advantages. Another company, BEA Associates ("BEA"), had a

---

[161] Although the notice of final partnership administrative adjustments was issued to Fulcrum in December 1995 with respect to the calendar year 1991, the IRS cited the "liability" definition in temporary regulations even though that definition was not included in final regulations issued by IRS on December 20, 1991.
[162] Notice of Final Partnership Administrative Adjustments issued to Fulcrum Financial Partners, dated December 4, 1995, Form 886-A (Explanation of Items) at 5.

similar plan known by the acronym MAPS ("Mortgage Arbitrage Partners") that used a broader array of investments but with a shorter range of maturities. BEA agreed to serve as investment adviser and portfolio manager for the STAMPS strategy.

In early October 1992, Goldman Sachs presented the STAMPS program to FPL Group, Inc. ("FPL"), the parent company of Florida Power & Light Co. Later that month, both Goldman Sachs and BEA met with representatives of FPL regarding both STAMPS and MAPS. In those October 1992 meetings, Goldman Sachs and BEA (1) promoted STAMPS as a means to increase FPL's return on its short-term, fixed-income investments, (2) advised that FPL would recognize a capital gain for Federal income tax purposes upon entering into the STAMPS transaction, while simultaneously creating a built-in loss in its partnership interest, and (3) projected that the MAPS strategy would allow FPL to earn between 4% and 7% over the current Treasury bill yields, higher than it had been earning on its then-current short-term commercial paper investments.

In mid-December 1992, the FPL board of directors considered the proposed investment, concluding that "investing in the partnership would increase the return on the funds substantially and still keep them available for capital expenditures as needed" and that "the partnership could engage in certain transactions that could utilize certain of the tax losses from" FPL's recent sale of one of the members of its affiliated group. The board approved the investment, requiring that it liquidate its investments by December 30, 1992.

On December 16, 1992, two limited liability companies[163] formed in 1992 under non-U.S. law by a Dutch bank[164] formed Salina as a Delaware limited partnership. On December 17, 1992, Caraville contributed $750,000 for a 1% interest, and Pallico contributed $74,250,000 for a 99% interest.

On December 17, 1992, Salina ***purchased*** Treasury ***Notes*** in the principal amount of $140,000,000, bearing interest at 4.625%, and maturing on November 30, 1994. Salina borrowed $70,087,500 of the purchase price from Goldman Sachs under a master repurchase agreement secured by the Treasury notes.

On December 17, 1992, Salina entered into a ***short sale*** of Treasury ***Bills*** with a face value of $350,000,000, bearing interest at a rate not disclosed in the opinion, and maturing on June 17, 1993. Salina obtained the Treasury Bills to effect this transaction pursuant to a master repurchase agreement with ABN and Goldman Sachs.[165]

---

[163] Caraville Corporation, N.V. ("Caraville") and Pallico Corporation, N.V. ("Pallico").
[164] ABN AMRO Bank, N.V. ("ABN").
[165] As the IRS has recognized in Tech. Advice Mem. 9410008 (1993), some taxpayers use repurchase agreements to borrow securities for short sales:

> Taxpayer often enters, through its broker, into a short sale of Treasury securities in the following manner. Taxpayer obtains Treasuries in a reverse repurchase transaction (a reverse repo). That is,

On December 28, 1992, FPL transferred $76,540,327 to Pallico for a 98% limited partner interest in Salina. That day, Salina's investment advisor recommended that Salina liquidate its existing investments and that it reinvest the proceeds under the MAPS strategy. After Salina authorized it to do so, the advisor closed the short position in Treasury bills by purchasing Treasury bills at a cost of $344,675,333, sold Salina's Treasury Notes for $140,408,750, and repaid the amounts due under the repurchase agreement.

From January 1993 through November 1994, Salina (through its investment advisor) pursued the MAPS strategy, realizing a 1993 return (after fees) of approximately eight percent. In 1994, due to interest rate changes, Salina had no earnings from its MAPS strategy. Salina liquidated on November 30, 1994. FPL received $63,175,099 in cash and $16,713,749 in mortgage-backed securities in the liquidation.

Salina filed its Federal partnership income tax (information) return for the period from December 28 to December 31, 1992, asserting that FPL's purchase of its interest from Pallico triggered a termination of Salina, ultimately resulting in the realization of a $344,000,000 short-term capital gain upon the liquidation of Salina's investments on December 31, 1992 due to a reduction of Salina's basis in the partnership assets resulting from the distribution and recontribution of the assets deemed to occur under the partnership termination regulations then in effect.

The IRS disagreed, asserting that (1) FPL's purchase lacked economic substance, and (2) Salina erroneously computed the substituted basis of the assets it sold after the termination, in particular in not recognizing the obligation to close the short sale of Treasury bills as a liability under Code section 752. The Tax Court litigation followed.

The court addressed each of the objections expressed by the IRS in turn. After reviewing the facts and the case law with respect to the economic substance requirement, the court concluded that (1) FPL entered into the Salina transaction to achieve a valid business purpose independent of tax benefits, (2) FPL's investment in Salina provided a reasonable opportunity for FPL to earn profits independent of tax benefits, and (3) the potential profits associated with the investment were not *de minimis* relative to the perceived tax benefit. Although the court's analysis of the economic substance issue was quite extensive, this letter will not review that analysis in detail.

The court then proceeded to an analysis of the second contention of the IRS, namely that the short-term capital gain reported by Salina should be reduced substantially because Salina should have treated the obligation to close the short sale as a partnership liability, which would

---

Taxpayer purchases the Treasuries from a dealer, and simultaneously agrees to resell the securities to the dealer at a fixed price on a specified future date. Taxpayer then sells the securities in the marketplace. The proceeds of the sale are remitted to the person from which the Treasuries were originally transferred.

have increased its basis in the assets upon the deemed termination of the partnership and reduced the gain on their disposition.

The court began its analysis by commenting on the blend of aggregate and entity approaches to the concept of a partnership that are incorporated into Subchapter K of the Code. The court stated that in an effort to avoid "distortions in income tax reporting" resulting from such a hybrid approach, Congress had enacted several provisions "that generally are intended to equate the aggregate of the partnership's inside bases in its assets with the aggregate of its partners' outside bases in their partnership interests."[166] As examples of Congressional attempts to match inside and outside basis, the Court cited Code sections 722, 705(a), and 752. The first two sections do effect a matching of inside and outside basis.[167] The court associated Code section 752 with this matching in general based on the "practical impact" of the basis adjustments required by Code section 752, citing to this summary in a well-respected treatise:

> If a partnership borrows money, the basis of its assets increases by the amount of cash received, even though the receipt of the borrowed funds is not income. By treating the partners as contributing cash in an amount equal to their shares of the debt, inside/outside basis equality is preserved and distortions are avoided. If a liability for borrowed money were not added to the partners' bases, they could be taxed on a distribution of the borrowed cash even though there is no gain inherent in the partnership's assets. A similar result could occur if a partnership incurs a purchase money liability to acquire property, since the liability is added to the partnership's basis in the property.[168]

Although not apparently considered by the court, the same section of the same treatise cited by the court discusses several problems in defining the term "liability" for these purposes, and considers the effect of those problems on how well Code section 752 works in matching inside and outside basis.[169]

---

[166] *Salina* at 36.
[167] Code section 722 increases a partner's adjusted basis by the amount of the adjusted basis of property contributed, matching the partnership's basis in the contributed asset under Code section 723, and Code section 705(a)
[168] W. McKee, W. Nelson & R. Whitmire, FEDERAL INCOME TAXATION OF PARTNERSHIPS AND PARTNERS ¶7.01[1] (1997).
[169] In part, that discussion stated:

> While § 752 performs a valuable policy function by preserving the equality of inside and outside basis, it operates only on obligations that are treated as "liabilities." As will be discussed, some obligations, such as cash-method accounts payable, fall within the generally understood definition of the term "liability," but have no immediate effect on the basis of partnership assets. Therefore, treating such payables as liabilities for § 752 purposes would run counter to the purposes of the section. Conversely, certain obligations, such as the obligation of the grantor of property to deliver property on exercise of the option, are not generally thought to be liabilities, but the basis of the grantor's assets nevertheless is increased by any premium received upon the grant of the option (even though the premium is not taxed on receipt). Thus, § 752 may not achieve its inside/outside basis-equalizing function if the term "liability" is given its ordinary meaning.

*Id.*

The court then observed that, although the regulations do not define the term "liabilities," revenue rulings and the predecessor temporary regulations did so. The court began by summarizing Rev. Rul. 88-77, *supra*, Rev. Rul. 95-26, *supra*, and the definition of "liability" that was set forth in Temp. Reg. §1.752-1T(g), but was not included in the final regulations issued before the beginning of the 1992 tax year in controversy in *Salina*.

The IRS position in the case was based on the syllogism that (a) Code section 752 liabilities include an obligation to the extent it creates or increases the partnership's basis in any asset, including cash attributable to borrowings (Rev. Rul. 88-77, *supra*), (b) a short sale creates an obligation to return the borrowed securities (*Deputy v. Du Pont, supra*) that causes an increase the partnership's basis in its assets by the amount of cash received on the sale of the borrowed securities (Rev. Rul. 95-26, *supra*), consequently (c) the obligation to return securities borrowed to effect a short sale is a Code section 752 liability.

The court observed that Salina contended that the IRS position was inconsistent with the taxation of short sale under Code section 1233, and with Rev. Rul. 73-301, *supra*, and *Helmer v. Commissioner, supra*. The court concluded that "***[f]or present purposes***, we observe that the provisions of sections 1233 and 752 are mutually exclusive," based on the "disparate policies that sections 1233 and 752 are intended to promote," and that the characterization of the obligation to close the short sale as a Code section 752 liability "does not create tension or conflict with the deferred recognition of gain or loss prescribed for short sale transactions under section 1233."[170] The court did not explain why the functions of Sections 1233 and 752 and the policies that might be inferred from those functions could not be reconciled or harmonized, or under what circumstances or for what purposes those sections would ***not*** be mutually exclusive.

The court also stated that it was "not persuaded" that the position of the IRS in *Salina*, as set forth in Rev. Rul. 95-26, *supra*, conflicted with Rev. Rul. 73-301, *supra*, or *Helmer v. Commissioner, supra*. After summarizing each of the latter authorities, the court stated:

> In sum, the authorities that petitioner relies upon demonstrate that, although the amounts received by a partnership in an open transaction generally are not characterized as a liability under section 752, the transaction must nevertheless be examined to determine whether the partnership incurred related liabilities that may require partner-level basis adjustments pursuant to section 752. In light of these competing considerations, we reject petitioner's argument that the Commissioner's reasoning in Rev. Rul. 95-26, 1995-1 C.B. 131, conflicts with Rev. Rul. 73-301, *supra*, and the Court's holding in Helmer v. Commissioner, supra.[171]

Having stated a general principle subject to an exception based upon further examination, the court did not make further examination, but moved on to another subject. The court observed that Salina attempted to analogize between the option payments received by the partnership in *Helmer* and the cash proceeds received in *Salina*. The court concluded:

---

[170] *Salina* at 43 (emphasis added).
[171] *Salina* at 47.

> Although the two transactions are both considered open transactions for purposes of application of the income tax, the transactions are materially different for purposes of analysis under section 752. The option payments that the partnership received in *Helmer v. Commissioner, supra*, represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services. In contrast, Salina's gain or loss on the sale of borrowed Treasury bills was dependent upon the cost to Salina of fulfilling its obligation to replace the borrowed Treasury bills. Consequently, we hold that *Helmer v. Commissioner, supra*, does not support petitioner's position in this case.[172]

Contrary to the Tax Court's recital, the option payments in *Helmer* were ***not*** for the sale of a partnership asset, but rather were for an ongoing ***option*** of the payor to purchase a partnership asset, which payments were to be credited against the purchase price ***if*** the holder exercised the option and the transaction became a purchase. If the option holder ***did*** exercise the option, the option holder would have been required to pay the balance of the purchase price, and the option grantor would have been required to convey the property and recognize gain or loss (and depreciation recapture or other ordinary income components, as indicated by applicable law and facts) on the disposition of the property. If the option holder did ***not*** exercise the option, no sale would have occurred, the option grantor would have retained the payments, the transaction would have concluded, and the option grantor would have recognized income under Code section 1234(b). At the time of the filing of the return at issue in *Helmer*, it was unclear whether the option would be exercised and, correlatively, whether the payments would be taxed as part of the amount realized on the sale of property or as payments on a lapsed option to purchase property.

Similarly, the partnership in *Salina* is obligated to close its short sale by acquiring replacement Treasury securities and delivering them to the broker from which it borrowed such securities for purposes of the short sale. At the time an investor borrows the securities to effect a short sale, the price at which he will be able to purchase shares to satisfy that obligation is unknown.[173] Both the *Helmer* and the *Salina* transactions involve such uncertainty that Federal law defers the imposition of income tax until the resolution of that uncertainty. Although the uncertainty in *Helmer* goes to the nature of the transaction and the character of the income, gain, or loss and the uncertainty in *Salina* goes to the amount of the gain or loss recognized on the transaction, Federal tax law deems each uncertainty sufficiently significant to defer income or loss recognition, notwithstanding a strong prejudice in tax statutes and decisions against so-called "open transaction" treatment. This Federally-recognized uncertainty also should be deemed sufficiently significant (as the Tax Court did in *Helmer*) to defer recognition of any potential partnership liability under Code section 752. The court observed that the facts of the

---

[172] *Id.*

[173] The court's comparison of *Helmer* with the facts in *Salina* makes the same error as the IRS did in Rev. Rul. 95-26, *supra*, misconceiving or misconstruing the nature of a short sale as explained by the U.S. Supreme Court in *Provost v. United States, supra*. See note 79 and the accompanying text.

cases are different, but it did not set forth a rationale to distinguish *Salina* from *Helmer* as a matter of law.[174]

The court then addressed Salina's reliance on *Deputy v. du Pont, supra*, the United States Supreme Court decision that denied a deduction for interest expense claimed by a taxpayer who had engaged in a short sale.[175] The Tax Court deemed Salina's reliance "misplaced," observing that "the Supreme Court's rejection of the taxpayer's argument was more firmly rooted in the Court's holding that the disputed payments did not constitute a payment of interest within the meaning of the statute...."[176] The Tax Court then attempted to distinguish the Supreme Court's reasoning in *Deputy v. du Pont,* asserting:

> [T]he Supreme Court's statement ... that "an obligation is not necessarily an 'indebtedness'" ... does not constitute a blanket holding that a borrower's obligation to close a short sale by returning the borrowed securities to the lender will never be considered an indebtedness....
>
> We, of course, are in no way constrained (nor prepared) to assume that a liability within the meaning of Code section 752 must satisfy the definition of an indebtedness as that term is used elsewhere in the Code.[177]

The Tax Court did not cite a textual basis for either of these purported distinctions in the *du Pont* decision or in any later decisions of the Supreme Court or any other court.

At this point in its opinion, the court had (1) cited, and then ignored, the withdrawn temporary regulations that included such a definition, (2) declared that it was "not convinced" that the IRS position on the issue was inconsistent with Code section 1233 and Reg. §1.1233-1, (3) declared that it was "not persuaded" that the IRS position on the issue was inconsistent with Rev. Rul. 73-301, and *Helmer*, and (4) asserted that Salina's citation of *Deputy v. du Pont* overstated the Supreme Court's holding in the case. After seventeen pages of analysis of the Code section 752 issue, including observations that neither the statute nor the final regulations defined the term "liability," the court observed that Salina did not offer the court a definition of the term "liability."

The court did not cite or analyze other cases applying Code section 752 or the term "liability" either in a partnership tax context or in any other Federal income tax context. Instead, it ignored conventional precedent and resorted to Black's Law Dictionary for guidance in

---

[174] As a matter of logic, one could infer that the court would find no Section 752 liability if, rather than engaging in a short sale of a security, an investor instead sold a call option on a security he did not own. Consistent with the *Salina* court's explanation of *Helmer*, such a transaction would yield proceeds to the call writer that would be "free and clear of any claim for repayment or demand for further services." If the call option holder exercised his option, the option writer would have had to acquire and transfer the securities, just as the option writer in *Helmer* would have had to transfer the property if the holder of the option in that case had exercised its option.
[175] See text accompanying footnotes 37 & 38.
[176] *Salina* at 49.
[177] *Salina* at 49-50.

determining the "ordinary meaning" of the term "liability." It found and quoted the following definition:

> 1. The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment. * * * 2. A financial or pecuniary obligation * * *.[178]

The Tax Court deemed this definition to be dispositive, stating:

> Based upon the aforementioned meaning of the term "liability", and consistent with the policy underlining section 752, we hold that Salina's obligation to close its short sale by replacing the Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the Treasury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN. Significantly, Salina reported the obligation as a liability on its opening balance sheet.[179]

The Tax Court opinion in *Salina* is most noteworthy for its inconsistencies, incongruities, loose ends, and omissions. In particular, the Tax Court:

- Deemed the matching of inside basis and outside basis important, and relied upon an "ordinary meaning" construction of the term "liability," but failed to harmonize, distinguish, or even mention the rejection by the McKee, Nelson, Whitmire partnership taxation treatise of an "ordinary meaning" construction as a way of effecting the matching of inside basis and outside basis, even though the court cited that treatise earlier in its opinion;[180]

- Observed that it was "significant" that Salina reported the obligation as a liability on its opening balance sheet,[181] did not explain why such reporting was significant, and failed to note that, after reviewing the nature and objectives of financial accounting and tax accounting, the United States Supreme Court has held that "[g]iven this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable"; [182]

- Cited the definition of "liability" in Temp. Reg. 1.752-1T(g) with apparent approval and noted it again in connection with the discussion of Rev. Rul. 88-77, *supra*, but failed to mention that Treasury issued the final regulations—omitting this

---

[178] *Salina* at 50, *citing* Black's Law Dictionary 925 (7th ed. 1999).
[179] *Salina* at 50-51.
[180] See footnote 169.
[181] *Salina* at 51.
[182] *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 542-543 (1979).

definition—on December 20, 1991, before the beginning of the 1992 year in controversy before the Court in *Salina*;[183]

- Discussed Rev. Rul. 95-26—issued well after the close of the 1992 tax year in controversy—as though it had been outstanding during the year in controversy, without recognizing the extremely limited effect given to such agency opinions by all courts[184] and without mention of the inconsistent use of *Deputy v. du Pont, supra*, in Rev. Rul. 95-8;[185]

- Disregarded the United States Supreme Court's decision in *Deputy v. du Pont, supra*, with slight analysis;

- Failed to discuss any of the cases that deferred tax recognition of liabilities deemed too contingent to quantify;[186]

- Placed reliance on a dictionary definition despite the existence of a statute (Code section 1233) on a closely-related subject, and many cases in a variety of contexts considering the existence and treatment of obligations and liabilities;[187] and

- Issued the case as a memorandum opinion, a class usually limited to cases involving the application of settled legal principles to the facts presented, even though it was the

---

[183] The court did observe that "the final regulations under section 752 do not contain a definition of the term 'liabilities.'" *Salina* at 40. Although the court does not appear to have used this withdrawn definition in deciding the case, it is unclear why it chose to cite the regulation if not to use it.

[184] *Compare Salina* at 40-41 with the authorities set forth in footnote 70 and the related text. Moreover, as noted by the Tax Court in *Estate of Morgan v. Commissioner*, 52 T.C. 478, 484 (1969), aff'd per curiam 448 F.2nd 1397 (9th Cir. 1971), in responding to an IRS citation of a ruling issued after the period in controversy in that case, "We dismiss this argument by pointing out that the Revenue Ruling is no more binding nor has any more legal force than the opening statements of counsel at the time of trial of this case."

[185] See footnote 51 and related text.

[186] *Long v. Commissioner*, 71 T.C. 1 (1978), *supplemented on reconsideration*, 71 T.C. 724 (1979), *aff'd on this issue*, 650 F.2nd 416 (10th Cir. 1981), *citing Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 179 (1973); *Lemery v. Commissioner*, 52 T.C. 367, 377 (1969), *aff'd per curiam*, 451 F.2d 173 (9th Cir. 1971); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), *aff'd per curiam*, 333 F.2d 653 (2d Cir. 1964), and McKee, Nelson & Whitmire, FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS 7.01[2] (1977); *LaRue v. Commissioner*, 90 T.C. 465 (1988).

[187] The court commented that it was "in no way constrained (nor prepared) to assume that a liability within the meaning of Code section 752 must satisfy the definition of an indebtedness as that term is used elsewhere in the Code." *Salina* at 50. Its assertion in this respect—that the Supreme Court's determination that the short sale obligation is not indebtedness should be ignored in favor of a "plain meaning" construction effected as though the Tax Court were writing on a blank slate—is inconsistent with the canons of statutory construction that provide, in general, that (1) statutes *in pari materia* should be construed consistently with one another, e.g., N. Singer, SUTHERLAND STATUTORY CONSTRUCTION §51.02, 121 & n. 3 (5th Ed. 1992), and (2) statutes dealing with the same subject are to be construed to be in harmony if reasonably possible, *id.* at 122 & n. 13.

> first case to consider whether the obligation to close a short sale should be characterized as a liability for purposes of Code section 752.[188]

The parties settled the issues presented in *Salina* and certain related cases by documents filed with the court on September 24, 2001. Accordingly, *Salina* never became a final decision, making the precedential value of the Tax Court opinion uncertain at best. Likewise, it is uncertain whether any inference can be drawn from the positions in and the settlement of the *Fulcrum* case. Until another case presenting the Code section 752 issue arises and is litigated to a final decision, the IRS position merely represents one of two positions on this issue. We believe that the Court's conclusion on the Code section 752 issue in *Salina* is incorrect, would have been reversed on appeal, and would not be followed if the issue were presented to a different court.

If the IRS challenges the tax consequences of the Financial Plan, it may well attempt to use *Salina* as precedent notwithstanding the settlement of that decision and related cases. Were it to do so, a reviewing court would have to consider the precedential value, if any, of the Tax Court opinion in *Salina*. In addition, a reviewing court would scrutinize carefully the facts in each situation to determine the extent to which the transactions in controversy are comparable and the extent to which they are distinguishable from those presented in *Salina*. Until another case presenting the Code section 752 issue arises and is litigated to a final decision, such a comparison is of uncertain value.

***Tax shelter registration, list keeping, and disclosure; related penalties***

*Tax shelter registration*. There are two sets of tax shelter registration requirements. The first set applies to certain arrangements in which a significant purpose of the structure is to avoid or evade Federal income tax for a direct or indirect participant that is a ***corporation***. The Financial Plan should not be characterized as an arrangement with such a purpose. Accordingly, this set of registration requirements should not apply. The second set of registration requirements applies in the context of a noncorporate taxpayer if an arrangement has several statutorily-prescribed characteristics. Those required characteristics include that the arrangement be (1) required to be registered under federal or state securities law, (2) sold under an exemption from registration requiring the filing of a notice with a federal or state securities agency, or (3) a substantial investment. An arrangement is a substantial investment if the aggregate amount that may be offered for sale exceeds $250,000, and (b) there are expected to be five or more investors. The Financial Plan involves five investors (Mr. Sands, Richard Sands, Marilyn Sands, CWC-I, and Mrs. Robinson). Moreover, even if the Financial Plan involved fewer than five investors, Treasury regulations provide that

> For purposes of determining whether investments are parts of a substantial investment, similar investments offered by the same person or related persons (as

[188] B. Bittker & L. Lokken, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶115.2.1 (Second/Third Edition 2000).

LEWIS, RICE & FINGERSH, L.C.



> defined in section 168(e)(4) are aggregated together. Investments are considered similar if they involve similar principal business assets and similar plans or arrangements. Investments that include no business assets will be considered similar if they involve similar plans or arrangements.[189]

The conference committee report adopted at the time of enactment of this provision illustrated the operation of the aggregation provision by an example involving eight limited partnerships, each with a different general partner, three different limited partners, but investing in a separate but similar asset, concluding that registration would be required.[190] A virtually-identical example appears in the Treasury regulations relating to registration.[191]

Concerning the requirement of five or more investors, the regulations relating to an offering involving (in the aggregate) fewer than five investors state that registration is not required if there is neither knowledge nor reason to know that the person making the offering (or a related person) will offer subsequent similar investments. However, the regulation states that a tax shelter organizer will be presumed to have known of similar investments offered during the twelve months following the first offering of an investment.

Under the circumstances presented, without regard to whether a court would sustain an IRS assertion that the Financial Plan should be aggregated for this purpose with separate but similar investments of unrelated parties, the filing of a tax shelter registration could be required.

If an arrangement is within the definition of a tax shelter required to be registered, the statute places the duty to register on several people. These include the person principally responsible for organizing the shelter, any other person who participated in the organization of the shelter, and any person who participated in the sale or management of the shelter when it was not registered. Treasury regulations elaborate on this, making it clear that even though preparation of documents establishing the shelter and other acts frequently done by lawyers generally constitute participation in organization, the performance of such acts "will not constitute participation in the organization or management of a tax shelter unless the person performing the act is related to the tax shelter (or a principal organizer of the tax shelter) or the person participates in the entrepreneurial risks or benefits of the tax shelter." The regulation contemplates determination of whether parties are "related" by reference to the related party / anti-churning rules related to accelerated cost recovery deductions as set forth in Code section 168(e)(4) as it existed in 1984. The examples set forth in the registration regulations provide the following guidance:

> For example, assume that A forms Z partnership, a tax shelter for which registration is required. Z hires the X law firm, none of the partners of which is

---

[189] Reg § 301.6111-1T (Q&A 22).
[190] H.R. Rep. No. 98-432, 98th Cong., 2nd Sess. 226 (1984).
[191] Reg § 301.6111-1T (Q&A 22).

> related to the tax shelter, to prepare the documents necessary to register the offering of Z securities with the Securities and Exchange Commission. X charges $100 an hour for its services in connection with the preparation of the necessary documents, and payment of the fee is not contingent. X will not be treated as a participant in the organization of the tax shelter. If, however, X were to charge a fee equal to 1 percent of the value of the units in the tax shelter that are sold, X would be considered a participant in the organization of the shelter.
>
> As another example, assume that individual C is an attorney employed by W corporation, the corporate general partner and principal organizer of Z, and that C prepares the documents necessary to register the tax shelter with the Securities and Exchange Commission. C will be treated as having participated in the organization of the tax shelter regardless of the way in which C's compensation is structured, because C, as an employee, is related to the principal organizer of the tax shelter.[192]

Although the penalty for failure to register a tax shelter is severe—the greater of $500 or 1% of the aggregate amount invested in the shelter—the penalty is imposed on "a person who is required to register a tax shelter under section 6111," and is not imposed where the failure to register is due to reasonable cause. However, if the Financial Plan or one or more components of that Plan were characterized as a tax shelter, as observed above, the individuals or entities that participated in the organization, sale, or management of the tax shelter would be required to effect a registration.

*Listkeeping*. In addition to registration of tax shelters as defined in Code section 6111, the Code also provides that any person who organizes a "potentially abusive tax shelter" or sells an interest in such a shelter must keep a list of the names, addresses, identification numbers, and certain other information relating to each investor. The definition of a "potentially abusive tax shelter" subject to this requirement includes not only tax shelters required to register with the IRS as such, but also "any transaction a significant purpose of the structure of which is the avoidance or evasion of Federal income tax within the meaning of section 6111(d)(1)(A) and §301.6111-2T(b)." As interpreted by regulations, any person who participates in the organization, management, or sale of the investment is subject to this requirement, but the definition contains a cross-reference to the definition of "principal organizer" in the tax shelter registration regulations, which in turn contain the legal services safe harbor described above. To the extent it is applicable, the penalty for failure to maintain an investor list is $50 for each person not listed, not to exceed $100,000 for any calendar year, but is not imposed where the failure to maintain the list is due to reasonable cause.

---

[192] Reg § 301.6111-1T (Q&A 30)

*Disclosure*. The last of the tax-shelter provisions to which the IRS, the Congress, and the tax bar have devoted a significant amount of attention recently is the requirement that taxpayers attach a specific disclosure statement to their returns if they participated in one or more "reportable transactions." There are two types of reportable transactions. The first type comprises the so-called listed transactions, transactions specifically identified by the IRS in published guidance as such, or transactions substantially similar to the ones so identified. To date, the IRS has identified sixteen listed transactions. The second type of reportable transaction is defined by its characteristics. At present, the failure to make the required disclosure of participation in a reportable transaction pursuant to these provisions is not subject to penalty, although the failure to make such a disclosure could be taken into account in considering whether to impose a deficiency-related penalty, such as the accuracy-related penalty, on an affected taxpayer. These disclosure provisions would take on more significance if proposed tax shelter legislation is enacted, as discussed below.

***Interest and penalties***

If the IRS were to assert a deficiency in tax relating to any aspect of the Financial Plan in general and the tax consequences of that plan discussed in this letter in particular, interest would be payable on any deficiency ultimately determined to be due. The IRS would also consider the assertion of penalties, sometimes referred to as "additions to tax."

Interest on underpayments of tax and on most penalties (including the accuracy-related penalty, discussed below) accrues at a rate equal to three percentage points over the Federal short-term interest rate. The IRS reviews these rates on a quarterly basis. For the quarter beginning January 1, 2002, interest on underpayments by taxpayers other than corporations will accrue at six percent (6%) per annum. Interest compounds daily, resulting in the accrual of interest on unpaid interest.

As noted above, the IRS would consider the assertion of penalties or additions to tax were it to assert a tax deficiency in connection with the Financial Plan. The principal penalty it would be likely to consider is the so-called "accuracy-related penalty" imposed under Code section 6662. That penalty will be sustained if an underpayment of tax is attributable to negligence, disregard of rules or regulations, or a substantial understatement of income tax.[193] The penalty is twenty percent (20%) of the amount of the underpayment so attributable.[194] The penalty percentage is forty percent (40%) to the extent attributable to a gross valuation misstatement.[195] The Code defines a gross valuation misstatement, as that term might be applied in this case, as being present if "the value of any property (or the adjusted basis of any property) claimed on any

[193] Code section 6662(b). The penalty also can be imposed where an underpayment is attributable to a substantial valuation overstatement, a substantial overstatement of pension liabilities, or a substantial estate or gift tax valuation understatement. *Id.*
[194] Code section 6662(a).
[195] Code section 6662(h)(1).

return of tax imposed by chapter 1 is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)...."[196]

In general, the "underpayment" subject to tax is the excess of the correct tax over the tax reported on the taxpayer's return and not abated, credited, refunded, or otherwise repaid.[197] However, the term is limited further for this purpose. In general, the underpayment is reduced by those portions attributable to positions for which there was "substantial authority," as that term is defined, or for which there was adequate disclosure on the taxpayer's return.[198] Congress limited these reductions in cases involving "tax shelters," as defined. Congress defined a tax shelter for this purpose as follows:

> 6662(d)(2)(C)(iii) TAX SHELTER.--For purposes of this subparagraph, the term "tax shelter" means--
> (I) a partnership or other entity,
> (II) any investment plan or arrangement, or
> (III) any other plan or arrangement,
> if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.

A portion of an underpayment attributable to a "tax shelter" item is excluded if there is "substantial authority" for the taxpayer's treatment of that item, ***and*** the taxpayer reasonably believed that his tax treatment of that item was more likely than not the proper treatment.[199]

As developed in applicable Regulations,[200] a taxpayer is deemed to satisfy the reasonable belief requirement if:

> The taxpayer reasonably relies in good faith on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the manner described in paragraph (d)(3)(ii) of this section and unambiguously states that the tax advisor concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service.

That Regulation also states that one must take into account all of the facts and circumstances in determining whether this reasonable belief requirement has been satisfied and, in any event, that standard will not be deemed to be satisfied unless the requirements of Reg. §1.6664-4(c)(1) have been satisfied.[201] That section provides, in pertinent part, that:

- Reliance may not be reasonable or in good faith if the taxpayer knew, or should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.

---

[196] Code sections 6662(e)(1)(A), 6662(h)(2).
[197] Code sections 6211(b)(2), 6662(d)(2).
[198] Code section 6662(d)(2)(B).
[199] Code section 6662(d)(2)(C)(i)(II).
[200] Reg. §1.6662-4(g)(4)(i)(B).
[201] Reg. §1.6662-4(g)(4)(ii).

- The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances including the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. This requirement will not be satisfied if the taxpayer fails to disclose a fact that he knows, or should know, to be relevant to the proper tax treatment of an item.

- The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person.

As noted above in the section entitled "opinion standards," we have used the "substantial authority" and "more likely than not" terminology and related standards as set forth in Code sections 6662 and 6664 and related Regulations in analyzing the potentially-applicable legal authorities and in issuing the opinions set forth above. Although this letter and the opinions set forth above should satisfy the opinion requirements, you must rely on those opinions reasonably and in good faith in order to avoid the imposition of the accuracy-related penalty on matters opined on above.

***Risk of adverse legislation***

Over the past several years, Congress has considered several proposals that, if enacted, would have imposed a more demanding disclosure and penalty structure for transactions characterized as "tax shelters." Most recently, in August 2001, the Senate Finance Committee released a bipartisan staff discussion draft, revising proposals issued by the staff of that committee in May 2000 and in October 2000. Under the most recent draft, a taxpayer would be subject to a forty percent (40%) penalty on any "applicable tax shelter understatement." As defined by the draft, an applicable tax shelter understatement generally is an increase in the income tax of a taxpayer resulting from a difference between the taxpayer's treatment of items attributable to a tax shelter, as defined, and the proper tax treatment of those items. However, tax attributable to an item would be excluded from the applicable tax shelter understatement if:

- there was substantial authority for the tax treatment of such item by the taxpayer,
- the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return, ***and***
- the taxpayer had a reasonable belief that the tax treatment of such item by the taxpayer was more likely than not the proper treatment.

Accordingly, if this proposal were to be enacted, if a taxpayer did not make an affirmative disclosure of the relevant facts relating to an issue, the penalty could be applied if the taxpayer lost in litigation even if the position taken on the return was supported by substantial authority and the taxpayer reasonably believed that his return was accurate.

The proposal also provides that certain tax opinions[202] known as "disqualified opinions" and certain tax advisors[203] each known as a "disqualified tax advisor" could not be relied upon to establish that a taxpayer had the requisite "reasonable belief." As to any applicable tax shelter understatement, the proposal would eliminate the "reasonable cause" exception presently provided under Code section 6664(c)(1).

The proposal presently includes an effective date provision that would apply these rules to transactions entered into, offerings, or activities, as the case may be, after the enactment of the bill. As a result, the proposals, if enacted, would not apply to the Financial Plan. However, if the proposal is adopted and, in doing so, Congress changes the effective date provisions so as to cause these provisions to apply to the Financial Plan, the IRS might argue that this Firm should be characterized as a "disqualified tax advisor" based upon its receipt of client referrals from one or more persons who or which IRS might argue to be tax shelter organizers or promoters. Were this Firm to be so characterized, the opinions stated in this letter could not be used to establish reasonable cause and thereby to avoid assessment of an accuracy-related penalty even if all other conditions for avoiding such a penalty were present.

In addition to this revision to the accuracy-related penalty, the bill—titled the Tax Shelter Disclosure Act—would:

- impose a new penalty[204] for failure to make a statutorily-required disclosure of information relating to participation in a so-called "listed transaction" or "reportable transaction;"
- expand confidential corporate tax shelters registration provisions to cover transactions not involving corporations.
- expand and increase the current penalties for aiding and abetting the promotion of tax shelters;

---

[202] Specifically, the proposal would characterize a tax opinion as a "disqualified opinion" if it: (i) is based on unreasonable factual or legal assumptions (including assumptions as to future events), (ii) unreasonably relies on representations, statements, findings, or agreements of the taxpayer or any other person, (iii) does not identify and consider all relevant facts, or (iv) fails to meet any other requirement as the Secretary may prescribe.

[203] Specifically, the proposal would characterize an advisor as a "disqualified tax advisor" if the advisor: (i) is an organizer or promoter of the tax shelter, (ii) is compensated directly or indirectly by such organizer or promoter with respect to the tax shelter, (iii) has a contingent fee arrangement with respect to such tax shelter, (iv) has any type of referral agreement or other similar agreement or understanding with such organizer or promoter which relates to the tax shelter, or (v) has any other similar characteristic which, as determined under regulations prescribed by the Secretary, is indicative of a potential conflict of interest or compromise of independence.

[204] As to a reportable transaction, the penalty amount would be the greater of (A) 5 percent of any increase in Federal tax which results from a difference between the taxpayer's treatment (as shown on its return) of items attributable to the reportable transaction to which the failure relates and the proper tax treatment of such items, or (B) $100,000. As to a listed transaction, the penalty amount would be the greater of (A) 10 percent of any increase in Federal tax which results from a difference between the taxpayer's treatment (as shown on its return) of items attributable to the reportable transaction to which the failure relates and the proper tax treatment of such items, or (B) $200,000.

- increase the penalty imposed on tax shelter promoters and organizers who fail to maintain investor lists;
- increase the penalties on promoters who furnish false or fraudulent statements in connection with tax shelter transactions; and
- authorize the Treasury Department to censure tax advisers or impose monetary sanctions against tax advisers and firms that participate in "inappropriate shelter activities" and practice before IRS.

Several groups have submitted comments on and suggestions for changes of these proposals.[205] The effective date sections of the bill provide generally that it is to be applied to transactions entered into, offerings, or activities, as the case may be, after the enactment of the bill. None of these changes has been enacted into law, and it is uncertain whether the Bush Administration or the Congress will seek near-term enactment of these proposals, particularly under the current economic conditions. Nevertheless, there can be no assurance that Congress will not enact new laws or modify existing laws in a way that would adversely affect the opinions set forth in this letter. Likewise, there can be no assurance that Congress will not enact new laws or modify existing laws in a way that would result in a more severe application of interest and penalties if IRS were to succeed in asserting any adjustment with respect to the Financial Plan.

## CONDITIONS AND LIMITATIONS

Our opinion is based solely upon our understanding of the facts as set forth above, the representations set forth in a Certificate of Mr. Sands dated as of December 28, 2001, and the Operative Documents. A copy of the Certificate is attached to this letter.

In rendering the opinions set forth above, we have assumed the accuracy of all information set forth in the Certificate, the authenticity of all original documents, the conformity of all document copies to the original documents, and the genuineness of all signatures. We have also assumed that each transaction contemplated herein will be carried out strictly in accordance with the Operative Documents and with the Certificate. Any variance in the facts from those set forth herein may adversely affect our opinions, and may cause the Financial Plan to have Federal income tax consequences that differ from those reflected in the opinions set forth above.

---

[205] *See, e.g.*, Washington Council Ernst & Young Comments Dated September 4, 2001, to Senate Finance Committee on Proposed Tax Shelter Disclosure Act, BNA Daily Tax Report (September 10, 2001) (submitted on behalf of the Tax Fairness Coalition); Arthur Anderson LLP Letter Dated September 4, 2001, Transmitting Comments on Proposed Tax Shelter Disclosure Act on Behalf of the Coalition for Fair Taxation of Business Transactions, BNA Daily Tax Report (September 10, 2001); ABA Tax Section Comments Dated September 6, 2001, to Senate Finance Committee on Proposed Tax Shelter Disclosure Act, BNA Daily Tax Report (September 10, 2001); New York State Bar Association Comments Dated October 30, 2001, to Senate Finance Committee and House Ways and Means Committee on Draft Tax Shelter Legislation Proposed by the Senate Finance Committee, BNA Daily Tax Report (November 6, 2001).

The opinions set forth above are based upon our understanding and interpretation of the Code and its legislative history, the Regulations, administrative rulings, and published court decisions as of the date of this letter. These authorities may be modified, amended, or revoked at any time. Any such change may or may not be retroactive with respect to transactions entered into prior to the issuance thereof, could alter significantly the Federal income tax consequences of the transactions discussed in this letter, and could cause those consequences to differ significantly from the opinions expressed in this letter. There is no assurance that legislative, judicial, or administrative changes will not occur in the future, and we assume no obligation to advise you of any such changes or to update or modify this letter to reflect any such developments that may occur after the date of this letter.

The opinions set forth above reflect our legal judgment on what we believe to be the material Federal income tax issues relating to the Financial Plan, as presented and discussed herein. Many of the issues raised by the Financial Plan, including matters on which we have stated opinions, are extremely complex and have not been addressed by the IRS or the courts and, therefore, have not been resolved definitively. Our opinions are based upon our interpretation and understanding of existing law. Such opinions have no official status or binding effect of any kind. Accordingly, we can provide no assurance that the interpretation of the Federal income tax laws set forth in our opinions will prevail if challenged by the IRS in an administrative or judicial proceeding. Our opinions are based on the assumption that the taxpayers will undertake reasonable effort and expense to present these positions if challenged. We express no opinion with respect to Federal or state securities laws, state, local, or foreign tax consequences, or any other Federal, state, local, or foreign issue not specifically referred to and discussed above.

Our opinions also reflect our assessment of the probable outcome of litigation or other adversarial proceedings properly and effectively presented by your representatives arising from IRS challenges to the transactions discussed herein. Such proceedings are often resolved on the basis of negotiation between the government and the taxpayer. Our opinions address the current state of the law and not the impact of subsequent negotiations between the IRS and taxpayers.

This opinion letter is furnished to you solely for your benefit, and is not to be used, circulated, quoted, or otherwise referred to, or relied upon by any other person without the express written consent of Lewis, Rice & Fingersh, L.C. We assume no responsibility for the tax treatment of other participants to the transactions described herein. This opinion letter is rendered as of the date set forth above.

Very truly yours,

LEWIS, RICE & FINGERSH, L.C.

Lewis, Rice & Fingersh, L.C.