IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: August 4, 2008)

| | |
|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, Plaintiffs submit these Proposed Findings of Uncontroverted Fact. These facts rely on documents produced in plaintiffs' initial disclosures, affidavits of the Sands family members, documents included in the Appendices to Plaintiffs' Response to Defendant's Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment, and a declaration of Julie P. Bowling with exhibits, attached hereto as Appendices A and B.

**Formation of R, R, M & C Group, L.P.**

1. In 2001, as part of a financial plan, certain Sands family members and certain family trusts formed and invested in R,R,M & C Group, L.P. ("Group"), a family investment partnership. Pls.' Ex. 1, App. at pp. 4, 25-26; Ex. 17 App. at p. 356.
2. Group was a limited partnership formed on August 23, 2001 under the laws of Missouri. Pls.' Ex. 2, App. at pp. 31-32.
3. At its formation in 2001, the original limited partners in Group were Robert Sands, Richard Sands, Marilyn Sands, and CWC Partnership I ("CWC") (hereinafter referred to collectively as the "original limited partners of Group"). Pls.' Ex. 1, App. at p. 4, 25-26.

4. CWC is a general partnership organized under the law of New York. As of December 31, 2001, the Trust FBO Abigail Stern U/W Laurie Sands ("Abigail Trust") and Trust FBO Zachary Stern U/W Laurie Sands ("Zachary Trust") each held a 49.5% Class 2 partnership interest in CWC. Richard Sands and Robert Sands each held a .5% Class 2 partnership interest in CWC. (Pls.' Prop. Findings Uncont. Fact Ex. 8, App. at pp. 104-111, 116-123.)

5. The general partner in Group was at all times R, R, M & C Management Corp. Pls.' Ex. 1, App. at p. 4.

6. R, R, M & C Management Corp. is a corporation that was formed on August 23, 2001 under the laws of Missouri. (Pls.' Prop. Findings Uncont. Fact Ex. 9, App. at pp. 227-228.)

7. In 2001 and 2002, R, R, M & C Management Corp.'s sole shareholders were Robert Sands and Richard Sands. Robert Sands and Richard Sands each contributed $55,000 and 1,001 shares of Constellation stock to Management Corp. in exchange for the stock they received from Management Corp. (Pls.' Prop. Findings Uncont. Fact Ex. 10, 11, and 12, App. at pp. 229-230, 235-246.)

8. On August 28, 2001, the original limited partners of Group each contributed cash and various assets to Group for limited partner interests in the partnership. Their respective partnership interests were as follows:

| | | |
|---|---|---|
| a. | Robert Sands | 24.975% limited partner interest |
| b. | Richard Sands | 24.975% limited partner interest |
| c. | Marilyn Sands | 24.975% limited partner interest |
| d. | CWC | 24.975% limited partner interest |

Pls.' Ex. 1, App. at pp. 27-30.

9. On August 28, 2001, R,R,M &C Management Corporation contributed $3,403 and 2,002 shares of Class A common stock of Constellation with a fair market value of $84,785 to Group for a .1% general partnership interest in Group. Pls.' Ex.1, App. at pp. 27, 29.

10. On September 21, 2001 Group held $359,290 and 2,002,002 shares of stock Constellation Brands, Inc. Pls.' Ex. 3, App. at p. 52.

**The Transfers**

11. The partnership agreement of Group provided that a limited partner could transfer or assign (but not mortgage, pledge or otherwise grant a security interest in) his interest in the partnership to any person (defined to include a trust) upon delivering reasonably requested instruments of transfer and assignment to the general partner and upon obtaining consent in writing by the general partner to such substitution of a limited partner. Pls.' Ex. 1, App. at pp. 18-19.

12. The partnership agreement of Group provided that the rights and obligations of the parties under the agreement were to be "governed by and construed and interpreted in accordance with the laws of the State of Missouri applicable to contracts made and to be performed wholly within Missouri, without regard to choice or conflict of laws rules." Pls.' Ex. 1, App. at p. 23.

13. On September 21, 2001, the original limited partners of Group each formed a charitable remainder unitrust: Robert Sands was the grantor of the Robert Sands Charitable Remainder Unitrust – 2001; Richard Sands was the grantor of the Richard Sands Charitable Remainder Unitrust – 2001; Marilyn Sands was the grantor of the Marilyn Sands Charitable Remainder Unitrust – 2001; and CWC was the grantor of the CWC

Partnership I Charitable Remainder Unitrust – 2001. Pls.' Ex. 4, 5, 6, and 7, App. at pp. 131, 169, 205, and 242.

14. The trustees of each CRUT were Richard Sands, Robert Sands, and the Alaska Trust Company. Pls.' Ex. 4, 5, 6 and 7, App. at pp. 131, 169, 205, and 242.

15. The terms of the CRUTs complied with the requirements of Section 664(d) of the Code and the related Treasury Regulations. Pls.' Ex. 4, App. at pp. 131-141; Pls.' Ex. 5, App. at pp. 169-179; Pls.' Ex. 6, App. at pp. 205-215; Pls.' Ex. 7, App. at pp. 242-252.

16. The IRS did not audit the CRUTs or determine that they did not meet the requirements of Section 664(d) of the Code and the related Treasury Regulations. Pls.' Ex. 16, App. at pp. 347, 349, and 351.

17. On September 21, 2001, the original limited partners of Group transferred their partnership interests in Group to four charitable remainder trusts ("CRUTs"): Robert Sands transferred his interest to the Robert Sands Charitable Remainder Unitrust – 2001; Richard Sands transferred his interest to the Richard Sands Charitable Remainder Unitrust – 2001; Marilyn Sands transferred her interest to the Marilyn Sands Charitable Remainder Unitrust – 2001; and CWC transferred its interest to the CWC Partnership I Charitable Remainder Unitrust – 2001 (the four CRUTs are hereinafter referred to as the "CRUT limited partners" or "the CRUTs"). Pls.' Ex. 8, App. at pp. 275, 278, 281 and 284.

18. Pursuant to Assignment and Assumption of Partnership Interest agreements, the original limited partners of Group assigned and delivered their right, title and interest in Group to their respective CRUTs, and the CRUTs assumed such interests and agreed to be substitute limited partners in Group. Pls.' Ex. 8, App. at pp. 275, 278, 281 and 284.

19. The Assignment and Assumption of Partnership Interest agreements entered by the original limited partners of Group and the CRUT limited partners were to be governed by and construed in accordance with the laws of the State of Missouri. Pls.' Ex. 8, App. at pp. 276, 279, 282 and 285.

20. The general partner of Group, R,R,M & C Management Corporation, received notice of and consented to the assignments of limited partnership interests by the original limited partners of Group to the CRUT limited partners. Pls.' Ex. 9, App. at pp. 287-90; Pls.' Ex. 10, App. at pp. 291-98.

21. In order to determine the amount of a current deduction for their gifts to the CRUTs, the Sands hired Goerig & Associates, L.L.C., a qualified appraisal firm, to determine the fair market value of their limited partnership interests on the date of the gift. Pls.' Ex. 3, App. at p. 36.

22. The appraisal determined the fair market value of a 24.975% limited partnership interest in Group on September 21, 2001 to be $5,198,897. Pls.' Ex. 3, App. at p. 97.

23. Each of the Sands claimed a current deduction on their 2001 personal tax returns for the present value of their respective remainder interests as determined by the appraisal from Goerig & Associates. The IRS has not contested these charitable deductions. Pls.' Ex. 11, App. at p. 300-301; Pls.' Ex. 12, App. at p. 303-304; Pls.' Ex. 13, App. at p. 306-307; Pls.' Ex. 14, App. at p. 310-311.

24. All profits, losses, and credits of Group were to be allocated to the partners in proportion to their percentage interests. Pls.' Ex. 1, App. at p. 14.

25. On October 1, 2001, Group sold the 2,002,002 shares of Constellation it held for $74,862,863. On the Form 1065 U.S. Return of Partnership Income filed by Group for

the taxable period ending December 31, 2001, Group reported capital losses from the sale totaling $(19,894,501). Pls.' Ex. 15, App. at p. 317.

26. Since the CRUT limited partners owned their interests in Group when it sold the stock, the capital losses from the sale of the Constellation Brands stock were allocated to the CRUT limited partners in accordance with their limited partnership interests. Pls.' Ex. 1, App. at p. 14; Pls.' Ex. 15, App. at pp. 317-329.

27. In a motion filed on April 11, 2008 and granted by the Court on May 14, 2008, plaintiffs requested leave to amend their complaints to concede the capital gains adjustments asserted by defendant. Group conceded that on its Form 1065 for 2001 it should have reported long term capital gain of $65,539,019 and short-term capital loss of ($207,636). Group and the other plaintiffs conceded the capital gains adjustments on the ground that none of the transactions of the partnerships increased the amount considered at-risk for an activity under Section 465(b)(1) and that the at-risk rules would disallow losses and require the partnerships and their partners to recognize gain on the transactions as set forth in the FPAAs.[1] (Pls.' Mot. for Leave to Amend Compls. at p. 6; Order, May 14, 2008.)

28. Since the CRUT limited partners owned their interests in Group when it sold the stock, the capital gains from the sale of the Constellation Brands stock would properly be allocated to the CRUT limited partners. Pls.' Ex. 1, App. at p. 14; Pls.' Ex. 15, App. at pp. 317-329.

[1] Though plaintiffs conceded the capital gains adjustments, plaintiffs maintained that penalties were not applicable and that plaintiffs Alpha, Beta, Group, and Partners were valid partnerships that should not be disregarded. Plaintiff Group also maintained (a) that the Service erred in disregarding the transfers of limited partnership interests made by the original limited partners of Group, (b) that the Court lacks jurisdiction to determine the validity of the transfers of limited partnership interests in Group, and (c) that the transfers of the limited partnership interests in Group by the Initial Limited Partners to the CRUT Partners were valid.

**Subsequent Events**

29. On February 22, 2002, the original limited partners of Group each exercised the power found in Article Fourth, page 5 of their respective CRUTs to irrevocably designate a charity to receive the CRUTs' remainder interests. They designated the Educational and Health Support Fund ("the Fund"). (Def.'s Second Prop. Findings Uncont. Fact Ex. 16, App. A at pp. 190-192.)

30. The trustees of the Fund were James Locke, Freddy Robinson, and Wesley Stallings. Pls.' Ex. 18, App. at p. 360.[2]

31. Freddy Robinson is the Executive Partner of Bernard Robinson & Company, LLP, an accounting firm that had provided personal tax preparation services to the Sands family for many years. Wesley Stallings was a partner with Bernard Robinson & Company in 2002 and now works for one of its clients, Blue Ridge Companies. Pls.' Ex. 19 and 28, App. at pp. 387 and 587.

32. Since 2000, on an annual basis the fees Bernard Robinson & Company, LLP receives from the Sands family for services rendered averaged approximately 3% of the firm's total annual revenue. Pls.' Ex. 19, App. at p. 387.

33. James Locke is now senior counsel with Nixon Peabody, LLP and has served as a member of the law firm's governing committee and as head of the Business Group in the firm's Rochester office. Pls.' Ex. 20, App. at p. 392.

34. Nixon Peabody is the principal outside counsel for Constellation Brands, Inc. (the "Company"). The fees that Nixon Peabody has received from the Company for legal

---

[2] James Locke executed an original counterpart to this agreement. To avoid cluttering the Record, only his signature page is included in the Appendix.

services during the period 2001 through 2007 have not exceeded in any single year more than 1.5 percent of the firm's revenues for such year. Pls.' Ex. 20, App. at p. 393.

35. When the trustees of the Fund were appointed, they did not have a prearrangement, agreement, or understanding with the Sands family members that as trustees they would agree to sell the Fund's remainder interests in the CRUTs to the grantors/lead beneficiaries of those CRUTs. Pls.' Ex. 17, 19, 20 and 28, App. at pp. 357, 388, 393, and 589.

36. On February 27, 2002, the original limited partners of Group entered into purchase agreements with the trustees of the Educational and Health Support Fund whereby they purchased the remainder interests in their respective CRUTs from the Educational and Health Support Fund. Pls.' Ex. 21[3], App. at p. 399.

37. The original limited partners in Group obtained an updated appraisal opining that the discounts for lack of marketability used in valuing the 24.975% limited partnership interests in Group were still valid. Based on this appraisal, the 24.975% limited partnership interest in Group held by each CRUT was worth $5,482,334. (Def.'s Second Prop. Findings Uncont. Fact Ex. 23, App. A at p. 263.)

38. The original limited partners each paid $550,074.56, the present value of a remainder interest in the 24.975% limited partnership interest in Group to the Educational and Health Support Fund for a total of $2,200,298.24. Pls.' Ex. 22, App. at p. 412.

39. The trustees of the Educational and Health Support Fund exercised their independent judgment in agreeing to sell the remainder interests in the CRUTs to the original limited

---

[3] All the original limited partners executed substantially similar agreements. To avoid cluttering the Record, only Robert Sands' agreement is included in the Appendix.

partners of Group. They did not have a prearrangement or understanding with the Sands family members that they would agree to sell the remainder interests in the CRUTs to the grantors at the time of their appointment as trustees of the Educational and Health Support Fund. They determined that the best interests of the Educational and Health Support Fund would be served by obtaining cash up front rather than waiting for up to 20 years to obtain the remainder interests in the CRUTs which could fluctuate significantly in value during that time period. Pls.' Ex. 19 and 20, App. at pp. 387-88, 393-94.

40. The purchase of the remainder interests in the CRUTs by the original limited partners of Group (who were the present beneficiaries of the CRUTs) terminated each CRUT. The original limited partners of Group then received a distribution of the asset held by their respective CRUT, a 24.975% limited partnership interests in Group. Pls.' Ex. 23[4], App. at p. 432.

41. The Sands family members were advised that the distributions by the CRUTs were not taxable events. Pls.' Ex. 23, App. at p. 432.

42. On February 27, 2002, Group made distributions of $75,267,108.29. Group first distributed $94,307.04 to the trustees of each CRUT so that the CRUTs could make the required unitrust payment through February 27, 2002. Def. APP-A-326-337. The CRUTs made their pro rata unitrust payments of $94,307.04 to the term beneficiaries for the period leading up to the termination of the CRUTs. Def. APP-A-326-337; Pl. Ex. 29[5], App. at 591, Part III, Line A.

[4] All the original limited partners received substantially similar legal opinions. To avoid cluttering the Record, only Robert Sands' opinion is included in the appendix.

[5] Each CRUT filed substantially similar information returns. To avoid cluttering the Record, only the 2002 information return for the Marilyn Sands Charitable Remainder Unitrust 2001 is included in the appendix.

43. Later that same day, Group made the following distributions to its new partners: $18,703,680.15 each to Robert, Richard, Marilyn and CWC and $75,159.52 to RRMC Corp. (App-A-326-337). Pls.' Ex. 24, App. at pp. 443-45.

44. The Educational and Health Support Fund has provided donations of $2,752,288 to a number of charitable organizations since it sold its remainder interests in the CRUTs to the original limited partners of Group. Pls.' Ex. 19, App. at p. 388.

**Reasonable Cause and Good Faith of Plaintiffs and Their Partners**

45. In deciding how to report the above transactions for tax purposes, the Group limited partners relied on the their personal advisors at their long-time accounting firm Bernard Robinson & Company ("Bernard Robinson") and at the law firm of Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") who reviewed the financial plan presented by Heritage. Pls.' Ex. 17, App. at p. 356-59.

46. Members of the Sands family, including Richard and Robert's parents, had engaged Bernard Robinson & Company to prepare tax returns and provide tax advice for decades prior to 2001, beginning in the 1950s. (Pls.' Ex. 52 and 53, App. B at pp. 1351, 1358.)

47. Members of the family had also engaged the law firm of Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed"), in particular Jonathan Blattmachr, to provide legal services beginning in the 1990s. (Pls.' Prop. Findings Uncont. Fact Ex. 52 and 53, App. B at pp. 1351, 1358.)

48. In implementing the transactions described above and in determining the correct tax treatment of the transactions, the Group limited partners engaged Lewis Rice and Milbank Tweed to provide legal services and advice relating to the transactions. Pls.' Ex. 17, App. at p. 357.

49. Lewis Rice made an independent evaluation whether to enter into attorney-client relationships with the Sands family members. Lewis Rice independently determined the fee it would seek directly from the Sands family for its services, based upon its estimate of the amount of time and complexity of the services and based upon the factors expressly permitted under the applicable rules of professional conduct in Missouri. The fee was not dependent upon the outcome of any transaction, nor was it a percentage of an amount invested. (Pls.' Prop. Findings Uncont. Fact Ex. 55, App. B at pp.1369.)

50. Heritage did not pay or agree to pay Lewis Rice any referral fee. In addition, Lewis Rice did not pay or agree to pay any referral fee to Heritage, nor did the firm split any fees with Heritage. (Pls.' Prop. Findings Uncont. Fact Ex. 55, App. B at pp.1369.)

51. Robert Sands completed his due diligence on Lewis Rice on behalf of his family. He researched Lewis Rice and reviewed information on the principal attorneys who would be assisting the family in the transactions described above. (Pls.' Prop. Findings Uncont. Fact Ex. 48 and 52, App. B at pp. 1272 -1280, 1352.)

52. In implementing the transactions described above and in determining the correct tax treatment of the transactions, the original limited partners of Group engaged Lewis Rice to provide legal services and tax opinions relating to the transactions. The engagement agreements with Lewis Rice were independent of any agreements with Heritage. (Pls.' Prop. Findings Uncont. Fact Ex. 49 and 55, App. B at pp. 1281-1294, 1369.)

53. Lewis Rice independently determined the fee the firm would seek from the clients for their services, and they were paid for their services by the partners of plaintiff R, R, M & C Group, L.P. (Pls.' Prop. Findings Uncont. Fact Ex. 50 and 55, App. B at p. 1295-1315, 1369.)

54. The principal attorneys at Lewis Rice who worked on implementing the transactions described above and in drafting legal opinions relating to the proper tax treatment of the transactions were Michael Mulligan, William Falk, and Lawrence Weltman. (Pls.' Prop. Findings Uncont. Fact Ex. 52 and 55, App. B at pp. 1352, 1369, 1371-1372.)

55. Michael Mulligan, William Falk, and Lawrence Weltman are experienced attorneys who have primarily practiced in the area of tax law. Michael Mulligan is Co-Chairman of the Estate Planning Department at Lewis Rice and had been with the firm since 1972. Mr. Mulligan has written numerous articles on tax and estate planning issues. He also has spoken frequently on such topics at conferences for attorneys and accountants. William Falk is the Chairman of the Tax Department at Lewis Rice and previously practiced law with the Internal Revenue Service and with Thompson Coburn LLP. Mr. Falk received his LL.M. in taxation from Washington University School of Law in 1982. When he worked with the IRS, Mr. Falk served as a Trial Attorney and Tax Shelter Litigation Coordinator with the Internal Revenue Service, Office of District Counsel, St. Louis, Missouri. Lawrence Weltman received his law degree from Washington University School of Law in 1968, and his LL.M. in taxation from New York University School of Law in 1970. Mr. Weltman practiced with Baker & McKenzie from 1970-1973 and has been with Lewis Rice since 1973. (Pls.' Prop. Findings Uncont. Fact Ex. 48 and 55, App. B at pp. 1272-1280, 1368, 1372.)

56. Over the course of its engagement, 10 different Lewis Rice personnel expended approximately 549 hours representing the Sands family. Mr. Mulligan spent approximately 122 hours on the engagement, and Mr. Falk, who was the principal drafter

of the opinions, personally spent approximately 258 hours on the engagements. (Pls.' Prop. Findings Uncont. Fact Ex. 55, App. B at p. 1369.)

57. Lewis Rice researched Constellation Brands and conducted interviews of various Group limited partners or requested information from them to determine their purposes in engaging in the transactions, their investment experience, their investment goals, and other relevant information. Based on the information gathered, Lewis Rice prepared factual representations for the Group limited partners to sign. (Pls.' Prop. Findings Uncont. Fact Ex. 55, App. B at pp. 1369-71.); Pls.' Ex. 25, App. at pp. 448-482.

58. Lewis Rice extensively researched and analyzed the applicable law and authorities in evaluating the tax consequences of the transactions. (Pls.' Prop. Findings Uncont. Fact Ex. 55, App. B at p. 1372.)

59. Lewis Rice issued an opinion dated December 28, 2001 to each of the original limited partners of Group. The opinions concluded that it was more likely than not correct to not treat the contingent obligations to cover the short sale positions as liabilities for purposes of section 752. Pls.' Ex. 26[6], App. at pp. 490-91.

60. The opinions Lewis Rice issued to the members of the Sands family were based on the research and analysis of applicable law and authorities, consistent with applicable opinion standards, and the experience, professional judgment, and assessment of the probable outcome of litigation or other adversarial proceedings arising from IRS challenges to the transactions. (Pls.' Prop. Findings Uncont. Fact Ex. 55, App. B at p. 1372.)

[6] Robert Sands, Richard Sands, Marilyn Sands, the Abigail Stern Trust and the Zachary Stern Trust received substantially similar legal opinions. To avoid cluttering the Record, only Robert Sands' opinion is included in the appendix.

61. Lewis Rice continues to affirm that the opinions rendered accurately reflected the law and the proper tax treatment of the transactions at the time the opinions were issued, and that the tax treatment by the plaintiffs would more likely than not be upheld. (Pls.' Prop. Findings Uncont. Fact Ex. Ex. 55, App. B at p. 1372.)

62. The original limited partners of Group relied on the opinions issued by Lewis Rice in determining the proper tax treatment of the transactions described above. Pls.' Ex. 17, App. at p. 358.

63. The principal attorneys at Milbank Tweed who worked on forming the CRUTs and in drafting legal opinions relating to the proper tax treatment of the transactions were Jonathan Blattmachr and Eric X. Wallace. Mr. Blattmachr carefully supervised the work of Mr. Wallace. Pls.' Ex. 27, App. at p. 556.

64. Mr. Blattmachr is an experienced attorney who has primarily practiced in the area of trusts and estate planning. Mr. Blattmachr has been an attorney at Milbank Tweed since 1977, and a partner since 1980. Mr. Blattmachr is currently Chairman of Milbank Tweed's Trusts and Estates Department. He has written numerous of articles on tax and estate planning issues. He speaks frequently on such topics at conferences for attorneys and accountants and has taught such classes for law students at Columbia and New York University. Pls.' Ex. 27, App. at p. 555, 559-584.

65. Milbank Tweed provided services relating to both the drafting of documents relating to the formation of the CRUTs and the research, analysis, and drafting of a tax opinion on the effect of the purchase of the remainder interests in the CRUTs by the original limited partners of Group who were the lead interest beneficiaries of the CRUTs. Pls.' Ex. 27, App. at p. 555-556.

66. .Over the course of the engagement, nine different Milbank Tweed personnel expended approximately 240 hours representing the Sands family. Milbank Tweed personnel researched the applicable law for formation of the CRUTs. Milbank Tweed attorneys drafted documents relating to formation of CRUTs. Milbank Tweed personnel extensively researched and analyzed the applicable law and authorities in evaluating the tax consequences of the transactions involving the CRUTs. Pls.' Ex. 27, App. at pp. 555-556.

67. The Sands did not withhold any material information from Milbank Tweed in connection with the representation. Pls.' Ex. 27, App. at p. 556-557.

68. Milbank Tweed issued an opinion dated June 21, 2002 to each of the original limited partners of Group. The opinions concluded that it was more likely than not: (1) the remainder interests in the CRUTs could be assigned; (2) that the purchase of the remainder interest by the original limited partners of Group would terminate the CRUTs under Alaska law; (3) that the purchase of the remainder interests and termination of the CRUTs would not cause the CRUTs to retroactively lose their status as charitable remainder trusts; (4) that the termination of the CRUTs would not be an income tax recognition event to the Sands family members; (5) that the purchasers would have a carryover basis in the assets distributed in satisfaction of the lead interest and a cost basis in the assets distributed in satisfaction of the remainder interest; (6) that the purchasers' holding period in the purchased remainder interest becomes the holding period in the assets distributed in satisfaction of the remainder interest and the CRUTs' bases in the assets distributed in satisfaction of the lead interest becomes the purchasers' bases in those assets. Pls.' Ex. 23 and 27, App. at pp. 432 and 556.

69. The opinions Milbank Tweed issued to the members of the Sands family were based on extensive research and analysis of the pertinent legal authorities available at the time, consistent with the experience and professional judgment of the attorneys who worked on the matter. Pls.' Ex. 27, App. at p. 556-557.

70. Milbank Tweed continues to affirm that the opinions rendered accurately reflected the applicable legal authorities at the time the opinions were issued. Pls.' Ex. 27, App. at p. 557.

71. The Group limited partners relied on the opinions issued by Milbank Tweed in determining the proper tax treatment of the transactions described above. Pls.' Ex. 17, App. at p. 358-359.

72. Bernard Robinson & Company prepared tax returns for plaintiffs and their partners in 2001 and 2002. Pls.' Ex. 19, App. at p. 388.

73. The positions taken on the tax returns prepared by Bernard Robinson & Company for plaintiffs and their partners are consistent with the opinion by Lewis Rice that it was more likely than not correct to not treat the contingent obligations to cover the short sale positions as liabilities for purposes of section 752. Pls.' Ex. 17 and 19, App. at pp. 358-359 and 388.

74. The positions taken on the tax returns prepared by Bernard Robinson & Company for plaintiffs and their partners are consistent with the opinion of Milbank Tweed that it was more likely than not: (1) that the purchase of the remainder interests and termination of the CRUTs would not cause the CRUTs to retroactively lose their status as charitable remainder trusts; (2) that the termination of the CRUTs would not be an income tax recognition event to the Sands family members; (3) that the purchasers would have a

carryover basis in the assets distributed in satisfaction of the lead interest and a cost basis in the assets distributed in satisfaction of the remainder interest; (4) that the purchasers' holding period in the purchased remainder interest becomes the holding period in the assets distributed in satisfaction of the remainder interest and the CRUTs' bases in the assets distributed in satisfaction of the lead interest becomes the purchasers' bases in those assets. Pls.' Ex. 19, App. at p. 388-89.

75. The original limited partners of Group trusted their advisors, Freddy Robinson, Jonathan Blattmachr, and Lewis Rice in taking the tax positions at issue and had no reason to question their advice. Pls.' Ex. 17, App. at pp. 358-59.



7949795.1

Dated: August 4, 2008

Respectfully submitted,

/s/ Lewis S. Wiener____________

LEWIS S. WIENER
Sutherland, Asbill & Brennan LLP
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0140
Fax: (202) 637-3593
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 853-8000
(404) 853-8806 (fax)

Kent L. Jones
Sutherland, Asbill & Brennan
1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: (202) 383-0732
Fax: (202) 637-3593

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Proposed Findings of Uncontroverted Fact has been made on August 4, 2008 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
thomas.m.herrin@usdoj.gov

s/ Lewis S. Wiener
LEWIS S. WIENER