IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: August 4, 2008)

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-409 T |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |



7967445.1

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S SECOND SET OF PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims, plaintiffs hereby respond to the facts alleged by defendant in its Proposed Findings of Uncontroverted Fact.

## GENERAL OBJECTIONS

Plaintiffs object to any facts alleged by Defendant based on Exhibits 24 and 26 of Appendix A to Defendant's Motion for Summary Judgment in Cause Nos. 06-409T, 06-410T, and 06-411T. Plaintiffs have separately filed a Motion to Strike these exhibits from the record. As discussed more fully in Plaintiffs' Motion to Strike, Exhibit 26 is a transcript of purported a conversation between Gary Kornman, principal of the Heritage Organization, LLC ("Heritage"), Jonathan Blattmachr, a partner with Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") in New York, and an unidentified taxpayer unrelated to the Sands family who was not involved in any of the transactions at issue in this case. Exhibit 24 is the expert report of Jerry McCoy containing his opinion of the tax effect of gifts to certain charitable remainder trusts and the later termination of those trusts.

Exhibit 26 should be stricken for a variety of reasons. First, the transcript is inadmissible because it has not been authenticated as an accurate representation of the conversation that purportedly occurred. No party to this purported conversation has authenticated the transcript, and as described in Plaintiffs' Second Motion to Strike, many transcripts obtained from the Heritage bankruptcy trustee were purportedly made from tapes which no longer exist, and the witnesses involved in the conversations were not able to testify to the accuracy of the transcripts. The tapes that did exist were generally incomprehensible and contained serious gaps. The chain of custody for the transcripts and tapes cannot be established, and several employees of Heritage have testified that Gary Kornman, Heritage founder, erased parts of tapes. Second, the transcript is irrelevant as it involves a purported conversation with an individual who is not related to the Sands family and was not involved in any of the events at issue in this case. Third, the transcript contains inadmissible hearsay. Finally, plaintiffs have been prejudiced by defendant's belated production of the transcript on December 21, 2007; therefore the transcript should be excluded as a discovery sanction.

Exhibit 24 is the expert report of Jerry McCoy containing his opinion of the tax effect of gifts to certain charitable remainder trusts and the later termination of those trusts. Mr. McCoy's report should be excluded because it offers nothing more than his application of the "law" as he sees it to the alleged facts of this case, which "facts" he determined without reference to any of the testimony or plaintiffs or other individuals actually involved in the transactions at issue. Moreover, his report fails to meet the standard of Fed. R. Evid. 702 as it would not assist the trier of fact to understand the evidence or determine a fact in issue, is not based on sufficient facts or data, is not the product of reliable principles and methods, and does not reliably apply any principle or method to the facts of the case.

Because Exhibits 26 and 24 would be inadmissible at trial, they must be excluded by this Court in making summary judgment determinations. *Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 444-50 (2000). Exhibits 26 and 24 thus cannot provide a foundational basis for the facts Defendant has alleged. Plaintiffs have responded below to defendant's statements of fact based on these exhibits; however, plaintiffs' responses in no way constitute admissions that Exhibits 26 and 24 are admissible evidence.

Plaintiffs also object to any facts alleged by defendant based on Exhibits 26 through 29 of Appendix B to Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment for the reasons described in Plaintiffs' Motion to Strike which was filed on September 14, 2007 and is pending.[1] Plaintiffs have responded below to Defendant's statements of fact based on these exhibits; however, Plaintiffs' responses in no way constitute admissions that the transcripts are admissible evidence.

Plaintiffs object to defendant's repeated characterization of the transactions entered by plaintiffs as "tax shelters" or "tax strategies" and to the characterization of plaintiffs' partners as "tax shelter participants." Defendant does not define the term "tax shelter" or cite to any evidence to support the purported facts that the investments at issue were "tax shelters" or the investors were "tax shelter participants." Rather, defendant uses this self-serving terminology throughout its Second Set of Proposed Findings of Uncontroverted Fact in complete disregard for RCFC 56(e) and 56(h)(1). As stated in Plaintiffs' Proposed Findings of Fact being filed in support of their Response To Defendant's Motion for Summary Judgment in Cause Nos. 06-

---

[1] On September 14, 1007, plaintiffs filed a motion to strike Exhibits 26-29 and references thereto in Defendant's Response to Plaintiffs' Cross-Motion for Summary Judgment ("Defendant's Response") and Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Fact ("Defendant's Facts"). Plaintiffs' motion to strike has been fully briefed by the parties, and any ruling thereon would be equally applicable to the use of the same inadmissible evidence by defendant in Defendant's Second Set of Proposed Findings of Uncontroverted Fact and related filings.

409T, 06-410T, and 06-411T, plaintiffs made the investments at issue in this case for valid business reasons, and the evidence plaintiffs cite to support that fact is unrebutted. Accordingly, plaintiffs' responses in no way constitute an admission as to the validity of such characterizations by defendant.

Plaintiffs object to defendant's repeated use of the term "inflated basis" and defendant's assertion that plaintiffs attempted to "inflate their basis" through the financial plan. Even if such characterization was correct, it is no longer relevant in these cases. The capital gains adjustments that would alternatively be supported by defendant's argument that plaintiffs' improperly inflated their bases in the Constellation Brands stock have been conceded by plaintiffs on a different ground (that none of the activities of the partnerships increased the amount considered to be at risk under Section 465(b)(1)).

## SPECIFIC RESPONSES

## I. THE TAX SHELTER PARTICIPANTS[2]

1. In 2001 and 2002, Robert Sands ("Robert"), Richards Sands ("Richard"), Marilyn Sands ("Marilyn") and the Trusts for Abigail ("Abigail's Trust") and Zachary ("Zachary's Trust") Stern engaged in a tax strategy promoted by The Heritage Organization, L.L.C. ("Heritage") to eliminate the capital gains on approximately $75 million in Constellation Brand, Inc. ("Constellation") stock sold October 1, 2001 (the "First Shelter"). Abigail's Trust and Zachary's Trust participated in the transaction through an entity known as CWC Partnership I. Robert, Richard, Marilyn and CWC (the "Sands Heirs"), in turn, participated in the Heritage Strategy through two flow-through entities: R,R,M &C Group, L.P. ("Group") and R,R,M & C

[2] As stated in plaintiffs' general objection, plaintiffs' object to the characterization of their partners as "tax shelter participants."

Partners, L.L.C. ("Partners"). (App-A-48-104). Although the Sands Heirs were the ultimate recipients of the tax benefits generated by the Heritage Strategy, the adjustments directly at issue in these consolidated proceedings are those made to the various partnerships used by the Sands Heirs as part of the Heritage Strategy. (FPAAs attached to Docket Entries 97 – 103).

**Response**: Plaintiffs disagree with this statement of purported fact on multiple grounds. First, as noted in plaintiffs' General Objection, plaintiffs disagree with defendant's characterizations of plaintiffs' investments as "tax shelters" and "tax strategies." Defendant cites no evidence to support its statement that the Sands family members sought to eliminate the capital gains on the sale of Constellation stock in October 2001. In fact, plaintiffs' goals for participating in the transactions at issue included making a profit, diversifying their holdings which were concentrated in Constellation stock, accomplishing estate planning goals, and providing for philanthropic interests, in addition to obtaining any potential tax benefit. (Pls.' Ex. 57, App. B at pp. 1394, 1397A.) Plaintiffs disagree that the partnerships at issue here, CWC, Group, and Partners, were "used" by the family as part of the Heritage Strategy. CWC had been an investment vehicle for the family for many years prior to 2001.

Plaintiffs agree that the sale price of the Constellation stock was nearly $75 million and agree that the Sands family members participated in RRMC Group, and through it, in RRMC Partners. Plaintiffs also agree that the adjustments at issue in these consolidated proceedings are those made to plaintiffs Group, Partners, and CWC, though plaintiffs disagree that the Court has jurisdiction to consider all such adjustments.

2. During the period at issue, Constellation was a leader in the production and marketing of branded beverage alcohol products in North America and the United Kingdom. For

the company's fiscal year ending February 28, 2001, Constellation's gross sales exceeded $3 billion. (Docket Entry 34, p. 4. II. 1 & 2).

**Response**: Plaintiffs agree.

3. Constellation was founded by the late Marvin Sands ("Marvin"). Marilyn is Marvin's widow. Richard and Robert are Marvin and Marilyn's surviving children. Andrew Stern ("Andrew") is the widower of Marvin and Marilyn's deceased daughter Laurie ("Laurie"). Laurie and Andrew's children are Abigal [sic] ("Abigail") and Zachary ("Zachary") Stern. (Docket Entry 34, p. 4-5, II.3,4 & 8).

**Response**: Plaintiffs agree.

4. During 2001 and 2002, Richard was the Chief Executive Officer, President, and Chairman of the Board of Constellation, and Robert was a Director and Group President of Constellation. (Docket Entry 34, p. 6, II.12).

**Response**: Plaintiffs agree.

## II. THE HERITAGE TAX SHELTERS[3]

5. On May 10, 2001, Chet Decker, on behalf of Heritage, contacted Richard to promote a strategy that could reduce federal and state capital gains. Richard and Robert subsequently met with Heritage personnel on May 31, 2001, June 13, 2001 and on June 27, 2001. (Docket Entry 63, pgs. 5 & 10-14).

**Response**: Plaintiffs disagree that the cited documents supports defendant's statement. Plaintiffs agreed to the following statement in Docket Entry 63: Chester Decker contacted Richard Sands on or about May 10, 2001 by telephone to discuss an investment strategy that could also reduce federal and state capital gains. (Pls.' Ex. 63, App. B at pp. 63-

[3] As stated in plaintiffs' general objection, plaintiffs' object to the characterization of their investments as "tax shelters."

64.) Plaintiffs also agreed that Richard and Robert Sands subsequently met with Heritage personnel on or about May 31, 2001, June 13, 2001 and on June 27, 2001, indicating that the exact dates may not be correct.

6. During these meetings, Robert and Richard discussed the elimination of capital gains tax. Specifically, Robert and Richard's goal was to eliminate the capital gains that would results from their sale of Constellation brand stock. (App-A-2; Docket Entry 50, p. 4-6). At these meetings, Heritage stressed the low probability that the transaction would be discovered and audited by the IRS. (Docket Entry 52 in App. B pp. 23-24 & 62). Minimizing the potential of an audit was a goal of Heritage. This theme is equally present in a Heritage transcript of a December 5, 2000 conversation between a different potential investor (not one of the Sands Heirs), Gary Kornman and Jonathan Blattmachr (the "Blattmacher [sic] Transcript"). (App-A-278-323). [sic] Gary Kornman, the founder and one of the principals of Heritage, and Jonathan Blattmachr, a partner with the law firm of Milbank, Tweed, Hadley & Cloy [sic] LLP ("Milbank Tweed") and the author of the opinion letters provided to the Sands Heirs in connection with the CRUT aspect of the First Shelter, worked together to devise the strategies used by the Sands. (App-A-7). In the Blattmachr Transcript, Kornman and Blattmachr discuss both the § 752 and the CRUT strategies with another potential investor and they explain how the use of a charitable remainder trust will minimize the chance of an IRS audit. . [sic] In this conversation, Blattmachr states:

> "[T]here are two benefits of the CRT: One, is a huge net of camouflage because there is no program to audit them; and number two, even if they attack the 752 transaction they also have to attack the CRT." (Blattmachr Transcript p.2).
>
> "So those are two enormously high hurdles for them and also I think the chances of them even finding out about the CRT are exceptionally remote." (Blattmachr Transcript p.2).

"These are just the rules that Congress has put out. And you could go into court and say, Your Honor, I did this to save income taxes. But everyone that does a CRT is to save income taxes." (Blattmachr Transcript p.3).

"You don't need a business purpose, you don't need a charitable motive. You create your CRT. This way you have a valid CRT." (Blattmachr Transcript p.3)

"It's just additional camouflage." (Blattmachr Transcript p.4).

"[A]gain for all the massinations is one huge net of camouflage. They can't see your tank from the air." (Blattmachr Transcript p.12).

"I met with a guy from Arthur Anderson I do a fair amount of work with … I asked him, I said, How many of your individuals – I mean really high level individuals are getting audited these days? And he said, Virtually none." (Blattmachr Transcript p. 13).

"There is a risk. If out of the million public charities out there, including the one you will form or Gary will form as a supporting org –

* * *

I'm going to tell you, as a practical matter that isn't going to happen; but, yeah, as a practical matter, they aint going to happen. But yeah, you take a risk."

In this same conversation, Kornman similarly played down any audit potential stating:

"Right I totally agree with you. I mean that's the whole point, **deleted),** as far as cosmetics go this is probably the – besides the fact that it works is that it adds another thing that they would have to overcome on some type of audit. It further – capital gains are never audited and capital gains inside a CRT are just absolutely never audited." (Blattmachr Transcript p.2).

"[O]nce the basis is stepped up see then you have the belt and suspenders. In other words, if you every [sic] got challenged on any of this, which once you have these two transactions in place, I think the chances of you even getting looked at are two or three percent at best, at most." (Blattmachr Transcript, p.3)

"That's exactly right. Talk about stealth, **(deleted)**, you say you never want to be audited. This guarantees that it's never be found." (Blattmachr Transcript p.12).

"And for you not do to do this I think would be unwise and because I think you're giving the up the best camouflage there is." (Blattmachr Transcript p.16)

**Response:** Regarding the first four sentences, plaintiffs disagree. Plaintiffs object to the use of Exhibits 26 through 29 of Defendant's Appendix A to its Response to Plaintiffs' Cross-Motion for Summary Judgment for the reasons set forth in Plaintiffs' pending Motion to Strike. As to defendant's assertions that various statements were made during alleged the May 31, June 13, or June 27 meetings between Heritage personnel Tim Seaberg and Gary Kornman and Richard Sands, Robert Sands, and/or their attorney, Plaintiffs do not agree that Exhibits 27 through 29 ("the transcripts") accurately or completely reflect the conversations between the Heritage employees and the Sands. Richard Sands and Robert Sands have both testified that they do not remember the conversations they had with Heritage employees in detail. (Pls.' Ex. 63 and 66, App. B at pp. 62, 65-67, 116-17.) The transcripts of the conversations between the Heritage personnel and the Sands contains numerous gaps that Seaberg could not fill and indications that the transcribers could not understand what was being said. (Pls.' Ex. 62, App. B at pp. 44-47, 49-54.) Seaberg could not verify the accuracy of the transcripts and noted that the tapes were hard to hear and that sometimes the staff guessed as to what was said. (Pls.' Ex. 62, App. B at pp. 44-46, 56.) Regarding Exhibits 27 and 28, some words contained in the transcript were not on the tapes, and some words heard on the tapes were not included in the transcripts. (Pls.' Ex. 62, App. B at pp. 49-52, 57-59.)

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact to the first four sentences:**

During the subsequent May and June meetings with Heritage representatives, Richard and Robert learned that Heritage's investment transactions could result in tax savings, provide other advantages including diversification of assets, or assist them in family estate planning. To find out how the transactions worked or whether they provided sufficient benefits for the family

to engage in them, the Sands had to sign a confidentiality agreement with Heritage and pay a $22,500 retainer fee. (Pls.' Ex. 61, App. B at pp. 31-34.)

Before signing such an agreement or paying any fees to Heritage, Robert Sands asked Jonathan Blattmachr of Milbank, Tweed, Hadley & McCloy LLP to provide him Jonathan's impression of Heritage and some background information on Gary Kornman, one of the principals of Heritage. Robert Sands also requested references from Heritage and contacted those references. (Pls.' Ex.1, 2, 52 and 53, App. B at pp. 1-5, 1350-1351, 1357.)

After signing the agreement and paying the $22,500 fee, a relatively small amount when compared to the short sales involved in these cases, the Sands had other meetings and calls with Heritage personnel which apparently were not recorded, transcribed, or retained by Heritage. In these later meetings and conversations, Heritage personnel spent a significant amount of time explaining all of the benefits of their financial plans to the Sands. They discussed the fluctuation of interest rates and how such fluctuations could provide the possibility for profiting in short sales of Treasury notes or affect Constellation stock. (Pls.' Ex. 61, App. B at pp. 16-21.) They also discussed the ability to provide for philanthropic interests through the Heritage financial plan. (Pls.' Ex. 61, App. B at pp. 16-21.) Richard Sands and Robert Sands recalled learning of a number of benefits from the investment strategy such as making a profit, providing for philanthropic interests, and diversifying their holdings. (Pls.' Ex. 57, App. B at pp. 1394, 1397A.) The combination of all of these benefits, including any potential tax benefit, led the Sands family to engage in the financial plan. (Pls.' Ex. 57, App. B at pp. 1394, 1397A.)

**Response to the remainder of the paragraph:** As stated in plaintiffs' general objections, plaintiffs object to the use of the term "shelter" to characterize the transactions entered by the Sands. Plaintiffs also object to the use of an unauthenticated, irrelevant, and

inadmissible transcript of a purported conversation involving an individual who was not related to the Sands or a party to any of the transactions at issue in this case. Plaintiffs dispute that the purported December 5, 2000 conversation occurred or that it was transcribed correctly.

Plaintiffs agree that Gary Kornman founded Heritage and that Jonathan Blattmachr is a partner with Milbank Tweed. Plaintiffs also agree that Mr. Blattmachr's firm authored an opinion provided to the Sands family regarding the proper tax treatment of the termination of four CRUTs that were partners in R,R,M & C Group. Plaintiffs disagree that Mr. Blattmachr provided an opinion in connection with a tax shelter or that he and Mr. Kornman worked together to devise a tax shelter for the Sands.

Plaintiffs also dispute the accuracy of defendant's quotes from the purported transcript. Defendant has taken quotes out of context and has not correctly quoted the purported transcript. *See*, Def. App-A-280 to App-A-294.

7. After Robert and Richard's meetings with Heritage personnel, the Sands Heirs engaged in two strategies with Heritage both of which involved a series of tiered partnerships and the short sale of treasury notes. Prior to the Sands Heirs engaging in these two strategies, Heritage prepared and provided the Sands Heirs detailed graphical presentations outlining the graphical presentations outlining the steps that needed to be taken in order to possibly realize the tax savings promoted by Heritage. (App-A-4-5; App-A-12-104).

**Response**: Plaintiffs disagree that the Sands family members engaged in two strategies "with Heritage." The Sands decided to engage in short sales of Treasury notes, and the Sands formed family limited partnerships for investment purposes and formed LLCs to allow for individual investors outside the family an opportunity to invest with the family members. (Pls.' Ex. 52 and 53, App. B at 1352-53, 1359.) They were advised and assisted by Heritage in these

transactions. Plaintiffs disagree that Exhibits 2 and 3 (App-A-12-140) were given to the Sands before engaging in the financial plan presented by Heritage. Both are dated July 30, 2002, and the Sands engaged in the short sale transactions in August and December of 2001. Plaintiffs additionally disagree that any presentation including all the information contained in Exhibit 3, in particular APP-A-93-104 showing the purchase of the remainder interests in the CRUTs from the Educational and Health Support Fund, was provided to the Sands prior to their investment in short sales of Treasury notes in August 2001 and participation in Group. Plaintiffs have provided the presentations they received from Heritage to defendant and did not have in their records any such presentation including APP-A-93-104 dated prior to July 30, 2002.

8. The implementation of the first strategy began in August 2001 (the "First Shelter"), and the implementation of the second began in December of 2001 (the "Second Shelter). In both instances, partnerships were set up for the purposes of the specific Heritage strategy. The primary purpose of both the partnerships and the short sales was the anticipated tax benefit that could result. (App-A-3 & 5).

**Response**: As stated in plaintiffs' general objections, plaintiffs object to the use of the term "shelter" by defendant in describing the investment transactions of the Sands. Defendant cites no evidence to support this characterization. Plaintiffs disagree that the partnerships were set up for "purposes of the specific Heritage strategy" and that "the primary purpose of both the partnerships and short sales was the anticipated tax benefit." As described in plaintiffs' response to paragraph 6, Richard Sands and Robert Sands recalled learning of a number of benefits from the investment strategy such as making a profit, providing for philanthropic interests, and diversifying their holdings. (Pls.' Ex. 57, App. B at pp. 1394, 1397A.) The combination of all of

these benefits, including any potential tax benefit, led the Sands family to engage in the financial plan. (Pls.' Ex. 57, App. B at pp. 1394, 1397A.)

9. Each step of the two strategies was detailed on a transaction calendar prepared prior to the execution of any of the short sale transactions. Moreover, Lewis, Rice & Fingersh, L.C. ("Lewis Rice"), the law firm who wrote one of the two sets of tax opinion letters relied on the Sands Heirs in these proceedings, was apprised of the various steps set out in the transaction calenders [sic] at the beginning of the strategy's implementation. (App-A-5; App-A-105-128).

**Response**: Plaintiffs disagree. Plaintiffs disagree that the events described on the transaction calendars and implementation lists were "steps" of "strategies." Nowhere in the referenced exhibits are the events described as "steps" to be taken. (Def. APP-A-105-128.) Moreover, defendant is incorrect that each "step" of the "strategies," (as defendant has attempted to define them) was included in the transaction calendars and implementation lists, because they contain no information about the gifts to the CRUTs or the later purchase of the remainder interests from the Educational and Health Support Fund. (Def. APP-A-105-128.)

Plaintiffs agree that Lewis Rice was apprised of the events set out in the transaction calendars when the financial plan was implemented and that Lewis Rice authored one set of tax opinions that plaintiffs are relying on in the three cases at issue here. (Def. APP-A-5; Def. APP-A-105.)

10. The amount of each strategy's short sale was arrived at based on the amount of potential basis that could be applied. If the Heritage client wanted to possibly eliminate all of the tax on the sale of $75 million in stock with a $10 million basis, then $65 million would be the size of the short sales. (App-A-6).

**Response**: Plaintiffs disagree. The document cited for this fact does not support it. Mr. Czerwinksi did not testify that the amount of the short sales entered by the Sands were arrived at based on the amount of potential basis that could be applied; in fact he stated that he did not remember how the amount of the short sales were determined for the transactions entered by the Sands. (Def. APP-A-6.) He also stated, in response to a hypothetical question (not the facts of this case), that how the transaction was structured "would have been dependant upon, you know, whatever the client's ultimate goals were. If—if the client was wanting to possibly eliminate all of the tax, then $65 million plus 75 minus ten would be the size of the short sales." (Def. APP-A-6.) Plaintiffs have repeatedly pointed out that the Sands had a variety of reasons for engaging in the financial plan, including making a profit, providing for philanthropic interests, diversifying their holdings, and potentially obtaining a tax benefit. (Pls.' Ex. 57, App. B at pp. 1394, 1397A.)

Moreover, defendant has not supported this statement with an affidavit or testimony from any other client of Heritage that would indicate what they "wanted."

11. The First Shelter also involved the use of four Charitable Reminder Unitrusts ("CRUTs"). Although the CRUTs specified that their terms were for 20 years, the purchase of the remainder interests in the CRUTs and the CRUTs early termination was discussed prior to the time the CRUTs were formed. (App-A-7-9; App-A-48-104; App-A-130-131).

**Response**: As stated in plaintiffs' general objection, plaintiffs object to defendant's repeated characterizations of the investment transactions entered by the Sands family members as "shelters." Plaintiffs disagree that the Sands "used" four CRUTs as part of a tax shelter. Plaintiffs agree that the CRUTs specified that their terms were for 20 years. Plaintiffs disagree that the purchase of the remainder interests in the CRUTs and their early termination was



7967445.1

discussed prior to their formation. Plaintiffs object to this statement because it is vague and incomplete. It does not describe who had this purported discussion. Mr. Czerwinski stated that the "possibility of purchasing it would have been discussed" at a meeting where Richard Sands, Robert Sands, Mr. Czerwinksi, and Gary Kornman were present. (Def. APP-A-8-9.) According to Mr. Czerwinski, however, none of the trustees of the Educational and Health Support Fund were present. (Def. APP-A-8-9.)

12. The early termination of the CRUT was central to this Heritage Strategy. Blattmachr explains the reasons for early CRUT termination in the Blattmachr Transcript, stating:

> "[W]ere [sic] going to keep the CRT a life for a very short period of time, which minimizes what he could be potentially taxed on. (Blattmachr Transcript p.2).
>
> "[F]irst of all, … we can test the charity by giving it a little bit; but number two, we can make the designation revocable and provide it prior to the time that the interest – before charity gets it's interest by sale or termination, he can change it. (Blattmachr Transcript p.4).
>
> (JGB) "You name little Red Cross or the supporting org, whatever it is, and if they say Nope. We're really not really interested. Thanks, but we're not really interested in selling. Guess what, your [sic] off the list. But nobody is that dumb." (Blattmachr Transcript p.4).

Similarly, Kornman states in the December 5, 2000 conversation:

> "[L]et's just go through it, **deleted** and explain to you how the trustees will work. We'll set up a supporting org. and it will be a Type One supporting org. where certain named charities that it supports elect six directors. Those six directors – there will be a total of 11 directors.
>
> (Kornman) You will have five **deleted**, that will be your family members; so you're the minority.
> (**deleted**) Can't it be a smaller number?
> (Kornman) Well, let me explain to you why. I mean, yeah, it could be but let me explain the purpose of this. The way the vote is set up, you and anyone of those six directors control the Board; your family. Your five plus one control the Board.
> (**deleted**) Okay.

> (Kornman) And all you have to do is have one of those six charitably named directors agree with you. Well, strangely enough since you control the Board and control who gets the money, I don't think you're going to have a bit of trouble doing that because your supporting org will support whatever charity the Board votes to support."
>
> * * *
>
> (**deleted**) The supporting org will be the remainder beneficiary of what?
>
> * * *
>
> (Kornman) Of your charitable remainder trust. That's where your money goes when this is over.
> (**deleted**) Okay.
> (Kornman) And it's that Board that you buy it from. (Blattmachr Transcript p. 18-19).
>
> (Kornman) "But the key is that most people don't want to tie up their money and lose control of it, [sic] That's the reason why this whole thing of buying back the remainder interest is so nifty; you get the money back." (Blattmachr Transcript p.33).

**Response**: Plaintiffs object to the use of an unauthenticated, irrelevant, and inadmissible transcript of a purported conversation involving an individual who was not related to the Sands or a party to any of the transactions at issue in this case. Indeed, it appears to describe a structure that has nothing to do with this case. (Def. APP-A-280-294.) Plaintiffs dispute that the purported December 5, 2000 conversation occurred or that it was transcribed correctly. Plaintiffs also dispute the accuracy of defendant's quotes from the purported transcript. Defendant has taken quotes out of context and has not correctly quoted the purported transcript. (*See*, Def. APP-A-280 to APP-A-294.)

Plaintiffs disagree that the "early termination of the CRUT was essential" to the "Heritage Strategy." It is impossible to decipher what defendant means by "the Heritage Strategy," and whether defendant is even referring to the Sands, since the transcript purports to depict a conversation that took place between Mr. Kornman, Mr. Blattmachr, and a different taxpayer. Additionally, the Sands had no guarantee that the trustees of the Support Fund would

agree to sell their remainder interests to the original limited partners of Group. Pls.' Ex. 19, 20 and 28, App. at pp. 388, 393 and 589.

## III. STRUCTURING THE FIRST SHELTER[4]

### A. The Short Sales

13. The first Heritage strategy implemented by the Sands Heirs, involving the short sale of approximately $85,000,000 in U.S. Treasuries, the use of the four CRUTs and the October 1, 2001 sale of 2,002,002 shares of Constellation stock, is diagramed in a document captioned "A Group of Strategies to Maximize Capital Preservation and Provide Investment Profits for the Sands Family 7/30/02." (App-A-48-104).

**Response**: Plaintiffs disagree. Plaintiffs disagree that all of the events described in Exhibit 3 were part of a "Heritage strategy." A number of the events described therein were not in the control of the Sands and though considered, were not guaranteed to occur until they actually happened. Pls.' Ex. 19, 20 and 28, App. at pp. 388, 393 and 589. Plaintiffs note further that Exhibit 3 is dated July 30, 2002 a date several months after all the events described therein had occurred. (Def. APP-A-48.)

14. On August 21, 2001, Robert, Richard, Marilyn, Abigail's Trust and Zachary's Trust each opened one or more brokerage accounts at UPS PaineWebber, Inc. ("PaineWebber"), infusing each account with several hundred thousand dollars. (Partners Amended Complaint, ¶19 – Docket Entry 99).

**Response**: Plaintiffs agree.

---

[4] As stated in plaintiffs' general objection, plaintiffs' object to the characterization of the Sands investment activities as "tax shelters."

15. On August 23, 2001, Robert, Richard, Marilyn, the Abigail Trust and the Zachary Trust each borrowed U.S. Treasury securities from PaineWebber and sold the securities on the open market (the "Short Sales"). The net proceeds of the Short Sales were transferred to their respective brokerage accounts at PaineWebber. (Partners Amended Complaint, ¶20).

Response: Plaintiffs agree.

16. The net proceeds received from the Short Sales is as follows:

| | |
|---|---|
| Robert | $23,451,562.50 |
| Richard | $23,451,562.50 |
| Marilyn | $23,451,562.50 |
| Abigail Trust | $ 7,647,248.65 |
| Zachary Trust | $ 7,647,248.65 |

(App-A-48-104).

**Response:** Plaintiffs agree. Plaintiffs note further that Exhibit 3 is dated July 30, 2002 a date several months after all the events described therein had occurred. (Def. APP-A-48.)

17. Group was formed August 23, 2001. Group's general partner was R,R,M & C Management Corporation ("RRMC Corp.") and its limited partners were Robert, Richard [sic] Marilyn and CWC. (App-A-132-161).

**Response**: Plaintiffs agree.

18. On August 27, 2001, both the Abigail Trust and the Zachary Trust assigned their interests in their respective PaineWebber Accounts to CWC. At this time, they also delegated to CWC the responsibility to cover their portions of the Short Sales. (Partners Amended Complaint, ¶21 & ¶22).

**Response**: Plaintiffs agree.

19. CWC is a general partnership and its partners are Abigail's Trust, Zachary's Trust, Robert and Richard. (CWC Amended Complaint, ¶2 – Docket Entry 101).

**Response**: Plaintiffs agree.

20. RRMC Corp. was incorporated on August 23, 2001. RRMC Corp.'s shareholders were Robert and Richard, each of whom contributed 1,001 shares of Constellation stock. (App-A-162-166).

**Response**: Plaintiffs agree that this statement is correct, but object because it is incomplete. Robert and Richard additionally contributed $55,000 each to RRMC Corp. Pls.' Ex. 32, App. at pp. 608-09.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact to the second sentence:** RRMC Corp.'s shareholders were Robert and Richard, each of whom contributed $55,000 and 1,001 shares of Constellation stock. (Def. APP-A-162-166); Pls.' Ex. 32, App. at pp. 608-09.

21. Also on August 23, 2001, Partners was incorporated. (App-A-167-169). The initial members of Partners were Group and Gloria Robinson. (Partners' Amended Complaint, ¶2). FN 7: For purposes of this motion, Gloria Robinson's purported interested in Partners is largely ignored as *de minimus*. The United States notes that to the extent that Gloria Robinson actually held an interest in Partners, that interest was held for less than three weeks when Group purportedly purchased that interest to terminate Partners. (Partners Amended Complaint, ¶30). Gloria Robinson has been diagnosed with a "chronic and progressive neurologic disorder" making her incompetent to testify in a legal proceeding. (App-A-172).

**Response**: Plaintiffs disagree that Partners was "incorporated" as it was not a corporation. (Def. APP-A-167.) Plaintiffs also disagree that Group "purportedly" purchased Ms.

Robinson's interest in Partners as there was an actual sale and purchase. Pls.' Ex. 30, App. at pp. 601-05. Plaintiffs agree that the initial members of Partners were Group and Gloria Robinson. Plaintiffs disagree with any assertion by defendant in FN 7 that Partners was not a valid partnership. Plaintiffs agree that Ms. Robinson held her interest in Partners for less than three weeks when Group purchased her interest and Partners terminated, but object because the statement is imprecise. Ms. Robinson held her interest in Partners for 19 days. Plaintiffs also agree that Ms. Robinson has been diagnosed with a chronic and progressive neurologic disorder making her incompetent to testify in a legal proceeding.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact to the first sentence:** Also on August 23, 2001, Partners was organized as a limited liability company under the laws of the state of Missouri. (Def. APP-A-167.)

22. Partnership contributions were made to Group on August 28, 2001, as follows:

| | | |
|---|---|---|
| RRMC Corp. | – | 2002 shares of Constellation Brands stock<br>(with a market value of approximately $84,784.70) |
| Marilyn | – | 500,000 shares of Constellation Brands stock<br>(with a market value of approximately $21,175,000)<br>PaineWebber account, market value $24,310,024.53 |
| Richard | – | 500,000 shares of Constellation Brands stock<br>(with a market value of approximately $21,175,000)<br>PaineWebber account, market value $24,310,024.53 |
| Robert | – | 500,000 shares of Constellation Brands stock<br>(with a market value of approximately $21,175,000)<br>PaineWebber account, market value $24,310,024.53 |
| CWC | – | 500,000 shares of Constellation Brands stock<br>(with a market value of approximately $21,175,000)<br>PaineWebber account, market value $16,150,083.36 |

(App-A-160-161). The cost basis in the contributed Constellation stock was $9,108,119. (Group Amended Complaint ¶¶ 33 & 37 – Docket Entry 100).

**Response**: Plaintiffs agree that this fact is correct, but object because it is incomplete. RRMC Corp. additionally contributed $3,403.40 to Group. (Def. APP-A-160.)

23. The responsibility to cover each of the Short Sales was delegated to Group at the time that the PaineWebber accounts containing the Short Sales proceeds were contributed to Group. (Partners Amended Complaint, ¶23 – ¶ 27).

**Response**: Plaintiffs agree.

24. On August 31, 2001, Group contributed the 2,002,002 shares of Constellation stock and the $88,634,419 from the PaineWebber accounts (and the requirement to cover the Short Sales) to Partners for a 99.7163% interest in Partners. Robinson contributed $250,000 for her interest in Partners. (Partners Amended Complaint, ¶28; App-A-178-179).

**Response**: Plaintiffs agree.

## IV. INFLATING THE BASIS OF THE CONSTELLATION STOCK[5]

25. On September 6, 2001, Partners closed the Short Sales and recognized a net loss of $425,565. (Partners Amended Complaint, ¶¶ 29).

**Response**: Plaintiffs agree.

26. On September 10, 2001, Group purchased Gloria Robinson's interest in Partners. This purchase had the effect of terminating Partners and distributing Partner's [sic] assets to Group. (Partners Amended Complaint, ¶30 & 31). Partners reported a tax basis in the Constellation stock as $94,757,364. (App-A-181; Docket Entry 21, p. 5). After the constructive liquidation of Partners, Group allocated its outside basis, including the basis initially attributable

[5] Plaintiffs object to defendant's characterization of the transactions at issue as "inflating the basis" of the Constellation Brands stock. Plaintiffs disagree with defendant's characterization of the basis claimed by Group on the sale of stock in 2001 as inflated. Group claimed its adjusted tax basis in the stock it sold.

to the Short Sales proceeds, among Partners' remaining assets, claiming an aggregate adjusted tax basis in the Constellation stock of $94,757,364.

**Response**: Plaintiffs agree.

27. On September 21, 2001, Robert, Richard, Marilyn and CWC (the "CRUTS [sic] Partners") purportedly transferred their respective interests in Group to four charitable remainder trusts: Robert transferred his interest to the Robert Sands Charitable Remainder Unitrust – 2001; Richard transferred his interest to the Richard Sands Charitable Remainder Unitrust – 2001; Marilyn transferred her interest to the Marilyn Sands Charitable Remainder Unitrust – 2001; and CWC transferred its interest to the CWC Charitable Remainder Unitrust – 2001. (Partners Amended Complaint, ¶7). The CRUTs had been established that same day with the grantors designated as the recipient of the mandatory annual payments over the 20 year term of the CRUTs. (App-A-193-228). At this time, Group held $359,290 in cash and 2,002,002 shares of Constellation stock. (Docket Entry 21, p. 5).

**Response**: Plaintiffs disagree with the use of the word "purportedly" as the transfers actually occurred and were completed gifts.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** On September 21, 2001, Robert, Richard, Marilyn and CWC (the "original limited partners") transferred their respective interests in Group to four charitable remainder trusts: Robert transferred his interest to the Robert Sands Charitable Remainder Unitrust – 2001; Richard transferred his interest to the Richard Sands Charitable Remainder Unitrust – 2001; Marilyn transferred her interest to the Marilyn Sands Charitable Remainder Unitrust – 2001; and CWC transferred its interest to the CWC Charitable Remainder Unitrust – 2001. (Partners Amended Complaint, ¶7). The CRUTs had been established that same day with the grantors

designated as the recipients of the annual payments over the 20 year term of the CRUTs. (Def. APP-A-193-228). At this time, Group held $359,290 in cash and 2,002,002 shares of Constellation stock. (Docket Entry 21, p. 5).

28. On October 1, 2001, Group sold the 2,002,002 shares of Constellation stock for $74,862,863. Group reported capital losses from the sale of the stock totaling $19,894,501. (Group' Amended Complaint, ¶32; App-A-171). Group's cost basis in the Constellation stock, which was derivative of its partners' basis in the stock, was $9,108,119. Correspondingly, Partners' basis in the stock was derivative of Group's basis. (Group Amended Complaint, ¶32); Partners Amended Complaint, ¶32; Ex. 1 to Group and Partners' Amended Complaints).

**Response**: Plaintiffs agree with the first two sentences. Plaintiffs object to the third and fourth sentences because they do not contain a time reference and are incorrect as of October 1, 2001, the date of the sale of the Constellation Brands stock. Group's carryover basis in the Constellation stock when it was sold was $94,757,364. Pls.' Ex. 15, App. at p. 317. Group's carryover basis was derivative of Partners' basis in its assets at the time it terminated. (Def. APP-A-181.)

Plaintiffs agree that Group's cost basis in the Constellation stock, which was derivative of its partners' bases in the stock, was $9,108,119 when its partners contributed the stock to Group in August 2001. Plaintiffs also agree that when the stock was contributed to Partners, Partners' basis in the stock was derivative of Group's basis.

29. Group's inflated basis in the Constellation stock was premised on the proposition that Group's basis in its assets was equal to the partners' cash contributions (primarily the proceeds from the Short Sales unreduced by the liability associated with the obligation to close the Short Sales), plus any prior basis in their contributed Constellation stock. (App-A-48-104).

A similar assertion is made in plaintiff's summary judgment motion with respect to the second Heritage strategy engaged in by the Sands Heirs. (Docket Entry 35, at Fact 5, pgs. 6-7).

**Response**: Plaintiffs object to defendant's characterization of the basis claimed by Group on the sale of stock in 2001 as inflated. Plaintiffs disagree with this statement. Group took a carryover basis in the stock equal to its basis in Partners. Group's basis in the stock was equal to its basis in Partners. Plaintiffs do not agree that the obligation to close the short sales was a "liability" as there is a significant body of law indicating that contingent obligations are not liabilities. Pls.' Ex. 26, App. at p. 490. Plaintiffs disagree that they made the same assertion in the facts supporting their Cross-Motion for Summary Judgment. In that motion plaintiffs asserted that Alpha calculated its tax basis in Beta by reference to the cash that it contributed to Beta unreduced by the contingent obligation to cover the short sale positions, because contingent obligations are not "liabilities" within the meaning of section 752, which was consistent with the position taken by Alpha's partners. (Docket Entry 35, pp. 6-7). Here, Group calculated its tax basis in Partners by reference to the cash and stock contributed to Partners unreduced by the contingent obligation to cover the short sale positions, because contingent obligations are not "liabilities" within the meaning of section 752.

30. Heritage, on behalf of the Sands Heirs, obtained an appraisal valuing, for gift tax purposes, the respective partnership interests in Group, as of September 21, 2001 (the date of the purported transfers to the CRUTs) at $5,198,897 each. This appraisal was done by George E. Goerig, an attorney in Alaska. The appraisal applied a 50% discount for marketability, on top of a 42% discount for public market, to the value of Group. In 2001, the CRUT Partners each claimed a charitable deduction of $519,935 attributable to the remainder interests in the CRUTs. At this point, the assets of Group were 2,002,002 share [sic] of Constellation stock (valued at

$71,421,421) and $359,290 in cash. Goerig's discounted fair market value for Group was $20,816,406. (App-A-182-187; Docket Entry 21, p. 5).

**Response**: Plaintiffs agree.

31. On January 28, 2002, each of the CRUT Partners designated the "Sands Supporting Foundation" as the charitable beneficiary of each CRUT. Robert and Richard were named as the "Independent Trustees" of this foundation. (App-A-188-189).

**Response**: Plaintiffs agree.

32. On Friday, February 22, 2002, the CRUT Partners revoked their earlier charity designations to the Sands Supporting Foundation and, instead, named the Educational and Health Support Fund (the "Support Fund") as a charitable beneficiary of each trust. The Support Fund had been created on February 22, 2002. Robert and Richard were the grantors of the Support Fund. The Support Funds' [sic] trustees were Freddy H. Robinson ("Robinson"), James A. Locke, III ("Locke") and Wesley M. Stallings ("Stallings"). (App-A-190-228).

**Response**: Plaintiffs agree.

33. Robinson is the head of Bernard Robinson & Co. LP, a Greensboro, North Carolina accounting firm that served as the Sands Heirs [sic] long-time accounting firm. Robinson is also the son of Gloria Robinson. (App-A-229-234). Wesley Stallings is an accountant at Bernard Robinson. (App-A-235-239). Locke is an attorney with Nixon Peabody, L.P., and a member of the board [sic] of Directors of Constellation. (App-A-235-241).

**Response**: Plaintiffs agree with the first two sentences. Plaintiffs disagree with the second sentence. Wesley Stallings was an accountant at Bernard Robinson in 2001 and 2002. He is currently Chief Financial Officer with The Blue Ridge Companies in High Point, North

Carolina. Pls.' Ex. 28, App. at p. 587. Plaintiffs agree that Mr. Locke is an attorney with Nixon Peabody and a member of the Board of Directors of Constellation Brands, Inc.

34. Five days after creating the Support Fund, on Wednesday, February 27, 2002, Richard, Robert, Marilyn and CWC purchased the remainder interest in the respective CRUTs from the Support Fund. Each paid a purchase price of approximately $550,000 for his or her remainder interest, for a total of slightly more than $2 million. (App-A-256-258). After Richard, Robert, Marilyn and CWC purchased the remainder interests in the CRUTs, Group is terminated and CWC reports its basis attributable to its former interest in Group (and correspondingly to its interest in the Constellation stock) at approximately $15,000,000 (the amount realized from the August 23, 2001 short sales [sic] by Abigail's [sic] and Zachary's Trust). (App-A-262).

**Response**: Plaintiffs agree that on Wednesday February 27, 2002, Richard, Robert, Marilyn, and CWC purchased the remainder interest in their respective CRUTs from the Support Fund, five days after the Support Fund was formed. Plaintiffs disagree with the second sentence for its lack of precision. The original limited partners of Group each paid $550,074.56, to the Support Fund for a total of $2,200,298.24. Pls.' Ex. 22, App. at p. 412. Plaintiffs object to the third sentence because it is vague and incomprehensible. The document cited to support the third sentence is an excerpt from CWC's 2001 Form 1065 which does not indicate how it reported its basis in Group in 2002. Additionally, in 2002 when the CRUTs terminated, the Constellation stock had already been sold.

35. At the time that they purportedly purchased the remainder interests from their respective CRUTs, an updated appraisal was obtained valuing their respective partnership interests at $5,482,334 (for a total $21,951,288), even though Group's assets consisted of



7967445.1

$75,694,095 in cash. According to the updated appraisal, the value of Group's assets increased by $3,913,384 between September 21, 2001 and January 21, 2002. (App-A-262; App-A-324-325).

**Response**: Plaintiffs disagree. The original limited partners of Group purchased the remainder interests in their CRUTs from the Educational and Health Support Fund (not from their respective CRUTs). (Def. APP-A-256-258.) On February 25, 2002, George Goerig provided an updated appraisal which valued a 24.975% limited partnership interest in Group as of January 31, 2002 at $5,482,334. (Def. APP-A-324-325.) Mr. Goerig's updated appraisal indicated that Group's net asset value had increased by $3,913,384 from September 21, 2001 to January 21, 2003. Even though Group's net asset value as of January 21, 2002 was $75,694,095, the value of limited partnership interests in the partnership were discounted based on the public market and lack of marketability. (Def. APP-A-324-325.) Additionally, on February 26, 2002, Mr. Goerig provided a letter confirming that the discounts used to value the limited partnership interests (42% for public market and 50% for lack of marketability) were still valid. (Def. APP-A-263.)

36. The February 27, 2001 purchase of the CRUT remainder interests by Richard, Robert, Marilyn and CWC was treated by the parties as causing the termination of each CRUT. Each CRUT Partner thus became the outright owner of an interest in a partnership holding assets, primarily cash, amounting in the aggregate to approximately $75 million. (App-A-48-104). On February 27, 2001, $75,267,108.29 was credited to Group's Merrill Lynch account. On the same day, the entire $75,267,108.29 was paid out by Group as follows: $18,797,987.19 each to Robert, Richard, Marilyn and CWC and $75,159.52 to RRMC Corp. (App-A-326-337).

**Response**: Plaintiffs disagree that this statement is correct. The purchase of the CRUT remainder interests occurred on February 27, 2002. (Def. APP-A-326 to APP-A-337.) The purchase of the remainder interests by the original limited partners and the termination of the CRUTs made the original limited partners the outright owners of limited partnership interests in Group. Of the $18,797,987.19 defendant asserts was paid to Robert, Richard, Marilyn, and CWC on February 27, 2002, $94,307.04 was actually a distribution to the CRUTs of the unitrust payments to be made to the Sands from their respective CRUTs. Pls.' Ex. 29, App. at p. 591, Part III, Line A. The remaining amount, $18,703,680.15 was a distribution to Richard, Robert, Marilyn, and CWC from Group. (Def. APP-A-326 to APP-A-337.)

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** The February 27, 2002 purchase of the CRUT remainder interests by Richard, Robert, Marilyn and CWC was treated by the parties as causing the termination of each CRUT. Pls.' Ex. 28, App. at p. 432. Each original limited partner of Group thus became the outright owner of a limited partnership interest in Group, a limited partnership which held assets, primarily cash, amounting in the aggregate to approximately $75 million. (Def. APP-A-326-337.) On February 27, 2002, Group made distributions of $75,267,108.29. Group first distributed $94,307.04 to the trustees of each CRUT so that the CRUTs could make the required unitrust payment through February 27, 2002. (Def. APP-A-326-337.) The CRUTs made their pro rata unitrust payments of $94,307.04 to the term beneficiaries for the period leading up to the termination of the CRUTs. (Def. APP-A-326-337); Pls.; Ex. 29, App. at p. 591, Part III, Line A. Later that same day, Group made the following distributions to its partners: $18,703,680.15 each to Robert, Richard, Marilyn and CWC and $75,159.52 to RRMC Corp. (Def. APP-A-326-337.)

37. According to the Heritage Strategy, the termination of the CRUTS [sic] and the distribution of their assets was not a taxable event. (App-A-48-104).

**Response**: Plaintiffs disagree. According to the applicable law and authorities, as described in the opinion Milbank Tweed provided to the original limited partners of Group, the termination of the CRUTs and the distribution of their assets was not a taxable event. Pls.' Ex. 23, App. at p. 432. Plaintiffs note further that Exhibit 3 is dated July 30, 2002 a date several months after all the events described therein had occurred. (Def. APP-A-48.)

38. Once again, the Blattmachr Transcript provides greater insight to the structuring of the Heritage tax avoidance scheme, including the use of discounts to minimize any amount paid to the charity for the remainder interest. As Blattmachr and Kornman state, therein:

> (Blattmachr) "Well, what we'll do, Gary I think is to put a new pass through – because we won't even have to represent it – L.L.C. into the trust. That will hold units of **deleted**. Then we'll redeem those units tax free because there will be no gain." (Blattmachr Transcript p.4).
>
> (Blattmachr) "Then the new L.L.C. Will sell them. The L.L.C. is going to give a K-1 to the partnership which is going to slow [sic?] minimal gain or loss." (Blattmachr Transcript p.4).
>
> (Blattmachr) "And the that [sic] CRT is going to give a K-1 to **deleted** showing minimal gain or loss." (Blattmachr Transcript p.4).
>
> (Kornman) "Cosmetically it looks better if you don't pull the shares right back out of the partnership. I think that's where Jonathan was going."
> (Blattmachr) "Right. And also all the trust is ever owned [sic?] are [sic?] interest in the new L.L.C. and we can claim a discount with the charity we're buying out. All we've ever held is these [sic?] unmarketable L.L.C. interest." (Blattmachr Transcript p.4).
>
> (Blattmachr) "And the brokerage firms [sic] records are going to show virtually no gain or loss because at the time you open up the account with the **deleted** because now we're transferring it from **deleted** over to a new taxpayer, the new L.L.C., the brokerage firm is going to say, What is the basis –
> (**deleted**) They don't get involved in that.
> (Blattmachr) Well, some of them do.
> (GMK) If they do, all you do is tell them and they type it in.
>
> * * *

(Blattmachr) It's just more paperwork in your favor.

* * *

(Blattmachr) [I]t doesn't mean anything but it's a good record. (Blattmachr Transcript p.11-12).

(Blattmachr) "Let's take the worst [sic] case scenario on the economics for you. You put in a million dollars, you get a hundred thousand dollars income tax deduction that saves you 40 thousand bucks. You go to a charity and say, I'll pay you a hundred thousand for your remainder interest. You now get a million dollars back that's in the trust, and we believe, tax free. You wind up – you put a million in and you get a million back and you got this tax savings of 40 thousand but the charity has gotten a hundred thousand." Blattmachr Transcript p.23). [sic]

(**deleted**) "[H]ow much are you going to pay for [the remainder interest]?
(Kornman) Well, say, "we'll just get it appraised. I'll pay the appraised value.
(**deleted**) Then who appraises it?
(Kornman) Any appraiser is going to appraise it. They are going to take discounts for the L.L.C. interest and they are going to take discounts for time.

* * *

(Kornman) Yeah, you need to get it appraised. And the reason is because if you ever get challenged on that thing, you want to have some good reason. You know you are going to get an appraisal for less than face value." (Blattmachr Transcript p.34).

**Response**: As stated in their general objections, plaintiffs object to facts based on Exhibit 26 because it is an unauthenticated, irrelevant, and inadmissible transcript of a purported conversation involving an individual who was not related to the Sands or a party to any of the transactions at issue in this case. Plaintiffs dispute that the purported December 5, 2000 conversation occurred or that it was transcribed correctly.

Plaintiffs also dispute the accuracy of defendant's quotes from the purported transcript. Defendant has taken quotes out of context and has not correctly quoted the purported transcript. (*See*, Def. APP-A-284 to APP-A-312.)

39. According to United States' expert Jerry McCoy, the trusts were used by their creators as temporary partners in Group during a period when Group realized large amounts of capital gain income from sales of Constellation stock and other securities. Normally, the

beneficiaries would have paid tax over the twenty-year trust term on these gains realized by the trusts, under the four-tier system of tax applicable to CRUT beneficiaries. The CRUTs were terminated almost immediately after their remainder interests were purchased, so that the beneficiaries received only two partial distributions. The current beneficiaries acquired nearly $75 million in assets as a result of their payments of approximately $2 million for the remainder interests. (App-A-271).

**Response**: As stated in their general objections, plaintiffs object to facts based on Mr. McCoy's report because the report fails to meet the standard of Fed. R. Evid. 702 as it would not assist the trier of fact to understand the evidence or determine a fact in issue, is not based on sufficient facts or data, is not the product of reliable principles and methods, and does not reliably apply any principle or method to the facts of the case. Plaintiffs agree that Mr. McCoy's report includes the incorrect characterizations and determinations in the paragraph above.

40. On September 25, 2003, Richard and Robert, as grantors of the Support Fund, appointed themselves to trustee positions with the Support Fund. (App-A-277).

**Response**: Plaintiffs agree that this fact is correct, but plaintiffs object because it is incomplete.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** On September 25, 2003, the trustees of the Educational and Health Support Fund voted to expand the board of trustees to five members. On September 25, 2003, Richard and Robert, as grantors of the Educational and Health Support Fund, exercised the authority found in subparagraphs 5(c)(ii) and 5(f) of Article III of The Educational and Health Support Fund U/T/A dated February 22, 2002 and appointed themselves to trustee positions with the Fund. (Def. APP-A-277); Pls.' Ex. 31, App. at 606-07. Had the initial trustees not voted to

increase the number of trustees from three to five, Richard and Robert would not have been able to appoint themselves as trustees under the Fund's governing document. Pls.' Ex. 18, App. at pp. 373, 375-76.

## V. CLAIMING THE INFLATED BASIS[6]

41. Maintaining that its basis in the 2,002,002 of Constellation stock was $94,757,364, Group reported a total loss on the sale of this stock of $19,894,501. Group's cost basis in the Constellation stock was $9,108,119. (Group Amended Complaint, ¶32; Partners Amended Complaint, ¶32; App-A-171; Docket Entry 21, p. 5). Partners reported a tax basis in the Constellation stock of $94,757,364. (App-A-181). CWC overstated its basis in Group by more than $15,000,000. (App-A-262; Exhibit 1 to CWC Amended Complaint).

**Response**: Plaintiffs agree with the first and third sentences.

Plaintiffs object to the second sentence because it does not contain a time reference and appears to be incorrect as of October 1, 2001, the date of the sale of the Constellation Brands stock. Group's carryover basis in the Constellation stock when it was sold was $94,757,364. Pls.' Ex. 15, App. at p. 317. Plaintiffs agree that Group's cost basis in the Constellation stock, which was derivative of its partners' bases in the stock, was $9,108,119 when its partners contributed the stock to Group in August 2001.

Plaintiffs disagree that CWC overstated its basis in Group by more than $15,000,000. CWC properly calculated its basis in Group in accordance with the law in effect at that time. Pls.' Ex. 26, App. at pp. 490-492. Plaintiffs additionally note that Group's carryover basis in the Constellation stock was $94,757,364. Pls.' Ex. 15, App. at p. 317.

---

[6] Plaintiffs object to defendant's characterization of the transactions at issue as "inflating the basis" of the Constellation Brands stock. Plaintiffs disagree with defendant's characterization of the basis claimed by Group on the sale of stock in 2001 as inflated. Group claimed its adjusted tax basis in the stock it sold.

## VI. THE FPAA ADJUSTMENTS

42. On December 22, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustment of Group's partnership items for 2001 ("Group FPAA"). The primary adjustment in the Group FPAA reduces the reported basis in Constellation stock from $94,538,125 to $9,108,119, resulting in a long-term capital gain of $65,539,019 and a reduction in short-term capital loss of $219,239. For federal income tax purposes, the FPAA also disregards both the existence of Group and Partners (as well as the contributions to either) and the transfer of the partnership interests in Group to the CRUTs. The FPAA also asserts a 40% accuracy-related penalty against Group or, alternatively, a 20% accuracy-related penalty. (Group Amended Complaint ¶ 11-12 and 33; Exhibit A to Group Amended Complaint).

**Response**: Plaintiffs agree that this statement is correct, but object because it is incomplete.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** On December 22, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustment of Group's partnership items for 2001 ("Group FPAA"). The primary adjustment in the Group FPAA reduces the reported basis in Constellation stock from $94,538,125 to $9,108,119, resulting in a long-term capital gain of $65,539,019 and a reduction in short-term capital loss of $219,239. For federal income tax purposes, the FPAA also disregards both the existence of Group and Partners (as well as the contributions to either) and the transfer of the partnership interests in Group to the CRUTs. The FPAA also asserts that none of the transactions increased the amount considered at risk for an activity under Code Section 465(b)(1). The FPAA also asserts a 40% accuracy-related penalty against Group or, alternatively, a 20% accuracy-related penalty. Group Amended Complaint ¶ 11-12 and 33; Exhibit A to Group Amended Complaint).

43. On December 22, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustments of Partners' partnership items for 2001 ("Partners FPAA"). One of the two primary adjustments in the Partners FPAA increases Partners' liabilities by $85,649,245 (the proceeds of the Short Sales). The other primary adjustment disallows the $424,565 loss claimed on the closing of the Short Sales because the Short Sales lacked a primary profit motive. The FPAA also asserts that both the partnership and the contributions to it should be disregarded for federal income tax purposes. The FPAA also asserts a 40% accuracy-related penalty against Partners or, alternatively, a 20% accuracy-related penalty. (Partners Amended Complaint ¶ 11-12 and 34; Exhibit A to Partners Amended Complaint).

**Response**: Plaintiffs agree that this statement is correct, but object because it is incomplete.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** On December 22, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustment of Partners' partnership items for 2001 ("Partners FPAA"). One of the two primary adjustments in the Partners FPAA increases Partners' liabilities by $85,649,245 (the proceeds of the Short Sales). The other primary adjustment disallows the $424,565 loss claimed on the closing of the Short Sales because the Short Sales lacked a primary profit motive. The FPAA also asserts that both the partnership and the contributions to it should be disregarded for federal income tax purposes. The FPAA also asserts that none of the transactions increased the amount considered at risk for an activity under Code Section 465(b)(1). The FPAA also asserts a 40% accuracy-related penalty against Partners or, alternatively, a 20% accuracy-related penalty. (Partners Amended Complaint ¶ 11-12 and 34; Exhibit A to Partners Amended Complaint).

44. On December 28, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustment of CWC's partnership items for 2001 ("CWC FPAA"). On the CWC FPAA, the IRS's primary adjustment was to reduce the capital contributed by $21,032,464 and to increase partnership liabilities by the amount of $21,032,464 (the amount of the proceeds from both the first and the second Short Sales), which adjustment reflects CWC's participation in the First and Second Shelters. The FPAA also asserts that the contribution of the Short Sales to CWC should be disregarded for federal income tax purposes. The FPAA also asserts a 40% accuracy-related penalty against CWC or, alternatively, a 20% accuracy-related penalty. (CWC Amended Complaint ¶ 11-12 and 28; Exhibit A to CWC Amended Complaint).

**Response**: As stated in plaintiffs' general objection, plaintiffs object to defendant's repeated characterizations of the investment transactions entered by the Sands family members as "shelters." With the exception of the phrase "which adjustment reflected CWC's participation in the First and Second Shelters" plaintiffs agree that the above statements are correct, but objects because the statements are incomplete.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** On December 28, 2005, the IRS mailed a Notice of Final Partnership Administrative Adjustment of CWC's partnership items for 2001 ("CWC FPAA"). On the CWC FPAA, the IRS's primary adjustment was to reduce the capital contributed by $21,032,464 and to increase partnership liabilities by the amount of $21,032,464 (the amount of the proceeds from both the first and the second Short Sales). The FPAA also asserts that the contribution of the Short Sales to CWC should be disregarded for federal income tax purposes. The FPAA also asserts that none of the transactions increased the amount considered at risk for an activity under Code Section 465(b)(1). The FPAA also asserts a 40% accuracy-related penalty against CWC

or, alternatively, a 20% accuracy-related penalty. (CWC Amended Complaint ¶ 11-12 and 28; Exhibit A to CWC Amended Complaint).

## VII. PLAINTIFFS' AMENDED COMPLAINTS

45. Group concedes that Group erroneously claimed a net long-term capital loss of $19,890,987 instead of reporting a long-term capital gain of $65,539,019 and that it also erroneously claimed a net short-term capital loss of $426,875 instead of a net short-term capital loss of $207,636. (Group Amended Complaint, ¶37).

**Response**: Plaintiffs disagree. Group made the following concession: Plaintiff does not now claim that the transactions increased the amount considered at risk for an activity under Code Section 465(b)(1) and, for this reason, does not now object to the Service's conclusion that Group has net short-term capital loss of $(207,636) instead of $(426,875) and long-term capital gain of $65,539,019 instead of the $(19,890,987) net long-term capital loss reported on Group's return. Instead, plaintiff now concedes the correctness of these specific adjustments proposed by the Service in the FPAA. (Group Amended Complaint, ¶37).

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** Group concedes that it has net short-term capital loss of $(207,636) instead of $(426,875) and long-term capital gain of $65,539,019 instead of the $(19,890,987) net long-term capital loss reported on Group's return. (Group Amended Complaint, ¶37).

46. Group maintains that the IRS erred by disregarding the CRUT Partners' transfers of their Group partnership interests to the CRUTs. However, it further asserts that the Court lacks jurisdiction over this issue. Group also asserts that it is a valid partnership for federal income tax purposes and that neither Group nor its partners are subject to the penalties asserted in the FPAA. (Group Amended Complaint, ¶38-¶45).

**Response**: Plaintiffs disagree in part. Group maintains that the IRS erred by disregarding the original limited partners' transfers of their Group partnership interests to their respective CRUTs. (Group Amended Complaint, ¶38-¶45). Plaintiffs agree with the remainder of the statement.

47. Partners concede that Group erroneously claimed a net short-term capital loss of $424,565 instead of a net short-term capital loss of $-0-. (Partners Amended Complaint, ¶37).

**Response**: Plaintiffs disagree. Partners made the following concession: Plaintiff does not now claim that the transactions increased the amount considered at risk for an activity under Code Section 465(b)(1) and, for this reason, does not now object to the Service's conclusion that Partners has net short-term capital loss of $0 instead of the net short-term capital loss of $(424,565) reported on Partners' return. Instead, plaintiff now concedes the correctness of these specific adjustments proposed by the Service in the FPAA. (Partners Amended Complaint, ¶37).

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** Partners concedes that it has net short-term capital loss of $0 instead of the net short-term capital loss of ($424,565) reported on Partners' return.

48. Partners maintains that the IRS erred, for federal income tax purposes, in disregarding both the partnership's existence and the contributions to it. Partners also asserts that neither Partners nor its partners are subject to the penalties asserted in the FPAA. (Partners Amended Complaint, ¶38-¶45).

**Response**: Plaintiffs disagree in part. Partners maintains that the IRS erred by disregarding the existence of Partners. (Partners Amended Complaint, ¶38-¶45). Plaintiffs agree

that Partners also asserts that neither Partners nor its partners are subject to the penalties asserted in the FPAA.

49. CWC only maintains that neither CWC nor its partners are subject to the penalties asserted in the FPAA. (Group Amended Complaint, ¶38-¶45).

**Response**: Plaintiffs disagree. The Group Amended Complaint does not support this fact as Group maintains that the IRS erred by disregarding the original limited partners' transfers of their Group partnership interests to their respective CRUTs, that the Court lacks jurisdiction over the transfers, that Group is a valid partnership for federal income tax purposes and that neither Group nor its partners are subject to the penalties asserted in the FPAA. (Group Amended Complaint, ¶38-¶45). CWC's amended complaint asserts that CWC and its partners are not subject to penalties. (CWC Amended Complaint, ¶¶ 34-38)

## VIII. COSTS ASSOCIATED WITH THE HERITAGE TRANSACTIONS[7]

50. The Sands Heirs agreed to pay Heritage 25% of all "projected" present and future taxes that would have been incurred but were not incurred due to the implementation of the Heritage strategies. In 2001 and 2002, the Sands Heirs paid Heritage $6,586,287. (Docket Entry 34, p. 7; App-A-246-248).

**Response**: Plaintiffs disagree. Plaintiffs do not agree that the documents cited support these facts. Plaintiffs otherwise agree that the Heritage agreements calculated a fee as 25% of all "projected" present and future taxes that would have been incurred but were not incurred due to implementation of the financial plan. Plaintiffs did not pay Heritage the invoiced

[7] Plaintiffs dispute that the "costs" asserted by defendant were associated solely with the financial plan Heritage presented to the Sands. The Sands continue to use certain of the partnerships (e.g. Alpha I, L.P., Mickey Management, L.P.) formed by Lewis Rice and Milbank. Pl. Ex. 52, App. A at 1352. For example, in July of 2007, Alpha held over $60,000,000 in assets and is used by the family for investments. *Id.*

fee of $8,507,067.26. Def. APP-A-246-247. In 2001 and 2002 the Sands paid Heritage $6,586,291.62. Docket Entry 34, p. 7; Def. APP-A-247.

51. The Sands Heirs paid the Lewis Rice firm $300,000. (Docket Entry 63, p. 12; App-A-249-251).

**Response**: Plaintiffs agree that this fact is true, but object because it is incomplete.

**Pursuant to Ct. Fed. Cl. R. 56(h)(2), Plaintiffs propose the following alternative statement of fact:** The Sands family members paid the Lewis Rice firm $300,000. These payments were for the following services provided by Lewis Rice: 1) provision of legal advice regarding the income tax consequences of the implementation of a financial plan to meet the goals of the Sands family members, including the preparation of tax opinion letters and related documents and the related due diligence; 2) assistance in implementing the financial plan including preparing documents, drafting and preparing partnership agreements or other organizational documents, and filing documents with the appropriate state or federal agencies. Def. APP-A-251.

52. The Sands Heirs did not make any payment to the Milbank Tweed firm. (App-A-252-253).

**Response:** Plaintiffs disagree because this statement is inaccurate. Neither plaintiffs nor their partners made any direct payments to Milbank in 2001 and 2002 for work relating to the transactions involved in these consolidated cases, though Milbank provided services to plaintiffs and their partners relating to the transactions involved in these cases. Def. APP-A-252-253. The Sands family members have paid Milbank for a variety of legal services unrelated to these cases prior to and after the events at issue here.

53. The CRUT Partners paid Goerig & Associates $13,542.34 for the partnership appraisals. (App-A-254-255).

**Response**: Plaintiffs disagree that this fact is correct and that the cited source supports this fact. Goerig & Associates was paid the following amounts for its appraisal of Group from the following accounts: 1) $10,026.80 from Group's Merrill Lynch account and 2) $3,515.54 from the Marvin Sands Master Trust Merrill Lynch account. Def. APP-A-255.

54. Marilyn, Robert, CWC and Richard each paid $550,074.56 to purchase the remainder interests in their CRUTS. (App-A-256-257).

**Response**: Plaintiffs agree.

Dated: August 4, 2008

Respectfully submitted,

/s/ Lewis S. Wiener

LEWIS S. WIENER
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
202.383.0140 Telephone
202.637.3593 Facsimile
Email: lewis.wiener@sablaw.com

Of Counsel:

N. Jerold Cohen
Thomas A. Cullinan
Joseph M. DePew
Julie P. Bowling
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
404.853.8000 Telephone
404.853.8806 Facsimile

Kent L. Jones
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
202.383.0732 Telephone
202.637.3593 Facsimile

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Response to Defendant's Second Set of Proposed Findings of Uncontroverted Fact has been made on August 4, 2008 via the Court's CM/ECF system to:

Thomas M. Herrin
Attorney, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
thomas.m.herrin@usdoj.gov

s/ Lewis S. Wiener
LEWIS S. WIENER