IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: August 21, 2008)

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-407 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-408 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-409 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-810 T |

| | | |
|---|---|---|
| M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 06-811 T |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. THE COURT MUST MAKE A PARTNERSHIP LEVEL DETERMINATION AS TO THE ISSUES IN THIS LITIGATION . . . . . 1

II. THE REQUIREMENT TO COVER A SHORT SALE IS A LIABILITY FOR PURPOSES OF § 752 . . . . . 2

III. THIS COURT HAS JURISDICTION TO DETERMINE THE VALIDITY OF THE TRANSFERS IN THIS PROCEEDING . . . . . 5

IV. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT . . . . . 5

A. The transfers to the CRUTs should be disregarded for federal tax purposes . . . . . 5

B. The CRUTs violate the principles of § 664 . . . . . 8

V. TREAS. REG. § 1.701-2, THE PARTNERSHIP ANTI-ABUSE RULE, IS BOTH APPLICABLE TO THESE FACTS AND VALID . . . . . 11

A. Treas. Reg. § 1.701-2 applies to these facts . . . . . 10

B. Treas. Reg. § 1.701-2 is valid and constitutional . . . . . 13

1. Treas. Reg. § 1.701-2 is an Interpretive Regulation . . . . . 15
2. Application of the Chevron Standard to the Anti-Abuse Rule . . . . . 15
3. Rebuttal of the Void-for-Vagueness Argument . . . . . 18

VI. THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT AS TO THE APPLICATION OF ACCURACY-RELATED PENALTIES . . . . . 21

A. The Court does not have jurisdiction in this TEFRA proceeding to determine whether the Sands Heirs may be excused from penalties under I.R.C. § 6664(c) . . . . . . . . . . 21

B. Even if this court has jurisdiction to review the "reasonable cause" defense, the plaintiffs did not have reasonable cause for taking the positions on their returns . . . . . . . . . . 23

1. Reasonable Cause/Reasonable Reliance on Tax Professionals . . . . . . . 24

2. Substantial Authority . . . . . . . . . . 26

3. Application to Facts . . . . . . . . . . 27

CONCLUSION. . . . . . . . . . 29

## TABLE OF AUTHORITIES

### FEDERAL CASES

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3rd Cir. 1998) .......................... 14,17

*AMP Inc. v. United States*, 185 F.3d 1333 (Fed. Cir. 1999) ........................................... 4

*Ammex, Inc. v. United States*, 367 F.3d 530 (6th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005) ........................................................................................ 3

*Atlantic Mutual Insurance Co. v. Commissioner*, 523 U.S. 382 (1998) ........................ 15

*Chevron USA, Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984) ........................................................................................ 3, 15

*DeWitt v. United States.*, 204 Ct. Cl. 274 (1974) ............................................................ 5

*Enbridge Energy Co., Inc. v. United States*, 553 F. Supp. 2d 716 (S.D. Tex 2008) ........................................................................................ 9

*Foil v. Commissioner*, 920 F.2d 1196 (5th Cir. 1990) ................................................ 3, 4

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..................................................... 18

*Gregory v. Helvering*, 293 U.S. 465 (1935) ......................................................... 13, 17 20

*Grove v. Commissioner*, 490 F.2d 241 (2nd Cir. 1973) .................................................. 5

*Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007) ......................................... 21

*Knetsch v. United States*, 364 U.S. 361 (1960) ............................................................ 17

*Kornman & Associates, Inc. v. United States*, 527 F.3d 443 (5th Cir. 2008) ........................................................................................ 2,3,4

*Marandola v. United States*, 76 Fed. Cl. 237 (2007) ...................................................... 4

*Neonatology Associate, P.A. v. Commissioner*, 299 F.3d 221 (3rd Cir. 2002) .............. 25

*Omohundro v. United States*, 300 F.3d 1065 (9th Cir. 2002) ......................................... 3

*Palmer v. Commissioner*, 62 T.C. 684 (1974) ................................................................ 5

*Pohl Corp. v. United States*, 22 Cl. Ct 849 (1991) .......................................................... 2

*Sheppard v. United States*, 361 F.2d 972 (Ct. Cl. 1966) ................................................. 5

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................................... 3, 4

*Stobie Creek Investments, LLC v. United States*, 2008 WL 2968170 (Fed. Cl. 2008) ........................................................................................... 21,23 25,26 28

*Swallows Holding, Ltd. v. Commissioner*, 515 F.3d 162 (3rd Cir. 2008) ....................... 15

*Transcapital Leasing Associates 1990-II, L.P. v. United States*, 2006 WL 897723 (W.D. Tex.) ............................................................................... 9

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ...................................................... 15

*USA Choice Internet Service, LLC v. United States*, 73 Fed. Cl. 780 (2006), *rev'd on other grounds*, 522 F.3d 1332 (Fed. Cir. 2008) ...................................... 4

## FEDERAL STATUTES

H.R. Rep. No. 83-1337 (1954) ..................................................................... 13,15

H.R. Rep. No. 83-2543 (1954) ......................................................................... 15

I.R.C.§ 269 ........................................................................................................ 20

I.R.C. § 357(b) .................................................................................................. 20

I.R.C. § 446 ....................................................................................................... 21

I.R.C. § 531 ....................................................................................................... 20

I.R.C. § 1001(c) ................................................................................................ 10

I.R.C. § 6226(e) ................................................................................................ 21

I.R.C. §§ 6621 ................................................................................................... 21

I.R.C. § 6662(d)(2)(B) .................... 27

I.R.C. § 6664(c) .................... 21, 23

I.R.C. § 7520 .................... 9

I.R.C. §§ 701-777 .................... 13

PS-49-91, 1991-2 C.B. 1125 .................... 16

S. Rep. No. 83-1622 (1954) .................... 15

S. Rep. No. 94-938 (1976) .................... 15

S. Rep. No. 1622, 83d Cong., 2d Sess. (1954) *reprinted in* 1954 U.S.C.C.A.N. 4623 .................... 13

T.D. 8380, 1992-1 C.B. 218(1992) .................... 16

T.D. 8588, 1995-1 C.B. 109 (1995) .................... 13

Treas. Reg. § 1.1275-2(g)(1) .................... 19

Treas. Reg. § 1.1445-1(c)(2)(ii)(A) .................... 19

Treas. Reg. § 1.1445-2(d)(3)(v) .................... 19

Treas. Reg. § 1.1445-5(b)(5)(ii) .................... 19

Treas. Reg. § 1.469-4(f)(1) .................... 19

Treas. Reg. §1.165-1(b) .................... 20

Treas. Reg. § 1.6662-4(d)(3)(i) .................... 25

Treas. Reg. § 1.701-2 .................... 10 11 13, 14 18,19

Treas. Reg. § 1.701-2(a) .................... 13,15

Treas. Reg. § 1.701-2(a)(1)-(3) .................... 18

Treas. Reg. § 1.701-2(b) .................................................................................... 10,14
19

Treas. Reg. § 1.701-2(b)(2) .................................................................................... 12

Treas. Reg. § 1.701-2(c) .................................................................................... 19

Treas. Reg. § 1.701-2(d) .................................................................................... 20

Treas. Reg. § 1.752-2(j) .................................................................................... 16

Treas. Reg. § 301.6226(f)-1 .................................................................................... 22

Treas. Reg. § 301.6221-1T .................................................................................... 23

**MISCELLANEOUS**

Cunningham and Repetti, *Textualism and Tax Shelters*, 24 Virginia Tax Review 1 (2004) .................................................................................... 20

*Executive Summary of Report by United States Senate Committee on Governmental Affairs, Permanent Subcommittee on Investigations* (2003) .................................... 17

Philip Kanan, *Advisory Opinions by Federal Courts*, 32 U. Rich. L. Rev. 769 (1998) .................................................................................... 1,2

PLR 200127023, 2001 WL 757770 .................................................................................... 9,10

PLR 200314021, 2003 WL 1789238 .................................................................................... 10

PLR 200403051, 2004 WL 69095 .................................................................................... 10

PLR 200441024, 2004 WL 2266831 .................................................................................... 10

**UNITED STATES' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

On July 2, 2008, the United States filed for summary judgment sustaining the FPAAs at issue in Cause Nos. 06-409T, 06-410T and 06-411T, including the imposition of the 40% penalty addressed therein. Plaintiffs counter that summary judgment is inappropriate because: (1) the Court cannot consider the United States' argument that the short sale liabilities at issue in this case are liabilities for purposes of § 752; (2) the Court lacks jurisdiction to determine whether the Sands' transfers of Group's partnership interests to the CRUTs were valid; (3) conversely, if jurisdiction exists to determine whether the Sands' transfers of Group's partnership interests to the CRUTs were valid, fact issues exist which preclude summary judgment; and (4) fact issues exist precluding summary judgment as to the 40% accuracy related penalties. As shown below, as well as in the United States' motion, the Court has jurisdiction over the issues raised in the United States' motion. Further, while plaintiffs may have raised fact issues in their reply, these fact issues are not material and they do not preclude summary judgment sustaining the FPAAs issued to Group, Partners and CWC, including the imposition of the 40% penalties addressed therein.

**I. <u>The Court must make a partnership level determination as to the issues in this litigation.</u>**

The United States addressed this issue in its response to the plaintiffs' motion for partial summary judgment (Docket #115), and it will not repeat those arguments here.

Plaintiffs assert that this Court's consideration of the § 752 issue will result in an improper advisory opinion. Contrary to plaintiffs' assertions, this Court will not be issuing an advisory opinion but, instead, will be performing its judicial function to resolve outstanding issues. An advisory opinion is one where a court merely offers advice as opposed to performing its judicial function to resolve an existing case or controversy. Philip Kanan, *Advisory Opinions by Federal*

*Courts*, 32 U. Rich. L. Rev. 769, 771 (1998) (defining "advisory opinion" through citation to Supreme Court precedent). Here, the Court is not offering its advice on § 752, rather it is resolving an ongoing dispute where the interpretation and application of § 752 is critical. The taxpayers failed to account for their obligation to close treasury short sales as a liability under § 752, resulting in the overstatement of basis at issue in this litigation. This overstatement of basis remains a material issue in this litigation. Furthermore, this overstatement of basis is central to the application of the penalties imposed by the FPAAs.

Plaintiffs' reliance on *Pohl Corp. v. United States*, 22 Cl. Ct. 849 (1991) is misplaced. In *Pohl Corp.*, the United States conceded every issue between the parties, entitling plaintiff to the full amount of its claim. To the contrary, in this case, only a partial concession has been made by plaintiffs and no concession has been made by the United States. Significantly, plaintiffs have not conceded the penalty adjustments, nor have they conceded their overstatement of basis resulting in the gross valuation misstatement penalty.

## II. <u>The requirement to cover a short sale is a liability for purposes of § 752.</u>

This issue has been fully briefed in the June 4, 2007 Motion for Summary Judgment filed by the United States in connection with the Second Shelter (Docket # 28). The legal issue is the same and the Court's ruling on the § 752 issue will be dispositive for both shelters. Rather than restate an argument already before the Court in this case, the United States refers the Court to that briefing for arguments as to why the obligations to close the short sales are liabilities pursuant to § 752.

In the United States' Motion for Summary Judgment sustaining the FPAAs at issue in Cause Nos. 06-409T, 06-410T and 06-411T (Docket #106), the United States relies on *Kornman &*

*Associates, Inc. v. United States*, 527 F.3d 443 (5th Cir. 2008)(affirming *COLM Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006)), as support that the short sale obligations at issue are liabilities under §752. Plaintiffs maintain, however, that this Court should not place any reliance on *Kornman* since the Fifth Circuit's decision adopted "the reasoning espoused by the IRS in several revenue rulings and determin[ed] that such rulings were entitled to *Skidmore* deference because they were reasonable." Response, pg. 10.

The United States asserts, as a general matter, that revenue rulings should be entitled to the higher level of deference set out in *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Chevron* requires a court to follow an agency's interpretation of a statute unless that interpretation is arbitrary, capricious, or manifestly contrary to the statute. 467 U.S. at 844. However, even if this Court concludes that revenue rulings are not entitled to *Chevron* deference, they are certainly highly persuasive precedent that should be followed unless they are unreasonable. *See Foil v. Commissioner*, 920 F.2d 1196, 1202-1203 (5th Cir. 1990); *Omohundro v. United States*, 300 F.3d 1065, 1067-1069 (9th Cir. 2002); *Ammex, Inc. v. United States*, 367 F.3d 530, 535 (6th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005).

While the Fifth Circuit declined to give revenue rulings *Chevron* deference, the Fifth Circuit stated that "[t]he degree of deference owed to a particular revenue ruling will depend upon several disjunctive factors: 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Kornman*, 527 F.3d at 455 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). After thoroughly analyzing the three revenue rulings at issue, the Fifth Circuit held that these "three revenue rulings should be afforded 'significant weight.'" *Id.*

Plaintiffs rely on *AMP Inc. v. United States*, 185 F.3d 1333 (Fed. Cir. 1999) as authority that revenue rulings are not entitled to any deference. However, in *AMP*, the disputed revenue ruling was issued while AMP's refund claims were pending with the IRS. In contrast, the revenue rulings at issue, both here and in *Kornman*, were issued years before the transactions took place – in 1988 and 1995. In *Kornman*, the Court determined that the revenue rulings were entitled to "significant weight," holding that:

> One factor which gives a revenue ruling its power to persuade is its reasonableness. *See Foil*, 920 F.2d at 1201. We are particularly struck by the absurd result that would arise if we accepted the Appellant's argument that the obligation to close a short sale is not a liability for purposes of section 752. We are reluctant to adopt any definition of liability that would defeat the manifest intent of Congress and would allow the Trust to continue its conspicuous raid on the Treasury through the use of this tax shelter.

*Kornman*, 527 F.3d at 455-456.

Consistent with *Kornman*, this Court has previously indicated that revenue rulings should be entitled to at least *Skidmore* deference where they exhibit, thorough consideration, valid reasoning and consistency with prior precedent. *See Marandola v. United States*, 76 Fed. Cl. 237, 247 n.14 (2007) and *USA Choice Internet Service, LLC v. United States*, 73 Fed. Cl. 780, 792-793 (2006), *rev'd on other grounds*, 522 F.3d 1332 (Fed. Cir. 2008). In *Kornman*, the Court found that the revenue rulings at issue met this standard. While the United States continues to maintain that *Chevron* deference to revenue rulings is appropriate, the lesser *Skidmore* deference afforded in *Kornman* is certainly no less than what this Court has already determined to be appropriate. Accordingly, while not controlling, *Kornman* is certainly persuasive in its conclusion that the short sale obligations at issue are liabilities under §752 and plaintiffs' request that the *Kornman* case be disregarded should be summarily rejected.

**III. This Court has jurisdiction to determine the validity of the transfers in this proceeding.**

This issue has been previously briefed and United States' position is set forth in its response to Plaintiffs' Motion to Substitute (Docket # 24). Again, rather than re-state arguments already before the Court in this proceeding, the United States refers the Court to that briefing for arguments as to why this Court has jurisdiction to determine the validity of the transfers in this proceeding.

**IV. There are no genuine issues of material fact.**

A. The transfers to the CRUTs should be disregarded for federal tax purposes.

This case does not involve a donation of appreciated property to a charity. Instead, this case involves a purported donation of a remainder interest in Group's limited partnership interest. At issue is the transitory placement into four CRUTs of $75 million worth of appreciated Constellation Brand stock held by Group. The United States does not dispute the $2 million charitable gift made to the Fund. Rather, the United States disputes the Sands' claim that they are entitled to receive, tax free, the gain recognized on the Sands' retained income interest in appreciated Constellation stock held by Group. By disregarding, for federal tax purposes, the transfer of Group to the CRUTs, this gain is properly recognized by the Sands in the year the stock was sold and the gain realized.

The cases cited by plaintiffs involve facts very different than the facts of this case. In each of these cases (*Grove, DeWitt, Sheppard, and Palmer*)[1], the charity actually received the full value of the asset, whether it be a horse, stock or college assets. Here, the charity received a remainder interest in a deeply discounted partnership. The cases cited by plaintiffs might be comparable if the Sands had donated $75 million of appreciated stock to a charity, repurchased the same stock from the charity for $75 million and then sold the stock for $75 million. In that instance, there would be

---

[1] *Grove v. Commissioner*, 490 F.2d 241 (2nd Cir. 1973); *DeWitt v. United States.*, 204 Ct. Cl. 274 (1974); *Sheppard v. United States*, 361 F.2d 972 (Ct. Cl. 1966); *Palmer v. Commissioner*, 62 T.C. 684 (1974).

no capital gain on the sale of the stock because the Sands would have a $75 million basis in the stock. At the same time, the charity would have received $75 million, rather than only $2 million as the Fund did here. In a nutshell, here, the Sands seek to generate an $85 million basis in the Constellation stock through a $2 million charitable gift.[2]

Plaintiffs have attempted to avoid summary judgment by creating factual disputes regarding: (1) the existence of a plan or prearrangement to prematurely terminate the CRUTs; and (2) the Sands' ability to control the Fund. They failed on both accounts.

Plaintiffs fail to create a fact issue with respect to the Sands' ability to control the Fund. At best, plaintiffs create a fact issue as to the Sands' ability to control Robinson, Locke and Stallings. While Robert Sands' affidavit defies credibility, it is sufficient for summary judgment purposes that he denies in his affidavit that this control existed.[3] However, the Sands' ability to control Robinson, Locke and Stallings is not material. Rather, it is the Sands' ability to control the Fund that is material.

The Fund Trust Agreement (App-B-13), Art. III, ¶ 5(b) provides that the grantors (Richard and Robert Sands) may remove a co-trustee by giving written notice of such removal to such co-

---

[2] On pg. 7 of plaintiffs' response, plaintiffs assert that the purchasers of the CRUT interest would have a carryover basis in the lead interest and cost basis in the assets of the remainder interest. The plaintiffs have never explained to this Court how they come to this determination. Is this a carryover basis from the $9 million of basis in Constellation stock that was contributed to Group? Is this a basis that was pumped up by the proceeds from the short sale? Is it basis acquired by the transaction with the CRUTs? If the Sands Heirs thought they would receive basis from the CRUT plan and they were so confident in the tax opinion letters they received, why was the CRUT transaction combined with the Son of BOSS short sale transaction?

[3] Freddy Robinson is the head of Bernard Robinson & Co. LP, a Greensboro, North Carolina accounting firm that served as the Sands Heirs long-time accounting firm. Bernard Robinson also prepared the tax returns that claimed the inflated basis at issue in this litigation. Wesley Stallings is an accountant at Bernard Robinson. Locke is an attorney with Nixon Peabody, L.P., and a member of the board of Directors of Constellation. Essentially, the three co-trustees of the Fund were quasi-employees of the Sands family and it is unlikely they would have risked terminating that long-term relationship with the Sands by refusing to abide by the wishes of Richard and Robert Sands. This is especially true since each knew that they served in their trustee capacity at the sole discretion of Robert and Richard.

trustee. Further, as established by Art. III, ¶ 5c(ii) of this agreement, Robert and Richard also had the power to chose any replacement trustee. Clearly, these abilities gave Richard and Roberts Sands control over the Fund since any Fund trustee refusing to do Robert and Richard's bidding could simply be removed and replaced with someone who would comply with the Sands' directives. Additionally, as the United States' summary judgment evidence established, if necessary, Robert and Richard Sands were ready, willing and able to step in as Fund trustees.

With respect to the existence of a plan or prearrangement to prematurely terminate the CRUTs, at best, plaintiffs create a fact dispute as to whether a such a plan or prearrangement existed between the Sands and Robinson, Locke and Stallings. However, as pointed out above, Robinson, Locke and Stalling's cooperation was not essential in consummating the premature termination of the CRUTs since Robert and Richard Sands, *de facto*, controlled the actions of the trustees of the Fund. If the trustees refused to cooperate, they could summarily be replaced.

Plaintiffs present no summary judgment evidence to rebut the United States' summary judgment evidence that a plan or prearrangement existed as between the Sands to prematurely terminate the CRUTs. The point at which the Sands let Robinson, Locke and Stallings in on this prearrangement is immaterial, although by necessity it had to occur in close proximity to the time that they were named the Fund's trustees. As the summary judgment evidence establishes, the Fund was only created, and Robinson, Locke and Stallings named its trustees, on February 22, 2002, which was a Friday. Five days later, on February 27, Locke, Stallings and Robinson agreed to sell the Fund's remainder interest to the Sands. As McCoy opines, "[i]t exceeds reasonable comprehension to believe that this newly created organization, ostensibly run by Sands family advisors, could independently negotiate an arm's length sale of those interests to the Sands family

members and consummate that sale between the Friday on which it was formed and the following Wednesday." Finally, it is clear that the sale of the CRUT remainder interests agreed to by the Trustees of the Fund, under the terms reached, was not in the best interest of the charity. The value of the Group limited partnership interests was based upon an appraisal that discounted the asset value of Group ($75,694,095) through the application of two discount factors (42% and 50% – combined as a 71% discount) to arrive at a final valuation of $21,951,288 for Group.[4] The CRUT Partners repurchased the charitable remainder interest after 5 months at this steeply discounted low value. Accordingly, even though Group held liquid assets of over $75 million, the charity only received $2.2 million. The $2.2 million amount was based on a discounted value of approximately $22 million, of which the charity received approximately 10%. It would have been in the best interest of the charitable remainderman to either (1) request an undiscounted value for the Group partnership interest, which would have netted the charity $7.5 million (10% of $75 million), or (2) purchase the income interest of the Sands beneficiaries at the discounted value, which would have given the charities $75 million worth of assets for a discounted price of $19.8 million (90% of $21,951,288 million). Structuring the transaction as they did in this case was not in the best interest of the charitable remainderman, it was only in the best interest of the Sands.

B. The CRUTs violate the principles of § 664.

The United States asserts that the CRUTs did not operate exclusively as a charitable remainder trust from their creation. The CRUTs were used merely (i) as a device to avoid the tax realized on the capital gain generated by the sale of the Constellation stock; (ii) to provide further

---

[4] This appraisal performed by an appraiser from Alaska is highly questionable; it claimed discounts both for "discount for lack of public market" and for lack of marketability. But this is not a valuation case. As pointed out in the United States Motion for Summary Judgment, a low appraisal was part of the scheme whereby the charity would receive a relatively small amount. (See Govt. Exs.14 and 27)

camouflage for the abusive Son of BOSS transaction; and (iii) provide an alternative argument to attempt to inflate the basis in the Constellation Brands stock. The CRUTS existed only long enough to sell the Constellation stock and to reach into the next tax year to further obfuscate the transaction. The CRUTs were mere conduits similar to those used in other abusive tax shelter transactions. *See Enbridge Energy Co., Inc. v. United States*, 553 F.Supp.2d 716 (S.D. Tex 2008) (use of intermediary to sell assets is disregarded); *Transcapital Leasing Associates 1990-II, L.P. v. United States*, 2006 WL 897723 (W.D. Tex.); *aff'd*, 246 Fed. Appx. 266 (5th Cir. 2007) (tax shelter attempted to have all income recognized by indian tribe).

In response, the plaintiffs cite to four private letter rulings in which the IRS approved of the early termination of CRUTs. Initially, PLR 200525014 was revoked by PLR 200614032. In PLR 200802033, the charitable remainder trust was terminated because of extensive litigation related to the probate of a will and subsequent administration of the charitable remainder trust. PLR 200821024 does not involve a charitable remainder trust.

Regardless, the United States admits that the IRS has permitted some charitable remainder trusts to terminate early. In PLR 200127023, 2001 WL 757770, the taxpayer was the settlor and non-charitable beneficiary of a 20-year CRUT. The taxpayer, the trustee of the CRUT and the charitable beneficiary of the CRUT agreed to prematurely terminate the CRUT. Upon termination, the trustee of the CRUT determined the actuarial value of the taxpayer's interest and the charity's interest pursuant to I.R.C. § 7520 and distributed the trust assets representing such interests to the taxpayer and the charity at termination of the CRUT. The IRS concluded that the transaction is treated as if the taxpayer sold his interest in the CRUT to the charitable remainderman. The amount the taxpayer realized from the sale of his interest in the CRUT is the amount of money and the fair

market value of the property received by the taxpayer. Pursuant to § 1001(e), the portion of the adjusted uniform basis assigned to the taxpayer's interest in the CRUT is disregarded and, accordingly, the taxpayer has no basis in its interest in the CRUT. The amount of gain recognized under I.R.C. § 1001(c) is the amount the taxpayer realized from the disposition of the taxpayer's interest in the CRUT. *See also* PLR 200403051, 2004 WL 69095; PLR 200441024, 2004 WL 2266831; PLR 200314021, 2003 WL 1789238. This court should note though that in each of these PLRs, the income beneficiary was taxed on the gain with respect to the amount realized from his disposition of his income interest in the trust. Here, the Sands assert that the $75 million distribution received from the CRUTs in 2002 is tax free. However, since the CRUTs were terminated in 2002 and the distributions occurred in 2002, the issue of whether gain should be realized on the termination of the CRUTs, is not before this Court.

The CRUTs here did not operate exclusively as a charitable remainder trust from their inception because the charitable remainderman here did not receive fair value for their remainder interest. As discussed above, the value of Group was based upon an appraisal that discounted the asset value of Group ($71,780,711) to a final valuation of $20,816,406. The CRUT Partners repurchased the charitable remainder interest after 5 months at this steeply discounted low value. Accordingly, even though Group held liquid assets of almost $72 million, the charity only received $2 million. Structuring the transaction as they did in this case was not in the best interest of the charitable remainderman, it was only in the best interest of the Sands.

## V. **Treas. Reg. § 1.701-2, the Partnership Anti-Abuse rule, is both applicable to these facts and valid.**

Plaintiffs' summary judgment motion argues, among other things, that not only is Treas. Reg. § 1.701-2 not applicable to these facts, but that it is also invalid and unconstitutional. Plaintiffs' arguments lack merit.

### A. Treas. Reg. § 1.701-2 applies to these facts.

Plaintiffs assert that it is doubtful that Treas. Reg. § 1.701-2 could ever apply to gifts of partnership interests to charitable entities. To the contrary, Treas. Reg. § 1.701-2(b) gives the Service broad authority to recast a transaction or series of transactions in the event that a partnership is formed or availed of in connection with a transaction, a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. In light of this, the partnership anti-abuse rule should be applied by disregarding the CRUTs as partners of Group, or disregarding the purported transfers of partnership interests to the purported CRUTs, so that the tax consequences of the transaction will be consistent with the economic consequences to the Sands Heirs, who received the same economic benefits they would have received from holding their interests in Group for the duration. In fact, the anti-abuse regulations were promulgated to combat abuses like the one in this case. Plaintiffs assert that for the "Commissioner to determine that such reduction [of a partners' federal tax liability] is, in the Commissioner's view, 'inconsistent with the intent of subchapter K' thwarts the will of Congress in allowing charitable deductions for gifts of property to charitable entities." While taxpayers are entitled to a deduction for gifts to charities, taxpayers are not entitled to use charitable entities to shelter $75 million in taxable capital gain. These types of abuses were certainly not

envisioned by Congress and are exactly the types of abuses that Treas. Reg. § 1.701-2 was promulgated to prevent.

Plaintiffs also argue that Treas. Reg. § 1.701-2 does not support an attempt by the Commissioner to change the partners of a partnership. To the contrary, the Treasury Regulations clearly provide that "the Commissioner can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K – ... (2) One of more of the purported partners of the partnership should not be treated as a partner..." Treas. Reg. § 1.701-2(b)(2).

The plaintiffs argue that there is no evidence to show that the principal purpose of the CRUTs was to reduce the Sands' taxes. This is simply not true. The entire design of the two tax shelters at issue in this litigation was to create a mechanism for the Sands to avoid paying capital gains tax. There was no other purpose for the complex and expensive plan other than to reduce the Sands' taxes. The United States presented evidence of this purpose in its first Motion for Summary Judgment filed on August 14, 2007 and has presented evidence of this intent with the present Motion for Summary Judgment. From the outset, the Sands Heirs intended to prematurely terminate the CRUTs shortly after their creation and receive the bulk of the proceeds generated from the sale of the Constellation Brands stock. The Sands Heirs used the CRUTs solely to launder the $75 million of gain generated by the sale of the Constellation Brands stock. Each step of the two strategies at issue in this litigation was detailed on a transaction calender prepared prior to the execution of any of the short sale transactions. Moreover, Lewis, Rice & Fingersh, L.C. ("Lewis Rice")(the law firm who wrote one of the two sets of tax opinion letters relied on by the Sands Heirs in these proceedings), was apprised of the various steps set out in the transaction calenders at the beginning

of the strategy's implementation. (PF 9) The amount of each strategy's short sale was arrived at based on the amount of potential basis that could be applied. (PF 10)

With respect to the CRUTs, although the CRUTs specified that their terms were for 20 years, the purchase of the remainder interests in the CRUTs and the CRUTs early termination was discussed prior to the time the CRUTs were formed. (PF 11). There was no other purpose for the use of the CRUTs other than to shelter the capital gains tax. If the Sands had wanted to give $2 million to charities, the gift could have been made outright, instead of through the use of CRUTs.

B. Treas. Reg. § 1.701-2 is valid and constitutional.

The anti-abuse regulations, Treas. Reg. § 1.701-2, continue the 70-year tradition of examining the economic substance of transactions, and not simply their form, in determining tax consequences. Just as the Supreme Court in *Gregory v. Helvering*, 293 U.S. 465 (1935) insisted that form does not control if what was done is not what the statute *intended*, the regulations examine whether the form of what was done comports with Congress' intent in enacting the partnership provisions (subchapter K, I.R.C. §§ 701-777). It cannot be doubted, and certainly the Supreme Court often has instructed, that statutes are not intended to convey tax consequences that depart from economic substance. In enacting subchapter K, Congress did not intend its statutes to permit creative legions of attorneys, accountants, and investment consultants to guide their clients to artificial tax losses that do not reflect actual economic losses.[5]

[5]The Supreme Court's economic substance test was well established when Congress enacted subchapter K in 1954 as part of the Internal Revenue Code. Moreover, when Congress passed the statutes that comprise subchapter K, it belied any intent that they be applied rigidly, without regard to economic reality. Its goals instead included "flexibility" and "equity." H.R. Rep. No. 1337, 83d Cong., 2d Sess. (1954), *reprinted in* 1954 U.S.C.C.A.N. 4019, 4091; S. Rep. No. 1622, 83d Cong., 2d Sess. (1954) *reprinted in* 1954 U.S.C.C.A.N. 4623, 4722. *App-B-116-119.* Congress' explicit intent also included closing (not opening) "loopholes." *See* S. Rep. No. 1622, 83d Cong., 2d Sess. (1954) *reprinted in* 1954 U.S.C.C.A.N. 4623, 4733. *App-B-120-121*.

The anti-abuse regulations therefore examine economic substance and reality in effecting Congress' intent and determining whether the claimed tax benefits should be adjusted. Three requirements illuminate economic substance and the intent of subchapter K (Treas. Reg. § 1.701-2(a)):[6]

> 1. The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose.
>
> 2. The form of each partnership transaction must be respected under substance over form principles.
>
> 3. . . . the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partnership and the partner must accurately reflect the partners' economic agreement and clearly reflect the partner's income (collectively, proper reflection of income) . . .

If a partnership is formed or availed of in connection with a transaction a principal purpose of which is to substantially reduce the partners' federal tax liability *"in a manner that is inconsistent with the intent of subchapter K"* (as set forth in Treas. Reg. § 1.701-2(a)) (emphasis supplied), then the transaction may be recast for tax purposes. Treas. Reg. § 1.701-2(b). Indeed, just as the Supreme Court ruled that economic substance prevails over literal compliance with statutory requirements, the regulations provide that the three-part test used to reflect the intent of subchapter K can lead to an adjustment of tax consequences, even though the "transaction may fall within the literal words of a particular statutory or regulatory provision."[7] *Ibid.*

---

[6]The complete text of the regulations, along with the explanatory statement by the Treasury Department, T.D. 8588, 1995-1 C.B. 109 (1995), are provided in App-B-122-148.

[7] In footnote 29 of *ACM Partnership v. Commissioner*, 157 F.3d 231 (3rd Cir. 1998), the court acknowledged Treas. Reg. § 1.701-2(a) and noted that partnership transactions carried out on or after May 12, 1994, would also be subject to the economic substance analysis of Treas. Reg. § 1.701-2(a), though the regulations were not effective for the year in issue before the court.

*1. Treas. Reg. § 1.701-2 is an Interpretive Regulation*

Treasury regulations issued pursuant to the Secretary's general authority under Section 7805(a) of the Internal Revenue Code to "prescribe all needful rules and regulations for the enforcement" of the internal revenue laws are considered interpretive regulations. Section 1.701-2 is considered an interpretive regulation (*i.e.*, a general authority regulation). As a general matter, treasury regulations are entitled to the higher level of deference set out in *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Chevron* requires a court to follow an agency's interpretation of a statute unless that interpretation is arbitrary, capricious, or manifestly contrary to the statute. 467 U.S at 844. In *United States v. Mead Corp*., 533 U.S. 218 (2001), the Court, refining its *Chevron* analysis, determined that *Chevron* deference was available to any administrative implementation of a statutory provision "when it appears that Congress delegated authority to the agency generally to make such rules carrying the force of law," and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id*. at 226-227. It is well settled that Treasury Regulations (both general and specific authority regulations) are entitled to *Chevron* deference. *Atlantic Mut. Ins. Co. v. Commissioner*, 523 U.S. 382, 387-89 (1998); *Swallows Holding, Ltd. v. Commissioner*, 515 F.3d 162 (3rd Cir. 2008).

*2. Application of the Chevron Standard to the Anti-Abuse Rule.*

As set out above, *Chevron* requires a court to follow an agency's interpretation of a statute unless that interpretation is arbitrary, capricious, or manifestly contrary to the statute. Although there is no statutory language explicitly directing the Secretary of the Treasury to promulgate a subchapter K anti-abuse rule, this regulation does implement the congressional mandate of subchapter K.

Subchapter K was enacted to permit businesses for joint profit to be conducted with "simplicity, flexibility, and equity as between the partners." S. Rep. No. 83-1622, at 89 (1954); H.R. Rep. No. 83-1337, at 65 (1954). *App-B-112-115.* When enacting subchapter K, Congress also indicated that the aggregate rather than entity concepts should be applied if such concepts are more appropriate in the application of other provisions of the Code. *See, e.g.*, H.R. Rep. No. 83-2543, at 59 (1954) (use of aggregate treatment for partnership rental property under application of Section 543(a)(6)). *App-B-110-111*. Similarly, when later amending the partnership special allocation rules, Congress sought to "prevent the use of special allocations for tax avoidance purposes, while allowing their use for bona fide business purposes." S. Rep. No. 94-938, at 100 (1976). *App-B-108-109.* Furthermore, in the explanations of the 1984 amendments to subchapter K, it is stated that, "Congress believed that . . . the use of a partnership form should not result in greater tax benefits than would be available in the case of direct ownership." Staff of the Joint Committee on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 238 (Comm. Print 1985). *App-B-106-107.* Thus, while Congress intended the provisions of subchapter K to allow taxpayers to conduct business for joint economic profit through a more flexible arrangement that accurately reflects the partners' agreement without incurring an entity-level tax, the subchapter K provisions were not intended to allow taxpayers to structure transactions using partnerships to achieve tax results that are inconsistent with the underlying economic arrangement.

Over time, as taxpayers became more familiar with the provisions of subchapter K, abuse of subchapter K provisions also became more prevalent. In response, in 1991, the Treasury Department first promulgated specific anti-abuse rules by adding Treas. Reg. Section 1.752-2(j).

One of the factors considered in the Section 1.752-2(j) rules was whether facts and circumstances indicated that the substance of the economic arrangement did not match the assignment of risk made between the partners. *See* PS-49-91, 1991-2 C.B. 1125; and T.D. 8380, 1992-1 C.B. 218. *App-B-48-66.*

In 1993, Section 1.704-3 was added to the Treasury Regulations in order to implement Section 704(c) as amended by the Tax Reform Act of 1984 and the Revenue Reconciliation Act of 1989. When the Section 1.704-3 regulations were promulgated, an anti-abuse provision was incorporated under Section 1.704-3(a)(10), and this anti-abuse rule focused on whether an allocation method substantially reduced the present value of the partners' aggregate tax liability.

As discussed above, for the past 70 years, since the Supreme Court's decision in *Gregory*, courts have applied substance over form considerations to effectuate Congress' intent underlying Internal Revenue Code provisions, and they have not permitted that intent to be defeated by artificial, tax-driven form. *Gregory v. Helvering*, 293 U.S. at 409 ("whether what was done, apart from the tax motive, was the thing which the statute intended"); *accord ACM Partnership v. Commissioner*, 157 F.3d at 245-246 (transactions lacked "sufficient economic substance" and tax loss therefore was disallowed, notwithstanding that they "in form, satisfied each requirement" of applicable statutory and regulatory provisions).

Likewise, as previously discussed, it is beyond dispute that Congress did not intend the partnership provisions to be rigidly and mechanistically applied to permit clever consultants to create artificial tax losses that did not occur economically. *See also Introduction, Findings, and Executive Summary of Report by United States Senate Committee on Governmental Affairs, Permanent Subcommittee on Investigations* (2003) at 2, *(App-B-67-85)*; *Knetsch v. United States*,

364 U.S. 361, 367 (1960) (We look to the statute and materials relevant to its construction in vain for evidence that Congress meant to authorize the deduction of payments made under sham transactions). Congress can neither anticipate and then express in advance its disapproval of each tax artifice that fertile minds might some day invent. Neither can Congress devote itself to legislating immediately as each creation of a nimble industry comes into being. Congress' intention not to permit such tax dodges, and to ensure the integrity and fairness of the tax system, is clear however, and it falls to the courts, and the Department of Treasury in its regulatory capacity, to combat the substantial threat presented by the tax shelter industry.

The premise of plaintiff's argument that the regulations overrule Congress is that tax results are guaranteed if statutory requirements are satisfied. That premise is, as we have shown, false. Artificial tax losses claimed in connection with a scheme that ignores economic reality are, as the courts have ruled, neither intended by Congress, nor permitted. Thus, like the case law, the anti-abuse regulations implement Congress' intent – they don't countermand it.

*3. Rebuttal of the Void-for-Vagueness Argument***.**

The Supreme Court has held that "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Section 1.701-2 is not unconstitutionally vague. Specifically, Section 1.701-2(a) includes specific requirements to aid the taxpayer in understanding the intent of the subchapter K provisions. Section 1.701-2(b) provides specific remedies available to the Commissioner should a transaction be found to be inconsistent with the intent of subchapter K. Section 1.701-2(c) provides a detailed description of the facts and circumstances considered when determining the purpose for which a partnership was formed. Furthermore, eleven examples were provided to assist

the taxpayer in understanding the application of the general anti-abuse rule, and three additional examples were provided on the application of the abuse of entity treatment portion of the rule.

Treas. Reg. § 1.701-2 depends for its application on a variety of terms and concepts that have long been a feature of the tax law. The regulations provide that the undoubted intent of subchapter K to prohibit artificial tax driven schemes may be implemented by determining whether a partnership is "bona fide", whether a transaction was entered into for a "substantial business purpose", whether the form of a transaction must be respected under "substance over form" principles, and whether tax consequences reflect the partners' "economic agreement" and "clearly reflect" their income. Treas. Reg. § 1.701-2(a)(1)-(3). And in determining whether these requirements have been met, there may be an inquiry as to whether a partnership was "formed or availed of" with a "principal purpose" to "reduce substantially" the "partners' aggregate federal tax liability" in a manner inconsistent with the intent of subchapter K. Treas. Reg. § 1.701-2(b); *see also* Treas. Reg. § 1.701-2(c).

These terms and concepts in the regulations are founded on those that are well-established in statutes, regulations, and indeed the case law discussed throughout this case regarding substance over form. Plaintiff's argument that the anti-abuse regulations are unconstitutionally vague amounts to a claim that other statutes, regulations, and case law also must be rejected for unconstitutional vagueness.

For example, 26 U.S.C. § 357(b) contains several of the terms and concepts echoed in the anti-abuse regulations. That provision addresses the tax treatment of an assumption of liability in

a corporate exchange and contains the terms "principal purpose," "tax avoidance purpose," and "bona fide business purpose":

> If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption was made, it appears that the principal purpose of the taxpayer with respect to the assumption . . . was (A) a purpose to avoid Federal income tax liability in the exchange, or (B) if not such purpose, was not a bona fide business purpose . . .

Similarly, 26 U.S.C. § 269 authorizes the disallowance of a deduction, credit, or other allowance in connection with an acquisition whose "principal purpose" is "avoidance of Federal income tax."[8]

Still other terms and concepts used in the anti-abuse regulations are found elsewhere in statutes and regulations. 26 U.S.C. § 531 imposes an additional tax on a corporation's accumulated earnings if the corporation was "formed or availed of for the purpose of avoiding income tax" with respect to its shareholders. 26 U.S.C. § 446, addresses permissible methods of accounting and provides that taxable income shall be computed using a method of accounting to "clearly reflect income." And, as cited above, Treas. Reg. §1.165-1(b), in effect for decades, provides that only a "bona fide loss" is allowable and that "substance and not mere form" govern.

All of these existing and established statutory and regulatory concepts lie at the core of the anti-abuse regulations. In addition, the overall focus of the anti-abuse regulations ... to ensure that tax results comport with real economic consequences and substance ... is, as we have discussed, drawn from and is a complement to the case law that began with *Gregory v. Helvering*. Courts have engaged in fact finding under these standards without committing a constitutional violation.

[8]The "principal purpose" of avoiding tax language in the anti-abuse regulations also is found in other existing regulations. S*ee* Treas. Reg. § 1.469-4(f)(1); Treas. Reg. § 1.1275-2(g)(1); Treas. Reg. §§ 1.1445-1(c)(2)(ii)(A), 1.1445-2(d)(3)(v), and 1.1445-5(b)(5)(ii).

Especially with the added guidance of numerous examples, explaining how its provisions apply in a variety of circumstances (see Treas. Reg. § 1.701-2(d) examples 1-11), the anti-abuse regulations likewise are not unconstitutionally vague.[9]

**VI. <u>The United States is entitled to summary judgment as to the application of accuracy-related penalties.</u>**

The plaintiffs assert that the application of penalties is inherently a factual issue, especially where the taxpayers are asserting a defense of reasonable cause and good faith. However, the Court of Federal Claims has found in two different cases, that the application of the valuation misstatement penalty at the partnership level is computational only. In *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007), the Court stated that "[o]nce a gross valuation misstatement has occurred, the penalty applies mechanically, regardless of the intent of the taxpayers in executing the transaction or their reliance on legal authority." *Id.* at 54. *See also Stobie Creek Investments, LLC v. United States*, 2008 WL 2968170, * 71 (Fed. Cl. 2008) (application of the penalty is mandatory and applies mechanically). Accordingly, application of the valuation misstatement penalty here is mechanical if the Court finds that a valuation misstatement existed.

A. <u>The Court does not have jurisdiction in this TEFRA proceeding to determine whether the Sands Heirs may be excused from penalties under I.R.C. § 6664(c).</u>

The Sands Heirs cannot argue in this TEFRA proceeding that they should be excused from penalties under the "reasonable cause" defense found in 26 U.S.C. § 6664(c). Section 6664(c)

---

[9] Plaintiff invites the Court to be influenced by the opinions of others, as they refer to various articles that criticize the regulations. (*See* Pltf.'s Response, n.10). It should be kept in mind, however, (1) most of the articles addressed the earlier proposed regulations, but the final regulations were revised to reflect many of the expressed concerns, (2) many of the critics plaintiff cites approvingly are from the ranks of those who were, and remain, involved as facilitators of the tax shelter industry and whose financial ox the regulations gore, and (3) others, with no stake in the outcome, have expressed their support for the regulations. *See e.g.*, Cunningham and Repetti, *Textualism and Tax Shelters*, 24 Virginia Tax Review 1 (2004); Selected comments on proposed regulations *(App-B-86-105).*

provides an affirmative defense to accuracy and fraud related penalties for taxpayers who can show there was reasonable cause for their underpayment, and that they acted in good faith. Although this Court has jurisdiction over all partnership items arising from the partnerships' 2001 tax year, and the initial application of penalties, it does not have jurisdiction over partner-level defenses to those penalties. *See* I.R.C. §§ 6621, 6226(e) and 6230(c)(1)(4).

Section 6226(e) limits the Court's jurisdiction to determine the "applicability of any penalty... which relates to an adjustment to a partnership item." This gives the Court jurisdiction to determine whether the initial elements for the application of a penalty have been met, but does not give the Court jurisdiction to determine defenses to the application of that penalty which are based on an individual partner's circumstances (partner level defenses). This rule is made explicitly clear by similar language in § 6230(c)(1)(4) which preserves the right of partners to file refund suits after a proceeding under § 6226 has been completed in order to challenge the application of penalties to their personal returns using defenses that are personal to them rather than to the partnership.

For tax years beginning on or after October 4, 2001, Treasury Regulation § 301.6226(f)-1 was enacted, which provides, in relevant part:

> (c) Penalties determined at partnership level. Any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be determined at the partnership level. Partner-level defenses to such items can only be asserted through refund actions following assessment and payment. Assessment of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be made based on partnership-level determinations. Partnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty, addition to tax, or additional amount, other than partner-level defenses specified in paragraph (d) of this section.
>
> (d) Partner-level defenses. Partner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment. See section 6230(c)(4).

> Partner-level defenses are limited to those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level. Examples of these determinations are whether any applicable threshold underpayment of tax has been met with respect to the partner or whether the partner has met the criteria of section 6664(b) (penalties applicable only where return is filed), or section 6664(c)(1) (reasonable cause exception) subject to partnership-level determinations as to the applicability of section 6664(c)(2).

Treas. Reg. § 301.6226(f)-1 (effective for tax year beginning after Oct. 4, 2001).[10]

This Court does not have jurisdiction to rule upon an I.R.C. §6664(c) defense to accuracy and fraud related penalties. The tax opinion letters relied on by the Sands Heirs are addressed to the Sands Heirs in their individual capacities, not in their capacities as partners of Group. Therefore, the reasonable cause defense is personal to each of the Sands Heirs and can only be asserted in a partner level proceeding.

B. Even if this Court has jurisdiction to review the "reasonable cause" defense, the plaintiffs did not have reasonable cause for taking the positions on their returns.

There is an exception to the exclusion of the reasonable cause and good faith defense from the partnership level proceeding when the partnership itself offers the defense. In such instances, courts look to the actions of the partnership through its managing partner. *Stobie Creek Investments, LLC v. United States*, 2008 WL 2968170, *70 (Fed. Cl. 2008). To the extent that plaintiffs are asserting a reasonable cause defense through the partnership and its managing partner, the United States asserts that no reasonable cause existed. The United States addressed the reasonable cause/substantial authority defense in its Response to Plaintiffs' Cross-Motion for Summary Judgment and to Plaintiffs' Reply to United States' Motion for Summary Judgment, filed on August

[10] *See also* § 301.6221-1T (effective January 26, 1999), 64 FR 3837, 1999-1 C.B. 682 (the same statutory provision as § 301.6221(f)-1).

14, 2007 (Docket # 51), at pgs. 25-38. The United States will not repeat those arguments again but refers this Court to the arguments made in that brief. In that Motion, the United States argued that there was still discovery pending and thus, there were genuine issues of material fact that prevented summary judgment. Since filing that Response on August 14, 2007, the United States has learned additional information which might be helpful to this Court. After completing discovery, the United States now asserts that there are no genuine issues of material fact as to reasonable cause.

1. *Reasonable Cause/Reasonable Reliance on Tax Professionals*

Plaintiffs argue that they acted with reasonable cause and good faith in taking the positions on their returns because they relied on two well-regarded law firms and received opinion letters that the positions taken on their returns were correct. The Court in *Stobie Creek* thoroughly analyzed all defenses to penalties including (i) the reasonable cause/good faith defense to the valuation misstatement penalty; (ii) the substantial authority defense to the substantial understatement of income tax penalty; and (iii) with respect to the negligence penalty, whether the taxpayers exercised ordinary care and whether the taxpayers appropriately relied on professional advice. In analyzing these defenses, the Court held that there is significant overlap between the defense to the negligence penalty based on reasonable reliance on the advice of professionals and the reasonable cause and good faith defense to all accuracy-related penalties. *Stobie Creek*, 2008 WL 2968170, * 76.

In analyzing both the negligence penalty and the reasonable cause defense, the Court held that reasonable reliance on professional advice exists when (1) the advice itself is reasonable (in that it is based upon accurate information and representations supplied by the taxpayer, reflects reasonable investigation into the transactions, and does not make unreasonable or unsupported assumptions); and (2) the taxpayer's reliance thereon is reasonable (in that the professional does not

manifest a conflict-of-interest, and, given the taxpayer's knowledge and experience, the transactions are not "too good to be true.") *Stobie Creek*, 2008 WL 2968170, at *80 and *86. The Court further held that "[g]iven the purpose to execute a series of transactions that enhance the basis of a separate asset and shield resultant capital gains, the advice given to endorse those transactions, and any reliance thereon, is deserving of a higher level of critical evaluation.... *Id.* at *90. One consideration in assessing whether the advice was reasonable is whether the advice is based upon unreasonable assumptions or representations by the taxpayer that all the facts presented are true. *Id.* at *82. In determining that the taxpayers in *Stobie Creek* did not have reasonable reliance, the Court found that not only was no investigation made into the validity of the representations (they were presumed to be true), but the representations were demonstrably false, "a fact that could not have been doubted by any sentient person involved. A 'bury your head in the sand' approach where a genuine investigation ... would have revealed [a] lack of profitability-does not commend the reasonableness of advice based on unsupportable assumptions." *Id.*

The Court also looked to the taxpayer's knowledge and experience in judging whether a strategy is "too good to be true." *Id.* at * 84. The *Stobie Creek* court relied on *Neonatology Assoc., P.A. v. Commissioner*, 299 F.3d 221 (3rd Cir. 2002) in considering whether a reasonable and prudent person would consider the transaction to be "too good to be true."

> When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril. ... As highly educated professionals, the individual taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations and tax free income for themselves.

*Stobie Creek*, at * 80 (citing *Neonatology Assoc., P.A. v. Commissioner*, 299 F.3d 221 (3rd Cir. 2002)). To say that Richard and Robert Sands are highly educated and sophisticated investors is an understatement. Together, they run a $3 billion wine company with domestic and worldwide

operations. They have engaged in sophisticated and complex investment arrangements using a variety of entities. Here, Richard and Robert Sands were presented with what they hoped would be a "fabulous opportunity" to avoid their tax obligations on $75 million. Clearly, this opportunity was "too good to be true." For Richard and Robert Sands to assert otherwise is disingenuous.

2. *Substantial Authority*

With respect to the penalty imposed for a substantial understatement of income tax, a reduction in the amount of the understatement is allowed if the tax treatment is based upon "substantial authority." 26 U.S.C. § 6662(d)(2)(B). The substantial authority standard is an objective standard: the taxpayer's subjective belief that substantial authority exists for the tax treatment of an item is not relevant. *Id.* at * 73. Substantial authority exists only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. Treas. Reg. § 1.6662-4(d)(3)(i). In *Stobie Creek*, the Court held that "no substantial authority exists to support recognition of tax results that are premised on transactions with no appreciable business purpose beyond conferring tax benefits." *Id.* at *73, n.64. Substantial authority analysis must include long-standing doctrines developed to achieve the purpose of the tax law, including the economic substance doctrine and the step transaction doctrine. The authorities mandating that tax treatment turn on the substance rather than the form of the transactions displace *Helmer* and its progeny. *Id.* at *73. The Court held that the factual contentions underlying the tax opinion letter in *Stobie Creek* were not supported and that the evidence directly contradicts the representations upon which the tax opinion was based.

3. *Application to Facts*

Here, both Richard Sands and Robert Sands were highly educated individuals. During 2001 and 2002, Richard was the Chief Executive Officer, President, and Chairman of the Board of Constellation. After serving in various positions involving wine production, finance, and sales and marketing, he was appointed Executive Vice-President in 1982. He was named president and Chief Operating Officer in 1986, and assumed the management of Constellation's domestic and worldwide operations with his appointment to Chief Executive Officer in 1993. Richard Sands has a Master's and a Ph.D. in social psychology. Plaintiffs' Ex. 25, App. pg. 455.

In 2001, Robert Sands was a Director and President of Constellation. He first joined Constellation in 1986 as General Counsel and was made Vice-President and appointed to the Board of Directors in June 1990. After overseeing numerous acquisitions, he was appointed Executive Vice-President and General Counsel in October 1993, overseeing the expansion of Constellation's legal department. In 1998, he was appointed to the role of Chief Executive Officer International after he spearheaded the acquisition of Constellation's United Kingdom division. He was named President in early 2000, and assumed the management of the Canandaigua Wine Company and Matthew Clark divisions. He holds a J.D. from Pace University Law School. Plaintiffs' Ex. 25, App. pg. 448.

In the United States' Response to plaintiffs' Proposed Findings of Uncontroverted Fact filed on August 14, 2007 (Docket # 50), ¶ 4, the United States discusses a meeting on June 27, 2001, between Tim Seaberg, Gary Kornman, Robert Sands and Jim Locke at the Constellation, Inc. office. During the meeting, Robert said to Kornman that "elimination of the capital gains on the sale of the stock that's probably the first thing that we would embark upon with you." Robert elaborated, [t]his

is the first level of importance because we're thinking of selling [?] stock." Kornman later tells Robert "we can set it up to do exactly what you want to do. I mean [?] capital gains long or short it doesn't make a difference. We can eliminate the tax." Later still, Kornman explains that "if you ever get audited and our agreement is part of what they'll see there's a business purpose built into the original engagement agreement. Uh obviously when you sign this thing it won't have the bold E that says what we're really doing it for is capital gains." Clearly, the only purpose for entering into the transactions at issue was to shelter the capital gains on the sale of the Constellation Brands stock. Business purpose and profit motive were non-existent.

With respect to the actual tax opinion letters, Lewis Rice stated that "[o]ur opinion is based solely upon our understanding of the facts as set forth above, the representations set forth in a Certificate of Mr. Sands dated as of December 28, 2001, and the Operative Documents. ... In rendering the opinions set forth above, we assumed the accuracy of all information set forth in the Certificate ..." Plaintiffs' Ex. 26, App. pg. 551. Just as in *Stobie Creek*, Lewis Rice made no investigation into the validity of these representations – they were presumed to be true and formed the basis of the Lewis, Rice opinion. *Stobie Creek*, at *82. As the United States has shown in this Motion for Summary Judgment and the Motion for Summary Judgment filed with respect to the Second Shelter, those factual representations by the Sands are false.

Brian Czerwinski, a representative of Heritage, testified that each step of the two strategies at issue in this litigation was detailed on a transaction calender prepared prior to the execution of any of the short sale transactions. Moreover, Lewis Rice was apprised of the various steps set out in the transaction calenders at the beginning of the strategy's implementation. (PF 9) They also assisted in structuring the shelter through the creation of the partnerships used to facilitate the shelter.

Czerwinski also testified that the amount of each strategy's short sale was arrived at based on the amount of potential basis that could be applied. If the Heritage client wanted to possibly eliminate all of the tax on the sale of $75 million in stock with a $10 million basis, then $65 million would be the size of the short sales. (PF 10)

With respect to the use of the four CRUTs, although the CRUTs specified that their terms were for 20 years, according to Czerwinski, the purchase of the remainder interests in the CRUTs and the CRUTs early termination was discussed prior to the time the CRUTs were formed. (PF 11). The early termination of the CRUT was central to this Heritage Strategy as indicated in the Blattmachr Transcript. (PF 12) As Jonathan Blattmachr ("Blattmachr"), the drafter of one set of the opinion letters plaintiffs purport to rely on in this case, explains, the benefits of the CRUT have nothing to do with charity. Rather, according to Blattmachr, the use of a CRUT creates camouflage because the IRS does not typically audit CRUTs and it creates a second hurdle that the IRS must win in attempting to overturn the transaction. (PF 6) Thus, the reason for using the CRUTs was not a donative charitable intent, but it was to decrease the potential risk of audit by creating a second layer of complexity to the transaction.

In his Expert Report, David DeRosa ("DeRosa") opines, among other things, that if the Heritage fees are taken into account, there was no economic chance (absent tax benefits) for the short sale transactions at issue in this litigation to earn a profit. *See* App-B-198. This conclusion is unrebutted.

Here, plaintiffs did not have reasonable cause for taking the positions on their returns. The advice in the tax opinion letters was based on inaccurate information and representations and Lewis Rice did not make any independent investigation into the facts. Additionally, the plaintiffs' reliance

on the tax opinion letters was unreasonable, given the taxpayer's knowledge and experience. Additionally, no substantial authority exists in this case to support recognition of tax results that are premised on transactions with no appreciable business purpose beyond conferring tax benefits.

## CONCLUSION

This Court is obligated to make a judicial determination as to the application of § 752 and the application of penalties. Furthermore, the Sands Heirs are not permitted to avoid recognizing the tax on the capital gains generated by the sale of the Constellation stock through their contrived use of the CRUTs. The FPAAs before the Court adjust the plaintiffs' various partnerships' returns consistent with this requirement. Accordingly, the United States is entitled to summary judgment sustaining the FPAAs issued to Group, Partners and CWC. The United States is also entitled to summary judgment sustaining the 40% penalties in the FPAAs.

Respectfully submitted,

/s/ Thomas M. Herrin
THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

JOHN A. DiCICCO
Deputy Assistant Attorney General
STEVEN I. FRAHM
Acting Chief, Court of Federal Claims Section
LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney