increases the basis of its undistributed property to the extent provided in section 734(b)(1)(B)



## Section 752.—Treatment of Certain Liabilities

*26 CFR 1 752–0 Table of contents*

### T.D. 8380

### DEPARTMENT OF THE TREASURY
### Internal Revenue Service
### 26 CFR Parts 1 and 602

### Treatment of Partnership Liabilities

AGENCY Internal Revenue Service, Treasury

ACTION: Final regulations and removal of temporary regulations.

SUMMARY: This document contains final regulations relating to the treatment of partnership liabilities The final regulations reflect changes to the applicable tax law made by section 79 of the Tax Reform Act of 1984 [Pub. L. 98–369, 1984–3 C B (Vol. 1) 1, 105] The regulations affect partnerships and their partners, and are necessary to provide them with guidance needed to comply with the applicable tax law

EFFECTIVE DATE· These regulations are effective December 28, 1991, and generally apply to liabilities incurred or assumed by a partnership on or after December 28, 1991

SUPPLEMENTARY INFORMATION:

*Paperwork Reduction Act*

The collection of information contained in these final regulations has been reviewed and approved by the Office of Management and Budget in accordance with the requirements of the Paperwork Reduction Act of 1980 (44 U.S C. 3504(h)) under control number 1545–1090. The estimated annual burden per respondent varies from 3 minutes to 8 minutes, depending on individual circumstances, with an estimated average of 5 minutes

The estimates are an approximation of the average time expected to be necessary for a collection of information They are based on such information as is available to the Internal Revenue Service. Individual respondents may require greater or less time, depending on their particular circumstances.

Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to the Internal Revenue Service, Attn: IRS Reports Clearance Officer, T.FP, Washington, D.C. 20224 and to the Office of Management and Budget, Attn. Desk Officer for the Department of the Treasury, Office of Information and Regulatory Affairs, Washington, D.C 20503

*Introduction*

This document adds new regulation §§1.752–0 through 1 752–5 to the Income Tax Regulations (26 CFR part 1) under section 752 of the Internal Revenue Code of 1986 and removes existing §§1.752–0T through 1.752–4T.

*Background*

Proposed [PS–229–84, 1989–1 C B. 1057] and temporary regulations [T.D. 8237, 1989–1 C B 180] under section 752 were published on December 30, 1988, and amended on November 21, 1989 [T.D 8274, 1989–2 C.B 101], and July 26, 1991 [T.D. 8355, 1991–2 C.B. 329], ("temporary regulations"). This document removes the temporary regulations effective December 27, 1991. On July 26, 1991, the Internal Revenue Service published proposed regulations [PS–49–91, 1991–2 C.B. 1125] simplifying the temporary regulations and addressing several issues raised by commentators with respect to the temporary regulations. Written comments were received and a public hearing was held on September 17, 1991.

*Explanation of Provisions*

I *Sharing Recourse Liabilities* The final regulations provide that a partnership liability is a recourse liability to the extent that any partner bears the economic risk of loss for that liability, and a partner's share of any recourse liability of the partnership equals the portion, if any, of the economic risk of loss for the liability that is borne by the partner. The final regulations also provide that a partner bears the economic risk of loss for a partnership liability to the extent that the partner or related person would be obligated to make a contribution or payment with respect to a partnership liability (and would not be entitled to be reimbursed for the contribution or payment by another partner, a person related to another partner, or the partnership) if the partnership constructively liquidates In a constructive liquidation the following events are deemed to occur: (A) all of the partnership's liabilities become due and payable in full, (B) with the exception of property contributed to secure a partnership liability, all of the partnership's assets (including money) become worthless, (C) the partnership disposes of all of its assets in a fully taxable transaction for no consideration (other than relief from certain liabilities), (D) the partnership allocates its items of income, gain, loss, deduction, and credit for the year among the partners, and (E) the partnership completely liquidates The constructive liquidation approach is used to determine who bears the economic risk of loss for a partnership liability taking into account the manner in which the partners have agreed to share economic losses and taking into account all arrangements among the partners, related persons, and the partnership

II. *Sharing Nonrecourse Liabilities*. The final regulations provide that, if no partner bears the economic risk of loss for a partnership liability, the liability is a nonrecourse liability of the partnership. The partners generally share nonrecourse liabilities in accordance with their interests in partnership profits. However, the final regulations require that the nonrecourse liabilities of a partnership be allocated among the partners first to reflect the partners' shares of any partnership minimum gain (within the meaning of section 704(b)) and any gain that would be allocated to the partners under section 704(c) (or in the same manner as section 704(c) in connection with a revaluation of partnership property) if the partnership disposed of (in a taxable transaction) all partnership property subject to one or more nonrecourse liabilities of the partnership in full satisfaction of the liabilities and for no other consideration.

III. *Modifications To Proposed Regulations*

After full consideration of the comments and the statements made at the public hearing, the following actions were taken with respect to the proposed regulations issued on July 26, 1991.

A. *Guarantee of Interest Rule.*

Section 1 752–2(c) of the proposed and final regulations contains a guarantee

of interest rule generally providing that if one or more partners guarantee the payment of more than 25 percent of the total interest that will accrue on an otherwise nonrecourse partnership liability during its term, the loan is deemed to be recourse to those partners to the extent of the present value of the guaranteed future interest payments. To the extent that the guarantee of interest is subject to a contingency, the principles of §1.752–2(b)(4) apply.

The final regulations add a de minimis exception to the guarantee of interest rule that generally parallels the de minimis exception to the rule for a guarantee of a nonrecourse loan by a partner or related person.

B. *Economic Risk of Loss Analysis*

Section 1 752–2(b)(2) of the proposed regulations provides that, for purposes of the constructive liquidation analysis, gain or loss on the deemed disposition of the partnership's assets is computed as follows: (1) if the creditor's right to repayment of a partnership liability is limited solely to one or more assets of the partnership, gain or loss is recognized in an amount equal to the difference between the amount of the liability that is extinguished by the deemed disposition and the tax basis in those assets; and (2) a loss is recognized equal to the remaining tax basis of all of the partnership's assets not taken into account in (1). The final regulations clarify that the use of book value rather than tax basis for purposes of the constructive liquidation analysis is appropriate if tax basis and book value differ by reason of adjustments made under section 704(c) and the section 704(b) regulations

C. *Pledged Assets.*

Section 1 752–2(h)(1) of the proposed regulations provides that a partner is considered to bear the economic risk of loss for a partnership liability to the extent of the value of any of the partner's separate property (other than an interest in the partnership) that is pledged as security for the partnership liability This provision has been clarified in the final regulations as applying to a related person's separate property that is pledged as security, as well as that of a partner.

Section 1.752–2(h)(2) of the proposed and final regulations provides that a partner is considered to bear the economic risk of loss for a partnership liability to the extent of the value of any property that the partner contributes to the partnership solely for the purpose of securing a partnership liability. The rule governing when property is contributed solely for the purpose of securing a partnership liability is modified in the final regulations The purpose of the modification is to provide some flexibility in applying the rule in situations where allocations are mandated by the provisions of section 704 and the regulations thereunder

D. *Partner's Share of Nonrecourse Liabilities.*

The proposed and final regulations require that the nonrecourse liabilities of a partnership be allocated among the partners first to reflect the partners' shares of any partnership minimum gain, then to reflect any gain that would be allocated to the partners under section 704(c), and finally in accordance with the partners' interests in partnership profits. The partnership agreement may specify the partners' interests in partnership profits provided the interests so specified are reasonably consistent with allocations (which have substantial economic effect under the section 704(b) regulations) of some significant item of partnership income or gain Alternatively, nonrecourse liabilities in excess of those allocated to reflect partnership minimum gain and section 704(c) gain ("excess nonrecourse liabilities") may be allocated among the partners in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated. The final regulations provide that excess nonrecourse liabilities need not be allocated under the same method each year

E. *De Minimis Rules*

Section 1.752–2(d) of the proposed and final regulations provides *de minimis* exceptions to the general economic risk of loss analysis in certain situations when a partner is the lender or guarantor One of the requirements of the *de minimis* rules in the proposed regulations was that a partner maintain a 10 percent or less interest in each item of partnership income, gain, loss, deduction, and credit for any taxable year of the partnership The final regulations clarify that the *de minimis* rules apply only as long as the partner maintains a 10 percent or less interest in each item of partnership income, gain, loss, deduction, or credit for every taxable year that the partner is a partner in the partnership.

Some commentators suggested that the 10 percent requirement of the *de minimis* rule be eliminated After full consideration of the comments, the requirement has not been eliminated The legislative history of section 752 indicates that regulations under this section should apportion partnership liabilities based on the manner in which the partners, and persons related to the partners, share the economic risk of loss for the liabilities (other than bona fide nonrecourse liabilities) H R. Rep. No 861, 98th Cong., 2d Sess 869 (1984). The *de minimis* rule is a narrow exception to the general risk of loss analysis, applying only when a partner who is in the business of lending money and whose relationship to the partnership is primarily that of a lender also owns a small equity interest in the partnership. Because it is limited to these narrow circumstances, the exception provided by the *de minimis* rule does not distort the economic risk of loss analysis.

F *Effective Dates*

The final regulations are effective for liabilities incurred or assumed by the partnership on or after December 28, 1991. The final regulations provide a partnership with an election to apply the regulations to all of its liabilities to which the provisions of §§1.752–1 through 1 752–4 do not otherwise apply as of the beginning of the first taxable year of the partnership ending on or after December 28, 1991. Several commentators have suggested that there is some confusion regarding the treatment of certain situations under the effective date rules of the temporary and final regulations. The following addresses the comments received and is not intended to be a complete restatement of the effective date provisions.

First, regulations under section 752 are generally effective based on the date liabilities are incurred. As a result, a partnership with liabilities incurred in different periods may allocate basis to its partners under different sets of regulations: (1) §1.752–1 (TD 6175 and TD 6500) (the "old" regulations), (2) §1.752–0T to §1.752–4T (TD 8237, TD 8274, and TD 8355) (the "temporary" regulations), and (3) the final regulations contained in this document

Second, if a grandfathered partnership liability is materially modified, it loses its grandfathering and becomes subject to a different set of regulations, depending on when the material modification occurs.

Third, a nonrecourse liability incurred or assumed by a partnership prior to

March 1, 1984, is not governed by the temporary or final regulations unless an election has been made to apply the temporary or final regulations to the liability or unless a material modification of the liability has occurred. If a liability incurred or assumed by the partnership prior to March 1, 1984, is guaranteed by a partner after March 1, 1984, the liability is not governed by the temporary or final regulations Similarly, if a third-party nonrecourse liability incurred or assumed by a partnership prior to January 30, 1989, is guaranteed by a related person after January 30, 1989, and again assuming no election is made to apply the temporary or final regulations to the liability, the liability is not governed by the temporary or final regulations. In addition, the subsequent guarantee by a partner of a liability incurred or assumed by the partnership prior to March 1, 1984, or the subsequent guarantee by a related person of a liability incurred or assumed by the partnership prior to January 30, 1989, is not considered a material modification of the liability for purposes of applying the regulations under section 752.

*Special Analyses*

These final regulations are not major rules as defined in Executive Order 12291. Therefore, a Regulatory Impact Analysis is not required.

It is hereby certified that section 553(b) of the Administrative Procedure Act (5 U S.C chapter 5) does not apply to these regulations

It is hereby certified that these rules do not have a significant impact on a substantial number of small entities. Therefore, a final Regulatory Flexibility Analysis under the Regulatory Flexibility Act (5 U S C. chapter 6) is not required.

Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking for the regulations was submitted to the Small Business Administration for comment on the impact of the rules on small business.

*Adoption of Amendments to the Regulations*

Accordingly, 26 CFR parts 1 and 602 are amended as follows

PART 1—INCOME TAX, TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1953

Paragraph 1. The authority for part 1 continues to read in part as follows:

Authority: Sec. 7805, 68A Stat. 917; 26 U.S.C. 7805 ***

Par. 2. Sections 1.752–0T through 1.752–4T are removed

Par 3. Sections 1 752–0 through 1.752–5 are added to read as follows:

*§1.752–0 Table of Contents.*

This section lists the captions that appear in §§1.752–1 through 1.752–5.

*§1 752–1 Treatment of partnership liabilities.*

(a) Definitions.
(1) Recourse liability defined.
(2) Nonrecourse liability defined.
(3) Related person.
(b) Increase in partner's share of liabilities.
(c) Decrease in partner's share of liabilities.
(d) Assumption of liability.
(e) Property subject to a liability.
(f) Netting of increases and decreases in liabilities resulting from same transaction.
(g) Example.
(h) Sale or exchange of partnership interest
(i) Bifurcation of partnership liabilities.

*§1 752–2 Partner's share of recourse liabilties.*

(a) In general.
(b) Obligation to make a payment.
(1) In general
(2) Treatment upon deemed disposition.
(3) Obligations recognized.
(4) Contingent obligations.
(5) Reimbursement rights.
(6) Deemed satisfaction of obligation
(c) Partner or related person as lender.
(1) In general.
(2) Wrapped debt
(d) *De minimis* exceptions.
(1) Partner as lender.
(2) Partner as guarantor
(e) Special rule for nonrecourse liability with interest guaranteed by a partner
(1) In general.
(2) Computation of present value.
(3) Safe harbor.
(4) *De minimis* exception
(f) Examples
(g) Time-value-of-money considerations
(1) In general.
(2) Valuation of an obligation.
(3) Satisfaction of obligation with partner's promissory note.
(4) Example.
(h) Partner providing property as security for partnership liability.
(1) Direct pledge
(2) Indirect pledge.
(3) Valuation.
(4) Partner's promissory note
(i) Treatment of recourse liabilities in tiered partnerships
(j) Anti-abuse rules.
(1) In general
(2) Arrangements tantamount to a guarantee
(3) Plan to circumvent or avoid the regulations.
(4) Example.

*§1.752–3 Partner's share of nonrecourse liabilities*

(a) In general.
(b) Examples.

*§1.752–4 Special rules*

(a) Tiered partnerships
(b) Related person definition.
(1) In general
(2) Person related to more than one partner.
(i) In general.
(ii) Natural persons
(iii) Related partner exception.
(iv) Special rule where entity structured to avoid related person status
(A) In general.
(B) Ownership interest
(C) Example.
(c) Limitation.
(d) Time of determination.

*§1 752–5 Effective dates and transition rules.*

(a) In general.
(b) Election.
(1) In general
(2) Time and manner of election
(c) Effect of section 708(b)(1)(B) termination on determining date liabilities are incurred or assumed

*§1.752–1 Treatment of Partnership Liabilities.*

(a) *Definitions*. For purposes of section 752, the following definitions apply:

(1) *Recourse liability defined.* A partnership liability is a recourse liability to the extent that any partner or related person bears the economic risk of loss for that liability under §1 752–2

(2) *Nonrecourse liability defined.* A partnership liability is a nonrecourse liability to the extent that no partner or related person bears the economic risk of loss for that liability under §1.752–2

(3) *Related person*. Related person means a person having a relationship to a partner that is described in §1.752–4(b)

(b) *Increase in partner's share of liabilities* Any increase in a partner's share of partnership liabilities, or any increase in a partner's individual liabilities by reason of the partner's assumption of partnership liabilities, is treated as a contribution of money by that partner to the partnership.

(c) *Decrease in partner's share of liabilities.* Any decrease in a partner's share of partnership liabilities, or any decrease in a partner's individual liabilities by reason of the partnership's assumption of the individual liabilities of the partner, is treated as a distribution of money by the partnership to that partner.

(d) *Assumption of liability* Except as otherwise provided in paragraph (e) of this section, a person is considered to assume a liability only to the extent that:

(1) The assuming person is personally obligated to pay the liability, and

(2) If a partner or related person assumes a partnership liability, the person to whom the liability is owed knows of the assumption and can directly enforce the partner's or related person's obligation for the liability, and no other partner or person that is a related person to another partner would bear the economic risk of loss for the liability immediately after the assumption.

(e) *Property subject to a liability* If property is contributed by a partner to the partnership or distributed by the partnership to a partner and the property is subject to a liability of the transferor, the transferee is treated as having assumed the liability, to the extent that the amount of the liability does not exceed the fair market value of the property at the time of the contribution or distribution

(f) *Netting of increases and decreases in liabilities resulting from same transaction* If, as a result of a single transaction, a partner incurs both an increase in the partner's share of the partnership liabilities (or the partner's individual liabilities) and a decrease in the partner's share of the partnership liabilities (or the partner's individual liabilities), only the net decrease is treated as a distribution from the partnership and only the net increase is treated as a contribution of money to the partnership. Generally, the contribution to or distribution from a partnership of property subject to a liability or the termination of the partnership under section 708(b) will require that increases and decreases in liabilities associated with the transaction be netted to determine if a partner will be deemed to have made a contribution or received a distribution as a result of the transaction.

(g) *Example* The following example illustrates the principles of paragraphs (b), (c), (e), and (f) of this section.

*Example Property contributed subject to a liability, netting of increase and decrease in partner's share of liability* B contributes property with an adjusted basis of $1,000 to a general partnership in exchange for a one-third interest in the partnership At the time of the contribution, the partnership does not have any liabilities outstanding and the property is subject to a recourse debt of $150 and has a fair market value in excess of $150 After the contribution, B remains personally liable to the creditor and none of the other partners bears any of the economic risk of loss for the liability under state law or otherwise Under paragraph (e) of this section, the partnership is treated as having assumed the $150 liability As a result, B's individual liabilities decrease by $150 At the same time, however, B's share of liabilities of the partnership increases by $150 Only the net increase or decrease in B's share of the liabilities of the partnership and B's individual liabilities is taken into account in applying section 752 Because there is no net change, B is not treated as having contributed money to the partnership or as having received a distribution of money from the partnership under paragraph (b) or (c) of this section Therefore B's basis for B's partnership interest is $1,000 (B's basis for the contributed property)

(h) *Sale or exchange of a partnership interest*. If a partnership interest is sold or exchanged, the reduction in the transferor partner's share of partnership liabilities is treated as an amount realized under section 1001 and the regulations thereunder. For example, if a partner sells an interest in a partnership for $750 cash and transfers to the purchaser the partner's share of partnership liabilities in the amount of $250, the seller realizes $1,000 on the transaction.

(i) *Bifurcation of partnership liabilities*. If one or more partners bears the economic risk of loss as to part, but not all, of a partnership liability represented by a single contractual obligation, that liability is treated as two or more separate liabilities for purposes of section 752 The portion of the liability as to which one or more partners bear the economic risk of loss is a recourse liability and the remainder of the liability, if any, is a nonrecourse liability.

*§1.752–2 Partner's share of recourse liabilities*

(a) *In general* A partner's share of a recourse partnership liability equals the portion of that liability, if any, for which the partner or related person bears the economic risk of loss. The determination of the extent to which a partner bears the economic risk of loss for a partnership liability is made under the rules in paragraphs (b) through (j) of this section.

(b) *Obligation to make a payment.*

(1) *In general*. Except as otherwise provided in this section, a partner bears the economic risk of loss for a partnership liability to the extent that, if the partnership constructively liquidated, the partner or related person would be obligated to make a payment to any person (or a contribution to the partnership) because that liability becomes due and payable and the partner or related person would not be entitled to reimbursement from another partner or person that is a related person to another partner. Upon a constructive liquidation, all of the following events are deemed to occur simultaneously.

(i) All of the partnership's liabilities become payable in full;

(ii) With the exception of property contributed to secure a partnership liability (see §1.752–2(h)(2)), all of the partnership's assets, including cash, have a value of zero;

(iii) The partnership disposes of all of its property in a fully taxable transaction for no consideration (except relief from liabilities for which the creditor's right to repayment is limited solely to one or more assets of the partnership);

(iv) All items of income, gain, loss, or deduction are allocated among the partners; and

(v) The partnership liquidates.

(2) *Treatment upon deemed disposition*. For purposes of paragraph (b)(1) of this section, gain or loss on the deemed disposition of the partnership's assets is computed in accordance with the following:

(i) If the creditor's right to repayment of a partnership liability is limited solely to one or more assets of the partnership, gain or loss is recognized in an amount equal to the difference between the amount of the liability that is extinguished by the deemed disposition

and the tax basis (or book value to the extent section 704(c) or §1.704-1(b)(4)(i) applies) in those assets.

(ii) A loss is recognized equal to the remaining tax basis (or book value to the extent section 704(c) or §1.704-1(b)(4)(i) applies) of all of the partnership's assets not taken into account in paragraph (b)(2)(i) of this section.

(3) *Obligations recognized.* The determination of the extent to which a partner or related person has an obligation to make a payment under paragraph (b)(1) of this section is based on the facts and circumstances at the time of the determination All statutory and contractual obligations relating to the partnership liability are taken into account for purposes of applying this section, including:

(i) Contractual obligations outside the partnership agreement such as guarantees, indemnifications, reimbursement agreements, and other obligations running directly to creditors or to other partners, or to the partnership;

(ii) Obligations to the partnership that are imposed by the partnership agreement, including the obligation to make a capital contribution and to restore a deficit capital account upon liquidation of the partnership; and

(iii) Payment obligations (whether in the form of direct remittances to another partner or a contribution to the partnership) imposed by state law, including the governing state partnership statute.

To the extent that the obligation of a partner to make a payment with respect to a partnership liability is not recognized under this paragraph (b)(3), paragraph (b) of this section is applied as if the obligation did not exist.

(4) *Contingent obligations* A payment obligation is disregarded if, taking into account all the facts and circumstances, the obligation is subject to contingencies that make it unlikely that the obligation will ever be discharged. If a payment obligation would arise at a future time after the occurrence of an event that is not determinable with reasonable certainty, the obligation is ignored until the event occurs.

(5) *Reimbursement rights.* A partner's or related person's obligation to make a payment with respect to a partnership liability is reduced to the extent that the partner or related person is entitled to reimbursement from another partner or a person who is a related person to another partner.

(6) *Deemed satisfaction of obligation.* For purposes of determining the extent to which a partner or related person has a payment obligation and the economic risk of loss, it is assumed that all partners and related persons who have obligations to make payments actually perform those obligations, irrespective of their actual net worth, unless the facts and circumstances indicate a plan to circumvent or avoid the obligation See §1 752-2(j).

(c) *Partner or related person as lender*—(1) *In general.* A partner bears the economic risk of loss for a partnership liability to the extent that the partner or a related person makes (or acquires an interest in) a nonrecourse loan to the partnership and the economic risk of loss for the liability is not borne by another partner.

(2) *Wrapped debt.* If a partnership liability is owed to a partner or related person and that liability includes (*i.e.*, is "wrapped" around) a nonrecourse obligation encumbering partnership property that is owed to another person, the partnership liability will be treated as two separate liabilities. The portion of the partnership liability corresponding to the wrapped debt is treated as a liability owed to another person.

(d) *De minimis exceptions*—(1) *Partner as lender.* The general rule contained in paragraph (c)(1) of this section does not apply if a partner or related person whose interest (directly or indirectly through one or more partnerships including the interest of any related person) in each item of partnership income, gain, loss, deduction, or credit for every taxable year that the partner is a partner in the partnership is 10 percent or less, makes a loan to the partnership which constitutes qualified nonrecourse financing within the meaning of section 465(b)(6) (determined without regard to the type of activity financed).

(2) *Partner as guarantor.* The general rule contained in paragraph (b)(1) of this section does not apply if a partner or related person whose interest (directly or indirectly through one or more partnerships including the interest of any related person) in each item of partnership income, gain, loss, deduction, or credit for every taxable year that the partner is a partner in the partnership is 10 percent or less, guarantees a loan that would otherwise be a nonrecourse loan of the partnership and which would constitute qualified nonrecourse financing within the meaning of section 465(b)(6) (without regard to the type of activity financed) if the guarantor had made the loan to the partnership

(e) *Special rule for nonrecourse liability with interest guaranteed by a partner*—(1) *In general* For purposes of this section, if one or more partners or related persons have guaranteed the payment of more than 25 percent of the total interest that will accrue on a partnership nonrecourse liability over its remaining term, and it is reasonable to expect that the guarantor will be required to pay substantially all of the guaranteed future interest if the partnership fails to do so, then the liability is treated as two separate partnership liabilities. If this rule applies, the partner or related person that has guaranteed the payment of interest is treated as bearing the economic risk of loss for the partnership liability to the extent of the present value of the guaranteed future interest payments. The remainder of the stated principal amount of the partnership liability constitutes a nonrecourse liability Generally, in applying this rule, it is reasonable to expect that the guarantor will be required to pay substantially all of the guaranteed future interest if, upon a default in payment by the partnership, the lender can enforce the interest guaranty without foreclosing on the property and thereby extinguishing the underlying debt The guarantee of interest rule continues to apply even after the point at which the amount of guaranteed interest that will accrue is less than 25 percent of the total interest that will accrue on the liability.

(2) *Computation of present value* The present value of the guaranteed future interest payments is computed using a discount rate equal to either the interest rate stated in the loan documents, or if interest is imputed under either section 483 or section 1274, the applicable federal rate, compounded semi-annually. The computation takes into account any payment of interest that the partner or related person may be required to make only to the extent that the interest will accrue economically (determined in accordance with section 446 and the regulations thereunder) after the date of the interest guarantee If the loan document contains a variable rate of interest that is an interest rate based on current values of an objective interest index, the present value is computed on the assumption that the interest determined under the objective interest index on the date of the computation will remain constant over the term of the loan The term "objective interest index" has the meaning given to it in section 1275 and the regulations thereunder (relating to variable rate debt instruments). Examples of an objective interest index include the prime rate of a designated financial institution, LIBOR (London Interbank Offered

Rate), and the applicable federal rate under section 1274(d).

(3) *Safe harbor* The general rule contained in paragraph (e)(1) of this section does not apply to a partnership nonrecourse liability if the guarantee of interest by the partner or related person is for a period not in excess of the lesser of five years or one-third of the term of the liability.

(4) *De minimis exception*. The general rule contained in paragraph (e)(1) of this section does not apply if a partner or related person whose interest (directly or indirectly through one or more partnerships including the interest of any related person) in each item of partnership income, gain, loss, deduction, or credit for every taxable year that the partner is a partner in the partnership is 10 percent or less, guarantees the interest on a loan to that partnership which constitutes qualified nonrecourse financing within the meaning of section 465(b)(6) (determined without regard to the type of activity financed). An allocation of interest to the extent paid by the guarantor is not treated as a partnership item of deduction or loss subject to the 10 percent or less rule.

(f) *Examples*. The following examples illustrate the principles of paragraphs (a) through (e) of this section.

*Example 1 Determining when a partner bears the economic risk of loss* A and B form a general partnership with each contributing $100 in cash The partnership purchases an office building on leased land for $1,000 from an unrelated seller, paying $200 in cash and executing a note to the seller for the balance of $800 The note is a general obligation of the partnership, *i e* , no partner has been relieved from personal liability The partnership agreement provides that all items are allocated equally except that tax losses are specially allocated 90% to A and 10% to B and that capital accounts will be maintained in accordance with the regulations under section 704(b), including a deficit capital account restoration obligation on liquidation In a constructive liquidation, the $800 liability becomes due and payable All of the partnership's assets, including the building, are deemed to be worthless The building is deemed sold for a value of zero Capital accounts are adjusted to reflect the loss on the hypothetical disposition, as follows

| | *A* | *B* |
|---|---|---|
| Initial contribution | $100 | $100 |
| Loss on hypothetical sale | (900) | (100) |
| | ($800) | $-0- |

Other than the partners' obligation to fund negative capital accounts on liquidation, there are no other contractual or statutory payment obligations existing between the partners, the partnership and the lender Therefore, $800 of the partnership liability is classified as a recourse liability because one or more partners bears the economic risk of loss for non-payment B has no share of the $800 liability since the constructive liquidation produces no payment obligation for B A's share of the partnership liability is $800 because A would have an obligation in that amount to make a contribution to the partnership

*Example 2 Recourse liability, deficit restoration obligation* C and D each contribute $500 in cash to the capital of a new general partnership, CD CD purchases property from an unrelated seller for $1,000 in cash and a $9,000 mortgage note The note is a general obligation of the partnership, *i e* , no partner has been relieved from personal liability The partnership agreement provides that profits and losses are to be divided 40% to C and 60% to D C and D are required to make up any deficit in their capital accounts In a constructive liquidation, all partnership assets are deemed to become worthless and all partnership liabilities become due and payable in full The partnership is deemed to dispose of all its assets in a fully taxable transaction for no consideration. Capital accounts are adjusted to reflect the loss on the hypothetical disposition, as follows.

| | *C* | *D* |
|---|---|---|
| Initial contribution | $500 | $500 |
| Loss on hypothetical sale | (4,000) | (6,000) |
| | ($3,500) | ($5,500) |

C's capital account reflects a deficit that C would have to make up of $3,500 and D's capital account reflects a deficit that D would have to make up of $5,500 Therefore, the $9,000 mortgage note is a recourse liability because one or more partners bear the economic risk of loss for the liability C's share of the recourse liability is $3,500 and D's share is $5,500

*Example 3 Guarantee by limited partner, partner deemed to satisfy obligation* E and F form a limited partnership E, the general partner, contributes $2,000 and F, the limited partner, contributes $8,000 in cash to the partnership. The partnership agreement allocates losses 20% to E and 80% to F until F's capital account is reduced to zero, after which all losses are allocated to E The partnership purchases depreciable property for $25,000 using its $10,000 cash and a $15,000 recourse loan from a bank F guarantees payment of the $15,000 loan to the extent the loan remains unpaid after the bank has exhausted its remedies against the partnership In a constructive liquidation, the $15,000 liability becomes due and payable All of the partnership's assets, including the depreciable property, are deemed to be worthless The depreciable property is deemed sold for a value of zero Capital accounts are adjusted to reflect the loss on the hypothetical disposition, as follows

| | *E* | *F* |
|---|---|---|
| Initial contribution | $2,000 | $8,000 |
| Loss on hypothetical sale | (17,000) | (8,000) |
| | ($15,000) | -0- |

E, as a general partner, would be obligated by operation of law to make a net contribution to the partnership of $15,000 Because E is assumed to satisfy that obligation, it is also assumed that F would not have to satisfy F's guarantee The $15,000 mortgage is treated as a recourse liability because one or more partners bear the economic risk of loss E's share of the liability is $15,000, and F's share is zero This would be so even if E's net worth at the time of the determination is less than $15,000, unless the facts and circumstances indicate a plan to circumvent or avoid E's obligation to contribute to the partnership

*Example 4 Partner guarantee with right of subrogation* G, a limited partner in the GH partnership, guarantees a portion of a partnership liability The liability is a general obligation of the partnership, *i e* , no partner has been relieved from personal liability. If under state law G is subrogated to the rights of the lender, G would have the right to recover the amount G paid to the recourse lender from the general partner Therefore, G does not bear the economic risk of loss for the partnership liability

*Example 5 Bifurcation of partnership liability, guarantee of part of nonrecourse liability* A partnership borrows $10,000, secured by a mortgage on real property. The mortgage note contains an exoneration clause which provides that in the event of default, the holder's only remedy is to foreclose on the property The holder may not look to any other partnership asset or to any partner to pay the liability However, to induce the lender to make the loan, a partner guarantees payment of $200 of the loan principal The exoneration clause does not apply to the partner's guarantee If the partner paid pursuant to the guarantee, the partner would be subrogated to the rights of the lender with respect to $200 of the mortgage debt, but the partner is not otherwise entitled to reimbursement from the partnership or any partner For purposes of section 752, $200 of the $10,000 mortgage liability is treated as a recourse liability of the partnership and $9,800 is treated as a nonrecourse liability of the partnership The partner's share of the recourse liability of the partnership is $200

*Example 6 Wrapped debt* I, an individual, purchases real estate from an unrelated seller for $10,000, paying $1,000 in cash and giving a $9,000 purchase mortgage note on which I has no personal liability and as to which the seller can look only to the property for satisfaction At a time when the property is worth $15,000, I sells the property to a partnership in which I is a general partner The partnership pays for the property with a partnership purchase money mortgage note of $15,000 on which neither the partnership nor any partner (or person related to a partner) has personal liability The $15,000 mortgage note is a wrapped debt that includes the $9,000 obligation to the original seller The liability is a recourse liability to the extent of $6,000 because I is the creditor with respect to the loan and I bears the economic risk of loss for $6,000 I's share of the recourse liability is $6,000 The remaining $9,000 is treated as a partnership nonrecourse liability that is owed to the unrelated seller

*Example 7 Guarantee of interest by partner treated as part recourse and part nonrecourse* On January 1, 1992, a partnership obtains a $4,000,000 loan secured by a shopping center owned by the partnership Neither the partnership nor any partner has any personal liability under the loan documents for repayment of the stated principal amount Interest accrues at a 15 percent annual rate and is payable on December 31 of each year The principal is payable in a lump sum on December 31, 2006 A partner guarantees payment of 50 percent of each interest payment required by the loan The guarantee can be enforced without first foreclosing on the property When the partnership obtains the loan, the present value (discounted at 15 percent, compounded annually) of the future interest payments is $3,508,422, and of the future principal payment is $491,578 If tested on that date, the loan would be treated as a partnership liability of $1,754,211 ($3,508,422 × 5) for which the guaranteeing partner bears the economic risk of loss and a partnership nonrecourse liability of $2,245,789 ($1,754,211 + $491,578)

*Example 8 Contingent obligation not recognized* J and K form a general partnership with cash contributions of $2,500 each J and K share partnership profits and losses equally The partnership purchases an apartment building for its $5,000 of cash and a $20,000 nonrecourse loan from a commercial bank The nonrecourse loan is secured by a mortgage on the building The loan documents provide that the partnership will be liable for the

outstanding balance of the loan on a recourse basis to the extent of any decrease in the value of the apartment building resulting from the partnership's failure properly to maintain the property There are no facts that establish with reasonable certainty the existence of any liability on the part of the partnership (and its partners) for damages resulting from the partnership's failure properly to maintain the building Therefore, no partner bears the economic risk of loss, and the liability constitutes a nonrecourse liability Under §1 752-3, J and K share this nonrecourse liability equally because they share all profits and losses equally

(g) *Time-value-of-money considerations*—(1) *In general*. The extent to which a partner or related person bears the economic risk of loss is determined by taking into account any delay in the time when a payment or contribution obligation with respect to a partnership liability is to be satisfied. If a payment obligation with respect to a partnership liability is not required to be satisfied within a reasonable time after the liability becomes due and payable, or if the obligation to make a contribution to the partnership is not required to be satisfied before the later of—

(i) The end of the year in which the partner's interest is liquidated, or

(ii) 90 days after the liquidation,

the obligation is recognized only to the extent of the value of the obligation

(2) *Valuation of an obligation*. The value of a payment or contribution obligation that is not required to be satisfied within the time period specified in paragraph (g)(1) of this section equals the entire principal balance of the obligation only if the obligation bears interest equal to or greater than the applicable federal rate under section 1274(d) at the time of valuation, commencing on—

(i) In the case of a payment obligation, the date that the partnership liability to a creditor or other person to whom the obligation relates becomes due and payable, or

(ii) In the case of a contribution obligation, the date of the liquidation of the partner's interest in the partnership.

If the obligation does not bear interest at a rate at least equal to the applicable federal rate at the time of valuation, the value of the obligation is discounted to the present value of all payments due from the partner or related person (*i e.*, the imputed principal amount computed under section 1274(b)). For purposes of making this present value determination, the partnership is deemed to have constructively liquidated as of the date on which the payment obligation is valued and the payment obligation is assumed to be a debt instrument subject to the rules of section 1274 (*i e.*, the debt instrument is treated as if it were issued for property at the time of the valuation)

(3) *Satisfaction of obligation with partner's promissory note*. An obligation is not satisfied by the transfer to the obligee of a promissory note by a partner or related person unless the note is readily tradeable on an established securities market.

(4) *Example*. The following example illustrates the principle of paragraph (g) of this section.

*Example Value of obligation not required to be satisfied within specified time period* A, the general partner, and B, the limited partner, each contributes $10,000 to partnership AB AB purchases property from an unrelated seller for $20,000 in cash and a $70,000 recourse purchase money note The partnership agreement provides that profits and losses are to be divided equally A and B are required to make up any deficit in their capital accounts While A is required to restore any deficit balance in A's capital account within 90 days after the date of liquidation of the partnership, B is not required to restore any deficit for two years following the date of liquidation The deficit in B's capital account will not bear interest during that two-year period In a constructive liquidation, all partnership assets are deemed to become worthless and all partnership liabilities become due and payable in full The partnership is deemed to dispose of all its assets in a fully taxable transaction for no consideration. Capital accounts are adjusted to reflect the loss on the hypothetical disposition, as follows

| | *A* | *B* |
|---|---|---|
| Initial contribution | $10,000 | $10,000 |
| Loss on hypothetical sale | (45,000) | (45,000) |
| | ($35,000) | ($35,000) |

A's and B's capital accounts each reflect deficits of $35,000 B's obligation to make a contribution pursuant to B's deficit restoration obligation is recognized only to the extent of the fair market value of that obligation at the time of the constructive liquidation because B is not required to satisfy that obligation by the later of the end of the partnership taxable year in which B's interest is liquidated or within 90 days after the date of the liquidation Because B's obligation does not bear interest, the fair market value is deemed to equal the imputed principal amount under section 1274(b) Under section 1274(b), the imputed principal amount of a debt instrument equals the present value of all payments due under the debt instrument Assume the applicable federal rate with respect to B's obligation is 10 percent compounded semiannually Using this discount rate, the present value of the $35,000 payment that B would be required to make two years after the constructive liquidation to restore the deficit balance in B's capital account equals $28,795 To the extent that B's deficit restoration obligation is not recognized, it is assumed that B's obligation does not exist Therefore, A, as the sole general partner, would be obligated by operation of law to contribute an additional $6,205 of capital to the partnership Accordingly, under paragraph (g) of this section, B bears the economic risk of loss for $28,795 and A bears the economic risk of loss for $41,205 ($35,000 + $6,205)

(h) *Partner providing property as security for partnership liability*—(1) *Direct pledge* A partner is considered to bear the economic risk of loss for a partnership liability to the extent of the value of any of the partner's or related person's separate property (other than a direct or indirect interest in the partnership) that is pledged as security for the partnership liability

(2) *Indirect pledge*. A partner is considered to bear the economic risk of loss for a partnership liability to the extent of the value of any property that the partner contributes to the partnership solely for the purpose of securing a partnership liability. Contributed property is not treated as contributed solely for the purpose of securing a partnership liability unless substantially all of the items of income, gain, loss, and deduction attributable to the contributed property are allocated to the contributing partner, and this allocation is generally greater than the partner's share of other significant items of partnership income, gain, loss, or deduction.

(3) *Valuation*. The extent to which a partner bears the economic risk of loss as a result of a direct pledge described in paragraph (h)(1) of this section or an indirect pledge described in paragraph (h)(2) of this section is limited to the fair market value of the property at the time of the pledge or contribution

(4) *Partner's promissory note*. For purposes of paragraph (h)(2) of this section, a promissory note of the partner or related person that is contributed to the partnership shall not be taken into account unless the note is readily tradeable on an established securities market

(i) *Treatment of recourse liabilities in tiered partnerships*. If a partnership (the "upper-tier partnership") owns (directly or indirectly through one or more partnerships) an interest in another partnership (the "lower-tier partnership"), the liabilities of the lower-tier partnership are allocated to the upper-tier partnership in an amount equal to the sum of the following—

(1) The amount of the economic risk of loss that the upper-tier partnership bears with respect to the liabilities; and

(2) Any other amount of the liabilities with respect to which partners of the upper-tier partnership bear the economic risk of loss.

(j) *Anti-abuse rules*—(1) *In general*. An obligation of a partner or related person to make a payment may be disregarded or treated as an obligation of another person for purposes of this section if facts and circumstances indicate that a principal purpose of the arrangement between the parties is to eliminate

the partner's economic risk of loss with respect to that obligation or create the appearance of the partner or related person bearing the economic risk of loss when, in fact, the substance of the arrangement is otherwise Circumstances with respect to which a payment obligation may be disregarded include, but are not limited to, the situations described in paragraphs (j)(2) and (j)(3) of this section

(2) *Arrangements tantamount to a guarantee* Irrespective of the form of a contractual obligation, a partner is considered to bear the economic risk of loss with respect to a partnership liability, or a portion thereof, to the extent that

(i) The partner or related person undertakes one or more contractual obligations so that the partnership may obtain a loan,

(ii) The contractual obligations of the partner or related person eliminate substantially all the risk to the lender that the partnership will not satisfy its obligations under the loan, and

(iii) One of the principal purposes of using the contractual obligations is to attempt to permit partners (other than those who are directly or indirectly liable for the obligation) to include a portion of the loan in the basis of their partnership interests.

The partners are considered to bear the economic risk of loss for the liability in accordance with their relative economic burdens for the liability pursuant to the contractual obligations. For example, a lease between a partner and a partnership which is not on commercially reasonable terms may be tantamount to a guarantee by the partner of a partnership liability

(3) *Plan to circumvent or avoid the obligation* An obligation of a partner to make a payment is not recognized if the facts and circumstances evidence a plan to circumvent or avoid the obligation.

(4) *Example* The following example illustrates the principle of paragraph (j)(3) of this section.

*Example Plan to circumvent or avoid obligation* A and B form a general partnership A, a corporation, contributes $20,000 and B contributes $80,000 to the partnership A is obligated to restore any deficit in its partnership capital account The partnership agreement allocates losses 20% to A and 80% to B until B's capital account is reduced to zero, after which all losses are allocated to A The partnership purchases depreciable property for $250,000 using its $100,000 cash and a $150,000 recourse loan from a bank B guarantees payment of the $150,000 loan to the extent the loan remains unpaid after the bank has exhausted its remedies against the partnership A is a subsidiary, formed by a parent of a consolidated group, with capital limited to $20,000 to allow the consolidated group to enjoy the tax losses generated by the property while at the same time limiting its monetary exposure for such losses These facts, when considered together with B's guarantee, indicate a plan to circumvent or avoid A's obligation to contribute to the partnership The rules of section 752 must be applied as if A's obligation to contribute did not exist Accordingly, the $150,000 liability is a recourse liability that is allocated entirely to B

*§1.752-3 Partner's share of nonrecourse liabilities*

(a) *In general* A partner's share of the nonrecourse liabilities of a partnership equals the sum of paragraphs (a)(1) through (a)(3) of this section as follows—

(1) The partner's share of partnership minimum gain determined in accordance with the rules of section 704(b) and the regulations thereunder;

(2) The amount of any taxable gain that would be allocated to the partner under section 704(c) (or in the same manner as section 704(c) in connection with a revaluation of partnership property) if the partnership disposed of (in a taxable transaction) all partnership property subject to one or more nonrecourse liabilities of the partnership in full satisfaction of the liabilities and for no other consideration; and

(3) The partner's share of the excess nonrecourse liabilities (those not allocated under paragraphs (a)(1) and (a)(2) of this section) of the partnership as determined in accordance with the partner's share of partnership profits The partner's interest in partnership profits is determined by taking into account all facts and circumstances relating to the economic arrangement of the partners The partnership agreement may specify the partners' interests in partnership profits for purposes of allocating excess nonrecourse liabilities provided the interests so specified are reasonably consistent with allocations (that have substantial economic effect under the section 704(b) regulations) of some other significant item of partnership income or gain. Alternatively, excess nonrecourse liabilities may be allocated among the partners in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated. Excess nonrecourse liabilities are not required to be allocated under the same method each year.

(b) *Examples* The following examples illustrate the principles of paragraph (a) of this section.

*Example 1 Partner's share of nonrecourse liabilities* The AB partnership purchases depreciable property for a $1,000 purchase money note that is a nonrecourse liability under the rules of this section Assume that this is the only nonrecourse liability of the partnership, and that no principal payments are due on the purchase money note for a year The partnership agreement provides that all items of income, gain, loss, and deduction are allocated equally Immediately after purchasing the depreciable property, the partners share the nonrecourse liability equally because they have equal interests in partnership profits A and B are each treated as if they contributed $500 to the partnership to reflect each partner's increase in his or her share of partnership liabilities (from $0 to $500) The minimum gain with respect to an item of partnership property subject to a nonrecourse liability equals the amount of gain that would be recognized if the partnership disposed of the property in full satisfaction of the nonrecourse liability and for no other consideration Therefore, if the partnership claims a depreciation deduction of $200 for the depreciable property for the year it acquires that property, partnership minimum gain for the year will increase by $200 (the excess of the $1,000 nonrecourse liability over the $800 adjusted tax basis of the property) See section 704(b) and the regulations thereunder A and B each have a $100 share of partnership minimum gain at the end of that year because the depreciation deduction is treated as a nonrecourse deduction See section 704(b) and the regulations thereunder Accordingly, at the end of that year, A and B are allocated $100 each of the nonrecourse liability to match their shares of partnership minimum gain The remaining $800 of the nonrecourse liability will be allocated equally between A and B ($400 each)

*Example 2 Excess nonrecourse liabilities allocated consistently with reasonably expected deductions* The facts are the same as in *Example 1* except that the partnership agreement provides that depreciation deductions will be allocated to A The partners agree to allocate excess nonrecourse liabilities in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated Assuming that the allocation of all of the depreciation deductions to A is valid under section 704(b), immediately after purchasing the depreciable property, A's share of the nonrecourse liability is $1,000 Accordingly, A is treated as if A contributed $1,000 to the partnership

*§1.752-4 Special rules.*

(a) *Tiered partnerships*. An upper-tier partnership's share of the liabilities of a lower-tier partnership (other than any liability of the lower-tier partnership that is owed to the upper-tier partnership) is treated as a liability of the upper-tier partnership for purposes of applying section 752 and the regulations thereunder to the partners of the upper-tier partnership.

(b) *Related person definition* —(1) *In general*. A person is related to a partner if the person and the partner bear a relationship to each other that is specified in sections 267(b) or 707(b)(1), subject to the following modifications.

(i) Substitute ''80 percent or more'' for ''more than 50 percent'' each place it appears in those sections;

(ii) A person's family is determined by excluding brothers and sisters, and

(iii) Disregard sections 267(e)(1) and 267(f)(1)(A)

(2) *Person related to more than one partner*—(i) *In general* If, in applying the related person rules in paragraph (b)(1) of this section, a person is related to more than one partner, paragraph (b)(1) of this section is applied by treating the person as related only to the partner with whom there is the highest percentage of related ownership. If two or more partners have the same percentage of related ownership and no other partner has a greater percentage, the liability is allocated equally among the partners having the equal percentages of related ownership

(ii) *Natural persons* For purposes of determining the percentage of related ownership between a person and a partner, natural persons who are related by virtue of being members of the same family are treated as having a percentage relationship of 100 percent with respect to each other.

(iii) *Related partner exception*. Notwithstanding paragraph (b)(1) of this section (which defines related person), persons owning interests directly or indirectly in the same partnership are not treated as related persons for purposes of determining the economic risk of loss borne by each of them for the liabilities of the partnership This paragraph (iii) does not apply when determining a partner's interest under the *de minimis* rules in §1 752–2(d) and (e)

(iv) *Special rule where entity structured to avoid related person status*—(A) *In general*. If—

(*1*) A partnership liability is owed to or guaranteed by another entity that is a partnership, an S corporation, a C corporation, or a trust,

(*2*) A partner or related person owns (directly or indirectly) a 20 percent or more ownership interest in the other entity, and

(*3*) A principal purpose of having the other entity act as a lender or guarantor of the liability was to avoid the determination that the partner that owns the interest bears the economic risk of loss for federal income tax purposes for all or part of the liability,

then the partner is treated as holding the other entity's interest as a creditor or guarantor to the extent of the partner's or related person's ownership interest in the entity

(B) *Ownership interest*. For purposes of paragraph (b)(2)(iv)(A) of this section, a person's ownership interest in:

(*1*) A partnership equals the partner's highest percentage interest in any item of partnership loss or deduction for any taxable year;

(*2*) An S corporation equals the percentage of the outstanding stock in the S corporation owned by the shareholder,

(*3*) A C corporation equals the percentage of the fair market value of the issued and outstanding stock owned by the shareholder, and

(*4*) A trust equals the percentage of the actuarial interests owned by the beneficial owner of the trust

(C) *Example Entity structured to avoid related person status* A, B, and C form a general partnership, ABC A, B, and C are equal partners, each contributing $1,000 to the partnership A and B want to loan money to ABC and have the loan treated as nonrecourse for purposes of section 752 A and B form partnership AB to which each contributes $50,000 A and B share losses equally in partnership AB Partnership AB loans partnership ABC $100,000 on a nonrecourse basis secured by the property ABC buys with the loan Under these facts and circumstances, A and B bear the economic risk of loss with respect to the partnership liability equally based on their percentage interest in losses of partnership AB

(c) *Limitation*. The amount of an indebtedness is taken into account only once, even though a partner (in addition to the partner's liability for the indebtedness as a partner) may be separately liable therefor in a capacity other than as a partner.

(d) *Time of determination*. A partner's share of partnership liabilities must be determined whenever the determination is necessary in order to determine the tax liability of the partner or any other person See §1 705–1(a) for rules regarding when the adjusted basis of a partner's interest in the partnership must be determined.

*§1.752–5 Effective dates and transition rules*.

(a) *In general*. Unless a partnership makes an election under paragraph (b)(1) of this section to apply the provisions of §§1.752–1 through 1 752–4 earlier, §§1.752–1 through 1.752–4 apply to any liability incurred or assumed by a partnership on or after December 28, 1991, other than a liability incurred or assumed by the partnership pursuant to a written binding contract in effect prior to December 28, 1991, and at all times thereafter For liabilities incurred or assumed by a partnership prior to December 28, 1991 (or pursuant to a written binding contract in effect prior to December 28, 1991, and at all times thereafter), unless an election to apply these regulations has been made, see §§1 752–0T to 1.752–4T, set forth in 26 CFR 1.752–0T through 1.752–4T as contained in 26 CFR edition revised April 1, 1991, (TD 8237, TD 8274, and TD 8355) and §1.752–1, set forth in 26 CFR 1 752–1 as contained in 26 CFR edition revised April 1, 1988 (TD 6175 and TD 6500).

(b) *Election*—(1) *In general* A partnership may elect to apply the provisions of §§1 752–1 through 1.752–4 to all of its liabilities to which the provisions of those sections do not otherwise apply as of the beginning of the first taxable year of the partnership ending on or after December 28, 1991.

(2) *Time and manner of election*. An election under this paragraph (b) is made by attaching a written statement to the partnership return for the first taxable year of the partnership ending on or after December 28, 1991 The written statement must include the name, address, and taxpayer identification number of the partnership making the statement and contain a declaration that an election is being made under this paragraph (b).

(c) *Effect of section 708(b)(1)(B) termination on determining date liabilities are incurred or assumed*. For purposes of applying this section, a termination of the partnership under section 708(b)(1)(B) will not cause partnership liabilities incurred or assumed prior to the termination to be treated as incurred or assumed on the date of the termination

* * * * * *

PART 602—OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT

Par. 4. The authority for part 602 continues to read as follows

Authority. 26 U.S C 7805.

Par. 5. Section 602.101(c) is amended by removing the citation

"1 752–4T . . 1545–1090"

and adding the following citation to read as follows

"1.752–5 . . . . . . . . . . . . 1545–1090.

Fred T. Goldberg, Jr ,
*Commissioner of Internal Revenue*.

Approved December 5, 1991

Kenneth W. Gideon,
*Assistant Secretary of the Treasury*.

(Filed by the Office of the Federal Register on December 20, 1991, 8 45 a m , and published in the issue of the Federal Register for December 23, 1991, 56 F R 66348)

person whose relationship to the transferor, the transferee or any member of the family of either is not described in section 267(b) of the Internal Revenue Code, provided that for purposes of this section the term ''fiduciary of a trust'' as used in section 267(b) does not include a bank as defined in section 581 of the Internal Revenue Code. A restriction imposed or required to be imposed by Federal or State law is not an applicable restriction An option, right to use property, or agreement that is subject to section 2703 is not an applicable restriction.

(c) *Effect of disregarding an applicable restriction.* If an applicable restriction is disregarded under this section, the transferred interest subject to the restriction is valued as if the restriction does not exist and as if the rights of the transferor are determined under the State law that would apply but for the limitation.

(d) *Examples* The following examples illustrate the provisions of this section.

*Example 1* D owns a 76 percent interest and each of D's children, A and B, owns a 12 percent interest in general partnership X The partnership agreement requires the consent of all the partners to liquidate the partnership Under the State law that would apply in the absence of the restriction in the partnership agreement, the consent of partners owning 70 percent of the total partnership interests would be required to liquidate X On D's death, D's partnership interest passes to D's child, C The requirement that all the partners consent to liquidation is an applicable restriction Because A, B and C (all members of D's family), acting together after the transfer, can remove the restriction on liquidation, D's interest is valued without regard to the restriction, *i e* , as though D's interest is sufficient to liquidate the partnership

*Example 2* D owns all the preferred stock in corporation X The preferred stock carries a right to liquidate X that cannot be exercised until 1999 D's children, A and B, own all the common stock of X The common stock is the only voting stock In 1994, D transfers the preferred stock to D's child The restriction on D's right to liquidate is an applicable restriction that is disregarded Therefore, the preferred stock is valued as though the right to liquidate were presently exercisable

*Example 3* D owns 60 percent of the stock of corporation X The corporate by-laws provide that the corporation cannot be liquidated for 10 years after which time liquidation requires approval by 60 percent of the voting interests In the absence of the provision in the by-laws, State law would require approval by 80 percent of the voting interests to liquidate X D transfers the stock to a trust for the benefit of D's child, A, during the 10-year period The 10-year restriction is an applicable restriction and is disregarded Therefore, the value of the stock is determined as if the transferred block could currently liquidate X

*Example 4* D and D's children, A and B, are partners in limited partnership Y Each has a 3 33 percent general partnership interest and a 30 percent limited partnership interest Any general partner has the right to liquidate the partnership at any time As part of a loan agreement with a lender who is related to D, each of the partners agreed that the partnership would not be liquidated without the lender's consent while any portion of the loan remains outstanding During the term of the loan agreement, D transfers one-half of both D's partnership interests to each of A and B Because the lender is a related party, the requirement that the lender consent to liquidation is an applicable restriction and the transfers of's interests are valued as if such consent were not required

*Example 5* D owns all the preferred and common stock in corporation X The preferred stock carries a right to liquidate X that cannot be exercised until 1999 In 1995, D transfers the common stock to D's child in a transfer that is subject to section 2701 The restriction on D's right to liquidate is an applicable restriction that is disregarded in determining the amount of the gift under section 2701

*§25.2704–3 Interaction of sections 2701(a) and 2704(a).*

If sections 2701(a) and 2704(a) would apply simultaneously to the same transfer, the application of chapter 14 to such transfer is determined under the section that provides the greater increase in taxable transfers

Fred T. Goldberg, Jr.,
*Commissioner of Internal Revenue*

(Filed by the Office of the Federal Register on September 10, 1991, 8 45 a m , and published in the issue of the Federal Register for September 11, 1991, 56 F R 46245)

---

## Notice of Proposed Rulemaking

## Treatment of Partnership Liabilities

## PS–49–91

AGENCY. Internal Revenue Service, Treasury.

ACTION: Notice of proposed rulemaking.

SUMMARY. This document contains proposed regulations relating to the treatment of partnership liabilities The proposed regulations reflect changes to the applicable tax law made by section 79 of the Tax Reform Act of 1984 The proposed regulations affect partnerships and their partners, and are necessary to provide them with guidance needed to comply with the applicable tax law

DATES: Written comments must be received by September 9, 1991. Requests to appear and outlines of oral comments for the public hearing scheduled for September 17, 1991, at 10·00 a.m. must be received by September 3, 1991. See notice of hearing published elsewhere in *** [Announcement 91–122, 1991–33 I.R.B 32]

ADDRESSES Send comments, requests to appear at the public hearing, and outlines to: Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Attn. CC·CORP·T:R (PS–229–84), Room 5228, Washington, D C 20044. The public hearing will be held in Room 2615, Internal Revenue Building, 1111 Constitution Avenue, N.W , Washington, D.C.

SUPPLEMENTARY INFORMATION:

*Paperwork Reduction Act*

The collection of information contained in this notice of proposed rulemaking has been submitted to the Office of Management and Budget for review in accordance with the Paperwork Reduction Act of 1980 (44 U.S.C 3504(h)). Comments on the collection of information should be sent to the Office of Management and Budget, Attention. Desk Officer for the Department of the Treasury, Office of Information and Regulatory Affairs, Washington, D.C. 20503, with copies to the Internal Revenue Service, Attn: IRS Reports Clearance Officer, T FP, Washington, D C. 20224.

The collection of information in these proposed regulations is in §1 752–5 This information is required by the Internal Revenue Service to administer section 752. This information will be used to determine whether partners or partnerships are complying with section 752 and the regulations thereunder The respondents are partnerships who wish to make the election under §1 752–5(b)

The following estimates are an approximation of the average time expected to be necessary for a collection of information. They are based on such information as is available to the Internal Revenue Service. Individual respondents may require greater or less time, depending on their particular circumstances

Estimated total annual reporting burden 417 hours

The estimated annual burden per respondent varies from 3 minutes to 8 minutes, depending on individual circumstances, with an estimated average of 5 minutes.

Estimated number of respondents 5,000

Estimated frequency of responses 1.

*Introduction*

This document proposes to add new regulation §§1 752–0 through 1.752–5 to

the Income Tax Regulations (26 CFR part 1) under section 752 of the Internal Revenue Code of 1986 and to remove existing §§1.752–0T through 1 752–4T

*Background*

Proposed and temporary regulations under section 752 were published on December 30, 1988, and amended on November 21, 1989 ("temporary regulations"). This document simplifies the temporary regulations and addresses several issues raised by commentators with respect to the temporary regulations. The major substantive changes incorporated in the proposed regulations are discussed in part III of the explanation section of this document.

*Explanation of Provisions*

I. *Sharing Recourse Liabilities* The proposed regulations provide that a partnership liability is a recourse liability to the extent that any partner bears the economic risk of loss for that liability, and a partner's share of any recourse liability of the partnership equals the portion, if any, of the economic risk of loss for the liability that is borne by the partner. The proposed regulations also provide that a partner bears the economic risk of loss for a partnership liability to the extent that the partner or related person would be obligated to make a payment with respect to a partnership liability (and would not be entitled to be reimbursed for the contribution or payment by another partner, a person related to another partner, or the partnership) if the partnership constructively liquidates In a constructive liquidation the following events are deemed to occur. (A) all of the partnership's liabilities become due and payable in full, (B) all of the partnership's assets (including money) become worthless, (C) the partnership disposes of all of its assets in a fully taxable transaction for no consideration (other than relief from certain liabilities), (D) the partnership allocates its items of income, gain, loss, deduction, and credit for the year among the partners, and (E) the partnership completely liquidates. The constructive liquidation is a means of testing who bears the economic risk of loss for a partnership liability taking into account the manner in which the partners have agreed to share economic losses relating to the liabilities of the partnership under all the arrangements among the partners, related persons, and the partnership

II *Sharing Nonrecourse Liabilities.* The proposed regulations provide that, if no partner bears the economic risk of loss for a partnership liability, the liability is a nonrecourse liability of the partnership The partners generally share nonrecourse liabilities in accordance with their interests in partnership profits However, the proposed regulations require that the nonrecourse liabilities of a partnership be allocated among the partners first to reflect the partners' shares of any partnership minimum gain (within the meaning of section 704(b)) and any tax gain that would be allocated to the partners under section 704(c) (or in the same manner as section 704(c) in connection with a revaluation of partnership property) if the partnership disposed of (in a taxable transaction) all partnership property subject to one or more nonrecourse liabilities of the partnership in full satisfaction of the liabilities and for no other consideration.

III. *Modifications To Temporary Regulations.*

The proposed regulations reflect several modifications of rules found in the temporary regulations in response to comments received on the temporary regulations

A *General Anti-abuse Rules.*

A new section, "Anti-abuse rules," has been added which provides a general rule that an obligation of a partner or related person to make a payment may be disregarded or treated as an obligation of another person if the facts and circumstances indicate that a principal purpose of an arrangement between the parties is to eliminate the partner's economic risk of loss with respect to that obligation or create the appearance of the partner or related person bearing the economic risk of loss when, in fact, the substance of the arrangement is otherwise

B. *Guarantee of Interest Rule.*

Section 1 752–1T(d)(3)(v) of the temporary regulations contains a guarantee of interest rule. This rule generally provides that if one or more partners guarantee the payment of more than 20 percent of the total interest that accrues on an otherwise nonrecourse partnership liability during its term, the loan is deemed to be recourse to those partners to the extent of the present value of the guaranteed future interest payments. The proposed regulations retain the guarantee of interest rule, but increase the threshold percentage from 20 percent to 25 percent to better coordinate the general rule with the safe harbor discussed below The guarantee of interest rule applies when a partner or related person has guaranteed more than 25 percent of the total interest that accrues, and the rule continues to apply even if the total guaranteed interest falls below the initial 25 percent threshold The proposed regulations also add a safe harbor, providing that a guarantee of interest for a period not in excess of the lesser of five years or one-third of the term of the loan is not subject to the general rule. Finally, the rule is clarified with respect to its application when the interest rate varies

C *Valuation of Pledged Property*

The proposed regulations revise the rule concerning the valuation of pledged assets in §1 752–1T(d)(3)(ii) of the temporary regulations Under the temporary regulations, the value of property with a readily ascertainable fair market value is recomputed from time to time over the life of the loan, but the value of property without a readily ascertainable fair market value is computed only at the time of the pledge. Under the proposed regulations, the value of all pledged property is the fair market value of the property at the time of the pledge.

D *De Minimis Rule*

The *de minimis* rule in §1.752–1T(d)(3)(vii) of the temporary regulations provides an exception to the general economic risk of loss rule Under the *de minimis* rule, a partner is not treated as bearing the economic risk of loss with respect to a nonrecourse loan made by the partner or related person if the partner owns a ten percent or less interest in each item of income, gain, loss, deduction, or credit of the partnership and the loan constitutes qualified nonrecourse financing within the meaning of section 465(b)(6) (determined without regard to the type of activity financed) The proposed regulations expand this rule to include certain guarantees by partners or related persons Under the expanded rule, a partner is not treated as bearing the economic risk of loss with respect to a guarantee of a partnership nonrecourse loan by the partner or related person if the guarantor's interest in each partnership item of income, gain, loss, deduction, or credit for any taxable year is ten percent or less, and the loan would meet the requirements of section 465(b)(6) (determined without

regard to the type of activity financed) if the guarantor had made the loan to the partnership

E *Partner's Share of Nonrecourse Liabilities.*

The proposed regulations require that the nonrecourse liabilities of a partnership be allocated among the partners first to reflect the partners' shares of any partnership minimum gain, then to reflect any tax gain that would be allocated to the partners under section 704(c), and finally in accordance with the partners' interests in partnership profits. Section 1 752–1T(e) of the temporary regulations provides, in part, that the partnership agreement may specify the partners' interests in partnership profits provided the interests so specified are reasonably consistent with allocations (which have substantial economic effect under the section 704(b) regulations) of some significant item of partnership income or gain. The proposed regulations retain this provision, but also provide an alternative under which nonrecourse liabilities in excess of those allocated to reflect partnership minimum gain and section 704(c) gain may be allocated among the partners in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated.

F. *Effective Dates.*

Amendments to the effective dates of the temporary regulations are being issued concurrently with the proposed regulations One amendment provides a transitional election allowing partnerships to elect to apply the temporary regulations to liabilities incurred or assumed by the partnership on or after December 28, 1991 and before January 1, 1992.

The proposed regulations are effective for liabilities incurred or assumed by the partnership on or after December 28, 1991. The proposed regulations provide taxpayers with the opportunity to elect to apply the regulations as of the beginning of the first taxable year of the partnership ending on or after December 28, 1991. In addition, the proposed regulations clarify that a termination of a partnership under section 708(b)(1)(B) will not cause any partnership liabilities incurred or assumed prior to the termination to be treated as incurred or assumed on the date of the termination.

*Special Analyses*

It has been determined that these proposed rules are not major rules as defined in Executive Order 12291. Therefore, a Regulatory Impact Analysis is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U S C. chapter 5) and the Regulatory Flexibility Act (5 U S.C. chapter 6) do not apply to these regulations, and, therefore, an initial Regulatory Flexibility Analysis is not required. Pursuant to section 7805(f) of the Code, these proposed regulations will be submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

*Comments and Public Hearing*

Before adopting these proposed regulations, consideration will be given to any written comments that are timely submitted (preferably a signed original and eight copies) to the Internal Revenue Service. All comments will be available for public inspection and copying. Written comments must be received by September 9, 1991. A public hearing will be held on September 17, 1991, beginning at 10.00 a.m. Requests to speak and outlines of oral comments must be received by September 3, 1991. The public hearing will be held in Room 2615, Internal Revenue Building, 1111 Constitution Avenue, N W , Washington, D.C. Comments, requests to speak, and outlines of oral comments should be submitted to the Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Attn: CC:CORP:T.R (PS–49–91), Room 5228, Washington, D C. 20044 See notice of hearing published elsewhere in *** [Announcement of 91–122, 1991–33 I R B. 32]

*List of Subject in 26 CFR 1 751–1 through 1.755–2T*

Income taxes.

*Proposed Amendments to the Regulations*

The proposed amendments to 26 CFR part 1 are as follows:

PART 1—INCOME TAX; TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1953

Paragraph 1. The authority for part 1 continues to read in part as follows:

Authority: 26 U.S.C. 7805 ***

Par. 2. Sections 1.752–0T through 1.752–4T are removed.

Par. 3. Sections 1.752–0 through 1.752–5 are added to read as follows:

*§1.752–0 Table of Contents.*

This section lists the captions that appear in §§1.752–1 through 1.752–5.

*§1.752–1 Treatment of partnership liabilities.*


(a) Definitions.

(1) Recourse liability defined.

(2) Nonrecourse liability defined.

(3) Related person.

(b) Increase in partner's share of liabilities

(c) Decrease in partner's share of liabilties

(d) Assumption of liability.

(e) Property subject to a liability.

(f) Netting of increases and decreases in liabilities resulting from same transaction.

(g) Sale or exchange of partnership interest.

(h) Bifurcation of partnership liabilities.


*§1.752–2 Partner's share of recourse liabilities.*


(a) In general.

(b) Obligation to make a payment.

(1) In general.

(2) Treatment upon deemed disposition.

(3) Obligations recognized.

(4) Contingent obligations.

(5) Reimbursement rights.

(6) Deemed satisfaction of obligation.

(c) Partner or related person as lender.

(1) In general.

(2) Wrapped debt.

(d) *De minimis* exceptions.

(1) Partner as lender.

(2) Partner as guarantor.

(e) Special rule for nonrecourse liability with interest guaranteed by a partner.

(1) In general.

(2) Computation of present value.

(3) Safe harbor.

(f) Examples.

(g) Time-value-of-money considerations.

(1) In general.

(2) Valuation of an obligation.

(3) Satisfaction of obligation with partner's promissory note.

(h) Partner providing property as security for partnership liability.

(1) Direct pledge

(2) Indirect pledge.

(3) Valuation

(4) Partner's promissory note.

(i) Treatment of recourse liabilities in tiered partnerships

(j) Anti-abuse rules

(1) In general.

(2) Arrangements tantamount to a guarantee.

(3) Plan to circumvent or avoid the regulations.

(4) Example

*§1.752–3 Partner's share of nonrecourse liabilities.*

(a) In general.

(b) Examples.

*§1 752–4 Special rules.*

(a) Tiered partnerships.

(b) Related person definition.

(1) In general.

(2) Person related to more than one partner.

(i) In general.

(ii) Natural persons.

(iii) Related partner exception.

(iv) Special rule where entity structured to avoid related person status.

(A) In general.

(B) Ownership interest.

(C) Example.

(c) Limitation.

(d) Time of determination.

*§1 752–5 Effective dates and transition rules.*

(a) In general.

(b) Election

(1) In general.

(2) Time and manner of election.

(c) Effect of section 708(b)(1)(B) termination on determining date liabilities are incurred or assumed.

*§1.752–1 Treatment of Partnership Liabilities.*

(a) *Definitions.* For purposes of section 752, the following definitions apply:

(1) *Recourse liability defined.* A partnership liability is a recourse liability to the extent that any partner or related person bears the economic risk of loss for that liability under §1 752–2

(2) *Nonrecourse liability defined* A partnership liability is a nonrecourse liability to the extent that no partner or related person bears the economic risk of loss for that liability under §1.752–2

(3) *Related person.* Related person means a person having a relationship to a partner that is described in §1.752–4(b)

(b) *Increase in partner's share of liabilities* Any increase in a partner's share of partnership liabilities, or any increase in a partner's individual liabilities by reason of the partner's assumption of partnership liabilities, is treated as a contribution of money by that partner to the partnership.

(c) *Decrease in partner's share of liabilities.* Any decrease in a partner's share of partnership liabilities, or any decrease in a partner's individual liabilities by reason of the partnership's assumption of the individual liabilities of the partner, is treated as a distribution of money by the partnership to that partner.

(d) *Assumption of liability.* Except as otherwise provided in paragraph (e) of this section, a person is considered to assume a liability only to the extent that:

(1) The assuming person is personally obligated to pay the liability, and

(2) If a partner or related person assumes a partnership liability, the person to whom the liability is owed knows of the assumption and can directly enforce the partner's or related person's obligation for the liability, and no other partner or person that is a related person to another partner would bear the economic risk of loss for the liability immediately after the assumption

(e) *Property subject to a liability* If property is contributed by a partner to the partnership or distributed by the partnership to a partner and the property is subject to a liability of the transferor, the transferee is treated as having assumed the liability, to the extent that the amount of the liability does not exceed the fair market value of the property at the time of the contribution or distribution.

(f) *Netting of increases and decreases in liabilities resulting from same transaction.* If, as a result of a single transaction, a partner incurs both an increase in the partner's share of the partnership liabilities (or the partner's individual liabilities) and a decrease in the partner's share of the partnership liabilities (or the partner's individual liabilities), only the net decrease is treated as a distribution from the partnership and only the net increase is treated as a contribution of money to the partnership. Generally, the contribution to or distribution from a partnership of property subject to a liability or the termination of the partnership under section 708(b) will require that increases and decreases in liabilities associated with the transaction be netted to determine if a partner will be deemed to have made a contribution or received a distribution as a result of the transaction

(g) *Sale or exchange of a partnership interest* If a partnership interest is sold or exchanged, the reduction in the transferor partner's share of partnership liabilities is treated as an amount realized under section 1001 and the regulations thereunder. For example, if a partner sells an interest in a partnership for $750 cash and transfers to the purchaser the partner's share of partnership liabilities in the amount of $250, the seller realizes $1,000 on the transaction

(h) *Bifurcation of partnership liabilities* If one or more partners bears the economic risk of loss as to part, but not all, of a partnership liability represented by a single contractual obligation, then that liability is treated as two or more separate liabilities for purposes of section 752. The portion of the liability as to which one or more partners bear the economic risk of loss is a recourse liability and the remainder of the liability, if any, is a nonrecourse liability.

*§1 752–2 Partner's share of recourse liabilities*

(a) *In general.* A partner's share of a recourse partnership liability equals the portion of that liability, if any, for which the partner or related person bears the economic risk of loss The determination of the extent to which a partner bears the economic risk of loss for a partnership liability is made under the rules in paragraphs (b) through (j) of this section

(b) *Obligation to make a payment.*

(1) *In general.* Except as otherwise provided in this section, a partner bears the economic risk of loss for a partnership liability to the extent that, if the partnership constructively liquidated, the partner or related person would be obligated to make a payment to any person (or a contribution to the partnership)



APP-B-000060

because that liability becomes due and payable and the partner or related person would not be entitled to reimbursement from another partner or person that is a related person to another partner Upon a constructive liquidation, all of the following events are deemed to occur simultaneously·

(i) All of the partnership's liabilities become payable in full;

(ii) With the exception of property contributed to secure a partnership liability (see §1 752–2(h)), all of the partnership's assets, including cash, have a value of zero,

(iii) The partnership disposes of all of its property in a fully taxable transaction for no consideration (except relief from liabilities for which the creditor's right to repayment is limited solely to one or more assets of the partnership);

(iv) All items of income, gain, loss, or deduction are allocated among the partners, and

(v) The partnership liquidates.

(2) *Treatment upon deemed disposition*. For purposes of paragraph (b)(1) of this section, gain or loss on the deemed disposition of the partnership's assets is computed in accordance with the following.

(i) If the creditor's right to repayment of a partnership liability is limited solely to one or more assets of the partnership, gain or loss is recognized in an amount equal to the difference between the amount of the liability that is extinguished by the deemed disposition and the tax basis in those assets.

(ii) A loss is recognized equal to the remaining tax basis of all of the partnership's assets not taken into account in paragraph (b)(2)(i) of this section.

(3) *Obligations recognized*. The determination of the extent to which a partner or related person has an obligation to make a payment under paragraph (b)(1) of this section is based on the facts and circumstances at the time of the determination All statutory and contractual obligations relating to the partnership liability are taken into account for purposes of applying this section, including:

(i) Contractual obligations outside the partnership agreement such as guarantees, indemnifications, reimbursement agreements, and other obligations running directly to creditors or to other partners, or to the partnership;

(ii) Obligations to the partnership that are imposed by the partnership agreement, including the obligation to make a capital contribution and to restore a deficit capital account upon liquidation of the partnership, and

(iii) Payment obligations (whether in the form of direct remittances to another partner or a contribution to the partnership) imposed by state law, including the governing state partnership statute

To the extent that the obligation of a partner to make a payment with respect to a partnership liability is not recognized under this paragraph (b)(3), paragraph (b) of this section is applied as if the obligation did not exist.

(4) *Contingent obligations*. A payment obligation is disregarded if, taking into account all the facts and circumstances, the obligation is subject to contingencies that make it unlikely that the obligation will ever be discharged. If a payment obligation would arise at a future time after the occurrence of an event that is not determinable with reasonable certainty, the obligation is ignored until the event occurs.

(5) *Reimbursement rights*. A partner's or related person's obligation to make a payment with respect to a partnership liability is reduced to the extent that the partner or related person is entitled to reimbursement from another partner or a person who is a related person to another partner.

(6) *Deemed satisfaction of obligation* For purposes of determining the extent to which a partner or related person has a payment obligation and the economic risk of loss, it is assumed that all partners and related persons who have obligations to make payments actually perform those obligations, irrespective of their actual net worth, unless the facts and circumstances indicate a plan to circumvent or avoid the obligation. See §1 752–2(j).

(c) *Partner or related person as lender*—(1) *In general* A partner bears the economic risk of loss for a partnership liability to the extent that the partner or a related person makes (or acquires an interest in) a nonrecourse loan to the partnership and the economic risk of loss for the liability is not borne by another partner

(2) *Wrapped debt* If a partnership liability is owed to a partner or related person and that liability includes (*i e.*, is "wrapped" around) a nonrecourse obligation encumbering partnership property that is owed to another person, the partnership liability will be treated as two separate liabilities. The portion of the partnership liability corresponding to the wrapped debt is treated as a liability owed to another person

(d) *De minimis exceptions*—(1) *Partner as lender* The general rule contained in paragraph (c)(1) of this section does not apply if a partner or related person whose interest (directly or indirectly through one or more partnerships including the interest of any related person) in each item of partnership income, gain, loss, deduction, or credit for any taxable year is 10 percent or less, makes a loan to the partnership which constitutes qualified nonrecourse financing within the meaning of section 465(b)(6) (determined without regard to the type of activity financed).

(2) *Partner as guarantor* The general rule contained in paragraph (b)(1) of this section does not apply if a partner or related person whose interest (directly or indirectly through one or more partnerships including the interest of any related person) in each item of partnership income, gain, loss, deduction, or credit for any taxable year is 10 percent or less, guarantees a loan that would otherwise be a nonrecourse loan of the partnership and which would constitute qualified nonrecourse financing within the meaning of section 465(b)(6) (without regard to the type of activity financed) if the guarantor had made the loan to the partnership.

(e) *Special rule for nonrecourse liability with interest guaranteed by a partner*—(1) *In general* For purposes of this section, if one or more partners or related persons have guaranteed the payment of more than 25 percent of the total interest that will accrue on a partnership nonrecourse liability over its remaining term, and it is reasonable to expect that the guarantor will be required to pay substantially all of the guaranteed future interest if the partnership fails to do so, then the liability is treated as two separate partnership liabilities. If this rule applies, the partner or related person that has guaranteed the payment of interest is treated as bearing the economic risk of loss for the partnership liability to the extent of the present value of the guaranteed future interest payments The remainder of the stated principal amount of the partnership liability constitutes a nonrecourse liability Generally, in applying this rule, it is reasonable to expect that the guarantor will be required to pay substantially all of the guaranteed future interest if, upon a default in payment by the partnership, the lender can enforce the interest guaranty without foreclosing on the property and thereby extinguishing the underlying debt

(2) *Computation of present value.* The present value of the guaranteed future interest payments is computed using a discount rate equal to either the interest rate stated in the loan documents, or if interest is imputed under either section 483 or section 1274, the applicable federal rate, compounded semi-annually. The computation takes into account any payment of interest that the partner or related person may be required to make only to the extent that the interest will accrue economically (determined in accordance with section 446 and the regulations thereunder) after the date of the interest guarantee. If the loan document contains a variable rate of interest that is an interest rate based on current values of an objective interest index, the present value is computed on the assumption that the interest determined under the objective interest index on the date of the computation will remain constant over the term of the loan. The term "objective interest index" has the meaning given to it in section 1275 and the regulations thereunder (relating to variable rate debt instruments). Examples of an objective interest index include the prime rate of a designated financial institution, LIBOR (London Interbank Offered Rate), and the applicable federal rate under section 1274(d)

(3) *Safe harbor* Paragraph (e) of this section does not apply to a partnership nonrecourse liability if the guarantee of interest by the partner or related person is for a period not in excess of the lesser of five years or one-third of the term of the liability.

(f) *Examples.* The following examples illustrate the principles of paragraphs (a) through (e) of this section.

*Example 1 Determining when a partner bears the economic risk of loss* A and B form a general partnership with each contributing $100 in cash The partnership purchases an office building on leased land for $1,000 from an unrelated seller, paying $200 in cash and executing a note to the seller for the balance of $800 The note is a general obligation of the partnership, *i e* , no partner has been relieved from personal liability The partnership agreement provides that all items are allocated equally except that tax losses are specially allocated 90% to A and 10% to B and that capital accounts will be maintained in accordance with the regulations under section 704(b), including a deficit capital account restoration obligation on liquidation In a constructive liquidation, the $800 liability becomes due and payable All of the partnership's assets, including the building, are deemed to be worthless The building is deemed sold for a value of zero Capital accounts are adjusted to reflect the loss on the hypothetical disposition, as follows·

| | A | B |
|---|---|---|
| Initial contribution | $ 100 | $ 100 |
| Loss on hypothetical sale | (900) | (100) |
| | ($800) | $ -0- |

Other than the partners' obligation to fund negative capital accounts on liquidation, there are no other contractual or statutory payment obligations existing between the partners, the partnership and the lender Therefore, $800 of the partnership liability is classified as a recourse liability because one or more partners bears the economic risk of loss for non-payment B has no share of the $800 liability since the constructive liquidation produces no payment obligation for B A's share of the partnership liability is $800 because A would have an obligation in that amount to make a contribution to the partnership

*Example 2 Recourse liability, deficit restoration obligation* C and D each contribute $500 in cash to the capital of a new general partnership, CD CD purchases property from an unrelated seller for $1,000 in cash and a $9,000 mortgage note The note is a general obligation of the partnership, *i e* , no partner has been relieved from personal liability The partnership agreement provides that profits and losses are to be divided 40% to C and 60% D C and D are required to make up any deficit in their capital accounts In a constructive liquidation, all partnership assets are deemed to become worthless and all partnership liabilities become due and payable in full The partnership is deemed to dispose of all its assets in a fully taxable transaction for no consideration Capital accounts are adjusted to reflect the loss on the hypothetical disposition, as follows

| | C | D |
|---|---|---|
| Initial contribution | $500 | $500 |
| Loss on hypothetical sale | (4,000) | (6,000) |
| | ($3,500) | ($5,500) |

C's capital account reflects a deficit that C would have to make up of $3,500 and D's capital account reflects a deficit that D would have to make up of $5,500 Therefore, the $9,000 mortgage note is a recourse liability because one or more partners bears the economic risk of loss for the liability C's share of the recourse liability is $3,500 and D's share is $5,500

*Example 3 Guarantee by limited partner, partner deemed to satisfy obligation* E and F form a limited partnership E, the general partner, contributes $2,000 and F, the limited partner, contributes $8,000 in cash to the partnership The partnership agreement allocates losses 20% to E and 80% to F until F's capital account is reduced to zero, after which all losses are allocated to E The partnership purchases depreciable property for $25,000 using its $10,000 cash and a $15,000 recourse loan from a bank F guarantees payment of the $15,000 loan to the extent the loan remains unpaid after the bank has exhausted its remedies against the partnership In a constructive liquidation, the $15,000 liability becomes due and payable All of the partnership's assets, including the depreciable property, are deemed to be worthless The depreciable property is deemed sold for a value of zero Capital accounts are adjusted to reflect the loss on the hypothetical disposition, as follows

| | E | F |
|---|---|---|
| Initial contribution | $ 2,000 | $ 8,000 |
| Loss on hypothetical sale | (17,000) | (8,000) |
| | ($15,000) | -0- |

E, as a general partner, would be obligated by operation of law to make a net contribution to the partnership of $15,000 Because E is assumed to satisfy that obligation, it is also assumed that F would not have to satisfy F's guarantee The $15,000 mortgage is treated as a recourse liability because one or more partners bears the economic risk of loss E's share of the liability is $15,000, and F's share is zero This would be so even if E's net worth at the time of the determination is less than $15,000, unless the facts and circumstances indicate a plan to circumvent or avoid E's obligation to contribute to the partnership

*Example 4 Partner guarantee with right of subrogation* G, a limited partner in the GH partnership, guarantees a portion of a partnership liability The liability is a general obligation of the partnership, *i e* , no partner has been relieved from personal liability If under state law G is subrogated to the rights of the lender, G would have the right to recover the amount G paid to the recourse lender from the general partners Therefore, G does not bear the economic risk of loss for the partnership liability

*Example 5 Bifurcation of partnership liability, guarantee of part of nonrecourse liability* A partnership borrows $10,000, secured by a mortgage on real property The mortgage note contains an exoneration clause which provides that in the event of default, the holder's only remedy is to foreclose on the property The holder may not look to any other partnership asset or to any partner to pay the liability However, to induce the lender to make the loan, a partner guarantees payment of $200 of the loan principal The exoneration clause does not apply to the partner's guarantee If the partner paid pursuant to the guarantee, the partner would be subrogated to the rights of the lender with respect to $200 of the mortgage debt, but the partner is not otherwise entitled to reimbursement from the partnership or any partner For purposes of section 752, $200 of the $10,000 mortgage liability is treated as a recourse liability of the partnership and $9,800 is treated as a nonrecourse liability of the partnership The partner's share of the recourse liability of the partnership is $200

*Example 6 Wrapped debt* I, an individual, purchases real estate from an unrelated seller for $10,000, paying $1,000 in cash and giving a $9,000 purchase mortgage note on which I has no personal liability and as to which the seller can look only to the property for satisfaction At a time when the property is worth $15,000, I sells the property to a partnership in which I is a general partner The partnership pays for the property with a partnership purchase money mortgage note of $15,000 on which neither the partnership nor any partner (or person related to a partner) has personal liability The $15,000 mortgage note is a wrapped debt that includes the $9,000 obligation to the original seller The liability is a recourse liability to the extent of $6,000 because I is the creditor with respect to the loan and I bears the economic risk of loss for $6,000 I's share of the recourse liability is $6,000 The remaining $9,000 is treated as a partnership nonrecourse liability that is owed to the unrelated seller

*Example 7 Guarantee of interest by partner treated as part recourse and part nonrecourse* On January 1, 1992, a partnership obtains a $4,000,000 loan secured by a shopping center owned by the partnership Neither the partnership nor any partner has any personal liability under the loan documents for repayment of the stated principal amount Interest accrues at a 15 percent annual rate and is payable on December 31 of each year The principal is payable in a lump sum on December 31, 2006 A partner guarantees payment of 50 percent of each interest payment required by the loan The guarantee can be enforced without first foreclosing on the property When the partnership obtains the loan, the present value (discounted at 15 percent, compounded annually) of the future interest payments is $3,508,422, and of the future principal payment is $491,578 If tested on that date, the loan would be treated as a partnership liability of $1,754,211 ($3,508,422 × 5) for which the guaranteeing partner bears the economic risk of loss and a partnership nonrecourse liability of $2,245,789 ($1,754,211 + $491,578)

*Example 8 Contingent obligation not recognized* J and K form a general partnership with cash contributions of $2,500 each J and K share partnership profits and losses equally The partnership purchases an apartment building for its $5,000 of cash and a $20,000 nonrecourse loan from a commercial bank The nonrecourse loan is secured by a mortgage on the building The loan documents provide that the partnership will be liable for the outstanding balance of the loan on a recourse basis to the extent of any decrease in the value of the apartment building resulting from the partnership's failure properly to maintain the property There are no facts that establish with reasonable certainty the existence of any liability on the part of the partnership (and its partners) for damages resulting from the partnership's failure properly to maintain the building Therefore, no partner bears the economic risk of loss, and the liability constitutes a nonrecourse liability Under §1 752–3, J and K share this nonrecourse liability equally because they share all profits and losses equally

(g) *Time-value-of-money considerations*—(1) *In general.* The extent to which a partner or related person bears the economic risk of loss is determined by taking into account any delay in the time when a payment or contribution obligation with respect to a partnership liability is to be satisfied If a payment obligation with respect to a partnership liability is not required to be satisfied within a reasonable time after the liability becomes due and payable, or if the obligation to make a contribution to the partnership is not required to be satisfied before the later of—

(i) the end of the year in which the partner's interest is liquidated, or

(ii) 90 days after the liquidation,

the obligation is recognized only to the extent of the value of the obligation.

(2) *Valuation of an obligation.* The value of a payment or contribution obligation that is not required to be satisfied within the time period specified in paragraph (g)(1) of this section equals the entire principal balance of the obligation only if the obligation bears interest equal to or greater than the applicable federal rate under section 1274(d) at the time of valuation, commencing on—

(i) in the case of a payment obligation, the date that the partnership liability to a creditor or other person to whom the obligation relates becomes due and payable, or

(ii) in the case of a contribution obligation, the date of the liquidation of the partner's interest in the partnership.

If the obligation does not bear interest at a rate at least equal to the applicable federal rate at the time of valuation, the value of the obligation is discounted to the present value of all payments due from the partner or related person (*i.e* , the imputed principal amount computed under section 1274(b)) For purposes of making this present value determination, the partnership is deemed to have constructively liquidated as of the date on which the payment obligation is valued and the payment obligation is assumed to be a debt instrument subject to the rules of section 1274 (*i e* , the debt instrument is treated as if it were issued for property at the time of the valuation)

(3) *Satisfaction of obligation with partner's promissory note* An obligation is not satisfied by the transfer to the obligee of a promissory note by a partner or related person unless the note is readily tradeable on an established securities market

(h) *Partner providing property as security for partnership liability*—(1) *Direct pledge* A partner is considered to bear the economic risk of loss for a partnership liability to the extent of the value of any of the partner's separate property (other than an interest in the partnership) that is pledged as security for the partnership liability.

(2) *Indirect pledge.* A partner is considered to bear the economic risk of loss for a partnership liability to the extent of the value of any property that the partner contributes to the partnership solely for the purpose of securing a partnership liability Contributed property is treated as contributed solely for the purpose of securing a partnership liability if substantially all of the items of income, gain, loss, and deduction attributable to the contributed property are allocated to the contributing partner, and this allocation is greater than the partner's share of any other significant item of partnership income, gain, loss, or deduction

(3) *Valuation* The extent to which a partner bears the economic risk of loss as a result of a direct pledge described in paragraph (h)(1) of this section or an indirect pledge described in paragraph (h)(2) of this section is limited to the fair market value of the property at the time of the pledge or contribution.

(4) *Partner's promissory note* For purposes of paragraphs (h)(1) and (h)(2) of this section, a promissory note of the partner or related person that is pledged or contributed to the partnership shall not be taken into account unless the note is readily tradeable on an established securities market

(i) *Treatment of recourse liabilities in tiered partnerships* If a partnership (the "upper-tier partnership") owns (directly or indirectly through one or more partnerships) an interest in another partnership (the "subsidiary partnership"), the liabilities of the subsidiary partnership are allocated to the upper-tier partnership in an amount equal to the sum of the following—

(1) The amount of the economic risk of loss that the upper-tier partnership bears with respect to the liabilities; and

(2) Any other amount of the liabilities with respect to which partners of the upper-tier partnership bear the economic risk of loss

(j) *Anti-abuse rules*—(1) *In general.* An obligation of a partner or related person to make a payment may be disregarded or treated as an obligation of another person for purposes of this section if facts and circumstances indicate that a principal purpose of the arrangement between the parties is to eliminate the partner's economic risk of loss with respect to that obligation or create the appearance of the partner or related person bearing the economic risk of loss when, in fact, the substance of the arrangement is otherwise Circumstances with respect to which a payment obligation may be disregarded include, but are not limited to, the situations described in paragraphs (j)(2) and (j)(3) of this section

(2) *Arrangements tantamount to a guarantee* Irrespective of the form of a contractual obligation, a partner is considered to bear the economic risk of loss with respect to a partnership liability, or a portion thereof, to the extent that.

(i) The partner or related person undertakes one or more contractual obligations so that the partnership may obtain a loan,

(ii) The contractual obligations of the partner or related person eliminate substantially all the risk to the lender that the partnership will not satisfy its obligations under the loan, and

(iii) One of the principal purposes of using the contractual obligations is to attempt to permit partners (other than those who are directly or indirectly liable for the obligation) to include a portion of the loan in the basis of their partnership interests.

The partners are considered to bear the economic risk of loss for the liability in accordance with their relative economic burdens for the liability pursuant to the contractual obligations For example, a lease between a partner and a partnership which is not on commercially reasonable terms may be tantamount to a guarantee by the partner of a partnership liability

(3) *Plan to circumvent or avoid the regulations.* An obligation of a partner to

make a payment is not recognized if the facts and circumstances evidence a plan to circumvent or avoid the obligation.

(4) *Example*. The following example illustrates the principle of paragraph (j)(3) of this section.

*Example Plan to circumvent or avoid obligation* A and B form a general partnership A, a corporation, contributes $20,000 and B contributes $80,000 to the partnership A is obligated to restore any deficit in its partnership capital account The partnership agreement allocates losses 20% to A and 80% to B until B's capital account is reduced to zero, after which all losses are allocated to A The partnership purchases depreciable property for $250,000 using its $100,000 cash and a $150,000 recourse loan from a bank B guarantees payment of the $150,000 loan to the extent the loan remains unpaid after the bank has exhausted its remedies against the partnership A is a subsidiary, formed by a parent of a consolidated group, with capital limited to $20,000 to allow the consolidated group to enjoy the tax losses generated by the property while at the same time limiting its monetary exposure for such losses These facts, when considered together with B's guarantee, indicate a plan to circumvent or avoid A's obligation to contribute to the partnership The rules of section 752 must be applied as if A's obligation to contribute did not exist Accordingly, the $150,000 liability is a recourse liability that is allocated entirely to B

*§1 752–3 Partner's share of nonrecourse liabilities.*

(a) *In general*. A partner's share of the nonrecourse liabilities of a partnership equals the sum of paragraphs (a)(1) through (a)(3) of this section as follows—

(1) The partner's share of partnership minimum gain determined in accordance with the rules of section 704(b) and the regulations thereunder;

(2) The amount of any taxable gain that would be allocated to the partner under section 704(c) (or in the same manner as section 704(c) in connection with a revaluation of partnership property) if the partnership disposed of (in a taxable transaction) all partnership property subject to one or more nonrecourse liabilities of the partnership in full satisfaction of the liabilities and for no other consideration; and

(3) The partner's share of the excess nonrecourse liabilities (those not allocated under paragraphs (a)(1) and (a)(2) of this section) of the partnership as determined in accordance with the partner's share of partnership profits. The partner's interest in partnership profits is determined by taking into account all facts and circumstances relating to the economic arrangement of the partners. The partnership agreement may specify the partners' interests in partnership profits for purposes of allocating excess nonrecourse liabilities provided the interests so specified are reasonably consistent with allocations (that have substantial economic effect under the section 704(b) regulations) of some other significant item of partnership income or gain. Alternatively, excess nonrecourse liabilities may be allocated among the partners in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated.

(b) *Examples*. The following examples illustrate the principles of paragraph (a) of this section.

*Example 1 Partner's share of nonrecourse liabilities* The AB partnership purchases depreciable property for a $1,000 purchase money note that is a nonrecourse liability under the rules of this section Assume that this is the only nonrecourse liability of the partnership, and that no principal payments are due on the purchase money note for a year The partnership agreement provides that all items of income, gain, loss, and deduction are allocated equally Immediately after purchasing the depreciable property, the partners share the nonrecourse liability equally because they have equal interests in partnership profits A and B are each treated as if they contributed $500 to the partnership to reflect each partner's increase in his or her share of partnership liabilities (from $0 to $500) The minimum gain with respect to an item of partnership property subject to a nonrecourse liability equals the amount of gain that would be recognized if the partnership disposed of the property in full satisfaction of the nonrecourse liability and for no other consideration Therefore, if the partnership claims a depreciation deduction of $200 for the depreciable property for the year it acquires that property, partnership minimum gain for the year will increase by $200 (the excess of the $1,000 nonrecourse liability over the $800 adjusted tax basis of the property) See §1 704–1T(b)(4)(iv)(*c*) A and B each have a $100 share of partnership minimum gain at the end of that year because the depreciation deduction is treated as a nonrecourse deduction See §1 704–1T(b)(4)(iv)(*b*) and (*f*) Accordingly, at the end of that year, A and B are allocated $100 each of the nonrecourse liability to match their shares of partnership minimum gain The remaining $800 of the nonrecourse liability will be allocated equally between A and B ($400 each)

*Example 2 Excess nonrecourse liabilities allocated consistently with reasonably expected deductions* The facts are the same as in *Example 1* except that the partnership agreement provides that depreciation deductions will be allocated to A The partners agree to allocate excess nonrecourse liabilities in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated Assuming that the allocation of all of the depreciation deductions to A is valid under section 704(b), immediately after purchasing the depreciable property, A's share of the nonrecourse liability is $1,000 Accordingly, A is treated as if A contributed $1,000 to the partnership

*§1.752–4 Special rules.*

(a) *Tiered partnerships*. An upper-tier partnership's share of the liabilities of a subsidiary partnership (other than any liability of the as liabilities of the upper-tier partnership for purposes of applying section 752 and the regulations thereunder to the partners of the upper-tier partnership.

(b) *Related person definition.*—(1) *In general*. A person is related to a partner if the person and the partner bear a relationship to each other that is specified in sections 267(b) or 707(b)(1), subject to the following modifications

(i) Substitute "80 percent or more" for "more than 50 percent" each place it appears in those sections,

(ii) A person's family is determined by excluding brothers and sisters, and

(iii) Disregard sections 267(e)(1) and 267(f)(1)(A)

(2) *Person related to more than one partner*—(i) *In general* If, in applying the related person rules in paragraph (b)(1) of this section, a person is related to more than one partner, paragraph (b)(1) of this section is applied by treating the person as related only to the partner with whom there is the highest percentage of related ownership If two or more partners have the same percentage of related ownership and no other partner has a greater percentage, the liability is allocated equally among the partners having the equal percentages of related ownership.

(ii) *Natural persons*. For purposes of determining the percentage of related ownership between a person and a partner, natural persons who are related by virtue of being members of the same family are treated as having a percentage relationship of 100 percent with respect to each other.

(iii) *Related partner exception* Notwithstanding paragraph (b)(1) of this section (which defines related person), persons owning interests directly or indirectly in the same partnership are not treated as related persons for purposes of determining the economic risk of loss borne by each of them for the liabilities of the partnership. This paragraph (iii) does not apply when determining a partner's interest under the de minimis rules in §1.752–2(d)

(iv) *Special rule where entity structured to avoid related person status*—(A) *In general* If—

(*1*) A partnership liability is owed to or guaranteed by another entity that is a partnership, an S corporation, a C corporation, or a trust,

(*2*) A partner or related person owns (directly or indirectly) a 20 percent or more ownership interest in the other entity, and

(*3*) A principal purpose of having the other entity act as a lender or guarantor of the liability was to avoid the determination that the partner that owns the interest bears the economic risk of loss for federal income tax purposes for all or part of the liability;

then the partner is treated as holding the other entity's interest as a creditor or guarantor to the extent of the partner's or related person's ownership interest in the entity.

(B) *Ownership interest*. For purposes of paragraph (b)(2)(iv)(A) of this section, a person's ownership interest in:

(*1*) a partnership equals the partner's highest percentage interest in any item of partnership loss or deduction for any taxable year;

(*2*) an S corporation equals the percentage of the outstanding stock in the S corporation owned by the shareholder;

(*3*) a C corporation equals the percentage of the fair market value of the issued and outstanding stock owned by the shareholder; and

(*4*) a trust equals the percentage of the actuarial interests owned by the beneficial owner of the trust.

(C) *Example Entity structured to avoid related person status* A, B, and C form a general partnership, ABC A, B, and C are equal partners, each contributing $1,000 to the partnership A and B want to loan money to ABC and have the loan treated as nonrecourse for purposes of section 752 A and B form partnership AB to which each contributes $50,000. A and B share losses equally in partnership AB Partnership AB loans partnership ABC $100,000 on a nonrecourse basis secured by the property ABC buys with the loan Under these facts and circumstances, A and B bear the economic risk of loss with respect to the partnership liability equally based on their percentage interest in losses of partnership AB

(c) *Limitation*. The amount of an indebtedness is taken into account only once, even though a partner (in addition to the partner's liability for the indebtedness as a partner) may be separately liable therefor in a capacity other than as a partner.

(d) *Time of determination*. A partner's share of partnership liabilities must be determined whenever the determination is necessary in order to determine the tax liability of the partner or any other person. See §1.705–1(a) for rules regarding when the adjusted basis of a partner's interest in the partnership must be determined.

*§1.752–5 Effective dates and transition rules*.

(a) *In general*. Unless a partnership makes an election under paragraph (b)(1) of this section to apply the provisions of §§1 752–1 through 1 752–4 earlier, §§1.752–1 through 1.752–4 apply to any liability incurred or assumed by a partnership on or after December 28, 1991, other than a liability incurred or assumed by the partnership pursuant to a written binding contract in effect prior to December 28, 1991 and at all times thereafter.

(b) *Election*—(1) *In general*. A partnership may elect to apply the provisions of §§1 752–1 through 1.752–4 as of the beginning of the first taxable year of the partnership ending on or after December 28, 1991.

(2) *Time and manner of election*. An election under this paragraph (b) is made by attaching a written statement to the partnership return for the first taxable year of the partnership ending on or after December 28, 1991. The written statement must include the name, address, and taxpayer identification number of the partnership making the statement and contain a declaration that an election is being made under this paragraph (b)

(c) *Effect of section 708(b)(1)(B) termination on determining date liabilities are incurred or assumed*. For purposes of applying this section, a terminationof the partnership under section 708(b)(1)(B) will not cause partnership liabilities incurred or assumed prior to the termination to be treated as incurred or assumed on the date of the termination

Fred T. Goldberg, Jr.,
*Commissioner of Internal Revenue*.

(Filed by the Office of the Federal Register on July 26, 1991, 2 27 p m , and published in the issue of the Federal Register for July 31, 1991, 56 F R 36704)

---

## Notice of Proposed Rulemaking

## Excise Tax on Chemicals That Deplete the Ozone Layer; Special Rule for Floor Stocks Tax Imposed in 1991

**PS–60–91**

AGENCY· Internal Revenue Service, Treasury.

ACTION: Notice of proposed rulemaking by cross-reference to temporary regulations.

SUMMARY. In *** [T.D. 8356, page 400, this Bulletin], the Internal Revenue Service is issuing temporary regulations relating to the tax on chemicals that deplete the ozone layer The text of those temporary regulations also serves as the comment document for this notice of proposed rulemaking

DATES: Written comments and requests for a public hearing must be received by September 13, 1991.

ADDRESSES: Send comments and requests for a public hearing to: Internal Revenue Service, P O Box 7604, Ben Franklin Station, Washington, D C. 20044 (Attention. CC.CORP:T.R (PS–60–91), Room 5228) In the alternative, comments and requests may be hand delivered to. CC.CORP T.R (PS–60–91), Internal Revenue Service, Room 5228, 1111 Constitution Avenue, N W., Washington D.C. 20224.

SUPPLEMENTARY INFORMATION.

*Background*

Temporary regulations in *** [T D. 8356, page 400, this Bulletin] amend the Environmental Tax Regulations (26 CFR part 52) relating to section 4682 of the Internal Revenue Code. The temporary regulations contain rules relating to the floor stocks tax on chemicals that deplete the ozone layer.

This document proposes to adopt the temporary regulations as final regulations Accordingly, the text of the temporary regulations serves as the comment document for this notice of proposed rulemaking. For the text of the temporary regulations, see T D 8356 published in *** [page 400, this Bulletin] The preamble to the temporary regulations explains the proposed and temporary rules.

*Special Analyses*

It has been determined that these proposed rules are not major rules as defined in Executive Order 12291 Therefore, a Regulatory Impact Analysis is not required. It also has been determined that section 553(b) of the Administrative Procedure Act (5 U S C chapter 5) and the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply to these regulations, and therefore, an initial Regulatory Flexibility Analysis is not required. Pursuant to section 7805(f) of the Internal Revenue Code, these regulations will be submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

*Comments and Requests for a Public Hearing*

Before these proposed regulations are adopted, consideration will be given to any written comments that are submitted (preferably a signed original and seven copies) to the Internal Revenue Service All comments will be available for public inspection and copying. A public hearing will be scheduled and held upon written request to the Internal Revenue Service by any person who also submits written comments. If a public hearing is scheduled, notice of the time and place will be published in the Federal Register.

Fred T. Goldberg, Jr ,
*Commissioner of Internal Revenue*

(Filed by the Office of the Federal Register on August 13, 1991, 8 45 a m , and published in the issue of the Federal Register for August 14, 1991, 56 F R 40286)

*United States Senate*

***PERMANENT SUBCOMMITTEE ON INVESTIGATIONS***

*Committee on Governmental Affairs*

*Norm Coleman, Chairman*
*Carl Levin, Ranking Minority Member*

# U.S. TAX SHELTER INDUSTRY: THE ROLE OF ACCOUNTANTS, LAWYERS, AND FINANCIAL PROFESSIONALS

## FOUR KPMG CASE STUDIES: FLIP, OPIS, BLIPS, AND SC2

## REPORT

PREPARED BY THE

## MINORITY STAFF
OF THE
## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

RELEASED IN CONJUNCTION WITH THE
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS' HEARINGS
ON NOVEMBER 18 & 20, 2003

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . . 1

II. FINDINGS . . . . . . 4

III. EXECUTIVE SUMMARY . . . . . . 5
A. Developing New Tax Products . . . . . . 7
B. Mass Marketing Tax Products . . . . . . 8
C. Implementing Tax Products . . . . . . 9
D. Avoiding Detection . . . . . . 13
E. Disregarding Professional Ethics . . . . . . 15

IV. RECOMMENDATIONS . . . . . . 16

V. OVERVIEW OF U.S. TAX SHELTER INDUSTRY . . . . . . 18
A. Summary of Current Law on Tax Shelters . . . . . . 18
B. U.S. Tax Shelter Industry and Professional Organizations . . . . . . 20

VI. FOUR KPMG CASE HISTORIES . . . . . . 23
A. KPMG In General . . . . . . 23
B. KPMG's Tax Shelter Activities . . . . . . 25
(1) Developing New Tax Products . . . . . . 30
(2) Mass Marketing Tax Products . . . . . . 47
(3) Implementing Tax Products . . . . . . 67
a. KPMG's Implementation Role . . . . . . 67
b. Role of Third Parties in Implementing KPMG Tax Products . . . . . . 77
(4) Avoiding Detection . . . . . . 99
(5) Disregarding Professional Ethics . . . . . . 109

APPENDIX A. CASE STUDY OF BOND LINKED ISSUE PREMIUM STRUCTURE (BLIPS) . . . . . . 120

APPENDIX B. CASE STUDY OF S-CORPORATION CHARITABLE CONTRIBUTION STRATEGY (SC2) . . . . . . 123

APPENDIX C. OTHER KPMG INVESTIGATIONS OR ENFORCEMENT ACTIONS . . 125

# U.S. TAX SHELTER INDUSTRY: THE ROLE OF ACCOUNTANTS, LAWYERS, AND FINANCIAL PROFESSIONALS

## FOUR KPMG CASE STUDIES: FLIP, OPIS, BLIPS, AND SC2

## I. Introduction

In 2002, the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, at the direction of Senator Carl Levin, then its Chairman, initiated an in-depth investigation into the development, marketing, and implementation of abusive tax shelters by professional organizations such as accounting firms, banks, investment advisors, and law firms. The information in this Report is based upon the ensuing bipartisan investigation conducted jointly by the Subcommittee's Democratic and Republican staffs, with the support of Subcommittee Chairman Norm Coleman.

During the course of its investigation, the Subcommittee issued numerous subpoenas and document requests, and the Subcommittee staff reviewed over 235 boxes, and several electronic compact disks, containing hundreds of thousands of pages of documents, including tax product descriptions, marketing material, transactional documents, manuals, memoranda, correspondence, and electronic mail. The Subcommittee staff also conducted numerous, lengthy interviews with representatives of accounting firms, banks, investment advisory firms, and law firms. In addition, the Subcommittee staff reviewed numerous statutes, regulations, legal pleadings, reports, and legislation, dealing with federal tax shelter law. The staff consulted with federal and state agencies and various accounting, tax and financial experts, including the U.S. Department of the Treasury, U.S. Internal Revenue Service (IRS), Public Company Accounting Oversight Board (PCAOB), California Franchise Tax Board, tax experts on the staffs of the Joint Commission on Taxation, Senate Committee on Finance, and House Committee on Ways & Means, various tax professionals, and academic experts, and other persons with relevant information.

The evidence reviewed by the Subcommittee establishes that the development and sale of potentially abusive and illegal tax shelters have become a lucrative business in the United States, and professional organizations like major accounting firms, banks, investment advisory firms, and law firms have become major developers and promoters. The evidence also shows that respected professional firms are spending substantial resources, forming alliances, and developing the internal and external infrastructure necessary to design, market, and implement hundreds of complex tax shelters, some of which are illegal and improperly deny the U.S. Treasury of billions of dollars in tax revenues.

The term "tax shelter" has come to be used in a variety of ways depending upon the context. In the broadest sense, a tax shelter is a device used to reduce or eliminate the tax liability of the tax shelter user. Some tax shelters are specific tax benefits explicitly enacted by Congress to advance a legitimate endeavor, such as the low income housing tax credit. Those types of legitimate tax shelters are not the focus of this Report. The tax shelters under investigation by the Subcommittee are complex transactions used by corporations or individuals to obtain significant tax benefits in a manner never intended by the tax code. These transactions have no economic substance or business purpose other than to reduce or eliminate a person's tax liability. These abusive tax shelters can be custom-designed for a single user or prepared as a generic "tax product" available for sale to multiple clients. The Subcommittee investigation focuses on the abusive tax shelters sold as generic tax products available to multiple clients.

Under current law, generic tax shelters are not illegal per se; they are potentially illegal depending upon how purchasers actually use them and calculate their tax liability on their tax returns. Over the last five years, the IRS has begun publishing notices identifying certain generic tax shelters as "potentially abusive" and warning taxpayers that use of such "listed transactions" may lead to an audit and assessment of back taxes, interest, and penalties for using an illegal tax shelter. As used in this Report, "potentially abusive" tax shelters are those that come within the scope of an IRS "listed transaction," while "illegal" tax shelters are those with respect to which the IRS has taken actual enforcement action against taxpayers for violating federal tax law.

The Subcommittee investigation perceives an important difference between selling a potentially abusive or illegal tax shelter and providing routine tax planning services. None of the transactions examined by the Subcommittee derived from a request by a specific corporation or individual for tax planning advice on how to structure a specific business transaction in a tax-efficient way; rather all of the transactions examined by the Subcommittee involved generic tax products that had been affirmatively developed by a firm and then vigorously marketed to numerous, in some cases thousands, of potential buyers. There is a bright line difference between responding to a single client's tax inquiry and aggressively developing and marketing a generic tax shelter product. While the tax shelter industry of today may have sprung from the former, it is now clearly driven by the latter.

In order to gain a deeper understanding of the issues, the Subcommittee conducted four in-depth case studies examining tax products sold by a leading accounting firm, KPMG, to individuals or corporations to help them reduce or eliminate their U.S. taxes. KPMG is one of the largest accounting firms in the world, and it had built a reputation as a respected auditor and expert tax advisor. KPMG vigorously denies being a tax shelter promoter, but the evidence obtained as a result of the Subcommittee investigation is overwhelming in demonstrating KPMG's active and, at times, aggressive role in promoting and profiting from generic tax products sold to individuals and corporations, including tax products later determined by the IRS to be potentially abusive or illegal tax shelters.

Earlier this year, KPMG informed the Subcommittee that it maintained an inventory of over 500 "active tax products" designed to be offered to multiple clients for a fee. The four KPMG case studies featured in this Report are the Bond Linked Issue Premium Structure (BLIPS), Foreign

Leveraged Investment Program (FLIP), Offshore Portfolio Investment Strategy (OPIS), and the S-Corporation Charitable Contribution Strategy (SC2). KPMG sold these four tax products to more than 350 individuals from 1997 to 2001. All four generated significant fees for the firm, producing total revenues in excess of $124 million.[1] The IRS later determined that three of the products, BLIPS, FLIP, and OPIS, were potentially abusive or illegal tax shelters, while the fourth, SC2, is still under review. As of June 2002, an IRS analysis of just some of the tax returns associated with BLIPS, FLIP, and OPIS had identified 186 people who had used BLIPS to claim losses on their tax returns totaling $4.4 billion, and 57 people who had used FLIP or OPIS to claim tax losses of $1.4 billion, for a grand total of $5.8 billion.[2] Evidence made available to the Subcommittee suggests that lost tax revenues are also significant, including documents which show that, for 169 out of 186 BLIPS participants for which information was recorded, federal tax revenues were reduced by $1.4 billion.

Some members of the U.S. tax profession are apparently claiming that the worst tax shelter abuses are already over, so there is no need for investigations, reforms, or stronger laws. The Subcommittee investigation, however, indicates just the opposite: while a few tax shelter promoters have ended their activities, the tax shelter industry as a whole remains active, developing new products, marketing dubious tax shelters to numerous individuals and corporations, and continuing to wrongfully deny the U.S. Treasury billions of dollars in revenues, leaving average U.S. taxpayers to make up the difference.

---

[1]Letter dated 9/12/03, from KPMG's legal counsel, Wilkie Farr & Gallagher, to the Subcommittee, at 2. According to KPMG information provided to the Subcommittee in this letter and a letter dated 8/8/03, FLIP was sold to 80 persons, in 63 transactions, and produced total gross revenues for the firm of about $17 million over a four-year period, 1996-1999. OPIS was sold to 111 persons in 79 transactions, and produced about $28 million over a two-year period, 1998-1999 BLIPS, the largest revenue generator, was sold to 186 persons in 186 transactions, and produced about $53 million over a one-year period from about October 1999 to about October 2000 SC2 was sold to 58 S corporations in 58 transactions, and produced about $26 million over an 18-month period from about March 2000 to about September 2001. Other information presented to the Subcommittee suggests these revenue figures may be understated and that, for example, BLIPS generated closer to $80 million in fees for the firm, OPIS generated over $50 million, and SC2 over $30 million

[2]United States v. KPMG, Case No 1. 02MS00295 (D.D.C 7/9/02), "Declaration of Michael A Halpert," Internal Revenue Agent, at ¶37.

## II. Findings

Based upon its investigation to date, the Subcommittee Minority staff recommends that the Subcommittee make the following findings of fact.

(1) The sale of potentially abusive and illegal tax shelters has become a lucrative business in the United States, and some professional firms such as accounting firms, banks, investment advisory firms, and law firms are major participants in the mass marketing of generic "tax products" to multiple clients.

(2) Although KPMG denies being a tax shelter promoter, the evidence establishes that KPMG has devoted substantial resources to, and obtained significant fees from, developing, marketing, and implementing potentially abusive and illegal tax shelters that U.S. taxpayers might otherwise have been unable, unlikely or unwilling to employ, costing the Treasury billions of dollars in lost tax revenues.

(3) KPMG devotes substantial resources and maintains an extensive infrastructure to produce a continuing supply of generic tax products to sell to multiple clients, using a process which pressures its tax professionals to generate new ideas, move them quickly through the development process, and approve, at times, potentially abusive or illegal tax shelters.

(4) KPMG uses aggressive marketing tactics to sell its generic tax products, including by turning tax professionals into tax product salespersons, pressuring its tax professionals to meet revenue targets, using telemarketing to find clients, using confidential client tax data to identify potential buyers, targeting its own audit clients for sales pitches, and using tax opinion letters and insurance policies as marketing tools.

(5) KPMG is actively involved in implementing the tax shelters which it sells to its clients, including by enlisting participation from banks, investment advisory firms, and tax exempt organizations; preparing transactional documents; arranging purported loans; issuing and arranging opinion letters, providing administrative services, and preparing tax returns.

(6) Some major banks and investment advisory firms have provided critical lending or investment services or participated as essential counter parties in potentially abusive or illegal tax shelters sold by KPMG in return for substantial fees or profits.

(7) Some law firms have provided legal services that facilitated KPMG's development and sale of potentially abusive or illegal tax shelters, including by providing design assistance or collaborating on allegedly "independent" opinion letters representing to clients that a tax product would withstand an IRS challenge, in return for substantial fees.

(8) Some charitable organizations have participated as essential counter parties in a highly questionable tax shelter developed and sold by KPMG, in return for donations or the promise of future donations.

(9) KPMG has taken a number of measures to conceal its tax shelter activities from tax authorities and the public, including by refusing to register potentially abusive tax shelters with the IRS, restricting file documentation, and using improper tax return reporting techniques.

## III. Executive Summary

The Subcommittee's investigation into the role of professional organizations in the tax shelter industry has identified two fundamental, relatively recent changes in how the industry operates.

First, the investigation has found that the tax shelter industry is no longer focused primarily on providing individualized tax advice to persons who initiate contact with a tax advisor. Instead, the industry focus has expanded to developing a steady supply of generic "tax products" that can be aggressively marketed to multiple clients. In short, the tax shelter industry has moved from providing one-on-one tax advice in response to tax inquiries to also initiating, designing, and mass marketing tax shelter products.

Secondly, the investigation has found that numerous respected members of the American business community are now heavily involved in the development, marketing, and implementation of generic tax products whose objective is not to achieve a business or economic purpose, but to reduce or eliminate a client's U.S. tax liability. Dubious tax shelter sales are no longer the province of shady, fly-by-night companies with limited resources. They are now big business, assigned to talented professionals at the top of their fields and able to draw upon the vast resources and reputations of the country's largest accounting firms, law firms, investment advisory firms, and banks.

The four case studies featured in this Report examine tax products developed by KPMG, a respected auditor and tax expert and one of the top four accounting firms in the United States. In the latter half of the 1990s, according to KPMG employees interviewed by Subcommittee staff, KPMG's Tax Services Practice underwent a fundamental change in direction by embracing the development of generic tax products and pressing its tax professionals to sell them. KPMG now maintains an inventory of more than 500 active tax products and routinely presses its tax professionals to participate in tax product marketing campaigns.

Three of the tax products examined by the Subcommittee, FLIP, OPIS, and BLIPS, are similar in nature. In fact, BLIPS was developed as a replacement for OPIS which was developed as a replacement for FLIP.[3] All three tax products function as "loss generators," meaning they generate large paper losses that the purchaser of the product then uses to offset other income, and shelter it

---

[3]See, e.g., document dated 5/18/01, "PFP Practice Reorganization Innov tive Strategies Business Plan – DRAFT," authored by Jeffrey Eischeid, Bates KPMG 0050620-23, at 1.

from taxation.[4] All three products have generated hundreds of millions of dollars in phony paper losses for taxpayers, using a series of complex, orchestrated transactions involving shell corporations, structured finance, purported multi-million dollar loans, and deliberately obscure investments.[5] All three also generated substantial fees for KPMG, with BLIPS and OPIS winning slots among KPMG's top ten revenue producers in 1999 and 2000, before sales were discontinued. All three tax products are also covered by the "listed transactions" that the IRS has published and declared to be potentially abusive tax shelters.[6] In all three cases, the IRS has already begun requiring taxpayers who used these products to pay back taxes, interest, and penalties. Over a dozen taxpayers penalized by the IRS for using these tax products have subsequently filed suit against KPMG for selling them an illegal tax shelter.[7]

The fourth tax product, SC2, is described by KPMG as a "charitable contribution strategy."[8] It is directed at individuals who own profitable corporations organized under Chapter S of the tax code (hereinafter "S corporations"), which means that the corporation's income is attributed directly to the corporate owners and taxable as personal income. SC2 is intended to generate a tax deductible charitable donation for the corporate owner and, more importantly, to defer and reduce taxation of a substantial portion of the income produced by the S corporation, essentially by "allocating" but not actually distributing that income to a tax exempt charity holding the corporation's stock. Like BLIPS, FLIP, and OPIS, SC2 requires a series of complex, orchestrated transactions to obtain the promised tax benefits. Among other measures, these transactions involve the issuance of non-voting stock and warrants, a corporate non-distribution resolution, and a stock redemption agreement; a temporary donation of the non-voting stock to a charity; and various steps to "allocate" but not distribute corporate income to the tax exempt charity.[9] Early in its development, KPMG tax professionals referred to SC2 as "S-CAEPS," pronounced "escapes." The name was changed after a senior tax official pointed out: "I think the last thing we or a client would want is a letter in the files regarding a tax planning strategy for which the acronym when pronounced sounds like we are saying 'escapes.'"[10]

---

[4]Id. See also document dated 7/21/99, entitled "Action Required," authored by Jeff Eischeid, Bates KPMG 0040502 (In the case of BLIPS, "a key objective is for the tax loss associated with the investment structure to offset/shelter the taxpayer's other, unrelated, economic profits ").

[5]See Appendix A for a more detailed explanation of BLIPS.

[6]FLIP and OPIS are covered by IRS Notice 2001-45 (2001-33 IRB 129)(8/13/01), while BLIPS is covered by IRS Notice 2000-44 (2000-36 IRB 255)(9/5/00). See also United States v KPMG, Case No. 1·02MS00295 (D D C 9/6/02)

[7]See, e.g., Jacoboni v KPMG, Case No. 6 02-CV-510 (M D. Fla 4/29/02)(OPIS), Swartz v KPMG, Case No. C03-1252 (W.D Wash. 6/6/03)(BLIPS); Thorpe v. KPMG, Case No. 5-030CV-68 (E.D N.C. 1/27/03)(FLIP/OPIS).

[8]The formal title of the tax product is the S-Corporation Charitable Contribution Strategy.

[9]See Appendix B for a more detailed explanation of SC2.

[10]Email dated 3/24/00, from Mark Springer to multiple KPMG tax professionals, "RE: S-corp Product," Bates KPMG 0016515 See also email dated 3/24/00, from Mark Springer to multiple KPMG tax professionals, "Re. S-corp Product," Bates 0016524 (suggesting replacing "all S-CAEPS references with something much more

In 2000 and 2001, SC2 was one of KPMG's top ten revenue producers. SC2 is not covered by one of the "listed transactions" issued by the IRS, but is currently undergoing IRS review.[11]

Together, these four case histories, BLIPS, FLIP, OPIS, and SC2, provide an in-depth portrait of how a professional organization like KPMG, and the professional organizations it allies itself with, end up developing, marketing, and implementing highly questionable or illegal tax products. The evidence also sheds light on the critical roles played by other professional organizations to make suspect tax products work.

## A. Developing New Tax Products

The Subcommittee investigation has found that the tax product development and approval process used at KPMG was deeply flawed and led, at times, to the approval of tax products that the firm knew were potentially abusive or illegal. Among other problems, the evidence shows that the KPMG approval process has been driven by market considerations, such as consideration of a product's revenue potential and "speed to market," as well as by intense pressure that KPMG supervisors have placed on subordinates to "sign-off" on the technical merits of a proposed product even in the face of serious questions about its compliance with the law.

The case of BLIPS illustrates the problems. Evidence obtained by the Subcommittee discloses an extended, unresolved debate among KPMG tax professionals over whether BLIPS met the technical requirements of federal tax law. In 1999, the key KPMG technical reviewer resisted approving BLIPS for months, despite repeated expressions of dismay from superiors. He finally agreed to withdraw his objections to the product in this email sent to his supervisor: "I don't like this product and would prefer not to be associated with it [but] I can reluctantly live with a more-likely-than-not opinion being issued for the product." This assessment is not exactly the solid endorsement that might be expected for a tax product sold by a major accounting firm.

The most senior officials in KPMG's Tax Services Practice exchanged emails which frankly acknowledged the problems and reputational risks associated with BLIPS, but nevertheless supported putting it on the market for sale to clients. One senior tax professional summed up the pending issues with two questions:

> " (1) Have we drafted the opinion with the appropriate limiting bells and whistles ... and (2) Are we being paid enough to offset the risks of potential litigation resulting from the transaction? ... My own recommendation is that we should be paid a lot of money here for our opinion since the transaction is clearly one that the IRS would view as falling squarely within the tax shelter orbit."

---

benign").

[11]See email dated 4/10/02, from US-Tax Innovation Center to multiple KPMG tax professionals, "IRS Summons Information Request for SC2," Bates XX 001433 ("The IRS has requested certain information from the Firm related to SC2."), undated KPMG document entitled, "April 18 IRS Summons Response."

STANFORD LAW SCHOOL

Joseph Bankman
Professor of Law

Crown Quadrangle
Stanford, CA 94305-8610
(415) 725-3825

July 1, 1994

Internal Revenue Service
CC:DOM:CORP:T:R (PS-27-94)
Courier's Desk, Internal Revenue Service
1111 Constitution Avenue, NW
Washington, DC. 20044

Re: Proposed Regulation §1.701-2

Dear Sir or Madam:

I am writing to comment on Proposed Regulation §1.701-2, which I support. The Proposed Regulation, summarized briefly, provides that Subchapter K rules will be applied literally only in situations in which such tax treatment is consistent with the purpose of that Subchapter and other relevant statutory provisions. A number of commentators on the regulation have stated that, whatever role purpose-based interpretation is given in other areas of the law, or the tax law, it should have no role here. Subchapter K and the companion provisions of Subchapters C and S are thought by such commentators to be so arbitrary as to admit only the most literal interpretation. Some commentators have made the additional claim that, in light of the incoherent manner in which business enterprise is now taxed, fairness and efficiency is furthered by allowing taxpayers to use any superficially plausible interpretation of the law to reduce tax liability. In that manner, all taxpayers will be able to achieve the favorable tax results now available only to some taxpayers.

The weakness of both claims can, I believe, be shown by examining the application of the Proposed Regulation to some recent abusive transactions that have apparently motivated it. In addition, the first claim assumes that as an alternative to the Proposed Regulation, it is possible to have clear, self-executing rules that do not require purposive interpretation by the courts. As discussed below, I believe that assumption is wrong; that is, all statutory regimens require purpose-based interpretation.

Finally, some commentators have suggested that while there is nothing wrong with what the Treasury Department is trying to accomplish with the Proposed Regulation, existing common-law doctrines already give it all the power it needs. Obviously, this argument -- that the Proposed Regulation is redundant with existing law -- is in tension with the first set of claims that

release

the Regulation will extend in undesirable ways the IRS's existing discretionary power. As discussed below, I agree that the IRS already has the power to do what it seeks to do under the Proposed Regulation, in part through existing common-law doctrines, but think some redundancy in this area is at worst harmless, and may well have some real virtues.

## Targeted Transactions

The Proposed Regulation appears to have been motivated at least in part by three recent abusive transactions. The first is often referred to as a "reverse MIPs." In simplified form, in a reverse MIPs a corporation sells preferred stock to a newly-formed controlled partnership. The partnership raises capital by issuing debt to the public, and transfers that capital up to its corporate owner as consideration for the preferred stock. Payments on the debt are made by the partnership out of distributions it receives on the preferred stock. If payments on the preferred stock are in arrears, interest on the public debt will be in arrears. In that event, the public bondholders will assume direct ownership of the partnership's sole asset, the preferred stock. The bondholders will have no recourse against the corporation.

The corporation takes the position that the preferred stock distributions received by the partnership and allocated to the corporation under the partnership agreement are nontaxable distributions on its own stock. The corporation takes the further position that it should be able to deduct its allocable share of the interest the partnership pays to public bondholders. The net result is that the corporation deducts an amount essentially identical to the distributions paid on its preferred stock. It is obvious that the sole purpose for structuring the transaction this way, rather than in the more straightforward form of issuing preferred stock directly to its "bondholders," is to convert an otherwise undeductible dividend payment to deductible interest. The taxpayer's position is supported by a facially plausible reading of certain statutes and rulings -- provided one ignores other relevant statutes, legislative intent and accepted principles of corporate taxation.

Reverse MIPs have been defended on the grounds that the distinction between preferred stock and subordinated debt is often quite minor; that many corporations are limited by regulators or financial markets from issuing additional debt; and that the hoped-for tax consequences simply give this class of corporations the treatment other corporations achieve through debt. A related though somewhat more ambitious argument is that the entire system of "double taxation" of corporate income is ill-advised, and efforts of taxpayers to circumvent that system through deductions of dividends ought to be lauded, or at least tolerated.

*please*

The difficulty with the defense is obvious, even for those (including this author) who agree that current law is arbitrary and that integration is desirable. During the past two decades, Congress has repeatedly rejected integration proposals, including proposals that would allow companies a deduction for dividends paid. Instead, Congress continues to rely on the corporate tax for a substantial portion of government revenues. Given that the effect of reverse MIPs is to allow a company to deduct its dividends, in time, the use of reverse MIPs would eliminate that portion of the corporate tax now collected from income used to pay dividends on preferred stock. One does not have to put together a perfectly coherent picture of Subchapters K and C to conclude that it would be in derogation of Treasury's responsibilities to allow a taxpayer to put together literal readings of seemingly unrelated provisions to reach a result Congress has explicitly considered and rejected. (While not strictly relevant to the analysis, it is worth noting that the claimed-for efficiency and equity advantages of the reverse MIPs may be illusory. The case for a sensible form of integration may be quite strong; the case for the sort of ad hoc, piecemeal integration presented by reverse MIPs seems much weaker.)

A second set of transactions that rest upon an interpretation of a statute and regulations that seems plausible only if one ignores legislative and regulatory intent involve the use of partnerships in connection with so-called "income stripping" schemes. Under one such scheme, taxable persons form a partnership with a person who is effectively tax-exempt, such as a 501(c)(3) organization or a person with expiring NOLs. The partnership purchases a piece of equipment, such an airplane, and then enters into a long-term lease of that equipment. Shortly thereafter, the partnership sells its right to lease payments for a term of years. Under existing law, amounts received on the sale constitute income and no basis offset is allowed. The partnership recognizes taxable income even though it has not experienced any economic profit. This "phantom income" is allocated to the tax-exempt partner. The partnership agreement also provides that the tax-exempt partner will be allocated future depreciation on the equipment to offset current income. In the following year, however, the partnership buys back the partnership interest of the tax-exempt partner. At the time of liquidation, the capital account of the tax-exempt partner is "booked down" to reflect the future reductions due to the allocation of cost recovery-based losses.

The dollar consequences of the linked transactions are such that the tax-exempt party is bought out for its initial capital contribution, plus a fee for its willingness to take the "income hit" in year one. The tax consequences of the transactions are to leave the taxable partners with cash attributable to the sale of the lease payments but no income. In addition, the taxable partners recognize annual deductions for cost recovery on the



release

leased-out plane. Variants on this transaction may be found in partnerships that allocate to tax-exempt parties cancellation of indebtedness income or, due to a snafu in the installment sale rules, income from installment sales overstated by the understatement of basis recovery.

A third class of transactions relevant to this issue involve the interposition of a controlled partnership to avoid otherwise applicable statutory provisions. Perhaps the most well-publicized of instance of this type of transaction is found in Brown Group Inc., 102 TC No. 24, (1994), where the interposition of a controlled partnership allowed a corporation to defer recognition of income by avoiding the reach of Subpart F.

It is possible that problems created by the last two sets of transactions could be solved without recourse to the Proposed Regulation or the explicit invocation of other judicially-developed doctrines such as substance over form, business purpose or step transaction. As in the case of the Proposed Regulation, these doctrines are used to defeat transactions that comply with the letter of a particular statute but are inconsistent with any responsible notion of legislative intent or purpose. For example, the IRS might challenge the allocations at issue in income-stripping partnerships as insubstantial under the §704(b) regulations and the holding of Brown Group Inc. as incorrectly adopting the entity theory in questions of status rather than activity. See D. Shakow, How Now Brown K?, Tax Notes, June 27, 1994 at 1761. However, a court considering these challenges could not accept the government's position without adopting, however implicitly, some notion of legislative purpose of, or structure to, the law at issue. I see no reason why the government should not be able to invoke the Proposed Regulation, or existing common law doctrine, to challenge more directly the tax result sought in those transactions as inconsistent with any sensible interpretation of the law.

## Costs of the Proposed Regulation

It is of course one thing to identify discrete cases in which recourse to legislative intent and general principles is appropriate and another to conclude that the Proposed Regulation is desirable. Commentators have raised a number of objections to the Proposed Regulation. Some of these objections have been met by recent actions of the Service and now seem inapposite. For example, the fear that "rogue agents" will misuse or overuse the Proposed Regulation has been addressed by the government's announcement that field examiners will have authority to invoke the Proposed Regulation only in coordination with the National Office. Announcement 94-87.

Other objections rely on scenarios that seem to me far-



release

fetched. One prominent critic, for example, has argued that the regulation casts into doubt the ability to make garden variety special allocations of depreciation. One could dispute this claim at some length by pointing out that the present ability of taxpayers to make such allocations is not an unintended byproduct of statute or regulation but was directly contemplated by the drafters of that regulation; that such ability has long been a part of the law and has produced significant reliance interests, making it an altogether unlikely object of IRS attack; that the Preamble to the regulations seems to eschew explicitly any intent to mount such an attack; that taxpayers would challenge any attack in court and raise these and other issues, and so on. One suspects, however, that those voicing this objection do not actually believe the IRS will use the Proposed Regulation in this manner and will not advise clients to forgo the benefits of the garden variety special allocation due to the increased risk of IRS challenge.

A more serious objection to the Proposed Regulation is that, at least in the short run, it will increase the uncertainty lawyers and their clients face. All else equal, an increase in uncertainty is undesirable. A number of commentators have stated that the increased uncertainty attributable to the Proposed Regulation will have a chilling effect on a large class of investments. Is that fear well founded?

One way to approach this issue is to look at the experience the tax system has had with the judicially-developed doctrines mentioned earlier: substance over form, business purpose, step transaction and sham transaction. These doctrines, uniformly accepted by courts, are at least as vague in scope as the Proposed Regulation and apply to transactions both in and out of Subchapter K. Field agents have not been restricted in their use of these doctrines by the explicit requirement that such use be made only in coordination with the National Office. Have these doctrines discouraged productive investment? Is it possible to identify a class of transactions that would have added to the social product but were abandoned because of these doctrines? Would we be a wealthier society without those doctrines? I suspect most readers will find these questions rhetorical. The investment community has decades of experience with "anti-literalist" doctrine. As noted at a later point in this comment, I believe the investment community has more to fear from the tendency to overlegislate against loopholes than it does from adding to the Treasury's authority to interpret the law in a manner that takes into account legislative purpose.

### The legislative alternative

No one would expect our tax system to allow a transaction such as an income-stripping partnership to continue, year after



release

year, without some sort of government response. If we limit the power of the Treasury to attack such transactions by interpreting the law so as to give effect to general principles and/or legislative purpose, then we force the Treasury to rely increasingly on detailed rulemaking, either by asking Congress to rewrite existing law in a manner that explicitly (rather than implicitly) covers the activities in question or, as a middle ground, by further increasing the complexity of its own regulations.

One obvious disadvantage to the legislative approach is that it gives taxpayers a multi-year window in which to "cash in" on even the most egregious tax-driven transactions, so long as those transactions are supported by the literal language of one or more statutes. Enacting tax legislation is a lengthy process. The process cannot begin until the Service discovers a set of abusive transactions, which often does not occur until years after the transactions are first employed. Once drafted, even the most noncontroversial piece of tax legislation must await a tax bill, and then might be delayed or defeated due to other measures in that same bill. The delay inherent in the legislative approach may produce an ongoing revenue shortfall of substantial magnitude, much of which can be avoided by giving the Treasury the flexibility to respond under the principles of the Proposed Regulation or existing non-literalist doctrine.

The legislative approach has other disadvantages as well. While it is difficult to quantify, legislation probably increases the complexity of the law and so increases transaction costs. Problems of complexity would exist even if legislation, once enacted, were perfectly drafted. That, of course, is not the case. In the tax shelter area, at least, one persistent problem with legislation is its tendency to be overbroad. A good example of this is the passive loss rules. The rules are undoubtedly clearer than anti-formalist doctrine used to attack abusive tax shelters and in many respects the rules must be regarded as a success. But one undeniable aspect of §469 is that it denies current deductions even to investors who suffer economic and out-of-pocket losses on passive investments. Lawyers who oppose the Proposed Regulation out of concern for the effects it will have on the investment community may well be doing that community a disservice. The Proposed Regulation is likely to have less effect on productive investment than the first piece of legislation introduced in its stead.

As noted above, some attorneys may favor detailed administrative rule-making, rather than legislation, as an alternative to allowing the Service to use legislative purpose, as well as the plain language of a statute, in case-by-case application of the law. Unfortunately, administrative rule-making involves some of the same drawbacks of legislation: it is a lengthy process and regulations, like statutes, may be poorly



release

drafted. Perhaps the best example of how complex rule-making can become may be found in the §704(b) regulations -- the full meaning of which elude all but the most specialized practitioners.

### The Fallacy of Self-Executing Rules

Finally, those who have attacked the Proposed Regulation for undermining the clear-edged, literalist nature of tax law erroneously assume there is such a thing as facially obvious, self-executing laws. All systems of rules require interpretation. In some cases, the interpretation and interpretative method is so obvious as to be barely worthy of mention-- for example, the principle that a statute be interpreted according to the everyday meaning of its terms. In other cases, the proper interpretation of a rule might require investigation into legislative intent, or the relationship of the rule to an existing system of rules.

Interpretive problems in tax law are ubiquitous. In a typical beginning tax class, for example, in the first week students encounter interpretive issues in connection with the term "gift" and in deciding whether the term "income" ought to include various forms of nontransferable noncash benefits. In the second week of class, students encounter the "realization requirement," which has its origin and development not in the plain language of the Code but in the sensible and accepted judicial interpretation of that language. More sophisticated issues of interpretation arise in connection with doctrines such as "substance over form," "business purpose" and "step transaction" -- a subject to which I return below.

Perhaps not surprisingly, academics have gone to great lengths to describe the process by which a lawyer decides when the plain language of a statute must give way to an interpretation based on intent, or other factors. In general, academics have come to common sense conclusions with which practicing lawyers would agree. For example, academics believe that the vast majority of issues can and should be decided without recourse to legislative history or intent. Legislative intent or purpose becomes relevant, however, in those situations in which the seemingly "plain language" of a statute or rule admits more than one meaning, conflicts with the plain language of other statutes or a body of well accepted doctrine, or produces a nonsensical result. Tax lawyers should find nothing particularly mysterious or troublesome about that statement of intent. Interpreting statutes and regulations in this manner is an everyday task of the practicing lawyer.



release

The "Common Law" Alternatives

I have earlier analogized the Proposed Regulation to existing "non-literalistic" doctrines such as substance over form, sham transaction, step transaction and business purpose. This suggests, correctly, that I believe the Proposed Regulation is best seen as an additional arrow in the government's quiver, rather than as a fearsome "superweapon" in the government's arsenal. Indeed, I believe the Treasury has always had the residual, unstated power and responsibility to interpret the literal language of the law according to its underlying purpose. In addition, many transactions subject to attack under the Proposed Regulation will also be subject to attack under existing common-law doctrines, including the four listed above.

That leads to the last criticism that has been levelled against the Proposed Regulation: that it is unnecessary because the Treasury Department already has the authority it now seeks.

A few responses are in order here. First, redundancy of this sort hardly seems like a significant harm in itself. Second, it may well be a clear virtue, if its effect is to signal to the legal community the Treasury's clear intent to go after a class of abusive transactions in subchapter K. While the government has successfully challenged some of the more egregious classes of transactions, on the whole the government has not been able to hold the line against an increasingly aggressive tax bar. The fact that leading financial institutions were able to come up with opinions drafted by leading law firms for the sort of transactions discussed at the beginning of this comment indicates that present law, at least as commonly understood, may be inadequate to the task. In the eyes of the lawyers who drafted those opinions, clearly, existing common law doctrines such as substance over form or business purpose have little vitality.

Of course, the Proposed Regulation is not the only means to signal the advent of a more aggressive regulatory regime. A number of attorneys have suggested that the Treasury withdraw the Proposed Regulation in favor of an announcement that it intends to pursue abusive tax shelters more vigorously through existing common law doctrine. I think it may be useful to issue such an announcement, and, more importantly, to put new life in old doctrine with an active enforcement policy. As noted above, I also do not think the Proposed Regulation adds any power the Treasury does not now possess, under a combination of common-law anti-abuse doctrines and its residual powers to interpret tax laws in light of their underlying purpose. But I think signalling that intent through an explicit Regulation, rather than implied or common-law powers, has a valuable <u>in terrorem</u> effect in deterring the most aggressive behavior of the private tax bar. When coupled with examples of the sorts of abusive behavior the Regulation is meant to target, it would also give

private practitioners clearer guidance as to what is expected of them than would a general statement of the Service's intent to enforce doctrines like the "business purpose" rule more strictly -- a result they should applaud.

## Suggested Changes

That brings me to the last point. The Treasury has sought to clarify the intended operation of the Proposed Regulation through the examples supplied in the regulation, and through statements issued in the past few weeks. At the same time, the Treasury has been besieged by requests that it provide more examples as to the intended operation of the Proposed Regulation. To the extent the Treasury can supply further clarification without unduly limiting the scope of the Proposed Regulation I think it should do so. Further examples and statements will eliminate uncertainty with respect to the transactions covered and will give practitioners a better sense of how the Treasury intends to apply the Regulation to other transactions. Further examples will also reduce the sincere (but I believe unfounded) concerns many practitioners have as to the effect of the Proposed Regulation. I also believe the Treasury should provide timely advice to practitioners as to the effect of the Proposed Regulation on a given transactions, and should publicize (perhaps as Revenue Rulings or Procedures) significant internal decisions it takes as to the effect of the Proposed Regulation on a particular class of transactions.

The Treasury will find it impossible, however, to describe fully the circumstances under which the Proposed Regulation is to be applied. Such a full description requires an enumeration of all instances where proper interpretation of a rule requires reference to legislation intent and purpose. To the extent a necessarily incomplete list is taken as exhaustive, it also would undo much of the benefit from flexibility that the Regulation provides. Some uncertainty as to the precise limits of the Proposed Regulation is an unavoidable cost to the approach that Treasury has chosen. For reasons discussed above, I believe the benefits of the Proposed Regulation far outweigh that cost. I therefore support the proposed regulation.



release

I would be happy to answer any questions you may have about this comment, and would appreciate the opportunity to testify on the Proposed Regulation at the July 25th hearing.

Sincerely,

Joseph Bankman
Professor of Law and Helen L. Crocker Faculty Scholar