1995-7 I.R.B. 5, T.D. 8588, 1995 WL 966 (IRS TD), 60 FR 23, 60 FR 23-01

**(Cite as: 60 FR 23)**

RULES and REGULATIONS

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Part 1

[TD 8588]

RIN 1545-AS70

Subchapter K Anti-Abuse Rule

Tuesday, January 3, 1995

***23** AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulation.

SUMMARY: This document contains a final regulation providing an anti-abuse rule under subchapter K of the Internal Revenue Code of 1986 (Code). The rule authorizes the Commissioner of Internal Revenue, in certain circumstances, to recast a transaction involving the use of a partnership. The final regulation affects partnerships and the partners of those partnerships and is necessary to provide guidance needed to comply with the applicable tax law.

***24** EFFECTIVE DATES: This regulation is effective May 12, 1994, except that § 1.701-2 (e) and (f) are effective December 29, 1994.

FOR FURTHER INFORMATION CONTACT: Mary A. Berman or D. Lindsay Russell, (202) 622-3050 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

Introduction

This document adds §1.701-2 to the Income Tax Regulations (26 CFR part 1) under section 701 of the Code.

Background

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Subchapter K was enacted to permit businesses organized for joint profit to be conducted with "simplicity, flexibility, and equity as between the partners." S. Rep. No. 1622, 83d Cong., 2d Sess. 89 (1954); H.R. Rep. No. 1337, 83d Cong., 2d Sess. 65 (1954). It was not intended, however, that the provisions of subchapter K be used for tax avoidance purposes. For example, in enacting subchapter K, Congress indicated that aggregate, rather than entity, concepts should be applied if such concepts are more appropriate in applying other provisions of the Code. H.R. Conf. Rep. No. 2543, 83d Cong., 2d Sess. 59 (1954). Similarly, in later amending the rules relating to special allocations, Congress sought to "prevent the use of special allocations for tax avoidance purposes, while allowing their use for bona fide business purposes." S. Rep. No. 938, 94th Cong., 2d Sess. 100 (1976).

On May 12, 1994, the IRS and Treasury issued a notice of proposed rulemaking (59 FR 25581) under section 701 of the Code. That document proposed to add an anti-abuse rule under subchapter K. Comments responding to the notice were received, and a public hearing was held on July 25, 1994. After considering the comments that were received in response to the notice of proposed rulemaking and the statements made at the hearing, the IRS and Treasury adopt the proposed regulation as revised by this Treasury decision. The anti-abuse rule in this final regulation applies to the operation and interpretation of any provision of the Code and the regulations thereunder that may be relevant to a particular partnership transaction (including income, estate, gift, generation-skipping, and excise tax). The anti-abuse rule in the final regulation is expected primarily to affect a relatively small number of partnership transactions that make inappropriate use of the rules of subchapter K. The regulation is not intended to interfere with bona fide joint business arrangements conducted through partnerships.

Explanation of Provisions

A. Overview of Provisions

As noted above, subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are three requirements. First, the partnership must be bona fide and each partnership transaction (or series of related transactions) must be entered into for a substantial business purpose. Second, the form of each partnership transaction must be respected under substance over form principles. Third, the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income (referred to in the final regulation as proper reflection of income), except to the extent that a provision of subchapter K that is intended to promote administrative convenience or other policy objectives causes tax results that deviate from that requirement. In those cases, if the application of that provision of subchapter K and the ultimate tax results to the partners and the partnership, taking into account all

© 2006 Thomson/West. No Claim to Orig U.S. Govt. Works.

the relevant facts and circumstances, are clearly contemplated by that provision, the transaction is treated as properly reflecting the partners' income. In determining whether a transaction clearly reflects the partners' income, the principles of sections 446(b) and 482 apply.

The provisions of subchapter K must be applied to partnership transactions in a manner consistent with the intent of subchapter K. The final regulation clarifies the authority of the Commissioner to recast transactions that attempt to use partnerships in a manner inconsistent with the intent of subchapter K as appropriate to achieve tax results that are consistent with this intent, taking into account all the facts and circumstances.

In addition, the final regulation provides that the Commissioner can treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Code or regulations, except to the extent that (1) a provision of the Code or regulations prescribes the treatment of the partnership as an entity, and (2) that treatment and the ultimate tax results, taking into account all of the facts and circumstances, are clearly contemplated by that provision.

B. Discussion of Comments Relating to Provisions in the Regulation

Comments that relate to the application of the proposed regulation and the responses to them, including an explanation of the revisions made to the final regulation, are summarized below.

1. Scope of the Regulation

Several comments stated that, as drafted, the language in the proposed regulation was too broad and too vague to provide adequate guidance to taxpayers as to which transactions are affected by the regulation. Similarly, some comments suggested that the intent of subchapter K as stated in the proposed regulation (upon which the regulation operates) was overbroad and potentially conflicted with explicit statutory or regulatory provisions. Several comments expressed concern that the regulation, if finalized as proposed, would adversely affect the legitimate use of partnerships. Other comments suggested that additional examples should be added to clarify the scope of the regulation, which would provide the necessary guidance. Some of the comments requested that the regulation be withdrawn, or revised and reproposed.

On the other hand, other comments supported the approach in the proposed regulation, noting that it was well established that the provisions of the Code must be interpreted consistent with their purpose. Some of these comments noted that the regulation would in large part simply be codifying aspects of existing judicial doctrines, such as substance over form and business purpose, as they relate to partnership transactions. Finally, some of these comments suggested that the regulation be modified in various respects, including by adding additional examples of its application.

© 2006 Thomson/West. No Claim to Orig. U S. Govt. Works.

In response to these comments, the IRS and Treasury have revised the final regulation in three principal respects. First, the scope of the regulation has been clarified substantially by revising the portion captioned Intent of Subchapter K, in paragraph (a) of the proposed regulation. Paragraph (a) of the final regulation now specifically requires that (1) the partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose, (2) the form of each partnership transaction must be ***25** respected under substance over form principles, and (3) the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must, subject to certain exceptions, accurately reflect the partners' economic agreement and clearly reflect the partner's income (proper reflection of income). However, certain provisions of subchapter K that were adopted to promote administrative convenience or other policy objectives may, under certain circumstances, produce tax results that do not properly reflect income. To reflect the conscious choice in these instances to favor administrative convenience or such other objectives over the accurate measurement of income, the final regulation provides that proper reflection of income will be treated as satisfied with respect to the tax consequences of a partnership transaction that satisfies paragraphs (a) (1) and (2) of the final regulation to the extent the application of such a provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision. Examples of such provisions include section 732, the elective feature of section 754, and the value-equals-basis rule in §1.704-1(b)(2)(iii)(c), as well as regulatory de minimis rules such as those reflected in §§1.704-3(e)(1) and 1.752-2(e)(4). A number of examples in the final regulation demonstrate the proper application of these rules.

In addition, the revised Intent of Subchapter K set forth in paragraph (a) no longer provides that the provisions of subchapter K are not intended to permit taxpayers "to use the existence of the partnerships to avoid the purposes of other provisions of the Internal Revenue Code." Many comments expressed confusion regarding the scope of this clause. Other comments suggested that this clause should be limited to questions of the appropriate treatment of a partnership as an entity or as an aggregate of its partners for purposes of applying another provision of the Code. Some comments further suggested that the correct application of the aggregate/entity concept does not depend on the intent of the taxpayer in structuring the transaction.

This clause was principally intended to address aggregate/entity issues that exist under current law. The final regulation clarifies this aspect of the regulation by removing the clause from paragraph (a) and adding a new paragraph (e) to address inappropriate treatment of a partnership as an entity. Paragraph (e) confirms the Commissioner's authority to treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Code or the regulations thereunder. As stated in some comments, as well as under current law, the Commissioner's authority to treat a partnership

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as an aggregate of its partners is not dependent on the taxpayer's intent in structuring the transaction. However, the Commissioner may not treat the partnership as an aggregate of its partners under paragraph (e) to the extent that a provision of the Code or the regulations thereunder prescribes the treatment of a partnership as an entity, in whole or in part, and that treatment and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision. Underlying the promulgation of paragraph (e) is the belief that significant potential for abuse exists in the inappropriate treatment of a partnership as an entity in applying rules outside of subchapter K to transactions involving partnerships. Examples in new paragraph (f) illustrate the application of paragraph (e).

Paragraph (c) contains the second principal revision reflected in this final regulation. The corresponding paragraph in the proposed regulation provides that the purposes for structuring a transaction involving a partnership will be determined based on all of the facts and circumstances. In response to comments requesting guidance concerning the factors that will indicate that the taxpayers had a principal purpose to reduce substantially their aggregate federal tax liability in a manner inconsistent with the intent of subchapter K, paragraph (c) of the final regulation sets forth several of those factors.

Finally, in response to comments that the examples in the proposed regulation do not provide adequate guidance regarding the application of the regulation, as well as to suggestions that additional examples would help clarify the scope of the regulation, the final regulation contains numerous examples that illustrate the application of the regulation to specifically described transactions, including the weight to be given to relevant factors listed in paragraph (c) in the particular situations involved. The examples include transactions that are consistent with the intent of subchapter K as well as transactions that are inconsistent with the intent of subchapter K.

2. A Principal Purpose

The proposed regulation provides that if a partnership is formed or availed of in connection with a transaction or series of related transactions with a principal purpose of substantially reducing the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K, the Commissioner can disregard the form of the transaction. Some comments stated that all partnership transactions have a principal purpose of reducing federal taxes, and therefore, the standard should be changed from a principal purpose to the principal purpose. Other comments supported an "a principal purpose" standard, because the Commissioner can recast the transaction only if the tax results are also found to be inconsistent with the intent of subchapter K. Other comments stated that the taxpayer's intent should be irrelevant in all cases; rather, the inquiry should only be whether the results are inconsistent with the intent of subchapter K. Still other comments suggested that the taxpayer's intent should be irrelevant only in the case of aggregate/entity determinations.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The IRS and Treasury continue to believe that an inquiry into the taxpayer's intent generally is appropriate for an anti-abuse rule of this nature. As noted above, the regulation applies only if both (1) the taxpayer has a principal purpose to achieve substantial federal tax reduction, and (2) that tax reduction is inconsistent with the intent of subchapter K. Having a principal purpose to use a bona fide partnership to conduct business activities in a manner that is more tax efficient than any alternative means available does not establish that the resulting tax reduction is inconsistent with the intent of subchapter K. In those cases, the Commissioner cannot recast the transaction under this regulation. A number of examples in the final regulation demonstrate this point. Thus, the additional requirement in the regulation that the tax results be inconsistent with the intent of subchapter K sufficiently restricts the potential application of the regulation, so that the requirement of a principal purpose of federal tax reduction is appropriate.

By contrast, as noted above, the entity/aggregate determination under paragraph (e) of the final regulation does not require the taxpayer to have a principal purpose of substantially reducing taxes through misapplication of that principle. In this context, the IRS and Treasury agree with those ***26** comments that suggested that the entity/aggregate principle is properly applied, as under current law, solely on the basis of carrying out the purpose of the particular provision to be applied.

3. Scope of Commissioner's Ability To Recast Transactions

The proposed regulation provides that if a transaction is determined to be inconsistent with the intent of subchapter K and the taxpayer acted with the requisite principal purpose of federal tax reduction, the Commissioner can disregard the form of the transaction. The proposed regulation describes several ways in which a transaction could appropriately be recast. Some comments interpreted this language as attempting to provide the Commissioner with unlimited discretionary recharacterization powers, without guidance as to which recharacterization applies to a particular transaction. To address these concerns, paragraph (b) of the final regulation has been revised to clarify that the Commissioner may recast transactions only as appropriate to ensure that the tax treatment of each transaction is consistent with the intent of subchapter K.

4. Effective Date of the Regulation

The regulation was proposed to be effective for all transactions relating to a partnership occurring on or after May 12, 1994, the date the proposed regulation was issued. Some comments requested that, in order to address the regulation's effect on bona fide partnership transactions, it apply prospectively only from the date the final regulation is issued. In light of the significant revisions made in the final regulation that clarify and narrow its potential scope and application, the final regulation generally continues to be effective as of May 12, 1994. However, to preclude the possibility that the regulation could be interpreted to apply, for example, when a partner who received an asset from a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

partnership before the effective date disposes of the asset after the effective date, the final regulation has been revised to clarify that it applies only to transactions involving a partnership after the effective date. Also, in light of the elimination of the proposed requirement that the taxpayer must have a principal purpose to achieve substantial tax reduction in the case of aggregate/entity determinations under paragraph (e), paragraphs (e) and (f) are effective for all transactions involving a partnership on or after December 29, 1994. No inference is intended as to the treatment of partnership transactions prior to the applicable effective date of the regulation.

5. Relationship of the Regulation to Established Legal Doctrines

Several comments questioned the relationship between the regulation and established legal doctrines, such as the business purpose and substance over form doctrines (including the step transaction and sham transaction doctrines), which are designed to assure that the tax consequences of transactions under the Code are governed by their substance and that statutes and regulations are interpreted consistent with their purposes.

Partnerships, like other business arrangements, are subject to those doctrines. The application of those doctrines to partnership transactions is particularly important in light of (i) the flexibility of partnership arrangements, which can take myriad forms that are often of substantial complexity, and (ii) the tax rules for partnerships, which are also often complex and, in many cases, appear purely mechanical. A literal application of these partnership tax rules in contexts not contemplated by Congress has, in certain circumstances, resulted in taxpayers claiming tax results that are contrary to those doctrines.

The final regulation confirms certain fundamental principles that must, in all cases, be satisfied in applying the provisions of subchapter K to partnership transactions, to assure that those provisions are not used to achieve inappropriate tax results. While the fundamental principles reflected in the regulation are consistent with the established legal doctrines, those doctrines will also continue to apply.

So viewed, the uncertainty regarding the application of the regulation reflects the uncertainty that already exists in properly evaluating transactions under current law, including the proper application of existing legal doctrines. As a result, the regulation should not impose any undue administrative burdens on either taxpayers or the IRS.

C. Other Comments

1. Suggested Alternatives to the Regulation

While some comments stated that it is appropriate to include a general anti-abuse rule in the regulations to limit the misuse of the provisions of subchapter K, others claimed that was not necessary. These comments stated that the IRS and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Treasury already have sufficient means to challenge abusive partnership transactions and that existing authority should be used to address specific transactions as they are discovered. These comments suggested using the established legal doctrines, amending the section 704(b) regulations, and increasing partnership audits. These comments are discussed below.

In the past, the IRS and Treasury have attempted to address partnership transactions on a case-by-case basis. However, as recognized in those comments supporting a regulatory anti-abuse rule, experience has demonstrated that the case-by-case approach has been inadequate. A case-by-case approach arguably encourages non-economic, tax-motivated behavior by inappropriately putting a premium on being the first to engage in a transaction that would violate the principles of this regulation. The IRS and Treasury believe that the final regulation is a reasonable and effective way to reduce the number and magnitude of these abusive transactions. Moreover, the IRS and Treasury believe that proper application of the principles embodied in the regulation will forestall additional complexity in the Code and the regulations, by reducing the pressure for case-by-case legislative or regulatory revisions to prevent inappropriate use of the provisions of subchapter K.

Although the section 704(b) regulations are one example of the provisions of subchapter K that may be used inappropriately to reach results that are inconsistent with the intent of subchapter K, there are many other provisions of subchapter K that are being inappropriately applied to partnership transactions in a manner inconsistent with the intent of subchapter K. Therefore, an amendment to the section 704(b) regulations, by itself, is not sufficient.

Significant efforts are already underway to reduce the inappropriate use of subchapter K through increased resource allocation to partnership audits. This regulation is part of that focus on partnership transactions, and should not be viewed as an alternative to increased audits of partnerships. As part of this overall focus, a new team under the Industry Specialization Program has been established that will coordinate partnership audits and (together with the IRS National Office) the application of this regulation to partnership transactions. Thus, the IRS and Treasury believe that the regulation complements the increased enforcement of partnership transactions through enhanced audit activity.

2. Application by Revenue Agents

Many comments expressed concern that the regulation, if finalized as proposed, will not be applied ***27** appropriately by Revenue Agents. As stated in Announcement 94-87, 1994-27 I.R.B. 124, when an issue that may be affected by the regulation is considered on examination, any application of the regulation must be coordinated with both the Issue Specialist on the Partnership Industry Specialization Program team and the IRS National Office. The IRS and Treasury believe that this coordination, together with the many clarifying changes made in the final regulation, will result in fair and consistent treatment of taxpayers in the application of the final regulation to partnership transactions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3. Special Analyses and the Secretary's Authority

Some comments questioned the determination that the notice of proposed rulemaking was not a significant regulatory action as defined in EO 12866, as well as the determination that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) and the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply. Some comments also questioned the Secretary's authority to issue the regulation as proposed. The IRS and Treasury believe that the regulation complies with all statutory and regulatory requirements relating to the issuance of the notice of proposed rulemaking, and that it is clearly within the Secretary's authority to issue the final regulation. The final regulation clarifies that the authority for the regulation includes sections 701 through 761.

4. De Minimis Rule

In the preamble accompanying the proposed regulation, the IRS and Treasury solicited comments on the appropriateness of a safe harbor or de minimis rule. Some comments responded that a de minimis rule would be appropriate, and suggested delineating the rule on the basis of the number of partners, the value of the partnership assets, or the amount of the reduction in the present value of the partners' aggregate federal tax liability resulting from the transaction.

The requirement in the regulation that the present value of the partners' aggregate federal tax reduction must be substantial assures that the regulation will not be applied where the amounts involved are not significant. In addition, the IRS and Treasury believe that the clarifications made in the final regulation provide sufficient safeguards for bona fide joint business arrangements involving partnerships. For example, the exception from the proper reflection of income standard set forth in paragraph (a)(3) for transactions that are clearly contemplated by a particular provision of subchapter K provides appropriate safeguards for these business arrangements. Finally, the final regulation explicitly recognizes the application of specific statutory and regulatory de minimis rules in subchapter K. In light of these safeguards, the IRS and Treasury believe no additional specific safe harbor rules are needed.

Special Analyses

It has been determined that this Treasury decision is not a significant regulatory action as defined in EO 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) and the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply to this regulation, and, therefore, a Regulatory Flexibility Analysis is not required. Pursuant to section 7805(f) of the Internal Revenue Code, the notice of proposed rulemaking was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business. Comments were submitted and are addressed in the Supplementary Information section of this document.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

List of Subjects in 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

Amendments to the Regulations

Accordingly, 26 CFR part 1 is amended as follows:

PART 1--INCOME TAXES

Paragraph 1. The authority citation for part 1 is amended by adding an entry in numerical order to read as follows:

Authority: 26 U.S C. 7805 * * *

Section 1.701-2 also issued under 26 U.S.C. 701 through 761 * * *

Par. 2. Section 1.701-2 is added under the heading "Determination of Tax Liability" to read as follows:

§1.701-2 Anti-abuse rule.

(a) Intent of subchapter K. Subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are the following requirements--

(1) The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose.

(2) The form of each partnership transaction must be respected under substance over form principles.

(3) Except as otherwise provided in this paragraph (a)(3), the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income (collectively, proper reflection of income). However, certain provisions of subchapter K and the regulations thereunder were adopted to promote administrative convenience and other policy objectives, with the recognition that the application of those provisions to a transaction could, in some circumstances, produce tax results that do not properly reflect income. Thus, the proper reflection of income requirement of this paragraph (a)(3) is treated as satisfied with respect to a transaction that satisfies paragraphs (a)(1) and (2) of this section to the extent that the application of such a provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision. See, for example, paragraph (d) Example 8 of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section (relating to the value-equals-basis rule in §1.704-1(b)(2)(iii)(c)), paragraph (d) Example 11 of this section (relating to the election under section 754 to adjust basis in partnership property), and paragraph (d) Examples 12 and 13 of this section (relating to the basis in property distributed by a partnership under section 732). See also, for example, §§1.704-3(e)(1) and 1.752-2(e)(4) (providing certain de minimis exceptions).

(b) Application of subchapter K rules. The provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in paragraph (a) of this section (intent of subchapter K). Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even *28 though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Commissioner can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K--

(1) The purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners;

(2) One or more of the purported partners of the partnership should not be treated as a partner;

(3) The methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income;

(4) The partnership's items of income, gain, loss, deduction, or credit should be reallocated; or

(5) The claimed tax treatment should otherwise be adjusted or modified.

(c) Facts and circumstances analysis; factors. Whether a partnership was formed or availed of with a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is determined based on all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. The factors set forth below may be indicative, but do not necessarily establish, that a partnership was used in such a manner. These factors are illustrative only, and therefore may not be the only factors taken into account in making the determination under this section. Moreover, the weight given to any factor (whether specified in this paragraph or otherwise) depends on all the facts and circumstances. The presence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or absence of any factor described in this paragraph does not create a presumption that a partnership was (or was not) used in such a manner. Factors include:

(1) The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly;

(2) The present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated and treated as steps in a single transaction. For example, this analysis may indicate that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest in the partnership was liquidated or disposed of (in whole or in part) would be a partner only temporarily in order to provide the claimed tax benefits to the remaining partners;

(3) One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities (through distribution preferences, indemnity or loss guaranty agreements, or other arrangements), or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital;

(4) Substantially all of the partners (measured by number or interests in the partnership) are related (directly or indirectly) to one another;

(5) Partnership items are allocated in compliance with the literal language of §§ 1.704-1 and 1.704-2 but with results that are inconsistent with the purpose of section 704(b) and those regulations. In this regard, particular scrutiny will be paid to partnerships in which income or gain is specially allocated to one or more partners that may be legally or effectively exempt from federal taxation (for example, a foreign person, an exempt organization, an insolvent taxpayer, or a taxpayer with unused federal tax attributes such as net operating losses, capital losses, or foreign tax credits);

(6) The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or a related party); or

(7) The benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distributee partner (or a related party).

(d) Examples. The following examples illustrate the principles of paragraphs (a), (b), and (c) of this section. The examples set forth below do not delineate the boundaries of either permissible or impermissible types of transactions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Further, the addition of any facts or circumstances that are not specifically set forth in an example (or the deletion of any facts or circumstances) may alter the outcome of the transaction described in the example. Unless otherwise indicated, parties to the transactions are not related to one another.

Example 1. Choice of entity; avoidance of entity-level tax; use of partnership consistent with the intent of subchapter K. (i) A and B form limited partnership PRS to conduct a bona fide business. A, the corporate general partner, has a 1% partnership interest. B, the individual limited partner, has a 99% interest. PRS is properly classified as a partnership under §§301.7701-2 and 301.7701-3. A and B chose limited partnership form as a means to provide B with limited liability without subjecting the income from the business operations to an entity-level tax.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. Although B has retained, indirectly, substantially all of the benefits and burdens of ownership of the money or property B contributed to PRS (see paragraph (c)(6) of this section), the decision to organize and conduct business through PRS under these circumstances is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 2. Choice of entity; avoidance of subchapter S shareholder requirements; use of partnership consistent with the intent of subchapter K. (i) A and B form partnership PRS to conduct a bona fide business. A is a corporation that has elected to be treated as an S corporation under subchapter S. B is a nonresident alien. PRS is properly classified as a partnership under §§301.7701-2 and 301.7701-3. Because section 1361(b) prohibits B from being a shareholder in A, A and B chose partnership form, rather than admit B as a shareholder in A, as a means to retain the benefits of subchapter S treatment for A and its shareholders.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. Although it may be argued that the form of the partnership transaction should not be respected because it does not reflect its substance (inasmuch as application of the substance over form doctrine arguably could result in B being treated as a shareholder of A, thereby invalidating A's subchapter S election), the facts indicate otherwise. The shareholders of A are subject to tax on their pro rata shares of A's income (see section 1361 et seq.), and B is subject to tax on B's distributive share of partnership income (see sections 871 and 875). Thus, the form in which this arrangement is cast accurately reflects its substance as a separate partnership and S corporation. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Example 3. Choice of entity; avoidance of more restrictive foreign tax credit limitation; ***29** use of partnership consistent with the intent of subchapter K. (i) X, a domestic corporation, and Y, a foreign corporation, form partnership PRS under the laws of foreign Country A to conduct a bona fide joint business. X and Y each owns a 50% interest in PRS. PRS is properly classified as a partnership under §§301.7701-2 and 301.7701-3. PRS pays income taxes to Country A. X and Y chose partnership form to enable X to qualify for a direct foreign tax credit under section 901, with look-through treatment under §1.904-5(h)(1). Conversely, if PRS were a foreign corporation for U.S. tax purposes, X would be entitled only to indirect foreign tax credits under section 902 with respect to dividend distributions from PRS. The look-through rules, however, would not apply, and pursuant to section 904(d)(1)(E) and § 1.904-4(g), the dividends and associated taxes would be subject to a separate foreign tax credit limitation for dividends from PRS, a noncontrolled section 902 corporation.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS in order to take advantage of the look-through rules for foreign tax credit purposes, thereby maximizing X's use of its proper share of foreign taxes paid by PRS, is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 4. Choice of entity; avoidance of gain recognition under sections 351(e) and 357(c); use of partnership consistent with the intent of subchapter K. (i) X, ABC, and DEF form limited partnership PRS to conduct a bona fide real estate management business. PRS is properly classified as a partnership under §§ 301.7701-2 and 301.7701-3. X, the general partner, is a newly formed corporation that elects to be treated as a real estate investment trust as defined in section 856. X offers its stock to the public and contributes substantially all of the proceeds from the public offering to PRS. ABC and DEF, the limited partners, are existing partnerships with substantial real estate holdings. ABC and DEF contribute all of their real property assets to PRS, subject to liabilities that exceed their respective aggregate bases in the real property contributed, and terminate under section 708(b)(1)(A). In addition, some of the former partners of ABC and DEF each have the right, beginning two years after the formation of PRS, to require the redemption of their limited partnership interests in PRS in exchange for cash or X stock (at X's option) equal to the fair market value of their respective interests in PRS at the time of the redemption. These partners are not compelled, as a legal or practical matter, to exercise their exchange rights at any time. X, ABC, and DEF chose to form a partnership rather than have ABC and DEF invest directly in X to allow ABC and DEF to avoid recognition of gain under sections 351(e) and 357(c). Because PRS would not be treated as an investment company within the meaning of section 351(e) if PRS were incorporated (so long as it did not elect under section 856), section 721(a) applies to the contribution of the real property to PRS. See section 721(b).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS, thereby avoiding the tax consequences that would have resulted from contributing the existing partnerships' real estate assets to X (by applying the rules of sections 721, 731, and 752 in lieu of the rules of sections 351(e) and 357(c)), is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. Although it may be argued that the form of the transaction should not be respected because it does not reflect its substance (inasmuch as the present value of the partners' aggregate federal tax liability is substantially less than would be the case if the transaction were integrated and treated as a contribution of the encumbered assets by ABC and DEF directly to X, see paragraph (c)(2) of this section), the facts indicate otherwise. For example, the right of some of the former ABC and DEF partners after two years to exchange their PRS interests for cash or X stock (at X's option) equal to the fair market value of their PRS interest at that time would not require that right to be considered as exercised prior to its actual exercise. Moreover, X may make other real estate investments and other business decisions, including the decision to raise additional capital for those purposes. Thus, although it may be likely that some or all of the partners with the right to do so will, at some point, exercise their exchange rights, and thereby receive either cash or X stock, the form of the transaction as a separate partnership and real estate investment trust is respected under substance over form principles (see paragraph (a)(2) of this section). The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 5. Family partnership to conduct joint business activities; valuation discount; use of partnership consistent with the intent of subchapter K. (i) H and W, husband and wife, form limited partnership PRS by contributing their interests in actively managed, income-producing real property that PRS will own and operate. H holds a general partnership interest, and W holds a limited partnership interest. At a later date, W makes a gift of a portion of her limited partnership interest to each of H and W's two children, S and D. Appropriate discounts, consistent with the taxpayers' treatment of the arrangement as a partnership, were applied in determining the value of W's gifts to the children.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. Although PRS is owned entirely by related parties (see paragraph (c)(4) of this section), the decision to organize and conduct business through PRS under these circumstances is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. Therefore, absent other facts (such as the creation of the partnership immediately before the gifts by W), the Commissioner cannot invoke paragraph (b) of this section to recast the transaction. But see sections 2701 through 2704 for special valuation rules applicable to family arrangements for estate and gift tax purposes. See also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sections 2036 through 2039.

(iii) The special valuation rules provided under chapter 14 of the Code, in particular section 2701, prescribe certain special rules in valuing gifts of family controlled partnership interests. These special rules clearly contemplate that a bona fide partnership like PRS be treated as an entity and not as an aggregate of its partners for that purpose. Accordingly, under paragraph (e) of this section, the Commissioner cannot treat PRS as an aggregate of its partners for purposes of valuing the gifts from W to S and D.

Example 6. Family partnership not engaged in bona fide joint business activities; valuation discount; use of partnership not consistent with the intent of subchapter K. (i) H and W, husband and wife, form limited partnership PRS and contribute to it their respective interests in their vacation home. H holds a general partnership interest, and W holds a limited partnership interest. At a later date, W makes a gift of a portion of her limited partnership interest to each of H and W's two children, S and D. Discounts, consistent with the taxpayers' treatment of the arrangement as a partnership, were applied in determining the value of W's gifts to the children.

(ii) PRS is not bona fide and there is no substantial business purpose for the purported activities of PRS. In addition, by using a partnership (if respected), H and W's aggregate federal tax liability would be substantially less than had they owned the partnership's assets directly (see paragraph (c)(1) of this section). On these facts, PRS has been formed and availed of with a principal purpose to reduce H's and W's aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under applicable judicial principles, such as the substance over form doctrine, see paragraph (h) of this section), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.

Example 7. Special allocations; dividends received deductions; use of partnership consistent with the intent of subchapter K. (i) Corporations X and Y contribute equal amounts to PRS, a bona fide partnership formed to make joint investments. PRS pays $100 for a share of common stock of Z, an unrelated corporation, which has historically paid an annual dividend of $6. PRS specially allocates the dividend income on the Z stock to X to the extent of the London Inter-Bank Offered Rate (LIBOR) on the record date, applied to X's contribution of $50, and allocates the remainder of the dividend ***30** income to Y. All other items of partnership income and loss are allocated equally between X and Y. The allocations under the partnership agreement have substantial economic effect within the meaning of § 1.704-1(b)(2). In addition to avoiding an entity-level tax, a principal purpose for the formation of the partnership was to invest in the Z common stock and to allocate the dividend income from the stock to provide X with a floating-rate return based on LIBOR, while permitting X and Y to claim the dividends received deduction under section 243 on the dividends allocated to each of them.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. Section 704(b) and §1.704-1(b)(2) permit income realized by the partnership to be allocated validly to the partners separate from the partners' respective ownership of the capital to which the allocations relate, provided that the allocations satisfy both the literal requirements of the statute and regulations and the purpose of those provisions (see paragraph (c)(5) of this section). Section 704(e)(2) is not applicable to the facts of this example (otherwise, the allocations would be required to be proportionate to the partners' ownership of contributed capital). The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 8. Special allocations; nonrecourse financing; low-income housing credit; use of partnership consistent with the intent of subchapter K. (i) A and B, high-bracket taxpayers, and X, a corporation with net operating loss carryforwards, form general partnership PRS to own and operate a building that qualifies for the low-income housing credit provided by section 42. The project is financed with both cash contributions from the partners and nonrecourse indebtedness. The partnership agreement provides for special allocations of income and deductions, including the allocation of all depreciation deductions attributable to the building to A and B equally in a manner that is reasonably consistent with allocations that have substantial economic effect of some other significant partnership item attributable to the building. The section 42 credits are allocated to A and B in accordance with the allocation of depreciation deductions. PRS's allocations comply with all applicable regulations, including the requirements of §§1.704- 1(b)(2)(ii) (pertaining to economic effect) and 1.704-2(e) (requirements for allocations of nonrecourse deductions). The nonrecourse indebtedness is validly allocated to the partners under the rules of § 1.752-3, thereby increasing the basis of the partners' respective partnership interests. The basis increase created by the nonrecourse indebtedness enables A and B to deduct their distributive share of losses from the partnership (subject to all other applicable limitations under the Internal Revenue Code) against their nonpartnership income and to apply the credits against their tax liability.

(ii) At a time when the depreciation deductions attributable to the building are not treated as nonrecourse deductions under §1.704-2(c) (because there is no net increase in partnership minimum gain during the year), the special allocation of depreciation deductions to A and B has substantial economic effect because of the value-equals-basis safe harbor contained in § 1.704-1(b)(2)(iii)(c) and the fact that A and B would bear the economic burden of any decline in the value of the building (to the extent of the partnership's investment in the building), notwithstanding that A and B believe it is unlikely that the building will decline in value (and, accordingly, they anticipate significant timing benefits through the special allocation). Moreover, in later years, when the depreciation deductions attributable to the building are treated as nonrecourse deductions under §1.704-2(c), the special allocation of depreciation deductions to A and B is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

considered to be consistent with the partners' interests in the partnership under § 1.704-2(e).

(iii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a) (1), (2), and (3) of this section have been satisfied. Section 704(b), §1.704-1(b)(2), and §1.704-2(e) allow partnership items of income, gain, loss, deduction, and credit to be allocated validly to the partners separate from the partners' respective ownership of the capital to which the allocations relate, provided that the allocations satisfy both the literal requirements of the statute and regulations and the purpose of those provisions (see paragraph (c)(5) of this section). Moreover, the application of the value-equals-basis safe harbor and the provisions of §1.704-2(e) with respect to the allocations to A and B, and the tax results of the application of those provisions, taking into account all the facts and circumstances, are clearly contemplated. Accordingly, even if the allocations would not otherwise be considered to satisfy the proper reflection of income standard in paragraph (a)(3) of this section, that requirement will be treated as satisfied under these facts. Thus, even though the partners' aggregate federal tax liability may be substantially less than had the partners owned the partnership's assets directly (due to X's inability to use its allocable share of the partnership's losses and credits) (see paragraph (c)(1) of this section), the transaction is not inconsistent with the intent of subchapter K. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 9. Partner with nominal interest; temporary partner; use of partnership not consistent with the intent of subchapter K. (i) Pursuant to a plan a principal purpose of which is to generate artificial losses and thereby shelter from federal taxation a substantial amount of income, X (a foreign corporation), Y (a domestic corporation), and Z (a promoter) form partnership PRS by contributing $9,000, $990, and $10, respectively, for proportionate interests (90.0%, 9.9%, and 0.1%, respectively) in the capital and profits of PRS. PRS purchases offshore equipment for $10,000 and validly leases the equipment offshore for a term representing most of its projected useful life. Shortly thereafter, PRS sells its rights to receive income under the lease to a third party for $9,000, and allocates the resulting $9,000 of income $8,100 to X, $891 to Y, and $9 to Z. PRS thereafter makes a distribution of $9,000 to X in complete liquidation of its interest. Under § 1.704-1(b)(2)(iv)(f), PRS restates the partners' capital accounts immediately before making the liquidating distribution to X to reflect its assets consisting of the offshore equipment worth $1,000 and $9,000 in cash. Thus, because the capital accounts immediately before the distribution reflect assets of $19,000 (that is, the initial capital contributions of $10,000 plus the $9,000 of income realized from the sale of the lease), PRS allocates a $9,000 book loss among the partners (for capital account purposes only), resulting in restated capital accounts for X, Y, and Z of $9,000, $990, and $10, respectively. Thereafter, PRS purchases real property by borrowing the $8,000 purchase price on a recourse

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

basis, which increases Y's and Z's bases in their respective partnership interests from $1,881 and $19, to $9,801 and $99, respectively (reflecting Y's and Z's adjusted interests in the partnership of 99% and 1%, respectively). PRS subsequently sells the offshore equipment, subject to the lease, for $1,000 and allocates the $9,000 tax loss $8,910 to Y and $90 to Z. Y's and Z's bases in their partnership interests are therefore reduced to $891 and $9, respectively.

(ii) On these facts, any purported business purpose for the transaction is insignificant in comparison to the tax benefits that would result if the transaction were respected for federal tax purposes (see paragraph (c) of this section). Accordingly, the transaction lacks a substantial business purpose (see paragraph (a)(1) of this section). In addition, factors (1), (2), (3), and (5) of paragraph (c) of this section indicate that PRS was used with a principal purpose to reduce substantially the partners' tax liability in a manner inconsistent with the intent of subchapter K. On these facts, PRS is not bona fide (see paragraph (a)(1) of this section), and the transaction is not respected under applicable substance over form principles (see paragraph (a)(2) of this section) and does not properly reflect the income of Y (see paragraph (a)(3) of this section). Thus, PRS has been formed and availed of with a principal purpose of reducing substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under judicial principles or the validity of the allocations under §1.704- 1(b)(2) (see paragraph (h) of this section)), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.

***31** Example 10. Plan to duplicate losses through absence of section 754 election; use of partnership not consistent with the intent of subchapter K. (i) A owns land with a basis of $100 and a fair market value of $60. A would like to sell the land to B. A and B devise a plan a principal purpose of which is to permit the duplication, for a substantial period of time, of the tax benefit of A's built-in loss in the land. To effect this plan, A, C (A's brother), and W (C's wife) form partnership PRS, to which A contributes the land, and C and W each contribute $30. All partnership items are shared in proportion to the partners' respective contributions to PRS. PRS invests the cash in an investment asset (that is not a marketable security within the meaning of section 731(c)). PRS also leases the land to B under a three-year lease pursuant to which B has the option to purchase the land from PRS upon the expiration of the lease for an amount equal to its fair market value at that time. All lease proceeds received are immediately distributed to the partners. In year 3, at a time when the values of the partnership's assets have not materially changed, PRS agrees with A to liquidate A's interest in exchange for the investment asset held by PRS. Under section 732(b), A's basis in the asset distributed equals $100, A's basis in A's partnership interest immediately before the distribution. Shortly thereafter, A sells the investment asset to X, an unrelated party, recognizing a $40 loss.

(ii) PRS does not make an election under section 754. Accordingly, PRS's basis in the land contributed by A remains $100. At the end of year 3, pursuant to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lease option, PRS sells the land to B for $60 (its fair market value). Thus, PRS recognizes a $40 loss on the sale, which is allocated equally between C and W. C's and W's bases in their partnership interests are reduced to $10 each pursuant to section 705. Their respective interests are worth $30 each. Thus, upon liquidation of PRS (or their interests therein), each of C and W will recognize $20 of gain. However, PRS's continued existence defers recognition of that gain indefinitely. Thus, if this arrangement is respected, C and W duplicate for their benefit A's built-in loss in the land prior to its contribution to PRS.

(iii) On these facts, any purported business purpose for the transaction is insignificant in comparison to the tax benefits that would result if the transaction were respected for federal tax purposes (see paragraph (c) of this section). Accordingly, the transaction lacks a substantial business purpose (see paragraph (a)(1) of this section). In addition, factors (1), (2), and (4) of paragraph (c) of this section indicate that PRS was used with a principal purpose to reduce substantially the partners' tax liability in a manner inconsistent with the intent of subchapter K. On these facts, PRS is not bona fide (see paragraph (a)(1) of this section), and the transaction is not respected under applicable substance over form principles (see paragraph (a)(2) of this section). Further, the tax consequences to the partners do not properly reflect the partners' income; and Congress did not contemplate application of section 754 to partnerships such as PRS, which was formed for a principal purpose of producing a double tax benefit from a single economic loss (see paragraph (a)(3) of this section). Thus, PRS has been formed and availed of with a principal purpose of reducing substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under judicial principles or other statutory authorities, such as the substance over form doctrine or the disguised sale rules under section 707 (see paragraph (h) of this section)), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.

Example 11. Absence of section 754 election; use of partnership consistent with the intent of subchapter K. (i) PRS is a bona fide partnership formed to engage in investment activities with contributions of cash from each partner. Several years after joining PRS, A, a partner with a capital account balance and basis in its partnership interest of $100, wishes to withdraw from PRS. The partnership agreement entitles A to receive the balance of A's capital account in cash or securities owned by PRS at the time of withdrawal, as mutually agreed to by A and the managing general partner, P. P and A agree to distribute to A $100 worth of non-marketable securities (see section 731(c)) in which PRS has an aggregate basis of $20. Upon distribution, A's aggregate basis in the securities is $100 under section 732(b). PRS does not make an election to adjust the basis in its remaining assets under section 754. Thus, PRS's basis in its remaining assets is unaffected by the distribution. In contrast, if a section 754 election had been in effect for the year of the distribution, under these facts section 734(b) would have required PRS to adjust the basis in its remaining assets downward by the amount of the untaxed appreciation in the distributed property, thus reflecting that gain in PRS's retained assets. In selecting the assets to be distributed, A

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and P had a principal purpose to take advantage of the facts that (i) A's basis in the securities will be determined by reference to A's basis in its partnership interest under section 732(b), and (ii) because PRS will not make an election under section 754, the remaining partners of PRS will likely enjoy a federal tax timing advantage (i.e., from the $80 of additional basis in its assets that would have been eliminated if the section 754 election had been made) that is inconsistent with proper reflection of income under paragraph (a)(3) of this section.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1) and (2) of this section have been satisfied. The validity of the tax treatment of this transaction is therefore dependent upon whether the transaction satisfies (or is treated as satisfying) the proper reflection of income standard under paragraph (a)(3) of this section. A's basis in the distributed securities is properly determined under section 732(b). The benefit to the remaining partners is a result of PRS not having made an election under section 754. Subchapter K is generally intended to produce tax consequences that achieve proper reflection of income. However, paragraph (a)(3) of this section provides that if the application of a provision of subchapter K produces tax results that do not properly reflect income, but application of that provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision (and the transaction satisfies the requirements of paragraphs (a)(1) and (2) of this section), then the application of that provision to the transaction will be treated as satisfying the proper reflection of income standard.

(iii) In general, the adjustments that would be made if an election under section 754 were in effect are necessary to minimize distortions between the partners' bases in their partnership interests and the partnership's basis in its assets following, for example, a distribution to a partner. The electivity of section 754 is intended to provide administrative convenience for bona fide partnerships that are engaged in transactions for a substantial business purpose, by providing those partnerships the option of not adjusting their bases in their remaining assets following a distribution to a partner. Congress clearly recognized that if the section 754 election were not made, basis distortions may result. Taking into account all the facts and circumstances of the transaction, the electivity of section 754 in the context of the distribution from PRS to A, and the ultimate tax consequences that follow from the failure to make the election with respect to the transaction, are clearly contemplated by section 754. Thus, the tax consequences of this transaction will be treated as satisfying the proper reflection of income standard under paragraph (a)(3) of this section. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 12. Basis adjustments under section 732; use of partnership consistent with the intent of subchapter K. (i) A, B, and C are partners in partnership PRS,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which has for several years been engaged in substantial bona fide business activities. For valid business reasons, the partners agree that A's interest in PRS, which has a value and basis of $100, will be liquidated with the following assets of PRS: a nondepreciable asset with a value of $60 and a basis to PRS of $40, and related equipment with two years of cost recovery remaining and a value and basis to PRS of $40. Neither asset is described in section 751 and the transaction is not described in section 732(d). Under section 732 (b) and (c), A's $100 basis in A's partnership interest will be allocated between the nondepreciable asset and the equipment received in the liquidating distribution in proportion to PRS's bases in those assets, or $50 to the nondepreciable asset and $50 to the equipment. Thus, A will have a $10 built-in gain in the nondepreciable asset ($60 value less $50 basis) and a $10 built-in loss in the equipment ($50 basis less $40 value), which it expects to recover rapidly through cost recovery deductions. In selecting the assets to ***32** be distributed to A, the partners had a principal purpose to take advantage of the fact that A's basis in the assets will be determined by reference to A's basis in A's partnership interest, thus, in effect, shifting a portion of A's basis from the nondepreciable asset to the equipment, which in turn would allow A to recover that portion of its basis more rapidly. This shift provides a federal tax timing advantage to A, with no offsetting detriment to B or C.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1) and (2) of this section have been satisfied. The validity of the tax treatment of this transaction is therefore dependent upon whether the transaction satisfies (or is treated as satisfying) the proper reflection of income standard under paragraph (a)(3) of this section. Subchapter K is generally intended to produce tax consequences that achieve proper reflection of income. However, paragraph (a)(3) of this section provides that if the application of a provision of subchapter K produces tax results that do not properly reflect income, but the application of that provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision (and the transaction satisfies the requirements of paragraphs (a)(1) and (2) of this section), then the application of that provision to the transaction will be treated as satisfying the proper reflection of income standard.

(iii) A's basis in the assets distributed to it was determined under section 732 (b) and (c). The transaction does not properly reflect A's income due to the basis distortions caused by the distribution and the shifting of basis from a nondepreciable to a depreciable asset. However, the basis rules under section 732, which in some situations can produce tax results that are inconsistent with the proper reflection of income standard (see paragraph (a)(3) of this section), are intended to provide simplifying administrative rules for bona fide partnerships that are engaged in transactions with a substantial business purpose. Taking into account all the facts and circumstances of the transaction, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

application of the basis rules under section 732 to the distribution from PRS to A, and the ultimate tax consequences of the application of that provision of subchapter K, are clearly contemplated. Thus, the application of section 732 to this transaction will be treated as satisfying the proper reflection of income standard under paragraph (a)(3) of this section. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 13. Basis adjustments under section 732; plan or arrangement to distort basis allocations artificially; use of partnership not consistent with the intent of subchapter K. (i) Partnership PRS has for several years been engaged in the development and management of commercial real estate projects. X, an unrelated party, desires to acquire undeveloped land owned by PRS, which has a value of $95 and a basis of $5. X expects to hold the land indefinitely after its acquisition. Pursuant to a plan a principal purpose of which is to permit X to acquire and hold the land but nevertheless to recover for tax purposes a substantial portion of the purchase price for the land, X contributes $100 to PRS for an interest therein. Subsequently (at a time when the value of the partnership's assets have not materially changed), PRS distributes to X in liquidation of its interest in PRS the land and another asset with a value and basis to PRS of $5. The second asset is an insignificant part of the economic transaction but is important to achieve the desired tax results. Under section 732 (b) and (c), X's $100 basis in its partnership interest is allocated between the assets distributed to it in proportion to their bases to PRS, or $50 each. Thereafter, X plans to sell the second asset for its value of $5, recognizing a loss of $45. In this manner, X will, in effect, recover a substantial portion of the purchase price of the land almost immediately. In selecting the assets to be distributed to X, the partners had a principal purpose to take advantage of the fact that X's basis in the assets will be determined under section 732 (b) and (c), thus, in effect, shifting a portion of X's basis economically allocable to the land that X intends to retain to an inconsequential asset that X intends to dispose of quickly. This shift provides a federal tax timing advantage to X, with no offsetting detriment to any of PRS's other partners.

(ii) Although section 732 recognizes that basis distortions can occur in certain situations, which may produce tax results that do not satisfy the proper reflection of income standard of paragraph (a)(3) of this section, the provision is intended only to provide ancillary, simplifying tax results for bona fide partnership transactions that are engaged in for substantial business purposes. Section 732 is not intended to serve as the basis for plans or arrangements in which inconsequential or immaterial assets are included in the distribution with a principal purpose of obtaining substantially favorable tax results by virtue of the statute's simplifying rules. The transaction does not properly reflect X's income due to the basis distortions caused by the distribution that result in shifting a significant portion of X's basis to this inconsequential asset. Moreover, the proper reflection of income standard contained in paragraph (a)(3) of this section is not treated as satisfied, because, taking into account all the facts and circumstances, the application of section 732 to this arrangement, and the ultimate tax consequences that would thereby result, were not clearly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contemplated by that provision of subchapter K. In addition, by using a partnership (if respected), the partners' aggregate federal tax liability would be substantially less than had they owned the partnership's assets directly (see paragraph (c)(1) of this section). On these facts, PRS has been formed and availed of with a principal purpose to reduce the taxpayers' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under applicable judicial principles and statutory authorities, such as the disguised sale rules under section 707, see paragraph (h) of this section), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.

(e) Abuse of entity treatment--(1) General rule. The Commissioner can treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Internal Revenue Code or the regulations promulgated thereunder.

(2) Clearly contemplated entity treatment. Paragraph (e)(1) of this section does not apply to the extent that--

(i) A provision of the Internal Revenue Code or the regulations promulgated thereunder prescribes the treatment of a partnership as an entity, in whole or in part, and

(ii) That treatment and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision.

(f) Examples. The following examples illustrate the principles of paragraph (e) of this section. The examples set forth below do not delineate the boundaries of either permissible or impermissible types of transactions. Further, the addition of any facts or circumstances that are not specifically set forth in an example (or the deletion of any facts or circumstances) may alter the outcome of the transaction described in the example. Unless otherwise indicated, parties to the transactions are not related to one another. See also paragraph (d) Example 5 (iii) of this section (also demonstrating the application of the principles of paragraph (e) of this section).

Example 1. Aggregate treatment of partnership appropriate to carry out purpose of section 163(e)(5). (i) Corporations X and Y are partners in partnership PRS, which for several years has engaged in substantial bona fide business activities. As part of these business activities, PRS issues certain high yield discount obligations to an unrelated third party. Section 163(e)(5) defers (and in certain circumstances disallows) the interest deductions on this type of obligation if issued by a corporation. PRS, X, and Y take the position that, because PRS is a partnership and not a corporation, section 163(e)(5) is not applicable.

(ii) Section 163(e)(5) does not prescribe the treatment of a partnership as an entity for purposes of that section. The purpose of section 163(e)(5) is to limit corporate-level interest deductions on certain obligations. The treatment of PRS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as an entity could result in a partnership with corporate partners issuing those obligations and thereby circumventing the purpose of section ***33** 163(e)(5), because the corporate partner would deduct its distributive share of the interest on obligations that would have been deferred until paid or disallowed had the corporation issued its share of the obligation directly. Thus, under paragraph (e)(1) of this section, PRS is properly treated as an aggregate of its partners for purposes of applying section 163(e)(5) (regardless of whether any party had a tax avoidance purpose in having PRS issue the obligation). Each partner of PRS will therefore be treated as issuing its share of the obligations for purposes of determining the deductibility of its distributive share of any interest on the obligations. See also section 163(i)(5)(B).

Example 2. Aggregate treatment of partnership appropriate to carry out purpose of section 1059. (i) Corporations X and Y are partners in partnership PRS, which for several years has engaged in substantial bona fide business activities. As part of these business activities, PRS purchases 50 shares of Corporation Z common stock. Six months later, Corporation Z announces an extraordinary dividend (within the meaning of section 1059). Section 1059(a) generally provides that if any corporation receives an extraordinary dividend with respect to any share of stock and the corporation has not held the stock for more than two years before the dividend announcement date, the basis in the stock held by the corporation is reduced by the nontaxed portion of the dividend. PRS, X, and Y take the position that section 1059(a) is not applicable because PRS is a partnership and not a corporation.

(ii) Section 1059(a) does not prescribe the treatment of a partnership as an entity for purposes of that section. The purpose of section 1059(a) is to limit the benefits of the dividends received deduction with respect to extraordinary dividends. The treatment of PRS as an entity could result in corporate partners in the partnership receiving dividends through partnerships in circumvention of the intent of section 1059. Thus, under paragraph (e)(1) of this section, PRS is properly treated as an aggregate of its partners for purposes of applying section 1059 (regardless of whether any party had a tax avoidance purpose in acquiring the Z stock through PRS). Each partner of PRS will therefore be treated as owning its share of the stock. Accordingly, PRS must make appropriate adjustments to the basis of the corporation Z stock, and the partners must also make adjustments to the basis in their respective interests in PRS under section 705(a)(2)(B). See also section 1059(g)(1).

Example 3. Prescribed entity treatment of partnership, determination of CFC status clearly contemplated. (i) X, a domestic corporation, and Y, a foreign corporation, intend to conduct a joint venture in foreign Country A. They form PRS, a bona fide domestic general partnership in which X owns a 40% interest and Y owns a 60% interest. PRS is properly classified as a partnership under §§ 301.7701-2 and 301.7701-3. PRS holds 100% of the voting stock of Z, a Country A entity that is classified as an association taxable as a corporation for federal tax purposes under §301.7701-2. Z conducts its business operations in Country A. By investing in Z through a domestic partnership, X seeks to obtain the benefit of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the look-through rules of section 904(d)(3) and, as a result, maximize its ability to claim credits for its proper share of Country A taxes expected to be incurred by Z.

(ii) Pursuant to sections 957(c) and 7701(a)(30), PRS is a United States person. Therefore, because it owns 10% or more of the voting stock of Z, PRS satisfies the definition of a U.S. shareholder under section 951(b). Under section 957(a), Z is a controlled foreign corporation (CFC) because more than 50% of the voting power or value of its stock is owned by PRS. Consequently, under section 904(d)(3), X qualifies for look-through treatment in computing its credit for foreign taxes paid or accrued by Z. In contrast, if X and Y owned their interests in Z directly, Z would not be a CFC because only 40% of its stock would be owned by U.S. shareholders. X's credit for foreign taxes paid or accrued by Z in that case would be subject to a separate foreign tax credit limitation for dividends from Z, a noncontrolled section 902 corporation. See section 904(d)(1)(E) and §1.904-4(g).

(iii) Sections 957(c) and 7701(a)(30) prescribe the treatment of a domestic partnership as an entity for purposes of defining a U.S. shareholder, and thus, for purposes of determining whether a foreign corporation is a CFC. The CFC rules prevent the deferral by U.S. shareholders of U.S. taxation of certain earnings of the CFC and reduce disparities that otherwise might occur between the amount of income subject to a particular foreign tax credit limitation when a taxpayer earns income abroad directly rather than indirectly through a CFC. The application of the look-through rules for foreign tax credit purposes is appropriately tied to CFC status. See sections 904(d)(2)(E) and 904(d)(3). This analysis confirms that Congress clearly contemplated that taxpayers could use a bona fide domestic partnership to subject themselves to the CFC regime, and the resulting application of the look-through rules of section 904(d)(3). Accordingly, under paragraph (e) of this section, the Commissioner cannot treat PRS as an aggregate of its partners for purposes of determining X's foreign tax credit limitation.

(g) Effective date. Paragraphs (a), (b), (c), and (d) of this section are effective for all transactions involving a partnership that occur on or after May 12, 1994. Paragraphs (e) and (f) of this section are effective for all transactions involving a partnership that occur on or after December 29, 1994.

(h) Application of nonstatutory principles and other statutory authorities. The Commissioner can continue to assert and to rely upon applicable nonstatutory principles and other statutory and regulatory authorities to challenge transactions. This section does not limit the applicability of those principles and authorities.

Margaret Milner Richardson,

Commissioner of Internal Revenue.

Approved: December 20, 1994.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Leslie Samuels,

Assistant Secretary of the Treasury.

[FR Doc. 94-32331 Filed 12-29-94; 8:45 am]

BILLING CODE 4830-01-U

1995-7 I.R.B. 5, T.D. 8588, 1995 WL 966 (IRS TD), 60 FR 23, 60 FR 23-01

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Expert Report of David F. DeRosa, Ph.D.

**March 17, 2008**

***Alpha I, L.P., et al v.***

***The United States***

**Table of Contents**

I. Introduction and Summary

A. Qualifications. . . . . . . . . . . . . . . . . . . . . . 4

B. Purpose of Report . . . . . . . . . . . . . . . . . . . . 7

C. Disclosure Compliance . . . . . . . . . . . . . . . . . . 10

D. Summary of Conclusions. . . . . . . . . . . . . . . . . . 11

II. United States Treasury Securities . . . . . . . . . . . . . 13

III. Background Information on Short Sales

A. Short Sales . . . . . . . . . . . . . . . . . . . . . . . 16

B. Margin Calculations . . . . . . . . . . . . . . . . . . . 19

C. Margin Requirements for the Short Sale of US Treasury Securities. . . . . . . . . . . . . . . . . . . 23

IV. Sale and Repurchase Agreements ("Repos"). . . . . . . . . . . 25

V. The Participants' Transactions. . . . . . . . . . . . . . . . 28

VI. Economics of the Participants' Transactions . . . . . . . . . 31

VII. Opinions

1. The August and December Transactions had negative expected returns . . . . . . . . . . . . . . . . . . . . . . 33

2. The short sales of US Treasury securities required the Participants to purchase securities for settlement. The Participants entered into repo transactions and used the securities purchased through the repos to make delivery on their short sales. By doing so, the Participants created the obligation to replace the repo'ed securities in-kind when the trade was closed out or "assigned". . . . . . . . . . . . . . . . . . . . . . . 37

3. If accounts with short positions could be "assigned," their economic value would be the net equity in the account. . . . . . . . . . . . . . . . . . . . . 42

4. There was no economic chance for a profit on the transactions (absent any potential tax benefits) if the Heritage Fees are included . . . . . . . . . . . . . . . 43

VIII. Conclusions . . . . . . . . . . . . . . . . . . . . . . . . 49

IX. Appendices

Appendix I: Résumé

Appendix II: August Transactions

Appendix III: December Transactions

Appedix IV: Duration Calculations

## I. INTRODUCTION AND SUMMARY

### A. Qualifications

I have had extensive experience with the capital markets over the past thirty years and with managing and evaluating hedge funds over the past thirteen years. I was a derivatives portfolio manager at Alliance Capital Management, a currency trader at Swiss Bank Corporation, and a hedge fund trader at Quadrangle Investments LLC. I am currently on the board of directors of five hedge funds, Rubicon Fund Management, BlueCrest Capital International, The Children's Investment Fund, GSA Capital International, and Preston Capital Management. The combined capital of these funds is approximately $30 billion.

I am the president and owner of DeRosa Research and Trading, Inc. DeRosa Research and Trading, Inc. is a member of the National Futures Association. I am an adjunct professor of finance at the Yale School of Management and Fellow of the International Center for Finance, where I have taught courses in finance, derivatives, and emerging markets financial policy since 1996. I am also an adjunct associate professor of industrial engineering and

operations research at Columbia University where I teach a course in foreign exchange and related derivative instruments.

I received my Ph.D in finance and economics from the Graduate School of Business of the University of Chicago and my A.B. in economics from the College of the University of Chicago. In addition to Yale and Columbia, I have served on the faculties of the Graduate School of Business of the University of Chicago, the University of Southern California, and Loyola University of Chicago.

I am the author of three books on foreign exchange derivatives: Options on Foreign Exchange, 2nd ed. John Wiley & Sons, 2000 (Japanese Language Edition, Toyo Keizai, Tokyo); Currency Derivatives, John Wiley & Sons, 1998; and Managing Foreign Exchange Risk, Revised Edition, Irwin / McGraw-Hill, 1996 (Japanese Language Edition, Yuuhikaku, Tokyo). I am also the author of In Defense of Free Capital Markets: The Case Against a New International Financial Architecture, Bloomberg Press, January, 2001.

My full *curriculum vitae* (CV) is attached hereto as Appendix I.

B. Purpose of Report

I have been asked by the Department of Justice to review and opine on two sets of transactions. Both sets of transactions involve short positions in US Treasury securities.

The first set of transactions took place in August and September 2001, and the second set of transactions took place in December 2001, which I refer to as the "August Transactions" and "December Transactions," respectively.

The August Transactions were undertaken by Marilyn Sands, Richard Sands, Robert Sands, the Abigail Stern Trust, and the Zachary Stern Trust, collectively referred to herein as "the Participants".[1] Additionally, I may refer to the Abigail Stern Trust and the Zachary Stern Trust as "the Trust Participants" and the other Participants as "the non-Trust Participants." The short positions undertaken by the Trust Participants were later "assigned" to CWC Partnership "CWC".[2] The Non-Trust Participants "assigned" their accounts

---

[1] When I refer to the Participants' actions, I include actions taken by other individuals and entities which the individual Participants had authorized

[2] As discussed at in Opinion 3 below, I do not actually believe it is possible to "assign" a brokerage account. I will use the term "assigning" a brokerage account to refer to accounts the Plaintiffs claim were assigned by one entity ("the assignor") to another ("the assignee").

to RRM&C Group. CWC also later "assigned" its account to RRM&C Group. RRM&C Group then "assigned" its account to RRM&C Partners. I refer to CWC, RRM&C Group and RRM&C Partners collectively as "the Partnerships".

The December Transactions were undertaken by Marilyn Sands, the Marvin Sands Master Trust, Richard Sands, Robert Sands, the Abigail Stern Trust, Andrew Stern, and the Zachary Stern Trust."[3] [4] The Non-Trust Participants later "assigned" their accounts to Alpha Partners, LLC ("Alpha") and the Trust Participants "assigned" their accounts to the CWC Partnership "CWC". CWC later "assigned" its account to Alpha. Alpha later "assigned" its account to Beta Partners, LLC ("Beta"). I refer to Alpha, Beta, and CWC collectively as "the Partnerships".[5]

My report will describe the mechanics and economics of short-selling and of the short sales involved in these transactions in particular, as well as give opinions I have formed about the transactions.

[3] When I refer to the Participants' actions, I include actions taken by other individuals and entities which the individual Participants had authorized

[4] The Marvin Sands Master Trust and Andrew Stern were not involved in the August transactions. When I describe Participants' actions regarding the August Transactions in my report, I exclude these two Participants who were involved in the December transactions.

[5] Some of the Partnerships involved in the December Transactions were different entities than those involved in the August Transactions. When I describe the Partnerships' actions regarding the August Transactions, I am referring to CWC, RRM&C Group, and RRM&C Partners. When I describe the Partnerships' actions regarding the December Transactions, I am referring to CWC, Alpha, and Beta.

The short sale transactions I examine occurred in accounts the Participants and Partnerships opened at UBS PaineWebber ("PaineWebber").

The transactions also were undertaken with advice from the Heritage Organization "Heritage".

C. Disclosure Compliance

I have been compensated for my time in this case at a rate of $400 hour.

I have relied upon the following documents:

DOJ 1-12245, 12316-14722

ALPHA 000001-009083

Response to RFP RRM&C Requests 1-3, 5-9, 12, 16-18, 22-23

Plaintiffs' Repsonses to United States' First Set of Interrogatories

D. Summary of Conclusions

My conclusions are summarized as follows:

1. The August and December Transactions had negative expected returns.

2. The short sales of US Treasury securities required the Participants to purchase securities for settlement. The Participants entered into repo transactions and used the securities purchased through the repos to make delivery on their short sales. By doing so, the Participants created the obligation to replace the repo'ed securities in-kind when the trade was closed out or "assigned".

3. If accounts with short positions could be "assigned," their economic value would be the net equity in the account.

4. There was no economic chance for a profit on the transactions (absent any potential tax benefits)[6] if the Heritage fees are included.

[6] It is my understanding that the parties are contesting the tax treatment of the Transactions. I am not expressing an opinion on that, or any other tax matter.

These conclusions are subject to change based on further information I may receive.

## II. United States Treasury Securities

United States Treasury securities are debt securities backed by the full faith and credit of the United States government. They are viewed as having no credit risk. United States Treasury bond yields are the benchmarks for the entire international capital market.

The US Treasury securities in this case were coupon securities, meaning that they made semi-annual fixed interest payments. Coupon securities make fixed interest payments every six months and return the principal amount at maturity. They are generally issued at or around par.

US Treasury bonds of the variety that concern this case pay fixed semi-annual coupon payments and a lump sum of cash ($1,000 per bond) at the maturity of the bond. Those who participate in the fixed income markets compare bonds and notes using a concept called yield to maturity. The yield to maturity on a bond is the single discount rate that makes the present value of all future coupons and the maturity payment equal to the current market price of the bond. By mathematical construction, the higher the price of the bond, the lower is its yield to maturity and the lower

the price of the bond the higher is its yield to maturity. A "basis point" is defined as 1 / 100th of one percent of yield to maturity.

Bonds are sometimes quoted in dollars and sometimes in terms of yield to maturity - either way, if you know the price you can calculate the yield or if you know the yield you can calculate the price.

The dollar price of a coupon bond is equal to its quoted price plus the "accrued interest". Accrued interest refers to the interest on a security that has accumulated since the previous interest payment. If a coupon security were traded on the date of a coupon payment, there would be no accrued interest. If a coupon security traded 30 days after an interest payment, for example, in addition to the price of the bond, the purchaser would pay the seller an amount equal to 30 days of interest at the coupon interest rate of the bond.

Bond traders frequently speak of the term structure - this is a graph that has bond yields on the vertical axis and corresponding terms to maturity (the length of time that will transpire until the bond matures) on the horizontal

axis. The term structure moves up and down but not always in parallel shifts. It can twist in shape or change from being positively sloped to negatively sloped and back again.

The expected impact of changes in bond yields on the price of a bond can be calculated by analyzing the "duration" of the bond. Duration quantifies the effect of a change in bond yields on the price of a bond to a reasonable degree of approximation. In general, longer term bonds have longer durations, holding coupons constant in the comparison. Thus it is that a short-term bond, such as a two-year bond, has substantially less price risk than a longer-term bond, such as a ten-year or a thirty-year bond with substantially similar coupons, given the same change in bond yields. In analyzing investments, investors often use a form of duration know as "modified duration". This is a simple transformation of duration that allows a direct connection between changes in bond yields and the resultant change in bond price.

## III. Background Information on Short Sales

### A. Short Sales

There are two ordinary reasons an investor may wish to enter into a short sale ("sell a security short" or simply "short" a security).[7] He may wish to short a security to "hedge" a position he holds, or he may short a security to "bet" that the price of the security will decline. An investor can sell short many types of securities; in this report we will concern ourselves only with bonds.

Hedging transactions are those undertaken to reduce or "hedge" risk in a portfolio. For example, an investor with a portfolio of General Electric bonds could short sell US Treasury securities with similar maturity (and to some extent like coupon characteristics) to reduce the risk of yield curve movements. To a degree this would immunize the investor from changes in bond yields because the price movement in the General Electric bonds, up or down, would be roughly matched by opposite moves in prices of the treasury bonds. However, many investors find it far simpler

7 There can be other reasons for selling short. Sophisticated investors and traders sometimes establish short positions in bonds as component parts of complex financial trades.

to construct such a hedge using derivative securities, such as bond futures or futures options. Still, some complex hedges are constructed with actual bonds as opposed to derivative instruments, though this requires a degree of trading sophistication usually found only with professional investors and Wall Street traders.

A speculative, or non-hedging, short sale of bonds attempts to take advantage of an investor's view that the market price of a specific security will decline. It requires an investor to sell a security that he does not own and hold it "short" with the expectation that, net of coupon or other expenses, its depreciation in value will lead to a profit. Conversely, a non-hedging long purchase strategy involves buying a security and holding it for appreciation and coupon. In all cases an investor wants to execute his purchases at a lower price than his sales. The difference is that the bullish, purchasing long, strategy would require first buying (low) and then selling (higher). The bearish, selling short, strategy would require first selling (high) and then buying back (lower).

It is important to distinguish between selling long and selling short. Selling long involves selling a security

that an investor currently owns. An investor purchases a security for a specific strategy and at some point afterward decides to sell it. He sells a position he currently holds.

Selling short, on the other hand, involves selling a security that the investor does not own. The investor must be able to deliver the securities sold short. The mechanics of selling short is covered in Section IV. of this report.

The investor must obtain the securities he has sold short in order to deliver them. This is typically done under the terms of a sale and repurchase agreement, the mechanics of which are discussed in section IV. below.

B. Margin Calculations

Short sales of bonds in brokerage accounts are governed by the margin rules of the New York Stock Exchange ("NYSE") and National Association of Securities Dealers ("NASD"). Short sellers must post initial margin with the broker when entering into such a transaction and adhere to minimum maintenance margin requirements. Brokerage firms continuously revalue or "mark-to-market" such short positions.

Margin requirements concern the customer's account equity balance. Equity in a brokerage account is the difference between assets and liabilities. The relationship between the three elements is described by the equation:

$$\text{Equity} = \text{Assets} - \text{Liabilities}$$

By way of example, a brokerage account that contains $100 worth of assets and $50 in liabilities (e.g. margin debt) has equity of $50. Stated another way, the account has an equity percentage of 50% (equity percentage = equity / assets).

If the value of the assets were to fall to $80, the equity in the account would be $30 and the equity percentage would be 37.5% (37.5% = $30 / $80).

In actual fact, trading in US Treasury debt instruments is done with substantially less equity than either of these examples would suggest. Many times, trading is done with as little as 5% or less equity. This is allowed because US Treasury instruments are highly liquid, meaning they can be readily turned into cash, and because their price movements are deemed to be small relative to other securities markets (such as the equity markets). Nonetheless, professional bond trading done on a margin basis requires investors to secure their long and short positions with collateral. As common sense would dictate brokers calculate client margin positions every day. If the market moves violently they may even calculate client margin positions many times during the same day. The purpose of this exercise is to determine whether the client's account is in adherence with house (i.e. the brokerage house) and regulatory margin maintenance requirements. If not, the broker will contact the client and present him with a "margin call" - a demand that cash or other additional collateral be posted in order to bring the account in line with margin requirements.

If the client does not post the necessary cash or other collateral, the brokerage firm will begin to liquidate positions in the client's account. Account agreements typically give the broker the right to liquidate at its discretion at any time the account is not in compliance with margin requirements.

The system is designed to protect the broker, and indeed the entire financial system, from being caught up in client losses stemming from trading on margin. Although brokerage margin systems are designed to limit the broker's potential exposure to losses, it is possible that a sharp move in an underlying security could cause a situation where the loss realized in buying back the position will be greater than the equity in the account. This means the account has "negative equity" or has an "unsecured debit balance." The client remains personally responsible for the losses in the account but the broker could end up having to absorb the losses if the client defaults on the losing trades. In the transactions of this case, as I will explain later in this report, there was very little chance of either the client or the broker experiencing any financial consequences from

price movements, because the risk for these trades was so small.

C. Margin Requirements for the Short Sale of US Treasury Securities.

Short sales of US Treasury securities are not governed by Regulation T of the Federal Reserve, which sets initial margin requirements for equity share transactions. Margin requirements on long and short transactions in US Treasury securities are set by the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"). Individual brokerage firms may set their own house requirements at higher, but not at lower levels. The amount of margin necessary depends on the maturity of the bonds.

Rule 431(e)(2)(A) of the NYSE and Rule 2520(e)(2)(A) of the NASD state that for US Treasury obligations the maintenance margin rates required for different lengths to maturity are:

| | | |
|---|---|---|
| (i) | Less than one year to maturity, | 1% |
| (ii) | One year but less than three years to maturity, | 2% |
| (iii) | Three years but less than five years to maturity, | 3% |
| (iv) | Five years but less than ten years to maturity, | 4% |

| | | |
|---|---|---|
| (v) | Ten years but less than twenty years to maturity, | 5% |
| (vi) | Twenty years or more to maturity. | 6% |

As discussed in section III.A. above, this means that for every $1000 worth of US Treasury securities (with a 2 year maturity) that an investor sells short, he would need to have $20 worth of equity in his account.

## IV. Sale and Repurchase Agreements ("Repos")

As described in section III.A. above, a short sale is a transaction in which an investor sells a security that he does not own. To do this, the investor must be able to deliver the security that he wishes to sell short. This can be achieved by the investor entering into a sale and repurchase agreement (which bond traders refer to as a "repo" agreement).[8]

A repo effectively allows the investor to "borrow" a security to make delivery on his short sale. The industry convention is to refer to repo transactions from the point of view of the broker. I will refer to the transactions in this case as repos (because PaineWebber enters into agreements to <u>sell</u> the US Treasury securities to the Participants and <u>repurchase</u> them later.) Repo transactions consist of two legs. In the first leg of the repo transaction, the broker gives up physical possession of title to the security; and the investor gives up possession of cash. For the broker, the transaction is the equivalent of its borrowing in the form of a collateralized loan, with the collateral being the security. In the second leg of the

[8] From the persepective of the investor, the transaction described above is actually a "reverse repo" as the investor is buying the securities and promising to sell them back to the broker at a later date.

repo (at its conclusion) the investor sells the security back to the broker at the established price.

The prices at which the investor purchases the repo'ed security in the first leg and sells the repo'ed security in the second leg are identical (with no adjustment for the additional days of accrued interest). Because the price in leg one is equal to the price in leg two, additional cash flows are needed to make the transaction economical. There are two other cash flows to discuss. The first is the coupon. Any coupon payment made during the repo period is paid by the investor to the broker. Secondly, the investor is entitled to receive interest payments on the funds paid to the broker. The rate of interest paid to the investor is referred to as the "repo rate," which has an observable value in the marketplace. However, the actual repo rate that an individual investor receives can be different from the general market rate if the securities are not deemed to be "general collateral" or if there is an agreement to establish a different interest rate. Most repo agreements are overnight transactions. If the investor wishes to stay in the trade, the repo must be "rolled" or re-established daily. Sometimes investors and their brokers agree to a repo transaction with a term longer than overnight (e.g.

one week, one month, etc.) The repo rate is typically based on a rate which is the prevailing daily Federal Funds rate minus a small differential.

It is interesting to note that the two legs of a repo transaction (the first where the investor buys a security from the dealer and the second where he sells the security back to the dealer) occur at the same price -- regardless of any movement of the bond price in the interim period. This is because the two legs of the repo transaction are essentially components of a single transaction. Once the investor executes the first leg, he is unconditionally bound to do the second leg wherin the bond is sold back to the broker.

In summary, the purpose of the repo transaction is to allow the investor to meet the delivery requirements of his short sale. When the investor enters into the repo, he receives the desired securities in exchange for cash paid to the broker. When the investor closes out the repo, he is obligated to sell the securities back to the broker at the price established when he entered into the repo.

## V. The Participants' Transactions

The Participants and the Partnerships entered into two sets of short sale transactions.

August Transactions

On August 24, 2001, margin funds were transferred into the accounts of Marilyn Sands, Richard Sands, Robert Sands, the Abigail Stern Trust, and the Zachary Stern Trust. The same day, each account entered into short sales of US Treasury securities and a repo agreement on the same securities. The repo amount was equal to the proceeds from the short sale plus the margin funds. The US Treasury sold short was the 4 1/4% coupon treasury note due 11/15/03 (the "4 1/4s of 11/03").

On August 27, 2001 the Trust Participants "assigned" their accounts to CWC Partnership.

On August 28, 2001 the Non-Trust Participants "assigned" their accounts to RRM&C Group. On August 28, 2001, CWC Partnership also "assigned" its account to RRM&C Group.

On September 4, 2001, RRM&C Group "assigned" its account to RRM&C Partners. RRM&C Partners closed out its positions on September 7, 2001.

<u>December Transactions</u>

On December 12, 2001, margin funds were transferred into each Participant's account. The same day, each Participant entered into two short sales of US Treasury securities and two repo agreements on the same securities. The repo amount was equal to the proceeds from the short sale plus the margin funds. The US Treasuries sold short were a 4 5/8% coupon treasury note due 5/15/06 (the "4 5/8s of 5/06") and a 2 3/4% coupon treasury note maturing 5/15/06 (the "2 3/4s of 5/06").

The Participants entered into different sizes of short sales and repo agreements, but the number of bonds sold short was equal to the number of bond purchased under the repo transaction for each security. Additionally, the ratio of US Treasury 4 5/8s of 5/06 notes sold short to US

Treasury 2 3/4s of 5/06 sold short was 1 : 2.33 in each account.[9]

On December 13, 2001, the Trust Participants "assigned" their accounts to CWC Partnership.

On December 17, 2001 the non-Trust Participants "assigned" their accounts to Alpha. On December 17, 2001, CWC also "assigned" its positions to Alpha.

On December 21, 2001, Alpha "assigned" its account to Beta. Beta closed out all of the positions on December 27, 2001.

[9] For example, the Zachary Stern Trust sold $855,000 of 4 5/8 treasury notes short and $1,995,000 face value of 2 3/4 treasury notes short.

## VI. Economics of the Transactions

Actual Losses on the Transactions.

The total profit or loss on a short sale is calculated by subtracting the cost of purchasing replacement positions from the proceeds of the original short sale (including accrued interest), and then adding the interest earned on the repos. As discussed above, for the purpose of my economic analysis, I have considered only the overall trades, and ignored the inter-account "assignments" of the short positions.

In all, the August Transactions had a loss of $316,606. The December Transactions had a profit of $102,745. In combination, the August and December Transactions lost a total of $213,861. These figures do not account for the associated costs related to these transactions, most notably, the significant fees paid to Heritage.

The inclusion of these costs dramatically alters the economic picture on the short sales. As I discuss in Opinion 4 below, because of the enormity of the fees -

relative to the range of probable potential outcomes on the short sales, if the fees are included, there is no realistic probability of a profit.

Appendix II shows the details of the August Transactions and Appendix III shows the details of the December Transactions.

## VII. Opinions

Opinion 1: The August and December Transactions had negative expected returns.

As a general rule, trading bonds is more complex than trading stocks, commodities, or foreign exchange. As such, bond markets are the domain of professional, full-time traders at brokerage firms, banks, and hedge funds. For this reason, private investors usually stick to the stock market. While many private investors may choose to hold individual bonds or bond funds in their portfolios, few private investors actively trade bonds.

Forecasting interest rates and movements in the term structure of interest rates is a profession in and of itself on Wall Street. Major brokerage firms and banks employ teams of economists and market experts to make predictions on future interest rates and bond yields. The economists and market strategists also prepare professional research reports for institutional clients of the firm. In part this information is used by the institutions to inform their own trading departments where traders use the firm's capital to take risk and possibly make profits in

the fixed income markets. Nonetheless, anyone with familiarity of the fixed income market knows that in the case of trading bonds, the outcome is far from certain. The bond market and movements in the term structure of interest rates are notoriously hard, if not impossible, to accurately forecast on a consistent basis.

The reason for this goes back to a basic axiom of financial theory that states that developed capital markets tend to be highly efficient in the informational sense. In an efficient market, asset prices reflect all knowable and relevant information. The US Treasury debt market, being one of the most highly scrutinized of all markets, is an example of a highly efficient market. Said another way, the chance that a non-professional investor would be able to guess the direction in yields of the US Treasury market over the short term is no better than 50%, comparable to calling heads or tails correctly in a coin flip.

In the case of the transactions discussed in this report, because of the repo transaction, the Participants had a negative expected return. This is because the interest rate the Participants received on their repos was well below the market rate.

On August 24, 2001 the overnight repo interest rate was 3.45%. The statements indicate that the the Participants only earned 3.15% on their repo transactions.

On December 12, 2001, the overnight repo interest rate was 1.75%. The statements indicate that the Participants earned 1% on the repos involving the 4 5/8s of 5/06 and 1.5% on the repos involving the 2 3/4s of 9/03.

Because the Participants and Partnerships received below-market interest rates on their repos, the expected returns on the Transactions were negative.

Static Case Example

As an example, in the case of the August Transactions, I calculate what the expected return on the August Transaction would have been if the price of the bonds and the repo interest rate did not change over the fourteen calendar days the positions were open.

On August 24, 2001, the partnerships shorted a combined $84,000,000 face worth of US Treasury 4 1/4s of 11/03. The

daily accrued interest on these bonds was $9,701. Each additional day the short position was open the Participants would have had to pay an additional $9,701 in accrued interest to buy back the US Treasury securities.

The Participants earned repo interest on a total of $88,230,000 (the proceeds from the short sales plus the margin deposited in the account). At the reported repo interest rate of 3.15%, the Participants' daily repo interest would have been $7,614.

Therefore, if the prices of the bonds and the repo interest rate did not change, the Participants would expect to lose $2,087 each day the short positions were open. Over the fourteen calendar days the August Transactions were open, this would have cost $29,214.[10]

[10] The December Transactions would also have had a negative expected return if the price of the bonds and the repo interest rate did not change over the period they were open.

Opinion 2: The short sales of US Treasury securities required the Participants to purchase securities for settlement. The Participants entered into repo transactions and used the securities purchased through the repos to make delivery on their short sales. By doing so, the Participants created the obligation to replace the repo'ed securities in-kind when the trade was closed out or "assigned".

When the Participants sold US Treasury securities short, they needed to obtain the securities sold short in order to make delivery on the short sales' settlement dates. To do so, the Participants entered into repo agreements. As discussed in section IV. above, a repo agreement is an agreement where one party sells another party securities and agrees to repurchase the securities at a later date.

Under the repo agreements, PaineWebber sold the Participants US Treasury securities, and agreed to purchase them back at a later date. The Participants used the US Treasury securities they purchased under the repo agreements to make delivery on their short sales.

This effectively meant that the Participants had the economic position of being short the repo'ed US Treasury securities (as they would have to repurchase the US Treasury securities at a later date to sell them back to PaineWebber under the terms of the repo agreement).

Each time a Participants' "assigned" its account to a Partnership, and each time a Partnership "assigned" its account to another Partnership, it signed a "Transfer and Assignment" agreement and sent an instruction letter to PaineWebber. The Transfer and Assignment agreements indicate "The Assignor hereby transfers and assigns the Assets and delegates the Obligations to Assignee."[11] The instruction letters to PaineWebber state that "as of the close of business on (DATE), I transferred and assigned all of the assets, obligation and duties from the above reference brokerage account."[12] Brokerage accounts cannot simply be unilaterally assigned.

Brokerage firms are under heightened obligations to adhere to established procedures for opening accounts. These requirements stem from a fundamental rule of practice in

[11] Where I reference a group of documents including identical language, such as the Assignment and Assumption agreements, I will cite one specific document; in this case, DOJ 006316.
[12] DOJ 006321

the industry known as "know your customer." Additional requirements come from procedures designed to enable "anti-money laundering" surveillance. When an account is opened, a broker must obtain information about the identity of the beneficial owners and the purpose for establishing the relationship. Whereas positions and securities within in account can potentially be assigned, accounts may not. Industry practice dictates that new customers go through the entire procedure of opening an account and filing information. Accounts cannot be summarily "assigned" from one name to the next without running afoul of "know your customer" and "anti-money laundering".

The Participants, who entered into the initial short sales, then received delivery of US Treasury securities from the Partnership they "assigned" their positions to. This allowed the Participants to close out their repo positions with PaineWebber. The Partnerships that delivered US Treasury securities to the Participants received those US Treasury Securities by entering into repo transactions of their own with PaineWebber.[13]

[13] As an example, Marilyn Sands entered into a short sale and repo on August 24, 2001. She "assigned" the account to RRM&C Group as of August 28, 2001. RRM&C Group subsequently "assigned" the account to RRM&C Partners as of September 4, 2001.

Each time the short positions were "assigned," the "assignee" entered into a repo transaction purchasing US Treasury securities in the amount of the "assignor's'" position. The "assignee" then transferred the US Treasury securities to the "assignor's" account allowing the "assignor" to close out their repo transaction with PaineWebber, and leaving the "assignor" with no economic exposure to fluctuations in the price of the US Treasury securities initially shorted.

Related to these transfers, there are two sets of irregularities with the Participants' and Partnerships' accounts for each set of transactions.

In the case of the August Transactions[14], whenever US Treasury Securities are transferred from one account to another[15], the PaineWebber statements show the securities valued at the amount of the repo in the "assignor" account. This is unusual, as one would expect true, arms-length transactions to be marked-to-market. Additionally, when an account is "assigned" the PaineWebber statements do not reflect any activity other than the delivery of US Treasury

[14] See appendix II.
[15] The transfer is indicated as a "Receive" in the "assignor" account and a "Deliver" in the "assignee" account.

securities from the "assignee" account to the "assignor" account and the transfer of repo interest.

In the case of the December Transactions[16], whenever US Treasury Securities are transferred from one account to another, the PaineWebber statements show the securities valued at the amount of the repo in the "assignor" account plus accrued repo interest. Additionally, when an account is "assigned", the PaineWebber statements do not reflect any activity other than the delivery of US Treasury securities from the "assignee" account to the "assignor" account. Unlike the August Transactions, the statements for the December Transactions do not even reflect a separate transfer of repo interest. The repo interest instead is added into the stated value of the securities delivered from the "assignee" account to the "assignor" account.

[16] See Appendix III.

Opinion 3: If accounts with short positions could be "assigned," their economic value would be the net equity in the account.

I have been asked by counsel to opine on what would be the economic value of an "assigned" account that contains a short position. I don't believe that such an "assignment" could occur (in the sense of one account's obligation being directly "assigned" to another account) as discussed in Opinion 2, above. Nonetheless, if such an "assignment" did occur, it is my opinion that the economic value of the account at the time of "assignment" would have been the net equity in the account.

On an economic basis, if the Participants actually had been able to "assign" their margin accounts with short sale positions, they would have been in essentially the same economic position as it would have been in had it closed out the position. The net equity in the account would have been the account's cash and proceeds from the short sales (plus the anticipated short sale credit) less the cost to close out the short positions.

Opinion 4: There was no economic chance for a profit on the transactions (absent any potential tax benefits) if the Heritage fees are included.

The Participants and CWC paid significant fees to Heritage related to the transactions. I relied on the Plaintiff's Responses dated August 2, 2007 for an accounting of what fees were actually paid to Heritage. I considered the total fees paid and apportioned them between the August and December Transactions based on the proceeds from the initial short sales in the Participants' accounts.[17] According to the Plaintiff's Responses, the Participants and CWC paid a total of $6,586,292 in fees to Heritage.

The initial proceeds from the August Transactions were $85,649,185 and the initial proceeds from the December Transactions were $44,293,087. Therefore, I apportion 65.91% of the Heritage fees ($4,341,239) to the August Transactions and 34.09% ($2,245,052) to the December Transactions. I turn to consideration of whether the Transactions could be profitable enough to cover these fees.

[17] As I note previously, I am not a tax expert. However, it is my understanding that the tax benefits at the center of this dispute are related to the proceeds from the short sales in the Participants' accounts.

Potential Profit and Loss on the Short Sales

I employed the following methodology to calculate the dollar values of potential changes in bond yields. The calculations were based on information that would have been available when the Participants entered into the Transactions.

I began by constructing a historical time series of daily yields to maturity on each bond for the trading days for the year that preceded the transactions, using data from Bloomberg, LP. I then calculated the standard deviation of the changes in daily yields. Standard deviation is a measure of statistical dispersion. For a normal, or Gaussian, distribution, one standard deviation on either side of the mean includes approximately 68.26% of all observations. Two standard deviations on either side of the mean include 95.5% of all observations and three standard deviations on either side of the mean include 99.7% of all observations.

In the case of the August Transactions, I estimated the daily standard deviation of the bond yield for the 4 1/4s of 11/03 to be 4.04 basis points (4.04 hundredths of one

percent). The corresponding 10-day standard deviation was 12.79 basis points (the August Transactions were open for 10 trading days)[18].

In the case of the December Transactions, I estimated the daily standard deviation of the bond yield for the US Treasury 2 3/4s of 9/03 to be 6.26 basis points, and the daily standard deviation for the US Treasury 4 5/8s of 5/15/06 to be 5.05 basis points.[19] The corresponding 11-day standard deviations were 20.77 and 16.75 basis points, respectively (the December Transactions were open for 11 trading days).

Next, I calculated the modified duration of the bonds.[20] This allowed me to estimate the profit or loss on the US Treasury securities given various assumed yield to maturity movements.

In the case of the August Transactions, the modified duration for the 4 1/4s of 11/03 was 2.084 on August 24, 2001. In the case of the December Transactions, the

[18] I count both the day the trade was put on on the day the trade was closed as trading days.
[19] The US Treasury securities that were sold short in the December Transactions were issued in the year 2001. The standard deviations of their yields was comparable to other US Treasury securities with similar maturities.
[20] My modified duration figures come from Bloomberg's "Government Bond Price/Yield Calculator," a ubiquitous tool in the investment world.

modified duration for the US Treasury 2 3/4s of 9/03 was 1.734 on December 12, 2001 and the modified duration of the US Treasury 5 5/8s of 5/06 was 3.957 on December 12, 2001.

Modified duration analysis allows us to estimate how much a bond's price changes given a change in yield-to-maturity. The US Treasury securities in the August Transaction (the 4 1/4s of 11/03) would have decrease $1,784,929 in value had there been a 1% (100 basis point) increase in bond yields. In the case of the December Transactions, a 1% (100 basis point) increase in bond yields would have caused an estimated $1,221,859 decrease in value of the US Treasury 2 3/4s of 9/03 and an estimated $232,610 decrease in the value of the US Treasury 5 5/8s of 5/06.

It would have been extremely unlikely for any of the bonds which are the subject of this case to have fluctuated by so large an amount as 100 basis points over the relatively short periods of the Transactions. As discussed above, I calculated the standard deviation in the movement of the historical yields-to-maturity for the US Treasury securities that are the subject of this case. Applying these standard deviations in yields to modified duration

allows me to calculate the dollar value of the movement in each US Treasury security given a 1-standard deviation move in yield. The August Transactions' standard deviation in dollar terms was $228,292. The December Transactions' portfolio's standard deviation in dollar terms was $254,462. (Appendix IV contains the details of these calculations.)

The dollar values for 1, 2, and 3 standard deviations changes in bond yields on the August Transactions were $228,292, $456,585, and $684,877. The dollar values for 1, 2, and 3 standard deviation changes in bond yields on the December Transactions were $254,462, $508,924, and $763,386.

A two standard deviation is a unusual event. A three standard deviation event is even more unusual, statistically speaking.

A profit or loss on the August Transactions of greater than $4,341,239 resulting from a change in interest rates would be a greater than 19 standard deviation event.

A profit or loss on the December Transactions of greater

than $2,245,052 resulting from a change in interest rates would be a greater than 8.8 standard deviation event.

Said another way, the chance of either the August or December Transactions generating a return greater than the Heritage Fee would require an extremely rare event. In my opinion, these Transactions had no economic chance of a profit if the Heritage fees are included.

## VIII. Conclusions

After examining the August and December Transactions, I conclude that:

1) The Participants and Partnerships had a negative expected return on the Transactions because they received a below-market interest rate on their repo transactions.

2) The Participants' accounts could not simply be "assigned" to the Partnerships (and similarly the Partnerships could not simply "assign" their accounts to other Partnerships). In reality, when a Participant "assigned" its account to a Partnership, the Partnership effectively entered into a short position in the US Treasury security held in the Participant's account by entering into a repo transaction and transferring the shares purchased in the repo transaction to the "assignee's" account. By doing so, the "assignee" created a short position in its account and by transferring the securities, allowed the "assignor" to close out its short position created by its repo transaction.

3) Even if the Participants and Partnerships could have "assigned" their accounts, the values of the assigned accounts would have been the net equity in the accounts.

4) If the Heritage fees are taken into consideration, there was no economic chance (absent tax benefits) for the Transactions to earn a profit.

x [signature] 3/17/08

David F. DeRosa, Ph.D.

**DeRosa Research and Trading, Inc.**
495 White Oak Shade Road
New Canaan, CT 06840
Tele (203) 801-4340 Fax (203) 801-4342
derosa@derosa-research.com

# Dr. David DeRosa

## Education

**The University of Chicago, Graduate School of Business** Chicago, Illinois
Doctor of Philosophy (Ph.D.), December 1978. Finance and Economics.
- Dissertation: Rates of Return on Common Stocks and Inflation

**The University of Chicago** Chicago, Illinois
Bachelor of Arts (AB), August 1972.
- Major Field: Economics

## Experience

1997 - Present **DeRosa Research and Trading, Inc.** New Canaan, Connecticut
*President and Owner*
- Consultant for international financial markets and derivative instruments matters.
- Expert witness in foreign exchange, international finance, emerging markets, derivatives, and risk management.
- Commodity Trading Advisor (effective May 1998).

Spring 1996 - Present **Yale School of Management** New Haven, Connecticut
*Adjunct Professor of Finance*
- Instructor for advanced graduate courses in financial management, international finance, financial policy in emerging markets, foreign exchange, derivatives, and asset management.

Summer 2006 - Present **Columbia University** New York, New York
*Adjunct Associate Professor Industrial Engineering and Operations Research*
- Instructor in graduate program in Financial Engineering

1998 - 2004 **Midwest Independent Transmission System Operator** Carmel, Indiana
*Director, Chairman of the Markets Committee, Member of the Finance and Audit Committee*
- Member of a seven-director board for MISO, which oversees wholesale transmission electricity in the Midwest and portions of Canada.

1999 - Present **Rubicon Fund Management** Cayman Islands
*Director*
- Member of boards of directors of Cayman Islands-registered macro-hedge funds.

2002 - Present **BlueCrest Capital International** Cayman Islands
*Director*
- Member of boards of directors of Cayman Islands-registered investment companies.

2003 - Present **The Children's Investment Fund** Cayman Islands
*Director*
- Member of boards of directors of Cayman Islands-registered European equity, event-driven hedge funds.

2005 - Present **GSA Capital International** Cayman Islands
*Director*
- Member of boards of directors of Cayman Island-registered statistical arbitrage hedge funds.

2005 - 2006 **CCC Carbon Fund** Cayman Islands
*Director*
- Member of boards of directors of Cayman Island-registered hedge funds.

2007- Present **Preston Capital Management** Cayman Islands
*Director*
- Member of board of directors of Cayman Island-registered convertible bond and volatility arbitrage hedge fund.

1998 - 2004 **Bloomberg News** New Canaan, Connecticut
*Financial Columnist*
- Regular columnist for Bloomberg News, Bloomberg Radio, and Bloomberg Magazines on international finance, foreign exchange, and global politics.

1996-1997 **Quadrangle Investments, LLC** Greenwich Connecticut
*Co-Founder and Managing Partner*
- Global trader of foreign exchange, options, and exotic options on foreign exchange.
- Founder of macro-fundamental hedge fund with $32 million in assets.

1993 - 1996 **Swiss Bank Corporation** New York, New York
*Director, Foreign Exchange Trading*
- Global proprietary trader of foreign exchange, options, and exotic options on foreign exchange.
- Head of SBC technical education for North America.
- Instructor, intensive training courses for traders.
- Spokesman to financial press (wire services, newspapers, and television) re: foreign exchange issues.

Spring 1995 - Fall 1996 **The University of Chicago, Graduate School of Business** Chicago, Illinois
*Lecturer in Finance*
- Concurrent with Swiss Bank.

1992 – 1993 **BEA Associates** New York, New York
*Vice President and Derivatives Portfolio Manager*
- Portfolio Manager in $7 billion hedging and arbitrage group.

1988 - 1992 **Alliance Capital Management L.P.** New York, New York
*Vice President – Derivatives and Synthetics*
- Handled portfolio management, product design, trading, and marketing for start-up derivatives group.

1985 - 1988 **DeRosa & Company** Los Angeles, California
*President and Owner*
- Established NASD broker-dealer firm which performed soft-dollar funded quantitative research for investment managers. Company sold in 1988.

1984 - 1985 **International Financial Advisers** Kuwait City, Kuwait
*Acting General Manager*
- Advised and ran operations of IFA, a registered investment banking firm in Kuwait owned by members of the royal family and their close business associates.

1981 - 1983 **Consulting Center For Finance and Investment** Riyadh, Saudi Arabia
*Senior Vice President*

1980 - 1981 **Wilshire Associates** Santa Monica, California
*Senior Associate*

1979 - 1980 **The University of Southern California** Los Angeles, California
*Assistant Professor of Finance and Business Economics*

1979 **Ministry of Finance and National Economy** Riyadh, Saudi Arabia
*Economic Advisor*

1975 - 1978 **Loyola University of Chicago** Chicago, Illinois
*Instructor in Finance*

**Books**

In Defense of Free Capital Markets: The Case Against a New International Financial Architecture, Bloomberg Press, January, 2001. (Turkish language edition, Simple Chinese edition).

Options on Foreign Exchange, 2nd ed. John Wiley & Sons, 2000 (Japanese Language Edition, Toyo Keizai, Tokyo).

Currency Derivatives, John Wiley & Sons, 1998.

Managing Foreign Exchange Risk, Revised Edition, Irwin / McGraw-Hill, 1996 (Japanese Language Edition, Yuuhikaku, Tokyo).

**Chapters, Articles and Seminars**

"The International Funds Conference" January 9, 2008, Speaker

"China's Defense of the Peg Perpetuates Central Planning", *Cato Journal,* Vol.25, No. 1 (Winter 2005).

"Financial Markets and Legal Ambiguity," Columbia University Practitioners in Mathematics of Finance Conference, October 2003

"Memo to Argentina: Dollarize or Die" In *Newsweek*, December 17, 2001.

'Innovations in World Monetary Policy",," Columbia University Practitioners in Mathematics of Finance Conference, September 15, 2001

"Recent Innovations in Japanese Monetary Policy," Yale University, August 1, 2001

"The Capital Mistress: Free Market Models and the Global Economy" In *Harvard International Review*, Summer 1999.

"Foreign Exchange Hedging by Managers of International Fixed Income and Equity Portfolios" In *Handbook of Portfolio Management*, edited by Frank J. Fabozzi. New Hope, PA: Frank J. Fabozzi Associates, 1998.

"Going Along for the Ride" In *Newsweek*, June 22, 1998.

"The Southeast Asian Currency Crisis," New York Society of Securities Analysts, New York, Summer 1997.

"An Option-Based Approach to Currency Risk Mangement." In *Strategic Currency Investing*, edited by Andrew W. Gitlin. Chicago: Probus Publishing, 1993.

"Equity-Linked Cross Currency Swaps." With Philip G. Nehro in Cross Currency Swaps, edited by Carl R Beidleman. Homewood, IL: Business-One Irwin, 1992.

"An Introduction to Currency Insurance" In *Global Portfolios – Quantitative Tools for Maximum Performance*, edited by Robert Aliber and Brian Bruce. Homewood, IL: Dow Jones-Irwin, 1991.

**Expert Witness**

American Boat Company, LLC, et. Al. v. The United States of America – Expert Report for Tax Court

Cappy Court Partners, et. Al. v. Commissioner of Internal Revenue – Expert Report for Tax Court

Richard H. & Patricia Penske v. Lewis, Rice & Fingersh, L.C. – Expert Report Eastern District of Pennsylvania

Stobie Creek Investments, L.L.C, et al. v. United States of America – Expert Report and Deposition for the United States Court of Federal Claims

Carmel Partners, et al. v. United States – Expert Report and Deposition U.S. District Court, Southern District of Indiana

JBJZ, et al. v. United States – Expert Report and Deposition for United States Court of Federal Claims

Murfarm Farms, et al. v. United States – Expert Report and Deposition for the United States Court of Federal Claims

Gary Woods, et al. v. United States – Expert Report and Deposition U.S. District Court, Western District of Texas

Sala v. United States – Expert Report and Deposition U.S. District Court, District of Colorado

K2 Trading, et al. v. United States – Expert Report and Deposition for the United States Court of Federal Claims

Jade Trading, et al. v. United States – Expert Report and Testimony in the United States Court of Federal Claims (2005)

COLM Producer, Inc., Kornman & Associates, and the Ettman Family Trust v. The United States, expert report and deposition for U.S. District Court, Northern District of Texas

Compton et al v. Alex Brown et al., Case No. 24-C-03-007514, Deposition for Circuit Court of Baltimore City

Klamath v. The United States and Kinabalu v. The United States, expert report and testimony U.S. District Court, Eastern District of Texas

United States of America v. Polina Sirotina; Mamed Mekhtiev; Albert Guglielmo; Philip Levinson, and Justin Fauci (Evergreen International Spot Trading) – Testimony in U.S. District Court, Eastern District of New York (May – June 2003)

"Opening Trade in Financial Services – The Chile and Singapore Examples" – Testimony before the U.S. House of Representatives Committee on Financial Services (March 2003)

High Risk Opportunities Hub Fund LTD. v. Credit Lyonnais and Societe Generale – Affidavit to Supreme Court of the State of New York (May 2002)

Hermes v. J.P. Morgan – Affidavit to Superior Court of New York (2002)

Re: Enron – Testimony in U.S. Bankruptcy Court (Jan 2001)

De Kwiatkowski v. Bear Stearns – Testimony in U.S. District Court, Southern District of New York (May 2000)

Evergreen Security, LTD v. Windels Marx Lane & Mittendorf, LLP – Expert Report in U.S. District Court, Middle District of Florida (November 2003)

State of Florida v. Richard Maseri -- Deposition

DeRosa Research and Trading, Inc.
Privileged and Confidential
Alpha I, L.P., et al v. US

APPENDIX II: Transaction Timeline, August-September 2001

| Date | As/of date | Action | Security | Quantity | Amount w/acc int | Accrued Interest/ Repo Interest | Bates |
|---|---|---|---|---|---|---|---|
| ***Marilyn Sands*** | | | | | | | |
| 08/24/2001 | 08/24/2001 | Transfer Misc Adj | | | 708,437.50 | | DOJ-007361 |
| 08/24/2001 | 08/24/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007362 |
| 08/24/2001 | 08/24/2001 | Sell Short | 4.25% of 11/15/03 | -23,000,000 | 23,451,562.50 | 268,281.25 | DOJ-007362 |
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | -8,456.00 | | DOJ-007362 |
| 08/28/2001 | 08/28/2001 | Receive | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007362 |
| 08/28/2001 | 08/28/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -23,000,000 | 24,168,456.00 | 8,456.00 | DOJ-007362 |
| | | | | | 0.00 | 276,737.25 | |
| | | | Total short proceeds: | $ 23,451,562.50 | | | |
| ***Richard Sands*** | | | | | | | |
| 08/24/2001 | 08/24/2001 | Transfer Misc Adj | | | 708,437.50 | | DOJ-007411 |
| 08/24/2001 | 08/24/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007412 |
| 08/24/2001 | 08/24/2001 | Sell Short | 4.25% of 11/15/03 | -23,000,000 | 23,451,562.50 | 268,281.25 | DOJ-007412 |
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | -8,456.00 | | DOJ-007412 |
| 08/28/2001 | 08/28/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -23,000,000 | 24,168,456.00 | 8,456.00 | DOJ-007412 |
| 08/29/2001 | 08/28/2001 | Receive | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007412 |
| | | | | | 0.00 | 276,737.25 | |
| | | | Total short proceeds: | $ 23,451,562.50 | | | |
| ***Robert Sands*** | | | | | | | |
| 08/24/2001 | 08/24/2001 | Transfer Misc Adj | | | 708,437.50 | | DOJ-007361 |
| 08/24/2001 | 08/24/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007362 |
| 08/24/2001 | 08/24/2001 | Sell Short | 4.25% of 11/15/03 | -23,000,000 | 23,451,562.50 | 268,281.25 | DOJ-007362 |
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | -8,456.00 | | DOJ-007362 |
| 08/28/2001 | 08/28/2001 | Receive | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007362 |
| 08/28/2001 | 08/28/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -23,000,000 | 24,168,456.00 | 8,456.00 | DOJ-007362 |
| | | | | | 0.00 | 276,737.25 | |
| | | | Total short proceeds: | $ 23,451,562.50 | | | |

***Zachary Stern Trust***

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 08/24/2001 | 08/24/2001 | Transfer Misc Adj | | | 227,751.35 | | DOJ-004832 |
| 08/24/2001 | 08/24/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 7,500,000 | -7,875,000.00 | | DOJ-004833 |
| 08/24/2001 | 08/24/2001 | Sell Short | 4.25% of 11/15/03 | -7,500,000 | 7,647,248.65 | 87,483.02 | DOJ-004833 |
| 08/27/2001 | 08/27/2001 | Receive | 4.25% of 11/15/03 | 7,500,000 | -7,875,000.00 | | DOJ-004833 |
| 08/27/2001 | 08/27/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -7,500,000 | 7,877,067.19 | 2,067.19 | DOJ-004833 |
| 08/28/2001 | 08/27/2001 | Transfer | 4.25% of 11/15/03 | | -2,067.19 | | DOJ-004833 |
| | | | | | 0.00 | 89,550.21 | |

***Abigail Stern Trust***

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 08/24/2001 | 08/24/2001 | Transfer Misc Adj | | | 227,751.35 | | DOJ-004884 |
| 08/24/2001 | 08/24/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 7,500,000 | -7,875,000.00 | | DOJ-004884 |
| 08/24/2001 | 08/24/2001 | Sell Short | 4.25% of 11/15/03 | -7,500,000 | 7,647,248.65 | 87,483.02 | DOJ-004884 |
| 08/28/2001 | 08/27/2001 | Transfer | 4.25% of 11/15/03 | | -2,067.19 | | DOJ-004884 |
| 08/27/2001 | 08/27/2001 | Receive | 4.25% of 11/15/03 | 7,500,000 | -7,875,000.00 | | DOJ-004884 |
| 08/27/2001 | 08/27/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -7,500,000 | 7,877,067.19 | 2,067.19 | DOJ-004884 |
| | | | | | 0.00 | 89,550.21 | |

***CWC Partnership I***

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 08/27/2001 | 08/27/2001 | Transfer | 4.25% of 11/15/03 | | -2,067.19 | | DOJ-001491 |
| 08/27/2001 | 08/27/2001 | Deliver | 4.25% of 11/15/03 | -7,500,000 | 7,875,000.00 | | DOJ-001492 |
| 08/27/2001 | 08/27/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 15,000,000 | -15,750,000.00 | | DOJ-001492 |
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | 2,067.19 | | DOJ-001492 |
| 08/28/2001 | 08/28/2001 | Deliver | 4.25% of 11/15/03 | -7,500,000 | 7,875,000.00 | | DOJ-001492 |
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | -5,512.50 | | DOJ-001492 |
| 08/28/2001 | 08/28/2001 | Receive | 4.25% of 11/15/03 | 15,000,000 | -15,750,000.00 | | DOJ-001492 |
| 08/28/2001 | 08/28/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -15,000,000 | 15,751,378.12 | 1,378.12 | DOJ-001492 |
| 08/29/2001 | 08/29/2001 | Transfer | 4.25% of 11/15/03 | | -1,378.12 | | DOJ-001492 |
| 08/29/2001 | 08/29/2001 | Transfer | 4.25% of 11/15/03 | | 5,512.50 | | DOJ-001492 |
| | | | | | 0.00 | 1,378.12 | |

*RRM&C Group L.P.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | 8,456.00 | | DOJ-007493 |
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | 8,456.00 | | DOJ-007493 |
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | 8,456.00 | | DOJ-007493 |
| 08/28/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | 5,512.50 | | DOJ-007493 |
| 08/29/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | 1,378.12 | | DOJ-007493 |
| 08/29/2001 | 08/28/2001 | Transfer | 4.25% of 11/15/03 | | -5,512.50 | | DOJ-007493 |
| | | | | | 26,746.12 | | |
| | | | | | | | |
| 08/28/2001 | 08/28/2001 | Deliver | 4.25% of 11/15/03 | -23,000,000 | 24,160,000.00 | | DOJ-007495 |
| 08/28/2001 | 08/28/2001 | Deliver | 4.25% of 11/15/03 | -23,000,000 | 24,160,000.00 | | DOJ-007496 |
| 08/28/2001 | 08/28/2001 | Deliver | 4.25% of 11/15/03 | -38,000,000 | 39,910,000.00 | | DOJ-007496 |
| 08/28/2001 | 08/28/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007496 |
| 08/28/2001 | 08/28/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007496 |
| 08/28/2001 | 08/28/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007496 |
| 08/28/2001 | 08/28/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 7,500,000 | -7,875,000.00 | | DOJ-007496 |
| 08/28/2001 | 08/28/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 7,500,000 | -7,875,000.00 | | DOJ-007496 |
| | | | | | 0.00 | | |
| | | | | | | | |
| 09/04/2001 | 09/04/2001 | Receive | 4.25% of 11/15/03 | 7,500,000 | -7,879,823.44 | | DOJ-007488 |
| 09/04/2001 | 09/04/2001 | Receive | 4.25% of 11/15/03 | 7,500,000 | -7,879,823.44 | | DOJ-007489 |
| 09/04/2001 | 09/04/2001 | Receive | 4.25% of 11/15/03 | 23,000,000 | -24,174,798.00 | | DOJ-007489 |
| 09/04/2001 | 09/04/2001 | Receive | 4.25% of 11/15/03 | 23,000,000 | -24,174,798.00 | | DOJ-007489 |
| 09/04/2001 | 09/04/2001 | Receive | 4.25% of 11/15/03 | 23,000,000 | -24,174,798.00 | | DOJ-007489 |
| 09/04/2001 | 09/04/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -23,000,000 | 24,174,798.00 | 14,798.00 | DOJ-007489 |
| 09/04/2001 | 09/04/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -23,000,000 | 24,174,798.00 | 14,798.00 | DOJ-007489 |
| 09/04/2001 | 09/04/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -23,000,000 | 24,174,798.00 | 14,798.00 | DOJ-007489 |
| 09/04/2001 | 09/04/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -7,500,000 | 7,879,823.44 | 4,823.44 | DOJ-007489 |
| 09/04/2001 | 09/04/2001 | Repo Sell @ 3.15% | 4.25% of 11/15/03 | -7,500,000 | 7,879,823.44 | 4,823.44 | DOJ-007489 |
| | | | | | 0.00 | 54,040.88 | |
| | | | Total short proceeds: | $ (88,284,040.88) | | | |

*RRM&C Partners, L.L.C.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | 4,823.44 | | DOJ-007569 |
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | 14,798.00 | | DOJ-007569 |
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | 14,798.00 | | DOJ-007569 |
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | 4,823.44 | | DOJ-007569 |
| 09/07/2001 | 09/07/2001 | Transfer | 4.25% of 11/15/03 | | 14,798.00 | | DOJ-007569 |
| | | | | | 54,040.88 | | |
| | | | | | | | |
| 09/04/2001 | 09/04/2001 | Deliver | 4.25% of 11/15/03 | -7,500,000 | 7,879,823.44 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Deliver | 4.25% of 11/15/03 | -7,500,000 | 7,879,823.44 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Deliver | 4.25% of 11/15/03 | -23,000,000 | 24,174,798.00 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Deliver | 4.25% of 11/15/03 | -23,000,000 | 24,174,798.00 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Deliver | 4.25% of 11/15/03 | -23,000,000 | 24,174,798.00 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 23,000,000 | -24,160,000.00 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 7,500,000 | -7,875,000.00 | | DOJ-007616 |
| 09/04/2001 | 09/04/2001 | Repo Buy @ 3.15% | 4.25% of 11/15/03 | 7,500,000 | -7,875,000.00 | | DOJ-007616 |
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | -4,823.44 | | DOJ-007616 |
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | -14,798.00 | | DOJ-007616 |
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | -14,798.00 | | DOJ-007617 |
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | -4,823.44 | | DOJ-007617 |
| 09/06/2001 | 09/06/2001 | Transfer | 4.25% of 11/15/03 | | -14,798.00 | | DOJ-007617 |
| 09/07/2001 | 09/07/2001 | Transfer | 4.25% of 11/15/03 | | -2,179,287.82 | | DOJ-007617 |
| 09/07/2001 | 09/07/2001 | Buy | 4.25% of 11/15/03 | 50,000,000 | -51,234,375.00 | 664,062.50 | DOJ-007617 |
| 09/07/2001 | 09/07/2001 | Buy | 4.25% of 11/15/03 | 34,000,000 | -34,839,375.00 | 451,562.50 | DOJ-007617 |
| 09/07/2001 | 09/07/2001 | Repo Sell @ 3.1333% | 4.25% of 11/15/03 | -23,000,000 | 24,166,308.44 | 6,308.44 | DOJ-007617 |
| 09/07/2001 | 09/07/2001 | Repo Sell @ 3.1333% | 4.25% of 11/15/03 | -23,000,000 | 24,166,308.44 | 6,308.44 | DOJ-007617 |
| 09/07/2001 | 09/07/2001 | Repo Sell @ 3.1333% | 4.25% of 11/15/03 | -23,000,000 | 24,166,308.44 | 6,308.44 | DOJ-007617 |
| 09/07/2001 | 09/07/2001 | Repo Sell @ 3.1333% | 4.25% of 11/15/03 | -7,500,000 | 7,877,056.25 | 2,056.25 | DOJ-007617 |
| 09/07/2001 | 09/07/2001 | Repo Sell @ 3.1333% | 4.25% of 11/15/03 | -7,500,000 | 7,877,056.25 | 2,056.25 | DOJ-007618 |
| | | | | | 0.00 | | |
| | | | | | Repo Interest: | $107,959.20 | |
| | | | | Total short proceeds: | $85,649,184.80 | | |
| | | | | Cost to Close (including Accrued Interest) | -$86,073,750.00 | | |
| | | | | Gross P&L: | -$316,606.00 | | |
| | | | | | -$213,861.00 | | |

DeRosa Research and Trading, Inc.
Privileged and Confidential
Alpha I, L.P., et al v. US

**APPENDIX III: Transaction Timeline, December 2001**

| Date | As/of date | Action | Security | Quantity | Amount w/acc int | Accrued Interest / Repo Interest | Bates |
|---|---|---|---|---|---|---|---|
| ***Zachary Stern Trust*** | | | | | | | |
| 12/12/2001 | 12/12/2001 | Transfer | | | $72,572.18 | | DOJ004825 |
| 12/12/2001 | 12/12/2001 | Sell Short | 4.625% of 5/15/06 | -855,000 | $868,904.09 | $2,949.40 | DOJ004826 |
| 12/12/2001 | 12/12/2001 | Repo Buy @ 1.5% | 2.75% of 9/30/03 @ 1% | 1,995,000 | -$2,044,875.00 | | DOJ004826 |
| 12/12/2001 | 12/12/2001 | Sell Short | 2.75% of 9/30/03 | -1,995,000 | $2,000,079.98 | $11,002.64 | DOJ004826 |
| 12/14/2001 | 12/12/2001 | Repo Buy as of 12/12 @ 1% | 4.625% of 5/15/06 @ 1.5% | 855,000 | -$896,681.25 | | DOJ004826 |
| 12/14/2001 | 12/13/2001 | Repo Sell as of 12/13 @ 1% | 4.625% of 5/15/06 | -855,000 | $896,706.16 | $24.91 | DOJ004826 |
| 12/14/2001 | 12/13/2001 | Repo Sell as of 12/13 @ 1.5% | 2.75% of 9/30/03 | -1,995,000 | $2,044,960.20 | $85.20 | DOJ004826 |
| 12/17/2001 | 12/13/2001 | Receive as of 12/13 | 4.625% of 5/15/06 | 855,000 | -$896,706.16 | | DOJ004826 |
| 12/17/2001 | 12/13/2001 | Receive as of 12/13 | 2.75% of 9/30/03 | 1,995,000 | -$2,044,960.20 | | DOJ004826 |
| | | | | | $0.00 | $14,062.15 | |
| | | | Total short proceeds: | $ 2,868,984.07 | | | |
| ***Marilyn Sands*** | | | | | | | |
| 12/12/2001 | 12/12/2001 | Transfer | | | $164,242.30 | | DOJ-007702 |
| 12/12/2001 | 12/12/2001 | Repo Buy @ 1% | 4.625% of 5/15/06 | 1,935,000 | -$2,029,331.25 | | DOJ-007703 |
| 12/12/2001 | 12/12/2001 | Sell Short | 4.625% of 5/15/06 | -1,935,000 | $1,966,467.14 | $6,674.95 | DOJ-007703 |
| 12/12/2001 | 12/12/2001 | Repo Buy @ 1.5% | 2.75% of 9/30/03 | 4,515,000 | -$4,627,875.00 | | DOJ-007703 |
| 12/12/2001 | 12/12/2001 | Sell Short | 2.75% of 9/30/03 | -4,515,000 | $4,526,496.81 | $24,900.72 | DOJ-007703 |
| 12/17/2001 | 12/17/2001 | Repo Sell @ 1.26% | 4.625% of 5/15/06 | -1,835,000 | $2,029,688.38 | $355.13 | DOJ-007703 |
| 12/17/2001 | 12/17/2001 | Repo Sell @ 1.42% | 2.75% of 9/30/03 | -4,515,000 | $4,628,787.72 | $912.72 | DOJ-007703 |
| 12/18/2001 | 12/17/2001 | Receive as of 12/17 | 4.625% of 5/15/06 | 1,935,000 | -$2,029,688.38 | | DOJ-007703 |
| 12/18/2001 | 12/17/2001 | Receive as of 12/17 | 2.75% of 9/30/03 | 4,515,000 | -$4,628,787.72 | | DOJ-007703 |
| | | | | | $0.00 | $32,843.52 | |
| | | | Total short proceeds: | $6,492,963.95 | | | |
| ***Andrew Stern*** | | | | | | | |
| 12/12/2001 | 12/12/2001 | Transfer | | | $64,933.01 | | DOJ-007724 |
| 12/12/2001 | 12/12/2001 | Repo Buy @ 1% | 4.625% of 5/15/06 | 765,000 | -$802,293.75 | | DOJ-007724 |
| 12/12/2001 | 12/12/2001 | Sell Short | 4.625% of 5/15/06 | -765,000 | $777,440.49 | $2,638.93 | DOJ-007725 |
| 12/12/2001 | 12/12/2001 | Repo Buy @ 1.5% | 2.75% of 9/30/03 | 1,785,000 | -$1,829,625.00 | | DOJ-007725 |
| 12/12/2001 | 12/12/2001 | Sell Short | 2.75% of 9/30/03 | -1,785,000 | $1,789,545.25 | $9,844.47 | DOJ-007725 |
| 12/17/2001 | 12/17/2001 | Repo Sell @ 1.26% | 4.625% of 5/15/06 | -765,000 | $802,434.15 | $140.40 | DOJ-007725 |
| 12/17/2001 | 12/17/2001 | Repo Sell @ 1.42% | 2.75% of 9/30/03 | -1,785,000 | $1,829,965.84 | $360.84 | DOJ-007725 |
| 12/18/2001 | 12/17/2001 | Receive as of 12/17 | 4.625% of 5/15/06 | 765,000 | -$802,434.15 | | DOJ-007725 |
| 12/18/2001 | 12/17/2001 | Receive as of 12/17 | 2.75% of 9/30/03 | 1,785,000 | -$1,829,965.84 | | DOJ-007725 |
| | | | | | $0.00 | $12,984.64 | |
| | | | Total short proceeds: | $2,566,985.74 | | | |

***Abigail Stern Trust***

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/12/2001 | 12/12/2001 Transfer | | | $72,572.18 | | DOJ001457 |
| 12/12/2001 | 12/12/2001 Sell Short | 4.625% of 5/15/06 | -855,000 | $868,904.09 | $2,949.40 | DOJ001458 |
| 12/12/2001 | 12/12/2001 Repo Buy @ 1.5% | 2.75% of 9/30/03 | 1,995,000 | -$2,044,875.00 | | DOJ001458 |
| 12/12/2001 | 12/12/2001 Sell Short | 2.75% of 9/30/03 | -1,995,000 | $2,000,079.98 | $11,002.64 | DOJ001458 |
| 12/14/2001 | 12/12/2001 Repo Buy as of 12/12 @ 1% | 4.625% of 5/15/06 | 855,000 | -$896,681.25 | | DOJ001458 |
| 12/14/2001 | 12/13/2001 Repo Sell as of 12/13 @ 1% | 4.625% of 5/15/06 | -855,000 | $896,706.16 | $24.91 | DOJ001458 |
| 12/14/2001 | 12/13/2001 Repo Sell as of 12/13 @ 1.5% | 2.75% of 9/30/03 | -1,995,000 | $2,044,960.20 | $85.20 | DOJ001458 |
| 12/17/2001 | 12/13/2001 Receive as of 12/13 | 4.625% of 5/15/06 | 855,000 | -$896,706.16 | | DOJ001458 |
| 12/17/2001 | 12/13/2001 Receive as of 12/13 | 2.75% of 9/30/03 | 1,995,000 | -$2,044,960.20 | | DOJ001458 |
| | | | | $0.00 | $14,062.15 | |
| | | Total short proceeds: | $2,868,984.07 | | | |

***Richard Sands***

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/12/2001 | 12/12/2001 Transfer | | | $202,438.18 | | DOJ-007919 |
| 12/12/2001 | 12/12/2001 Repo Buy @ 1% | 4.625% of 5/15/06 | 2,385,000 | -$2,501,268.75 | | DOJ-007920 |
| 12/12/2001 | 12/12/2001 Sell Short | 4.625% of 5/15/06 | -2,385,000 | $2,423,785.07 | $8,227.26 | DOJ-007920 |
| 12/12/2001 | 12/12/2001 Repo Buy @ 1.5% | 2.75% of 9/30/03 | 5,565,000 | -$5,704,125.00 | | DOJ-007920 |
| 12/12/2001 | 12/12/2001 Sell Short | 2.75% of 9/30/03 | -5,565,000 | $5,579,170.50 | $30,691.59 | DOJ-007920 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.26% | 4.625% of 5/15/06 | -2,385,000 | $2,501,708.47 | $437.72 | DOJ-007920 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.42% | 2.75% of 9/30/03 | -5,565,000 | $5,705,249.98 | $1,124.98 | DOJ-007920 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 4.625% of 5/15/06 | 2,385,000 | -$2,501,708.47 | | DOJ-007920 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 2.75% of 9/30/03 | 5,565,000 | -$5,705,249.98 | | DOJ-007920 |
| | | | | $0.00 | $40,481.55 | |
| | | Total short proceeds: | $8,002,955.57 | | | |

***Robert Sands***

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/12/2001 | 12/12/2001 Transfer | | | $240,634.06 | | DOJ-007947 |
| 12/12/2001 | 12/12/2001 Repo Buy @ 1% | 4.625% of 5/15/06 | 2,835,000 | -$2,973,206.25 | | DOJ-007948 |
| 12/12/2001 | 12/12/2001 Sell Short | 4.625% of 5/15/06 | -2,835,000 | $2,881,103.02 | $9,779.58 | DOJ-007948 |
| 12/12/2001 | 12/12/2001 Repo Buy @ 1.5% | 2.75% of 9/30/03 | 6,615,000 | -$6,780,375.00 | | DOJ-007948 |
| 12/12/2001 | 12/12/2001 Sell Short | 2.75% of 9/30/03 | -6,615,000 | $6,631,844.17 | $36,482.45 | DOJ-007948 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.26% | 4.625% of 5/15/06 | 2,835,000 | $2,973,726.56 | $520.31 | DOJ-007948 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.42% | 2.75% of 9/30/03 | -6,615,000 | $6,781,712.24 | $1,337.24 | DOJ-007948 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 4.625% of 5/15/06 | 2,835,000 | -$2,973,726.56 | | DOJ-007948 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 2.75% of 9/30/03 | 6,615,000 | -$6,781,712.24 | | DOJ-007948 |
| | | | | $0.00 | $48,119.58 | |
| | | Total short proceeds: | $9,512,947.19 | | | |

***Marvin Sands Master Trust***

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/12/2001 | 12/12/2001 Transfer | | | $303,020.67 | | DOJ-007972 |
| 12/12/2001 | 12/12/2001 Repo Buy @ 1% | 4.625% of 5/15/06 | 3,570,000 | -$3,744,037.50 | | DOJ-007972 |
| 12/12/2001 | 12/12/2001 Sell Short | 4.625% of 5/15/06 | -3,570,000 | $3,628,055.65 | $12,315.02 | DOJ-007973 |
| 12/12/2001 | 12/12/2001 Repo Buy @ 1.5% | 2.75% of 9/30/03 | 8,330,000 | -$8,538,250.00 | | DOJ-007973 |
| 12/12/2001 | 12/12/2001 Sell Short | 2.75% of 9/30/03 | -8,330,000 | $8,351,211.18 | $45,940.87 | DOJ-007973 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.26% | 4.625% of 5/15/06 | -3,570,000 | $3,744,692.71 | $655.21 | DOJ-007973 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.42% | 2.75% of 9/30/03 | -8,330,000 | $8,538,933.93 | $1,683.93 | DOJ-007973 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 4.625% of 5/15/06 | 3,570,000 | -$3,744,692.71 | | DOJ-007973 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 2.75% of 9/30/03 | 8,330,000 | -$8,538,933.93 | | DOJ-007973 |
| | | | | $0.00 | $60,595.03 | |
| | | Total short proceeds: | $11,979,266.83 | | | |

***CWC Partnership I***

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/14/2001 | 12/14/2001 Repo Buy @ 1.25% | 4.625% of 5/15/06 | 855,000 | -$896,681.25 | | DOJ001494 |
| 12/14/2001 | 12/14/2001 Repo Buy @ 1.25% | 4.625% of 5/15/06 | 855,000 | -$896,681.25 | | DOJ001494 |
| 12/14/2001 | 12/14/2001 Repo Buy @ 1.35% | 2.75% of 9/30/03 | 1,995,000 | -$2,044,875.00 | | DOJ001494 |
| 12/14/2001 | 12/14/2001 Repo Buy @ 1.35% | 2.75% of 9/30/03 | 1,995,000 | -$2,044,875.00 | | DOJ001494 |
| 12/17/2001 | 12/13/2001 Deliver as of 12/13 | 4.625% of 5/15/06 | -855,000 | $896,706.16 | | DOJ001494 |
| 12/17/2001 | 12/13/2001 Deliver as of 12/13 | 4.625% of 5/15/06 | -855,000 | $896,706.16 | | DOJ001494 |
| 12/17/2001 | 12/13/2001 Deliver as of 12/13 | 2.75% of 9/30/03 | -1,995,000 | $2,044,960.20 | | DOJ001494 |
| 12/17/2001 | 12/13/2001 Deliver as of 12/13 | 2.75% of 9/30/03 | -1,995,000 | $2,044,960.20 | | DOJ001494 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.25% | 4.625% of 5/15/06 | -855,000 | $896,805.79 | $124.54 | DOJ001494 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.25% | 4.625% of 5/15/06 | -855,000 | $896,805.79 | $124.54 | DOJ001494 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.35% | 2.75% of 9/30/03 | -1,995,000 | $2,045,181.73 | $306.73 | DOJ001494 |
| 12/17/2001 | 12/17/2001 Repo Sell @ 1.35% | 2.75% of 9/30/03 | -1,995,000 | $2,045,181.73 | $306.73 | DOJ001495 |
| 12/18/2001 | 12/17/2001 Transfer as of 12/17 | 4.625% of 5/15/06 | | -$24.91 | | DOJ001495 |
| 12/18/2001 | 12/17/2001 Transfer as of 12/17 | 4.625% of 5/15/06 | | -$24.91 | | DOJ001495 |
| 12/18/2001 | 12/17/2001 Transfer as of 12/17 | 4.625% of 5/15/06 | | -$85.20 | | DOJ001495 |
| 12/18/2001 | 12/17/2001 Transfer as of 12/17 | 4.625% of 5/15/06 | | -$85.20 | | DOJ001495 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 4.625% of 5/15/06 | 855,000 | -$896,805.79 | | DOJ001495 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 4.625% of 5/15/06 | 855,000 | -$896,805.79 | | DOJ001495 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 2.75% of 9/30/03 | 1,995,000 | -$2,045,181.73 | | DOJ001495 |
| 12/18/2001 | 12/17/2001 Receive as of 12/17 | 2.75% of 9/30/03 | 1,995,000 | -$2,045,181.73 | | DOJ001495 |
| | | | | $0.00 | $862.54 | |

***Alpha Partners, L.L.C***

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/17/2001 | 12/17/2001 Repo Buy @ 1.375% | 4.625% of 5/15/06 | 13,200,000 | -$13,843,500.00 | | DOJ000613 |
| 12/17/2001 | 12/17/2001 Repo Buy @ 2.75% | 2.75% of 9/30/03 | 30,800,000 | -$31,570,000.00 | | DOJ000613 |
| 12/18/2001 | 12/17/2001 Deliver as of 12/17 | 4.625% of 5/15/06 | -13,200,000 | $13,845,857.85 | | DOJ000613 |
| 12/18/2001 | 12/17/2001 Deliver as of 12/17 | 2.75% of 9/30/03 | -30,800,000 | $31,576,033.17 | | DOJ000613 |
| 12/21/2001 | 12/20/2001 Repo Sell as of 12/20 @ 1.2516% | 4.625% of 5/15/06 | -13,200,000 | $13,844,943.96 | $1,443.96 | DOJ000613 |
| 12/21/2001 | 12/20/2001 Repo Sell as of 12/20 @ 1.2233% | 2.75% of 9/30/03 | -30,800,000 | $31,573,218.38 | $3,218.38 | DOJ000613 |
| 12/24/2001 | 12/21/2001 Receive as of 12/21 | 4.625% of 5/15/06 | 13,200,000 | -$13,844,943.96 | | DOJ000613 |
| 12/24/2001 | 12/21/2001 Receive as of 12/21 | 4.625% of 5/15/06 | 13,200,000 | -$13,843,500.00 | | DOJ000613 |
| 12/24/2001 | 12/21/2001 Receive as of 12/21 | 2.75% of 9/30/03 | 34,090,000 | -$31,573,218.38 | | DOJ000613 |
| 12/26/2001 | 12/20/2001 Transfer as of 12/20 | 4.625% of 5/15/06 | | -$2,357.85 | | DOJ000613 |
| 12/26/2001 | 12/20/2001 Deliver as of 12/20 | 4.625% of 5/15/06 | -13,200,000 | $13,843,500.00 | | DOJ000613 |
| 12/26/2001 | 12/20/2001 Transfer as of 12/20 | 2.75% of 9/30/03 | | -$6,033.17 | | DOJ000613 |
| 12/28/2001 | 12/20/2001 Deliver as of 12/20 | 2.75% of 9/30/03 | -3,290,000 | | | DOJ000613 |
| | | | | $0.00 | $4,662.34 | |

***Beta Partners, L.L.C***

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12/21/2001 | 12/20/2001 | Repo Buy as of 12/20 @ .45% | 4.625% of 5/15/06 | 13,200,000 | -$13,843,500.00 | | DOJ013119 |
| 12/21/2001 | 12/20/2001 | Repo Buy as of 12/20 @ 1.25% | 2.75% of 9/30/03 | 30,800,000 | -$31,570,000.00 | | DOJ013119 |
| 12/21/2001 | 12/21/2001 | Repo Buy @ .35% | 4.625% of 5/15/06 | 13,200,000 | -$13,843,500.00 | | DOJ013119 |
| 12/21/2001 | 12/21/2001 | Repo Sell @ .45% | 4.625% of 5/15/06 | -13,200,000 | $13,843,673.04 | $173.04 | DOJ013119 |
| 12/21/2001 | 12/21/2001 | Repo Buy @ .8% | 2.75% of 9/30/03 | 30,800,000 | -$31,570,000.00 | | DOJ013119 |
| 12/21/2001 | 12/21/2001 | Repo Sell @ 1.25% | 2.75% of 9/30/03 | -30,800,000 | $31,571,096.18 | $1,096.18 | DOJ013119 |
| 12/24/2001 | 12/21/2001 | Deliver as of 12/21 | 4.625% of 5/15/06 | -13,200,000 | $13,844,943.96 | | DOJ013119 |
| 12/24/2001 | 12/21/2001 | Deliver as of 12/21 | 4.625% of 5/15/06 | -13,200,000 | $13,843,500.00 | | DOJ013119 |
| 12/24/2001 | 12/21/2001 | Deliver as of 12/21 | 2.75% of 9/30/03 | -34,090,000 | $31,573,218.38 | | DOJ013119 |
| 12/26/2001 | 12/21/2001 | Transfer as of 12/21 | 4.625% of 5/15/06 | | $2,357.85 | | DOJ013119 |
| 12/26/2001 | | Receive as of 12/20 | 4.625% of 5/15/06 | 13,200,000 | -$13,843,500.00 | | DOJ013119 |
| 12/26/2001 | | Transfer as of 12/20 | 2.75% of 9/30/03 | | $6,033.17 | | DOJ013119 |
| 12/26/2001 | | Receive as of 12/20 | 2.75% of 9/30/03 | 3,290,000 | | | DOJ013119 |
| 12/27/2001 | | Transfer to TX 64436 6100 | | | -$1,240,964.98 | | DOJ013119 |
| 12/27/2001 | | Buy | 4.625% of 5/15/06 | 13,200,000 | -$13,359,518.99 | -$70,831.49 | DOJ013119 |
| 12/27/2001 | | Repo Sell @ .5% | 4.625% of 5/15/06 | -13,200,000 | $13,844,653.62 | $1,153.62 | DOJ013119 |
| 12/27/2001 | | Buy | 2.75% of 9/30/03 | 30,800,000 | -$30,843,550.48 | -$204,769.23 | DOJ013119 |
| 12/27/2001 | | Repo Sell @ .9083% | 2.75% of 9/30/03 | -30,800,000 | $31,574,779.33 | $4,779.33 | DOJ013119 |
| 12/31/2001 | | Transfer | | | $10,278.92 | | DOJ013119 |
| | | | | | $0.00 | -$268,398.55 | |
| | | | | | Repo Interest: | $12,727.05 | |
| | | | Total short proceeds: | | $44,293,087.42 | | |
| | | | Cost to Close (including Accrued Interest) | | -$44,203,069.47 | | |
| | | | Net P&L: | | $102,745.00 | | |

**DeRosa Research and Trading, Inc.**
**Privileged and Confidential**
**Alpha I, L.P. , et al v. US**

**APPENDIX IV: Duration**

| Security | Transaction Amount | Modified Bond Duration | Estimated 1 Standard Deviation Change in Interest Rates | Expected Change in Price @ 1 Standard Deviation | Expected Change in Price @ 2 Standard Deviations | Expected Change in Price @ 3 Standard Deviations |
|---|---|---|---|---|---|---|
| US Treasury 4 1/4s of 11/03 | $85,649,184.80 | 2.084 | 0.128% | $228,292.42 | $456,584.84 | $684,877.26 |

| Security | Transaction Amount | Modified Bond Duration | Estimated 1 Standard Deviation Change in Interest Rates | Expected Change in Price @ 1 Standard Deviation | Expected Change in Price @ 2 Standard Deviations | Expected Change in Price @ 3 Standard Deviations |
|---|---|---|---|---|---|---|
| US Treasury 4 5/8s of 5/15/06 | $30,878,427.87 | 3.982 | 0.1675% | $205,910.47 | $411,820.94 | $617,731.40 |
| US Treasury 2 3/4s of 9/30/03 | $13,414,659.55 | 1.742 | 0.2078% | $48,551.69 | $97,103.39 | $145,655.08 |
| Combined | $44,293,087.42 | | | $254,462.16 | $508,924.32 | $763,386.49 |