IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-407 T
(into which have been consolidated Nos. 06-408 T,
06-409 T, 06-410 T, 06-411 T, 06-810 T, 06-811 T)
Judge Emily C. Hewitt
(E-Filed: August 21, 2008)

---

| | | |
|---|---|---|
| ALPHA I, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-407 T |
| BETA PARTNERS, L.L.C., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-408 T |
| R, R, M & C PARTNERS, L.L.C., BY AND THROUGH R, R, M & C GROUP, L.P., A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | 06-409 T |

| | |
|---|---|
| R, R, M & C GROUP, L.P., BY AND THROUGH ROBERT SANDS, A NOTICE PARTNER<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-410 T |
| CWC PARTNERSHIP I, BY AND THROUGH TRUST FBO ZACHARY STERN U/A FIFTH G. ANDREW STERN AND MARILYN SANDS, TRUSTEES, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-411 T |
| MICKEY MANAGEMENT, L.P., BY AND THROUGH MARILYN SANDS, A NOTICE PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 06-810 T |

M, L, R & R, BY AND THROUGH RICHARD E. SANDS, TAX MATTERS PARTNER,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

06-811 T

**UNITED STATES' RESPONSE TO PLAINTIFFS' SECOND MOTION TO STRIKE**

Respectfully submitted,

THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

JOHN A. DICICCO
Acting Assistant Attorney General
STEVEN I. FRAHM
Acting Chief, Court of Federal Claims Section
LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Exhibit 24 Should Not Be Stricken From the Record in This Case. . . . . . . . . . . . . . . . . . . 1

II. Exhibit 26 Should Not Be Stricken From the Record in this Case . . . . . . . . . . . . . . . . . . . 6

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**CITATIONS**

Cases:

*Banks v. United States*, 78 Fed. Cl. 603, 617 (Fed. Cl. 2007) . . . . . . . . . . . . . . . . . . . . . . 1
*Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y) . . . . . . . . . . . 8
*Cabot v. United States*, 35 Fed.Cl. 80 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
*Hill v. Manning*, 236 F.Supp.2d 1292 (M.D. Ala. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . 4
*In re The Heritage Organization, L.L.C.*, 375 B.R. 230 (Bankr. N.D. Tex. 2007) . . . 7,13
*Rosie D. v. Romney*, 256 F.Supp. 2d 115 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . 11
*Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) . 2
*United States v. Fuentes*, 563 F.2d 527 (2nd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 9
*United States v. Maxwell*, 383 F.2d 437 (2nd Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544, 574-75 (Fed.Cl. 2003) *rev'd in part on other grounds*, 407 F.3d 1352 (2005) . . . . . . . . . . . . . . . . . . . 2, 4
*Williams v. Wal-Mart Stores, Inc.*, 922 F.2d 1357, 1360 (8th Cir. 1990) . . . . . . . . . . . . . . 6

Statutes:

26 U.S.C.:

§ 6103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,13,15,16

Miscellaneous:

Fed. R. Evid.:

702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4
704(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
803(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
804(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## INTRODUCTION

Plaintiffs seek to strike two exhibits (numbers 24 & 26) supporting the United States' summary judgment motion filed July 2, 2008 (Docket Entry 106). Exhibit 24 is a report prepared by an expert retained by the United States to testify in this proceeding. Exhibit 26 is a transcript of a conversation between three individuals, including both Gary Kornman ("Kornman") (the promoter of the tax shelters at issue in this litigation) and also Jonathan Blattmachr ("Blattmachr")( the author of one of the sets of opinion letters being relied on by the plaintiffs as a defense to penalties). In both instances, the exhibits are competent summary judgment evidence and plaintiffs' motion to strike these exhibits should be denied.

## I. Exhibit 24 Should Not Be Stricken From the Record in This Case.

The Rules of Evidence permit the United States to present specialized expert testimony which may assist the Court in reaching a resolution of the case. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Federal Rule of Evidence 702 enables the trier of fact to rely on the testimony of a witness with specialized knowledge. *Banks v. United States*, 78 Fed. Cl. 603, 617 (Fed. Cl. 2007). Without expert assistance, the Court is unable to reach conclusions on evidence that is beyond its non-expert ability to interpret. *Id.* at 619.

It is Jerry McCoy's ("McCoy") extensive practice in the specialized field of charitable gifting which supports his use as an expert witness in this case. Because of this experience,

McCoy is in a position to assist the Court in understanding charitable remainder unitusts and their intended use. Exhibit 24 accomplishes this goal. As gatekeeper to ensure that an expert's testimony rests both on a reliable foundation and that it is relevant to the task at hand, it is up to the Court to decide the value and weight afforded expert testimony. *Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544, 574-75 (Fed.Cl. 2003)*(rev'd in part on other grounds*, 407 F.3d 1352 (2005)); *see also Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999).

McCoy was retained to comment on facts related to the transfers of certain partnership interests to four charitable remainder unitrusts and the termination of those trusts shortly thereafter by purchase of the charitable remainder interests by the Sands. (Docket No. 107, App-A-264). Plaintiffs' assertions to the contrary, McCoy's expert report is not an assemblage of "his own legal conclusions" which "improperly attempts to usurp the role of this Court in determining the facts, applicable law, and applying the law to the facts." Instead, McCoy's report is the testimony of an individual with extensive specialization in the area of charitable tax planning, offered to assist the Court in understanding a method of charitable gifting with which the Court may have limited knowledge or experience (*i.e.* charitable remainder unitrusts).

McCoy's expertise in the field of charitable gift giving is unchallenged. As set out in his report, McCoy has practiced exclusively in charitable tax planning for the last 10 years and he has specialized in this area for more than 25 years, representing both donors and charitable organizations. The opinions expressed in the report are the product of applying McCoy's extensive expertise in the field of charitable tax planning to the somewhat unique facts presented in this case.

The report first establishes McCoy's expertise in the field of charitable estate planning. After identifying the materials reviewed in preparing the report, McCoy provides a basic primer on charitable remainder unitrusts. McCoy then details the facts relevant to the report and concludes, based on those facts, that the charitable remainder trusts at issue were merely interim steps in a plan to sell Constellation stock at a profit and retain substantially all of the pretax proceeds realized. While this conclusion goes to the heart of the dispute presented in this case, as an expert, McCoy is permitted to opine on an ultimate issue under Rule 704(a) of the Federal Rules of Evidence, which provides:

> **Rule 704. Opinion on Ultimate Issue**
> **(a)** Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

As previously stated, McCoy's expert report is offered to assist the Court in understanding a method of charitable gifting with which the Court may have limited knowledge or experience. Clearly, McCoy did not participate in the tax avoidance scheme at issue and he has no personal knowledge of the facts related to that tax avoidance scheme. McCoy does, however, have extensive first-hand knowledge with respect to charitable remainder unitrusts, a key element in the tax avoidance scheme at issue. Through his expert report, McCoy imparts that specialized knowledge to the Court.

Federal Rule of Evidence 703 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

McCoy's analysis applies his specialized experience to the facts referenced in his report. In so doing, and consistent with the intent of FRCP 703, McCoy affords the Court his insight into a highly specialized area of charitable gifting. While plaintiffs may disagree with some of the facts considered by McCoy, this difference of opinion goes to the weight McCoy's opinion will be afforded by the Court, and not to the report's admissibility. *Westfed*, 55 Fed.Cl. at 574-75.

Plaintiffs correctly assert that McCoy reaches numerous "determinations" in his analysis. Unquestionably, McCoy concludes that plaintiffs abused charitable remainder trusts "to accomplish tax avoidance on a massive scale." However, it is clear that McCoy reached his determinations or conclusions by applying his extensive experience in the practice of charitable gift giving to the peculiar facts presented in this case, as presented by key documentary evidence. As McCoy states, never in his 40 years of practice has he known a charitable remainder trust to terminate in a period of just 160 days.

Although he is an attorney, McCoy is not testifying regarding the law. Moreover, the fact that McCoy is a lawyer does not preclude him from testifying as an expert in this case. To the contrary, lawyers may testify as to legal matters when those matters involve questions of fact. *See e.g., Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983) (a lawyer could testify that language in a boilerplate contract was standard because the effect of the language went to scienter).

Plaintiffs complain that McCoy reviewed the United States' Response to Plaintiffs' Motion to Substitute in preparing his report.[1] What plaintiffs fail to mention is that McCoy also reviewed the following documents:

(1) complaints (prepared by plaintiffs), including exhibits;
(2) CRUT documents;
(3) assignment and assumption of partnership interest;
(4) designations of charitable remainder beneficiaries for the CRUTs;
(5) the agreement for purchase of the remainder interest in the trusts;
(6) a February 26, 2002 letter from The Heintzberger Company;
(7) an opinion letter dated June 21, 2002 from Millbank, Tweed (setting out plaintiffs' versions of the facts);
(8) tax returns filed for the trusts and for the charitable remainder beneficiary of the trusts; and
(9) an appraisal by Goerig & Associates of the partnership interest.

App. A to the United States' Motion for Summary Judgment at App-A-264.

The plaintiffs also assert that McCoy speculated regarding each and every such fact included in his report. Contrary to plaintiffs' assertions, McCoy only makes an objective analysis of the relevant facts, based on his 25 years of experience in the charitable giving field. This analysis was based on his review of the relevant documents and was not mere speculation.

Plaintiffs also argue that McCoy's report improperly applied an "amorphous and unstated legal standard" to the facts. Unlike the report of plaintiffs' expert, Stuart Smith, which is rife with case citations, legal conclusions and statutory analysis, McCoy's report does not contain one case citation. Indeed, when questioned at his deposition, McCoy makes it clear that "what I was asked to do was to put this in the context of my experience in planning charitable transactions and representing charities and donors." (Motion to Strike, pg. 13).

[1] The United States provided McCoy a copy of the United States' Response to Plaintiffs' Motion to Substitute as a preliminary matter so that McCoy could take a look at some basic facts to determine whether he had any conflict of interest and to determine whether he thought he could assist with the case. McCoy's opinion was not based solely on the facts set out in the reponse to the Motion to Substitute, but instead, was based on his thorough and careful examination of all of the relevant documents related to the CRUTs.

In the final analysis, the Court will decide the issues presented and, in making that determination, determine what weight to afford the evidence offered by the parties. However, to the extent that doubts exists as to whether McCoy's expert testimony will be useful, these doubts should generally be resolved in favor of admissibility. *See Williams v. Wal-Mart Stores, Inc.*, 922 F.2d 1357, 1360 (8th Cir. 1990). McCoy's expert report assists the Court in evaluating evidence that must be construed in the context of a specialized area of charitable gifting. McCoy's expert report is both competent and probative and plaintiffs' request to exclude the report should be denied.

**II. Exhibit 26 Should Not Be Stricken From the Record in This Case.**

Exhibit 26 is a transcript of a conversation between Kornman (the founder and one of the principals of Heritage), Blattmachr (a partner with the law firm of Milbank, Tweed, Hadley & McCloy LLP and the author of the opinion letters provided to the Sands in connection with the CRUT aspect of the First Shelter) and an unnamed potential Heritage client.[2] Although the transcribed conversation occurred nearly one year before the events at issue in this litigation, the conversation is extremely relevant to the case at bar because it provides a candid insight into the thought process of both the shelter promoter (Kornman) and the attorney (Blattmachr) who now seeks to defend the shelter.

The transcript at issue, obtained through a IRS summons served on the Heritage Bankruptcy Trustee, was not received by the Department of Justice until after discovery had concluded. Like most of the Heritage files, it was received through the IRS pursuant to an IRS document summons served on Heritage's bankruptcy trustee in a matter not directly related to

[2] The name of this third person has been excised due to 26 U.S.C. §6103 considerations.

this case. The United States offers the transcript as Heritage's business records, obtained through Heritage's bankruptcy trustee. Fed. R. Evid. 803(6), the "business records" exception, provides that:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness...

As corroborated by the Bankruptcy Court, Heritage taped many of its conversations with third parties. *In re The Heritage Organization, L.L.C.*, 375 B.R. 230, 255 (Bkrtcy. N.D. Tex. 2007).

The documents received from the Heritage bankruptcy trustee can be authenticated as business records by former Heritage employee Vickie Walker. Vickie Walker was employed with Heritage in 2002 as the Secretary and Treasurer and mostly in charge of the accounting department. (Docket Entry 30 at App-A-27). Walker had access to all of the Heritage documents and records after the Chapter 11 trustee was appointed and Walker was involved in turning over these Heritage documents and records to the Chapter 11 trustee pursuant to a request from the bankruptcy trustee or a court directive. (Docket Entry 30 at App-A-28).

Walker testified that the records she turned over to the Heritage bankruptcy trustee were records in the possession of Heritage and were related to Heritage's business. (Docket Entry 30 App-A-28). In April 2004, the Heritage documents were moved from the Heritage' offices to a hanger at the Addison, Texas, airport. Subsequently, the documents were moved to various places to make them more secure and more environmentally protected. Some of the records were taken to a climate controlled warehouse where they could be sorted and turned over to the

trustee. There were armed guards protecting the documents. Also, the client files were in a locked area that had very restricted access. (Docket Entry 30 at App-A-29 & 31).

Walker testified that she has no reason to believe that any of the Heritage documents were altered from the time the bankruptcy was filed until the time the documents were turned over to the trustee. (Docket Entry 30 at App-A-30). According to Walker, Kornman would not have altered documents or tapes, nor would he have directed any Heritage employees to alter documents or tapes. (Docket Entry 30 at App-A-32-33).[3]

It is significant that Kornman refused to testify in this proceeding at a deposition, asserting a Fifth Amendment privilege. It is equally significant that, in addition to authoring the opinion letters relied on by the Sands in connection with their use of the CRUT strategy, Blattmachr also provided two declarations in this case, one offered in support of plaintiffs' motion for summary judgment in the cases not related to the CRUT strategy and the other offered in opposition to the United States' Motion for Summary Judgment in the cases in which the Sands' employed the CRUT strategy as part of their tax avoidance scheme. While Blattmachr had ample opportunity to dispute the veracity of the transcript, he did not do so.

In the transcribed conversation, Kornman and Blattmachr candidly discuss both the § 752 strategy and the CRUT strategy, stressing how the combination of both strategies serves to minimize the chance of an IRS audit. Both strategies were later employed by the Sands, and both strategies are currently at issue in this case. Kornman and Blattmachr frankly discuss how the use of a charitable remainder trust camouflages the underlying transaction and virtually

---

[3] Plaintiffs' reliance on *Bank Brussels Lambert v. Credit Lyonnais*, 168 F. Supp. 2d 57 (S.D.N.Y) is misplaced. *Bank Brussels* deals with the pre-trial exclusion of an "edited, non-verbatim non-final draft transcript" of a witness interview. *Id.* At 57.

guarantees that the transaction will escape notice by the IRS. They further outline the use of a controlled trust to insure the trust's premature termination and they brazenly discuss how using the charitable trust, coupled with various pass-through entities, effectively hides the true substance of the underlying transactions.

Plaintiffs first challenge the authenticity of the transcript. The accuracy of a transcript from a tape recording presents a best evidence question. *United States v. Maxwell*, 383 F.2d 437, 442 (2nd Cir. 1967). Where the original tape has been lost, destroyed or become otherwise unavailable through no fault of the proponent, and provided the transcript does not otherwise appear untrustworthy, a properly authenticated transcript of a recording is admissible. *Id.* In fact, the deletion of the inaudible, irrelevant and repetitive portions of a tape will not render the transcript inadmissible. *Id.*

In *United States v. Fuentes*, 563 F.2d 527, 532 (2nd Cir. 1977)(also dealing with a tape recording and relied on by plaintiffs at p. 7 of their motion), the Court found no requirement that the tapes be put in evidence through a person who made the recording or, for that matter, a contemporary witness to the conversation. *Id.* The *Fuentes* Court also summarily rejected, as speculative, an argument that the tapes may have been altered, holding that, in any event, such argument went toward the weight to be given the tapes rather than to their admissibility. *Id.*

Plaintiffs also challenge the transcript as hearsay. However, in a motion for summary judgment, the court may consider a hearsay statement if that statement could be reduced to admissible form at trial. *Hill v. Manning*, 236 F.Supp.2d 1292, 1297 (M.D. Ala. 2002) (unauthenticated transcripts of tape recorded conversations were proper summary judgment evidence since the Court presumes transcripts can be reduced to admissible form at trial).

Here, the statements in the transcript can be further authenticated at trial though Kornman, Blattmachr or the potential Heritage client taking part in the conversation.

Furthermore, the transcripts may be admitted under various exceptions to the hearsay rule. Rule 803(3) of the Federal Rules of Evidence, provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> **(3) Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Both Kornman and Blattmachr's statements contained in the transcript describe a scheme to conceal an abusive tax shelter transaction through the use of a CRUT and, as such, may be admitted as reflecting intent, plan or motive. Similarly, because his invocation of the Fifth Amendment renders him unavailable to testify, Kornman's statements may be admissible as an exception to hearsay under Rule 804(b)(3) of the Federal Rules of Evidence, which provides for the admission of statements against interest.

Finally, the transcript may be admitted under the residual exception afforded by Rule 807 of the Federal Rules of Evidence. The statements contained therein are evidence of a material fact (whether the CRUTs were intended as part of a plan to conceal an abusive tax shelter), and due to their candid nature and because they were not uncovered until after discovery had closed, the statements are more probative than any other evidence which can be procured through reasonable efforts. Further, while plaintiffs have had ample opportunity to prepare a challenge to

the transcripts, they apparently chose not to do so even though Blatttmachr offered a declaration in defense against the United States' summary judgment.

Although plaintiffs have the audacity to ask that the transcript be stricken because they are prejudiced by the timing of its production, this request is baseless. First, it must be emphasized that, despite the privity between plaintiffs and Heritage, plaintiffs apparently made no attempt of their own to secure the Heritage material. It is incontrovertible that Heritage acted as plaintiffs' agent in implementing the underlying tax shelters for the Sands' family and, in fact, initiated most of the underlying transactions involved. The fact that Heritage was a direct source of documentation relevant to this case could not possibly have escaped the plaintiffs' attention. More likely, plaintiffs deliberatively chose to ignore Heritage as a source of relevant documents fearing what they might find. This ostrich-like behavior, however, did not relieve them of their Rule 34 production obligations, which they apparently chose to disregard. *See Rosie D. v. Romney*, 256 F.Supp. 2d 115, 119 (D. Mass. 2003) (Control may be established by the existence of a principal-agent relationship); *Cabot v. United States*, 35 Fed.Cl. 80, 83 (1996) (Control comprehends not only possession but also the right, authority, or ability to obtain the documents and if a producing party has the legal right or practical ability to obtain the documents, then it is deemed to have control over the documents).

Plaintiffs had to have known that Heritage had a wealth of documentation relevant to these proceedings, yet it apparently chose to ignore this source of material. Plaintiffs candidly admit that the United States advised them at an early stage that the IRS was examining the Heritage documents held by the bankruptcy trustee yet, plaintiffs failed to independently pursue the same material.

As plaintiffs acknowledge, the undersigned obtained the Heritage documents from the IRS, which had served a summons on the Heritage Trustee. Pursuant to the summons, the Trustee produced over 372 boxes of documents, which the IRS spent thousands of hours reviewing and segregating by Heritage client. After the documents had been reviewed and segregated to avoid disclosure issues, they had to be copied at a significant expense and then reviewed again to ensure that only the materials related to the Sands transactions were being provided to the undersigned for production in these consolidated cases.

In mid-May 2007, plaintiffs served their first request for production of documents on the United States. Document Production Request No. 13 sought:

> any documents or information relating to the audits of plaintiffs or their members summonsed or otherwise obtained from any third party, including any law firm, accounting firm, financial institution, or investment advisory firm, as well as any firm that the IRS construes as a "promoter" of the transaction.

In response to this discovery request, the United States again advised plaintiffs that:

> the Trustee in The Heritage Organization bankruptcy proceeding has documents related to The Heritage Organization in its possession. The Internal Revenue Service is currently reviewing these documents and, if any of the documents are relevant to the matters at issue in these cases, the United States will provide copies of those documents as soon as practicable.

Plaintiffs claim that they were prejudiced by not receiving these documents earlier. However, it is important to remember that the United States attorneys litigating this case also did not have a copy of this transcript. In fact, counsel for the United States would have benefitted from having this transcript in time to schedule a deposition of Blattmachr. In plaintiffs' Motion to Strike, plaintiffs gloss over the amount of work, resources and costs the IRS expended in obtaining these Heritage documents from the bankruptcy trustee.

Ms. Daugherty testified that it took from December 2006 until July 24, 2007 to complete the process of reviewing and segregating the Sands documents because of the volume and the number of persons and entities unrelated to the Sands. Ms. Daugherty testified that "it all had to be segregated. It all had to be separated. Because under 6103 if we made an inadvertent disclosure, there were ten agents out there who have civil and criminal penalties, loss of pension, jail, whatever. I mean we have to be extremely careful." (Docket Entry 30 at App-A-61).

On July 24, 2007, the IRS completed its review and segregation of the Sands' related documents from the other documents provided by the Heritage Trustee, and it forwarded the Sands' related material to the undersigned. However, the transcript at issue, was not immediately identified by the IRS as related to this case because it dealt with a different potential Heritage investor.

The Bankruptcy Court corroborates that Heritage did not willingly cooperate in producing its files to the Chapter 11 Trustee. *In re The Heritage Organization, L.L.C.*, 375 B.R. at 255-56. As the Court notes, only after the Trustee filed a motion for contempt did Heritage turn over boxes of documents and tapes not previously produced. *Id.* The Bankruptcy Court further noted that Heritage continues to turn over documents "on a time-table that appears only to suit Heritage's former principals." *Id.*

A discussion of the amount of work involved will be helpful this Court. This timeline and information was obtained from the deposition of IRS Agent, Rita Daugherty, who was the primary agent in charge of the Heritage document summons.

On October 12, 2006, the IRS issued the summons to the bankruptcy trustee. The trustee responded on November 29, 2006 with 372 boxes available for review at the trustee's office (Docket Entry 30 at App-A-50). The IRS spent approximately 10 full days reviewing each box

for relevant information. (Docket Entry 30 at App-A-50). It is important for this Court to understand that only a small proportion of the documents produced by the Trustee was relevant to the Sands' shelters. Tens of thousands of pages produced by the Trustee had no relationship to the shelters utilized by the Sands. After the initial review of all of the documents produced was completed, the IRS whittled the 372 boxes down to a total of 66 boxes which they believed contained relevant information covered by the IRS summons. (Docket Entry 30 at App-A-52). However, the IRS had to obtain budget approval to have any of the relevant documents copied.[4] (Docket Entry 30 at App-A-53). Daugherty estimated the copying expenses to be around $7,000 and requested only this amount in her request for approval memo. (Docket Entry 30 at App-A-56). When it was determined that the copying expenses would total approximately $23,000, Daugherty was required to get additional budget approval for this higher amount. Between budget approval issues and the time it took for photocopying the 66 boxes of documents, it was not until April 11, 2007, that the photocopied boxes arrived at the IRS office. (Docket Entry 30 at App-A-52).[5]

---

[4] Plaintiffs counsel questioned Ms. Daugherty in her deposition regarding why she did not segregate Sands documents during her review of the 372 documents so these documents could be produced in this litigation. Ms. Daugherty responded that she did not "have authority to approve paying for a copy without funding approval. And there was huge amount of volume of documents." (Docket Entry 30 at App-A-59). Further, the trustee, who was merely a third party record keeper, would not permit the IRS to just walk off with documents. (Docket Entry 30 at App-A-60). It should also be noted that the Sands are not the only Heritage clients involved in litigation with the United States. It was impossible for the IRS to segregate all documents relating to all Heritage investors and expedite all matters related to all Heritage investors.

[5] It is misleading for the plaintiffs to assert that the transcript came into defendant's possession on November 29, 2006 (see pg. 23 of Plaintiffs' Second Motion to Strike). At a minimum, the documents were not in possession of the IRS until April 11, 2007. (Docket Entry 30 at App-A-60). However, simply because Daugherty finally had physical possession of the 66 boxes of documents on April 11, 2007, did not mean that the Sands' related documents, much less documents not directly related to the Sands, were in an identifiable form that could be delivered to the undersigned and, in turn, be delivered to plaintiffs.

After reviewing the voluminous amount of documents at the trustee's office and photocopying of the relevant documents, the IRS still had to review the copied documents (now condensed into 28 boxes) to properly index these documents (which totaled 89,994 bates stamped pages). (Docket Entry 30 at App-A-52 & 54). After the documents were copied, the documents relating to each taxpayer were not segregated, nor was the disc containing the electronic version of the documents searchable. (Docket Entry 30 at App-A-60). Thus, indexing of these documents was required in order to segregate the documents. This indexing project required the manpower of 8 IRS agents and took 1 month to complete. (Docket Entry 30 at App-A-54). It took each agent one day to properly index one box of documents. (Docket Entry 30 at App-A-55). The indexing of these documents was necessary for the IRS to have some sort of spreadsheet showing the types of documents involved and showing what taxpayers were involved. This was also necessary to prevent inadvertent disclosure of taxpayer information pursuant to 26 U.S.C. § 6103.

After the documents were indexed, for the first time, they could be sorted into specific files dealing with each particular taxpayer. The first date that the 28 boxes were searchable and indexed so that someone could segregate the Sands' documents from the unrelated taxpayer documents was June 5, 2007. (Docket Entry 30 at App-A-60). Once the documents were segregated by taxpayer, the documents related to each of these separate taxpayers were burned onto a disc and the discs were outsourced to various IRS agents for review to ensure that every document contained on the disc belonged to that specific taxpayer. (Docket Entry 30 at App-A-57 & 60). The disc containing the Sands documents was sent to the IRS Agent responsible for the Sands audit, Peter Brokus, in July 2007 and Mr. Brokus completed his review on July 24, 2007. (Docket Entry 30 at App-A-60). Mr. Brokus' review of the Sands' disc revealed that

there were indeed some documents on the Sands' disc that related to different taxpayers. (Docket Entry 30 at App-A-60). Thus, this indexing and final review of documents was necessary to ensure that documents relating to different taxpayers were not inadvertently disclosed. (Docket Entry 30 at App-A-58). While the IRS had placed an emphasis on identifying Sands' related Heritage documents, the Blattmachr transcript dealt with a different potential investor. Accordingly, its potential relevance to the Sands' proceeding was not determined until afterwards. Authorization to produce the document then had to be obtained in order not to violate 26 U.S.C. §6103. Shortly after receiving authority to produce the transcript, a copy of the transcript was forwarded to plaintiffs' attorneys.

The Blattmachr transcript is crucial to the penalty aspect of the United States' case as it is evidence of the intent, plan and design of both the shelter promoter and Blattmachr, who, it appears, worked hand-in-hand with Heritage in structuring the CRUT strategy. The transcript also bears on the credibility to be given to the opinion letter drafted by Blattmachr and purportedly relied by plaintiffs.

To the extent that anyone was prejudiced by the late receipt of the Blattmachr transcript, that party is the United States and not plaintiffs. Clearly, plaintiffs have both access and an existing relationship to Blattmachr, which the United States does not share. As previously noted, Blattmachr has provided plaintiffs with two declarations in this case and he is the author of one of the two sets of opinion letters plaintiffs purport to rely on in support of their actions. It is significant that Blattmachr chooses not to address the transcript in this second declaration, even though his transcript had been placed directly at issue prior to the declaration's submission.

## CONCLUSION

Plaintiffs' Second Motion to Strike should be denied. As gatekeeper to ensure that an expert's testimony rests both on a reliable foundation and that it is relevant to the task at hand, it is up to the Court to decide the value and weight afforded expert testimony. McCoy's expert report meets this standard. Further it assists the Court in understanding a method of charitable gifting with which the Court may have limited knowledge or experience (*i.e.* charitable remainder unitrusts), rather than seeking to usurp the Court's role as fact finder and interpreter of the law. With respect to the Blattmachr Transcript, this transcript sheds light on the true reasons why a CRUT was employed in one of the two abusive tax-motivated schemes employed by the Sands. Plaintiffs' efforts to suppress the truth and to exclude the most reliable and best evidence of the nature of their tax avoidance scheme must be rejected

Respectfully submitted,

/s/ Thomas M. Herrin
THOMAS M. HERRIN
Attorney of Record
Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9745 / (214) 880-9762
(214) 880-9742 (FAX)

JOHN A. DiCICCO
Deputy Assistant Attorney General
STEVEN I. FRAHM
Acting Chief, Court of Federal Claims Section

LOUISE HYTKEN
Chief, Southwestern Civil Trial Section
MICHELLE C. JOHNS
Trial Attorney